## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| JED LEMEN, Individually and On Behalf of All Others Similarly Situated, | Case No. 3:21-cv-01254-TJC-PDB |
| | <u>CLASS ACTION</u> |
| Plaintiff, | |
| v. | |
| REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ, | |
| Defendants. | |

## **<u>FIRST AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..................................................................................2

II.     NATURE AND SUMMARY OF THE ACTION ...................................3

III.    JURISDICTION AND VENUE .........................................................15

IV.     PARTIES ...........................................................................................16

V.      SUBSTANTIVE ALLEGATIONS ......................................................18

        A.      Background ...........................................................................18

        B.      Materially False and Misleading Statements Alive or
                Issued During the Class Period .............................................22

        C.      Partial Disclosure of the Truth at the End of the Class
                Period and Subsequent Disclosures ......................................45

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER .........................52

        A.      Motive and Circumstantial Evidence of Scienter ................53

        B.      Scienter as to Defendant William Read. ..............................55

        C.      Scienter as to Defendant Peter Cannito................................56

        D.      Scienter Inferred by Proximity in Time to Adoption of
                Whistleblower Policy. ..........................................................57

        E.      The Termination of William Read Supports and
                Inference of Scienter ............................................................57

        F.      Defendants' Imputed Knowledge about Redwire's
                Financial and Accounting Policies and Procedures .............59

        G.      Redwire's Previously Disclosed and Unremediated
                Deficiencies in its Internal Controls Over Financial
                Reporting Further Contributes to an Inference of Scienter.................60

VII.    LOSS CAUSATION ..........................................................................64

A.    Corrective Disclosures ..........................................................................65

B.    Materialization of Risks .....................................................................67

VIII.  CLASS ACTION ALLEGATIONS.................................................................69

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE
       (FRAUD-ON-THE-MARKET DOCTRINE) ...............................................72

X.     NO SAFE HARBOR .....................................................................................75

FIRST CLAIM  VIOLATION OF SECTION 10(B) OF THE
       EXCHANGE ACT AND RULE 10B-5 PROMULGATED
       THEREUNDER AGAINST ALL DEFENDANTS......................................76

SECOND CLAIM  VIOLATION OF SECTION 20(A) OF THE
       EXCHANGE ACT AGAINST THE INDIVIDUAL
       DEFENDANTS .............................................................................................79

PRAYER FOR RELIEF ..........................................................................................80

JURY TRIAL DEMAND ........................................................................................81

Lead Plaintiff Jared Thompson ("Lead Plaintiff"), by and through his counsel, brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of himself and all persons and entities, except Defendants and their affiliates as more particularly defined below, against Redwire Corporation ("Redwire" or the "Company") f/k/a/ Genesis Park Acquisition Corp. ("GPAC") and its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") on behalf of investors who purchased or otherwise acquired Redwire securities during the period from March 25, 2021 to March 31, 2022, inclusive (the "Class Period").

Lead Plaintiff's allegations are based upon personal knowledge as to himself and his actions and, as to other matters, on the investigation of Court-appointed Lead Counsel Hagens Berman Sobol Shapiro LLP. The investigation included, without limitation: (a) review and analysis of regulatory filings made by Redwire Corporation ("Redwire" or the "Company") f/k/a/ Genesis Park Acquisition Corp. ("GPAC") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) transcripts of Redwire's conference calls with analysts and investors; (c) Redwire's press releases and presentations; (d) review and analysis of news and media reports issued by and disseminated by Redwire; (d) data reflecting the trading and pricing of Redwire's securities; and (e) review of other publicly available information concerning Defendants.

Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This case arises from misstatements and omissions made by Redwire and its top executives about the Company's senior management and their purported commitment to being honest and ethical with respect to Redwire's internal controls over its accounting and financial reporting. As detailed herein, Redwire's senior management took the Company public through a de-SPAC transaction in the spring of 2021 based on Defendants repeated representations concerning the impeccable management and financial prowess, experience and credentials of the Individual Defendants (Old Redwire CEO Peter Cannito ("Cannito") and CFO William Read ("Read")), the Company's adherence to its published Conduct of Ethics, and the Company's remediation efforts to bring the internal controls of the Business Combination up to regulatory standards as a public company.

2.    Instead of providing the solid foundation for promising business prospects of the proposed business combination, within two months of the merger or "de-SPAC" transaction, undisclosed material deficiencies in senior

management's "tone at the top" would lead to a whistleblower complaint (pursuant to a policy just implemented under stock exchange listing requirements); the inability of the Company to file its financial statements until half a year later; disclosure of a failure of "tone at the top" by "certain members of senior management" for "the need for compliance with certain of the Company's accounting and finance policies and procedures"; the need for at least another year of remediation of internal control inadequacies; the inability of an external auditor to assess internal controls; and the termination of CFO Read, a key person in the strategy that created the Company in its operating form.

3.      Redwire investors, including Lead Plaintiff Thompson, incurred significant losses following disclosure of these material facts. This action now seeks to recover the substantial damages caused to class members by Defendants' wrongful conduct.

## II.     NATURE AND SUMMARY OF THE ACTION

4.      "Tone at the top," commonly referred to in auditing, is a phrase used to reference the attitude of a company's management towards internal controls and ethics.[1] The phrase gained popularity through its use in the Sabanes-Oxley (SOX)

---

[1] *See* "Tone at the Top: The management and board of director's leadership and their commitment to being honest and ethical," (Corporate Finance Institute), Updated February 25, 2022, available at https://corporatefinanceinstitute.com/resources/knowledge/finance/tone-at-the-top/

Act of 2002, passed in the wake of a number of highly publicized accounting scandals, such as Enron, Worldcom and Adelphia - an element that was missing in the preceding scandals mentioned. *Id*. The tone at the top outlines that the management team should embody and not merely pay "lip service" to compliance and upholding ethics. It states that those at the top of the organization should be honest, show integrity, and uphold an ethically-correct corporate culture. *Id.*

5.    A company's "tone at the top" is important to investors. A company with poor tone results is a company that is more likely to display unethical behavior, engage in fraudulent activity, and not support internal controls. *Id*. In instances where a company's management team disregards internal controls by not complying with company's accounting policies, employees, seeing this conduct, will likely tend to mimic senior management's behaviors. This results in an organization that is more prone to engaging in fraudulent activities, thereby increasing investment risk. *Id*. Therefore, the tone at the top sets forth the company's culture and values. Indeed, according to leading global auditor Deloitte Touche Tohmatsu Limited, commonly referred to as Deloitte, "[t]he tone at the top sets an organization's guiding values and ethical climate. Properly fed and nurtured, it is the foundation upon which the culture of an enterprise is built. Ultimately, it is the glue that holds an organization

together."[2] Or, as stated in Strategic Finance, "A poor tone at the top is a strong predictor of aggressive or questionable financial reporting…. If the tone at the top is at all suspect, a prudent investor will sell first and ask questions later or not even buy."[3] As described herein, unbeknownst to investors, Redwire lacked this "foundation" thereby making investments in Redwire far more risky than originally contemplated.

6.    By way of background, Old Redwire Corporation is an American aerospace manufacturer and space infrastructure technology company headquartered in Jacksonville, Florida. The company was formed in 2020 by the private equity firm AE Industrial Partners Fund II, LP ("AEI") as a "growth-oriented investor and partner with strong management teams to create value through a combination of organic and acquisition-based growth initiatives that drive long-term value". Redwire was initially created through the merger of Adcole Space and Deep Space Systems. Shortly after formation, in June 2020, Redwire acquired Jacksonville, Florida-based Made In Space, Inc. In September 2020, Redwire announced that it

---

[2] Deloitte Perspectives, The first ingredient in a world-class ethics and compliance program. Tone at the top. https://www2.deloitte.com/us/en/pages/risk/articles/tone-at-the-top-the-first-ingredient-in-a-world-class-ethics-and-compliance-program.html

[3] Strategic Finance, March 2013. https://sfmagazine.com/wp-content/uploads/sfarchive/2013/03/Tone-at-the-Top-Why-Investors-Should-Care.pdf#:~:text=If%20the%20tone%20at%20the%20top%20is%20at,-%20mance%20over%20the%20long%20run.%20Three%20Examples

was moving its headquarters to Jacksonville. Redwire then continued acquiring five more companies throughout 2020 and through February 23, 2021.

7.    Genesis Park Acquisition Corp. ("GPAC") is a Cayman Islands exempted company and formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses. GPAC had already completed its initial public offering on November 27, 2020, and its securities began trading on the NYSE as a public company. Prior to the business combination with Old Redwire, it had no business other than the need to acquire an operating company within 18 months of its foundation (or May 27, 2022).

8.    AEI, Redwire and GPAC began discussions for Redwire to go public by business combination with GPAC in December 2020 while Redwire was still acquiring companies. On March 25, 2021, GPAC and Old Redwire jointly announced Old Redwire's intentions to go public through a merger with the SPAC Genesis Park Acquisition Corp., valuing the company at $615 million in a proposed business combination ("Merger", "Business Combination" or "de-SPAC transaction"). As partial consideration, security holders in Old Redwire would be entitled to receive $75 million in cash, 37.2 million shares of New Redwire common stock, and 2 million warrants to purchase Redwire stock. Redwire, itself, would get

as much as $170 million in cash to enable it to continue operations.[4] By going public

through a de-SPAC transaction, Defendants could avoid the rigorous due diligence

of a traditional IPO.

9.    On March 24, 2021, GPAC filed a registration statement with the SEC.

The registration statement, and subsequent press releases, investor presentations and

SEC filings were directed towards soliciting investors and their vote on the Proxy

statement, and emphasized the impeccable management, operational and financial

experience and credentials of Redwire's senior management and the Individual

Defendants (Old Redwire CEO Peter Cannito ("Cannito") and CFO William Read

("Read")) in particular. Defendants specifically highlighted Redwire's "proven

management team" and "strong financial foundation." Moreover, Defendants

emphasized Redwire's "best in class" senior management and their "extensive"

experience. Defendants specifically identified Redwire's "experienced and proven

management team" as a key factor for its shareholders to approve the business

combination allowing Redwire to be publicly traded.

