# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

JED LEMEN, Individually and On Behalf of All Others Similarly Situated,

                    Plaintiff,

      v.

REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ,

                    Defendants.

Case No. 3:21-cv-01254-TJC-PDB

CLASS ACTION

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Reed R. Kathrein (Fla. Bar. No. 262161)
Lucas E. Gilmore (admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: reed@hbsslaw.com
Email: lucasg@hbsslaw.com

Steve W. Berman (admitted *pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com

*Lead Counsel for Lead Plaintiff*
*Jared Thompson*

011081-11/2047948 V1

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ..................................................................1

II. ARGUMENT.........................................................................................6

    A.  Defendants' Statements Were False and Material ...............................6

    B.  The Complaint Adequately Alleges a Strong Inference of
        Scienter .................................................................................17

    C.  The Complaint Adequately Alleges Control Person
        Liability ................................................................................20

III. CONCLUSION......................................................................................20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Acerra v. Trulieve Cannabis Corp.*,
2021 WL 1269919 (N.D. Fla. Mar. 18, 2021)......................................................10

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) .................................................................16

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012)..................................................................16

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ......................................................................11, 12

*In re ChoicePoint, Inc. Sec. Litig.*,
2006 WL 8429145 (N.D. Ga. Nov. 21, 2006) .....................................................15

*In re Ebix, Inc. Sec. Litig.*,
898 F.Supp.2d 1325 (N.D. Ga. 2012)....................................................................7

*In re Electrobras Sec. Litig.*,
245 F.Supp.3d 450 (S.D.N.Y. 2017) ..............................................................12, 18

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019).................................................7, 12, 13, 20

*FindWhat Inv'r Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) .........................................................................6, 7

*Fresno Cnty. Emps' Ret. Assoc. v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) .................................................................18

*Gross v. GFI Grp., Inc.*,
784 Fed. Appx. 27 (2d Cir. 2019)........................................................................12

*Gross v. Medaphis Corp.*,
977 F.Supp. 1463 (N.D. Ga. 1997).................................................................7, 9, 14

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) ..............................................................10

*Hartel v. GEO Grp., Inc.*,
  2021 WL 4397841 (S.D. Fla. Sept. 23, 2021)....................................11

*Hessefort v. Super Micro Computer, Inc.*,
  2021 WL 1169906 (N.D. Cal. Mar. 29, 2021) ...................................17

*Luczak v. Nat'l Beverage Corp.*,
  812 F. App'x 915 (11th Cir. 2020).........................................6, 11, 17

*Luna v. Marvell Tech. Grp.*,
  2017 WL 2171273 (N.D. Cal. May 17, 2017)......................17, 18, 19

*Meide v. Pulse Evolution Corp.*,
  2020 WL 5350325 (M.D. Fla. Sept. 4, 2020)................................12, 13

*Mich. Carpenters' Pens. Fund v. Rayonier Advanced Materials, Inc.*,
  2019 WL 1429667 (M.D. Fla. Mar. 29, 2019) ...................................12

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010) ...................................................................12

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014) ...................................................18

*In re Petrobras Sec. Litig.*,
  116 F.Supp.3d 368 (S.D.N.Y. 2015) ......................................12, 14, 16

*In re Premiere Techs. Inc.*,
  2000 WL 33231639 (N.D. Ga. 2000).............................................7, 13

*Santa Fe Indus. v. Green*,
  430 U.S. 462 (1977)................................................................................6

*SEC v. Radius Capital Corp.*,
  2012 WL 695668 (M.D. Fla. Mar. 1, 2012) .........................................6

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir.1992) .................................................................13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)....................................................................................................20

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
  2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) .......................................................12

## I.   PRELIMINARY STATEMENT

Defendants' motion presents two questions. First, in seeking to bring Old Redwire public, through a merger with a Special Purpose Acquisition Corporation (SPAC), while disclosing specific deficiencies in internal control over financial reporting (ICFR or internal controls) Defendants claimed to be remediating, did Defendants materially mislead investors by repeatedly emphasizing and reasserting the qualifications of management overseeing this remediation, when omitting that, in fact, management was merely playing lip-service to Redwire's ICFR.[1] Second, does the finding by Redwire's Audit Committee that the lip-service emanated from a "tone at the top", along with the dismissal of the CFO, resulting in another projected year of remediation, strongly infer knowledge or recklessness by Redwire's CEO and CFO. The answer to both these questions is a clear yes.

Defendants counter that the repeated statements about managements' qualifications and commitment to corporate honesty and ethics are immaterial puffery that no reasonable investor would rely upon in deciding to invest in (or approve the merger with) Old Redwire. MTD at 1.[2] Defendants also argue that any

---

[1] An in-depth description of SPACs, how they operate, and the importance of ICFR, can be found in the SEC's Mar. 31, 2021, Statement of the Office of the Chief Accountant, Financial Reporting and Audit Considerations of Companies Merging with SPACS. https://www.sec.gov/news/public-statement/munter-spac-20200331.

[2] All citations to "MTD" refer to ECF 48. All ¶ citations refer to Plaintiffs First Amended Complaint (June 17, 2022). ECF 47. All citations to "Ex." refer ECF 49.

011081-11/2047948 V1                            - 1 -

disclosure of "tone at the top" was excused, since they disclosed the "management team [had] limited experience managing a public company" and "limited resources" and "limited personnel" causing "insufficient segregation of duties in our finance and accounting functions." MTD at 2.

Defendants' arguments miss the point. Disclosure of an inappropriate "tone at the top" would have been the death knell to investor support for the merger. "A poor tone at the top is a strong predictor of aggressive or questionable financial reporting….If the tone at the top is at all suspect, a prudent investor will sell first and ask questions later or not even buy."[3] ¶¶5, 85. It was Old Redwire's "experienced" management, committed to "honesty and integrity" in ICFR upon whom Defendants asked investors to put their faith (¶46), not only to running the the new company after the proposed merger, but in "working to remediate the material weaknesses as efficiently and effectively as possible". ¶¶50-52. Or as Defendants pitched: "The Right Team for the Right Mission." ¶¶48, 57. But when Redwire

---

[3] Alfred M. King CMA, CFM, "Tone at the Top: Why Investors Should Care," STRATEGIC FINANCE (March 2013), https://sfmagazine.com/wp-content/uploads/sfarchive/2013/03/Tone-at-the-Top-Why-Investors-Should-Care.pdf; Peter Driscoll, Director, Office of Compliance Inspection and Examinations, SEC, The Role of the CCO – Empowered Senior and With Authority, (Nov. 19, 2020) in https://www.sec.gov/news/speech/driscoll-role-cco-2020-11-19 ("Without a culture that truly values the CCO, supported by a sincere 'tone at the top' by senior management, a firm stands to lose the hard-earned trust of its clients, investors, customers and other key stakeholders.")

disclosed that this "Right Team" merely played lip-service to ICFR by failing "to consistently message and set certain aspects of an appropriate tone at the top" and "***reinforce the need for compliance with certain of the Company's accounting and finance policies*** and procedures, including reinforcement of appropriate communication" resulting in at least another year of remediation (¶¶2, 14, 21, 25, 69, 77-79) Redwire's stock plummeted almost 30% (¶¶20, 76, 108, 116) and Defendant CFO Read was terminated (¶24, 34, 81, 95-97).

