# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JED LEMEN, Individually and on
Behalf of All Others Similarly
Situated and JARED THOMPSON,
Lead Plaintiff,

      Plaintiffs,

v.                                                    Case No. 3:21-cv-1254-TJC-PDB

REDWIRE CORPORATION,
PETER CANNITO, and WILLIAM
READ,

      Defendants.

_____

# O R D E R

This is a securities fraud class action about the "tone at the top." It is before the Court on Defendants Redwire Corporation, Peter Cannito, and William Read's Motion to Dismiss the First Amended Complaint. (Docs. 48, 49). Plaintiffs[1] responded (Doc. 58) and Defendants replied (Doc. 60, 61). In the two-count amended complaint, Plaintiffs allege that Redwire and two of its senior executives, Cannito and Read, misled investors by misrepresenting their commitment and ability to manage Redwire as the company went public. See

---

[1] This case was originated by Plaintiff Jed Lemen, Plaintiff Jared Thompson has been appointed lead plaintiff, and this action involves a proposed class of investor plaintiffs. See (Docs. 36, 47). For simplicity, the Court refers to "Plaintiffs."

(Doc. 47 ¶¶ 1, 133–46). Plaintiffs thus seek to lead a proposed class of plaintiff-investors who allegedly lost money when Redwire missed reporting targets, its mismanagement was exposed, and the stock price plummeted. Id. ¶¶ 121–126.

## I. FACTS[2]

Redwire is an aerospace manufacturer and space infrastructure technology company headquartered in Jacksonville, Florida. Id. ¶ 6. Founded in 2020 through the merger of two aerospace companies, Redwire soon began acquiring companies—six in all by February 2021. Id. By December 2020, Redwire was in merger talks with a special purpose acquisition company, Genesis Park Acquisition Corp. ("GPAC"). Id. ¶¶ 7–8. By merging with GPAC—a public company formed for the purpose of acquiring or merging with other companies—Redwire sought to become a public company through a de-SPAC transaction, avoiding the arduous traditional public offering process. Id. ¶ 8. GPAC filed a registration statement with the Securities and Exchange Commission ("SEC") on March 24, 2021, and the companies jointly announced their merger plans the next day. Id. ¶¶ 8–9.

In its registration statement, press releases, presentations, and other filings, GPAC "emphasized the impeccable management, operational and

---

[2] In resolving the motion to dismiss, the Court treats the well-pleaded facts in the amended complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

financial experience and credentials of Redwire's senior management"—especially Cannito and Read. Id. ¶ 9. Thereafter, GPAC, Redwire, and their officers "affirmed their commitment to the Company's Code of Ethics" which promoted "honest and ethical conduct" and "full, fair, accurate, timely and understandable disclosure" in public statements and SEC submissions. Id. ¶¶ 10, 49, 64. On September 1, 2021, GPAC's shareholders approved the transaction and the companies merged the next day to become a single publicly traded entity: Redwire Corporation. Id. ¶¶ 11, 32, 63. The next day, Redwire began trading on the New York Stock Exchange under the ticker "RDW" and the stock price soared. Id. ¶¶ 11, 63.

The newly public Redwire continued emphasizing its management prowess and commitment to business ethics and transparency. Id. ¶ 12. Within two months of the public merger, Redwire's share price hit $13.19 and the company had a market capitalization of over $760 million. Id. ¶ 13. But the honeymoon did not last—on November 10, 2021, just over two months after going public, Redwire announced that it would postpone releasing its third quarter earnings results and that it was investigating internal allegations of accounting issues. Id. ¶ 15. The stock price fell 16% that same day. Id. ¶ 16. Five days later, on November 15, 2021, Redwire gave an update saying that it could not timely file its quarterly report, sending the stock down another 8.3%. Id. ¶¶ 17–18. More than four months later, on March 31, 2022, Redwire released

its internal audit results as part of an announcement about its fiscal year 2021 earnings. Id. ¶ 19. The announcement indicated a host of internal procedural and control failures, including "an additional material weakness" beyond the company's "previously identified internal control deficiencies." Id. The stock fell another 29%. Id. ¶ 20.

The next day, on April 1, 2022, Redwire finally filed its third-quarter report for 2021. Id. ¶ 21. The report explained that Redwire's "disclosure controls and procedures" suffered from an ineffective "control environment" and that "certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top," including failing to "reinforce the need for compliance" with Redwire's "accounting and finance policies and procedures." Id. (emphasis omitted). Fixing these problems, Redwire added, would cost an unknown amount of money, strain its resources, impact its ability to accurately and timely make future reporting obligations, and would likely spill into 2023. Id. ¶ 22. A few days later, on April 11, 2022, Redwire filed an Annual Report on Form 10-K explaining that it was unable to fully assess internal control deficiencies dating back to the GPAC merger and that to do so would incur "unreasonable effort or expense." Id. ¶ 23.

