# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JED LEMEN, Individually and On Behalf of All Others Similarly Situated, | Case No.  3:21-cv-01254-TJC-PDB |
| Plaintiff, | CLASS ACTION |
| v. | |
| REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ, | |
| Defendants. | |

EXPERT REPORT OF MATTHEW D. CAIN, PHD

January 19, 2024

**Table of Contents**

**I.    Scope of Report and Opinions** ...................................................................................**3**

**II.   Qualifications**.............................................................................................................**4**

**III.  Case Background and Alleged Fraud Scheme** ........................................................**7**

**IV.   Bases for Opinions on Market Efficiency** .............................................................**11**

**V.    Evaluation of Market Efficiency Factors for Redwire Common Stock**......................**14**

      A.    *Cammer* Factor 1: Average Weekly Trading Volume ............................... 16

      B.    *Cammer* Factor 2: Analyst Coverage ........................................................ 18

      C.    *Cammer* Factor 3: Market Makers ............................................................ 20

      D.    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ................................. 23

      E.    *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices........................................................ 25

      F.    Additional Factor 1: Market Capitalization ............................................... 34

      G.    Additional Factor 2: Bid-Ask Spread......................................................... 35

      H.    Additional Factor 3: Public Float ............................................................... 37

      I.    Additional Factor 4: Institutional Ownership............................................. 37

      J.    Additional Factor 5: Autocorrelation ......................................................... 38

      K.    Additional Factor 6: Active Options Trading ............................................. 40

**VI.   Evaluation of Market Efficiency for Options and Warrants on Redwire Common Stock**....................................................................................................................**41**

      A.    Overview of Warrants and Options............................................................. 41

      B.    The Academic Literature Strongly Supports the Presumption that Options Quickly Reflect Value-Relevant Information  ............................. 42

      C.    The *Cammer* and *Krogman* Factors are not Relevant for Gauging Market Efficiency of Options and Warrants Markets ............................... 45

      D.    Cause and Effect Between Redwire Common Stock and Warrant Prices ......................................................................................................... 46

      E.    Cause and Effect Between Redwire Common Stock and Option Prices ......................................................................................................... 47

      F.    Market Efficiency in the Market for Redwire's Common Stock Strongly Reinforces the Conclusion that the Redwire Options and Warrants Also Traded in an Efficient Market............................................. 49

**VII.   Ability to Calculate Damages on a Class-Wide Basis**......................................................**50**

    A.    Calculation of Damages for Violations of §10(b) and §20(a) of the Exchange Act ..............................................................................................50

    B.    Damage Methodologies are Flexible and Can Incorporate Alternative Findings ...................................................................................54

**VIII.  Conclusion** ............................................................................................................**55**

**Appendix A** ...................................................................................................... **A-1**

**Appendix B** .......................................................................................................**B-1**

**Exhibits** .............................................................................................................**E-1**

## I.    Scope of Report and Opinions

1.    Lead Plaintiff Jared Thompson, through his attorneys Hagens Berman Sobol Shapiro LLP, The Schall Law Firm, and Buckner + Miles ("Lead Plaintiff's Counsel") have asked me to determine whether the market for Redwire Corporation ("Redwire" or the "Company") common stock ("Common Stock"), options ("Options") and warrants ("Warrants") was efficient during the period March 25, 2021 to March 31, 2022, inclusive (the "Class Period").

2.    In addition, Lead Plaintiff has asked me to opine on whether damages for investors trading in Redwire Common Stock, Options and Warrants during the Class Period can be calculated using a common methodology for all Class members that is consistent with Lead Plaintiff's claims under (i) §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§10(b) claims"), and (ii) §20(a) of the Exchange Act.[1]

3.    Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the following opinions:

a.    The market for Redwire Common Stock was efficient throughout the Class Period.

b.    The *Cammer*, *Krogman*, and other additional factors accepted and applied by courts in the Eleventh Circuit to assess market efficiency corroborate that Redwire Common Stock traded in an efficient market.

c.    Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting Common Stock price movements (which I analyze under the fifth *Cammer*

---

[1] *See* Complaint (Doc. No. 47); Order re: Motion to Dismiss Re. Doc. No. 48, dated March 22, 2023 (Doc. No. 62) ("March 2023 MTD Order").

factor) further demonstrates that Redwire Common Stock traded in an efficient market throughout the Class Period.

d.	The market for Redwire Options and Warrants was efficient throughout the Class Period.

e.	Damages in this matter can be calculated on a class-wide basis subject to standard, common methodologies for each of Lead Plaintiff's pending claims. In particular, the out-of-pocket damages methodology, which is used in virtually all §10(b) class action securities cases, is appropriate and applicable here.

4.	The remainder of my report is organized as follows: **Section II** describes my qualifications. **Section III** summarizes the case background. **Section IV** briefly explains the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period. **Section VI** discusses how the market efficiency of common stock relates to derivatives of the common stock, *i.e.*, the options and warrants markets, and why I conclude that the market for Redwire Options and Warrants was also efficient. **Section VII** addresses how damages can be calculated on a class-wide basis subject to common methodologies. **Section VIII** summarizes my conclusions.

## II.	Qualifications

5.	I hold a Ph.D. in Finance from Purdue University and am a Senior Fellow at the Berkeley Center for Law and Business at the University of California - Berkeley. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.

4

6. My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

7. Before my current roles, I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research for which I was awarded the Chairman's Award for Economic Research.

8. Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

9. Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements

5

of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

10.     In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

11.     I have published research in leading peer-reviewed journals in the fields of finance, accounting, law, and economics, including the *Journal of Financial Economics, Journal of Law and Economics*, *Journal of Accounting and Economics, Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications.

12.     In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters through my LLC, Cleveland Analytics, as well as in conjunction with other consulting firms. As an expert in financial economics, I have conducted analyses or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation/damages in over 60 cases. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

13.     The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $950 per hour for my work on this matter. I have been assisted in this matter by staff at Fideres Partners LLP, working under my direction. I have no financial or other interest in Fideres Partners' billings in this matter.

14.     My compensation is in no way contingent on the outcome of this case.

15.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III.    Case Background and Alleged Fraud Scheme

16.     Genesis Park Acquisition Corp. ("GPAC") was a publicly traded blank check company, also known as a special purpose acquisition company ("SPAC"), formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses. Following the closing of its IPO on November 27, 2020, GPAC's Units, consisting of one Class A Common Stock and one-half of one Warrant, traded on the New York Stock Exchange ("NYSE") under the symbol "GNPK.U". GPAC's Common Stock and Warrants, "GNPK" and "GNPK WS," respectively, began trading on the NYSE on January 14, 2021. On March 25, 2021, GPAC and Redwire issued a press release announcing a plan to bring Redwire public via a merger with GPAC.[2] The business combination was completed on September 2, 2021, resulting in the public listing of Redwire Common Stock and Warrants under the new trading symbols "RDW" and "RDW WS," respectively, on the NYSE on September 3, 2021.[3]

17.     The Company's March 25, 2021 press release described Redwire as "a pure play space infrastructure company providing critical technology and services to fast-growing national security, civil, and commercial markets."[4] It further stated that Redwire had a "proven

---

[2] Complaint ¶8 (Doc. No. 47). The following overview section summarizes the allegations in the Complaint as context for Lead Plaintiff's claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

[3] *Id.* ¶11

[4] Redwire, Form 8-K, March 25, 2021. Available at:
https://www.sec.gov/Archives/edgar/data/1819810/000119312521093279/d76989dex991.htm

management team and 50+ years of space heritage and deep customer relationships in space and aerospace."[5] In addition, throughout the Class Period, Defendants continued to emphasize "Redwire's senior management's operational and financial experience and credentials, the Company's solid foundation and published Codes of Conduct of Ethics, and remediation efforts to bring the internal controls of the Business Combination up to regulatory standards as a public company".[6]

18.     The Complaint alleges that throughout the Class Period, Defendants perpetrated a scheme, misled investors, and made numerous materially false and misleading statements and omissions relating to the Company's business, operations, and prospects. Specifically, the Complaint alleges that Redwire, and its respective officers and directors, concealed material deficiencies in its internal controls over its financial disclosures, emanating from a deficient "tone at the top," including that "certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication."[7]

19.     The Complaint alleges that the relevant truth about Redwire's deficiencies partially emerged on November 10, 2021, when Redwire announced that it would postpone the release of its third quarter earnings results due to a notification from an employee about "potential accounting issues at a business subunit", and that its Audit Committee had opened an internal investigation.[8] Additionally, the Complaint alleges that the truth was further partially revealed on November 15, 2021, when Redwire stated that it could not timely file its quarterly report for the period ended

---

[5] *Id.*

[6] Complaint ¶ 12.

[7] *Id.* ¶ 25.

[8] Redwire, Press Release, November 10, 2021, Available at: https://ir.redwirespace.com/news-events/press-releases/detail/34/redwire-corporation-announces-updates-on-q3-2021-earnings.

September 30, 2021—its first quarter as an operating company, and stated that "the Company has not been able to finalize its financial statements or its assessment of the effectiveness of its disclosure controls and procedures and any impact."[9]

20.     The Complaint alleges that the relevant truth was further revealed after-hours on March 31, 2022, when Redwire announced results for its fiscal year ended December 31, 2021. Redwire revealed that the Audit Committee investigation "confirmed the existence of previously identified internal control deficiencies as well as identified certain additional internal control deficiencies" and that "certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication."[10,11] Furthermore, the Complaint alleges that on April 1, 2022, when Redwire filed its Quarterly Report for the quarterly period ending September 30, 2021, it stated that one of the material weaknesses in internal control over financial reporting was that "we did not maintain an effective control environment, as certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top."[12,13]  The Quarterly Report also stated that "full remediation" of the material weaknesses in internal controls would "likely go beyond December 31, 2022" and would be "time consuming,

---

[9] Complaint ¶ 72.

[10] Complaint ¶ 19.

[11] Redwire Corporation Reports Full Fiscal Year 2021 Financial Results on Form 8-K and press release dated March 31, 2022.
https://www.sec.gov/Archives/edgar/data/0001819810/000181981022000014/exhi
bit991redwire12312021e.htm.

[12] Complaint ¶ 21.

[13] Redwire Corp. 10-Q dated April 1, 2022.
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001819810/000181981022000 021/rdw-
20210930.htm.

will result in the Company incurring additional costs, and will place additional demands on our financial and operational resources."[14]

21.    The Complaint alleges that the relevant truth was further revealed post-Class Period on April 11, 2022, in Redwire's Annual Report on Form 10-K[15], which stated "the design of internal controls over financial reporting for the Company post-Merger has required and will continue to require significant time and resources from management and other personnel. As a result, management was unable, without incurring unreasonable effort or expense to conduct an assessment of [Redwire's] internal control over financial reporting as of December 31, 2021."[16] Redwire further confirmed that its "disclosure controls and procedures were not effective as of December 31, 2021."[17] Then, on June 1, 2022, Redwire announced that CFO Read was terminated and given a hefty severance agreement in which the former CFO "agreed to a release of claims in favor of the Company and reaffirmed his commitment to comply with his existing restrictive covenant obligations."[18] The Complaint alleges that CFO Read was fired and his silence was assured relating to any further information about the internal control deficiencies.[19]

22.    The Complaint also alleges that, as a result of Defendants' allegedly wrongful acts and omissions, investors traded Redwire Common Stock, Options and Warrants at artificially

---

[14] *Id.*

[15] Annual Report on Form 10-K for fiscal year ended December 31, 2021. https://www.sec.gov/ix?doc=/Archives/edgar/data/0001819810/000181981022000 025/rdw-20211231.htm.

[16] Complaint ¶ 23.

[17] Complaint ¶ 79.

[18] Redwire Corp. 8-K dated June 1, 2022. https://www.sec.gov/ix?doc=/Archives/edgar/data/0001819810/000181981022000 074/rdw-20220601.htm.

[19] Complaint ¶ 24.

inflated or deflated prices during the Class Period.[20] **Exhibit 1** graphs the closing stock price and trading volume for Redwire's Common Stock shares throughout the Class Period.

## IV.   Bases for Opinions on Market Efficiency

23.   I understand that, with respect to their claims under §10(b), Lead Plaintiff asserts the "fraud-on-the-market" theory of class-wide reliance, *e.g.*, that all Redwire shareholders relied on the alleged misstatements or material omissions of fact (and the fraudulent schemes and acts underlying such misstatements) through their effect on stock prices in an informationally efficient market.[21]

24.   As courts, including the Supreme Court, have repeatedly explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors in securities traded in an informationally efficient market rely on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[22]

25.   The Supreme Court reaffirmed the availability of this theory to satisfy §10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the

---

[20] *Id.* ¶ 127; page 1, ¶1 (defining the Class to include all "securities").

[21] *Id.* ¶ 127.