10.    In addition, Defendants repeatedly affirmed their commitment to the

Company's Code of Ethics under which the Individual Defendants promoted "honest

---

[4] March 25, 2022 Redwire Press Release. https://ir.redwirespace.com/news-events/press-releases/detail/10/redwire-an-innovative-space-infrastructure-company-serving

and ethical conduct" and "the full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to [the SEC]."

11.    Investors credited these representations, as on September 2, 2021, GPAC's shareholders approved the de-SPAC transaction and the business combination was completed. On September 3, 2021, Redwire's common stock trades began trading on the New York Stock Exchange ("NYSE") under the symbol "RDW." Subsequently, the Company's stock price later soared based on them.

12.    Thereafter and all throughout the Class Period, Defendants continued to make SEC filings, issue press releases, and give presentations to investors and securities analysts emphasizing Redwire's senior management's operational and financial experience and credentials, the Company's solid foundation and published Codes of Conduct of Ethics, and remediation efforts to bring the internal controls of the Business Combination up to regulatory standards as a public company.

13.    Based on these representations, Redwire's share price soared, closing as high as $13.19 on October 26, 2021, giving the Company a market capitalization of over $760 million and putting the Individual Defendants in place to cash in on lucrative warrants granted in connection with the de-SPAC transaction.

14.    Unfortunately for investors, however, Defendants omitted to disclose material deficiencies in Redwire's internal controls over its financial disclosures – a

fact Redwire's senior management knew, but desperately tried to conceal, including through touting their "dedicate[ion] to conducting business with efficiency, fairness and integrity and encourage[ing] behavior that will maintain the public's confidence and trust in [Redwire's] operations." Indeed, these internal control deficiencies were not attributable to some rogue middle-management employee. To the contrary, as Redwire's Audit Committee would later disclose, the internal control deficiencies emanated from a "tone at the top." Specifically, "certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication

15.    The truth about Redwire's senior management, deficient internal controls over financial reporting and remediation efforts began to emerge on November 10, 2021, when Redwire announced that it would postpone the release of its third quarter earnings results. The Company disclosed that it "was notified by an employee of potential accounting issues at a business subunit," and the Audit Committee was investigating the allegations.

16.    On this news, Redwire's stock price fell $1.92, or 16%, from $11.91 per share at the close of trading on November 9, 2021 to close at $9.99 per share on November 10, 2021, on unusually heavy trading volume.

17.    Then, on November 15, 2021, Redwire stated that it could not timely file its quarterly report for the period ended September 30, 2021—its first quarter as an operating company. Due to the pending investigation into the accounting issues the press release continued, "the Company has not been able to finalize its financial statements or its assessment of the effectiveness of its disclosure controls and procedures and any impact" on the report.

18.    On this news, Redwire's stock price fell another $0.93, or 8.3%, over two consecutive trading sessions from $11.25 per share on November 12, 2021 to close at $10.32 per share on November 16, 2021, on unusually heavy trading volume.

19.    Nothing further was said about the investigation until March 31, 2022, when Redwire announced results for its fiscal year ended December 31, 2021. Redwire reported a loss of $61.5 million, or a loss of $1.36 per share, for the year ended December 31, 2021, compared to a loss of $14.4 million, or a loss of 39 cents per share, for the prior year. The company said the increased loss was driven by expenses associated with going public and, to a lesser extent, costs associated with developing and supporting the new business. Redwire also revealed:

> the Audit Committee investigation into potential accounting issues at a business subunit, which has concluded …***confirmed the existence of previously identified internal control deficiencies*** as well as ***identified certain additional internal control deficiencies***. Consequently, ***the Company expects to***

***report an additional material weakness with respect to its control environment in its Quarterly Report on Form 10-Q and Annual Report on Form 10-K***. Specifically, ***certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication***. … As previously disclosed, the Company self-reported this matter to the SEC on November 8, 2021 and ***intends to continue to cooperate with any requests from the SEC***. [5]

20.    These dismal unexpected results and the new internal control deficiencies caused Redwire's stock to drop $2.43 per share or 29%, from a close of $8.48 per share on March 31, 2022 to a close of $6.05 per share on April 1, 2022.

21.    On April 1, 2022, Redwire finally filed its first SEC financial filing since September 2021 and provided further detail regarding its newly disclosed internal control deficiencies over financial reporting.[6] The carefully crafted Quarterly Report for the quarterly period ending September 30, 2021, revealed that Redwire found that "disclosure controls and procedures were not effective as of September 30, 2021, due to … material weaknesses in internal control over financial

---

[5] Redwire Corporation Reports Full Fiscal Year 2021 Financial Results on Form 8-K and press release dated March 31, 2022. https://www.sec.gov/Archives/edgar/data/0001819810/000181981022000014/exhibit991redwire12312021e.htm

[6] Redwire Corp. 10-Q dated April 1, 2022. https://www.sec.gov/ix?doc=/Archives/edgar/data/0001819810/000181981022000021/rdw-20210930.htm

reporting." Redwire also admitted that one of those weaknesses was that "*we did not maintain an effective control environment, as certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top*. Specifically, *certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication*."

22. The Quarterly Report further revealed Redwire would need to continue to "*remediate the material weaknesses as efficiently and effectively as possible and expect full remediation will likely go beyond December 31, 2022*"; that Redwire could not "*provide an estimate of costs expected to be incurred in connection with implementing this remediation plan*"; that "*these remediation measures will be time consuming, will result in the Company incurring additional costs, and will place additional demands on our financial and operational resources*." Finally, Redwire revealed that if it was not able to successfully remediate its existing material weaknesses in our internal control over financial reporting, "*the accuracy and timing of our financial reporting may be adversely affected; investors may lose confidence in our financial reporting; we could become subject to litigation or investigations by the New York Stock Exchange ("NYSE"), the SEC or other regulatory authorities*."

23.    Just days later, on April 11, 2022, Redwire further revealed, in its Annual Report on Form 10-K, that the "Annual Report on Form 10-K **does not include a report of management's assessment regarding [Redwire's] internal control over financial reporting** … or an attestation report of [Redwire's] independent registered public accounting firm,…[as] *it is not possible to conduct an assessment of the private operating company's internal control over financial reporting* in the period between the consummation date of the reverse acquisition and the date of management's assessment of internal control over financial reporting …."[7] Defendants further revealed that "the design of internal controls over financial reporting for the Company post-Merger *has required and will continue to require significant time and resources from management and other personnel*. As a result, *management was unable, without incurring unreasonable effort or expense to conduct an assessment of [Redwire's] internal control over financial reporting as of December 31, 2021.*" In other words, what was revealed about internal control deficiencies that existed during the Class Period could just be the tip of the iceberg.

24.    Then, on June 1, 2022, Redwire announced that the CFO Read was terminated and given a hefty severance agreement in which the former CFO "agreed

---

[7] Annual Report on Form 10-K for fiscal year ended December 31, 2021. https://www.sec.gov/ix?doc=/Archives/edgar/data/0001819810/000181981022000 025/rdw-20211231.htm

to a release of claims in favor of the Company and reaffirmed his commitment to comply with his existing restrictive covenant obligations." [8] Essentially, Mr. Read was fired and his silence assured.

25.    Thus, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) Redwire's senior management "did not maintain an effective control environment, as certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top"; (2) "certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication"; and (3) that, as a result of the foregoing, Defendants' statements about the Company's business and operations, management, internal controls and ethics and corporate governance were materially misleading.

26.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff

---

[8] Redwire Corp. 8-K dated June 1, 2022.
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001819810/000181981022000074/rdw-20220601.htm

- 14 -

and other Class members have suffered significant losses and damages. Indeed, while Redwire's stock closed as high as $13.19 on October 26, 2021, it trades at $3.66 at the close of trading on June 16, 2021, erasing more than $500 million in market capitalization.

### III.    JURISDICTION AND VENUE

27.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

28.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

29.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

30.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate

commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.    PARTIES

31.    Lead Plaintiff Jared Thompson, as set forth in the certification previously filed with the Court and incorporated by reference herein, purchased Redwire securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

32.    Defendant Redwire Corporation is incorporated under the laws of Delaware with its principal executive offices located in Jacksonville, Florida. Redwire's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "RDW" and its warrants trade under the symbol "RDW WS". Redwire was formerly known as Genesis Park Acquisition Corp. Prior to the de-SPAC merger GPAC's units, public shares and public warrants were listed on the New York Stock Exchange ("NYSE") under the symbols "GPAC.U," "GPAC" and "GPAC WS," respectively.

33.    Defendant Peter Cannito ("Cannito") was the Company's Chief Executive Officer ("CEO") of Old Redwire at all relevant times, and the CEO of New Redwire after the de-SPAC merger consummated on September 2, 2021 at all relevant times. As of June 2022, Cannito is still the CEO of Redwire.

34.    Defendant William Read ("Read") was the Company's Chief Financial Officer ("CFO") of Old Redwire at all relevant times, and the CFO on New Redwire after the de-SPAC merger consummated on September 2, 2021 at all relevant times. Defendant Read was terminated in June 2022.

35.    Defendants Cannito and Read (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports, press releases and presentations alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

36.    GPAC was incorporated as a Cayman Islands exempted company on July 29, 2020. The Company was incorporated for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses (the "Business Combination").