Defendants thus avoid talking about "tone at the top", mentioning it only three times. But "tone at the top" matters.[4] ¶5 "Tone at the top," is a phrase used by auditors to describe management's attitude towards ICFR, honesty and ethics. ¶4.[5] The phrase gained popularity through its use in the Sabanes-Oxley Act of 2002, passed in the wake of a number of highly publicized accounting scandals, such as Enron, Worldcom and Adelphia. *Id.* "Tone at the top" delineates what management should embody and not merely pay "lip service" to compliance and upholding ethics. It states that those at the top of the organization should be honest, show integrity, and uphold an ethically correct corporate culture. *Id.*

---

[4] *See*, Cynthia A. Glassman, SEC Commissioner, Remarks On Sarbanes-Oxley's Lessons For Broker Dealers at the NASD Fall Securities Conference U.S. Securities and Exchange Commission Scottsdale, Arizona (Oct. 17, 2003), in 2003 WL 23638640 at *1.

[5] "Tone at the Top" CORPORATE FINANCE INSTITUTE (Oct. 13, 2022), https://corporatefinanceinstitute.com/resources/knowledge/finance/tone-at-the-top/.

A company with poor tone results in a company that is more likely to display unethical behavior, engage in fraudulent activity and not support internal controls. ¶5. Where a company's management team disregards internal controls by not complying with the company's accounting policies, employees, seeing this conduct, will likely tend to mimic senior management's behaviors. This results in an organization that is more prone to engaging in fraudulent activities, thereby increasing investment risk. *Id.* According to leading global auditor Deloitte Touche Tohmatsu Limited, "[t]he tone at the top sets an organization's guiding values and ethical climate. Properly fed and nurtured, it is the foundation upon which the culture of an enterprise is built. Ultimately, it is the glue that holds an organization together."[6] Unbeknownst to investors, Redwire lacked this "foundation" thereby making investments in Redwire far riskier than originally contemplated.

The Securities and Exchange Commission ("SEC") has reminded companies merging with SPACS that a commitment to ICFR is required and proper "tone at the top" is paramount to this commitment.[7] In fact, Defendants' pitch to GPAC investors, in seeking their investment and vote, and to New Redwire investors, in

---

[6] "The first ingredient in a world-class ethics and compliance program" DELOITTE PERSPECTIVES, https://www2.deloitte.com/us/en/pages/risk/articles/tone-at-the-top-the-first-ingredient-in-a-world-class-ethics-and-compliance-program.html (last accessed Oct. 14, 2022).

[7] *See*, Statement of the OCA, supra at fn. 1.

seeking to sell their own shares in a new offering after the approved merger (¶68), was all about the "tone at the top". Only after the successful September shareholder vote when a whistleblower came forward under the newly adopted whistleblower policy (¶64-67, 94) did hints of the truth come out. Just two months after the merger, New Redwire could no longer file any financial reports, and the new audit committee directed an investigation. ¶¶70-77. Redwire's stock plummeted 8.3%. (¶¶18, 73) Half a year later, the Audit Committee disclosed findings that "disclosure controls and procedures were not effective as of September 30, 2021, [not just 2020] due to … material weaknesses in [IFCR]" adding that "we did not maintain an effective control environment, as *certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top*. Specifically, *certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures*, including reinforcement of appropriate communication." ¶77. Defendants further added that remediation would require at least another year beyond previous expectations (¶¶78, 80) emphasizing "*investors may lose confidence in our financial reporting*" ¶78. Defendants also revealed "the design of [ICFR] for the Company post-Merger has required and will continue to *require significant time and resources from management and other personnel. As a result, management was unable, without incurring unreasonable effort or expense to*

***conduct an assessment of [Redwire's] [IFCR] as of December 31, 2021*.**" ¶79-80.

Defendants expanded their list of remediation efforts (¶78) and stated they could not perform an assessment of ICFR in their annual report, indicating their disastrous revelations could be just the tip of the iceberg. ¶80. Redwire' stock plummeted another 29%. ¶¶20, 76. Shortly thereafter, Defendant CFO Read was terminated. ¶¶81, 95-97.[8]

## II.    ARGUMENT

### A.    Defendants' Statements Were False and Material

The "fundamental purpose" of § 10(b) is to implement a "philosophy of full disclosure." *Santa Fe Indus. v. Green,* 430 U.S. 462, 478 (1977). "Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Luczak v. Nat'l Beverage Corp.,* 812 F. App'x 915, 923 (11th Cir. 2020); *see also SEC v. Radius Capital Corp.*, 2012 WL 695668, at \*6 (M.D. Fla. Mar. 1, 2012). Critically, "a defendant may not deal in half-truths." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011). "By voluntarily revealing one fact about its operations, a duty arises for the

---

[8] Though Defendants' Appendix A is taken out of the surrounding context, attached is Plaintiffs' Revision adding additional statements ignored by Defendants and the reason they are misleading.

corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'" *Id.*

"[F]alse or misleading statements or omissions concerning material facts about management or internal operations may be actionable, such as when a defendant 'makes certain statements while that defendant knows that *existing mismanagement* makes those statements false or misleading.'" *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1217 (N.D. Ga. 2019) *citing In re Ebix, Inc. Sec. Litig.*, 898 F.Supp.2d 1325, 1340 (N.D. Ga. 2012) (*quoting In re Premiere Techs. Inc.*, 2000 WL 33231639, at *14 (N.D. Ga. 2000)). *See also Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1473 (N.D. Ga. 1997)). Here, Defendants repeatedly emphasized management's qualifications and commitment to honesty and integrity in the Code of Conduct/Ethics and to remediate ICFR deficiencies in order to persuade investors to invest in the pre-merger SPAC and vote to approve the merger with Old Redwire.