Finally, on June 1, 2022, Redwire announced that Read, its Chief Financial Officer, would be stepping down. Id. ¶ 24 It explained that under the severance agreement Read would release any claims against Redwire and

would continue to "comply with his existing restrictive covenant obligations."

Id.

## II.    COUNT I — SECTION 10(B) CLAIM

Plaintiffs allege that Redwire and the defendant officers' misleading statements and omissions violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Id. ¶ 134. Claims brought under these sections must satisfy three different sets of pleading requirements: standard federal pleading requirements under Rule 8(a)(2), heightened pleading standards under Rule 9(b), and "special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4." Carvelli v. Ocwen Fin. Corp., 934 F.3d 1307, 1317–18 (11th Cir. 2019).

To properly allege securities fraud under Section 10(b) through Rule 10b-5, a plaintiff must show:

> (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation."

Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1236–37 (11th Cir. 2008) (citation omitted). Defendants challenge the first two elements: (1) material

misrepresentation or omission and (2) scienter. (Doc. 48 at 14–31). The Court takes each in turn.

### A.  Material Misrepresentation or Omission

A misrepresentation or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." S.E.C. v. Morgan Keegan & Co., 678 F.3d 1233, 1245 (11th Cir. 2012) (quotation marks and citation omitted). "[A] defendant may not deal in half-truths." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1305 (11th Cir. 2011) (citation omitted). And "[b]y voluntarily revealing one fact about its operations" a defendant may need "to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'" Id. (citation omitted).

Underpinning Plaintiffs' overall case is the allegation that Redwire suffered from an undisclosed "tone at the top" problem with some of its senior officers. (Doc. 47 ¶¶ 2, 14). Tone at the top, according to business and accounting publications incorporated into the amended complaint, is "the attitude of a company's management towards internal controls and ethics." Id. ¶ 4. It consists in top-down messaging of values, and, according to Plaintiffs, has a significant impact on the entire company as subordinate employees will "likely tend to mimic senior management's behaviors." Id. ¶ 5. Thus, tone at the top

can be something of a litmus test for prudent investors: "If the tone at the top is at all suspect, a prudent investor will sell first and ask questions later or not even buy." Id. Plaintiffs allege that had investors known about Redwire's deficient tone at the top, they would have realized that supporting the GPAC merger and "making investments in Redwire" was "far more risky than originally contemplated." Id. ¶ 5, 85, 104. Thus, nondisclosure was materially omissive. Id. ¶ 14.

Other courts have considered tone at the top in securities fraud cases, albeit in different contexts. See, e.g., Luna v. Marvell Tech. Grp., No. C 15-05447 WHA, 2017 WL 2171273, at *4 (N.D. Cal. May 17, 2017) (finding senior management's "inappropriate 'tone at the top'" supported connecting the CEO to impropriety in the finance department); Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc., 268 F. Supp. 3d 526, 551–52 (S.D.N.Y. 2017) (finding that an inappropriate tone at the top suggested that management knew about and possibly contributed to accounting misconduct); Alaska Elec. Pension Fund v. Asar, 768 F. App'x 175, 185–86 (5th Cir. 2019) (emphasizing that deficient tone at the top could be a viable theory but finding it was insufficiently pled). And at least one other court has found that a deficient tone at the top undercut a company's representations that "[its] disclosure controls and procedures were

effective at a reasonable assurance level." <u>In re LendingClub Sec. Litig.</u>, 254 F. Supp. 3d 1107, 1115–17, 1121–22 (N.D. Cal. 2017).[3]

Defendants argue that investors should not have been misled because GPAC disclosed several potential control and reporting risks before the merger. (Doc. 48 at 7–8, 10–11). Defendants cite several portions from early disclosures made to investors describing Redwire's inexperience with public companies and then-existing internal control over financial reporting ("ICFR") weaknesses. <u>See</u> (Doc. 60 at 2); (Doc. 49-1 at 29–30). Further, Defendants seek to characterize the allegedly omissive or misleading statements as puffery, protected forward-looking statements,[4] or opinion. (Doc. 48 at 15). Plaintiffs respond that the initial ICFR disclosures—focusing mostly on expertise and training—fell short of identifying the later-revealed deficient tone at the top—"management's <u>attitude</u> towards ICFR." (Doc. 58 at 8, 14–15) (emphasis added); <u>see, e.g.</u>, (Doc. 47 ¶ 19) (Redwire disclosure on March 31, 2022, suggesting that the tone at the top deficiency was "an <u>additional</u> material weakness" beyond the previously disclosed ICFR problems) (emphasis added).

---

[3] The Eleventh Circuit does not appear to have addressed "tone at the top."

[4] Plaintiffs have dropped one of the two statements Defendants argue are forward looking. (Doc. 58 at 39).