[22] *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

11

price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[23]

26.    A market is defined as informationally efficient if prices of securities trading in that market reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs.[24] Economic research and literature support the concept of market efficiency for publicly traded securities. For example, Nobel Prize winner Eugene Fama has observed that "[t]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse."[25] More recently, Professor Fama reiterated that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[26]

27.    Indeed, research continues to support the empirical soundness of the efficient market hypothesis, as modern scholars have concluded that, in fact, "capital markets are more efficient than previously recognized."[27] Academic research thus provides ample support for the concept of market efficiency of public exchange-traded securities.

28.    Litigants and scholars have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, should be granted a presumption of efficiency for virtually all securities traded on

---

[23] *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[24] *See, e.g.,* Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1575.

[25] Eugene F. Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, at 383, 416.

[26] Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1575, 1576.

[27] *See, e.g.,* Kewei Hou, Chen Xue, and Lu Zhang, 2020, "Replicating Anomalies," *Review of Financial Studies* 33, at 2071.

them.[28] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other rules for these exchanges practically guarantee a liquid market for securities traded on these exchanges.[29] The fact that Redwire's Common Stock traded on the NSYE therefore leads to a strong presumption of market efficiency.[30]

29.    The U.S. Supreme Court has not set forth a definitive test for assessing market efficiency for securities.  Nor has the Eleventh Circuit dictated a mandatory standard for evaluating market efficiency.[31]  Nonetheless, courts in the Eleventh Circuit have applied the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purposes of establishing the presumption of investor reliance articulated by the Supreme Court in

---

[28] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*") ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'" (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988))).

[29] *Id.*

[30] *See Local 703, I.B. of T. Grocery & Food Emps. Welfare Fun v. Regions Fin. Corp.*, 762 F.3d 1248, 1257-1258 (11th Cir. 2014) (noting fact that stock traded on NYSE supported a finding of market efficiency); *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661, at *13  (S.D. Fla. Mar. 16, 2016) (same); *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022) (finding efficient market where security traded on the NYSE in substantial volumes); *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012) (Defendant "has cited no case, and none has been found, holding that the NYSE is not an efficient market for shares of common stock traded, as here, in substantial volumes.").

[31] *See Local 703, I.B. of T. Grocery & Food Emps. Welfare Fun v. Regions Fin. Corp.*, 762 F.3d at 1254-1255.

13

*Basic*.[32] Eleventh Circuit courts also apply the additional factors for evaluating market efficiency found in another widely cited opinion, *Krogman v. Sterritt*.[33]

30.     Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.[34] However, as explained below, it is important to understand that an assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that the market for a security is efficient.[35]

## V.     Evaluation of Market Efficiency Factors for Redwire Common Stock

31.     In the following section, I discuss the *Cammer*, *Krogman*, and additional factors and evaluate them in relation to Redwire Common Stock. In doing so, I compare the factors' application to Redwire's Common Stock against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

32.     As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that Redwire Common Stock traded in an efficient market throughout the Class Period.

---

[32] *See Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661, at \*13; *In re Netbank, Inc. Secs. Litigation*, 259 F.R.D. 656, 669-676 (N.D. Ga. 2009); *Aranz v. Catalyst Pharmaceutical Partners, Inc.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014); *see also Cammer*, 711 F. Supp. at 1292.

[33] *See In re Netbank, Inc. Secs. Litigation*, 259 F.R.D. at 672-673; *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501-502 (S.D. Fla. 2003); *see also Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[34] *See, e.g.,* Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

[35] *Id.*, at pp. 204-205; *see also In re Netbank, Inc. Secs. Litigation*, 259 F.R.D. at 669.

33.     One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, and I refer to it as the "MRK Study."[36] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[37]

34.     The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock. . . . Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[38]

35.     The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[39] Therefore, I interpret the sample of MRK Covered firms as those

---

[36] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, "Is There Life After the Complete Loss of Analyst Coverage?," *Accounting Review* 88, at 667-705.

[37] MRK Study at 678, 681-682.

[38] MRK Study at 667.

[39] MRK Study at 681 (footnotes omitted).

eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets.

36.    Below, I compare several of Redwire's market efficiency factors to the samples of firms in the MRK Study to assess whether Redwire's characteristics are consistent with firms operating in efficient markets.

### A.    *Cammer* Factor 1: Average Weekly Trading Volume

37.    Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security.[40] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[41] Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[42]

38.    The first *Cammer* factor for stock trading volume has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the

---

[40] *See, e.g.,* Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review Online* (the "Bhole Study"), at 101-102; Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, at 108; MRK Study at 681.

[41] *Id.*

[42] Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, at 108.

market for the security is an efficient one; 1% would justify a substantial presumption."[43]

39.     **Exhibit 2** graphs Redwire's Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[44] The average weekly trading volume was 9.03% of Redwire's common shares outstanding over the Class Period. This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court. As a result, Redwire's level of stock trading volume throughout the Class Period supports the conclusion that Redwire's Common Stock traded in an efficient market throughout the Class Period.

40.     I also note that the average weekly trading volume of Redwire's Common Stock over the Class Period was 3.6 million shares on the NYSE. According to the authors in the MRK Study, the median weekly trading volume for the MRK Sample firms was 0.034 million shares while the median for the MRK Covered firms was 0.215 million shares weekly.[45]

41.     Additionally, Redwire's daily turnover rate of 1.82% during the Class Period placed it above the 75th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[46] Redwire's average weekly trading volume during the Class Period exceeds that of both the median MRK Sample firms and the MRK Covered firms. This further supports the conclusion that Redwire's Common Stock traded in an efficient market throughout the Class Period.

---

[43] *Cammer*, 711 F. Supp. At 1293 (quoting Bromberg, § 8.6).

[44] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[45] MRK Study at 678 (Table 3). The median annual trading volume for MRK sample firms was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK covered firms was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

[46] Bhole Study, at 102. The 75th percentile of daily turnover for the 2016-2018 sample period is 1.17%. I note that the 2016-2018 subsample time period is the most recent period reported in this study.

B.    *Cammer* **Factor 2: Analyst Coverage**

42.    An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry.  Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.[47]

43.    Analyst coverage can be indicative of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[48]

44.    In **Exhibit 3** I reviewed the analyst coverage of Redwire over the Class Period. I identified a total of 8 reports issued by analysts at 3 separate firms during that period.[49] The list of analyst reports that I was able to identify includes reports by firms that conducted thorough and detailed research on Redwire and the industry within which it operated, such as the reports prepared by analysts at Jefferies. I further note that around half of the Class Period pertains to the pre-business combination history of Redwire and GPAC. In my professional experience, among SPACs, analyst coverage typically begins after the closing of a business combination. Redwire's

---

[47] MRK Study at 670-671.

[48] *Cammer*, 711 F. Supp. at 1286.

[49] These statistics represent a lower bound of the analyst coverage of Redwire because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

analyst coverage following the closing of the business combination is consistent with this pattern. Collectively, Redwire's analyst coverage served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

45.     This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[50] A separate academic study by Charles M.C. Lee and Eric So documented that, on average, many firms are covered by zero, one, or two analysts.[51] Redwire's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest.

46.     Moreover, Redwire's level of analyst coverage also placed it above the 10th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[52] The analyst coverage of Redwire during the Class Period supports the conclusion that Redwire's Common Stock traded in an efficient market throughout the Class Period.

47.     In addition to the analyst coverage documented above, investors could access information about Redwire from a variety of other sources. For example, I conducted a search of press and news articles about Redwire using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes *Dow Jones Newswires*, *Reuters News*, *PR Newswire*, *Associated Press Newswires*, *Business Wire*, and

---

[50] MRK Study at 668.

[51] Charles M.C. Lee and Eric C. So, 2017, "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124, at 336 (see Table 1, Panel B – "COV").

[52] Bhole Study, at 104: 10th percentile defined as 1.5 analysts.

numerous other outlets. This search produced over 400 articles throughout the Class Period.[53] Investors can also receive information from online research forums, such as SeekingAlpha, short sellers, and other investor research services, which offer both free and subscription-based research reports.

48.    Moreover, Redwire produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. Individual and institutional investors thus had access to publicly available information about Redwire from a variety of sources during the Class Period.

49.    As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about Redwire supports the conclusion that its Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### C.    *Cammer* Factor 3: Market Makers

50.    The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[54] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in

---

[53] The articles were identified through a Factiva search, including Redwire's company tag over all available sources. After excluding potential duplicates, 457 unique news articles were identified by my search.

[54] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

> a given security, the more information is available about it and the quicker its dissemination in the price.[55]

51.     In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[56]

The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

52.     Redwire's Common Stock traded on the NYSE throughout the Class Period. Similar to other large, national exchanges, the NYSE reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient. The *Cammer* court stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[57]

---

[55] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law* 19, at 291.

[56] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Ca. 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

[57] *Cammer,* 711 F. Supp. at 1292.

53.     I understand that courts typically view large, established stock exchanges with market makers (such as the NYSE and NASDAQ[58]) as being informationally efficient.[59] Redwire's public listings on the NSYE, a well-developed and established national exchange, thus satisfies the intent of this *Cammer* factor.

54.     Redwire had at least 60 market makers and brokers providing similar activity over the Class Period.[60]

---

[58] The NYSE Market Model, *NYSE*, available at: https://www.nyse.com/market-model ("The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery."); *see also*: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: ("NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades).").

[59] *See Todd v. STAAR Surg. Co.*, 2017 WL 821662, at *6 (C.D. Cal. Jan. 5, 2017) (NASDAQ listing "strongly favors a finding of market efficiency"); *Brown v. China Integr. Energy Inc.*, 2015 WL 12720322, at *16 (C.D. Cal. Feb. 17, 2015) (same); *Monroe Cty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 383-84 (N.D. Ga. 2019) ("Trading on the NYSE supports a finding of efficiency.").

[60] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact…RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow").

55.    Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading.[61] Academic research has similarly found that institutional investors can facilitate trading liquidity.[62]  As I discuss further in **Section V.I** below, Redwire's Common Stock was widely held by institutional investors during the Class Period.[63] In sum, Redwire easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for Redwire Common Stock throughout the Class Period.

D.    *Cammer* **Factor 4: SEC Form S-3 Filing Eligibility**

56.    The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of

---

[61] *See In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading." (citations omitted)); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.").

[62] MRK Study at 678 (Table 3). Authors reported that Sample firms had a median of 9 institutional investors while Covered firms had a median of 40 institutional investors; *see also* Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19, at p. 302.

[63] Redwire Common Stock was held by at least 108 institutional investors at some point during the Class Period (see **Exhibit 10**). Institutional ownership fluctuated on a quarterly basis throughout the Class Period, from a minimum of 61.42% of shares outstanding on March 31, 2021 to a maximum of 87.88% of shares outstanding on September 30, 2021, according to data from Bloomberg and Redwire SEC Filings. These figures represent a conservative estimate of institutional holdings as some institutions may not be reflected in Bloomberg's coverage.

23

shares traded and value of shares outstanding that involve the facts which imply efficiency.[64]

57.     Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases, and the registrant has a public float of $75 million, as measured by the aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant.[65] The logic and intuition behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

58.     As Redwire went public in September, 2021, it was technically not eligible for S-3 registration during the Class Period because it had not filed financial reports for a full 12 months on account of it being a private entity prior to the merger with GPAC. However, Redwire's Common Stock public float exceeded the required $75 million threshold during the Class Period,[66] and I also note that the Company filed an S-3 form after the end of the Class Period.[67] As mentioned in the Complaint, I note that Redwire failed to make all required filings with the SEC in a timely

---

[64] *Cammer*, 711 F. Supp. at 1287.

[65] *See* SEC Form 3, *available at* https://www.sec.gov/files/forms-3.pdf.

[66] Redwire's float averaged $355.7 million over the full Class Period and $170.5 million for the pre-business combination period from March 25, 2021 to September 2, 2021.

[67] *See* Redwire Corporation, SEC Form S-3, filed Sep. 6, 2023, available at: https://www.sec.gov/edgar/browse/?CIK=1819810&owner=exclude.

manner during the Class Period, filing two NT 10-Qs and one NT 10-K during the Class Period.[68] However, as noted above, Redwire's other characteristics (*e.g.*, float, satisfaction of debts and dividends, shares available for trading, volume of trading on the NYSE) were consistent with the S-3 *Cammer* factor throughout the Class Period. Thus, my interpretation of this *Cammer* Factor for Redwire relative to the *Cammer* court's discussion above indicates that it neither supports nor disputes the efficiency of the market for Redwire Common Stock during the Class Period.

**E.     *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices**

59.     The fifth *Cammer* factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information. The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[69]

60.     Below, I summarize my empirical analysis, which finds that Redwire's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*.  As part of my analysis, I compared the behavior of Redwire Common Stock on days when company-specific news was issued with its behavior on days when no such news was issued. This analysis demonstrates that Redwire's Common Stock price reacted rapidly to company-specific news, and thus further supports the conclusion that Redwire Common Stock traded in an efficient market throughout the Class Period.