37.    GPAC's IPO was declared effective by the U.S. Securities and Exchange Commission (the "SEC") on November 23, 2020 (the "Effective Date"). On November 27, 2020, the Company consummated the IPO of 16,377,622 units (the "Units"), including the issuance of 1,377,622 Units as a result of the underwriter's partial exercise of its over-allotment option. Each Unit consists of one Class A ordinary share, $0.0001 par value ("Ordinary Share"), and one-half of one redeemable warrant ("Warrant") entitling its holder to purchase one Class A ordinary share at a price of $11.50 per share. [9]

38.    Following the closing of the IPO on November 27, 2020, an amount of $166,232,863 ($10.15 per Unit) from the net proceeds of the sale of the Units in the IPO and the sale of the Private Warrants was placed in a trust account. The proceeds from the IPO and the sale of the Private Warrants could not be released from the

---

[9] Genesis Park Acquisition Corp. Form S-4/A dated August 5, 2021. https://www.sec.gov/Archives/edgar/data/0001819810/000119312521237714/d593 89ds4a.htm

Trust Account until the earliest to occur of: (a) the completion of the GPAC's initial Business Combination, (b) the redemption of any public shares properly submitted in connection with a shareholder vote to amend the GPAC's amended and restated memorandum and articles of association (i) to modify the substance or timing of the Company's obligation to provide for the redemption of its public shares in connection with an initial Business Combination or to redeem 100% of its public shares *if the GPAC did not complete its initial Business Combination by May 27, 2022* or (ii) with respect to any other material provisions relating to shareholders' rights or pre-initial Business Combination activity, and (c) the redemption of the GPAC's public shares if the Company is unable to complete its initial Business Combination by May 27, 2022 (the "Combination Period"), *the eighteen month anniversary of the closing of the IPO*.[10]

39.    If the GPAC was unable to complete its initial business combination within the Combination Period, the GPAC would: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to

---

[10] *Id.*

the Company (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding Public Shares, which redemption will completely extinguish Public Shareholders' rights as shareholders (including the right to receive further liquidating distributions, if any), and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the Company's remaining shareholders and the Company's board of directors, liquidate and dissolve, subject in the case of clauses (ii) and (iii) to the Company's obligations under Cayman Islands law to provide for claims of creditors and the requirements of other applicable law.[11]

40.     Beginning in November of 2020, the GPAC's common stock began trading on the New York Stock Exchange under the ticker symbol GNPK. The GPAC's units traded under the ticker symbol GNPK.U and its warrants traded under the ticker symbol GNPK WS.

41.     Old Redwire was a group of cobbled together small companies in 2020 by private equity firm, AE Industrial Partners Fund II, LP ("AEI"), that purported to offer mission critical space solutions and high reliability components for the next generation space economy, with valuable IP for solar power generation and in-space 3D printing and manufacturing.

---

[11] *Id.*

42.     On March 25, 2021, the GPAC and Old Redwire entered into an Agreement and Plan of Merger. The proposed Business Combination was expected to be consummated after the required approval by the shareholders of the GPAC and the satisfaction of certain closing conditions described in the GPAC's Current Report on Form 8-K, as filed with the SEC on March 25, 2021.

43.     On August 11, 2021, the SEC declared effective the registration statement filed by the GPAC in relation to the Business Combination, which allowed the GPAC to proceed with soliciting a shareholder vote on the transaction. Amongst other things, the registration statement warned that Redwire was "***dependent on its full senior management team and other highly skilled personnel, and if it is not successful in attracting or retaining highly qualified personnel, it may not be able to successfully implement its business strategy***" and "***[c]ertain members of our senior management team have extensive experience in the aerospace industry, and we believe that their depth of experience is instrumental to our continued success. The loss of any one or more members of our senior management team for any reason, including resignation or retirement, could impair our ability to execute our business strategy and have a material adverse effect on our business, financial condition and results of operations.***"

44.     The GPAC shareholders approved the merger, and on September 2, 2021, the Business Combination was completed, and on September 3, 2021,

Redwire's securities began trading on the New York Stock Exchange. ("NYSE")

under the symbol "RDW."

## B. Materially False and Misleading Statements Alive or Issued During the Class Period

45.    Lead Plaintiff alleges that the statements highlighted in bold and italics

within this Section were false, misleading and omitted to disclose material

information. In some instances, graphical or presentation material is alleged to be

false and misleading and the reason it is false or misleading and omits material

information is called out in the introductory sentences. As alleged herein, the false

and misleading statements and omissions artificially inflated or artificially

maintained the price of Redwire's securities. As described below, Defendants

created an impression of a state of affairs related to the Company's management,

adherence to a Code of Conduct, and financial and internal controls base that differed

in a material way from the one that actually existed.

46.    On March 25, 2021, in connection with the Merger Agreement with

Old Redwire, Defendants issued a press release announcing the transaction, entitled,

"Redwire, An Innovative Space Infrastructure Company Serving The Fast-Growing

Space Industry, To Become Publicly Traded Through Merger With Genesis Park

Acquisition Corp." and in the subheading highlighting in italics, "***Proven***

***management team and 50+ years*** *of space heritage and deep customer relationships*

*in space and aerospace* • ***Strong financial foundation*** *with current revenue,*

EBITDA, and free cash flow • Projected 2021 revenue of $163 million and forecasted 72% 2021E – 2025E revenue CAGR, with positive and growing Adj. EBITDA and cash flow driven by an over $23 billion pipeline of identifiable contracts....”[12] The press release continued:

> “We intended to find a profitable partner **with strong management**, powerful intellectual property and impressive organic growth. Redwire achieves that vision by transforming the future of space infrastructure and services at a time when the space industry is on the brink of exponential growth. **Redwire is a proven, solidly profitable player** in the space community and the undisputed leader in on-orbit 3D printing, servicing, assembly, and manufacturing…Redwire **has established itself as a first-mover consolidator and an acquirer of choice**, and we believe its position will be further improved as a public company,” said Paul Hobby, CEO and Director of Genesis Park. “We are very excited about Redwire’s growth potential and we look forward to partnering with Peter and his team as they help usher in this new era of space exploration.”

47.    In conjunction with the press release on March 25, 2021, Old Redwire and GPAC hosted a joint investor conference available to the investing public by visiting https://www.genesis-park.com/redwire or live call and posted the replay of the call on the Genesis Park website. Defendants also posted a transcript of a video

---

[12] https://www.sec.gov/Archives/edgar/data/0001819810/000119312521093279/d76989dex991.htm

with the narrator stating that Redwire, "***provide[s] the infrastructure*** that fuels expansion, infrastructure that delivers new possibilities."[13]

48.    Defendants also posted an investor presentation slide deck touting the management experience of the combined team.[14] The slide presentation included slides on pages 6 and 7 that touted the experience of the sponsors of the Business Combination and the management of the Business Combination going forward. Slide 6 referred to the private equity entity that created Old Redwire, AEI, and the SPAC, GPAC, as having "***Best-In-Class Private and Public Management***" and detailing AEI's and GPAC's experience. Slide 7 referred to five executives from the two sponsors who would manage or be on the Board of New Redwire (three from Old Redwire and two from GPAC) as the "***Right Team for the Right Mission***" and highlighted each executive's experience. Defendant CFO Read was touted as having "***30+ years of experience in operational finance***", as being the "***[f]ormer CFO of Abaco Systems, BBB Industries, Continental Motors and business units within Teledyne (NYSE:TDY)***", and "***[e]xtensive M&A background with extensive experience ranging from target identification through business integration.***" Defendant Cannito was touted as having "***25+ years of experience in aerospace and***

---

[13] https://www.sec.gov/Archives/edgar/data/0001819810/000119312521093279/d76989dex993.htm
[14] https://www.sec.gov/Archives/edgar/data/0001819810/000119312521093279/d76989dex992.htm

*defense*", including as "*[f]ormer CEO of Polaris Alpha leading up to the Parsons acquisition*" and as "*Operating Partner at AE Industrial Partners…*" The slide also provided impressive, detailed backgrounds on each of the other members of Old Redwire management which were slated to be the management of the combined businesses of New Redwire:





49.     On March 29, 2021, Defendants filed its Annual Report on Form 10-K

with the SEC identifying, the Code of Ethics it had adopted on November 23, 2020.[15]

The Code of Ethics states, in part, that the Code:

> is applicable to all of the Company's directors, officers
> and employees (to the extent that employees are hired in
> the future) to: • *promote honest and ethical conduct,*
> including the ethical handling of actual or apparent
> conflicts of interest between personal and professional
> relationships; • *promote the full, fair, accurate, timely* and
> understandable *disclosure* in reports and documents that
> the Company files with, or submits to, the U.S. Securities
> and Exchange Commission (the "SEC"), as well as in
> other public communications made by or on behalf of the
> Company; • *promote compliance with applicable*
> *governmental laws, rules and regulations*; • deter

---

[15] https://www.sec.gov/Archives/edgar/data/0001819810/
000119312521098429/d121100d10k.htm

wrongdoing; and • require prompt internal reporting of breaches of, and accountability for adherence to, this Code.

Under the Section entitled "**Honest, Ethical and Fair Conduct**" the Code states:

> Each person owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest, fair and candid. Deceit, dishonesty and subordination of principle are inconsistent with integrity. Service to the Company should never be subordinated to personal gain or advantage. Each person must: • act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or when in the Company's interests; • observe all applicable governmental laws, rules and regulations; • comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records and other business-related information and data; • adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices; • deal fairly with any customers, suppliers, competitors, employees and independent contractors of the Company; • refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice; • protect the assets of the Company and ensure their proper use…

Under the Section entitled "Disclosure", the Code states:

> The Company strives to ensure that the contents of and the disclosures in the reports and documents that the Company files with the SEC and other public communications shall be full, fair, accurate, timely and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate.