The SPAC had a mere 18 months to find an acquisition to bring public before GPAC would have to return the money it raised from investors. ¶¶7, 36-39. The merger would allow Old Redwire's, Cannito and Read to raise more funds to operate and to multiply their compensation. ¶¶6, 8, 41-42, 86-7, 89, 92 (bringing Cannito a four-fold increase in compensation and Read a three-fold increase). Old Redwire, itself, would get as much as $170 million in cash to enable it to continue operations.

¶8. AEI, of which Cannito was an operating partner, would receive $75 million in cash, 37.2 million shares of New Redwire common stock, and 2 million warrants (¶8) with another offering for Defendants to sell their shares immediately after the merger. ¶68

To sell the merger to the SPAC investors, Defendants repeatedly emphasized and reasserted, in SEC filings and investor presentations, the quality of Redwire's "proven" and "strong" management as an "established ... acquirer of choice" (¶¶46, 50) with "Best-In-Class Private and Public Management", including Defendant CFO Read's "30+ years of experience in operational finance", and "[f]ormer CFO of [several companies] and business units within the public company Teledyne (NYSE:TDY)" and Cannito's "25+ years of experience", including as "[f]ormer CEO of Polaris Alpha leading up to the Parsons acquisition" and as "Operating Partner at [AEI]…" ¶¶48, 50-51, 57-63. Defendants also repeatedly identified Old and New Redwires' Codes of Conduct/Ethics "applicable to all of the Company's directors, officers and employees … to: promote honest and ethical conduct, … promote the full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission (the "SEC") … promote compliance with applicable governmental laws, rules and regulations … deter wrongdoing; and require prompt internal reporting of breaches of, and accountability for adherence to, this Code."

¶¶10, 12, 49 (March 29, 2021), 53 (May 12, 2021), 64-65 (September 2, 2021), 68 (September 24, 2021)

Defendants argue, however, that certain statements about management qualifications and Old Redwire's strong financial footing are immaterial because they disclosed certain internal control deficiencies. MTD at 10-11. In the May 12, 2021 Proxy Statement (issued to obtain investor approval) Defendants identified specific material weaknesses in internal controls they represented they were remediating—namely inexperienced and limited personnel and thus an insufficient segregation of duties in finance and accounting functions. ¶52. Defendants repeatedly reassured investors that Old Redwire was "***working to remediate the material weaknesses as efficiently and effectively as possible*** and expect full remediation will likely go beyond December 31, 2021." *Id.*[9] As admitted by Defendants, "[a]fter GPAC and Old Redwire disclosed these risks, GPAC's stockholders approved the Business Combination on September 2, 2021." ¶63. MTD at 5. *See also* ¶11.

But those disclosures were specific and tailored to emphasize a new and growing company that needed more personnel and training. MTD at 10-11. These

---

[9] *See also* MTD at 4-5 repeating these assurances on May 11, 2021 Form S-4 Registration Statement, August 5, 2021 Amendment and September 23, 2021 Registration Statement (Exs. 1-3) in addition to the May 12, 2021 Proxy Statement set forth in the Complaint.

are far different risks from the undisclosed risk of management, overseeing remediation, merely paying lip-service to the ICFR deficiencies. In truth, according to New Redwire's Audit Committee findings, Old and New Redwire "did not maintain an effective control environment, as certain members of senior management failed to consistently message and set certain aspects of an appropriate *tone at the top*. Specifically, certain members of senior management ***failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures***, including reinforcement of appropriate communication" ¶¶14, 79. The consequences of these very different disclosures were not minimal. For example, Defendants admitted "the design of internal controls over financial reporting for the Company post-Merger ***has required and will continue to require significant time and resources from management and other personnel***.[10] As a result, ***management was unable, without incurring unreasonable***

---

[10] *Acerra v. Trulieve Cannabis Corp.*, 2021 WL 1269919, at *5 (N.D. Fla. Mar. 18, 2021) (MTD at 10) is inapplicable as the complaint did not allege facts suggesting investors cared about the questionable facilities or even that they understood they were, unlike a deficient "tone at the top", which is well understood. *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) (MTD at 10-11) is inapplicable as the claimed false statements there were "assumptions" "underlying a projection or economic forecast". Management's qualifications and their dedication or honesty, integrity and efforts to remediate internal controls deficiencies, are not assumptions but present tense. Even if forward looking, there was no meaningful cautionary language. Defendants' "tone at the top" or lip-service to ICFR are not "risks of a significance similar to the risk actually realized" and revealed only after a Whistleblower came forward. *Id.*

011081-11/2047948 V1    - 10 -

*effort or expense to conduct an assessment of [Redwire's] internal control over financial reporting as of December 31, 2021.*" Remediation would take at minimum another year. ¶¶2, 22, 80. And Defendant CFO Read, whose qualifications were consistently emphasized to investors in order to persuade a shareholder vote in favor of the merger, was terminated. ¶¶81, 95-97.[11]

Defendants' argument that statements about management, remediation efforts and dedication to ICFR, honesty and ethics, are non-actionable puffery is wrong. "A conclusion that a statement constitutes puffery doesn't absolve the reviewing court of the duty to consider the possibility—however remote—that in context and in light of the 'total mix' of available information, a reasonable investor might nonetheless attach importance to the statement … Accordingly, when considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" (internal citations omitted). *Carvelli v. Ocwen Fin. Corp.,* 934 F.3d 1307, 1320 (11th Cir. 2019); *Luczak*, 812 F. App'x at 924 (same).

---

[11] Defendants' argument that statements about management's qualifications were forward looking is not supported. *Hartel v. GEO Grp., Inc.*, 2021 WL 4397841, at *5 (S.D. Fla. Sept. 23, 2021) has nothing to do with statements about management but must be a mis-cite as the referenced statement in a company disclaimer about objectives being forward-looking.