"[W]hen considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Carvelli, 934 F.3d at 1320–21 (citation omitted). While proceeding on a "tone at the top" theory of liability in this context is relatively novel, the amended complaint meets the pleading requirements for a securities fraud action. See id. at 1317–18. Put another way, Plaintiffs' well-pleaded complaint, with its substantial detail, persuasive timeline, and pertinent statements from Redwire itself, is sufficient to state a viable claim at this stage. The Court is confident it will be presented with the opportunity to revisit this issue later in the case.

## B.   Scienter

Plaintiffs must allege that Defendants made any misleading or omissive statements with scienter: the "intent to deceive, manipulate, or defraud, or severe recklessness." Mizarro, 544 F.3d at 1238 (quotation marks and citation omitted). The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. (emphasis omitted) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). And Plaintiffs must make this showing for each for "each alleged violation of the statute" for each defendant. FindWhat, 658 F.3d at 1296 (citation omitted). Finally, because corporations "have no state of mind of their own," Redwire's scienter must be

imputed from its agents' states of mind—here, Read and Cannito. See Mizzaro, 544 F.3d at 1254.

As discussed, the misrepresentations here all share the same alleged omission: Defendants' failure to disclose Redwire's deficient tone at the top. So Plaintiffs must adequately allege that Read, Cannito (and Redwire by imputation) knew about the tone at the top problems and failed to disclose them—either out of severe recklessness or deceptive intent.

Beginning with knowledge, Plaintiffs allege that Read and Cannito knew about the tone at the top problems because they were the main perpetrators. (Doc. 47 ¶¶ 88, 92). As Redwire eventually disclosed, the tone at the top failures emanated from "certain members of senior management" who were involved with "the Company's accounting and finance policies and procedures." Id. ¶¶ 75, 79. Of the three executives Redwire ever identified as "senior management," only two—Read and Cannito—were involved with Redwire's accounting and finances. Id. ¶ 91. Indeed, as CFO, these were Read's direct responsibilities— and Read reported to Cannito, the CEO. Id. ¶¶ 88, 91. Defendants attack this theory, arguing that it is overly speculative to assume the officers knew about the ICFR deficiencies just because of their positions. (Doc. 48 at 26–27). But Plaintiffs' allegations, incorporating Redwire's own disclosures, are sufficiently robust. See (Doc. 47 ¶¶ 75–79).

Next, Plaintiffs allege that the officers had several motives for concealing their tone at the top deficiencies from investors. For one, neither wanted the GPAC-Redwire merger to fail. Id. ¶¶ 90, 93. Read and Cannito both stood to make a lot of money if the deal went through. Id. ¶¶ 89, 92. But if investors had known that Redwire—in addition to the known ICFR weaknesses—did not and would not even have an appropriate tone at the top, they never would have invested in GPAC, supported the merger, or bought Redwire shares. See id. ¶¶ 5, 90, 93, 118. Add to this Read's fear of being fired as CFO (as Plaintiffs allege he eventually was) and Plaintiffs say one can reasonably infer scienter. See id. ¶¶ 81, 88.

Of course, Defendants disagree. They argue that greed, standing alone, is insufficient to establish scienter, that a CFO's termination, standing alone, is insufficient to establish scienter, and that Redwire self-reported its ICFR deficiencies immediately, further undercutting any inference of scienter. (Doc. 48 at 23–31). Defendants' position carries some force. But examining the entire amended complaint and taking as true all well-pleaded allegations, Plaintiffs allegations of scienter are sufficient at this stage. Cf. Mizzaro, 544 F.3d at 1239; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322–24 (2007). Finally, the Court having found that Plaintiffs adequately pleaded scienter for Read and Cannito, Defendants do not dispute that the officers' scienter can be imputed to Redwire. See Mizzaro, 544 F.3d at 1254.

11

## III.   COUNT II – SECTION 20(A) CLAIM

Count II is brought against Read and Cannito individually and alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Doc. 47 ¶¶ 142–147). Section 20(a) liability requires a primary § 10(b) violation and further allegations regarding the individual Defendants' control over the company's business affairs. § 78t(a); Mizzaro, 544 F.3d at 1237. Because Plaintiffs have adequately alleged a primary Section 10(b) violation in Count I and Defendants do not contest Plaintiffs' control allegations, Count II may move forward.

Accordingly, it is hereby

**ORDERED:**

1.     Defendants' Motion to Dismiss the First Amended Complaint (Doc. 48) is **DENIED**.

2.     No later than **April 21, 2023**, Defendants must answer the amended complaint.

3.     No later than **April 21, 2023**, the parties shall jointly file a case management report in accordance with Local Rule 3.02.

**DONE AND ORDERED** in Jacksonville, Florida the 22nd day of March,

2023.



TIMOTHY J. CORRIGAN
United States District Judge

rmv
Copies to:
Counsel of record