---

[68] *See* Redwire Corporation, SEC Form NT 10-Q, filed on May 17, 2021, Nov. 15, 2021, Mar. 31, 2022, available at https://www.sec.gov/edgar/browse/?CIK=1819810&owner=exclude.

[69] *Cammer,* 711 F. Supp. at 1291.

### i.    Event Study Methodology

61.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study.

62.    Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[70]  As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[71]

63.    To determine whether Redwire stock price movements on any given date are statistically significant, I performed an event study using generally accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

---

[70] *See* A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 13.

[71] Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1607.

64.    Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

65.    I applied these widely used and generally accepted econometric methodologies to perform my event study here.  Specifically, in order to isolate the impact of company-specific news on Redwire's stock price during the Class Period, I performed regression analyses to measure the relationship between Redwire's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Redwire's industry. By modeling how Redwire's stock price returns moved relative to an overall market index and an industry index, I was also able to measure the response of Redwire's Common Stock to announcements of company-specific news.

66.    I conducted my regression analysis over the Class Period (March 25, 2021 through March 31, 2022, inclusive), plus one year beyond the Class Period (the "Analysis Period"). Because GPAC had only been listed for 48 days as of the start of the Class Period, I constructed a fixed regression model from January 15, 2021 to July 12, 2021 (the first 120 days of Common Stock returns for GPAC/Redwire) to evaluate the abnormal returns from the March 25, 2021 to July 12, 2021. For each trading day following July 12, 2021, within the Analysis Period, I

constructed a regression model using data from the prior 120 trading days ("Estimation Window")[72].

67. To study the relationship between Redwire's stock price returns and overall market factors, I used the S&P 1500 Composite Total Return Index (the "Market Index"). This Market Index is commonly used by economists as a representation of the overall market.

68. To study the relationship between Redwire's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in Redwire's particular industry, I used the S&P Aerospace and Defense Select Industry Index (the "Industry Index").[73]

69. I established the relationship between the daily return of Redwire's Common Stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[74] As shown in **Exhibit 4**, the event study models revealed an evolving relation between the daily returns of Redwire Common Stock and those of the overall stock market and industry indices throughout the Class Period, including a generally positive correlation between the

---

[72] *See, e.g.,* Mark L. Mitchell and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *Business Lawyer* 49; A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[73] Redwire describes itself as belonging to the Aerospace & Defense industry. *See* Redwire Corporation, company information available at: https://ir.redwirespace.com/company-information.

[74] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35; Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, "Good News, Bad News, Volatility, and Betas," *Journal of Finance* 50, at 1597.

Company's Common Stock and the Market Index. In other words, movements of the Market Index and Industry Index help explain movements in Redwire's stock price.

70. Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of the Company on any given date within the Class Period that controlled for that day's market and industry returns. Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

71. Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in Redwire's Common Stock abnormal returns, or the "standard deviation of the regression errors". The standard deviation of errors provides a metric for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of Redwire's common stock after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

> ii. *Cause and Effect Analysis Comparing Redwire Common Stock Price Behavior on News Days versus No News Days*

72. A generally-accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on news days with its behavior on other days with relatively little or no news.[75] A showing that a security's price is statistically significantly

---

[75] Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

more volatile on "news days" than on "no news days" is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding of efficiency.[76]

73.    Importantly, research has shown that in an efficient market, a security can exhibit some large price movements despite the absence of news and, conversely, there can be news without large price movements.[77]  For instance, a company may announce earnings (or a lack thereof) that are in line with investor expectations – and while such an expected announcement is clearly important to investors, it will often not alter the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again would result in no statistically significant price movement. Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level.

74.    Accordingly, to minimize the influence of random fluctuations, a generally accepted, peer-reviewed methodology accepted by numerous courts is to compare (i) a subject company's stock price behavior on a *group* of "news days" to (ii) its stock price behavior on a *group* of "no news days."[78]

---

[76] *Id.*

[77] *See* Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, "Information, Trading, and Volatility: Evidence from Firm-Specific News," *Review of Financial Studies* 32, at 1004; Ray Fair, 2002, "Events That Shook the Market," *Journal of Business* 75, at 713, 714.

[78] Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57. This approach been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, In re: Under Armour Securities Litigation*, 631 F.Supp.3d 285, 311-12 (D. Md. 2022); *Bond v. Clover Health Investments, Corp., et al.*, 2023 WL 1999859, at *11 (M.D. Tenn. Feb. 14, 2023); *In re: QuantumScape Securities Class Action Litigation*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

75.    Here, I performed such an analysis comparing the behavior of Redwire Common Stock on news versus no news days.  My analysis demonstrates that the price of Redwire stock was statistically significantly more volatile on news than on no news days.  This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price" for Redwire Common Stock during the Class Period and, thus, further supports a finding of market efficiency.

76.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I identified dates pertaining to key GPAC and/or Redwire communications relating to the status of the business combination, or any delays in the filing of relevant SEC Form 10-Qs or 10-Ks. After completion of the business combination, I also identified Redwire's quarterly earnings announcements (collectively, with the business combination status announcements and the SEC filing delays, the "News Days"). Such announcements are commonly studied by financial economists, both in litigation-related work and in academic papers. These announcements represent a potential opportunity for the public release of new value-relevant Company information to investors.[79] One would not expect every earnings announcement to cause a significant stock price movement for a company because investors and analysts may anticipate the reported performance, or because the information may contain a mix of both positive and negative information. [80] However, the mix of unanticipated results, forward

---

[79] *See* SEC, "How to Read an 8-K," https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/how-read-8 ("The types of information required to be disclosed on Form 8-K are generally considered to be "material." That means that, in general, there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.").

[80] *See* Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility: Evidence From Firm-Specific News, *Review of Financial Studies* 32.3, at 1004; Ray Fair, 2002, Events That Shook the Market, *Journal of Business* 75, at 713, 714.

guidance, executive statements, analyst interpretations of this information, and other unanticipated company-specific news can cause company stock prices to move in an efficient market.

77.    I also considered the fact that other types of news or information could be more or less relevant for a given company during certain time periods, as well as the length of the Class Period in this matter. Because Redwire only hosted one earnings announcement during the Class Period, I extended the analysis period by one year past the end of the Class Period to cover all earnings announcements between the start of the Class Period and March 31, 2023 (the Analysis Period). As shown in **Exhibit 6a**, in total, Redwire had 12 news days related to press releases to SEC Form 8-K, the business combination, and late SEC Form filings during the Analysis Period. I then classified each day on which such news was first issued as a News Day.[81]

78.    I then compared the stock returns and trading volume of Redwire's Common Stock on these News Days versus those metrics on trading days that contained the least news during the Class Period (the "No News Days"). The No News Days provide a benchmark measurement of days in which relatively little or no new Redwire-specific information was provided to the market. If Redwire's stock prices tend to move more significantly on News Days than on No News Days, this would support a conclusion of market efficiency. As discussed below, there were 224 No News Days during the Class Period.[82]

79.    **Exhibit 6a** reports the list of 12 News Days – *i.e.*, their market impact dates and corresponding disclosure headlines.

---

[81] If the release were issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day.

[82] I identified "No News Days" as days on which there were no SEC filings or news stories / media reports identifiable in the Factiva database tagged to Redwire. As described above, Factiva is a well-known compiler of business news from across a wide range of publications, including Dow Jones Newswire, Reuters News, PR Newswire, Associated Press Newswire, Business Wire, and numerous other outlets. For purposes of considering news to identify No News Days under this methodology, I exclude headlines that merely identify stock price or volume movements on a given date without discussing any other information (however, there were no such days in this sample).

32

80.    **Exhibit 6b** reports the results of my event study using Redwire Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, and the p-value corresponding to statistical significance.

81.    Overall, 8 out of 12 Redwire News Days were associated with same-day stock price movements that were statistically significant at the 95% level or better.  I compare this rate with that on the 224 No News Days in **Exhibit 7a**. As shown in **Exhibit 7a**, 66.7% of the News Day disclosures caused stock movements that were statistically significant at the 95% level. This compares to 6.3% of the No News Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at a level greater than 99%. These results provide strong evidence of a cause-and-effect relationship between new information and Redwire Common Stock price movements. Moreover, relative to the No News Days, the News Days had a higher average absolute abnormal return and greater trading volume, with these differences being statistically significant at a level greater than 95%.

82.    In **Exhibit 7b**, I repeat the statistical tests but limiting only to the 7 News Days and 104 No News Days that fall within the Class Period. [83] As can be seen, 85.7% of these News Days were statistically significant at the 95% level. This compares to 7.7% of No News Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at a level greater than 99%. These results provide strong evidence of a cause-and-effect relationship between new information and Redwire Common Stock price movements. Moreover, relative to the No News Days, the News Days had a higher average absolute abnormal return and greater trading volume.

---

[83] The 7 News Days and 104 No News Days combined cover 43% of the trading days (111 of 258) in the Class Period.

33

83.     In summary, these results establish a clear cause-and-effect relationship between the release of new company-specific information and Redwire Common Stock price movements. As a result, this *Cammer* Factor Five analysis supports the conclusion that Redwire Common Stock traded in an efficient market during the Class Period.

### F.     Additional Factor 1: Market Capitalization

84.     I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[84] Similarly, the *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[85]

85.     Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors—such as relatively small market capitalization—that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Sample firms was $27.91 million.[86] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[87] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

---

[84] *Cammer*, 711 F. Supp. at 1287.

[85] *Krogman,* 202 F.R.D. at 478.

[86] MRK Study at 678 (Table 3).

[87] MRK Study at 678 (Table 3).

34

86.    **Exhibit 8** reports Redwire's market capitalization throughout the Class Period.[88] This market capitalization averaged $353 million over the Class Period. Redwire's total market capitalization places it above the 25th percentile of all companies listed on the NASDAQ and NYSE from 2016-2018.[89] Redwire's market capitalization also exceeded the MRK Sample firms on an inflation-adjusted basis.[90] Moreover, Redwire's market capitalization exceeded the minimum $75 million float required by the SEC for Form S-3 eligibility. As documented in **Exhibit 10** (Column 2), Redwire's number of shares outstanding ranged from 16.4 million to 59.7 million during the Class Period.

87.    Redwire's market capitalization, shares outstanding available for trading, and its sizeable float, as discussed below, are consistent with the conclusion that the Common Stock traded in an efficient market during the Class Period.

**G.    Additional Factor 2: Bid-Ask Spread**

88.    The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[91]

89.    The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient

---

[88] Bloomberg daily reported "PX_LAST" variable multiplied by shares outstanding figures from Redwire SEC Filings.

[89] Bhole Study, at 107: 25h percentile of market capitalization defined as $167 million.

[90] Source: U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at: https://www.bls.gov/data/inflation_calculator.htm.

[91] *Krogman*, 202 F.R.D. at 478.

market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

90.     I analyzed the bid-ask spread of Redwire's Common Stock during the Class Period. **Exhibit 9** reports Redwire's monthly average bid-ask spread as a percentage of the bid-ask midpoint.[92] This spread averaged 0.26% over the Class Period.[93]

91.     By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55%, while the MRK Covered firms had a median bid-ask spread of 1.69%.[94] Redwire's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade Redwire's Common Stock at very low relative cost. Additionally, Redwire's average bid-ask spread over the Class Period places it below the 75th percentile of all companies listed on NASDAQ and the NYSE from 2016-2018 (a lower percentile ranking corresponds to a narrower bid-ask spread).[95]

92.     As a result, Redwire's bid-ask spread also supports the conclusion that Redwire Common Stock traded in an efficient market throughout the Class Period.

---

[92] I calculated the percent bid-ask spread using daily closing bid and ask quotes from Bloomberg. Kee H. Chung and Hao Zhang, A Simple Approximation of Intraday Spreads Using Daily Data, 17 *J. Fin. Markets*, 94, Table 2 (2014). This study compared data using end-of-day prices to intraday data and documented that the spreads were very similar. *See also* Farshid Abdi and Angelo Ranaldo, 2017, A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices, *Review of Financial Studies* 30, at p. 4439: "An approximation of intraday bid-ask spreads with end-of-day quotes provides accurate measures and computational savings" (citations omitted).

[93] The average bid-ask spread for Redwire's Common Stock for the pre-business combination period of March 25, 2021 – September 2, 2021 was 0.22%.

[94] MRK Study at 678 (Table 3).

[95] Bhole Study, at 105, 75th percentile of bid-ask spread defined as 0.75%.