Each person must: • not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent registered public accountants, governmental regulators, self-regulating organizations and other governmental officials, as appropriate; and • in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness. In addition to the foregoing, the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") of the Company and each subsidiary of the Company (or persons performing similar functions), and each other person that typically is involved in the financial reporting of the Company must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company. Each person must promptly bring to the attention of the Chairman of the Board any information he or she may have concerning (a) significant deficiencies in the design or operation of internal and/or disclosure controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

50.    On May 12, 2021, Defendants filed on Form S-4[16] with the SEC a draft registration statement/preliminary proxy statement and prospectus ("Draft Registration Statement") to bring Old Redwire public via a merger with GPAC. The Draft Registration Statement stated that in making its determination to approve, and

---

[16]    https://www.sec.gov/Archives/edgar/data/0001819810/000095012321005918/filename1.htm

recommend the Merger Agreement and Business Combination with Old Redwire,

the GPAC Board considered several factors including:

> ***Experienced and Proven Management Team:*** Redwire's
> management team has extensive experience in key aspects
> of the aerospace industry. GPAC reviewed the executive
> team's qualifications following the initial Redwire
> management presentation on January 8, 2021. ***Peter***
> ***Cannito, Chief Executive Officer of Redwire, has proven***
> ***experience in the defense, technology and government***
> ***service industries, and has shown that he has a strong***
> ***track record in successfully executing M&A***
> ***transactions.*** Andrew Rush, President and Chief
> Operating Officer of Redwire, not only has an extensive
> record of leadership in the industry, having served as the
> President and Chief Executive Officer of Made in Space
> from March 2015 to June 2020, but his law degree and
> intellectual property specialization makes him uniquely
> qualified to oversee Redwire's extensive patent and
> intellectual property portfolio. ***Bill Read, Chief Financial***
> ***Officer of Redwire, has served in that role in a number***
> ***of companies, most recently for Abaco Systems from***
> ***February 2018 to October 2019***. We expect the Redwire
> senior management team will continue with New Redwire
> following the Business Combination. For additional
> information regarding Redwire's executive officers, see
> "Management of New Redwire Following the Business
> Combination—Executive Officers."

51.    The Draft Registration Statement identified Defendant CFO William

Read as one of the only three corporate executives for the Redwire after the business

combination, along with Defendant CEO Peter Cannito and non-party Chief

Operating Officer Andrew Rush. Touting ***the qualifications*** of Defendants Cannito

and Read, the filing stated:

- 29 -

**Peter Cannito.** Mr. Cannito has served as Holdings' Chief Executive Officer since March 2020. Prior to his current role, Mr. Cannito served as the CEO of Polaris Alpha from October 2016 until December 2018, a high-tech solutions provider developing systems for the DoD and Intelligence Community Prior to that, Mr. Cannito previously held executive roles, including CEO and COO, at EOIR Technologies and he led a team of software and systems engineers at Booz Allen Hamilton focused on critical defense and intelligence programs. Mr. Cannito has been an operating partner with AEI Industrial from August 2019 to Present. Mr. Cannito received a bachelor's degree in Finance from the University of Delaware, an MBA from the University of Maryland, and served as an officer in the U.S. Marine Corps. We believe that Mr. Cannito's extensive experience in the defense, technology and government service industries qualifies him to serve as a director of the New Redwire Board.

**Bill Read.** Mr. Read has served as Holdings' Chief Financial Officer since August, 2020. Prior to Holdings, Mr. Read was the EVP/CFO of Abaco Systems from February 2018 to October 2019, a major private equity backed supplier of embedded computing systems for the defense and aerospace industry. Mr. Read also served as CFO of Harmar Mobility from May 2017 until February 2018 and CFO of Domo Tactical Communications from June 2016 to April 2017. Mr. Read also served as CFO for BBB Industries, the leading supplier of remanufactured automotive hard parts to the US aftermarket from November 2012 until May 2016. Bill has a bachelor's degree in Accounting from the University of Tennessee at Martin and an MBA from the Massey School of Business at Belmont University. He is a licensed Certified Public Accountant (inactive-TN), a Certified Management Accountant and a Chartered Global Management Accountant.

52.    The Proxy Statement contained the financial statements of both GPAC and Redwire predecessor and identified "a material weakness" in Redwire's internal control over financial reporting related to insufficient resources:

> We identified a material weakness related to an insufficient complement of resources with an appropriate level of accounting knowledge, experience and training commensurate with our structure and financial reporting requirements to appropriately analyze, record and disclose accounting matters timely and accurately, and establish effective processes and internal controls. The limited personnel resulted in an inability to consistently establish appropriate authorities and responsibilities in pursuit of financial reporting objectives, as demonstrated by, among other things, insufficient segregation of duties in our finance and accounting functions.

The Prospectus further stated that Redwire was ***working to remediate the material weaknesses as efficiently and effectively as possible and expect full remediation will likely go beyond December 31, 2021.***"

53.    The Draft Registration Statement also identified Defendants' Code of Ethics applicable to its directors, officers and employees filed with the SEC and directed investors where to find it.

54.    On July 6, 2021, Defendants filed its registration statement and preliminary proxy statement/prospectus ("Preliminary Prospectus) on Form S-4 with the SEC to bring Old Redwire public via a merger with GPAC. The Preliminary Prospectus repeated the statements identified above from the Draft Registration Statement.

55.     On July 9, 2021, Defendants CFO Read kicked off a presentation at Analyst Day for Old Redwire, with presentations by Old Redwire top management including Defendant CEO Cannito.

56.     Defendants filed the slide presentation with the SEC July 9, 2021 Defendants filed on Form 425 as part of the prospectus for the proposed business combination. The transcript of the presentation was filed by Defendants with the SEC on July 12, 2021 on Form 425 as part of the prospectus for the proposed business combination.

57.     The slide presentation which included the following slide on page 6 referring to these executives as the "***Right Team for the Right Mission***" and highlighted each executive experience. Defendant CFO Read was touted as having "30+ years of experience in operational finance", as being the "[f]ormer CFO of Abaco Systems, BBB Industries, Continental Motors and business units within Teledyne (NYSE:TDY)", and "[e]xtensive M&A background with extensive experience ranging from target identification to business integration." Defendant Cannito was touted as having "25+ years of experience in aerospace and defense", including as "[f]ormer CEO of Polaris Alpha leading up to the Parsons acquisition" and as "Operating Partner at AE Industrial Partners…" The slide also provided impressive, detailed backgrounds on each of the other members of Old Redwire

management which were slated to be the management of the combined businesses of New Redwire:



58.    Referring to the slide presentation Defendant Cannito elaborated on the management teams qualifications, after thanking Defendant Read for kicking of the presentation, stating:

> Thanks, Bill. Alright, well I am extremely proud to introduce some of the Redwire team that are here today. As Bill said, my name in Peter Cannito, I'm the Chairman and Chief Executive Officer, and ***we have assembled a world-class team of executives here at Redwire,*** that have a really diverse group of experience, everything from start-ups to large businesses. I, myself, have 25 years plus of experience working in the aerospace and defense industry.
>
> Redwire is the 3rd high-technology, high-growth platform that I've had the privilege to lead, and I've been working very closely with our partners at AE as an operating partner advising them on aerospace and defense mergers

and acquisitions. With me today also is Andrew, Rush, our President and Chief Operating Officer. Andrew was the CEO of Made In Space, one of our critical acquisitions during the formation of Redwire. He is also a former attorney, focused on intellectual property, which is critical to Redwire, because intellectual property is one of the foundations of our strategy. He also chairs the NASA Advisory Council Regulatory and Policy Committee, which is extremely important to us, because it underscores his trust of the customer. Andrew is very well known throughout the space industry and we're very happy to have him as part of our team.

*You just heard from Bill Read, our Chief Financial Officer, he has over 30 years of experience in a variety of strategic and operational financial roles. He is the former CFO of a number of private equity-backed as well as public companies, and has extensive M&A background ranging across the whole gambit of financial integration all the way through back office experience.*

We also have with us today, Mike Snyder, our Chief Technology Officer. Mike is the father of 3D printing in space. He was one of the founders of Made In Space and is very well-known throughout the industry as a technical leader, particularly in the area of advanced manufacturing on orbit.

You will also hear from today, Al Tadros, our Chief Growth Officer. Al comes to us with over 30 years of experience as a space innovator. He came to us from MAXAR, which as I pointed out in the beginning, we have a combination of both a small business startup and large business experience. And Al brings us a tremendous amount of that large business experience as we continue to grow here, and I think it's always a good sign when you have a high-tech, high-growth company, whose head of business development also has an Undergraduate and Masters degree from an institution like MIT.

- 34 -

We also have with us today, Faith Horowitz, our Chief Administrative Officer. Faith is a serial entrepreneur. She has over 30 years of experience in operations management and has started a number of different companies successfully and grown them successfully over her career.

And lastly, we have with us today, Jonathan Baliff, President, CFO and Director of Genesis Park who has just been an outstanding partner to Redwire to us as we go through our SPAC process. Jon has a tremendous amount of experience of over 30 years in aviation and infrastructure. He's the former CFO and CEO of a public company, and it's just been extremely empowering to have him with us with his public company experience and background helping us through this process.

***The one thing I really want to point out here about this team, because I believe that it is very unique and a major competitive merger for Redwire, is the amount of experience we have in mergers and acquisitions. For a high growth company that's in the phase of growth that we're in, that's highly unusual for a team with a depth of M&A experience, and in addition to our fantastic, organic growth story, that M&A experience helps us to be able to significantly accelerate growth as we execute our strategy.*** Moving to slide 7.

59.    On August 5, 2021, Defendants filed an amended registration statement proxy statement/prospectus ("Amended Registration Statement") on Forms S-4/A and 424(b)(3) in connection with the Business Combination which repeated the information above in the July 6, 2021 Preliminary Prospectus. The Amended Registration Statement repeated the information above and also stated that upon the consummation of the Business Combination, and stated above in the prior registration statements and prospectus drafts.

60. On August 11, 2021, Defendants filed a final definitive proxy statement/prospectus ("Definitive Prospectus") in connection with the Business Combination. The Definitive Statement repeated the information above and also stated that upon the consummation of the Business Combination, and stated above in the prior registration statements and prospectus drafts.