"[W]hen (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company." *In re Electrobras Sec. Litig.*, 245 F.Supp.3d 450, 463 (S.D.N.Y. 2017) *citing In re Petrobras Sec. Litig.*, 116 F.Supp.3d 368, 381 (S.D.N.Y. 2015).[12] Accordingly, "there was a substantial likelihood that these statements, made to reassure investors, would be important to a reasonable person in considering whether to buy or sell shares of [Redwire securities]." *Id. citing Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010). ("First and foremost, what the Fund investors could not divine from the disclosures was that they were at the mercy of a faithless fiduciary.") *Compare Equifax*, 357 F. Supp. 3d at 1223-24 ("[T]he context of … 'aspirational' statements matters: the Defendants repeatedly stated that cybersecurity, an important aspect of their business, was a top

---

[12] *Meide v. Pulse Evolution Corp.*, 2020 WL 5350325 (M.D. Fla. Sept. 4, 2020), *Mich. Carpenters' Pens. Fund v. Rayonier Advanced Materials, Inc.*, 2019 WL 1429667 (M.D. Fla. Mar. 29, 2019), *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) and *Carvelli*, 934 F. 3d 1307 are distinguishable. None dealt with repeated and emphasized statements about management's qualities and integrity to lead and operate the Company and a specific representation (and plans) that Defendants were remediating deficient ICFR, while omitting that Defendants in fact only played lip-service to ICFR. None dealt with a non-disclosure of an inappropriate "tone at the top" that undercut everything said. Context matters. *Gross v. GFI Grp., Inc.*, 784 Fed. Appx. 27, 30 (2d Cir. 2019) merely held a "general statement that does no more than state a goal … in no way amounts to a specific promise or guarantee, nor could it."

priority for senior management, despite the fact that Equifax failed to employ some of the most elementary cybersecurity practices. Even if, in a vacuum, each of these statements seems like a meaningless, corporate vaguery, when taken together a reasonable investor would rely upon them to conclude that Equifax made cybersecurity a serious priority.")[13] As in the cases above, Redwire's investors could not divine from the disclosures the faithlessness of the highly touted senior management to ICFR.

*Premiere* is instructive. There the Court found Defendants put "in play" the company's infrastructure, personnel and management issues when they touted "continued diligence in managing our core business," the "depth and experience" of senior management "to manage the acquisition process." *Id.* at 15 *citing Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 282 (3d Cir.1992) (finding labels such as "adequate", "cautious" and "conservative" can be the basis of liability.) *See also Equifax*, 357 F.

---

[13] Cannito's statements about management merger experience (MTD at 12) are not in isolation, but expand other statements in the broader context of gaining confidence in the leadership to garner support for the shareholder vote. ¶¶54-58, It is not protected opinion because it, and the surrounding other statements about management contain the embedded fact that management does not only pay lip-service to its duties and ICFR. It is not like the boasts in *Meide,* 2020 WL 5350325 at *8, *13 ("years ahead of the competition", "exclusive" opportunity, "great deal", and an executive who "had DuPont blood and he gets things done"). That Cannito actually held the opinion is not credible. *See* scienter Section II C. below.

GPAC's President/CFO's statements extolling management (MTD at 13 citing ¶61) were published by Defendant Redwire in an SEC filing and are therefore those of Redwire (formerly GPAC ¶32). Accordingly, GPAC's CFO scienter is irrelevant.

Supp. 3d at 1224 (Equifax's "aspirational" representations that its cybersecurity efforts were extensive, a top priority for senior management" or that it was "committed" to data security were actionable when "Equifax failed to employ some of the most elementary cybersecurity practices."); *Petrobras*, 116 F. Supp. 3d at 381 (Court could not say "statements regarding its general integrity and ethical soundness were immaterial as a matter of law.")[14]

Thus, Defendants put the need to disclose their deficient "tone at the top" "in play" when Defendants made half-truth claims of a "strong financial position foundation" and Redwire "can go on in perpetuity without any problem" (MTD at 13-15 citing ¶¶46, 47, 61, 62.) while touting managements' qualifications and representing management was ***"working to remediate the material weaknesses as efficiently and effectively as possible*** and to "***expect full remediation***". Still, these half-truths were not alone, but included other statements embedding an appropriate

---

[14] The statements in *Petrobras* were "aimed at assuring the highest ethical standards", that it "adopts the best corporate governance practices", that it undertook to "conduct its business with transparency and integrity" and to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions", that it was "fully committed to implementing a fair and transparent operation" and "will invest all of our resources with efficiency and discipline", and that its Business and Management Plan "is underpinned by realism, precise targets and rigorous project management with capital discipline," *Petrobras* 116 F. Supp. 3d at 381; *See also Gross*, 977 F. Supp. at 1467-68. ("[I]immense competitive advantage", progressing well, "outperforming expectations" were actionable when Company was experiencing severe operational problems.)

"tone at the top", including "proven, solidly profitable" with "proven management" (¶46), "provide[s] *the infrastructure* that fuels expansion, infrastructure that delivers new possibilities" (¶47), "we provide a tremendous amount of … *financial knowledge as public company executive*…" "and how to finance it appropriately… [and] *how to control the nature of what you need to control* and properly disclosed [sic]" (¶61), "our strategy from an investor perspective is to offer a company that has a *blue-chip foundation* ... That is our term for a *conservative company* …" ¶62.

Similarly, Defendants put "in play" their deficient "tone at the top" by claiming adherence to a Code of Conduct/Ethics "to promote honest and ethical conduct"; to "comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records". The Codes professed the CEO and CFO would "familiarize" themselves "with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company" and "promptly bring to the attention of the Chairman of the Board any … significant deficiencies in the design or operation of internal and/or disclosure controls that could adversely affect the Company's ability to record, process, summarize and report financial data". ¶¶49, 65. All omitted the reality of the "tone at the top". *Compare In re ChoicePoint, Inc. Sec. Litig.*, 2006 WL 8429145, at *2, *6 (N.D. Ga. Nov. 21, 2006) ("ChoicePoint operates with the highest

professional, ethical, legal and socially responsible standards and [uses] information responsibly to create a safer, more secure society" when in fact Defendants knew of inadequate security procedures, rendering the statements false or misleading.) *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (holding that aspirational statements about a code of conduct were material because "they were made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern"); *In re Petrobras*, 116 F. Supp. 3d at 377, 381 (When offering documents incorporated Code of Ethics, pursuant to which it undertook to "conduct its business with transparency and integrity," "a reasonable investor could rely on them as reflective of the true state of affairs at the [c]ompany.")