36

### H.      Additional Factor 3: Public Float

93.      The *Krogman* court also considered the public float of a company in weighing market efficiency.[96]

94.      The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances, thereby hindering efficiency.

95.      **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for Redwire Common Stock during the Class Period. As shown in that exhibit, on average, Redwire insiders held 0.98% of the Common Stock during the Class Period. Approximately 75.3% of Redwire's public float was held by institutions and other large outside investors. Column 6 documents that between 16.3 million and 60.4 million shares of Common Stock were available for trading in the public float during the Class Period.

96.      This large degree of public float for Redwire's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.[97]

### I.      Additional Factor 4: Institutional Ownership

97.      Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the

---

[96] *Krogman*, 202 F.R.D. at 478: "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders."

[97] *Id.*

new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

98.    I also report the total institutional ownership of Redwire Common Stock in **Exhibit 10**, which shows that at least 108 institutions held the stock at some point during the Class Period. By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors while the MRK Covered firms had a median of 40 institutional investors.[98] Redwire's institutional ownership base greatly exceeds both of these levels. Moreover, Redwire's average institutional ownership as a percent of shares during the Class Period placed it between the 50th and 75th percentile of NYSE and NASDAQ traded companies.[99]

99.    Thus, the significant institutional ownership base for Redwire Common Stock supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### J.    Additional Factor 5: Autocorrelation

100.    Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns, a potential phenomenon that has been widely studied in the academic literature.[100] The interval over which autocorrelation is examined tends to be on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated.

---

[98] MRK Study at 678 (Table 3).

[99] Bhole Study, at 106: 50th percentile defined as institutional ownership of 68.26% of shares outstanding; 75th percentile defined as 88.89%.

[100] *See, e.g.,* Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, at 95-101.

101.    A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are above (below) average in order to generate profits as the returns continue over subsequent trading days.[101]

102.    A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are above (below) average in order to capture profits when the returns reverse.[102]

103.    Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters, and if such autocorrelation is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly-available information about prior stock price movements would not be fully reflected in current stock prices.

104.    I use an established methodology, *i.e.*, a regression analysis, to test for autocorrelation in Redwire's Common Stock returns.[103] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[104] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it

---

[101] *See, e.g.*, Adem Atmaz, Huseyin Gulen, Stefano Cassella, and Fangcheng Ruan, 2023, "Contrarians, Extrapolators, and Stock Market Momentum and Reversal," *Management Science*, at 1.

[102] *Id*.

[103] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor five analysis section of this report (V.E).

[104] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, at 95-101.

becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

105.    **Exhibit 11** presents the results from the autocorrelation test for Redwire's Common Stock during the Class Period. The autocorrelation coefficient over the full Class Period is not statistically significant. Thus, I find no evidence of persistent autocorrelation in Redwire's Common Stock returns. This finding supports the conclusion that Redwire's Common Stock traded in an efficient market throughout the Class Period.

### K.    Additional Factor 6: Active Options Trading

106.    Academic studies have shown that options written on a company's shares of stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as reflected by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[105] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading.[106]

---

[105] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53; Stephen A. Ross, 1976, "Options and Efficiency," *Quarterly Journal of Economics* 90.

[106] *See, e.g.,* Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41; Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22; Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48; Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

107.     Redwire Common Stock had 544,460 call option contracts and 131,424 put option contracts traded during the Class Period.[107] The presence of options trading supports the conclusion that Redwire Common Stock traded in an efficient market throughout the Class Period.

## VI.    Evaluation of Market Efficiency for Options and Warrants on Redwire Common Stock

108.     I have also been asked to determine whether the market for Redwire's Options and Warrants was efficient during the Class Period.

### A.    Overview of Warrants and Options

109.     Options are derivative securities, a type of security whose value is dependent on, or derived from, the market price of an underlying security or asset such as the common stock. According to the Black-Scholes model, prices for options are affected by six factors: the current (or spot) stock price, the option exercise (or strike) price, the time to expiration, the volatility of the underlying stock, the risk-free interest rate, and expected dividends.[108] In this case, during the Class Period, the pricing for the Redwire Options at issue was dependent on the market price of Redwire Common Stock.

110.     A warrant is a particular type of option issued by a company or a financial institution, frequently pertaining to the company's own common stock. A warrant is essentially a call option that gives the warrant holder the right to purchase a share of the company's stock at a pre-determined price ("strike price") on or before a fixed date ("expiration" or "maturity" date).[109]

---

[107] Source: Chicago Board Options Exchange ("CBOE"). The first date of option trading indicated within the CBOE data was September 3, 2021.

[108] Option valuation models, such as the Black-Scholes model, depend directly on the current underlying stock price. *See, e.g.,* John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201, 291.

[109] *See, e.g.,* "Stock Warrants," Dec. 13, 2022, *Corporate Finance Institute. Available at*: https://corporatefinanceinstitute.com/resources/derivatives/stock-warrants/. "Stock warrants are options issued by a company that trade on an exchange and give investors the right (but not obligation) to purchase company stock at a specific price within a specified time period. When an

In this case, during the Class Period, the pricing for the Redwire Warrants at issue was dependent on the market price of Redwire Common Stock.

111.    One difference between call options and warrants is that the exercise of a warrant requires the firm to issue a new share of stock, which increases the total shares outstanding. Exercise of a call option requires only that the writer of the call option deliver an existing share of stock to fulfill the obligation. Also, unlike call options, warrants result in a cash flow to the firm when the warrant holder pays the exercise price.[110]

112.    On any given date, the prices of the Redwire Warrants and Options were primarily dependent on the magnitudes of the differences between the fixed strike prices of the Warrants or Options and the variable prices of the underlying Redwire Common Stock. Hence, when the price of the underlying security rises (falls), all else constant, in an efficient market it is expected that the price of a warrant or call option will rise (fall), while the price of a put option should fall (rise).[111] However, in general the prices of warrants and options are not expected to move by the same per-share dollar or percentage amount as the underlying stock price.

**B.    The Academic Literature Strongly Supports the Presumption that Options Quickly Reflect Value-Relevant Information**

113.    Throughout this section, I discuss option market efficiency. Because warrants are one type of option, my discussion of "options" includes various option series, such as calls, puts,

---

investor exercises a warrant, they purchase the stock, and the proceeds are a source of capital for the company."

[110] *Id.*

[111] A warrant or call option is in-the-money ("ITM") if the market price of the underlying security is above the strike price. A warrant or call option is at-the-money ("ATM") if the market price of the underlying security equals the strike price. A warrant or call option is out-of-the-money ("OTM") if the market price of the underlying security is below the strike price. The correlations between derivative and stock price movements are strongest among in-the-money options and warrants, as out-of-the-money options and warrants may still expire with zero value despite movements in the underlying stock prices.

and warrants. A wide body of academic literature has studied options pricing in relation to common stocks. For example, numerous studies have evaluated the potential for arbitrage profits to be earned from persistent mispricing opportunities between common stock and options prices, and have concluded that such opportunities do not persist in general due to the efficiency of option pricing.[112]

114.    Many studies have documented that options prices quickly impound and reflect new information.[113] Other studies find that options enhance the overall stock market by making it more informationally efficient.[114] For example, a study by Jennings and Starks finds that stock prices react more quickly to earnings announcements when firms have options traded on the

---

[112] *See*, *e.g.,* Dan Galai, 1977, "Tests of Market Efficiency of the Chicago Board Options Exchange," *Journal of Business* 50; Robert C. Klemkosky and Bruce G. Resnick, 1979, "Put-Call Parity and Market Efficiency," *Journal of Finance* 34; Robert C. Klemkosky and Bruce G. Resnick, 1980, "An Ex-Ante Analysis of Put-Call Parity," *Journal of Financial Economics* 8; Robert E. Whaley, 1982, "On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests," *Journal of Financial Economics* 19.

[113] *See, e.g.*, James M. Patell and Mark A. Wolfson, 1981, "The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research* 19; Steven Manaster and Richard J. Rendleman, Jr., 1982, "Option Prices as Predictors of Equilibrium Stock Prices," *Journal of Finance* 37; Joseph A. Anthony, 1988, "The Interrelation of Stock and Options Market Trading-Volume Data," *Journal of Finance* 43.

[114] *See, e.g.*, Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41; Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22; Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48; Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

stocks.[115] A study by Kumar, Sarin, and Shastri concludes that: "Overall, our results suggest that option listings improve the market quality of the underlying stocks."[116]

115. From my review and experience, the academic literature strongly supports the presumption that options and warrants prices quickly reflect value-relevant information that is also reflected in common stock prices.

116. Moreover, academic studies have concluded that options can enhance market efficiency of the underlying common stocks.[117] Options could not improve common-stock market efficiency if the options themselves were inefficient.[118] As a result, "where the underlying stock trades in an efficient market," academics consider market efficiency of options to be an "essentially settled" matter.[119]

---

[115] Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41, at p. 107.

[116] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53, at p. 717.

[117] *See, e.g.*, Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41; Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22; Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48; Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

[118] *Id.*

[119] *See In re Apple Inc. Sec. Litig.*, 2023 WL 2763952 (N.D. Cal. Mar. 28, 2023). *See also* preceding footnotes.

C.      The *Cammer* and *Krogman* Factors are not Relevant for Gauging Market
        Efficiency of Options and Warrants Markets

117.    While I understand that courts view the *Cammer* and *Krogman* factors as informative of stock market efficiency, these factors are not directly applicable to options or warrants as tests of market efficiency.[120] I summarize some of the reasons below:

a.      Average Weekly Trading Volume: Stock options can be created, or "written" in unlimited quantities. As a result, the ability for investors to buy or sell options is not limited by the amount of trading volume in a given option series.

b.      Analyst Coverage: Option and warrant trading counterparties include sophisticated, institutional traders and market makers who have significant financial interest in pricing these securities based on fundamental valuation techniques, regardless of existing analyst coverage regarding a company.[121]

c.      Market Makers: Options trade on liquid national exchanges like the Chicago Board Options Exchange (CBOE), ensuring that investors can buy or sell options any time during normal trading hours. Because options can be created, or written, in unlimited quantities, trading in options differs from trading in stock, which is limited to the available float and thus benefits from the liquidity provision of market makers. However, the warrants at issue in this matter were traded on the NYSE, which weighs in favor of their efficiency.

d.      SEC Form S-3 Filing Eligibility: A company's ability to issue stock under the shortened registration requirements of Form S-3 has no bearing on investors' ability to trade options or warrants on that company's stock.

e.      Cause and Effect Relationship Between Company Information and Prices: While academic research establishes that option and warrant prices quickly impound new value-relevant information, it also explains that other factors may simultaneously affect prices, sometimes in offsetting directions.[122] For example, a sharp decline in the stock price may cause the value of a warrant or call option to fall, yet the value of the warrant or call option may also increase if the volatility of the stock increases at the same time.

---

[120] *Id.*

[121] *See, e.g.*, John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201-204.

[122] *Id.*, at pp. 201, 291.

45

Correspondingly, while a stock price increase may cause the value of a put option to fall, the value may also increase if the stock's volatility increases at the same time. Moreover, even in an efficient market, deep out-of-the-money option or warrant prices may not react to stock price changes if the options or warrants remain likely to expire out-of-the-money (worthless). Nonetheless, below I evaluate evidence relating to a cause and effect relationship for the options and warrants.

f.      Market Capitalization: Stock options can be created, or "written" in unlimited quantities. As a result, the ability for investors to buy or sell options is not limited by the existing market capitalization of any given option series. Moreover, because the exercise of warrants creates new shares of common stock, it is more appropriate to consider their market capitalization as that of the common stock.

g.      Bid-Ask Spread: Option and warrant prices are generally lower than the current trading prices of the underlying stocks, which causes the bid-ask spread to be wider as a percentage of the option and warrant prices. Options and warrants are traded less frequently, and the trading is facilitated by professional investors and market makers with fixed service provider costs. As a result, the bid-ask spreads of common stocks are not comparable to the bid-ask spreads of options and warrants.

h.      Public Float: Stock options can be created, or "written" in unlimited quantities. As a result, the ability for investors to buy or sell options is not limited by the existing public float of any given option series.

**D.      Cause and Effect Between Redwire Common Stock and Warrant Prices**

118.    I test for a cause-and-effect relationship between Redwire's Common Stock price and Warrant Price throughout the Class Period by examining whether the price changes in the Warrants are directionally consistent with what would typically be observed in an efficient market given Redwire's stock price changes. Specifically, holding all other Warrant pricing inputs constant, if the stock price increases by a large enough amount, Warrant prices typically are expected to increase (depending on the moneyness of the Warrant) and if the stock price declines by a large enough amount, Warrant prices typically are expected to decrease (depending on the

moneyness of the Warrant).[123] In order to avoid any potential bias introduced due to bid-ask bounce[124] or due to non-synchronous trading[125] between the Redwire Common Stock and Warrants, I use the mid-point of the end-of-day bid and ask quotes as a proxy for price for both the Common Stock and the Warrants. I also indicate the moneyness of the Warrants on each trading day, defined as the ratio of the stock price to the Warrant strike price of $11.50. In percentage terms, the range of moneyness for the Redwire Warrants during Class Period ranged from 40.65% to 114.83%.[126]

119.    As shown in **Exhibit 12**, during the Class Period, there were 35 dates when the absolute abnormal stock price return (*i.e.*, magnitude of the stock price movement without regard to direction) was significant at the 95% level or greater according to the event study conducted in **Section V.E**. On 34 out of 35 of these days, the stock and the Warrant prices moved in the same direction. This pattern is consistent with the expected price co-movements that tend to occur in efficient markets.