61. To sell the business combination, on August 12, 2021, Jonathan Baliff, the President and Chief Financial Officer of GPAC sat for an interview with Austin Moeller, the senior aerospace defense analyst at Canaccord Genuity. Defendants published and filed a transcript of that interview on form 425 with the SEC on August 16, 2021. In providing an overview of GPAC, Baliff said:

> We believe that we're unique, right? **We're a set of operationally oriented executives, mostly CFOs, CEOs and COOs coming from deep aerospace and aviation background.** And really we're here in our mind set, and I think a lot of the markets, because we've had some success to fill a niche and that there's not a lot of mid-market aerospace and space companies.
>
> And so we are focused on that and we are pleased to say especially today, Austin, because last night we did get approval from the SEC to close our transaction with Redwire. We announced the transaction on March 25, 2021 with Redwire Space, the leader in space infrastructure, technology and services, which we'll talk about here in a few minutes, Austin….
>
> Our focus, again, as one of the first SPACs to go public in the aerospace and aviation, **there really aren't that many of us that had both the experience, the perspective, and the scars to prove that you can make money and really**

***good money in aerospace and aviation***, but it is a part of the industrial complex that you need to understand and know quite well to be able to have that sustained significant growth, which we believe Redwire has already demonstrated in its life, and we'll demonstrate over the next four and five years as part of what we're going to discuss today….

***We, as you can tell, are 10 executives with deep experience,*** decades long, hundreds of years, long experience, whether it be David Siegel, our Chairman, who comes from both an aerospace and aviation services background. I'm just going to introduce a few of us. Two, Paul Hobby, our CEO and Director, who's been involved in a number of different aerospace and aviation associated companies in both the FBO and airline market. You've got Richard Anderson, the former CEO and Chairman of both Northwest and Delta. I'm going to mention also John Bolton from Honeywell and Honeywell Aerospace, who led their divisions. And so we've got just a whole wealth of knowledge.

Andrea Newman, who comes really from the aerospace and aviation, but more from the regulatory side. Gil West comes from both Boeing and Delta from the operation side, but he's also been CEOs of businesses. And then finally, we've got also Nina and Dave Davis on our advisory board. Nina, one of the most senior women in aerospace and aviation fleet management. And then Dave Davis, who's been a CEO of aerospace companies and also CFO, most recently, President and CFO of Sun Country Airlines, which went public around the same time that we did as Genesis Park and then merging with Redwire.

So you can tell, we're purpose-built, we're very unique in that we are really focused on a niche play, which we think is one of the success drivers for Genesis Park and other SPACs. ***And you've got to have a reason to exist other than just the capital. And we provide a tremendous amount of operational, commercial and financial***

- 37 -

*knowledge* as both public company executives and people who know how Redwire is going to significantly grow and how we can help that growth be both sustainable and actually even beat their expectations over the next five years….

So why did we combine with Redwire? What was it about Redwire Space that made this attractive to Genesis Park? For us, we had as an early SPAC really in this kind of what we call a next wave of SPACs in aerospace, we did get to see a lot. We got to see 60 companies. A lot of this has profiled in the S-4 that we went live with yesterday in our registration statement. So for us, we got to see everything from eVTOLs to start-up airlines, to aviation services, to even a number of ecosystems associated with the space and space launch industries….

… And so for us, one of the things that's really important is *we're starting from a very strong foundation financially* that has both the nature of an operating company, which it is….

… So it's not just enough *to say that you are operationally, commercially, financially strong*. Do you have the legal work around that to protect yourself as this industry grows spectacularly and Redwire does…..

So it's everything that an investor that we think about given that we've invested a lot in aerospace over the last three decades as a group. We understand what kind of really, really good looks like I should mention, *Pete Cannito is formed a fantastic team of executives* that both have the technology and the knowledge of how to bring that technology to commercialization. *And on the other side, how to finance it appropriately, how to talk about it appropriately, how to control as a public company, the nature of what you need to control and properly disclosed. So they, again, great companies do great things well, Pete Cannito has formed a great team to do so.*

- 38 -

62.    On August 25, 2021, Defendant Cannito was interviewed at the 36th Annual Space Symposium by Jeff Carr, President of Griffin Communications Group. A transcript of that interview was filed with the SEC on Form 425[17] as a further prospectus on August 27, 2021. In that interview, Defendant Cannito talked about the Company's strategy and strong foundation to move that strategy forward:

> Jeff Carr: So Pete, you and your team have gone for zero to 60 in no time at all. It was just, what, a little over a year since the founding merger. How far have you come in that time and what's on your agenda for the Symposium this year?

> Peter Cannito: That is an excellent question. So we've come together pretty quickly, but I think that's a function of the fact that the strategy that we've put together has really resonated for the industry. And the idea is that there are a number of small companies out there that just have extraordinary technical capability but could really benefit from being part of a well-capitalized, larger platform with scale in order to take their strategies and their technology to the next level. ***When you combine that with all the fantastic collaboration and integration as we come together as One Redwire to build out second order capabilities that are a mix of the different capabilities of the organizations that we've brought together, it's really started to take on a life of its own***….

> Jeff Carr: Starting with the near future okay, what are the Redwire headlines going to be say coming up over the next six-twelve months? What can you say?

> Peter Cannito: All statements are forward looking, as you know. Obviously, our biggest next milestone is very public, we're going to close our de-SPAC process on

---

[17] https://www.sec.gov/Archives/edgar/data/ 0001819810/000119312521257883/d190425d425.htm

September 2nd and become a publicly traded company. So that's the new biggest headline coming out of Redwire coming out of the next couple of months. So then what you are going to see from there is we are going to use that additional capital to continue what we've been doing already and that's bringing more capabilities into this middle market, pure-play space infrastructure company of scale in a way that continues to propel the industry forward….

Jeff Carr: So you have pretty diversified growth strategy. So, from an investor's standpoint, what is the value proposition you see for private investors as you guys are getting ready to go public?

Peter Cannito: Yeah, yeah. Well it's an interesting question, because obviously SPACs have been very high profile over the past three to six months and it's interesting. Our strategy from an investor perspective is ***to offer a company that has a blue-chip foundation*** with venture optionality. ***That's our term for a conservative company*** that is revenue and cash-flow positive today but has these disruptive capabilities in the portfolio that enable us to grow faster than the broader market into the future. So, first and foremost, we are already a revenue and cash-flow positive company ***that can go on in perpetuity without any problem.*** We don't need to raise capital in order to continue to execute our strategy. So it's a very strong foundational investment opportunity – some might say a value opportunity – but it has this unique aspect of having this unique venture optionality associated with breakthrough technologies, like our 3D printing on-orbit where you're the undisputed leader in on-orbit 3D printing and manufacturing. That kind of venture optionality gives the investors an opportunity to share in the upside in our breakout growth as those markets mature and come to fruition. Now the nice thing is that although we have a number of different projections as to when this is going to happen, we can be patient because we are fiscally conservative, we have a strong revenue and cash-flow

positive foundation. ***So if it's going to be ten years instead of five, we will still be in the game, because ultimately to not only the investors but to the industry at large, we are in it for the long term and that's how we think about it.*** We want long term investors and we want to be a critical part of this industry well into the future.

63.    On September 1, 2021, based on the Proxy materials and statements above, the shareholders of GPAC approved the Business Combination. On September 2, 2021, the Business Combination was consummated. Following the consummation of the Business Combination, the combined company began to operate as Redwire Corporation and its shares of common stock and warrants began trading on the New York Stock Exchange beginning on September 3, 2021 under the symbols "RDW" and "RDW WS," respectively.

64.    On September 2, 2021, in conjunction with the consummation of the Business Combination, New Redwire adopted and posted on its website a revised Code of Conduct and Ethics, which mirrored in relevant part, the prior Code of Ethics of the Company.[18] The stated purpose of the Code was:

> to deter wrongdoing and promote: 1. ***honest and ethical conduct***, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; 2. ***full, fair, accurate, timely and understandable disclosure*** in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other

---

[18] Redwire Corp. Code of Conduct and Ethics effective September 2, 2021. https://d1io3yog0oux5.cloudfront.net/_1e953fca85d2c2fd0c4b7a009d272fee/red wirespace/db/867/7489/file/Redwire+-+Code+of+Conduct+and+Ethics.PDF

public communications made by the Company; 3. compliance with applicable governmental laws, rules and regulations; 4. the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and 5. accountability for adherence to the Code.

65.    All directors, officers and employees were "required to be familiar with the Code, comply with its provisions and report any suspected violations." Amongst other things, all officers were to "ensure that the Company's books, records and accounts are *accurately maintained*" and "*take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.*"

66.    Redwire also adopted and posted on its website, effective September 2, 2021, a Whistleblower policy.[19] The policy stated that "Redwire Corporation and its subsidiaries (the "Company") *is dedicated to conducting business with efficiency, fairness and integrity and encourages behavior that will maintain the public's confidence and trust in its operations.*" The policy was adopted for the "receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, the confidential, anonymous submission by employees

---

[19]    Redwire Corp. Whistleblower Policy effective September 2, 2021. https://d1io3yog0oux5.cloudfront.net/_1e953fca85d2c2fd0c4b7a009d272fee/red wirespace/db/867/7491/file/Redwire+-+Whistleblower+Policy.pdf

of the Company of concerns regarding questionable accounting or auditing matters (as further defined below, "Inappropriate Conduct"), and to alert the Audit Committee to possible problems before they have serious consequences to the Company." Inappropriate conduct was defined as follows:

> • ***Irregular accounting methods, financial reporting practices or auditing conduct***, including fraud or deliberate error in the preparation, evaluation, review or audit of any financial statement of the Company; fraud or deliberate error in the recording or maintaining of financial records of the Company; ***deficiencies in or noncompliance with the Company's internal accounting controls***; misrepresentations or false statements to or by a senior officer of the Company or an accountant regarding a matter contained in the financial records, financial reports or audit reports of the Company; and deviation from full and fair reporting of the Company's financial condition. • Unusual or dubious payments or arrangements. • Violations of state or federal securities laws or violations of the Foreign Corrupt Practices Act or similar anti-bribery statutes. • Any other activity that may violate federal, state or local (which includes foreign jurisdictions in which we conduct business) laws or regulations or may be otherwise unlawful. • Violations of the rules and regulations of the New York Stock Exchange or any other market on which the Company's securities are traded. • Activities that pose substantial and specific danger to the health and safety of directors, officers or employees of the Company or the general public. • ***Other activities in violation of the Company's Code of Conduct and Ethics or any of the Company's other policies***.