Even if the Court were to conclude that these statements are immaterial puffery, Defendants ignore that the disclosures concerning deficient ICFR, and remediation efforts, alone, were materially misleading by omitting the deficient "tone at the top". ¶¶1, 12, 22, 52.[15]

---

[15] "A repeated utterance, even on a promise of progress, can become misleading where repetition becomes a statement of current and ongoing compliance." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 759 (S.D. Tex. 2012) ("Plaintiffs have alleged sufficient facts to call into question whether BP and its corporate officers and directors were in fact implementing the process safety reforms as they represented."). These statements are repeated in Ex. 1 (May 11, 2021 Registration Statement) ECF 49-1 at 23, 30-32, 50-51; Ex. 2 (August 4, 2021 Registration

**B.    The Complaint Adequately Alleges a Strong Inference of Scienter**

Under the PSLRA the plaintiff must "plead 'with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *Luczak*, 812 F. App'x at 924. The inference need only "be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*.

Defendants all but ignore that the Audit Committee found the lip-service to ICFR emanated from a "tone at the top" by "certain senior management". ¶75 District courts have inferred scienter from a company's admission of an inappropriate "tone at the top". *See Luna v. Marvell Tech. Grp.*, 2017 WL 2171273, at *4-5 (N.D. Cal. May 17, 2017) (strong inference of scienter against CEO where company admitted senior management employed an inappropriate "tone at the top", CEO was terminated shortly after audit committee's investigation, and company provided remedial training to senior management and executives after CEO's termination); *Hessefort v. Super Micro Computer, Inc.*, 2021 WL 1169906, at *12-13 (N.D. Cal. Mar. 29, 2021) (strong inference of scienter against CEO where company found inappropriate tone at the top involving management, CEO had control over key decisions, CEO evaluated internal controls and CEO had a financial

---

Statement) ECF 49-2 at 23, 30-32, 50-51; Ex. 3 (September 23, 2021 Registration Statement) ECF 49-3 at 19-20, 25-27.

motive to conceal fraud); *Fresno Cnty. Emps' Ret. Assoc. v. comScore, Inc.*, 268 F. Supp. 3d 526, 552-53 (S.D.N.Y. 2017) (strong inference of scienter based on disclosure of internal control deficiencies involving inappropriate "tone at the top" plausibly "flowed from the top-down").

Here, as in *Fresno*, the Defendants had control over and made the statements about the ICFR deficiencies and remediation efforts. ¶35. To make those statements Redwire (previously GPAC), Cannito and Read admitted they reviewed the ICFR, were taking steps to remediate and were documenting the processes and procedures. ¶¶99-102. As experienced businesspersons from multiple private and public companies they and Redwire undoubtedly understood the importance of ICFR and "tone at the top". ¶98. Defendants were also the two highest of only three members identified as senior management: Cannito, Read and Rush. ¶¶48, 88, 91. *Compare Eletrobras*, 245 F. Supp. 3d at 468. ("high-ranking positions are probative in large part because [Defendants] had responsibility and oversight over the very topics about which…Defendants misled investors."); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) ("A lack of adequate internal controls may support the inference of scienter" of the CEO and CFO).

The inference is further buttressed by the termination of CFO Read shortly after the Audit Committer findings were complete. ¶¶95-97 *Id.* at 632-33. *Compare Luna* 2017 WL 2171273, at *5 (allegations of "an inappropriate tone at the top"

created a strong inference of scienter when combined with termination of executives and remedial actions). Here, as in *Luna*, (1) Defendant Read was terminated shortly after audit committee announced the results of its investigation, (2) the termination was unusual as Read was one of the most two highly touted members of management meant to lead Redwire's future, (3) Read announced no future plans (¶95) but rather the press release merely stated Read was "transitioning" out (Ex. 6); (4) Read was given a hefty termination package conditioned on an agreement to remain silent typical of unilateral termination ¶95, (5) the termination was consistent with the new "Remediation Plans" ¶78[16], and (6) consistent with Redwire's need to create confidence in Redwire's management ahead of the upcoming new offering of 1.7 million shares announced that same day as it announced Reads termination, ¶¶95, 97.

Defendants also had strong motives supporting an inference of scienter, including an infusion of cash to grow the continued business, not having to return investor funds, and significant personal financial gain. ¶¶7-8, 39, 84-89, 92.[17]

---

[16] Redwire was "in the process of implementing measures … that led to the material weaknesses, including tone at the top and … and had reviewed its "personnel structure …." ¶78.

[17] Contrary to Defendants' argument (MTD at fn4) the Complaint pleads with particularity that Redwire needed access to new capital or otherwise benefited from becoming a public company. ¶62 ("what you are going to see from there is we are going to use that additional capital to continue what we've been doing already and

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007) ("While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, … the absence of a motive allegation is not fatal.")

Finally, scienter is also adequately pled against Redwire. As high-ranking corporate officials, Defendant Cannito and Read's scienter is imputed to Redwire f/k/a GPAC. *See Eletrobras*, 245 F. Supp. at 469 (reasoning that "because the SAC properly alleges scienter against two key officers of Eletrobras, it necessarily alleges scienter against Eletrobras itself").

## C.      The Complaint Adequately Alleges Control Person Liability

Defendants do not contest the adequacy of the allegations of control. Therefore, because the Section 10(b) allegations are sufficient against Cannito and Read, there is Section 20(a) liability for statements made by Old Redwire (GPAC and New Redwire. *Equifax,* 357 F. Supp. 3d at1252.

## III.   CONCLUSION

For the foregoing reasons, Defendants motion to dismiss should be denied.

---

that's bringing more capabilities into this middle market, pure-play space infrastructure company of scale in a way that continues to propel the industry forward…"). *See also* MTD Ex. 1, ECF 49-1 at 7 and Ex. 7, ECF 49-7 at 7 (identifying further cash intensive M&A goals).

Dated: October 17, 2022

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: *s/ Reed R. Kathrein*
  Reed R. Kathrein (Fla. Bar. No. 262161)
Lucas E. Gilmore (admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: reed@hbsslaw.com
Email: lucasg@hbsslaw.com

Steve W. Berman (admitted *pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com

*Lead Counsel for Lead Plaintiff*
*Jared Thompson*

Brian Schall (*pro hac vice* forthcoming)
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*
*Jared Thompson*

David M. Buckner (Fla. Bar No. 60550)
BUCKNER + MILES
2020 Salzedo Street, Suite 302
Coral Gables, FL 33134
Telephone: (305) 964-8003
Facsimile:  (786) 523-0485

Email: david@bucknermiles.com

*Liaison Counsel for Lead Plaintiff*
*Jared Thompson*

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2022, I electronically filed the foregoing document using the CM/ECF system, which will send notice of this filing to all counsel of record.