### E.    Cause and Effect Between Redwire Common Stock and Option Prices

120.    Because neither *Cammer* nor *Krogman* involved options, it is also important to note that there are additional factors supportive of a finding of efficiency in the options context that those courts would not have had cause to consider. Most significantly, Redwire's Options benefited from significant trading opportunities on a national, liquid options exchange – the CBOE

---

[123] *Id*.

[124] Bid-ask bounce happens when trades bounce between bid and ask prices in the absence of new information.

[125] Non-synchronous trading means that transactions can happen at different times even for a fixed interval (*e.g.,* different timing of last traded price for each day), especially for less liquid assets. Price quotes, on the other hand, are more frequent than transactions, thus reducing the impact of this phenomenon.

[126] A warrant is ITM if its moneyness is above 100%. A warrant is ATM if its moneyness is equal to 100%. A warrant is OTM if its moneyness is below 100%.

– during the Class Period. As noted above, over 675,000 Option contracts traded during the Class Period. Each contract covered 100 shares of stock, indicating significant investor interest in trading options on millions of shares of Redwire Common Stock.

121.    Similar to the analysis applied in **Section VI.D**, I also evaluate whether the Options prices tended to move in a directionally consistent manner with the underlying Common Stock price movements. All else equal, in an efficient market, one would expect call option prices to move in the same direction as underlying stock prices and put options prices to move in the opposite direction as the underlying stock prices. As discussed above in **Sections VI.A** and **C**, this prediction is stronger for options that are in-the-money than those that are out-of-the-money. I also note that if the volatility of the underlying stock price changes at the same time as a large stock return, this volatility input to option pricing may result in a movement in the option price that differs from the prediction based only on the underlying stock price input.[127]

122.    In **Exhibit 13**, I report the stock log returns for any dates from my *Cammer* Factor 5 event studies which are statistically significant at the 95% level or better, as well as the corresponding Option log returns.[128] For each trading day, I report three different option series based on options that: a) have strike prices nearest the prior day's closing stock price, and b) are the nearest to expiration. As can be seen in the exhibit, of the 90 call options and 90 put options, only 4 call and 7 puts move in a direction that is inconsistent with the underlying stock price movements. This finding provides further support for the conclusion that the Options traded in an efficient market throughout the Class Period.

---

[127] Note that this is similarly true for warrants.

[128] The first date of option trading indicated within the CBOE data was September 3, 2021.

**F.    Market Efficiency in the Market for Redwire's Common Stock Strongly Reinforces the Conclusion that the Redwire Options and Warrants Also Traded in an Efficient Market**

123.    In this case, during the Class Period, the pricing for the Redwire Options and Warrants at issue was dependent on the market price of Redwire Common Stock.[129] Courts have presumed that when a market for common stock is found to be informationally efficient, reliance on misstatements or omissions can be presumed for associated derivative securities, since their prices are derivative of the market prices for common stock, which in turn reflect any value-related information.[130] Moreover, courts have found efficiency for the options market when application of the *Cammer* Factors supports efficiency of the underlying stock.[131]

124.    As demonstrated above, Redwire Common Stock satisfied each of the efficiency factors I evaluated with the exception of S-3 filing eligibility, and thus were informationally efficient. As a result, I conclude that Redwire Common Stock traded in an efficient market during the Class Period. Because I have concluded that the market for Redwire Common Stock was efficient, I also conclude -- based on my review and analysis of (i) the academic literature, (ii) Redwire Options and Warrants trading during the Class Period, and (iii) price movements in Redwire Options and Warrants during the Class Period -- that the Redwire Options and Warrants traded in an efficient market.

---

[129] Indeed, the most widely used option and warrant valuation models, such as the Black-Scholes model, depend directly on the current underlying stock price. *See, e.g.*, John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201, 291.

[130] *See In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 100 (D. Conn. 2006); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F.Supp.2d 1315, 1330 (N.D. Ga. 2007); *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 41-42 (D.D.C. 2008).

[131] *See Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.,* 2023 WL 4981716, at *5 (D.N.J. Aug. 3, 2023) (collecting cases).

## VII.     Ability to Calculate Damages on a Class-Wide Basis

125.     I have also been asked to opine on whether per-share damages for traders of Redwire securities (*i.e.*, Common Stock, Options, and Warrants) can be assessed for all Class members based upon a methodology common to all Class members and consistent with Lead Plaintiff's theories of liability. As discussed below, damages for Lead Plaintiff's claims can be calculated on a class-wide basis through one or more common methodologies.

### A.     Calculation of Damages for Violations of §10(b) and §20(a) of the Exchange Act

126.     For the §10(b) claims, Lead Plaintiff alleges that the Defendants perpetrated a scheme, misled investors, and made numerous materially false and misleading statements and omissions relating to the Company's business and internal controls over financial reporting which deceived the investing public, artificially inflated the market price of Redwire securities, and caused Class members to purchase Redwire securities at artificially inflated prices.[132] Lead Plaintiff also claims certain Defendants are liable as control persons under §20(a).[133]

127.     The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Securities Litigation

---

[132] Complaint ¶ 326.

[133] *Id.* ¶ 360. §20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. See 15 U.S.C. §78t(a). Given §20(a)'s derivative nature, Lead Plaintiff has instructed me to assume that §20(a) damages can be calculated using the same methodologies for assessing §10(b) damages.

Reform Act of 1995 ("PSLRA").[134] This limit on damages can also be applied class-wide. The out-of-pocket methodology has been widely accepted for use across §10(b) matters.

128.    As part of the §10(b) claims, Lead Plaintiff alleges that "Defendants' false statements served to conceal the risks that the fraud scheme would be publicly exposed, as well as the risks related to Defendants' dissemination of false and misleading statements in investor materials, press releases, interviews, and social media posts."[135] Lead Plaintiff further alleges that the "declines in the price of the Redwire stock and resulting losses are directly attributable to the materialization of risks that were previously misrepresented or concealed by the Defendants."[136]

129.    The out-of-pocket methodology described above is also capable of incorporating this element of Lead Plaintiff's theory of liability. Fundamental principles of valuation analysis demonstrate that a company's stock price reflects the value of all future cash flows discounted to the present time at a rate that reflects the riskiness of the business and those cash flows.[137] The discount rate does not depend on the identities or differing risk preferences of individual investors.[138] To the extent that any portion of a stock price decline following a corrective disclosure is unrelated to Lead Plaintiff's allegations involving the materialization of concealed risk, this

---

[134] The PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S. Code § 78u–4 (codifying language).

[135] Complaint ¶ 113. *See also*, *id*., at ¶¶ 110-120.

[136] *Id*. ¶ 117.

[137] *See, e.g.,* Joshua Rosenbaum and Joshua Pearl, *Investment Banking*, 2009, Wiley Finance. At p. 109: "The projected [free cash flows] and terminal value are discounted to the present at the target's weighted average cost of capital (WACC), which is a discount rate commensurate with its business and financial risks."

[138] *Id*.

51

portion can be disaggregated using the same techniques described above. As a result, calculation

of the inputs to the out-of-pocket methodology is formulaic and common across Class members.

130.    The claims process produces information necessary for the calculation of damages

for each Class member, including the purchase and sale information for the security. This

information is available from brokerage statements and other documentation of securities

transactions. Artificial inflation per share is quantified for each day of the Class period and then

damages are calculated using the formula described above. As a result, the methodology for

calculating damages in §10(b) matters such as this is well-established and formulaic across all

Class members.

131.    The quantification of artificial inflation per share is based upon a detailed loss

causation analysis. I have not been asked to perform a loss causation analysis at this time, and I

understand that such analysis often incorporates information produced during discovery.

Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

132.    Event studies are widely employed to calculate artificial inflation. Event studies

measure stock price reactions to corrective disclosures which revealed the relevant truth that was

concealed by alleged material omissions and/or misrepresentations.[139]

133.    To the extent that reliable evidence is introduced showing that a material portion of

the difference in the estimated artificial inflation between the purchase and sale of the securities

may be attributed to non-fraud related factors, the impact of such "confounding information" on

the price of Redwire securities can be determined on a common, class-wide basis using various

accepted methodologies.  The value of any confounding information can then be subtracted from

the price impact of corrective disclosures in calculating inflation. This process may rely upon

---

[139] In this report I conducted an event study to assist with the evaluation of market efficiency. My
event study in this report was not intended to quantify artificial inflation.

additional information learned during discovery and will be based on the specific set of facts and circumstances in a given case.

134.    A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery.

135.    One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period.

136.    Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

137.    All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances.

138.    Damages relating to Redwire's Options and Warrants can also be calculated in a similar manner and utilizing the same techniques described above. Once artificial inflation is estimated, the embedded inflation contributing to an option's or warrant's price can change based on a number of factors. [140] These factors include, but are not limited to, the level of the stock price in relation to the strike price, time to maturity, and volatility.

---

[140] Option and warrant valuation models, such as the Black-Scholes model, depend directly on the current underlying stock price. *See, e.g.,* John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201, 291, 295.

139.    One can employ various options and warrants pricing methodologies, such as the widely utilized Black-Scholes pricing model[141] or the binomial model,[142] to infer the inflation at the time of each Class member's purchase and sale. These models provide a way to value an option or warrant as a function of the variables that influence option or warrant values: the strike price, time to expiration, risk-free interest rate, volatility of the underlying security, and the current market price of the underlying security.

140.    By changing the underlying price of the security in the equation to reflect the removal of the artificial inflation, one can assess how the value of the option or warrant would be impacted. Therefore, Options and Warrants damages in this matter can be calculating using a standard, well-established methodology and can be applied on a class-wide basis.

**B.    Damage Methodologies are Flexible and Can Incorporate Alternative Findings**

141.    The damages methodologies I have laid out above for §10(b) are flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period.  The methodologies I have described above to calculate §10(b) can be modified based on alternative findings the finder of fact may determine, including, but not limited to any: (1) confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) the first actionable fraudulent conduct.

142.    First, irrespective of what the ultimate finder of fact, *i.e.*, the jury, determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. Regardless of how the jury weighs

---

[141] Fischer Black and Myron Scholes, 1973, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81.

[142] John C. Cox, Stephen A. Ross, and Mark Rubinstein, 1979, "Option Pricing: A Simplified Approach," *Journal of Financial Economics* 7.

evidence, whether they find that any such disaggregation analysis I may conduct is the most appropriate, or they determine that based upon the evidence, a different amount is more appropriate, this finding can simply be incorporated into the damages calculation.

143. Second, should the jury determine that the true economic inflation evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis.

144. Third, should the jury decide that the first actionable misstatement and/or omission or otherwise actionable fraudulent conduct happened at a date later than March 25, 2021, prior to such date, inflation could simply be set to zero.

145. If the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

146. To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of the claims in this matter, I conclude that Common Stock, Options and Warrants damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## VIII. Conclusion

147. In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I base my analyses, it is my opinion that Redwire's Common Stock, Redwire's Options and Redwire's Warrants traded in an efficient market throughout the Class Period. Moreover, it is my opinion that Common Stock, Options and Warrants damages in this matter under §10(b) and §20(a) can both be calculated on a class-wide basis utilizing common methodologies.

I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

_____

Matthew D. Cain

**Appendix A**

**Matthew D. Cain, Ph.D.**                                                            January 2024

E-mail: mdcain@outlook.com                                                      Homepage
Mobile: 574-485-8065                                                                     SSRN

## Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                          Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

A-1

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).


**Presentations**
- All Indiana Conference

A-2

- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

A-3

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies*, *Financial Management*, *North American Journal of Economics and Finance*, *International Review of Law & Economics*, *Managerial and Decision Economics*, *Annals of Finance*, *Journal of Economics and Business*

## Teaching Experience

UC Berkeley School of Law
> LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2023
> LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business
> FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
> FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
> MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
> MGMT 610: Financial Management I (MBA Core), Fall: 2007

## Expert Witness Experience

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

A-5

- *Securities and Exchange Commission v. Anatoly Hurgin, et al*., Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al*., Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

A-7

**Appendix B**

## Documents Considered

**Court Documents:**

- First Amended Consolidated Complaint for Violations of the Federal Securities Laws, No. 3:21-cv-01254-TJC-PDB (Doc. 47).

- Order Denying Defendants' Motion to Dismiss, dated Mar. 22, 2023 (Doc. 62).