67.    The new Whistleblower policy promised anonymity and protection to the whistleblower.

68.     On September 24, 2021, Redwire and Defendant William Read filed a Registration Statement and Prospectus to sell 13,920,979 shares of Redwire Common Stock, up to 67,262,510 shares of common stock by "Selling Shareholders" and 5,732,168 warrants by "Selling Shareholders". Of those shares AE Red Holdings[20] planned to sell all of the 39,200,000 shares it owned. Similarly Genesis Park Holdings[21] and Genesis Park II L.P. planned to sell all of the 9,500,947 and 2,500,000 shares they owned, respectively. The registration statement was signed by Defendant William Read for Redwire, as well as Defendant Cannito, and non-party directors Les Daniels, Louis R. Brothers, Joanne Isham, Kirk Konert, Jonathan E. Baliff and John S. Bolton, and Executive Vice President, General Counsel and Secretary Nathan O'Konek. The registration statement incorporated and or repeated the false or misleading statements set forth above in this section.

69.     The above statements identified in this Section above were materially false and/or misleading and failed to disclose material adverse facts about the

---

[20] AE Red Holdings is controlled by AE Industrial Partners Fund II, LP, AE Industrial Partners Fund II-A, LP and AE Industrial Partners Fund II-B, LP (collectively the "AE Partners Funds"). The general partner of the AE Partners Funds is AE Industrial Partners Fund II GP, LP, which in turn is managed by its general partner AeroEquity GP, LLC. AeroEquity GP, LLC is controlled.

[21] Genesis Park II, LP ("GPLP") is the managing member of the Sponsor, and Genesis Park II GP, LLC ("GPLLC") is the general partner of GPLP, and as such, has voting and investment discretion with respect to the ordinary shares held of record by the Sponsor and may be deemed to have shared beneficial ownership of the ordinary shares held directly by the Sponsor.

Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) Redwire's senior management "did not maintain an effective control environment, as certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top"; (2) "certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication" and (3) that, as a result of the foregoing, Defendants' statements about the Company's business and operations, management, internal controls and ethics and corporate governance, and the supposed impeccable qualifications about its senior management team in operating private and public companies and the necessary pedigree degrees, were materially misleading.

**C.    Partial Disclosure of the Truth at the End of the Class Period and Subsequent Disclosures**

70.    On November 10, 2021, Redwire issued a press release announcing that it would postpone the release of its third quarter earnings results. The Company "***was notified by an employee of potential accounting issues at a business subunit***," and the Audit Committee was investigating the allegations. In a press release, the Company stated:

> Redwire Corporation (NYSE: RDW; "Redwire" or "the Company") announced yesterday it would reschedule its earnings announcement for the third quarter ended

September 30, 2021, which had been previously scheduled for Wednesday, November 10, 2021.

On Friday evening, November 5, 2021, Redwire management was notified by an employee of potential accounting issues with a business subunit. Management promptly informed the independent Audit Committee of the Board of Directors. The Audit Committee has commenced an independent investigation. Given the timing of the recent notification, the Company has not finalized its financial statements and expects to file an NT-10Q. The Company has voluntarily reported the matter to the Securities and Exchange Commission.

Redwire remains confident in its business prospects and, to date, the Company has not identified any material misstatements or restatements of its previously filed financial statements.

71.    On this news, Redwire's stock price fell $1.92, or 16%, from $11.91 per share at the close of trading on November 9, 2021 to close at $9.99 per share on November 10, 2021, on unusually heavy trading volume.

72.    Then, on November 15, 2021, before the market opened, Redwire stated that it could not timely file its quarterly report for the period ended September 30, 2021. Due to the pending investigation into the accounting issues at a business subunit, "**the Company has not been able to finalize its financial statements or its assessment of the effectiveness of its disclosure controls and procedures and any impact**" on the report.

73.    On this news, Redwire's stock price fell another $0.93, or 8.3%, over two consecutive trading sessions from $11.25 per share at the close of trading on

November 12, 2021 to close at $10.32 per share on November 16, 2021, on unusually heavy trading volume.

74.    On December 2, 2021, Redwire issued a press release announcing it had received a notice on November 23, 2021 from the New York Stock Exchange (the "NYSE") indicating that the Company is not in compliance with Section 802.01E of the NYSE Listed Company Manual as a result of its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2021 (the "Form 10-Q") with the Securities and Exchange Commission (the "SEC").

75.    Four months later, on March 31, 2022, Redwire issued a press release announcing financial results for its fiscal year ended December 31, 2021 and the quarter ended September 30, 2021. Redwire reported a loss of $61.5 million, or a loss of $1.36 per share, for the year ended December 31, 2021 compared to a loss of $14.4 million, or a loss of 39 cents per share, for the prior year. The company said the increase was driven by expenses associated with going public and, to a lesser extent, costs associated with developing and supporting the new business. In addition, Defendants revealed that the Audit Committee investigation into the Whistleblower complaint:

> *confirmed the existence* of previously identified internal control deficiencies as well as *identified certain additional internal control deficiencies*. Consequently, the Company *expects to report an additional material weakness with respect to its control environment in its Quarterly Report on Form 10-Q and Annual Report on*

*Form 10-K*. Specifically, ***certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication***. …As previously disclosed, the Company self-reported this matter to the SEC on November 8, 2021 and ***intends to continue to cooperate with any requests from the SEC***.

76.     These dismal unexpected results and the revelation that the Audit Committee's investigation found additional internal control deficiencies not previously disclosed, that senior management failed to enforce compliance with Redwire's accounting and finance policies, and the threat of an SEC investigation caused Redwire's stock to drop $2.43 per share or ***29%***, from a close of $8.48 per share on March 31, 2022 to a close of $6.05 per share on April 1, 2022.

77.     On April 1, 2022, Redwire finally filed with the SEC its first financial filing as a Combined Company since the de-SPAC transaction was consummated on September 2, 2021 by filing Form 10Q, Redwire's Quarterly Report for the period ended September 20, 2021. The carefully crafted Quarterly Report for the quarterly period ending September 30, 2021, revealed that Redwire found that "***disclosure controls and procedures were not effective as of September 30, 2021, due to … material weaknesses in internal control over financial reporting***." Redwire also admitted that one of those weaknesses was that "***we did not maintain an effective control environment, as certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top.***

*Specifically, certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication*."

78.   The Quarterly Report further revealed Redwire would need to continue to "*remediate the material weaknesses as efficiently and effectively as possible and expect full remediation will likely go beyond December 31, 2022*"; that Redwire could not "*provide an estimate of costs expected to be incurred in connection with implementing this remediation plan*"; and that "*these remediation measures will be time consuming, will result in the Company incurring additional costs, and will place additional demands on our financial and operational resources.*" Finally, Redwire revealed that if it was not able to successfully remediate its existing material weaknesses in our internal control over financial reporting, "*the accuracy and timing of our financial reporting may be adversely affected; investors may lose confidence in our financial reporting; we could become subject to litigation or investigations by the New York Stock Exchange ("NYSE"), the SEC or other regulatory authorities*." The Quarterly report then set out an extensive section entitled "Remediation Plans", which stated that Redwire was "in the process of implementing measures designed to improve our internal control over financial reporting and remediate the deficiencies that led to the material weaknesses, including tone at the top and other communications training, hiring additional

finance and accounting personnel, designing and implementing new control activities, and enhancing existing control activities." It also listed, amongst other things, that Redwire had reviewed its "personnel structure and identified new positions to enhance our accounting and financial reporting team."[22]

79.    Then on April 11, 2022, Redwire filed a carefully crafted Annual Report on Form 10-K for the period ended December 31, 2021. The Annual Report repeated the "tone at the top" and internal control revelations in the Quarterly Report, adding "***disclosure controls and procedures were not effective as of December 31, 2021 due to the following material weaknesses in internal control over financial reporting.***" Redwire repeated that it "did not maintain an effective control environment, ***as certain members of senior management*** failed to consistently message and set certain aspects of an appropriate ***tone at the top***. Specifically, certain members of senior management ***failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication***" and that "***the design of internal controls over financial reporting for the Company post-Merger has required and will continue to require significant time and resources from***

_____

[22] Redwire 10-Q for the period ending September 30, 2021
https://www.sec.gov/ix?doc=/Archives/edgar/data/1819810/000181981022000021/rdw-20210930.htm

*management and other personnel. As a result, management was unable, without incurring unreasonable effort or expense to conduct an assessment of [Redwire's] internal control over financial reporting as of December 31, 2021.*"[23]

80.    Even though a restatement was purportedly unnecessary, Defendants revealed that the "*Annual Report on Form 10-K does not include a report of management's assessment regarding [Redwire's] internal control over financial reporting* (as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act), *or an attestation report of [Redwire's] independent registered public accounting firm, as allowed by the SEC for reverse acquisitions between an issuer and a private operating company when it is not possible to conduct an assessment of the private operating company's internal control over financial reporting in the period between the consummation date of the reverse acquisition and the date of management's assessment of internal control over financial reporting (pursuant to Section 215.02 of the SEC Division of Corporation Finance's Regulation S-K Compliance & Disclosure Interpretations).*" In other words, what was revealed about internal control deficiencies that existed during the Class Period could just be

---

[23] Annual Report on Form 10-K for fiscal year ended December 31, 2021. https://www.sec.gov/ix?doc=/Archives/edgar/data/0001819810/000181981022000 025/rdw-20211231.htm

the tip of the iceberg. As such, Defendants stated remediation "***would likely extend well beyond December 31, 2022***", be time consuming and costly.

81.     Further, despite stating that the "tone at the top" material weaknesses did not result in any misstatement, on June 1, 2022, Redwire announced that the CFO, Defendant Bill Read, would "transition from his role as Chief Financial Officer" and be replaced by the head of the Board of Directors Audit Committee. Only in the SEC filing that day did Redwire make clear that Defendant Read was terminated, effective immediately on June 1, 2021, and given a hefty severance agreement in which the former CFO "agreed to a release of claims in favor of the Company and reaffirmed his commitment to comply with his existing restrictive covenant obligations." [24] Reading between the lines of corporate speak, Mr. Read was fired and silenced.