*/s/    Reed R. Kathrein*

**Plaintiff's Revised Appendix A to Defendants' Motion to Dismiss**

| No. | Compl. | Date of Statement | Statement | Reason Misleading |
|---|---|---|---|---|
| 1. | 46 | March 25, 2021<br><br>Press Release announcing Merger | (a) "***Proven management team and 50+ years*** of space heritage and deep customer relationships in space and aerospace<br><br>(b) "***Strong financial foundation*** with current revenue EBITDA, and free cash flow"<br><br>(c) "We intended to find a profitable partner ***with strong management***, powerful intellectual property and impressive organic growth"<br><br>(d) "***Redwire is a proven, solidly profitable player*** in the space community and the undisputed leader in on-orbit 3D printing, servicing, assembly, and manufacturing..."<br><br>(e) "Redwire ***has established itself as a first-mover consolidator and an acquirer of choice***, and we believe its position will be further improved as a public company" | (a) Incomplete Half Truth<br><br>(b) Incomplete Half Truth<br><br>(c) Incomplete Half Truth<br><br>(d) Incomplete Half Truth<br><br>(e) Incomplete Half Truth |
| 2. | 47 | March 25, 2021<br><br>Joint Investor Conference call transcript | (a) Redwire, "***provide[s] the infrastructure*** that fuels expansion, infrastructure that delivers new possibilities." | (a) Incomplete Half Truth |
| 3. | 48 | March 25, 2021<br><br>Investor Presentation Slide Deck | (a) Slide 6 referred to the private equity entity that created Old Redwire, AEI, and the SPAC, GPAC, as having "***Best-In-Class Private and Public Management***" and detailing AEI's and GPAC's experience.<br><br>(b) Slide 7 referred to five executives from the two sponsors who would manage or be on the Board of New Redwire (three from Old Redwire and two from GPAC) as the "***Right Team for the Right Mission***" and highlighted each executive's experience. | (a) Incomplete Half Truth<br><br>(b) Incomplete Half Truth |

011081-11/2047949 V1

| No. | Compl. | Date of Statement | Statement | Reason Misleading |
|---|---|---|---|---|
| | | | (c) Defendant CFO Read was touted as having "**30+ years of experience in operational finance**", as being the "**[f]ormer CFO of Abaco Systems, BBB Industries, Continental Motors and business units within Teledyne (NYSE:TDY)**", and "**[e]xtensive M&A background with extensive experience ranging from target identification through business integration.**" | (c) Incomplete Half Truth |
| | | | (d) Defendant Cannito was touted as having "**25+ years of experience in aerospace and defense**", including as "**[f]ormer CEO of Polaris Alpha leading up to the Parsons acquisition**" and as "**Operating Partner at AE Industrial Partners...**" | (d) Incomplete Half Truth |
| 4. | 49 | March 29, 2021 Form 10-K | (a) The Code of Ethics states, in part, that the Code: is applicable to all of the Company's directors, officers and employees (to the extent that employees are hired in the future) to: • **promote honest and ethical conduct**, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; • **promote the full, fair, accurate, timely** and understandable disclosure in reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission (the "SEC"), as well as in other public communications made by or on behalf of the Company; • **promote compliance with applicable governmental laws, rules and regulations**; • deter wrongdoing; and • require prompt internal reporting of breaches of, and accountability for adherence to, this Code. | (a) Incomplete Half Truth |
| | | | (b) Each person owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest, fair and candid. Deceit, dishonesty and subordination of principle are inconsistent with integrity. Service to the Company should never be subordinated to personal gain or advantage. Each person must: • act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or when in the Company's interests; • observe all applicable governmental laws, rules and regulations; • comply with the requirements of applicable accounting and auditing standards, as well as | (b) Incomplete Half Truth |

2

| No. | Compl. | Date of Statement | Statement | Reason Misleading |
|---|---|---|---|---|
| | | | Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records and other business-related information and data; • adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices; • deal fairly with any customers, suppliers, competitors, employees and independent contractors of the Company; • refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice; • protect the assets of the Company and ensure their proper use… <br><br> (c) The Company strives to ensure that the contents of and the disclosures in the reports and documents that the Company files with the SEC and other public communications shall be full, fair, accurate, timely and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate. Each person must: • not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent registered public accountants, governmental regulators, self-regulating organizations and other governmental officials, as appropriate; and • in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness. ***In addition to the foregoing, the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") of the Company and each subsidiary of the Company (or persons performing similar functions), and each other person that typically is involved in the financial reporting of the Company must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company. Each person must promptly bring to the attention of the Chairman of the Board any information he or she may have concerning (a) significant deficiencies in the design or operation of internal and/or disclosure controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud that involves*** | (c) Incomplete Half Truth |

011081-11/2047949 V1

| No. | Compl. | Date of Statement | Statement | Reason Misleading |
|---|---|---|---|---|
| | | | *management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.* | |
| 4a. | Ex.1 | May 11, 2021 Genesis Park Acquisition Corp. Form S-4 Registration Statement | (a) ECF 49-1 at 23*. Our reputation and ability to do business may be impacted by the improper conduct of our employees, agents or business partners.* We have implemented compliance controls, training, policies and procedures designed to prevent and detect reckless or criminal acts from being committed by our employees, agents or business partners that would violate the laws of the jurisdictions in which we operate, including laws governing payments to government officials, such as the U.S. Foreign Corrupt Practices Act ("FCPA"), the protection of export controlled or classified information, such as ITAR, false claims, procurement integrity, cost accounting and billing, competition, information security and data privacy and the terms of our contracts. This risk of improper conduct may increase as we continue to grow and expand our operations. We cannot ensure, however, that our controls, training, policies and procedures will prevent or detect all such reckless or criminal acts, and we have been adversely impacted by such acts in the past, which have been immaterial in nature. If not prevented, such reckless or criminal acts could subject us to civil or criminal investigations, monetary and non-monetary penalties and suspension and debarment by the U.S. government and could have a material adverse effect on our ability to conduct business, our results of operations and our reputation. In addition, misconduct involving data security lapses resulting in the compromise of personal information or the improper use of our customer's sensitive or classified information could result in remediation costs, regulatory sanctions against us and serious harm to our reputation and could adversely impact our ability to continue to contract with the U.S. government. | (a) Incomplete Half Truth |
| | | | (b) ECF 49-1 at 30 *Management is responsible for establishing and maintaining adequate internal control over financial reporting and for evaluating the effectiveness of our internal control over financial reporting. If we were to identify additional material weaknesses or other* | (b) Incomplete Half Truth |