**Court Decisions and Securities Law:**

- *Aranz v. Catalyst Pharmaceutical Partners, Inc.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014)

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).

- *Bond v. Clover Health Investments, Corp., et al.*, WL 1999859 (M.D. Tenn. Feb. 14, 2023).

- *Brown v. China Integr. Energy Inc.*, WL 12720322 (C.D. Cal. Feb. 17, 2015)

- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

- *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501-502 (S.D. Fla. 2003).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D.Ca. 2016).

- *In re Apple Inc. Sec. Litig.*, WL 2763952 (N.D. Cal. Mar. 28, 2023).

- *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012).

- *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009).

- *In re Fannie Mae Sec. Litig.*, No. 04-1639 (RJL).

- *In re HealthSouth Corp. Sec. Litig., 257 F.R.D. 260, 281* (N.D. Ala. 2009*).*

- *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 664-65 (E.D. Va. 2000).

- *In re Netbank, Inc. Secs. Litigation*, 259 F.R.D. 656, 669-676 (N.D. Ga. 2009).

- *In re Priceline.com Inc. Sec. Litig.*, No. 3:00CV01884(DJS).

- *In re QuantumScape Securities Class Action Litigation*, WL 17974629, (N.D. Cal. Dec. 19, 2022).

- *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F.Supp.2d 1315, 1330 (N.D. Ga. 2007).

- *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022).

- *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2023 WL 4981716 (D.N.J. 2023).

B-1

- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

- *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fun v. Regions Fin. Corp.*, 762 F.3d 1248, 1257-1258 (11th Cir. 2014).

- *Monroe Cty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 383-84 (N.D. Ga. 2019).

- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

- *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661, (S.D. Fla. Mar. 16, 2016).

- *Todd v. STAAR Surg. Co.*, 2017 WL 821662 (C.D. Cal. Jan. 5, 2017)

**Academic Literature:**

- Farshid Abdi and Angelo Ranaldo, 2017, "A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices," *Review of Financial Studies* 30.

- Joseph A. Anthony, 1988, "The Interrelation of Stock and Options Market Trading-Volume Data," *Journal of Finance* 43.

- Adem Atmaz, Huseyin Gulen, Stefano Cassella, and Fangcheng Ruan, 2023, "Contrarians, Extrapolators, and Stock Market Momentum and Reversal," *Management Science* (forthcoming).

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61.

- Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law* 19.

- Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22.

- Bharat Bhole, Sunita Surana, and Frank Torchio, 2020, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review Online*.

- Fischer Black and Myron Scholes, 1973, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81.

- Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, "Information, Trading, and Volatility: Evidence from Firm-Specific News," *Review of Financial Studies* 32.

- Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, "Good News, Bad News, Volatility, and Betas," *Journal of Finance* 50.

- Kee H. Chung and Hao Zhang, 2014, "A Simple Approximation of Intraday Spreads using Daily Data," *Journal of Financial Markets* 17.

- John C. Cox, Stephen A. Ross, and Mark Rubinstein, 1979, "Option Pricing: A Simplified Approach," *Journal of Financial Economics* 7.

- Ray Fair, 2002, "Events That Shook the Market," *Journal of Business* 75.

- Eugene F. Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25.

- Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46.

- Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48.

- Dan Galai, 1977, "Tests of Market Efficiency of the Chicago Board Options Exchange," *Journal of Business* 50.

- Kewei Hou, Chen Xue, and Lu Zhang, 2020, "Replicating Anomalies," *Review of Financial Studies* 33.

- John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009.

- Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41.

- Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6.

- Robert C. Klemkosky and Bruce G. Resnick, 1979, "Put-Call Parity and Market Efficiency," *Journal of Finance* 34.

- Robert C. Klemkosky and Bruce G. Resnick, 1980, "An Ex-Ante Analysis of Put-Call Parity," *Journal of Financial Economics* 8.

- Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

- Charles M.C. Lee and Eric C. So, 2017, "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124.

- A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 13.

- Steven Manaster and Richard J. Rendleman, Jr., 1982, "Option Prices as Predictors of Equilibrium Stock Prices," *Journal of Finance* 37.

- Mark L. Mitchell and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49.

- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, "Is There Life After the Complete Loss of Analyst Coverage?," *Accounting Review* 88.

- James M. Patell and Mark A. Wolfson, 1981, "The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research* 19.

- Joshua Rosenbaum and Joshua Pearl, *Investment Banking*, Wiley Finance, 2009.

- Stephen A. Ross, 1976, "Options and Efficiency", *Quarterly Journal of Economics* 90.

B-3

- Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63.

- Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

- Robert E. Whaley, 1982, "On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests," *Journal of Financial Economics* 19.

**Data Sources:**

- Bloomberg Terminal

- Factiva News

- CBOE

- SEC Edgar Online

- Redwire Press Releases and SEC Filings

**Other:**

- https://www.bls.gov/data/inflation_calculator.htm

- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers

- https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/how-read-8

- http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess

- https://www.nyse.com/market-model

- https://www.sec.gov/files/forms-3.pdf

- All data and documents cited throughout this report

**Exhibits**

Exhibit 1. Redwire Common Stock Closing Stock Price and Daily Volume

Exhibit 2. Redwire Weekly Trading Volume

Exhibit 3. Analyst Coverage

Exhibit 4. Coefficients from Rolling Event Study Regressions

Exhibit 5. Root Mean Squared Error (RMSE) from Rolling Event Study Regressions

Exhibit 6a. Description of Redwire News Days

Exhibit 6b. Redwire News Days and Common Stock Abnormal Returns

Exhibit 7a. Comparison of Statistical Significance on Redwire Common Stock for News Days vs. No News Days During the Analysis Period

Exhibit 7b. Comparison of Statistical Significance on Redwire Common Stock for News Days vs. No News Days During the Class Period

Exhibit 8. Redwire Common Stock Market Capitalization

Exhibit 9. Redwire Common Stock Average Bid-Ask Spread

Exhibit 10. Redwire Common Stock Public Float, Insider Holdings, and Institutional Ownership

Exhibit 11. Test for Autocorrelation During the Class Period

Exhibit 12. Warrant Price Movements Around Significant Common Stock Price Movements

Exhibit 13. Option Price Movements Around Significant Common Stock Price Movements

**Exhibit 1**

**Redwire Common Stock Closing Stock Price and Daily Volume**
**March 25, 2021 – April 30, 2022**



Data source: Bloomberg.

Note: From March 25, 2021, through September 02, 2021, price and volume data reflect GPAC. From the closing of the business combination on September 03, 2021, price and volume data reflect RDW.

E-2

**Exhibit 2**



**Redwire Weekly Trading Volume**
**March 25, 2021 – March 31, 2022**

Data source: Bloomberg, SEC Filings.

Note: Average weekly trading volume is calculated by analyzing non-overlapping group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period. The weekly trading volume for the week of March 29, 2022, has been scaled by a factor of 5/3 as the final week of the Class Period contained only 3 trading days.

**Exhibit 3**

**Analyst Coverage**
**Class Period: March 25, 2021 – March 31, 2022**

| | Analyst Name | Reports Issued During the Class Period |
|---|---|---|
| [1] | Jefferies | 3 |
| [2] | Validea | 3 |
| [3] | ValuEngine, Inc | 2 |
| | Total | 8 |

Data source: Investext.

**Exhibit 4**

**Coefficients from Event Study Regressions**
**March 25, 2021 – March 31, 2022**



Data source: Bloomberg, SEC Filings, Factiva, Complaint.

Note: Regression models described in notes below Exhibit 7.

E-5

**Exhibit 5**



**Root Mean Squared Error (RMSE) from Event Study Regressions**
**March 25, 2021 – March 31, 2022**

Data source: Bloomberg, SEC Filings, Factiva, Complaint.

Note: Regression models described in notes below Exhibit 7.

**Exhibit 6a**

### Description of Redwire News Days

|        | Market Impact Date | Press Release Headline |
|--------|--------------------|------------------------|
| [1]  | 25-Mar-2021 | Redwire To Merge With Genesis Park Acquisition, Becomes Publicly Traded Company |
| [2]  | 18-May-2021 | Genesis Park Acquisition Corp. - Late Filing Notice (SEC Filing - NT 10-Q) |
| [3]  | 02-Sep-2021 | Genesis Park Acquisition Corp. and Redwire Announce Shareholder Approval of the Business Combination |
| [4]  | 03-Sep-2021 | Redwire Announces Completion Of Business Combination With Genesis Park Acquisition Corp |
| [5]  | 10-Nov-2021 | Redwire Corporation to Reschedule Third Quarter 2021 Results |
| [6]  | 15-Nov-2021 | Redwire Corporation - Late Filing Notice (Form NT 10-Q) |
| [7]  | 31-Mar-2022 | Redwire Corporation - Late Filing Notice (Form NT 10-K); (Included notice in 8-K filed after-hours 30-Mar-2022) |
| [8]  | 01-Apr-2022 | Redwire Corporation Reports Full Fiscal Year 2021 Financial Results |
| [9]  | 13-May-2022 | Redwire Corporation Reports First Quarter 2022 Financial Results |
| [10] | 10-Aug-2022 | Redwire Corporation Reports Second Quarter 2022 Financial Results |
| [11] | 09-Nov-2022 | Redwire Corporation Reports Third Quarter 2022 Financial Results |
| [12] | 29-Mar-2023 | Redwire Corporation Reports Fourth Quarter and Full Year 2022 Financial Results |

Data source: Bloomberg, SEC Filings, Factiva, Complaint.

**Exhibit 6b**

**Redwire News Days and Common Stock Abnormal Returns**

|  | Market Impact Date | Log Return | Abnormal Return | Abnormal Dollar Return | t-Statistic | p-Value |
|---|---|---|---|---|---|---|
| [1] | 25-Mar-2021 | 3.1% | 3.1% | $0.31 | 2.48 | 0.014 |
| [2] | 18-May-2021 | 0.2% | 0.6% | $0.06 | 0.52 | 0.604 |
| [3] | 02-Sep-2021 | 4.6% | 4.6% | $0.47 | 6.15 | 0.000 |
| [4] | 03-Sep-2021 | 15.3% | 15.4% | $1.75 | 20.72 | 0.000 |
| [5] | 10-Nov-2021 | -17.6% | -17.2% | $-1.88 | -6.19 | 0.000 |
| [6] | 15-Nov-2021 | -6.9% | -6.9% | $-0.75 | -2.35 | 0.020 |
| [7] | 31-Mar-2022 | 6.3% | 9.4% | $0.79 | 2.27 | 0.025 |
| [8] | 01-Apr-2022 | -33.8% | -34.6% | $-2.48 | -8.32 | 0.000 |
| [9] | 13-May-2022 | 1.6% | -3.4% | $-0.12 | -0.80 | 0.425 |
| [10] | 10-Aug-2022 | 3.6% | -0.2% | $-0.01 | -0.04 | 0.969 |
| [11] | 09-Nov-2022 | -13.9% | -12.8% | $-0.32 | -3.25 | 0.002 |
| [12] | 29-Mar-2023 | -2.3% | -4.2% | $-0.11 | -0.75 | 0.452 |

Data source: Bloomberg, SEC Filings, Factiva, Complaint.

Note: Regression models described in notes below Exhibit 7.

**Exhibit 7a**

### Comparison of Statistical Significance on Redwire Common Stock
### for News Days vs. No News Days During the Analysis Period

| Statistic | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 12 | 224 | |
| Significant Days at 95% Confidence Level | 8 | 14 | |
| % Significant Days at 95% Confidence Level | 66.7% | 6.3% | 0.00 |
| Average Absolute Abnormal Return | 9.4% | 2.6% | 0.04 |
| Average Volume (Millions) | 1.34 | 0.36 | 0.04 |

Data source: Bloomberg, SEC Filings, Factiva.

Notes: These results are based on a fixed regression model from January 15, 2021 to July 12, 2021 (the first 120 days of Common Stock returns for GPAC/Redwire) and rolling 120 day regressions after July 12, 2021. Each model regresses the daily GPAC/RDW stock return on the daily return of the S&P 1500 Composite Total Return Index ("Market Index") and the return of the S&P Aerospace and Defense Select Industry Index ("Industry Index"). Excluded from estimation are the alleged Corrective Disclosures, News Days identified in Exhibits 6a and 6b, and two outlier news dates: After-market hours on Oct. 12, 2021, Redwire announced that the Company would be providing navigational technology to NASA on the organization's latest mission. See, https://redwirespace.com/newsroom/redwire-providing-critical-navigation-technology-to-guide-nasas-first-mission-to-the-trojan-asteroids/. On Oct. 25, 2021, Redwire announced further news regarding its collaboration with NASA. See, https://redwirespace.com/newsroom/nasa-selects-orbital-reef-to-develop-space-station-replacement/. Both market impact dates (Oct. 13, 2021 and Oct. 25, 2021) have been excluded from the regression estimations.