## VI.     ADDITIONAL ALLEGATIONS OF SCIENTER

82.     The allegations in this Section allege scienter as to each Defendant. The inference and conclusion that Defendants acted with scienter, that is, that they intended to mislead the investing public or were reckless as to the possibility of misleading the investing public, is supported by the following facts. While organized

---

[24] Redwire Corp. 8-K dated June 1, 2022.
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001819810/000181981022000074/rdw-20220601.htm

into sub-Sections for readability, the following allegations of scienter are mutually corroborating.

## A.   Motive and Circumstantial Evidence of Scienter

83.   Defendants' misrepresentations were necessary to the repackaging of the non-public Private Equity companies cobbled together by GPAC and AEI, whose purpose is to repackage and take companies public on behalf of its investors through a take public SPAC merger and provide Defendants access to the stock exchange to raise much needed capital.

84.   Just as with other SPACs make their money by bringing companies public by avoiding the scrutiny and limitations of an IPO under Section 11 of the Securities Act of 1933, this unique motive—the motive to avoid the full regulatory disclosure and meeting the internal control requirements of a public company—is compelling, especially in conjunction with the other allegations of scienter alleged herein. A SPAC, like Redwire, was eligible for relief as an emerging growth company and is not subject to section 404(b) of the Sarbanes-Oxley Act requiring auditors to audit the efficacy of the company's internal control over financial reporting.

85.   Moreover, without such representations about management and their experience and the commitment to a Code of Ethics and remediation of internal

control deficiencies, Defendants likely would have never received shareholder approval for the take public SPAC merger and Redwire would not have gone public.

86.    Instead, these false representations paved the way for Redwire to be listed on the NYSE with an enterprise value of over $615 million and allow the Company to raise additional proceeds. In addition, the SPAC merger, which had also involved a $100 million PIPE (Private Investment in Public Equity), would provide Redwire with $170 million in cash in exchange for 45% of the company's equity:



87.    Defendants benefitted immensely by convincing shareholders to approve the take public merger under false pretenses. Defendants' scienter is further

evident from the shockingly large profits they stood to make after the de-SPAC Merger, given their holdings of Redwire securities.

**B.    Scienter as to Defendant William Read.**

88.    Defendant Read's scienter is supported as he was the Chief Financial Officer and the senior executive in charge of compliance with the Company's accounting and finance policies and procedures. He had the motive to hide his own failure to provide a proper "tone at the top" as that would, under Redwire's policies, put his job in jeopardy. Indeed, his termination shortly after the conclusion of Redwire's findings, and his replacement by the head of the Board Audit Committee who was in charge of the investigation, supports scienter.

89.    Defendant Read also had the motive to hide the omissions set forth above as he received, amongst other compensation, a handsome award of 152,700 warrants upon the consummation of the de-SPAC Transaction on September 2, 2021, convertible at $10.03 per share. Defendant Read's other compensation is set forth in the Definitive Proxy Statement of Redwire filed on at pages 16-19, and incorporated herein by reference. According to Redwire's S-1 filed on June 16, 2022, Read's 2020 total compensation before the de-SPAC transaction was $350,533.00, where as in 2021, along with going public in the de-SPAC transaction, Read's total compensation was $1,710,734.00 --- an almost fivefold increase.

90.     Defendant Read would have known that disclosure of his or other senior management's failures with respect to "tone at the top" would have undercut the GPAC shareholders faith in the honesty and integrity of any and all representations made by Redwire and would have jeopardized the de-SPAC transaction and the purchase of Redwire shares post-de-SPAC.

**C.     Scienter as to Defendant Peter Cannito**

91.     Defendant Cannito's scienter is supported as he and Read were two of the only three members of senior management identified by Defendants in their statements and filings during the Class Period and through the termination of Read in June of 2022. The other member of senior management acts in an operating role and does not have a role in accounting and financial policies and procedures as would both a CEO and CFO. Defendant Cannito also oversaw Read in his duties as a CFO reports up to the CEO.

92.     Defendant Cannito also had the motive to hide the omissions set forth above as he received, amongst other compensation, a handsome award of 300,000 warrants upon the consummation of the de-SPAC Transaction on September 2, 2021, convertible at $10.03 per share. Defendant Cannito's other compensation is set forth in the Definitive Proxy Statement of Redwire filed on at pages 16-19, and incorporated herein by reference. According to Redwire's S-1 filed on June 16, 2022, Cannito's 2020 total compensation before the de-SPAC transaction was

$769,346.00, whereas in 2021, along with going public in the de-SPAC transaction, Read's total compensation was $3,065.456 --- an almost fourfold increase.

93.     Defendant Cannito would have known that disclosure of his or other senior management's failures, including Defendant Read, with respect to the "tone at the top" would have undercut the GPAC shareholders faith in the honesty and integrity of any and all representations made by Redwire and would have jeopardized the de-SPAC transaction and the purchase of Redwire shares post-de-SPAC

## D.    Scienter Inferred by Proximity in Time to Adoption of Whistleblower Policy.

94.     The fact that the Whistleblower came forward within weeks of Redwire's required adoption of a Whistleblower policy that protected whistleblowers from senior management provides an inference that senior management was aware of the problems uncovered by the Audit Committee's investigation. Prior to the adoption of a policy and a new Board of Directors and head of the Audit Committee, an employee had every reason to fear senior management's wrath.

## E.    The Termination of William Read Supports and Inference of Scienter

95.     Defendant Read was unexpectedly terminated in June 2022. No reason was given and he was replaced by the head of the Audit Committee of the Board. Redwire also disclosed that Read received a handsome termination package,

released any claims against the Company, and agreed to abide by a non-disparagment agreement as a condition to his payments. Read's Separation and Release Agreement dated June 1, 2021 filed with the SEC as Exhibit 10.20 Redwire's S-1 registration statement to sell over 1.7 million shares, filed shortly after Read's termination is incorporated by reference in this Complaint.[25]

96.   A separation agreement is a common result from a negotiated process for a terminated executive to avoid being terminated for cause and the likely result of weeks of negotiation. "Cause" under Read's employment contract and Redwire's 2021 Plan means any of the following:

> (i) the participant's plea of nolo contendere to, conviction of or indictment for, any crime (whether or not involving the Company or its affiliates) (a) constituting a felony or (b) that has, or could reasonably be expected to result in, an adverse impact on the performance of the participant's duties, or otherwise has, or could reasonably be expected to result in, an adverse impact on the business or reputation of the Company or its affiliates, (ii) conduct of the participant, in connection with his or her employment or service, that has resulted, or could reasonably be expected to result, in injury to the business or reputation of the Company or its affiliates, (iii) any material violation of the policies of the participant's employer, including, but not limited to, those relating to sexual harassment or the disclosure or misuse of confidential information, or those set forth in the manuals or statements of policy of the employer; (iv) the participant's act(s) of negligence or willful misconduct in the course of his or her employment

---

[25] Separation and Release Agreement dated June 1 between Read and Redwire, 2021. https://www.sec.gov/Archives/edgar/data/0001819810/000181981022000074/exhibit102-separationandre.htm

or service; (v) misappropriation by the participant of any assets or business opportunities of the Company or its affiliates; (vi) embezzlement or fraud committed by the participant, at the participant's direction, or with the participant's prior actual knowledge; or (vii) ***willful neglect in the performance of the participant's duties or willful or repeated failure or refusal to perform such duties.[26]***

97.    Defendant Read's unexpected termination is also consistent with Defendants "Remediation Program" noted above to address the "tone at the top" and internal controls fiasco, as well as the need to take action before more shares are sold pursuant to Defendants' outstanding prospectus to sell shares, including under the registration statement filed on June 16, 2022. While the termination of a key executive officer shortly after the results of an investigation, or ahead of an offering, is not alone sufficient to establish scienter, it does add support to the inference of scienter when combined with the other facts alleged herein.

## F.    Defendants' Imputed Knowledge about Redwire's Financial and Accounting Policies and Procedures

98.    Redwire is a small operation with few members of senior management as set forth above. The Individual Defendants were highly sophisticated and in positions to know that their statements concerning qualifications while ignoring their lack of "tone at the top" where false and misleading. The sophistication of the

---

[26] Redwire Definitive Proxy filed April 22, 2022. https://www.sec.gov/Archives/edgar/data/0001819810/000114036122015574/edge 20003348x1_def14a.htm

Individual Defendants strengthens the allegations of scienter, by undermining an exculpating explanation for the fraud.

**G.    Redwire's Previously Disclosed and Unremediated Deficiencies in its Internal Controls Over Financial Reporting Further Contributes to an Inference of Scienter**

99.    In its public disclosures throughout the Class Period, Defendants represented that Redwire's management, with the participation of Defendants CEO Cannito and CFO Read, had evaluated the effectiveness of Redwire's disclosure controls and procedures, including ensuring that such information is accumulated and communicated to management (including the principal executive officer and principal financial officer) as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, Defendants CEO Cannito and CFO Read concluded that Redwire's disclosure controls and procedures were not effective throughout the entire Class Period due to material weaknesses in internal control over financial reporting, which Defendants failed to remedy.  Specifically, Defendants CEO Cannito and CFO Read had "identified a material weakness related to an insufficient complement of resources with an appropriate level of accounting knowledge, experience and training commensurate with our structure and financial reporting requirements to appropriately analyze, record and disclose accounting matters timely and accurately, and establish effective processes and internal controls. The limited personnel resulted in an inability to consistently establish appropriate

authorities and responsibilities in pursuit of financial reporting objectives, as demonstrated by, among other things, insufficient segregation of duties in our finance and accounting functions."

100.    Defendants CEO Cannito and CFO Read further concluded that these identified material weakness in Redwire's internal controls over financial reporting contributed to *additional* material weaknesses, including that:

•    Redwire did not design and maintain an effective risk assessment process at a precise enough level to identify new and evolving risks of material misstatement in the consolidated financial statements. Specifically, changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement to financial reporting.

•    Redwire did not design and maintain formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over the preparation and review of business performance reviews, account reconciliations, journal entries and contract estimates used in determining the recognition of revenue.