011081-11/2047949 V1

| No. | Compl. | Date of Statement | Statement | Reason Misleading |
|---|---|---|---|---|
| | | | *deficiencies, or otherwise fail to maintain effective internal control over financial reporting, we may not be able to accurately and timely report our financial results, in which case our business may be harmed and investors may lose confidence in the accuracy and completeness of our financial reports.*<br><br>(c)  Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). We identified material weaknesses in our internal control over financial reporting as of December 31, 2020. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.<br><br>(d)  We identified a material weakness related to an insufficient complement of resources with an appropriate level of accounting knowledge, experience and training commensurate with our structure and financial reporting requirements to appropriately analyze, record and disclose accounting matters timely and accurately, and establish effective processes and internal controls. The limited personnel resulted in an inability to consistently establish appropriate authorities and responsibilities in pursuit of financial reporting objectives, as demonstrated by, among other things, insufficient segregation of duties in our finance and accounting functions.<br><br>(e)  ECF 49-1 at 31. We are in the process of implementing measures designed to improve our internal control over financial reporting and remediate the deficiencies that led to the material weaknesses, including hiring additional finance and accounting personnel, designing and implementing new control activities, and enhancing existing control activities….• We have commenced developing a risk assessment across the organization to | (c)  Incomplete Half Truth<br><br><br>(d)  Incomplete Half Truth<br><br><br>(e)  Incomplete Half Truth |

5

011081-11/2047949 V1

| No. | Compl. | Date of Statement | Statement | Reason Misleading |
|---|---|---|---|---|
| | | | identify risks and design new controls or enhance existing controls responsive to such risks to ensure timely and accurate financial reporting. • We are in the process of designing and implementing additional review procedures within our accounting and finance department to provide more robust and comprehensive internal control over financial reporting that address the relevant financial statement assertions and risks of material misstatement within our business processes, including implementing a comprehensive close process checklist with additional layers of reviews as well as controls around non-routine, unusual or complex transactions, including controls over the accounting for purchase business combinations. • We will continue to document our processes and procedures, including accounting policies, across the Company to ensure consistent application including controls over the preparation and review of business performance reviews, account reconciliations, journal entries and contract estimates used in determining the recognition of revenue….We are working to remediate the material weaknesses as efficiently and effectively as possible and expect full remediation will likely go beyond December 31, 2021. …If we are unable to successfully remediate our existing or any future material weaknesses or other deficiencies in our internal control over financial reporting, the accuracy and timing of our financial reporting may be adversely affected; loss of status as an emerging growth company, investors may lose confidence in our financial reporting; we could become subject to litigation or investigations by the NYSE, the SEC or other regulatory authorities. | |
| | | | (f)  ECF 49-1 at 50. ***We have identified a material weakness in our internal control over financial reporting.*** This material weakness could continue to adversely affect our ability to report our results of operations and financial condition accurately and in a timely manner. Our management is responsible for establishing and maintaining adequate internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with GAAP. Our management is likewise required, on a quarterly basis, to evaluate the | (f)  Incomplete Half Truth |

6

| No. | Compl. | Date of Statement | Statement | Reason Misleading |
|---|---|---|---|---|
| | | | effectiveness of our internal controls and to disclose any changes and material weaknesses identified through such evaluation in those internal controls. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis….*To respond to this material weakness, we have devoted, and plan to continue to devote, significant effort and resources to the remediation and improvement of our internal control over financial reporting. While we have processes to identify and appropriately apply applicable accounting requirements, we plan to enhance these processes to better evaluate our research and understanding of the nuances of the complex accounting standards that apply to our consolidated financial statements. Our plans at this time include providing enhanced access to accounting literature, research materials and documents and increased communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications*….Any failure to maintain such internal control could adversely impact our ability to report our financial position and results from operations on a timely and accurate basis. If our financial statements are not accurate, investors may not have a complete understanding of our operations. Likewise, if our financial statements are not filed on a timely basis, we could be subject to sanctions or investigations by the stock exchange on which our securities are listed, the SEC or other regulatory authorities. In either case, there could result a material adverse effect on our business. Failure to timely file will cause us to be ineligible to utilize short form registration statements on Form S-3, which may impair our ability to obtain capital in a timely fashion to execute our business strategies or issue shares to effect an acquisition. Ineffective internal controls could also cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our stock. | |
| 5. | 50 | May 12, 2021 | (a) *Experienced and Proven Management Team:* Redwire's management team has extensive experience in key aspects of the aerospace industry. | (a) Incomplete Half Truth |

011081-11/2047949 V1

| No. | Compl. | Date of Statement | Statement | Reason Misleading |
|---|---|---|---|---|
| | | Draft Registration Statement (Form S-4) | GPAC reviewed the executive team's qualifications following the initial Redwire management presentation on January 8, 2021.<br><br>(b) *Peter Cannito, Chief Executive Officer of Redwire, has proven experience in the defense, technology and government service industries, and has shown that he has a strong track record in successfully executing M&A transactions*.<br><br>(c) *Bill Read, Chief Financial Officer of Redwire, has served in that role in a number of companies, most recently for Abaco Systems from February 2018 to October 2019.*<br><br>(d) Identification of Cannito and Read's biographies as "qualifications."<br><br>(e) Redwire was "*working to remediate the material weaknesses as efficiently and effectively as possible and expect full remediation will likely go beyond December 31, 2021.*" | (b) Incomplete Half Truth<br><br>(c) Incomplete Half Truth<br><br>(d) Incomplete Half Truth<br><br>(e) Incomplete Half Truth |
| 5a. | 52 | May 12, 2021 | (a) We identified a material weakness related to an insufficient complement of resources with an appropriate level of accounting knowledge, experience and training commensurate with our structure and financial reporting requirements to appropriately analyze, record and disclose accounting matters timely and accurately, and establish effective processes and internal controls. The limited personnel resulted in an inability to consistently establish appropriate authorities and responsibilities in pursuit of financial reporting objectives, as demonstrated by, among other things, insufficient segregation of duties in our finance and accounting functions.<br><br>(b) Redwire was "*working to remediate the material weaknesses as efficiently and effectively as possible and expect full remediation will likely go beyond December 31, 2021.*" | (a) Incomplete Half Truth<br><br>(b) Incomplete Half Truth |