**Exhibit 7b**

**Comparison of Statistical Significance on Redwire Common Stock
for News Days vs. No News Days During the Class Period**

| Statistic | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 7 | 104 | |
| Significant Days at 95% Confidence Level | 6 | 8 | |
| % Significant Days at 95% Confidence Level | 85.7% | 7.7% | 0.00 |
| Average Absolute Abnormal Return | 8.2% | 1.8% | 0.04 |
| Average Volume (Millions) | 1.58 | 0.53 | 0.15 |

Data source: Bloomberg, SEC Filings, Factiva.

Notes: These results are based on a fixed regression model from January 15, 2021 to July 12, 2021 (the first 120 days of Common Stock returns for GPAC/Redwire) and rolling 120 day regressions after July 12, 2021. Each model regresses the daily GPAC/RDW stock return on the daily return of the S&P 1500 Composite Total Return Index ("Market Index") and the return of the S&P Aerospace and Defense Select Industry Index ("Industry Index"). Excluded from estimation are the alleged Corrective Disclosures, News Days identified in Exhibits 6a and 6b, and two outlier news dates: After-market hours on Oct. 12, 2021, Redwire announced that the Company would be providing navigational technology to NASA on the organization's latest mission. See, https://redwirespace.com/newsroom/redwire-providing-critical-navigation-technology-to-guide-nasas-first-mission-to-the-trojan-asteroids/. On Oct. 25, 2021, Redwire announced further news regarding its collaboration with NASA. See, https://redwirespace.com/newsroom/nasa-selects-orbital-reef-to-develop-space-station-replacement/. Both market impact dates (Oct. 13, 2021 and Oct. 25, 2021) have been excluded from the regression estimations.

E-10

**Exhibit 8**

**Redwire Common Stock Market Capitalization**
**March 25, 2021 – March 31, 2022**



Data source: Bloomberg, SEC Filings.

**Exhibit 9**

**Redwire Common Stock Average Monthly Bid-Ask Spread**
**March 25, 2021 – March 31, 2022**



Data source: Bloomberg.

Notes:
(1) The percentage bid-ask spread was calculated as the a) the closing ask quote less the closing bid quote divided by b) the average of the closing bid and ask quotes.
(2) March 2021 and March 2022 data are limited to the Class Period.

E-12

**Exhibit 10**

**Redwire Common Stock Public Float, Insider Holdings, and Institutional Ownership**

| Date | Shares Outstanding | Total Institutions Owning Stock | Insider Holdings | Short Interest | Public Float | Insider Holdings as % of Shares Outstanding | Institutional Holdings | Institutional Holdings as % of Shares Outstanding | Institutional Holdings as % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 31-Mar-2021 | 16,377,622 | 29 | 145,000 | 82,014 | 16,314,636 | 0.89% | 10,059,834 | 61.42% | 61.66% |
| 30-Jun-2021 | 16,377,622 | 39 | 145,000 | 85,719 | 16,318,341 | 0.89% | 10,575,918 | 64.58% | 64.81% |
| 30-Sep-2021 | 59,661,273 | 38 | 350,000 | 575,730 | 59,887,003 | 0.59% | 52,429,810 | 87.88% | 87.55% |
| 31-Dec-2021 | 59,661,273 | 56 | 752,700 | 1,477,506 | 60,386,079 | 1.26% | 49,493,892 | 82.96% | 81.96% |
| 31-Mar-2022 | 59,661,273 | 58 | 752,700 | 1,381,340 | 60,289,913 | 1.26% | 48,645,904 | 81.54% | 80.69% |
| **Total Institutions over Class Period:** | | **108** | | | **Class Period Average:** | **0.98%** | | **75.67%** | **75.33%** |

Data Sources: Bloomberg, SEC Filings.

E-13

**Exhibit 11**

**Test for Autocorrelation During the Class Period**

| Quarter | Coefficient on Previous Day's Abnormal Return | p-Value | Sample Size |
|---|---|---|---|
| 2021Q1 | 0.11 | 0.25 | 53 |
| 2021Q2 | 0.01 | 0.95 | 63 |
| 2021Q3 | 0.05 | 0.84 | 64 |
| 2021Q4 | -0.04 | 0.81 | 64 |
| 2022Q1 | -0.07 | 0.60 | 62 |
| **Full Class Period** | **-0.02** | **0.87** | **258** |

Data source: Bloomberg.

Notes:

(1) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.
(2) 2021Q1 includes all trading days within the quarter (only five trading days fall within the Class Period).

**Exhibit 12**

**Warrant Price Movements Around Significant Common Stock Price Movements**

| Date | Stock Price | Stock Return | Warrant Price | Warrant Return | Moneyness | ITM/ATM/OTM |
|---|---|---|---|---|---|---|
| 25-Mar-2021 | $10.17 | 2.79% | $1.68 | 53.39% | 88.39% | OTM |
| 26-Mar-2021 | $10.54 | 3.62% | $2.37 | 34.41% | 91.65% | OTM |
| 31-Aug-2021 | $10.19 | 1.98% | $2.08 | -0.24% | 88.57% | OTM |
| 02-Sep-2021 | $10.49 | 4.53% | $2.47 | 7.35% | 91.22% | OTM |
| 03-Sep-2021 | $12.14 | 14.61% | $2.60 | 4.94% | 105.57% | ITM |
| 07-Sep-2021 | $11.74 | -3.35% | $2.48 | -4.53% | 102.09% | ITM |
| 09-Sep-2021 | $12.85 | 7.60% | $2.81 | 14.53% | 111.74% | ITM |
| 10-Sep-2021 | $11.65 | -9.85% | $2.66 | -5.67% | 101.26% | ITM |
| 13-Sep-2021 | $11.36 | -2.48% | $2.52 | -5.22% | 98.78% | OTM |
| 14-Sep-2021 | $10.71 | -5.94% | $2.38 | -5.72% | 93.09% | OTM |
| 16-Sep-2021 | $11.04 | 4.68% | $2.45 | 1.23% | 96.00% | OTM |
| 23-Sep-2021 | $10.92 | -3.55% | $2.36 | -3.13% | 94.96% | OTM |
| 24-Sep-2021 | $10.49 | -4.07% | $2.36 | -0.21% | 91.17% | OTM |
| 27-Sep-2021 | $10.00 | -4.79% | $2.25 | -4.78% | 86.91% | OTM |
| 04-Oct-2021 | $9.05 | -4.70% | $2.02 | -1.23% | 78.65% | OTM |
| 07-Oct-2021 | $9.77 | 10.69% | $2.66 | 27.58% | 84.91% | OTM |
| 12-Oct-2021 | $9.90 | 7.07% | $2.81 | 10.69% | 86.04% | OTM |
| 13-Oct-2021 | $12.13 | 20.32% | $3.56 | 23.52% | 105.43% | ITM |
| 14-Oct-2021 | $10.81 | -11.53% | $3.05 | -15.32% | 93.96% | OTM |
| 15-Oct-2021 | $10.23 | -5.52% | $2.91 | -4.70% | 88.91% | OTM |
| 22-Oct-2021 | $12.18 | 8.25% | $3.73 | 8.25% | 105.91% | ITM |
| 25-Oct-2021 | $13.13 | 7.47% | $4.42 | 17.11% | 114.13% | ITM |
| 01-Nov-2021 | $12.70 | 6.51% | $4.12 | 6.40% | 110.43% | ITM |
| 10-Nov-2021 | $9.99 | -17.76% | $3.17 | -21.74% | 86.83% | OTM |
| 11-Nov-2021 | $10.85 | 8.26% | $3.51 | 10.19% | 94.30% | OTM |
| 15-Nov-2021 | $10.50 | -6.90% | $3.39 | -10.89% | 91.26% | OTM |
| 01-Dec-2021 | $8.12 | -8.73% | $2.71 | -10.83% | 70.57% | OTM |
| 07-Dec-2021 | $7.98 | 7.88% | $2.58 | 8.07% | 69.39% | OTM |

| Date | Stock Price | Stock Return | Warrant Price | Warrant Return | Moneyness | ITM/ATM/OTM |
|---|---|---|---|---|---|---|
| 13-Dec-2021 | $7.31 | -7.39% | $2.28 | -10.21% | 63.52% | OTM |
| 05-Jan-2022 | $6.22 | -9.80% | $1.71 | -15.46% | 54.04% | OTM |
| 31-Jan-2022 | $5.37 | 9.78% | $1.34 | 14.42% | 46.65% | OTM |
| 03-Feb-2022 | $5.64 | 6.41% | $1.52 | 12.27% | 49.00% | OTM |
| 24-Feb-2022 | $5.22 | 11.03% | $1.30 | 4.74% | 45.39% | OTM |
| 08-Mar-2022 | $5.76 | 7.48% | $1.47 | 8.52% | 50.04% | OTM |
| 31-Mar-2022 | $8.48 | 6.01% | $2.23 | 15.49% | 73.74% | OTM |

Data Source: Bloomberg, SEC Filings.

Note: A warrant is in-the-money ("ITM") if the common stock's market price is above the warrant's strike price. A warrant is at-the-money ("ATM") if the market price equals the strike price. A warrant is out-of-the-money ("OTM") if the market price is below the strike price.

**Exhibit 13**

### Option Price Movements Around Significant Common Stock Price Movements

| Date | Stock Return (Log) | Stock Price One Day Prior | Options Series | Call Option Return | Same Direction as Common? | Put Option Return | Opposite Direction as Common? |
|---|---|---|---|---|---|---|---|
| 07-Sep-2021 | -3.35% | $12.14 | $10.0 Strike, Expiring 17-Sep-2021 | -3.68% | Yes | -13.98% | No |
| 07-Sep-2021 | -3.35% | $12.14 | $12.5 Strike, Expiring 17-Sep-2021 | -37.27% | Yes | -5.33% | No |
| 07-Sep-2021 | -3.35% | $12.14 | $15.0 Strike, Expiring 17-Sep-2021 | -31.37% | Yes | 4.60% | Yes |
| 09-Sep-2021 | 7.60% | $11.91 | $10.0 Strike, Expiring 17-Sep-2021 | 32.61% | Yes | -69.31% | Yes |
| 09-Sep-2021 | 7.60% | $11.91 | $12.5 Strike, Expiring 17-Sep-2021 | 56.45% | Yes | -35.22% | Yes |
| 09-Sep-2021 | 7.60% | $11.91 | $15.0 Strike, Expiring 17-Sep-2021 | 32.85% | Yes | -26.98% | Yes |
| 10-Sep-2021 | -9.85% | $12.85 | $10.0 Strike, Expiring 17-Sep-2021 | -51.08% | Yes | 0.00% | Yes |
| 10-Sep-2021 | -9.85% | $12.85 | $12.5 Strike, Expiring 17-Sep-2021 | -93.61% | Yes | 30.42% | Yes |
| 10-Sep-2021 | -9.85% | $12.85 | $15.0 Strike, Expiring 17-Sep-2021 | -113.94% | Yes | 25.62% | Yes |
| 13-Sep-2021 | -2.48% | $11.65 | $10.0 Strike, Expiring 17-Sep-2021 | -19.11% | Yes | 13.35% | Yes |
| 13-Sep-2021 | -2.48% | $11.65 | $12.5 Strike, Expiring 17-Sep-2021 | -35.67% | Yes | 1.63% | Yes |
| 13-Sep-2021 | -2.48% | $11.65 | $15.0 Strike, Expiring 17-Sep-2021 | -69.31% | Yes | 5.33% | Yes |
| 14-Sep-2021 | -5.94% | $11.36 | $10.0 Strike, Expiring 17-Sep-2021 | -51.67% | Yes | 11.78% | Yes |
| 14-Sep-2021 | -5.94% | $11.36 | $12.5 Strike, Expiring 17-Sep-2021 | -84.73% | Yes | 25.49% | Yes |
| 14-Sep-2021 | -5.94% | $11.36 | $15.0 Strike, Expiring 17-Sep-2021 | -28.77% | Yes | 16.71% | Yes |
| 16-Sep-2021 | 4.68% | $10.54 | $7.5 Strike, Expiring 17-Sep-2021 | 18.23% | Yes | 0.00% | Yes |
| 16-Sep-2021 | 4.68% | $10.54 | $10.0 Strike, Expiring 17-Sep-2021 | 47.45% | Yes | -55.96% | Yes |
| 16-Sep-2021 | 4.68% | $10.54 | $12.5 Strike, Expiring 17-Sep-2021 | 28.77% | Yes | -36.51% | Yes |
| 23-Sep-2021 | -3.55% | $11.32 | $10.0 Strike, Expiring 15-Oct-2021 | -15.42% | Yes | 6.90% | Yes |
| 23-Sep-2021 | -3.55% | $11.32 | $12.5 Strike, Expiring 15-Oct-2021 | -18.92% | Yes | 8.52% | Yes |
| 23-Sep-2021 | -3.55% | $11.32 | $15.0 Strike, Expiring 15-Oct-2021 | -15.42% | Yes | 5.53% | Yes |
| 24-Sep-2021 | -4.07% | $10.92 | $7.5 Strike, Expiring 15-Oct-2021 | -12.52% | Yes | -47.00% | No |
| 24-Sep-2021 | -4.07% | $10.92 | $10.0 Strike, Expiring 15-Oct-2021 | -24.42% | Yes | 12.52% | Yes |
| 24-Sep-2021 | -4.07% | $10.92 | $12.5 Strike, Expiring 15-Oct-2021 | -34.48% | Yes | 9.72% | Yes |
| 27-Sep-2021 | -4.79% | $10.49 | $7.5 Strike, Expiring 15-Oct-2021 | -16.25% | Yes | 0.00% | Yes |