•    Redwire did not design and maintain effective controls to address the identification of and accounting for certain non-routine, unusual or complex transactions, including the proper application of U.S. GAAP to such transactions. Specifically, we did not design and maintain effective controls to account for

purchase business combinations, including the appropriate review of the assumptions, data and models used in the forecasted cash flows, used to determine the fair value of the acquired assets and liabilities.

- These material weaknesses resulted in material audit adjustments to substantially all accounts and disclosures in the successor consolidated financial statements as of December 31, 2020 and for the period from February 10, 2020 to December 31, 2020, and to the predecessor consolidated financial statements for the period from January 1, 2020 to June 21, 2020 and as of and for the year ended December 31, 2019.[27]

101.   Throughout the Class Period, Defendants CEO Cannito and CFO Read represented that they were in the process of implementing measures designed to improve Redwire's internal control over financial reporting and remediate the deficiencies that led to the material weaknesses, including hiring additional finance and accounting personnel, designing and implementing new control activities, and enhancing existing control activities.  Among other control activities undertaken, Defendants represented throughout the Class Period that:

- We are in the process of designing and implementing additional review procedures within our accounting and finance department to provide more

---

[27] *See, e.g.*, Redwire's Registration Statement filed on Form S-1 with the SEC on September 23, 2021.

robust and comprehensive internal control over financial reporting that address the relevant financial statement assertions and risks of material misstatement within our business processes, including implementing a comprehensive close process checklist with additional layers of reviews as well as controls around non-routine, unusual or complex transactions, including controls over the accounting for purchase business combinations.

● We will continue to document our processes and procedures, including accounting policies, across the Company to ensure consistent application including controls over the preparation and review of business performance reviews, account reconciliations, journal entries and contract estimates used in determining the recognition of revenue.

102. Executives of public companies committed to accurate financial reporting do not allow material weakness in internal controls to exist, let alone go unremediated for long portions of time. Moreover, given Defendants CEO Cannito and CFO Read's evaluation of Redwire's internal controls, their conclusions regarding the existence and persistence of identified material weaknesses throughout the Class Period (including with respect to compliance with the Company's accounting and finance policies and procedures), and the extensive remediation plan Defendants purportedly put in place, it would be absurd to suggest that Defendants CEO Cannito and CFO Read were not aware of Redwire's senior management's

failure to consistently message and set certain aspects of an appropriate tone at the top, including their failure to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication. Indeed, since the previously identified material weaknesses overlapped in subject matter with the tone at the top material weaknesses ultimately disclosed, it is not plausible that Defendants CEO Cannito and CFO Read and other senior management did not know about these material weaknesses when making their misstatements and omissions.

## VII.  LOSS CAUSATION

103.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

104.  During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and engaged in a fraudulent course of conduct that artificially inflated the price of Redwire's securities and operated as a fraud or deceit on Class Period purchasers of Redwire's securities. By failing to disclose the true state of Redwire's business and operations, Defendants presented a misleading picture of Redwire's condition and value, which had the intended effect and caused Redwire's stock to trade at artificially inflated prices during the Class Period. Shareholders invested based on these false premises. And Redwire stock could not

have been issued, or would have been sold at dramatically lower prices, had investors been aware of Defendants' fraudulent scheme.

105.   Because Lead Plaintiff was unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose that its financial results were achieved through a fraudulent scheme), Lead Plaintiff paid an artificially inflated and unreasonable price for their purchases of Redwire's stock.

## A.   Corrective Disclosures

106.   As Defendants' materially false, misleading, and incomplete statements, and fraudulent scheme were disclosed, the price of Redwire's securities fell, as the prior inflation came out of the Company's stock price as set forth above on at least November 10, 15 and 16, 2021. These disclosures did not reveal the full extent of Defendants' omissions.

107.   On March 31, 2022, Defendants revealed (along with other information below in the Section on Materialization of the Risks) that the Audit Committee investigation into the Whistleblower complaint:

> ***confirmed the existence*** of previously identified internal control deficiencies as well as ***identified certain additional internal control deficiencies***. Consequently, the Company ***expects to report an additional material weakness with respect to its control environment in its Quarterly Report on Form 10-Q and Annual Report on Form 10-K***. Specifically, ***certain members of senior management failed to reinforce the need for compliance***

> ***with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication***. …As previously disclosed, the Company self-reported this matter to the SEC on November 8, 2021 and ***intends to continue to cooperate with any requests from the SEC***.

108.    The next day, Redwire's stock plummeted 29%. The decline in the price of Redwire's stock was a direct result of the nature and extent of Defendants' fraud (or results of its fraud) being revealed to investors and the market. The timing and magnitude of Redwire's stock price declines negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic, or industry factors, or other matters unrelated to Defendants' fraudulent conduct.

109.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Redwire's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Redwire securities and that the corrective disclosure

of the Defendants' misrepresentations and omissions would cause the price of Redwire securities to decline.

## B.    Materialization of Risks

110.   As detailed herein, Defendants made misleading statements and omitted material information to deceive Lead Plaintiff, investors and GPAC shareholders, which artificially inflated the price of Redwire stock and operated as a fraud or deceit on Lead Plaintiff, investors and shareholders by failing to disclose and misrepresenting the adverse facts detailed herein

111.   Redwire's financial results and future business prospects were based upon false and misleading statements and omissions regarding managements regarding its integrity and honesty.

112.   Throughout the period during which Lead Plaintiff and investors purchased Redwire securities, the prices of these securities were artificially inflated as a result of Defendants' materially false and misleading statements and omissions as alleged herein.

113.   Defendants' false statements served to conceal the risks that the fraud scheme would be publicly exposed, as well as the risks related to Defendants' dissemination of false and misleading statements in investor materials, press releases, interviews, and social media posts.

114.   It was foreseeable that public exposure of the material information would lead to negative financial to Defendants, including unforeseen losses related expenses needed to address the whistleblowers complaint, the investigation, and remediation efforts, as well as the costly termination of Defendant Read. The materialization of any one or more of these factors would lead to a significant decline in the price of Redwire's stock.

115.   The value of Redwire stock was negatively impacted when the concealed risks materialized in at least the following respects: Defendants' results for the full fiscal year 2021 included an unexpected increase in net losses from $47.2 million to $61.5 million for 2021 compared to the Successor 2020 Period. Defendants stated the Net loss was driven by expenses associated with taking the Company public and, to a lesser extent, costs associated with developing and supporting the new business.

116.   These revelations, along with the additional material weaknesses in internal controls, caused a 29% drop in Redwire's stock price.

117.   The declines in the price of the Redwire stock and resulting losses are directly attributable to the materialization of risks that were previously misrepresented or concealed by the Defendants.

118.   Had Lead Plaintiff and other investors known of the material adverse information not disclosed by the Defendants or been aware of the truth behind their

material misstatements, they would not have purchased the Redwire stock at artificially inflated prices.

119.   As a result of their purchases of the Redwire stock, Lead Plaintiff, and other members of the Class, suffered economic loss and damages, as contemplated by the federal securities laws.

120.   During the Class Period, Plaintiff and the Class purchased Redwire's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VIII.  CLASS ACTION ALLEGATIONS

121.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Redwire securities between March 25, 2021 and March 31, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

122.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Redwire's shares actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Redwire shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Redwire or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

123.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

124.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

125.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether Defendants' acts as alleged violated the federal securities laws;

b.    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c.    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e.    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.    whether the prices of the Company's securities and the securities of Redwire during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

g.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

126.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

127.   The market for Redwire's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Redwire's securities traded at artificially inflated prices during the Class Period. On October 26, 2021, the Company's share price closed at a Class Period high of $13.19 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Redwire's securities and market information relating to Redwire, and have been damaged thereby.

128.   During the Class Period, the artificial inflation of Redwire's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Redwire's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Redwire and its business, operations, and prospects, thus causing the price of the Company's securities to be

artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

129. At all relevant times, the market for Redwire's securities was an efficient market for the following reasons, among others:

      a.    Redwire shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

      b.    As a regulated issuer, Redwire filed periodic public reports with the SEC and/or the NYSE;

      c.    Redwire regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

      d.    Redwire was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports and articles were distributed to the sales force and certain customers of their respective

brokerage firms. Each of these reports was publicly available and entered the public marketplace.

130.   As a result of the foregoing, the market for Redwire's securities promptly digested current information regarding Redwire from all publicly available sources and reflected such information in Redwire's share price. Under these circumstances, all purchasers of Redwire's securities during the Class Period suffered similar injury through their purchase of Redwire's securities at artificially inflated prices and a presumption of reliance applies.

131.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    NO SAFE HARBOR

132.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Redwire who knew that the statement was false when made.

## FIRST CLAIM

## VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

133.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

134.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

135.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated

as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

137.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

138.   Defendant Redwire is liable for all materially false and misleading statements made during the Class Period, as alleged above. The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other

personnel of the Company to members of the investing public, including Plaintiff and the Class.

139.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

140.   Had Lead Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

141.   As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial. 311. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**SECOND CLAIM**

**VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
AGAINST THE INDIVIDUAL DEFENDANTS**

142.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

143.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

144.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

145.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were

"controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

146.   The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

147.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Lead Plaintiff as the Class Representative;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury.


Dated: June 17, 2022          Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: *s/ Reed R. Kathrein*
Reed R. Kathrein (Fla. Bar. No. 262161)
Lucas E. Gilmore (admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: reed@hbsslaw.com
Email: lucasg@hbsslaw.com

Steve W. Berman (admitted *pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com

*Lead Counsel for Lead Plaintiff*
*Jared Thompson*

Brian Schall (*pro hac vice* forthcoming)
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*
*Jared Thompson*

David M. Buckner (Fla. Bar No. 60550)
BUCKNER + MILES
2020 Salzedo Street, Suite 302
Coral Gables, FL 33134
Telephone: (305) 964-8003
Facsimile:  (786) 523-0485
Email: david@bucknermiles.com

*Liaison Counsel for Lead Plaintiff*
*Jared Thompson*