| No. | Compl. | Date of Statement | Statement | Reason Misleading |
|---|---|---|---|---|
| 6. | 57 | July 9, 2021<br><br>Slide Presentation filed on Form 425 | (a) The slide presentation which included the following slide on page 6 referring to these executives as the "***Right Team for the Right Mission***" and highlighted each executive experience. | (a) Incomplete Half Truth |
| 7. | 58 | July 12, 2021<br><br>Investor conference transcript | (a) "As Bill said, my name in Peter Cannito, I'm the Chairman and Chief Executive Officer, and *we have assembled a world-class team of executives here at Redwire,* that have a really diverse group of experience, everything from startups to large businesses..."<br><br>(b) "*You just heard from Bill Read, our Chief Financial Officer, he has over 30 years of experience in a variety of strategic and operational financial roles. He is the former CFO of a number of private equity-backed as well as public companies, and has extensive M&A background ranging across the whole gambit of financial integration all the way through back office experience...*"<br><br>(c) "*The one thing I really want to point out here about this team, because I believe that it is very unique and a major competitive merger for Redwire, is the amount of experience we have in mergers and acquisitions. For a high growth company that's in the phase of growth that we're in, that's highly unusual for a team with a depth of M&A experience, and in addition to our fantastic, organic growth story, that M&A experience helps us to be able to significantly accelerate growth as we execute our strategy.*" | (a) Incomplete Half Truth<br><br>(b) Incomplete Half Truth<br><br>(c) Incomplete Half Truth |
| 7a. | Ex.2 | August 5, 2021 Redwire Amendment No. 1 to Form S-4 Registration Statement | ECF 49-2 at 23, 31-32, 50-1. Same as 4a above. | Incomplete Half-Truth |
| 8. | 61 | August 12, 2021 | (a) "*We're a set of operationally oriented executives, mostly CFOs, CEOs and COOs coming from deep aerospace and aviation background...*" | (a) Incomplete Half Truth |

| No. | Compl. | Date of Statement | Statement | Reason Misleading |
|---|---|---|---|---|
| | | Interview with Austin Moeller, the senior aerospace defense analyst at Canaccord Genuity | (b) "Our focus, again, as one of the first SPACs to go public in the aerospace and aviation, *there really aren't that many of us that had both the experience, the perspective, and the scars to prove that you can make money and really good money in aerospace and aviation*." | (b) Incomplete Half Truth |
| | | | (c) "*We, as you can tell, are 10 executives with deep experience* … ." | (c) Not false, Incomplete Half Truth |
| | | | (d) "*And we provide a tremendous amount of operational, commercial and financial knowledge* as both public company executives and people who know how Redwire is going to significantly grow and how we can help that growth be both sustainable and actually even beat their expectations over the next five years...." | (d) Not false, Incomplete Half Truth |
| | | | (e) "And so for us, one of the things that's really important is *we're starting from a very strong foundation financially* that has both the nature of an operating company, which it is...." | (e) Incomplete Half Truth |
| | | | (f) "So it's not just enough *to say that you are operationally, commercially, financially strong.* Do you have the legal work around that to protect yourself as this industry grows spectacularly and Redwire does..." | (f) Incomplete Half Truth |
| | | | (g) We understand what kind of really, really good looks like I should mention, *Pete Cannito is formed a fantastic team of executives* that both have the technology and the knowledge of how to bring that technology to commercialization. *And on the other side, how to finance it appropriately, how to talk about it appropriately, how to control as a public company, the nature of what you need to control and properly disclosed. So they, again, great companies do great things well, Pete Cannito has formed a great team to do so.* | (g) Incomplete Half Truth |

10

011081-11/2047949 V1

| No. | Compl. | Date of Statement | Statement | | Reason Misleading |
|---|---|---|---|---|---|
| 9. | 62 | August 25, 2021<br><br>Cannito Interview with Jeff Carr, President of Griffin Commc'ns Group) | (a) | *"When you combine that with all the fantastic collaboration and integration as we come together as One Redwire to build out second order capabilities that are a mix of the different capabilities of the organizations that we've brought together, it's really started to take on a life of its own … ."* | (a) Incomplete Half Truth |
| | | | (b) | "Our strategy from an investor perspective is *to offer a company that has a blue-chip foundation* with venture optionality. *That's our term for a conservative company* that is revenue and cash-flow positive today but has these disruptive capabilities in the portfolio that enable us to grow faster than the broader market into the future. So, first and foremost, we are already a revenue and cash-flow positive company *that can go on in perpetuity without any problem* …" | (b) Incomplete Half Truth |
| | | | (c) | ~~"*So if it's going to be ten years instead of five, we will still be in the game, because ultimately to not only the investors but to the industry at large, we are in it for the long term and that's how we think about it. We want long term investors and we want to be a critical part of this industry well into the future.*"~~ | (c) Agree to Strike |
| 10. | 64, 65 | September 2, 2021<br><br>Revised Code of Conduct and Ethics | (a) | The stated purpose of the Code was: to deter wrongdoing and promote: 1. *honest and ethical conduct*, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; 2. *full, fair, accurate, timely and understandable disclosure* in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company... | (a) Incomplete Half Truth |
| | | | (b) | All directors, officers and employees were "required to be familiar with the Code, comply with its provisions and report any suspected violations." Amongst other things, all officers were to "ensure that the Company's books, records and accounts are *accurately maintained*" and "*take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the* | (b) Incomplete Half Truth |

11

| No. | Compl. | Date of Statement | Statement | | Reason Misleading |
|---|---|---|---|---|---|
| | | | *Company provide full, fair, accurate, timely and understandable disclosure.* | | |
| 11. | 66 | September 2, 2021<br><br>Whistleblower Policy | (a) | The policy stated that "Redwire Corporation and its subsidiaries (the "Company") *is dedicated to conducting business with efficiency, fairness and integrity and encourages behavior that will maintain the public's confidence and trust in its operations.*" | (a) Incomplete Half Truth |
| | | | (b) | Inappropriate conduct was defined as follows: "*Irregular accounting methods, financial reporting practices or auditing conduct,* including fraud or deliberate error in the preparation, evaluation, review or audit of any financial statement of the Company; fraud or deliberate error in the recording or maintaining of financial records of the Company; *deficiencies in or noncompliance with the Company's internal accounting controls*... • *Other activities in violation of the Company's Code of Conduct and Ethics or any of the Company's other policies.*" | (b) Incomplete Half Truth |
| 11a | 68 and Ex.3 | September 23, 2021 Redwire Form S-1 Registration Statement | ECF 49-3 at 19-20, 25-27. Substantially the same as 4a and 7a above. | | Incomplete Half Truth |

12