| Date | Stock Return (Log) | Stock Price One Day Prior | Options Series | Call Option Return | Same Direction as Common? | Put Option Return | Opposite Direction as Common? |
|---|---|---|---|---|---|---|---|
| 27-Sep-2021 | -4.79% | $10.49 | $10.0 Strike, Expiring 15-Oct-2021 | -32.38% | Yes | 16.25% | Yes |
| 27-Sep-2021 | -4.79% | $10.49 | $12.5 Strike, Expiring 15-Oct-2021 | -43.53% | Yes | 9.70% | Yes |
| 04-Oct-2021 | -4.70% | $9.48 | $7.5 Strike, Expiring 15-Oct-2021 | -31.85% | Yes | 28.77% | Yes |
| 04-Oct-2021 | -4.70% | $9.48 | $10.0 Strike, Expiring 15-Oct-2021 | -74.19% | Yes | 16.36% | Yes |
| 04-Oct-2021 | -4.70% | $9.48 | $12.5 Strike, Expiring 15-Oct-2021 | -69.31% | Yes | 11.44% | Yes |
| 07-Oct-2021 | 10.69% | $8.78 | $7.5 Strike, Expiring 15-Oct-2021 | 46.78% | Yes | -69.31% | Yes |
| 07-Oct-2021 | 10.69% | $8.78 | $10.0 Strike, Expiring 15-Oct-2021 | 138.63% | Yes | -37.95% | Yes |
| 07-Oct-2021 | 10.69% | $8.78 | $12.5 Strike, Expiring 15-Oct-2021 | 146.63% | Yes | -20.14% | Yes |
| 12-Oct-2021 | 7.07% | $9.22 | $7.5 Strike, Expiring 15-Oct-2021 | 32.62% | Yes | 0.00% | Yes |
| 12-Oct-2021 | 7.07% | $9.22 | $10.0 Strike, Expiring 15-Oct-2021 | 42.74% | Yes | -46.13% | Yes |
| 12-Oct-2021 | 7.07% | $9.22 | $12.5 Strike, Expiring 15-Oct-2021 | 98.08% | Yes | -13.79% | Yes |
| 13-Oct-2021 | 20.32% | $9.90 | $7.5 Strike, Expiring 15-Oct-2021 | 65.10% | Yes | 0.00% | Yes |
| 13-Oct-2021 | 20.32% | $9.90 | $10.0 Strike, Expiring 15-Oct-2021 | 140.78% | Yes | -142.14% | Yes |
| 13-Oct-2021 | 20.32% | $9.90 | $12.5 Strike, Expiring 15-Oct-2021 | 170.47% | Yes | -65.06% | Yes |
| 14-Oct-2021 | -11.53% | $12.13 | $10.0 Strike, Expiring 15-Oct-2021 | -90.57% | Yes | -33.65% | No |
| 14-Oct-2021 | -11.53% | $12.13 | $12.5 Strike, Expiring 15-Oct-2021 | -183.83% | Yes | 18.23% | Yes |
| 14-Oct-2021 | -11.53% | $12.13 | $15.0 Strike, Expiring 15-Oct-2021 | -203.69% | Yes | 17.03% | Yes |
| 15-Oct-2021 | -5.52% | $10.81 | $7.5 Strike, Expiring 15-Oct-2021 | -17.93% | Yes | 0.00% | Yes |
| 15-Oct-2021 | -5.52% | $10.81 | $10.0 Strike, Expiring 15-Oct-2021 | -155.81% | Yes | -91.63% | No |
| 15-Oct-2021 | -5.52% | $10.81 | $12.5 Strike, Expiring 15-Oct-2021 | -125.28% | Yes | 23.42% | Yes |
| 22-Oct-2021 | 8.25% | $11.22 | $7.5 Strike, Expiring 19-Nov-2021 | 21.26% | Yes | 0.00% | Yes |
| 22-Oct-2021 | 8.25% | $11.22 | $10.0 Strike, Expiring 19-Nov-2021 | 28.77% | Yes | -31.02% | Yes |
| 22-Oct-2021 | 8.25% | $11.22 | $12.5 Strike, Expiring 19-Nov-2021 | 30.01% | Yes | -26.99% | Yes |
| 25-Oct-2021 | 7.47% | $12.18 | $10.0 Strike, Expiring 19-Nov-2021 | 29.73% | Yes | -25.78% | Yes |
| 25-Oct-2021 | 7.47% | $12.18 | $12.5 Strike, Expiring 19-Nov-2021 | 48.84% | Yes | -10.38% | Yes |
| 25-Oct-2021 | 7.47% | $12.18 | $15.0 Strike, Expiring 19-Nov-2021 | 65.81% | Yes | -8.46% | Yes |
| 01-Nov-2021 | 6.51% | $11.90 | $10.0 Strike, Expiring 19-Nov-2021 | 23.81% | Yes | -40.55% | Yes |
| 01-Nov-2021 | 6.51% | $11.90 | $12.5 Strike, Expiring 19-Nov-2021 | 29.85% | Yes | -23.73% | Yes |

E-18

| Date | Stock Return (Log) | Stock Price One Day Prior | Options Series | Call Option Return | Same Direction as Common? | Put Option Return | Opposite Direction as Common? |
|---|---|---|---|---|---|---|---|
| 01-Nov-2021 | 6.51% | $11.90 | $15.0 Strike, Expiring 19-Nov-2021 | 29.73% | Yes | -17.44% | Yes |
| 10-Nov-2021 | -17.76% | $11.93 | $10.0 Strike, Expiring 19-Nov-2021 | -102.96% | Yes | 145.53% | Yes |
| 10-Nov-2021 | -17.76% | $11.93 | $12.5 Strike, Expiring 19-Nov-2021 | -120.40% | Yes | 66.60% | Yes |
| 10-Nov-2021 | -17.76% | $11.93 | $15.0 Strike, Expiring 19-Nov-2021 | -109.86% | Yes | 38.10% | Yes |
| 11-Nov-2021 | 8.26% | $9.99 | $7.5 Strike, Expiring 19-Nov-2021 | 25.78% | Yes | 0.00% | Yes |
| 11-Nov-2021 | 8.26% | $9.99 | $10.0 Strike, Expiring 19-Nov-2021 | 49.06% | Yes | -76.21% | Yes |
| 11-Nov-2021 | 8.26% | $9.99 | $12.5 Strike, Expiring 19-Nov-2021 | 28.77% | Yes | -32.19% | Yes |
| 15-Nov-2021 | -6.90% | $11.25 | $7.5 Strike, Expiring 19-Nov-2021 | -20.97% | Yes | 0.00% | Yes |
| 15-Nov-2021 | -6.90% | $11.25 | $10.0 Strike, Expiring 19-Nov-2021 | -59.14% | Yes | 28.77% | Yes |
| 15-Nov-2021 | -6.90% | $11.25 | $12.5 Strike, Expiring 19-Nov-2021 | -109.86% | Yes | 26.83% | Yes |
| 01-Dec-2021 | -8.73% | $8.86 | $7.5 Strike, Expiring 17-Dec-2021 | -45.20% | Yes | 40.55% | Yes |
| 01-Dec-2021 | -8.73% | $8.86 | $10.0 Strike, Expiring 17-Dec-2021 | -73.76% | Yes | 18.00% | Yes |
| 01-Dec-2021 | -8.73% | $8.86 | $12.5 Strike, Expiring 17-Dec-2021 | -40.55% | Yes | 13.04% | Yes |
| 07-Dec-2021 | 7.88% | $7.38 | $5.0 Strike, Expiring 17-Dec-2021 | 23.81% | Yes | -69.31% | Yes |
| 07-Dec-2021 | 7.88% | $7.38 | $7.5 Strike, Expiring 17-Dec-2021 | 47.00% | Yes | -61.90% | Yes |
| 07-Dec-2021 | 7.88% | $7.38 | $10.0 Strike, Expiring 17-Dec-2021 | 0.00% | No | -23.46% | Yes |
| 13-Dec-2021 | -7.39% | $7.87 | $5.0 Strike, Expiring 17-Dec-2021 | -22.31% | Yes | -69.31% | No |
| 13-Dec-2021 | -7.39% | $7.87 | $7.5 Strike, Expiring 17-Dec-2021 | -98.08% | Yes | 47.00% | Yes |
| 13-Dec-2021 | -7.39% | $7.87 | $10.0 Strike, Expiring 17-Dec-2021 | -40.55% | Yes | 17.48% | Yes |
| 05-Jan-2022 | -9.80% | $6.86 | $5.0 Strike, Expiring 21-Jan-2022 | -39.89% | Yes | 40.55% | Yes |
| 05-Jan-2022 | -9.80% | $6.86 | $7.5 Strike, Expiring 21-Jan-2022 | -51.08% | Yes | 37.16% | Yes |
| 05-Jan-2022 | -9.80% | $6.86 | $10.0 Strike, Expiring 21-Jan-2022 | 0.00% | No | 15.63% | Yes |
| 31-Jan-2022 | 9.78% | $4.87 | $2.5 Strike, Expiring 18-Feb-2022 | 19.11% | Yes | 0.00% | Yes |
| 31-Jan-2022 | 9.78% | $4.87 | $5.0 Strike, Expiring 18-Feb-2022 | 44.63% | Yes | -47.96% | Yes |
| 31-Jan-2022 | 9.78% | $4.87 | $7.5 Strike, Expiring 18-Feb-2022 | -28.77% | No | -18.05% | Yes |
| 03-Feb-2022 | 6.41% | $5.29 | $2.5 Strike, Expiring 18-Feb-2022 | 12.68% | Yes | 0.00% | Yes |
| 03-Feb-2022 | 6.41% | $5.29 | $5.0 Strike, Expiring 18-Feb-2022 | 43.53% | Yes | -28.77% | Yes |
| 03-Feb-2022 | 6.41% | $5.29 | $7.5 Strike, Expiring 18-Feb-2022 | 22.31% | Yes | -10.41% | Yes |

E-19

| Date | Stock Return (Log) | Stock Price One Day Prior | Options Series | Call Option Return | Same Direction as Common? | Put Option Return | Opposite Direction as Common? |
|---|---|---|---|---|---|---|---|
| 24-Feb-2022 | 11.03% | $4.68 | $2.5 Strike, Expiring 18-Mar-2022 | 20.48% | Yes | 69.31% | No |
| 24-Feb-2022 | 11.03% | $4.68 | $5.0 Strike, Expiring 18-Mar-2022 | 58.78% | Yes | -26.24% | Yes |
| 24-Feb-2022 | 11.03% | $4.68 | $7.5 Strike, Expiring 18-Mar-2022 | 51.08% | Yes | -17.02% | Yes |
| 08-Mar-2022 | 7.48% | $5.34 | $2.5 Strike, Expiring 18-Mar-2022 | 12.46% | Yes | 0.00% | Yes |
| 08-Mar-2022 | 7.48% | $5.34 | $5.0 Strike, Expiring 18-Mar-2022 | 40.55% | Yes | -48.55% | Yes |
| 08-Mar-2022 | 7.48% | $5.34 | $7.5 Strike, Expiring 18-Mar-2022 | 0.00% | No | -19.11% | Yes |
| 31-Mar-2022 | 6.01% | $7.99 | $5.0 Strike, Expiring 14-Apr-2022 | 14.81% | Yes | 0.00% | Yes |
| 31-Mar-2022 | 6.01% | $7.99 | $7.5 Strike, Expiring 14-Apr-2022 | 34.48% | Yes | -49.25% | Yes |
| 31-Mar-2022 | 6.01% | $7.99 | $10.0 Strike, Expiring 14-Apr-2022 | 40.55% | Yes | -18.23% | Yes |

Data sources: CBOE, Bloomberg, SEC filings, Factiva.

Note: The end of day bid-ask midpoint is used as the Option price. Where the end of day bid price is zero, I take the non-zero ask price. There are no zero end of day ask prices.