# EXHIBIT G

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# FORM 10-K

**(Mark One)**

☐ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to

**Commission file number 001-39733**



## Redwire Corporation
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **98-1550429** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **8226 Philips Highway, Suite 101**<br>**Jacksonville, Florida** | **32256** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(650) 701-7722**
Registrant's telephone number, including area code

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | RDW | New York Stock Exchange |
| Warrants, each to purchase one share of Common Stock | RDW WS | New York Stock Exchange |

Securities registered pursuant to section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | | Smaller reporting company | ☒ |
| | | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☐

The aggregate market value of the Class A ordinary shares held by non-affiliates of the registrant, previously known as Genesis Park Acquisition Corp., as of June 30, 2021 was approximately $132.2 million based on the closing price of $10.31 for the shares of the registrant's Class A ordinary shares, as reported by the New York Stock Exchange. Class A ordinary shares beneficially owned by each executive officer, director, and each person who may be deemed an affiliate have been excluded. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

The registrant had outstanding 62,690,869 shares of common stock as of April 4, 2022.

## DOCUMENTS INCORPORATED BY REFERENCE

Certain information in the registrant's definitive proxy statement to be filed with the Securities and Exchange Commission relating to the registrant's 2022 Annual Meeting of Stockholders is incorporated by reference into Part III of this Annual Report on Form 10-K.

# REDWIRE CORPORATION

**Annual Report on Form 10-K**

**December 31, 2021**

**Table of Contents**

| ITEM | Page Number |
|---|---|
| **Part I** | 3 |
| Item 1. Business | 3 |
| Item 1A. Risk Factors | 14 |
| Item 1B. Unresolved Staff Comments | 41 |
| Item 2. Properties | 41 |
| Item 3. Legal Proceedings | 42 |
| Item 4. Mine Safety Disclosures | 42 |
| | |
| **Part II** | 43 |
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 43 |
| Item 6. [Reserved] | 43 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 44 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 59 |
| Item 8. Financial Statements and Supplementary Data | 60 |
| Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosures | 108 |
| Item 9A. Controls and Procedures | 108 |
| Item 9B. Other Information | 110 |
| Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 110 |
| | |
| **Part III** | 110 |
| Item 10. Directors, Executive Officers and Corporate Governance | 110 |
| Item 11. Executive Compensation | 110 |
| Item 12. Security Ownership of Certain Beneficial Owner and Management and Related Stockholder Matters | 111 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 111 |
| Item 14. Principal Accounting Fees and Services | 111 |
| | |
| **PART IV** | 112 |
| Item 15. Exhibits, Financial Statement Schedules | 112 |
| Item 16. Form 10-K Summary | 114 |
| | |
| Signatures | 115 |

## PART I

Each of the terms the "Company," "Redwire," "we," "our," "us" and similar terms used herein refer collectively to Redwire Corporation, a Delaware corporation, and its consolidated subsidiaries, unless otherwise stated.

## INFORMATION RELATING TO FORWARD LOOKING STATEMENTS

This Annual Report on Form 10-K contains statements that constitute "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 concerning us and other matters. Words such as "will," "expect," "anticipate," "intend," "may," "could," "should," "plan," "project," "forecast," "believe," "estimate," "outlook," "trends," "goals," "contemplate," "continue," "might," "possible," "potential," "predict," "would" and similar expressions generally identify these forward looking statements, but the absence of these words does not mean that a statement is not forward looking. Forward looking statements include, among other things, statements relating to our future financial condition, results of operations and/or cash flows, and our projects and related timelines. Forward looking statements are based upon assumptions, expectations, plans and projections that we believe to be reasonable when made, but which may change over time. These statements are not guarantees of future performance and inherently involve a wide range of risks and uncertainties that are difficult to predict. Specific risks and uncertainties that could cause actual results to differ materially from those expressed or implied in these forward looking statements include, but are not limited to, those identified in this Annual Report on Form 10-K, particularly in Part I, Item 1A "Risk Factors" and other important factors disclosed from time to time in our other filings with the SEC.

Undue reliance should not be placed on these forward looking statements. The forward looking statements contained in this Annual Report on Form 10-K are based on current expectations and beliefs concerning future developments and their potential effects on us. There can be no assurance that future developments affecting us will be those that we have anticipated. We do not undertake any obligation to update or revise any forward looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

### Item 1. Business

Redwire is a leader in mission critical space solutions and high reliability components for the next generation space economy, with valuable intellectual property for solar power generation, in-space 3D printing and manufacturing, avionics, critical components, sensors, digital engineering and space-based biotechnology. We combine decades of flight heritage with the agile and innovative culture. Our "Heritage plus Innovation" strategy enables us to combine proven performance with new, innovative capabilities to provide our customers with the building blocks for the present and future of space infrastructure.

Our mission is to accelerate humanity's expansion into space by delivering reliable, economical and sustainable infrastructure for future generations. We offer a broad array of foundational products and services, many of which have been enabling space missions since the 1960s and have been flight-proven on over 160 satellite missions, including high-priority missions and constellations such as the GPS constellation, the International Space Station (ISS) and Mars Perseverance. We are a leading provider of innovative technologies with the potential to help transform the economics of space and create new markets for its exploration, commercialization and security. One example of this is our patented suite of in-space manufacturing and robotic assembly technologies (referred to herein as on-orbit servicing, assembly and manufacturing, or "OSAM"), which is revolutionizing the approximately $23 billion satellite manufacturing market in the same way that reusable launch vehicles revolutionized the approximately $10 billion launch market, per Research and Markets and Allied Market Research, respectively. Other examples of our proprietary technologies include deployable structures, roll out solar array (ROSA) systems, human-rated camera systems and advanced payload adapters. Of particular note, our ROSA arrays are being installed on the ISS to efficiently augment its power generation capabilities as the ISS enters its next decade of operations. ROSA systems are experiencing significant market adoption, being utilized not only on the ISS but also launching on NASA's Double Asteroid Redirect Test mission. Other ROSA systems are being developed or delivered for the OVZON-3 telecommunications satellite, the Power and Propulsion Element for the NASA Lunar Gateway, and other programs. Many Redwire products and services are experiencing similar adoption.

We are a pure-play space infrastructure company with mission solutions for civil, commercial and national security space customers. We have grown organically as well as through several acquisitions from a fragmented landscape of space-focused technology companies. Our proven track record of successful growth through mergers and acquisitions is a major differentiator in our market.

We believe the space economy is at an inflection point. The reduction of launch costs by approximately 95% over the last decade has eliminated the single largest economic barrier to entry for the expanded utilization of space, and the increasing cadence of launches provides more flexible, reliable access. This lower cost access has resulted in both the expansion and modernization of traditional national security and civil uses of space and has enticed new commercial entrants to invest substantial capital to develop new space-based business models. Our goal is to provide a full suite of infrastructure solutions, including mission-critical components, services and systems that will contribute to a dramatic expansion of the space-based economy. We believe that our products and services are

the foundational building blocks essential to the growth of the space civil, commercial and national security ecosystem now and into the future.

**History**

Redwire was formed to fill a void in the middle market for a pure play, public space infrastructure company with scale.We are achieving this goal by combining proven space technology providers with next generation space disruptors into a single, integrated platform. The Company, in its current form, was founded in 2020 by private equity firm AE Industrial Partners Fund II, LP ("AEI"), but the heritage of the various businesses that were brought together to form Redwire stretch back decades.

AEI formed a series of acquisition vehicles on February 10, 2020, which included Cosmos Parent, LLC, Cosmos Intermediate, LLC ("Cosmos" or the "Successor"), Cosmos Finance, LLC and Cosmos Acquisition, LLC, with Cosmos Parent, LLC being the top holding company. Upon the formation of these acquisition vehicles, Cosmos effected a number of acquisitions through its wholly owned subsidiary, Cosmos Acquisition, LLC. Following the acquisitions, the Successor is a wholly owned subsidiary of AE Red Holdings, LLC formerly known as Redwire, LLC ("Holdings").

The Company has grown organically while also continuing to integrate several acquisitions from a fragmented landscape of space-focused technology companies with innovative capabilities and deep flight heritage. Strategic acquisitions that augment our technology and product offerings are a key part of our growth strategy. We have completed eight acquisitions since March 2020, which collectively have provided us with a wide variety of complementary technologies and solutions to serve our target markets and customers. These acquisitions include:

- *March 2020* – Acquired Adcole Space, LLC ("Adcole"), based in Marlborough, MA was a leading provider of space-capable navigational components. Adcole brought to Redwire 50 years of proven flight heritage providing a foundational set of critical navigation components to some of the most successful missions in the history of space infrastructure development such as the GPS constellation.

- *June 2020* – Acquired Deep Space Systems, Inc. ("DSS"), in Littleton, CO, a space-systems engineering company that supports the design, development, integration, testing, and operations of spacecraft and spacecraft systems supporting science, technology, and exploration missions. DSS contributed to Redwire a strong history of spacecraft development and expertise. They are an original prime contractor awardee on NASA's Commercial Lunar Payload Services (CLPS) contract and continue as part of Redwire to provide mission critical sensors and services to notable spacecrafts such as Orion and Dream Chaser.

- *June 2020* – Acquired In Space Group, Inc. and its subsidiaries such as Made In Space (collectively "MIS" or "Predecessor"), was a leader in space manufacturing technologies, delivering next-generation capabilities on-orbit to support exploration objectives and national security priorities. MIS is the first commercial company to additively manufacture in space, and specializes in OSAM technologies, the development of space-enabled materials and exploration manufacturing technologies. They contributed to Redwire the scale necessary to form a platform and a portfolio of disruptive intellectual property with the potential to change the economics of space infrastructure. MIS facility in Jacksonville, FL became Redwire's headquarters.

- *October 2020* – Acquired Roccor, LLC ("Roccor"), in Littleton, CO, a provider of advanced aerospace structures, including solar arrays, antennas, boom products, deorbit devices and thermal products. Roccor's novel designs address cost and performance limitations to meet customer mission requirements. Roccor contributed to Redwire a solid foundation in the National Security space markets and one-of-a-kind deployable programs such as providing the solar sail for NASA's upcoming Solar Cruiser mission.

- *December 2020* – Acquired LoadPath, LLC ("LoadPath"), which specializes in the development and delivery of aerospace structures, mechanisms, and thermal control solutions. LoadPath brought to Redwire a long history of strong relationships and contracts with the Air Force Research Lab at Kirkland Air Force base in Albuquerque, New Mexico. They were a key entry point to this critical location and customer.

- *January 2021* – Acquired Oakman Aerospace, Inc. ("Oakman"), in Littleton, CO, which specializes in the development of modular open system architecture, rapid spacecraft design and development, and custom missions, payloads, and data distribution services. Oakman added to Redwire a critical software development and digital engineering capability to include an enterprise level digital engineering software system called ACORN which is capable of digitally modeling space capabilities from single components to satellites to full constellations.

- *February 2021* – Acquired Deployable Space Systems, Inc. ("DPSS"), in Goleta, CA, whose mission is to develop new and enabling deployable technologies for space applications, transition emerging technologies to industry for infusion into future Department of Defense ("DoD"), National Aeronautics and Space Administration ("NASA"), and/or commercial programs and design, analyze, build, test and deliver on-time the deployable solar arrays, deployable structures and space system products. DPSS's product portfolio includes the award-winning and patented ROSA (Roll-Out Solar Array), Integrated Modular Blanket Assembly; Rigid- Panel and Functional Advanced Concentrator Technology solar array technologies; a multitude of elastically

and articulated deployable structures and booms, open-lattice booms, telescopic booms; and a variety of mission-enabling mechanisms for space applications. DPSS brought to Redwire the iROSA program to upgrade the International Space Station with a next generation power solution and a unique facility for the manufacture and test of large solar array capabilities.

- *November 2021* – Acquired Techshot, Inc. ("Techshot"), in Greenville, IN, a leader in on-orbit manufacturing, biotechnology in microgravity, and bioprinting needed for commercial space-based biotechnology and pharmaceutical research and development. Techshot enhances the Redwire civil and commercial space capabilities by adding additional in-space manufacturing and biotechnology capabilities to an already premier portfolio of space research, development and commercialization payloads.

On September 2, 2021, the previously announced merger (the "Merger") with Genesis Park Acquisition Corp. ("GPAC") was consummated pursuant to the Agreement and Plan of Merger (the "Merger Agreement") dated March 25, 2021 by and among GPAC, Shepard Merger Sub Corporation ("Merger Sub"), a Delaware corporation and direct, wholly owned subsidiary of GPAC, Cosmos Intermediate, LLC and AE Red Holdings, LLC.

Pursuant to the Merger Agreement, the parties completed a business combination transaction by which, (i) GPAC domesticated as a Delaware corporation in accordance with Section 388 of the Delaware General Corporation Law and the Companies Act of the Cayman Islands (the "Domestication"), (ii) Merger Sub merged with and into Cosmos, with Cosmos being the surviving entity in the merger (the "First Merger"), and (iii) immediately following the First Merger, Cosmos merged with and into GPAC, with GPAC being the surviving entity in the merger (the "Second Merger" and, together with the First Merger, the "Mergers" or the "Merger" and, together with the other transactions contemplated by the Merger Agreement, the "Transactions"). In this Annual Report on Form 10-K, we refer to the Domestication and the Transactions, collectively, as the "Merger".

Upon the closing of the Merger, GPAC was renamed to Redwire Corporation. The Merger is accounted for as a reverse recapitalization in which GPAC is treated as the acquired company. A reverse recapitalization does not result in a new basis of accounting, and the consolidated financial statements of the combined entity represent the continuation of the consolidated financial statements of the Company in many respects. The Company was deemed the accounting predecessor and the combined entity is the successor SEC registrant, Redwire.

From time to time, the Company will acquire or dispose of businesses and realign contracts, programs or businesses among and within our organization. These realignments are typically designed to leverage existing capabilities more fully and to enhance efficient development and delivery of products and services. As of December 31, 2021, the Company operated in one operating segment and one reportable segment: space infrastructure. Refer to Note B of the accompanying notes to the consolidated financial statements for additional information regarding this conclusion.

## Business Strategy

With decades of flight heritage combined with the agile and innovative culture of a commercial space platform, we are uniquely positioned to assist our customers in solving the complex challenges of future space missions. Redwire is providing core technologies that form the foundational building blocks for the future of space infrastructure. Our technology innovation is centered on the following key strategic focus areas:

### *On-Orbit Servicing, Assembly & Manufacturing*

We anticipate that one of the most dramatic disruptions in the space industry will come from on-orbit servicing, assembly and manufacturing ("OSAM") of satellites and other spacecraft. The ability to manufacture in space significantly expands a satellite's capabilities and reduces costs relative to the conventional method of manufacturing and assembling prior to launch. Space infrastructure such as satellite assets manufactured on Earth are designed to survive the acoustic vibrations and acceleration forces that accompany launch and are inherently limited by these design requirements. Space infrastructure manufactured in space may be optimized for the operational environment in orbit and are never exposed to launch conditions. Design optimization for in-space operation allows for improved performance, such as increased power generation via larger solar arrays or higher gain via large-scale antennas than those that can be economically deployed using conventional manufacturing methods.

By mitigating spacecraft volume limitations imposed by launch vehicles, manufacturing in space can also help to significantly reduce the costs of launch. Launch costs depend in part on the mass and volume of the spacecraft. The manufacturing and assembly of large spacecraft structures in orbit reduces spacecraft volume at launch, resulting in decreased launch costs and increased flexibility in launch provider selection, including utilization of smaller launch providers and rideshare programs.

Current OSAM applications include government-funded programs to enable increased small satellite power generation via large deployable solar arrays attached to booms that are 3D printed on-orbit. Commercial adoption of this technology could be a significant catalyst for growth in the overall space economy, enabling users to put more capability on orbit than state of the art approaches. We believe that OSAM represents a technological sea change that has the potential to upend traditional space operations. With sustainable in-space solutions, we believe OSAM will enable the next generation of growth in the space industry. Redwire's additive manufacturing intellectual property that is critical to our OSAM solution has been proven in operation on the ISS since 2014 and is protected by our numerous patents.

Additionally, Redwire is developing a robotic arm for space applications. This scalable robotic arm system is expected to meet growing demand for space-capable robotic solutions in mission profiles ranging from lunar surface activities to on-orbit satellite servicing and beyond.

### Advanced Sensors & Components

Our technology has been at the forefront of space exploration for decades, providing satellite components that are integral to the mission success of hundreds of low Earth orbit ("LEO"), geosynchronous ("GEO") and interplanetary spacecraft. These are foundational components that are critical to almost every spacecraft deployment. We are combining our new and innovative space technologies with our proven spaceflight heritage to meet the complexity and demands of today's growing and evolving space industry. Our sensor and component capabilities include the design and manufacture of mission-critical, high reliability technologies serving a wide variety of functions on the spacecraft. Our offerings include:

*Solar Arrays:* We offer a variety of solar array solutions for spacecraft spanning the entire spectrum of satellite size, power needs, and orbital location. We possess proprietary technologies, technical knowhow, and the facilities to design, build, and deliver competitive power generation solutions tailored to customer need. Of particular note, our patented and award-winning ROSA (Roll-Out Solar Array) technology features an innovative "roll-out" design which uses composite booms to serve as both the primary structural elements and the deployment actuator, and a modular photovoltaic blanket assembly that can be configured into a variety of solar array architectures. When configured for launch, ROSA stows into a compact cylindrical volume yielding efficient space utilization. The unique ROSA stowed configuration allows extremely large solar arrays to be stowed compactly within launch vehicles.

*Composite Booms:* We develop cost-effective, furlable composite boom products that deploy antennas and instruments from small satellites. We develop very long lightweight composite booms for applications including solar sails, dipole antennas and deployable tethers. The efficient packaging scheme of our Triangular Rollable and Collapsible ("TRAC") Boom enables our customers to deploy extremely large systems from very small volumes.

*RF Antennas:* We are a supplier of high strain composite ("HSC") antennas that have much simpler mechanical designs than larger, conventional satellite antennas. HSC structural elements can provide deployment actuation, damping, deployed stiffness and integrated electrical / RF functionality in one multifunctional part, enabling a variety of antenna architectures and structural designs.

*Payload Adapters:* We are a supplier of integrated structural systems that support multiple satellites of different sizes across multiple launch vehicle platforms. Our payload interface solutions are tailored to launch vehicle/payload requirements to achieve optimal performance, and efficient allocation of mass to support on-orbit function rather than launch vehicle interfaces.

*Space-Qualified Camera Systems*: We supply customers with low size, weight and power, flight-proven cameras for a variety of use cases. Our camera solutions are used for vehicle docking and near- and far-field cameras are used for space situational awareness and satellite navigation.

*Star Trackers and Sun Sensors:* Our star tracker solution provides superior guidance, navigation and control as it takes an image of the stars, measures its apparent position in the reference frame of the spacecraft and identifies the stars so its position can be compared with its known absolute position from a star catalog.

Over 1,000 of our sun sensors have been deployed on hundreds of spacecraft since the 1960s and we remain a leader in attitude control, solar array pointing, gyro updating and fail-safe recovery solutions.

### Space Domain Awareness & Resiliency

The U.S. national security community is increasingly viewing space as a warfighting domain, as evidenced by significant space-based military infrastructure investment such as the National Defense Space Architecture ("NDSA") and the creation of the U.S. Space Force. Advances in potentially adversarial capabilities in space have highlighted the need to improve both the physical and cyber resiliency of U.S. and allied space assets, as well as monitoring of all assets, friendly and potentially hostile, on orbit. In our Space Domain Awareness and Resiliency ("SDA&R") strategic focus area, our core competencies and products support the national security community's space resiliency and situational awareness missions.

Our key offerings in this area include sensor systems for on-orbit monitoring, advanced modeling & simulation, cyber resiliency, asset hardening, robotics, and full satellite solutions leveraging our OSAM capabilities. Our SDA&R portfolio contains a variety of optical instruments that perform situational awareness functions and can be adapted to act as space situational awareness cameras as a primary or secondary payload.

*Digitally-Engineered Spacecraft*

Digitally-engineered spacecraft are systems that are designed, developed and manufactured on a digital foundation. Model-based engineering and high fidelity digital engineering tools reduce assembly hours by utilizing an end-to-end virtual environment that is capable of producing a near perfect virtual replica of a physical space system, before a physical instance is created. This capability significantly reduces the cost and schedule required to design, develop and deploy spacecraft while also reducing the risk of deployment and the cost of operations and maintenance. Additionally, "digital twins" of individual components, spacecraft and constellations are used to improve cyber resiliency, health and monitoring, operations and maintenance of deployed space assets.

We believe that the DoD and U.S. Space Force have embraced digital engineering as a foundational technology for the rapid, cost-effective development of their future space architectures. Digital engineering enables the modeling and simulation of future space architectures to provide high fidelity trade analysis, operational concepts and testing. Cyber resiliency is an increasing challenge for deployed space assets. This capability is critical to ensuring future civil, commercial and national security space assets are protected from cyber-based attacks.

Redwire has a proprietary enterprise software suite that enables advanced digital engineering and generation of high fidelity, interactive modeling and simulations of individual components, entire spacecraft and full constellations in a cloud-based Software as a Service (SaaS) business model.

*Low-Earth Orbit Commercialization*

Our LEO commercialization strategic focus area is developing next-generation capabilities with a goal of developing efficient, commercial services for the ISS and other current and future human spaceflight programs. This focus area includes in-space additive manufacturing, space-based biotechnology applications, space plant and animal science, in-space advanced material manufacturing and support of human exploration, habitation and commercial activities in space.

We created the first permanent commercial manufacturing platform to operate in LEO, the Additive Manufacturing Facility ("AMF"). AMF was developed based on a desire for on-demand local manufacturing that is expected to become a mainstay for mission planning to address critical needs in space. This technology increases the reliability of long-duration missions and makes human spaceflight missions safer by providing crews with additional flexibility in responding to situations that may threaten a mission. The ability for tools to be manufactured on-site, on-demand, allows mission planners to reduce the amount of specialized equipment that must be included during launch, providing maximum flexibility and contingency while reducing costs. Beginning with a small ratchet created on the International Space Station, we have now manufactured 200+ parts in-space over the past six years and are the only company currently providing commercial 3D printing on the ISS.

Additionally, our in-space manufacturing capabilities and space biotechnology solutions provide the building blocks for a robust commercial space economy building products and solutions for use on Earth. Production of advanced industrial materials and biological materials in microgravity offer performance advantages over comparable products manufactured on Earth. The microgravity environment enables certain space-based products to be created with properties superior to their terrestrial analogue. By identifying advanced manufacturing processes, product development and biotechnology research and development which can leverage the microgravity environment to manufacture high performance materials and groundbreaking biomedical solutions that meet specific industrial and commercial use cases, we believe our approach to space commercialization advances the creation of a space-Earth value chain to spur economic development. We have demonstrated the ability to 3D print biological materials, to manufacture advanced ceramics, fiber optics, crystals and other industrial materials in microgravity.

**Products and Solutions**

*Antennas*

Our antenna systems enable space-to-space and space-to-Earth communications. Some form of communications antenna is required for nearly all satellites that are put into orbit. We offer a wide variety of antennas to meet a range of satellite mission requirements. Our Link-16 antenna can be used to facilitate the exchange of tactical imagery from space in near-real time between military aircraft, ships and ground forces. Our antennas also enable the exchange of encrypted messages, imagery data and multiple channels of digital voice communication. We believe this will enable reliable and efficient space-based tactical communications in environments in which it has historically been difficult to conduct communications-intensive operations.

*Space-Qualified Sensors*

We have a deep heritage in manufacturing space-qualified sensors. Every satellite that goes into orbit requires at least one star tracker, sun sensor and avionics package and we have developed advanced capabilities in these critical subsectors of the space supply chain. We also provide narrow and wide-field-of-view camera systems, in addition to camera systems that are rated for human space flight, to our customers across civil, national security and commercial space.

*Structures & Deployables*

We provide a variety of deployable space structure offerings to help meet our customers' mission requirements. We believe that our instrument booms are instrumental to the DoD's goal of achieving space domain awareness. Our composite instrument booms can allow small satellites ("Smallsats") to deploy high-power solar arrays, large antennas for high data rate communications and large drag augmentation devices for rapid end-of-life deorbiting. We have provided our ROSA technology to NASA to upgrade the International Space Station's solar arrays since 2021. We have also developed rigid solar panels that we expect PlanetIQ to use for its HD GPS-RO weather satellite constellation. We also develop cost- effective composite booms that deploy antennas and instruments from small satellites, enabling a new generation of satellite constellations to provide science measurements and communications from space.

*Space-enabled Manufacturing Payloads*

Space-enabled manufacturing is a form of in-space manufacturing that leverages microgravity to produce materials with superior performance and broader applications when compared to comparable terrestrial materials. We have a suite of space-enabled manufacturing payloads configured for installation and operation aboard the ISS for demonstrating a variety of advanced manufacturing techniques and facilities with broad applications. We offer payloads capable of additive manufacturing, optical fiber manufacturing, ceramic turbine blisk manufacturing, industrial crystal manufacturing, hybrid metal / polymer manufacturing and more. These techniques may one day have the potential to transform the LEO commercial environment by providing solutions in space for space and in space for Earth.

*Space-enabled Biotechnology Payloads*

Redwire develops advanced space biotechnology payloads for the purpose of pharmaceutical and medical research and development and human space flight operations and sustainment. For example, the 3D BioFabrication Facility (BFF) and the ADvanced Space Experiment Processor (ADSEP), together comprise the first-ever system capable of manufacturing human tissue in the microgravity condition of space. Utilizing adult human cells (such as pluripotent or stem cells), the system can create viable tissue in space through technology that enables it to precisely place and build ultra-fine layers of bioink – layers that may be several times smaller than the width of a human hair – involving the smallest print tips in existence. Additionally, we have developed critical biotechnology payloads for the research of musculoskeletal disease, osteoarthritis, regenerative medicine, and space plant/food production.

*Cloud-enabled Digital Engineering Enterprise Software Platform*

Redwire sells a proprietary enterprise software suite that enables advanced digital engineering and generation of high fidelity, interactive modeling and simulations of individual components, entire spacecraft and full constellations in a cloud-based Software as a Service (SaaS) business model. This software suite supports spacecraft and constellation developers in the design, development, deployment, management, maintenance and cyber protection of their space assets.

*Engineering, Support Services, Testing and Operation Solutions*

We are a one-stop-shop for mechanism design and manufacturing, power supply design and analysis, project planning and management, control processes, structural and thermal analysis, and system engineering solutions for space-based products and applications. We provide our engineering services at any stage of the design process for our customers, whether it be final testing or initial project schematics. This service offering allows us to introduce customers to our capabilities and demonstrate our ability to help optimize and enable the success of their missions.

**Backlog**

We view growth in backlog as a key measure of our business growth. As of December 31, 2021, our total backlog was $271.6 million, which incudes contracted and uncontracted backlog of $139.7 million and $131.9 million, respectively. Contracted backlog represents the estimated dollar value of firm funded executed contracts for which work has not been performed (also known as the remaining performance obligations on a contract). Uncontracted backlog represents the anticipated contract value, or portion thereof, of goods and services to be delivered under existing contracts which have not been appropriated or otherwise authorized. For further information, refer to "Backlog" in Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A").

**Seasonality**

No material portion of our business is considered to be seasonal. Various factors can affect the distribution of our revenue between accounting periods, including the timing of contract awards and the timing and availability of U.S. Government funding, as well as the timing of product deliveries and customer acceptance.

**Customers and Strategic Partnerships / Relationships**

Our product and solution offerings are designed to meet the needs of a wide variety of public and private entities operating in space. We have formalized contracts and strategic partnerships with numerous customers, and we plan to continue pursuing additional agreements and partnerships.

*Civil Space Community Relationships*

Civilian space agencies currently make up the largest portion of our current revenue base. Projects for these customers are typically meant to gather data for the public's use, advance research objectives, further the exploration and utilization of space, and/or develop new scientific and commercial applications and uses of the space domain. Contracts are primarily fielded by governmental entities that are not funded by defense budgets. Many of these contracts will have a research and demonstration phase which may later convert to full-scale production contracts or commercial opportunities.

### NASA

NASA is one of our largest and most long-standing customers. We participate in numerous large, high-profile contracts, our largest by revenue currently being the Archinaut One program, also known as OSAM-2. Our Archinaut One program includes the design, manufacture, test, integration and operation of the first satellite to construct a portion of its own structure on-orbit. The Archinaut One satellite combines our additive manufacturing and robotic assembly capabilities for the construction of large, complex structures in space. We have provided services and products supporting a number of other NASA missions, including sun sensors and star trackers for exploration missions like Perseverance, thermal control solutions for technology demonstrators, camera systems for upcoming human spaceflight missions, and development of various additive manufacturing methods on the ISS.

### Luxembourg Space Agency and European Space Agency

We are working with the Luxembourg Space Agency and the European Space Agency to develop a robotic arm for space applications. This scalable robotic arm system is expected to meet growing demand for space-capable robotic solutions in mission profiles ranging from lunar surface activities to on-orbit satellite servicing and beyond.

*National Security Community Relationships*

We supply a wide variety of technologies and solutions supporting the U.S. and allied countries' national security objectives in space. As space becomes an increasingly contested domain and near peer threats continue to emerge, the DoD has articulated a need for significant investment in both improving the resiliency of existing space assets and the deployment of new, next-generation capabilities.

*Commercial Community Relationships*

Through our numerous strategic partnerships with large and high-profile commercial customers, we believe that our technologies are enabling the commercialization of LEO and potentially beyond. We view the commercial market opportunity as one with significant growth possibilities as launch costs continue to decrease, making industrial and other commercial pursuits increasingly viable and prolific.

*Customer Concentration*

The majority of the Company's revenues are derived from government contracts. Refer to Note S of the accompanying notes to the consolidated financial statements for further information on sales by major customers and location.

### Space Economy Overview

Prior to the 1990's, access to the global space industry was largely limited to federal governments and a few select telecommunications providers, providing little incentive to lower launch costs or innovate. Over the past three decades, the advent of lower-cost launch technology has driven a paradigm shift and democratized access to space. This has created a vibrant commercial landscape that is driving innovation across major terrestrial industries on Earth. The entrepreneurial energy dedicated to space is disrupting industries including telecommunications, internet infrastructure, weather, aviation, agriculture, advanced materials science, insurance and Earth observation. The military and scientific communities have continued to pursue and fund technological advancement, bolstering a myriad of technologies that have both national security and commercial applications.

We believe that the space industry is at the dawn of a new economic era driven by significant investment. In addition to government contracting, private capital entering the space market has accelerated its growth. Over the last 10 years, there has been approximately $253 billion of equity investment across 1,694 space companies per Space Capital (2021 Q4 Analysis). This has led to a wave of new companies reimagining parts of the traditional space industry.

Today's space market is primarily driven by satellite technologies and applications but is quickly expanding to include tangential capabilities such as space tourism, in-space manufacturing, LEO commercialization, deep space exploration and space-based resource extraction. The global space economy generated approximately $420 billion of total revenue in 2019 and is expected to grow to an

estimated $2 trillion by 2040, per the Space Report (2020 Q2 Analysis). The rapid deployment of satellite constellations coinciding with an increasingly competitive landscape in the launch industry is creating unprecedented access to space.

Government agencies have realized the value of the private commercial space industry and have become increasingly supportive and reliant on private companies to catalyze innovation and advance national space objectives. In the U.S., this has been evidenced by notable policy initiatives and commercial contractors' growing share of federally funded space activity.

*Launch Costs and Small Satellite Proliferation*

The emergence of large reusable rockets, such as the SpaceX's Falcon 9 and Blue Origin's upcoming New Glenn rocket, has brought launch costs down by as much as approximately 95% over the past decade according to a July 2018 report by NASA. Additionally, small launch providers have been actively pursuing the market for delivering smaller satellites into LEO. The competition among launch providers is creating a unique opportunity for new space entrants to grow quickly and take advantage of the fact that the per-kilogram cost of launching satellites to LEO is as low as approximately $2,700/kg. Improving launch economics have driven an increase in assets sent to orbit, with both commercial providers and governments participating.

The satellite market has gone through a paradigm shift over the past 10 years, with larger numbers of Smallsats, defined as any satellite under 600 kg, replacing large, exquisite satellites that have traditionally been placed into geosynchronous Earth orbit, or GEO. Smallsat adoption has increased as satellite technology has miniaturized. In LEO, more capability can be offered without the need for redundancy and radiation tolerance that is expected for the harsher GEO environment. The annual number of Smallsats launched has increased almost eightfold since 2012. In 2021, 94% of all launches included a smallsat, up from 24% in 2012, per Bryce Space and Technology. We anticipate continued growth in the satellite constellation market given the relatively short lifespan, need for larger constellations to provide global coverage and continued technological advancements.

In the U.S., the Space Development Agency is planning to launch thousands of small satellites in support of the National Defense Space Architecture. The advent of the Space Force and interest in Smallsats from the intelligence community has established the DoD as a significant stakeholder in the space economy as space becomes a contested domain. Missile defense capabilities and hardened, low-latency military communications networks are critical for the U.S. to counter aggression from near-peer threats. Additionally, hundreds of commercial providers of internet broadband, imagery and other value-added services have applied to launch over 50,000 small satellites in the next decade as they seek to secure market share in the new space economy. This compares to just 6,000 satellites in orbit as of April 2020.

*LEO Commercialization & On-Orbit Servicing, Assembly and Manufacturing*

A major growth opportunity for the global space economy is the increased commercialization of LEO. Increased accessibility to space has given rise to a growing number of start-up technology companies that aim to serve diverse end-markets including energy, telecommunications, tourism and Internet-of-things connectivity. There are increasingly attractive economics for manufacturing advanced materials in space for industrial use on Earth, including ZBLAN optical fiber and advanced ceramic materials. Ceramic parts manufactured in microgravity have a myriad of applications on Earth, including components for turbines and nuclear plants. Other fast currents in LEO include space tourism and sustainable human space habitats. The International Space Station has served as a breeding ground for the commercialization of space and many well-funded operators have announced a vision to enable millions of humans visiting and living in space.

We anticipate that the most dramatic disruption in the space industry will come from capabilities surrounding on-orbit servicing, assembly and manufacturing of spacecraft. With sustainable in-space solutions, we believe OSAM will be instrumental in enabling the next generation of growth in the space industry.

**Competition**

We operate in highly competitive markets that are sensitive to technological advances and generally encounter intense competition to win contracts from many other firms, including lower and mid-tier federal contractors with specialized capabilities, large defense contractors and the federal government. Some of our competitors in each of our markets are larger than we are and can maintain higher levels of expenditures for research and development. In each of our markets, we concentrate on the opportunities that we believe are compatible with our resources, overall technological capabilities and objectives. Principal competitive factors in these markets are product quality and reliability; technological capabilities, including reliable, resilient and innovative space infrastructure technologies; service; past performance; ability to develop and implement complex, integrated solutions; ability to meet delivery schedules; and cost-effectiveness. We believe that we compete favorably on the basis of these factors.

We frequently "partner" or are involved in subcontracting and teaming relationships with companies that are, from time to time, competitors on other programs. We compete domestically and internationally against (i) non-traditional aerospace and defense contractors, principally Blue Canyon Technologies, Inc. (a subsidiary of Raytheon Technologies), York Space Systems and Tyvak

Page 10

Nano-Satellite Systems, Inc., Space Micro Inc., Amergient Technologies, Sodern, and (ii) occasionally large aerospace and defense companies, principally, Northrop Grumman Corporation, L3Harris, Moog, Ball Aerospace, and Maxar Technologies. Our defense prime contractor customers could decide to pursue one or more of our product development areas as a core competency and insource that technology development and production rather than purchase that capability from us as a supplier. This competition could result in fewer customer orders and a loss of market share.

In addition, some of our foreign competitors currently benefit from, and others may benefit in the future from, protective measures by their home countries where governments are providing financial support, including significant investments in the development of new technologies. Government support of this nature greatly reduces the commercial risks associated with aerospace technology development activities for these competitors. This market environment may result in increased pressures on our pricing and other competitive factors.

**Resources**

*Research and Development*

Our research and product development programs are intended to advance the future of space infrastructure. We have both internally and externally funded research and development projects. Our business strategy is dependent on technological advancements that support our existing and future products and solutions. Our focus for research and development aligns with our strategic focus areas outlined above with particular emphasis on areas of significant growth and long-term opportunity. Looking forward, we expect to continue our investment in fields that we believe offer the greatest opportunities for long-term growth and profitability.

We conduct research and development principally in the United States and Luxembourg. Research and development expenses were $4.5 million for the year ended December 31, 2021.

*Intellectual Property*

We own a substantial intellectual property portfolio that includes many U.S. and foreign patents, as well as many U.S. trademarks, domain names and copyrights. We actively pursue internal development of intellectual property. In addition to our patent portfolio, we own other intellectual property such as unpatented trade secrets, know-how, data and software. Additionally, we rely on licenses of certain intellectual property to conduct our business operations, including certain proprietary rights licensed to and from third parties. While our intellectual property rights in the aggregate are important to our operations, we do not believe that any particular trade secret, patent, trademark, copyright, license or other intellectual property right is of such importance that its loss, expiration or termination would have a material effect on our business.

*Raw Materials and Suppliers*

We are generally engaged in light manufacturing activities and have limited exposure to fluctuations in the supply of raw materials. When we manufacture and sell products and systems, most of the value that we provide is labor oriented, such as design, engineering, assembly and test activities. In manufacturing our products, we use our own production capabilities as well as a base of third-party suppliers and subcontractors. Certain aspects of our manufacturing activities require relatively scarce raw materials; occasionally, we have experienced difficulty in our ability to procure raw materials, components, sub-assemblies and other supplies required in our manufacturing process.

**Regulatory**

*Federal Communications Commission*

The regulations, policies and guidance issued by the Federal Communications Commission ("FCC") apply to the operation of our spacecraft. When we communicate with our spacecraft using any part of the electromagnetic spectrum, we are operating a space station to which FCC regulations apply. Operators of regulated space stations are required to hold and maintain compliance with proper licenses throughout the duration of any given mission. We are currently preparing an FCC license application in connection with the Archinaut One program.

The FCC recently enacted a new set of licensing guidelines for small satellites and related systems that may apply to future spacecraft. As a result, we may face a transition to the small satellite licensing guidelines. Additionally, the FCC is currently considering additional rules which could change the operational, technical and financial requirements for commercial space operators subject to U.S. jurisdiction. If these, proposed rules become final, they could change system design and financial costs in order to comply with or secure new Redwire spectrum licensure.

*National Oceanic and Atmospheric Administration*

Redwire spacecraft will operate with space-qualified photographic equipment installed. While primarily intended to function as mission assurance tools, these cameras may be capable of capturing incidental Earth imagery while in orbit. As such, these cameras may be subject to the licensing requirements and regulations of National Oceanic and Atmospheric Association's ("NOAA") Commercial Report Sensing Regulatory Affairs ("CRSRA") office. We are currently assessing the applicability of NOAA's licensing requirements and exclusions in connection with the Archinaut One program.

*The Federal Aviation Administration*

As a participant in launch activities, we are indirectly subject to the license requirements of the Federal Aviation Administration's ("FAA") Office of Commercial Space Transportation ("AST"). The FAA regulates the airspace of the United States, through which launch vehicles must fly during launch to orbit. The AST office predominantly processes launch license requests submitted by launch vehicle operators, which include information on the constituent payloads flying on any given mission. As a result, reviews of our payloads by AST will occur during, for example, the processing of a launch vehicle provider launch license.

*International Traffic in Arms Regulations and Export Controls*

Our orbital infrastructure business is subject to, and we must comply with, stringent U.S. import and export control laws, including the International Traffic in Arms Regulations ("ITAR") and Export Administration Regulations ("EAR") of the Bureau of Industry and Security of the U.S. Department of Commerce. The ITAR generally restricts the export of hardware, software, technical data and services that have defense or strategic applications. The EAR similarly regulates the export of hardware, software and technology that has commercial or "dual-use" applications (i.e., for both military and commercial applications) or that have less sensitive military or space-related applications that are not subject to the ITAR. The regulations exist to advance the national security and foreign policy interests of the United States.

**Human Capital**

We are committed to technical excellence and mission success which is reinforced by our core values:

- *Integrity:* We stand for honesty, fairness, and commitment in all that we do, and an uncompromising adherence to ethical behavior.
- *Innovation:* We are change agents. We find new ways to solve our customers' most challenging problems. Our thought leadership will create new opportunities for better ways to accomplish our goals.
- *Impact:* We will have a positive impact on our industry, community, nation and humanity. We focus on solving important problems that will shape future outcomes in a positive way.
- *Inclusion:* We believe in the value of diverse perspectives. Individuals from all backgrounds, experiences and skill sets are needed to make Redwire successful. We value each other.
- *Excellence:* We are focused professionals who are committed to delivering results.

We strive to be the employer of choice in the space community. As of December 31, 2021, we had 606 employees, all of whom are based in the United States and Luxembourg.

We have established and experienced human resources team that is leading this effort. Most of our employees fall into one or more of the following categories: (a) graduates from well-regarded engineering universities with a desire to make a long-term impact, (b) experienced engineers from other aerospace companies who are excited about the ongoing innovation and industry transformations that we believe we are driving, and (c) founders and employees from companies we have acquired. Many of these employees are highly accomplished in their fields and earned advanced degrees in concentrations such as aerospace engineering, mechanical engineering, physics, chemistry, robotics and astronomy.

*Recruitment*

Based on existing programs, we are planning to increase the size of our workforce by approximately one third to support already contracted work. We have established an experienced talent acquisition team and anticipate that we will be able to achieve this goal based on our past record. Our recruitment efforts have been successful over the past year leading to approximately 34% of our current employees having been hired in the previous twelve months.

As we continue to grow, we are increasing our recruiting capacity by expanding our talent acquisition team of professionals and enhancing internal incentives for recruitment. In addition, we are continuing to develop our compensation and benefits programs to compete for talent in a tight labor market. One particular recruitment advantage the Company has is the ability to offer equity participation through the Redwire Corporation 2021 Omnibus Incentive Plan. This program encourages the "founder mentality" we hope all of our employees maintain.

*Diversity and Inclusion*

Redwire is committed to recruiting, retaining and promoting a diverse workforce. We support several organizations supporting diversity in the aerospace field, such as: the Brooke Owens Fellowship, the Matthew Isakowitz Fellowship, and the ZED Factor Fellowship program. At Redwire, Inclusion is a core value. We are implementing programs that celebrate the diversity of our workforce and highlight the contributions of under-represented communities. Through our leadership communications, community sponsorships and policy development, we are committed to a culture that promotes diversity and inclusion throughout the company and our industry.

*Compensation and Benefits*

We strive to offer competitive salaries and benefits. Management monitors the changing labor conditions at a national and local level and adjusts compensation packages in order to attract and retain high performing individuals. The Company offers short- and long-term incentive programs, a defined contribution plan, healthcare benefits, flexible paid time off as well as employee assistance programs. The Company's incentives programs are intended to motivate and reward strong performance.

*Support for Our Employees During the COVID-19 Pandemic*

The Company has been actively engaged in promoting the health and welfare of our employees during the COVID-19 pandemic. A COVID-19 task force was created and met regularly to implement COVID-19 health protocols in compliance with federal, state and local recommendations. During the height of the pandemic, employees were permitted to work remotely when possible. Management also implemented changes to physical office layouts and work schedules as well as encouraged masking, vaccination and social distancing to ensure our employees remained protected from illness. Management continues to monitor cases of exposure and contagion on a weekly basis to respond quickly to COVID-19 incidents as they occur.

**Available Information**

Copies of our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 are available free of charge through our website (www.redwirespace.com) as soon as reasonably practicable after we electronically file the material with, or furnish it to, the Securities and Exchange Commission. The information contained on the Company's website is not included in, nor incorporated by reference into, this Annual Report on Form 10-K.

**Item 1A. Risk Factors**

*Readers should carefully consider the following risk factors, together with all of the other information included in this Annual Report on Form 10-K. The risks and uncertainties described herein may not be the only ones facing the Company and are not organized in order of priority. Additional risks and uncertainties not presently known to management or that management currently believes to be immaterial may also adversely affect the Company's business. If any of the following risks and uncertainties develop into actual events, it could affect the Company's business, financial condition, or results of operations, cause the trading price of the Company's common stock to decline, or cause actual results to differ materially from those expected.*

**Risk Factors Summary**

Some of the principal risks that may impact our business and results of operations are listed below:

**Business and Industry Risks**

- our limited operating history makes it difficult to evaluate our future prospects and the risks and challenges we may encounter;

- our ability to grow our business depends on the successful development and continued refinement of many of our proprietary technologies, products, and service offerings;

- competition with existing or new companies could cause downward pressure on prices, fewer customer orders, reduced margins, the inability to take advantage of new business opportunities, and the loss of market share;

- if we are unable to successfully integrate our recently completed and pending acquisitions or successfully select, execute or integrate future acquisitions into the business, our operations and financial condition could be materially and adversely affected;

- matters relating to or arising from our Audit Committee investigation, including regulatory investigations and proceedings, litigation matters, and potential additional expenses, may adversely affect our business and results of operations;

- the COVID-19 pandemic could continue to adversely affect our business;

- unsatisfactory performance of our products and services could have a material adverse effect on our business, financial condition and results of operations;

- the market for in-space infrastructure services has not been established with precision, is still emerging and may not achieve the growth potential that we expect or may grow more slowly than expected;

- we may in the future invest significant resources in developing new offerings and exploring the application of our technologies for other uses and those opportunities may never materialize;

- we may not be able to convert our orders in backlog into revenue;

- a portion of our business model is related to the in-space manufacture and robotic assembly of space structures, a technology that is still in development and has not been fully validated through in-space deployment and testing;

- our reliance on third-party launch vehicles to launch our spacecraft and customer payloads into space;

**Government Contract Risks**

- we are subject to the requirements of the National Industrial Security Program Operating Manual ("NISPOM") for our facility security clearance, which is a prerequisite to our ability to perform on classified contracts for the U.S. government;

- the U.S. government's budget deficit and the national debt, as well as any inability of the U.S. government to complete its budget process for any government fiscal year and consequently having to shut down or operate on funding levels equivalent to its prior fiscal year pursuant to a "continuing resolution," could have an adverse impact on our business, financial condition, results of operations and cash flows;

- we depend significantly on U.S. government contracts, which often are only partially funded, subject to immediate termination, and heavily regulated and audited;

**Regulatory Risks**

- we are subject to stringent U.S. economic sanctions, and trade control laws and regulations;

- we have government customers, which subjects us to risks including early termination, audits, investigations, sanctions and penalties;

- if we fail to adequately protect our intellectual property rights, our competitive position could be impaired and our intellectual property applications for registration may not be issued or registered;

**Public Company Risks**

- our management team has limited experience managing a public company;

- if we were to identify additional material weaknesses or other deficiencies, or otherwise fail to maintain effective internal control over financial reporting, we may not be able to accurately and timely report our financial results, in which case our business may be harmed and investors may lose confidence in the accuracy and completeness of our financial reports;

**Debt Related Risks**

- our level of indebtedness and the potential need for substantial funding to finance our operations, which may not be available when we need it, on acceptable terms or at all;

- we may require substantial additional funding to finance our operations, but adequate additional financing may not be available when we need it, on acceptable terms or at all;

**General Risks**

- our operating results may fluctuate significantly, which makes our future operating results difficult to predict and could cause our operating results to fall below expectations or any guidance we may provide.

**Risks Relating to the Company's Business and Industry**

***Our limited operating history makes it difficult to evaluate our future prospects and the risks and challenges we may encounter.***

Our limited operating history makes it difficult to evaluate our future prospects and the risks and challenges we may encounter. Risks and challenges we have faced or expect to face include our ability to:

- forecast our revenue and budget for and manage our expenses;

- attract new customers and retain existing customers;

- effectively manage our growth and business operations, including planning for and managing capital expenditures for our current and future space and space-related systems and services, managing our supply chain and supplier relationships related to our current and future product and service offerings, and integrating acquisitions;

- comply with existing and new or modified laws and regulations applicable to our business, including the impact of Small Business Innovation Research ("SBIR") and other small business set aside ineligibility of newly acquired entities;

- anticipate and respond to macroeconomic changes and changes in the markets in which we operate;

- maintain and enhance the value of our reputation and brand;

- develop and protect intellectual property; and

- hire, integrate and retain talented people at all levels of our organization.

If we fail to address the risks and difficulties that we face, including those associated with the challenges listed above as well as those described elsewhere in this *Risk Factors*" section, our business, financial condition and results of operations could be adversely affected. Further, because we have limited historical financial data and operate in a rapidly evolving market, any predictions about our future revenue and expenses may not be as accurate as they would be if we had a longer operating history or operated in a more developed market. We have encountered in the past, and will encounter in the future, risks and uncertainties frequently experienced by growing companies with limited operating histories in rapidly changing industries. If our assumptions regarding these risks and uncertainties, which we use to plan and operate our business, is incorrect or changes or if we do not address these risks successfully,

our results of operations could differ materially from our expectations and our business, financial condition and results of operations could be adversely affected.

***Our ability to grow our business depends on the successful development and continued refinement of many of our proprietary technologies, products, and service offerings, which are subject to many uncertainties, some of which are beyond our control.***

The market for our products and services is characterized by rapid change and technological improvements. Failure to respond in a timely and cost-effective way to these technological developments would result in serious harm to our business and operating results. We have derived, and we expect to continue to derive, a substantial portion of our revenues from providing innovative products, engineering services and manufacturing and technical solutions that are based upon today's leading technologies and that are capable of adapting to future technologies. As a result, our success will depend, in part, on our ability to develop and market product and service offerings that respond in a timely manner to the technological advances of our customers, evolving industry standards and changing customer preferences. We may not be successful in identifying, developing and marketing products or systems that respond to rapid technological change, evolving technical standards and systems developed by others.

We believe that, in order to remain competitive in the future, we will need to continue to invest significant financial resources to develop new offerings and technologies or to adapt or modify our existing offerings and technologies, including through internal research and development, acquisitions and joint ventures or other teaming arrangements. These expenditures could divert our attention and resources from other projects, and we cannot be sure that these expenditures will ultimately lead to the timely development of new offerings and technologies or identification of and expansion into new markets. Due to the design complexity of our products, we may, in the future, experience delays in completing the development and introduction of new products. Any delays could result in increased costs of development or deflect resources from other projects. In addition, there can be no assurance that the market for our products will develop or continue to expand or that we will be successful in newly identified markets as we currently anticipate. If we are unable to achieve sustained growth, we may be unable to execute our business strategy, expand our business or fund other liquidity needs and our business prospects, financial condition and results of operations could be materially and adversely affected. Furthermore, we cannot be sure that our competitors will not develop competing technologies that gain market acceptance in advance of our products.

We also rely on our customers to fund/co-fund development of new offerings and technologies. If our customers reduce their investments, that may impact our ability to bring new products and services to market and/or increase the investment that is necessary for the Company to make in order to remain competitive, either of which could have a material adverse effect on our business, results of operations and financial condition.

Additionally, the possibility exists that our competitors might develop new technology or offerings that might cause our existing technology and offerings to become obsolete. If we fail in our new product development efforts or our products or services fail to achieve market acceptance more rapidly as compared to our competitors, our ability to procure new contracts could be negatively impacted, which could negatively impact our results of operations and financial condition.

***Competition from existing or new companies could cause us to experience downward pressure on prices, fewer customer orders, reduced margins, the inability to take advantage of new business opportunities, and the loss of market share.***

We operate in highly competitive markets and generally encounter intense competition to win contracts from many other firms, including lower and mid-tier federal contractors with specialized capabilities, large defense contractors and the federal government. Additionally, our markets are facing increasing industry consolidation, resulting in larger competitors who have more market share putting more downward pressure on prices and offering a more robust portfolio of products and services. We are subject to competition based upon product design, performance, pricing, quality, and services. Our product performance, engineering expertise, and product quality have been important factors in our growth. While we try to maintain competitive pricing on those products that are directly comparable to products manufactured by others, in many instances our products will conform to more exacting specifications and carry a higher price than analogous products. Many of our customers and potential customers have the capacity to design and internally manufacture products that are similar to our products. We face competition from research and product development groups and the manufacturing operations of current and potential customers, who continually evaluate the benefits of internal research, product development, and manufacturing versus outsourcing. Our defense prime contractor customers could decide to pursue one or more of our product development areas as a core competency and insource that technology development and production rather than purchase that capability from us as a supplier. This competition could result in fewer customer orders and a loss of market share.

Our primary competitors for satellite manufacturing contracts include Blue Canyon Technologies, Inc., York Space Systems and Tyvak Nano-Satellite Systems, Inc. We may also face competition in the future from emerging low-cost competitors in Europe, India, Russia and China. Competition in our guidance, navigation and control business is highly diverse, and while our competitors offer different products, there is often competition for contracts that are part of governmental budgets. Our major existing and potential competitors for our guidance, navigation and control business include Ball Aerospace & Technologies Corp., Space Micro Inc. and

Bradford Space Inc. Our major existing competitor for our deployables business is Northrop Grumman Corporation and M.M.A. Design, LLC and our major and existing competitors for in-space manufacturing are Amergint Technologies and Maxar Technologies.

In addition, some of our foreign competitors currently benefit from, and others may benefit in the future from, protective measures by their home countries where governments are providing financial support, including significant investments in the development of new technologies. Government support of this nature greatly reduces the commercial risks associated with aerospace technology development activities for these competitors. This market environment may result in increased pressures on our pricing and other competitive factors.

We believe our ability to compete successfully in designing, engineering and manufacturing our products and services at significantly reduced cost to customers does and will depend on a number of factors, which may change in the future due to increased competition, our ability to meet our customers' needs and the frequency and availability of our offerings. If we are unable to compete successfully, our business, financial condition and results of operations would be adversely affected.

*As part of growing our business, we have and may make acquisitions. If we fail to successfully select, execute or integrate our acquisitions, then our business, results of operations and financial condition could be materially adversely affected, and our stock price could decline.*

Since our inception in 2020, we have made a number of acquisitions and, to date, we have limited experience operating such acquisitions, having begun the integration of acquired technology and personnel only recently. Failure to successfully identify, complete, manage and integrate acquisitions, including the acquisitions that we have made since our inception could materially and adversely affect our business, financial condition and results of operations and could cause the Company's stock price to decline.

From time to time, we may undertake acquisitions to add new products and technologies, acquire talent, gain new sales channels or enter into new markets or sales territories. In addition to possible stockholder approval, we may need approvals and licenses from relevant government authorities for the acquisitions and to comply with any applicable laws and regulations, and a failure to obtain such approvals and licenses could result in delays and increased costs, and may disrupt our business strategy. Furthermore, acquisitions and the subsequent integration of new assets, businesses, key personnel, customers, vendors and suppliers require significant attention from our management and could result in a diversion of resources from our existing business, which in turn could have an adverse effect on our operations. Acquired assets or businesses may not generate the financial results we expect. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant.

*Any acquisitions, partnerships or joint ventures that we enter into could disrupt our operations and have a material adverse effect on our business, financial condition and results of operations.*

From time to time, we may evaluate potential strategic acquisitions of businesses, including partnerships or joint ventures with third parties. We may not be successful in identifying acquisition, partnership and joint venture candidates. In addition, we may not be able to continue the operational success of such businesses or successfully finance or integrate any businesses that we acquire or with which we form a partnership or joint venture. We may have potential write-offs of acquired assets and/or an impairment of any goodwill recorded as a result of acquisitions. Furthermore, the integration of any acquisition may divert management's time and resources from our core business and disrupt our operations or may result in conflicts with our business. Any acquisition, partnership or joint venture may not be successful, may reduce our cash reserves, may negatively affect our earnings and financial performance and, to the extent financed with the proceeds of debt, may increase our indebtedness. Further, depending on market conditions, investor perceptions of the Company and other factors, we might not be able to obtain financing on acceptable terms, or at all, to implement any such transaction. We cannot ensure that any acquisition, partnership or joint venture we make will not have a material adverse effect on our business, financial condition and results of operations.

*We may not be able to maintain or increase profitability or positive cash flow.*

We expect our operating expenses to increase over the next several years as we scale our operations, increase research and development efforts relating to new offerings and technologies, and hire more employees. These efforts may be more costly than we expect and may not result in increased revenue or growth in our business. Any failure to increase our revenue sufficiently to keep pace with our investments and other expenses could prevent us from maintaining or increasing profitability or positive cash flow. Furthermore, if our future growth and operating performance fail to meet investor or analyst expectations, or if we have future negative cash flow or losses resulting from expanding our operations, this could have a material adverse effect on our business, financial condition and results of operations.

***Matters relating to or arising from our Audit Committee investigation, including regulatory investigations and proceedings, litigation matters, and potential additional expenses, may adversely affect our business and results of operations. We may also become involved in litigation from time to time that may materially adversely affect us.***

On November 5, 2021, the Company was notified of potential accounting issues with a business unit by an employee in connection with his resignation. Management promptly informed the independent Audit Committee and its independent registered public accounting firm. The timing of the investigation prevented the timely filing of our Quarterly Report on Form 10-Q for the quarter ended September 30, 2021. The Audit Committee promptly engaged independent, external legal and accounting firms to complete an independent investigation. After completing its investigation, the Audit Committee concluded that the potential issues raised by the former employee did not require a restatement or adjustment of the Company's previously issued consolidated financial statements relating to any prior periods. Additionally, there were no modifications to any previously announced non-GAAP financial information previously disclosed by the Company. However, the results of the investigation confirmed the existence of previously identified internal control deficiencies as well as identified certain additional internal control deficiencies. Please refer to Item 9A, Controls and Procedures for additional information related to matters that were determined to represent material weaknesses in internal control over financial reporting. The Company self-reported this matter to the Securities and Exchange Commission ("SEC") on November 8, 2021 and intends to continue to cooperate with any requests from the SEC.

Additionally, on December 17, 2021, the Company, our CEO, Peter Cannito, and, our CFO, William Read, were named as defendants in a putative class action complaint filed in the United States District Court for the Middle District of Florida. In the complaint, the plaintiff alleges that the Company and certain of its directors and officers made misleading statements and/or failed to disclose material facts about the Company's business, operations, and prospects, allegedly in violation of Section 10(b) (and Rule 10b-5 promulgated thereunder) and Section 20(a) of the Securities Exchange Act of 1934. As relief, the plaintiffs are seeking, among other things, compensatory damages. The defendants believe the allegations are without merit and intend to defend the suit vigorously. However, given the early stage of the proceedings, a reasonable estimate of the amount of any possible loss or range of loss cannot be made at this time.

From time to time, we have also become and may in the future be involved in legal proceedings relating to various matters, including intellectual property, commercial, employment, class action, whistleblower and other litigation and claims, as well as governmental and other regulatory investigations and proceedings. Litigation and governmental and regulatory investigations and proceedings are time-consuming, and may divert management's attention and resources, cause us to incur significant expenses or liability or require us to change our business practices. Because of the potential risks, expenses and uncertainties of litigation, we may, from time to time, settle disputes, even where we believe that we have meritorious claims or defenses. Because litigation and governmental and regulatory investigations and proceedings are inherently unpredictable, we cannot assure you that the results of any of these actions will not have a material adverse effect on our business.

***The COVID-19 pandemic, has and may continue to adversely affect our business.***

The global spread of COVID-19 has disrupted certain aspects of our operations and may adversely impact our business operations and financial results, including our ability to execute on our business strategy and goals. Specifically, the continued spread of COVID-19 and related precautionary measures have resulted in delays or disruptions in our supply chain; delays in the launch or execution of certain of our customers' projects; and a decrease of our operational efficiency in the development of our systems, products, technologies and services. We continue to take measures within our facilities to ensure the health and safety of our employees, which include the creation of a task force to implement COVID-19 protocols in compliance with federal, state and local recommendations, encouraging masking and vaccination, rearranging facilities and work schedules to follow social distancing protocols and undertaking regular and thorough disinfecting of surfaces and tools. However, there can be no assurances that these measures will prevent disruptions due to COVID-19 within our workforce. These measures have also resulted in the reduction of operational efficiency within our impacted workforce, and we expect they will continue to do so.

The pandemic has also resulted in, and may continue to result in, significant disruption and volatility of global financial markets. This disruption and volatility may adversely impact our ability to access capital, which could in the future negatively affect our liquidity and capital resources. Given the rapid and evolving nature of the impact of the virus, responsive measures taken by governmental authorities and the continued uncertainty about its impact on society and the global economy, we cannot predict the extent to which it will affect our operations, particularly if these impacts persist or worsen over an extended period of time. To the extent COVID-19 adversely affects our business operations and financial results, it may also have the effect of heightening many of the other risks described in this "*Risk Factors*" section.

***Adverse publicity stemming from any incident involving us, our customers, users of our products and services, other operators in the space sector or our competitors could have a material adverse effect on our business, financial condition and results of operations.***

We are at risk of adverse publicity stemming from any public incident involving our company, our customers, users of our products

and services, other operators in the space sector, our competitors, our people or our brand. If certain of our products and services are sold to customers, and such customers were to be involved in a public incident, accident or catastrophe this could create an adverse public perception of spaceflight and result in decreased customer demand for spaceflight experiences, which could cause a material adverse effect on our business, financial conditions and results of operations. The insurance we carry may be inapplicable or inadequate to cover any such incident, accident or catastrophe. In the event that our insurance is inapplicable or not adequate, we may be forced to bear substantial losses from any such incident, accident or catastrophe.

*If we are unable to adapt to and satisfy customer demands in a timely and cost-effective manner, our ability to grow our business may suffer.*

The success of our business depends in part on effectively designing, producing and engineering developmental technologies related to satellites and space structures, testing of sensors and cameras/trackers used in space and satellite applications, providing engineering services and aerospace product development and developing products for deployable structure systems, thermal management systems and advanced manufacturing in the aerospace industry. If for any reason we are unable to continue to manufacture, design and develop technologies as planned or provide the services and products that our customers expect from us, this could have a material adverse effect on our business, financial condition and results of operations. If our current or future product and service offerings do not meet expected performance or quality standards, including with respect to customer safety and satisfaction, this could cause operational delays. In addition, any delay in manufacturing new products as planned could increase costs and cause our products and services to be less attractive to potential new customers. Further, certain government bodies may have priority with respect to the use of our products and services for national defense reasons, which may impact our cadence of producing and selling products and services to other customers. Any production, operational or manufacturing delays or other unplanned changes to our ability to design, develop and manufacture our products or offer our services could have a material adverse effect on our business, financial condition and results of operations.

*Our business involves significant risks and uncertainties that may not be covered by insurance or indemnity.*

A significant portion of our business relates to designing, developing, engineering and manufacturing advanced space technology products and systems. New technologies may be untested or unproven. Failure of some of these products and services could result in extensive property damage. Accordingly, we may incur liabilities that are unique to our products and services.

We endeavor to obtain insurance coverage from established insurance carriers to cover these risks and liabilities consistent with industry norms. However, the amount of insurance coverage that we maintain may not be adequate to cover all claims or liabilities. Existing coverage may be canceled while we remain exposed to the risk and it is not possible to obtain insurance to protect against all operational risks, natural hazards and liabilities.

We have historically insured certain of our products to the extent that insurance was available on acceptable premiums and other terms. The insurance proceeds received in connection with a partial or total loss of the functional capacity of certain of our products would not be sufficient to cover the replacement cost, if we choose to do so, of such products. In addition, this insurance will not protect us against all losses to our products due to specified exclusions, deductibles and material change limitations and it may be difficult to insure against certain risks, including on orbit performance of an overall system or portion of such a system. In addition, problems and delays in development or delivery as a result of issues with respect to design, technology, licensing and patent rights, labor, learning curve assumptions or materials and components could prevent us from achieving contractual requirements. In many circumstances, we may receive indemnification from the U.S. government. We generally do not receive indemnification from foreign governments.

The price and availability of insurance fluctuate significantly. Although we have historically been able to obtain insurance coverage, we cannot guarantee that we will be able to do so in the future. Any determination we make as to whether to obtain insurance coverage will depend on a variety of factors, including the availability of insurance in the market, the cost of available insurance and other factors. Insurance market conditions or factors outside our control at the time we are in the market for the required insurance, such as unrelated launch failures and on-orbit failures, could cause premiums to be significantly higher than current estimates and could reduce amounts of available coverage. The cost of our insurance has been increasing and may continue to increase. Higher premiums on insurance policies will reduce our operating income by the amount of such increased premiums. If the terms become less favorable than those currently available, there may be limits on the amount of coverage that we can obtain or we may not be able to obtain insurance at all.

In addition, any accident or incident for which we are liable, even if fully insured, could negatively affect our standing with our customers and the public, thereby making it more difficult for us to compete effectively, and could significantly impact the cost and availability of adequate insurance in the future. Any disruption of our ability to operate our business could result in a material decrease in our revenues or significant additional costs to replace, repair or insure our assets, which could have a material adverse impact on our financial condition and results of operations.

Page 19

*If we fail to respond to commercial industry cycles in terms of our cost structure, manufacturing capacity, and/or personnel needs, our business could be seriously harmed.*

The timing, length, and severity of the up-and-down cycles in the commercial space, defense, space and space related industries are difficult to predict. The cyclical nature of the industries in which we operate affects our ability to accurately predict future revenue, and in some cases, future expense levels. During down cycles in our industry, the financial results of our customers may be negatively impacted, which could result not only in a decrease in orders but also a weakening of their financial condition that could impair our ability to recognize revenue or to collect on outstanding receivables. When cyclical fluctuations result in lower than expected revenue levels, operating results may be adversely affected and cost reduction measures may be necessary in order for us to remain competitive and financially sound. We must be in a position to adjust our cost and expense structure to reflect prevailing market conditions and to continue to motivate and retain our key employees. If we fail to respond, then our business could be seriously harmed. In addition, during periods of rapid growth, we must be able to increase engineering and manufacturing capacity and personnel to meet customer demand. We can provide no assurance that these objectives can be met in a timely manner in response to industry cycles. Each of these factors could adversely impact our operating results and financial condition.

*Any delays in the development, design, engineering and manufacturing of our products and services may adversely impact our business, financial condition and results of operations.*

We have previously experienced, and may experience in the future, delays or other complications in the design, manufacture, production, delivery and servicing ramp of our systems, products, technologies, services, and related technology, including on account of the global COVID-19 health crisis. If delays like this arise or recur, if our remediation measures and process changes do not continue to be successful or if we experience issues with planned manufacturing improvements or design and safety, we could experience issues or delays in increasing production further.

If we encounter difficulties in scaling our delivery or servicing capabilities, if we fail to develop and successfully commercialize our products and services, if we fail to develop such technologies before our competitors, or if such technologies fail to perform as expected, are inferior to those of our competitors or are perceived to offer less mission assurance than those of our competitors, our business, financial condition and results of operations could be materially and adversely impacted.

*Unsatisfactory performance of our products and services could have a material adverse effect on our business, financial condition and results of operation.*

We manufacture, design and engineer highly sophisticated systems, products, technologies and services and offer onsite engineering services and aerospace product development that depends on complex technology. While we have built operational processes to ensure that the design, manufacture, performance and servicing meet rigorous performance goals, there can be no assurance that we will not experience operational or process failures and other problems, including through manufacturing or design defects, operator error, cyber-attacks or other intentional acts, that could result in potential safety risks. Any actual or perceived safety or mission assurance issue may result in significant reputational harm to our businesses, in addition to tort liability, maintenance, increased mission assurance infrastructure and other costs that may arise. Such issues with our products and services could result in our customers' delaying or cancelling planned missions, increased regulation or other systemic consequences. Our inability to meet our mission assurance standards or adverse publicity affecting our reputation as a result of accidents, mechanical failures, damages to customer property could have a material adverse effect on our business, financial condition and results of operation.

*Our results of operations and cash flows are substantially affected by our mix of fixed-price, cost-plus and time-and-material type contracts. Our profits may decrease and/or we may incur significant unanticipated costs if we do not accurately estimate the costs of these engagements.*

We generate revenue through various fixed-price, cost-plus and time-and-material contracts. A significant number of our arrangements with our customers are on fixed-price contracts, rather than contracts in which payment to us is determined on a time and materials or other basis. These fixed-price contracts allow us to benefit from cost savings, but subject us to the risk of potential cost overruns, particularly for firm fixed-price contracts because we assume all of the cost burden. If our initial estimates are incorrect, we can lose money on these contracts. U.S. government contracts can expose us to potentially large losses because the U.S. government can hold us responsible for completing a project or, in certain circumstances, paying the entire cost of its replacement by another provider regardless of the size or foreseeability of any cost overruns that occur over the life of the contract. Because many of these contracts involve new technologies and applications and can last for years, unforeseen events, such as technological difficulties, fluctuations in the price of raw materials, a significant increase in inflation in the U.S. or other countries, problems with our suppliers and cost overruns, can result in the contractual price becoming less favorable or even unprofitable to us over time. Our failure to estimate accurately the resources and schedule required for a project, or our failure to complete our contractual obligations in a manner consistent with the project plan upon which our fixed-price contract was based, could adversely affect our overall profitability and could have a material adverse effect on our business, financial condition, and results of operations. We are consistently entering into

contracts for large projects that magnify this risk. We have been required to commit unanticipated additional resources to complete projects in the past, which has occasionally resulted in losses on those contracts. We could experience similar situations in the future. In addition, we may fix the price for some projects at an early stage of the project engagement, which could result in a fixed price that is too low. Therefore, any changes from our original estimates could adversely affect our business, financial condition, and results of operations.

***Our cash flow and profitability could be reduced if expenditures are incurred prior to the final receipt of a contract.***

We provide various professional services, specialized products, and sometimes procure equipment and materials on behalf of our customers under various contractual arrangements. From time to time, in order to ensure that we satisfy our customers' delivery requirements and schedules, we may elect to initiate procurement in advance of receiving final authorization from the government customer or a prime contractor. In addition, from time to time, we may build production units in advance of receiving an anticipated contract award. If our government or prime contractor customer's requirements should change or if the government or the prime contractor should direct the anticipated procurement to another contractor, or if the anticipated contract award does not materialize, or if the equipment or materials become obsolete or require modification before we are under contract for the procurement, our investment in the equipment or materials might be at risk if we cannot efficiently resell them. This could reduce anticipated earnings or result in a loss, negatively affecting our cash flow and profitability.

***Our products are complex, and undetected defects may increase our costs, harm our reputation with customers or lead to costly litigation.***

Our products are extremely complex and must operate successfully with complex products of our customers and their other vendors. Our products may contain undetected errors when first introduced or as we introduce product upgrades. The pressures we face to be the first to market new products or functionality and the elapsed time before our products are integrated into our customers' systems increases the possibility that we will offer products in which we or our customers later discover problems. We have experienced new product and product upgrade errors in the past and expect similar problems in the future. These problems may cause us to incur significant warranty costs and costs to support our service contracts and divert the attention of personnel from our product development efforts. Also, hostile third parties or nation states may try to install malicious code or devices into our products or software. Undetected errors may adversely affect our product's ease of use and may create customer satisfaction issues. If we are unable to repair these problems in a timely manner, we may experience a loss of or delay in revenue and significant damage to our reputation and business prospects. Many of our customers rely upon our products for mission-critical applications. Because of this reliance, errors, defects, or other performance problems in our products could result in significant financial and other damage to our customers. Our customers could attempt to recover those losses by pursuing products liability claims against us which, even if unsuccessful, would likely be time-consuming and costly to defend and could adversely affect our reputation.

***The market for in-space infrastructure services has not been established with precision, is still emerging and may not achieve the growth potential we expect or may grow more slowly than expected.***

A substantial portion of our business involves in-space infrastructure services, the market for which has not been established with precision as the commercialization of space is a relatively new development and is rapidly evolving. Our estimates for the total addressable markets for in-space infrastructure services are based on a number of internal and third-party estimates, including our current backlog, assumed prices at which we can offer services, assumed frequency of service, our ability to leverage our current manufacturing and operational processes and general market conditions. While we believe our assumptions and the data underlying our estimates of the total addressable markets for in-space infrastructure services are reasonable, these assumptions and estimates may not be correct and the conditions supporting our assumptions or estimates may change at any time, thereby reducing the predictive accuracy of these underlying factors. As a result, our estimates of the annual total addressable markets for in-space infrastructure services, as well as the expected growth rate for the total addressable market for those products and services, may prove to be incorrect, which could have a material adverse effect on our business, financial condition and results of operation.

***We may in the future invest significant resources in developing new offerings and exploring the application of our technologies for other uses and those opportunities may never materialize.***

While our primary focus for the foreseeable future will be on our satellite design/manufacturing, satellite component and subsystem design/manufacturing, guidance, navigation and control, and deployables businesses, we may invest significant resources in developing new technologies, services, products and offerings. However, we may not realize the expected benefits of these investments. In addition, we expect to explore the application of our proprietary technologies for other commercial and government uses, including those that are Earth-based. These anticipated technologies, however, are unproven and these products or technologies may never materialize or be commercialized in a way that would allow us to generate ancillary revenue streams. Relatedly, if such technologies become viable offerings in the future, we may be subject to competition from our competitors within the space-infrastructure industry, some of which may have substantially greater monetary and knowledge resources than we have and expect to

have in the future to devote to the development of these technologies. Such competition or any limitations on our ability to take advantage of such technologies could impact our market share, which could have a material adverse effect on our business, financial condition and results of operations.

Such research and development initiatives may also have a high degree of risk and involve unproven business strategies and technologies with which we have limited operating or development experience. They may involve claims and liabilities (including, but not limited to, personal injury claims), expenses, regulatory challenges and other risks that we may not be able to anticipate. There can be no assurance that consumer demand for such initiatives will exist or be sustained at the levels that we anticipate, or that any of these initiatives will gain sufficient traction or market acceptance to generate sufficient revenue to offset any new expenses or liabilities associated with these new investments. Further, any such research and development efforts could distract management from current operations, and would divert capital and other resources from our more established offerings and technologies. Even if we were to be successful in developing new products, services, offerings or technologies, regulatory authorities may subject us to new rules or restrictions in response to our innovations that may increase our expenses or prevent us from successfully commercializing new products, services, offerings or technologies.

### *We may not be able to convert our orders in backlog into revenue.*

As of December 31, 2021, our backlog consisted of $139.7 million in customer contracts. However, many of these contracts are cancellable by customers for convenience. In the event of a cancellation for convenience, we are generally entitled to be compensated for the work performed up to the date of cancellation. The remaining amounts may not be collected in this situation.

In addition, backlog is typically subject to large variations from quarter to quarter and comparisons of backlog from period to period are not necessarily indicative of future revenues. Furthermore, some contracts comprising the backlog are for services scheduled many years in the future, and the economic viability of customers with whom we have contracted is not guaranteed over time. As a result, the contracts comprising our backlog may not result in actual revenue in any particular period or at all, and the actual revenue from such contracts may differ from our backlog estimates. The timing of receipt of revenues, if any, on projects included in backlog could change because many factors affect the scheduling of missions and adjustments to contracts may also occur. The failure to realize some portion of our backlog could adversely affect our revenues and gross margins. Furthermore, the presentation of our financial results requires us to make estimates and assumptions that may affect revenue recognition and changes in estimates are likely to occur from period to period. Accordingly, actual results could differ significantly from our estimates.

### *A portion of our business model is related to the in-space manufacture and robotic assembly of space structures. The technology for these processes is still in development and has not been fully validated through in-space deployment and testing. If we are unable to develop and validate such technology or technology for other planned services, our operating results and business will be materially adversely affected.*

While we plan to initially develop technologies related to additive manufacturing of on-orbit satellites and structures at costs significantly lower than our competitors, the success of our business is in large part dependent on our ability to develop more powerful and efficient in-space manufacturing technology and space-capable robotics. This technology is currently under development and may take longer than anticipated to materialize, if at all, and may never be commercialized in a way that would allow us to generate revenue from the sale of these services and offerings. Relatedly, if such technologies become viable in the future, we may be subject to increased competition, and some competitors may have substantially greater monetary and knowledge resources than we have and expect to have in the future to devote to the development of these technologies. If we fail to successfully complete the development and validate this technology through actual deployment and testing of such technology, experience any delays or setbacks in the development of this technology, or encounter difficulties in scaling our manufacturing or assembly capabilities, we may not be able to fully realize our business model and our financial results and prospects would be materially adversely affected.

### *We are dependent on third-party launch vehicles to launch our spacecraft and customer payloads into space.*

Currently there are only a handful of companies who offer launch services, and if this sector of the space industry does not grow or there is consolidation among these companies, we may not be able to secure space on a launch vehicle or such space may be more costly.

We are dependent on third-party launch vehicles to deliver our systems, products and technologies into space. If the number of companies offering launch services or the number of launches does not grow in the future or there is a consolidation among companies who offer these services, this could result in a shortage of space on these launch vehicles, which may cause delays in our ability to meet our customers' needs. Additionally, a shortage of space available on launch vehicles may cause prices to increase or cause delays in our ability to meet our customers' needs. Either of these situations could have a material adverse effect on our results of operations and financial condition.

Further, in the event that a launch is delayed, our timing for recognition of revenue may be impacted depending on the length of the delay and the nature of the contract with the customers with payloads on such delayed flight.

Such a delay in recognizing revenue could materially impact our financial statements or result in negative impacts to our earnings during a specified time period, which could have a material effect on our results of operations and financial condition.

***We may be unable to manage our future growth effectively, which could make it difficult to execute our business strategy.***

If our operations continue to grow as planned, of which there can be no assurance, we will need to expand our sales and marketing, research and development, customer and commercial strategy, products and services, supply, and manufacturing functions. We will also need to continue to leverage our manufacturing and operational systems and processes, and there is no guarantee that we will be able to scale the business and the manufacture of systems, products, technologies and services as currently planned or within the planned timeframe. The continued expansion of our business may also require additional manufacturing, design and operational facilities, as well as space for administrative support, and there is no guarantee that we will be able to find suitable locations for the manufacture, design and testing of our systems, products, technologies and services.

Our continued growth could increase the strain on our resources, and we could experience operating difficulties, including difficulties in hiring and training employees, finding manufacturing capacity to design, test and produce our vehicles, spaceflight technology and related equipment, and delays in production. These difficulties may divert the attention of management and key employees and impact financial and operational results. If we are unable to drive commensurate growth, these costs, which include lease commitments, headcount and capital assets, could result in decreased margins, which could have a material adverse effect on our business, financial condition and results of operations.

***We may experience a total loss of our technology and products and our customers' payloads if there is an accident on launch or during the journey into space, and any insurance we have may not be adequate to cover our loss.***

Although there have been and will continue to be technological advances in spaceflight, it is still an inherently dangerous activity. Explosions and other accidents on launch or during the flight have occurred and will likely occur in the future. If such incident should occur, we will likely experience a total loss of our systems, products, technologies and services and our customers' payloads. The total or partial loss of one or more of our products or customer payloads could have a material adverse effect on our results of operations and financial condition. For some missions, we can elect to buy launch insurance, which can reduce our monetary losses from the launch failure, but even in this case we will have losses associated with our inability to test our technology in space and delays with further technology development.

***Our financial results may vary significantly from quarter to quarter.***

We expect our revenue and operating results to vary from quarter to quarter. Reductions in revenue in a particular quarter could lead to lower profitability in that quarter because a relatively large amount of our expenses are fixed in the short-term. We may incur significant operating expenses during the start-up and early stages of large contracts and may not be able to recognize corresponding revenue in that same quarter. We may also incur additional expenses when contracts are terminated or expire and are not renewed. We may also incur additional expenses when companies are newly acquired.

In addition, payments due to us from our customers may be delayed due to billing cycles or as a result of failures of government budgets to gain congressional and administration approval in a timely manner. The U.S. government's fiscal year ends September 30. If a federal budget for the next federal fiscal year has not been approved by that date in each year, our customers may have to suspend engagements that we are working on until a budget has been approved. Any such suspensions may reduce our revenue in the fourth quarter of the federal fiscal year or the first quarter of the subsequent federal fiscal year. The U.S. government's fiscal year end can also trigger increased purchase requests from customers for equipment and materials. Any increased purchase requests we receive as a result of the U.S. government's fiscal year end would serve to increase our third or fourth quarter revenue, but will generally decrease profit margins for that quarter, as these activities generally are not as profitable as our typical offerings.

Additional factors that may cause our financial results to fluctuate from quarter to quarter include those addressed elsewhere in this *"Risk Factors"* section and the following factors, among others:

- the terms of customer contracts that affect the timing of revenue recognition;

- variability in demand for our services and solutions;

- commencement, completion or termination of contracts during any particular quarter;

- timing of shipments and product deliveries;

- timing of award or performance incentive fee notices;

- timing of significant bid and proposal costs;

- the costs of remediating unknown defects, errors or performance problems of our product offerings;

- variable purchasing patterns under blanket purchase agreements and other indefinite delivery/indefinite quantity ("IDIQ") contracts;

- restrictions on and delays related to the export of defense articles and services;

- costs related to government inquiries;

- strategic decisions by us or our competitors, such as acquisitions, divestitures, spin-offs and joint ventures;

- strategic investments or changes in business strategy;

- changes in the extent to which we use subcontractors;

- seasonal fluctuations in our staff utilization rates;

- changes in our effective tax rate, including changes in our judgment as to the necessity of the valuation allowance recorded against our deferred tax assets; and

- the length of sales cycles.

Significant fluctuations in our operating results for a particular quarter could cause us to fall out of compliance with the financial covenants related to our debt, which if not waived, could restrict our access to capital and cause us to take extreme measures to pay down the debt, if any, under the Adams Street Credit Agreement.

***Our margins and operating results may suffer if we experience unfavorable changes in the proportion of cost-plus-fee or fixed-price contracts in our total contract mix.***

Although fixed-price contracts entail a greater risk of a reduced profit or financial loss on a contract compared to other types of contracts we enter into, fixed-price contracts typically provide higher profit opportunities because we may be able to benefit from cost savings and operating efficiencies. In contrast, cost-plus-fee contracts are subject to statutory limits on profit margins and generally are the least profitable of our contract types. Our U.S. Government customers typically determine what type of contract we enter into. To the extent that we enter into more cost-plus-fee or less fixed-price contracts in proportion to our total contract mix in the future, our margins and operating results may suffer. Our operating results may also suffer to the extent we have a contract mix that is focused on developmental projects, which are typically at lower profit margins as compared to margins on production projects.

***Our systems, products, technologies and services and related equipment may have shorter useful lives than we anticipate.***

Our growth strategy depends in part on developing systems, products, technologies and services. These reusable systems, products, technologies and services and other space related technology and systems will have a limited useful life. While we intend to design our products and technologies for a certain lifespan, which corresponds to a number of cycles, there can be no assurance as to the actual operational life of a product or that the operational life of individual components will be consistent with its design life. A number of factors will impact the useful lives of our products and systems, including, among other things, the quality of their design and construction, the durability of their component parts and availability of any replacement components, and the occurrence of any anomaly or series of anomalies or other risks affecting the technology during launch and in orbit. In addition, any improvements in technology may make our existing products, designs or any component of our products prior to the end of its life obsolete. If our systems, products, technologies and services and related equipment have shorter useful lives than we currently anticipate, this may lead to delays in increasing the rate of our follow on work and new business, which would have a material adverse effect on our business, financial condition and results of operations. In addition, we are continually learning, and as our engineering and manufacturing expertise and efficiency increases, we aim to leverage this learning to be able to manufacture our products and equipment using less of our currently installed equipment, which could render our existing inventory obsolete. Any continued improvements in spaceflight technology and space related technology may make our existing products or any component of our products obsolete prior to the end of its life. If the space related equipment have shorter useful lives than we currently anticipate, this may lead to delays in the manufacturing and design of space and spaceflight components and may also lead to a delay in commencing additional operations or increasing the rate of our operations, or greater maintenance costs than previously anticipated such that the cost to maintain the products and related equipment may exceed their value, which would have a material adverse effect on our business, financial condition and results of operations.

Page 24

**Risks Related to Government Contracts**

***We are subject to the requirements of the National Industrial Security Program Operating Manual ("NISPOM") for our facility security clearance, which is a prerequisite to our ability to perform on classified contracts for the U.S. government.***

A facility security clearance is required in order to be awarded and perform on classified contracts for the U.S. Department of Defense ("DoD") and certain other agencies of the U.S. government. As a cleared entity, we must comply with the requirements of NISPOM, and any other applicable U.S. government industrial security regulations.

Certain of our facilities maintain a facility security clearance and many of our employees maintain a personal security clearance in order to access sensitive information necessary to the performance of our work on certain U.S. Government contracts and subcontracts. Failure to comply with the NISPOM or other security requirements may subject us to civil or criminal penalties, loss of access to sensitive information, loss of a U.S. Government contract or subcontract, or potentially debarment as a government contractor. Therefore, any failure to comply with U.S. Government security protocols could adversely affect our ability to operate.

If we were to violate the terms and requirements of the NISPOM, or any other applicable U.S. government industrial security regulations (which may apply to us under the terms of classified contracts), we could lose our security clearance. Even if we implement centralized compliance policies, we cannot be certain that we will be able to maintain our security clearance if a breach or violation occurs. If for some reason our security clearance is invalidated or terminated, we may not be able to continue to perform on classified contracts and would not be able to enter into new classified contracts, which could materially adversely affect our business, financial condition, and results of operations.

***Many of our contracts contain performance obligations that require innovative design capabilities, are technologically complex, require state-of-the-art manufacturing expertise, or are dependent upon factors not wholly within our control. Failure to meet these obligations could adversely affect our profitability and future prospects. Early termination of client contracts or contract penalties could adversely affect our results of operations.***

We design, develop, and manufacture technologically advanced and innovative products and services, which are applied by our customers in a variety of environments. Problems and delays in development or delivery as a result of issues with respect to design, technology, licensing and intellectual property rights, labor, inability to achieve learning curve assumptions, manufacturing materials or components could prevent us from meeting requirements. Either we or the customer may generally terminate a contract as a result of a material uncured breach by the other. If we breach a contract or fail to perform in accordance with contractual service levels, delivery schedules, performance specifications, or other contractual requirements set forth therein, the other party thereto may terminate such contract for default, and we may be required to refund money previously paid to us by the customer or to pay penalties or other damages. Even if we have not breached, we may deal with various situations from time to time that may result in the amendment or termination of a contract. These steps can result in significant current period charges and/or reductions in current or future revenue, and/or delays in collection of outstanding receivables and costs incurred on the contract. Other factors that may affect revenue and profitability include inaccurate cost estimates, design issues, unforeseen costs and expenses not covered by insurance or indemnification from the customer, diversion of management focus in responding to unforeseen problems, and loss of follow-on work.

***We rely on a limited number of suppliers for certain raw materials and supplied components. We may not be able to obtain sufficient raw materials or supplied components to meet our manufacturing, design and operating needs, or obtain such materials on favorable terms or at all, which could impair our ability to fulfill our orders in a timely manner or increase our costs of design and production.***

Our ability to produce our current and future systems, products, technologies and services and other components of operation is dependent upon sufficient availability of raw materials and supplied components, which we secure from a limited number of suppliers. Global supply chains have recently experienced disruption as a result of industry capacity constraints, material availability and global logistics delays arising from transportation capacity of ocean shipping containers and a prolonged delay in resumption of operations by one or more key suppliers as a result of COVID-19. Our reliance on suppliers to secure raw materials and supplied components exposes us to volatility in the prices and availability of these materials. We may not be able to obtain sufficient supplies of raw materials or supplied components on favorable terms or at all, which could result in delays in the manufacture of our systems, products, technologies and services or increased costs.

In addition, we may in the future experience delays in manufacturing or operation as we go through the requalification process with any replacement third-party supplier, as well as the limitations imposed by the International Traffic in Arms Regulations ("ITAR"), the Export Administration Regulations ("EAR"), or other restrictions on transfer of sensitive technologies. Moreover, the imposition of tariffs on such raw materials or supplied components could have a material adverse effect on our operations. Prolonged disruptions in the supply of any of our key raw materials or components, difficulty qualifying new sources of supply, implementing use of replacement materials or new sources of supply or any volatility in prices could have a material adverse effect on our ability to operate

in a cost-efficient, timely manner and could cause us to experience cancellations or delays of scheduled missions, customer cancellations or reductions in our prices and margins, any of which could harm our business, financial condition and results of operations.

*We use estimates when accounting for certain contracts and changes in these estimates may have a significant impact on our financial results.*

Our quarterly and annual sales are affected by a variety of factors that may lead to significant variability in our operating results. We evaluate the contract value and cost estimates for performance obligations at least quarterly, and more frequently when circumstances change significantly. Changes in estimates and assumptions related to the status of certain long-term contracts which could have a material adverse effect on our operating results, financial condition, and/or cash flows.

*The U.S. government's budget deficit and the national debt, as well as any inability of the U.S. government to complete its budget process for any government fiscal year and consequently having to shut down or operate on funding levels equivalent to its prior fiscal year pursuant to a "continuing resolution," could have an adverse impact on our business, financial condition, results of operations and cash flows.*

Considerable uncertainty exists regarding how future budget and program decisions will unfold, including the defense spending priorities of the U.S. government, what challenges budget reductions will present for the defense industry and whether annual appropriations bills for all agencies will be enacted for U.S. government fiscal 2022 and thereafter due to many factors, including but not limited to, changes in the political environment, including before or after a change to the leadership within the government administration, and any resulting uncertainty or changes in policy or priorities and resultant funding. The U.S. government's budget deficit and the national debt could have an adverse impact on our business, financial condition, results of operations and cash flows in a number of ways, including the following:

- • The U.S. government could reduce or delay its spending on, reprioritize its spending away from, or decline to provide funding for the government programs in which we participate;

- • U.S. government spending could be impacted by alternate arrangements to sequestration, which increases the uncertainty as to, and the difficulty in predicting, U.S. government spending priorities and levels; and

- • We may experience declines in revenue, profitability and cash flows as a result of reduced or delayed orders or payments or other factors caused by economic difficulties of our customers and prospective customers, including U.S. federal, state and local governments.

Furthermore, we believe continued budget pressures could have serious negative consequences for the security of the U.S., the defense industrial base and the customers, employees, suppliers, investors and communities that rely on companies in the defense industrial base. Budget and program decisions made in this environment would have long-term implications for the Company and the entire defense industry.

*We depend significantly on U.S. government contracts, which often are only partially funded, subject to immediate termination, and heavily regulated and audited. The termination or failure to fund, or negative audit findings for, one or more of these contracts could have an adverse impact on our business, financial condition, results of operations and cash flows.*

Over its lifetime, a U.S. government program may be implemented by the award of many different individual contracts and subcontracts. The funding of U.S. government programs is subject to U.S. Congressional appropriations. In recent years, U.S. government appropriations have been affected by larger U.S. government budgetary issues and related legislation. Although multi-year contracts may be authorized and appropriated in connection with major procurements, the U.S. Congress generally appropriates funds on a government fiscal year basis. Procurement funds are typically made available for obligation over the course of one to three years. Consequently, programs often initially receive only partial funding, and additional funds are obligated only as the U.S. Congress authorizes further appropriations. We cannot predict the extent to which total funding and/or funding for individual programs will be included, increased or reduced as part of the annual appropriations process ultimately approved by U.S. Congress and the President of the United States or in separate supplemental appropriations or continuing resolutions, as applicable. The termination of funding for a U.S. government program would result in a loss of anticipated future revenue attributable to that program, which could have an adverse impact on our operations. In addition, the termination of a program or the failure to commit additional funds to a program that already has been started could result in lost revenue and increase our overall costs of doing business.

Generally, U.S. government contracts are subject to oversight audits by U.S. government representatives. Such audits could result in adjustments to our contract costs. Any costs found to be improperly allocated to a specific contract will not be reimbursed, and such costs already reimbursed must be refunded. We have recorded contract revenue based on costs we expect to realize upon final audit. However, we do not know the outcome of any future audits and adjustments, and we may be required to materially reduce our revenue

Page 26

or profits upon completion and final negotiation of audits. Negative audit findings could also result in termination of a contract, forfeiture of profits, suspension of payments, fines or suspension or debarment from U.S. Government contracting or subcontracting for a period of time.

In addition, U.S. government contracts generally contain provisions permitting termination, in whole or in part, without prior notice at the U.S. government's convenience upon payment only for work done and commitments made at the time of termination. For some contracts, we are a subcontractor and not the prime contractor, and in those arrangements, the U.S. Government could terminate the prime contractor for convenience without regard for our performance as a subcontractor. We can give no assurance that one or more of our U.S. government contracts will not be terminated under those circumstances. Also, we can give no assurance that we would be able to procure new contracts to offset the revenue or backlog lost as a result of any termination of our U.S. government contracts. Because a significant portion of our revenue is dependent on our performance and payment under our U.S. government contracts, the loss of one or more large contracts could have a material adverse impact on our business, financial condition, results of operations and cash flows.

Our U.S. government business also is subject to specific procurement regulations and a variety of socioeconomic and other requirements. These requirements, although customary in U.S. government contracts, increase our performance and compliance costs. These costs might increase in the future, thereby reducing our margins, which could have an adverse effect on our business, financial condition, results of operations and cash flows. In addition, the U.S. government has and may continue to implement initiatives focused on efficiencies, affordability and cost growth and other changes to its procurement practices. These initiatives and changes to procurement practices may change the way U.S. government contracts are solicited, negotiated and managed, which may affect whether and how we pursue opportunities to provide our products and services to the U.S. government, including the terms and conditions under which we do so, which may have an adverse impact on our business, financial condition, results of operations and cash flows. For example, contracts awarded under the DoD's Other Transaction Authority for research and prototypes generally require cost-sharing and may not follow, or may follow only in part, standard U.S. government contracting practices and terms, such as the Federal Acquisition Regulation ("FAR") and Cost Accounting Standards.

Failure to comply with applicable regulations and requirements could lead to fines, penalties, repayments, or compensatory or treble damages, or suspension or debarment from U.S. government contracting or subcontracting for a period of time. Among the causes for debarment are violations of various laws and regulations, including those related to procurement integrity, export control (including ITAR), U.S. government security, employment practices, protection of the environment, accuracy of records, proper recording of costs and foreign corruption. The termination of a U.S. government contract or relationship as a result of any of these acts would have an adverse impact on our operations and could have an adverse effect on our standing and eligibility for future U.S. government contracts.

***The terms of certain of our current and likely future contracts are highly sensitive and we are limited in our ability to disclose such terms.***

Our success, in large part, depends on our ability to maintain protection over the terms of certain of our current and likely future contracts and agreements, each of which is a highly negotiated agreement with sensitive information that, if publicly disclosed, would be beneficial for our and our partners' competitors to learn and harmful to our and our partners' commercial interests. We are limited in our ability to disclose the terms of these agreements, including terms that may affect our expected cash flows or the value of any collateral, and have taken precautions to protect the disclosure of the sensitive information in such agreements. Therefore, we have not allowed third parties to review the terms of these agreements. If the terms of these agreements were to be disclosed, our ability to compete could be hindered and our relationships with our partners could be damaged, both of which could have a material adverse effect on our business, financial condition and results of operations. Furthermore, our relationships with our partners could also be damaged, and they may take legal action against us, if they believe that we have disclosed any terms of these agreements without their prior consent.

***Disputes with our subcontractors or the inability of our subcontractors to perform, or our key suppliers to timely deliver our components, parts or services, could cause our products, systems or services to be produced or delivered in an untimely or unsatisfactory manner.***

We engage subcontractors on many of our contracts. We may have disputes with our subcontractors, including regarding the quality and timeliness of work performed by the subcontractor, customer concerns about the subcontract or subcontractor, our failure to extend existing task orders or issue new task orders under a subcontract, our hiring of the personnel of a subcontractor or vice versa or the subcontractor's failure to comply with applicable law. In addition, there are certain parts, components and services for many of our products, systems, technologies and services that we source from other manufacturers or vendors. Some of our suppliers, from time to time, experience financial and operational difficulties, which may impact their ability to supply the materials, components, subsystems and services that we require. Tariffs recently imposed on certain materials and other trade issues may create or exacerbate existing materials shortages and may result in further supplier business closures. Our supply chain could also be disrupted by external events,

such as natural disasters or other significant disruptions (including extreme weather conditions, medical epidemics, acts of terrorism, cyber-attacks and labor disputes), governmental actions and legislative or regulatory changes, including product certification or stewardship requirements, sourcing restrictions, product authenticity and climate change or greenhouse gas emission standards, or availability constraints from increased demand from customers. In addition, the ongoing COVID-19 pandemic has resulted in increased travel restrictions and extended shutdown of certain businesses across the globe. These or any further political or governmental developments or health concerns could result in social, economic and labor instability. Any inability to develop alternative sources of supply on a cost-effective and timely basis could materially impair our ability to manufacture and deliver products, systems and services to our customers. We can give no assurances that we will be free from disputes with our subcontractors; material supply constraints or problems; or component, subsystems or services problems in the future. Also, our subcontractors and other suppliers may not be able to acquire or maintain the quality of the materials, components, subsystems and services they supply, which may result in greater product returns, service problems and warranty claims and could harm our business, financial condition, results of operations and cash flows. In addition, in connection with our government contracts, we are required to procure certain materials, components and parts from supply sources approved by the U.S. government and we rely on our subcontractors and suppliers to comply with applicable laws, regulations and other requirements regarding procurement of counterfeit, unauthorized or otherwise non-compliant parts or materials, including parts or materials they supply to us, and in some circumstances, we rely on their certifications as to their compliance. From time to time, there are components for which there may be only one supplier, which may be unable to meet our needs. Each of these subcontractor and supplier risks could have a material adverse effect on our business, financial condition, results of operations and cash flows.

**Regulatory Risk Factors**

*Investments in us may be subject to U.S. foreign investment regulations which may impose conditions on or limit certain investors' ability to purchase our common stock, potentially making our common stock less attractive to investors. Our investments in U.S. companies may also be subject to U.S. foreign investment regulations.*

Under the "Exon-Florio Amendment" to the U.S. Defense Production Act of 1950, as amended (the "DPA"), the U.S. President has the power to disrupt or block certain foreign investments in U.S. businesses if he determines that such a transaction threatens U.S. national security. The Committee on Foreign Investment in the United States ("CFIUS") has the authority to conduct national security reviews of certain foreign investments. CFIUS may impose mitigation conditions to grant clearance of a transaction. The Foreign Investment Risk Review Modernization Act ("FIRRMA"), enacted in 2018, amended the DPA to, among other things, expand CFIUS's jurisdiction beyond acquisitions of control of U.S. businesses. Now, CFIUS also has jurisdiction over certain foreign non-controlling investments in U.S. businesses that involve critical technology or critical infrastructure, or that collect and maintain sensitive personal data of U.S. citizens ("TID U.S. Businesses"), if the foreign investor receives specified triggering rights or access in connection with its investment. We are a TID U.S. Business because we develop and design technologies that would be considered critical technologies. Certain foreign investments in TID U.S. Businesses are subject to mandatory filing with CFIUS. The enhanced scrutiny and potential restrictions on the ability of foreign persons to invest in us could limit our ability to engage in strategic transactions that could benefit our shareholders, including a change of control, and could also affect the price that an investor may be willing to pay for our common stock.

*We are subject to stringent U.S. economic sanctions, and trade control laws and regulations. Unfavorable changes in these laws and regulations or U.S. government licensing policies, our failure to secure timely U.S. government authorizations under these laws and regulations, or our failure to comply with these laws and regulations could have a material adverse effect on our business, financial condition and results of operation.*

Our business is subject to stringent U.S. trade control laws and regulations as well as economic sanctions laws and regulations. We are required to comply with U.S. export control laws and regulations, including ITAR administered by the U.S. Department of State, the EAR administered by the U.S. Department of Commerce's Bureau of Industry and Security ("BIS"), and economic sanctions administered by the Treasury Department's Office of Foreign Assets Control ("OFAC"). Similar laws that impact our business exist in other jurisdictions. These foreign trade controls prohibit, restrict, or regulate our ability to, directly or indirectly, export, deemed export, re-export, deemed re-export or transfer certain hardware, technical data, technology, software, or services to certain countries and territories, entities, and individuals, and for end uses. Violations of applicable export control laws, sanctions, and related regulations could result in criminal and administrative penalties, including fines, possible denial of export privileges, and debarment, which could have a material adverse impact on our business, including our ability to enter into contracts or subcontracts for U.S. government customers.

Pursuant to these foreign trade control laws and regulations, we are required, among other things, to (i) maintain a registration under ITAR, (ii) determine the proper licensing jurisdiction and export classification of products, software, and technology, and (iii) obtain licenses or other forms of U.S. government authorization to engage in the conduct of our space-focused business. The authorization requirement includes the need to get permission to release controlled technology to foreign person employees and other foreign persons. In order to comply with these requirements, we must develop and implement centralized sanctions and export control policies

that can be quickly adopted by all the Company's Subsidiaries.

The inability to secure and maintain necessary licenses and other authorizations could negatively impact our ability to compete successfully or to operate our spaceflight business as planned. Any changes in sanctions and export control regulations or U.S. government licensing policy, such as those necessary to implement U.S. government commitments to multilateral control regimes, may restrict our operations. Given the significant discretion the government has in issuing, denying or conditioning such authorizations to advance U.S. national security and foreign policy interests, there can be no assurance we will be successful in our current and future efforts to secure and maintain necessary licenses, registrations, or other U.S. government regulatory approvals. In addition, changes in U.S. foreign trade control laws and regulations, U.S. foreign policy, or reclassifications of our products or technologies, may restrict our future operations.

***Our business is subject to a wide variety of additional extensive and evolving government laws and regulations. Failure to comply with such laws and regulations could have a material adverse effect on our business.***

We are subject to a wide variety of laws and regulations relating to various aspects of our business, including with respect to our manufacturing in-space operations, employment and labor, health care, tax, privacy and data security, health and safety, and environmental issues. Laws and regulations at the foreign, federal, state and local levels frequently change, especially in relation to new and emerging industries, and we cannot always reasonably predict the impact from, or the ultimate cost of compliance with, current or future regulatory or administrative changes. We monitor these developments and devote a significant amount of management's time and external resources towards compliance with these laws, regulations and guidelines, and such compliance places a significant burden on management's time and other resources, and it may limit our ability to expand into certain jurisdictions. Moreover, changes in law, the imposition of new or additional regulations or the enactment of any new or more stringent legislation that impacts our business could require us to change the way we operate and could have a material adverse effect on our sales, profitability, cash flows and financial condition.

Failure to comply with these laws, such as with respect to obtaining and maintaining licenses, certificates, authorizations and permits critical for the operation of our business, may result in civil penalties or private lawsuits, or the suspension or revocation of licenses, certificates, authorizations or permits, which would prevent us from operating our business. For example, commercial space launches and the operation of any space transport system in the United States require licenses and permits from the Federal Communications Commission (the "FCC") and review by other agencies of the U.S. government, including the DoD and NASA. License approval can include an interagency review of safety, operational, national security, and foreign policy and international obligations implications, as well as a review of foreign ownership.

Additionally, regulation of our industry is still evolving, and new or different laws or regulations could affect our operations, increase direct compliance costs for us or cause any third-party suppliers or contractors to raise the prices they charge us because of increased compliance costs. For example, the FCC has an open notice of proposed rulemaking relating to mitigation of orbital debris, which could affect us and our operations. Application of these laws to our business may negatively impact our performance in various ways, limiting the collaborations we may pursue, further regulating the export and re-export of our products, services, and technology from the United States and abroad, and increasing our costs and the time necessary to obtain required authorization. The adoption of a multi-layered regulatory approach to any one of the laws or regulations to which we are or may become subject, particularly where the layers are in conflict, could require alteration of our manufacturing processes or operational parameters which may adversely impact our business. We may not be in complete compliance with all such requirements at all times and, even when we believe we are in complete compliance, a regulatory agency may determine that we are not.

***We have government customers, which subjects us to risks including early termination, audits, investigations, sanctions and penalties.***

We derive a substantial portion of our revenue from contracts with NASA, the U.S. and foreign governments and may enter into additional contracts with the U.S. or foreign governments in the future. This subjects us to statutes and regulations applicable to companies doing business with the government, including the Federal Acquisition Regulation. These government contracts customarily contain provisions that give the government substantial rights and remedies, many of which are not typically found in commercial contracts and which are unfavorable to contractors. For instance, most U.S. government agencies include provisions that allow the government to unilaterally terminate or modify contracts for convenience, and in that event, the counterparty to the contract may generally recover only its incurred or committed costs and settlement expenses and profit on work completed prior to the termination. If the government terminates a contract for default, the defaulting party may be liable for any extra costs incurred by the government in procuring undelivered items from another source.

Some of our federal government contracts are subject to the approval of appropriations being made by the U.S. Congress to fund the expenditures under these contracts. In addition, government contracts normally contain additional requirements that may increase our costs of doing business, reduce our profits, and expose us to liability for failure to comply with these terms and conditions. These

Page 29

requirements include, for example:

- specialized disclosure and accounting requirements unique to government contracts;
- financial and compliance audits that may result in potential liability for price adjustments, recoupment of government funds after such funds have been spent, civil and criminal penalties, or administrative sanctions such as suspension or debarment from doing business with the U.S. government;
- public disclosures of certain contract and company information; and
- mandatory socioeconomic compliance requirements, including labor requirements, non-discrimination and affirmative action programs and environmental compliance requirements.

Government contracts are also generally subject to greater scrutiny by the government, which can initiate reviews, audits and investigations regarding our compliance with government contract requirements. In addition, if we fail to comply with government contracting laws, regulations and contract requirements, our contracts may be subject to termination, and we may be subject to financial and/or other liability under our contracts, the Federal Civil False Claims Act (including treble damages and other penalties), or criminal law. In particular, the False Claims Act's "whistleblower" provisions also allow private individuals, including present and former employees, to sue on behalf of the U.S. government. Any penalties, damages, fines, suspension, or damages could adversely affect our ability to operate our business and our financial results.

***Our reputation and ability to do business may be impacted by the improper conduct of our employees, agents or business partners.***

We have implemented compliance controls, training, policies and procedures designed to prevent and detect reckless or criminal acts from being committed by our employees, agents or business partners that would violate the laws of the jurisdictions in which we operate, including laws governing payments to government officials, such as the U.S. Foreign Corrupt Practices Act ("FCPA"), the protection of export controlled or classified information, such as ITAR, false claims, procurement integrity, cost accounting and billing, competition, information security and data privacy and the terms of our contracts. This risk of improper conduct may increase as we continue to grow and expand our operations. We cannot ensure, however, that our controls, training, policies and procedures will prevent or detect all such reckless or criminal acts, and we have been adversely impacted by such acts in the past, which have been immaterial in nature. If not prevented, such reckless or criminal acts could subject us to civil or criminal investigations, monetary and non-monetary penalties and suspension and debarment by the U.S. government and could have a material adverse effect on our ability to conduct business, our results of operations and our reputation. In addition, misconduct involving data security lapses resulting in the compromise of personal information or the improper use of our customer's sensitive or classified information could result in remediation costs, regulatory sanctions against us and serious harm to our reputation and could adversely impact our ability to continue to contract with the U.S. government.

***Failure to comply with federal, state and foreign laws and regulations relating to privacy, data protection and consumer protection, or the expansion of current or the enactment of new laws or regulations relating to privacy, data protection and consumer protection, could adversely affect our business and our financial condition.***

We collect, store, process, and use personal information and other customer data, and we rely in part on third parties that are not directly under our control to manage certain of these operations and to collect, store, process and use payment information. Due to the sensitivity of the personal information and data we and these third parties manage and expect to manage in the future, as well as the nature of our customer base, the security features of our information systems are critical. A variety of federal, state and foreign laws and regulations govern the collection, use, retention, storage, destruction, sharing and security of this information. Laws and regulations relating to privacy, data protection and consumer protection are evolving and subject to potentially differing interpretations. These requirements may not be harmonized, may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another or may conflict with other rules or our practices. As a result, our practices may not have complied or may not comply in the future with all such laws, regulations, requirements and obligations. For example, in January 2020, the California Consumer Privacy Act ("CCPA") took effect, which provides California consumers with enhanced rights to access, correct, delete, and limit the processing of their personal information by companies, and which requires companies doing business in California to implement and maintain operational capabilities to respond to certain requests made by California consumers in respect of such rights. CCPA provides a private right of action for California Consumers whose personal information is improperly disclosed.

We expect that new industry standards, laws and regulations will continue to be proposed regarding privacy, data protection and information security in many jurisdictions. In late 2020, the state of California adopted the California Privacy Rights Act ("CPRA") ballot initiative, which expands and modifies the CCPA. In 2021, the states of Virginia and Colorado each enacted comprehensive privacy laws that resemble the European Union's ("E.U.") General Data Protection Regulation ("GDPR"). The CPRA and the Virginia and Colorado laws will become effective in 2023.

We are also subject to non-U.S. privacy rules and regulations, such as the E.U.'s GDPR, the European e-Privacy Regulation and national laws supplementing GDPR, the Data Protection Act of 2018 ("DPA 18") in the United Kingdom, and the E.U. Privacy and Electronic Communications Regulation. GDPR and DPA 18 require companies to meet stringent requirements regarding the processing of personal data of individuals located in the European Economic Area ("EEA"). GDPR and DPA 18 also include significant penalties for noncompliance, which may result in monetary penalties of up to the higher of €20.0 million or 4% of a group's worldwide revenue for the preceding financial year for the most serious violations. The GDPR, DPA 18, and other similar regulations require companies to give specific types of notice and informed consent is required for certain actions, and the GDPR also imposes additional conditions in order to satisfy such consent, such as bundled consents.

We cannot yet determine the impact any future laws, regulations and standards may have on our business. Complying with these evolving obligations is costly. Expanding definitions and interpretations of what constitutes "personal data" (or the equivalent) within the United States, the EEA and elsewhere may increase our compliance costs and legal liability.

In addition, a significant data breach or any failure, or perceived failure, by us to comply with any federal, state or foreign privacy or consumer protection-related laws, regulations or other principles or orders to which we may be subject or other legal obligations relating to privacy or consumer protection could adversely affect our reputation, brand and business, and may result in claims, investigations, proceedings, litigation, or enforcement actions against us by governmental entities. This may result in penalties, liabilities or loss, increased compliance or operational costs, or otherwise require us to change our operations and/or cease using certain data sets. Depending on the nature of the information compromised, we may also have obligations to notify users, law enforcement or payment companies about the incident and may need to provide some form of remedy for the individuals affected by the incident.

***We are exposed to risks related to geopolitical and economic factors, laws and regulations and our international business subjects us to numerous political and economic factors, legal requirements, cross-cultural considerations and other risks associated with doing business globally.***

Our international business is subject to both U.S. and foreign laws and regulations, including, without limitation, laws and regulations relating to export/import controls, economic sanctions, technology transfer restrictions, government contracts and procurement, data privacy and protection, anti-corruption (including the anti-bribery, books and records, and internal controls provisions of the FCPA governing interactions with foreign government officials), the anti-boycott provisions of the U.S. Export Administration Act, security restrictions and intellectual property. Failure by us, our employees, subsidiaries, affiliates, partners or others with whom we work to comply with any of these applicable laws and regulations could result in administrative, civil, commercial or criminal liabilities, including suspension or debarment from government contracts or suspension of our export/import privileges. New regulations and requirements, or changes to existing ones in the various countries in which we operate can significantly increase our costs and risks of doing business internationally.

Changes in laws, regulations, political leadership and environment, and/or security risks may dramatically affect our ability to conduct or continue to conduct business in international markets, including sales to customers and purchases from suppliers outside the United States. We may also be impacted by shifts in U.S. and foreign national policies and priorities, political decisions and geopolitical relationships, any of which may be influenced by changes in the threat environment, political leadership, geopolitical uncertainties, world events, bilateral and multi-lateral relationships and economic and political factors. Any changes to these policies could impact our operations and/or export authorizations, or delay purchasing decisions or payments and the provision of supplies, goods and services including, without limitation, in connection with any government programs. Current conflicts in the geopolitical environment, including the Russian and Ukrainian conflict, may result in economic instability and political uncertainties that could have a material adverse effect on the timing of the government programs in which we are involved, and consequently our business, operations and profitability.

Global economic conditions and fluctuations in foreign currency exchange rates could also impact our business. For example, the tightening of credit in financial markets outside of the U.S. could adversely affect the ability of our customers and suppliers to obtain financing and could result in a decrease in or cancellation of orders for our products and services or impact the ability of our customers to make payments.

We are increasingly dependent on in-country suppliers and face risks related to their failure to perform in accordance with the contracts and applicable laws, particularly where we rely on a sole source supplier. The occurrence and impact of these factors is difficult to predict, but one or more of them could have a material adverse effect on our financial position, results of operations and/or cash flows.

*We are subject to environmental regulation and may incur substantial costs.*

We are subject to federal, state, local and foreign laws, regulations and ordinances relating to the protection of the environment, including those relating to emissions to the air, discharges to surface and subsurface waters, safe drinking water, greenhouse gases and the management of hazardous substances, oils and waste materials. Federal, state and local laws and regulations relating to the protection of the environment may require a current or previous owner or operator of real estate to investigate and remediate hazardous or toxic substances or petroleum product releases at or from the property. Under federal law, generators of waste materials, and current and former owners or operators of facilities, can be subject to liability for investigation and remediation costs at locations that have been identified as requiring response actions. Compliance with environmental laws and regulations can require significant expenditures. In addition, we could incur costs to comply with such current or future laws and regulations, the violation of which could lead to substantial fines and penalties.

We may have to pay governmental entities or third parties for property damage and for investigation and remediation costs that they incurred in connection with any contamination at our current and former facilities without regard to whether we knew of or caused the presence of the contaminants. Liability under these laws may be strict, joint and several, meaning that we could be liable for the costs of cleaning up environmental contamination regardless of fault or the amount of waste directly attributable to us. Even if more than one person may have been responsible for the contamination, each person covered by these environmental laws may be held responsible for all of the clean-up costs incurred. Environmental liabilities could arise and have a material adverse effect on our financial condition and performance. We do not believe, however, that pending environmental regulatory developments in this area will have a material effect on our capital expenditures or otherwise materially adversely affect its operations, operating costs, or competitive position.

*Changes in tax laws or regulations may increase tax uncertainty and adversely affect results of our operations and our effective tax rate.*

The Company is subject to taxes in the United States and certain foreign jurisdictions. Due to economic and political conditions, tax rates in various jurisdictions, including the United States, may be subject to change. The Company's future effective tax rates could be affected by changes in the mix of earnings in countries with differing statutory tax rates, changes in the valuation of deferred tax assets and liabilities and changes in tax laws or their interpretation. In addition, the Company may be subject to income tax audits by various tax jurisdictions. Although the Company believes its income tax liabilities are reasonably estimated and accounted for in accordance with applicable laws and principles, an adverse resolution by one or more taxing authorities could have a material impact on the results of its operations.

*Certain U.S. state tax authorities may assert that we have a state nexus and seek to impose state and local income taxes which could harm our results of operations.*

There is a risk that certain state tax authorities where we do not currently file a state income tax return could assert that we are liable for state and local income taxes based upon income or gross receipts allocable to such states. States are becoming increasingly aggressive in asserting a nexus for state income tax purposes. If a state tax authority successfully asserts that our activities give rise to a nexus, we could be subject to state and local taxation, including penalties and interest attributable to prior periods. Such tax assessments, penalties and interest may adversely impact our results of operations.

*If we fail to adequately protect our intellectual property rights, our competitive position could be impaired and our intellectual property applications for registration may not issue or be registered, which may have a material adverse effect on our ability to prevent others from commercially exploiting products similar to ours.*

Our success depends, in significant part, on our ability to protect our intellectual property rights, including practices, tools, technologies and technical expertise we utilize in designing, developing, manufacturing, implementing and maintaining applications and processes used in our systems, products, technologies and services and related technologies. To date, we have relied on trade secret laws and other intellectual property laws, non-disclosure agreements with our employees, consultants and other relevant persons and other measures to protect our intellectual property, and intend to continue to rely on these and other means. We also try to protect our intellectual property by filing patent applications related to our technology, inventions and improvements that are important to the development of our business. The steps we take to protect our intellectual property may be inadequate. The various patent offices of jurisdictions where we file for protection vary in the amount of time they take to evaluate applications for patents which may affect our ability to protect our intellectual property or to prosecute infringers in a timely fashion.

We currently have various patents in the U.S. and in other jurisdictions and a number of pending patents applications in the U.S. and in other jurisdictions. Our pending patent applications may not result in patents being issued, which may have a material adverse effect on our ability to prevent others from commercially exploiting products similar to ours. The Company cannot be certain that it is the first inventor of the subject matter to which it has filed a particular patent application, or if it is the first party to file such a patent

application. If another party has filed a patent application to the same subject matter that the Company has, the Company may not be entitled to the protection sought by the patent application. The Company also cannot be certain whether the claims included in a patent application will ultimately be allowed in the applicable issued patent. As a result, the Company cannot be certain that the patent applications that it files will be issued. Further, the scope of protection of issued patent claims is often difficult to determine.

The Company's patents may be challenged, invalidated or circumvented. If our patents are invalidated or found to be unenforceable, we will lose the ability to exclude others from making, using, selling, or importing into the United States the inventions claimed. Moreover, an issued patent does not guarantee us the right to use the patented technology or commercialize a product using that technology. Third parties may have blocking patents that could be used to prevent us from developing our product. Thus, patents that we may own currently or in the future may not allow us to exploit the rights conferred by our intellectual property protection. Even if issued, any future patents may not be issued with claims sufficiently broad to protect our technologies or may not provide us with a competitive advantage against competitors with similar technologies. Despite our precautions, it may be possible for unauthorized third parties to copy our technology and use information that we regard as proprietary to create technology that competes with ours. Further, the laws of some countries do not protect proprietary rights to the same extent as the laws of the United States, and mechanisms for enforcement of intellectual property rights in some foreign countries may be inadequate. Because the Company operates in space, the application of intellectual property laws to orbiting hardware is of particular interest and it should be noted such laws also vary from country to country. To the extent we expand our international activities, our exposure to unauthorized copying and use of our technologies and proprietary information may increase. Accordingly, despite our efforts, we may be unable to prevent third parties from infringing upon, misappropriating or otherwise violating our technology and intellectual property.

We rely in part on trade secrets, proprietary know-how and other confidential information to maintain our competitive position. The Company's competitors may also design around the Company's issued patents, which may adversely affect the Company's business, prospects, financial condition and operating results. In addition, although we enter into nondisclosure and invention assignment agreements with our employees, enter into non-disclosure agreements with consultants and other parties with whom we have strategic relationships and business alliances and enter into intellectual property assignment agreements with our consultants and vendors, no assurance can be given that these agreements will be effective in controlling access to and distribution of our technology and proprietary information. Further, these agreements do not prevent our competitors from independently developing technologies that are substantially equivalent or superior to our products.

***Protecting and defending against intellectual property claims may have a material adverse effect on our business.***

Our success depends in part upon successful prosecution, maintenance, enforcement and protection of our owned intellectual property. To protect our intellectual property rights, we may be required to spend significant resources to monitor and protect these rights. Litigation may be necessary in the future to enforce our intellectual property rights and to protect our trade secrets. Such litigation could be costly, time consuming and distracting to management and could result in the impairment or loss of portions of our intellectual property. Furthermore, our efforts to enforce our intellectual property rights may be met with defenses, counterclaims and countersuits attacking the validity and enforceability of our intellectual property rights. Our inability to protect our technology, as well as any costly litigation or diversion of our management's attention and resources, could disrupt our business, as well as have a material adverse effect on our financial condition and results of operations. The results of intellectual property litigation are difficult to predict and may require us to stop using certain technologies or offering certain services or may result in significant damage awards or settlement costs. There is no guarantee that any action to defend, maintain or enforce our owned or licensed intellectual property rights will be successful, and an adverse result in any such proceeding could have a material adverse impact on our business, financial condition, operating results and prospects.

In addition, we may from time to time face allegations that we are infringing, misappropriating, or otherwise violating the intellectual property rights of third parties, including the intellectual property rights of our competitors. We may be unaware of the intellectual property rights that others may claim cover some or all of our technology or services. Irrespective of the validity of any such claims, we could incur significant costs and diversion of resources in defending against them, and there is no guarantee any such defense would be successful, which could have a material adverse effect on our business, contracts, financial condition, operating results, liquidity and prospects.

Even if these matters do not result in litigation or are resolved in our favor or without significant cash settlements, these matters, and the time and resources necessary to litigate or resolve them, could divert the time and resources of our management team and harm our business, our operating results and our reputation.

**Reliance on Third Parties and Key Personnel Risk Factors**

*Data breaches or incidents involving our technology could damage our business, reputation and brand and substantially harm our business and results of operations.*

If our data and network infrastructure were to fail, or if we were to suffer an interruption or degradation of services in our data center, third-party cloud, and other infrastructure environments, we could lose important manufacturing and technical data, which could harm our business. Our facilities, as well as the facilities of third-parties that maintain or have access to our data or network infrastructure, are vulnerable to damage or interruption from earthquakes, hurricanes, floods, fires, cyber security attacks, terrorist attacks, power losses, telecommunications failures and similar events. In the event that our or any third-party provider's systems or service abilities on which we rely are hindered by any of the events discussed above, our ability to operate may be impaired. A decision to close facilities without adequate notice, or other unanticipated problems, could adversely impact our operations. Any of the aforementioned risks may be augmented if our or any third-party provider's business continuity and disaster recovery plans prove to be inadequate. Our data center, third-party cloud, and managed service provider infrastructure also could be subject to break-ins, cyber-attacks, denial of service, sabotage, intentional acts of vandalism and other misconduct, from a spectrum of actors ranging in sophistication from threats common to most industries to more advanced and persistent, highly organized adversaries. Any security breach, including personal data breaches, or incident, including cybersecurity incidents, that we experience could result in unauthorized access to, misuse of, or unauthorized acquisition of our internal sensitive corporate data, such as financial data, intellectual property, or data related to contracts with commercial or government customers or partners. Such unauthorized access, misuse, acquisition, or modification of sensitive and proprietary data may result in data loss, corruption or unauthorized alteration, interruptions in our operations or damage to our computer hardware or systems or those of our employees and customers. Moreover, negative publicity arising from these types of disruptions could damage our reputation. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any events that cause interruptions in our service. Significant unavailability of our services due to cyber security attacks or natural disasters could cause users to cease using our services and materially and adversely affect our business, prospects, financial condition and results of operations. A security breach that involves classified information could subject us to civil or criminal penalties, loss of a government contract, loss of access to classified information, or debarment as a government contractor. Similarly, a breach that involves loss of customer-provided data could subject us to loss of a customer, loss of a contract, litigation costs and legal damages, and reputational harm.

We use proprietary software which we have developed in our technology infrastructure, which we seek to continually update and improve. This software supports spacecraft and constellation developers in the design, development, deployment, management, maintenance and cyber protection of their space assets. Replacing such systems is often time-consuming and expensive and can also be intrusive to daily business operations. Further, we may not always be successful in executing these upgrades and improvements, which may occasionally result in a failure of our systems. We may experience periodic system interruptions from time to time. Any slowdown or failure of our underlying technology infrastructure could harm our business, reputation and ability to execute on our business plan, which could materially and adversely affect our results of operations. Our disaster recovery plan or those of our third-party providers may be inadequate, and our business interruption insurance may not be sufficient to compensate us for the losses that could occur.

*We are highly dependent on the services of our senior management team and other highly skilled personnel, and if we are not successful in attracting or retaining highly qualified personnel, we may not be able to successfully implement our business strategy.*

The Company is highly dependent on its full senior management team and on our ability to attract, motivate, develop and retain a sufficient number of other skilled personnel, manufacturing and quality assurance, engineering, design, finance, marketing, sales and support personnel. Certain members of our senior management team have extensive experience in the aerospace industry, and we believe that their depth of experience is instrumental to our continued success. The loss of any one or more members of our senior management team for any reason, including resignation or retirement, could impair our ability to execute our business strategy and have a material adverse effect on our business, financial condition and results of operations.

Competition for qualified highly skilled personnel can be strong, and we can provide no assurance that we will be successful in attracting or retaining such personnel now or in the future. Any inability to recruit, develop and retain qualified employees may result in high employee turnover and may force us to pay significantly higher wages, which may harm our profitability or could result in difficulties performing under our contracts if our needs for such employees were unmet. Additionally, we do not carry key man insurance for any of our management executives, and the loss of any key employee or our inability to recruit, develop and retain these individuals as needed, could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to our Indebtedness**

*We have a substantial amount of debt. Our ability to operate is limited by the agreements governing our debt.*

As of December 31, 2021, we had $79.2 million of total debt outstanding and up to $5.0 million of additional borrowing capacity under our revolving credit facility. On March 25, 2022, our existing credit facilities were amended to, among other things, increase commitments under the revolving credit facility to $25.0 million. Subject to the limits contained in some of the agreements governing our outstanding debt, we may incur additional debt in the future. Our maintenance of higher levels of indebtedness could have adverse consequences including impairing our ability to obtain additional financing in the future

Our level of debt places significant demands on our cash resources, which could:

- make it more difficult to satisfy our outstanding debt obligations;

- require us to dedicate a substantial portion of our cash for payments related to our debt, reducing the amount of cash flow available for working capital, capital expenditures, entitlement of our real estate assets, contributions to our tax-qualified pension plan, and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in the industries in which we compete;

- place us at a competitive disadvantage with respect to our competitors, some of which have lower debt service obligations and greater financial resources than we do;

- limit our ability to borrow additional funds;

- limit our ability to expand our operations through acquisitions; and

- increase our vulnerability to general adverse economic and industry conditions If we are unable to generate sufficient cash flow to service our debt and fund our operating costs, our liquidity may be adversely affected.

*We may require substantial additional funding to finance our operations, but adequate additional financing may not be available when we need it, on acceptable terms or at all.*

Our primary sources of liquidity are cash flows provided by operations, access to existing credit facilities and proceeds from the Merger.Prior to the Merger, AEI provided an additional source of liquidity to facilitate certain acquisitions. Since inception, we have incurred net losses and negative cash flows from operating activities, and have used our cash to fund capital expenditures, costs associated with our acquisitions, and costs associated with the Merger, among other uses. While some of these cash outflows have been non-recurring in nature, we have continued to experience net cash outflows from operating activities and expect to continue to incur additional operating expenses and capital expenditures as we continue to grow our business. As of December 31, 2021, our available liquidity totaled $25.5 million, which was comprised of $20.5 million in cash and cash equivalents, and $5.0 million in available borrowings from our existing credit facilities. On March 25, 2022, our existing credit facilities were amended to, among other things, increase commitments under the revolving credit facility to $25.0 million.

We believe that our existing sources of liquidity will be sufficient to meet our working capital needs for at least the next twelve months from the date on which our consolidated financial statements were issued. However, our current liquidity may not be sufficient to meet the required long-term liquidity needs associated with continued use of cash from operating activities at historic levels, in addition to our other liquidity needs associated with our capital expenditures, debt payments, and other investing and financing requirements. In the future, we could be required to raise capital through public or private financing or other arrangements. Such financing may not be available on acceptable terms, or at all, and our failure to raise capital when needed could harm our business. We may sell equity securities or debt securities in one or more transactions at prices and in a manner as we may determine from time to time. If we sell any such securities in subsequent transactions, our current investors may be materially diluted. Any debt financing, if available, may involve restrictive covenants and could reduce our operational flexibility or profitability. If we cannot raise funds on acceptable terms, we may not be able to grow our business or respond to competitive pressures.

**Risks Related to Us Being a Public Company**

*Our management team has limited experience managing a public company.*

Most of the members of our management team have limited experience managing a publicly traded company, interacting with public company investors, and complying with the increasingly complex laws pertaining to public companies. Our being a public company subjects us to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These obligations and constituents require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, financial condition, and operating results. We may not have adequate personnel with the appropriate level of knowledge, experience

and training in the accounting policies, practices or internal control over financial reporting required of public companies in the U.S. Our failure to maintain an enterprise system suitable for a public company could impact our ability or prevent us from timely reporting our operating results, timely filing required reports with the SEC and complying with Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX"), when applicable. The maintenance of the standards and controls necessary for us to support the level of accounting standards required of a public company in the U.S. may require costs greater than expected. It is possible that we will be required to expand our employee base and hire additional employees to support our operations as a public company which will increase our operating costs in future periods.

*We identified material weaknesses in internal control over financial reporting. Until we remediate these material weaknesses or if we identify additional material weaknesses, we may not be able to accurately and timely report our financial results, in which case our business may be harmed and investors may lose confidence in the accuracy and completeness of our financial reports.*

Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). We identified material weaknesses in our internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

Material Weaknesses in Internal Control over Financial Reporting

We did not maintain an effective control environment, as certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top. Specifically, certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication. We also identified that we had an insufficient complement of resources with an appropriate level of accounting knowledge, experience and training commensurate with our structure and financial reporting requirements to appropriately analyze, record and disclose accounting matters timely and accurately, and establish effective processes and internal controls. The limited personnel resulted in an inability to consistently establish appropriate authorities and responsibilities in pursuit of financial reporting objectives, as demonstrated by, among other things, insufficient segregation of duties in our finance and accounting functions. These material weaknesses contributed to the following additional material weaknesses:

- We did not design and maintain an effective risk assessment process at a precise enough level to identify new and evolving risks of material misstatement in the consolidated financial statements. Specifically, changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement to financial reporting.

- We did not design and maintain formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over the preparation and review of business performance reviews, account reconciliations, journal entries and contract estimates used in determining the recognition of revenue.

- We did not design and maintain effective controls to address the identification of and accounting for certain non-routine, unusual or complex transactions, including the proper application of U.S. GAAP to such transactions. Specifically, we did not design and maintain effective controls to account for purchase business combinations, including the appropriate review of the assumptions, data and models used in the forecasted cash flows, used to determine the fair value of the acquired assets and liabilities.

The material weakness related to certain aspects of tone at the top did not result in a misstatement to the consolidated financial statements for either the Successor or Predecessor periods. Each of the other material weaknesses resulted in material audit adjustments to substantially all accounts and disclosures in the Successor consolidated financial statements as of December 31, 2020 and for the period from February 10, 2020 to December 31, 2020, as well as the Predecessor consolidated financial statements for the period from January 1, 2020 to June 21, 2020 as of and for the year ended December 31, 2019.

In addition, we did not design and maintain effective information technology ("IT") general controls for information systems that are relevant to the preparation of the consolidated financial statements. Specifically, we did not design and maintain:

- program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized, and implemented appropriately;

- user access controls to ensure appropriate segregation of duties and that adequately restrict user and privileged access to financial applications, programs, and data to appropriate Company personnel;

- computer operations controls to ensure that critical batch jobs are monitored and data backups are authorized and monitored; and

- testing and approval controls for program development to ensure that new software development is aligned with business and IT requirements.

The IT deficiencies noted above did not result in a misstatement to the consolidated financial statements for either the Successor or Predecessor; however, the deficiencies, when aggregated, could impact maintaining effective segregation of duties, as well as the effectiveness of IT-dependent controls (such as automated controls that address the risk of material misstatement to one or more assertions, along with the IT controls and underlying data that support the effectiveness of system-generated data and reports) that could result in misstatements potentially impacting all financial statement accounts and disclosures that would not be prevented or detected.

Additionally, these material weaknesses could result in misstatements of substantially all accounts and disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

Remediation Plans

We are in the process of implementing measures designed to improve our internal control over financial reporting and remediate the deficiencies that led to the material weaknesses, including tone at the top and other communications training, hiring additional finance and accounting personnel, designing and implementing new control activities, and enhancing existing control activities.

- We reviewed the personnel structure and identified new positions to enhance our accounting and financial reporting team. Some of these individuals were onboarded during 2021 while others are expected to be onboarded during 2022. We have and expect to continue to align our personnel to specific areas and responsibilities to alleviate the numerous competing responsibilities currently faced.

- We have commenced developing and formalizing a risk assessment process across the organization to identify risks and design new controls or enhance existing controls responsive to such risks to ensure timely and accurate financial reporting.

- We are in the process of designing and implementing additional review and communications training procedures within our accounting, finance and program management functions to provide more robust knowledge and understanding of internal control over financial reporting.

- We are in the process of implementing a comprehensive financial closing process checklist with additional layers of reviews as well as controls around non-routine, unusual or complex transactions, including controls over the accounting for purchase business combinations.

- We will continue to conduct training, document our processes and procedures, including accounting policies, across the Company to ensure consistent application including controls over the preparation and review of business performance reviews, account reconciliations, journal entries and contract estimates used in determining the recognition of revenue.

- We are in the process of performing an assessment of all information technology systems which provide data for financial reporting purposes. As part of this assessment, we will be designing, implementing and documenting IT general controls.

We are working to remediate the material weaknesses as efficiently and effectively as possible and expect full remediation will likely go beyond December 31, 2022. At this time, we cannot provide an estimate of costs expected to be incurred in connection with implementing this remediation plan; however, these remediation measures will be time consuming, will result in the Company incurring additional costs, and will place additional demands on our financial and operational resources.

If we are unable to successfully remediate our existing or any future material weaknesses in our internal control over financial reporting, the accuracy and timing of our financial reporting may be adversely affected; investors may lose confidence in our financial reporting; we could become subject to litigation or investigations by the New York Stock Exchange ("NYSE"), the SEC or other regulatory authorities.

***We may not be able to remain in compliance with the continued listing requirements of the NYSE, and if the NYSE delists our common stock, it would have an adverse impact on the trading, liquidity and market price of our common stock.***

On November 23, 2021, we received written notification from the NYSE that we were not in compliance with an NYSE continued listing standard in Rule 802.01E of the NYSE Listed Company Manual because we failed to timely file our Quarterly Report on Form 10-Q for the period ended September 30, 2021.

The Company expects to regain compliance with the NYSE's continued listing standards after having filed the delinquent Quarterly Report on Form 10-Q. However, we cannot assure you that we will continue to remain in compliance with this standard or that we will

remain in compliance with any of the other applicable continued listing standards of the NYSE. The price of our common stock may be adversely affected due to, among other things, our financial results, market conditions and the impacts of the COVID-19 pandemic.

Any future failure to remain in compliance with the NYSE's continued listing standards, and any subsequent failure to timely resume compliance with the NYSE's continued listing standards within the applicable cure period, could have adverse consequences including, among others, reducing the number of investors willing to hold or acquire our common stock, reducing the liquidity and market price of our common stock, adverse publicity and a reduced interest in us from investors, analysts and other market participants. In addition, a suspension or delisting could impair our ability to raise additional capital through the public markets and our ability to attract and retain employees by means of equity compensation.

***We may issue additional common stock or other equity securities without your approval, which would dilute your ownership interests and may depress the market price of the common stock.***

We may issue additional shares of common stock or other equity securities in the future in connection with, among other things, future acquisitions, repayment of outstanding indebtedness or grants under the Redwire Corporation 2021 Omnibus Incentive Plan without stockholder approval in a number of circumstances. Our issuance of additional common stock or other equity securities of equal or senior rank would have the following effects:

- our existing shareholders' proportionate ownership interest will decrease;

- the amount of cash available per share, including for payment of dividends in the future, may decrease;

- the relative voting strength of each previously outstanding share of common stock may be diminished; and

- the market price of our common stock may decline.

***A market for our common stock may not be sustained, which would adversely affect the liquidity and price of our common stock.***

The price of our common stock may fluctuate significantly due to general market and economic conditions. An active trading market for our common stock may not be sustained.

***The price of our common stock has and may continue to fluctuate substantially.***

The market price for our common stock has and may continue to be volatile.

Factors affecting the trading price of our common stock may include:

- actual or anticipated fluctuations in our quarterly financial results or the quarterly financial results of companies perceived to be similar to it;

- changes in the market's expectations about our operating results;

- success of competitors;

- our operating results failing to meet market expectations in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning us or the payments industry and market in general;

- operating and stock price performance of other companies that investors deem comparable to us;

- our ability to market new and enhanced products on a timely basis;

- changes in laws and regulations affecting our business;

- commencement of, or involvement in, litigation involving us;

- changes in its capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares of common stock available for public sale;

- any significant change in our board or management;

- sales of substantial amounts of common stock by our directors, executive officers or significant stockholders or the perception that such sales could occur; and

- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations and acts of war or terrorism.

Broad market and industry factors may depress the market price of our common stock irrespective of our operating performance. The stock market in general and NYSE have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of our securities, may not be predictable. A decline in the market price of our common stock also could adversely affect its ability to issue additional securities and its ability to obtain additional financing in the future.

*We do not anticipate paying dividends for the foreseeable future.*

We do not anticipate that our board of directors will declare dividends in the foreseeable future. In addition, the ability of our board of directors to pay dividends in the future may be restricted by our debt documents, our holding company structure and capital requirements at our subsidiaries.Because we do not pay dividends, and do not anticipate paying dividends for the foreseeable future, the price of our common stock must appreciate in order for you to realize a gain on your investment. This appreciation may not occur.

**General Business Risks**

*Our business, financial condition and results of operations are subject to risks resulting from broader geographic operations.*

Our operations outside of the U.S. may lead to more volatile financial results and make it more difficult for us to manage our business. Reasons for this include, but are not limited to, the following:

- political and economic instability;
- governments' restrictive trade policies;
- the imposition or rescission of duties, taxes or government royalties;
- exchange rate risks;
- exposure to varying legal standards, including data privacy, security and intellectual property protection in other jurisdictions;
- difficulties in obtaining required regulatory authorizations;
- local domestic ownership requirements;
- requirements that certain operational activities be performed in-country;
- changing and conflicting national and local regulatory requirements; and
- the geographic, language and cultural differences between personnel in different areas of the world.

*If we experience a disaster or other business continuity problem, we may not be able to recover successfully, which could cause material financial loss, loss of human capital, regulatory actions, reputational harm, or legal liability.*

If we experience a local or regional disaster or other business continuity problem, such as an earthquake, hurricane, blizzard, terrorist attack, pandemic or other natural or man-made disaster, our continued success will depend, in part, on the availability of our personnel, our facilities, and the proper functioning of our computer, telecommunication, and other business systems and operations. As we attempt to grow our operations, the potential for particular types of natural or man-made disasters, political, economic, or infrastructure instabilities, or other country or region-specific business continuity risks increases. We cannot ensure that provisions in our customer contracts will be legally sufficient to protect us if we are sued and our errors and omissions and product liability insurance coverage may not be adequate, may not continue to be available on reasonable terms or in sufficient amounts to cover one or more large claims, or the insurer may disclaim coverage as to some types of future claims. The successful assertion of any large claim against us could seriously harm our business. Even if not successful, these claims may result in significant legal and other costs, be a distraction to our management and harm our reputation.

*Our operating results may fluctuate significantly, which makes our future operating results difficult to predict and could cause our operating results to fall below expectations or any guidance we may provide.*

Our quarterly and annual operating results may fluctuate significantly, which makes it difficult for us to predict our future operating results. These fluctuations may occur due to a variety of factors, many of which are outside of our control, including:

- unexpected weather patterns, natural disasters or other events that force a cancellation or rescheduling of launches;
- the cost of raw materials or supplied components critical for the manufacture and operation of our systems, products, technologies and services;

- the timing and cost of, and level of investment in, research and development relating to our technologies and our current or future facilities;

- developments involving our competitors;

- changes in governmental regulations or in the status of our regulatory approvals or applications;

- future accounting pronouncements or changes in our accounting policies;

- the impact of epidemics or pandemics, including current business disruption and related financial impact resulting from the global COVID-19 health crisis; and

- general market conditions and other factors, including factors unrelated to our operating performance or the operating performance of our competitors.

The individual or cumulative effects of factors discussed above could result in large fluctuations and unpredictability in our quarterly and annual operating results. As a result, comparing our operating results on a period-to-period basis may not be meaningful.

This variability and unpredictability could also result in our failing to meet the expectations of industry or financial analysts or investors for any period. If our revenue or operating results fall below the expectations of analysts or investors or below any guidance we may provide, or if any guidance we provide is below the expectations of analysts or investors, the price of our common stock could decline substantially. Such a stock price decline could occur even when we have met any previously publicly stated guidance we may provide.

### *The Company's ability to use its net operating loss carryforwards and certain other tax attributes may be limited.*

As of December 31, 2021, the Company had $9.5 million of U.S. federal, $2.0 millions of state, net, and $0.5 million of deferred tax assets related to foreign net operating loss carryforwards ("NOLs") available to reduce future taxable income. The $9.5 million in U.S. federal operating loss carryforwards may be carried forward indefinitely for U.S. federal tax purposes. Certain state net operating losses will begin to expire in 2038. Foreign net operating losses will begin expiring in 2036. It is possible that the Company will not generate sufficient taxable income to use these NOLs before their expiration or at all.

Any limitation on using NOLs could, depending on the extent of such limitation and the NOLs previously used, result in the Company retaining less cash after payment of U.S. federal and state income taxes during any year in which we have taxable income, rather than losses, than the Company would be entitled to retain if such NOLs were available as an offset against such income for U.S. federal and state income tax reporting purposes, which could adversely impact the Company's operating results.

### *Natural disasters, unusual weather conditions, epidemic outbreaks, terrorist acts and political events could disrupt our business.*

The occurrence of one or more natural disasters such as fires, floods and earthquakes, unusual weather conditions, epidemic or pandemic outbreaks, terrorist attacks or disruptive political events where our facilities or the launch facilities our transport partners use are located, or where our third-party suppliers' facilities are located, could adversely affect our business. Natural disasters including tornados, hurricanes, floods and earthquakes may damage our facilities, the launch facilities we use or those of our suppliers, which could have a material adverse effect on our business, financial condition and results of operations. Severe weather, such as rainfall, snowfall or extreme temperatures, may impact the ability for launches to occur as planned, resulting in additional expense to reschedule, thereby reducing our sales and profitability. Terrorist attacks, actual or threatened acts of war or the escalation of current hostilities, or any other military or trade disruptions impacting our domestic or foreign suppliers of components of our products, may impact our operations by, among other things, causing supply chain disruptions and increases in commodity prices, which could adversely affect our raw materials or transportation costs. These events also could cause or act to prolong an economic recession or depression in the United States or abroad, such as the current business disruption and related financial impact resulting from the global COVID-19 health crisis. To the extent these events also impact one or more of our suppliers or result in the closure of any of their facilities or our facilities, we may be unable to fulfill our other contracts.

### *Net earnings and net assets could be materially affected by an impairment of goodwill.*

We have a significant amount of goodwill recorded on our consolidated balance sheet as of December 31, 2021. We are required at least annually to test the recoverability of goodwill. The recoverability test of goodwill is based on the current fair value of our identified reporting units. Fair value measurement requires assumptions and estimates of many critical factors, including revenue and market growth, operating cash flows and discount rates. If general market conditions deteriorate in portions of our business, we could experience a significant decline in the fair value of reporting units. This decline could lead to an impairment of all or a significant portion of the goodwill balance, which could materially affect our U.S. GAAP net earnings and net assets.

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

We operate from 18 locations in the United States and one location in Europe consisting of offices, warehouses, service centers, laboratories and other facilities totaling 246,829 square feet as of December 31, 2021.

We lease all of our properties. The majority of leases are for varying term lengths up to eight years. Our locations range in size from 500 to 40,200 square feet.

Our headquarters is located in Jacksonville, Florida, in proximity to major NASA and other space offices and operations. We also have North American locations in Alabama, California, Colorado, Florida, Indiana, Maryland, Massachusetts, Michigan and New Mexico. In Europe, we have a facility in Luxembourg. Each of these facilities is strategically located near major national security or civil space community facilities, key customer facilities, commercial space centers and/or prestigious engineering talent pools.



| Company | Location | Facilities |
|---|---|---|
| *Domestic* | | |
| Corporate Headquarters | Jacksonville, Florida | 1 |
| Adcole | Linthicum, Maryland | 1 |
| | Marlborough, Massachusetts | 1 |
| Deep Space Systems | Littleton, Colorado | 1 |
| Deployable Space Systems | Goleta, California | 2 |
| Loadpath | Englewood, Colorado[i] | 1 |
| | Albuquerque, New Mexico | 1 |
| Made in Space | Huntsville, Alabama[i] | 1 |
| | Moffett Field, California[i] | 1 |
| Oakman | Littleton, Colorado | 2 |
| | Kincheloe, Michigan | 1 |
| Roccor | Longmont, Colorado | 1 |
| Techshot | Merritt Island, Florida | 1 |
| | Floyds Knobs, Indiana | 1 |
| | Greenville, Indiana | 1 |
| *Foreign* | | |
| Made in Space Europe | Luxembourg City, Luxembourg | 1 |

(i)   During 2021, the Company exited certain locations after the lease expiration to consolidate operations within the respective state.

We believe that our properties are in good operating condition and believe the productive capacity of our properties is adequate to meet current contractual requirements and those for the foreseeable future. We may improve, replace or reduce facilities as considered appropriate to meet the needs of our operations. Our current facilities have supported the development of technology that is transforming the space industry, and the current footprint is sufficient to support near-term growth. However, as we continue to grow, we plan to continue and even accelerate the pace of leasehold improvements so that our facility capacity is not a limiting factor on our growth. Expansion space is also being studied to support further growth in 2022.

**Item 3. Legal Proceedings**

The Company is subject to litigation, claims, investigations and audits arising from time to time in the ordinary course of business. Although legal proceedings are inherently unpredictable, the Company believes that it has valid defenses with respect to any matters currently pending against the Company and intends to defend itself vigorously. Excluding pending matters referenced below, the outcome of these matters, individually and in the aggregate, is not expected to have a material impact on the Company's consolidated financial statements.

For additional information on pending matters, please refer to Note N of the accompanying notes to the consolidated financial statements. For further information on the risks associated with existing and future investigations, lawsuits, arbitration, claims, enforcement actions and other legal proceedings, please refer to Item 1A. "Risk Factors."

**Item 4. Mine Safety Disclosures**

Not Applicable.

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

*Market Information*

Our common stock and warrants are listed on the New York Stock Exchange and trade under the symbols "RDW" and "RDW WS", respectively. Each warrant entitles the registered holder to purchase one share of our common stock at a price of $11.50 per share, subject to certain adjustments. As of April 4, 2022, there were 62,690,869 shares of common stock outstanding and 8,188,811 warrants outstanding.

*Holders*

As of April 4, 2022, there were 42 holders of our common stock and 1 holders of our warrants of record. These numbers do not include an estimate of the indeterminate number of beneficial holders whose shares and warrants may be held by brokerage firms and clearing agencies.

*Dividends*

We have never declared dividends on our common stock and we do not anticipate paying cash dividends in the foreseeable future. Any decisions to declare and pay dividends in the future will be made at the discretion of our Board and will depend on, among other things, our results of operations, financial condition, cash requirements, contractual restrictions and other factors that our Board may deem relevant.

*Recent Sales of Unregistered Securities; Use of Proceeds from Registered Offerings*

In connection with our acquisition of Techshot, Inc. ("Techshot") on November 1, 2021, we issued an aggregate of 3,029,595 shares of our common stock to the sellers. These shares were issued in a private placement exempt from registration under Section 4(a)(2) of the Securities Act of 1933, as amended. A portion of the shares is subject to transfer restrictions.

*Purchases of Equity Securities by the Issuer and Affiliated Purchasers*

None.

*Stock Performance Graph*

Not applicable.

**Item 6. [Reserved]**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis should be read in conjunction with the consolidated financial statements and accompanying notes included in this Annual Report on Form 10-K. Certain information contained in this discussion and analysis includes forward looking statements that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward looking statements as a result of many factors. For information identifying important factors that could cause actual results to differ materially from those anticipated in the forward looking statements, please refer to the "Risk Factors" and the "Information Relating to Forward Looking Statements" sections of this Annual Report on Form 10-K. Unless the context otherwise requires, all references in this section to the "Company," "Redwire," "we," "us" or "our" refer to Redwire Corporation and its consolidated subsidiaries.*

The following discussion and analysis of financial condition and results of operations is provided to supplement the consolidated financial statements and the accompanying notes included in this Annual Report on Form 10-K. We intend for this discussion to provide you with information that will assist you in understanding our financial statements and the accompanying notes, the changes in those financial statements and the accompanying notes from period to period, and the primary factors that accounted for those changes. The discussion and analysis of financial condition and results of operations is organized as follows:

- *Business Overview*: This section provides a general description of our business, our priorities and the trends affecting our industry in order to provide context for management's discussion and analysis of our financial condition and results of operations.

- *Recent Developments*: This section provides recent developments that we believe are necessary to understand our financial condition and results of operations.

- *Results of Operations:* As further explained below, this section provides a discussion of our results of operations for the year ended December 31, 2021 and the periods from February 10, 2020 (inception) to December 31, 2020 and from January 1, 2020 to June 21, 2020.

- *Liquidity and Capital Resources*: This section provides an analysis of our ability to generate cash and to meet existing or reasonably likely future cash requirements.

- *Critical Accounting Estimates*: This section discusses the accounting estimates that we consider important to our financial condition and results of operations and that require significant judgment and estimates on the part of management in their application. In addition, our significant accounting policies, including critical accounting policies, are summarized in Note B of the accompanying notes to the consolidated financial statements.

**Business Overview**

We are a leader in mission critical space solutions and high reliability components for the next generation space economy, with valuable intellectual property for solar power generation and in-space 3D printing and manufacturing. With decades of flight heritage combined with the agile and innovative culture of a commercial space platform, we are uniquely positioned to assist our customers in solving the complex challenges of future space missions.

We manufacture and deliver space infrastructure to our customers. We offer a broad array of products and services, many of which have been enabling space missions since the 1960s and have been flight-proven on over 200 spaceflight missions, including missions such as the GPS constellation, New Horizons and Perseverance. We are also a provider of innovative technologies with the potential to help transform the economics of space and create new markets for its exploration and commercialization. One example of this is our patented suite of in-space manufacturing and robotic assembly technologies (referred to herein as on-orbit servicing, assembly, and manufacturing, or "OSAM"). Other examples of our proprietary technologies include deployable structures, human-rated camera systems and digital engineering.

We have grown organically while also continuing to integrate several acquisitions from a fragmented landscape of space-focused technology companies with innovative capabilities and deep flight heritage. Many of our technologies are flight-proven and have been adopted by a broad range of customers across national security, civil and commercial space. Combining heritage and innovation has enabled us to accelerate the delivery of disruptive technologies.

We believe the space economy is at an inflection point. The reduction of launch costs over the last decade has eliminated the single largest economic barrier to entry for the expanded utilization of space, and the increasing cadence of launches provides more flexible, reliable access. This lower cost access has resulted in both the expansion and modernization of traditional national security and civil uses of space and has enticed new commercial entrants to invest substantial capital to develop new space-based business models. Our goal is to provide a full suite of infrastructure solutions, including mission-critical components, services and systems that will

contribute to a dramatic expansion of the space-based economy. We believe that our products and services are essential to the growth of space as a strategic military and commercial domain, as well as a frontier for science and exploration.

**Recent Developments**

*Executive Summary*

In 2021, we drove strong order volume and won significant new business mandates, demonstrating the strength and breadth of our suite of breakout space infrastructure solutions, including critical avionics, navigation systems, advanced payloads, digital engineering and deployable systems. However, uncertainty around the timing of U.S. government funding, and program execution delays related to COVID-19, impacted our customers and programs. In planning 2021, we anticipated making several significant contributions to the development of the Artemis Human Landing System (HLS). However, the single award to SpaceX, protest by Blue Origin and Dynetics, and the subsequent voluntary stay of work by NASA have significantly delayed any work that would have been available to Redwire on that program. This delay and subsequent loss of the protest by our prime contractor teammate, Blue Origin, together with increasing costs associated with transitioning to operating as a publicly listed company, impacted our second half performance.

*Business Highlights*

- On November 1, 2021, we acquired Techshot Inc., a leader in on-orbit manufacturing, biotechnology in microgravity, and bioprinting needed for commercial space-based biotechnology and pharmaceutical research and development.

- Installed the first of three pairs of patented Roll Out Solar Arrays ("ROSA") on the International Space Station ("ISS"), which we expect will increase aggregate power on the ISS by more than 30%. Deployment of ROSA and rigid panel solar array technology, with more than 200 kilowatts power, will be utilized for the Double Asteroid Redirection Test ("DART") NASA planetary defense mission, the Lunar Gateway, and future commercial and Department of Defense satellite projects.

- Partnered with leading space companies on the new Orbital Reef project, a proposed dynamic commercial ecosystem in low Earth orbit ("LEO"). This next-generation space station could leverage Redwire's capabilities including our ROSA technology, digital engineering, and microgravity manufacturing expertise.

- Completed a successful merger with Genesis Park Acquisition Corp. and began trading on the New York Stock Exchange ("NYSE") on September 3, 2021.

- Demonstrated the feasibility of manufacturing space-enhanced products such as KDP crystals and ceramics via payloads designed and built by Redwire. These technical milestones further demonstrate the potential for developing terrestrial markets for goods manufactured in space.

- Completed a large-scale 3D printing test for the approximately $73.8 million Archinaut One satellite mission, also known as OSAM-2. Archinaut One was established to demonstrate first of its kind in-space 3D printing and robotic assembly of satellites, revolutionizing the approximately $23 billion satellite manufacturing market (according to Research and Markets), by enabling significant capability expansion and launch cost reduction compared to traditional satellites.

- Under contract with NASA, completed preliminary design work on Optimast SCI, a novel in-space manufactured telescope using Archinaut technology, which can spot more asteroids at greater resolutions than the Hubble Telescope.

- Delivered the first two of five contracted navigational and inspection cameras for the Orion Spacecraft production line on NASA's Artemis program, which is expected to carry the first woman, next man, and other explorers to sustainably explore the Moon's surface.

- Awarded Firefly Blue Ghost Lunar Lander contract to provide avionics and critical Terrain Relative Navigation systems for NASA's Artemis program to explore the Moon's surface.

- Designed and built deployable Link 16 antennas for Tranche 0 of the Space Development Agency's proliferated LEO satellite constellation, which is expected to deploy over 1,000 satellites over the next decade, ensuring constant world-wide global coverage.

- Selected to provide Virgin Orbit state-of-the-art digital engineering solutions that will support multi-mission planning through systematic analysis and advanced modeling and dynamic mission simulation.

*Acquisition Activity*

On March 2, 2020, the Company acquired the business unit of Adcole Corporation, Adcole Maryland Aerospace, LLC, which was subsequently renamed Adcole Space, LLC ("Adcole"). Adcole Maryland Aerospace, LLC was established in 2017 after a merger between a division of Adcole Corporation (founded in 1957) and Maryland Aerospace Incorporated and has been at the forefront of space exploration since its early history, providing satellite components that are integral to the mission success of hundreds of LEO, geosynchronous and interplanetary spacecraft. The Company's core capabilities include the design and manufacture of mission-critical, high reliability optical sensors for satellites providing guidance, navigation, situational awareness and control capabilities. Key products include sun sensors, star trackers and star cameras.

On June 1, 2020, the Company acquired Deep Space Systems, Inc. ("DSS"), which was established in 2001. DSS provides systems engineering that supports the design, development, integration, testing and operations of science and exploration spacecraft. DSS provides critical systems engineering support to next generation space exploration programs such as Dream Chaser and Orion. The Company is a prime contractor on NASA's Commercial Lunar Payload Services (CLPS) contract.

On June 22, 2020, the Company acquired In Space Group, Inc. and its subsidiaries (collectively, "MIS" or "Predecessor"). MIS was established in 2010 and is the industry leader for space manufacturing technologies, delivering next-generation capabilities in orbit to support exploration objectives and national security priorities. As the first commercial company to additively manufacture in space, MIS's vision is to sustainably develop off-Earth manufacturing capabilities to enable the future of space exploration. With a focus on industrializing the space environment, MIS specializes in on-orbit manufacturing, space-enabled materials development, and exploration manufacturing technology. On August 31, 2020, the Company entered into the Original Silicon Valley Bank ("SVB") Loan Agreement for $45.4 million, proceeds of which were primarily used to repay AE for financing the MIS acquisition.

On October 28, 2020, the Company acquired Roccor, LLC ("Roccor"), which was established in 2012. Roccor specializes in deployable structure systems, thermal management systems, and advanced manufacturing in the aerospace industry. Roccor develops a variety of products including solar arrays, antennas and thermal management solutions. Roccor was selected by NASA to develop a first-of-its-kind deployable structure for a nearly 18,000 square foot solar sail that will allow solar scientists to view the sun from different perspectives and stay in orbit longer than ever before. On October 28, 2020, the Company entered into the Adams Street Credit Agreement for a $31.0 million term loan to finance the Roccor acquisition.

On December 11, 2020, the Company acquired LoadPath, LLC ("LoadPath"), which was established in 2009. LoadPath specializes in the development and delivery of aerospace structures, mechanisms, and thermal control solutions, and performs design, analysis, testing and fabrication to advanced technologies through the complete concept-to-flight development cycle. Specific products and services include multiple payload adapters, deployable structures and booms, thermal management technology, spacecraft mechanisms, CubeSat components and launch accommodations, Veritrek, ground support equipment and testing services.

On January 15, 2021, the Company acquired Oakman Aerospace, Inc. ("Oakman"), which was established in 2012. Oakman specializes in the development of Modular Open System Architecture, rapid spacecraft design and development, and custom missions, payloads and applications. Oakman's proprietary digital engineering modular, open systems software environment, Advanced Configurable Open-system Research Network, ACORN, enables the next generation of digitally engineered spacecraft that helps to optimize the balance between cost and tailor ability in spacecraft design and development. On January 15, 2021, the Company drew $15.0 million on its Adams Street Delayed Draw Term Loan (as defined below) under the Adams Street Credit Agreement to finance the Oakman acquisition.

On February 17, 2021, the Company acquired Deployable Space Systems, Inc. ("DPSS"), which was established in 2008. DPSS's mission is to develop new and enabling deployable technologies for space applications, transition emerging technologies to industry for infusion into future Department of Defense ("DoD"), NASA and/or commercial programs and design, analyze, build, test and deliver on-time among the deployable solar arrays, deployable structures and space system products. DPSS has developed a one-of-a-kind, patented Roll Out Solar Array ("ROSA") technology which is a new and innovative mission-enabling rolled flexible blanket solar array system that offers greatly improved performance over state-of-the-art rigid panel solar arrays. On February 17, 2021, the Company amended the Adams Street Credit Agreement to increase the principal amount of the Adams Street Term Loan by an additional $32.0 million to finance the DPSS acquisition.

On November 1, 2021, the Company acquired 100% of the equity interests of Techshot, Inc. ("Techshot") in exchange for cash and shares of common stock of the Company. Techshot is a biotechnology leader in microgravity, bioprinting, and on-orbit manufacturing needed for commercial space-based research and development. Techshot has developed the first American system capable of manufacturing human tissue in microgravity; a platform containing a set of centrifuges for in-space biological and physical-science research; an experiment processor for biological research and small scale manufacturing in space; and an in-orbit X-ray machine for researching new treatments for osteoporosis and muscle wasting diseases.

*Merger with Genesis Park Acquisition Corp. ("GPAC")*

On March 25, 2021, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement"), by and among GPAC, Shepard Merger Sub Corporation, a Delaware corporation and direct, wholly owned subsidiary of GPAC ("Merger Sub"), Cosmos Intermediate, LLC ("Cosmos") and AE Red Holdings, LLC formerly known as Redwire, LLC ("Holdings").

Pursuant to the Merger Agreement, the parties completed a business combination transaction by which, (i) GPAC domesticated as a Delaware corporation in accordance with Section 388 of the Delaware General Corporation Law and the Companies Act of the Cayman Islands (the "Domestication"), (ii) Merger Sub merged with and into Cosmos, with Cosmos being the surviving entity in the merger (the "First Merger"), and (iii) immediately following the First Merger, Cosmos merged with and into GPAC, with GPAC being the surviving entity in the merger (the "Second Merger" and, together with the First Merger, the "Mergers" or the "Merger" and, together with the other transactions contemplated by the Merger Agreement, the "Transactions"). In this Annual Report on Form 10-K, we refer to the Domestication and the Transactions, collectively, as the "Merger".

On September 2, 2021, the Company consummated the Merger. Upon the closing of the Merger, GPAC was renamed to Redwire Corporation. The Merger was accounted for as a reverse recapitalization in which GPAC was treated as the acquired company. A reverse recapitalization does not result in a new basis of accounting, and the consolidated financial statements of the combined entity represent the continuation of the consolidated financial statements of the Company in many respects. MIS was deemed the accounting predecessor and the combined entity is the successor SEC registrant, Redwire.

The aggregate consideration paid to Holdings consisted of a combination of cash and stock. The cash consideration was comprised of $75.0 million (such amount, the "Closing Cash Consideration"). The remainder of the consideration was comprised of (i) 37,200,000 shares of common stock, par value $0.0001 per share, of GPAC (the "Closing Share Consideration") and (ii) 2,000,000 warrants to purchase one share of common stock per warrant (the "Closing Warrant Consideration"), with such amount of warrants corresponding to the forfeiture of certain warrants acquired by GPAC's Sponsor, Genesis Park Holdings, a Cayman Islands limited liability company and Jefferies LLC in connection with GPAC's initial public offering. At the effective time of the First Merger, the units of Cosmos were cancelled and automatically deemed for all purposes to represent the right to receive, in the aggregate, the Closing Cash Consideration, the Closing Share Consideration and the Closing Warrant Consideration.

*COVID-19 Operational Posture and Impact*

We continue to evaluate the ongoing impact of the pandemic. As aerospace manufacturing, communications and defense are federal critical infrastructure sectors, we continue to keep some of our workforce onsite to maintain critical operations. As such, our operations continue to expose our workforce to risks associated with the COVID-19 pandemic.

In response to this exposure, our pandemic crisis response plan remains activated to protect the health and safety of our team members, families, customers, and communities, while continuing to meet our commitments to customers. Our mitigation strategies cover employee preparation, travel, security, supply chain, the ability to work virtually offsite, facility preparation and communications. In doing so, we continue to diligently follow safety protocols, including social distancing, alternating shifts, temperature checks, deep cleaning facilities and employee isolation strategies for essential personnel working at our sites. Additionally, we are encouraging employees to receive COVID-19 vaccinations.

Given the ongoing nature of the outbreak and consequences on the economy, at this time we cannot reasonably estimate the magnitude of the ultimate impact that COVID-19 will have on our business, financial performance, and operating results. The pandemic has caused program execution delays as a result of variant resurgences. Therefore, the near and long-term impacts of the pandemic on the cost and schedule of the numerous programs in our existing backlog and the timing of new awards remains uncertain. We are also observing stress in our supplier base inside and outside the U.S., which is tied to global supply chain constraints, labor shortages and inflationary pressures globally. We will continue to monitor and assess the actual and potential COVID-19 impacts on employees, customers, suppliers and the productivity of the work being done, all of which, to some extent, has and will continue to impact revenues, estimated costs to complete projects, earnings and cash flow.

**Results of Operations**

The following periods are presented in the results of operations:

- the year ended December 31, 2021 (the "Successor 2021 Period"), which includes the results of Adcole, DSS, MIS, Roccor and LoadPath from the beginning of the period as well as 2021 acquisitions Oakman, DPSS and Techshot from their respective acquisition dates;

- the period from February 10, 2020 (inception) to December 31, 2020 (the "Successor 2020 Period"), which includes the results of Adcole, DSS, MIS, Roccor and LoadPath from their respective acquisition dates; and

- the period from January 1, 2020 to June 21, 2020 (the "Predecessor 2020 Period"), which only includes the results of MIS.

Table of Contents

MIS was identified as the Predecessor through an analysis of various factors, including the size, financial characteristics, ongoing management, and order in which the acquired entities were acquired. As a result, financial information of the Predecessor and Successor periods have been prepared under two different bases of accounting and therefore are not comparable.

### *Results of operations for the year ended December 31, 2021 compared to the Successor period from February 10, 2020 to December 31, 2020 compared to the Predecessor period from January 1, 2020 to June 21, 2020*

The following table presents our results of operations for the year ended December 31, 2021 compared to the Successor Period from February 10, 2020 to December 31, 2020 and the Predecessor period from January 1, 2020 to June 21, 2020, along with the percentage of revenues and the dollar and percent change compared to the Successor 2020 Period:

| | Successor | | | | | | Predecessor | |
|---|---|---|---|---|---|---|---|---|
| (in thousands, except percentages) | Year Ended December 31, 2021 | % of revenues | Period from February 10, 2020 to December 31, 2020 | % of revenues | $ Change from prior year period | % Change from prior year period | Period from January 1, 2020 to June 21, 2020 | % of revenues |
| Revenues | $ 137,601 | 100 % | $ 40,785 | 100 % | $ 96,816 | 237 % | $ 16,651 | 100 % |
| Cost of sales | 108,224 | 79 | 32,676 | 80 | 75,548 | 231 | 12,623 | 76 |
| Gross margin | **29,377** | **21** | **8,109** | **20** | **21,268** | **262** | **4,028** | **24** |
| Operating expenses: | | | | | | | | |
| Selling, general and administrative | 78,695 | 57 | 13,103 | 32 | 65,592 | 501 | 5,260 | 32 |
| Contingent earnout expense | 11,337 | 8 | — | — | 11,337 | 100 | — | — |
| Transaction expenses | 5,016 | 4 | 9,944 | 24 | (4,928) | (50) | — | — |
| Research and development | 4,516 | 3 | 2,008 | 5 | 2,508 | 125 | 387 | 2 |
| Operating income (loss) | **(70,187)** | **(51)** | **(16,946)** | **(41)** | **(53,241)** | **314** | **(1,619)** | **(10)** |
| Interest expense, net | 6,456 | 5 | 1,072 | 3 | 5,384 | 502 | 76 | — |
| Other (income) expense, net | (3,837) | (3) | 15 | — | (3,852) | (25,680) | 23 | — |
| Income (loss) before income taxes | **(72,806)** | **(53)** | **(18,033)** | **(44)** | **(54,773)** | **304** | **(1,718)** | **(10)** |
| Income tax expense (benefit) | (11,269) | (8) | (3,659) | (9) | (7,610) | 208 | (384) | (2) |
| Net income (loss) | **$ (61,537)** | **(45) %** | **$ (14,374)** | **(35) %** | **$ (47,163)** | **328 %** | **$ (1,334)** | **(8) %** |

#### *Revenues*

Revenues increased by $96.8 million, or 237%, for the Successor 2021 Period compared to the Successor 2020 Period. The increase in revenues was primarily driven by 2021 acquisitions of $32.8 million, organic revenue growth from a full year of operations on 2020 acquisitions of $51.4 million, as well as new contracts and modifications to expand existing contracts awarded. The 2021 acquisitions included Oakman, DPSS and Techshot, while the 2020 acquisitions included Adcole, DSS, Roccor and LoadPath after their respective acquisition dates. MIS revenues are included in all periods presented.

#### *Cost of Sales*

Cost of sales as a percentage of revenues was 79% for the Successor 2021 Period, as compared to 80% for the Successor 2020 Period and 76% for the Predecessor 2020 Period. The increase in cost of sales in the Successor 2021 Period compared to the Successor 2020 Period was primarily driven by 2021 acquisitions of $25.4 million, organic growth from a full year of operations on 2020 acquisitions of $36.0 million. Organic cost of sales increased primarily due to equity-based compensation expense of $2.1 million and high costs incurred for our largest contract during the Predecessor 2020 Period, the Archinaut One contract, contributed to a higher gross profit margin than usual, compared to historical margins for the product mix at this business unit.

#### *Selling, General and Administrative*

SG&A expenses as a percentage of revenues for the Successor 2021 Period were 57%, as compared to 32% for the Successor 2020 Period and the Predecessor 2020 Period. Of the 501% increase in SG&A in the Successor 2021 Period compared to the Successor 2020 Period, equity-based compensation expense in the Successor 2021 Period relating to the vesting of the Class P Units Incentive Plan and shares granted under the Company's long-term incentive plan contributed $25.0 million of the SG&A increase. T he acquisitions of Oakman, DPSS and Techshot contributed $8.9 million of the increase in SG&A compared to the Successor 2020 Period. In the Successor 2021 Period, higher spending for human capital and systems as we invested in our business development and centralized corporate functions at the beginning of the year to support near and long-term growth contributed $1.4 million of the SG&A increase compared to the Successor 2020 Period. In addition, higher expenses related to the capital market and advisory fees incurred for public company readiness contributed $7.7 million of the SG&A increase compared to the Successor 2020 Period. The remaining $22.6 million of the SG&A increase primarily relates to increased payroll costs from expanding the workforce and increased professional fees.

*Contingent Earnout Expense*

Contingent earnout expense as a percentage of revenues for the Successor 2021 Period was 8%, as compared to 0% for the Successor 2020 Period and Predecessor 2020 Period. Contingent earnout expense in the Successor 2021 Period related to a settlement agreement executed with the sellers of MIS regarding the contingent earnout payment set forth in the purchase agreement and the Roccor contingent earnout payment of which there was no comparable cost incurred in the Successor 2020 Period and Predecessor 2020 Period. Refer to Note C of the accompanying notes to the consolidated financial statements for further discussion.

*Transaction Expenses*

Transaction expenses as a percentage of revenues for the Successor 2021 Period were 4%, as compared to 24% for the Successor 2020 Period and 0% for the Predecessor 2020 Period. The transaction expenses incurred in the Successor 2021 Period were primarily related to the acquisition of Oakman, DPSS and Techshot. The transaction expenses incurred in the Successor 2020 Period were related to the acquisitions of Adcole, DSS, MIS, Roccor and LoadPath, as well as costs associated with our evaluation of other acquisition opportunities. There was no comparable cost incurred during the Predecessor 2020 period. We expect to incur acquisition costs and other related expenses periodically in the future as we continue to seek acquisition opportunities to expand our technological capabilities. Transaction costs incurred by the acquired entities prior to the consummation of an acquisition are not reflected in our historical results of operations.

*Research and Development*

Research and development expenses as a percentage of revenues for the Successor 2021 Period were 3%, as compared to 5% for the Successor 2020 Period and 2% for the Predecessor 2020 Period. The decrease was related to varying spending in research and development projects. Our primary research and development projects relate to the next generation star tracker, camera systems, and software applications.

*Interest Expense, net*

Interest expense, net as a percentage of revenues for the Successor 2021 Period was 5%, as compared to 3% for the Successor 2020 Period and less than 1% for the Predecessor 2020 Period. The interest expense, net incurred for the Successor 2021 Period was primarily related to us entering into the September 2, 2021 amendment to the Adams Street Capital Credit Agreement to increase the principal amount of the Adams Street Term Loan, as further discussed in the "Liquidity and Capital Resources" section. The interest expense, net incurred for the Predecessor 2020 Period related to credit agreements with outstanding balances repaid prior to the acquisition of MIS.

*Other (Income) Expense, net*

Other (income) expense, net as a percentage of revenues was 3% for the Successor 2021 Period, while the Successor 2020 Period and Predecessor 2020 Period were both less than 1%. The increase in other (income) expense, net is primarily related to a gain recognized as a result of a decrease in the private warrant liability of $2.6 million during the Successor 2021 Period. Refer to Note P of the accompanying notes to the consolidated financial statements for further discussion. The remaining increase was related to a gain of $1.0 million recognized in conjunction with a favorable legal settlement that was reached in the fourth quarter of the Successor 2021 Period.

*Income Tax Expense (Benefit)*

Income tax expense (benefit) as a percentage of revenues for the Successor 2021 Period was 8%, as compared to 9% for the Successor 2020 Period and 2% for the Predecessor 2020 Period.

The table below provides information regarding our income tax expense (benefit) for the following periods:

| | Successor | | Predecessor |
|---|---|---|---|
| (in thousands, except percent) | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** | **Period from January 1, 2020 to June 21, 2020** |
| Income tax expense (benefit) | $ (11,269) | $ (3,659) | $ (384) |
| Effective tax rate | 15.5 % | 20.3 % | 22.4 % |

The decrease in our effective tax rate for the Successor 2021 Period compared to the Successor 2020 and the Predecessor 2020 Period is primarily due to the impact of equity-based compensation, nondeductible transaction costs and earnout expense. Refer to Note L of the accompanying notes to the consolidated financial statements for further discussion.

Page 49

*Results of operations for the Successor period from February 10, 2020 to December 31, 2020 compared to the Predecessor period from January 1, 2020 to June 21, 2020 compared to the Predecessor results for the year ended December 31, 2019*

For a comparison of our historical results of operations for the Successor period from February 10, 2020 to December 31, 2020 compared to the Predecessor period from January 1, 2020 to June 21, 2020 compared to the Predecessor results for the year ended December 31, 2019, refer to the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the prospectus filed on October 4, 2021.

**Supplemental Non-GAAP Information**

We use certain financial measures to evaluate our operating performance, generate future operating plans, and make strategic decisions, including those relating to operating expenses and the allocation of internal resources which are not calculated in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP") and are considered to be Non-GAAP financial performance measures. These Non-GAAP financial performance measures are used to supplement the financial information presented on a U.S. GAAP basis and should not be considered in isolation or as a substitute for the relevant U.S. GAAP measures and should be read in conjunction with information presented on a U.S. GAAP basis. Because not all companies use identical calculations, our presentation of Non-GAAP measures may not be comparable to other similarly titled measures of other companies.

Adjusted EBITDA and Pro Forma Adjusted EBITDA are two such Non-GAAP financial measures that we use. Adjusted EBITDA is defined as net income (loss) adjusted for interest expense (income), net, income tax (benefit) expense, depreciation and amortization, acquisition costs, acquisition integration costs, purchase accounting fair value adjustment related to deferred revenue, capital market and advisory fees, write-off of long-lived assets, and equity-based compensation. Pro Forma Adjusted EBITDA is computed to give effect to the business combinations as if they occurred on January 1 of the year in which they were acquired.

The table below presents a reconciliation of Adjusted EBITDA and Pro Forma Adjusted EBITDA to net income (loss), computed in accordance with U.S. GAAP for the following periods:

| (in thousands) | Successor | | Predecessor |
| --- | --- | --- | --- |
| | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
| Net income (loss) | $ (61,537) | $ (14,374) | $ (1,334) |
| Interest expense | 6,458 | 1,074 | 83 |
| Income tax expense (benefit) | (11,269) | (3,659) | (384) |
| Depreciation and amortization | 10,584 | 3,107 | 59 |
| Acquisition deal cost (i) | 5,237 | 9,944 | — |
| Acquisition integration cost (i) | 2,383 | 937 | — |
| Acquisition earnout cost (ii) | 11,337 | — | — |
| Purchase accounting fair value adjustment related to deferred revenue (iii) | 310 | 598 | — |
| Capital market and advisory fees (iv) | 10,306 | 2,598 | — |
| Write-off of long-lived assets (v) | — | 227 | — |
| Litigation-related expenses (vi) | 2,978 | — | — |
| Equity-based compensation (vii) | 27,112 | — | 997 |
| Warrant liability change in fair value adjustment (viii) | (2,629) | — | — |
| Adjusted EBITDA | 1,270 | 452 | (579) |
| Pro forma impact on EBITDA (ix) | 1,979 | 1,152 | — |
| Pro forma adjusted EBITDA | $ 3,249 | $ 1,604 | $ (579) |

i. Redwire incurred acquisition costs including due diligence and integration costs.

ii. Redwire incurred acquisition costs related to the Roccor and MIS contingent earnout payments.

iii. Redwire incurred purchase accounting fair value adjustments to unwind deferred revenue for Adcole, MIS, Roccor, and DPSS.

iv. Redwire incurred capital market and advisory fees related to advisors assisting with preparation for the Merger.

v. Redwire incurred write-off costs for long-lived assets at Adcole related to the write-off of leasehold improvements when Adcole moved office locations.

vi. Redwire incurred expenses related to the securities litigation as further described in Note N of the accompanying notes to the consolidated financial statements.

vii. Redwire incurred expenses related to equity-based compensation under Redwire's equity-based compensation plan.

viii. Redwire adjusted the fair value of the private warrants between the initial valuation as of September 2, 2021, the date the warrants were assumed, and December 31, 2021.

ix. Pro forma impact represents the incremental results of a full period of operations assuming the entities acquired during the periods presented were acquired from January 1 of the year in which they occurred. For the year ended December 31, 2021 the pro forma impact included Oakman from January 1, 2021 to January 15, 2021, DPSS from January 1, 2021 to February 17, 2021, and Techshot from January 1, 2021 to November 1, 2021 and for the year ended December 31, 2020 the pro forma impact includes Adcole from January 1, 2020 to March 2, 2020, DSS from January 1, 2020 to June 1, 2020, MIS from January 1, 2020 to June 22, 2020, Roccor from January 1, 2020 to October 28, 2020 and LoadPath from January 1, 2020 to December 11, 2020.

**Key Performance Indicators**

***Book-to-bill Ratio***

Book-to-bill is the ratio of total contract awarded to revenues recorded in the same period. The contracts awarded balance includes firm contract orders including time and material contracts which were awarded during the period and does not include unexercised contract options or potential orders under indefinite delivery/indefinite quantity contracts. Although the contracts awarded balance reflects firm contract orders, terminations, amendments, or contract cancellations may occur which could result in a reduction to the contracts awarded balance.

We view book-to-bill as an indicator of future revenue growth potential. To drive future revenue growth, our goal is for the level of contract awarded in a given period to exceed the revenue recorded, thus yielding a book-to-bill ratio greater than 1.0.

Our book-to-bill ratio was as follows for the periods presented:

| | Successor | | Predecessor |
|---|---|---|---|
| (in thousands, except ratio) | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
| Contracts awarded | $ 155,070 | $ 22,668 | $ 8,209 |
| Revenues | 137,601 | 40,785 | 16,651 |
| **Book-to-bill ratio** | 1.13 | 0.56 | 0.49 |

Our book-to-bill ratio was 1.13 for the Successor 2021 Period, as compared to 0.56 for the Successor 2020 Period and 0.49 for the Predecessor 2020 Period. In the Successor 2021 Period, $41.5 million of the contracts awarded balance relates to acquired contract value from the Oakman, DPSS, and Techshot acquisitions. In the Successor 2020 Period, $22.7 million of the contracts awarded balance relates to acquired contract value from the Adcole, DSS, MIS, Roccor, and LoadPath acquisitions.

The increase in contract awarded value in the Successor 2021 Period, compared to the Successor 2020 Period (which includes only Adcole, DSS, MIS, Roccor, and LoadPath), and the Predecessor 2020 Period, is due to inclusion of contracts awarded to Adcole, DSS, MIS, Roccor, LoadPath, Oakman, DPSS, and Techshot.

***Backlog***

We view growth in backlog as a key measure of our business growth. Contracted backlog represents the estimated dollar value of firm funded executed contracts for which work has not been performed (also known as the remaining performance obligations on a contract). Our contracted backlog includes $10.7 million and $4.3 million in remaining contract value from time and materials contracts as of December 31, 2021 and as of December 31, 2020, respectively.

Organic contracted backlog change excludes backlog activity from acquisitions for the first four full quarters since the entities' acquisition date. Contracted backlog activity for the first four full quarters since the entities' acquisition date is included in acquisition-related contracted backlog change. After the completion of four fiscal quarters, acquired entities are treated as organic for current and comparable historical periods.

Organic contract value includes the remaining contract value as of January 1 not yet recognized as revenue and additional orders awarded during the period for those entities treated as organic. Acquisition-related contract value includes remaining contract value as of the acquisition date not yet recognized as revenue and additional orders awarded during the period for entities not treated as organic. Similarly, organic revenue includes revenue earned during the period presented for those entities treated as organic, while

acquisition-related revenue includes the same for all other entities, excluding any pre-acquisition revenue earned during the period. The Predecessor 2020 Period is treated as organic below to ensure comparability of acquisition-related contracted backlog for future reporting periods.

| (in thousands) | Successor | |
|---|---|---|
| | December 31, 2021 | December 31, 2020 |
| Organic backlog as of January 1 | $ 122,273 | $ 77,663 |
| Organic additions during the period | 86,013 | 102,045 |
| Organic revenue recognized during the period | (105,452) | (57,435) |
| Organic backlog at end of period | 102,834 | 122,273 |
| | | |
| Acquisition-related contract value beginning of period | — | — |
| Acquisition-related additions during the period | 69,057 | — |
| Acquisition-related revenue recognized during the period | (32,149) | — |
| Acquisition-related backlog at end of period | 36,908 | — |
| | | |
| Contracted backlog at end of period | $ 139,742 | $ 122,273 |

The acquisition-related contracted backlog activity in the Successor 2021 Period includes contracted backlog activity of Oakman, DPSS, and Techshot. The organic contracted backlog activity in the Successor 2021 Period includes contracted backlog activity of Adcole, DSS, MIS, Roccor, and LoadPath. Contracted backlog increased during the Successor 2021 period primarily due to the acquisitions of Oakman, DPSS, and Techshot, offset by a decrease in organic contracted backlog related to higher organic revenue than organic additions during the period.

The organic contracted backlog activity for the year ended December 31, 2020 includes the contracted backlog activity of MIS during the Predecessor 2020 Period and the contracted backlog activity of Adcole, DSS, MIS, Roccor, and LoadPath during the Successor 2020 period.

Although contracted backlog reflects business associated with contracts that are considered to be firm, terminations, amendments or contract cancellations may occur, which could result in a reduction in our total backlog. In addition, some of our multi-year contracts are subject to annual funding. Management fully expects all amounts reflected in contracted backlog to ultimately be fully funded. Contracted backlog related to contracts from MIS operations in Luxembourg of $5.3 million as of December 31, 2021 and $8.6 million as of December 31, 2020 is subject to foreign exchange rate conversions from euros to U.S. dollars that could cause the remaining backlog balance to fluctuate with the foreign exchange rate at the time of measurement.

Our total backlog as of December 31, 2021, which includes both contracted and uncontracted backlog, was $271.6 million. Uncontracted backlog represents the anticipated contract value, or portion thereof, of goods and services to be delivered under existing contracts which have not been appropriated or otherwise authorized. Our uncontracted backlog as of December 31, 2021 was $131.9 million. Uncontracted backlog includes $67.8 million of contract extensions under negotiation that are priced, fully scoped, verbally awarded, and expected to be executed shortly.

**Liquidity and Capital Resources**

Our primary sources of liquidity are cash flows provided by our operations, access to existing credit facilities and proceeds from the Merger. Prior to becoming a public company, in the Successor 2020 period, AE Industrial Partners provided an additional source of liquidity to facilitate the purchase of Adcole, DSS and MIS.

Since its inception, the Company has incurred net losses and negative operating cash flow, and has used its cash to fund capital expenditures, costs associated with the Company's acquisitions, and costs associated with the Merger, among other uses. While some of these cash outflows have been non-recurring in nature, the Company has continued to experience net cash outflows from operating activities. While the Company believes its continued growth and cash flow management will result in improvements in cash from operating activities going forward, there can be no assurance these improvements will be achieved.

Our primary short-term cash requirements are to fund working capital, operating lease obligations, and short-term debt, including current maturities of long-term debt. Working capital requirements can vary significantly from period to period, particularly as a result of the timing of receipts and disbursements related to long-term contracts. Significant fluctuations in working capital could adversely impact the Company's cash position and short-term liquidity needs.

Our medium-term to long-term cash requirements are to service and repay debt, expand our breadth and footprint through acquisitions as well as invest in facilities, equipment, technologies, and research and development for our growth initiatives. To support these initiatives, we expect to continue to make significant investments in our business, including hiring additional staff, implementing processes and procedures to address public company requirements and other customary practices as well as evaluating strategic acquisitions. As a result, we will likely incur additional operating expenses and capital expenditures.

Our ability to fund our cash needs is dependent upon the successful execution of our business strategy and future operating results. Our future operating results are subject to, among others, general economic conditions, including as a result of the COVID-19 pandemic, competitive dynamics in our target markets as well as legislative and regulatory factors that may be outside of our control. As part of our business and debt management strategy, we continuously evaluate opportunities to further strengthen our financial and liquidity position including the issuance of additional equity or debt securities, refinance or otherwise restructure our existing credit facilities, or enter into new financing arrangements. In addition, the Company has identified a plan to execute certain cost reduction actions including, among others, integration-related workforce rationalizations, real estate synergies, business unit optimization initiatives, and cost savings associated with certain Corporate level employment costs. There can be no assurances that any of these actions will be sufficient to allow us to service our debt obligations, meet our debt covenants, or that such actions will not result in an adverse impact on our business.

As of December 31, 2021, our available liquidity totaled $25.5 million, which was comprised of $20.5 million in cash and cash equivalents, and $5.0 million in available borrowings from our existing credit facilities. As further disclosed below, on March 25, 2022, our existing credit facilities were amended to, among other things, increase commitments under the revolving credit facility to $25.0 million. We believe that our existing sources of liquidity will be sufficient to meet our working capital needs and comply with our debt covenants for at least the next twelve months from the date on which our consolidated financial statements were issued. However, the Company's current liquidity may not be sufficient to meet the required long-term liquidity needs associated with continued use of cash from operating activities at historical levels, in addition to its other liquidity needs associated with its capital expenditures, debt payments, and other investing and financing requirements.

The table below summarizes our outstanding debt as of the following periods:

|  | Successor | |
| --- | --- | --- |
| (in thousands) | December 31, 2021 | December 31, 2020 |
| Adams Street Term Loan | $ 30,690 | $ 31,000 |
| Adams Street Revolving Credit Facility | — | — |
| Adams Street Delayed Draw Term Loan | 14,850 | — |
| Adams Street Incremental Term Loan | 31,760 | — |
| Silicon Valley Bank Loan | — | 46,500 |
| DSS PPP Loan | — | 1,058 |
| D&O Financing Loan | 1,904 | — |
| Total debt | 79,204 | 78,558 |
| Less: unamortized discounts and issuance costs | 1,653 | 842 |
| Total debt, net | 77,551 | 77,716 |
| Less: Short-term debt, including current portion of long-term debt | 2,684 | 1,074 |
| Total long-term debt, net | $ 74,867 | $ 76,642 |

### *Adams Street Credit Agreement*

On October 28, 2020, we entered into the Adams Street Credit Agreement, which included the following:

i.  $31.0 million term loan (the "Adams Street Term Loan"). Proceeds from the Adams Street Term Loan were used to finance the acquisition of Roccor, pay acquisition-related costs, fund working capital needs (including the payment of any working capital adjustment pursuant to the Roccor acquisition agreement) and other general corporate purposes;

ii.  $5.0 million revolving credit facility (the "Adams Street Revolving Credit Facility"); and

iii.  $15.0 million delayed draw term loan (the "Adams Street Delayed Draw Term Loan").

On January 15, 2021, we drew $15.0 million on the delayed draw term loan to finance the Oakman acquisition. On February 17, 2021, we amended the Adams Street Credit Agreement to increase the principal amount of the Adams Street Term Loan by an additional $32.0 million to finance the DPSS acquisition. On July 30, 2021, we drew $3.0 million on the revolving credit facility and repaid the $3.0 million draw down on September 23, 2021.

On September 2, 2021, the Adams Street Credit Agreement was amended to provide that the consolidated total net leverage ratio not exceed 6.50:1.00 on the last day of any quarter ("the Financial Covenant"), to remove the cap on the amount of unrestricted cash which may be netted for purposes of the Financial Covenant, to redefine "Consolidated EBITDA", and to reset the call protection terms.

The Adams Street Credit Agreement has a maturity date of October 28, 2026. The Adams Street Credit Agreement is secured by a first lien security interest in all right, title or interest in or to certain assets and properties owned by us and the guarantors included in the Adams Street Credit Agreement. The Adams Street Credit Agreement requires us to meet customary affirmative and negative covenants, default provisions, representations and warranties and other terms and conditions. We are required to make mandatory prepayments of the outstanding principal and accrued interest under the Adams Street Credit Agreement (i) upon the occurrence of certain events and (ii) to the extent a specified net leverage ratio is exceeded as evaluated on any test period ending date. The test period ending dates are March 31, June 30, September 30 and December 31 each year, starting on March 31, 2021, through the maturity of the agreement.

In December 2021, the Company entered into a Consent to Credit Agreement whereby Adams Street Capital agreed to an extension of the delivery of periodic financials required under the Adams Street Credit Agreement. As of December 31, 2021, we were in compliance with our debt covenants under the Adams Street Credit Agreement.

On March 25, 2022, Redwire Holdings, LLC, a wholly-owned subsidiary of the Company (the "Lead Borrower"), and certain other subsidiaries of the Company party thereto, entered into a Third Amendment (the "Amendment") to the Adams Street Capital Credit Agreement to, among other things, increase commitments under the revolving credit facility from $5.0 million to $25.0 million.

The Amendment also modified certain negative covenants and increased the per annum interest rate (i) with respect to revolving loans in an aggregate principal amount of $5.0 million or less, to 6.00% for Eurocurrency rate loans and 5.00% for Base Rate Loans, and (ii) with respect to revolving loans in an aggregate principal amount in excess of $5.0 million, to 7.50% for Eurocurrency rate loans and 6.50% for Base Rate Loans.

The Adams Street Capital Credit Agreement, as amended, contains certain customary representations and warranties, affirmative and other covenants and events of default, including among other things, payment defaults, breach of representations and warranties, and covenant defaults.

In connection with the entry into the Amendment, AEI and certain of its affiliates (the "AEI Guarantors"), provided a limited guarantee for the payment of outstanding revolving loans in excess of $10.0 million, with a $15.0 million cap in the aggregate. In the event that the AEI Guarantors are required to make payments to the lenders under the Adams Street Capital Credit Agreement pursuant to the terms of the limited guarantee, each AEI Guarantor would be subrogated to the rights of the lenders. In connection with the limited guarantee, the Lead Borrower agreed to pay to the AEI Guarantors, a fee equal to 2% of any amount actually paid by such guarantors under the limited guarantee. The fee is waivable by the AEI Guarantors in their discretion.

*SVB Loan Agreement*

On August 31, 2020, we entered into a $45.4 million loan agreement with Silicon Valley Bank (the "Original SVB Loan Agreement") maturing on August 31, 2021, which was subsequently modified on October 28, 2020 to (i) increase the available commitment by $5.7 million and (ii) pay $0.6 million toward the outstanding principal under the Original SVB Loan Agreement. This resulted in a modified loan (the "SVB Loan Agreement") for $50.5 million. On October 30, 2020, we made a $4.0 million principal payment. On April 2, 2021, we extended the maturity date to September 30, 2022.

On September 2, 2021, we repaid the full outstanding principal and interest of $41.6 million on the SVB Loan.

*DSS Paycheck Protection Program Loan*

On May 1, 2020, prior to the DSS Acquisition, DSS received a Paycheck Protection Program ("PPP") loan for $1.1 million (the "DSS PPP Loan"), with a maturity date of May 1, 2022. Under the terms of the DSS PPP Loan, DSS could apply for forgiveness under the PPP regulations if DSS used the proceeds of the loan for its payroll costs and other expenses in accordance with the requirements of the PPP. As the funds were disbursed to DSS prior to the acquisition, the Company intended to repay any unforgiven balance with funds held in a DSS savings account as of the date of the DSS acquisition. On June 18, 2021, $0.6 million of the DSS PPP Loan was forgiven and as a result reclassified as a note payable to the seller of DSS. During the Successor 2021 Period, we repaid the $0.6 million note payable to the seller of DSS and the remaining outstanding principal and interest of $0.5 million on the DSS PPP loan.

*D&O Financing Loan*

On September 3, 2021, we entered into a $3.0 million loan with BankDirect Capital Finance (the "D&O Financing Loan") to finance our directors and officers insurance premium. The D&O Financing Loan has an interest rate of 1.74% per annum, an effective interest rate of 1.75%, and a maturity date of May 3, 2022.

*Contractual Obligations*

The following table presents our contractual obligations as of December 31, 2021:

| (in thousands) | 2022 | 2023 | 2024 | 2025 | 2026 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Adams Street Term Loan | $ 310 | $ 310 | $ 310 | $ 310 | $ 29,450 | $ — | $ 30,690 |
| Adams Street Delayed Draw Term Loan | 150 | 150 | 150 | 150 | 14,250 | — | 14,850 |
| Adams Street Incremental Term Loan | 320 | 320 | 320 | 320 | 30,480 | — | 31,760 |
| D&O Financing Loan | 1,904 | — | — | — | — | — | 1,904 |
| Total long-term debt maturities | 2,684 | 780 | 780 | 780 | 74,180 | — | 79,204 |
| Future minimum lease payments | 4,330 | 4,517 | 4,625 | 4,015 | 3,030 | 5,772 | 26,289 |
| Total contractual obligations | $ 7,014 | $ 5,297 | $ 5,405 | $ 4,795 | $ 77,210 | $ 5,772 | $ 105,493 |

The Company is obligated under certain operating leases for its facilities and office equipment. Certain facility leases contain predetermined fixed escalation of minimum rents at rates ranging from 1.96% to 4.00% per annum and renewal options that could extend certain leases up to an additional nine years; the office equipment lease contains a renewal option that could extend the lease to consecutive 60-day terms and a purchase option. As of December 31, 2021, the future annual minimum lease payments for operating leases for the year 2022 was estimated at $4.3 million with estimated aggregate minimum lease payments of $26.3 million through expiration of current leases. Refer to Note K of the accompanying notes to the consolidated financial statements for further information.

*Cash Flows*

The table below summarizes certain information from the consolidated statements of cash flows for the following periods:

| (in thousands) | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
| Net cash provided by (used in) operating activities | $ (37,358) | $ (15,650) | $ 3,162 |
| Net cash provided by (used in) investing activities | (38,541) | (85,322) | (250) |
| Net cash provided by (used in) financing activities | 74,210 | 122,705 | 1,361 |
| Effect of foreign currency rate changes on cash and cash equivalents | 136 | 343 | (6) |
| Net increase (decrease) in cash and cash equivalents | (1,553) | 22,076 | 4,267 |
| Cash and cash equivalents at end of period | $ 20,523 | $ 22,076 | $ 13,559 |

*Operating activities*

For the Successor 2021 Period, net cash used in operating activities was $37.4 million. Net loss before deducting depreciation, amortization and other non-cash items generated a cash outflow of $27.8 million and was further impacted by an unfavorable change in net working capital of $9.5 million during this period. The unfavorable change in net working capital was largely driven by increase in accounts receivable of $6.8 million, contract assets of $5.0 million, prepaid insurance of $2.8 million, and decrease in deferred revenue of $4.5 million and notes payable of $0.6 million, offset by the increase in accounts payable and accrued expenses of $10.4 million. The change in prepaid insurance relates to the Company's directors and officers insurance policy purchased and prepaid during the Successor 2021 Period, and the changes in accounts receivable, contract assets and deferred revenue relates to the timing of billable milestones occurring during the Successor 2021 Period. The change in accounts payable and accrued expenses is primarily a result of increase accrued payroll related costs and accounts payable due to acquisitions during the Successor 2021 period.

For the Successor 2020 Period, net cash used by operating activities was $15.7 million. Net loss before deducting depreciation, amortization and other non-cash items generated a cash outflow of $14 million and was further impacted by an unfavorable change in net working capital of $1.7 million during this period. The unfavorable change in net working capital was largely driven by the decrease in other liabilities of $5.7 million, increase in prepaid and other current assets of $0.6 million and accounts receivable of $1.6 million, offset by an increase in deferred revenue of $3.6 million and increase in accounts payable and accrued expenses of $2.6 million. The changes in accounts receivable and deferred revenue relates to the timing of billable milestones occurring during the

Successor 2020 Period.

For the Predecessor 2020 Period, net cash provided by operating activities was $3.2 million. Net loss before deducting depreciation, amortization and other non-cash items generated a cash outflow of $0.1 million while favorable changes in net working capital of $3.3 million contributed to operating cash flows during this period. The favorable change in net working capital was largely driven by the increase in accounts payable and accrued expenses of $4.6 million.

*Investing activities*

For the Successor 2021 Period, net cash used in investing activities was $38.5 million, consisting of $40.6 million used for the acquisitions of Oakman, DPSS and Techshot, as well as $2.1 million used for the purchase of property, plant and equipment. This was partially offset by $4.9 million of cash received related to the settlement of a related party receivable.

For the Successor 2020 Period, net cash used in investing activities was $85.3 million, consisting of $79.5 million used for the acquisition of Adcole, DSS, MIS, Roccor and LoadPath and $4.9 million used for advances to related parties as well as $0.9 million used for the purchase of property, plant and equipment.

For the Predecessor 2020 Period, net cash used in investing activities was $0.3 million, consisting of the purchase of property, plant and equipment.

*Financing activities*

For the Successor 2021 Period, net cash provided by financing activities was $74.2 million, consisting of proceeds from debt of $53.0 million and proceeds from the Merger of $110.6 million offset by repayment of debt of $52.8 million and Merger costs of $35.9 million.

For the Successor 2020 Period, net cash provided by financing activities was $122.7 million, consisting of proceeds from debt of $81.3 million and Holdings' contribution of $46.1 million offset by the repayment of debt of $4.7 million.

For the Predecessor 2020 Period, net cash provided by financing activities was $1.4 million, consisting of proceeds from long-term debt of $1.5 million offset by repayment of long-term debt of $0.1 million.

### *Foreign Currency Exposures*

There were no material changes to our foreign currency exposures that occurred in the periods covered by this report.

### Critical Accounting Estimates

For the critical accounting estimates used in preparing our consolidated financial statements, we make assumptions and judgments that can have a significant impact on net revenues, cost and expenses, and other expense (income), net, in our consolidated statements of operations and comprehensive income (loss), as well as, on the value of certain assets and liabilities on our consolidated balance sheets. We base our assumptions, judgments and estimates on historical experience and various other factors that we believe are reasonable under the circumstances. Actual results could differ materially from these estimates under different assumptions or conditions.

In accordance with the Company's policies, we regularly evaluate estimates, assumptions, and judgments; our estimates, assumptions, and judgments are based on historical experience and on factors we believe are reasonable under the circumstances. The results involve judgments about the carrying values of assets and liabilities not readily apparent from other sources. If our assumptions or conditions change, the actual results the Company reports may differ from these estimates. We believe the following critical accounting policies affect the more significant estimates, assumptions, and judgments the Company uses to prepare our consolidated financial statements.

### *Business Combinations*

Under the acquisition method of accounting, the Company recognizes tangible and identifiable intangible assets acquired and liabilities assumed based on their estimated fair values at acquisition date. The accounting for business combinations requires us to make significant estimates and assumptions, especially with respect to goodwill, intangible assets, and contingent consideration.

### *Goodwill*

The Company recognizes the goodwill for business combinations in which the acquisition method of accounting is applied, whereby the excess of the purchase consideration over the fair value of identifiable net assets acquired and liabilities assumed is allocated to goodwill. The goodwill reflects the potential synergies and expansion of the Company's offerings across product lines and markets complementary to its existing products and markets.

The Company assesses goodwill for impairment at the reporting unit level, which is defined as an operating segment or one level below an operating segment. Goodwill is tested annually for impairment as of October 1, or more frequently if events or circumstances indicate the carrying value may be impaired. In circumstances where a qualitative analysis indicates that the fair value of a reporting unit does not exceed its carrying value, a quantitative analysis is performed using an income approach. The Company performed the qualitative assessment for each of the three reporting units on October 1, 2021 and did not find any indicators that the fair value is more likely than not below the carrying value.

As such, the quantitative assessment was not required, and no goodwill impairment was recognized for the Successor 2021 Period.

In circumstances where a quantitative assessment is performed, the discounted cash flow approach requires management to make certain assumptions based upon information available at the time the valuations are performed. Actual results could differ from these assumptions.

Additional risks for goodwill across all reporting units include, but are not limited to:

- our failure to reach our internal forecasts could impact our ability to achieve our forecasted levels of cash flows and reduce the estimated discounted value of our reporting units;

- adverse technological events that could impact our performance;

- volatility in equity and debt markets resulting in higher discount rates; and

- significant adverse changes in the regulatory environment or markets in which we operate.

It is not possible at this time to determine if an impairment charge would result from these factors. We will continue to monitor our goodwill for potential impairment indicators in future periods.

*Intangible Assets*

Identifiable finite-lived intangible assets, including technology, trademarks, and customer relationships, have been acquired through the Company's various business combinations. The fair value of the acquired trademarks, technology, and customer relationships has been estimated using various underlying judgments, assumptions, and estimates. Potential changes in the underlying judgments, assumptions, and estimates used in our valuations of acquired intangible assets could result in different estimates of the future fair values. A potential increase in discount rates, a reduction in projected cash flows or a combination of the two could lead to a reduction in estimated fair values, which may result in impairment charges that could materially affect our financial statements in any given year. The approaches used for determining the fair value of finite-lived technology, trademarks and customer relationships acquired depends on the circumstances; the Company has used the income approach (within the income approach, various methods are available such as multi-period excess earnings, with and without, incremental and relief from royalty methods). Within each income approach method, a tax amortization benefit is included, which represents the tax benefit resulting from the amortization of that intangible asset depending on the tax jurisdiction where the intangible asset is held.

Finite-lived intangible assets are reported at cost, net of accumulated amortization, and are either amortized on a straight-line basis over their estimated useful lives or over the period the economic benefits of the intangible asset are consumed. Significant judgment is also required in assigning the respective useful lives of intangible assets. Our assessment of intangible assets that have a finite life is based on a number of factors including the competitive environment, market share, brand history, underlying product life cycles, attrition rate, operating plans, cash flows (i.e., economic life based on the discounted and undiscounted cash flows), future usage of intangible assets and the macroeconomic environment. The costs of finite-lived intangible assets are amortized to expense over the estimated useful life.

*Contingent Consideration*

We record contingent consideration resulting from a business combination at its fair value on the acquisition date. The fair value of any contingent consideration is calculated considering the probability of occurrence of an earnout payment. The fair value of contingent consideration is estimated using the Black-Scholes options pricing model, which uses assumptions such as a risk-free interest rates, discount rates and volatility rates.

**Revenue Recognition**

The recognition and measurement of revenue requires the use of judgments and estimates. Specifically, judgment is used in interpreting complex arrangements with nonstandard terms and conditions and determining when all criteria for revenue recognition have been met. The Company's revenues are derived from the sales of products and services.

The Company engages in long-term contracts for production and service activities and recognizes revenue for performance obligations over time. The Company's contracts generally do not contain penalties, credits, price concessions or other types of potential variable consideration. Prices are fixed at contract inception and are not contingent on performance or any other criteria. Revenue is recognized over time (versus point in time recognition), due to the fact that the Company's performance creates an asset with no alternative use to the Company and the Company has an enforceable right to payment for performance completed to date. The Company considers the nature of these contracts and the types of products and services provided when determining the proper accounting for a particular contract. These contracts include both fixed-price and cost reimbursable contracts. The Company's cost reimbursable contracts typically include cost-plus fixed fee and time and material ("T&M") contracts. The portion of the payments retained by the customer or advance payment is not considered a significant financing component because it is used to facilitate inventory demands at the onset of a contract and to safeguard the Company from the failure of the other party to abide by some or all of their obligations under the contract.

The Company recognizes revenue over time using the cost-to-cost method to measure progress. Under the cost-to-cost method, revenue is recognized based on the proportion of total costs incurred to estimated total costs-at-completion ("EAC"). An EAC includes all direct costs and indirect costs directly attributable to a program or allocable based on our program cost pooling arrangements. Estimates regarding the Company's cost associated with the design, manufacture and delivery of products and services are used in determining the EAC. Changes in EAC are applied retrospectively and when adjustments in estimated contract costs are identified, such revisions may result in current period adjustments to earnings applicable to performance in prior periods. For acquisitions that occurred in the Successor 2020 Period, contracts recognized under the cost-to-cost method were reset as of the date of acquisition to calculate prospective periods using the contract value and estimated costs to complete as of the acquisition date rather than the contract value and estimated costs to complete since inception of the contract. Effective January 1, 2021, the Company adopted Accounting Standards Update ("ASU") 2021-08, "Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers." Accordingly, for acquisitions in the Successor 2021 Period, contracts were recognized and measured in accordance with Accounting Standards Codification ("ASC") 606, "Revenue from Contracts with Customers" which does not prescribe a reset as of the date of acquisition. For T&M contracts, the Company recognizes revenue reflecting the number of direct labor hours expended in the performance of a contract multiplied by the contract billing rate, as well as reimbursement of other direct billable costs.

Our cost estimation process is based on the professional knowledge of our engineering, program management and financial professionals and draws on their significant experience and judgment. We prepare EACs for our contracts and calculate estimated revenues and costs over the life of our contracts. Accounting for long-term contracts requires significant judgment relative to estimating total contract revenues and costs, in particular, assumptions relative to the amount of time to complete the contract, including the assessment of the nature and complexity of the work to be performed. The Company's estimates are based upon the professional knowledge and experience of its engineers, program managers and other personnel, who review each long-term contract monthly to assess the contract's schedule, performance, technical matters and estimated cost at completion. For acquisitions that occurred in the Successor 2020 Period, changes in estimates are applied retrospectively for contracts executed after the date of acquisition and are applied via the ASC 805 reset method described above for contracts existing at the date of acquisition. Subsequent to the adoption of ASU 2021-08, all changes in estimates are retrospectively applied. When adjustments in estimated contract costs are identified, such revisions may result in current period adjustments to earnings applicable to performance in prior periods.

Factors considered in these estimates include our historical performance, the availability, productivity and cost of labor, the nature and complexity of work to be performed, availability and cost of materials, components and subcontracts, the risk and impact of delayed performance and the level of indirect cost allocations.

*Impairment of Long-Lived Assets*

The Company evaluates the recoverability of the carrying value of long-lived assets whenever events or circumstances indicate the carrying amount may not be recoverable. If a long-lived asset is tested for recoverability and the undiscounted estimated future cash flows to which the asset relates is less than the carrying amount of the asset, the asset cost is adjusted to fair value and an impairment loss is recognized as the amount by which the carrying amount of a long-lived asset exceeds its fair value. No such impairment charges were recognized during the periods presented.

Using a discounted cash flow method involves significant judgment and requires the Company to make significant estimates and assumptions, including long-term projections of cash flows, market conditions and appropriate discount rates. Judgments are based on historical experience, current market trends, consultations with external valuation specialists and other information. If facts and circumstances change, the use of different estimates and assumptions could result in a materially different outcome. The Company generally develops these forecasts based on recent sales data for existing products, acquisitions, and estimated future growth of the market in which it operates.

*Income Taxes*

Significant judgments are required in order to determine the realizability of tax assets. In assessing the need for a valuation allowance, we evaluate all significant available positive and negative evidence, including historical operating results, estimates of future sources of taxable income, carry-forward periods available, the existence of prudent and feasible tax planning strategies and other relevant factors. The Company recognizes a tax benefit only if it is more likely than not the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such positions are then measured based on the largest benefit that has a greater than 50% likelihood of being realized upon settlement.

*Warrants*

As part of the Merger, public warrants were established as equity and private warrants were established as a liability. Classification of the public warrants as equity instruments and the private warrants as liability instruments is based on management's analysis of the guidance in ASC 815 *Derivatives and Hedging* and in a statement issued by the Staff of the SEC regarding the accounting and reporting considerations for warrants issued by special purpose acquisition companies entitled "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies." Management determined that while the public warrants meet the definition of a derivative, they meet the equity scope exception in ASC 815-10-15-74(a) to be classified in stockholders' equity and are not subject to remeasurement provided that the Company continues to meet the criteria for equity classification. Management considered whether the private warrants display the three characteristics of a derivative under ASC 815, and concluded that the private warrants meet the definition of a derivative. However, the private warrants fail to meet the equity scope exception in ASC 815-10-15-74(a) and thus are classified as a liability measured at fair value, subject to remeasurement at each reporting period. The Company measures the private warrant liability at fair value each reporting period with the change in fair value recorded as other (income) expense, net in the consolidated statements of operations and comprehensive income (loss). The Company measured the public warrants at the fair value of the equity instruments as of the date of the Merger.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

The Company is a smaller reporting company and is not required to provide the information required under this Item 7A.

**Item 8. Financial Statements and Supplementary Data**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 238) | 61 |
|  |  |
| Consolidated Balance Sheets | 63 |
| Consolidated Statements of Operations and Comprehensive Income (Loss) | 64 |
| Consolidated Statements of Changes in Shareholders' Equity | 65 |
| Consolidated Statements of Cash Flows | 66 |
| Notes to Consolidated Financial Statements | 67 |

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Shareholders of Redwire Corporation

***Opinion on the Financial Statements***

We have audited the accompanying consolidated balance sheets of Redwire Corporation and its subsidiaries (Successor) (the "Company") as of December 31, 2021 and 2020, and the related consolidated statements of operations and comprehensive income (loss), of changes in shareholders' equity and of cash flows for the year ended December 31, 2021 and for the period from February 10, 2020 to December 31, 2020, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the year ended December 31, 2021 and for the period from February 10, 2020 to December 31, 2020 in conformity with accounting principles generally accepted in the United States of America.

***Basis for Opinion***

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP
Jacksonville, Florida
April 8, 2022

We have served as the Company's auditor since 2020.

Page 61

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Shareholders of In Space Group, Inc.

***Opinion on the Financial Statements***

We have audited the consolidated statements of operations and comprehensive income (loss), of changes in shareholders' equity and of cash flows of In Space Group, Inc. and its subsidiaries (Predecessor) (the "Company") for the period from January 1, 2020 to June 21, 2020, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the results of operations and cash flows of the Company for the period from January 1, 2020 to June 21, 2020, in conformity with accounting principles generally accepted in the United States of America.

***Basis for Opinion***

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of these consolidated financial statements in accordance with the standards of the PCAOB and in accordance with the auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP
Jacksonville, Florida
May 11, 2021

We have served as the Company's auditor since 2020.

**REDWIRE CORPORATION**
**CONSOLIDATED BALANCE SHEETS**
*(In thousands of U.S. dollars, except share data)*

| | | Successor | | |
|---|---|---|---|---|
| | | December 31, 2021 | | December 31, 2020 |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 20,523 | $ | 22,076 |
| Accounts receivable, net | | 16,262 | | 6,057 |
| Contract assets | | 11,748 | | 4,172 |
| Inventory | | 688 | | 330 |
| Income tax receivable | | 688 | | 688 |
| Related party receivable | | — | | 4,874 |
| Prepaid insurance | | 2,819 | | — |
| Prepaid expenses and other current assets | | 2,488 | | 1,109 |
| **Total current assets** | | **55,216** | | **39,306** |
| Property, plant and equipment, net | | 19,384 | | 3,262 |
| Goodwill | | 96,314 | | 52,711 |
| Intangible assets, net | | 90,842 | | 60,961 |
| Other non-current assets | | — | | 534 |
| **Total assets** | $ | **261,756** | $ | **156,774** |
| | | | | |
| **Liabilities and Equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 13,131 | $ | 7,158 |
| Notes payable to sellers | | 1,000 | | 1,827 |
| Short-term debt, including current portion of long-term debt | | 2,684 | | 1,074 |
| Accrued expenses | | 17,118 | | 7,462 |
| Deferred revenue | | 15,734 | | 15,665 |
| Other current liabilities | | 1,571 | | 378 |
| **Total current liabilities** | | **51,238** | | **33,564** |
| Long-term debt | | 74,867 | | 76,642 |
| Warrant liabilities | | 19,098 | | — |
| Deferred tax liabilities | | 8,601 | | 7,367 |
| Other non-current liabilities | | 730 | | 6 |
| **Total liabilities** | | **154,534** | | **117,579** |
| Shareholders' Equity: | | | | |
| Preferred stock, $0.0001 par value, 100,000,000 shares authorized; none issued and outstanding as of December 31, 2021 | | — | | — |
| Common stock, $0.0001 par value, 500,000,000 shares authorized; 62,690,869 issued and outstanding as of December 31, 2021 and 37,200,000 issued and outstanding as of December 31, 2020 | | 6 | | 4 |
| Additional paid-in capital | | 183,024 | | 53,059 |
| Accumulated deficit | | (75,911) | | (14,374) |
| Accumulated other comprehensive income (loss) | | 103 | | 506 |
| **Shareholders' equity** | | **107,222** | | **39,195** |
| **Total liabilities and shareholders' equity** | $ | **261,756** | $ | **156,774** |

The accompanying notes are an integral part of the consolidated financial statements.

Page 63

**REDWIRE CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME (LOSS)**
*(In thousands of U.S. dollars, except share and per share data)*

|  | Successor | | Predecessor |
|---|---|---|---|
|  | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
| Revenues | $ 137,601 | $ 40,785 | $ 16,651 |
| Cost of sales | 108,224 | 32,676 | 12,623 |
| **Gross margin** | **29,377** | **8,109** | **4,028** |
| Operating expenses: |  |  |  |
| Selling, general and administrative | 78,695 | 13,103 | 5,260 |
| Contingent earnout expense | 11,337 | — | — |
| Transaction expenses | 5,016 | 9,944 | — |
| Research and development | 4,516 | 2,008 | 387 |
| **Operating income (loss)** | **(70,187)** | **(16,946)** | **(1,619)** |
| Interest expense, net | 6,456 | 1,072 | 76 |
| Other (income) expense, net | (3,837) | 15 | 23 |
| **Income (loss) before income taxes** | **(72,806)** | **(18,033)** | **(1,718)** |
| Income tax expense (benefit) | (11,269) | (3,659) | (384) |
| **Net income (loss)** | $ **(61,537)** | $ **(14,374)** | $ **(1,334)** |
|  |  |  |  |
| Net income (loss) per share, basic and diluted | $ (1.36) | $ (0.39) | $ — |
| Weighted-average shares outstanding: |  |  |  |
| Basic and diluted | 45,082,544 | 37,200,000 | — |
|  |  |  |  |
| **Comprehensive income (loss):** |  |  |  |
| Net income (loss) | $ (61,537) | $ (14,374) | $ (1,334) |
| Foreign currency translation gain (loss), net of tax | (403) | 506 | 2 |
| Total other comprehensive income (loss), net of tax | (403) | 506 | 2 |
| **Total comprehensive income (loss)** | $ **(61,940)** | $ **(13,868)** | $ **(1,332)** |

The accompanying notes are an integral part of the consolidated financial statements.

**REDWIRE CORPORATION**
**CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY**
*(In thousands of U.S. dollars, except share and unit data)*

*For the Predecessor Period*

| | Common Stock | | Class F Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | Shares | Par Value | Shares | Par Value | | | | |
| **Predecessor Balance as of December 31, 2019** | 2,401,881 | $ — | 1,316,467 | $ — | $ 10 | (13,198) | $ (8) | $ (13,196) |
| Equity-based compensation expense | — | — | — | — | 998 | — | — | 998 |
| Foreign currency translation, net of tax | — | — | — | — | — | — | 2 | 2 |
| Net income (loss) | — | — | — | — | — | (1,334) | — | (1,334) |
| **Predecessor Balance as of June 21, 2020** | **2,401,881** | **$ —** | **1,316,467** | **$ —** | **$ 1,008** | **(14,532)** | **$ (6)** | **$ (13,530)** |

*For the Successor Period*

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Successor Balance as of February 10, 2020** | — | $ — | $ — | $ — | $ — | $ — |
| Holdings' contributions [1] | 37,200,000 | 4 | 53,059 | — | — | 53,063 |
| Foreign currency translation, net of tax | — | — | — | — | 506 | 506 |
| Net income (loss) | — | — | — | (14,374) | — | (14,374) |
| **Successor Balance as of December 31, 2020** | 37,200,000 | $ 4 | 53,059 | $ (14,374) | $ 506 | $ 39,195 |
| GPAC shares net of redemptions, including PIPE, warrant liability, and Merger costs | 22,461,273 | 2 | 52,919 | — | — | 52,921 |
| Holdings' contributions | 3,029,596 | — | 40,646 | — | — | 40,646 |
| Earnout settlement in Holdings' equity | — | — | 9,288 | — | — | 9,288 |
| Equity-based compensation expense | — | — | 27,112 | — | — | 27,112 |
| Foreign currency translation, net of tax | — | — | — | — | (403) | (403) |
| Net income (loss) | — | — | — | (61,537) | — | (61,537) |
| **Successor Balance as of December 31, 2021** | **62,690,869** | **$ 6** | **$ 183,024** | **$ (75,911)** | **$ 103** | **$ 107,222** |

[1] The units of the Company prior to the Merger (as defined in Note A) have been retroactively restated to reflect the exchange ratio established in the Merger (computed as 37,200,000 shares of common stock to 100 Company units).

The accompanying notes are an integral part of the consolidated financial statements.

**REDWIRE CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(In thousands of U.S. dollars)*

| | Successor | | Predecessor |
|---|---|---|---|
| | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** | **Period from January 1, 2020 to June 21, 2020** |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ (61,537) | $ (14,374) | $ (1,334) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization expense | 10,584 | 3,107 | 59 |
| Amortization of debt issuance costs and discount | 304 | 30 | 134 |
| Holdings' contribution non-cash | — | 705 | — |
| Equity-based compensation expense | 27,112 | — | 997 |
| Loss on disposal of property and equipment | — | 227 | — |
| Contingent earnout expense not yet settled | 448 | — | — |
| Earnout settlement in Holdings' equity | 9,288 | — | — |
| Change in fair value of warrants | (2,629) | — | — |
| Deferred provision (benefit) for income taxes | (11,405) | (3,658) | — |
| Other | (6) | — | — |
| Changes in assets and liabilities: | | | |
| (Increase) decrease in accounts receivable | (6,819) | (1,625) | (548) |
| (Increase) decrease in contract assets | (4,995) | 11 | (433) |
| (Increase) decrease in inventory | (195) | (67) | (30) |
| (Increase) decrease in prepaid insurance | (2,819) | — | — |
| (Increase) decrease in prepaid expenses and other assets | (527) | (568) | (354) |
| Increase (decrease) in accounts payable and accrued expenses | 10,379 | 2,647 | 4,647 |
| Increase (decrease) in deferred revenue | (4,497) | 3,621 | 64 |
| Increase (decrease) in other liabilities | 564 | (5,706) | (40) |
| Increase (decrease) in notes payable to seller | (608) | — | — |
| Net cash provided by (used in) by operating activities | (37,358) | (15,650) | 3,162 |
| **Cash flows from investing activities:** | | | |
| Acquisition of businesses, net of cash acquired | (40,558) | (79,531) | — |
| Purchases of property, plant and equipment, net | (2,094) | (917) | (250) |
| Purchase of intangible assets | (763) | — | — |
| Advance to related party | — | (4,874) | — |
| Settlement of related party receivable | 4,874 | — | — |
| Net cash provided by (used in) investing activities | (38,541) | (85,322) | (250) |
| **Cash flows from financing activities:** | | | |
| Repayments of loans | (52,800) | (4,661) | (102) |
| Payment of loan fees to third parties | (62) | — | — |
| Proceeds received from loans | 53,024 | 81,289 | 1,463 |
| Payments for the Merger transaction costs | (35,935) | — | — |
| Proceeds from the Merger | 110,583 | — | — |
| Payment of contingent earnout | (600) | — | — |
| Holdings' contribution | — | 46,077 | — |
| Net cash provided by (used in) financing activities | 74,210 | 122,705 | 1,361 |
| Effect of foreign currency rate changes on cash and cash equivalents | 136 | 343 | (6) |
| Net increase (decrease) in cash and cash equivalents | (1,553) | 22,076 | 4,267 |
| Cash and cash equivalents at beginning of period | 22,076 | — | 9,292 |
| **Cash and cash equivalents at end of period** | $ 20,523 | $ 22,076 | $ 13,559 |
| | | | |
| **Cash paid (received) during the period for:** | | | |
| Interest | $ 6,017 | $ 196 | $ 70 |
| Income taxes | — | 135 | 41 |
| Earnout settlement | 1,602 | — | — |
| **Supplemental Schedule of Non-Cash Investing and Financing Activities:** | | | |
| Holdings' contribution for acquisition of businesses | 40,646 | (5,981) | — |
| Purchase of intangible assets settled by Holdings | — | (300) | — |
| Initial fair value of warrants at closing of Merger | 21,727 | — | — |
| Capital expenditures not yet paid | 1,576 | 83 | — |

The accompanying notes are an integral part of the consolidated financial statements.

Page 66

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

## Note A – Description of the Business

Redwire Corporation develops and manufactures mission critical space solutions and high reliability components for the next generation space economy. With decades of flight heritage combined with the agile and innovative culture of a commercial space platform, Redwire Corporation is uniquely positioned to assist our customers in solving the complex challenges of future space missions.

AE Industrial Partners Fund II, LP ("AEI"), a private equity firm specializing in aerospace, defense, and government services, formed a series of acquisition vehicles on February 10, 2020, which included Cosmos Parent, LLC, Cosmos Intermediate, LLC, Cosmos Finance, LLC and Cosmos Acquisition, LLC, with Cosmos Parent, LLC being the top holding company. Cosmos Parent, LLC owned 100% of the equity in Cosmos Intermediate, LLC; Cosmos Intermediate, LLC owned 100% of the equity in Cosmos Finance, LLC; Cosmos Finance, LLC owned 100% of the equity in Cosmos Acquisition, LLC. Upon the formation of these acquisition vehicles, Cosmos Intermediate, LLC ("Successor") effected a number of acquisitions through its wholly owned subsidiary, Cosmos Acquisition, LLC. Following the acquisitions, the Successor became a wholly owned subsidiary of AE Red Holdings, LLC formerly known as Redwire, LLC ("Holdings").

Strategic acquisitions that augment our technology and product offerings are a key part of our growth strategy. The Company has completed eight acquisitions since March 2020, which collectively have provided us with a wide variety of complementary technologies and solutions to serve our target markets and customers. These acquisitions included: Adcole Space, LLC ("Adcole"), Deep Space Systems, Inc. ("DSS"), In Space Group, Inc. and its subsidiaries (collectively, "MIS" or "Predecessor"), Roccor, LLC ("Roccor"), and LoadPath, LLC ("LoadPath") as of December 31, 2020.

During the year ended December 31, 2021, the following acquisitions were completed:

- *January 2021 –* Acquired Oakman Aerospace, Inc. ("Oakman"), which specializes in the development of modular open system architecture, rapid spacecraft design and development, and custom missions, payloads, and data distribution services.

- *February 2021 –* Acquired Deployable Space Systems, Inc. ("DPSS"), whose mission is to develop new and enabling deployable technologies for space applications, transition emerging technologies to industry for infusion into future Department of Defense ("DoD"), National Aeronautics and Space Administration ("NASA"), and/or commercial programs and design, analyze, build, test and deliver on-time the deployable solar arrays, deployable structures and space system products. DPSS's product portfolio includes the award-winning and patented ROSA (Roll-Out Solar Array), Integrated Modular Blanket Assembly; Rigid-Panel and Functional Advanced Concentrator Technology solar array technologies; a multitude of elastically and articulated deployable structures and booms, open-lattice booms, telescopic booms; and a variety of mission-enabling mechanisms for space applications.

- *November 2021 –* Acquired Techshot, Inc. ("Techshot"), a leader in on-orbit manufacturing, biotechnology in microgravity, and bioprinting needed for commercial space-based biotechnology and pharmaceutical research and development.

On September 2, 2021, the previously announced merger (the "Merger") with Genesis Park Acquisition Corp. ("GPAC") was consummated pursuant to the Agreement and Plan of Merger dated March 25, 2021 by and among GPAC, Shepard Merger Sub Corporation, a Delaware corporation and direct, wholly owned subsidiary of GPAC, Cosmos Intermediate, LLC and Holdings. Upon the closing of the Merger, GPAC was renamed to Redwire Corporation ("Redwire" or the "Company"), the SEC registrant. As a result of the Merger, the Company received aggregate gross proceeds of $110.6 million from the trust account of GPAC and PIPE proceeds. Proceeds from the Merger were partially used to repay the $41.6 million outstanding under the Silicon Valley Bank ("SVB") Loan, including interest of $0.1 million, and Merger transaction costs and other costs paid through the funds flow of $38.7 million, consisting of marketing, legal and other professional fees.

The Merger was accounted for as a reverse recapitalization in which GPAC was treated as the acquired company. A reverse recapitalization does not result in a new basis of accounting, and the consolidated financial statements of the combined entity represent the continuation of the consolidated financial statements of Cosmos Intermediate, LLC in many respects. Immediately prior to the closing of the Merger, but following the consummation of the Company's domestication to a Delaware corporation, the authorized capital stock of the Company consisted of 600,000,000 shares of capital stock, including (i) 500,000,000 shares of Redwire common stock with a par value $0.0001 per share and (ii) 100,000,000 shares of Redwire preferred stock. At the effective time of the Merger, the 100 company units of Cosmos Intermediate, LLC were cancelled and automatically deemed for all purposes to represent Holdings' right to receive, in the aggregate, $75.0 million of cash, 37,200,000 shares of common stock and 2,000,000 warrants to purchase one share of common stock per warrant (with such amount of warrants corresponding to the forfeiture of certain private placement

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

warrants acquired by Genesis Park Holdings (the "Sponsor") and Jefferies LLC ("Jefferies") in connection with GPAC's initial public offering). The exchanged 37,200,000 shares of common stock consideration to Holdings, the GPAC common stock shares outstanding at the time of closing of 13,961,273, and the PIPE financing shares issued at closing of 8,500,000 made up the total of the 59,661,273 shares of common stock outstanding as of September 2, 2021. The 100 units of the Company prior to the Merger were retroactively restated to reflect the exchange ratio established in the Merger (computed as 37,200,000 shares of common stock to 100 Company units).

The Company includes the Predecessor, which is comprised of MIS before its acquisition date, and the Successor, including Adcole, DSS, MIS, Roccor, LoadPath, Oakman, DPSS, and Techshot, after the acquisition of each, respectively.

### COVID-19 Operational Posture and Impact

Since early 2020, the COVID-19 pandemic has created a climate of uncertainty which has significantly impacted global economies and the Company's operating environment. Such impacts include, among others, supply chain disruptions, labor shortages, regulatory challenges, inflationary pressures, as well as market volatility. In addition, decreases in the availability, cost and delivery of supplies have caused shortages and delays for the procurement of raw materials, components and other supplies required to fulfill the Company's performance obligations. The long-term impacts of COVID-19 on government budgets and other funding priorities are difficult to predict and could adversely affect the Company's operations and financial results. There can be no assurances that actions or responsive measures taken on the part of the Company or governmental authorities will be successful in mitigating increased risks associated with COVID-19.

### Note B – Summary of Significant Accounting Policies

### Basis of Presentation

The accompanying consolidated financial statements are presented for the following periods:

- as of December 31, 2021 and the year ended December 31, 2021 (the "Successor 2021 Period"), which includes the results of Adcole, DSS, MIS, Roccor and LoadPath from the beginning of the period as well as 2021 acquisitions Oakman, DPSS and Techshot from their respective acquisition dates.

- as of December 31, 2020 and the period from February 10, 2020 (inception) to December 31, 2020 (the "Successor 2020 Period"), which includes the results of Adcole, DSS, MIS, Roccor and LoadPath from from their respective acquisition dates.

- the period from January 1, 2020 to June 21, 2020 (the "Predecessor 2020 Period"), which only includes the results of MIS.

MIS was identified as the Predecessor through an analysis of various factors, including the size, financial characteristics, ongoing management, and order in which the acquired entities were acquired.

The accompanying consolidated financial statements have been prepared in accordance with United States Generally Accepted Accounting Principles ("U.S. GAAP"). All intercompany balances and transactions have been eliminated in consolidation.

### Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent liabilities as of the date of the financial statements, and the reported amounts of revenues and expenses during the reporting periods.

Management has prepared the estimates using the most current and best available information that are considered reasonable under the circumstances. However, actual results could differ materially from those estimates. Accounting policies subject to estimates include, but are not limited to, valuation of goodwill and intangible assets, contingent consideration, revenue recognition, income taxes, and warrant liabilities.

### Business Combinations

The Company utilizes the acquisition method of accounting in Accounting Standards Codification ("ASC") 805, *Business Combinations ("ASC 805"),* for all transactions and events in which it obtains control over one or more other businesses (even if less than 100% ownership is acquired), to recognize the fair value of all assets acquired and liabilities assumed and to establish the acquisition date fair value as of the measurement date.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

While the Company uses its best estimates and assumptions as part of the purchase price allocation process to accurately value assets acquired and liabilities assumed at the business combination date, the estimates and assumptions are inherently uncertain and subject to refinement. As a result, during the measurement period, which may be up to one year from the business combination date, the Company records adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill. For changes in the valuation of intangible assets between the preliminary and final purchase price allocation, the related amortization is adjusted in the period it occurs. Subsequent to the measurement period, any adjustment to assets acquired or liabilities assumed is included in operating results in the period in which the adjustment is identified. Transaction costs that are incurred in connection with a business combination, other than costs associated with the issuance of debt or equity securities, are expensed as incurred.

Contingent consideration is classified as a liability or as equity on the basis of the definitions of a financial liability and an equity instrument; contingent consideration payable in cash is classified as a liability. The Company recognizes the fair value of any contingent consideration that is transferred to the seller in a business combination on the date at which control of the acquiree is obtained. Contingent consideration payments related to acquisitions are measured at fair value each reporting period using Level 3 unobservable inputs (Level 3). Any changes in the fair value of these contingent consideration payments are included in operating income in the consolidated statements of operations and comprehensive income (loss).

*Revenue Recognition*

Based on the specific analysis of its contracts, the Company has determined that its contracts are subject to revenue recognition in accordance with ASC 606 *Revenue from Contracts with Customers* ("ASC 606"). Recognition under the ASC 606 five-step model involves (i) identification of the contract, (ii) identification of performance obligations in the contract, (iii) determination of the transaction price, (iv) allocation of the transaction price to the previously identified performance obligations, and (v) revenue recognition as the performance obligations are satisfied.

During step one of the five step model, the Company considers whether contracts should be combined or separated, and based on this assessment, the Company combines closely related contracts when all the applicable criteria are met. The combination of two or more contracts requires judgment in determining whether the intent of entering into the contracts was effectively to enter into a single contract, which should be combined to reflect an overall profit rate. Similarly, the Company may separate an arrangement, which may consist of a single contract or group of contracts, with varying rates of profitability, only if the applicable criteria are met. Judgment is involved in determining whether a group of contracts may be combined or separated based on how the arrangement and the related performance criteria were negotiated. The conclusion to combine a group of contracts or separate a contract could change the amount of revenue and gross profit recorded in a given period.

A performance obligation is a promise in a contract to transfer a distinct good or service to the customer. A contract's transaction price is allocated to each distinct performance obligation and recognized as revenue when the performance obligation is satisfied. The Company's contracts with customers generally do not include a right of return relative to delivered products. In certain cases, contracts are modified to account for changes in the contract specifications or requirements. In most instances, contract modifications are accounted for as part of the existing contract. Certain contracts with customers have options for the customer to acquire additional goods or services. In most cases, the pricing of these options are reflective of the standalone selling price of the good or service. These options do not provide the customer with a material right and are accounted for only when the customer exercises the option to purchase the additional goods or services. If the option on the customer contract was not indicative of the standalone selling price of the good or service, the material right would be accounted for as a separate performance obligation.

The Company's revenues are derived from the design and sales of components for spacecraft and satellites and the performance of engineering, modeling and simulation services related to spacecraft design and mission execution. Each promised good or service within a contract is accounted for separately under the guidance of ASC 606, if they are distinct. Promised goods or services not meeting the criteria for being a distinct performance obligation are bundled into a single performance obligation with other goods or services that together meet the criteria for being distinct. The appropriate allocation of the transaction price and recognition of revenue is then applied for the bundled performance obligation. The Company has concluded that its service contracts generally contain a single performance obligation given the interrelated nature of the activities which are significantly customized and not distinct within the context of the contract.

Once the Company identifies the performance obligations, the Company determines the transaction price, which includes estimating the amount of variable consideration to be included in the transaction price, if any. The Company's contracts generally do not contain penalties, credits, price concessions, or other types of potential variable consideration. Prices are fixed at contract inception and are not contingent on performance or any other criteria.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The Company engages in long-term contracts for production and service activities and recognizes revenue for performance obligations over time. These long-term contracts involve the design, development, manufacture, or modification of components for spacecraft and satellites. Revenue is recognized over time (versus point in time recognition), as the Company's performance creates an asset with no alternative use to the Company and the Company has an enforceable right to payment for performance completed to date, and the customer receives the benefit as the Company builds the asset. The Company considers the nature of these contracts and the types of products and services provided when determining the proper accounting for a particular contract. These contracts include both fixed-price and cost reimbursable contracts. The Company's cost reimbursable contracts typically include cost-plus fixed fee and time and material ("T&M") contracts.

For long-term contracts, the Company typically recognizes revenue using the input method, using a cost-to-cost measure of progress. The Company believes that this method represents the most faithful depiction of the Company's performance because it directly measures value transferred to the customer. Contract estimates are based on various assumptions to project the outcome of future events that may span several years. These assumptions include, but are not limited to, the amount of time to complete the contract, including the assessment of the nature and complexity of the work to be performed; the cost and availability of materials; the availability of subcontractor services and materials; and the availability and timing of funding from the customer. The Company bears the risk of changes in estimates to complete on a fixed-price contract, which may cause profit levels to vary from period to period. For cost reimbursable contracts, the Company is reimbursed periodically for allowable costs and is paid a portion of the fee based on contract progress. In the limited instances where the Company enters into T&M contracts, revenue recognized reflects the number of direct labor hours expended in the performance of a contract multiplied by the contract billing rate, as well as reimbursement of other direct billable costs. For T&M contracts, the Company recognizes revenue in the amount for which the Company has a right to invoice the customer based on the control transferred to the customer. For over time contracts, the Company recognizes anticipated contract losses as soon as they become known and estimable.

Accounting for long-term contracts requires significant judgment relative to estimating total contract revenues and costs, in particular, assumptions relative to the amount of time to complete the contract, including the assessment of the nature and complexity of the work to be performed. The Company's estimates are based upon the professional knowledge and experience of its engineers, program managers and other personnel, who review each long-term contract monthly to assess the contract's schedule, performance, technical matters and estimated cost at completion. Changes in estimates are applied retrospectively and when adjustments in estimated contract costs are identified, such revisions may result in current period adjustments to earnings applicable to performance in prior periods.

On long-term contracts, the portion of the payments retained by the customer is not considered a significant financing component. At contract inception, the Company also expects that the lag period between the transfer of a promised good or service to a customer and when the customer pays for that good or service will not constitute a significant financing component. Many of the Company's long-term contracts have milestone payments, which align the payment schedule with the progress towards completion on the performance obligation. On some contracts, the Company may be entitled to receive an advance payment, which is not considered a significant financing component because it is used to facilitate inventory demands at the onset of a contract and to safeguard the Company from the failure of the other party to abide by some or all of their obligations under the contract.

*Contract Balances*

Contract balances result from the timing of revenue recognized, billings and cash collections, and the generation of contract assets and liabilities.

Contract assets represent revenue recognized in excess of amounts invoiced to the customer and the right to payment is not subject to the passage of time. Contract liabilities are presented as deferred revenue on the Company's consolidated balance sheets and consist of deferred product revenue, billings in excess of revenues, deferred service revenue, and customer advances. Deferred product revenue represents amounts that have been invoiced to customers but are not yet recognizable as revenue because the Company has not satisfied its performance obligations under the contract. Billings in excess of revenues represent milestone billing contracts where the billings of the contract exceed recognized revenues.

*Remaining Performance Obligations*

The Company includes in its computation of remaining performance obligations customer orders for which it has accepted signed sales orders. The definition of remaining performance obligations excludes those contracts accounted for under the "right to invoice" practical expedient.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

***Cash and Cash Equivalents***

Cash and cash equivalents includes cash on hand, cash balances with banks and similar institutions and all highly liquid investments with an original maturity of three months or less.

***Fair Value of Financial Instruments***

The Company measures certain financial assets and liabilities, including, but not limited to, contingent consideration, at fair value. ASC 820 *Fair Value Measurement and Disclosures* ("ASC 820"), specifies a hierarchy of valuation techniques based on whether the inputs to those valuation techniques are observable or unobservable. Observable inputs reflect market data obtained from independent sources, while unobservable inputs reflect the Company's market assumptions. These two types of inputs have created the following fair-value hierarchy:

| | |
|---|---|
| **Level 1:** | Quoted prices for identical instruments in active markets; |
| **Level 2:** | Quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active, and model-derived valuations in which all significant inputs and significant value drivers are observable in active markets; and |
| **Level 3:** | Valuations derived from valuation techniques in which one or more significant inputs or significant value drivers are unobservable. |

***Concentration of Credit Risk***

Financial instruments which potentially subject the Company to concentrations of credit risk consist primarily of cash and cash equivalents, certificates of deposit, and accounts receivable. The Company places its cash and cash equivalents with financial institutions of high-credit quality. At times, such amounts may exceed federally insured limits. Cash and cash equivalents on deposit or invested with financial and lending institutions was $20.5 million and $22.1 million, as of December 31, 2021 and December 31, 2020, respectively.

The Company provides credit to customers in the normal course of business. The carrying amount of current accounts receivable is stated at cost, net of an allowance for doubtful accounts. The Company performs ongoing credit evaluations of its customers' financial condition and limits the amount of credit extended when deemed necessary. The Company maintains an allowance for doubtful accounts to provide for the estimated amount of accounts receivable that will not be fully collected. The allowance is based on the assessment of the following factors: customer creditworthiness, historical payment experience, age of outstanding accounts receivable and any applicable collateral.

***Inventory***

Inventory is stated at the lower of cost or net realizable value. Cost is calculated on a first-in, first-out ("FIFO") basis. Inventory may consist of raw materials, work-in-process, and finished goods. Net realizable value is the estimated selling price in the ordinary course of business, less the estimated costs of completion and selling expense. Inventory is impaired when it is probable that inventory values exceed their net realizable value. Changes in these estimates are included in cost of sales in the consolidated statements of operations and comprehensive income (loss).

***Segment Information***

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker ("CODM") in deciding how to allocate resources and in assessing performance. The Company's CODM is its Chief Executive Officer. The Company has concluded that it operates in one operating segment and one reportable segment, space infrastructure, as the CODM reviews financial information presented on a consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance.

***Goodwill and Intangible Assets***

Goodwill is the amount by which the purchase price exceeded the fair value of the net identifiable assets acquired and liabilities assumed in a business combination on the date of acquisition (refer to Note H). Goodwill is assessed for impairment at least annually as of October 1, on a reporting unit basis, or when events and circumstances occur indicating that the recorded goodwill may be impaired. The Company assesses impairment first on a qualitative basis to determine if a quantitative assessment is necessary. In

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

circumstances where our qualitative analysis indicates that it is more likely than not that the fair value of a reporting unit does not exceed its carrying value, the Company would perform a quantitative analysis and the goodwill impairment loss, if any, is measured as the amount by which a reporting unit's carrying amount exceeds its fair value, not to exceed the carrying amount of goodwill.

Intangible assets include those acquired from the Company's various business combinations (refer to Note C) as well as licensed software for internal-use. Licensed software is acquired solely to meet the Company's internal needs which provides the right to take possession of the software and is hosted on the Company's specific hardware components as well as the capitalization of qualifying costs during the application development stage. Indefinite-lived intangible assets include tradenames and in-process research and development ("IPR&D"), Finite-lived intangible assets include customer relationships, technology trademarks, and internal-use software. Finite-lived intangible assets are reported at cost, net of accumulated amortization, and are either amortized on a straight-line basis over their estimated useful lives or over the period the economic benefits of the intangible assets are consumed.

All indefinite-lived assets are reviewed for impairment annually, and as necessary if indicators of impairment are present.

*Property, Plant and Equipment*

Property, plant and equipment are the long-lived, physical assets of the Company, acquired for use in the Company's normal business operations and not intended for resale by the Company. These assets are recorded at cost. Renewals and betterments that increase the useful lives of the assets are capitalized. Repair and maintenance expenditures that increase the efficiency of the assets are expensed as incurred. Assets under capital lease are recorded at the present value of the minimum lease payments required during the lease period. Depreciation is based on the estimated useful lives of the assets using the straight-line method and is included in selling, general and administrative or cost of sales based upon the asset; depreciation and amortization expense includes the amortization of assets under capital leases.

Expected useful lives are reviewed at least annually. Estimated useful lives are as follows:

| Property, plant and equipment | Estimated useful life in years |
|---|---|
| Computer equipment | 3 |
| Furniture and fixtures | 7 |
| Laboratory equipment | 3-10 |
| Software | 3-5 |
| Leasehold improvements | 5 or lease term |

As assets are retired or sold, the related cost and accumulated depreciation are removed from the accounts and any resulting gain or loss is included in other (income) expense, net in the consolidated statements of operations and comprehensive income (loss).

*Finite-Lived Assets*

The Company regularly evaluates its property, plant and equipment and finite-lived intangible assets for impairment when events or changes in circumstances indicate that the carrying amount of an asset or asset group may not be recoverable, in accordance with ASC 360, *Property, Plant, and Equipment* ("ASC 360") and *ASC 350, Intangibles—Goodwill and Other* ("ASC 350"). If the Company determines that the carrying amount of an asset or asset group is not recoverable based upon the undiscounted expected future cash flows of the asset or asset group, the Company records an impairment loss equal to the excess of carrying amount over the estimated fair value of the asset or asset group.

*Income Taxes*

The Company accounts for income taxes under ASC 740, *Income Taxes* ("ASC 740"). The Company computes its provision for income taxes using the asset and liability method, under which deferred tax assets and liabilities are calculated based on the basis difference for financial reporting and tax basis of assets and liabilities using enacted tax rates for the year in which the differences are expected to reverse. All deferred income taxes are classified as non-current in the Company's consolidated balance sheets. The Company records a valuation allowance against net deferred tax assets if, based upon the available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The Company recognizes a tax benefit only if it is more likely than not the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such positions are then measured based on the largest benefit that has a greater than 50% likelihood of being realized upon settlement. The Company recognizes interest and penalties accrued on any unrecognized tax benefits as a component of income tax expense.

### *Research and Development Costs*

Research and development costs are primarily made up of labor charges, prototype material, and development expenses. Research and development costs are expensed in the period incurred.

### *Advertising Costs*

All advertising, promotional and marketing costs are expensed when incurred and are included in Selling, general and administrative within the consolidated statements of operations and comprehensive income (loss). The table below presents the advertising cost for the following periods:

| | Successor | | Predecessor |
| --- | --- | --- | --- |
| | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
| Advertising costs | $ 1,156 | $ 147 | $ 86 |

### *Equity-based Compensation*

The Company's equity-based compensation plans are classified as equity plans and compensation expense is generally recognized over the vesting period of stock awards. The Company issues stock awards in the form of incentive units, non-qualified stock options and restricted stock units. The fair value of incentive units and stock options are calculated on the grant date using the Black-Scholes Option Pricing Model ("OPM"). Given the absence of adequate historical data, the Company uses the Simplified Method to estimate the term of stock options granted to employees. The fair value of the restricted stock units are calculated based on the closing market price of the Company's common stock on the grant date.

The vesting of the incentive units is contingent on service-based, performance-based, and market conditions and, as such, the recognition of compensation expense is deferred until it is probable the performance conditions will be satisfied. Once it is probable that the performance conditions will be satisfied, unrecognized compensation expense is recognized based on the portion of the requisite service period that has been rendered. If the requisite period is complete, compensation expense is recognized regardless of market conditions being met and recognizes forfeitures as they occur.

For non-qualified stock options and restricted stock units, the Company recognizes the grant date fair value as compensation expense on a straight-line method over the vesting period (typically three years) and recognizes forfeitures as they occur.

### *Warrants*

As part of the Merger, public warrants were established as equity and private warrants were established as a liability. Classification of the public warrants as equity instruments and the private warrants as liability instruments is based on management's analysis of the guidance in ASC 815 *Derivatives and Hedging* and in a statement issued by the Staff of the SEC regarding the accounting and reporting considerations for warrants issued by special purpose acquisition companies entitled "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies." Management determined that while the public warrants meet the definition of a derivative, they meet the equity scope exception in ASC 815-10-15-74(a) to be classified in stockholders' equity and are not subject to remeasurement provided that the Company continues to meet the criteria for equity classification. Management considered whether the private warrants display the three characteristics of a derivative under ASC 815, and concluded that the private warrants meet the definition of a derivative. However, the private warrants fail to meet the equity scope exception in ASC 815-10-15-74(a) and thus are classified as a liability measured at fair value, subject to remeasurement at each reporting period. The Company measured the private warrant liability at fair value at the closing of the Merger and then at each reporting period with changes in fair value recognized as other (income) expense, net in the consolidated statements of operations and comprehensive income (loss).

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

*Foreign Currency Translation*

The Company's consolidated financial statements are presented in United States dollars ("USD"), which is the functional currency of the Company. The local currency of our operations in Luxembourg, the euro, is considered to be the functional currency of that operation. Assets and liabilities of the Company's foreign subsidiaries, where the functional currency is the local currency, are translated into USD at exchange rates effective as of the balance sheet date. Revenues and expenses are translated using average exchange rates in effect for the periods presented.

Balance sheet translation adjustments are reported in accumulated other comprehensive income (loss). Realized gains and losses on foreign currency transactions are included in other (income) expense, net on the consolidated statements of operations and comprehensive income (loss).

*Emerging Growth Company*

Section 102(b)(1) of the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act") exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that an emerging growth company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard.

This may make comparison of the Company's financial statements with another public company that is neither an emerging growth company nor an emerging growth company that has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

*Recently Issued Accounting Pronouncements*

In February 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2016-02, *Leases (Topic 842)*, which supersedes the current lease requirements in ASC 840, Leases. ASU 2016-02 requires lessees to recognize a right-of-use asset and related lease liability for all leases, with a limited exception for short-term leases. Leases will be classified as either finance or operating, with the classification affecting the pattern of expense recognition in the consolidated statements of operations and comprehensive income (loss). Currently, leases are classified as either capital or operating, with any capital leases recognized on the consolidated balance sheets. The reporting of lease-related expenses in the consolidated statements of operations and comprehensive income (loss) and consolidated statements of cash flows will be generally consistent with the current guidance.

Effective January 1, 2022, the Company adopted the new lease standard using a modified retrospective transition method with a cumulative effect adjustment in the period of adoption. In accordance with ASC 842, the Company elected the following package of practical expedients: (i) to use hindsight analysis on expired or existing leases as of the effective date; (ii) to not apply this standard to short-term leases (i.e. with a term less than 12 months); and (iii) to not reassess the lease classification for existing or expired contracts. The Company currently estimates that the adoption of this standard will result in the recognition of right of use assets and lease liabilities ranging from approximately $8.0 million to $11.0 million. Adoption of this standard is not expected to have a material impact on the Company's results of operations or cash flows.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments–Credit Losses (Topic 326)*, an amendment of the FASB ASC. Subsequent to the issuance of ASU 2016-13, there were various updates that amended and clarified the impact of ASU 2016-13. ASU 2016-13 broadens the information that an entity must consider in developing its expected credit loss estimate for assets measured either collectively or individually. The amendments in ASU 2016-13 will require an entity to record an allowance for credit losses for certain financial instruments and financial assets, including accounts receivable, based on expected losses rather than incurred losses. The measurement of expected credit losses is based on relevant information about past events, including historical experience, current conditions, and reasonable and supportable forecasts that affect the collectability of the reported amount. An entity must use judgment in determining the relevant information and estimation methods that are appropriate in its circumstances. The use of forecasted information incorporates more timely information in the estimate of expected credit losses. The new guidance will be effective for the year beginning January 1, 2023. The Company does not expect this guidance to have a material impact on its consolidated financial statements or related disclosures.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

In October 2021, the FASB issued ASU No. 2021-08, "Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers." ASU 2021-08 requires the company acquiring contract assets and contract liabilities obtained in a business combination to recognize and measure them in accordance with ASC 606, "Revenue from Contracts with Customers". Prior to adoption, such amounts were recognized by the acquiring company at fair value on the acquisition date. The amendments in ASU 2021-08 are effective for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. Early adoption is permitted, including in interim periods, for any financial statements that have not yet been issued. Effective January 1, 2021, the Company elected to early adopt these requirements prospectively which did not have a material impact for business combinations completed in the Successor 2021 Period.

**Note C – Business Combinations**

*Adcole Acquisition*

On March 2, 2020, the Successor acquired 100% of the equity interest of Adcole in exchange for cash. The acquisition supports the Company's growth in its offering of space structures.

The following table summarizes the fair value of the consideration transferred and the estimated fair values of the major classes of assets acquired and liabilities assumed as of the acquisition date.

| | | March 2, 2020 |
|---|---|---|
| Cash paid | $ | 32,640 |
| Purchase consideration | $ | 32,640 |
| Assets: | | |
| Cash | $ | 156 |
| Accounts receivable | | 840 |
| Contract assets | | 1,427 |
| Inventory | | 212 |
| Prepaid expenses and other current assets | | 661 |
| Property, plant and equipment | | 444 |
| Intangible assets | | 9,690 |
| Total assets | | 13,430 |
| Liabilities: | | |
| Accounts payable | | 894 |
| Accrued expenses | | 644 |
| Deferred revenue | | 777 |
| Total liabilities | | 2,315 |
| Fair value of net identifiable assets acquired | | 11,115 |
| Goodwill | $ | 21,525 |

The following table summarizes the intangible assets acquired by class:

| | | March 2, 2020 | Weighted average useful life in years |
|---|---|---|---|
| Trademark | $ | 1,000 | 10 |
| Technology | | 2,400 | 10 |
| Customer relationships | | 6,100 | 20 |
| In-process research and development | | 190 | |
| Total intangible assets | $ | 9,690 | |

The fair value of the acquired trademark and technology was estimated using the relief from royalty ("RFR") method. The fair value of the acquired customer relationships was estimated using the excess earnings method. The fair value of the IPR&D was estimated using the replacement cost method.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The acquisition was accounted for as a business combination, whereby the excess of the consideration paid over the fair value of identifiable net assets was allocated to goodwill. The goodwill reflects the potential synergies and expansion of the Company's offerings across product lines and markets complementary to its existing products and markets. For tax purposes, the goodwill is deductible over 15 years.

The results of operations of Adcole for the period from March 2, 2020 to December 31, 2020 have been included in the results of operations for the Successor 2020 Period. The table below presents the post-acquisition revenues, net income (loss), and acquisition-related costs (included in transaction expenses) of Adcole included in the consolidated statements of operations and comprehensive income (loss) for the following period:

|  | Successor Period Ended December 31, 2020 |
|---|---|
| Post-acquisition revenues | $ 8,096 |
| Net income (loss) | $ (1,878) |
| Transaction expenses | $ 2,055 |

*DSS Acquisition*

On June 1, 2020, the Successor acquired 100% of the equity interest of DSS in exchange for cash and 1,000,000 units of the Successor's Holdings' equity ("Parent Units"). The acquisition supported the Company's growth in its offering of engineering solutions.

The following table summarizes the fair value of the consideration transferred and the estimated fair values of the major classes of assets acquired and liabilities assumed as of the acquisition date.

|  | June 1, 2020 |
|---|---|
| Cash paid | $ 3,940 |
| Equity issued | 1,000 |
| Purchase consideration | $ 4,940 |
| Assets: |  |
| Cash | $ 1,071 |
| Accounts receivable | 1,282 |
| Contract assets | 107 |
| Inventory | 39 |
| Prepaid expenses and other current assets | 37 |
| Property, plant and equipment | 710 |
| Intangible assets | 850 |
| Other non-current assets | 26 |
| Total assets | 4,122 |
| Liabilities: |  |
| Accounts payable | 284 |
| Deferred revenue | 103 |
| Current portion of long-term debt | 353 |
| Other current liabilities | 1,178 |
| Long-term debt | 705 |
| Deferred tax liabilities | 458 |
| Total liabilities | 3,081 |
| Fair value of net identifiable assets acquired | 1,041 |
| Goodwill | $ 3,899 |

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The following table summarizes the intangible assets acquired by class:

| | June 1, 2020 | Weighted average useful life in years |
|---|---|---|
| Trademark | $ 150 | 5 |
| Customer relationships | 700 | 20 |
| Total intangible assets | $ 850 | |

The fair value of the acquired trademark was determined using the RFR method. The fair value of the acquired customer relationships was determined using the excess earnings method.

The acquisition was accounted for as a business combination, whereby the excess of the purchase consideration over the fair value of identifiable net assets was allocated to goodwill. The goodwill reflects the potential synergies and expansion of the Company's offerings across product lines and markets complementary to its existing products and markets. For tax purposes, the goodwill is not deductible.

During the Successor 2021 Period, there was a measurement period adjustment to goodwill of $0.1 million, decreasing the balance to $3.9 million. Refer to Note H for further discussion.

The results of operations of DSS for the period from June 1, 2020 to December 31, 2020 have been included in the results of operations for the Successor 2020 Period.The table below presents the post-acquisition revenues, net loss, and acquisition-related costs (included in transaction expenses) of DSS included in the consolidated statements of operations and comprehensive income (loss) for the following period:

| | Successor Period Ended December 31, 2020 |
|---|---|
| Post-acquisition revenues | $ 5,381 |
| Net income (loss) | $ (1,707) |
| Transaction expenses | $ 434 |

### MIS Acquisition

On June 22, 2020, the Successor acquired 100% of the equity interest of MIS in exchange for cash and 2,615,726 Parent Units. The acquisition supports the Company's growth in its offering of space structures.

The purchase agreement with the sellers of MIS awarded such sellers with a contingent right to an earnout payment from the Company upon the achievement of certain revenue milestones over the year ended December 31, 2020. The earnout amount would be computed as $1.50 for every $1.00 of MIS Revenue (as defined in the purchase agreement), in excess of $40.0 million for the year ended December 31, 2020, and the contingent earnout would not exceed $15.0 million or be less than $0.

The fair value of the earnout is arrived at using the Black-Scholes option pricing model ("OPM") using the following assumptions:

| MIS Black-Scholes OPM Assumptions | |
|---|---|
| Risk-free interest rate | 0.05 % |
| Revenue volatility | 51.7 % |

Including the equity component, the total fair value of the contingent earnout payment of $11.5 million was settled as of December 31, 2021 for $2.2 million in cash and $9.3 million in equity of Holdings of which $10.9 million was reflected in contingent earnout expense on the consolidated statements of operations and comprehensive income (loss) for the Successor 2021 Period as the adjustment in fair value occurred subsequent to the MIS measurement period.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The following table summarizes the fair value of the consideration transferred and the estimated fair values of the major classes of assets acquired and liabilities assumed as of the acquisition date.

|  | June 22, 2020 |
|---|---|
| Cash paid | $ 42,177 |
| Equity issued | 2,616 |
| Contingent consideration | 600 |
| Purchase consideration | $ 45,393 |
| Assets: | |
| Cash | $ 13,559 |
| Accounts receivable | 1,097 |
| Contract assets | 665 |
| Property, plant and equipment | 451 |
| Intangible assets | 35,000 |
| Other non-current assets | 676 |
| Total assets | 51,448 |
| Liabilities: | |
| Accounts payable | 3,689 |
| Deferred revenue | 7,128 |
| Other current liabilities | 2,749 |
| Deferred tax liabilities | 7,297 |
| Total liabilities | 20,863 |
| Fair value of net identifiable assets acquired | 30,585 |
| Goodwill | $ 14,808 |

The following table summarizes the intangible assets acquired by class:

|  | June 22, 2020 | Weighted average useful life in years |
|---|---|---|
| Trademarks | $ 3,400 | 6 |
| Technology | 16,000 | 10 |
| Customer relationships | 15,600 | 20 |
| Total intangible assets | $ 35,000 | |

The fair value of the acquired trademark and technology was estimated using the RFR method. The fair value of the acquired customer relationships was estimated using the excess earnings method.

The acquisition was accounted for as a business combination, whereby the excess of the purchase consideration over the fair value of identifiable net assets was allocated to goodwill. The goodwill reflects the potential synergies and expansion of the Company's offerings across product lines and markets complementary to its existing products and markets. For tax purposes, the goodwill is not deductible.

During the Successor 2021 Period, there was a measurement period adjustment to goodwill of $0.5 million, decreasing the balance to $14.8 million. Refer to Note H for further discussion.

Table of Contents

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The results of operations of MIS for the period from June 22, 2020 to December 31, 2020 have been included in the results of operations for the Successor 2020 Period. The table below presents the post-acquisition revenues, net loss, and acquisition-related costs (included in transaction expenses) of MIS included in the consolidated statements of operations and comprehensive income (loss) for the following period:

|  | Successor Period Ended |
|---|---|
|  | December 31, 2020 |
| Post-acquisition revenues | $ 22,061 |
| Net income (loss) | $ (1,186) |
| Transaction expenses | $ 4,132 |

### Roccor Acquisition

On October 28, 2020, the Successor acquired 100% of the equity interest of Roccor in exchange for cash and 1,564,531 Parent Units. The acquisition supports the Company's growth in its offering of space structures.

The purchase agreement with the sellers of Roccor awarded such sellers with a contingent right to an earnout payment from the Company upon the achievement of certain revenue milestones for the year ended December 31, 2021. The earnout amount would be based on one of the following: (i) $0 if Roccor revenue for the year ended December 31, 2021 is less than $30.0 million, (ii) $1.0 million if Roccor revenue for the year ended December 31, 2021 is equal to or greater than $30.0 million but less than $40.0 million, (iii) $2.0 million if Roccor revenue for the year ended December 31, 2021 is equal to or greater than $40.0 million. The fair value of the Roccor contingent earnout was estimated using the Black-Scholes OPM; the fair value of the Roccor contingent earnout was $0.6 million as of the acquisition date.

The assumptions used in the Black-Scholes OPM were as follows:

| Roccor Black-Scholes OPM Assumptions | |
|---|---|
| Risk-free interest rate | 0.1 % |
| Revenue discount rate | 7.0 % |
| Revenue volatility | 30.0 % |
| Earnout payment discount rate | 4.0 % |

During the Successor 2021 Period, the revenue based earnout described above and accrued to date of $0.5 million was recorded in contingent earnout expense on the consolidated statements of operations and comprehensive income (loss). As the Roccor revenue for the year ended December 31, 2021 is equal to or greater than $30.0 million but less than $40.0 million, the earnout to be paid to the sellers of Roccor is $1.0 million, which was fully accrued as of December 31, 2021 and reported as Notes payable to sellers on the consolidated balance sheets.

The purchase agreement also stipulated that certain funds in the amount of $0.5 million were to be held in escrow (the "PBR Escrow"), subject to a variance (the "PBR Variance"), for the benefit of the sellers. The PBR Variance was defined as the excess revenue recorded by Roccor for the year ended December 31, 2020, based on the difference between Roccor's forecasted revenues and Roccor's actual revenues for the eight months ended August 31, 2020. Upon determination of the PBR Variance, an amount equal to (i) the PBR Escrow less (ii) the PBR Variance will be disbursed to the sellers of Roccor; any remaining PBR Escrow funds will be disbursed to the Company. Since the transfer of the PBR Escrow funds is contingent upon the PBR Variance, the Company's obligation to deliver the PBR Escrow funds net of PBR Variance was determined to be a contingent consideration. The fair value of the PBR Variance was determined to be $0.4 million as of the acquisition date, therefore contingent consideration related to PBR Escrow was determined to be $0.1 million. PBR Escrow amount of $0.1 million was paid to sellers of Roccor in March 2021.

The following table summarizes the fair value of the consideration transferred and the estimated fair values of the major classes of assets acquired and liabilities assumed as of the acquisition date.

|  | October 28, 2020 |
|---|---|
| Cash paid | $ 14,999 |
| Equity issued | 1,565 |

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

| | October 28, 2020 |
|---|---|
| Contingent consideration | 657 |
| Purchase consideration | $ 17,221 |
| Assets: | |
|     Cash | $ 6,161 |
|     Accounts receivable | 517 |
|     Contract assets | 1,797 |
|     Property, plant and equipment | 1,128 |
|     Intangible assets | 13,400 |
|     Other non-current assets | 361 |
| Total assets | 23,364 |
| Liabilities: | |
|     Accounts payable | 1,880 |
|     Deferred revenue | 3,240 |
|     Other current liabilities | 5,112 |
|     Deferred tax liabilities | 1,952 |
| Total liabilities | 12,184 |
| Fair value of net identifiable assets acquired | 11,180 |
| Goodwill | $ 6,041 |

The following table summarizes the intangible assets acquired by class:

| | October 28, 2020 | Weighted average useful life in years |
|---|---|---|
| Trademarks | $ 1,200 | 10 |
| Technology | 6,500 | 15 |
| Customer relationships | 5,700 | 20 |
| Total intangible assets | $ 13,400 | |

The fair value of the acquired trademark and technology was estimated using the RFR method. The fair value of the acquired customer relationships was estimated using the excess earnings method.

The acquisition was accounted for as a business combination, whereby the purchase consideration over the fair value of identifiable net assets was allocated to goodwill. The goodwill reflects the potential synergies and expansion of the Company's offerings across product lines and markets complementary to its existing products and markets. For tax purposes, the goodwill is not deductible.

During the Successor 2021 Period, there was a measurement period adjustment to goodwill of $0.7 million, decreasing the balance to $6.0 million. Refer to Note H for further discussion.

The results of operations of Roccor for the period from October 28, 2020 to December 31, 2020 have been included in the results of operations for the Successor 2020 Period. The table below presents the post-acquisition revenues, net loss, and acquisition-related costs (included in transaction expenses) of Roccor included in the consolidated statements of operations and comprehensive income (loss) for the following period:

| | Successor Period Ended December 31, 2020 |
|---|---|
| Post-acquisition revenues | $ 5,003 |
| Net income (loss) | $ 338 |
| Transaction expenses | $ 1,838 |

Page 80

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

*LoadPath Acquisition*

On December 11, 2020, the Successor acquired 100% of the equity interest of LoadPath in exchange for cash and 800,000 Parent Units. The acquisition supports the Company's growth in its offering of engineering solutions.

The following table summarizes the fair value of the consideration transferred and the estimated fair values of the major classes of assets acquired and liabilities assumed as of the acquisition date.

|  | December 11, 2020 |
|---|---|
| Cash paid | $ 7,598 |
| Equity issued | 800 |
| Purchase consideration | $ 8,398 |
| Assets |  |
| Cash | $ 995 |
| Accounts receivable | 1,208 |
| Contract assets | 187 |
| Prepaid expenses and other current assets | 2 |
| Property, plant and equipment | 42 |
| Intangible assets | 4,230 |
| Total assets | 6,664 |
| Liabilities |  |
| Accounts payable | 334 |
| Deferred revenue | 115 |
| Other current liabilities | 1,203 |
| Total liabilities | 1,652 |
| Fair value of net identifiable assets acquired | 5,012 |
| Goodwill | $ 3,386 |

The following table summarizes the intangible assets acquired by class:

|  | December 11, 2020 | Weighted average useful life in years |
|---|---|---|
| Trademarks | $ 560 | 10 |
| Technology | 370 | 10 |
| Customer relationships | 3,300 | 15 |
| Total intangible assets | $ 4,230 |  |

The fair value of the acquired trademark and technology was estimated using the RFR method. The fair value of the acquired customer relationships was estimated using the excess earnings method.

The acquisition was accounted for as a business combination, whereby the excess of purchase consideration over the fair value of identifiable net assets was allocated to goodwill. The goodwill reflects the potential synergies and expansion of the Company's offerings across product lines and markets complementary to its existing products and markets. For tax purposes, the goodwill is deductible.

During the Successor 2021 Period, there was a measurement period adjustment to goodwill of $1.4 million, decreasing the balance to $3.4 million. Refer to Note H for further discussion.

The results of operations of LoadPath for the period from December 11, 2020 to December 31, 2020 have been included in the results of operations for the Successor 2020 Period. The table below presents the post-acquisition revenues, net loss, and acquisition-related costs (included in transaction expenses) of LoadPath included in the consolidated statements of operations and comprehensive income (loss) for the following period:

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

| | Successor Period Ended December 31, 2020 |
|---|---|
| Post-acquisition revenues | $ 245 |
| Net income (loss) | $ (32) |
| Transaction expenses | $ 1,485 |

***Oakman Acquisition***

On January 15, 2021, the Successor acquired 100% of the equity interest of Oakman for cash and 1,000,000 Parent Units. The acquisition supports the Company's growth in its offering of engineering solutions.

The following table summarizes the fair value of the consideration transferred and the estimated fair values of the major classes of assets acquired and liabilities assumed as of the acquisition date.

| | January 15, 2021 |
|---|---|
| Cash paid | $ 12,142 |
| Equity issued | 2,110 |
| Purchase consideration | $ 14,252 |
| Assets: | |
| Accounts receivable | $ 1,279 |
| Contract assets | 121 |
| Inventory | 40 |
| Prepaid expenses and other current assets | 50 |
| Property, plant and equipment | 493 |
| Intangible assets | 7,980 |
| Total assets | 9,963 |
| Liabilities: | |
| Accounts payable | $ 46 |
| Accrued expenses | 2,022 |
| Deferred revenue | 253 |
| Other current liabilities | 45 |
| Deferred tax liabilities | 2,128 |
| Total liabilities | 4,494 |
| Fair value of net identifiable assets acquired | 5,469 |
| Goodwill | $ 8,783 |

The following table summarizes the intangible assets acquired by class:

| | January 15, 2021 | Weighted average useful life in years |
|---|---|---|
| Trademark | $ 80 | 1 |
| Technology | 4,400 | 15 |
| Customer relationships | 3,500 | 20 |
| Total intangible assets | $ 7,980 | |

The fair value of the acquired trademark and technology was estimated using the RFR method. The fair value of the acquired customer relationships was estimated using the excess earnings method.

The acquisition was accounted for as a business combination, whereby the excess of the consideration paid over the fair value of

Page 82

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

identifiable net assets was allocated to goodwill. The goodwill reflects the potential synergies and expansion of the Company's offerings across product lines and markets complementary to its existing products and markets. For tax purposes, the goodwill is not deductible.

During the Successor 2021 Period, there was a measurement period adjustment to goodwill of $1.9 million, increasing the balance to $8.8 million. Refer to Note H for further discussion.

The results of operations of Oakman for the period from January 15, 2021 to December 31, 2021 have been included in the results of operations for the Successor 2021 Period. The table below presents the post-acquisition revenues, net income (loss), and acquisition-related costs (included in transaction expenses) of Oakman included in the consolidated statements of operations and comprehensive income (loss) for the following period:

|  | Successor Period Ended December 31, 2021 |
|---|---|
| Post-acquisition revenues | $ 4,531 |
| Net income (loss) | $ (1,762) |
| Transaction expenses | $ 657 |

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

*DPSS Acquisition*

On February 17, 2021, the Successor acquired 100% of the equity interest of DPSS in exchange for cash. The acquisition supports the Company's growth in its offering of deployable technology.

The following table summarizes the fair value of the consideration transferred and the estimated fair values of the major classes of assets acquired and liabilities assumed as of the acquisition date.

|  | February 17, 2021 |
|---|---|
| Cash paid | $ 27,305 |
| Purchase consideration | $ 27,305 |
| Assets: |  |
| Cash | $ 711 |
| Accounts receivable | 1,270 |
| Contract assets | 1,534 |
| Inventory | 3 |
| Prepaid expenses and other current assets | 53 |
| Property, plant and equipment | 734 |
| Intangible assets | 24,370 |
| Other non-current assets | 48 |
| Total assets | 28,723 |
| Liabilities: |  |
| Accounts payable | 1,186 |
| Accrued expenses | 1,282 |
| Deferred revenue | 4,003 |
| Other current liabilities | 63 |
| Deferred tax liabilities | 6,138 |
| Total liabilities | 12,672 |
| Fair value of net identifiable assets acquired | 16,051 |
| Goodwill | $ 11,254 |

The following table summarizes the intangible assets acquired by class:

|  | February 17, 2021 | Weighted average useful life in years |
|---|---|---|
| Trademark | $ 170 | 1 |
| Technology | 11,900 | 20 |
| Customer relationships | 12,300 | 20 |
| Total intangible assets | $ 24,370 |  |

The fair value of the acquired trademark was determined using the RFR method. The fair value of the acquired customer relationships was determined using the excess earnings method.

The acquisition was accounted for as a business combination, whereby the excess of the purchase consideration over the fair value of identifiable net assets was allocated to goodwill. The goodwill reflects the potential synergies and expansion of the Company's offerings across product lines and markets complementary to its existing products and markets. For tax purposes, the goodwill is not deductible.

During the Successor 2021 Period, there was a measurement period adjustment to goodwill of $0.4 million, increasing the balance to $11.3 million. Refer to Note H for further discussion.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The results of operations of DPSS for the period from February 17, 2021 to December 31, 2021 have been included in the results of operations for the Successor 2021 Period. The table below presents the post-acquisition revenues, net income (loss), and acquisition-related costs (included in transaction expenses) of DPSS included in the consolidated statements of operations and comprehensive income (loss) for the following period:

|  | Successor Period Ended |
|---|---|
|  | December 31, 2021 |
| Post-acquisition revenues | $ 26,678 |
| Net income (loss) | $ (554) |
| Transaction expenses | $ 1,605 |

*Techshot Acquisition*

On November 1, 2021, the Successor acquired 100% of the equity interest of Techshot in exchange for cash and 3,029,596 shares of common stock. The acquisition supports the Company's growth in its offering of mission solutions.

The following table summarizes the fair value of the consideration transferred and the estimated fair values of the major classes of assets acquired and liabilities assumed as of the acquisition date.

|  | November 1, 2021 |
|---|---|
| Cash paid | $ 2,228 |
| Common stock issued | 38,493 |
| Purchase consideration | $ 40,721 |
| Assets: |  |
| Cash | $ 406 |
| Accounts receivable and other receivable | 287 |
| Contract assets | 926 |
| Inventory | 120 |
| Prepaid expenses and other current assets | 86 |
| Property, plant and equipment | 14,818 |
| Intangible assets | 4,120 |
| Total assets | 20,763 |
| Liabilities: |  |
| Accounts payable | 39 |
| Accrued expenses | 293 |
| Deferred revenue | 675 |
| Other current liabilities | 35 |
| Deferred tax liabilities | 5,521 |
| Total liabilities | 6,563 |
| Fair value of net identifiable assets acquired | 14,200 |
| Goodwill | $ 26,521 |

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The following table summarizes the intangible assets acquired by class:

| | November 1, 2021 | Weighted average useful life in years |
|---|---|---|
| Trademark | $ 240 | 3 |
| Technology | 1,800 | 10 |
| Customer relationships | 1,400 | 9 |
| IPR&D | 680 | |
| Total intangible assets | $ 4,120 | |

The amounts above represent the current preliminary fair value estimates but the measurement period is still open and subject to further adjustments as additional information becomes available and as additional analyses and final allocations are completed.

The fair value of the acquired trademark, technology, and IPR&D was estimated using the relief from royalty ("RFR") method. The fair value of the acquired customer relationships was estimated using the excess earnings method.

The acquisition was accounted for as a business combination, whereby the excess of the consideration paid over the fair value of identifiable net assets was allocated to goodwill. The goodwill reflects the potential synergies and expansion of the Company's offerings across product lines and markets complementary to its existing products and markets. For tax purposes, the goodwill is not deductible.

The results of operations of Techshot for the period from November 1, 2021 to December 31, 2021 have been included in the results of operations for the Successor 2021 Period. The table below presents the post-acquisition revenues, net income (loss), and acquisition-related costs (included in transaction expenses) of Techshot included in the consolidated statements of operations and comprehensive income (loss) for the following period:

| | Successor Period Ended December 31, 2021 |
|---|---|
| Post-acquisition revenues | $ 1,563 |
| Net income (loss) | ($392) |
| Transaction expenses | $ 1,620 |

***Pro Forma Financial Data (Unaudited)***

The tables below present the pro forma combined results of operations for the business combinations for the years ended December 31, 2021 and 2020 as though the acquisitions of Adcole, DSS, MIS, Roccor, and LoadPath (the "2020 business combinations") had been completed as of January 1, 2019, and the acquisitions of Oakman, DPSS, and Techshot (the "2021 business combinations") had been completed as of January 1, 2020.

The pro forma information for the year ended December 31, 2021 includes the Successor 2021 Period and the pre-acquisition 2021 results of Oakman, DPSS, and Techshot for the year ended December 31, 2021. The pro forma information for the year ended December 31, 2020 includes the Predecessor 2020 Period, the Successor 2020 Period, and the pre-acquisition results of Adcole, DSS, Roccor, LoadPath, Oakman, DPSS, and Techshot for the year ended December 31, 2020.

| | Pro forma for Year Ended | |
|---|---|---|
| | December 31, 2021 | December 31, 2020 |
| Revenues | $ 149,295 | $ 126,999 |
| Net income (loss) | (57,766) | (7,902) |

The amounts included in the pro forma information are based on the historical results and do not necessarily represent what would have occurred if the 2021 business combinations had taken place as of January 1, 2020 and the 2020 business combinations had taken place as of January 1, 2019, nor do they represent the results that may occur in the future. Accordingly, the pro forma financial

Page 86

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

information should not be relied upon as being indicative of the results that would have been realized had the business combination occurred as of the date indicated or that may be achieved in the future.

During the Successor 2021 Period, the Company incurred $5.0 million of acquisition related costs attributable to the business combinations, included in the Successor 2021 Period transaction expenses on the consolidated statements of operations and comprehensive income (loss). These expenses are reflected in the pro forma earnings for the year ended December 31, 2020, in the table above.

**Note D – Fair Value of Financial Instruments**

Cash and cash equivalents, accounts receivable, inventories, prepaid expenses and other current assets, accounts payable, salaries and benefits payable, accrued interest, other accrued expenses and current liabilities are reflected on the consolidated balance sheets at amounts that approximate fair value because of the short-term nature of these financial assets and liabilities.

The fair value of the Company's debt approximates its carrying value and is classified as a Level 2 fair value in the fair value hierarchy as it is based on discounted cash flows using a current borrowing rate.

The private warrants were valued using a modified Black-Scholes OPM, which is considered to be a Level 3 fair value measurement. Refer to Note P for information on the Level 3 inputs used to value the private warrants.

As of December 31, 2021, contingent consideration consists of estimated future payments related to the Successor's acquisition of Roccor. As certain inputs are not observable in the market, contingent consideration payments are classified as Level 3 instruments and included in notes payable to seller on the Successor's consolidated balance sheets. Significant changes in the significant unobservable inputs used in the Black-Scholes OPM to determine the fair value of contingent consideration would result in a significantly lower or higher fair value measurement. The Company adjusts the previous fair value estimate of contingent consideration at each reporting period while considering changes in forecasted financial performance and overall change in risk based on the period of time elapsed. Refer to Note C for information on the Level 3 inputs used to value the contingent consideration.

Financial liabilities measured at fair value on a recurring basis are as follows:

| | | Successor | | | |
| | | December 31, 2021 | | | |
| | Balance Sheet Location | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| **Liabilities:** | | | | | |
| Private warrants | Warrant liabilities | $ — | $ — | $ 19,098 | $ 19,098 |
| Contingent consideration | Notes payable to sellers | — | — | 1,000 | 1,000 |
| Total | | $ — | $ — | $ 20,098 | $ 20,098 |

| | | Successor | | | |
| | | December 31, 2020 | | | |
| | Balance Sheet Location | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|
| **Liabilities:** | | | | | |
| Private warrants | Warrant liabilities | $ — | $ — | $ — | $ — |
| Contingent consideration | Notes payable to sellers | — | — | 1,257 | 1,257 |
| Total | | $ — | $ — | $ 1,257 | $ 1,257 |

Page 87

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The changes in the Level 3 fair values of private warrants and contingent consideration are as follows:

|  | Private Warrants | Contingent Consideration | Total Level 3 |
|---|---|---|---|
| ***Predecessor*** | | | |
| January 1, 2020 | $ — | $ — | $ — |
| Additions | — | — | — |
| Changes in fair value | — | — | — |
| Settlements | — | — | — |
| June 21, 2020 | $ — | $ — | $ — |
| | | | |
| ***Successor*** | | | |
| February 10, 2020 | $ — | $ — | $ — |
| Additions | — | 1,257 | 1,257 |
| Changes in fair value | — | — | — |
| Settlements | — | — | — |
| December 31, 2020 | — | 1,257 | 1,257 |
| Additions | 21,727 | 450 | 22,177 |
| Changes in fair value | (2,629) | 10,891 | 8,262 |
| Settlements | — | (11,598) | (11,598) |
| December 31, 2021 | $ 19,098 | $ 1,000 | $ 20,098 |

## Note E – Accounts Receivable, net

The accounts receivable, net balance was as follows:

|  | Successor | |
|---|---|---|
|  | December 31, 2021 | December 31, 2020 |
| **Accounts receivable, net** | | |
| Billed receivables | $ 14,820 | $ 5,352 |
| Unbilled receivables | 1,442 | 705 |
| Total accounts receivable, net | $ 16,262 | $ 6,057 |

Accounts receivable are recorded for amounts to which the Company is entitled and has invoiced to the customer. Unbilled receivables consist of unbilled amounts as of December 31, 2021 under T&M contracts where billing and payment is subject solely to the passage of time. There was no allowance for doubtful accounts as of December 31, 2021 and December 31, 2020.

## Note F – Inventory

The inventory balance was as follows:

|  | Successor | |
|---|---|---|
|  | December 31, 2021 | December 31, 2020 |
| Raw materials | $ 414 | $ 330 |
| Work in process | 117 | — |
| Finished goods | 157 | — |
| Inventory, net | $ 688 | $ 330 |

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

**Note G – Property, Plant and Equipment, net**

The property, plant and equipment, net balances were as follows:

| | Successor | |
| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Computer equipment | $ 1,380 | $ 739 |
| Furniture and fixtures | 783 | 442 |
| Laboratory equipment | 16,856 | 1,357 |
| Software | — | 359 |
| Leasehold improvements | 2,205 | 672 |
| Construction in process | 415 | — |
| Less: accumulated depreciation | (2,255) | (307) |
| Total property, plant and equipment, net | $ 19,384 | $ 3,262 |

The table below presents the depreciation expense related to property, plant and equipment for the following periods:

| | Successor | | Predecessor |
| | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
|---|---|---|---|
| Depreciation expense | $ 1,944 | $ 307 | $ 59 |

The depreciation expense for the Successor 2021 Period, included $0.1 million of accelerated depreciation due to a reduction of the estimated useful life for certain assets as a result of the early termination of the underlying lease. Refer to Note K for further information.

The Company occasionally designs and builds its own machinery. The cost of these projects, including direct material and labor, and other indirect costs attributable to the construction, are capitalized as construction in progress. No provision for depreciation is made on construction in progress until the related assets are completed and placed in service.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

**Note H – Goodwill**

The Company performed an annual qualitative assessment of impairment of goodwill as of October 1, 2021 and 2020 for each of the three reporting units, Mission Solutions, Space Components, and Engineering Services, concluding there was no impairment. The Company also concluded that there were no indicators of goodwill impairment requiring further testing during the Successor 2021 Period.

The changes in the carrying amount of goodwill were as follows:

|  | Successor |
|---|---|
| Balance of goodwill as of February 10, 2020 | $ — |
| Goodwill arising from the Adcole acquisition | 21,525 |
| Goodwill arising from the DSS acquisition | 3,984 |
| Goodwill arising from the MIS acquisition | 15,320 |
| Goodwill arising from the Roccor acquisition | 6,725 |
| Goodwill arising from the LoadPath acquisition | 4,813 |
| Change arising from impact of foreign currency | 344 |
| Balance of goodwill as of December 31, 2020 | 52,711 |
| Goodwill arising from the Oakman acquisition | 6,866 |
| Goodwill arising from the DPSS acquisition | 10,904 |
| Goodwill arising from the Techshot acquisition | 26,521 |
| Measurement period adjustment — DSS acquisition | (85) |
| Measurement period adjustment — MIS acquisition | (512) |
| Measurement period adjustment — Roccor acquisition | (684) |
| Measurement period adjustment — DPSS acquisition | 350 |
| Measurement period adjustment — Oakman acquisition | 1,917 |
| Measurement period adjustment — LoadPath acquisition | (1,427) |
| Change arising from impact of foreign currency | (247) |
| Balance of goodwill as of December 31, 2021 | $ 96,314 |

The Company's estimate of the amount payable to/receivable from the seller as of the acquisition date changed during the Successor 2021 Period resulting in measurement period adjustments for DSS, MIS, Roccor and DPSS. These changes primarily related to the settlement of net working capital adjustments.

During the Successor 2021 Period, LoadPath finalized its predecessor tax return which included an election for which assets and liabilities are recorded at fair value and no differences between book and tax basis exist at the acquisition date, resulting in a measurement period adjustment to the deferred tax liability recorded at acquisition. Based on the Company's continued refinement of estimates around the LoadPath percentage of completion calculation, during the Successor 2021 Period, the Company recorded a measurement period adjustment to reduce the deferred revenue balance with a corresponding reduction to the goodwill balance as of the acquisition date.

Also during the Successor 2021 Period, the Company continued to refine its estimates around the valuation of intangible assets from the acquisition of Oakman. Based on the fair value methodologies described in Note C, a measurement period adjustment was recognized to reduce the fair value of intangible assets with a corresponding increase in goodwill as of the acquisition date.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

### Note I – Intangible Assets, net

The intangible asset gross carrying amount and accumulated amortization were as follows:

| | Successor | | | |
| | December 31, 2021 | | | |
| | Gross carrying amount | Accumulated amortization | Net carrying amount | Weighted average useful life in years |
|---|---|---|---|---|
| Finite-lived intangible assets: | | | | |
| Customer relationships | $ 48,612 | $ (3,592) | $ 45,020 | 19 |
| Technology | 43,339 | (5,894) | 37,445 | 14 |
| Trademarks | 6,807 | (1,572) | 5,235 | 7 |
| Internal-use software licenses | 2,292 | (385) | 1,907 | 3 |
| Indefinite-lived intangible assets: | | | | |
| Cosmos Tradename | 300 | — | 300 | |
| IPR&D | 935 | — | 935 | |
| Total intangible assets | $ 102,285 | $ (11,443) | $ 90,842 | |

| | Successor | | | |
| | December 31, 2020 | | | |
| | Gross carrying amount | Accumulated amortization | Net carrying amount | Weighted average useful life in years |
|---|---|---|---|---|
| Finite-lived intangible assets: | | | | |
| Customer relationships | $ 31,541 | $ (899) | $ 30,642 | 19 |
| Technology | 25,368 | (1,508) | 23,860 | 12 |
| Trademarks | 6,344 | (393) | 5,951 | 9 |
| Indefinite-lived intangible assets: | | | | |
| Cosmos Tradename | 300 | — | 300 | |
| IPR&D | 208 | — | 208 | |
| Total intangible assets | $ 63,761 | $ (2,800) | $ 60,961 | |

The table below presents the amortization expense related to intangible assets for the following periods:

| | Successor | | Predecessor |
| | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
|---|---|---|---|
| Amortization expense | $ 8,640 | $ 2,800 | $ — |

The table below presents the future amortization expense on intangible assets as of December 31, 2021:

| Year | Total |
|---|---|
| 2022 | $ 9,443 |
| 2023 | 9,304 |
| 2024 | 8,664 |
| 2025 | 7,768 |
| 2026 | 7,221 |
| Thereafter | 47,207 |
| Total future amortization expense on intangible assets | $ 89,607 |

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

**Note J – Debt**

*Adams Street Capital Credit Agreement*

On October 28, 2020, the Company entered into a credit agreement with Adams Street Capital (the "Adams Street Credit Agreement"). The Adams Street Credit Agreement includes a $31.0 million term loan commitment, $5.0 million revolving credit facility commitment, and $15.0 million delayed draw term loan, all of which mature on October 28, 2026. On January 15, 2021, the Company drew $15.0 million on the delayed draw term loan to finance the Oakman acquisition. On February 17, 202, the Company amended the Adams Street Capital Credit Agreement to increase the principal amount of the Adams Street Term Loan by an additional $ 32.0 million, which was incurred to finance the DPSS acquisition. On July 30, 2021, we drew $3.0 million on the revolving credit facility and repaid the $3.0 million draw down on September 23, 2021. There were no borrowings outstanding under the revolving credit facility as of December 31, 2021 and December 31, 2020.

On September 2, 2021, the Adams Street Credit Agreement was amended to provide that the consolidated total net leverage ratio not exceed 6.50:1.00 on the last day of any quarter ("the Financial Covenant"), to remove the cap on the amount of unrestricted cash which may be netted for purposes of the Financial Covenant, to redefine "Consolidated EBITDA", and to reset the call protection terms.

In December 2021, the Company entered into a Consent to Credit Agreement whereby Adams Street Capital agreed to an extension of the delivery of periodic financial statements required under the Adams Street Credit Agreement. As of December 31, 2021 and December 31, 2020, the Company was in compliance with the covenant requirements.

*Silicon Valley Bank Loan Agreement*

On August 31, 2020, the Company entered into a $45.4 million loan agreement with Silicon Valley Bank, which was subsequently modified to increase the principal to $51.1 million on October 28, 2020 (the "SVB Loan"). On April 2, 2021, the Company amended the SVB Loan Agreement to extend the term from August 2021 to September 30, 2022. On September 2, 2021, the Company repaid the full outstanding principal and interest on the SVB Loan.

*Paycheck Protection Program ("PPP") Loan*

On May 1, 2020, prior to its acquisition, DSS received a PPP Loan for $1.1 million (the "DSS PPP Loan"). Under the terms of the DSS PPP Loan, DSS could apply for forgiveness under the PPP regulations if DSS used the proceeds of the loan for its payroll costs and other expenses in accordance with the requirements of the PPP. Proceeds from the DSS PPP loan, including interest calculated at a nominal and effective interest rate of 1.00% per annum, were included in a DSS savings account as of the DSS acquisition date. Any amount of the DSS PPP Loan forgiven and proportionate interest amount will be released to the seller of DSS. The Company did not use any of the DSS PPP Loan funds assumed as part of the DSS acquisition. On June 18, 2021, $0.6 million of the DSS PPP Loan was forgiven and as a result was reclassified as a note payable to the seller of DSS. During the Successor 2021 Period, the Company repaid the $0.6 million note payable to the seller of DSS and the remaining outstanding principal and interest of $0.5 million on the DSS PPP loan.

*D&O Financing Loan*

On September 3, 2021, the Company entered into a $3.0 million loan (the "D&O Financing Loan") with BankDirect Capital Finance to finance the Company's directors and officers insurance premium. The D&O Financing Loan has an interest rate of 1.74% per annum and a maturity date of May 3, 2022.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The table below presents details of the Company's debt as of the following periods including the effective interest rate as of December 31, 2021:

| | | Successor | |
| --- | --- | --- | --- |
| | Effective interest rate | December 31, 2021 | December 31, 2020 |
| Adams Street Term Loan | 7.58 % | $ 30,690 | $ 31,000 |
| Adams Street Revolving Credit Facility | 7.00 | — | — |
| Adams Street Delayed Draw Term Loan | 7.57 | 14,850 | — |
| Adams Street Incremental Term Loan | 7.47 | 31,760 | — |
| SVB Loan | — | — | 46,500 |
| DSS PPP Loan | — | — | 1,058 |
| D&O Financing Loan | 1.75 | 1,904 | — |
| Total debt | | 79,204 | 78,558 |
| Less: unamortized discounts and issuance costs | | 1,653 | 842 |
| Total debt, net | | 77,551 | 77,716 |
| Less: Short-term debt, including current portion of long-term debt | | 2,684 | 1,074 |
| Total long-term debt, net | | $ 74,867 | $ 76,642 |

The maturities of the Company's long-term debt outstanding as of December 31, 2021 are as follows:

| | 2022 | 2023 | 2024 | 2025 | 2026 | Thereafter | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Adams Street Term Loan | $ 310 | $ 310 | $ 310 | $ 310 | $ 29,450 | $ — | $ 30,690 |
| Adams Street Delayed Draw Term Loan | 150 | 150 | 150 | 150 | 14,250 | — | 14,850 |
| Adams Street Incremental Term Loan | 320 | 320 | 320 | 320 | 30,480 | — | 31,760 |
| D&O Financing Loan | 1,904 | — | — | — | — | — | 1,904 |
| Total long-term debt maturities | $ 2,684 | $ 780 | $ 780 | $ 780 | $ 74,180 | $ — | $ 79,204 |

The table below presents the interest expense on debt, including the amortization of discounts and issuance costs for the following periods:

| | Successor | | Predecessor |
| --- | --- | --- | --- |
| | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
| Interest expense on debt | $ 6,458 | $ 878 | $ 83 |

*Liquidity Risks and Uncertainties*

The Company's primary sources of liquidity are cash flows provided by operations, access to existing credit facilities and proceeds from the Merger. Prior to becoming a public company, in the Successor 2020 period, AEI provided an additional source of liquidity to facilitate the purchase of Adcole, DSS and MIS.

Liquidity risk refers to the risk that the Company will be unable to finance its operations due to a loss of access to existing sources of liquidity and the Company's ability to meet its financial obligations as they become due.

Since its inception, the Company has incurred net losses and negative operating cash flows, in addition to other cash uses associated with capital expenditures, costs associated with the Company's acquisitions, and costs associated with the Merger, among other uses. While some of these cash outflows have been non-recurring in nature, the Company has continued to experience net cash outflows from operating activities. While the Company believes its continued growth and cash flow management will result in improvements in cash flow usage from operating activities going forward, there can be no assurance these improvements will be achieved.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

As of December 31, 2021, total available liquidity was $25.5 million, comprised of $20.5 million in cash and cash equivalents and $5.0 million in available borrowings from our existing credit facilities. As further disclosed in Note U, on March 25, 2022, our existing credit facilities were amended to, among other things, increase commitments under the revolving credit facility to $25.0 million. The Company believes that existing sources of liquidity will be sufficient to meet its working capital needs and comply with its debt covenants for at least the next twelve months from the date on which the consolidated financial statements were issued. As part of the Company's debt management strategy, management continuously evaluates opportunities to further strengthen the Company's financial position including the issuance of additional equity or debt securities, refinance or otherwise restructure the existing credit facilities, or enter into new financing arrangements. In addition, the Company has identified a plan to execute certain cost reduction actions including, among others, integration-related workforce rationalizations, real estate synergies, business unit optimization initiatives, and cost savings associated with certain Corporate level employment costs. There can be no assurances that any of these actions will be sufficient to allow the Company to service its debt obligations, meet its debt covenants, or that such actions will not result in an adverse impact on our business.

**Note K – Leases**

The Company is obligated under certain operating leases for its facilities and office equipment. Certain facility leases contain predetermined fixed escalation of minimum rents at rates ranging from 1.96% to 4.00% per annum and renewal options that could extend certain leases up to an additional nine years; the office equipment lease contains a renewal option that could extend the lease to consecutive 60-day terms and a purchase option.

During the Successor 2021 Period, the Company negotiated the early termination of a lease agreement for office space located in Littleton, Colorado. With an original termination date in December 2027, the early termination reduced the Company's total future minimum lease obligations by $1.6 million.

As of December 31, 2021, the future annual minimum lease payments for operating leases are as follows:

| Year | | Total |
|---|---|---|
| 2022 | $ | 4,330 |
| 2023 | | 4,517 |
| 2024 | | 4,625 |
| 2025 | | 4,015 |
| 2026 | | 3,030 |
| Thereafter | | 5,772 |
| Total future annual minimum lease payments | $ | 26,289 |

The Company records rent expense on a straight-line basis over the life of the lease. The table below presents the rent expense under all leases for the following periods:

| | Successor | | Predecessor |
|---|---|---|---|
| | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** | **Period from January 1, 2020 to June 21, 2020** |
| Rent expense on leases | $ 3,424 | $ 1,091 | $ 228 |

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

### Note L – Income Taxes

The table below presents the current and deferred components of income tax expense (benefit) for the following periods:

| | Successor | | Predecessor |
| --- | --- | --- | --- |
| | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** | **Period from January 1, 2020 to June 21, 2020** |
| Current: | | | |
| Federal | $ — | $ — | $ (387) |
| State | — | — | 3 |
| Foreign | — | — | — |
| Total current income tax expense (benefit) | — | — | (384) |
| | | | |
| Deferred: | | | |
| Federal | (9,376) | (3,064) | — |
| State | (1,893) | (595) | — |
| Foreign | — | — | — |
| Total deferred income tax expense (benefit) | (11,269) | (3,659) | — |
| | | | |
| Total income tax expense (benefit) | $ (11,269) | $ (3,659) | $ (384) |

A reconciliation of the U.S. federal statutory income tax expense to actual income tax expense is as follows:

| | Successor | | Predecessor |
| --- | --- | --- | --- |
| | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** | **Period from January 1, 2020 to June 21, 2020** |
| Income (loss) before income taxes | $ (72,806) | $ (18,033) | $ (1,718) |
| Federal statutory income tax rate | 21.0 % | 21.0 % | 21.0 % |
| Expected federal provision (benefit) for income taxes at the federal statutory income tax rate | (15,289) | (3,787) | (361) |
| State income tax (benefit), net of federal tax benefit | (1,946) | (595) | 29 |
| Research and development tax credits | 324 | (20) | (460) |
| Permanent differences | 1,931 | 57 | (17) |
| Tax (benefits) / non-deductible expenses related to equity-based compensation | 5,228 | — | (119) |
| Acquisition costs | (1,106) | 685 | — |
| Reserves for unrecognized income tax benefits | (273) | 1 | 386 |
| Change in valuation allowance | 458 | — | 129 |
| Other | (596) | — | 29 |
| Total tax expense (benefit) | $ (11,269) | $ (3,659) | $ (384) |
| | | | |
| Effective tax rate | 15.5 % | 20.3 % | 22.4 % |

The effective tax rate for the Successor 2021 Period differs from the U.S. federal income tax rate of 21.0% primarily due to nondeductible compensation costs on the Class P Unit Incentive plan, contingent earnout payments from the MIS acquisition and state income tax expense. The effective tax rate for the Successor 2020 Period differs from the U.S. federal income tax rate of 21.0% primarily due to acquisition costs and state income tax expense. The effective tax rate for the Predecessor 2020 Period differs from the U.S. federal income tax rate of 21.0% primarily due to the full valuation allowance of the net deferred tax asset offset by the income tax benefit of the carry back of net operating losses under the Coronavirus Aid, Relief and Economic Security Act ("CARES Act").

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The table below presents the components of the deferred tax assets, net and deferred tax liabilities:

| | Successor as of | |
|---|---|---|
| | December 31, 2021 | December 31, 2020 |
| Deferred tax assets: | | |
| Accrued expenses and reserves | $ 1,106 | $ 493 |
| Deferred rent | 58 | 82 |
| Tax credit carryforwards | 226 | 346 |
| Deferred revenue | 636 | 1,168 |
| Net operating loss carryforwards | 12,052 | 3,467 |
| Interest disallowance | 1,921 | 271 |
| Equity-based compensation | 566 | — |
| Other assets | 14 | — |
| Total deferred tax assets | 16,579 | 5,827 |
| Less: valuation allowance | (515) | (57) |
| Deferred tax assets, net of valuation allowance | 16,064 | 5,770 |
| | | |
| Deferred tax liabilities: | | |
| Depreciation and amortization | (23,922) | (12,949) |
| Other | (743) | (188) |
| Deferred tax liabilities | (24,665) | (13,137) |
| Total net deferred tax assets (liabilities) | $ (8,601) | $ (7,367) |

In assessing the realizability of deferred income tax assets, the Company considers whether it is more-likely-than-not that some or all of the deferred income tax assets will not be realized. The ultimate realization of the deferred income tax assets is dependent upon the generation of future taxable income during the periods in which the net operating loss ("NOL") carryforwards are available. For the Successor 2021 Period and Successor 2020 Period, the Company has concluded that substantially all of the deferred tax assets in the U.S. are more-likely-than-not realizable and that foreign deferred tax assets are more-likely-than not to expire before realization.

As of December 31, 2021, the Company had $45.2 million of U.S. federal net operating losses resulting in U.S. federal, state (net), and foreign deferred tax assets of $9.5 million, $2.0 million, and $0.5 million, respectively. The $9.5 million in U.S. federal net operating loss carryforwards may be carried forward indefinitely to reduce future taxable income for U.S. federal tax purposes, while certain state net operating losses will begin to expire in 2038. Foreign net operating losses will begin to expire in 2036. The Company has federal and state NOL and other tax credit carryforwards. Due to changes in the Company's ownership, the utilization of net operating loss carryforwards and research and development credit carryforwards, that can be used to offset future taxable income, are subject to annual limits in accordance with Internal Revenue Code (IRC) Section 382, as well as similar state provisions. The Company does not expect Section 382 to limit the Company's ability to realize its deferred tax assets.

The table below presents changes in reserves for unrecognized income tax benefits for the periods presented:

| | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
| Unrecognized tax benefits, beginning of period | $ 1,671 | $ 1,671 | $ 1,275 |
| Increase (decrease) for tax positions taken related to a prior period | (291) | — | 105 |
| Increase (decrease) for tax positions taken during the current period | — | — | 291 |
| Unrecognized tax benefits, end of period | $ 1,380 | $ 1,671 | $ 1,671 |

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

During the Successor 2021 Period, Successor 2020 Period and Predecessor 2020 Period, the Company did not recognize certain tax benefits from uncertain tax positions within the provision for income taxes. As of December 31, 2021, the Company's estimated gross unrecognized tax benefits were $1.4 million, of which $1.3 million if recognized would favorably impact the Company's future earnings. The Company believes there will be no material changes to unrecognized tax benefits within the next twelve months. Due to uncertainties in any tax audit outcome, estimates of the ultimate settlement of our unrecognized tax positions may change and the actual tax benefits may differ from the estimates. During the Successor 2021 Period, Successor 2020 Period and Predecessor 2020 Period, the Company did not recognize any interest and penalties in the consolidated statements of operations.

The Company and its subsidiaries file income tax returns in various U.S. and foreign jurisdictions. As of December 31, 2021, the Company is subject to examination by the IRS for tax years beginning in 2018. The Company is open to state and foreign income tax examinations until the applicable statute of limitations expires, generally four years after tax return filing for state income tax and five years for foreign income tax; however, the ability for the taxing authority to adjust tax attribute carryforwards will continue until the applicable statute of limitations expires after tax attribute utilization or expiration.

**Note M – Employee Benefit Plans**

*401(k) Plans*

The Company maintains six qualified 401(k) plans for its U.S. employees: the Redwire 401(k) plan, the Roccor 401(k) plan, the LoadPath 401(k) plan, the Oakman 401(k) plan, the DPSS 401(k) plan and the Techshot 401(k) plan. During the Successor 2021 Period, the Company matched employee contributions 50% up to 6% for the Redwire 401(k) plan and matched employee contributions 100% up to 4% for the Roccor 401(k) plan, 100% up to 6% for the LoadPath 401(k) plan, 100% up to 3% and then 50% of the next 2% for the Oakman 401(k), 100% up to 3% and then 50% of the next 2% for the DPSS 401(k) plan, and 50% up to 8% for the Techshot 401(k) plan. During the Successor 2020 Period, the Company matched employee contributions up to 50% up to 6% for the Redwire 401(k) plan. The Predecessor maintained a qualified 401(k) plan (the "Predecessor 401(k) Plan") for its U.S. employees.

The table below presents the expense for matching contributions for the following periods:

| | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
| Expense for matching contributions, included in: | | | |
| Cost of sales | $ 2,143 | $ 187 | $ — |
| Selling, general and administrative | 156 | — | — |
| Total expense for matching contributions | $ 2,299 | $ 187 | $ — |

**Note N – Commitments and Contingencies**

*Contingencies in the Normal Course of Business*

Under certain contracts with the U.S. government and certain governmental entities, contract costs, including indirect costs, are subject to audit by and adjustment through negotiation with governmental representatives. Revenue is recorded in amounts expected to be realized on final settlement of any such audits.

*Legal Proceedings*

The Company is subject to litigation, claims, investigations and audits arising from time to time in the ordinary course of business. Although legal proceedings are inherently unpredictable, the Company believes that it has valid defenses with respect to any matters currently pending against the Company and intends to defend itself vigorously. Excluding pending matters disclosed below, the outcome of these matters, individually and in the aggregate, is not expected to have a material impact on the Company's consolidated financial statements.

On November 5, 2021, the Company was notified of potential accounting issues with a business unit by an employee in connection with his resignation. Management promptly informed the independent Audit Committee and its independent registered public accounting firm. The timing of the investigation prevented the timely filing of our Quarterly Report on Form 10-Q for the quarter ended September 30, 2021. The Audit Committee promptly engaged independent, external legal and accounting firms to complete an independent investigation. After completing its investigation, the Audit Committee concluded that the potential issues raised by the former employee did not require a restatement or adjustment of the Company's previously issued consolidated financial statements

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

relating to any prior periods. However, the results of the investigation confirmed the existence of previously identified internal control deficiencies as well as identified certain additional internal control deficiencies. The Company self-reported this matter to the Securities and Exchange Commission ("SEC") on November 8, 2021 and intends to continue to cooperate with any requests from the SEC.

Additionally, on December 17, 2021, the Company, our CEO, Peter Cannito, and our CFO, William Read, were named as defendants in a putative class action complaint filed in the United States District Court for the Middle District of Florida. In the complaint, the plaintiff alleges that the Company and certain of its directors and officers made misleading statements and/or failed to disclose material facts about the Company's business, operations, and prospects, allegedly in violation of Section 10(b) (and Rule 10b-5 promulgated thereunder) and Section 20(a) of the Securities Exchange Act of 1934. As relief, the plaintiffs are seeking, among other things, compensatory damages. The defendants believe the allegations are without merit and intend to defend the suit vigorously. However, given the early stage of the proceedings, a reasonable estimate of the amount of any possible loss or range of loss cannot be made at this time.

### Business Combinations

The Company has acquired and plans to continue to acquire businesses with prior operating histories. These acquisitions may have unknown or contingent liabilities, which the Company may become responsible for and could have a material impact on the Company's future operating results and cash flows. In addition, the Company may incur acquisition costs, regardless of whether or not the acquisition is ultimately completed, which may be material to future periods.

### Note O – Shareholders' Equity

The Successor's 100 issued and outstanding Successor units ("Units") as of December 31, 2020 were cancelled and exchanged for 37,200,000 shares of common stock as part of the closing of the Merger. Refer to the consolidated statement of changes in shareholders' equity for further details.

On September 2, 2021, the Company approved the authorization to issue up to 500,000,000 shares of common stock at a $0.0001 par value per share and 100,000,000 shares of preferred stock at a $0.0001 par value per share.

### Common Stock

The Company had 62,690,869 and 37,200,000 shares of common stock outstanding as of December 31, 2021 and December 31, 2020, respectively. The units of the Company prior to the Merger have been retroactively restated to reflect the exchange ratio established in the Merger (computed as 37,200,000 shares of common stock to 100 Company units).

### Dividend Rights

Subject to applicable law and the rights, if any, of the holders of any outstanding series of the Company's preferred stock or any class or series of stock having a preference over or the right to participate with the Company's common stock with respect to the payment of dividends, dividends may be declared and paid ratably on the Company's common stock out of the assets of the Corporation that are legally available for this purpose at such times and in such amounts as the Company's Board in its discretion shall determine.

### Voting Rights

Each outstanding share of the Company's common stock is entitled to one vote on all matters submitted to a vote of shareholders. Holders of shares of common stock do not have cumulative voting rights.

### Conversion or Redemption Rights

The Company's common stock is neither convertible nor redeemable.

### Liquidation Rights

Upon the Company's liquidation, the holders of the Company's common stock are entitled to receive prorata the Company's assets that are legally available for distribution, after payment of all debts and other liabilities and subject to the prior rights of any holders of the Company's preferred stock then outstanding.

### Preferred Stock

The Company had no shares of preferred stock outstanding as of December 31, 2021 and December 31, 2020, respectively.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The Company's Board may, without further action by the Company's shareholders, from time to time, direct the issuance of shares of preferred stock in series and may, at the time of issuance, determine the designations, powers, preferences, privileges and relative participating, optional or special rights as well as the qualifications, limitations or restrictions thereof, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which maybe greater than the rights of the Company's common stock. Satisfaction of any dividend preferences of outstanding shares of the Company's preferred stock would reduce the amount of funds available for the payment of dividends on shares of the Company's common stock. Upon the affirmative vote of a majority of the total number of directors then in office, the Company's Board may issue shares of the Company's preferred stock with voting and conversion rights which could adversely affect the holders of shares of the Company's common stock.

**Note P - Warrants**

*Public Warrants*

Each public warrant entitles the registered holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment. Pursuant to the warrant agreement, a warrant holder may exercise its warrants only for a whole number of shares of common stock. This means only a whole warrant may be exercised at a given time by a warrant holder. The warrants will expire on September 2, 2026, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

The Company may call the public warrants for redemption as follows: (1) in whole and not in part; (2) at a price of $0.01 per warrant; (3) upon a minimum of 30 days prior written notice of redemption; and (4) only if the last reported closing price of the common stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the 3rd trading day prior to the date on which the Company sends the notice of redemption to the warrant holders.

If the Company calls the public warrants for redemption, management will have the option to require all holders that wish to exercise the Company public warrants to do so on a "cashless basis."

The exercise price and number of shares of common stock issuable upon exercise of the warrants may be adjusted in certain circumstances including a consolidation, combination, reverse stock split or reclassification of shares of the Company's common stock or other similar event. In no event will the Company be required to net cash settle the warrant shares.

As of December 31, 2021, there were 8,188,811 public warrants issued and outstanding.

*Private Warrants*

The terms and provisions of the public warrants above also apply to the private warrants. If the private warrants are held by holders other than Sponsor, Jefferies, Holdings or their respective permitted transferees, the private warrants will be redeemable by the Company and exercisable by the holders on the same basis as the public warrants. The Sponsor, Jefferies, Holdings and their respective permitted transferees have the option to exercise the private placement warrants on a cashless basis.

The private warrants were valued at $2.81 and $2.47 per warrant as of September 2, 2021 and December 31, 2021, respectively, under the Black-Scholes OPM using the following assumptions:

|  | September 2, 2021 | | December 31, 2021 |
|---|---|---|---|
| Exercise price | $ | 11.50 | $ 11.50 |
| Common stock price | $ | 10.50 | $ 6.75 |
| Expected option term (years) | | 5 | 4.67 |
| Expected volatility | | 32.80 % | 60.50 % |
| Risk-free rate of return | | 0.78 % | 1.21 % |
| Expected annual dividend yield | | — % | — % |

The fair value of the private warrants decreased $2.6 million between the initial valuation as of the date the warrants were assumed on September 2, 2021 and December 31, 2021. The fair value decrease is reflected in other (income) expense, net on the consolidated statements of operations and comprehensive income (loss) for the Successor 2021 Period.

As of December 31, 2021, there were 7,732,168 private warrants issued and outstanding.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

**Note Q – Equity-Based Compensation**

*Predecessor Plans*

Prior to June 22, 2020 the Predecessor maintained two equity-based compensation plans, which are described below.

The Predecessor maintained a plan to provide a performance incentive and to encourage stock ownership by employees, officers, and directors of the Predecessor ("the 2011 Equity Incentive Plan"). 1,000,000 Predecessor common stock shares were reserved and available for grant and issuance pursuant to the 2011 Equity Incentive Plan. Under the 2011 Equity Incentive Plan, incentive stock options ("ISOs") could only be granted to employees, while non-qualified stock options ("NQSOs") could be granted to employees, officers, directors, and other service providers of the Predecessor.

Between 2014 and 2017, the Predecessor extended loans to three key members of management for the purchase of Predecessor shares for a principal of $1.0 million (the "Predecessor Promissory Notes"). The Predecessor Promissory Notes were secured by the underlying shares and were nonrecourse to the respective debtor's personal assets. The Predecessor Promissory Notes carried interest at between 1.85% and 1.91% per annum, and were expected to mature between April 2020 and June 2023 or earlier upon the occurrence of certain events specified in the Predecessor Promissory Notes.

The Predecessor Promissory Notes represented in-substance ISOs with a grant date fair value of $0.5 million and the equity-based compensation expense related to them was recognized over the requisite service period of four years. Pursuant to the Recapitalization, a Release of Security Interest Agreement, dated October 17, 2019, was executed between the three debtors of the Predecessor Promissory Notes and the Predecessor. The Release of Security Interest Agreement stipulated the release of the Predecessor's security interest in the portion of the Common Stock issued to each debtor of the Predecessor Promissory Notes that was reclassified to Class F Common Stock and to Preferred Stock in the Recapitalization, while retaining the security interest in the portion that remained as Common Stock after the Recapitalization. These events resulted in a modification of the original in-substance options associated with the Predecessor Promissory Notes; the total incremental cost resulting from this modification was $2.2 million.

*Successor Plans*

On December 31, 2021, the Company has three equity-based compensation plans, which are described below.

Holdings, the Company's former parent adopted a written compensatory benefit plan (the "Class P Unit Incentive Plan") to provide incentives to existing or new employees, officers, managers, directors, or other service providers of the Company or its subsidiaries in the form of Holdings' Class P Units ("Incentive Units"). Incentive Units have a participation threshold of $1.00 and are divided into three tranches ("Tranche I," "Tranche II," and "Tranche III"): Tranche I, Tranche II, and Tranche III Incentive Units were subject to performance-based, service-based, and market-based conditions.

On September 2, 2021, the company's board of directors adopted the Redwire Corporation 2021 Omnibus Incentive Plan (the "Plan") which authorizes the grant of stock options (incentive and non-qualified), stock appreciation rights, restricted stock, restricted stock units, and other cash or share-based awards to employees, officers, non-employee directors and consultants of the Company. The Company reserved an aggregate of 7,936,136 shares (subject to annual increases on January 1 of each year beginning in 2022 and ending with a final increase on January 1, 2031) of the Company's common stock for grants under the Plan. Incentive stock options may only be granted to employees and officers employed by the Company. The Plan appoints the board of directors, the compensation committee or such other committee consisting of two or more individuals (the "Committee") appointed by the board to administer the Plan. Awards under the Plan will contain such terms and conditions not inconsistent with the Plan as the Committee in its discretion approves. The Committee has discretion to administer the Plan in the manner which it determines, from time to time, is in the best interest of the Company.

On September 2, 2021, the company's board of directors adopted the Redwire Corporation 2021 Employee Stock Purchase Plan (the "ESPP") which authorizes the grant of rights to purchase common stock of the Company to employees, officers and directors (if they are otherwise employees) of the Company. The Company reserved an aggregate of 755,822 common shares (subject to annual increases on January 1 of each year beginning in 2022 for a period of up to ten years) of the Company's common stock for grants under the ESPP. The ESPP appoints the Compensation Committee (the "Committee") to administer the ESPP. Awards under the ESPP will contain such terms and conditions not inconsistent with the ESPP as the Committee in its discretion approves. The Committee has discretion to administer the ESPP in the manner which it determines, from time to time, is in the best interest of the Company. As of December 31, 2021, no awards had been granted under the ESPP.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

***Promissory Notes***

The assumptions used in determining the fair value of the in-substance ISOs represented by the Predecessor Promissory Notes for the Predecessor 2020 Period were as follows:

| | Predecessor | | |
|---|---|---|---|
| | Period from January 1, 2020 to June 21, 2020 | | |
| Range of expected time to exit (years) | 3 | to | 5 |
| Range of volatilities | 55.00% | to | 63.09% |
| Range of Predecessor Promissory Notes interest rates | 1.85% | to | 1.91% |
| Range of risk-free interest rates | 1.33% | to | 1.62% |

The expected time to exit used in the determination of the fair value of the Predecessor Promissory Notes was based on the expected time to liquidity assessed by the Predecessor. The historical volatility used in the determination of the fair value of the in-substance ISOs represented by the Predecessor Promissory Notes was based on analysis of the historical volatility of comparable public companies and factors specific to the Predecessor.

The grant date fair value of the Predecessor in-substance shares vested was $12 thousand for the Predecessor 2020 Period.

A summary of the activity of the Predecessor Promissory Notes is as follows:

| | In-substance ISO's represented by the Predecessor Promissory Notes | Weighted-average exercise price |
|---|---|---|
| Predecessor Outstanding as of December 31, 2019 | 1,028,784 | $ 0.99 |
| Settled or cancelled | (1,028,784) | 0.99 |
| Outstanding as of December 31, 2020 | $ — | $ — |

***Incentive Units***

On March 24, 2021 ("modification date"), Holdings, the Company's former parent amended the Class P Unit Incentive Plan so that the Tranche I and the Tranche III Incentive Units became fully vested, upon the closing of the Merger. Holdings also amended the Class P Unit Incentive Plan so that the Tranche II Incentive Units would vest on any liquidation event, as defined in the Class P Unit Incentive Plan, rather than only upon consummation of the sale of Holdings, subject to the market-based condition stipulated in the Class P Unit Incentive Plan prior to its amendment.

As a result of the Merger, Tranches I and III Incentive Units vested on September 2, 2021 ("vesting date") and the performance vesting condition was met for the Tranche II Incentive Units. The fair value determined at the date of the amendment of the Class P Unit Incentive Plan was immediately recognized as compensation expense on the vesting date for Tranches I and III. Compensation expense for the Tranche II Incentive Units is being recognized over the derived service period of twelve months from the modification date, which resulted in approximately seventy-five percent of the compensation expense for Tranche II being recognized during the Successor 2021 Period. The remaining compensation expense for the Tranche II Incentive Units will be recognized over the remaining service period of three months.

As of December 31, 2021, there was approximately $2.4 million of unrecognized compensation costs related to Tranche II Incentive Units.

***Stock Options***

*Predecessor*

Pursuant to the 2011 Equity Incentive Plan ISOs and NQSOs had a four-year graded vesting period, with a 25% of each grant vesting one year from the grant date and 2.08% vesting monthly thereafter over 36 months; the vesting of ISOs was subject to continued employment. The maximum term over which ISOs and NQSOs were exercisable was 10 years from the date the ISOs or the NQSOs

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

were granted. The Predecessor recognized the equity-based compensation cost related to the 2011 Equity Incentive Plan over the requisite service period using the straight-line attribution method.

*Successor*

Pursuant to the Plan, the Company's board of directors granted certain Grantees, options to purchase shares of the Company's common stock with a contractual term of 10 years. The options vest over a three year term as follows: 33.3% on the first anniversary of the grant date, 33.3% on the second anniversary of the grant date, and 33.4% on the third anniversary of the grant date. Vesting is contingent upon continued employment or service to the Company; both the vested and unvested portion of a Grantee's option will be immediately forfeited and cancelled if the Grantee ceases employment or service to the Company. The Company recognizes equity-based compensation expense for the options equal to the fair value of the awards on a straight-line basis over the service based vesting period and recognizes forfeitures as they occur.

The fair value of each option granted under the Predecessor 2011 Equity Incentive Plan and the Successor Plan was estimated on the grant date under the Black-Scholes OPM using the following assumptions:

|  | Successor | Predecessor |
|---|---|---|
| Expected option term (years) | 6 | 3-5 |
| Expected volatility | 32.80 % | 55.00%-63.09% |
| Risk-free rate of return | 0.93%-1.15% | 1.33%-2.51% |
| Expected annual dividend yield | — % | — % |

A summary of option activity under the Predecessor 2011 Equity Incentive Plan and the Successor Plan as of December 31, 2021 and December 31, 2020, and changes during the years then ended is presented as follows:

| Options | Shares | Weighted-Average Grant Date Fair Value per Share | Weighted-Average Exercise Price per Share | Weighted-Average Remaining Contractual Term (Years) |
|---|---|---|---|---|
| Predecessor Outstanding at December 31, 2019 | 133,661 | $ 0.66 | $ 1.47 | |
| Forfeited | (2,900) | 0.77 | 1.80 | |
| Settled or cancelled | (130,761) | 0.66 | 1.46 | |
| Successor Outstanding at December 31, 2020 | — | — | — | |
| Granted | 1,546,400 | 3.32 | 10.00 | |
| Exercised | — | — | — | |
| Forfeited | — | — | — | |
| Successor Outstanding at December 31, 2021 | 1,546,400 | $ 3.32 | $ 10.00 | 9.67 |

Under the 2011 Equity Incentive Plan, certain unvested ISOs and NQSOs became fully vested and were settled for $0.5 million of the purchase consideration on the MIS acquisition date. Accelerated vesting was triggered by the actions of the Successor, therefore fair value of the consideration attributable to the accelerated equity-based awards relating to post-acquisition services of $0.1 million was recognized in the Successor 2020 Period. The component relating to pre-acquisition services has been included as part of the MIS purchase consideration. There were no remaining ISOs and NQSOs outstanding under the 2011 Equity Incentive Plan as of December 31, 2020 (Successor).

As of December 31, 2021, there was $4.6 million of unrecognized compensation cost related to unvested stock options granted under the Plan. There were no shares that vested or were exercisable under the Plan during Successor 2021 Period.

**Restricted Stock Units**

Restricted stock units awarded under the Plan generally is subject to forfeiture in the event of termination of employment prior to vesting dates. The Company recognizes equity-based compensation expense for the restricted stock units equal to the fair value of the awards on a straight-line basis over the service based vesting period and recognizes forfeitures as they occur.

Pursuant to the Plan, the Company granted 1,659,600 shares of restricted stock units of the Company's common stock during the Successor 2021 Period to certain officers, managers and other employees. The shares of restricted stock units awarded follow the same

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

vesting terms and conditions as the options set forth above. The weighted average grant date fair value of these awards was $11.72 per share.

Pursuant to the Plan, the Company granted 75,000 shares of restricted stock units of the Company's common stock during the Successor 2021 Period to non-employee directors. The shares of restricted stock units awarded vest over one year. The weighted average grant date fair value of these awards was $10.50 per share.

A summary of the status of the Company's restricted stock as of December 31, 2021, and changes during the Successor 2021 Period, is presented as follows:

| | Restricted Shares | Weighted-Average Grant Date Fair Value per Share | Weighted-Average Remaining Contractual Term (in Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Unvested at December 31, 2020 | — | $ — | | |
| Granted | 1,734,600 | 11.67 | | |
| Vested | — | — | | |
| Forfeited | (16,650) | 12.72 | | |
| Unvested at December 31, 2021 | 1,717,950 | $ 11.66 | 1.8 | $ 11,596 |

As of December 31, 2021, there was approximately $18.4 million of total unrecognized compensation cost related to unvested restricted stock units granted under the Plan. This cost is expected to be recognized over a weighted-average period of 1.8 years. There were no restricted stock units that vested during the Successor 2021 Period.

The table below presents the equity-based compensation expense recorded during the following periods:

| | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2021 | Period from February 10, 2020 to December 31, 2020 | Period from January 1, 2020 to June 21, 2020 |
| Cost of Sales | | | |
| Incentive Units | $ 1,635 | $ — | $ — |
| Stock Options | 15 | — | — |
| Restricted Stock Units | 466 | — | — |
| Total cost of sales | $ 2,116 | $ — | $ — |
| | | | |
| Selling, general and administrative | | | |
| Promissory Notes | $ — | $ — | $ 988 |
| Incentive Units | 23,260 | — | — |
| Stock Options | 542 | 102 | 7 |
| Restricted Stock units | 1,194 | — | — |
| Total selling, general and administrative | $ 24,996 | $ 102 | $ 995 |
| | | | |
| Total equity-based compensation expense | $ 27,112 | $ 102 | $ 995 |

The tax benefit of equity-based compensation was $0.2 million and $1 thousand related to the Predecessor Promissory Notes and the Predecessor ISOs and NQSOs, respectively, for the Predecessor 2020 Period. The tax benefit of equity-based compensation was $21 thousand related to the Successor ISOs and NQSOs for the Successor 2020 Period. There was no similar benefit recognized for the Successor 2021 Period.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

### Note R – Net Income (Loss) per Share

Prior to the Merger, the membership structure of Cosmos included units which had profit interests. As a result of the Merger, which was accounted for as a reverse recapitalization, the Company has retroactively adjusted the weighted average shares outstanding prior to the Merger to give effect to the exchange ratio used to determine the number of shares of common stock into which they were converted and is reflected in the denominator of basic and diluted net income (loss) per share in the table below.

The numerators and denominators of the basic and diluted net income (loss) per share were computed for the periods presented as follows:

| | Successor | |
| --- | --- | --- |
| | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** |
| **Numerator:** | | |
| Net income (loss) | $ (61,537) | $ (14,374) |
| **Denominator:** | | |
| Weighted average shares outstanding – basic and diluted | 45,082,544 | 37,200,000 |
| Basic and diluted net income (loss) per share | $ (1.36) | $ (0.39) |

Because the Company had a net loss for all periods presented, the Company did not have any dilutive securities and/or other contracts that could, potentially, be exercised or converted into shares of common stock and then share in the earnings of the Company. As a result, diluted net income (loss) per share is the same as basic net income (loss) per share for the periods presented.

### Note S – Revenue

The table below presents revenues by customer grouping for the following periods:

| | Successor | | Predecessor |
| --- | --- | --- | --- |
| | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** | **Period from January 1, 2020 to June 21, 2020** |
| Civil space | $ 60,052 | $ 23,571 | $ 15,844 |
| National security | 29,833 | 7,034 | 684 |
| Commercial and other | 47,716 | 10,180 | 123 |
| Total revenues | $ 137,601 | $ 40,785 | $ 16,651 |

*Contract Balances*

The table below presents the contract assets and contract liabilities included on the consolidated balance sheets for the following periods:

| | Successor | |
| --- | --- | --- |
| | **December 31, 2021** | **December 31, 2020** |
| Contract assets | $ 11,748 | $ 4,172 |
| Contract liabilities | $ 15,734 | $ 15,665 |

The increase in contract assets was primarily driven by growth in revenue recognized and timing of billable milestones occurring during the Successor 2021 Period, and also by the acquisitions of Oakman, DPSS, and Techshot compared to December 31, 2020 before they were acquired.

The decrease in contract liabilities was related to timing of billable milestones occurring during the Successor 2021 Period, partially offset by an increase related to the acquisitions of Oakman and DPSS during the Successor 2021 Period ending December 31, 2021, compared to December 31, 2020 before they were acquired. Revenue recognized in the Successor 2021 Period that was included in the contract liability balance as of December 31, 2020 was $15.3 million.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The Company evaluates the contract value and cost estimates at completion ("EAC") for performance obligations at least quarterly and more frequently when circumstances significantly change. Due to the nature of the work required to be performed on many of the Company's performance obligations, the estimate of total revenue and cost at completion is complex, subject to many variables and requires significant judgment by management on a contract by contract basis. As part of this process, management reviews information including, but not limited to, labor productivity, the nature and technical complexity of the work to be performed, availability and cost volatility of materials, subcontractor and vendor performance, volume assumptions, inflationary trends, and schedule and performance delays. Management's judgment related to these considerations has become increasingly more significant given the current economic environment primarily caused by the COVID-19 pandemic.

When the Company's estimate of total costs to be incurred to satisfy a performance obligation exceeds the expected revenue, the Company recognizes the loss immediately. When the Company determines that a change in estimate has an impact on the associated profit of a performance obligation, the Company records the cumulative positive or negative adjustment to the statement of operations and comprehensive income (loss). Changes in estimates and assumptions related to the status of certain long-term contracts may have a material effect on the Company's operating results.

The following table summarizes the impact of the net EAC adjustments for the periods presented:

| | Successor | |
| --- | --- | --- |
| | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** |
| Net EAC adjustments, before income taxes | $ (1,835) | $ 728 |
| Net EAC adjustments, net of income taxes | (1,551) | 580 |
| Net EAC adjustments, net of income taxes, per diluted share | (0.03) | 0.02 |

*Remaining Performance Obligations*

As of December 31, 2021, the aggregate amount of the transaction price allocated to remaining performance obligations was $129.3 million. The Company expects to recognize approximately 78% of its remaining performance obligations as revenue within the next 12 months and the balance thereafter.

*Geographic Information and Significant Customers*

The Company has customers located in the United States, Luxembourg, Germany, Japan, South Korea, Poland, Taiwan, and France.

The table below presents revenues based on the geographic location of the Company's customers for the following periods:

| | Successor | | Predecessor |
| --- | --- | --- | --- |
| | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** | **Period from January 1, 2020 to June 21, 2020** |
| U.S. | $ 133,309 | $ 38,774 | $ 15,856 |
| Luxembourg | 3,724 | 1,535 | 795 |
| Germany | 140 | 46 | — |
| South Korea | 272 | 147 | — |
| Poland | 138 | 169 | — |
| Other | 18 | 114 | — |
| Total revenues | $ 137,601 | $ 40,785 | $ 16,651 |

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The majority of the Company's revenues are derived from government contracts. Customers comprising 10% or more of revenues were as follows for the periods presented:

| | Successor | | Predecessor |
| --- | --- | --- | --- |
| | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** | **Period from January 1, 2020 to June 21, 2020** |
| Boeing [1] | $ 17,753 | $ — | $ — |
| NASA | 48,476 | 21,352 | 15,020 |
| Total | $ 66,229 | $ 21,352 | $ 15,020 |

[1] While revenue was generated in each of the periods presented, amounts are only disclosed for the periods in which revenue represented 10% or more of total revenue.

**Note T – Related Parties**

The table below presents details of the Company's related party transactions with AEI included on the consolidated statements of operations and comprehensive income (loss) for the following periods:

| | Successor | |
| --- | --- | --- |
| | **Year Ended December 31, 2021** | **Period from February 10, 2020 to December 31, 2020** |
| Management fees paid to AEI | $ 477 | $ 500 |
| Transaction fees paid to AEI | 1,019 | 2,226 |
| Total fees paid to AEI | $ 1,496 | $ 2,726 |

All related party fees associated with AEI were incurred prior to the close of the Merger. Additionally, the Company made a $4.9 million payment to AEI in October 2020, which was reflected as a related party receivable due from AEI on the consolidated balance sheets as of December 31, 2020. This amount was repaid in February 2021.

In November 2021, the Company granted 12,500 shares of common stock to Kirk Konert in his capacity as a member of the board of directors. Subject to his continued service, the common stock will vest in a single installment on November 1, 2022 and be assigned to AEI. Prior to such vesting and assignment, Kirk Konert will hold the securities for the benefit of AEI and he disclaims all right to title and interest in such securities.

**Note U – Subsequent Events**

On March 25, 2022, Redwire Holdings, LLC, a wholly-owned subsidiary of the Company (the "Lead Borrower"), and certain other subsidiaries of the Company party thereto, entered into a Third Amendment (the "Amendment") to the Adams Street Capital Credit Agreement to, among other things, increase commitments under the revolving credit facility from $5.0 million to $25.0 million.

The Amendment also modified certain negative covenants and increased the per annum interest rate (i) with respect to revolving loans in an aggregate principal amount of $5.0 million or less, to 6.00% for Eurocurrency rate loans and 5.00% for Base Rate Loans, and (ii) with respect to revolving loans in an aggregate principal amount in excess of $5.0 million, to 7.50% for Eurocurrency rate loans and 6.50% for Base Rate Loans.

The Adams Street Capital Credit Agreement, as amended, contains certain customary representations and warranties, affirmative and other covenants and events of default, including among other things, payment defaults, breach of representations and warranties, and covenant defaults.

In connection with the entry into the Amendment, AEI and certain of its affiliates (the "AEI Guarantors"), provided a limited guarantee for the payment of outstanding revolving loans in excess of $10.0 million, with a $15.0 million cap in the aggregate. In the event that the AEI Guarantors are required to make payments to the lenders under the Adams Street Capital Credit Agreement pursuant to the terms of the limited guarantee, each AEI Guarantor would be subrogated to the rights of the lenders. In connection with the limited guarantee, the Lead Borrower agreed to pay to the AEI Guarantors, a fee equal to 2% of any amount actually paid by such guarantors under the limited guarantee. The fee is waivable by the AEI Guarantors in their discretion.

**REDWIRE CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In thousands of U.S. dollars, except percentages, unit, share, and warrant amounts)*

The Company has evaluated subsequent events after the consolidated balance sheet as of December 31, 2021 through the consolidated financial statements issuance date and there were no additional subsequent events that required disclosure.

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosures**

None.

**Item 9A. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures, which are designed to ensure that the information required to be disclosed in reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, including ensuring that such information is accumulated and communicated to management (including the principal executive officer and principal financial officer) as appropriate to allow timely decisions regarding required disclosure. Based on such evaluation, our principal executive officer and our principal financial officer have concluded that such disclosure controls and procedures were not effective as of December 31, 2021 due to the following material weaknesses in internal control over financial reporting.

Internal Control over Financial Reporting

This Annual Report on Form 10-K does not include a report of management's assessment regarding our internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act), or an attestation report of our independent registered public accounting firm, as allowed by the SEC for reverse acquisitions between an issuer and a private operating company when it is not possible to conduct an assessment of the private operating company's internal control over financial reporting in the period between the consummation date of the reverse acquisition and the date of management's assessment of internal control over financial reporting (pursuant to Section 215.02 of the SEC Division of Corporation Finance's Regulation S-K Compliance & Disclosure Interpretations).

As discussed elsewhere in this Annual Report on Form 10-K, we completed the Merger on September 2, 2021. Prior to the Merger, we were a special purpose acquisition company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or other similar business combination with one or more operating businesses. As a result, previously existing internal controls are no longer applicable or comprehensive enough as of the assessment date as our operations prior to the Merger were insignificant compared to those of the consolidated entity post-Merger. The design of internal controls over financial reporting for the Company post-Merger has required and will continue to require significant time and resources from management and other personnel. As a result, management was unable, without incurring unreasonable effort or expense to conduct an assessment of our internal control over financial reporting as of December 31, 2021.

Material Weaknesses in Internal Control over Financial Reporting

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

We did not maintain an effective control environment, as certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top. Specifically, certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication. We also identified that we had an insufficient complement of resources with an appropriate level of accounting knowledge, experience and training commensurate with our structure and financial reporting requirements to appropriately analyze, record and disclose accounting matters timely and accurately, and establish effective processes and internal controls. The limited personnel resulted in an inability to consistently establish appropriate authorities and responsibilities in pursuit of financial reporting objectives, as demonstrated by, among other things, insufficient segregation of duties in our finance and accounting functions. These material weaknesses contributed to the following additional material weaknesses:

- We did not design and maintain an effective risk assessment process at a precise enough level to identify new and evolving risks of material misstatement in the consolidated financial statements. Specifically, changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement to financial reporting.

- We did not design and maintain formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over the preparation and review of business performance reviews, account reconciliations, journal entries and contract estimates used in determining the recognition of revenue.

- We did not design and maintain effective controls to address the identification of and accounting for certain non-routine, unusual or complex transactions, including the proper application of U.S. GAAP to such transactions. Specifically, we did not

design and maintain effective controls to account for purchase business combinations, including the appropriate review of the assumptions, data and models used in the forecasted cash flows, used to determine the fair value of the acquired assets and liabilities.

The material weakness related to certain aspects of tone at the top did not result in a misstatement to the consolidated financial statements for either the Successor or Predecessor periods. Each of the other material weaknesses resulted in material audit adjustments to substantially all accounts and disclosures in the Successor consolidated financial statements as of December 31, 2020 and for the period from February 10, 2020 to December 31, 2020, as well as the Predecessor consolidated financial statements for the period from January 1, 2020 to June 21, 2020 as of and for the year ended December 31, 2019.

In addition, we did not design and maintain effective information technology ("IT") general controls for information systems that are relevant to the preparation of the consolidated financial statements. Specifically, we did not design and maintain:

- program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized, and implemented appropriately;

- user access controls to ensure appropriate segregation of duties and that adequately restrict user and privileged access to financial applications, programs, and data to appropriate Company personnel;

- computer operations controls to ensure that critical batch jobs are monitored and data backups are authorized and monitored; and

- testing and approval controls for program development to ensure that new software development is aligned with business and IT requirements.

The IT deficiencies noted above did not result in a misstatement to the consolidated financial statements for either the Successor or Predecessor; however, the deficiencies, when aggregated, could impact maintaining effective segregation of duties, as well as the effectiveness of IT-dependent controls (such as automated controls that address the risk of material misstatement to one or more assertions, along with the IT controls and underlying data that support the effectiveness of system-generated data and reports) that could result in misstatements potentially impacting all financial statement accounts and disclosures that would not be prevented or detected.

Additionally, these material weaknesses could result in misstatements of substantially all accounts and disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

Remediation Plans

We are in the process of implementing measures designed to improve our internal control over financial reporting and remediate the deficiencies that led to the material weaknesses, including tone at the top and other communications training, hiring additional finance and accounting personnel, designing and implementing new control activities, and enhancing existing control activities.

- We reviewed the personnel structure and identified new positions to enhance our accounting and financial reporting team Some of these individuals were onboarded during 2021 while others are expected to be onboarded during 2022. We have and expect to continue to align our personnel to specific areas and responsibilities to alleviate the numerous competing responsibilities currently faced.

- We have commenced developing and formalizing a risk assessment process across the organization to identify risks and design new controls or enhance existing controls responsive to such risks to ensure timely and accurate financial reporting.

- We are in the process of designing and implementing additional review and communications training procedures within our accounting, finance and program management functions to provide more robust knowledge and understanding of internal control over financial reporting.

- We are in the process of implementing a comprehensive financial closing process checklist with additional layers of reviews as well as controls around non-routine, unusual or complex transactions, including controls over the accounting for purchase business combinations.

- We will continue to conduct training, document our processes and procedures, including accounting policies, across the Company to ensure consistent application including controls over the preparation and review of business performance reviews, account reconciliations, journal entries and contract estimates used in determining the recognition of revenue.

- We are in the process of performing an assessment of all information technology systems which provide data for financial reporting purposes. As part of this assessment, we will be designing, implementing and documenting IT general controls.

We are working to remediate the material weaknesses as efficiently and effectively as possible and expect full remediation will likely go beyond December 31, 2022. At this time, we cannot provide an estimate of costs expected to be incurred in connection with implementing this remediation plan; however, these remediation measures will be time consuming, will result in the Company incurring additional costs, and will place additional demands on our financial and operational resources.

If we are unable to successfully remediate our existing or any future material weaknesses in our internal control over financial reporting, the accuracy and timing of our financial reporting may be adversely affected; investors may lose confidence in our financial reporting; we could become subject to litigation or investigations by the New York Stock Exchange ("NYSE"), the SEC or other regulatory authorities.

*Changes in Internal Control over Financial Reporting*

There have been no changes in internal control over financial reporting during the quarter ended December 31, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B. Other Information

*Date of 2022 Annual Meeting of Shareholders*

The Board of Directors of the Company determined that the Company's 2022 annual meeting of shareholders (the "Annual Meeting") will be held virtually by means of remote communication on Wednesday, May 25, 2022. The record date for purposes of determining shareholders entitled to notice of, and vote at, the Annual Meeting has been set as the close of business on April 4, 2022.

Pursuant to the provisions of the Company's Bylaws, for any shareholder to propose business (other than pursuant to and in compliance with Exchange Act Rule 14a-8) or make a nomination before the annual meeting, the shareholder must deliver notice to the Secretary of the Company at the principal executive offices of the Company not later than the close of business on April 18, 2022, which is the tenth calendar day following the day of the filing of this Annual Report on Form 10-K. For the purposes of Rule 14a-8 and the Annual Meeting, the Company has determined that April 18, 2022 is a reasonable time before the Company plans to begin printing and mailing its proxy materials.

*Update to Previously Reported Contracted and Uncontracted Backlog*

On March 31, 2022, the Company filed a Current Report on Form 8-K and furnished its earnings press release announcing its financial results for the year 2021. Subsequently, in connection with the Company's completion of the audit process, the Company has updated the amounts reported in that press release under contracted and uncontracted backlog. Contracted backlog increased by $4.9 million to $139.7 million and uncontracted backlog decreased by the corresponding amount to $131.9 million. Total backlog of $271.6 million, as previously reported, has not changed. Refer to Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations – Key Performance Indicators" for more information about contracted, uncontracted and total backlog as of December 31, 2021.

## Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections

Not applicable

# Part III

## Item 10. Directors, Executive Officers and Corporate Governance

The information required by this item will be contained in our Proxy Statement for the Company's 2022 Annual Meeting of Stockholders and is incorporated herein by reference.

## Item 11. Executive Compensation

The information required by this item will be contained in our Proxy Statement for the Company's 2022 Annual Meeting of Stockholders and is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owner and Management and Related Stockholder Matters**

**Equity Compensation Plan Information**

The following table sets forth information regarding the Company's equity compensation plans as of December 31, 2021:

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights[ii] | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights[iii] | Number of Securities Remaining Available for Future Issuances Under Equity Compensation Plans (Excluding Securities Reflecting in First Column) |
|---|---|---|---|
| Equity Compensation Plans Approved by Security Holders[i] | 3,264,350 | $ 10.00 | 5,427,608 |
| Equity Compensation Plans Not Approved by Security Holders | — | — | — |
| **Total** | 3,264,350 | $ 10.00 | 5,427,608 |

[i] Includes the Redwire Corporation 2021 Omnibus Incentive Plan and the Redwire Corporation 2021 Employee Stock Purchase Plan. As of December 31, 2021, the number of shares reserved for issuance under the 2021 Omnibus Incentive Plan and the 2021 Employee Stock Purchase Plan were 7,936,136 shares and 755,822 shares, respectively. The number of shares reserved for issuance under the 2021 Omnibus Incentive Plan automatically increases each January 1st prior to the termination of the plan, in an amount equal to the lesser of 2% of the total number of shares of common stock outstanding on December 31st of the preceding calendar year or such lesser number of shares as determined by the Board. The total number of shares reserved for issuance under the 2021 Employee Stock Purchase Plan automatically increases for a period of up to ten years, commencing on January 1, 2022, in an amount equal to the lesser of 1% of the total number of shares of common stock outstanding on December 31st of the preceding calendar year, or such lesser number of shares as determined by the Board; provided, however, no more than 8,000,000 shares of Common Stock may be issued in total under the plan.

[ii] Includes 1,716,750 restricted stock units (RSUs) and options to purchase 1,546,000 shares of common stock, each granted and outstanding under the Redwire Corporation 2021 Omnibus Incentive Plan.

[iii] Excludes restricted stock units, which have no exercise price.

The remaining information required by this item will be contained in our Proxy Statement for the Company's 2022 Annual Meeting of Stockholders and is incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by this item will be contained in our Proxy Statement for the Company's 2022 Annual Meeting of Stockholders and is incorporated herein by reference.

**Item 14. Principal Accounting Fees and Services**

The information required by this item will be contained in our Proxy Statement for the Company's 2022 Annual Meeting of Stockholders and is incorporated herein by reference.

## PART IV

**Item 15. Exhibits, Financial Statement Schedules**

The following documents are filed as a part of this Form 10-K:

***(a)(1) All Financial Statements***

| Index to Financial Statements | Page |
|---|---|
| Consolidated Balance Sheets | 63 |
| Consolidated Statements of Operations and Comprehensive Income (Loss) | 64 |
| Consolidated Statements of Changes in Shareholders' Equity | 65 |
| Consolidated Statements of Cash Flows | 66 |
| Notes to Consolidated Financial Statements | 67 |

***(a)(2) Financial Statement Schedules***

None.

***(a)(3) Exhibits.***

The following is a list of all exhibits filed or furnished as part of this report:

| Exhibit Number | Description |
|---|---|
| 2.1† | Agreement and Plan of Merger, dated as of March 25, 2021, by and among Genesis Park Acquisition Corp., Shepard Merger Sub Corporation, Cosmos Intermediate, LLC and Redwire, LLC (incorporated by reference to Annex A to the proxy statement/prospectus filed by Genesis Park Acquisition Corp. on July 6, 2021). |
| 3.1 | Certificate of Incorporation of Redwire Corporation (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed with the SEC on September 10, 2021). |
| 3.2 | Bylaws of Redwire Corporation (incorporated by reference as Exhibit 3.2 to the Registrant's Current Report on Form 8-K filed with the SEC on September 10, 2021). |
| 4.1 | Description of the Registrant's securities. |
| 4.2 | Specimen Warrant Certificate (incorporated by reference to Exhibit 4.3 to the Registration Statement on Form S-1 filed by the Registrant on September 25, 2020). |
| 4.3 | Warrant Agreement, dated as of November 23, 2020, between Continental Stock Transfer & Trust Company and Genesis Park Acquisition Corp. (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed by the Registrant on November 27, 2020). |
| 10.1 | Form of Subscription Agreement, dated November 18, 2020 (incorporated by reference to Exhibit 10.18 to Form 8-K, filed by Genesis Park Acquisition Corp. on November 27, 2020). |
| 10.2 | Form of Subscription Agreement (incorporated by reference to Annex F to the proxy statement/prospectus filed by Genesis Park Acquisition Corp. on July 6, 2021). |
| 10.3 | Investor Rights Agreement, dated as of March 25, 2021, by and among Genesis Park Acquisition Corp., Redwire, LLC, Genesis Park Holdings, Genesis Park II LP and Jefferies LLC (incorporated by reference to Annex H to the proxy statement/prospectus filed by Genesis Park Acquisition Corp. on July 6, 2021). |
| 10.4 | Warrant Forfeiture Agreement, dated as of March 25, 2021, by and among Genesis Park Holdings, Jefferies LLC, Genesis Park Acquisition Corp., Redwire, LLC and Cosmos Intermediate, LLC (incorporated by reference to Annex I to the proxy statement/prospectus filed by Genesis Park Acquisition Corp. on July 6, 2021). |
| 10.5 | Letter Agreement, dated November 23, 2020, by and among Genesis Park Acquisition Corp., Genesis Park Holdings and each director and officer of Genesis Park Acquisition Corp. (incorporated by reference to Exhibit 10.17 to Form 8-K, filed by Genesis Park Acquisition Corp. on November 27, 2020). |
| 10.6+ | Form of Director and Officer Indemnification Agreement (incorporated by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed with the SEC on September 10, 2021). |
| 10.7+ | Redwire Corporation 2021 Omnibus Equity Incentive Plan (incorporated by reference to Exhibit 10.1 to the Registrant's Form S-8 filed with the SEC on November 1, 2021). |

| Exhibit Number | Description |
|---|---|
| 10.8+ | Redwire Corporation 2021 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.2 to the Registrant's Form S-8 filed with the SEC on November 1, 2021). |
| 10.9+ | First Amendment to the Redwire Corporation 2021 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.9 to the Registrant's Form 8-K filed with the SEC on September 10, 2021). |
| 10.10+ | Form of Restricted Stock Unit Award Agreement (Non-Employee Director) under the Redwire Corporation 2021 Omnibus Incentive Plan. |
| 10.11+ | Form of Restricted Stock Unit Award Agreement (Employee) under the Redwire Corporation 2021 Omnibus Incentive Plan. |
| 10.12+ | Form of Nonqualified Stock Option Award Agreement under the Redwire Corporation 2021 Omnibus Incentive Plan. |
| 10.13 | Credit Agreement, dated as of October 28, 2020, by and among Cosmos Finance, LLC, Cosmos Acquisition, LLC, the other Borrowers, Guarantors and Lenders (as defined therein) from time to time parties thereto, Adams Street Credit Advisors LP, as administrative agent and collateral agent and Adams Street Credit Advisors LP, as sole lead arranger and sole bookrunner. |
| 10.14 | First Amendment to Credit Agreement, dated as of February 17, 2021, by and among Cosmos Acquisition, LLC, Cosmos Finance, LLC, the other Borrowers, Guarantors and Lenders (as defined therein) from time to time parties thereto, Adams Street Credit Advisors LP, as administrative agent and collateral agent and the First Amendment Term Lenders (as defined therein). |
| 10.15 | Second Amendment to Credit Agreement, dated as of September 2, 2021, by and among Redwire Holdings, LLC, formerly known as Cosmos Acquisition, LLC, Redwire Intermediate Holdings, LLC, formerly known as Cosmos Finance, LLC, the other Borrowers, Guarantors and Lenders (as defined therein) from time to time parties thereto and Adams Street Credit Advisors LP, as administrative agent and collateral agent. |
| 10.16 | Third Amendment to Credit Agreement, dated as of March 25, 2022, by and between Redwire Holdings, LLC, the other Borrowers party thereto, the Guarantors party thereto, Adams Street Credit Advisors, LP, as Administrative Agent and as Collateral Agent and each lender party thereto (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the SEC on March 30, 2022). |
| 10.17+ | Offer Letter, dated as of March 11, 2020, by and between Cosmos Parent, LLC and Peter Cannito (incorporated by reference to Exhibit 10.25 to the proxy statement/prospectus filed by Genesis Park Acquisition Corp. on July 6, 2021). |
| 10.18+ | Employment Agreement, dated as of June 22, 2020, by and between Cosmos Acquisition, LLC and Andrew Rush (incorporated by reference to Exhibit 10.26 to the proxy statement/prospectus filed by Genesis Park Acquisition Corp. on July 6, 2021). |
| 10.19+ | Employment Agreement, dated as of August 3, 2020, by and between Cosmos Acquisition, LLC and William Read (incorporated by reference to Exhibit 10.27 to the proxy statement/prospectus filed by Genesis Park Acquisition Corp. on July 6, 2021). |
| 16 | Letter of WithumSmith+Brown, PC (incorporated by reference to Exhibit 16.1 to the Registrant's Current Report on Form 8-K filed with the SEC on September 10, 2021). |
| 21 | Subsidiaries of the Registrant. |
| 23.1 | Consent of Independent Registered Public Accounting Firm. |
| 23.2 | Consent of Independent Registered Public Accounting Firm. |
| 31.1 | Certification of Chief Executive Officer (Principal Executive Officer) Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Chief Financial Officer (Principal Financial Officer) Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Chief Executive Officer (Principal Executive Officer) Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Chief Financial Officer (Principal Financial Officer) Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101) |

† Schedules and exhibits to this Exhibit omitted pursuant to Regulation S-K Item 601(b)(2). The Registrant agrees to furnish supplementally a copy of any omitted schedule of exhibit to the SEC upon request.

+ Management or compensatory agreement or arrangement.

* The certifications furnished in Exhibit 32.1 and Exhibit 32.2 hereto are deemed to accompany this Annual Report on Form 10-K and will not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, except to the extent that the registrant specifically incorporates it by reference.

**Item 16. Form 10-K Summary**

None.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

| | | | |
|---|---|---|---|
| | **Redwire Corporation** | | |
| Date: | April 8, 2022 | By: | /s/ Peter Cannito |
| | | Name: | Peter Cannito |
| | | Title: | Chief Executive Officer and Chairman |
| | | | (*Principal Executive Officer*) |

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Peter Cannito | Chief Executive Officer and Chairman (*Principal Executive Officer*) | April 8, 2022 |
| Peter Cannito | | |
| | | |
| /s/ William Read | Chief Financial Officer (*Principal Financial Officer and Principal Accounting Officer*) | April 8, 2022 |
| William Read | | |
| | | |
| /s/ Jonathan S. Baliff | Director | April 8, 2022 |
| Jonathan S. Baliff | | |
| | | |
| /s/ John S. Bolton | Director | April 8, 2022 |
| John S. Bolton | | |
| | | |
| /s/ Louis R. Brothers | Director | April 8, 2022 |
| Louis R. Brothers | | |
| | | |
| /s/ Les Daniels | Director | April 8, 2022 |
| Les Daniels | | |
| | | |
| /s/ Joanne Isham | Director | April 8, 2022 |
| Joanne Isham | | |
| | | |
| /s/ Kirk Konert | Director | April 8, 2022 |
| Kirk Konert | | |

**Exhibit 4.1**

## DESCRIPTION OF SECURITIES

Redwire Corporation ("we," "us," "our," or the "Company") has two classes of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"): common stock, par value $0.0001 per share ("Common Stock"), and warrants, each whole warrant exercisable to purchase one share of Common Stock at an exercise price of $11.50 (the "Warrants"). The following summary of the material terms of the Company's securities is not intended to be a complete summary of the rights and preferences of such securities. We urge you to read our Certificate of Incorporation and Bylaws in their entirety for a complete description of the rights and preferences of Company's securities as well as the Delaware General Corporation Law, as amended (the "DGCL").

Defined terms used herein and not defined herein shall have the meaning ascribed to such terms in the Company's Annual Report on Form 10-K to which this Description of Securities is an exhibit.

### General

Our authorized capital stock consists of 500,000,000 shares of Common Stock, and 100,000,000 shares of preferred stock, par value $0.0001 per share, of the Company (the "Preferred Stock").

### Common Stock

#### Dividend Rights

Subject to applicable law and the rights, if any, of the holders of any outstanding series of our Preferred Stock or any class or series of stock having a preference over or the right to participate with our Common Stock with respect to the payment of dividends, dividends may be declared and paid ratably on our Common Stock out of the assets of the Company that are legally available for this purpose at such times and in such amounts as our board of directors (our "Board") in its discretion shall determine.

#### Voting Rights

Each outstanding share of our Common Stock is entitled to one vote on all matters submitted to a vote of shareholders. Holders of shares of Common Stock do not have cumulative voting rights.

#### Preemptive Rights

Our Common Stock is not be entitled to preemptive or other similar subscription rights to purchase any of our securities.

#### Conversion or Redemption Rights

The Company's Common Stock is neither convertible nor redeemable.

#### Liquidation Rights

Upon our liquidation, the holders of our Common Stock are entitled to receive pro rata the Company's assets that are legally available for distribution, after payment of all debts and other liabilities and subject to the prior rights of any holders of our Preferred Stock then outstanding.

**Preferred Stock**

Our Board may, without further action by our shareholders, from time to time, direct the issuance of shares of Preferred Stock in series and may, at the time of issuance, determine the designations, powers, preferences, privileges and relative participating, optional or special rights as well as the qualifications, limitations or restrictions thereof, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights of our Common Stock. Satisfaction of any dividend preferences of outstanding shares of the Company's Preferred Stock would reduce the amount of funds available for the payment of dividends on shares of the Company's Common Stock. Holders of shares of our Preferred Stock may be entitled to receive a preference payment in the event of our liquidation before any payment is made to the holders of shares of our Common Stock. Under certain circumstances, the issuance of shares of our Preferred Stock may render more difficult or tend to discourage a merger, tender offer or proxy contest, the assumption of control by a holder of a large block of our securities or the removal of incumbent management. Upon the affirmative vote of a majority of the total number of directors then in office, our Board may issue shares of our Preferred Stock with voting and conversion rights which could adversely affect the holders of shares of our Common Stock.

**Warrants**

*Public Warrants*

Each whole Warrant entitles the registered holder to purchase one whole share of our Common Stock at a price of $11.50 per share, subject to adjustment as discussed below, at any time commencing on November 24, 2021. Pursuant to the warrant agreement, dated November 23, 2020, between Genesis Park Acquisition Corp. and Continental Stock Transfer & Trust Company, as warrant agent (as may be amended, supplemented or otherwise modified from time to time, the "Warrant Agreement"), a Warrant holder may exercise its Warrants only for a whole number of shares of Common Stock. This means that only a whole Warrant may be exercised at any given time by a Warrant holder. The Warrants will expire on September 2, 2026, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

We will not be obligated to deliver any shares of our Common Stock pursuant to the exercise for cash of a Warrant and will have no obligation to settle such Warrant exercise unless a registration statement under the Securities Act with respect to the shares of our Common Stock underlying the Warrants is then effective and a prospectus relating thereto is current, subject to our satisfying our obligations described below with respect to registration. No Warrant will be exercisable and we will not be obligated to issue shares of our Common Stock upon exercise of a Warrant unless our Common Stock issuable upon such Warrant exercise has been registered, qualified or deemed to be exempt from the registration or qualifications requirements of the securities laws of the state of residence of the registered holder of the Warrants.

We may call the Warrants for redemption:

- in whole and not in part;

- at a price of $0.01 per Warrant;

- upon not less than 30 days' prior written notice of redemption (the "30-day redemption period") to each Warrant holder; and

- if, and only if, the reported last sale price of our Common Stock (or the closing bid price of our Common Stock in the event shares of our Common Stock are not traded on any specific day) equals or exceeds $18.00 per share for any 20 trading days within a 30 trading day period ending three business days before we send the notice of redemption to the Warrant holders.

If and when the Warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.

We have established the last of the redemption criterion discussed above to prevent a redemption call unless there is at the time of the call a significant premium to the Warrant exercise price. If the foregoing conditions are satisfied and we issue a notice of redemption of the Warrants, each Warrant holder will be entitled to exercise its Warrant prior to the scheduled redemption date. However, the price of our Common Stock may fall below the $18.00 redemption trigger price as well as the $11.50 (for whole shares) Warrant exercise price after the redemption notice is issued.

If we call the Warrants for redemption as described above, our management will have the option to require any holder that wishes to exercise its Warrant to do so on a "cashless basis." In determining whether to require all holders to exercise their Warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of Warrants that are outstanding and the dilutive effect on our shareholders of issuing the maximum number of shares of our Common Stock issuable upon the exercise of our Warrants. If our management takes advantage of this option, all holders of Warrants would pay the exercise price by surrendering their Warrants for that number of shares of our Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of our Common Stock underlying the Warrants, multiplied by the difference between the exercise price of the Warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of our Common Stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of Warrants. If our management takes advantage of this option, the notice of redemption will contain the information necessary to calculate the number of shares of our Common Stock to be received upon exercise of the Warrants, including the "fair market value" in such case. Requiring a cashless exercise in this manner will reduce the number of shares to be issued and thereby lessen the dilutive effect of a Warrant redemption. If we call our Warrants for redemption and our management does not take advantage of this option, the Sponsor and its permitted transferees would still be entitled to exercise their private placement Warrants for cash or on a cashless basis using the same formula described above that other Warrant holders would have been required to use had all Warrant holders been required to exercise their Warrants on a cashless basis, as described in more detail below.

A holder of a Warrant may notify us in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such Warrant, to the extent that after giving effect to such exercise, such person (together with such person's affiliates), to the Warrant agent's actual knowledge, would beneficially own in excess of 4.9% or 9.8% (or such other amount as a holder may specify) of the shares of our Common Stock outstanding immediately after giving effect to such exercise.

If the number of outstanding shares of our Common Stock is increased by a stock dividend payable in shares of our Common Stock, or by a split-up of shares of our Common Stock or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of our Common Stock issuable on exercise of each Warrant will be increased in proportion to such increase in the outstanding shares of our Common Stock. A rights offering to holders of our Common Stock entitling holders to purchase shares of our Common Stock at a price less than the fair market value will be deemed a stock dividend of a number of shares of our Common Stock equal to the product of (i) the number of shares of our Common Stock actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for our Common Stock) and (ii) one minus the quotient of (x) the price per share of our Common Stock paid in such rights offering divided by (y) the fair market value. For these purposes (A) if the rights offering is for securities convertible into or exercisable for our Common Stock, in determining the price payable for our Common Stock, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (B) fair market value means the volume weighted average price of our Common Stock as reported during the 10 trading day period ending on the trading day prior to the first date on which the shares of our Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

If the number of outstanding shares of our Common Stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of our Common Stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of our Common Stock issuable on exercise of each Warrant will be decreased in proportion to such decrease in outstanding shares of our Common Stock.

Whenever the number of shares of our Common Stock purchasable upon the exercise of the Warrants is adjusted, as described above, the Warrant exercise price will be adjusted by multiplying the Warrant exercise price immediately prior to such adjustment by a fraction (x) the numerator of which will be the number of shares of our Common Stock purchasable upon the exercise of the Warrants immediately prior to such adjustment, and (y) the denominator of which will be the number of shares of our Common Stock so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding shares of our Common Stock (other than those described above or that solely affects the par value of such shares of our Common Stock), or in the case of any merger or consolidation of us with or into another corporation (other than a consolidation or merger in which we are the continuing corporation and that does not result in any reclassification or reorganization of our outstanding shares of our Common Stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of us as an entirety or substantially as an entirety in connection with which we are dissolved, the holders of the Warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the Warrants and in lieu of the shares of our Common Stock immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the Warrants would have received if such holder had exercised their Warrants immediately prior to such event. If less than 70% of the consideration receivable by the holders of our Common Stock in such a transaction is payable in the form of our Common Stock in the successor entity that is listed for trading on a national securities exchange or is quoted in an established over-the-counter market, or is to be so listed for trading or quoted immediately following such event, and if the registered holder of the Warrant properly exercises the Warrant within thirty days following public disclosure of such transaction, the Warrant exercise price will be reduced as specified in the Warrant Agreement based on the Black-Scholes Warrant Value (as defined in the Warrant Agreement) of the Warrant.

The Warrants were issued in registered form under the Warrant Agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The Warrant Agreement provides that the terms of the Warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of a majority of the then-outstanding public Warrants to make any change that adversely affects the interests of the registered holders of public Warrants.

The Warrants may be exercised upon surrender of the warrant certificate on or prior to the expiration date at the offices of the warrant agent, with the exercise form on the reverse side of the warrant certificate completed and executed as indicated, accompanied by full payment of the exercise price (or on a cashless basis, if applicable), by certified or official bank check payable to us, for the number of Warrants being exercised. The Warrant holders do not have the rights or privileges of holders of our Common Stock and any voting rights until they exercise their Warrants and receive shares of our Common Stock. After the issuance of shares of our Common Stock upon exercise of the Warrants, each holder will be entitled to one vote for each share held of record on all matters to be voted on by shareholders.

Warrants may be exercised only for a whole number of shares of our Common Stock. No fractional shares will be issued upon exercise of the Warrants. If, upon exercise of the Warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round down to the nearest whole number of shares of our Common Stock to be issued to the Warrant holder.

*Private Placement Warrants*

The private placement Warrants are not redeemable by us, so long as they are held by Genesis Park Holdings, Jefferies LLC, AE Red Holdings, LLC, or their respective permitted transferees. Additionally, for so long as the private placement Warrants are held by Jefferies LLC or its designees or affiliates, they may not be exercised after November 27, 2025. Genesis Park Holdings, Jefferies LLC, AE Red Holdings, LLC and their respective permitted transferees have the option to exercise the private placement Warrants on a cashless basis. Except as described below, the private placement Warrants have terms and provisions that are identical to those of the public Warrants. If the private placement Warrants are held by holders other than the Genesis Park Holdings, Jefferies LLC, AE Red Holdings, LLC or their respective permitted transferees, the private placement Warrants will be

redeemable by us and exercisable by the holders on the same basis as the warrants included in the units sold in Genesis Park Acquisition Corp.'s initial public offering.

If holders of the private placement Warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their Warrants for that number of shares of our Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of our Common Stock underlying the Warrants, multiplied by the excess of the "fair market value" (defined below) of the shares of our Common Stock over the exercise price of the Warrants by (y) the fair market value. The "fair market value" will mean the average reported closing price of the shares of our Common Stock for the 10 trading days ending on the third trading day prior to the date on which the notice of Warrant exercise is sent to the warrant agent. The reason that we have agreed that these Warrants will be exercisable on a cashless basis so long as they are held by the Genesis Park Holdings, Jefferies LLC, AE Red Holdings, LLC s or their respective permitted transferees is because, in the case of Genesis Park Holdings and its permitted transferees, it is not known at this time whether they will be affiliated with Us following an initial business combination and, in the case of Genesis Park Holdings, AE Red Holdings, LLC and their respective permitted transferees, the Sponsor, Jefferies and Holdings agreed that the private placement Warrants purchased by Jefferies and issued to Holdings in connection with the closing of the Merger would have the same terms as the private placement Warrants purchased by the Sponsor. If the Sponsor or Holdings or any of their respective permitted transferees is affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect that we will have policies in place that prohibit insiders from selling our securities, except during specific periods of time. Even during such periods of time when insiders will be permitted to sell our securities, an insider cannot trade in our securities if such insider is in possession of material nonpublic information. Accordingly, unlike public shareholders who could exercise their warrants and sell our Common Stock issuable upon such exercise freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such Warrants on a cashless basis is appropriate.

### Quorum

The holders of a majority of the voting power of the capital stock issued and outstanding and entitled to vote at the meeting, present in person, or represented by proxy, will constitute a quorum at all meetings of the shareholders for the transaction of business except as otherwise required by law, the rules of any stock exchange upon which our securities are listed or provided by the Certificate of Incorporation or Bylaws; provided, however, that where a separate vote by a class or series or classes or series is required, the holders of a majority in voting power of the shares of such class or classes or series of the capital stock of Our issued and outstanding and entitled to vote on such matter, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to the vote on such matter. If, however, such quorum will not be present or represented at any meeting of the shareholders, the chairperson of the meeting or shareholders holding a majority in voting power of the shares of our stock, present in person or by proxy and entitled to vote thereon, shall have the power to adjourn the meeting from time to time without notice other than announcement at the meeting until a quorum shall be present. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting will be given to each shareholder entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

### Anti-Takeover Effects of Our Certificate of Incorporation and Our Bylaws

Our Certificate of Incorporation, Bylaws and the DGCL contain provisions, which are summarized in the following paragraphs that are intended to enhance the likelihood of continuity and stability in the composition of our Board. These provisions are intended to avoid costly takeover battles, reduce our vulnerability to a hostile change of control and enhance the ability of our Board to maximize shareholder value in connection with any unsolicited offer to acquire us. However, these provisions may have an anti-takeover effect and may delay, deter or prevent a merger or acquisition of the Company by means of a tender offer, a proxy contest or other takeover attempt that a shareholder might consider in its best interest, including those attempts that may result in a premium over the prevailing market price for the shares of Common Stock held by shareholders.

These provisions include:

- *Classified Board*: Our Certificate of Incorporation provides that our Board be divided into three classes of directors, with the classes as nearly equal in number as possible, and with the directors serving three-year terms. As a result, approximately one-third of our Board will be elected each year. The classification of directors will have the effect of making it more difficult for shareholders to change the composition of our Board. Our Certificate of Incorporation also provides that, subject to any rights of holders of our Preferred Stock to elect additional directors under specified circumstances, the number of directors will be fixed exclusively pursuant to a resolution adopted by our Board.

- *Shareholder Action by Written Consent*: Our Certificate of Incorporation will preclude shareholder action by written consent at any time when Holdings and its permitted transferees beneficially own, in the aggregate, less than 50% in voting power of our stock entitled to vote generally in the election of directors.

- *Special Meetings of Shareholders*: Our Certificate of Incorporation and Bylaws provides that, except as required by law, special meetings of our shareholders may be called at any time only by or at the direction of our Board or the chairman of our Board. Our Bylaws prohibit the conduct of any business at a special meeting other than as specified in the notice for such meeting. These provisions may have the effect of deferring, delaying or discouraging hostile takeovers, or changes in control or management of the Company.

- *Advance Notice Procedures*: Our Bylaws establish an advance notice procedure for shareholder proposals to be brought before an annual meeting of our shareholders, including proposed nominations of persons for election to our Board. Shareholders at an annual meeting are only able to consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of our Board or by a shareholder who was a shareholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given our Secretary timely written notice, in proper form, of the shareholder's intention to bring that business before the meeting. Although the Bylaws do not give our Board the power to approve or disapprove shareholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting, the Bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of Us.

- *Removal of Directors; Vacancies*: Our Certificate of Incorporation provides that directors may be removed with or without cause upon the affirmative vote of a majority in voting power of all outstanding shares of stock entitled to vote thereon, voting together as a single class; provided, however, at any time when Holdings and its permitted transferees beneficially own, in the aggregate, less than 50% in voting power of our stock entitled to vote generally in the election of directors, directors may only be removed for cause, and only by the affirmative vote of holders of at least 66 2/3% in voting power of all the then-outstanding shares of our stock entitled to vote thereon, voting together as a single class. In addition, our Certificate of Incorporation provides that, subject to the rights of any holders of our Common Stock under the Investor Rights Agreement and the rights granted to one or more series of our Preferred Stock then outstanding, at any time when AE Red Holdings, LLC and its permitted transferees beneficially own, in the aggregate, less than 50% in voting power of our stock, any newly created directorship on our Board that results from an increase in the number of directors and any vacancies on our Board will be filled only by the affirmative vote of a majority of the remaining directors, even if less than a quorum, or by a sole remaining director.

- *Supermajority Approval Requirements*: Our Certificate of Incorporation and Bylaws provide that our Board is expressly authorized to make, alter, amend, change, add to, rescind or repeal, in whole or in part, our Bylaws without a shareholder vote in any matter not inconsistent with the laws of the State of Delaware and our Certificate of Incorporation. The Bylaws may be amended

or repealed, and new bylaws may be adopted, by the affirmative vote of the holders of at least 66 2⁄3% of the voting power of all the then-outstanding shares of stock entitled to vote on such amendment, repeal or adoption, voting together as a single class; provided, however, that if the our Board recommends that shareholders approve such amendment or repeal at such meeting of shareholders, such amendment or repeal shall only require the affirmative vote of the majority of the outstanding shares of stock entitled to vote on such amendment or repeal, voting together as a single class. At any time when AE Red Holdings, LLC and its permitted transferees beneficially own, in the aggregate, less than 50% in voting power of all outstanding shares of the stock of the Company entitled to vote generally in the election of directors, any amendment, alteration, rescission or repeal of our Bylaws by our shareholders will require the affirmative vote of the holders of at least 66 2⁄3% in voting power of all the then-outstanding shares of our stock entitled to vote thereon, voting together as a single class.

The DGCL provides generally that the affirmative vote of a majority of the outstanding shares entitled to vote thereon, voting together as a single class, is required to amend a corporation's certificate of incorporation, unless the certificate of incorporation requires a greater percentage.

Our Certificate of Incorporation provides that at any time when Holdings and its permitted transferees beneficially own, in the aggregate, less than 50% in voting power of the stock of the Company entitled to vote generally in the election of directors, the following provisions in our Certificate of Incorporation may be amended, altered, repealed or rescinded only by the affirmative vote of the holders of at least 66 2⁄3% (as opposed to a majority threshold that would apply if Holdings and its permitted transferees beneficially own, in the aggregate, 50% or more) in voting power of all the then- outstanding shares of our stock entitled to vote thereon, voting together as a single class:

- the provision requiring a 66 2⁄3% supermajority vote for shareholders to amend our Bylaws;

- the provisions providing for a classified board of directors (the election and term of our directors);

- the provisions regarding resignation and removal of directors;

- the provisions regarding entering into business combinations with interested shareholders;

- the provisions regarding shareholder action by written consent;

- the provisions regarding calling special meetings of shareholders;

- the provisions regarding filling vacancies on our Board and newly created directorships;

- the provisions eliminating monetary damages for breaches of fiduciary duty by a director;

- the provision requiring exclusive forum in Delaware; and

- the amendment provision requiring that the above provisions be amended only with a 66 2⁄3% supermajority vote.

The combination of the classification of our Board, the lack of cumulative voting and the supermajority voting requirements will make it more difficult for our existing shareholders to replace our Board as well as for another party to obtain control of us by replacing our Board. Because our Board has the power to retain and discharge our officers, these provisions could also make it more difficult for existing shareholders or another party to effect a change in management.

*Authorized but Unissued Shares*

Our authorized but unissued shares of our Common Stock and our Preferred Stock will be available for future issuance without shareholder approval, subject to stock exchange rules, at the discretion of our Board. These additional shares may be utilized for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. One of the effects of the existence of authorized but unissued Common Stock or Preferred Stock may be to enable our Board to issue shares to persons friendly to current management, which issuance could render more difficult or discourage an attempt to obtain control of the Company by means of a merger, tender offer, proxy contest or otherwise, and thereby protect the continuity of our management and possibly deprive our shareholders of opportunities to sell their shares of our Common Stock at prices higher than prevailing market prices.

**Dissenters' Rights of Appraisal and Payment**

Under the DGCL, with certain exceptions, our shareholders have appraisal rights in connection with a merger or consolidation of us. Pursuant to the DGCL, shareholders who properly request and perfect appraisal rights in connection with such merger or consolidation have the right to receive payment of the fair value of their shares as determined by the Delaware Court of Chancery.

**Shareholders' Derivative Actions**

Under the DGCL, any of our shareholders may bring an action in our name to procure a judgment in Our favor, also known as a derivative action, provided that the shareholder bringing the action is a holder of Our shares at the time of the transaction to which the action relates or such shareholder's stock thereafter devolved by operation of law.

**Exclusive Forum**

Our Certificate of Incorporation provides that, unless we consent in writing to the selection of an alternative forum, a state court within the State of Delaware (or, if no state court within the State of Delaware has jurisdiction, the United States District Court for the District of Delaware) will be the sole and exclusive forum for (1) any derivative action or proceeding brought on Our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any of Our directors, officers or other employees to us or our shareholders, (3) any action asserting a claim against the Company or any director or officer of the Company arising pursuant to any provision of the DGCL, our Certificate of Incorporation or Our Bylaws, (4) any other action asserting a claim against us or any director or officer of the Company that is governed by the internal affairs doctrine or (5) any action asserting an "internal corporate claim" as that term is defined in Section 115 of the DGCL; provided that for the avoidance of doubt, the forum selection provision that identifies a state court within the State of Delaware as the exclusive forum for certain litigation, including any "derivative action", will not apply to suits to enforce a duty or liability created by the Securities Act, the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock will be deemed to have notice of and to have consented to the provisions of our Certificate of Incorporation described above. Although we believe these provisions benefit us by providing increased consistency in the application of Delaware law for the specified types of actions and proceedings, the provisions may have the effect of discouraging lawsuits against us or our directors and officers.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Common Stock is Continental Stock Transfer & Trust Company. The transfer agent's address is 1 State Street, 30th Floor, New York, New York 10004.

**Listing**

Our Common Stock and Warrants are listed on NYSE are under the symbols "RDW" and "RDW.WS", respectively.

**Exhibit 10.10**

**REDWIRE CORPORATION**
**2021 OMNIBUS INCENTIVE PLAN**

**RESTRICTED STOCK UNIT AWARD AGREEMENT (NON-EMPLOYEE DIRECTOR)**

THIS AGREEMENT (the "Agreement") is effective as of the Grant Date, by and between Redwire Corporation, a Delaware corporation (the "Company"), and Grantee.

| | |
|---|---|
| **Grantee:** | |
| **Grant Date:** | |
| **Grant Number:** | |
| **Number of Restricted Stock Units:** | |
| **Vesting Date:** | |

The Company has adopted the Redwire Corporation 2021 Omnibus Incentive Plan (as amended, modified or supplemented from time to time, the "Plan"), by this reference made a part hereof, for the benefit of eligible employees, prospective employees, consultants and non-employee directors of the Company or any of its Affiliates. Capitalized terms used and not otherwise defined herein shall have the meaning ascribed thereto in the Plan.

Pursuant to the Plan, the Committee, which has generally been assigned responsibility for administering the Plan, has determined that it would be in the interest of the Company and its stockholders to grant the Restricted Stock Units (the "RSUs") provided herein in order to provide the Grantee with the potential to earn additional remuneration for services rendered, to encourage the Grantee to remain in the employ of, or in service to, the Company or its Affiliates and to increase the Grantee's personal interest in the continued success and progress of the Company.

The Company and the Grantee therefore agree as follows:

1.    **Grant of RSUs**. Pursuant to the Plan and subject further to the terms and conditions herein, the Company and the Grantee enter into this Agreement pursuant to which the Company grants to the Grantee a Number of Restricted Stock Units, where each RSU represents the right to receive one share of Stock.

2.    **Vesting of RSUs**. The RSUs shall vest as follows:             subject to the Grantee's continuous employment or service with the Company or any of its Affiliates through each such vesting date (such date, and any earlier vesting date pursuant to Section 4(a), a "Vesting Date").

3.    **Settlement of RSUs**. Any RSUs that vest pursuant to Section 2 or Section 4 hereof shall be settled as soon as practicable following the applicable Vesting Date, but in no event later than thirty (30) days (or such shorter time period specified in Section 4) following such Vesting

-1-

Date. Upon such settlement the Company shall deliver to the Grantee certificates representing the applicable number of shares of Stock or cause the applicable number of shares of Stock to be evidenced in book-entry form in the Grantee's name in the stock register of the Company maintained by the Company's transfer agent.

4.    **Termination of Employment or Service**. Subject to Section 4(a) below, if the Grantee ceases employment or service to the Company or the applicable Affiliate for any reason, any unvested RSUs will be immediately forfeited and cancelled, and the Grantee will thereupon cease to have any right or entitlement to receive any shares of Stock under this Agreement.

(a)    Notwithstanding the foregoing,

(i)    upon a Termination due to death or Disability, one hundred percent (100%) of the RSUs shall vest as of the date of such Termination (which shall be considered a Vesting Date for purposes of Section 3) and be settled pursuant to Section 3 hereof; or

(ii)    upon the occurrence of a Change in Control, one hundred percent (100%) of the RSUs shall vest as of the date of such Change in Control (which shall be considered a Vesting Date for purposes of Section 3) and be settled pursuant to Section 3 hereof, subject to the Grantee's continuous employment or service with the Company or any of its Affiliates through the date of such Change in Control.

5.    **No Ownership Rights Prior to Issuance of Shares of Stock; Dividend Equivalents**.

(a)    Neither the Grantee nor any other person shall become the beneficial owner of the shares of Stock underlying the RSUs, nor have any rights of a shareholder (including, without limitation, dividend and voting rights) with respect to any such shares of Stock, unless and until and after such shares of Stock have been settled and delivered to the Grantee pursuant to Section 3 hereof.

(b)    Notwithstanding the foregoing, if, after the Grant Date and prior to the distribution or payment in settlement of the RSUs, dividends with respect to the shares of Stock underlying the RSUs are declared or paid by the Company, the Grantee shall be entitled to receive the equivalent value (in cash or shares of Stock) of any such dividends paid on such shares of Stock ("Dividend Equivalents") in an amount, without interest, equal to the cumulative dividends declared or paid on a share of Stock, if any, during such period multiplied by the number of RSUs that vest. Dividend Equivalents will be subject to the same terms and conditions of this Agreement applicable the RSUs. The Dividend Equivalents will be paid on the applicable date of distribution or payment in settlement of the underlying RSUs in cash or shares of Stock, as determined by the Committee in its discretion. If the underlying RSUs are forfeited or cancelled prior to the applicable date of distribution or payment in settlement of the underlying RSUs for any reason, any accrued and unpaid Dividend Equivalents related to forfeited or cancelled RSUs shall be forfeited and cancelled.

2

6.    **Mandatory Withholding of Taxes**. The Grantee acknowledges and agrees that the Company shall deduct from the shares of Stock or cash otherwise payable or deliverable an amount of cash and/or number of shares of Stock (valued at their Fair Market Value) on the applicable date that is equal to the amount of all federal, state and local income taxes and other taxes of any kind required to be withheld by the Company, as determined by the Committee. With the consent of the Committee, the Grantee may elect to have the Company withhold or purchase, as applicable, from shares of Stock or cash that would otherwise payable or deliverable an amount of cash and/or number of shares of Stock (valued at their Fair Market Value) that shall not exceed the product of the maximum federal rate that could be applicable to the Grantee and the Fair Market Value of the shares of Stock or cash otherwise payable or deliverable, as applicable.

7.    **Restrictions Imposed by Law**. The Grantee agrees that the Company will not be obligated to deliver any shares of Stock to the Grantee if counsel to the Company determines that such delivery would violate any applicable law or any rule or regulation of any governmental authority or any rule or regulation of, or agreement of the Company with, any securities exchange or association upon which the Stock is listed or quoted. The Company shall in no event be obligated to take any affirmative action in order to cause the issuance or delivery of shares of Stock to comply with any such law, rule, regulation or agreement.

8.    **Assignability**. Except as expressly provided herein, the RSUs are not transferable (voluntarily or involuntarily) other than by will or the laws of descent and distribution and may not otherwise be assigned, pledged, hypothecated or otherwise disposed of and shall not be subject to execution, attachment or similar process. Upon any attempt to effect any such disposition, or upon the levy of any such process, the award provided for herein shall immediately become null and void, and the RSUs shall be immediately forfeited and cancelled therefor for no consideration.

9.    **Notice**. Any notice required under this Agreement to be given or delivered to the Company must be in writing and addressed to the Corporate Secretary of the Company at its principal corporate offices. Any notice required to be given or delivered to the Grantee must be in writing and addressed to the Grantee at the address the Grantee designates in writing to the Company.

10.    **Grantee Employment or Service**. Nothing contained in this Agreement, and no action of the Company or the Committee with respect hereto, shall confer or be construed to confer on the Grantee any right to continue in the employ or service of the Company or any of its Affiliates or interfere in any way with the right of the Company or applicable Affiliate to terminate the Grantee's employment or service at any time, with or without Cause.

11.    **Governing Law**. This Agreement is governed by and construed in accordance with the laws of the State of Delaware without giving effect to its conflict of law principles. If any provision of this Agreement is determined by a court of law to be illegal or unenforceable, then such provision will be enforced to the maximum extent possible and the other provisions of the Agreement will remain fully effective and enforceable.

12.    **Construction**. References in this Agreement to "this Agreement" and the words "herein," "hereof," "hereunder" and similar terms include all exhibits and schedules appended hereto, including the Plan. This Agreement is entered into, and the award evidenced hereby is

3

granted, pursuant to the Plan and shall be governed by and construed in accordance with the Plan and the administrative interpretations adopted by the Committee thereunder. All decisions of the Committee upon questions regarding the Plan or this Agreement shall be conclusive. Unless otherwise expressly stated herein, in the event of any inconsistency between the terms of the Plan and this Agreement, the terms of the Plan shall control. The headings of the Sections of this Agreement have been included for convenience of reference only, are not to be considered a part hereof and shall in no way modify or restrict any of the terms or provisions hereof.

13.    **Duplicate Originals**. The Company and the Grantee may execute any number of copies of this Agreement. Each executed copy shall be an original, but all of them together represent the same agreement.

14.    **Rules by Committee**. The rights of the Grantee and obligations of the Company hereunder shall be subject to such reasonable rules and regulations as the Committee may adopt from time to time hereafter.

15.    **Entire Agreement**. The Grantee and the Company hereby declare and represent that no promise or agreement not herein expressed has been made and that this Agreement contains the entire agreement between the parties hereto with respect to the RSUs and replaces and makes null and void any prior agreements, oral or written, between the Grantee and the Company with respect to the RSUs.

16.    **Code Section 409A**. Payments under this Agreement are designed to be made in a manner that is exempt from Code Section 409A as a "short-term deferral," and the provisions of this Agreement will be administered, interpreted and construed accordingly (or disregarded to the extent such provision cannot be so administered, interpreted, or construed).

17.    **Forfeiture and Clawback Provisions**. Notwithstanding any other provision in this Agreement, all RSUs (including any proceeds, gains or other economic benefit actually or constructively received with respect thereto) shall, unless otherwise determined by the Committee or required by applicable law, be subject to the provisions of any clawback policy implemented by the Company or otherwise required by applicable law, whether or not such clawback policy was in place at the Grant Date and whether or not the RSUs are vested.

18.    **Restrictive Covenants**. All outstanding RSUs that have not been settled shall be automatically forfeited to the extent the Grantee violates any noncompetition, nonsolicitation, or any other restrictive covenants that may be contained in any employment or service agreement, restrictive covenant agreement, or any other agreement between the Company or any of its Affiliates and the Grantee, whether entered into prior to, on, or following the Grant Date, and the Grantee hereby reaffirms all such obligations.

19.    **Grantee Acceptance**. The Grantee shall signify acceptance of the terms and conditions of this Agreement by executing this Agreement and returning an executed copy to the Company.

**[*Signature Page Follows*]**

4

**REDWIRE CORPORATION**

By: _____
Name:
Title:


ACCEPTED:


_____
Grantee




Signature Page
to
Restricted Stock Unit Award Agreement

Exhibit 10.11

**REDWIRE CORPORATION**
**2021 OMNIBUS INCENTIVE PLAN**

**RESTRICTED STOCK UNIT AWARD AGREEMENT (EMPLOYEE)**

THIS AGREEMENT (the "Agreement") is effective as of the Grant Date, by and between Redwire Corporation, a Delaware corporation (the "Company"), and Grantee.

| | |
|---|---|
| **Grantee:** | |
| **Grant Date:** | |
| **Grant Number:** | |
| **Number of Restricted Stock Units:** | |

The Company has adopted the Redwire Corporation 2021 Omnibus Incentive Plan (as amended, modified or supplemented from time to time, the "Plan"), by this reference made a part hereof, for the benefit of eligible employees, prospective employees, consultants and non-employee directors of the Company or any of its Affiliates. Capitalized terms used and not otherwise defined herein shall have the meaning ascribed thereto in the Plan.

Pursuant to the Plan, the Committee, which has generally been assigned responsibility for administering the Plan, has determined that it would be in the interest of the Company and its stockholders to grant the Restricted Stock Units (the "RSUs") provided herein in order to provide the Grantee with the potential to earn additional remuneration for services rendered, to encourage the Grantee to remain in the employ of, or in service to, the Company or its Affiliates and to increase the Grantee's personal interest in the continued success and progress of the Company.

The Company and the Grantee therefore agree as follows:

1.      **Grant of RSUs**. Pursuant to the Plan and subject further to the terms and conditions herein, the Company and the Grantee enter into this Agreement pursuant to which the Company grants to the Grantee a Number of Restricted Stock Units, where each RSU represents the right to receive one share of Stock.

2.      **Vesting of RSUs**. The RSUs shall vest as follows:                 in each case, subject to the Grantee's continuous employment or service with the Company or any of its Affiliates through each such vesting date (each, and any earlier vesting date pursuant to Section 4(a), a "Vesting Date").

3.      **Settlement of RSUs**. Any RSUs that vest pursuant to Section 2 or Section 4 hereof shall be settled as soon as practicable following the applicable Vesting Date, but in no event later than thirty (30) days (or such shorter time period specified in Section 4) following such Vesting Date. Upon such settlement the Company shall deliver to the Grantee certificates representing the applicable number of shares of Stock or cause the applicable number of shares of Stock to be

-1-

evidenced in book-entry form in the Grantee's name in the stock register of the Company maintained by the Company's transfer agent.

4.    **Termination of Employment or Service**. Subject to Section 4(a) below, if the Grantee ceases employment or service to the Company or the applicable Affiliate for any reason, any unvested RSUs will be immediately forfeited and cancelled, and the Grantee will thereupon cease to have any right or entitlement to receive any shares of Stock under this Agreement.

(a)    Notwithstanding the foregoing,

(i)    upon a Termination due to death or Disability, one hundred percent (100%) of the RSUs shall vest as of the date of such Termination (which shall be considered a Vesting Date for purposes of Section 3) and be settled pursuant to Section 3 hereof; or

(ii)    upon the occurrence of a Change in Control, (x) to the extent the RSUs are not assumed by the surviving entity in connection with such Change in Control, one hundred percent (100%) of the RSUs shall vest as of the date of such Change in Control (which shall be considered a Vesting Date for purposes of Section 3) and be settled pursuant to Section 3 hereof; and (y) to the extent the RSUs are assumed by the surviving entity in connection with such Change in Control, upon a Termination by the Company or an Affiliate without Cause within the twenty-four (24) month period following such Change in Control, one hundred percent (100%) of the RSUs shall vest as of the date of such Termination and be settled pursuant to Section 3 hereof.

5.    **No Ownership Rights Prior to Issuance of Shares of Stock; Dividend Equivalents**.

(a)    Neither the Grantee nor any other person shall become the beneficial owner of the shares of Stock underlying the RSUs, nor have any rights of a shareholder (including, without limitation, dividend and voting rights) with respect to any such shares of Stock, unless and until and after such shares of Stock have been settled and delivered to the Grantee pursuant to Section 3 hereof.

(b)    Notwithstanding the foregoing, if, after the Grant Date and prior to the distribution or payment in settlement of the RSUs, dividends with respect to the shares of Stock underlying the RSUs are declared or paid by the Company, the Grantee shall be entitled to receive the equivalent value (in cash or shares of Stock) of any such dividends paid on such shares of Stock ("Dividend Equivalents") in an amount, without interest, equal to the cumulative dividends declared or paid on a share of Stock, if any, during such period multiplied by the number of RSUs that vest. Dividend Equivalents will be subject to the same terms and conditions of this Agreement applicable the RSUs. The Dividend Equivalents will be paid on the applicable date of distribution or payment in settlement of the underlying RSUs in cash or shares of Stock, as determined by the Committee in its discretion. If the underlying RSUs are forfeited or cancelled prior to the applicable date of distribution or payment in settlement of the underlying RSUs for any reason, any accrued

2

and unpaid Dividend Equivalents related to forfeited or cancelled RSUs shall be forfeited and cancelled.

6. **Mandatory Withholding of Taxes**. The Grantee acknowledges and agrees that the Company shall deduct from the shares of Stock or cash otherwise payable or deliverable an amount of cash and/or number of shares of Stock (valued at their Fair Market Value) on the applicable date that is equal to the amount of all federal, state and local income taxes and other taxes of any kind required to be withheld by the Company, as determined by the Committee. With the consent of the Committee, the Grantee may elect to have the Company withhold or purchase, as applicable, from shares of Stock or cash that would otherwise payable or deliverable an amount of cash and/or number of shares of Stock (valued at their Fair Market Value) that shall not exceed the product of the maximum federal rate that could be applicable to the Grantee and the Fair Market Value of the shares of Stock or cash otherwise payable or deliverable, as applicable.

7. **Restrictions Imposed by Law**. The Grantee agrees that the Company will not be obligated to deliver any shares of Stock to the Grantee if counsel to the Company determines that such delivery would violate any applicable law or any rule or regulation of any governmental authority or any rule or regulation of, or agreement of the Company with, any securities exchange or association upon which the Stock is listed or quoted. The Company shall in no event be obligated to take any affirmative action in order to cause the issuance or delivery of shares of Stock to comply with any such law, rule, regulation or agreement.

8. **Assignability**. Except as expressly provided herein, the RSUs are not transferable (voluntarily or involuntarily) other than by will or the laws of descent and distribution and may not otherwise be assigned, pledged, hypothecated or otherwise disposed of and shall not be subject to execution, attachment or similar process. Upon any attempt to effect any such disposition, or upon the levy of any such process, the award provided for herein shall immediately become null and void, and the RSUs shall be immediately forfeited and cancelled therefor for no consideration.

9. **Notice**. Any notice required under this Agreement to be given or delivered to the Company must be in writing and addressed to the Corporate Secretary of the Company at its principal corporate offices. Any notice required to be given or delivered to the Grantee must be in writing and addressed to the Grantee at the address the Grantee designates in writing to the Company.

10. **Grantee Employment or Service**. Nothing contained in this Agreement, and no action of the Company or the Committee with respect hereto, shall confer or be construed to confer on the Grantee any right to continue in the employ or service of the Company or any of its Affiliates or interfere in any way with the right of the Company or applicable Affiliate to terminate the Grantee's employment or service at any time, with or without Cause.

11. **Governing Law**. This Agreement is governed by and construed in accordance with the laws of the State of Delaware without giving effect to its conflict of law principles. If any provision of this Agreement is determined by a court of law to be illegal or unenforceable, then such provision will be enforced to the maximum extent possible and the other provisions of the Agreement will remain fully effective and enforceable.

12.     **Construction**. References in this Agreement to "this Agreement" and the words "herein," "hereof," "hereunder" and similar terms include all exhibits and schedules appended hereto, including the Plan. This Agreement is entered into, and the award evidenced hereby is granted, pursuant to the Plan and shall be governed by and construed in accordance with the Plan and the administrative interpretations adopted by the Committee thereunder. All decisions of the Committee upon questions regarding the Plan or this Agreement shall be conclusive. Unless otherwise expressly stated herein, in the event of any inconsistency between the terms of the Plan and this Agreement, the terms of the Plan shall control. The headings of the Sections of this Agreement have been included for convenience of reference only, are not to be considered a part hereof and shall in no way modify or restrict any of the terms or provisions hereof.

13.     **Duplicate Originals**. The Company and the Grantee may execute any number of copies of this Agreement. Each executed copy shall be an original, but all of them together represent the same agreement.

14.     **Rules by Committee**. The rights of the Grantee and obligations of the Company hereunder shall be subject to such reasonable rules and regulations as the Committee may adopt from time to time hereafter.

15.     **Entire Agreement**. The Grantee and the Company hereby declare and represent that no promise or agreement not herein expressed has been made and that this Agreement contains the entire agreement between the parties hereto with respect to the RSUs and replaces and makes null and void any prior agreements, oral or written, between the Grantee and the Company with respect to the RSUs.

16.     **Code Section 409A**. Payments under this Agreement are designed to be made in a manner that is exempt from Code Section 409A as a "short-term deferral," and the provisions of this Agreement will be administered, interpreted and construed accordingly (or disregarded to the extent such provision cannot be so administered, interpreted, or construed).

17.     **Forfeiture and Clawback Provisions**. Notwithstanding any other provision in this Agreement, all RSUs (including any proceeds, gains or other economic benefit actually or constructively received with respect thereto) shall, unless otherwise determined by the Committee or required by applicable law, be subject to the provisions of any clawback policy implemented by the Company or otherwise required by applicable law, whether or not such clawback policy was in place at the Grant Date and whether or not the RSUs are vested.

18.     **Restrictive Covenants**. All outstanding RSUs that have not been settled shall be automatically forfeited to the extent the Grantee violates any noncompetition, nonsolicitation, or any other restrictive covenants that may be contained in any employment or service agreement, restrictive covenant agreement, or any other agreement between the Company or any of its Affiliates and the Grantee, whether entered into prior to, on, or following the Grant Date, and the Grantee hereby reaffirms all such obligations.

19.     **Grantee Acceptance**. The Grantee shall signify acceptance of the terms and conditions of this Agreement by executing this Agreement and returning an executed copy to the Company.

4

[*Signature Page Follows*]

5

**REDWIRE CORPORATION**

By: _____
Name:
Title:


ACCEPTED:


_____
Grantee


Signature Page
to
Restricted Stock Unit Award Agreement

Exhibit 10.12

**REDWIRE CORPORATION**
**2021 OMNIBUS INCENTIVE PLAN**

**NONQUALIFIED STOCK OPTION AWARD AGREEMENT**

THIS AGREEMENT (the "Agreement") is effective as of the Grant Date, by and between Redwire Corporation, a Delaware corporation (the "Company"), and Grantee.

| | |
|---|---|
| **Grantee:** | |
| **Grant Date:** | |
| **Grant Number:** | |
| **Number of Shares:** | |
| **Exercise Price Per Share:** | |
| **Expiration Date:** | |

The Company has adopted the Redwire Corporation 2021 Omnibus Incentive Plan (as amended, modified or supplemented from time to time, the "Plan"), by this reference made a part hereof, for the benefit of eligible employees, prospective employees, consultants and non-employee directors of the Company or any of its Affiliates. Capitalized terms used and not otherwise defined herein shall have the meaning ascribed thereto in the Plan.

Pursuant to the Plan, the Committee, which has generally been assigned responsibility for administering the Plan, has determined that it would be in the interest of the Company and its stockholders to grant the Nonqualified Stock Option (the "Option") provided herein in order to provide the Grantee with the potential to earn additional remuneration for services rendered, to encourage the Grantee to remain in the employ of, or in service to, the Company or its Affiliates and to increase the Grantee's personal interest in the continued success and progress of the Company.

The Company and the Grantee therefore agree as follows:

1.    **Grant of Option**. Pursuant to the Plan and subject further to the terms and conditions herein, the Company and the Grantee enter into this Agreement pursuant to which the Company grants to the Grantee an Option to purchase a Number of Shares of Stock. The exercise price per share of Stock subject to the Option is defined above, and the Option shall expire on the tenth (10th) anniversary of the Grant Date (the "Expiration Date").

2.    **Vesting of Option**. The Option shall vest as follows:           in each case, subject to the Grantee's continuous employment or service with the Company or any of its Affiliates through each such vesting date (each, and any earlier vesting date pursuant to Section 4(a), a "Vesting Date").

-1-

3.      **Exercise of Option**. The Grantee shall be eligible to exercise the vested portion of the Option during its term, subject to the terms of the Plan and this Agreement. The Option shall be deemed exercised once the Company receives (a) a notice of exercise (in such form as the Committee may specify from time to time) from the Grantee, and (b) full payment of the exercise price for the shares of Stock underlying the portion of the Option that will be exercised (together with applicable tax withholding). The Grantee may pay the exercise price (and applicable tax withholding) in a manner approved by the Committee, which may include: (i) in cash or by certified or bank cashier's check, (ii) by delivery of shares of Stock having a value equal to the exercise price, (iii) by a broker-assisted cashless exercise, or (iv) by any other means approved by the Committee.

4.      **Termination of Employment or Service**. Subject to Section 4(a) below, if the Grantee ceases employment or service to the Company or the applicable Affiliate for any reason, the vested and unvested portion of the Option will be immediately forfeited and cancelled, and the Grantee will thereupon cease to have any right or entitlement to receive any shares of Stock under this Agreement.

(a)      Notwithstanding the foregoing,

(i)      upon a Termination (x) due to death or Disability, one hundred percent (100%) of the Option shall vest as of the date of such Termination (which shall be considered a Vesting Date for purposes of Section 3) and any outstanding portion of the Option shall expire on the earlier of (A) the Expiration Date or (B) the one (1)-year anniversary of such Termination; and (y) by the Grantee for any reason or by the Company or applicable Affiliate without Cause, one hundred percent (100%) of the unvested portion of the Option will be forfeited and cancelled for no consideration, and any vested portion of the Option will be cancelled and forfeited for no consideration unless such vested portion is exercised within thirty (30) days of such Termination; or

(ii)     upon the occurrence of a Change in Control, (x) to the extent the Option is not assumed by the surviving entity in connection with such Change in Control, one hundred percent (100%) of the unvested portion of the Option shall vest as of the date of such Change in Control (which shall be considered a Vesting Date for purposes of Section 3), and the Grantee shall receive a cash payment equal to the Fair Market Value of the shares of Stock subject to the Option; and (y) to the extent the Option is assumed by the surviving entity in connection with such Change in Control, upon a Termination by the Company or an Affiliate without Cause within the twenty-four (24) month period following such Change in Control, one hundred percent (100%) of the unvested portion of the Option shall vest as of the date of such Termination, and the Grantee shall have ninety (90) days following the date of such Termination to exercise the vested portion of the Option.

5.      **No Ownership Rights Prior to Issuance of Shares of Stock upon Exercise**. Neither the Grantee nor any other person shall become the beneficial owner of the shares of Stock underlying the Option nor have any rights of a shareholder (including, without limitation, dividend or dividend equivalent and voting rights) with respect to any such shares of Stock underlying the

Option, unless and until and after such shares of Stock have been issued in the name of the Grantee upon exercise of the Option pursuant to Section 3 hereof, as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company.

6.      **Mandatory Withholding of Taxes**. The Grantee acknowledges and agrees that the Company shall deduct from the shares of Stock otherwise deliverable upon exercise a number of shares of Stock (valued at their Fair Market Value) on the applicable date that is equal to the amount of all federal, state and local income taxes and other taxes of any kind required to be withheld by the Company, as determined by the Committee. With the consent of the Committee, the Grantee may elect to have the Company withhold or purchase, as applicable, from shares of Stock that would otherwise be deliverable upon exercise a number of shares of Stock (valued at their Fair Market Value) that shall not exceed the product of the maximum federal rate that could be applicable to the Grantee and the Fair Market Value of the shares of Stock otherwise deliverable.

7.      **Restrictions Imposed by Law**. The Grantee agrees that the Company will not be obligated to deliver any shares of Stock to the Grantee if counsel to the Company determines that such delivery would violate any applicable law or any rule or regulation of any governmental authority or any rule or regulation of, or agreement of the Company with, any securities exchange or association upon which the Stock is listed or quoted. The Company shall in no event be obligated to take any affirmative action in order to cause the issuance or delivery of shares of Stock to comply with any such law, rule, regulation or agreement.

8.      **Assignability**. Except as expressly provided herein, the Option is not transferable (voluntarily or involuntarily) other than by will or the laws of descent and distribution and may not otherwise be assigned, pledged, hypothecated or otherwise disposed of and shall not be subject to execution, attachment or similar process. Upon any attempt to effect any such disposition, or upon the levy of any such process, the award provided for herein shall immediately become null and void, and the Option shall be immediately forfeited and cancelled therefor for no consideration.

9.      **Notice**. Any notice required under this Agreement to be given or delivered to the Company must be in writing and addressed to the Corporate Secretary of the Company at its principal corporate offices. Any notice required to be given or delivered to the Grantee must be in writing and addressed to the Grantee at the address the Grantee designates in writing to the Company.

10.     **Grantee Employment or Service**. Nothing contained in this Agreement, and no action of the Company or the Committee with respect hereto, shall confer or be construed to confer on the Grantee any right to continue in the employ or service of the Company or any of its Affiliates or interfere in any way with the right of the Company or applicable Affiliate to terminate the Grantee's employment or service at any time, with or without Cause.

11.     **Governing Law**. This Agreement is governed by and construed in accordance with the laws of the State of Delaware without giving effect to its conflict of law principles. If any provision of this Agreement is determined by a court of law to be illegal or unenforceable, then such provision will be enforced to the maximum extent possible and the other provisions of the Agreement will remain fully effective and enforceable.

12. **Construction**. References in this Agreement to "this Agreement" and the words "herein," "hereof," "hereunder" and similar terms include all exhibits and schedules appended hereto, including the Plan. This Agreement is entered into, and the award evidenced hereby is granted, pursuant to the Plan and shall be governed by and construed in accordance with the Plan and the administrative interpretations adopted by the Committee thereunder. All decisions of the Committee upon questions regarding the Plan or this Agreement shall be conclusive. Unless otherwise expressly stated herein, in the event of any inconsistency between the terms of the Plan and this Agreement, the terms of the Plan shall control. The headings of the Sections of this Agreement have been included for convenience of reference only, are not to be considered a part hereof and shall in no way modify or restrict any of the terms or provisions hereof.

13. **Duplicate Originals**. The Company and the Grantee may execute any number of copies of this Agreement. Each executed copy shall be an original, but all of them together represent the same agreement.

14. **Rules by Committee**. The rights of the Grantee and obligations of the Company hereunder shall be subject to such reasonable rules and regulations as the Committee may adopt from time to time hereafter.

15. **Entire Agreement**. The Grantee and the Company hereby declare and represent that no promise or agreement not herein expressed has been made and that this Agreement contains the entire agreement between the parties hereto with respect to the Option and replaces and makes null and void any prior agreements, oral or written, between the Grantee and the Company with respect to the Option.

16. **Code Section 409A**. Payments under this Agreement are designed to be made in a manner that is exempt from Code Section 409A as a "short-term deferral," and the provisions of this Agreement will be administered, interpreted and construed accordingly (or disregarded to the extent such provision cannot be so administered, interpreted, or construed).

17. **Forfeiture and Clawback Provisions**. Notwithstanding any other provision in this Agreement, the Option and any shares of Stock issued upon exercise of the Option (including any proceeds, gains or other economic benefit actually or constructively received with respect thereto) shall, unless otherwise determined by the Committee or required by applicable law, be subject to the provisions of any clawback policy implemented by the Company or otherwise required by applicable law, whether or not such clawback policy was in place at the Grant Date and whether or not the Option is vested.

18. **Restrictive Covenants**. The vested and unvested portions of the Option shall be automatically forfeited to the extent the Grantee violates any noncompetition, nonsolicitation, or any other restrictive covenants that may be contained in any employment or service agreement, restrictive covenant agreement, or any other agreement between the Company or any of its Affiliates and the Grantee, whether entered into prior to, on, or following the Grant Date, and the Grantee hereby reaffirms all such obligations.

4

19.      **Grantee Acceptance**. The Grantee shall signify acceptance of the terms and conditions of this Agreement by executing this Agreement and returning an executed copy to the Company.

[*Signature Page Follows*]

5

**REDWIRE CORPORATION**

By: _____
Name:
Title:


ACCEPTED:



_____
Grantee




Signature Page
to
NonQualified Stock Option Award Agreement

**Exhibit 10.13**

CREDIT AGREEMENT

dated as of October 28, 2020 among

COSMOS FINANCE, LLC,
as the Parent,

COSMOS ACQUISITION, LLC,
as the Lead Borrower,

THE OTHER BORROWERS PARTY HERETO FROM TIME TO TIME,

THE OTHER GUARANTORS PARTY HERETO FROM TIME TO TIME, ADAMS STREET CREDIT ADVISORS LP,

as Administrative Agent and Collateral Agent, and

THE LENDERS PARTY HERETO FROM TIME TO TIME

and

ADAMS STREET CREDIT ADVISORS LP,
as Sole Lead Arranger and Sole Bookrunner

TABLE OF CONTENTS

ARTICLE I. DEFINITIONS AND ACCOUNTING TERMS

Section 1.01.   Defined Terms    1
Section 1.02.   Other Interpretive Provisions    68
Section 1.03.   Accounting Terms    70
Section 1.04.   Rounding    70
Section 1.05.   References to Agreements, Laws, Etc    70
Section 1.06.   Exchange Rates    70
Section 1.07.   Compliance with Certain Sections    71
Section 1.08.   Times of Day    71
Section 1.09.   Timing of Payment or Performance    72
Section 1.10.   Cumulative Credit Transactions    72
Section 1.11.   Pro Forma Calculations    72
Section 1.12.   [Reserved]    75
Section 1.13.   Appointment of Lead Borrower    75
Section 1.14.   Certifications    75

ARTICLE II. THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01.   The Loans    75
Section 2.02.   Borrowings, Conversions and Continuations of Loans    76
Section 2.03.   [Reserved]    78
Section 2.04.   [Reserved]    78
Section 2.05.   Prepayments    78
Section 2.06.   Termination or Reduction of Commitments    89
Section 2.07.   Repayment of Loans    90
Section 2.08.   Interest    90
Section 2.09.   Fees    91
Section 2.10.   Computation of Interest and Fees    92
Section 2.11.   Evidence of Indebtedness    92
Section 2.12.   Payments Generally    92
Section 2.13.   Sharing of Payments    94
Section 2.14.   Incremental Credit Extensions    95
Section 2.15.   Refinancing Amendments    102
Section 2.16.   Extension of Term Loans; Extension of Revolving Credit Loans    103
Section 2.17.   Defaulting Lenders    106
Section 2.18.   Permitted Debt Exchanges    107

ARTICLE III. TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY Section 3.01.   Taxes    109

Section 3.02.   Illegality    112
Section 3.03.   Inability to Determine Rates    113
Section 3.04.   Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan Reserves    114

Page

Section 3.05.   Funding Losses   115
Section 3.06.   Matters Applicable to All Requests for Compensation   115
Section 3.07.   Replacement of Lenders under Certain Circumstances   116
Section 3.08.   Survival   118

ARTICLE IV. CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01.   Conditions to Initial Credit Extension   118
Section 4.02.   Conditions to All Credit Extensions after the Closing Date   120

ARTICLE V. REPRESENTATIONS AND WARRANTIES

Section 5.01.   Existence, Qualification and Power; Compliance with Laws   121
Section 5.02.   Authorization; No Contravention   121
Section 5.03.   Governmental Authorization   121
Section 5.04.   Binding Effect   122
Section 5.05.   Financial Statements; No Material Adverse Effect   122
Section 5.06.   Litigation   123
Section 5.07.   Ownership of Real Property; Liens   123
Section 5.08.   Environmental Matters   123
Section 5.09.   Taxes   124
Section 5.10.   ERISA Compliance   124
Section 5.11.   Use of Proceeds   124
Section 5.12.   Margin Regulations; Investment Company Act   124
Section 5.13.   Disclosure   124
Section 5.14.   Labor Matters   125
Section 5.15.   Intellectual Property; Licenses, Etc   125
Section 5.16.   Solvency   125
Section 5.17.   USA Patriot Act; OFAC; FCPA   126
Section 5.18.   Security Documents   126

ARTICLE VI. AFFIRMATIVE COVENANTS

Section 6.01.   Financial Statements   127
Section 6.02.   Certificates; Other Information   130
Section 6.03.   Notices   130
Section 6.04.   Payment of Taxes   131
Section 6.05.   Preservation of Existence, Etc   131
Section 6.06.   Maintenance of Properties; Intellectual Property   131
Section 6.07.   Maintenance of Insurance   131
Section 6.08.   Compliance with Laws   132
Section 6.09.   Books and Records   132
Section 6.10.   Inspection Rights   132
Section 6.11.   Additional Collateral; Additional Borrowers and Guarantors   133
Section 6.12.   Compliance with Environmental Laws   135
Section 6.13.   Further Assurances; Post Closing Obligations   135
Section 6.14.   Designation of Subsidiaries   136
Section 6.15.   Use of Proceeds   136
Section 6.16.   Lines of Business   136

Page

Section 6.17.  End of Fiscal Years   137
Section 6.18.  Lender Meetings   137
Section 6.19.  Transactions with Affiliates   137

ARTICLE VII. NEGATIVE COVENANTS

Section 7.01.  Liens   140
Section 7.02.  Investments   145
Section 7.03.  Indebtedness   149
Section 7.04.  Fundamental Changes   154
Section 7.05.  Dispositions   155
Section 7.06.  Restricted Payments   159
Section 7.07.  [Reserved]   163
Section 7.08.  [Reserved]   164
Section 7.09.  Burdensome Agreements   164
Section 7.10.  Amendments or Waivers of Organizational Documents   166
Section 7.11.  Financial Covenant   166
Section 7.12.  Prepayments, Etc. of Junior Financings   167
Section 7.13.  Permitted Activities   168

ARTICLE VIII. EVENTS OF DEFAULT AND REMEDIES

Section 8.01.  Events of Default   169
Section 8.02.  Remedies Upon Event of Default   171
Section 8.03.  Application of Funds   172
Section 8.04.  Borrower's Right to Cure   172

ARTICLE IX. ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01.  Appointment and Authority   174
Section 9.02.  Rights as a Lender   175
Section 9.03.  Exculpatory Provisions   175
Section 9.04.  Reliance by Administrative Agent and Collateral Agent   176
Section 9.05.  Delegation of Duties   176
Section 9.06.  Resignation of Administrative Agent   176
Section 9.07.  Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders   178
Section 9.08.  No Other Duties, Etc   178
Section 9.09.  Administrative Agent May File Proofs of Claim   178
Section 9.10.  Collateral and Guaranty Matters   179
Section 9.11.  Secured Treasury Services Agreements and Secured Hedge Agreements   180
Section 9.12.  Withholding Tax Indemnity   180

ARTICLE X. MISCELLANEOUS

Section 10.01. Amendments, Etc   181
Section 10.02. Notices and Other Communications; Facsimile Copies   184
Section 10.03. No Waiver; Cumulative Remedies   186
Section 10.04. Attorney Costs and Expenses   186
Section 10.05. Indemnification by the Borrower   187

Page

Section 10.06. Payments Set Aside    189
Section 10.07. Successors and Assigns    189
Section 10.08. Confidentiality    198
Section 10.09. Setoff    199
Section 10.10. Interest Rate Limitation    199
Section 10.11. Counterparts    199
Section 10.12. Integration    200
Section 10.13. Survival of Representations and Warranties    200
Section 10.14. Severability    200
Section 10.15. GOVERNING LAW    200
Section 10.16. WAIVER OF RIGHT TO TRIAL BY JURY    201
Section 10.17. Binding Effect    201
Section 10.18. USA Patriot Act and Beneficial Ownership Regulation Notice    202
Section 10.19. No Advisory or Fiduciary Responsibility    202
Section 10.20. Intercreditor Agreements    202
Section 10.21. Acknowledgement and Consent to Bail-In of Affected Financial Institutions    203
Section 10.22. Closing Date Joinder    203
Section 10.23. Acknowledgment Regarding Any Supported QFCs    203
Section 10.24. Benchmark Transition Event    204

ARTICLE XI. GUARANTEE

Section 11.01. The Guarantee    208
Section 11.02. Obligations Unconditional    208
Section 11.03. Reinstatement    209
Section 11.04. Subrogation; Subordination    209
Section 11.05. Remedies    210
Section 11.06. Instrument for the Payment of Money    210
Section 11.07. Continuing Guarantee    210
Section 11.08. General Limitation on Guarantee Obligations    210
Section 11.09. Release of Guarantors    210
Section 11.10. Right of Contribution    211
Section 11.11. Keepwell    211
Section 11.12. Certain ERISA Matters    211

SCHEDULES

I   Guarantors 1.01A   Commitments
5.06       Litigation
5.07       Real Property
5.08   Environmental Matters 6.01(a)   Auditors
6.13(b)   Post Closing Obligations
6.19   Affiliate Transactions 7.01(b)   Existing Liens 7.02(f)   Existing
Investments 7.03(b)   Existing Indebtedness 7.05(s)   Dispositions
7.09   Burdensome Agreements

10.02   Administrative Agent's Office, Certain Addresses for Notices EXHIBITS

    *Form of*

A       Committed Loan Notice
B       [Reserved]
C-1      Term Note
C-2       Revolving Credit Note
C-3       [Reserved]
C-4    Delayed Draw Term Loan Note D-1    Compliance Certificate
D-2    Solvency Certificate
E-1       Assignment and Assumption
E-2    Sponsor-Controlled Affiliated Lender Notice E-3    Acceptance and Prepayment Notice
E-4    Discount Range Prepayment Notice E-5    Discount Range Prepayment Offer
E-6    Solicited Discounted Prepayment Notice E-7    Solicited Discounted Prepayment Offer E-
8    Specified Discount Prepayment Notice
E-9    Specified Discount Prepayment Response F    Security Agreement
G       Intercompany Note
H       United States Tax Compliance Certificate
I    Sponsor-Controlled Affiliated Lender Assignment and Assumption
J    Joinder

v

LEGAL_US_E # 151177818.11

**CREDIT AGREEMENT**

This CREDIT AGREEMENT is entered into as of October 28, 2020, among Cosmos Acquisition, LLC, a Delaware limited liability company (the "**Buyer**" and the "**Lead Borrower**"), Cosmos Finance, LLC, a Delaware limited liability company (the "**Parent**"), the other Borrowers party hereto from time to time, the other Guarantors party hereto from time to time, Adams Street Credit Advisors LP, as Administrative Agent (in such capacity, including any permitted successors thereto, the "**Administrative Agent**") and as Collateral Agent (in such capacity, including any permitted successors thereto, the "**Collateral Agent**") and each lender from time to time party hereto (collectively, the "**Lenders**" and, individually, a "**Lender**"), and the other Persons party hereto from time to time.

PRELIMINARY STATEMENTS

Pursuant to the Securities Purchase Agreement, dated as of October 28, 2020 (as amended, supplemented, waived or modified from time to time in accordance with the terms herein, the "**Acquisition Agreement**"), by and among Roccor, LLC, a Colorado limited liability company (the "**Target**"), the individuals executing a signature page thereto under the header "Sellers" (the "**Sellers**"), and Douglas Campbell, as representative for the Sellers (the "**Sellers' Representative**"), the Buyer will acquire, directly or indirectly, 100% of the issued and outstanding membership interests of the Target (referred to herein, together with its Subsidiaries, as the "**Company**") (such acquisition, the "**Acquisition**"), following which the Company will become a direct or indirect, as applicable, Wholly- owned Subsidiary of the Buyer.

The Lead Borrower has requested that, prior to but substantially simultaneously with the consummation of the Acquisition, the Lenders extend credit to the Lead Borrower in the form of Initial Term Loans (as this and other capitalized terms used in these preliminary statements are defined in Section 1.01 below), Delayed Draw Term Loan Commitments and Revolving Credit Commitments on the Closing Date.

The proceeds of the Initial Term Loans and, if applicable, the Revolving Credit Loans, together with cash on hand, will be used on the Closing Date (i) to fund the Acquisition, (ii) to pay fees and expenses incurred in connection with the Transactions, and (iii) to fund working capital needs, including the payment of any working capital adjustment pursuant to the Acquisition Agreement.

The applicable Lenders have indicated their willingness to lend on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE I.**
**DEFINITIONS AND ACCOUNTING TERMS**

Section 1.01.   Defined Terms.

As used in this Agreement, the following terms shall have the meanings set forth below: "**Acceptable Discount**" has the meaning set

forth in Section 2.05(a)(v)(D)(2).

"**Acceptable Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Acceptance and Prepayment Notice**" means a written notice of the Lead Borrower's acceptance

of the Acceptable Discount in substantially the form of <u>Exhibit E-3</u>.

"**Acceptance Date**" has the meaning set forth in  <u>Section 2.05(a)(v)(D)(2)</u>.

"**Acquisition**" has the meaning set forth in the preliminary statements to this Agreement.

"**Acquisition Agreement**" has the meaning set forth in the preliminary statements to this Agreement.

"**Additional Lender**" has the meaning set forth in  <u>Section 2.14(c)</u>.

"**Additional Refinancing Lender**" means, at any time, any bank, financial institution or other institutional lender or investor (other than any such bank, financial institution or other institutional lender or investor that is a Lender at such time) that agrees to provide any portion of Credit Agreement Refinancing Indebtedness pursuant to a Refinancing Amendment in accordance with <u>Section 2.15</u> (including any Sponsor-Controlled Affiliated Lender); *provided* that each Additional Refinancing Lender shall be subject to the approval of (i) the Administrative Agent, such approval not to be unreasonably withheld, conditioned, denied or delayed, and solely to the extent such consent would be required pursuant to <u>Section 10.07</u> with respect to an assignment to such Person, to the extent that each such Additional Refinancing Lender is not then an existing Lender, an Affiliate of a then existing Lender, an Approved Fund, or (subject to the same restrictions set forth in <u>Section 10.07(k)</u> as it would otherwise be subject to with respect to any assignment to such a Sponsor-Controlled Affiliated Lender of Initial Term Loans) a Sponsor-Controlled Affiliated Lender and (ii) the Lead Borrower.

 "**Administrative Agent**" means Adams Street Credit Advisors LP in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent, pursuant to <u>Section 9.06</u>.

"**Administrative Agent's Office** " means the Administrative Agent's address and account as set forth on  <u>Schedule 10.02</u>, or such other address or account as the Administrative Agent may from time to time notify the Lead Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affected Class**" has the meaning set forth in  <u>Section 3.07(a)</u>.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, officers, directors, employees, partners, agents, advisors and other representatives.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent, the Lead Arranger and the Bookrunner.

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Credit Agreement, as the same may be amended, restated, amended and restated, supplemented, extended, refinanced or otherwise modified from time to time.

2

"**AHYDO Payment**" shall mean any mandatory prepayment or redemption pursuant to the terms of any Indebtedness, in an amount not to exceed the minimum amount necessary to cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Code Section 163(i).

"**All-In Yield**" shall mean, as to any Indebtedness, the effective yield on such Indebtedness in the reasonable determination of the Administrative Agent and consistent with generally accepted financial practices, taking into account the applicable interest rate margins and any amendments to the interest rate margin on the applicable Indebtedness that became effective subsequent to the Closing Date but prior to the applicable date of determination, any interest rate floors, or similar devices and all fees, including upfront or similar fees or original issue discount (amortized over the shorter of (i) the remaining Weighted Average Life to Maturity of such Indebtedness and (ii) the four years following the date of incurrence thereof) payable generally to all Lenders or other institutions providing such Indebtedness, but excluding any arrangement, underwriting, structuring, ticking, syndication, amendment, consent, unused line, commitment fees and other similar fees payable in connection therewith and other fees payable in connection therewith that are not generally paid to all relevant lenders providing Indebtedness of such type and, if applicable, consent fees for an amendment paid generally to consenting lenders; *provided* that, for purposes of determining the Weighted Average Life to Maturity of the applicable Indebtedness, the effects of any prepayments or amortization made on such applicable Indebtedness prior to the date of the applicable modification, refinancing, refunding, renewal, replacement or extension shall be disregarded; *provided, further*, that if the applicable Indebtedness includes an interest rate floor greater than the applicable interest rate floor under the existing Indebtedness, such differential between the interest rate floors shall be equated to the applicable interest rate margin for purposes of determining whether an actual increase to the interest rate margin under the existing Indebtedness shall be required, but only to the extent an increase in the interest rate floor under the existing Indebtedness would cause an increase in the interest rate then in effect thereunder, and in such case the interest rate floor (but not the interest rate margin) applicable to the existing Indebtedness shall be increased to the extent of such differential between interest rate floors.

"**Alternative Interest Rate Election Event**" has the meaning set forth in  Section 3.03(b).

"**Anti-Terrorism Laws**" shall have the meaning assigned to such term in  Section 5.17(a).

"**Applicable Asset Sale Percentage**" means, for any Disposition, 100%. "**Applicable Discount**" has the meaning set forth in

Section 2.05(a)(v)(C)(2).

"**Applicable ECF Percentage**" means, for any fiscal year, (a) 50%, if the Consolidated Senior Secured Net Leverage Ratio (determined on a Pro Forma Basis in accordance with Section 1.11) as of the last day of such fiscal year is greater than 4.00 to 1.00, (b) 25%, if the Consolidated Senior Secured Net Leverage Ratio (determined on a Pro Forma Basis in accordance with Section 1.11) as of the last day of such fiscal year is less than or equal to 4.00 to 1.00 and greater than 3.50 to 1.00, and (c) 0%, if the Consolidated Senior Secured Net Leverage Ratio (determined on a Pro Forma Basis in accordance with Section 1.11) as of the last day of such fiscal year is less than or equal to 3.50 to 1.00.

"**Applicable Rate**" means a percentage per annum equal to:

(a)    with respect to Initial Term Loans and Delayed Draw Term Loans, (A) for Eurocurrency Rate Loans, 6.00% *per annum* and (B) for Base Rate Loans, 5.00% *per annum*; and

*(b)*    with respect to Revolving Credit Loans and unused Revolving Credit Commitments, (A) for Eurocurrency Rate Loans, 6.00% *per annum*, (B) for Base Rate Loans, 5.00% *per*

3

*annum* and

(c)     in the case of the undrawn commitment fees for the Revolving Credit Commitments, 0.50% per annum.

Notwithstanding the foregoing, (v) the Applicable Rate in respect of any Class of Extended Revolving Credit Commitments or any Extended Term Loans or Revolving Credit Loans made pursuant to any Extended Revolving Credit Commitments shall be the applicable percentages per annum set forth in the relevant Extension Amendment, (w) the Applicable Rate in respect of any Revolving Commitment Increase, any Class of Incremental Term Loans or any Class of Incremental Revolving Loans shall be the applicable percentages per annum set forth in the relevant Incremental Amendment, (x) the Applicable Rate in respect of any Class of Replacement Term Loans shall be the applicable percentages per annum set forth in the relevant agreement, (y) the Applicable Rate in respect of any Class of Refinancing Revolving Credit Commitments, any Class of Refinancing Revolving Credit Loans or any Class of Refinancing Term Loans shall be the applicable percentages per annum set forth in the relevant agreement and (z) in the case of the Initial Term Loans, the Applicable Rate shall be increased as, and to the extent, necessary to comply with the provisions of Section 2.14.

"**Appropriate Lender**" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Assignee**" has the meaning set forth in Section 10.07(b).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit E-1 hereto, or such other form approved by the Administrative Agent.

"**Assignment Taxes**" has the meaning set forth in Section 3.01(b).

"**Attorney Costs**" means and includes all reasonable and documented fees, out-of-pocket expenses and disbursements of (i) one primary external counsel, (ii) if reasonably necessary, one external local counsel in each relevant material jurisdiction, (iii) in the case of an actual or perceived conflict of interest, one firm of counsel for each group of similarly affected parties, and (iv) other external counsel otherwise retained with the Lead Borrower's prior written consent.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auction Agent**" means (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Lead Borrower or any Subsidiary (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Term Loan Prepayment pursuant to Section 2.05(a)(v) or as an arranger in connection with any Permitted Debt Exchange pursuant to Section 2.18; *provided* that the Lead Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent).

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the

4

applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" shall mean (i) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (ii) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate *plus* 0.50%, (b) the Prime Rate in effect on such day and (c) the one-month Eurocurrency Rate *plus* 1.00% (or, if such day is not a Business Day, the immediately preceding Business Day).

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Bookrunner**" means Adams Street Credit Advisors LP, in its capacity as the sole bookrunner. " **Borrower**" shall mean, as the context may

require, (a) the Lead Borrower and (b) thereafter, each

Restricted Subsidiary of the Parent that is a Wholly-owned Material Domestic Subsidiary that shall have become a Borrower pursuant to  Section 6.11. For the avoidance of doubt, the Lead Borrower may (subject to clause (b) and (f) of the "Collateral and Guarantee Requirement") elect to cause any Restricted Subsidiary that is not a Borrower or a Guarantor to cease to be an Excluded Subsidiary and to become a Borrower by causing such Restricted Subsidiary to execute a joinder to this Agreement substantially in the form attached as Exhibit J or in another form and substance reasonably satisfactory to the Administrative Agent and the Lead Borrower and causing such Restricted Subsidiary to satisfy the Collateral and Guarantee Requirement, and any such Restricted Subsidiary shall be a Borrower and a Loan Party hereunder for all purposes (it being understood and agreed that no Foreign Subsidiary may become a "Borrower").

"**Borrower Materials**" has the meaning set forth in  Section 6.01.

"**Borrower Offer of Specified Discount Prepayment**" means the offer by any Company Party to make a voluntary prepayment o f Term Loans at a Specified Discount to par pursuant to Section 2.05(a)(v)(B).

"**Borrower Solicitation of Discounted Prepayment Offers**" means the solicitation by any Company Party of offers for, and the subsequent acceptance, if any, by a Lender of, a voluntary prepayment

5

of Term Loans at a discount to par pursuant to  Section 2.05(a)(v)(D).

"**Borrower Solicitation of Discount Range Prepayment Offers**" means the solicitation by any Company Party of offers for, and the corresponding acceptance by a Lender of, a voluntary prepayment of Term Loans at a specified range of discounts to par pursuant to Section 2.05(a)(v)(C).

"**Borrowing**" means a Revolving Credit Borrowing or a Term Borrowing, as the context may require.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York, and, if such day relates to any Eurocurrency Rate Loan, means any such day that is also a London Banking Day.

"**Buyer**" has the meaning set forth in the preliminary statements to this Agreement.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Leases) by the Parent and its Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Parent and its Restricted Subsidiaries.

"**Capitalized Leases**" means, subject to Section 1.03, all leases that have been or are required to be, in accordance with GAAP, recorded as financing  leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP; *provided further*, that all leases of any Person that are or would be characterized as operating leases in accordance with GAAP on December 31, 2019 (whether or not such operating leases were in effect on such date) shall continue to be accounted for as operating leases (and not as Capitalized Leases) for purposes of this Agreement regardless of any change in GAAP following December 31, 2019 that would otherwise require such leases to be recharacterized as Capitalized Leases.

"**Capitalized Software Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Parent or any Restricted Subsidiary of the Parent:

(a)     Dollars, Euros, Pounds Sterling, Canadian Dollars, Mexican Pesos, Singapore Dollars or any national currency of any Participating Member State in the European Union or local currencies held from time to time in the ordinary course of business,

(b)     readily marketable securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any country that is a member state of the European Union or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition,

(c)     certificates of deposit, time deposits, and eurodollar time deposits with maturities of one year or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not

6

exceeding one year, and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $250,000,000 in the case of U.S. banks and $100,000,000 (or the equivalent thereof as of the date of determination) in the case of foreign banks,

(d)    repurchase obligations for underlying securities of the types described in clauses (b) and (c) above and clause (h) below entered into with any financial institution meeting the qualifications specified in clause (c) above,

(e)    commercial paper rated at least P-2 (or the equivalent thereof) by Moody's or at least A-2 (or the equivalent thereof) by S&P and in each case maturing within 12 months after the date of creation thereof,

(f)    marketable short-term money market and similar securities having a rating of at least P-2 or A-2 (or, in either case, the equivalent thereof) from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized ratings agency), and in each case maturing within 12 months after the date of creation or acquisition thereof,

(g)    readily marketable direct obligations issued by any state, commonwealth, or territory of the United States or any political subdivision or taxing authority thereof having one of the two highest rating categories obtainable from either Moody's or S&P with maturities of 24 months or less from the date of acquisition,

(h)    Indebtedness or preferred Equity Interests issued by Persons with a rating of "A" (or the equivalent thereof) or higher from S&P or "A2" (or the equivalent thereof) or higher from Moody's with maturities of 24 months or less from the date of acquisition,

(i)    solely with respect to any Foreign Subsidiary: (i) obligations of the national government of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; provided such country is a member of the Organization for Economic Cooperation and Development, in each case, maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business provided such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "Approved Foreign Bank"), and, in each case, with maturities of not more than 24 months from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank, in each case, customarily used by entities for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by such Foreign Subsidiary organized in such jurisdiction,

(j)    in the case of investments by any Foreign Subsidiary or investments made in a country outside the United States, Cash Equivalents shall also include investments of the type and maturity described in clauses (a) through (i) above of foreign obligors to the extent such investments are necessary or useful for the business of such Person, which investments have ratings, described in such clauses or equivalent ratings from comparable foreign rating agencies, and

(k)    investment funds investing all or substantially all of their assets in securities of the types described in clauses (a) through (i) above.

7

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above; *provided* that such amounts are converted into any currency listed in clause (a) as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"**Cash Management Obligations**" means obligations owed by any Borrower or any Restricted Subsidiary to any Hedge Bank in respect of any Cash Management Services, in each case, pursuant to a Treasury Services Agreement, and solely to the extent designated by the Lead Borrower and such Hedge Bank as "Cash Management Obligations" in writing to the Administrative Agent (but subject, in any event, to the limitations set forth in the definition of "Hedge Bank"). The designation of any Cash Management Obligations shall not create in favor of such Hedge Bank any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor under the Loan Documents.

"**Cash Management Services**" shall mean any one or more of the following types of services or facilities: (a) ACH transactions; (b) treasury and/or cash management services, including controlled disbursement services, depository, overdraft and electronic funds transfer services, return items and purchasing card services (including all "P-Card" arrangements); (c) foreign exchange facilities; (d) deposit and other accounts; (e) merchant services (other than those constituting a line of credit); (f) provision of performance bonds; and (g) credit card processing, credit or debit card services. For the avoidance of doubt, Cash Management Services do not include Hedging Obligations.

"**Casualty Event**" means any event that gives rise to the receipt by any Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holding Company**" shall mean a Subsidiary of the Parent that has no material assets other than (a) the equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes), or equity interests and indebtedness, in one or more Foreign Subsidiaries, each of which is a CFC, and/or one or more CFC Holding Companies and (b) cash, Cash Equivalents and other assets being held incidental to the holding of assets described in clause (a) of this definition (excluding for purposes of this determination any indebtedness of such Foreign Subsidiaries).

"**Change of Control**" shall be deemed to occur if:

(a)    at any time prior to a Qualified IPO, any combination of Permitted Holders shall fail to own beneficially (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date), directly or indirectly, in the aggregate Equity Interests representing at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Parent; or

(b)    at any time after a Qualified IPO, any person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), but excluding (w) any employee benefit plan of such person and its Subsidiaries and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, (x) any combination of Permitted Holders, (y) any one or more direct or indirect parent companies of the Lead Borrower and in which there is no Person or "group" (other than any persons described in the preceding clause (x)), and (z) any one or more direct or indirect parent companies of Parent in which the Sponsor, directly or indirectly, owns the largest percentage of such parent company's voting Equity Interests, shall have, directly or indirectly,

8

acquired beneficial ownership of Equity Interests representing 40% or more of the aggregate voting power represented by the issued and outstanding Equity Interests of the Relevant Public Company and the Permitted Holders shall own, directly or indirectly, less than such person or "group" of the aggregate voting power represented by the issued and outstanding Equity Interests of the Relevant Public Company; or

(c)    a "change of control" (or similar event) shall occur in any document entered into in connection with Other Term Loans, Other Notes or Credit Agreement Refinancing Indebtedness or Permitted Ratio Debt (or any Permitted Refinancing of any of the foregoing), in each case, with an aggregate outstanding principal amount in excess of the Threshold Amount and secured on a pari passu or junior basis to the Obligations; or

(d)    prior to a Qualified IPO, Parent (or New Parent) shall cease to own, directly or indirectly, 100% of the Equity Interests of the Lead Borrower,

unless, in the case of clause (a) or clause (b) of this definition of "Change of Control", the Permitted Holders have, at such time, the right or the ability by voting power, contract, or otherwise to elect or designate for election at least a majority of the board of directors (or analogous governing body) of Parent or the Relevant Public Company, as applicable.

Notwithstanding the preceding or any provision of Rule 13d-3 of the Exchange Act (or any successor provision), a Person or group shall not be deemed to beneficially own securities subject to an equity or asset purchase agreement, merger agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the transactions contemplated by such agreement.

"**Class**" (a) when used with respect to any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments, (b) when used with respect to Commitments, refers to whether such Commitments are Revolving Credit Commitments, Extended Revolving Credit Commitments of a given Extension Series, Refinancing Revolving Credit Commitments of a given Refinancing Series, Initial Term Commitments, Delayed Draw Term Loan Commitments, Incremental Term Commitments, Refinancing Term Commitments of a given Refinancing Series or Commitments in respect of Replacement Term Loans, and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Revolving Credit Loans, Revolving Credit Loans under Extended Revolving Credit Commitments of a given Extension Series, Incremental Revolving Loans, Revolving Credit Loans under Refinancing Revolving Credit Commitments of a given Refinancing Series, Initial Term Loans, Delayed Draw Term Loans, Extended Term Loans of a given Extension Series, Incremental Term Loans, Refinancing Term Loans of a given Refinancing Series or Replacement Term Loans. Commitments (and in each case, the Loans made pursuant to such Commitments) that have different terms and conditions shall be construed to be in different Classes. Commitments (and, in each case, the Loans made pursuant to such Commitments) that have the same terms and conditions shall be construed to be in the same Class.

"**Closing Date**" means October 28, 2020.

"**Closing Date Financial Statements**" means the reviewed consolidated balance sheets of the Company (as defined in the Acquisition Agreement) as of and for the periods ended (as applicable) December 31, 2018 and December 31, 2019, and the related reviewed statements of income, owners' equity and cash flows (or the equivalent) for the fiscal year then ended.

"**Code**" means the U.S. Internal Revenue Code of 1986, and the United States Treasury Regulations promulgated thereunder, as amended from time to time (unless as specifically provided otherwise).

9

"**Collateral**" means the "Collateral" (or any comparable term) as defined in the Security Agreement and all the "Collateral" or "Pledged Assets" (or comparable terms) as defined in any other Collateral Document and any other assets pledged pursuant to any Collateral Document (but, in any event, excluding the Excluded Assets).

"**Collateral Agent**" means Adams Street Credit Advisors LP in its capacity as collateral agent under the Loan Documents and its successors and permitted assigns.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date, pursuant to Section 4.01(a)(iv) and (ii) at such time as may be designated therein, pursuant to the Collateral Documents or Sections 6.11 or 6.13, subject, in each case, and as applicable, to the limitations and exceptions of this Agreement and the other Loan Documents, if applicable, duly executed by each Loan Party a party thereto;

(b)    all Obligations shall have been unconditionally guaranteed by the Parent, each Borrower (other than with respect to the Obligations of such Borrower) and each existing and subsequently acquired or organized (including, without limitation, by division) Restricted Subsidiary of the Lead Borrower that is a direct or indirect Wholly-owned Material Domestic Subsidiary (other than any Excluded Subsidiary) and not designated as a Borrower hereunder, including those that are listed on Schedule I hereto; *provided* that the Lead Borrower may, in its sole discretion, designate any Restricted Subsidiary that is an Excluded Subsidiary as a Guarantor (or, if a Wholly-owned Material Domestic Subsidiary, a Borrower) in accordance with the definition of "Guarantor" (or "Borrower", if applicable); *provided* that no Foreign Subsidiary shall become a Borrower or a Guarantor unless such security documents and other actions reasonably requested by the Administrative Agent and consistent with the market in such jurisdiction in respect of security and this Agreement (within such time periods as the Administrative Agent may agree in its reasonable discretion) shall have been delivered and/or taken to create and perfect the Liens on the Equity Interests and substantially all assets of such Foreign Subsidiary in its jurisdiction of organization;

(c)    the Obligations and the Guaranty shall have been secured by a first-priority security interest (subject to Liens permitted by Section 7.01) in (i) all of the Equity Interests of the Lead Borrower, of each other Borrower and of each Subsidiary Guarantor (if directly owned by a Loan Party),
(ii) all of the Equity Interests of each Wholly-owned Restricted Subsidiary that is a Material Subsidiary (other than a Domestic Subsidiary described in the following clause (iii) or a Foreign Subsidiary described in clause (iv) below) directly owned by the Parent, the Lead Borrower, any other Borrower or any Subsidiary Guarantor, (iii) 65% of the issued and outstanding voting Equity Interests and 100% of the non- voting Equity Interests of each Restricted Subsidiary that is a Wholly-owned Material Domestic Subsidiary and constitutes a CFC Holding Company that is directly owned by the Parent, the Lead Borrower, any other Borrower or any Subsidiary Guarantor (other than, for the avoidance of doubt, in each case, any Domestic Subsidiary of any Foreign Subsidiary of the Lead Borrower that is a CFC or of any Domestic Subsidiary of the Lead Borrower that is a CFC Holding Company) and (iv) 65% of the issued and outstanding voting Equity Interests and 100% of the non-voting Equity Interests of each Restricted Subsidiary that is a Wholly-owned Material Foreign Subsidiary that is a CFC or CFC Holding Company and directly owned by Parent, the Lead Borrower, any other Borrower or by any Subsidiary Guarantor, in each case other than any Excluded Pledged Subsidiary;

(d)    except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected first-priority security interest (to the extent such security interest may be perfected by delivering certificated securities or instruments, filing financing statements under the Uniform

10

Commercial Code or making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office or as required in the Security Agreement) in substantially all assets of the Lead Borrower, each other Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, Material Real Property, material intercompany notes, cash, deposit accounts, securities accounts and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents;

(e) with respect to Material Real Property, the Administrative Agent shall have received on or before the date required to be delivered pursuant to Section 6.11 or Section 6.13 (after giving effect to any extension by the Administrative Agent) (i) counterparts of a Mortgage with respect to each Material Real Property required to be delivered pursuant to Sections 6.11 and 6.13 (the "**Mortgaged Properties**") duly executed and delivered by the applicable Loan Party, (ii) a policy or policies (or an unconditional binding commitment therefor to be replaced by a final title policy) of title insurance issued by a nationally recognized title insurance company, in such amounts as are customary or otherwise reasonably acceptable to the Administrative Agent not to exceed the Fair Market Value of the applicable Mortgaged Property, insuring the Lien of each Mortgage as a valid first Lien on the Mortgaged Property described therein, free of any other Liens except as permitted by Section 7.01 or as otherwise permitted by the Administrative Agent and otherwise in form and substance reasonably acceptable to the Administrative Agent and the Lead Borrower, together with such endorsements, coinsurance and reinsurance as the Administrative Agent may reasonably request but only to the extent such endorsements are (x) available in the relevant jurisdiction (*provided* that in no event shall the Administrative Agent request a creditors' rights endorsement) and (y) at commercially reasonable rates (the "**Mortgage Policies**"), (iii) a completed Life- of-Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Lead Borrower and each Loan Party relating thereto) and, if any improvements on any Mortgaged Property are located within an area designated a "flood hazard area", evidence of such flood insurance as may be required under Section 6.07, (iv) ALTA surveys in form and substance reasonably acceptable to the Administrative Agent (such approval not to be unreasonably withheld, delayed, denied or conditioned) or such existing surveys together with no-change affidavits sufficient for the title company to remove all standard survey exceptions from the Mortgage Policies and issue the endorsements required in clause (ii) above and (v) to the extent reasonably requested, such customary legal opinions and other documents as the Administrative Agent may reasonably request with respect to any such Mortgaged Property; and

(f) in the case of any Foreign Subsidiary that the Lead Borrower has elected to become a Borrower or a Guarantor in accordance with clause (b) above and Section 6.11, the Administrative Agent shall have received such other customary Collateral Documents as it shall reasonably require to provide and perfect Liens on the Equity Interests and property of such Foreign Subsidiary constituting Collateral for the benefit of the Secured Parties securing the Secured Obligations on a basis substantially comparable to the Liens on the Collateral for the benefit of the Secured Parties securing the Secured Obligations granted by Borrowers and Guarantors that are not Foreign Subsidiaries, in each case, as mutually reasonably agreed by the Lead Borrower and the Administrative Agent and taking into account applicable foreign law and local market custom;

*provided*, *however*, that (i) the foregoing definition (other than as expressly set forth in clauses (b) and (f) above) shall not require, and the Loan Documents shall not contain any requirements as to, the creation or perfection of pledges of, security interests in, Mortgages on, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Assets and (ii) the Liens required

11

to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in this Agreement and the Collateral Documents.

The Administrative Agent may grant extensions of time for the perfection of security interests in, or the delivery of the Collateral Documents and the obtaining of title insurance and surveys with respect to, particular assets and the delivery of assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) or any other compliance with the requirements of this definition where it reasonably determines, in consultation with the Lead Borrower, that perfection or compliance cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement, the Collateral Documents or any other Loan Documents.

Notwithstanding anything herein to the contrary, if the Lead Borrower and the Collateral Agent mutually agree in their reasonable judgment that the cost or other consequences (including adverse tax, accounting and regulatory consequences (other than *de minimis* tax consequences)) of creating or perfecting any Lien on any property is excessive in relation to the benefits afforded to the Secured Parties thereby, then such property may be excluded from the Collateral for all purposes of the Loan Documents.

Notwithstanding anything herein to the contrary (other than as expressly set forth in  clauses (b) and (f)    above), the Borrowers and the Guarantors shall not be required, nor shall the Collateral Agent be authorized (unless otherwise approved by the Lead Borrower), (i) to perfect the above-described pledges, security interests and mortgages by any means other than by (A) filings pursuant to the Uniform Commercial Code in the office of the secretary of state (or equivalent filing office of the relevant State of the respective jurisdiction of organization of Parent, the Lead Borrower, any other Borrower or any Guarantor), (B) filings in United States government offices with respect to intellectual property as expressly required herein and under the other Loan Documents, (C) delivery to the Collateral Agent, for its possession and control, of all Collateral consisting of intercompany notes, instruments, chattel paper and all stock (or similar) certificates of the Lead Borrower and the Restricted Subsidiaries to the extent required herein and under the other Loan Documents, or (D) Mortgages required to be delivered pursuant to this definition of "Collateral and Guarantee Requirement" and fixture filings relating to Material Real Property, (ii) to enter into any control agreement, including, without limitation, with respect to any deposit account, securities account or commodities account or contract, (iii) (a) other than a Foreign Subsidiary that becomes a Borrower or a Guarantor pursuant to Section 6.11, to take any action in any non-U.S. jurisdiction or pursuant to the requirements of the laws of any non-U.S. jurisdiction in order to create any security interests (for the avoidance of doubt, other than the execution of documents by individuals located outside of the U.S.) or (b) to perfect any security interests in assets located outside of (or governed or arising under any Laws outside of) the United States, including with respect to any intellectual property registered outside of the United States (it being understood that there shall be no security agreements or pledge agreements governed by the laws of any non-U.S. jurisdiction), (iv) except as expressly provided above, to take any other action with respect to any Collateral to perfect through control agreements or to otherwise perfect by "control", (v) to provide any notice or to obtain the consent of governmental authorities under the Federal Assignment of Claims Act (or any state equivalent thereof) or (vi) to enter into any source code escrow arrangement (or be obligated to register intellectual property); provided that, for the avoidance of doubt, the Lead Borrower may elect to perform any of the foregoing in its sole discretion.

"**Collateral Documents**" means, collectively, the Security Agreement, any Intercreditor Agreement, the Intellectual Property Security Agreements, the Mortgages, Security Agreement Supplements, security agreements, pledge agreements, or other similar agreements delivered to the Administrative Agent or Collateral Agent pursuant to Sections 4.01(a)(iv), 6.11 or 6.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent or the Collateral Agent (or pursuant to a parallel debt structure, if applicable) for the

12

benefit of the Secured Parties.

"**Commitment**" means a Revolving Credit Commitment, Extended Revolving Credit Commitment of a given Extension Series, Revolving Commitment Increase, Refinancing Revolving Credit Commitment of a given Refinancing Series, Initial Term Commitment, Incremental Term Commitment, Refinancing Term Commitment of a given Refinancing Series or Commitment in respect of Replacement Term Loans, as the context may require.

"**Committed Loan Notice**" means a written notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other or (c) a continuation of Eurocurrency Rate Loans pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A hereto.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time, and any successor statute.

"**Company**" has the meaning set forth in the preliminary statements to this Agreement. " **Company Parties**" means the collective reference to

the Parent and its Restricted Subsidiaries,

and "**Company Party**" means any one of them.

"**Compensation Period**" has the meaning set forth in Section 2.12(c)(ii).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit D-1 hereto.

"**Consolidated EBITDA**" means, for any period, Consolidated Net Income for such period, *plus*:

(a)    without duplication and, except with respect to clauses (vii)(B), (x) and (xi) below, to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income, the sum of the following amounts for such period with respect to the Parent and its Restricted Subsidiaries:

(i)    total interest expense determined in accordance with GAAP (including, (A) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (B) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (C) non-cash interest payments, (D) the interest component of Capitalized Leases, (E) net payments, if any, pursuant to interest Swap Contracts with respect to Indebtedness, (F) amortization of deferred financing fees, debt issuance costs, commissions and fees, (G) the interest component of any pension or other post-employment benefit expense, and (H) to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities (whether amortized or immediately expensed),

(ii)    without duplication, provision for taxes based on income (or similar taxes in lieu of income taxes), profits or capital gains of the Parent and the Restricted Subsidiaries, including federal, foreign, state, local, franchise, excise and similar taxes and foreign withholding taxes paid or accrued during such period including penalties and interest related to such taxes or arising from any tax examinations paid or accrued during such period and, to the extent reflected as a charge in the statement of such Consolidated Net Income (regardless of classification), and any tax distributions made during, or with respect to, such period,

(iii)    depreciation and amortization expense, including the amortization of

13

deferred financing fees or costs, debt issuance costs, commissions, fees, and expenses, capitalized expenditures, Capitalized Software Expenditures or costs, amortization of expenditures relating to software, license and intellectual property payments, amortization of any lease related assets recorded in purchase accounting, depreciation of lease payments, customer acquisition costs, unrecognized prior service costs and actuarial gains and losses related to pensions and other post- employment benefits, depreciation of goodwill, the amortization of original issue discount resulting from the issuance of Indebtedness at less than par and incentive payments, conversion costs, and contract acquisition costs of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP,

(iv)     (A) extraordinary, exceptional, unusual or non-recurring charges, expenses or losses or special items and (B) any losses on sales of assets outside of the ordinary course of business,

(v)     any other non-cash charges, expenses or losses, including, without limitation, any non-cash asset retirement costs, non-cash increase in expenses resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments or due to purchase accounting, or any other acquisition, non-cash compensation charges, non-cash expense relating to the vesting of warrants, impairment charges, write-offs or write-downs for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (i) the Lead Borrower may determine not to add back such non-cash item in the current period or (ii) to the extent the Lead Borrower determines to add back such non-cash item in the current period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period), any non-cash asset retirement costs, non-cash compensation charges and non-cash translation (gain) loss,

(vi)     (x) retention, recruiting, relocation, integration and severance, signing and stay bonuses and expenses, including payments made to employees, producers or others who are subject to non-compete agreements, and stock option and other equity-based compensation expenses, and (y) costs associated with implementation of operational and reporting systems and technology initiatives (including any such payments made in connection with the consummation of the Transactions),

(vii)     (A)(x) restructuring costs, integration costs, opening, pre-opening, consolidation and closing costs for facilities, transactions fees and expenses and management, monitoring, consulting and advisory fees, indemnities and expenses, costs incurred in connection with any non-recurring strategic initiatives, costs incurred in connection with acquisitions and non- recurring intellectual property development after the Closing Date, contract termination costs, other business optimization expenses and charges (including costs and expenses relating to business optimization programs and new systems design, upgrade and implementation costs), project start- up costs and other restructuring charges, accruals or reserves (including restructuring costs related to acquisitions after the Closing Date and to closure/consolidation of facilities and retention charges), any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or public company and public company costs, and (y) transition costs (including systems establishment costs and excess pension charges) and (B) (i) LTM *pro forma* results for acquisitions and dispositions of business entities or properties or assets constituting a division or line of business of any business entity (and purchases and dispositions of intellectual property if pro forma treatment is elected by the Borrower in its discretion on a case-by-case basis), and new contracts and other customary specified transactions,

14

and (ii) the "run rate" amount of cost savings, operating expense reductions, other operating improvements and cost synergies projected by the Lead Borrower in good faith to be realizable in connection with the Transactions or any Specified Transaction or the implementation of an operational initiative or operational change (including, to the extent applicable, from the Transactions or the effect of new customer contracts or projects or increased pricing or volume in existing customer contracts with such cash flow to be generated within a 6 month period after contract signing) before or after the Closing Date (calculated on a Pro Forma Basis as though such cost savings, operating expense reductions, other operating improvements and cost synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions, other operating improvements and cost synergies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that (x) a duly completed certificate signed by a Responsible Officer of the Lead Borrower shall be delivered to the Administrative Agent together with the Compliance Certificate required to be delivered pursuant to Section 6.02, certifying that such cost savings, operating expense reductions, other operating improvements and/or cost synergies are readily identifiable, factually supportable and have been determined in good faith by the Lead Borrower to be reasonably anticipated to be realizable within twenty-four (24) months after the consummation of the Transactions or the applicable Specified Transaction or the implementation of the applicable operational initiative or operational change, as applicable (with actions in respect of any such transaction occurring prior to the Closing Date occurring within twenty-four (24) months of the Closing Date) and (y) no cost savings, operating expense reductions and synergies shall be added pursuant to this clause (vii)(B) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDA, whether through a *pro forma* adjustment or otherwise, for such period;

(viii) any director's fees and related expenses payable to any independent director or operating partner of the Parent or any direct or indirect parent entity thereof, in each case, in cash during such period,

(ix) (A) other accruals, charges, payments, fees and expenses (including rationalization, legal, tax, structuring and other costs and expenses), or any amortization thereof, related to, or otherwise incurred in connection with, the Transactions (including all Transaction Expenses) and all such accruals, charges, payments, fees and expenses payable in connection with the Loan Documents, acquisitions, Investments, Restricted Payments, Dispositions, or any amortization thereof, refinancings, issuances or registrations (actual or proposed) of Indebtedness or Equity Interests whether or not permitted by the terms of this Agreement, any Qualified IPO or repayment of debt, issuance of equity securities, refinancing transactions, negotiation, forbearance, extension or amendment or other modification or waiver of any documentation governing the transactions described in this clause (ix)(A) (including the Loan Documents) (in each case, including any such transaction consummated on the Closing Date and any such transaction undertaken but not completed) (including, for the avoidance of doubt, the effects of expensing all transaction-related expenses in accordance with Account Standards Codification Topic No. 805, Business Combinations) and (B) costs of surety bonds incurred in such period in connection with financing activities permitted by the terms of this Agreement,

(x) to the extent actually received or expected by the Lead Borrower in good faith to be received within 180 days of such determination and not already included in Consolidated Net Income, proceeds of business interruption insurance (it being understood and agreed that, to the extent such anticipated amounts are not actually received within such 180 day period, such amounts shall be deducted in calculating Consolidated EBITDA),

(xi) cash receipts (or any netting arrangements resulting in reduced cash

15

expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back,

(xii)   any non-cash increase in expenses (A) resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments (including any non-cash increase in expenses as a result of last-in first-out and/or first-in first-out methods of accounting) or any other acquisition or (B) due to purchase accounting,

(xiii)  the amount of any expense attributable to minority interests or non- controlling interests of third parties in any non-Wholly-owned Restricted Subsidiary,

(xiv)  the amount of (A) management, consulting, monitoring and advisory fees (including termination and exit fees), transaction fees and related expenses and indemnifications paid to the Permitted Holders in accordance with the Management Agreement and (B) payments by the Parent or any of its Restricted Subsidiaries to any of the Permitted Holders made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures which payments are approved by the Lead Borrower in good faith,

(xv)     any Equity Funded Employee Plan Costs,

(xvi)  the amount of loss or discount on sale of (A) Receivables Assets and related assets in connection with a Receivables Facility and (B) Securitization Assets and related assets in connection with a Qualified Securitization Financing,

(xvii) adjustments (A) of the type evidenced by or contained in the quality of earnings analysis and data or derived from quality of earnings reports prepared by PricewaterhouseCoopers LLP and delivered to the Administrative Agent on September 9, 2020, (B)     evidenced by or contained in a quality of earnings report made available to the Administrative Agent prepared with respect to the target of a Permitted Acquisition or other Investment permitted hereunder by (x) a "big-four" nationally recognized accounting firm or regionally recognized accounting firm or (y) any other accounting firm that shall be reasonably acceptable to the Administrative Agent (such approval not to be unreasonably withheld, delayed, denied or conditioned) with respect to the target of a Permitted Acquisition or other permitted Investment, (C)     consistent with Regulation S-X, or (D) including the *pro forma* adjustments (i) identified in writing and agreed to by the Administrative Agent and (ii) of the type set forth in the Sponsor Model,

(xviii) payments or accruals by the Parent, the Borrowers and their Restricted Subsidiaries paid or accrued during such period in respect of purchase price holdbacks, earn-outs and other similar contingent obligations to the extent deducted in calculating Consolidated Net Income of the Parent, the Borrowers and their Restricted Subsidiaries,

(xix)  with respect to any joint venture that is not a Restricted Subsidiary, an amount equal to the proportion of those items described in clauses (i), (ii) and (iii) above relating to such joint venture corresponding to the Parent's, the Borrowers' and their Restricted Subsidiaries' proportionate share of such joint venture's Consolidated Net Income (determined as if such joint venture were a Restricted Subsidiary),

16

(xx)    any net loss from disposed, abandoned or discontinued operations or product lines,

(xxi)  to the extent reducing Consolidated Net Income, any charges, costs, expenses or losses relating to any litigation (or the settlement thereof),

(xxii) the amount of costs, charges and expenses relating to payments made to option holders of any direct or indirect parent of the Borrowers in connection with, or as a result of, any distribution being made to equityholders of such Person, which payments are being made to compensate such option holders as though they were equityholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted under this Agreement,

(xxiii) any fees, costs and expenses incurred in connection with the implementation of ASC 606 and any non-cash losses or charges resulting from the application of ASC 606,

(xxiv)   any net increases in deferred revenue liabilities (including current portion),

(xxv) to the extent not otherwise added back pursuant to clause (xvii) above, the amount of all non-cash net periodic benefit costs recognized by Parent, the Borrowers or any of their Restricted Subsidiaries with respect to any defined benefit pension plan, and

*minus* (b) without duplication and to the extent included in arriving at such Consolidated Net Income, (i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period) including non- cash gains as a result of last-in first-out and/or first-in first-out methods of accounting, (ii)(x) any extraordinary or unusual net gains and (y) any gains on sales of assets outside of the ordinary course of business (cash and non-cash) and (iii) any net decreases in deferred revenue liabilities (including current portion); *provided* that:

(A)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA (x) currency translation gains and losses related to currency re- measurements of Indebtedness (including the net loss or gain (i) resulting from Swap Contracts for currency exchange risk and (ii) resulting from intercompany indebtedness) and (y) all other foreign currency translation gains or losses to the extent such gains or losses are non-cash items;

(B)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of FASB Accounting Standards Codification 815 and International Accounting Standard No. 39 and their respective related pronouncements and interpretations;

(C)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any income (loss) for such period attributable to the early extinguishment of (i) Indebtedness, (ii) obligations under any Swap Contracts or (iii) other derivative instruments; and

(D)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period the estimated pro forma service costs of pension, post-retirement employee benefits plans and SERPs as evidenced by and derived from the quality of earnings reports prepared by PricewaterhouseCoopers LLP and delivered to the Administrative Agent on September 9, 2020.

17

Notwithstanding anything to the contrary contained herein, (i) all amounts added to Consolidated EBITDA pursuant to clauses (a)(iv) and (a)(vii) above, together with all amounts added back to Consolidated EBITDA pursuant to Section 1.11(c)(ii), shall not exceed, in the aggregate, 25% of Consolidated EBITDA (determined after giving effect to all such amounts that would be added back pursuant to the foregoing) and (ii) for purposes of determining Consolidated EBITDA under this Agreement for any period that includes any of the fiscal quarters ended December 31, 2019, March 31, 2020, June 30, 2020 and September 30, 2020, Consolidated EBITDA for such fiscal quarters shall be $5,478,677.64, $1,024,867.90, $3,103,283.35 and $2,916,090.17, respectively, in each case as may be subject to add-backs and adjustments (without duplication) pursuant to clause (vii)(B) and Section 1.11(c) for the applicable Test Period (subject to the limitations set forth in the immediately preceding clause (i) with respect to such add- backs and adjustments). For the avoidance of doubt, Consolidated EBITDA shall be calculated, including *pro forma* adjustments, in accordance with Section 1.11.

"**Consolidated Net Income**" means, for any period, the net income (loss) of the Parent and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; *provided*, *however*, that, without duplication,

(a)     (i) any after-tax effect of extraordinary items (less all fees and expenses relating thereto), charges or expenses (including relating to the Transactions), (ii) severance, recruiting, retention and relocation costs, charges and expenses, (iii) costs, expenses and charges incurred in connection with curtailments or modifications to pension and post-retirement employee benefits plans and (iv) one-time compensation charges shall be excluded,

(b)     the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income shall be excluded,

(c)     accruals and reserves that are established or adjusted within 12 months after the Closing Date that are so required to be established or adjusted as a result of the Transactions (or within 12 months after the closing of any acquisition or other similar Investment that are so required to be established or adjusted as a result of such acquisition or other similar Investment) in accordance with GAAP or charges as a result of adoption or modification of accounting policies in accordance with GAAP shall be excluded,

(d)     any net after-tax effect of gains or losses (*less* all fees, expenses and charges relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any Equity Interests of any Person, in each case other than in the ordinary course of business, as determined in good faith by the Lead Borrower, shall be excluded,

(e)     the net income (loss) for such period of any Person that is not a Subsidiary of the Parent, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of the Parent shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent subsequently converted into cash or Cash Equivalents) to the Parent or a Restricted Subsidiary thereof in respect of such period,

(f)     any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, goodwill, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case, pursuant to GAAP or SEC guidelines, and the amortization of intangibles arising pursuant to GAAP or SEC guidelines shall be excluded,

18

(g)    any (i) equity or phantom equity based non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs or any other equity-based compensation, and (ii) cash charges associated with the rollover, acceleration or payout of Equity Interests by managers, officers, directors, consultants or employees of the Parent, the Borrowers, any Restricted Subsidiary or any of the Borrowers' direct or indirect parents, shall be excluded,

(h)    any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Lead Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365-day period), shall be excluded,

(i)    to the extent covered by insurance or a third party and actually paid for or reimbursed, or indemnified, or, so long as the Lead Borrower reasonably expects that such amount will in fact be paid for or reimbursed by the insurer or third party and only to the extent that such amount is in fact paid for, reimbursed or indemnified within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded,

(j)    the income (or loss) of any Person accrued prior to the date it becomes a Restricted Subsidiary of the Parent or is merged into or consolidated with the Parent or any of its Restricted Subsidiaries or such Person's assets are acquired by the Parent or any of its Restricted Subsidiaries shall be excluded (except to the extent required for any calculation of Consolidated EBITDA on a Pro Forma Basis in accordance with Section 1.11),

(k)    [reserved],

(l)    the purchase accounting effects of adjustments in component amounts required or permitted by GAAP (including in the inventory, property and equipment, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to the Parent, the Borrowers and their Restricted Subsidiaries), as a result of the Transactions, any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date, or the amortization or write-off of any amounts thereof shall be excluded,

(m)    letter of credit fees shall be excluded,

(n)    any deferred tax expense associated with tax deductions or net operating losses arising as a result of the Transactions, or the release of any valuation allowance related to such items, shall be excluded,

(o)    gains and losses due solely to fluctuations in currency values and the related tax effects determined in accordance with GAAP for such period shall be excluded,

(p)    any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising

19

in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of Statement of Financial Accounting Standards Nos. 87, 106 and 112, and any other items of a similar nature, shall be excluded,

(q)     any non-cash adjustments resulting from the application of Accounting Standards Codification Topic No. 460, *Guarantees*, or any comparable regulation, shall be excluded,

(r)     earn-out obligations and other contingent consideration obligations (including to the extent accounted for as bonuses, compensation or otherwise (and including deferred performance incentives in connection with Permitted Acquisitions or other Investments permitted hereunder whether or not a service component is required from the transferor or its related party)) and adjustments thereof and purchase price adjustments, shall be excluded,

(s)     (i) accruals and reserves (including contingent liabilities) that are (A) established or adjusted within twelve months after the Closing Date that are so required to be established as a result of the Transactions or (B) established or adjusted within twelve months after the closing of any Permitted Acquisition or any other acquisition (other than any such other acquisition in the ordinary course of business) that are so required to be established or adjusted as a result of such Permitted Acquisition or such other acquisition, in each case in accordance with GAAP or (ii) charges, accruals, expenses and reserves as a result of adoption or modification of accounting policies, shall be excluded,

(t)     (i) extraordinary, exceptional, unusual or non-recurring charges, expenses or losses or special items and (ii) any losses on sales of assets outside of the ordinary course of business, shall be excluded,

(u)     retention, recruiting, relocation, integration and signing bonuses and expenses, stock option and other equity-based compensation expenses, severance costs, stay bonuses, transaction fees and expenses and management fees and expenses, including any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or public company and implementation, replacement, development or upgrade of operational, reporting and information technology systems and technology initiatives (including, without limitation, any such payments made in connection with the consummation of the Transactions), shall be excluded,

(v)     [reserved], and

(w)     the amount of (i) management, consulting, monitoring and advisory fees and related expenses paid to the Permitted Holders in accordance with the Management Agreement and
(ii) payments by the Parent or any of its Restricted Subsidiaries to any of the Permitted Holders made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures which payments are approved by the Lead Borrower in good faith, shall be excluded.

In addition, to the extent not already included in the Consolidated Net Income of such Person and its Restricted Subsidiaries in any period, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall include the amount of proceeds received from business interruption insurance.

For the avoidance of doubt, Consolidated Net Income shall be calculated, including *pro forma* adjustments, in accordance with Section 1.11.

20

"**Consolidated Secured Net Debt**" means, as of any date of determination, "Consolidated Total Net Debt" outstanding on such date that is secured by a Lien on the assets of the Lead Borrower and its Restricted Subsidiaries.

"**Consolidated Secured Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Secured Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Consolidated Senior Secured Net Debt**" means, as of any date of determination, "Consolidated Total Net Debt" outstanding on such date that is secured by a first priority Lien on the assets of the Lead Borrower and its Restricted Subsidiaries.

"**Consolidated Senior Secured Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Senior Secured Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Consolidated Total Net Debt**" means, as of any date of determination, subject to Section 8.04(d)(ii), (a) the aggregate principal amount of gross Indebtedness of the Parent and its Restricted Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transactions or any acquisition constituting an Investment permitted under this Agreement) consisting of (i) Indebtedness for borrowed money, (ii) Attributable Indebtedness and (iii) purchase money Indebtedness, *minus* (b) the aggregate amount of Qualified Cash; *provided* that Consolidated Total Net Debt shall not include Indebtedness in respect of letters of credit, except to the extent of unreimbursed amounts thereunder; *provided*, *further*, that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Net Debt until three Business Days after such amount is drawn. For the avoidance of doubt, it is understood that obligations (w) under any PPP Loan (so long as, and solely to the extent to, each such PPP Loan is supported by a cash escrow account in respect thereof on terms reasonably acceptable to the Administrative Agent (it being understood and agreed that the cash collateral accounts in support of the PPP Loans as in effect on the Closing Date are reasonably acceptable to the Administrative Agent)), (x) under Swap Contracts and Treasury Services Agreements, (y) owed by Unrestricted Subsidiaries or (z) under Supplier Financing Facilities do not constitute Consolidated Total Net Debt.

"**Consolidated Total Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Consolidated Working Capital**" means, with respect to the Parent and its Restricted Subsidiaries on a consolidated basis at any date of determination, Current Assets at such date of determination *minus* Current Liabilities at such date of determination; *provided* that increases or decreases in Consolidated Working Capital shall be calculated without regard to any changes in Current Assets or Current Liabilities as a result of (a) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent, (b) the effects of purchase accounting or (c) the effect of fluctuations in the amount of accrued or contingent obligations, assets or liabilities under Swap Contracts.

"**Contract Consideration**" has the meaning set forth in the definition of "Excess Cash Flow". " **Contractual Obligation**" means, as to any

Person, any provision of any security issued by such

Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

21

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power or by contract. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Core Intellectual Property**" means the intellectual property owned by the Loan Parties that is material the operation of the business of the Parent and its Restricted Subsidiaries (taken as a whole) as of the Closing Date.

"**Covered Entity**" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b) or (c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Covered Party**" has the meaning assigned to such term in Section 10.23.

"**Credit Agreement Refinancing Indebtedness**" means (a) Permitted First Priority Refinancing Debt, (b) Permitted Junior Priority Refinancing Debt, (c) Permitted Unsecured Refinancing Debt or
(d) other Indebtedness, in each case, issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) in exchange for, or to extend, renew, replace, repurchase, retire or refinance, in whole or in part, existing Term Loans or existing Revolving Credit Loans (or unused Revolving Credit Commitments), or any then-existing Credit Agreement Refinancing Indebtedness (the "**Refinanced Debt**"); *provided* that (i) such Indebtedness has a scheduled maturity no earlier, and, in the case of any refinancing of Term Loans, a Weighted Average Life to Maturity equal to or greater, than the Refinanced Debt (without giving effect to any amortization or prepayments of such outstanding Term Loans), (ii) such Indebtedness shall not have a greater principal amount than the principal amount of the Refinanced Debt, *plus* accrued interest, fees, premiums (if any) and penalties thereon and fees and expenses associated with the refinancing, *plus* an amount equal to any existing commitment unutilized thereunder, *plus* any other amount that could be incurred pursuant to Section 7.03, (iii) the terms and conditions of such Indebtedness (except as otherwise provided in clauses (i) and (ii) above and clauses (iv) through (ix) below, and excluding pricing, fees and optional prepayment or redemption terms) shall contain such terms as are reasonably satisfactory to the Lead Borrower, the borrower thereof (if not the Lead Borrower) and the lenders providing such Indebtedness; *provided*, that the terms of such Indebtedness shall be consistent with, or (taken as a whole) not materially more favorable to the lenders providing such Credit Agreement Refinancing Indebtedness than those applicable to the Term Facility or revolving commitments being refinanced (unless (x) the lenders under the corresponding class of Term Facility or Incremental Term Loans and Revolving Credit Facility (if applicable) also receive the benefit of such more favorable terms or (y) such covenants or other provisions are applicable only to periods after the latest final maturity date of the Term Facility and revolving credit commitments existing at the time of such refinancing), (iv) the All-In Yield with respect such Credit Agreement Refinancing Indebtedness shall be determined by the applicable Borrowers and the lenders providing such Credit Agreement Refinancing Indebtedness, (v) the applicable Refinanced Debt shall be repaid, repurchased, retired, defeased or satisfied and discharged, and all accrued interest, fees, premiums (if any) and penalties in connection therewith shall be paid, on the date such Credit Agreement Refinancing Indebtedness is issued, incurred or obtained, (vi) such Indebtedness is not at any time guaranteed by any Person other than Guarantors, (vii) to the extent secured, such Indebtedness is not secured by property of the Parent, the Borrowers or any Restricted Subsidiary other than Collateral (or property the Administrative Agent has declined as Collateral) and shall be subject to an Intercreditor Agreement and/or another lien subordination and intercreditor arrangement reasonably satisfactory to the Lead Borrower and the Administrative Agent, (viii) if the applicable Refinanced Debt is subordinated in right of payment to the Obligations, then any Credit Agreement Refinancing Indebtedness in respect thereof shall be subordinated in right of payment to the Obligations, as applicable, on terms
(A) with customary subordination agreements (as determined in good faith by the Lead Borrower) or

22

(B)    otherwise reasonably acceptable to the Lead Borrower and the Administrative Agent, (ix) any Credit Agreement Refinancing Indebtedness shall be *pari passu* or junior in right of payment and, if secured, secured on a *pari passu* or junior basis with respect to security, with respect to the Revolving Credit Facility and the Term Facility, (x) any Credit Agreement Refinancing Indebtedness may (i) participate on a *pro rata* basis, a greater than *pro rata* basis or on a less than *pro rata* basis in any voluntary prepayments hereunder,
(ii)    to the extent such Indebtedness is secured on a *pari passu* basis with the Obligations, may participate on a *pro rata* basis or on a less than *pro rata* basis (but not greater than *pro rata* basis) in any mandatory prepayments hereunder (unless such amounts are declined hereunder) and (iii) shall not require any mandatory prepayments in addition to those hereunder; *provided* that no Credit Agreement Refinancing Indebtedness that is in the form of term loans shall be permitted to be voluntarily or mandatorily prepaid prior to the repayment in full of all Term Loans hereunder, unless accompanied by a ratable offer of prepayment of the Term Loans hereunder, and (xi) any Credit Agreement Refinancing Indebtedness that is Revolving Credit Loans does not mature (or require commitment reductions) prior to the latest maturity date of Revolving Credit Commitments being refinanced and is subject to no greater than *pro rata* borrowing, letter of credit participation and prepayment and commitment reduction provisions with the existing Revolving Credit Facility; *provided, further*, that in determining if the foregoing conditions in this proviso are met, a certificate of a Responsible Officer of the Lead Borrower delivered to the Administrative Agent at least three Business Days (or such shorter period as may be agreed by the Administrative Agent) prior to the issuance of the applicable Credit Agreement Refinancing Indebtedness, together with a reasonably detailed description of the material terms and conditions of such resulting Indebtedness or drafts of the documentation relating thereto, stating that the Lead Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement, shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Lead Borrower within such three Business Day period (or such shorter period as may be reasonably agreed by the Administrative Agent) that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees).

"**Credit Extension**" means a Borrowing (but not a continuation or conversion of a Eurocurrency Rate Loan).

"**Cumulative Credit**" means, at any date, an amount, not less than zero in the aggregate, determined on a cumulative basis equal to, without duplication:

*(a)*    the greater of (i) $2,500,000 and (ii) 25% of Consolidated EBITDA as of the last day of the last Test Period (calculated on a Pro Forma Basis), *plus*

*(b)*    an amount equal to the Cumulative Retained Excess Cash Flow Amount, *plus*

(c)    the cumulative amount of aggregate net proceeds from (i) the sale of Qualified Equity Interests of the Parent or Equity Interests of any other direct or indirect parent of the Borrowers after the Closing Date and on or prior to such time (including upon exercise of warrants or options) (other than (1) a sale to a Restricted Subsidiary, (2) any amount designated as a Cure Amount, (3) any Excluded Contribution Amount, (4) any amount used to build Section 7.02(i) or
(5) any amount used for Equity Funded Employee Plan Costs) which proceeds have been contributed as common equity to the capital of the Lead Borrower or any Restricted Subsidiary and
(ii) the Qualified Equity Interests of the Parent (or Equity Interests of any other direct or indirect parent of the Borrowers) (other than (1) any amount designated as a Cure Amount, (2) any Excluded Contribution Amount or (3) any amount used for Equity Funded Employee Plan Costs) issued upon conversion of Indebtedness (other than Indebtedness that is contractually subordinated in right of payment or security to the Obligations) of the Lead Borrower or any Restricted Subsidiary of the Lead Borrower owed to a Person other than a Loan Party or a Restricted Subsidiary of a Loan Party

23

not previously applied for a purpose (including as a Cure Amount, any Excluded Contribution Amount or any amount used for Equity Funded Employee Plan Costs) other than use in the Cumulative Credit, *plus*

(d)    100% of the aggregate amount of contributions to the common capital (including 100% of the Fair Market Value of property (other than cash and Cash Equivalents) as reasonably determined by the Lead Borrower) of the Lead Borrower and its Restricted Subsidiaries or the net proceeds of the issuance of Qualified Equity Interests of Parent (or any other direct or indirect parent of the Borrowers) contributed to the Lead Borrower and its Restricted Subsidiaries, received
(x) in cash or Cash Equivalents by the Lead Borrower and its Restricted Subsidiaries after the Closing Date (other than from a Restricted Subsidiary or the Lead Borrower and other than (1) any amount designated as a Cure Amount, (2) any Excluded Contribution Amount, (3) any amount used to build Section 7.02(i) or (4) any amount used for Equity Funded Employee Plan Costs) or (y) in other property, *plus*

(e)    100% of the aggregate amount of cash, Cash Equivalents and the Fair Market Value of other property received by the Lead Borrower and each Restricted Subsidiary (as reasonably determined by the Lead Borrower) after the Closing Date from:

(i)    the sale, transfer or other disposition (other than to the Parent or any such Restricted Subsidiary) of the Equity Interests or any assets of an Unrestricted Subsidiary or any minority Investments or other joint venture (that is not a Restricted Subsidiary),

(ii)    any dividend or other distribution by an Unrestricted Subsidiary or received in respect of minority Investments or other joint venture (that is not a Restricted Subsidiary), or

(iii)    any interest, returns of principal, repayments and similar payments by such Unrestricted Subsidiary or received in respect of any minority Investments,

*(f)*    in the event any Unrestricted Subsidiary has been re-designated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Lead Borrower or a Restricted Subsidiary, the Fair Market Value of the Investments of the Lead Borrower and the Restricted Subsidiaries made using the Cumulative Credit in such Unrestricted Subsidiary at the time of such re-designation, combination or transfer (or of the assets transferred or conveyed, as applicable), *plus*

*(g)*    an amount equal to any returns in cash and Cash Equivalents (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income, the Fair Market Value of property and similar amounts) actually received by the Lead Borrower or any Restricted Subsidiary in respect of any Investments to the extent of the Investments originally funded with and in reliance on the Cumulative Credit, *plus*

*(h)*    the proceeds and the fair market value (as reasonably determined by the Lead Borrower) of marketable securities or other property contributed to the Lead Borrower or a Restricted Subsidiary or contributed to the capital of the Lead Borrower and further contributed to a Borrower or a Restricted Subsidiary as cash common equity since the Closing Date from any Person other than the Lead Borrower or a Restricted Subsidiary of the Lead Borrower, *plus*

*(i)*    an aggregate amount equal to the sum of (i) Declined Proceeds and (ii) the Cumulative Retained Asset Sale Proceeds, *minus*

24

*(j)* any amount of the Cumulative Credit used to make Investments pursuant to Sections 7.02(i)(iii) and 7.02(n)(y) after the Closing Date and prior to such time, *minus*

*(k)* any amount of the Cumulative Credit used to pay dividends or make distributions or other Restricted Payments pursuant to Section 7.06(f)(A) or 7.06(g) after the Closing Date and prior to such time, *minus*

*(l)* any amount of the Cumulative Credit used to make payments or distributions in respect of Junior Financings pursuant to Section 7.12 after the Closing Date and prior to such time, *minus*

*(m)* any amount of the Cumulative Credit used to make any Permitted Acquisition pursuant to Section 7.02(i) after the Closing Date and prior to such time, *minus*

(n) the aggregate amount of prepayments, redemptions, purchases, defeasances and other payments made in respect of Junior Financings in reliance on clause (v) of Section 7.12(a); *provided* that, with respect to the amounts set forth in clauses (e)(i), (e)(ii), (e)(iii) and (f) of this definition, such amount shall be limited to the Investments made in such Unrestricted Subsidiary, minority Investments or other joint venture, as applicable, originally funded with and in reliance on the Cumulative Credit (but not in excess of the original amount of the Cumulative Credit used to fund such Investment).

"**Cumulative Retained Asset Sale Proceeds**" has the meaning set forth in the definition of "Net Proceeds".

"**Cumulative Retained Excess Cash Flow Amount**" shall mean, at any date, an amount, not less than zero, determined on a cumulative basis equal to the amount of Excess Cash Flow for all completed Excess Cash Flow Periods that was not required to be applied to prepay the Loans in accordance with Section 2.05(b)(i) (without giving effect to any reduction in respect of prepayments of Indebtedness as provided in clauses (B)(1) through (4) thereof) and including any amount that would otherwise be payable but for not exceeding the dollar threshold contained therein.

"**Cure Amount**" has the meaning set forth in Section 8.04(a).

"**Cure Expiration Date**" has the meaning set forth in Section 8.04(a).

"**Current Assets**" means, with respect to the Parent and the Restricted Subsidiaries on a consolidated basis at any date of determination, all assets (other than cash and Cash Equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Parent and its Restricted Subsidiaries as current assets at such date of determination, other than (i) amounts related to current or deferred Taxes based on income, profits or capital gains, (ii) assets held for sale, (iii) loans (permitted) to third parties, (iv) pension assets, (v) deferred bank fees, (vi) derivative financial instruments and (vii) in the event that any Securitization Facility is accounted for off-balance sheet, (A) gross accounts receivable comprising Securitization Assets sold pursuant to such Securitization Facility less (B) collection against the amount sold pursuant to clause (A), and excluding the effects of adjustments pursuant to GAAP resulting from the application of purchase accounting, as the case may be, in relation to the Acquisition or any consummated acquisition.

"**Current Liabilities**" means, with respect to the Parent and the Restricted Subsidiaries on a consolidated basis at any date of determination, all liabilities that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Parent and its Restricted Subsidiaries as current liabilities

25

at such date of determination, other than (a) the current portion of any Indebtedness, (b) the current portion of interest expense, (c) accruals for current or deferred Taxes based on income or profits, (d) accruals of any costs or expenses related to restructuring reserves, (e) deferred revenue, (f) any Revolving Credit Exposure or Revolving Credit Loans, and (g) the current portion of pension liabilities and excluding the effects of adjustments pursuant to GAAP resulting from the application of purchase accounting, as the case may be, in relation to the Acquisition or any consummated acquisition.

"**Debt Fund Affiliate**" means any affiliate of Parent or the Sponsor (other than a natural person) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course and whose managers have fiduciary duties to the third-party investors in such fund or investment vehicle independent of their duties to Parent or the Sponsor.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Declined Proceeds**" has the meaning set forth in Section 2.05(b)(viii).

"**Default**" shall mean any event, act, or condition set forth in Article VIII that with notice or lapse of time, or both, as set forth in such Article VIII would (unless cured or waived hereunder) constitute an Event of Default.

"**Default Rate**" means (a) with respect to overdue principal, an interest rate equal to (i) the Base Rate *plus* (ii) the Applicable Rate, if any, applicable to Base Rate Loans *plus* (iii) 2.00% per annum; *provided* that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan *plus* 2.00% per annum, and (b) with respect to any other overdue amount (including overdue interest), the interest rate (including any Applicable Rate) applicable to Base Rate Loans *plus* 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**Defaulting Lender**" means, subject to Section 2.17(b), any Lender that, as reasonably determined by the Administrative Agent and the Borrower, (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans within one Business Day of the date required to be funded by it hereunder, (b) has notified the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Administrative Agent or the Lead Borrower, to confirm in a manner satisfactory to the Administrative Agent and the Lead Borrower, as applicable, that it will comply with its funding obligations, (d) has failed, within two Business Days after request by the Administrative Agent, to pay any amounts owing to the Administrative Agent or the other Lenders, (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment ort (f) has, or has a direct or indirect parent company that has, become the subject of a Bail-in Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or

26

acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority.

"**Delayed Draw Term Loan Commitment**" shall mean $15,000,000; *provided*, that the Delayed Draw Term Loan Commitment shall be reduced to zero ($0) on the Delayed Draw Term Loan Expiration Date.

"**Delayed Draw Term Loan Expiration Date**" shall mean the earlier of (i) the first anniversary of the Closing Date or (ii) the date as of which the Delayed Draw Term Loan Commitment has been fully utilized in accordance with the terms of Section 2.01(b).

"**Delayed Draw Term Loans**" shall mean a Loan made by the Delayed Draw Term Loan Lenders to the Borrowers pursuant to Section 2.01(b).

"**Delayed Draw Term Loan Note**" shall mean a promissory note with respect to the Delayed Draw Term Loans substantially in the form of Exhibit C-4.

"**Designated Non-Cash Consideration**" means non-cash consideration received by any Borrower or a Restricted Subsidiary in connection with a Disposition pursuant to Section 7.05(j) that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer, setting forth the basis of such valuation.

"**Discount Prepayment Accepting Lender**" has the meaning set forth in Section 2.05(a)(v)(B)(2).

"**Discount Range**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Discount Range Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Discount Range Prepayment Notice**" means a written notice of a Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.05(a)(v)(C) substantially in the form of Exhibit E-4.

"**Discount Range Prepayment Offer**" means the irrevocable written offer by a Lender, substantially in the form of Exhibit E-5, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"**Discount Range Prepayment Response Date**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Discount Range Proration**" has the meaning set forth in Section 2.05(a)(v)(C)(3).

"**Discounted Prepayment Determination Date**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Discounted Prepayment Effective Date**" means in the case of a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offer or Borrower Solicitation of Discounted Prepayment Offer, five Business Days following the Specified Discount Prepayment Response Date, the Discount Range Prepayment Response Date or the Solicited Discounted Prepayment Response Date, as applicable, in accordance with Sections 2.05(a)(v)(B)(1), 2.05(a)(v)(C)(1) or 2.05(a)(v)(D)(1), respectively, unless a shorter period is agreed to between the Lead Borrower and the Auction Agent.

"**Discounted Term Loan Prepayment**" has the meaning set forth in  Section 2.05(a)(v)(A).

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (including any sale of Equity Interests (other than by the issuance thereof)), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests and cash in lieu of fractional shares), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than (i) contingent indemnification obligations not then due and (ii) Cash Management Obligations or obligations and liabilities pursuant to Secured Hedge Agreements) that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than (i) contingent indemnification obligations not then due and (ii) Cash Management Obligations or obligations and liabilities pursuant to Secured Hedge Agreements) that are accrued and payable and the termination of the Commitments), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Latest Maturity Date at the time of issuance of such Equity Interests; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of the Parent (or any direct or indirect parent thereof), the Borrowers or the Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Parent or its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of the termination, death or disability of such employee.

"**Disqualified Lender**" means any banks, financial institutions, institution lenders or any other Person (x) that have been specified to the Lead Arrangers by the Lead Borrower in writing at any time on or prior to the Closing Date (provided that such list may be updated by the Lead Borrower from time to time to include any other Person reasonably acceptable to the Administrative Agent) or to any Affiliates of such banks, financial institutions or institution lenders or other Persons, in each case that are readily identifiable as Affiliates on the basis of such affiliate's name or that have been specified to the Lead Arrangers by the Lead Borrower in writing, (y) that constitutes a competitor of the Lead Borrower or the Lead Borrower's subsidiaries or any Affiliate of such competitor that is readily identifiable as an Affiliate of such competitor on the basis of such Affiliate's name or that have been specified to the Lead Arrangers by the Lead Borrower in writing (and in each case other than a competitor that is a bona fide debt fund), or
(z) that is a Lender's or any of a Lender's Affiliates' deal teams that are engaged as principals primarily in private equity, mezzanine financing or venture capital (other than a bona fide debt fund) or are engaged in the sale of the Company and its subsidiaries, including through the provision of advisory services (the "**Excluded Affiliates**"). Notwithstanding anything to the contrary contained in this Agreement, (a) the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Lenders in such capacity and (b) the Borrowers (on behalf of themselves and the other Loan Parties) and the Lenders acknowledge and agree that the Administrative Agent shall have no responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Lender and that the Administrative

28

Agent shall have no liability with respect to any assignment or participation made to a Disqualified Lender. " **Dollar**" and "**$**" mean lawful money of the

United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" has the meaning set forth in Section 10.07(a)(i).

"**Enforcement Qualifications**" has the meaning set forth in Section 5.04.

"**Environment**" means indoor air, ambient air, surface water, groundwater, drinking water, land surface, subsurface strata or sediment, and natural resources such as wetlands, flora and fauna or as otherwise defined in any Environmental Law.

"**Environmental Laws**" means any applicable Law relating to the prevention of pollution or the protection of the Environment and natural resources, and the protection of human health and safety as it relates to exposure to Hazardous Materials, including any applicable provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.* (as it relates to exposure to Hazardous Materials), and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.*, and all analogous state or local statutes, and the regulations promulgated pursuant thereto.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Restricted Subsidiary directly or indirectly resulting from or based upon (a) noncompliance with any Environmental Law including any failure to obtain, maintain or comply with any Environmental Permit,
(b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials,
(c)     exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract or agreement to the extent pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any applicable Environmental Law.

29

"**Equity Funded Employee Plan Costs**" means cash costs or expenses, incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent funded with cash proceeds contributed to the capital of the Lead Borrower or net cash proceeds of an issuance of Qualified Equity Interests of the Lead Borrower or Equity Interests of any direct or indirect parent of the Lead Borrower (other than any amount designated as a Cure Amount, any Excluded Contribution Amount or any amount used in calculating the Cumulative Credit).

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities); *provided*, that any instrument evidencing Indebtedness convertible or exchangeable for Equity Interests shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with a Loan Party or any Restricted Subsidiary within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Loan Party, any Restricted Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party, any Restricted Subsidiary or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent (within the meaning of Section 4245 of ERISA) or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for, and that could reasonably be expected to result in, the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA, whether or not waived; (h) a failure by a Loan Party, any Restricted Subsidiary or any ERISA Affiliate to make a required contribution to a Multiemployer Plan; (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to a Loan Party or any Restricted Subsidiary; or (j) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due under Section 4007 of ERISA, upon a Loan Party, any Restricted Subsidiary or any ERISA Affiliate.

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Eurocurrency Rate**" means: for each Interest Period, the higher of (a) 1.00% per annum and (b) the offered rate per annum for deposits of Dollars for the applicable Interest Period that appears on the

30

applicable Bloomberg screen page (or the applicable successor page) as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period. If no such offered rate exists, such rate will be the rate of interest per annum, as determined by Administrative Agent in its reasonable discretion at which deposits of Dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period by major financial institutions reasonably satisfactory to Administrative Agent in the London interbank market for such Interest Period for the applicable principal amount on such date of determination.

"**Eurocurrency Rate Loan**" means a Loan that bears interest based on the Eurocurrency Rate. " **Euros**" means lawful currency of the

European Union.

"**Event of Default**" has the meaning set forth in  Section 8.01.

"**Excess Cash Flow**" means, for any Excess Cash Flow Period, an amount equal to:

     (a)     the sum, without duplication, of:

        (i)     Consolidated Net Income for such Excess Cash Flow Period,

        (ii)     an amount equal to the amount of all non-cash charges (including depreciation and amortization) to the extent deducted in arriving at such Consolidated Net Income,

        (iii)     decreases in Consolidated Working Capital for such Excess Cash Flow Period (other than (A) any such decreases arising from acquisitions or dispositions by the Parent and its Restricted Subsidiaries completed during such Excess Cash Flow Period or (B) reclassification of items from short-term to long-term or vice versa in accordance with GAAP),

        (iv)     an amount equal to the aggregate net non-cash loss on Dispositions by the Parent and its Restricted Subsidiaries during such Excess Cash Flow Period (other than sales in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income, and

        *(v)*     expenses deducted from Consolidated Net Income during such Excess Cash Flow Period in respect of expenditures made during any prior Excess Cash Flow Period for which a deduction from Excess Cash Flow was made in such Excess Cash Flow Period pursuant to clause (b)(xi), (xii), (xiii), (xv) or (xvi) below, *minus*

     (b)     the sum, without duplication, of:

        (i)     an amount equal to the amount of all non-cash gains and credits included in arriving at such Consolidated Net Income (including, to the extent constituting non-cash credits, amortization of deferred revenue acquired as a result of any Permitted Acquisition or other consummated acquisition permitted hereunder), and Transaction Expenses to the extent not deducted in arriving at such Consolidated Net Income and paid in cash during such period, and cash charges, losses, costs, fees or expenses to the extent excluded in arriving at such Consolidated Net Income during such period,

        (ii)     without duplication of amounts deducted pursuant to clause (xi) below in prior Excess Cash Flow Periods, the amount of any Capital Expenditures, Capitalized Software Expenditures or acquisitions of intellectual property to the extent not expensed or accrued during

31

such Excess Cash Flow Period, to the extent that such Capital Expenditures, Capitalized Software Expenditures or acquisitions were financed with Internally Generated Cash,

(iii)   to the extent financed with Internally Generated Cash, the aggregate amount of all principal payments of Indebtedness of the Parent and its Restricted Subsidiaries (including (A) the principal component of payments in respect of Capitalized Leases, (B) the amount of any scheduled repayment of Initial Term Loans pursuant to Section 2.07, Extended Term Loans, Refinancing Term Loans, Incremental Term Loans, Replacement Term Loans, Other Term Loans, Other Notes, (C) any mandatory prepayment of Term Loans pursuant to Section 2.05(b)(ii), Other Term Loans, Other Notes and Permitted Ratio Debt to the extent required due to a Disposition that resulted in an increase to Consolidated Net Income and not in excess of the amount of such increase and (D) payments of earn-outs or seller notes or notes converted from an earn-out, but excluding (X) all other prepayments of Term Loans and any other Indebtedness secured on a *pari passu* basis with the Term Loans (other than (x) prepayments referred to in clause (C) above and
(y) revolving Indebtedness) and (Y) all prepayments in respect of any revolving credit facility, except to the extent there is an equivalent permanent reduction in commitments thereunder),

(iv)   an amount equal to the aggregate net non-cash gain on dispositions by the Parent and its Restricted Subsidiaries during such Excess Cash Flow Period (other than dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income,

(v)   increases in Consolidated Working Capital for such Excess Cash Flow Period (other than (A) any such increases arising from acquisitions or dispositions by the Parent and its Restricted Subsidiaries during such Excess Cash Flow Period or (B) reclassification of items from short-term to long-term or vice versa in accordance with GAAP),

(vi)   cash payments by the Parent and its Restricted Subsidiaries during such Excess Cash Flow Period in respect of long-term liabilities of the Parent and its Restricted Subsidiaries other than Indebtedness to the extent such payments are not expensed during such Excess Cash Flow Period or are not deducted in calculating Consolidated Net Income and to the extent financed with Internally Generated Cash,

(vii)   without duplication of amounts deducted pursuant to clause (xi) below in prior Excess Cash Flow Periods, the amount of any Investments or acquisitions during such Excess Cash Flow Period pursuant to Section 7.02 (other than Section 7.02(a) or (c)) to the extent that such Investments and acquisitions were financed with Internally Generated Cash,

(viii)   the amount of Restricted Payments paid during such Excess Cash Flow Period pursuant to Section 7.06 (other than Section 7.06(f)(A), (q) and (s)) to the extent such Restricted Payments were financed with Internally Generated Cash,

(ix)   the aggregate amount of expenditures actually made by the Parent and its Restricted Subsidiaries in cash during such Excess Cash Flow Period (including Capital Expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such Excess Cash Flow Period, in each case to the extent financed with Internally Generated Cash,

(x)   the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by the Parent and its Restricted Subsidiaries during such Excess Cash Flow Period that are required to be made in connection with any prepayment of Indebtedness, in each

32

case to the extent financed with Internally Generated Cash,

(xi)    without duplication of amounts deducted from Excess Cash Flow in prior Excess Cash Flow Periods and, at the option of the Lead Borrower, (1) the aggregate consideration required to be paid in cash by the Parent and its Restricted Subsidiaries pursuant to binding contracts or executed letters of intent (the "**Contract Consideration**") entered into (x) prior to or during such Excess Cash Flow Period (including all contracts on account of which the Parent or any of its Subsidiaries have deferred revenue) or (y) at the election of the Lead Borrower, any Contract Consideration paid after year-end and prior to when such Excess Cash Flow prepayment is due, and (2) any planned cash expenditures by the Parent or any of the Restricted Subsidiaries, in the case of each of clauses (1) and (2) relating to Permitted Acquisitions, Investments (other than Investments made pursuant to Section 7.02(a) or (c)), Capital Expenditures or Capitalized Software Expenditures to be consummated or made during the period of four consecutive fiscal quarters following the end of the applicable Excess Cash Flow Period, *plus* any restructuring cash expenses, pension payments or tax contingency payments then due and payable that have been added to Excess Cash Flow pursuant to clause (a)(ii) above; *provided* that to the extent the aggregate amount of Internally Generated Cash actually utilized to finance such acquisitions, Investments, Capital Expenditures or Capitalized Software Expenditures during such Excess Cash Flow Period is less than the Contract Consideration, together with the amount of planned cash expenditures pursuant to clause (2) above, the amount of such shortfall shall be added to the calculation of Excess Cash Flow for the next fiscal year,

(xii)    without duplication of amounts deducted from Excess Cash Flow in prior Excess Cash Flow Periods, the amount of cash taxes (including penalties and interest) paid or tax reserves set aside or payable (without duplication) in such Excess Cash Flow Period, *plus* the amount of distributions with respect to taxes made in such Excess Cash Flow Period under Section 7.06, in each case, to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such Excess Cash Flow Period,

(xiii)    cash expenditures in respect of Swap Contracts during such Excess Cash Flow Period to the extent not deducted in arriving at such Consolidated Net Income,

(xiv)    any payment of cash to be amortized or expensed over a future Excess Cash Flow Period and recorded as a long-term asset,

(xv)    reimbursable or insured expenses incurred during such Excess Cash Flow Period to the extent that such reimbursement has not yet been received and to the extent not deducted in arriving at such Consolidated Net Income,

(xvi)    cash expenditures for costs and expenses (including retention, recruiting, relocation, stay and signing bonuses and expenses) in connection with the Transactions (including all Transaction Expenses), acquisitions, Investments, Restricted Payments, dispositions and the issuance of equity interests or Indebtedness, repayments of debt, Qualified IPOs, refinancing transactions or amendments or other modifications of any debt instrument (including, in each case, any such transaction consummated on the Closing Date and any such transaction undertaken but not completed), in each case to the extent not deducted in arriving at such Consolidated Net Income,

(xvii)    payments by the Parent and its Restricted Subsidiaries during such Excess Cash Flow Period in respect of purchase price holdbacks, earn-outs, other contingent obligations and long-term liabilities (other than the current portion thereof) of the Parent and its Restricted Subsidiaries other than Indebtedness (including purchase price holdbacks, earn-outs, seller notes

33

or notes converted from earn-outs and similar obligations), to the extent not already deducted from Consolidated Net Income; and

(xviii) any cash fees, costs and expenses incurred in connection with the implementation of ASC 606.

Notwithstanding anything in the definition of any term used in the definition of "Excess Cash Flow" to the contrary, all components of Excess Cash Flow shall be computed for the Parent and its Restricted Subsidiaries on a consolidated basis.

"**Excess Cash Flow Period**" shall mean each full fiscal year of the Parent commencing after the Closing Date.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Affiliate**" shall have the meaning set forth in the definition of "Disqualified Lenders".

"**Excluded Assets**" means (unless otherwise elected by the Lead Borrower) (i) any fee owned real property (other than Material Real Property) and any leasehold rights and interests in real property (it being understood and agreed that there shall be no requirement on the part of the Loan Parties to deliver landlord or other third-party waivers, estoppels, consents or collateral access letters), (ii) motor vehicles, airplanes and other assets subject to certificates of title, except to the extent a security interest therein may be perfected by filing of a UCC financing statement, (iii) commercial tort claims for which a claim with a value of less than $1,000,000 is made, (iv) any lease related to or any property subject to a purchase money security interest, Capitalized Lease or similar arrangements, in each case, to the extent permitted under the Loan Documents, to the extent that a grant of a security interest therein would violate or invalidate such lease, purchase money, Capitalized Lease or a similar arrangement or create a right of termination or consent in favor of any other party thereto (other than of the Parent or a Restricted Subsidiary of the Parent) (it being understood and agreed that there shall be no obligation to seek or obtain such consent), (v) any lease, license, permit, franchise or other agreement, and the property subject thereto, in each case, to the extent that a grant of a security interest therein (A) is prohibited by applicable Law other than to the extent such prohibition is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition or (B) to the extent and for so long as it would violate the terms thereof (in each case, after giving effect to the relevant provisions of the UCC or other applicable Laws) or would give rise to a termination or governmental or other third-party consent right (other than of the Parent or a Restricted Subsidiary of the Parent) thereunder (except to the extent such provision is overridden by the UCC or other applicable Laws), in each case, solely to the extent that such limitation on such pledge or security interest is otherwise permitted under Section 7.09, (vi)(A) Margin Stock and (B)(1) to the extent not permitted by the terms of such Person's organizational or joint venture documents (so long as such documents are not entered into in contemplation of this Agreement), Equity Interests in any Person other than the Borrowers and other Wholly-owned Restricted Subsidiaries of the Parent and (2) Equity Interests in any Person in an amount in excess of the amounts required to be pledged under the definition of "Collateral and Guarantee Requirement" above (and excluding, for the avoidance of doubt, Excluded Pledged Subsidiaries), (vii) any property subject to a Lien permitted by Sections 7.01(u) or (aa) (to the extent relating to a Lien originally incurred pursuant to Sections 7.01(u) or (aa) solely to the extent that a security interest therein is prohibited by the terms of the agreements governing such Lien, and such prohibition existed at the time such Restricted Subsidiary becomes a Loan Party (and was not incurred in contemplation thereof)), (viii) any property or assets (I) of any Subsidiary that is a CFC, CFC Holding Company or a Subsidiary of a CFC or CFC Holding Company or (II) for which the creation or perfection of pledges of, or security interests in, could result in adverse tax consequences (other than *de minimis* tax consequences) or adverse regulatory or accounting consequences to the Parent, the Borrowers or any of their Subsidiaries, each as reasonably determined by

34

the Lead Borrower, (ix) letter of credit rights with a value of less than $1,000,000, except to the extent constituting support obligations for other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a UCC financing statement (it being understood and agreed that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (x) deposit accounts maintained and used (I) for payroll or payroll taxes, (II) for withholding tax or other tax accounts, including without limitation, sales tax accounts, (III) for employee benefits or wages, (IV) as escrow, trust or any other fiduciary account, (V) zero balance accounts, (VI) cash collateral accounts securing credit card facilities, or merchant accounts permitted hereunder, (VII) accounts that are used as cash collateral or escrow accounts or otherwise with third parties to the extent such deposits or securities therein constitute Liens permitted hereunder, (VIII) accounts that are maintained outside of the United States, (IX) to support performance bonds and (X) accounts in which the average daily balance of any five (5) consecutive Business Day period does not exceed $500,000 in the aggregate for all such accounts, taken as a whole, (xi) any intent-to-use Trademark application prior to the filing and acceptance of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use Trademark application or any registration that issues therefrom under applicable federal Law, (xii) particular assets if and for so long as, if reasonably agreed by the Administrative Agent and the Lead Borrower, the cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance, surveys, abstracts or appraisals in respect of such assets is excessive in relation to the practical benefits to be obtained by the Lenders therefrom, (xiii)(a) Equity Interests of the type described in the proviso to Section 2.01(i) of the Security Agreement and (b) any assets of any Subsidiary of the Parent which is not a Loan Party, (xiv) Securitization Assets (or interests therein) sold to any Securitization Subsidiary or otherwise pledged, factored, transferred or sold in connection with a Qualified Securitization Financing permitted hereunder, (xv) Receivables Assets sold or otherwise pledged or transferred in connection with a Receivables Facility permitted hereunder and (xvi) Equity Interests and assets of captive insurance subsidiaries, Subsidiaries that are not Material Subsidiaries (except to the extent perfected by filing of a UCC financing statement), broker dealer subsidiaries, Unrestricted Subsidiaries and each other Excluded Pledged Subsidiary (other than, in each case, any such Subsidiary that is a Loan Party); *provided*, *however*, that Excluded Assets shall not include any Proceeds, substitutions or replacements of any Excluded Assets referred to in <u>clauses (i)</u> through <u>(xvi)</u> (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in <u>clauses (i)</u> through <u>(xvi)</u>).

"**Excluded Contribution Amount**" shall mean net cash proceeds received by a Borrower as capital contributions to its common equity capital after the Closing Date (other than from a Restricted Subsidiary of the Parent) or from the issuance or sale (other than (i) to a Restricted Subsidiary of the Parent, (ii) to any management equity plan or equity option plan or any other management or employee benefit plan or agreement of the Lead Borrower or direct or indirect parent thereof or (iii) Cure Amounts) of Equity Interests (other than Disqualified Equity Interests) of a Borrower or direct or indirect parent thereof or the Fair Market Value of Investment Grade Securities or Qualified Proceeds contributed to a Borrower, in each case, designated as Excluded Contribution Amounts pursuant to an officer's certificate executed by a Responsible Officer of the Lead Borrower from time to time, which are excluded from the calculation of Cumulative Credit, *minus* any Excluded Contribution Amount applied or used hereunder after the Closing Date and prior to such time.

"**Excluded Information**" has the meaning set forth in  Section 2.05(a)(v)(F).

"**Excluded Pledged Subsidiary**" means (a) any Subsidiary for which the pledge of its Equity Interests is prohibited by applicable Law or, solely in the case of a newly acquired Subsidiary, by Contractual Obligation in existence at the time of acquisition but not entered into in contemplation thereof, or for which governmental (including regulatory) consent, approval, license or authorization would be

35

required unless such consent, approval, license or authorization has been received (it being understood and agreed that there shall be no obligation to seek or obtain such consent, approval, license or authorization),
(b) any other Subsidiary with respect to which, to the extent reasonably agreed by the Lead Borrower and the Administrative Agent, the burden or cost or other consequences (including any adverse tax, regulatory or accounting consequences (other than *de minimis* tax or regulatory consequences)) of the pledge of its Equity Interests shall be excessive in view of the benefits to be obtained by the Lenders therefrom (as reasonably determined by the Lead Borrower and the Administrative Agent), (c) any not-for-profit Subsidiaries, (d) any special purpose securitization vehicle, Securitization Subsidiary or Receivables Subsidiary (or similar entity), but only to the extent that the pledge of the Equity Interests in such vehicle is prohibited by applicable Law or by Contractual Obligations and (e) any Unrestricted Subsidiary.

"**Excluded Subsidiary**" means, unless otherwise elected by the Lead Borrower, (a) any Subsidiary that is not a Wholly-owned Domestic Subsidiary of the Lead Borrower or a Guarantor and each joint venture, (b) any Subsidiary for which guarantees of the Obligations are (i) prohibited by applicable Law, rule or regulation or require consent, approval, license or authorization of a Governmental Authority, unless such consent, approval, license or authorization has been received; *provided*, that there shall be no obligation to obtain such consent, approval, license or authorization or (ii) contractually prohibited on the Closing Date or, following the Closing Date, the date of the acquisition thereof, so long as such prohibition exists and so long as such prohibition is not created in contemplation of the Transactions or any such acquisition, (c) any Subsidiary with respect to which, in the reasonable judgment of the Lead Borrower and the Administrative Agent, the burden or cost of providing a Guarantee shall be excessive in view of the benefits to be obtained by the Lenders therefrom (giving due consideration to regulatory, accounting and tax consequences), (d) any not-for-profit Subsidiaries, (e) any Unrestricted Subsidiaries, (f) any special purpose securitization vehicle (or similar entity), including each Receivables Subsidiary and Securitization Subsidiary, (g) any direct or indirect Subsidiary of the Lead Borrower or a Guarantor that is a CFC Holding Company or a CFC, (h) any Subsidiary that is a direct or indirect Subsidiary of a Subsidiary of the Lead Borrower or a Guarantor that is a CFC Holding Company or a CFC, (i) captive insurance Subsidiaries and any other Excluded Pledged Subsidiary, (j) any Subsidiary that is not a Material Subsidiary and (k) any Subsidiary acquired pursuant to a Permitted Acquisition or other Investment permitted under this Agreement and financed with assumed Indebtedness permitted to be incurred pursuant to this Agreement (and not incurred in contemplation of such Permitted Acquisition or Investment), and each Restricted Subsidiary acquired in such Permitted Acquisition or other Investment permitted hereunder that guarantees such Indebtedness, in each case to the extent that, and for so long as, the documentation relating to such Indebtedness to which such Subsidiary is a party prohibits such Subsidiary from guaranteeing the Obligations and such prohibition is not created in contemplation of such Permitted Acquisition or other Investment permitted hereunder.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any obligation (a "**Swap Obligation**") to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason not to constitute an "eligible contract participant" as defined in the Commodity Exchange Act.

"**Executive Order**" shall have the meaning assigned to such term in Section 5.17(a).

"**Existing Term Loan Tranche**" has the meaning set forth in Section 2.16(a).

"**Extended Revolving Credit Commitments**" has the meaning set forth in Section 2.16(b).

36

"**Extended Revolving Credit Loans**" means one or more Classes of Revolving Credit Loans that result from an Extension Amendment.

"**Extended Term Loans**" has the meaning set forth in Section 2.16(a).

"**Extending Term Lender**" has the meaning set forth in Section 2.16(c).

"**Extending Revolving Credit Lender**" has the meaning set forth in Section 2.16(c).

"**Extension**" means the establishment of an Extension Series by amending a Loan pursuant to the terms of Section 2.16 and the applicable Extension Amendment.

"**Extension Amendment**" has the meaning set forth in Section 2.16(d).

"**Extension Election**" has the meaning set forth in Section 2.16(c).

"**Extension Request**" means any Term Loan Extension Request or a Revolving Credit Loan Extension Request, as the case may be.

"**Extension Series**" means any Term Loan Extension Series or a Revolving Credit Loan Extension Series, as the case may be.

"**Facility**" means the Revolving Credit Facility, a given Extension Series of Extended Revolving Credit Commitments, a given Refinancing Series of Refinancing Revolving Credit Loans, the Term Facility, a given Extension Series of Extended Term Loans, a given Class of Incremental Term Loans or a given Refinancing Series of Refinancing Term Loans, as the context may require.

"**Fair Market Value**" means with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as determined in good faith by the Lead Borrower.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code as of the date of this Agreement (or any amended or successor version described above), any intergovernmental agreement implementing the foregoing, and any related fiscal or regulatory legislation, rules or official administrative practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing the foregoing.

"**FCPA**" has the meaning set forth in Section 5.17(a).

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the

37

Administrative Agent by three federal funds brokers of recognized standing selected by it on such day on such transactions as reasonably determined by the Administrative Agent, but in no event less than 0.00% per annum.

"**Fee Letter**" means the Fee Letter, dated as of October 28, 2020, among the Lead Borrower and the Administrative Agent.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Foreign Lender**" means any Lender which is not a United States person as defined in Section 7701(a)(30) of the Code.

"**Foreign Subsidiary**" means any direct or indirect Restricted Subsidiary of the Lead Borrower or any Guarantor which is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, *however*, that, subject to Section 1.03, if the Lead Borrower notifies the Administrative Agent that the Lead Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof (including through conforming changes made consistent with IFRS) on the operation of such provision (or if the Administrative Agent notifies the Lead Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through conforming changes made consistent with IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of or pertaining to government, or any supra-national bodies (such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning set forth in Section 10.07(h).

"**Guarantee**" means, as to any Person, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness of another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness,

38

(iii)   to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided, however*, that the term "Guarantee" shall not include (i) endorsements of instruments for deposit or collection in the ordinary course of business or (ii) customary and reasonable indemnity obligations or product warranties in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning set forth in Section 11.01.

"**Guarantors**" means (1) the Parent, (2) each Borrower with respect to the obligations of each other Borrower and the obligations of each Restricted Subsidiary in respect of Cash Management Obligations and Hedge Obligations, (3) each existing Restricted Subsidiary of the Lead Borrower that is a direct or indirect Wholly-owned Material Domestic Subsidiary (other than any Excluded Subsidiary) as of the Closing Date and not designated as a Borrower hereunder and (4) each subsequently acquired or organized (including, without limitation, by division) Restricted Subsidiary of the Lead Borrower that is a direct or indirect Wholly-owned Material Domestic Subsidiary (other than any Excluded Subsidiary) and not designated as a Borrower hereunder that shall become a Guarantor pursuant to Section 6.11. For the avoidance of doubt, the Lead Borrower may (subject to the terms of clause (b) and (f) of the "Collateral and Guarantee Requirement") elect to cause any Restricted Subsidiary that is not a Guarantor to cease to be an Excluded Subsidiary and to Guarantee the Obligations by causing such Restricted Subsidiary to execute a joinder to this Agreement substantially in the form attached as Exhibit J or in another form and substance reasonably satisfactory to the Administrative Agent and the Lead Borrower and causing such Restricted Subsidiary to satisfy the Collateral and Guarantee Requirement, whereupon any such Restricted Subsidiary shall be a Guarantor, Loan Party and Subsidiary Guarantor (but not a Borrower) hereunder for all purposes (any such Excluded Subsidiary that becomes a Guarantor, a "**Specified Guarantor**").

"**Guaranty**" means, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" means all materials, substances or wastes, all pollutants or contaminants, in any form, including petroleum or petroleum distillates, friable asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and toxic mold that are regulated pursuant to, or which could give rise to liability under, applicable Environmental Law because of their toxic, dangerous or deleterious properties or characteristics.

"**Hedge Bank**" means any Person that is (x) a Lender or an Affiliate of a Lender or Agent at the time it enters into a Secured Hedge Agreement or a Treasury Services Agreement, as applicable or (y) at the option of the Lead Borrower, any other Person, in each case, in its capacity as a party thereto and that is designated a "Hedge Bank" with respect to such Secured Hedge Agreement or Treasury Services Agreement, as applicable, in a writing from the Lead Borrower to the Administrative Agent, and (other than a Person already party hereto as a Lender or Agent) that delivers to the Administrative Agent a letter agreement reasonably satisfactory to it (i) appointing the Administrative Agent as its agent under the applicable Loan Documents and (ii) agreeing to be bound by Sections 10.05, 10.15 and 10.16 and Article IX as if it were a Lender; *provided* that the aggregate principal amount of the Hedging Obligations

39

and/or the Cash Management Obligations owed to all Persons so designated pursuant to the foregoing clause (y) at any time (other than in respect of purchasing card services, performance bonds and letters of credit permitted under Section 7.03(q), in each case, in the ordinary course of business) when taken together with the aggregate amount of Liens securing Swap Contracts pursuant to Section 7.01 below, shall not exceed $5,000,000 in the aggregate.

"**Hedging Obligations**" shall mean, with respect to any Person, the obligations of such Person under any Secured Hedge Agreements.

"**Identified Participating Lenders**" has the meaning set forth in Section 2.05(a)(v)(C)(3).

"**Identified Qualifying Lenders**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**IFRS**" means international accounting standards as promulgated by the International Accounting Standards Board.

"**Incremental Amendment**" has the meaning set forth in Section 2.14(f).

"**Incremental Commitments**" has the meaning set forth in Section 2.14(a).

"**Incremental Facility Closing Date**" has the meaning set forth in Section 2.14(d).

"**Incremental Lenders**" has the meaning set forth in Section 2.14(c).

"**Incremental Loan**" has the meaning set forth in Section 2.14(b).

"**Incremental Request**" has the meaning set forth in Section 2.14(a).

"**Incremental Revolving Credit Lender**" has the meaning set forth in Section 2.14(c).

"**Incremental Revolving Loan**" has the meaning set forth in Section 2.14(b).

"**Incremental Term Commitments**" has the meaning set forth in Section 2.14(a).

"**Incremental Term Lender**" has the meaning set forth in Section 2.14(c).

"**Incremental Term Loan**" has the meaning set forth in Section 2.14(b).

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding drawn letters of credit (including standby and commercial), bankers' acceptances, and bank guaranties issued or created by or for the account of such Person;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property;

40

(e)    indebtedness described in clauses (a)-(d) and (f)-(h) (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all obligations of such Person in respect of Disqualified Equity Interests if and to the extent that the foregoing would constitute indebtedness or a liability in accordance with GAAP; and

(h)    to the extent not otherwise included above, all Guarantees of such Person in respect of Indebtedness of the type described in clauses (a) through (g) in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Net Debt, (B) in the case of the Parent and its Restricted Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (C) exclude (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid for ten (10) Business Days after becoming due and payable, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business, (iv) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (v) contingent obligations incurred in the ordinary course of business, (vi) deferred Taxes, deferred and prepaid or deferred revenue, in each case arising in the ordinary course of business and
(vii) customary obligations under employment agreements and deferred compensation; *provided, further*, that Indebtedness of any direct or indirect parent company appearing upon the balance sheet of the Parent solely by reason of push down accounting under GAAP shall be excluded. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e), shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning set forth in  Section 10.05.

"**Indemnified Taxes**" means, with respect to any Agent or any Lender, all Taxes imposed on or with respect to payments made by or on account of any obligation of any Loan Party under the Loan Documents other than (i) any Taxes imposed on or measured by its net income, however denominated, and franchise Taxes, in each case, imposed by a jurisdiction (or any political subdivision thereof) as a result of such Agent or Lender being organized in or having its principal office or applicable lending office in such jurisdiction, or that are Other Connection Taxes, (ii) any Taxes attributable to the failure of such Agent or Lender to deliver the documentation required to be delivered pursuant to Section 3.01(d), Section 3.01(e), or Section 3.01(f), as applicable, (iii) any branch profits Taxes imposed by the United States under Section 884(a) of the Code or any similar Tax imposed by any jurisdiction described in clause (i) above,
(iv)    in the case of a Lender, any U.S. federal withholding Tax that would apply to amounts payable hereunder under the law applicable at such time the Lender becomes a party to this Agreement (other than pursuant to a request by the Lead Borrower under Section 3.07(a)), or designates a new Lending Office, except to the extent such Lender (or its assignor, if any) was entitled, immediately prior to the time of

41

designation of a new Lending Office (or assignment), to receive additional amounts from any Borrower or any Guarantor with respect to such withholding Tax pursuant to Section 3.01 and (v) any withholding Taxes imposed under FATCA.

"**Indemnitees**" has the meaning set forth in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Lead Borrower, qualified to perform the task for which it has been engaged and that is independent of the Lead Borrower and its Affiliates.

"**Information**" has the meaning set forth in Section 10.08.

"**Initial Revolving Borrowing**" means one or more borrowings of Revolving Credit Loans on the Closing Date which Revolving Credit Loans are used for Permitted Initial Revolving Credit Borrowing Purposes.

"**Initial Term Commitment**" means, as to each Term Lender, its obligation to make an Initial Term Loan to the Borrowers pursuant to Section 2.01(a) in an aggregate amount not to exceed the amount set forth opposite such Lender's name on Schedule 1.01A under the caption "Initial Term Commitment" or in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement (including Section 2.14). The aggregate amount of the Initial Term Commitments is $31,000,000.

"**Initial Term Loans**" means the term loans made by the Lenders on the Closing Date to the Borrowers pursuant to Section 2.01(a).

"**Intellectual Property Security Agreement**" has the meaning set forth in the Security Agreement. "**Intercompany Note**" means a promissory

note substantially in the form of Exhibit G.

"**Intercreditor Agreement**" shall mean an intercreditor agreement substantially in a form to be mutually agreed among the Lead Borrower and the Administrative Agent and the representatives for purposes thereof for holders of one or more classes of Indebtedness pari passu in right of payment and security (other than the Obligations) or secured by a Lien junior in priority to those securing the Obligations which shall be on customary terms in light of prevailing market conditions, which if deemed reasonably necessary by the Administrative Agent shall be posted to the Lenders not less than five Business Days before execution thereof and, if the Required Lenders shall not have objected to such agreement within five Business Days after posting, then the Required Lenders shall be deemed (a) to have agreed that the Administrative Agent's entry into such intercreditor agreement (with such changes as the Administrative Agent deems reasonably necessary) is reasonable and to have consented to such intercreditor agreement (with such changes as the Administrative Agent and the Lead Borrower deem reasonably necessary) and to the Administrative Agent's execution thereof and (b) to have directed the Administrative Agent to execute such agreement.

"**Interest Payment Date**" means, (a) as to any Eurocurrency Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Facility under which such Loan was made; *provided* that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date of the Facility under which such Loan was made.

42

"**Interest Period**" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, three or six months thereafter or, to the extent agreed by each applicable Lender of such Eurocurrency Rate Loan, 12 months or less than one month thereafter, as selected by the Lead Borrower in its Committed Loan Notice; *provided* that:

(a)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)    any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)    no Interest Period shall extend beyond the applicable Maturity Date.

"**Internally Generated Cash**" means, with respect to any Person, funds of such Person not constituting proceeds of the incurrence of long-term Indebtedness (other than revolving indebtedness or intercompany indebtedness) of such Person and its Restricted Subsidiaries.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of related transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; *provided*, that Investments shall not include, in the case of the Parent and its Restricted Subsidiaries, intercompany loans, advances, or Indebtedness made to or owing by the Parent or a Restricted Subsidiary having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business; *provided*, *further*, that, in the event that any Investment is made by Parent, any Borrower or any Restricted Subsidiary in any Person through substantially concurrent interim transfers of any amount through the Parent or any Restricted Subsidiary, then such other substantially concurrent interim transfers shall be disregarded for purposes of Section 7.02. For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment, *less* any Returns (except with respect to any Returns increasing the Cumulative Credit pursuant to clause (e) or (g) of the definition thereof) in respect of such Investment.

"**Investment Grade Securities**" shall mean:

(i)    securities issued or directly, fully and unconditionally guaranteed by the United States government or any agency or instrumentality thereof (other than Cash Equivalents),

(ii)    debt securities or debt instruments with an investment grade rating, but excluding any debt securities or instruments constituting loans or advances among the Parent and its Subsidiaries, and

(iii)    investments in any fund that invests all or substantially all of its assets in investments of the type described in clauses (i) and (ii), which fund may also hold immaterial amounts of cash pending investment or distribution.

43

"**IP Rights**" has the meaning set forth in  Section 5.15.

"**Junior Financing**" has the meaning set forth in  Section 7.12(a).

"**Junior Financing Documentation**" means any documentation governing any Junior Financing.

"**Latest Maturity Date**" means, at any date of determination, the latest Maturity Date applicable to any Loan or Commitment hereunder at such time, including the latest maturity date of any Extended Revolving Credit Commitments, Refinancing Revolving Credit Commitments, Extended Term Loans, Incremental Term Loans, Refinancing Term Loans, Replacement Term Loans and Refinancing Term Commitments, in each case, as extended in accordance with this Agreement from time to time.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the legally binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, legally binding requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lead Arranger**" means Adams Street Credit Advisors LP, in its capacity as the sole lead arranger under this Agreement.

"**Lead Borrower**" shall have the meaning provided in the preamble to this Agreement.

"**Lender**" has the meaning set forth in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender".

"**Lending Office**" means, as to any Lender, such office or offices as a Lender may from time to time notify the Lead Borrower and the Administrative Agent.

"**Lien**" means any mortgage, deed of trust, deed to secure debt, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing).

"**Limited Condition Transaction**" shall mean any (i) Permitted Acquisition or other permitted acquisition of any assets, business or person or Investment (including acquisitions subject to a letter of intent or purchase agreement), in each case, the consummation of which is not conditioned on the availability of, or on obtaining, financing, (ii) redemption, repurchase, defeasance, satisfaction and discharge or repayment of Indebtedness requiring irrevocable notice in advance of such redemption, repurchase, defeasance, satisfaction and discharge or repayment, (iii) Disposition or (iv) Restricted Payment.

"**Loan**" means an extension of credit hereunder by a Lender to the Borrowers, including, without limitation, in the form of a Term Loan, Delayed Draw Term Loan or Revolving Credit Loan (including, without limitation, any Initial Term Loans, any Incremental Term Loans and any extensions of credit under any Revolving Commitment Increase or Additional Revolving Commitments, any Extended Term Loans and any extensions of credit under any Extended Revolving Credit Commitment, any Refinancing Term Loans and any extensions of credit under any Refinancing Revolving Credit Commitment and any Replacement Term Loans).

44

"**Loan Documents**" means, collectively, (i) this Agreement (including the schedules hereto), (ii) the Notes, (iii) the Collateral Documents, (iv) any Refinancing Amendment, Incremental Amendment or Extension Amendment, (v) each Intercreditor Agreement, (vi) the Fee Letter, and (vii) any amendment or joinder to this Agreement. For the avoidance of doubt, Swap Contracts and agreements for the provision of Cash Management Services shall not constitute "Loan Documents".

"**Loan Parties**" means, collectively, each Borrower and each Guarantor.

"**London Banking Day**" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"**Management Agreement**" means that certain Consulting Agreement, dated as of March 2, 2020, by and between Adcole Maryland Aerospace, LLC, a Delaware limited liability company, the Lead Borrower, Parent and AE Industrial Partners, LP, a Delaware limited partnership and its Affiliates from time to time party thereto, as amended by that certain Amendment No. 1 to Consulting Agreement, dated as of July 1, 2020.

"**Management Equityholders**" shall mean any of (i) any current or former director, officer, employee or member of management of the Parent or any of its Subsidiaries or any direct or indirect parent company thereof (including with respect to warrants and options) in Parent or any direct or indirect parent thereof, (ii) any trust, partnership, limited liability company, corporate body or other entity established by any such director, officer, employee or member of management of Parent or any of its Subsidiaries or any direct or indirect parent thereof or any Person described in the succeeding clause (iii), as applicable, to hold an investment in the Parent or any direct or indirect parent thereof in connection with such Person's estate or tax planning and (iii) any Person who acquires an investment in the Parent or any direct or indirect parent thereof by will or by the laws of intestate succession as a result of the death of any such director, officer or member of management of the Parent or any of its Subsidiaries or any direct or indirect parent thereof.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" shall have the meaning set forth in the definition of "Swap Contract". " **Material Adverse Effect**" means (a) on the

Closing Date, a "Material Adverse Effect" (as defined

in the Acquisition Agreement) or (b) after the Closing Date, any event, circumstance or condition that has had or could reasonably be expected to have a material and adverse effect on (i) the business, results of operations or financial condition of the Lead Borrower and its Restricted Subsidiaries, taken as a whole, (ii)    material remedies (taken as a whole) of the Administrative Agent and the Lenders under this Agreement and the other Loan Documents or (iii) the ability of the Lead Borrower and the Guarantors, taken as a whole, to perform their material payment obligations under this Agreement and the other Loan Documents.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Parent's Domestic Subsidiaries that are Restricted Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 5.00% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 5.00% of the consolidated gross revenues of the Parent and its Restricted Subsidiaries for such period, in each case, determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are Restricted Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 7.50% of Total Assets as of the end of the most recently ended fiscal quarter of the Parent for which financial statements have been delivered pursuant to Section 6.01 or  more than 7.50% of the consolidated gross revenues o f the Parent and its Restricted

45

Subsidiaries for such Test Period, then the Lead Borrower shall, not later than 60 days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement (or such longer period as the Administrative Agent may agree in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Parent's Foreign Subsidiaries (a) whose consolidated total assets (calculated, for such purposes as the assets of such Foreign Subsidiary, together with the assets of its direct and indirect subsidiaries) at the last day of the most recent Test Period were equal to or greater than 5.00% of Total Assets at such date or (b) whose consolidated gross revenues (calculated, for such purposes as the gross revenues of such Foreign Subsidiary, together with the gross revenues of its direct and indirect subsidiaries) for such Test Period were equal to or greater than 5.00% of the consolidated gross revenues of the Parent and the Restricted Subsidiaries for such period, in each case, determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Foreign Subsidiaries not meeting the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 7.50% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrowers for which financial statements have been delivered pursuant to Section 6.01 or more than 7.50% of the consolidated gross revenues of the Parent and the Restricted Subsidiaries for such Test Period, then the Lead Borrower shall, not later than 60 days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement (or such longer period as the Administrative Agent may agree in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of the definition of "Collateral and Guarantee Requirement".

"**Material Intellectual Property**" means any material intellectual property that is necessary for the operation of the business of the Parent and its Restricted Subsidiaries as of the Closing Date, the loss of which would be reasonably expected to have a Material Adverse Effect on the business of the Borrower and its Restricted Subsidiaries (taken as a whole).

"**Material Non-Public Information**" means, with respect to any Person, information that is (a) of a type that would not be publicly available (and could not be derived from publicly available information) if such Person and its Subsidiaries were public reporting companies and (b) material (as reasonably determined by the Lead Borrower) with respect to such Person, its Subsidiaries or the respective securities of such Person and its Subsidiaries for purposes of United States Federal and state securities laws, in each case, assuming such laws were applicable to such Person and its Subsidiaries.

"**Material Real Property**" means any fee-owned real property located in the United States that is owned by any Loan Party and that has a Fair Market Value in excess of $2,500,000 (at the Closing Date or, with respect to real property acquired after the Closing Date, at the time of acquisition, in each case, as reasonably estimated by the Lead Borrower in good faith).

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means (i) with respect to the Initial Term Loans, October 28, 2026, (ii) with respect to the Delayed Draw Term Loans, October 28, 2026, (iii) with respect to the Revolving Credit Facility, October 28, 2026, (iv) with respect to any tranche of Extended Term Loans or Extended Revolving Credit Commitments, the final maturity date as specified in the applicable Extension Amendment, (v) with respect to any Incremental Term Loans, the final maturity date as specified in the applicable Incremental

46

Amendment, (vi) with respect to any Refinancing Term Loans or Refinancing Revolving Credit Commitments, the final maturity date as specified in the applicable Refinancing Amendment, and (vii) with respect to any Replacement Term Loans, the final maturity date as specified in the applicable agreement; *provided* that, in each case, if such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Rate**" has the meaning set forth in Section 10.10.

"**Minimum Tender Condition**" has the meaning set forth in Section 2.18(b).

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage Policies**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement".

"**Mortgaged Properties**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement".

"**Mortgages**" means collectively, the deeds of trust, trust deeds, deeds to secure debt, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties creating and evidencing a Lien on a Mortgaged Property in form and substance reasonably satisfactory to the Administrative Agent and the Lead Borrower, and any other mortgages executed and delivered pursuant to Sections 6.11 and 6.13.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party, any Restricted Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"**Net Proceeds**" means:

(a)    100% of the cash proceeds actually received by the Lead Borrower or any of its Restricted Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards in respect of Casualty Events, but in each case only as and when received and, in any event, excluding the proceeds of business interruption insurance) from any Disposition or Casualty Event, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees and expenses actually incurred in connection therewith, (ii) the principal amount of any Indebtedness that is secured by a Lien (other than a Lien contractually subordinated to the Liens securing the Obligations) on the asset subject to such Disposition or Casualty Event and that is required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents), together with any applicable premium, penalty, interest and breakage costs, (iii) in the case of any Disposition or Casualty Event by a non-Wholly-owned Restricted Subsidiary, the *pro rata* portion of the Net Proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of the Lead Borrower or a Wholly-owned Restricted Subsidiary as a result thereof, (iv) Taxes paid or reasonably estimated to be payable (including Taxes that would be payable in connection with the repatriation of any such proceeds, whether or not such repatriation actually occurs) and tax distributions with regard to taxes made pursuant to Section 7.06(i)(iii) in connection with such event, (v) the amount of any reasonable reserve established in accordance with GAAP against

47

any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) related to any of the applicable assets and (y) retained by the Lead Borrower or any of its Restricted Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (*provided*, *however*, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction) and (vi) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition (*provided* that to the extent that any amounts are released from such escrow to the Lead Borrower or a Restricted Subsidiary, such amounts net of any related expenses shall constitute Net Proceeds); *provided* that, subject to the restrictions set forth in Section 7.05(j), if the Lead Borrower or its Restricted Subsidiaries use any portion of such proceeds to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of the Lead Borrower or its Restricted Subsidiaries or to make Capital Expenditures, Permitted Acquisitions or other permitted Investments, in each case, within 12 months of such receipt (or, in the case of net cash proceeds from a Disposition, prior to the receipt of such net cash proceeds (so long as such reinvestment was made or committed to within 90 days prior to the receipt of such net cash proceeds)), such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 12 months of such receipt, so used or committed to be so used (it being understood that if any portion of such proceeds are not so used within such 12-month period but within such 12-month period are contractually committed to be used, then upon the termination of such contract or if such Net Proceeds are not so used within 18 months of such receipt, such remaining portion shall constitute Net Proceeds as of the date of such termination or expiry without giving effect to this proviso); *provided*, *further*, no proceeds realized in a single transaction or series of related transactions shall constitute Net Proceeds unless (x) such proceeds shall exceed $500,000 or (y) the aggregate net proceeds shall exceed $2,500,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds under this clause (a) (the aggregate amount of net cash proceeds retained pursuant to this proviso, the "**Cumulative Retained Asset Sale Proceeds**"), and

(b)    100% of the cash proceeds from the incurrence, issuance or sale by the Lead Borrower or any of its Restricted Subsidiaries of any Indebtedness, net of all taxes paid or reasonable estimated to be payable as a result thereof (including tax distributions in respect thereof) and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to the Borrowers shall be disregarded.

"**Non-Consenting Lender**" has the meaning set forth in Section 3.07(c).

"**Non-Debt Fund Affiliate**" means any Affiliate of the Parent, including the Parent or any of its Subsidiaries, but excluding (a) any Debt Fund Affiliate and (b) any natural person.

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender. "**Note**" means a Term Note or a Revolving

Credit Note, as the context may require. "**Notice of Intent to Cure**" has the meaning set forth in Section 8.04.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now

48

existing or hereafter arising and including interest, premium, fees and expenses that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, premium, fees and expenses are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party, in each case, in accordance with the terms of the Loan Documents and (b) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Lender may elect to pay or advance on behalf of such Loan Party in accordance with the terms of the Loan Documents.

"**OFAC**" has the meaning set forth in  Section 5.17(b).

"**Offered Amount**" has the meaning set forth in  Section 2.05(a)(v)(D)(1).

"**Offered Discount**" has the meaning set forth in  Section 2.05(a)(v)(D)(1).

"**OID**" means original issue discount.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Applicable Indebtedness**" has the meaning set forth in  Section 2.05(b)(i).

"**Other Commitments**" has the meaning set forth in  Section 2.14(a)(ii).

"**Other Connection Taxes**" means, with respect to any Agent or Lender, Taxes imposed as a result of a present or former connection between such Agent or Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Notes**" has the meaning set forth in  Section 2.14(a)(iii).

"**Other Taxes**" has the meaning set forth in  Section 3.01(b).

"**Other Term Loans**" has the meaning set forth in  Section 2.14(a)(ii).

"**Outstanding Amount**" means, with respect to the Term Loans and Revolving Credit Loans on any date, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans and Revolving Credit Loans, as the case may be, occurring on such date.

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an

49

overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Parent**" has the meaning (i) set forth in the introductory preamble to this Agreement or (ii) after the Closing Date, any other Person (" **New Parent**") that is a Subsidiary of Parent (to the extent such Subsidiary ceases to be a Subsidiary in connection with becoming New Parent) or that is the direct or indirect parent of Parent (or the previous New Parent, as the case may be) but not the Lead Borrower ("**Previous Parent**"); *provided* that (a) such New Parent directly owns 100% of the Equity Interests of the Lead Borrower, (b) New Parent shall expressly assume all the obligations of Previous Parent under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form and substance reasonably satisfactory to the Administrative Agent and the Lead Borrower, (c) if reasonably requested by the Administrative Agent, a customary opinion of counsel shall be delivered on behalf of the Lead Borrower to the Administrative Agent, (d) all Equity Interests of the Lead Borrower and substantially all of the other assets of Previous Parent are contributed or otherwise transferred, directly or indirectly, to such New Parent and pledged to secure the Obligations to the extent constituting Collateral, (e)(x) no Event of Default has occurred and is continuing at the time of such substitution and such substitution does not result in any Event of Default and (y) such substitution does not result in any adverse tax consequences (other than *de minimis* tax consequences) to any Lender (unless reimbursed hereunder) or to the Administrative Agent (unless reimbursed hereunder), (f) the Administrative Agent shall have received at least five (5) Business Days' prior written notice of the proposed transaction and Previous Parent, New Parent and the Lead Borrower shall promptly and in any event at least two (2) Business Days' prior to the consummation of the transaction provide all information the Administrative Agent (or any Lender through the Administrative Agent) may reasonably request in writing to satisfy its "know your customer" and other similar requirements necessary for such Person to comply with its internal compliance and regulatory requirements with respect to the proposed successor New Parent, (g) New Parent shall be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia, (h) if reasonably requested by the Administrative Agent, the Loan Parties shall execute and deliver amendments, supplements and other modifications to all Loan Documents, instruments and agreements executed in connection therewith necessary to perfect and protect the liens and security interests in the Collateral of New Parent, in each case, in form and substance reasonably satisfactory to the Administrative Agent and the Lead Borrower, and (i) the Lead Borrower delivers a certificate of a Responsible Officer with respect to the satisfaction of the conditions set forth in clauses (a), (e)(x) and (y) and (g) of this definition; *provided*, *further*, that if each of the foregoing is satisfied, Previous Parent shall be automatically released of all its obligations under the Loan Documents and any reference to "Parent" in the Loan Documents shall refer to New Parent.

"**Participant**" has the meaning set forth in  Section 10.07(e).

"**Participant Register**" has the meaning set forth in  Section 10.07(e).

"**Participating Lender**" has the meaning set forth in  Section 2.05(a)(v)(C)(2).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or to which any Loan Party contributes or has an obligation to contribute (including on account of any ERISA Affiliate), or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Permitted Acquisition**" has the meaning set forth in  Section 7.02(i).

50

"**Permitted Debt Exchange**" has the meaning set forth in Section 2.18(a).

"**Permitted Debt Exchange Notes**" has the meaning set forth in Section 2.18(a).

"**Permitted Debt Exchange Offer**" has the meaning set forth in Section 2.18(a).

"**Permitted First Priority Refinancing Debt**" means any secured Indebtedness (including any Registered Equivalent Notes) incurred by the Borrowers or any other Loan Party in the form of one or more series of senior secured notes or loans; *provided* that such Indebtedness otherwise meets the requirements contained in the proviso to the definition of "Credit Agreement Refinancing Indebtedness".

"**Permitted Holders**" means each of (i) the Sponsor; (ii) the Management Equityholders; (iii) any Permitted Transferee of any of the foregoing Persons; and (iv) any "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date) including any of the foregoing Persons; *provided*, that (x) any combination of such foregoing Persons referred to in clauses (i), (ii) and (iii) shall hold a majority of the aggregate voting interests in the Equity Interests of the Parent or the Relevant Public Company, as the case may be, held by all members of such combination and (y) as of the Closing Date, no other Person (together with its Affiliates) shall have more Equity Interests representing the ordinary voting power than the Sponsor (together with its Affiliates).

"**Permitted Initial Revolving Credit Borrowing Purposes**" means one or more Borrowings of Revolving Credit Loans to fund a portion of the purchase price of the Acquisition, to finance working capital, including in respect of working capital adjustments or purchases of working capital under the Acquisition Agreement, and for other general corporate purposes not prohibited by the Loan Documents, in an aggregate amount not to exceed $1,000,000.

"**Permitted IPO Reorganization**" means any transactions or actions taken in connection with consummating an initial public offering of the Lead Borrower or any direct or indirect parent thereof, so long as, after giving effect thereto, neither the value of the security interest of the Collateral Agent and the Lenders in the Collateral, taken as a whole (including as to the perfection and priority thereof), nor the value of the Guaranty, taken as a whole, is materially impaired.

"**Permitted Junior Priority Refinancing Debt**" means secured Indebtedness (including any Registered Equivalent Notes) incurred by the Borrowers or any other Loan Party in the form of one or more series of second lien (or other junior lien) secured notes or second lien (or other junior lien) secured loans; *provided* that (i) such Indebtedness is secured only by all or a portion of the Collateral on a second priority (or other junior priority) basis to the Liens securing the Obligations and the obligations in respect of any Permitted First Priority Refinancing Debt, (ii) such Indebtedness otherwise constitutes Credit Agreement Refinancing Indebtedness and (iii) such Indebtedness meets the Permitted Other Debt Conditions. Permitted Junior Priority Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"**Permitted Other Debt Conditions**" means that such applicable Indebtedness does not mature or have scheduled amortization payments of principal or payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligations (other than, in each case, customary offers or obligations to repurchase, redeem or repay upon a change of control, asset sale, excess cash flow sweeps, casualty or condemnation event or similar events, AHYDO Payments, customary acceleration rights after an event of default, solely with respect to any Indebtedness secured by a Lien ranking junior to the Secured Obligations, any payment obligations solely with respect to prepayment amounts declined by any Lender under this Agreement and/or any lender(s) in respect of any other Secured Obligations being prepaid or that constitute a customary prepayment provision with respect to Refinancing Indebtedness on a *pro rata* basis

51

in connection with such prepayment in accordance with this Agreement, and solely with respect to any Indebtedness secured by a Lien ranking *pari passu* with the Secured Obligations, any payment obligations that will also be applied to the Term Loans hereunder on a *pro rata* or greater than *pro rata* basis or that constitute a customary prepayment provision with respect to Refinancing Indebtedness), in each case prior to the Latest Maturity Date at the time such Indebtedness is incurred.

"**Permitted Parent Holdco Financing**" means the issuance of unsecured securities and other unsecured holding company debt issued or incurred by the Parent to fund any Excluded Contribution Amount described in Section 7.06(q); *provided* that (i) Sponsor at all times unconditionally guarantees such securities or debt, (ii) neither the Borrowers nor any other Restricted Subsidiary of the Parent is a borrower or a guarantor with respect to such securities or debt and (iii) neither the Borrowers nor any other Loan Party (other than Parent) shall otherwise be liable for such securities or debt.

"**Permitted Ratio Debt**" means Indebtedness of the Borrowers or any other Restricted Subsidiary of the Parent; *provided* that immediately after giving Pro Forma Effect thereto and to the use of the proceeds thereof, (i) the aggregate amount of such Indebtedness outstanding at the time of incurrence or issuance shall not exceed the sum of (A) an amount equal to the greater of (x) $7,500,000 or (y) 75% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis), *minus* the aggregate principal amount of Indebtedness incurred pursuant to Section 2.14(d)(iii)(A), *plus* (B) such additional amounts to the extent that, after giving effect thereto, for the most recently ended Test Period (on a Pro Forma Basis) at the time of incurrence or issuance, (1) in the case of Indebtedness secured by Liens on the Collateral that rank *pari passu* with the Liens securing the Initial Term Loans, the Consolidated Senior Secured Net Leverage Ratio (calculated on a Pro Forma Basis in accordance with Section 1.11) is not greater than 4.50:1.00, (2) in the case of Indebtedness secured by Liens on the Collateral that rank junior to the Liens on the Collateral securing the Initial Term Loans, the Consolidated Secured Net Leverage Ratio (calculated on a Pro Forma Basis in accordance with Section 1.1) is not greater than 4.50:1.00 and (3) in the case of unsecured Indebtedness or Indebtedness secured only by Liens on assets that do not constitute Collateral, the Consolidated Total Net Leverage Ratio (calculated on a Pro Forma Basis in accordance with Section 1.11) is not greater than 4.50:1.00, in each case after giving effect to any acquisition consummated in connection therewith and all other appropriate *pro forma* adjustments (including giving effect to the prepayment of Indebtedness on or prior to the consummation of such acquisition) and assuming for purposes of this calculation that (I) the full committed amount of any revolving loans then being made shall be treated as fully drawn and outstanding for such purpose and (II) cash proceeds of any such Permitted Ratio Debt or other Indebtedness permitted hereunder then being incurred shall not be netted from the numerator in the Consolidated Total Net Leverage Ratio, Consolidated Secured Net Leverage Ratio or the Consolidated Senior Secured Net Leverage Ratio, as applicable *plus* (C) the sum, without duplication, of all (i) voluntary prepayments and optional redemptions of Term Loans made pursuant to Section 2.05(a) or Section 10.07(l)(x) or mandatory assignments pursuant to Section 3.07 or of other *pari passu* Indebtedness incurred pursuant to clause (A) of Section 2.14(d)(iii), Section 7.03(m) or clause (i)(A) above and

(ii) voluntary commitment reductions and voluntary prepayments of the Loans under the Revolving Credit Facility or any other *pari passu* revolving facility incurred pursuant to clause (A) of Section 2.14(d)(iii), Section 7.03(m) or clause (i)(A) above to the extent accompanied by a permanent commitment reduction, (in each case, including any substantially concurrent prepayment, redemption, reduction, termination, buy-back (the amount of any debt buy backs limited to the cash payment actually made in respect thereof) or purchase, other than to the extent funded with (A) proceeds of long term Indebtedness (other than revolving Indebtedness or intercompany Indebtedness) or (B) proceeds of Indebtedness incurred pursuant to clause (A) of Section 2.14(d)(iii), Section 7.03(m) or clause (i)(A) above; *provided* that in the case of Indebtedness incurred by Restricted Subsidiaries that are not Guarantors, the Indebtedness shall not exceed an aggregate amount at the time of incurrence equal to the greater of (x) $1,500,000 and (y) 15% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis), (ii)(x) in the case of any Indebtedness secured by a Lien on any Collateral ranking junior to the Lien securing the

52

Secured Obligations, such Indebtedness shall have a final maturity not sooner than 91 days after the Latest Maturity Date in respect of Term Loans, as determined at the time of issuance or incurrence of such Indebtedness, and (y) in the case of any Indebtedness secured by a Lien on the Collateral ranking *pari passu* with the Secured Obligations, such Indebtedness shall have a final scheduled maturity date not sooner than the Latest Maturity Date in respect of Term Loans, as determined at the time of issuance or incurrence of such Indebtedness (in each case, other than any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with such requirements), (iii) in the case of any secured Indebtedness, such Indebtedness shall be subject to customary intercreditor terms (including those in an Intercreditor Agreement and/or any other lien subordination and intercreditor arrangement, as applicable, reasonably satisfactory to the Lead Borrower and the Administrative Agent), (iv) such Indebtedness shall not provide for any mandatory repayment (except, subject to clause (vii), scheduled principal amortization payments), redemption or sinking fund payment obligations prior to the Latest Maturity Date in respect of Term Loans, as determined at the time of issuance or incurrence of the Indebtedness (other than, in each case, customary offers or obligations to repurchase, redeem or repay upon a change of control, asset sale, excess cash flow sweep, casualty or condemnation event or similar events, AHYDO Payments, customary acceleration rights after an event of default, solely with respect to any such Indebtedness constituting Indebtedness secured by a Lien ranking junior to the Lien securing the Secured Obligations, any payment obligations solely with respect to prepayment amounts declined by any Lender under this Agreement and/or any lender(s) in respect of any other Indebtedness secured by a Lien ranking *pari passu* with the Secured Obligations being prepaid or that constitute a customary prepayment provision with respect to Refinancing Indebtedness on a *pro rata* basis in connection with such prepayment in accordance with this Agreement, and solely with respect to any such Indebtedness secured by a Lien ranking *pari passu* with the Lien securing the Secured Obligations, any payment obligations (including any mandatory repayment obligation relating to generation of excess cash flow) that will also be applied to the Term Loans hereunder on a *pro rata* or greater than *pro rata* basis or that constitute a customary prepayment provision with respect to Refinancing Indebtedness), (v) in the case of Indebtedness secured by a Lien ranking *pari passu* in right of payment and security with the Secured Obligations outstanding under this Agreement, the All-In Yield of the Initial Term Loans and the Delayed Draw Term Loans shall be subject to adjustment in the manner set forth in Section 2.14(e)(i)(D), determined for the purposes of this clause (v) as if such Indebtedness were Incremental Term Loans, (vi) other than as required by the preceding clauses (i) through (v) and the succeeding clauses (vii) and (viii), shall contain such terms as are reasonably satisfactory to the Lead Borrower, the borrower thereof (if not the Lead Borrower) and the providers of such Indebtedness; *provided*, that the terms of such Indebtedness shall be no more favorable to the providers of such Indebtedness than the applicable terms of this Agreement and the other Loan Documents (except for any terms (w) applicable only to periods after the Latest Maturity Date in respect of Term Loans, as determined at the time of issuance or incurrence of such Permitted Ratio Debt, (x) that are also added for the benefit of the Term Lenders, (y) that are not materially more restrictive than the terms of this Agreement (as determined by the Lead Borrower in good faith) or (z) reasonably acceptable to the Administrative Agent (not to be unreasonably withheld, conditioned, delayed or denied)), (vii) the Weighted Average Life to Maturity of such Permitted Ratio Debt constituting Term Loans is not shorter than the remaining Weighted Average Life to Maturity of then-existing Term Loans (excluding in all events customary bridge financings so long as the Indebtedness into which such bridge financing is to be converted complies with such requirements); *provided*, that for purposes of determining the Weighted Average Life to Maturity of the applicable Indebtedness, the effects of any prepayments or amortization made on the then existing Term Loans prior to the date of the incurrence of the applicable Indebtedness shall be disregarded, and (viii) the Indebtedness shall not at any time be guaranteed by any Person other than the Guarantors (unless the Required Lenders have declined a guarantee from such other Person and except as otherwise permitted under this Agreement) and, to the extent secured, are not secured by a Lien on any property or asset that does not secure the Facilities (unless the Required Lenders have declined and except as otherwise permitted under this Agreement) (it being understood that (x) amounts under clause (i)(B) (to the extent compliant therewith) and/or clause (i)(C) shall be deemed to have been used prior to utilization of amounts under

53

clause (i)(A), (y) Indebtedness may be incurred under clauses (i)(A), (i)(B) and (i)(C), and (i)(A), (i)(B) or (i)(C), and proceeds from any such incurrence under such clauses may be utilized in a single transaction or series of related transactions by first calculating the incurrence under clause (i)(B) and then calculating the incurrence under clause (i)(A) and/or (i)(C) and, for the avoidance of doubt, any such incurrence under clause (i)(A) and/or (i)(C) shall not be given *pro forma* effect for purposes of determining the Consolidated Total Net Leverage Ratio, Consolidated Secured Net Leverage Ratio or the Consolidated Senior Secured Net Leverage Ratio, as applicable, for purposes of effectuating the incurrence under clause (i)(B) and/or clause (i)(C) in such single transaction or series of related transactions and (z) any Indebtedness originally incurred pursuant to clause (i)(A) and/or clause (i)(C) shall be automatically redesignated (unless otherwise elected by Lead Borrower) as incurred pursuant to clause (i)(B) if the Borrowers meet the applicable leverage ratio under clause (i)(B) at such time on a Pro Forma Basis (for purposes of clarity, with any such redesignation having the effect of increasing the ability to incur Indebtedness pursuant to clause (i)(A) and/or clause (i)(C) as of the date of such redesignation by the amount of such Indebtedness so redesignated).

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal, restructuring, replacement or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, restructured, refunded, renewed, replaced or extended except by an amount equal to unpaid accrued interest and premium thereon *plus* other amounts owing or paid related to such Indebtedness, and fees and expenses incurred, in connection with such modification, refinancing, refunding, renewal, restructuring, replacement or extension and by an amount equal to any existing commitments unutilized thereunder or other than to the extent permitted by another exception set forth in Section 7.03, (b) other than with respect to (x) a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), (g) or (u) or (y) a Permitted Refinancing in the form of a bridge loan intended to be refinanced with a securities offering the maturity date of which provides for an automatic extension of the maturity date thereof, to a date that is not earlier than the maturity date of the Indebtedness being refinanced, such modification, refinancing, refunding, renewal, restructuring, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, restructured, replaced or extended, (c) if such Permitted Refinancing is secured by assets it shall not be secured by assets that do not secure the Indebtedness being refinanced and the priority of such Liens shall be *pari passu* or junior to the Liens securing the Indebtedness being refinanced, (d) if such Indebtedness being modified, refinanced, refunded, renewed, restructured, replaced or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal, restructuring, replacement or extension is subordinated in right of payment to the Obligations on subordination terms (i) at least as favorable (taken as a whole) (as reasonably determined by the Lead Borrower) to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, restructured, replaced or extended or (ii) otherwise reasonably acceptable to the Administrative Agent (such approval not to be unreasonably withheld, delayed, conditioned or denied), (e) such Indebtedness is incurred and guaranteed by one or more Persons who is an obligor of the Indebtedness being modified, refinanced, refunded, renewed, restructured, replaced or extended (and no other Persons unless otherwise permitted under Section 7.03), (f) with respect to Permitted Refinancings of Indebtedness incurred pursuant to Section 7.03(s), (w) or (x), if such Indebtedness is secured, is not secured by assets or property other than Collateral (unless declined by the Administrative Agent or otherwise permitted) and (g) with respect to Permitted Refinancings of Indebtedness incurred pursuant to Section 7.03(s), (w) or (x), in the case of any Indebtedness secured by the Collateral, shall be subject to the intercreditor terms of an Intercreditor Agreement and/or any other lien subordination and intercreditor arrangement, as applicable, reasonably satisfactory to the Lead Borrower and the Administrative Agent.

54

"**Permitted Repricing Amendment**" has the meaning set forth in Section 10.01.

"**Permitted Tax Restructuring**" means any re-organizations and other activities among the Parent and its Restricted Subsidiaries related to tax planning and re-organization so long as, after giving effect thereto, (a) taken as a whole, the security interests of the Collateral Agent in the Collateral are not materially impaired and (b) taken as a whole, the value of the Collateral securing the Obligations and the Guaranty by the Guarantors of the Obligations are not materially reduced.

"**Permitted Transferee**" means (A) in the case of any Management Equityholder, (i) his or her executor, administrator, testamentary trustee, legatee or beneficiaries, (ii) his or her spouse, parents, siblings, members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants or (iii) a trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only a Management Equityholder and his or her spouse, parents, siblings, members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants or (B) in the case of the Sponsor, (i) any Sponsor Associate, (ii) the heirs, executors, administrators, testamentary trustees, legatees or beneficiaries of any Sponsor Associate and
(iii)    any trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only a Sponsor Associate, his or her spouse, parents, siblings, members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants.

"**Permitted Unsecured Refinancing Debt**" means unsecured Indebtedness (including any unsecured Registered Equivalent Notes) incurred by the Lead Borrower or any Loan Party in the form of one or more series of senior unsecured notes or loans; *provided* that such Indebtedness (i) constitutes Credit Agreement Refinancing Indebtedness, (ii) meets the Permitted Other Debt Conditions and (iii) to the extent such unsecured Indebtedness is contractually subordinated in right of payment to the Obligations, the holders of such unsecured Indebtedness shall have entered into customary subordination agreements or provisions reasonably satisfactory to the Administrative Agent and the Lead Borrower.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by any Loan Party or any Restricted Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"**Platform**" has the meaning set forth in Section 6.01.

"**Pledged Debt**" has the meaning set forth in the Security Agreement. " **Pledged Equity**" has the meaning set forth in

the Security Agreement.

"**PPP Loans**" means, individually or collectively as the context may require, (1) that certain Note, dated as of May 1, 2020, by Deep Space Systems Inc. in favor of Customers Bank, in an aggregate principal amount equal to $1,057,500, (2) that certain Promissory Note, dated as of April 15, 2020, by Made In Space, Inc. in favor of Bank of America, N.A., in an aggregate principal amount equal to $1,462,639, (3) that certain Promissory Note, dated as of April 15, 2020, by Roccor, LLC in favor Citywide Banks, in an aggregate principal amount equal to $910,900 and (4) any other "paycheck protection program" that Parent or any Restricted Subsidiary applies for and obtains under the Coronavirus Aid, Relief and Economic Security Act (H.R. 748) (as in effect on the Closing Date and as may be amended or succeeded from time to time).

55

"**Prime Rate**" means the rate of interest quoted in the print edition of The Wall Street Journal, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 70% of the nation's ten (10) largest banks), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Proceeding**" has the meaning set forth in Section 10.05.

"**Proceeds**" has the meaning set forth in the Security Agreement.

"**Pro Forma Balance Sheet**" has the meaning set forth in Section 5.05(b).

"**Pro Forma Basis**" and "**Pro Forma Effect**" means, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.11.

"**Pro Forma Compliance**" means, with respect to the covenant in Section 7.11, compliance on a Pro Forma Basis with such covenant in accordance with Section 1.11.

"**Pro Forma Financial Statements**" has the meaning set forth in Section 5.05(b).

"**Pro Rata Share**" means, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments and, if applicable and without duplication, Term Loans of such Lender under the applicable Facility or Facilities at such time and the denominator of which is the amount of the Aggregate Commitments under the applicable Facility or Facilities and, if applicable and without duplication, Term Loans under the applicable Facility or Facilities at such time; *provided* that, in the case of the Revolving Credit Facility, if such Commitments have been terminated, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"**Projections**" has the meaning set forth in Section 6.01(d).

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" has the meaning set forth in Section 6.01.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"**QFC Credit Support**" has the meaning assigned to it in Section 10.23.

"**Qualified Cash**" means, as of any date of determination, an amount equal to the aggregate amount of cash and Cash Equivalents (other than Restricted Cash) of the Loan Parties on such date; provided that the aggregate amount of such cash and Cash Equivalents of the Loan Parties on such date that does not represent deferred revenue shall not exceed $20,000,000 as of any date of determination for purposes of this definition.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligations, each Loan Party that has

56

total assets exceeding $10,000,000 at the time such Swap Obligations are incurred.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests. "**Qualified IPO**" means (x) the issuance by

the Lead Borrower or any direct or indirect parent of

the Lead Borrower of its common Equity Interests in an underwritten primary public offering (other than a
public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission or in a commonly underwritten offering (or series of related offerings of securities to the public pursuant to a final prospectus in accordance with the Securities Act (whether alone or in connection with a secondary public offering)) or (y) a transaction where the Equity Interests of any direct or indirect parent of Parent become publicly registered on any United States or Canadian national securities exchange through a merger, acquisition or other combination with a "SPAC" or similar entity.

"**Qualified Proceeds**" shall mean assets that are used or useful in, or Equity Interests of any Person engaged in, any business conducted or proposed to be conducted by the Lead Borrower and its Restricted Subsidiaries, taken as a whole, on the Closing Date or any other business activities which are reasonable extensions thereof or otherwise similar, incidental, corollary, complementary, synergistic, reasonably related, or ancillary to any of the foregoing (including non-core incidental businesses acquired in connection with any Permitted Acquisition or permitted Investment), in each case as determined by the Lead Borrower in good faith.

"**Qualified Securitization Financing**" shall mean any Securitization Facility (and any guarantee of such Securitization Facility), that meets the following conditions: (i) the Lead Borrower shall have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrowers and the other Restricted Subsidiaries of the Parent; (ii) all transfers of Securitization Assets and related assets by any Borrower or any other Restricted Subsidiary of the Parent to the Securitization Subsidiary or any other Person are made at Fair Market Value, a portion of which may be paid in the form of an increase in the Seller's Retained Interest; (iii) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by the Lead Borrower) and may include Standard Securitization Undertakings; and (iv) the obligations under such Securitization Facility are non- recourse (except for customary representations, warranties, covenants, performance guarantees and indemnities made in connection with such facilities) to any Borrower or any other Restricted Subsidiary of the Parent (other than a Securitization Subsidiary).

"**Qualifying Lender**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Receivables Assets**" shall mean (a) any accounts receivable, including proceeds thereof, owed to any Borrower or any other Restricted Subsidiary of the Parent and arising in the ordinary course of business from the sale of goods and services and (b) all collateral securing such accounts receivable, all contracts and contract rights, guarantees or other obligations in respect of such accounts receivable, all records with respect to such accounts receivable and any other related assets customarily transferred together with accounts receivable in connection with a non-recourse accounts receivable factoring arrangement and

57

which are sold, conveyed, assigned or otherwise transferred or pledged in connection with a Receivables Facility.

"**Receivables Facility**" shall mean any of one or more receivables financing facilities (and any guarantee of such financing facility) that meets the following conditions: (i) the obligations under such facility are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities and customary Securitization Repurchasing Obligations) to the Borrowers and the other Restricted Subsidiaries of the Parent, (ii) pursuant to such facility any Borrower or any other Restricted Subsidiary of the Parent sells, directly or indirectly, grants a security interest in or otherwise transfers its Receivables Assets to either (a) a Person that is not a Borrower or another Restricted Subsidiary of the Parent or (b) a Receivables Subsidiary that in turn funds such purchase by (1) transferring its accounts receivable to a Person that is not a Borrower or another Restricted Subsidiary of the Parent or by borrowing from such Person or from another Receivables Subsidiary that in turn funds itself by borrowing from such Person or (2) the issuance to such Borrower or such Restricted Subsidiary of Seller's Retained Interests or an increase in such Seller's Retained Interests and (iii) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by the Lead Borrower) and may include Standard Securitization Undertakings and shall include any guaranty in respect of such financing facility.

"**Receivables Fee**" shall mean distributions or payments made directly or by means of discounts with respect to any accounts receivable or participation interest issued or sold in connection with, and other fees paid to a Person that is not a Borrower or another Restricted Subsidiary of the Parent in connection with, any Receivables Facility.

"**Receivables Subsidiary**" shall mean any Subsidiary of the Parent formed for the purpose of, and that solely engages in, facilitating or entering into one or more Receivables Facilities and any other activities reasonably related or incidental thereto or another Person formed for the purposes of engaging in a Receivables Facility in which the Lead Borrower or any Restricted Subsidiary makes an Investment and to which the Lead Borrower or such Restricted Subsidiary transfers accounts receivable and related assets or grants a security interest in Receivables Assets.

"**Refinanced Debt**" has the meaning set forth in the definition of "Credit Agreement Refinancing Indebtedness".

"**Refinanced Term Loans**" has the meaning set forth in Section 10.01.

"**Refinancing Amendment**" means an amendment to this Agreement executed by each of (a) the Lead Borrower, (b) the Administrative Agent, (c) each Additional Refinancing Lender and (d) each Lender that agrees to provide any portion of Refinancing Term Loans, Refinancing Revolving Credit Commitments or Refinancing Revolving Credit Loans incurred pursuant thereto, in accordance with Section 2.15.

"**Refinancing Revolving Credit Commitments**" means one or more Classes of Revolving Credit Commitments hereunder that result from a Refinancing Amendment.

"**Refinancing Revolving Credit Loans**" means one or more Classes of Revolving Credit Loans that result from a Refinancing Amendment.

"**Refinancing Series**" means all Refinancing Term Loans or Refinancing Term Commitments, Refinancing Revolving Credit Loans or Refinancing Revolving Credit Commitments that are established pursuant to the same Refinancing Amendment (or any subsequent Refinancing Amendment to the extent such Refinancing Amendment expressly provides that the Refinancing Term Loans or Refinancing Term

58

Commitments, Refinancing Revolving Credit Loans or Refinancing Revolving Credit Commitments provided for therein are intended to be a part of any previously established Refinancing Series) and that provide for the same All-In Yield (other than, for this purpose, any original issue discount or upfront fees), if applicable, and amortization schedule, if applicable.

"**Refinancing Term Commitments**" means one or more term loan commitments hereunder that fund Refinancing Term Loans of the applicable Refinancing Series hereunder pursuant to a Refinancing Amendment.

"**Refinancing Term Loans**" means one or more Classes of Term Loans that result from a Refinancing Amendment.

"**Register**" has the meaning set forth in  Section 10.07(d).

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in an offering pursuant to Rule 144A under the Securities Act or other private placement transaction under the Securities Act, substantially identical notes (having the same guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"**Rejection Notice**" has the meaning set forth in  Section 2.05(b)(viii).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the Environment.

"**Relevant Public Company**" means the Parent or any direct or indirect parent thereof that is the registrant with respect to a Qualified IPO.

"**Replacement Term Loans**" has the meaning set forth in  Section 10.01.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the otherwise applicable notice period has been waived by regulation or otherwise by the PBGC.

"**Request for Credit Extension**" means, with respect to a Borrowing, continuation or conversion of Term Loans or Revolving Credit Loans, a Committed Loan Notice.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the sum of the (a) Total Outstandings, (b) aggregate unused Initial Term Commitments, Incremental Term Commitments and Refinancing Term Commitments and (c) aggregate unused Revolving Credit Commitments, unused Incremental Term Commitments and unused Refinancing Revolving Credit Commitments; *provided* that the unused Term Commitment, Incremental Term Commitment, Refinancing Term Commitment and unused Revolving Credit Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders; provided, further, that, to the same extent set forth in Section 10.07(m) with respect to a determination of Required Lenders, the Loans of any Sponsor-Controlled Affiliated Lender shall in each case be excluded for purposes of making a determination of Required Lenders.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial

Institution, a UK Resolution Authority.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant treasurer, controller or other similar officer of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Cash**" means cash or Cash Equivalents of the Parent or any of its Restricted Subsidiaries that appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Parent (unless such appearance is related to the Loan Documents (or the Liens created thereunder) or other obligations or Indebtedness permitted under Section 7.03 which is permitted to be secured by a Lien).

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) on account of any Equity Interest of the Parent or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Parent's or such Restricted Subsidiary's stockholders, partners or members (or the equivalent Persons thereof).

"**Restricted Subsidiary**" means any Subsidiary other than an Unrestricted Subsidiary. Unless otherwise specified, all references herein to a "Restricted Subsidiary" or to "Restricted Subsidiaries" shall refer to a Restricted Subsidiary or Restricted Subsidiaries of the Parent.

"**Returns**" means, with respect to any Investment, any dividends, distributions, interest, fees, premium, return of capital, repayment of principal, income, profits (from a Disposition or otherwise) and other amounts received or realized in respect of such Investment (including the fair market value of any applicable assets).

"**Revolving Commitment Increase**" has the meaning set forth in Section 2.14(a).

"**Revolving Credit Borrowing**" means a borrowing consisting of simultaneous Revolving Credit Loans of the same Type and, in the case of Eurocurrency Rate Loans, having the same Interest Period, made by each of the Revolving Credit Lenders.

"**Revolving Credit Commitment**" means, as to each Revolving Credit Lender, its obligation to make Revolving Credit Loans to the Borrowers in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 1.01A under the caption "Revolving Credit Commitment" or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement (including Sections 2.14 and 10.07(b)). The aggregate Revolving Credit Commitments of all Revolving Credit Lenders shall be $5,000,000 on the Closing Date, as such amount may be adjusted from time to time in accordance with the terms of this Agreement.

"**Revolving Credit Exposure**" means, as to each Revolving Credit Lender, the sum of the amount of the Outstanding Amount of such Revolving Credit Lender's Revolving Credit Loans.

"**Revolving Credit Facility**" means the Revolving Credit Commitments, including any Revolving Commitment Increase, each Extension Series of Extended Revolving Credit Commitments, each

60

Refinancing Series of Refinancing Revolving Credit Commitments and the Credit Extensions made thereunder.

"**Revolving Credit Lender**" means, at any time, any Lender that has a Revolving Credit Commitment at such time or, if the Revolving Credit Commitments have terminated, Revolving Credit Exposure.

"**Revolving Credit Loan Extension Request**" has the meaning set forth in  Section 2.16(b).

"**Revolving Credit Loan Extension Series**" has the meaning set forth in  Section 2.16(b).

"**Revolving Credit Loans**" has the meaning set forth in  Section 2.01(b).

"**Revolving Credit Note**" means a promissory note of the Borrowers payable to any Revolving Credit Lender or its registered assigns, in substantially the form of Exhibit C-2 hereto, evidencing the aggregate Indebtedness of the Borrowers to such Revolving Credit Lender resulting from the Revolving Credit Loans made by such Revolving Credit Lender to the Borrowers.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Hedge Agreement**" means any Swap Contract permitted under Article VII (and subject, for the avoidance of doubt, to the limitations set forth in the definition of "Hedge Bank") that is entered into by and between any Borrower or any other Restricted Subsidiary of the Parent and any Hedge Bank, to the extent designated by the Lead Borrower and such Hedge Bank as a "Secured Hedge Agreement" in writing to the Administrative Agent. The designation of any Secured Hedge Agreement shall not create in favor of such Hedge Bank any rights in connection with the management or release of Collateral or of the obligations of any Guarantor under the Loan Documents.

"**Secured Obligations**" means, collectively, the Obligations, the Cash Management Obligations and all Hedging Obligations.

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, each Lender, the Hedge Banks (subject to the limitations set forth in the definition thereof) and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Securitization Asset**" shall mean (a) any accounts receivable or related assets and the proceeds thereof owed to any Borrower or any other Restricted Subsidiary of the Parent and arising in the ordinary course of business from the sale of goods or services and (b) all collateral securing such receivable or asset, all contracts and contract rights, guaranties or other obligations in respect of such receivable or asset, lockbox accounts and records with respect to such account or asset and any other related assets customarily transferred (or in respect of which security interests are customarily granted), together with accounts or assets in a securitization financing and which in the case of clause (a) and (b) above are sold, conveyed, assigned or otherwise transferred or pledged in connection with a Qualified Securitization Financing.

61

"**Securitization Facility**" shall mean any transaction or series of securitization financings that may be entered into by any Borrower or any other Restricted Subsidiary of the Parent pursuant to which any such Borrower or any such Restricted Subsidiary may sell, convey or otherwise transfer, or may grant a security interest in, Securitization Assets to either (a) a Person that is not a Borrower or another Restricted Subsidiary of the Parent or (b) a Securitization Subsidiary that in turn sells such Securitization Assets to a Person that is not a Borrower or another Restricted Subsidiary of the Parent, or may grant a security interest in, any Securitization Assets of any Borrower, any other Restricted Subsidiary of the Parent or any of its Subsidiaries.

"**Securitization Fees**" shall mean distributions or payments made directly or by means of discounts with respect to any Securitization Asset or participation interest therein issued or sold in connection with, and other fees and expenses (including reasonable fees and expenses of legal counsel) paid to a Person that is not a Borrower or another Restricted Subsidiary of the Parent in connection with, any Qualified Securitization Financing.

"**Securitization Repurchase Obligation**" shall mean any obligation of a seller (or any guaranty of such obligation) of (i) Receivables Assets under a Receivables Facility to repurchase Receivables Assets or (ii) Securitization Assets in a Qualified Securitization Financing to repurchase Securitization Assets, in either case, arising as a result of a breach of a representation, warranty or covenant or otherwise, including, without limitation, as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"**Securitization Subsidiary**" shall mean any Subsidiary of the Parent in each case formed for the purpose of, and that solely engages in, one or more Qualified Securitization Financings and other activities reasonably related thereto or another Person formed for the purposes of engaging in a Qualified Securitization Financing in which the Parent or any Restricted Subsidiary makes an Investment and to which the Parent or such Restricted Subsidiary transfers Securitization Assets and related assets.

"**Security Agreement**" means a security agreement substantially in the form of Exhibit F.

"**Security Agreement Supplement**" has the meaning set forth in the Security Agreement.

"**Seller's Retained Interest**" means the debt or equity interests held by the Lead Borrower or any Restricted Subsidiary in (i) a Securitization Subsidiary to which Securitization Assets have been transferred, and/or (ii) a Receivables Subsidiary to which Receivables Assets have been transferred including, in each case, any such debt or equity received as consideration for or as a portion of the purchase price for the Securitization Assets and/or Receivables Assets transferred, or any other instrument through which the Lead Borrower or any Restricted Subsidiary has rights to or receives distributions in respect of any deferred purchase price or other residual or excess interest in such Securitization Assets and/or Receivables Assets.

"**Senior Representative**" means, with respect to any series of Permitted First Priority Refinancing Debt, Permitted Junior Priority Refinancing Debt, Other Term Loans or Other Notes (if secured), the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Solicited Discount Proration**" has the meaning set forth in  Section 2.05(a)(v)(D)(3).

"**Solicited Discounted Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(D)(1).

"**Solicited Discounted Prepayment Notice**" means a written notice of the Borrower of Solicited Discounted Prepayment Offers made pursuant to Section 2.05(a)(v)(D) substantially in the form of Exhibit E-6.

"**Solicited Discounted Prepayment Offer**" means the irrevocable written offer by each Lender, substantially in the form of Exhibit E-7, submitted following the Administrative Agent's receipt of a Solicited Discounted Prepayment Notice.

"**Solicited Discounted Prepayment Response Date**" has the meaning set forth in Section 2.05(a)(v)(D)(1).

"**Solvent**" and "**Solvency**" mean, with respect to any Person or Persons on any date of determination, that on such date such Person or Persons (a) have property with fair value (on a going concern basis) that exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise, (b) have assets with the present fair saleable value of the property (on a going concern basis) that is, on a consolidated basis, greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business, (c) will be able to pay, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured in the ordinary course of business and (d) are not engaged in, and are not about to engage in, on a consolidated basis, business contemplated as of the date hereof for which they have unreasonably small capital.

"**SPC**" has the meaning set forth in Section 10.07(h).

"**Specified Acquisition Agreement Representations**" means the representations and warranties made with respect to the Companies (as defined in the Acquisition Agreement) in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that the Buyer (or its Affiliates) has (or have) the right (taking into account any applicable cure provisions) to terminate its (or their) obligations under the Acquisition Agreement or decline to consummate the Acquisition (in each case, in accordance with the terms of the Acquisition Agreement) as a result of a breach of such representations and warranties in the Acquisition Agreement.

"**Specified Discount**" has the meaning set forth in Section 2.05(a)(v)(B)(1).

"**Specified Discount Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(B)(1).

"**Specified Discount Prepayment Notice**" means a written notice of the Borrower Offer of Specified Discount Prepayment made pursuant to Section 2.05(a)(v)(B) substantially in the form of Exhibit E-8.

"**Specified Discount Prepayment Response**" means the irrevocable written response by each Lender, substantially in the form of Exhibit E-9, to a Specified Discount Prepayment Notice.

"**Specified Discount Prepayment Response Date**" has the meaning set forth in Section 2.05(a)(v)(B)(1).

"**Specified Discount Proration**" has the meaning set forth in Section 2.05(a)(v)(B)(3).

"**Specified Guarantor**" has the meaning set forth in the definition of "Guarantor".

"**Specified Junior Financing Obligations**" means any obligations in respect of any Junior Financing in respect of which any Loan Party is an obligor in a principal amount in excess of the Threshold Amount.

"**Specified Representations**" means those representations and warranties made by the Loan Parties in Sections 5.01(a) (other than with respect to a Subsidiary which does not constitute a Material Subsidiary) 5.01(b), 5.02(a), 5.02(b)(i) (solely as it relates to the entering into and performing under the Loan Documents), 5.04, 5.12, 5.16, 5.17(a) (solely in respect of (i) the use of Loan proceeds on the Closing Date and (ii) the USA Patriot Act), 5.17(b) (solely in respect of the use of Loan proceeds on the Closing Date), 5.17(c) (solely in respect of the use of Loan proceeds on the Closing Date) and 5.18 (subject to the proviso at the end of Section 4.01(a)).

"**Specified Transaction**" means (i) any Investment that results in a Person becoming a Restricted Subsidiary of the Parent, (ii) any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary, (iii) any Permitted Acquisition, (iv) any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Parent, (v) any Investment constituting an acquisition of assets constituting a business unit, line of business or division of, or all or substantially all of the Equity Interests of, another Person or any Disposition of a business unit, line of business or division of the Lead Borrower or a Restricted Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise, (vi) any incurrence or repayment of Indebtedness, (vii) any Restricted Payment, (viii) any of Revolving Commitment Increase, Incremental Revolving Loan or Incremental Term Loan or (ix) any other event that by the terms of this Agreement requires *pro forma* compliance with a test or covenant hereunder or requires such test or covenant to be calculated on a *pro forma* basis or giving *pro forma* effect to any such transaction or event that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"**Sponsor**" means any of (i) AE Industrial Partners Fund II, L.P. and (ii) any successors of a Person set forth in clause (i) and any of their Affiliates, and funds or partnerships managed or advised by any of them or any of their respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Sponsor Associate**" means any managing director, general partner, limited partner, director, officer or employee of the Sponsor.

"**Sponsor-Controlled Affiliated Lender**" means, at any time, any Lender that is the Sponsor or a Non-Debt Fund Affiliate, in each case, other than the Parent, any Borrower or any of its Restricted Subsidiaries, any Debt Fund Affiliate or any natural person

"**Sponsor-Controlled Affiliate Lender Assignment and Assumption**" has the meaning set forth in Section 10.07(k)(ii).

"**Sponsor-Controlled Affiliated Lender Cap**" has the meaning set forth in Section 10.07(k)(v).

"**Sponsor Model**" means that certain projection model delivered by the Sponsor to the Administrative Agent and the Lead Arranger on September 11, 2020, and any subsequent modifications by the Sponsor thereto that are reasonably acceptable to the Administrative Agent.

"**Standard Securitization Undertakings**" means representations, warranties, covenants, repurchase obligations and indemnities entered into by any Borrower or any other Restricted Subsidiary of the Parent which are customary for a seller or servicer of assets transferred in connection with a non- recourse, bankruptcy-remote financing of accounts receivable.

64

"**Submitted Amount**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Submitted Discount**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, any charitable organizations, and any other Person that meets the requirements of Section 501(c)(3) of the Code) of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, (ii) more than half of the issued share capital is at the time beneficially owned or (iii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Parent.

"**Subsidiary Guarantor**" means any Guarantor other than the Parent. "**Successor Company**" has the meaning set

forth in Section 7.04(d).

"**Supported QFC**" has the meaning assigned to it in Section 10.23.

"**Supplier Financing Assets**" shall mean (a) any accounts receivable owed to the Lead Borrower or any of its Subsidiaries subject to a Supplier Financing Facility and the proceeds thereof and (b) all collateral securing such accounts receivable, all contracts and contract rights, guarantees or other obligations in respect of such accounts receivable, all records with respect to such accounts receivable and any other assets customarily transferred together with accounts receivable in connection with a non- recourse accounts receivable factoring arrangement and which are sold, conveyed, assigned or otherwise transferred or pledged in connection with a Supplier Financing Facility.

"**Supplier Financing Facility**" means any agreement between the Lead Borrower or any of its Subsidiaries and a financial institution that is entered into at the request of a customer or supplier of the Lead Borrower or any of its Subsidiaries, pursuant to which (a) such Person, as applicable, agrees to sell to such financial institution accounts receivable owing by such customer, together with Supplier Financing Assets related thereto, at a maximum discount, for each such account receivable, not to exceed 5.00% of the face value thereof and (b) the obligations of the Person, as applicable, thereunder are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Parent and such Subsidiaries.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and
(b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

65

"**Swap Obligation**" has the meaning set forth in the definition of "Excluded Swap Obligation."

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" means all present or future taxes, duties, levies, imposts, deductions, assessments or withholdings (including backup withholding), fees or other charges imposed by any Governmental Authority, including any interest, penalties and additions to tax.

"**Term Borrowing**" means a borrowing consisting of Term Loans of the same Type and, in the case of Eurocurrency Rate Loans, having the same Interest Period, made by each of the Term Lenders pursuant to Section 2.01(a), or under any Incremental Amendment, Extension Amendment or Refinancing Amendment or otherwise.

"**Term Commitment**" means, as to each Term Lender, its obligation to make a Term Loan to the Borrowers hereunder, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Term Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to Section 2.06 and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Term Lender pursuant to an Assignment and Assumption, (ii) an Incremental Amendment, (iii) a Refinancing Amendment, (iv) an Extension Amendment, or (v) the incurrence of Replacement Term Loans. The initial amount of each Term Lender's Commitment is set forth on Schedule 1.01A under the caption "Initial Term Commitment" or, otherwise, in the Assignment and Assumption, Incremental Amendment, Extension Amendment or Refinancing Amendment pursuant to which such Lender shall have assumed its Commitment, as the case may be.

"**Term Facility**" means (a) prior to the Closing Date, the Initial Term Commitments and (b) thereafter, each Class of Term Loans and/or Term Commitments.

"**Term Lender**" means, at any time, any Lender that has (a) an Initial Term Commitment, Incremental Term Commitment, Refinancing Term Commitment or other Term Commitment or (b) a Term Loan at such time.

"**Term Loan**" means any Initial Term Loan, Extended Term Loan, Delayed Draw Term Loan, Incremental Term Loan, Refinancing Term Loan or Replacement Term Loan, as the context may require.

"**Term Loan Extension Request**" has the meaning set forth in Section 2.16(a).

"**Term Loan Extension Series**" has the meaning set forth in Section 2.16(a).

"**Term Loan Increase**" has the meaning set forth in Section 2.14(a).

"**Term Note**" means a promissory note of the Borrowers payable to any Term Lender or its registered assigns, in substantially the form of Exhibit C-1 hereto, evidencing the aggregate Indebtedness of the Borrowers to such Term Lender resulting from the Term Loans made by such Term Lender.

"**Test Period**" means, for any date of determination under this Agreement, the four consecutive

66

fiscal quarters of the Parent most recently ended as of such date of determination for which financial statements have been delivered.

"**Threshold Amount**" means $3,000,000.

"**Total Assets**" means the total assets of the Parent and the Restricted Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Parent delivered pursuant to Sections 6.01(a) or (b) or, for the period prior to the time any such statements are so delivered pursuant to Sections 6.01(a) or (b), the Pro Forma Financial Statements.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans. "**Trademark**" has the meaning set forth in

the Security Agreement.

"**Transaction Expenses**" means any fees or expenses incurred or paid by the Parent, the Borrowers or any of their respective Subsidiaries or any of their direct or indirect parent entities (including the Sponsor) in connection with the Transactions (including, without limitation, expenses in connection with hedging transactions), this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"**Transactions**" means, collectively, (a) the Acquisition and other related transactions contemplated by the Acquisition Agreement, (b) the funding of the Initial Term Loans and the Initial Revolving Borrowing on the Closing Date and the execution and delivery of Loan Documents to be entered into on the Closing Date and (c) the payment of Transaction Expenses in connection with the foregoing.

"**Transferred Guarantor**" has the meaning set forth in Section 11.09.

"**Treasury Services Agreement**" means any agreement between any Loan Party or Restricted Subsidiary and any Hedge Bank relating to treasury, depository, credit card, debit card, credit card and cash management services or automated clearinghouse transfer of funds or any similar services.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Uniform Commercial Code**" or "**UCC**" means (i) the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or (ii) the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral. References in this Agreement and the other Loan Documents to specific sections of the Uniform Commercial Code are based on the Uniform Commercial Code as in effect in the State of New York on the date hereof. In the event such Uniform Commercial Code is amended or another Uniform Commercial Code described in clause (ii) is applicable, such section reference shall be deemed to be a reference to the comparable section in such amended or other Uniform Commercial Code.

67

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning set forth in  Section 3.01(d)(ii)(C) and is in substantially the form of  Exhibit H hereto.

"**Unrestricted Subsidiary**" means any Subsidiary of the Borrowers designated by the Lead Borrower as an Unrestricted Subsidiary pursuant to Section 6.14 subsequent to the Closing Date.

"**USA Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness; *provided* that for purposes of the Weighted Average Life to Maturity of such Indebtedness, the effects of any prepayments or amortization made on such Indebtedness prior to the date of the applicable modification, refinancing, refunding, renewal, replacement or extension shall be disregarded.

"**Wholly-owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"**Write-Down and Conversion Powers**" shall mean, (i) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (ii) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02.    Other Interpretive Provisions.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

68

(d)        The term "including" is by way of example and not limitation.

(e)        The word "or" is not exclusive.

(f)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(g)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(h)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(i)        [Reserved].

(j)     All references to "knowledge" of any Loan Party or a Restricted Subsidiary of Parent means the actual knowledge of a Responsible Officer.

(k)     The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(l)     All references to any Person shall be constructed to include such Person's successors and assigns (subject to any restriction on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(m)     All references to "in the ordinary course of business" of the Parent or any Subsidiary thereof means (i) in the ordinary course of business of, or in furtherance of an objective that is in the ordinary course of business of the Parent or such Subsidiary, as applicable, (ii) generally consistent with the past or current practice of the Parent or such Subsidiary, as applicable, or any other jurisdiction in which the Parent or any Subsidiary does business, as applicable, or (iii) customary and usual in the industry or industries of the Parent and its Subsidiaries in the United States or any other jurisdiction in with the Parent or any Subsidiary does business, as applicable.

(n)     In the case of any cure or waiver, Parent, the Borrowers, the applicable Loan Parties, the Lenders and the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Loan Documents, and any Default or Event of Default cured or waived shall be deemed to be cured or waived, as applicable, and not continuing, it being understood that no such cure or waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

(o)     Any reference herein or in any other Loan Document to (i) a transfer, assignment, sale or disposition (including any Disposition), or similar term, shall be deemed to apply to a division (including, without limitation, a "plan of division" or similar plan under the Delaware Limited Liability Company Act) of or by a limited liability company, or an allocation of assets to a series of a limited liability company, as if it were a transfer, assignment, sale or disposition (including any Disposition), or similar term, as applicable, to a separate Person and (ii) a merger, consolidation, amalgamation or consolidation,

69

or similar term, shall be deemed to apply to any division (including, without limitation, a "plan of division" or similar plan under the Delaware Limited Liability Company Act) or the unwinding of such a division or allocation, as if it were a merger, consolidation, amalgamation or consolidation or similar term, as applicable, with a separate Person.

Section 1.03.    Accounting Terms.

All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein. Notwithstanding any other provision contained herein, (a) unless the Lead Borrower has requested an amendment pursuant to this Section 1.03 with respect to the treatment of operating leases and Capitalized Leases and until such amendment has become effective, all obligations of any Person that would have been treated as operating leases for purposes of GAAP prior to the implementation of ASC 842 (whether before or after the Closing Date) shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purposes of this Agreement (whether or not such operating lease obligations were in effect on such date) regardless of any change in or application of GAAP following such date pursuant to ASC 842 or otherwise that would require such leases (on a prospective or retroactive basis or otherwise) to be treated as Capitalized Leases and (b) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to Statement of Financial Accounting Standards 141R or ASC 805 (or any other financial accounting standard having a similar result or effect).

Section 1.04.    Rounding.

Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.05.    References to Agreements, Laws, Etc.

Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications thereto, but only to the extent that such amendments, refinancings, restatements, renewals, restructuring, extensions, supplements and other modifications are not prohibited by the Loan Documents and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06.    Exchange Rates.

(a)    Any amount specified in this Agreement (other than in  Article 2) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount to be determined at the rate of exchange quoted on the applicable Bloomberg screen page for the applicable currency at 11:00 a.m. (London time) on such day (or, in the event such rate does not appear on any Bloomberg screen page, by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Lead Borrower, or, in the absence of such agreement, by reference to such publicly available service for displaying exchange rates as the Administrative Agent selects in its reasonable discretion).

70

(b)    For purposes of determining the Consolidated Senior Secured Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio and the Consolidated Total Net Leverage Ratio, the amount of Indebtedness shall reflect the currency translation effects, determined in accordance with GAAP, of Swap Contracts permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

(c)    Notwithstanding the foregoing, for purposes of determining compliance with Article VII (and, in each case, other definitions used therein) with respect to the amount of any Indebtedness, Lien, Disposition, Investment, Restricted Payment or other applicable transaction in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Lien is incurred or such Disposition, Investment, Restricted Payment or other applicable transaction is made (or declared or notified, as applicable) (so long as such Indebtedness, Lien, Disposition, Investment, Restricted Payment or other applicable transaction at the time incurred or made (or declared or notified, as applicable) was permitted hereunder).

(d)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Lead Borrower's prior written consent to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

Section 1.07.    Compliance with Certain Sections.

For purposes of determining compliance with any of Section 6.19 or Sections 7.01 through 7.13 (other than Section 7.11), in the event that any Lien, Investment, Indebtedness (whether at the time of incurrence or upon application of all or a portion of the proceeds thereof), Disposition, Affiliate transaction, Contractual Obligation, Restricted Payment or prepayment of Junior Financing meets the criteria of one, or more than one, of the "baskets" or categories of transactions then permitted pursuant to any clause or subsection of any such section of Article VI o r Article VII, as applicable, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses of such Section at the time of such transaction or any later time from time to time, in each case, as determined by the Lead Borrower in its sole discretion at such time and thereafter may be reclassified within such section by the Lead Borrower in any manner not expressly prohibited by this Agreement. With respect to (x) any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that does not require compliance with a financial ratio or test (including the Consolidated Total Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio and/or the Consolidated Senior Secured Net Leverage Ratio) (any such amounts, the "**Fixed Amounts**") substantially concurrently with (y) any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that requires compliance with a financial ratio or test (including the Consolidated Total Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio and/or the Consolidated Senior Secured Net Leverage Ratio) (any such amounts, the "**Incurrence-Based Amounts**"), it is understood and agreed that the Fixed Amounts shall be disregarded in the calculation of the financial ratio or test applicable to Incurrence-Based Amounts. In addition, any Indebtedness (and associated Liens, subject to the applicable priorities required pursuant to the applicable Incurrence-Based Amounts), Investments, prepayments of debt and Restricted Payment incurred in reliance on Fixed Amounts may be reclassified at any time, as the Lead Borrower may elect from time to time, as incurred under any applicable Incurrence-Based Amounts if the Lead Borrower subsequently meets the applicable ratio or test for such Incurrence-Based Amounts on a pro forma basis (or would have met such ratio or test, in which case, such reclassification shall be deemed to have automatically occurred if not elected by the Lead Borrower).

Section 1.08.    Times of Day.

71

Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.09.    <u>Timing of Payment or Performance</u>.

Except as otherwise expressly provided herein, when the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

Section 1.10.    <u>Cumulative Credit Transactions</u>.

If more than one action occurs on any given date the permissibility of the taking of which is determined hereunder by reference to the amount of the Cumulative Credit immediately prior to the taking of such action, the permissibility of the taking of each such action shall be determined independently and in no event may any two or more such actions be treated as occurring simultaneously.

Section 1.11.    <u>Pro Forma Calculations</u>.

(a)    Notwithstanding anything to the contrary herein, financial ratios and tests, including the Consolidated Total Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio and the Consolidated Senior Secured Net Leverage Ratio shall be calculated in the manner prescribed by this <u>Section 1.11</u>; *provided* that notwithstanding anything to the contrary in this <u>Section 1.11</u>, when calculating the Consolidated Total Net Leverage Ratio for purposes of (i) the definition of "Applicable ECF Percentage," (ii)    the definition of "Applicable Asset Sale Percentage", and (iii) determining actual compliance (and not Pro Forma Compliance or compliance on a Pro Forma Basis) with any covenant pursuant to <u>Section 7.11</u>, in each case, the events described in this <u>Section 1.11</u> that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect. In addition, whenever a financial ratio or test is to be calculated on a *pro forma* basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements of the Parent are available (as determined in good faith by the Lead Borrower); *provided* that, the provisions of this sentence shall not apply for purposes of calculating the Consolidated Senior Secured Net Leverage Ratio for purposes of the definition of "Applicable ECF Percentage", the definition of "Applicable Asset Sale Percentage", or determining actual compliance with <u>Section 7.11</u> (other than for the purpose of determining *pro forma* compliance with <u>Section 7.11</u>), each of which shall be based on the financial statements delivered pursuant to <u>Sections 6.01(a)</u> or <u>(b)</u>, as applicable, for the relevant Test Period.

(b)    For purposes of calculating any financial ratio or test or basket that is based on a percentage of Consolidated EBITDA or Total Assets, Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to <u>Section 1.11(d)</u>) that have been made (i) during the applicable Test Period and (ii) if applicable as described in <u>Section 1.11(a)</u>, subsequent to such Test Period and prior to or substantially concurrently with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA, Total Assets and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of the determination of Total Assets, the last day of the applicable Test Period). If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary of the Parent or was merged, amalgamated or consolidated with or into any Borrower or any of the Parent's other Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this <u>Section 1.11</u>, then such financial ratio or

72

test (or the calculation of Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.11.

(c)    Whenever *pro forma* effect is to be given to the Transactions, a Specified Transaction, the implementation of an operational initiative or operational change, the *pro forma* calculations (i) shall be made in good faith by a Responsible Officer of the Lead Borrower and (ii) may include, for the avoidance of doubt, the amount of "run-rate" cost savings, operating expense reductions, other operating improvements and cost synergies resulting from, or relating to, such initiative or change, such Transaction or such Specified Transaction projected by the Lead Borrower in good faith to be realizable as a result of actions taken or expected to be taken (calculated on a *pro forma* basis as though such cost savings, operating expense reductions, other operating improvements and cost synergies had been realized on the first day of such period as if such cost savings, operating expense reductions, other operating improvements and cost synergies were realized during the entirety of such period and such that "run-rate" means the full recurring projected benefit for a period that is associated with any action taken or expected to be taken (including any savings or other benefits expected to result from the elimination of a public target's compliance costs with public company requirements) net of the amount of actual benefits realized during such period from such actions), and any such adjustments shall be included in the initial *pro forma* calculation of such financial ratios or tests or basket that is based on a percentage of Consolidated EBITDA relating to such initiative or change, such Transaction or such Specified Transaction (and in respect of any subsequent *pro forma* calculation in which such initiative or change, such Transaction or such Specified Transaction is given *pro forma* effect) and during any applicable subsequent Test Period in which the effects thereof are expected to be realizable, relating to such initiative or change, such Transaction or such Specified Transaction; *provided* that (x) a duly completed certificate signed by a Responsible Officer of the Lead Borrower shall be delivered to the Administrative Agent together with the Compliance Certificate required to be delivered pursuant to Section 6.02, certifying that such cost savings, operating expense reductions, other operating improvements and/or cost synergies are readily identifiable, factually supportable and have been determined in good faith by the Lead Borrower to be reasonably anticipated to be realizable in the good faith judgment of the Lead Borrower, within twenty-four (24) months after the consummation of such initiative or change (or, with respect to the Transactions, within 24 months after the consummation of the Transactions), such Transaction or such Specified Transaction, which is expected to result in such cost savings, operating expense reductions, other operating improvements or cost synergies and (y) no cost savings, operating expense reductions, other operating improvements or cost synergies shall be added pursuant to clause (ii) above to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDA (or any component thereof) , whether through a *pro forma* adjustment or otherwise, for such period; *provided, further*, that all amounts added back to Consolidated EBITDA pursuant to clause (ii) above, together with all amounts added back to Consolidated EBITDA pursuant to clauses (a)(iv) and (a)(vii) in the definition thereof, shall not exceed, in the aggregate 25% of Consolidated EBITDA (calculated after giving effect to such amounts that would be added back pursuant to such clause (ii) and clause (a)(vii)(B) in the definition of Consolidated EBITDA).

(d)    In the event that any Borrower or any other Restricted Subsidiary of the Parent incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of any financial ratio or test, (i) during the applicable Test Period or (ii) subject to Section 1.11(a) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(e)    Any provision requiring *pro forma* compliance with Section 7.11 shall be made assuming that compliance with the Consolidated Total Net Leverage Ratio pursuant to such Section is required with

73

respect to the most recent Test Period prior to such time (it being understood that for purposes of determining Pro Forma Compliance with Section 7.11, if no Test Period with an applicable Consolidated Total Net Leverage Ratio cited in Section 7.11 has passed, the applicable Consolidated Total Net Leverage Ratio level shall be the level for the first Test Period cited in Section 7.11 with an indicated Consolidated Total Net Leverage Ratio level).

(f)    [Reserved].

(g)    In connection with any action being taken in connection with a Limited Condition Transaction, for purposes of:

(i)    determining compliance with any provision of this Agreement which requires the calculation of any financial ratio or test, including the Consolidated Total Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or the Consolidated Senior Secured Net Leverage Ratio;

(ii)    testing availability under baskets set forth in this Agreement (including baskets measured as a percentage of Consolidated EBITDA); or

(iii)    determining compliance with representations, warranties, Defaults or Events of Default;

in each case, at the option of the Lead Borrower (the Lead Borrower's election to exercise such option in connection with any Limited Condition Transaction, an "**LCT Election**"), the date of determination of whether any such action is permitted hereunder shall be deemed to be the date the definitive agreement for such Limited Condition Transaction is entered into or irrevocable notice is given in respect of such transaction (or such later date as specified by the Lead Borrower in writing to the Administrative Agent from time to time) (the "**LCT Test Date**"), and if, after giving Pro Forma Effect to the Limited Condition Transaction and the other transactions to be entered into in connection therewith as if they had occurred at the beginning of the most recent Test Period ending prior to the LCT Test Date, the Parent or any of the Restricted Subsidiaries would have been permitted to take such action on the relevant LCT Test Date in compliance with such ratio, test or basket, such ratio, test or basket shall be deemed to have been complied with for all purposes; *provided* that if financial statements for one or more subsequent fiscal periods shall have been delivered pursuant to this Agreement, the Lead Borrower may elect, in its sole discretion, to redetermine all such ratios, tests or baskets on the basis of such financial statements, in which case such date or redetermination shall thereafter be deemed to be the applicable date the definitive agreements for such Limited Condition Transaction are entered into. For the avoidance of doubt, if the Lead Borrower has made an LCT Election and any of the ratios, tests or baskets for which compliance was determined or tested as of the LCT Test Date would have failed to have been satisfied as a result of fluctuations in any such ratio, test or basket (including due to fluctuations of the target of any Limited Condition Transaction), including due to fluctuations in Consolidated EBITDA or Total Assets, at or prior to the consummation of the relevant transaction or action, such baskets, tests or ratios will not be deemed to have been exceeded or failed to have been satisfied as a result of such fluctuations. If the Lead Borrower has made an LCT Election for any Limited Condition Transaction, then in connection with any event or transaction occurring after the relevant LCT Test Date and prior to the earlier of (i) the date on which such Limited Condition Transaction is consummated or (ii) the date that the definitive agreement or date for redemption, repurchase, defeasance, satisfaction and discharge or repayment specified in an irrevocable notice for such Limited Condition Transaction is terminated, expires or passes, as applicable, without consummation of such Limited Condition Transaction (a "**Subsequent Transaction**") in connection with which a ratio, test or basket availability calculation must be made on a *pro forma* basis or giving *pro forma* effect to such Subsequent Transaction, for purposes of determining whether such ratio, test or basket availability has been complied with under this Agreement, any such ratio, test or basket shall be required

74

to be satisfied on a *pro forma* basis assuming such Limited Condition Transaction and other transactions in connection therewith have been consummated; *provided* that, solely with respect to any such ratio, test or basket calculated with respect to a Restricted Payment or payment on account of Indebtedness under any Junior Financing, the calculation of any such ratio, test or basket shall be required to be satisfied on a non- pro forma basis until such time as such Subsequent Transaction is actually consummated.

(h)    For purposes of the definition of "Applicable ECF Percentage", (i) the Consolidated Senior Secured Net Leverage Ratio shall be recalculated to give Pro Forma Effect to (A) if the Lead Borrower elects any deduction be made pursuant to the clauses (B)(1) through (4) of Section 2.05(b)(i) after the end of the relevant fiscal year and prior to the time such Excess Cash Flow prepayment is due, any cash pay- downs or reductions made after the end of the relevant fiscal year and prior to the time the applicable Excess Cash Flow prepayment is due and (B) any repayments of the Loan to be made pursuant to Section 2.05(b)(i) utilizing such Excess Cash Flow and (ii) the Consolidated Senior Secured Net Leverage Ratio for the succeeding fiscal year shall not give Pro Forma Effect to such cash pay-downs or reductions.

Section 1.12.    [Reserved].

Section 1.13.    Appointment of Lead Borrower.

Each time that a Loan Party is joined to the Agreement as a "Borrower" in accordance with  Section 6.11, such Borrower hereby designates the Buyer (or any successor Lead Borrower appointed prior to such joinder in accordance with this Section 1.13) as its representative and agent on its behalf for the purposes of selecting interest rate options, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or the Borrowers under the Loan Documents, which appointment shall remain in full force and effect unless and until the Administrative Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed as the Lead Borrower. The Lead Borrower, including the Buyer on the Closing Date, hereby accepts such appointment. Notwithstanding anything to the contrary contained in this Agreement, no Borrower other than the Lead Borrower shall be entitled to take any of the foregoing actions. Each Agent and each Lender may regard any notice or other communication from all of the Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or all Borrowers hereunder to the Lead Borrower on behalf of such Borrower or all Borrowers. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Lead Borrower (in such capacity) shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

Section 1.14.    Certifications.

All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

## ARTICLE II.
## THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01.    The Loans.

(a)    *Term Borrowings*.

(i)      *Initial Term Loan Borrowings*. Subject to the terms and conditions expressly set forth herein, each Term Lender severally agrees to make to the Lead Borrower on the Closing Date one or more Term Borrowings denominated in Dollars in an aggregate amount not to exceed at any time outstanding the amount of such Term Lender's Term Commitment. Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be re-borrowed. Term Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

(ii)      *Delayed Draw Term Loan Borrowings*. Subject to the terms and conditions expressly set forth herein, each Term Lender agrees to make term loans denominated in Dollars equal to such Term Lenders' Delayed Draw Term Loan Commitment (" **Delayed Draw Term Loans**") in the amount requested from time to time by the Borrower at such time pursuant to this Section 2.01(b) on any Business Day during the period from the Closing Date until the Delayed Draw Term Loan Commitment Expiration Date, in an aggregate principal amount not to exceed at any time outstanding the amount of such Term Lenders' Delayed Draw Term Loan Commitment; *provided* that (i) the amount of the Delayed Draw Term Loans requested by the Borrower at such time shall not exceed the aggregate amount of unfunded Delayed Draw Term Loan Commitments at such time; and (ii) the terms of each Delayed Draw Term Loan shall be identical to the terms applicable to the Initial Term Loans. Amounts borrowed under this Section 2.01(b) and repaid or prepaid may not be re-borrowed.

(b)      *Revolving Credit Borrowings*. Subject to the terms and conditions expressly set forth herein, each Revolving Credit Lender severally agrees to make Revolving Credit Loans denominated in Dollars to the Borrowers pursuant to Section 2.02 (each such loan, together with any loans made pursuant to an Extended Revolving Credit Commitment, Incremental Revolving Loans and Refinancing Revolving Credit Loans, a "**Revolving Credit Loan**") from time to time, on any Business Day during the period from and including the Closing Date until the Maturity Date, in an aggregate principal amount not to exceed at any time outstanding the amount of such Lender's Revolving Credit Commitment; *provided* that after giving effect to any Revolving Credit Borrowing, the aggregate Outstanding Amount of the Revolving Credit Loans of any Lender shall not exceed such Lender's Revolving Credit Commitment. Within the limits of each Lender's Revolving Credit Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow, prepay, and re-borrow, in each case without premium or penalty (subject to Section 3.05). Revolving Credit Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

Section 2.02.    Borrowings, Conversions and Continuations of Loans.

(a)      Each Term Borrowing, each Revolving Credit Borrowing, each conversion of Term Loans or Revolving Credit Loans from one Type to the other, and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's delivery of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower to the Administrative Agent (*provided* that the notices in respect of the Borrowings (i) on the Closing Date may be conditioned on the closing of the Acquisition and (ii) in connection with a Permitted Acquisition or other permitted Investment may be conditioned on the closing of the applicable Permitted Acquisition or other permitted Investment). Each such notice must be received by the Administrative Agent not later than 2:00 p.m., (I) three Business Days prior to the requested date of any Borrowing or continuation of Eurocurrency Rate Loans or any conversion of Base Rate Loans to Eurocurrency Rate Loans and (II) three Business Day prior to the requested date of any Borrowing of Base Rate Loans or any conversion of Eurocurrency Rate Loans to Base Rate Loans; *provided* that the notice referred to in clause (I) above may be delivered no later than three (3) Business Day prior to the Closing Date in the case of initial Credit Extensions. Except as otherwise provided in Section 2.14, each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a minimum principal amount of $100,000 or a whole multiple of $100,000 in excess thereof. Except as

otherwise provided herein, each Borrowing of or conversion to Base Rate Loans shall be in a minimum principal amount of $100,000 or a whole multiple of $100,000 in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Lead Borrower is requesting a Term Borrowing, a Revolving Credit Borrowing, a conversion of Term Loans or Revolving Credit Loans from one Type to the other or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Term Loans or Revolving Credit Loans are to be converted, (v) if applicable, the duration of the Interest Period with respect thereto and (vi) wire instructions of the account(s) to which funds are to be disbursed (it being understood, for the avoidance of doubt, that the amount to be disbursed to any particular account may be less than the minimum or multiple limitations set forth above so long as the aggregate amount to be disbursed to all such accounts pursuant to such Borrowing meets such minimums and multiples). If the Lead Borrower fails to specify a Type of Loan in a Committed Loan Notice, then the applicable Loans shall be made as one month Eurocurrency Rate Loans. If the Lead Borrower fails to give a timely notice requesting a conversion or continuation, then (x) with respect to existing Base Rate Loans, such Base Rate Loans shall be continued as Base Rate Loans and (ii) with respect to existing Eurocurrency Rate Loans, subject to Section 2.02(c), such Eurocurrency Rate Loans shall be continued as Eurocurrency Rate Loans with an Interest Period of one month. Any such automatic conversion to Eurocurrency Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans. If the Lead Borrower requests a Borrowing of, conversion to, or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share or other applicable share provided for under this Agreement of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the Lead Borrower, the Administrative Agent shall notify each Lender of the details of any automatic continuation described in Section 2.02(a). In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice; *provided* that, on the Closing Date, such funds may be made available at such earlier time as may be agreed among the relevant Lenders, the Lead Borrower and the Administrative Agent for the purpose of consummating the Transactions. Upon receipt of all requested funds, the Administrative Agent shall make all funds so received available to the Borrowers in like funds as received by the Administrative Agent by wire transfer of such funds in accordance with instructions provided by the Lead Borrower to (and reasonably acceptable to) the Administrative Agent.

(c)     Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan unless the Borrowers pay the amount due, if any, under Section 3.05 in connection therewith. During the occurrence and continuation of an Event of Default under Section 8.01(a) or 8.01(f), the Required Lenders may require (effective following written notice thereof) that no Loans may be converted to or continued as Eurocurrency Rate Loans.

(d)     The Administrative Agent shall promptly notify the Lead Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such interest rate. The determination of the Eurocurrency Rate by the Administrative Agent shall be conclusive in the absence of manifest error. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Lead Borrower and the Lenders of any change in the Prime Rate used in determining the Base Rate promptly following the announcement of such change.

77

(e)    After giving effect to all Term Borrowings, all Revolving Credit Borrowings, all conversions of Term Loans or Revolving Credit Loans from one Type to the other, and all continuations of Term Loans or Revolving Credit Loans as the same Type, there shall not be more than eight (8) Interest Periods plus three (3) additional Interest Periods in respect of each Incremental Loan, each Delayed Draw Term Loan, each Loan in connection with an Extension Amendment and each Loan in connection with a Refinancing Amendment (or such greater amount as may be agreed by the Administrative Agent in its reasonable discretion).

(f)    The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(g)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share or other applicable share provided for under this Agreement available to the Administrative Agent on the date of such Borrowing in accordance with <u>Section 2.02(b)</u> above, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrowers on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrowers severally agree to repay to the Administrative Agent promptly after written demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrowers until the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrowers, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Overnight Rate *plus* any administrative, processing, or similar fees customarily charged by the Administrative Agent in accordance with the foregoing. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this <u>Section 2.02(g)</u> shall be conclusive in the absence of manifest error. If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.03.    <u>[Reserved]</u>.

Section 2.04.    <u>[Reserved]</u>.

Section 2.05.    <u>Prepayments</u>.

(a)    *Optional*. (i) The Borrowers may, upon written notice to the Administrative Agent by the Lead Borrower, at any time or from time to time voluntarily prepay any Class or Classes of Term Loans and Revolving Credit Loans of any Class or Classes in whole or in part without premium or penalty (except as expressly set forth in this <u>Section 2.05</u>); *provided* that (1) such notice must be received by the Administrative Agent not later than 4:00 p.m. (A) three Business Days prior to any date of prepayment of Eurocurrency Rate Loans and (B) one Business Day prior to the date of prepayment of Base Rate Loans;
(2)    any prepayment of Eurocurrency Rate Loans shall be in a minimum principal amount of $100,000, or a whole multiple of $100,000 in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a

78

minimum principal amount of $100,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid. In connection with any voluntary prepayment pursuant to this Section 2.05(a)(i) that is consummated in respect of all or any portion of the Term Loans (A) prior to the date that is one year after the Closing Date, the Borrower shall pay to the Term Lenders a fee equal to 2.00% of the aggregate principal amount of the Term Loans prepaid pursuant to this Section 2.05(a)(i) or (B) on or after the date that is one year after the Closing Date but prior to the date that is two years after the Closing Date, the Borrower shall pay to the Term Lenders a fee equal to 1.00% of the aggregate principal amount of the Term Loans prepaid pursuant to this Section 2.05(a)(i). The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment. If such notice is given by the Lead Borrower, unless rescinded pursuant to clause (iii) below, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Loan (other than prepayments of Base Rate Loans that are Revolving Credit Loans that are not made in connection with the termination or permanent reduction of the Revolving Credit Commitments) shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05. In the case of each prepayment of the Loans pursuant to this Section 2.05(a), the Lead Borrower may in its sole discretion select the Borrowing or Borrowings (and the order of maturity of principal payments) to be repaid, and such payment shall be paid to the Lenders in accordance with their respective Pro Rata Shares or other applicable share provided for under this Agreement.

(ii)    [Reserved].

(iii)    Notwithstanding anything to the contrary contained in this Agreement, the Lead Borrower may rescind any notice of prepayment under Sections 2.05(a)(i) or 2.05(a)(ii) by notice to the Administrative Agent on the date of prepayment if such prepayment would have resulted from a refinancing of all or any portion of the applicable Class or occurrence of any other event, which refinancing or other event shall not be consummated or shall otherwise be delayed.

(iv)    Voluntary prepayments of any Class of Term Loans permitted hereunder shall be applied to the remaining scheduled installments of principal thereof pursuant to Section 2.07(a) in a manner determined at the discretion of the Lead Borrower and specified in the notice of prepayment (and absent such direction, in direct order of maturity).

(v)    Notwithstanding anything in any Loan Document to the contrary, in addition to the terms set forth in Sections 2.05(a)(i) and (a)(ii) and 10.07, so long as no Event of Default has occurred and is continuing, any Company Party may prepay the outstanding Term Loans (which shall, for the avoidance of doubt, be automatically and permanently canceled immediately upon such prepayment) (or any Borrower or any of its Subsidiaries may purchase such outstanding Loans and in the case of any Borrower and each Restricted Subsidiary immediately cancel them) without premium or penalty on the following basis:

(A)    Any Company Party shall have the right to make a voluntary prepayment or purchase of Term Loans at a discount to par pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers (any such prepayment or purchase, the "**Discounted Term Loan Prepayment**"), in each case made in accordance with this Section 2.05(a)(v) and without premium or penalty.

(B)    (1) Any Company Party may from time to time offer to make a Discounted Term Loan Prepayment by providing the Auction Agent (with a copy to the Administrative Agent,

79

if the Administrative Agent is not acting as Auction Agent hereunder) with five Business Days' notice in the form of a Specified Discount Prepayment Notice (or such shorter period as agreed by the Auction Agent); *provided* that (I) any such offer shall be made available, at the sole discretion of the Company Party, to (x) each Term Lender and/or (y) each Term Lender with respect to any Class of Term Loans on an individual tranche basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "**Specified Discount Prepayment Amount**") with respect to each applicable tranche, the tranche or tranches of Term Loans subject to such offer and the specific percentage discount to par (the "**Specified Discount**") of such Term Loans to be prepaid (or purchased) (it being understood that different Specified Discounts and/or Specified Discount Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(a)(v)(B)), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than $500,000 and whole increments of $500,000 in excess thereof and (IV) unless rescinded pursuant to clause (iii) above, each such offer shall remain outstanding through the Specified Discount Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m. on the third Business Day after the date of delivery of such notice to such Lenders (or such later date specified therein) (the "**Specified Discount Prepayment Response Date**").

(2)    Each Term Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment (or purchase) of any of its applicable then outstanding Term Loans at the Specified Discount and, if so (such accepting Lender, a "**Discount Prepayment Accepting Lender**"), the amount and the tranches of such Lender's Term Loans to be prepaid (or purchased) at such offered discount. Each acceptance of a Discounted Term Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable. Any Term Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

(3)    If there is at least one Discount Prepayment Accepting Lender, the relevant Company Party will make a prepayment (or purchase) of outstanding Term Loans pursuant to this Section 2.05(a)(v)(B) to each Discount Prepayment Accepting Lender in accordance with the respective outstanding amount and tranches of Term Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to clause (2) above; *provided* that, if the aggregate principal amount of Term Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment (or purchase) shall be made *pro rata* among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid (or purchased) by each such Discount Prepayment Accepting Lender and the Auction Agent (subject to the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate such proration (the "**Specified Discount Proration**"). The Auction Agent shall promptly, and in any case within three Business Days following the Specified Discount Prepayment Response Date, notify (I) the relevant Company Party of the respective Term Lenders' responses to such offer, the Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Term Lender and the Administrative Agent (if not the Auction Agent) of the Discounted Prepayment Effective Date, and the aggregate principal amount and the tranches of Term Loans to be prepaid at the Specified Discount on such date, (III) each Discount Prepayment Accepting Lender of the Specified Discount

80

Proration, if any, and confirmation of the principal amount, tranche and Type of Term Loans of such Lender to be prepaid (or purchased) at the Specified Discount on such date, and (IV) the Administrative Agent to the extent not acting as the Auction Agent. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Company Party and such Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the Company Party shall be due and payable by such Company Party on the Discounted Prepayment Effective Date in accordance with Section 2.05(a)(v)(F) below (subject to Section 2.05(a)(v)(I) below).

(C)    (1) Any Company Party may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent with five Business Days' notice in the form of a Discount Range Prepayment Notice (or such shorter period as agreed by the Auction Agent); *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Company Party, to (x) each Term Lender and/or (y) each Term Lender with respect to any Class of Term Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Term Loans (the "**Discount Range Prepayment Amount**"), the tranche or tranches of Term Loans subject to such offer and the maximum and minimum percentage discounts to par (the "**Discount Range**") of the principal amount of such Term Loans with respect to each relevant tranche of Term Loans willing to be prepaid (or purchased) by such Company Party (it being understood that different Discount Ranges and/or Discount Range Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such event, each such offer will be treated as separate offer pursuant to the terms of this Section 2.05(a)(v)(C)), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $500,000 and whole increments of $500,000 in excess thereof and (IV) unless rescinded pursuant to clause (iii) above, each such solicitation by a Company Party shall remain outstanding through the Discount Range Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m. on the third Business Day after the date of delivery of such notice to such Lenders (or such later date specified therein) (the "**Discount Range Prepayment Response Date**"). Each Term Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify a discount to par within the Discount Range (the "**Submitted Discount**") at which such Lender is willing to allow prepayment (or purchase) of any or all of its then outstanding Term Loans of the applicable tranche or tranches and the maximum aggregate principal amount and tranches of such Lender's Term Loans (the "**Submitted Amount**") such Term Lender is willing to have prepaid (or purchased) at the Submitted Discount. Any Term Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Term Loan Prepayment of any of its Term Loans at any discount to their par value within the Discount Range.

(2)    The Auction Agent shall review all Discount Range Prepayment Offers received on or before the applicable Discount Range Prepayment Response Date and shall determine (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its reasonable discretion) the Applicable Discount and Term Loans to be prepaid (or purchased) at such Applicable Discount in accordance with this Section 2.05(a)(v)(C). The relevant Company Party agrees to accept on the Discount Range Prepayment Response Date all Discount Range Prepayment Offers received by Auction Agent by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted

81

Discount that is the smallest discount to par within the Discount Range being referred to as the "**Applicable Discount**") which yields a Discounted Term Loan Prepayment in an aggregate principal amount equal to the lower of (I) the Discount Range Prepayment Amount and (II) the sum of all Submitted Amounts. Each Term Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment (or purchase) of Term Loans equal to its Submitted Amount (subject to any required proration pursuant to the following clause (3)) at the Applicable Discount (each such Term Lender, a "**Participating Lender**").

(3)    If there is at least one Participating Lender, the relevant Company Party will prepay (or purchase) the respective outstanding Term Loans of each Participating Lender on the Discounted Prepayment Effective Date in the aggregate principal amount and of the tranches specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; *provided* that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discount Range Prepayment Amount, prepayment (or purchase) of the principal amount of the relevant Term Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "**Identified Participating Lenders**") shall be made *pro rata* among the Identified Participating Lenders in accordance with the Submitted Amount of each such Identified Participating Lender and the Auction Agent (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate such proration (the "**Discount Range Proration**"). The Auction Agent shall promptly, and in any case within five Business Days following the Discount Range Prepayment Response Date, notify (I) the relevant Company Party of the respective Term Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid (or purchased),
(II)    each Term Lender and the Administrative Agent (if not the Auction Agent) of the Discounted Prepayment Effective Date, the Applicable Discount and the aggregate principal amount and tranches of Term Loans to be prepaid (or purchased) at the Applicable Discount on such date,
(III)    each Participating Lender of the aggregate principal amount and tranches of such Term Lender to be prepaid (or purchased) at the Applicable Discount on such date, (IV) if applicable, each Identified Participating Lender of the Discount Range Proration, and (V) the Administrative Agent to the extent not acting as the Auction Agent. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the relevant Company Party and Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the Company Party shall be due and payable by such Company Party on the Discounted Prepayment Effective Date in accordance with Section 2.05(a)(v)(F) below (subject to Section 2.05(a)(v)(I) below).

(D)    (1) Any Company Party may from time to time solicit Solicited Discounted Prepayment Offers by providing the Auction Agent with five Business Days' notice in the form of a Solicited Discounted Prepayment Notice (or such later notice specified therein); *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Company Party, to (x) each Term Lender and/or (y) each Lender with respect to any Class of Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate amount of the Term Loans (the "**Solicited Discounted Prepayment Amount**") and the tranche or tranches of Term Loans the applicable Company Party is willing to prepay (or purchase) at a discount (it being understood that different Solicited Discounted Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(a)(v)(D)), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than $500,000 and whole increments of $500,000

82

in excess thereof and (IV) unless rescinded, each such solicitation by a Company Party shall remain outstanding through the Solicited Discounted Prepayment Response Date. The Auction Agent will promptly provide each Appropriate Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m. on the third Business Day after the date of delivery of such notice to such Term Lenders (or such later date specified therein) (the "**Solicited Discounted Prepayment Response Date**"). Each Term Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date and (z) specify both a discount to par (the "**Offered Discount**") at which such Term Lender is willing to allow prepayment (or purchase) of its then outstanding Term Loan and the maximum aggregate principal amount and tranches of such Term Loans (the "**Offered Amount**") such Term Lender is willing to have prepaid (or purchased) at the Offered Discount. Any Term Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Term Loans at any discount.

(2)    The Auction Agent shall promptly provide the relevant Company Party with a copy of all Solicited Discounted Prepayment Offers received on or before the Solicited Discounted Prepayment Response Date. Such Company Party shall review all such Solicited Discounted Prepayment Offers and select the largest of the Offered Discounts specified by the relevant responding Term Lenders in the Solicited Discounted Prepayment Offers that is acceptable to the Company Party in its sole discretion (the "**Acceptable Discount**"), if any. If the Company Party elects, in its sole discretion, to accept any Offered Discount as the Acceptable Discount, then as soon as practicable after the determination of the Acceptable Discount, but in no event later than by the fifth Business Day after the date of receipt by such Company Party from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this clause (2) (the "**Acceptance Date**"), the Company Party shall submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount. If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice from the Company Party by the Acceptance Date, such Company Party shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(3)    Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, within five Business Days after receipt of an Acceptance and Prepayment Notice (the "**Discounted Prepayment Determination Date**"), the Auction Agent will determine (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its reasonable discretion) the aggregate principal amount and the tranches of Term Loans (the "**Acceptable Prepayment Amount**") to be prepaid (or purchased) by the relevant Company Party at the Acceptable Discount in accordance with this Section 2.05(a)(v)(D). If the Company Party elects to accept any Acceptable Discount, then the Company Party agrees to accept all Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount. Each Term Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or equal to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment (or purchase) of Term Loans equal to its Offered Amount (subject to any required *pro rata* reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "**Qualifying Lender**"). The Company Party will prepay (or purchase) outstanding Term Loans pursuant to this Section 2.05(a)(v)(D) to each Qualifying Lender in the aggregate principal amount and of the tranches specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable

83

Discount; *provided* that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount, prepayment (or purchase) of the principal amount of the Term Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "**Identified Qualifying Lenders**") shall be made *pro rata* among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Solicited Discount Proration**"). On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) the relevant Company Party of the Discounted Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Term Loan Prepayment and the tranches to be prepaid (or purchased), (II) each Term Lender and the Administrative Agent (if not the Auction Agent) of the Discounted Prepayment Effective Date, the Acceptable Discount and the Acceptable Prepayment Amount of all Term Loans and the tranches to be prepaid (or purchased) at the Applicable Discount on such date, (III) each Qualifying Lender of the aggregate principal amount and the tranches of such Term Lender to be prepaid (or purchased) at the Acceptable Discount on such date, (IV) if applicable, each Identified Qualifying Lender of the Solicited Discount Proration, and (V) the Administrative Agent to the extent not acting as the Auction Agent. Each determination by the Auction Agent of the amounts stated in the foregoing notices to such Company Party and Term Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to such Company Party shall be due and payable by such Company Party on the Discounted Prepayment Effective Date in accordance with Section 2.05(a)(v)(F) below (subject to Section 2.05(a)(v)(I) below).

(E)    In connection with any Discounted Term Loan Prepayment, the Company Parties and the Term Lenders acknowledge and agree that the Auction Agent may require as a condition to any Discounted Term Loan Prepayment, the payment of customary and documented fees and out-of-pocket expenses from a Company Party in connection therewith.

(F)    If any Term Loan is prepaid (or purchased) in accordance with Sections 2.05(a)(v)(B) through 2.05(a)(v)(D) above, a Company Party shall prepay (or purchase) such Term Loans on the Discounted Prepayment Effective Date. The relevant Company Party shall make such prepayment (or purchase) to the Administrative Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, at the Administrative Agent's Office in immediately available funds not later than 1:00 p.m. on the Discounted Prepayment Effective Date and all such prepayments (or purchases) shall be applied to the remaining scheduled principal installments of the relevant tranche of Loans being prepaid (or purchased) on a *pro rata* basis across such installments. The Term Loans so prepaid shall be, as set forth in Section 2.05(c), accompanied by all accrued and unpaid interest on the par principal amount so prepaid (or purchased) up to, but not including, the Discounted Prepayment Effective Date. Each prepayment (or purchase) of the outstanding Term Loans pursuant to this Section 2.05(a)(v) shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders or Qualifying Lenders, as applicable, and shall be applied to the relevant Term Loans of such Lenders in accordance with their respective Pro Rata Share or other applicable share hereunder. The aggregate principal amount of the tranches and installments of the relevant Term Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the tranches of Term Loans prepaid (or purchased) on the Discounted Prepayment Effective Date in any Discounted Term Loan Prepayment. In connection with each prepayment (or purchase) pursuant to this Section 2.05(a)(v), each Lender participating in any prepayment (or purchase) described in this Section 2.05(a)(v) acknowledges and agrees that in connection therewith, (1) any

84

Borrower or any Company Party then may have, and later may come into possession of, information regarding the Borrowers, the Sponsor and their respective affiliates not known to such Lender and that may be material to a decision by such Lender to participate in such prepayment (including Material Non-Public Information) ("**Excluded Information**"), (2) such Lender has independently and, without reliance on any Borrower, any of its Subsidiaries, the Administrative Agent or any of their respective Affiliates, made its own analysis and determination to participate in such prepayment notwithstanding such Lender's lack of knowledge of the Excluded Information,
(3) none of the Borrowers, the Company Parties or the Sponsor or any of their respective Affiliates shall be required to make any representation that it is not in possession of material non-public information and all parties to the relevant transactions may render customary "big boy" disclaimer letters, and (4) none of the Borrowers, their Subsidiaries, the Administrative Agent, the Sponsor or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against the Borrowers, their Subsidiaries, the Administrative Agent, the Sponsor and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information.

(G)    To the extent not expressly provided for herein, each Discounted Term Loan Prepayment shall be consummated pursuant to procedures consistent with the provisions in this Section 2.05(a)(v), established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the applicable Company Party.

(H)    Each of the Company Parties and the Term Lenders acknowledge and agree that the Auction Agent may perform any and all of its duties under this Section 2.05(a)(v) by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate. The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any Discounted Term Loan Prepayment provided for in this Section 2.05(a)(v) as well as activities of the Auction Agent.

(I)    Each Company Party shall have the right, by written notice to the Auction Agent, to revoke in full (but not in part) its offer to make a Discounted Term Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice therefor at its discretion at any time on or prior to the applicable Specified Discount Prepayment Response Date (and if such offer is revoked pursuant to the preceding clauses, any failure by such Company Party to make any prepayment to a Lender, as applicable, pursuant to this Section 2.05(a)(v) shall not constitute a Default or Event of Default under Section 8.01 or otherwise).

(b)    *Mandatory*. (i) Within ten (10) Business Days after financial statements are required to have been delivered pursuant to Section 6.01(a) (commencing with the fiscal year ending December 31, 2021), the Borrowers shall cause to be prepaid an aggregate principal amount of Term Loans in an amount equal to (A) the Applicable ECF Percentage of Excess Cash Flow, if any, for the Excess Cash Flow Period covered by such financial statements, *minus*, without duplication of any amount deducted from Consolidated Net Income in calculating Excess Cash Flow for such Excess Cash Flow Period, (B) the sum (except to the extent such voluntary prepayments are funded with the proceeds of long term Indebtedness (other than revolving loans or intercompany Indebtedness)) of (1) all voluntary prepayments of Term Loans made during such Excess Cash Flow Period, in an amount equal to the discounted amount actually paid in cash in respect of the principal amount of such Term Loans during such Excess Cash Flow Period or, at the election of the Lead Borrower, after year-end and prior to when such Excess Cash Flow prepayment is due, (2) all other voluntary prepayments of the Initial Term Loans, any Incremental Term Loans, Other Term

Loans, Other Notes, Permitted Debt Exchange Notes, Credit Agreement Refinancing Indebtedness and any other Indebtedness, in each case, secured on a *pari passu* basis with the Initial Term Loans actually paid in cash in respect of the principal amount of such Initial Term Loans, Incremental Term Loans, Other Term Loans, Other Notes, Permitted Debt Exchange Notes, Credit Agreement Refinancing Indebtedness and any other Indebtedness, in each case, secured on a *pari passu* basis with the Term Loans during such Excess Cash Flow Period, or at the election of the Lead Borrower, after year-end and prior to when such Excess Cash Flow prepayment is due, (3) all voluntary prepayments of Revolving Credit Loans, Extended Revolving Credit Loans, Refinancing Revolving Credit Loans and Incremental Revolving Credit Loans secured on a *pari passu* basis with the Term Loans during such Excess Cash Flow Period, at the Lead Borrower's option, or after year-end and prior to when such Excess Cash Flow prepayment is due, to the extent (x) the Revolving Credit Commitments, Extended Revolving Credit Commitments, Refinancing Revolving Credit Commitments or Revolving Commitment Increase, as the case may be, are permanently reduced by the amount of such payments and (y) such prepayments were not made with the proceeds of long term Indebtedness (other than the proceeds of revolving loans or intercompany loans) and (4) the amount equal to all payments in cash actually paid by the Borrowers or any other Restricted Subsidiary of the Parent in connection with (x) the buyback of Indebtedness secured on a *pari passu* basis with the Initial Term Loans to the extent such buybacks are funded with Internally Generated Cash and (y) in connection with mandatory assignments pursuant to Section 3.07; *provided* that, to the extent any deduction is made pursuant to the foregoing clauses (B)(1) through (4) after year-end and prior to when such Excess Cash Flow prepayment is due, such prepayment shall not be deducted with respect to the Excess Cash Flow prepayment for the succeeding fiscal year; *provided, further*, that a prepayment of the principal amount of Term Loans pursuant to this Section 2.05(b)(i) in respect of any fiscal year shall only be required in the amount by which such Excess Cash Flow prepayment for such fiscal year exceeds $1,000,000; *provided, further* that, at the option of the Lead Borrower, to the extent that the foregoing prepayments exceed the amount of payments otherwise due pursuant to this Section 2.05(b)(i) for the applicable fiscal year, any such amount in excess may be applied to reduce the amount of Excess Cash Flow prepayments in the immediately subsequent fiscal year; *provided, further*, that if at the time that any such prepayment would be required, the Borrowers are required to offer to repurchase permitted Indebtedness (in each case, to the extent secured by Liens on the Collateral on a *pari passu* basis with the Obligations) and the Permitted Refinancing of any such Indebtedness, in each case, pursuant to the terms of the documentation governing such Indebtedness with the Excess Cash Flow (such Indebtedness required to be offered to be so repurchased, "**Other Applicable Indebtedness**"), then the Borrowers may apply such Excess Cash Flow on a *pro rata* basis (and not greater than a *pro rata* basis) (determined on the basis of the aggregate outstanding principal amount of the Term Loans and Other Applicable Indebtedness at such time; *provided* that the portion of such Excess Cash Flow allocated to the Other Applicable Indebtedness shall not exceed the amount of such Excess Cash Flow required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Excess Cash Flow shall be allocated to the Term Loans in accordance with the terms hereof) to the prepayment of the Term Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Term Loans that would have otherwise been required pursuant to this Section 2.05(b)(i) shall be reduced accordingly; *provided, further*, that to the extent the holders of Other Applicable Indebtedness decline to have such indebtedness repurchased or prepaid, the declined amount shall promptly (and in any event within five (5) Business Days after the date of such rejection) be offered to the Lenders in accordance herewith to be applied to repay the Term Loans in accordance with the terms hereof).

        (ii)    If (1) the Lead Borrower or any Restricted Subsidiary of the Lead Borrower Disposes of any property pursuant to Sections 7.05(j), (k) and (m) and, in each case, outside the ordinary course of business or (2) any Casualty Event occurs, which results in the realization or receipt by the Lead Borrower or any Restricted Subsidiary of the Lead Borrower of Net Proceeds, subject to this Section 2.05(b), the Borrowers shall cause to be prepaid on or prior to the date which is ten (10) Business Days after the date of the realization or receipt by the Lead Borrower or any Restricted Subsidiary of the

86

Lead Borrower of such Net Proceeds, an aggregate principal amount of Term Loans in an amount equal to the Applicable Asset Sale Percentage of all such Net Proceeds; *provided*, that if at the time that any such prepayment would be required, the Borrowers are required to offer to repurchase Other Applicable Indebtedness pursuant to the terms of the documentation governing such Other Applicable Indebtedness with the Net Proceeds of such Disposition or Casualty Event, then the Borrowers may apply such Net Proceeds on a *pro rata* basis (determined on the basis of the aggregate outstanding principal amount of the Term Loans and Other Applicable Indebtedness at such time; *provided* that the portion of such Net Proceeds allocated to the Other Applicable Indebtedness shall not exceed the amount of such Net Proceeds required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Net Proceeds shall be allocated to the Term Loans in accordance with the terms hereof) to the prepayment of the Term Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Term Loans that would have otherwise been required pursuant to this Section 2.05(b)(ii) shall be reduced accordingly; *provided*, *further*, that to the extent the holders of Other Applicable Indebtedness decline to have such indebtedness repurchased or prepaid, the declined amount shall promptly (and in any event within five (5) Business Days after the date of such rejection) be offered to the Lenders in accordance herewith to be applied to repay the Term Loans in accordance with the terms hereof.

   (iii) If the Lead Borrower or any Restricted Subsidiary of the Lead Borrower incurs or issues any Indebtedness after the Closing Date (A) not permitted to be incurred or issued pursuant to Section 7.03 or (B) that is intended to constitute Credit Agreement Refinancing Indebtedness in respect of any Class of Term Loans, the Borrowers shall cause to be prepaid an aggregate principal amount of Term Loans (or, in the case of Indebtedness constituting Credit Agreement Refinancing Indebtedness, the applicable Class of Term Loans) in an amount equal to 100% of all Net Proceeds, if any, received therefrom on or prior to the date which is three (3) Business Days after the receipt by the Lead Borrower or such Restricted Subsidiary of such Net Proceeds. In connection with any prepayment under Section 2.05(b)(iii)(B) that is consummated in respect of all or any portion of the Initial Term Loans (A) prior to the date that is one year after the Closing Date, the Borrowers shall pay to the Term Lenders a fee equal to 2.00% of the aggregate principal amount of the Initial Term Loans subject to such prepayment or
(B) on or after the date that is one year after the Closing Date but prior to the date that is two years after the Closing Date, the Borrowers shall pay to the Term Lenders a fee equal to 1.00% of the aggregate principal amount of the Initial Term Loans subject to such prepayment.

   (iv) If for any reason the aggregate Outstanding Amount of Revolving Credit Loans at any time exceeds the aggregate Revolving Credit Commitments then in effect, the Borrowers shall promptly, following the earlier of written notice from the Administrative Agent and knowledge of the Lead Borrower, prepay Revolving Credit Loans in an aggregate amount equal to such excess.

   (v) Notwithstanding any other provisions of this Section 2.05, (i) to the extent that the repatriation to the United States of any Excess Cash Flow attributable to Foreign Subsidiaries ("**Foreign Subsidiary Excess Cash Flow**") would be (x) prohibited or delayed by applicable Law or (y) restricted, prohibited or delayed by applicable material constituent documents or material agreements so long as such restrictions described in this clause (y) are not created in contemplation of such prepayments, an amount equal to the portion of such Foreign Subsidiary Excess Cash Flow that would be so affected were the Borrowers to attempt to repatriate such cash will not be required to be applied to repay Term Loans at the times provided in this Section 2.05 if the applicable local law or applicable material constituent documents or material agreements would not otherwise permit repatriation to the United States (the Lead Borrower hereby agrees to use commercially reasonable efforts during the year following the date such prepayment would otherwise have been required to be paid to overcome or eliminate any such restrictions on repatriation, even if the Borrowers do not intend to actually repatriate such cash, so that an amount equal to the full amount of such Foreign Subsidiary Excess Cash Flow will otherwise be subject to repayment

87

under this Section 2.05), and if within one year following the date on which the respective prepayment would otherwise have been required such repatriation of any of such affected Foreign Subsidiary Excess Cash Flow is permissible under the applicable Law or applicable material documents (even if such cash is actually not repatriated), an amount equal to the amount of the Foreign Subsidiary Excess Cash Flow that could be repatriated will be promptly (and in any event not later than five Business Days) applied (net of an amount equal to the additional taxes of each Borrower, its Subsidiaries and the direct and indirect holders of Equity Interests in such Borrower that would be payable or reserved against as a result of a repatriation and any additional costs that would be incurred as a result of a repatriation, whether or not a repatriation actually occurs, in each case to the extent not already taken into account in the definition of "Net Proceeds") by the Borrowers to the repayment of the Term Loans pursuant to this Section 2.05 and (ii) to the extent that the Lead Borrower has determined in good faith that repatriation of any Foreign Subsidiary Excess Cash Flow could reasonably be expected to have adverse tax, regulatory or accounting consequences (other than *de minimis* consequences), an amount equal to such Foreign Subsidiary Excess Cash Flow that would be so affected will not be subject to repayment under this Section 2.05; *provided* that in the case of each of clauses (i) and (ii), such nonpayment prior to the time such amounts must be prepaid, if at all, shall not constitute an Event of Default (and such amounts shall be available, to repay local foreign indebtedness, if any, and for working capital purposes of the Borrowers and the Restricted Subsidiaries of the Borrowers).

(vi)    Notwithstanding any other provisions of this Section 2.05, (i) to the extent that the repatriation to the United States of any or all of the Net Proceeds of any Disposition by a Foreign Subsidiary ("**Foreign Disposition**") or the Net Proceeds of any Casualty Event incurred by a Foreign Subsidiary ("**Foreign Casualty Event**") would be (x) prohibited or delayed by applicable Law or (y) restricted, prohibited or delayed by applicable material agreements (including material documents) so long as such restrictions described in this clause (y) are not created in contemplation of such prepayments, an amount equal to the Net Proceeds that would be so affected were the Borrowers to attempt to repatriate such cash will not be required to be applied to repay Term Loans at the times provided in this Section 2.05 if the applicable local law or applicable material documents would not otherwise permit repatriation to the United States (the Lead Borrower hereby agrees to use all commercially reasonable efforts during the year following the date such prepayment would otherwise have been required to be made to overcome or eliminate any such restrictions on repatriation even if the Borrowers do not intend to actually repatriate such cash, so that an amount equal to the full amount of such Net Proceeds will otherwise be subject to repayment under this Section 2.05), and if within one year following the date on which the respective prepayment would otherwise have been required such repatriation of any of such affected Net Proceeds is permissible under the applicable Law or applicable material documents, even if such cash is not actually repatriated at such time, an amount equal to the amount of the Net Proceeds will be promptly (and in any event not later than five Business Days) applied (net of an amount equal to the additional taxes of each Borrower, its Subsidiaries and the direct and indirect holders of Equity Interests in such Borrower that would be payable or reserved against and any additional costs that would be incurred as a result of a repatriation, whether or not a repatriation actually occurs) by the Borrowers to the repayment of the Term Loans pursuant to this Section 2.05 and (ii) to the extent that the Lead Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Disposition or Foreign Casualty Event could reasonably be expected to have adverse tax, regulatory or accounting consequences (other than *de minimis* tax consequences) with respect to such Net Proceeds, an amount equal to such Net Proceeds that would be so affected will not be subject to repayment under this Section 2.05; *provided* that in the case of each of clauses (i) and (ii), such nonpayment prior to the time such amounts must be prepaid, if at all, shall not constitute an Event of Default (and such amounts shall be available to repay local foreign indebtedness, if any, for working capital purposes of the Borrowers and the Restricted Subsidiaries of the Borrower, in each case, subject to the prepayment provisions in this Section 2.05(b)(vi)). For the avoidance of doubt, nothing in this Section 2.05 shall require any Person to cause any amounts to be repatriated to the United States (whether or not such amounts are used in or excluded from the determination of the amount of any mandatory prepayments hereunder).

88

(vii)    Except as otherwise provided in any Refinancing Amendment, Extension Amendment or any Incremental Amendment or as otherwise provided herein, (A) each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied ratably to each Class of Term Loans then outstanding (*provided* that any prepayment of Term Loans with the Net Proceeds of Credit Agreement Refinancing Indebtedness shall be applied solely to each applicable Class of Refinanced Debt); (B) with respect to each Class of Term Loans, each prepayment pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) shall be applied to the remaining installments of the principal of such Class of Term Loans then payable following the date of such prepayment in direct order of maturity; and (C) each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment.

(viii)    The Lead Borrower shall use commercially reasonable efforts to notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made by the Borrowers pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) not later than 3:00 p.m. at least three (3)    Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed estimated calculation of the aggregate amount of such prepayment to be made by the Borrowers. The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Lead Borrower's prepayment notice and of such Appropriate Lender's Pro Rata Share of the prepayment. Each Term Lender may reject all or a portion of its Pro Rata Share of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to be made pursuant to clauses (i), (ii) and (iii)(A) of this Section 2.05(b) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent no later than 5:00 p.m. one Business Day prior to the date of such prepayment; *provided*, *however*, in no event may the proceeds of any Credit Agreement Refinancing Indebtedness be rejected. If a Term Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans. The Borrower shall retain all Declined Proceeds.

(c)    *Interest, Funding Losses, Etc* . All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon (other than prepayments of Base Rate Revolving Credit Loans that are not made in connection with the termination or permanent reduction of the Revolving Credit Commitments), together with, in the case of any such prepayment of a Eurocurrency Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurocurrency Rate Loan pursuant to Section 3.05.

Notwithstanding any of the other provisions of this Section 2.05, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurocurrency Rate Loans is required to be made under this Section 2.05, prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.05 in respect of any such Eurocurrency Rate Loan prior to the last day of the Interest Period therefor, the Borrowers may, in the Lead Borrower's sole discretion, deposit an amount sufficient to make any such prepayment otherwise required to be made thereunder together with accrued interest to the last day of such Interest Period into a cash collateral account on terms reasonably satisfactory to the Administrative Agent until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrowers or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.05. Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrowers or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with the relevant provisions of this Section 2.05. Such deposit shall be deemed to be a prepayment of such Loans by the Borrowers for all purposes under this Agreement.

Section 2.06.    Termination or Reduction of Commitments.

89

(a)     *Optional*. The Lead Borrower may, upon revocable written notice to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class, in each case without premium or penalty; *provided* that (i) the Administrative Agent shall receive any such notice by 2:00 p.m., one Business Day prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $250,000, or any whole multiple of $250,000 in excess thereof or, if less, the entire amount thereof. Notwithstanding the foregoing, the Lead Borrower may rescind or postpone any notice of termination of any Commitments if such termination would have resulted from a refinancing of all or any portion of the applicable Class or occurrence of any other event, which refinancing or other event shall not be consummated or otherwise shall be delayed.

(b)     *Mandatory*. The Initial Term Commitments of each Term Lender shall be automatically and permanently reduced to $0 upon the funding of the Initial Term Loans to be made by such Term Lender on the Closing Date. The Delayed Draw Term Loan Commitments of each Term Lender shall be automatically and permanently reduced by the aggregate amount of any Delayed Draw Term Loan funded up by such Term Lender on the date such Delayed Draw Term Loan is funded. The Revolving Credit Commitments of each Revolving Credit Lender shall automatically and permanently terminate on the Maturity Date.

(c)     *Application of Commitment Reductions; Payment of Fees*. The Administrative Agent will promptly notify the Appropriate Lenders of any termination or reduction of the unused Commitments of any Class under this Section 2.06. Upon any reduction of unused Commitments of any Class, the Commitment of each Lender of such Class shall be reduced by such Lender's Pro Rata Share of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in Section 3.07). All commitment fees accrued until the effective date of any termination of the Aggregate Commitments of any Class shall be paid to the appropriate Lenders on the effective date of such termination.

Section 2.07.     Repayment of Loans.

(a)     *Term Loans*. The Borrowers shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders (A) on the last Business Day of each March, June, September and December, commencing with the first full fiscal quarter after the Closing Date, an aggregate principal amount equal to the sum of (i) 0.25% of the aggregate principal amount of all Initial Term Loans outstanding on the Closing Date and (ii) 0.25% of the aggregate principal amount of all funded Delayed Draw Term Loans (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Sections 2.05 or 10.07 (including pursuant to Dutch auctions or open market purchases, but for the avoidance of doubt without a reduction in the outstanding principal amount of any Loans not prepaid pursuant to such Dutch auction or open market purchase, as applicable)) and (B) on the Maturity Date for the Initial Term Loans and Delayed Draw Term Loans, the aggregate principal amount of all Initial Term Loans and Delayed Draw Term Loans outstanding on such date.

(b)     *Revolving Credit Loans*. The Borrowers shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders on the Maturity Date for the applicable Revolving Credit Facility the aggregate principal amount of all Revolving Credit Loans under such Facility outstanding on such date.

Section 2.08.     Interest.

(a)     Subject to the provisions of Section 2.08(b), (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to

90

the Eurocurrency Rate, for such Interest Period, *plus* the Applicable Rate and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate, *plus* the Applicable Rate.

(b)     (i) During the continuance of an Event of Default under Sections 8.01(a) (with respect to principal, interest or fees) or non-payment after acceleration pursuant to Section 8.01(f) (in each case unless otherwise waived or consented to by the Required Lenders) or (y) if any other Event of Default has occurred and is continuing and the Required Lenders have provided written notice to the Lead Borrower under this Section 2.08(b) of their intention for the Borrowers to pay interest at the Default Rate, the Borrowers shall pay interest on past due amounts owing by it under the Term Loans and the Revolving Credit Loans at a fluctuating interest rate per annum at all times thereafter equal to the Default Rate to the fullest extent permitted by applicable Laws; *provided* that no interest at the Default Rate shall accrue or be payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender. Accrued and unpaid interest on such amounts (including interest at the Default Rate accruing on past due interest) shall be due and payable upon written demand.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09.     Fees.

(a)     *Commitment Fee*. The Borrowers agree to pay to the Administrative Agent for the account of each Revolving Credit Lender under each Facility in accordance with its Pro Rata Share or other applicable share provided for under this Agreement, a commitment fee equal to the Applicable Rate as set forth in the definition thereof with respect to commitment fees for such Facility times the average daily amount by which the aggregate Revolving Credit Commitment for such Facility exceeds the Outstanding Amount of Revolving Credit Loans for such Facility; *provided* that any commitment fee accrued with respect to any of the Commitments of a Defaulting Lender during the period prior to the time such Lender became a Defaulting Lender and unpaid at such time shall not be payable by the Borrowers so long as such Lender shall be a Defaulting Lender except to the extent that such commitment fee shall otherwise have been due and payable by the Borrowers prior to such time; *provided*, *further*, that no commitment fee shall accrue on any of the Commitments of a Defaulting Lender so long as such Lender shall be a Defaulting Lender. The commitment fee on each Revolving Credit Facility shall accrue at all times from the Closing Date until the Maturity Date for the Revolving Credit Facility, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the last Business Day of each March, June, September and December, commencing with the first such date during the first full fiscal quarter to occur after the Closing Date, and on the Maturity Date for the Revolving Credit Facility. The commitment fee shall be calculated quarterly in arrears, and if there is any change in the Applicable Rate during any quarter, the average daily amount shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(b)     [Reserved].

(c)     *Closing Date Fees*. The Borrowers agree to pay on the Closing Date to the Administrative Agent the fees set forth in the Fee Letter and, at the election of the Borrowers, such fees shall be netted against Initial Term Loans made by such Lender.

(d)     *Other Fees*. The Borrowers shall pay to the Agents such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified. Such fees shall be fully

91

earned when paid and shall not be refundable for any reason whatsoever (except as agreed between the Lead Borrower and the applicable Agent).

Section 2.10.    Computation of Interest and Fees.

All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Eurocurrency Rate) shall be made on the basis of a year of 365 days, or 366 days, as applicable, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11.    Evidence of Indebtedness.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent in accordance with Section 10.07, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as non-fiduciary agent for the Borrowers, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Promptly following the reasonable request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender a Note payable to such Lender (through the Administrative Agent), which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    [Reserved]

(c)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(a), and by each Lender in its account or accounts pursuant to Section 2.11(a), shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrowers to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrowers under this Agreement and the other Loan Documents. In the event of any conflict between the Register maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the Register shall control.

Section 2.12.    Payments Generally.

(a)    All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective

92

Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in Same Day Funds not later than 1:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Appropriate Lender its Pro Rata Share (or other applicable share provided for under this Agreement) of such payment in like funds as received by wire transfer to such Lender's applicable Lending Office. All payments received by the Administrative Agent after 1:00 p.m. may, in each case, in the Administrative Agent's reasonable discretion, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    Except as otherwise provided herein, if any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurocurrency Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)    Unless the Lead Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrowers or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrowers or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i)    if the Borrowers failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(ii)    if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrowers to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrowers, and the Borrowers shall promptly pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate *per annum* equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrowers may have against any Lender as a result of any default by such Lender hereunder. A written notice (including documentation reasonably supporting such request) of the Administrative Agent to any Lender or the Borrowers with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)    If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the applicable Credit

Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)    The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(f)    Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)    Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03. If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may (to the fullest extent permitted by mandatory provisions of applicable Law), but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

(h)    Amounts to be applied to the prepayment of Loans in connection with any mandatory prepayments by the Borrowers of the Term Loans pursuant to Section 2.05(b) shall be applied, as applicable, on a *pro rata* basis (unless Lenders holding Term Loans incurred after the Closing Date elect a less than *pro rata* basis) to the then outstanding Term Loans in direct order of maturity being prepaid on a *pro rata* basis (except with respect to a Term Lender which has declined or otherwise agreed not to accept its Pro Rata Share of any such mandatory prepayment) irrespective of whether such outstanding Term Loans are Base Rate Loans or Eurocurrency Rate Loans; *provided* that if no Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to Section 2.05(b)(viii), then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to reduce outstanding Base Rate Loans. Any amounts remaining after each such application shall be applied to prepay Eurocurrency Rate Loans in a manner that minimizes the amount of any payments required to be made by the Borrowers pursuant to Section 3.05.

Section 2.13.    Sharing of Payments.

If, other than as provided elsewhere herein, any Lender shall obtain payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in respect of any principal or interest on account of the Loans made by it in excess of its *pro rata* share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of any principal or interest on such Loans or such participations, as the case may be, *pro rata* with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the

94

purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's *pro rata* share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. For the avoidance of doubt, the provisions of this paragraph shall not be construed to apply to
(A)  any payment made by the Borrowers pursuant to and in accordance with the terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder. The Borrowers agree that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Notwithstanding anything to the contrary contained in this Section 2.13 or elsewhere in this Agreement, the Lead Borrower may extend the final maturity of Term Loans and/or Revolving Credit Commitments in connection with an Extension that is permitted under Section 2.16 or otherwise pursuant to Section 10.01 without being obligated to effect such extensions on a *pro rata* basis among the Lenders (it being understood that no such extension (i) shall constitute a payment or prepayment of any Term Loans or Revolving Credit Loans, as applicable, for purposes of this Section 2.13 or (ii) shall reduce the amount of any scheduled amortization payment due under Section 2.07(a), except that the amount of any scheduled amortization payment due to a Lender of Extended Term Loans may be reduced to the extent provided pursuant to the express terms of the respective Extension Request) without giving rise to any violation of this Section 2.13 or any other provision of this Agreement. Furthermore, the Lead Borrower may take all actions contemplated by Section 2.16 in connection with any Extension (including modifying pricing, amortization and repayments or prepayments), and in each case such actions shall be permitted, and the differing payments contemplated therein shall be permitted without giving rise to any violation of this Section 2.13 or any other provision of this Agreement.

Section 2.14.  Incremental Credit Extensions.

(a)  *Incremental Commitments*. The Loan Parties may at any time or from time to time after the Closing Date, by written notice to the Administrative Agent (an "**Incremental Request**"), request
(i) one or more new commitments which shall be in the same Facility as any outstanding Term Loans (a " **Term Loan Increase**") or a new Class of term loans (collectively with any Term Loan Increase, the "**Incremental Term Commitments**") under this Agreement, (ii) one or more new term loans in a separate facility from the Facilities and that are either unsecured or secured on a *pari passu* or junior lien basis to the Facilities (the "**Other Commitments**" and the loans in respect thereof, the " **Other Term Loans**"),
(iii) one or more series of pari passu first lien secured, junior lien secured or unsecured notes (the " **Other Notes**"), (iv) one or more increases in the amount of the Revolving Credit Commitments (a "**Revolving Commitment Increase**"), and (v) one or more new Classes of Revolving Credit Loans (the "**Additional Revolving Commitments**" and together with the Revolving Commitment Increase, the "**Incremental Revolving Commitments** and, collectively with any Incremental Term Commitments, the " **Incremental Commitments**"), whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders. Notwithstanding anything herein to the contrary, the Lenders party to this Agreement at the time

95

of delivery of the written notice by the Loan Parties to the Administrative Agent pursuant to this Section 2.14(a) shall have the right, on a *pro rata* basis, to (i) make an initial offer with respect to any such Other Commitments and/or Incremental Commitments (and the Indebtedness to be incurred in respect thereof) within five Business Days of receipt of such written notice and (ii) in the event such initial offer is not accepted by the Borrower or its applicable Restricted Subsidiary (provided that the Lead Borrower shall be deemed to have rejected such offer unless it shall accept the same in writing within five Business Days after having received such initial offer), provide any such Other Commitments and/or Incremental Commitments (and the Indebtedness to be incurred in respect thereof) on the same terms as those being offered from any other financial institution or lending source.

(b)    *Incremental Loans*. Any Incremental Term Loans effected through the establishment of one or more new Term Loans made on an Incremental Facility Closing Date shall be designated a separate Class of Incremental Term Loans for all purposes of this Agreement. Any Additional Revolving Commitments effected through the establishment of one or more new Revolving Credit Commitments made on an Incremental Facility Closing Date shall be designated a separate Class of Incremental Revolving Commitments for all purposes of this Agreement. On any Incremental Facility Closing Date on which any Incremental Term Commitments of any Class are effected (including through any Term Loan Increase), subject to the satisfaction (or waiver) of the terms and conditions in this Section 2.14, (i) each Incremental Term Lender of such Class shall make a Loan to the Borrowers (an "**Incremental Term Loan**") in an amount equal to its Incremental Term Commitment of such Class and (ii) each Incremental Term Lender of such Class shall become a Lender hereunder with respect to the Incremental Term Commitment of such Class and the Incremental Term Loans of such Class made pursuant thereto. On any Incremental Facility Closing Date on which any Revolving Commitment Increases or Additional Revolving Commitments, as applicable, are effected, subject to the satisfaction (or waiver) of the terms and conditions in this Section 2.14, (i) each Incremental Revolving Credit Lender shall make its Commitment available to the Borrowers (when borrowed, an "**Incremental Revolving Loan**" and collectively with any Incremental Term Loan, an "**Incremental Loan**") in an amount equal to its Revolving Commitment Increase or Additional Revolving Commitment, as applicable, and (ii) each Incremental Revolving Credit Lender shall become a Lender hereunder with respect to the Revolving Commitment Increase or Additional Revolving Commitment, as applicable, and the Incremental Revolving Loans made pursuant thereto. Notwithstanding the foregoing, (i) Incremental Term Loans in the form of a Term Loan Increase shall have identical terms (other than with respect to original issue discount or upfront fees) to the relevant Class of increased Term Loans and shall be treated as the same Class as such Term Loans and (ii) Revolving Credit Loans under any Revolving Commitment Increase shall have identical terms (other than in respect of underwriting, arrangement, structuring, ticking, commitment, upfront or similar fees, and other fees payable in connection therewith) to the relevant increased Class of Revolving Credit Loans and be treated as the same Class as any such Revolving Credit Loans.

(c)    *Incremental Request*. Each Incremental Request from the Lead Borrower pursuant to this Section 2.14 shall set forth the requested amount and proposed terms of the relevant Incremental Term Loans, Revolving Commitment Increases, Additional Revolving Commitments, Other Term Loans or Other Notes. Incremental Term Loans, Other Term Loans and extensions of credit in respect of Other Notes may be made, and Revolving Commitment Increases and Additional Revolving Commitments, may be provided, by any existing Lender (but each existing Lender will not have an obligation to make any Incremental Commitment or Other Commitment, or to extend credit in respect of any Other Term Loans or Other Notes, nor will the Lead Borrower have any obligation to approach any existing lenders to provide any other Commitment, or to extend credit in respect of any Other Term Loans or Other Notes) or by any other bank or other financial institution (any such other bank or other financial institution being called an "**Additional Lender**") (each such existing Lender or Additional Lender providing such, an "**Incremental Revolving Credit Lender**" or "**Incremental Term Lender**," as applicable, and, collectively, the "**Incremental Lenders**"); *provided* that (i) the Administrative Agent shall have consented (not to be unreasonably

96

withheld, conditioned, denied or delayed) to such Lender's or Additional Lender's making such Incremental Term Loans or providing such Revolving Commitment Increases or Additional Revolving Commitments to the extent such consent, if any, would be required under Section 10.07(b) for an assignment of Loans or Revolving Credit Commitments, as applicable, to such Lender or Additional Lender and (ii) with respect to Incremental Term Commitments, any Sponsor-Controlled Affiliated Lender providing an Incremental Term Commitment shall (x) be subject to a requirement that such Incremental Term Commitments have been provided on arms-length terms and (y) be subject to the same restrictions set forth in Section 10.07(k) as they would otherwise be subject to with respect to any purchase by or assignment to such Sponsor- Controlled Affiliated Lender of Initial Term Loans.

(d)     *Effectiveness of Incremental Amendment*. The obtaining of Other Commitments, the making of Other Term Loans, the incurrence of Indebtedness in respect of Other Notes, the effectiveness of any Incremental Amendment, and the Incremental Commitments thereunder, shall be subject to the satisfaction (or waiver) on the date of such Incremental Amendment (or, in the case of Other Commitments, Other Term Loans and Other Notes, on the date of the extension of such commitments or the incurrence or issuance of such Other Term Loans or Other Notes, as applicable, in each case, subject to Section 1.11(g)) (the "**Incremental Facility Closing Date**") of each of the following conditions:

(i)     (x) no Event of Default exists or shall exist after giving effect to such Incremental Commitments, Other Commitments, Other Term Loans or Other Notes, as applicable; *provided*, that in the case of Incremental Commitments, Other Commitments, Other Term Loans or Other Notes incurred in connection with a Limited Condition Transaction, no Event of Default shall exist on the date of execution of the definitive documentation (or notice, as applicable) with respect to such Limited Condition Transaction and no Event of Default under Section 8.01(a) or 8.01(f) shall exist on such Incremental Facility Closing Date and (y) the representations and warranties of the Loan Parties contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Incremental Amendment (*provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date); *provided* that the conditions in clause (y) shall only be required to the extent requested by the Persons providing more than 50.0% of the applicable Incremental Commitments, Other Commitments, Other Term Loans or Other Notes, as the case may be; *provided*, *further*, that in the case of Incremental Commitments, Other Commitments, Other Term Loans or Other Notes incurred in connection with a Limited Condition Transaction, if required, only certain customary specified representations (conformed as necessary for such acquisition, investment or other transaction) shall be true and correct in all material respects;

(ii)     each Incremental Term Commitment shall be in an aggregate principal amount that is not less than $500,000 and shall be in an increment of $500,000 (*provided* that such amount may be less than $500,000 if (x) approved by the Administrative Agent (such approval not to be unreasonably withheld, delayed, denied or conditioned) or (y) such amount represents all remaining availability under the limit set forth in clause (iii) below) and each Revolving Commitment Increase shall be in an aggregate principal amount that is not less than $500,000 and shall be in an increment of $500,000 (*provided* that such amount may be less than $500,000 if (x) approved by the Administrative Agent (such approval not to be unreasonably withheld, delayed, denied or conditioned) or (y) such amount represents all remaining availability under the limit set forth in clause (iii) below); and

(iii)     the aggregate amount of the Incremental Term Loans, the Other Term Loans, Revolving Commitment Increases and the Other Notes shall not exceed (A) an amount equal to the greater of (x) $7,500,000 and (y) 75% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis) *minus* the aggregate principal amount of Indebtedness incurred pursuant to clause (i)(A) of the definition of "Permitted Ratio Debt", *plus* (B) an amount equal to the sum, without duplication, of all (i) voluntary prepayments and optional redemptions of Term Loans made

97

pursuant to Section 2.05(a) or Section 10.07(l)(x) or mandatory assignments pursuant to Section 3.07 or of other *pari passu* Indebtedness incurred pursuant to clause (A) above, Section 7.03(m) or clause (i)(A) of the definition of "Permitted Ratio Debt" and (ii) voluntary commitment reductions and voluntary prepayments of the Loans under the Revolving Credit Facility or any other *pari passu* revolving facility incurred pursuant to clause (A) above, Section 7.03(m) or clause (i)(A) of the definition of "Permitted Ratio Debt" to the extent accompanied by a permanent commitment reduction, (in each case, including any substantially concurrent prepayment, redemption, reduction, termination, buy-back (the amount of any debt buy backs limited to the cash payment actually made in respect thereof) or purchase, other than to the extent funded with (A) proceeds of long term Indebtedness (other than revolving Indebtedness or intercompany Indebtedness) or (B) proceeds of Indebtedness incurred pursuant to clause (A) above, Section 7.03(m) or clause (i)(A) of the definition of "Permitted Ratio Debt" *plus* (C) an unlimited amount so long as, in the case of this clause (C) only, such amount at such time could be incurred without causing (x) in the case of Indebtedness secured by Liens on the Collateral that rank *pari passu* with the Liens securing the Initial Term Loans, the Consolidated Senior Secured Net Leverage Ratio (calculated on a Pro Forma Basis) to exceed 4.50:1.00, (y) in the case of Indebtedness secured by Liens on the Collateral that rank junior to the Liens on the Collateral securing the Initial Term Loans, the Consolidated Secured Net Leverage Ratio (calculated on a Pro Forma Basis) to exceed 4.50:1.00, and (z) in the case of unsecured Indebtedness, the Consolidated Total Net Leverage Ratio (calculated on a Pro Forma Basis) to exceed 4.50:1.00, in each case, after giving effect to any acquisition consummated in connection therewith and all other appropriate pro forma adjustments (including giving effect to the prepayment of Indebtedness in connection therewith), and assuming for purposes of this calculation that (i) the full committed amount of any Additional Revolving Commitments or Revolving Commitment Increases then being made or incurred shall be treated as fully drawn and outstanding for such purpose and (ii) cash proceeds of any such Incremental Facility or other Indebtedness permitted hereunder then being incurred shall not be netted from Consolidated Total Net Debt, Consolidated Secured Net Debt or Consolidated Senior Secured Net Debt, as applicable, for purposes of calculating such Consolidated Senior Secured Net Leverage Ratio, Consolidated Secured Net Leverage Ratio or Consolidated Total Net Leverage Ratio, as applicable; *provided, however*, that if amounts incurred under this clause (C) are incurred concurrently with the incurrence of Incremental Loans in reliance on clause (A) and/or clause (B) above, the Consolidated Senior Secured Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or the Consolidated Total Net Leverage Ratio shall be permitted to exceed the Consolidated Senior Secured Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or the Consolidated Total Net Leverage Ratio, as applicable, set forth in clause (C) above to the extent of such amounts incurred in reliance on clause (A) and/or clause (B) (solely for the purpose of determining whether such concurrently incurred amounts incurred under this clause (C) are permissible) (it being understood that (I) if the Consolidated Senior Secured Net Leverage Ratio, the Consolidated Secured Net Leverage Ratio or the Consolidated Total Net Leverage Ratio, as applicable, incurrence test is met, then, at the election of the Lead Borrower, any Incremental Facility or other Indebtedness permitted hereunder may be incurred under clause (C) above regardless of whether there is capacity under clause (A) and/or clause (B) above and (II) any portion of any Incremental Facility or other Indebtedness permitted hereunder incurred in reliance on clause (A) and/or clause (B) shall be automatically reclassified (unless otherwise elected by the Lead Borrower) as incurred under clause (C) if the Borrowers meet the applicable leverage ratio under clause (C) at such time on a Pro Forma Basis).

(e)    *Required Terms.* The terms, provisions and documentation of the Incremental Term Loans and Incremental Term Commitments or the Incremental Revolving Loans and Revolving Commitment Increases or Additional Revolving Commitments, as the case may be, of any Class, and of the Other Term Loans and the Other Notes, except as otherwise set forth herein, shall be as agreed between the Lead Borrower and the applicable Incremental Lenders or Persons providing such Incremental Commitments, Other Term Loans or Other Notes, as applicable; *provided* that to the extent the terms of such Incremental Commitments are set forth in the Loan Documents and are not otherwise (taken as a whole) consistent with the Facilities (except to the extent permitted by this Section 2.14), the terms of such Incremental

98

Commitments, Other Term Loans or Other Notes shall be reasonably satisfactory to the Administrative Agent (such approval not to be unreasonably withheld, delayed, denied or conditioned). In any event:

(i)      the Incremental Term Loans, Other Term Loans and Other Notes (except as otherwise specified below in this  clause (i)):

(A)      (I)(x) shall rank *pari passu* or junior in right of payment with the Initial Term Loans and (y) other than with respect to Other Term Loans and Other Notes, shall rank *pari passu* or junior in right of security with the Initial Term Loans and Delayed Draw Term Loans; (II) shall not at any time be guaranteed by any Subsidiary other than a Loan Party (unless the Required Lenders have declined or otherwise permitted a guarantee from such other Person and except as otherwise permitted under this Agreement), and (III) are not secured by a Lien on any property or asset of the Loan Parties that does not constitute Collateral (unless the Required Lenders have declined or otherwise permitted a Lien on such Collateral and except as otherwise permitted under this Agreement), and if secured by a junior Lien, subject to an Intercreditor Agreement;

(B)      shall not have a scheduled maturity date earlier than the Latest Maturity Date of the Initial Term Loans and Delayed Draw Term Loans outstanding at the time of incurrence of such Incremental Term Loans (or in the case of Other Term Loans and Other Notes at least 91 days thereafter) in each case, other than any customary bridge facility so long as the Indebtedness into which such customary bridge facility is to be converted complies with such requirements;

(C)      shall have a Weighted Average Life to Maturity not shorter than the remaining Weighted Average Life to Maturity of then-existing Initial Term Loans and Delayed Draw Term Loans (without giving effect to any amortization or prepayments on the outstanding Term Loans) excluding in all events customary bridge financings so long as the Indebtedness into which such bridge financing is to be converted complies with the requirements herein;

(D)      the pricing, interest rate margins, discounts, premiums, interest rate floors, fees, and, subject to clause (C) above, amortization schedule applicable thereto shall be determined by the Lead Borrower and the lender(s) thereunder; *provided*, *however*, that, with respect to any Other Term Loans, Other Notes or Incremental Term Loans which rank *pari passu* in right of payment and security with the Initial Term Loans and Delayed Draw Term Loans, if the All-In Yield (determined as of the initial funding date) in respect of any such Other Term Loans, Other Notes or Incremental Term Loans exceeds the All-In Yield in respect of any Initial Term Loans and Delayed Draw Term Loans by more than 0.50%, the Applicable Rate in respect of such Initial Term Loans and Delayed Draw Term Loans shall be adjusted so that the All-In Yield in respect of such Initial Term Loans and Delayed Draw Term Loans is equal to the All-In Yield in respect of such Other Term Loans, Other Notes or Incremental Term Loans minus 0.50%; *provided*, *further*, to the extent any change in the All-In Yield of the Initial Term Loans and Delayed Draw Term Loans is necessitated by this  clause (D) on the basis of an effective interest rate floor in respect of the Other Term Loans, Other Notes or the Incremental Term Loans, the increased All-In Yield in the Initial Term Loans and Delayed Draw Term Loans shall (unless otherwise agreed in writing by the Lead Borrower) have such increase in the All-In Yield effected solely by increases in the interest rate floor(s) applicable to the Initial Term Loans and Delayed Draw Term Loans;

(E)      to the extent secured on a *pari passu* basis with the Initial Term Loans and Delayed Draw Term Loans, Incremental Term Loans may participate on a *pro rata* basis or less than *pro rata* basis (but not on a greater than *pro rata* basis except with respect to Declined Proceeds) in any mandatory prepayments of Initial Term Loans and Delayed Draw Term Loans hereunder, as specified in the applicable Incremental Amendment or definitive documentation;

(F)                         [Reserved];

(G)    may participate on a *pro rata* basis, greater than a *pro rata* basis (to the extent secured on a *pari passu* basis with the Initial Term Loans) or less than a *pro rata* basis in any voluntary prepayment of any Class of Term Loans hereunder; and

(H)    all other terms of any Other Term Loans, Other Notes and Incremental Term Loans (other than Term Loan Increases, which terms shall be on terms (other than fees) applicable to the Term Loans) shall be as determined by the Lead Borrower and the lenders thereof; *provided* that such terms shall either be (x) on market terms and conditions (taken as a whole as determined by the Lead Borrower in good faith) at the time of such incurrence or (y) reasonably acceptable to the Administrative Agent (such approval not to be unreasonably withheld, conditioned, delayed or denied).

(ii)    All terms of any Revolving Commitment Increases and Incremental Revolving Loans thereunder shall be identical to the Revolving Credit Commitments and the Revolving Credit Loans; *provided*, that underwriting, arrangement, structuring, ticking, commitment, upfront or similar fees, and other fees payable in connection therewith that are not shared with all relevant lenders providing such Revolving Commitment Increases and related Incremental Revolving Loans, that may be agreed to among the Lead Borrower and the lender(s) providing and/or arranging Revolving Commitment Increases and related Incremental Revolving Loans may be paid in connection with Revolving Commitment Increases.

(iii)    Additional Revolving Commitments and Additional Revolving Loans shall have terms and conditions that are substantially the same as the terms and conditions applicable to the Initial Revolving Commitments and the related Revolving Loans, other than the Maturity Date of such Additional Revolving Commitments and loans in respect thereof (the "**Additional Revolving Loans**") and as set forth in this Section 2.14(e)(iii); *provided, further,* that notwithstanding anything to the contrary in this Section 2.14 or otherwise:

(A)    any such Additional Revolving Commitments and Additional Revolving Loans shall rank *pari passu* in right of payment and of security with the Revolving Credit Loans;

(B)    any such Additional Revolving Commitments and Additional Revolving Loans shall not have a scheduled maturity earlier than the latest Revolving Credit Maturity Date, determined at the time of establishment of such Additional Revolving Commitments;

(C)    the borrowing and repayment (except for (1) payments of interest and fees at different rates on Additional Revolving Commitments (and related outstandings), (2) repayments required upon the Maturity Date of such Additional Revolving Commitments, and (3) repayment made in connection with a permanent repayment and termination of commitments (subject to clause (E) below)) of Additional Revolving Loans with respect to Additional Revolving Commitments shall be made on a pro rata basis with all other Revolving Commitments on the Incremental Facility Closing Date;

(D)                         [reserved];

(E)    the permanent repayment of Additional Revolving Loans with respect to, and termination of, Additional Revolving Commitments after the associated Incremental Facility Closing Date shall be made on a pro rata basis with all other Revolving Credit Commitments on such Incremental Facility Closing Date, except that the Borrower shall be permitted, in its sole discretion, to permanently repay and terminate commitments of any such Class on a greater than a pro rata basis (x) as compared to any other Class with a later Maturity Date than such Class and (y) as compared to any other Class in connection with the refinancing thereof with Refinancing Revolving Credit Commitments;

100

(F)     assignments and participations of Additional Revolving Commitments and Additional Revolving Loans shall be governed by the same assignment and participation provisions applicable to the then-outstanding Revolving Credit Commitments and Revolving Credit Loans on the applicable Incremental Facility Closing Date;

(G)     the pricing, fees and other immaterial terms of the Additional Revolving Loans may be different and shall be determined by the Borrower and the lender(s) thereunder; and

(H)     any such Additional Revolving Commitments and Additional Revolving Loans shall not at any time be guaranteed by any Person other than the Guarantors, and shall not be secured by a Lien on any property or asset that does not constitute Collateral.

(iv)     The terms, provisions and documentation of the Incremental Term Loans and Incremental Term Commitments or the Incremental Revolving Loans and Revolving Commitment Increases or Additional Revolving Commitments, as the case may be, may at the option of the Lead Borrower in consultation with the Administrative Agent, incorporate terms that would be favorable to existing Lenders of the applicable Class or Classes for the benefit of such existing Lenders of the applicable Class or Classes including, for the avoidance of doubt, any increase in the applicable yield relating to any existing Class of Term Loans to achieve fungibility for U.S. federal income tax purposes with any existing Class of Term Loans. In addition, if required to consummate any Incremental Term Loans and Incremental Term Commitments or the Incremental Revolving Loans and Revolving Commitment Increases or Additional Revolving Commitments, the pricing, interest rate margins, rate floors, undrawn fees and premiums on the applicable Loan being increased may be increased or extended but additional upfront fees, original issue discount or similar fees may be payable to the Lenders participating in any such Incremental Term Loans and Incremental Term Commitments or the Incremental Revolving Loans and Revolving Commitment Increases or Additional Revolving Commitments without any requirement to pay such amounts to any existing Lenders.

(f)     *Incremental Amendment*. Commitments in respect of Incremental Term Loans and Revolving Commitment Increases and Additional Revolving Commitments hereunder shall become Commitments (or in the case of a Revolving Commitment Increase to be provided by an existing Revolving Credit Lender, an increase in such Lender's applicable Revolving Credit Commitment), under this Agreement pursuant to an amendment (an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Loan Documents, executed by the Lead Borrower, each Incremental Lender providing such Commitments and the Administrative Agent. The Incremental Amendment may, without the consent of any other Loan Party, Agent or Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Lead Borrower and the Administrative Agent, to effect the provisions of this Section 2.14. The Borrowers will use the proceeds of the Incremental Term Loans, Additional Revolving Loans and Revolving Commitment Increases as determined by the Lead Borrower and the Lenders providing such Incremental Term Loans and Revolving Commitment Increases, subject to such use otherwise being permitted under the terms of this Agreement. No Lender shall be obligated to provide any Incremental Term Loans or Revolving Commitment Increases, unless it so agrees.

(g)     *Reallocation of Revolving Credit Exposure*. Upon any Incremental Facility Closing Date on which Revolving Commitment Increases or Additional Revolving Commitments are effected through an increase in the Revolving Credit Commitment are added hereunder pursuant to this Section 2.14, (a) if the increase relates to the Revolving Credit Facility, each of the Revolving Credit Lenders shall assign to each of the Incremental Revolving Credit Lenders, and each of the Incremental Revolving Credit Lenders shall purchase from each of the Revolving Credit Lenders, at the principal amount thereof, such interests in the Incremental Revolving Loans outstanding on such Incremental Facility Closing Date as shall be

101

necessary in order that, after giving effect to all such assignments and purchases, such Revolving Credit Loans will be held by existing Revolving Credit Lenders and Incremental Revolving Credit Lenders ratably in accordance with their Revolving Credit Commitments after giving effect to the addition of such Revolving Commitment Increases to the Revolving Credit Commitments, (b) each Revolving Commitment Increase shall be deemed for all purposes a Revolving Credit Commitment and each Loan made thereunder shall be deemed, for all purposes, a Revolving Credit Loan, and (c) each Incremental Revolving Credit Lender shall become a Lender with respect to the Revolving Commitment Increases and all matters relating thereto. The Administrative Agent and the Lenders hereby agree that the minimum borrowing, *pro rata* borrowing and *pro rata* payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(h)    *Documentation.* If an Incremental Loan is not secured on a *pari passu* basis with the Secured Obligations, such Incremental Loan shall be documented outside of the Loan Documents, and to the extent secured, subject to customary intercreditor terms (including those in an Intercreditor Agreement and/or any other lien subordination and intercreditor arrangement reasonably satisfactory to the Lead Borrower and the Administrative Agent, as applicable).

(i)    Section 2.14 shall supersede any provisions of this Agreement to the contrary.

Section 2.15.    Refinancing Amendments.

(a)    On one or more occasions after the Closing Date, the Loan Parties may obtain, from any Lender or any Additional Refinancing Lender, Credit Agreement Refinancing Indebtedness in respect of all or any portion of the Term Loans and the Revolving Credit Loans (or unused Revolving Credit Commitments) then outstanding under this Agreement (which for purposes of this Section 2.15(a) will be deemed to include any then outstanding Refinancing Term Loans, Incremental Term Loans or Incremental Revolving Credit Commitments), in the form of Refinancing Term Loans, Refinancing Term Commitments, Refinancing Revolving Credit Commitments or Refinancing Revolving Credit Loans pursuant to a Refinancing Amendment; *provided* that notwithstanding anything to the contrary in this Section 2.15 or otherwise, (1) the borrowing and repayment (except for (A) payments of interest and fees at different rates on Refinancing Revolving Credit Commitments (and related outstandings),
(B) repayments required upon the maturity date of the Refinancing Revolving Credit Commitments and
(C)    repayment made in connection with a permanent repayment and termination of commitments (subject to clause (3) below)) of Loans with respect to Refinancing Revolving Credit Commitments after the date of obtaining any Refinancing Revolving Credit Commitments shall be made on a *pro rata* basis with all other Revolving Credit Commitments, (2) [reserved], (3) the permanent repayment of Revolving Credit Loans with respect to, and termination of, Refinancing Revolving Credit Commitments after the date of obtaining any Refinancing Revolving Credit Commitments shall be made on a *pro rata* basis with all other Revolving Credit Commitments, except that the Borrowers shall be permitted to permanently repay and terminate commitments of any such Class on a better than a *pro rata* basis as compared to any other Class with a later maturity date than such Class and (4) assignments and participations of Refinancing Revolving Credit Commitments and Refinancing Revolving Credit Loans shall be governed by the same assignment and participation provisions applicable to Revolving Credit Commitments and Revolving Credit Loans.

(b)    Each issuance of Credit Agreement Refinancing Indebtedness under Section 2.15(a) shall be in an aggregate principal amount that is (x) not less than $500,000 (unless otherwise agreed by Administrative Agent) and (y) an integral multiple of $500,000 in excess thereof (or, if less, the remaining amount permitted to be incurred hereunder).

(c)    Each of the parties hereto hereby agrees that this Agreement and the other Loan Documents may be amended pursuant to a Refinancing Amendment, without the consent of any other Lenders, to the

102

extent (but only to the extent) necessary to (i) reflect the existence and terms of the Credit Agreement Refinancing Indebtedness incurred pursuant thereto, (ii) make such other changes to this Agreement and the other Loan Documents consistent with the provisions and intent of the third paragraph of Section 10.01 (without the consent of the Required Lenders called for therein) and (iii) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Lead Borrower, to effect the provisions of this Section 2.15, and the Lenders hereby expressly authorize the Administrative Agent to enter into any such Refinancing Amendment.

(d)    This Section 2.15 shall supersede any provisions of this Agreement to the contrary.

Section 2.16.    Extension of Term Loans; Extension of Revolving Credit Loans.

(a)    *Extension of Term Loans*. The Lead Borrower may at any time and from time to time request that all or a portion of the Term Loans of a given Class (each, an "**Existing Term Loan Tranche**") be amended or converted to extend the scheduled maturity date(s) with respect to all or a portion of any principal amount of such Term Loans (any such Term Loans which have been so amended or converted, "**Extended Term Loans**") and to provide for other terms consistent with this Section 2.16. In order to establish any Extended Term Loans, the Lead Borrower shall provide a written notice to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders under the applicable Existing Term Loan Tranche) (each, a "**Term Loan Extension Request**") setting forth the proposed terms of the Extended Term Loans to be established, which shall (x) be identical as offered to each Lender under such Existing Term Loan Tranche (including as to the proposed interest rates and fees payable) and offered *pro rata* to each Lender under such Existing Term Loan Tranche and (y) (except as to interest rates, fees, amortization, final maturity date, "AHYDO" payments, optional prepayments, premium, required prepayment dates and participation in prepayments, which shall be determined by the Lead Borrower and the Extending Term Lenders and set forth in the relevant Term Loan Extension Request), shall either, at the option of the Lead Borrower, (i) be reasonably satisfactory to the Administrative Agent (such approval not to be unreasonably withheld, delayed, denied or conditioned), (ii) be consistent with, or (taken as a whole) not materially more favorable to the lenders providing such Extended Term Loans or (iii) be on market terms and conditions (as determined by the Lead Borrower in good faith) reasonably acceptable to Administrative Agent (unless
(x) the lenders under the Existing Term Loan Tranche also receive the benefit of such more restrictive terms or (y) such covenants or other provisions are applicable only to periods after the latest final maturity date of the Existing Term Loan Tranche existing at the time of such refinancing); *provided*, *however*, that (1) the scheduled final maturity date shall be extended and all or any of the scheduled amortization payments of principal of the Extended Term Loans may be delayed to later dates than the scheduled amortization of principal of the Term Loans of such Existing Term Loan Tranche; *provided*, *however*, that at no time shall there be Classes of Term Loans hereunder (including Refinancing Term Loans and Extended Term Loans) which have more than eight different Maturity Dates, (with any such delay resulting in a corresponding adjustment to the scheduled amortization payments reflected in Section 2.07 or in the applicable joinder agreement, as the case may be, with respect to the Existing Term Loan Tranche from which such Extended Term Loans were amended or converted, in each case as more particularly set forth in Section 2.16), (2)(A) pricing, fees, optional prepayment or redemption terms shall be determined in good faith by the Lead Borrower and the interest margins and floors with respect to the Extended Term Loans may be higher or lower than the interest margins and floors for the Term Loans of such Existing Term Loan Tranche and/or
(B) additional fees, premiums or AHYDO Payments may be payable to the Lenders providing such Extended Term Loans in addition to or in lieu of any increased margins and floors contemplated by the preceding clause (A), in each case, to the extent provided in the applicable Extension Amendment, (3) the Extended Term Loans may participate on a *pro rata* basis, greater than *pro rata* basis or less than *pro rata* basis in any voluntary prepayment of any Class of Term Loans hereunder and may participate on a *pro rata* basis or less than *pro rata* basis (but, except as otherwise permitted by this Agreement, not on a greater

103

than *pro rata* basis) in any mandatory prepayments of any Class of Term Loans hereunder, (4) Extended Term Loans may have call protection and redemption terms as may be agreed by the Lead Borrower and the Lenders thereof, (5) any Extended Term Loans shall not at any time be guaranteed by any Person other than the Guarantors (unless the Required Lenders have declined or otherwise permitted a guarantee from such other Person and except as otherwise permitted under this Agreement) and shall not be secured by a Lien on any property that does not constitute Collateral (unless the Required Lenders have declined or otherwise permitted such collateral and except as otherwise permitted under this Agreement l) and (6) to the extent that any such provision that applies after the Initial Term Loan Maturity Date is added for the benefit of any such Indebtedness, no consent shall be required by the Administrative Agent or any of the Lenders. No Lender shall have any obligation to agree to have any of its Term Loans of any Existing Term Loan Tranche converted into Extended Term Loans pursuant to any Extension Request. Any Extended Term Loans of any Extension Series shall constitute a separate Class of Term Loans from the Existing Term Loan Tranche from which they were converted; *provided* that any Extended Term Loans converted from an Existing Term Loan Tranche may, to the extent provided in the applicable Extension Amendment, be designated as an increase in any then outstanding Class of Term Loans other than the Existing Term Loan Tranche from which such Extended Term Loans were converted (in which case scheduled amortization with respect thereto shall be proportionally increased). Any Extended Term Loans amended pursuant to any Term Loan Extension Request shall be designated a series (each, a "**Term Loan Extension Series**") of Extended Term Loans for all purposes of this Agreement; *provided* that any Extended Term Loans amended from an Existing Term Loan Tranche may, to the extent provided in the applicable Extension Amendment, be designated as an increase in any previously established Term Loan Extension Series with respect to such Existing Term Loan Tranche (in which case scheduled amortization with respect thereto shall be proportionally increased). Each Term Loan Extension Series of Extended Term Loans incurred under this Section 2.16 shall be in an aggregate principal amount that is not less than $500,000 (or, if less, the entire principal amount of the Indebtedness being extended pursuant to this Section 2.16(a) or such other amount approved by the Administrative Agent in its reasonable discretion).

(b)    *Extension of Revolving Credit Commitments*. The Lead Borrower may at any time and from time to time request that all or a portion of the Revolving Credit Commitments of any Class, each existing at the time of such request (each, an "**Existing Revolving Credit Commitment**" and any related Revolving Credit Loans thereunder, "**Existing Revolving Credit Loans**"; each Existing Revolving Credit Commitment and related Existing Revolving Credit Loans together being referred to as an "**Existing Revolving Credit Class**") be converted to extend the termination date thereof and the scheduled maturity date(s) of any payment of principal with respect to all or a portion of any principal amount of Revolving Credit Loans related to such Existing Revolving Credit Commitments (any such Existing Revolving Credit Commitments which have been so extended, "**Extended Revolving Credit Commitments**") and to provide for other terms consistent with this Section 2.16(b). In order to establish any Extended Revolving Credit Commitments, the Lead Borrower shall provide a notice to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders of the applicable Class of Existing Revolving Credit Commitments which such request shall be offered equally to all such Lenders) (a "**Revolving Credit Loan Extension Request**") setting forth the proposed terms of the Extended Revolving Credit Commitments to be established, which, if not consistent with the terms of the applicable Existing Revolving Credit Commitments, (i) shall not be materially more favorable to the Lenders providing such facility (as determined in good faith by the Lead Borrower), when taken as a whole, than the terms of such Existing Revolving Credit Commitments, (ii) shall be reasonably satisfactory to the Administrative Agent (such approval not to be unreasonably withheld, delayed, denied or conditioned) or (iii) be on market terms and conditions (as determined by the Lead Borrower in good faith) reasonably acceptable to the Administrative Agent (such approval not to be unreasonably withheld, delayed, denied or conditioned) (the "**Specified Existing Revolving Credit Commitment**") unless (x) the Lenders providing Existing Revolving Credit Loans receive the benefit of such more restrictive terms or (y) any such provisions apply after the latest maturity date of any Revolving Credit Commitments then outstanding under this Agreement, in each case,

104

to the extent provided in the applicable Extension Amendment; *provided*, *however*, that (w) all or any of the final maturity dates of such Extended Revolving Credit Commitments may be delayed to later dates than the final maturity dates of the Specified Existing Revolving Credit Commitments, (x)(A) the interest margins and floors with respect to the Extended Revolving Credit Commitments may be higher or lower than the interest margins and floors for the Specified Existing Revolving Credit Commitments and/or

(B)    additional fees and premiums may be payable to the Lenders providing such Extended Revolving Credit Commitments in addition to or in lieu of any increased margins and floors contemplated by the preceding clause (A) and (y) the commitment fee rate with respect to the Extended Revolving Credit Commitments may be higher or lower than the commitment fee rate for the Specified Existing Revolving Credit Commitment; *provided*, that, notwithstanding anything to the contrary in this Section 2.16(b) or otherwise,

(1)    the borrowing and repayment (other than in connection with a permanent repayment and termination of commitments) of Loans with respect to any Existing Revolving Credit Commitments shall be made on a *pro rata* basis with all other Existing Revolving Credit Commitments and (2) assignments and participations of Extended Revolving Credit Commitments and Extended Revolving Credit Loans shall be governed by the same assignment and participation provisions applicable to Revolving Credit Commitments and the Revolving Credit Loans related to such Commitments set forth in Section 10.07. No Lender shall have any obligation to agree to have any of its Revolving Credit Loans or Revolving Credit Commitments of any Existing Revolving Credit Class converted into Extended Revolving Credit Loans or Extended Revolving Credit Commitments pursuant to any Revolving Credit Loan Extension Request. Any Extended Revolving Credit Commitments amended pursuant to any Revolving Credit Loan Extension Request shall be designated a series (each, a "**Revolving Credit Loan Extension Series**") for all purposes of this Agreement and shall constitute a separate Class of revolving credit commitments from the Specified Existing Revolving Credit Commitments; *provided*, that any Extended Revolving Credit Commitments converted from an Existing Revolving Credit Commitment Class may, to the extent provided in the applicable Extension Amendment, be designated as an increase in any then outstanding Class of Revolving Credit Commitments other than the Existing Revolving Credit Commitment Class from which such Extended Revolving Credit Commitments were converted.

(c)    *Extension Request*. The Lead Borrower shall provide the applicable Extension Request at least three Business Days prior to the date on which Lenders under the Existing Term Loan Tranche or Existing Revolving Credit Commitment, as applicable, are requested to respond (or such shorter period as agreed by the Administrative Agent), and shall agree to such procedures, if any, as may be established by, or acceptable to, the Administrative Agent and the Lead Borrower, in each case acting reasonably to accomplish the purposes of this Section 2.16. Subject to Section 3.07, no Lender shall have any obligation to agree to have any of its Term Loans of any Existing Term Loan Tranche amended into Extended Term Loans or any of its Revolving Credit Commitments amended into Extended Revolving Credit Commitments, as applicable, pursuant to any Extension Request. Any Lender holding a Loan under an Existing Term Loan Tranche (each, an "**Extending Term Lender**") wishing to have all or a portion of its Term Loans under the Existing Term Loan Tranche subject to such Extension Request amended or converted into Extended Term Loans and any Revolving Credit Lender (each, an "**Extending Revolving Credit Lender**") wishing to have all or a portion of its Revolving Credit Commitments under the Existing Revolving Credit Commitment subject to such Extension Request amended into Extended Revolving Credit Commitments, as applicable, shall notify the Administrative Agent (each, an "**Extension Election**") on or prior to the date specified in such Extension Request of the amount of its Term Loans under the Existing Term Loan Tranche or Revolving Credit Commitments under the Existing Revolving Credit Commitment, as applicable, which it has elected to request be amended into Extended Term Loans or Extended Revolving Credit Commitments, as applicable (subject to any minimum denomination requirements imposed by the Administrative Agent). In the event that the aggregate principal amount of Term Loans under the Existing Term Loan Tranche or Revolving Credit Commitments under the Existing Revolving Credit Commitment, as applicable, in respect of which applicable Term Lenders or Revolving Credit Lenders, as the case may be, shall have accepted the relevant Extension Request exceeds the amount of Extended Term Loans or

105

Extended Revolving Credit Commitments, as applicable, requested to be extended pursuant to the Extension Request, Term Loans or Revolving Credit Commitments, as applicable, subject to Extension Elections shall be amended to Extended Term Loans or Revolving Credit Commitments, as applicable, on a *pro rata* basis (subject to rounding by the Administrative Agent, which shall be conclusive) based on the aggregate principal amount of Term Loans or Revolving Credit Commitments, as applicable, included in each such Extension Election.

(d)    *Extension Amendment*. Extended Term Loans and Extended Revolving Credit Commitments shall be established pursuant to an amendment (each, an "**Extension Amendment**") to this Agreement among the Borrower, the Administrative Agent and each Extending Term Lender or Extending Revolving Credit Lender, as applicable, providing an Extended Term Loan or Extended Revolving Credit Commitment, as applicable, thereunder, which shall be consistent with the provisions set forth in Section 2.16(a) or 2.16(b) above, respectively (but which shall not require the consent of any other Lender). The effectiveness of any Extension Amendment shall be subject to the satisfaction (or waiver) on the date thereof of each of the conditions set forth in Section 4.02 and, to the extent reasonably requested by the Administrative Agent, receipt by the Administrative Agent of (i) customary legal opinions, board resolutions and officers' certificates certifying such resolutions and (ii) reaffirmation agreements and/or such amendments to the Collateral Documents as may be reasonably requested by the Administrative Agent in order to ensure that the Extended Term Loans or Extended Revolving Credit Commitments, as applicable, are provided with the benefit of the applicable Loan Documents. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension Amendment. Each of the parties hereto hereby agrees that this Agreement and the other Loan Documents may be amended pursuant to an Extension Amendment, without the consent of any other Lenders, to the extent (but only to the extent) necessary to (i) reflect the existence and terms of the Extended Term Loans or Extended Revolving Credit Commitments, as applicable, incurred pursuant thereto, (ii) modify the scheduled repayments set forth in Section 2.07 with respect to any Existing Term Loan Tranche subject to an Extension Election to reflect a reduction in the principal amount of the Term Loans thereunder in an amount equal to the aggregate principal amount of the Extended Term Loans amended pursuant to the applicable Extension Amendment (with such amount to be applied ratably to reduce scheduled repayments of such Term Loans required pursuant to Section 2.07), (iii) modify the prepayments set forth in Section 2.05 to reflect the existence of the Extended Term Loans and the application of prepayments with respect thereto, (iv) make such other changes to this Agreement and the other Loan Documents consistent with the provisions and intent of the third paragraph of Section 10.01 (without the consent of the Required Lenders called for therein) and
(v) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Lead Borrower, to effect the provisions of this Section 2.16, and the Required Lenders hereby expressly authorize the Administrative Agent to enter into any such Extension Amendment.

(e)    No conversion of Loans pursuant to any Extension Amendment in accordance with this Section 2.16 shall constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement. This Section 2.16 shall supersede any provisions herein to the contrary.

Section 2.17.    Defaulting Lenders.

(a)    *Adjustments*. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    Waivers and Amendments. That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

106

(ii)    Reallocation of Payments. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, as the Lead Borrower may request (so long as no Event of Default has occurred and is continuing), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as reasonably determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Lead Borrower, to be held in a deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by such Borrowers against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.17(a)(ii) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees. That Defaulting Lender (x) shall not be entitled to receive any commitment fee pursuant to Section 2.09(a) for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender) and (y) shall not be entitled to receive any interest at the default rate payable under Section 2.08 for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee or interest that otherwise would have been required to have been paid to that Defaulting Lender).

(iv)        [Reserved].

(b)    Defaulting Lender Cure. If the Lead Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Revolving Credit Loans to be held on a pro rata basis by the Lenders in accordance with their Pro Rata Share (without giving effect to Section 2.17(a)(iv)), whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.18.    Permitted Debt Exchanges.

(a)    Notwithstanding anything to the contrary contained in this Agreement, pursuant to one or

107

more offers (each, a "**Permitted Debt Exchange Offer**") made from time to time by the Lead Borrower, the Loan Parties may from time to time following the Closing Date consummate one or more exchanges of Term Loans for Indebtedness offered on a *pro rata* basis with respect to each Class of Term Loans in the form of notes or mezzanine Indebtedness whether issued in a public offering, Rule 144A or other private placement or any bridge facility in lieu of the foregoing or otherwise (such notes or mezzanine Indebtedness which satisfy the conditions described in clauses (ii) through (viii) of the definition of "Permitted Ratio Debt," "**Permitted Debt Exchange Notes**," and each such exchange a "**Permitted Debt Exchange**"), so long as the following conditions are satisfied or waived: (i) no Event of Default shall have occurred and be continuing at the time the initial offering document in respect of a Permitted Debt Exchange Offer is delivered to the relevant Lenders, (ii) the aggregate principal amount (calculated on the face amount thereof) of Term Loans exchanged shall equal no more than the aggregate principal amount (calculated on the face amount thereof) of Permitted Debt Exchange Notes issued in exchange for such Term Loans; *provided* that the aggregate principal amount of the Permitted Debt Exchange Notes may also include accrued interest, fees and premium (if any) under the Term Loans exchanged and underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees and similar items) in connection with the exchange of such Term Loans and the issuance of such Permitted Debt Exchange Notes,

(iii) the aggregate principal amount (calculated on the face amount thereof) of all Term Loans exchanged under each applicable Class by the Borrowers pursuant to any Permitted Debt Exchange shall automatically be cancelled and retired by the Borrowers on the date of the settlement thereof (and, if requested by the Administrative Agent, any applicable exchanging Lender shall execute and deliver to the Administrative Agent an Assignment and Assumption, or such other form as may be reasonably requested by the Administrative Agent, in respect thereof pursuant to which the respective Lender assigns its interest in the Term Loans being exchanged pursuant to the Permitted Debt Exchange to the Borrowers for immediate cancellation), (iv) if the aggregate principal amount of all Term Loans of a given Class (calculated on the face amount thereof) tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof of the applicable Class actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of such Class offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrowers shall exchange Term Loans subject to such Permitted Debt Exchange Offer tendered by such Lenders ratably up to such maximum amount based on the respective principal amounts so tendered, (v) all documentation in respect of such Permitted Debt Exchange shall be consistent with the foregoing, and all written communications generally directed to the Lenders in connection therewith shall be in form and substance consistent with the foregoing and made in consultation with the Lead Borrower and the Auction Agent and (vi) any applicable Minimum Tender Condition shall be satisfied (or waived by the Lead Borrower in its sole discretion).

(b)    With respect to all Permitted Debt Exchanges effected by the Loan Parties pursuant to this  Section 2.18, (i) such Permitted Debt Exchanges (and the cancellation of the exchanged Term Loans in connection therewith) shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 2.05(a) or (b), and (ii) such Permitted Debt Exchange Offer shall be made for not less than $500,000 in aggregate principal amount of Term Loans; *provided* that subject to the foregoing clause (ii) the Lead Borrower may at its election specify as a condition (a "**Minimum Tender Condition**") to consummating any such Permitted Debt Exchange that a minimum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Lead Borrower's discretion) of Term Loans of any or all applicable Classes be tendered.

(c)    In connection with each Permitted Debt Exchange, the Lead Borrower and the Auction Agent shall mutually agree to such procedures as may be necessary or advisable to accomplish the purposes of this Section 2.18 and without conflict with Section 2.18(d); *provided* that the terms of any Permitted Debt Exchange Offer shall provide that the date by which the relevant Lenders are required to indicate their election to participate in such Permitted Debt Exchange shall be not less than a reasonable period (in the

108

discretion of the Lead Borrower and the Auction Agent) of time following the date on which the Permitted Debt Exchange Offer is made.

(d)    The Lead Borrower shall be responsible for compliance with, and hereby agrees to comply with, all applicable securities and other laws in connection with each Permitted Debt Exchange, it being understood and agreed that (x) none of the Auction Agent, the Administrative Agent nor any Lender assumes any responsibility in connection with the Lead Borrower's compliance with such laws in connection with any Permitted Debt Exchange and (y) each Lender shall be solely responsible for its compliance with any applicable "insider trading" laws and regulations to which such Lender may be subject under the Exchange Act.

**ARTICLE III.**
**TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY**

Section 3.01.    Taxes.

(a)    All payments made by or on account of any Borrower or Guarantor under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable Law. If any Borrower, any Guarantor or other applicable withholding agent shall be required (as determined in the good faith discretion of an applicable withholding agent) by any applicable Laws to deduct or withhold any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) if the Tax in question is an Indemnified Tax or Other Tax, the sum payable by any Borrower or any Guarantor shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall be entitled to make such deductions and withholdings, (iii) the applicable withholding agent shall pay the full amount deducted or withheld to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 30 days after the date of such payment (or, if receipts or evidence are not available within 30 days, as soon as possible thereafter), if any Borrower or any Guarantor is the applicable withholding agent, it shall furnish to such Agent or Lender (as the case may be) the original or a copy of a receipt evidencing payment thereof or other evidence reasonably satisfactory to such Agent or Lender.

(b)    In addition but without duplication of any obligation under Section 3.01(a), each Borrower agrees to pay any and all present or future stamp, court or documentary Taxes and any other excise, property, intangible or mortgage recording Taxes, imposed by any Governmental Authority, which arise from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document excluding, in each case, any such Tax that is an Other Connection Tax imposed as a result of an Agent or Lender's Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**"), except for Assignment Taxes resulting from assignment or participation that is requested or required in writing by the Lead Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)    Without duplication of any obligation under Section 3.01(a) or (b), each Borrower and each Guarantor agrees to indemnify each Agent and each Lender within ten (10) Business Days after written demand therefor, for (i) the full amount of Indemnified Taxes and Other Taxes payable by such Agent or such Lender, and (ii) any reasonable and documented out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority, *provided* that any Agent or Lender seeking indemnification pursuant to this Section 3.01(c) provides the Lead Borrower the original or a copy of a receipt evidencing payment thereof

109

or other evidence reasonably acceptable to the Lead Borrower; *provided further*, that no Lender or Agent shall be required to provide any tax return or any other information relating to Taxes that it reasonably deems confidential. A certificate as to the amount of such payment or liability prepared in good faith and delivered to the Borrower by such Agent or Lender (or by an Agent on behalf of such Lender), accompanied by a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts shall be conclusive absent manifest error. Notwithstanding anything to the contrary contained in this Section 3.01(c), no Loan Party shall be required to indemnify any Agent or Lender pursuant to this  Section 3.01(c) for any interest or penalties that would not have been imposed but for the failure by an Agent or such Lender to notify the Lead Borrower of such possible indemnification claim within 120 days after the Agent or such Lender receives written notice from the applicable taxing authority of the specific tax assessment giving rise to such indemnification claim.

(d)    Each Lender and Agent shall, at such times as are reasonably requested by the Lead Borrower or the Administrative Agent, provide the Lead Borrower and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Lead Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, withholding Tax with respect to any payments to be made to such Lender or Agent under the Loan Documents. In addition, each Lender and Agent, if reasonably requested by the Lead Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Lead Borrower or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender or Agent is subject to backup withholding or information reporting requirements. Each such Lender and Agent shall, whenever a lapse in time or change in circumstances renders such documentation obsolete or inaccurate in any material respect, deliver promptly and on or before the date such documentation expires, becomes obsolete or inaccurate to the Lead Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Lead Borrower or the Administrative Agent) or promptly notify the Lead Borrower and the Administrative Agent in writing of its legal ineligibility to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding Tax or are subject to such Tax at a rate reduced by an applicable tax treaty, the applicable withholding agent shall withhold amounts required to be withheld by applicable Law from such payments at the applicable statutory rate. Notwithstanding any other provision of this Section 3.01(d), a Lender or an Agent shall not be required to complete, execute, or deliver any form pursuant to this Section 3.01(d), Section 3.01(e) or Section 3.01(f) that such Lender or such Agent is not legally eligible to deliver or that would subject such Lender or such Agent to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Without limiting the foregoing:

(i)    Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Lead Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(ii)    Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Lead Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Lead Borrower or the Administrative Agent) whichever of the following is applicable:

(A)    In the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party, (A) with respect to payments of interest under any Loan Document, two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or any successor forms), as applicable, establishing an exemption from, or a reduction

110

of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (B) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(B)    two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of <u>Exhibit H</u> hereto to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (any such certificate a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or any successor forms), or

(D)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Lender is a partnership, or has sold a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, Form W-8BEN Form W-8BEN-E, a United States Tax Compliance Certificate substantially in the form of Exhibit H-2, Exhibit H-3 or Exhibit H-4, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (*provided* that, if the Foreign Lender is a partnership and if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate substantially in the form of Exhibit H-4 may be provided by such Foreign Lender on behalf of such beneficial owner).

(e)    If a payment made to a Lender or Agent under any Loan Document would be subject to U.S. federal withholding tax imposed under FATCA if such Lender or Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or Agent shall deliver to the Lead Borrower and the Administrative Agent at the time or times prescribed by Laws and at such time or times reasonably requested by the Lead Borrower or the Administrative Agent such documentation prescribed by applicable Laws (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Lead Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender or Agent has or has not complied with such Person's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 3.01(e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)    If an Agent is a United States person (as defined in Section 7701(a)(30) of the Code), it shall deliver to the Lead Borrower on or prior to the date on which it becomes an Agent under this Agreement with two duly completed copies of Form W-9. If the Administrative Agent is not a United States person (as defined in Section 7701(a)(30) of the Code), it shall provide to the Lead Borrower on or prior to the date on which it becomes an Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower): (A) two executed copies of Form W-8ECI with respect to any amounts payable to the Agent for its own account, and (B) two executed copies of Form W-8IMY with respect to any amounts payable to the Agent for the account of others, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business within the United States and that it is using such form as evidence of its agreement with the Borrowers to be treated as a United States person with respect to such payments (and the Borrowers and the Agent agree to so treat the Agent as a United States person with respect to such payments as

111

contemplated by Section 1.1441-1(b)(2)(iv) of the United States Treasury Regulations).

(g)    Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes or Other Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(e) relating to the maintenance of a Participant Register and (iii) any Taxes excluded from the definition of "Indemnified Taxes" or "Other Taxes" attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

(h)    If any Lender or Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by a Loan Party or a Lender pursuant to this Section 3.01, it shall promptly remit such refund to such indemnifying party (but only to the extent of indemnification or additional amounts paid by the indemnifying party under this Section 3.01 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of the Lender or Agent, as the case may be, and without interest (other than any interest paid by the relevant taxing authority with respect to such refund net of any Taxes payable by any Agent or Lender on such interest); *provided* that the indemnifying party, upon the request of the Lender or Agent, as the case may be, agrees to promptly return such refund (*plus* any penalties, interest or other charges imposed by the relevant taxing authority) to such indemnified party in the event such indemnified party is required to repay such refund to the relevant taxing authority; *provided*, *further*, that in no event will an indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 3.01(h) shall not be construed to require any Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it reasonably deems confidential) to the Lead Borrower or any other person.

(i)    For purposes of this Section 3.01, the term "applicable Law" shall include FATCA.

Section 3.02.    Illegality.

If any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, or to determine or charge interest rates based upon the Eurocurrency Rate, in each case after the Closing Date then, on written notice thereof by such Lender to the Lead Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Lead Borrower shall promptly following written demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all applicable Eurocurrency Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period

112

therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans.

Section 3.03.    Inability to Determine Rates.

(a)    If the Required Lenders determine after the Closing Date that for any reason adequate and reasonable means do not exist for determining the applicable Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or that the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar, or other applicable market for the applicable amount and the Interest Period of such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify each of the Lead Borrower and each Lender in writing. Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans shall be suspended and (y) in the event a determination described in the preceding sentence with respect to the Eurocurrency Rate component of the Base Rate, the utilization of the Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Lead Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of such Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request, if applicable, into a request for a Borrowing of Base Rate Loans in the amount specified therein.

(b)    If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that either (i) the circumstances set forth in subparagraph (a) of this Section 3.03 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in subparagraph (a) of this Section 3.03 have not arisen but the supervisor for the administrator of the Eurocurrency Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Eurocurrency Rate shall no longer be used for determining interest rates for loans (in the case of either such clause (i) or (ii), an "Alternative Interest Rate Election Event"), the Administrative Agent and the Lead Borrower shall endeavor to establish an alternate rate of interest to the Eurocurrency Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for leveraged syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. Notwithstanding anything to the contrary in Section 10.01, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5)    Business Days after the date notice of such alternate rate of interest is provided to the Lenders, a written notice from Required Lenders stating that they object to such amendment (which amendment shall not be effective prior to the end of such five (5) Business Day notice period). To the extent an alternate rate of interest is adopted as contemplated hereby, the approved rate shall be applied in a manner consistent with prevailing market convention; *provided* that, to the extent such prevailing market convention is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent and the Lead Borrower. From such time as an Alternative Interest Rate Election Event has occurred and is continuing until an alternate rate of interest has been determined in accordance with the terms and conditions of this paragraph, (x) any notice requesting a conversion or a continuation that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurocurrency Rate Loan shall be ineffective, and (y) if any Committed Loan Notice requests a Eurocurrency Rate Loan, such Borrowing shall be made as Base Rate Loan; *provided* that, to the extent such Alternative Interest Rate Election Event is as a result of clause (ii) above in this subparagraph (b), then clauses (x) and (y) of this sentence shall apply during such period only if the Eurocurrency Rate for such Interest Period is not available or published at such time on a current basis. Notwithstanding anything contained herein to the contrary, if such alternate rate of interest as determined in this

113

subparagraph (b) is determined to be less than 1.00%, such rate shall be deemed to be 1.00% for the purposes of this Agreement.

Section 3.04.    Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan Reserves.

(a)    If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Loans or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes indemnified pursuant to Section 3.01, or any Taxes excluded from the definition of (x) "Indemnified Taxes" or (y) "Other Taxes" or (ii) reserve requirements contemplated by Section 3.04(c)) and the result of any of the foregoing shall be to materially increase the cost to such Lender of making or maintaining the Eurocurrency Rate Loan (or of maintaining its obligations to make any Loan), or to reduce the amount of any sum received or receivable by such Lender, then from time to time within 15 Business Days after written demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrowers shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction. Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(b)    If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity requirements or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its Lending Office) therewith, has the effect of materially reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time promptly following written demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such written demand to the Administrative Agent given in accordance with Section 3.06), the Borrowers shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within 15 Business Days after receipt of such written demand.

(c)    The Borrowers shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each applicable Eurocurrency Rate Loan of the Borrowers equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of any Eurocurrency Rate Loans of the Borrowers, such additional costs (expressed as a percentage *per annum* and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error), which in each case shall be due and payable on each date on which interest is payable on such Loan, *provided* the Lead Borrower shall have received at least 15 Business Days' prior written

114

notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender. If a Lender fails to give notice 15 Business Days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable 15 Business Days from receipt of such notice.

(d)    Subject to <u>Section 3.06</u>, failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 3.04</u> shall not constitute a waiver of such Lender's right to demand such compensation.

Section 3.05.    <u>Funding Losses</u>.

Promptly following written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits) actually incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Eurocurrency Rate Loan of the Borrowers on a day other than the last day of the Interest Period for such Loan; or

(b)    any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurocurrency Rate Loan of the Borrowers on the date or in the amount notified by the Lead Borrower;

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

Section 3.06.    <u>Matters Applicable to All Requests for Compensation</u>.

(a)    Any Agent or any Lender claiming compensation under this <u>Article III</u> shall deliver a certificate to the Lead Borrower setting forth in reasonable detail the calculation of the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error. In determining such amount, such Agent or such Lender may use any reasonable and customary averaging and attribution methods.

(b)    With respect to any Lender's claim for compensation for any amounts under <u>Sections 3.02</u>, <u>3.03</u> or <u>3.04</u>, the Borrowers shall not be required to compensate such Lender for the interest and penalties with respect to such amounts if such Lender notifies the Lead Borrower of the event that gives rise to such claim more than 120 days after such event (to the extent that such interest and penalties accrue more than 120 days after such event); *provided*, that if the circumstance giving rise to such claim is retroactive, then such 120-day period referred to above shall be extended to include the period of retroactive effect thereof. If any Lender requests compensation by the Borrowers under <u>Section 3.04</u>, the Lead Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another applicable Eurocurrency Rate Loan, or, if applicable, to convert Base Rate Loans into Eurocurrency Rate Loan, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of <u>Section 3.06(c)</u> shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)    If the obligation of any Lender to make or continue any Eurocurrency Rate Loan, or to convert Base Rate Loans into Eurocurrency Rate Loans shall be suspended pursuant to <u>Section 3.06(b)</u> hereof, such Lender's applicable Eurocurrency Rate Loans shall be automatically converted into Base Rate Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s)

115

for such Eurocurrency Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Sections 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)    to the extent that such Lender's Eurocurrency Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurocurrency Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)    all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurocurrency Rate Loans shall be made or continued instead as Base Rate Loans (if possible), and all Base Rate Loans of such Lender that would otherwise be converted into Eurocurrency Rate Loans shall remain as Base Rate Loans.

(d)    If any Lender gives notice to the Lead Borrower (with a copy to the Administrative Agent) that the circumstances specified in Sections 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of any of such Lender's Eurocurrency Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders under the applicable Facility are outstanding, if applicable, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurocurrency Rate Loans under such Facility and by such Lender are held *pro rata* (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments for the applicable Facility.

(e)    Notwithstanding anything to the contrary in this Article III, no Lender shall demand compensation pursuant Sections 3.01, 3.02, 3.03, or 3.04 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable credit facilities.

(f)    Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Sections 3.01, 3.02, 3.03, or 3.04 with respect to such Lender, it will, if requested by the Lead Borrower use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; *provided* that such designation is made on such terms that such Lender and its lending office suffer no material disadvantage (as reasonably determined by such Lender in good faith), with the object of avoiding the consequence of the event giving rise to the operation of any such section.

Section 3.07.    Replacement of Lenders under Certain Circumstances.

(a)    If at any time (i) the Borrowers become obligated to pay additional amounts or indemnity payments described in Sections 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make any Eurocurrency Rate Loans as a result of any condition described in Sections 3.02 or 3.04 or requires the Borrowers to pay additional amounts as a result thereof, (ii) any Lender becomes a Defaulting Lender, (iii) any Lender becomes a Non-Consenting Lender or (iv) any Lender refuses to make an Extension Election pursuant to Section 2.16, a Refinancing Amendment pursuant to Section 2.15 or a Permitted Repricing Amendment or an amendment effecting a Replacement Term Loan pursuant to Section 10.01, then the Lead Borrower may, on written notice to the Administrative Agent and such Lender, either
(x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) all of its rights and obligations under this Agreement (which such assignment shall only apply (I) in respect of any applicable Facility (and not all Facilities hereunder), in the case of clause (i),

116

(II) in the case of a Non-Consenting Lender with respect to a vote of directly and adversely affected (or all Lenders) Lenders ("**Affected Class**"), in the case of clause (iii), or (III) with respect to an Extension Election only, in the case of clause (iv)) to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrowers to find a replacement Lender or other such Person; *provided*, *further*, that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents; or (y) terminate the commitment of such Lender and repay on a non-pro rata basis all Obligations of the Borrowers due and owing to such Lender relating to the Loans and participations held by such Lender as of such termination date; *provided* that (I) in the case of any such termination of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders after giving effect hereto) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents and (II) such termination shall be in respect of any applicable facility (and not all Facilities hereunder). Any such replacement, termination or prepayment shall not be deemed to be a waiver of any rights that the Borrowers, the Administrative Agent or any other Lender shall have against the replaced or prepaid Lender. Notwithstanding anything herein to the contrary, any replacement, or repayment of the Obligations, of a Non-Consenting Lender pursuant to this Section 3.07(a)(iii) or (iv) shall be accompanied by a payment to such Non-Consenting Lender of any prepayment premium that would have been due and owing to such Non-Consenting Lender had its obligations been voluntary prepaid pursuant to Section 2.05(a)(i).

(b)    Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's applicable Commitment and outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Lead Borrower or the Administrative Agent. Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans, (B) all obligations of the Borrowers owing to the assigning Lender relating to the Loans, Commitments and participations so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrowers, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender. In connection with any such replacement, if any such Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender, then such Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender.

(c)    In the event that (i) the Lead Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each affected Lender or each Lender of a Class in accordance with the terms of Section 10.01 or an Affected Class or all Lenders holding Term Loans subject to a Permitted Repricing Amendment and (iii) the Required Lenders (or, in the case of a consent, waiver or amendment (1) involving all of an Affected Class, at least 50.1% of such Affected Class or (2) involving a Permitted Repricing Amendment, all other Lenders holding a tranche of Term Loans subject to such repricing that will continue as repriced or modified Term Loans) have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**".

117

(d)    Notwithstanding anything to the contrary contained above, the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 9.06.

(e)    This Section 3.07 shall supersede any provisions in Section 2.13 or 10.01 to the contrary.

Section 3.08.    Survival.

Each party's obligations under this Article III shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other obligations under any Loan Document

**ARTICLE IV.**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

Section 4.01.    Conditions to Initial Credit Extension.

The obligation of each Lender to make a Credit Extension hereunder on the Closing Date is subject to satisfaction (or waiver by the Lead Arranger) of the following conditions precedent, except as otherwise agreed between the Lead Borrower and the Administrative Agent:

(a)    The Administrative Agent's receipt of the following, each of which shall be original, .pdf or facsimile copies or delivered by other electronic method (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party:

(i)    a Committed Loan Notice, executed by a Responsible Officer of the signing Loan Party and in accordance with the requirements hereof;

(ii)    counterparts of this Agreement executed by the Parent, the Lead Borrower and each of the Subsidiary Guarantors;

(iii)    a Note executed by the Lead Borrower in favor of each Lender that has requested a Note at least three (3) Business Days in advance of the Closing Date;

(iv)    each Collateral Document duly executed by each Loan Party party thereto, together with:

(A)    if required pursuant to the terms of the relevant Collateral Documents, certificates, if any, representing the Pledged Equity referred to therein accompanied by undated stock or comparable powers executed in blank and instruments, if any, evidencing the Pledged Debt indorsed in blank; and

(B)    proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the Security Agreement;

(v)    such certificates of good standing (to the extent such concept exists and subject to Schedule 6.13(b)) and corporate charters from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other corporate or limited liability company action, incumbency certificates and other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each

118

Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(vi)   a customary opinion from each of Kirkland & Ellis LLP and Brownstein Hyatt Farber Schreck, LLP, as counsel to the Loan Parties; and

(vii)   a solvency certificate from the chief financial officer (or equivalent officer) substantially in the form attached hereto as Exhibit D-2.

*provided, however*, to the extent that each of the requirements set forth in clause (iv)(A) and (B) above relating to perfection of security interests in Collateral, including the delivery of documents and instruments necessary to satisfy the requirement of the Collateral and Guarantee Requirement to perfect security interests in the Collateral, cannot be satisfied or provided on the Closing Date (other than the perfection of security interests in (x) assets with respect to which a lien may be perfected by the filing of a financing statement under the Uniform Commercial Code or (y) Equity Interests of the Lead Borrower or a Wholly-owned Material Domestic Subsidiary of the Lead Borrower with respect to which a lien may be perfected by the delivery of a stock (or comparable) certificate (in the case of Subsidiaries of the Lead Borrower, to the extent in the Lead Borrower's possession after use of commercially reasonably efforts to obtain the same)) after the Lead Borrower's use of commercially reasonable efforts to do so or without undue burden or expense, then such requirements shall not constitute a condition precedent to the Credit Extensions on the Closing Date but shall instead be required to be delivered and/or satisfied after the Closing Date within ninety (90) days after the Closing Date (or such later date as may reasonably be agreed by the Administrative Agent).

(b)   All costs, fees and expenses required to be paid to the Administrative Agent, the Collateral Agent, the Lead Arranger and the Lenders hereunder and pursuant to the Fee Letter, in each case invoiced at least three (3) Business Days before the Closing Date (or such later date as consented to by the Lead Borrower) shall have been paid, or shall be paid substantially concurrently with, the initial Borrowing on the Closing Date (which amount may be offset against the proceeds of the initial funding under the Facilities).

(c)   Prior to or substantially concurrently with the initial Borrowing on the Closing Date: the Acquisition shall have been consummated in all material respects in accordance with the Acquisition Agreement (without giving effect to any modifications, amendments, requests or approvals, waivers or consent thereto that are materially adverse to the Lenders in their capacity as such without the consent of the Lead Arranger (such consent not to be unreasonably withheld, delayed, denied or conditioned and provided that the Lead Arranger shall be deemed to have consented to such waiver, amendment, consent or other modification unless it shall object thereto within three (3) Business Days after written notice of such waiver, amendment, supplement, consent or other modification)), it being understood and agreed that (i) (x) any reduction in the aggregate purchase price for the Acquisition set forth in the Acquisition Agreement shall not be deemed to be material and adverse to the Lenders so long as the amount of such reduction (A) is pursuant to any purchase price or similar adjustment provisions set forth in the Acquisition Agreement, or (B) excluding the amount of any such purchase price or similar adjustment, is less than twelve and a half percent (12.5%) of the total Acquisition consideration, and (y) any increase in the purchase price that is funded solely with net cash proceeds received by a Borrower as capital contributions to its equity capital shall not be, in either case, deemed to be material and adverse to the Lenders and (ii) any modification, amendment, consent, waiver or determination in respect of the definition of Material Adverse Effect (as defined in the Acquisition Agreement as of the date hereof) shall be deemed to be material and adverse to the Initial Lender.

119

(d)    Since June 30, 2020, there has occurred no Material Adverse Effect (as defined in the Acquisition Agreement).

(e)    The Lead Arranger shall have received the Closing Date Financial Statements.

(f)    The Lead Arranger shall have received the Pro Forma Financial Statements.

(g)    The Lead Arranger and Administrative Agent shall have received at least two Business Days prior to the Closing Date (x) the documentation and other information about the Lead Borrower and the Guarantors required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act, that has been reasonably requested by the Administrative Agent in writing at least ten (10) Business Days prior to the Closing Date and (y) in respect of any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification to the extent reasonably requested by the Administrative Agent in writing at least ten (10) Business Days prior to the Closing Date.

(h)    The Specified Representations shall be true and correct in all material respects on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case, as of such date).

(i)    The Specified Acquisition Agreement Representations shall be true and correct in all material respects as of the Closing Date (except to the extent expressly made as of an earlier date, in which case, as of such date).

Without limiting the generality of the provisions of Section 9.03(b), for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02.    Conditions to All Credit Extensions after the Closing Date.

The obligation of each Lender to honor any Request for Credit Extension after the Closing Date (in the case of any Incremental Loan, subject to Section 2.14(d)(i) and, in the case of any Incremental Loan or other Credit Extension to finance a Limited Condition Transaction, subject to Section 1.11(g), and, for the avoidance of doubt, excluding any conversion or continuation of any Loan pursuant to Section 2.02), is subject to satisfaction or waiver of the following conditions precedent:

(i)    The representations and warranties of each Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (except where such representations and warranties are already qualified by materiality, in which case such representation and warranty shall be accurate in all respects).

(ii)    No Default or Event of Default shall exist or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(iii)    The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

120

(iv)    With respect to the funding of any Delayed Draw Term Loan, on a pro forma basis immediately after and immediately before giving effect to the making of any Delayed Draw Term Loan,
(a) the Consolidated Total Net Leverage Ratio shall be equal to or less than 4.50:1.00 and (b) the Loan Parties shall be in compliance with  Section 5.11 and Section 6.15.

Each Request for Credit Extension (in the case of any Incremental Loan, subject to  Section 2.14(d)(i) and, in the case of any Incremental Loan or other Credit Extension to finance a Limited Condition Transaction, subject to Section 1.11(g), and excluding, for the avoidance of doubt, any conversion or continuation of any Loan pursuant to Section 2.02) submitted by the Lead Borrower after the Closing Date shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(i), and
(ii) have been satisfied on and as of the date of the applicable Credit Extension to the extent referred by this  Section 4.02.

## ARTICLE V. REPRESENTATIONS AND WARRANTIES

The Parent, the Borrowers and each of the Subsidiary Guarantors party hereto represent and warrant (it being understood that the following representations and warranties shall be deemed made with respect to any Foreign Subsidiary only to the extent relevant under applicable law) to the Agents and the Lenders on the Closing Date and at the time of each Credit Extension (to the extent required to be made, true and correct for such Credit Extension pursuant to Article IV) that:

Section 5.01.    Existence, Qualification and Power; Compliance with Laws.

Each Loan Party and each other Restricted Subsidiary of the Lead Borrower that is a Material Subsidiary (a) is a Person duly incorporated, organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation to the extent such concept exists in such jurisdiction, (b) has all requisite organizational power and authority to, in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except, in each case, referred to in clauses (a) (other than with respect to the Borrowers), (c), (d) or (e), to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 5.02.    Authorization; No Contravention.

The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Law; except with respect to any violation, conflict, breach or contravention (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such violation, conflict, breach or contravention would not reasonably be expected to have a Material Adverse Effect.

Section 5.03.    Governmental Authorization.

No material approval, consent, exemption, authorization, or other action by, or notice to, or filing

121

with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or the exercise by the Administrative Agent, the Collateral Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for

(i)     approval, consent, exemption, authorization, or other action by, or notice to, or filing necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties (or release existing Liens) under applicable U.S. law, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

Section 5.04.    Binding Effect.

This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto. This Agreement and each other Loan Document constitutes, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws and by general principles of equity, (ii) the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (iii) the effect of foreign Laws, rules and regulations as they relate to pledges of Equity Interests in or Indebtedness owed by Foreign Subsidiaries (clauses (i) and (iii), the "**Enforcement Qualifications**").

Section 5.05.    Financial Statements; No Material Adverse Effect.

(a)     The Closing Date Financial Statements (including any notes thereto) present fairly the financial position of the Companies (as defined in the Acquisition Agreement) as and at the dates and for the periods set forth therein, and are complete and correct in all material respects and present fairly the cash flows, combined financial position, changes in stockholders' equity and results of operations of the Companies (as defined in the Acquisition Agreement) as and at the dates and for the periods set forth therein and, except as otherwise disclosed, have been prepared in accordance with GAAP in all material respects and, to the extent consistent with GAAP, the historical policies of the Companies (as defined in the Acquisition Agreement), without modification of the accounting principles used in the preparation thereof throughout the periods presented, applied on a consistent basis throughout the periods set forth therein, subject, in the case of unaudited financial statements, to the absence of footnote disclosures and normal year-end adjustments (none of which would be, individually or in the aggregate, material).

(b)     The unaudited *pro forma* consolidated balance sheet of the Parent and its Subsidiaries as of June 30, 2020, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (including the notes thereto) (the "**Pro Forma Balance Sheet**") and the unaudited *pro forma* consolidated statement of operations and EBITDA of the Parent and its Subsidiaries for the nine-month period ended June 30, 2020, prepared after giving effect to the Transactions as if the Transactions had occurred at the beginning of such period (together with the Pro Forma Balance Sheet, the "**Pro Forma Financial Statements**"), copies of which have heretofore been furnished to the Administrative Agent, have been prepared in good faith, based on assumptions believed by the Parent to be reasonable as of the date of delivery thereof and adjusted as agreed by the Parent, and present fairly in all material respects on a *pro forma* basis the estimated financial position of the Parent and its Subsidiaries as of June 30, 2020.

122

(c)    Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.06.    Litigation.

Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Lead Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrowers or any of the other Restricted Subsidiaries of the Parent or against any of their properties or revenues (other than actions, suits, proceedings and claims in connection with the Transactions) that have a reasonable likelihood of adverse determination and such determination either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.07.    Ownership of Real Property; Liens.

Schedule 5.07 hereto sets forth all Real Property owned by the Lead Borrower and each of the other Restricted Subsidiaries of the Parent as of the Closing Date (including whether or not any such Real Property constitutes a Material Real Property). The Lead Borrower and each of the other Restricted Subsidiaries of the Parent has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property necessary in the ordinary conduct of its business, free and clear of all Liens except (a) minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, (b) Liens permitted by Section 7.01 or
(c)    where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.08.    Environmental Matters.

Except as specifically disclosed on Schedule 5.08 or except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    each of the Borrowers and each Subsidiary Guarantor and its respective properties and operations are in compliance with all Environmental Laws, which includes obtaining and maintaining all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties;

(b)    each of the Borrowers and each Subsidiary Guarantor have not received any written notice that alleges any of them is in violation of or potentially liable under any Environmental Laws and none of the Borrowers nor any Subsidiary Guarantor nor to the knowledge of the Borrowers nor any Subsidiary Guarantor, any of the Real Property is the subject of any claims, investigations, liens, demands, or judicial, administrative or arbitral proceedings pending or threatened in writing, under any Environmental Law or to revoke or modify any Environmental Permit held by any of the Loan Parties;

(c)    there has been no Release of Hazardous Materials on, at, under or from (i) any Real Property or facilities owned, operated or leased by any of the Borrowers or any Subsidiary Guarantor, (ii) to the knowledge of the Borrower, Real Property formerly owned, operated or leased by any of the Borrowers or any Subsidiary Guarantor, or (iii) at any other location arising out of the conduct or current or prior operations of the Borrowers or any Subsidiary Guarantor that would, in any such case, reasonably be expected to require any investigation, remedial activity or corrective action or cleanup or would reasonably be expected to result in the Borrowers or any Subsidiary Guarantor incurring liability under Environmental Laws; and

123

(d)     to the knowledge of the Borrowers and each Subsidiary Guarantor, there are no facts, circumstances or conditions arising out of or relating to the operations of the Borrower or any Subsidiary Guarantor or Real Property or facilities owned, operated or leased by any of the Borrowers or any Subsidiary Guarantor or to the knowledge of the Borrowers or any Subsidiary Guarantor, Real Property or facilities formerly owned, operated or leased by the Borrowers or any Subsidiary Guarantor that would be reasonably be expected to result in the Borrowers or any Subsidiary Guarantor incurring liability under Environmental Laws.

Section 5.09.    Taxes.

Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, the Borrowers and the Restricted Subsidiaries (i) have timely filed all Tax returns required to be filed and (ii) have paid all Taxes levied or imposed upon them or their properties, income, profits or assets, that are due and payable (including in their capacity as a withholding agent), except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. To the knowledge of the Loan Parties, there is no proposed Tax deficiency or assessment against the Loan Parties that has a likelihood of being made and, if made, would individually or in the aggregate, have a Material Adverse Effect.

Section 5.10.    ERISA Compliance.

(a)     Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state Laws.

(b)     (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) neither any Loan Party, Restricted Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due under Section 4007 of ERISA); (iii) neither any Loan Party, Restricted Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (iv) neither any Loan Party, Restricted Subsidiary nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA; except, with respect to each of the foregoing clauses of this Section 5.10(b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.11.    Use of Proceeds.

The Loan Parties are in compliance with  Section 6.15.

Section 5.12.    Margin Regulations; Investment Company Act.

(a)     The Borrowers are not engaged and will not engage, principally or as one of their important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation T, U or X of the Board of Governors of the United States Federal Reserve System.

(b)     None of the Borrowers, the Parent or any of their Restricted Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.13.    Disclosure.

124

No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, *pro forma* financial information, budgets, estimates and information of a general economic or industry nature) to any Agent or any Lender pursuant to the terms of this Agreement or delivered hereunder or any other Loan Document (when taken as a whole) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading. With respect to projected financial information and *pro forma* financial information, the Borrowers represent that such information was prepared in good faith based upon assumptions believed to be reasonable at the time such information is furnished, it being understood that such projected financial information and *pro forma* financial information are not to be viewed as facts or as a guarantee of performance or achievement of any particular results, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Parent and its Subsidiaries, and that actual results may vary from such forecasts and that such variations may be material and that no assurance can be given that the projected results will be realized. As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all material respects.

Section 5.14.    Labor Matters.

As of the Closing Date, except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Borrowers or any of the Restricted Subsidiaries of the Lead Borrower pending or, to the knowledge of the Borrower, threatened in writing and (b) the Borrowers and the Restricted Subsidiaries are in compliance with the Fair Labor Standards Act or any other applicable Laws dealing with such matters.

Section 5.15.    Intellectual Property; Licenses, Etc.

The Borrowers and the other Restricted Subsidiaries of the Parent own, without restriction, free and clear of all Liens other than Liens permitted by Section 7.01, license or possess the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, licenses, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are used in the operation of their respective businesses as currently conducted, except to the extent the absence of such IP Rights or the existence of such Liens, in each case, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrowers, no IP Rights, advertising, product, process, method, substance, part or other material used by any Loan Party or any of its Restricted Subsidiaries in the operation of their respective businesses as currently conducted infringes upon, dilutes, misappropriates or otherwise violates any rights held by any Person except for such infringement, dilution, misappropriation or other violation individually or in the aggregate, which would not reasonably be expected to have a Material Adverse Effect. To the knowledge of Borrowers, there is no infringement, dilution, misappropriation or other violation by any Person of any IP Rights of any Loan Party or any of its Restricted Subsidiaries except as, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any IP Rights, is pending or, to the knowledge of the Borrowers, threatened in writing by or against any Loan Party or any of its Restricted Subsidiaries, which has a reasonable likelihood of adverse determination, and such determination would reasonably be expected to have a Material Adverse Effect. The Borrowers and the other Restricted Subsidiaries of the Parent have taken commercially reasonable steps to protect the confidentiality of their material trade secrets in accordance with industry standards, as determined by the Borrowers in their reasonable business judgment.

Section 5.16.    Solvency.

On the Closing Date, after giving effect to the Transactions and the related transactions

125

contemplated by the Loan Documents, the Parent and its Restricted Subsidiaries, on a consolidated basis, are Solvent.

Section 5.17.    USA Patriot Act; OFAC; FCPA.

(a)    The Borrowers will not use the proceeds of the Loans, directly or knowingly indirectly, or otherwise make available such proceeds to any Person, in any manner that would result in a violation of the Law in respect of terrorism and money laundering ("**Anti-Terrorism Laws**"), including (i) Executive Order No. 13224, effective September 24, 2001 (the "**Executive Order**") and the USA Patriot Act; and (ii)    the Trading with the Enemy Act (50 U.S.C. §§ 1-44, as amended), and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto.

(b)    The Borrowers will not use the proceeds of the Loans, directly or knowingly indirectly, or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person that is the subject to any U.S. sanctions administered by the Office of Foreign Assets Control ("**OFAC**") or the U.S. Department of State, the United Nations Security Council, the European Union, any European Union member state, or Her Majesty's Treasury of the United Kingdom (collectively, " **Sanctions**"), or in any country that, at the time of such financing is, or whose government is, the subject of any Sanctions, or in any other manner in each case that would result in a violation of Sanctions by any Person, except to the extent licensed by OFAC or otherwise authorized under U.S. law.

(c)    No part of the proceeds of the Loans will be used directly or knowingly indirectly for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation in any material respect of the United States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**").

Section 5.18.    Security Documents.

The provisions of the Collateral Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid, and enforceable Lien on all right, title and interest of the respective Loan Parties in the Collateral described therein subject as to enforceability, to the Enforcement Qualifications, and, except as otherwise contemplated hereby or under any other Loan Document, upon the filings and other actions required to be taken hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Debt and any Pledged Equity required to be delivered pursuant to the applicable Collateral Documents) such Lien of the Collateral Agent will be a perfected Lien on all right, title and interest of the respective Loan Parties in such Collateral, subject to no Liens other than Liens permitted by Section 7.01.

Notwithstanding anything herein (including this Section 5.18) or in any other Loan Document to the contrary, neither the Borrowers nor any other Loan Party makes any representation or warranty as to
(A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) on the Closing Date and until required pursuant to Sections 6.13 or 4.01(a)(iv) (subject to the provisos at the end of Section 4.01(a)), the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent not required on the Closing Date pursuant to Section 4.01(a)(iv)

126

(subject to the provisos at the end of Section 4.01(a)).

## ARTICLE VI. AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation (other than contingent indemnification obligations not then due) hereunder which is accrued and payable shall remain unpaid or unsatisfied, then after the Closing Date, the Parent (solely in the case of Sections 6.05, 6.11 and 6.13) and the Borrowers shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of their respective Restricted Subsidiaries to:

Section 6.01.    Financial Statements.

(a)    Deliver to the Administrative Agent for prompt further distribution to each Lender, within 120 days after the last day of each fiscal year (or, in the case of the fiscal year ending December 31, 2020, 150 days), a consolidated balance sheet of the Parent and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth, in each case, in comparative form to the figures for the previous fiscal year (commencing with the fiscal year ending December 31, 2021), all in reasonable detail and prepared in accordance in all material respects with GAAP, audited and accompanied by a report and opinion of (i) any accounting firm set forth on Schedule 6.01(a), (ii) one of the "Big Four" accounting firms or (iii) another independent registered public accounting firm approved by the Administrative Agent in its reasonable discretion (such consent not to be unreasonably withheld, delayed, denied or conditioned), which report and opinion shall be prepared in accordance in all material respects with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception (other than as a result of (w) an upcoming maturity date in respect of any Indebtedness, (x) changes in accounting principles or practices reflecting changes in GAAP, (y) a prospective or actual default in respect of any financial maintenance covenant in any agreement governing Indebtedness (including this Agreement), or (z) as a result of the activity, operations, financial results, assets or liabilities of any Unrestricted Subsidiaries) or any qualification or exception as to the scope of such audit; *provided* that, notwithstanding any of the foregoing, the financial statements and related deliveries required by this Section 6.01(a) for the period ended December 31, 2020 shall, at the election of the Lead Borrower be for the period beginning on the Closing Date and ending on December 31, 2020.

(b)    Deliver to the Administrative Agent for prompt further distribution to each Lender, within 60 days after the end of each fiscal quarter of each fiscal year (with such deliverables for the fourth fiscal quarter of each fiscal year being for informational purposes only) of the Parent, a consolidated balance sheet of the Parent and its Subsidiaries as at the end of such fiscal quarter and the related consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, and commencing with the fiscal quarter ending December 31, 2021, setting forth in each case (A) in comparative form to the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year and (B) in comparative form to the figures in the Projections for the corresponding fiscal quarter of the current fiscal year and the corresponding portion of the current fiscal year, in each case, all in reasonable detail (together with, in connection with the delivery of financial statements under this clause (b), customary management discussion and analysis), and certified by a Responsible Officer of the Parent as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Parent and its Subsidiaries in accordance in all material respects with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

127

(c)     Deliver to the Administrative Agent for prompt further distribution to each Lender, within 45 days after the end of each of the first three fiscal months of each fiscal quarter (or, in the case of the fiscal months ending October 31, 2020, November 30, 2020, January 31, 2021, and February 28, 2021, 60 days) of the Parent, a consolidated balance sheet of the Parent and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, and commencing with the fiscal month ending October 31, 2021, setting forth in each case (A) in comparative form to the figures for the corresponding fiscal month of the previous fiscal quarter and the corresponding portion of the previous fiscal year and (B) in comparative form to the figures in the Projections for the corresponding fiscal month of the current fiscal quarter and the corresponding portion of the current fiscal year, in each case, all in reasonable detail (together with, in connection with the delivery of financial statements under this clause (c), customary management discussion and analysis), and certified by a Responsible Officer of the Parent as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Parent and its Subsidiaries.

(d)     Prior to a Qualified IPO, deliver to the Administrative Agent for prompt further distribution to each Lender, no later than 90 days after the end of each fiscal year, a reasonably detailed consolidated budget for the following fiscal year on a quarterly basis (including a projected consolidated balance sheet of the Parent and its Subsidiaries, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed by such Responsible Officer to be reasonable at the time such Projections were furnished, it being understood that such Projections are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that actual results may vary from such Projections and that such variations may be material and that no assurance can be given that the projected results will be realized, in each case, together with information that explains in reasonable detail the material differences between the information relating to the Parent, on the one hand, and the information related to the Parent and its Subsidiaries on a standalone basis, on the other hand, in all material respects in accordance with GAAP; and

(e)     Deliver to the Administrative Agent with each set of consolidated financial statements referred to in  Sections 6.01(a), 6.01(b) and 6.01(c), the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Parent and of Unrestricted Subsidiaries (if any) (which may be in footnote form only) from such consolidated financial statements.

Notwithstanding the foregoing, the obligations in Sections 6.01(a), (b) and (c) may be satisfied with respect to financial information of the Parent and its Subsidiaries by furnishing (I) the applicable financial statements of the Parent (or any direct or indirect parent of the Parent) or (II) the Parent's (or any direct or indirect parent thereof) Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to clauses (I) and (II), (i) to the extent such information relates to a parent of the Parent, such information is accompanied by information that explains in reasonable detail the differences between the information relating to the Parent (or such parent), on the one hand, and the information relating to the Parent and its Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of (i) any accounting firm set forth on  Schedule 6.01(a), (ii) one of the "Big Four" accounting firms or (iii) another independent registered public accounting firm approved by the Administrative Agent in its reasonable discretion (such consent not to be unreasonably withheld, delayed, denied or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going-concern" or like qualification or exception (other than as a result of (w)

128

an upcoming maturity date in respect of any Indebtedness, (x) changes in accounting principles or practices reflecting changes in GAAP, (y) a prospective or actual default in respect of any financial maintenance covenant in any agreement governing Indebtedness (including this Agreement), or (z) as a result of the activity, operations, financial results, assets or liabilities of any Unrestricted Subsidiaries) or any qualification or exception as to the scope of such audit.

Any financial statement required to be delivered pursuant to Sections 6.01(a), (b) or (c) shall not be required to include purchase accounting adjustments relating to the Transactions or any Permitted Acquisition to the extent it is not practicable to include them.

Documents required to be delivered pursuant to Sections 6.01 and 6.02(a) through (d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower (or any direct or indirect parent of the Lead Borrower) posts such documents, or provides a link thereto on the website on the Internet at the website address listed on Schedule 10.02, updated from time to time, or (ii) on which such documents are posted on the Loan Parties' behalf on IntraLinks or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) or (iii) such financial statements and/or other documents are posted on the SEC's website on the Internet at www.sec.gov; *provided* that (i) upon written request by the Administrative Agent, the Lead Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Lead Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Lead Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(a) to the Administrative Agent (which may be electronic copies delivered via electronic mail). Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrowers hereby acknowledge that (a) the Administrative Agent and/or the Lead Arranger will make available to the Lenders materials and/or information provided by or on behalf of the Borrowers hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Lead Borrower hereby agrees that so long as the Parent, any Borrower or its Subsidiaries is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering, the Lead Borrower will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and agrees that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Lead Borrower shall be deemed to have authorized the Administrative Agent, the Lead Arranger and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Lead Arranger shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." Notwithstanding the foregoing, the Lead Borrower shall be under no obligation to mark any Borrower Materials "PUBLIC"; *provided*, *however*, that the following Borrower Materials

129

shall be deemed to be marked "PUBLIC" unless the Lead Borrower notifies the Administrative Agent promptly that any such document contains Material Non-Public Information: (1) the Loan Documents, (2) any notification of changes in the terms of the Facilities and (3) all information delivered pursuant to <u>Sections 6.01(a)</u>, <u>6.01(b)</u>, <u>6.01(c)</u> and <u>6.02(a)</u>.

Section 6.02.    <u>Certificates; Other Information.</u>

Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    no later than five Business Days after the delivery of the financial statements referred to in <u>Sections 6.01(a)</u> and <u>(b)</u>, a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which the Parent, any Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this <u>Section 6.02</u>;

(c)    (i) promptly after the furnishing thereof, copies of any financial statements, notices of default and material reports furnished to any holder of debt securities (other than in connection with any board observer rights) of any Loan Party or of any of its Restricted Subsidiaries pursuant to the terms of any Other Term Loans, Other Notes or Permitted Ratio Debt (and, in each case, any Permitted Refinancing thereof), in each case, in a principal amount in excess of the Threshold Amount and not otherwise required to be furnished to the Lenders pursuant to any other clause of <u>Sections 6.01</u>, <u>6.02</u> or <u>6.03</u> and (ii) promptly after receipt thereof, copies of any final accountants' letters (to the extent permitted by such accountant);

(d)    together with the delivery of each Compliance Certificate pursuant to <u>Section 6.02(a)</u>, a list of each Subsidiary of the Parent that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such Compliance Certificate (to the extent that there have been any changes in the identity or status as a Restricted Subsidiary or Unrestricted Subsidiary of any such Subsidiaries since the Closing Date or the most recent list provided); and

(e)    promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Restricted Subsidiaries, as the Administrative Agent (or any Lender through the Administrative Agent) may from time to time reasonably request (including, without limitation, if any Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification with respect to such Borrower).

In no event shall the requirements set forth in <u>Section 6.02(e)</u> require the Parent, any Borrower or any of the Restricted Subsidiaries to provide any such information which (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law, fiduciary duty or Contractual Obligation (not created in contemplation thereof) or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

Section 6.03.    <u>Notices.</u>

Promptly after a Responsible Officer of the Lead Borrower or any other Borrower or Subsidiary

130

Guarantor has obtained knowledge thereof, notify the Administrative Agent:

(a)    of the occurrence of any Event of Default (except to the extent the Administrative Agent shall have previously furnished to the Lead Borrower written notice of such Event of Default);

(b)    of the occurrence of an ERISA Event which could reasonably be expected to result in a Material Adverse Effect; and

(c)    of the filing or commencement of, or any threat in writing or written notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority against the Borrowers or any of the Restricted Subsidiaries that has a reasonable likelihood of adverse determination and such determination would reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Lead Borrower (x) that such notice is being delivered pursuant to Sections 6.03(a), (b), or (c) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken and propose to take with respect thereto.

Section 6.04.    Payment of Taxes.

Pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes and similar claims imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (a) any such Tax is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP or (b) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.05.    Preservation of Existence, Etc.

(a)    Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(b)    Take all reasonable action to maintain all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except, in the case of Section 6.05(a) (other than with respect to the Lead Borrower) or this Section 6.05(b), to the extent (i) that failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (ii) pursuant to any merger, consolidation, liquidation, dissolution, Disposition or other transaction permitted by Article VII.

Section 6.06.    Maintenance of Properties; Intellectual Property.

Maintain, preserve and protect (a) all of its material properties and equipment necessary in the operation of its business in satisfactory working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted and (b) all of its IP Rights, except to the extent (i) that failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (ii) pursuant to any merger, consolidation, liquidation, dissolution, Disposition or other transaction permitted by Article VII.

Section 6.07.    Maintenance of Insurance.

131

Maintain with insurance companies that the Lead Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to the properties and business of the Parent and its Restricted Subsidiaries against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and in similar locations, of such types and in such amounts (after giving effect to any self-insurance customary for similarly situated Persons engaged in the same or similar businesses and in similar locations as the Parent and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons. Not later than 90 days after the Closing Date (or 90 days after the date any such insurance is obtained, in the case of insurance obtained after the Closing Date), each such policy of insurance (other than business interruption insurance, director and officer insurance, worker's compensation insurance and other insurance customarily excluded) shall, as appropriate, (i) name the Collateral Agent as an additional insured thereunder or (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties, as a loss payee thereunder. If the improvements on any Mortgaged Property are at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Flood Insurance Laws, the Lead Borrower shall, or shall cause each Loan Party to,

(i)    maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Administrative Agent and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) upon the reasonable request of the Administrative Agent (except after the occurrence and during the continuation of an Event of Default, not to exceed one time per fiscal year), deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent (not to be unreasonably withheld, conditioned, delayed or denied).

Section 6.08.    Compliance with Laws.

Comply in all material respects with the requirements of all Laws (including, for the avoidance of doubt, (x) ERISA, the Code, and other Laws applicable to the Plans, (y) Anti-Terrorism Laws, the USA Patriot Act, FCPA and Laws related to OFAC) and (z) all orders, writs, injunctions and decrees applicable to it or to its business or property, except, in the case of clauses (x) and (y), if the failure to comply therewith would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; *provided* that this Section 6.08 should not apply to Laws related to Taxes.

Section 6.09.    Books and Records.

Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and which reflect all material financial transactions and matters involving the assets and business of the Parent or any Restricted Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries may maintain individual books and records in conformity with general accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

Section 6.10.    Inspection Rights.

Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrowers and at such reasonable times during normal

132

business hours and as often as may be reasonably desired, upon reasonable advance notice to the Lead Borrower; *provided* that only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this <u>Section 6.10</u> and the Administrative Agent shall not exercise such rights more often than one time during any calendar year and such time shall be at the Borrowers' expense; *provided*, *further*, that during the continuation of an Event of Default, the Administrative Agent (or any of its respective representatives or independent contractors), on behalf of the Lenders, may do any of the foregoing at the reasonable expense of the Borrowers at any time during normal business hours and upon reasonable advance notice. The Administrative Agent shall give the Lead Borrower the opportunity to participate in any discussions with the Loan Parties' independent public accountants. Notwithstanding anything to the contrary in this <u>Section 6.10</u>, none of the Parent nor any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter which (i) constitutes non- financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law, fiduciary duty or Contractual Obligation (not created in contemplation thereof) or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

Section 6.11.    Additional Collateral; Additional Borrowers and Guarantors.

At the Borrowers' expense, subject to the terms, conditions and provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document or herein, take all action necessary or reasonably requested by the Administrative Agent or the Collateral Agent to ensure that the Collateral and Guarantee Requirement is satisfied in accordance herewith, including:

(a)    Upon (1) the formation or acquisition (including, without limitation, by division) of any new direct or indirect Wholly-owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or (2) the designation in accordance with Section 6.14 of any existing direct or indirect Wholly-owned Material Domestic Subsidiary as a Restricted Subsidiary or (3) any Subsidiary ceasing to be an Excluded Subsidiary (including, as a result of the election or designation of the Lead Borrower pursuant to the Collateral and Guarantee Requirement and the definitions of "Borrower" and "Guarantor", as applicable):

(i)    within 60 days after such formation, acquisition, designation or cessation (or in the case of a Subsidiary ceasing to be an Excluded Subsidiary by virtue of becoming a Material Domestic Subsidiary, no later than 60 days after the date by which financial statements for such quarter are required to be delivered pursuant to the definitions thereof), or such longer period as the Administrative Agent may agree in writing in its reasonable discretion:

(A)    cause each such Material Domestic Subsidiary that is required to become a Loan Party pursuant to the Collateral and Guarantee Requirement (and any Subsidiary that the Lead Borrower elects to become a Borrower or a Guarantor pursuant to the Collateral and Guarantee Requirement and the definitions of Borrower and Guarantor) to duly execute and deliver to the Administrative Agent, joinders to this Agreement as Borrowers or Guarantors, as applicable, Security Agreement Supplements, Intellectual Property Security Agreements and other security agreements and documents as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent and the Lead Borrower (consistent, to the extent in effect on the Closing Date, with the Security Agreement, Intellectual Property Security Agreements and other security agreements in effect on the Closing Date (and, in the case of foreign law documents, consistent with the collateral market in such jurisdiction and this

133

Agreement)), in each case providing guarantees and granting Liens required by the Collateral and Guarantee Requirement;

(B)    cause each such Material Subsidiary that is required to make a pledge pursuant to the Collateral and Guarantee Requirement (and any Subsidiary that the Lead Borrower elects to become a Borrower or a Guarantor pursuant to the Collateral and Guarantee Requirement and the definitions of Borrower and Guarantor) (and the parent of each such Domestic Subsidiary and Foreign Subsidiary that is a Borrower or a Guarantor) to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required (or elected) to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank;

(C)    take and cause such Material Domestic Subsidiary that is required to become a Loan Party pursuant to the Collateral and Guarantee Requirement (and any Subsidiary that the Lead Borrower elects to become a Borrower or a Guarantor pursuant to the Collateral and Guarantee Requirement and the definitions of "Borrower" and "Guarantor") and each direct or indirect parent of such Domestic Subsidiary or Foreign Subsidiary to take whatever action (including the recording of Mortgages, the filing of UCC financing statements and delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Administrative Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected Liens to the extent required by the Collateral and Guarantee Requirement, and to otherwise comply with the requirements of the Collateral and Guarantee Requirement;

(ii)    if reasonably requested by the Administrative Agent or the Collateral Agent, within 60 days after such request (or such longer period as the Administrative Agent may agree in writing in its reasonable discretion), deliver to the Administrative Agent a signed copy of a customary opinion, addressed to the Administrative Agent, the Collateral Agent and the Lenders, of counsel for the Loan Parties;

(iii)    within 90 days after the reasonable request therefor by the Administrative Agent or the Collateral Agent (or such longer period as the Administrative Agent may agree in writing in its reasonable discretion), deliver to the Administrative Agent and the Collateral Agent with respect to each Material Real Property, copies of available title reports; and

(iv)    if reasonably requested by the Administrative Agent or the Collateral Agent, within 120 days after such request (or such longer period as the Administrative Agent may agree in writing in its discretion), deliver to the Collateral Agent other items necessary from time to time to satisfy the Collateral and Guarantee Requirement with respect to perfection and existence of security interests with respect to property of any Loan Party acquired after the Closing Date and subject to the Collateral and Guarantee Requirement, but not specifically covered by the preceding clauses (i), (ii) or (iii) or Section 6.11(b) below.

(b)    Not later than 120 days after the acquisition by any Loan Party of Material Real Property as determined by the Lead Borrower (acting reasonably and in good faith) (or such longer period as the Administrative Agent may agree in writing in its reasonable discretion) that is required to be provided as Collateral pursuant to the Collateral and Guarantee Requirement, which property would not be automatically subject to another Lien pursuant to pre-existing Collateral Documents, cause such Material

134

Real Property to be subject to a Lien and Mortgage in favor of the Collateral Agent for the benefit of the Secured Parties and take, or cause the relevant Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent or the Collateral Agent to grant and perfect or record such Lien, in each case to the extent required by, and subject to the limitations and exceptions of, the Collateral and Guarantee Requirement and the Loan Documents and to otherwise comply with the requirements of the Collateral and Guarantee Requirement.

Notwithstanding anything to the contrary herein or in any other Loan Document, it is understood and agreed that:

(i)    no Loan Party or any Subsidiary (other than any Foreign Subsidiary that the Lead Borrower elects to become a Borrower or a Guarantor pursuant to the Collateral and Guarantee Requirement and the definitions of Borrower and Guarantor (and the parent of each such Foreign Subsidiary that is a Borrower or Guarantor)) shall be required to take any action outside the United States to guarantee the Obligations or grant, maintain or perfect any security interest in the Collateral (including the execution of any agreement, document or other instrument governed by the law of any jurisdiction other than the United States, any State thereof or the District of Columbia);

(ii)    [reserved];

(iii)    no landlord waivers, collateral access agreements, bailee waivers or other similar agreements with respect to the Collateral shall be required hereunder or under any other Loan Document;

(iv)    no notice to obtain the consent of any Governmental Authority under the Federal Assignment of Claims Act (or any state equivalent thereof) shall be required; and

(v)    no environmental reports shall be required to be obtained hereunder or under any other Loan Document; and

(vi)    no Loan Party or any Subsidiary shall be required to enter into any source code escrow arrangement (or be obligated to register any intellectual property).

Section 6.12.    Compliance with Environmental Laws.

Except, in each case, to the extent that the failure to do so would not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect: (i) comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits; (ii) obtain and renew all Environmental Permits necessary for its operations and properties and (iii) in each case, to the extent the Loan Parties are required by Environmental Laws or a Governmental Authority, conduct any assessment, investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws.

Section 6.13.    Further Assurances; Post Closing Obligations.

(a)    Promptly upon reasonable request by the Administrative Agent or the Collateral Agent (i) correct any mutually identified material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) subject to the terms of and except as contained in Section 6.11 and the Collateral Documents, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent

135

or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents. If the Administrative Agent or the Collateral Agent reasonably determines that it is required by applicable Law to have appraisals prepared in respect of the owned Real Property of any Loan Party subject to a mortgage constituting Collateral, the Borrower shall promptly provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA.

(b)    Execute and deliver the documents and complete the tasks set forth on  Schedule 6.13(b), in each case within the time limits specified therein (or such longer period of time reasonably acceptable to the Administrative Agent).

Section 6.14.    Designation of Subsidiaries.

The Lead Borrower may at any time after the Closing Date designate any Restricted Subsidiary of the Lead Borrower as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary of the Lead Borrower ("**Unrestricted Subsidiary**"); *provided* that, (i) immediately before and after such designation, no Event of Default shall have occurred and be continuing, (ii) no Subsidiary may be designated as an Unrestricted Subsidiary if, after such designation, it would be a "Restricted Subsidiary" for the purpose of any Junior Financing, Credit Agreement Refinancing Indebtedness, Other Term Loans or Other Notes (and, in each case, any Permitted Refinancing thereof) and (iii) no Unrestricted Subsidiary shall own any Material Intellectual Property. The designation of any Subsidiary of the Lead Borrower as an Unrestricted Subsidiary after the Closing Date shall constitute an Investment by the Loan Parties therein at the date of designation in an amount equal to the Fair Market Value as determined in good faith by the Lead Borrower of such Loan Party's or its Subsidiary's (as applicable) Investment therein. The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute (i) the incurrence at the time of designation of any Investment, Indebtedness or Liens of such Subsidiary existing at such time and (ii) a Return on any Investment by the Loan Parties in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the Fair Market Value as determined in good faith by the Lead Borrower at the date of such designation of such Loan Party's or its Subsidiary's (as applicable) Investment in such Subsidiary.

Section 6.15.    Use of Proceeds.

(a)    The proceeds of the Initial Term Loans will be applied, together with any amount drawn under the Revolving Credit Facility and certain cash on the balance sheet of the Parent and its Subsidiaries,
(i) on the Closing Date to finance a portion of the Acquisition, (ii) on the Closing Date to pay Transaction Expenses and (iii) on or after the Closing Date for working capital and other general corporate purposes, including financing of Permitted Acquisitions, Capital Expenditures and other transactions not prohibited by the Loan Documents.

(b)    The proceeds of Delayed Draw Term Loans funded after the Closing Dates may be utilized solely for financing of Permitted Acquisitions.

(c)    The proceeds of Revolving Credit Loans may be utilized (x) with respect to Revolving Credit Loans made on the Closing Date, for Permitted Initial Revolving Credit Borrowing Purposes and (y) with respect to Revolving Credit Loans made after the Closing Date, for working capital and other general corporate purposes, including financing of Permitted Acquisitions, Capital Expenditures and other transactions not prohibited by the Loan Documents.

Section 6.16.    Lines of Business.

136

Engage solely in the lines of business substantially similar to those lines of business conducted by the Borrowers or any of the other Restricted Subsidiaries of the Parent on the Closing Date or any business or any other activities that are not materially different from the foregoing or that are reasonably similar, ancillary, incidental, complementary, synergistic, corollary or related to, or a reasonable extension, development or expansion of, the businesses conducted or proposed to be conducted by the Borrowers or any of the other Restricted Subsidiaries of the Parent on the Closing Date (and non-core incidental businesses acquired in connection with any Permitted Acquisition or permitted Investment), in each case as reasonably determined by the Lead Borrower in good faith.

Section 6.17.    End of Fiscal Years.

The Lead Borrower shall, for financial reporting purposes, cause each of its, and the Restricted Subsidiaries' fiscal years to end on December 31 of each year; *provided*, *however*, that the Lead Borrower may, upon written notice to the Administrative Agent change the fiscal year with the prior written consent of the Administrative Agent (not to be unreasonably withheld, conditioned, delayed or denied), in which case the Lead Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

Section 6.18.    Lender Meetings.

The Lead Borrower shall participate in an annual meeting (which may be conducted by conference call) with the Administrative Agent and Lenders to discuss the financial condition and results of operations of the Lead Borrower and its Restricted Subsidiaries for the most recently ended fiscal year for which financial statements have been delivered pursuant to Section 6.01(a) (beginning with respect to the fiscal period of the Borrower ending December 31, 2020), at a date and time to be determined by the Lead Borrower in consultation with the Administrative Agent (which shall, in any event, be a Business Day and during regular business hours), limited to one meeting (or conference call, as applicable) per fiscal year.

Section 6.19.    Transactions with Affiliates.

Not enter into any transaction of any kind with a value in excess of $750,000 per single transaction or $5,000,000 in the aggregate with any Affiliate of the Borrowers, whether or not in the ordinary course of business, other than:

(a)    transactions among the Parent and any of its Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction;

(b)    on terms (taken as a whole) substantially as favorable to such Borrower or such other Restricted Subsidiary of the Parent as would be obtainable by such Borrower or such other Restricted Subsidiary of the Parent at the time in a comparable arm's-length transaction with a Person other than an Affiliate (as reasonably determined by the Lead Borrower in good faith);

(c)    the Transactions and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transactions;

(d)    the issuance of Equity Interests of (x) the Lead Borrower (or any direct or indirect parent thereof) or (y) any other Restricted Subsidiary of the Parent (or any direct or indirect parent thereof) constituting directors' qualifying shares or other shares required by applicable Law, in each case, to any manager, officer, director, consultant or employee of the Parent or any of its Subsidiaries;

137

(e)    (i) so long as no Event of Default under Sections 8.01(a) or (f) has occurred and is continuing, the payment of management, monitoring, oversight, consulting, advisory and other fees (including refinancing, transaction and termination and exit fees) in an amount not to exceed the amounts set forth in the Management Agreement as in effect on the Closing Date; *provided* that, upon the occurrence and during the continuance of an Event of Default under Sections 8.01(a) or (f) such amounts described in this clause (i) may accrue, but not be payable in cash during such period, but all such accrued amounts may be payable in cash upon the cure or waiver of such Event of Default; (ii) indemnifications and reimbursement expenses, in each case, pursuant to the Management Agreement; and (iii) the payment of indemnities and reasonable expenses of the Sponsor related to the Parent and its Subsidiaries or the Management Agreement;

(f)    Restricted Payments permitted under Section 7.06 (other than 7.06(d));

(g)    loans and other transactions made by any Borrower and any other Restricted Subsidiaries of the Parent to Unrestricted Subsidiaries and joint ventures (to the extent any such Subsidiary that is not a Restricted Subsidiary or any such joint venture is only an Affiliate as a result of Investments by the Parent and its Restricted Subsidiaries in such Subsidiary or joint venture) to the extent otherwise permitted under Section 7.02.

(h)    transactions permitted under this Article VI or Article VII other than by reference to this Section 6.19;

(i)    employment, consulting and severance arrangements between any Borrower (or any direct or indirect parent) and the other Restricted Subsidiaries of the Parent and their respective officers and employees in the ordinary course of business (including loans and advances in connection therewith) and transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business;

(j)    the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Parent and its Restricted Subsidiaries (or any direct or indirect parent of the Lead Borrower) in the ordinary course of business to the extent attributable to the ownership or operation of the Parent and its Restricted Subsidiaries;

(k)    transactions pursuant to any arrangement or agreement in existence on the Closing Date and set forth on Schedule 6.19, or any amendment, extension, renewal, modification or replacement of any such arrangement or agreement (so long as any such amendment, extension, renewal, modification or replacement is not materially adverse to the Lenders in the good faith judgment of the Lead Borrower when taken as a whole);

(l)    so long as no Event of Default under Sections 8.01(a) or (f) has occurred and is continuing, customary payments (whether direct or indirect) by the Borrowers and any of the other Restricted Subsidiaries of the Parent to the Sponsor made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities (including in connection with acquisitions or divestitures) which payments are made pursuant to the Management Agreement;

(m)    payments by any Borrower or any of its Subsidiaries pursuant to any tax sharing agreements with any direct or indirect parent of the Borrowers to the extent attributable to the ownership or operation of the Borrowers and their Subsidiaries, but only to the extent permitted by Section 7.06(i)(iii);

(n)    the issuance or transfer of Equity Interests (other than Disqualified Equity

138

Interests) of the Parent to any Permitted Holder or to any former, current or future manager, officer, director, consultant or employee (or any spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees or Affiliates of any of the foregoing) of the Borrowers, any of their Subsidiaries or any direct or indirect parent) or any one of its Subsidiaries to the extent not otherwise prohibited by the Loan Documents;

(o)    transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrowers and the other Restricted Subsidiaries of the Parent, in the reasonable determination of the board of directors or the senior management of the Lead Borrower, or are on terms at least as favorable (as reasonably determined by the Lead Borrower) as might reasonably have been obtained at such time from an unaffiliated party;

(p)    the payment of reasonable out-of-pocket costs and expenses and indemnities pursuant to the stockholders agreement or the registration and participation rights agreement entered into on the Closing Date in connection therewith;

(q)    transactions in which any Borrower or any of the other Restricted Subsidiaries of the Parent, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to such Borrower or such other Restricted Subsidiary of the Parent from a financial point of view or meets the requirements of Section 6.19(b);

(r)    payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by the Parent and its Restricted Subsidiaries in such joint venture) in the ordinary course of business to the extent otherwise permitted under Section 7.02;

(s)    the existence and performance of agreements and transactions with any Unrestricted Subsidiary that were entered into prior to the designation of a Restricted Subsidiary as such Unrestricted Subsidiary to the extent that the transaction was permitted at the time that it was entered into with such Restricted Subsidiary and transactions entered into by an Unrestricted Subsidiary with an Affiliate of such Unrestricted Subsidiary (other than a Borrower or another Restricted Subsidiary of the Parent) prior to the redesignation of any such Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that such transaction was not entered into in contemplation of such designation or redesignation, as applicable;

(t)    Affiliate repurchases of (i) the Loans or Commitments to the extent permitted hereunder or (ii) Indebtedness that is secured by the Collateral on a *pari passu* or second priority basis, and the holding of such Loans or Commitments or Indebtedness that is secured by the Collateral on a second priority basis and, in the case of each of the foregoing, the payments and other transactions reasonably related thereto;

(u)    any customary transactions with a Receivables Subsidiary effected as part of a Receivables Facility and any customary transactions with a Securitization Subsidiary effected as part of a Qualified Securitization Financing;

(v)    transactions constituting any part of a Permitted Tax Restructuring or Permitted IPO Reorganization; and

(w)    licenses and sublicenses of IP Rights which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the value of said properties or materially impair their use in the operation of the business as currently conducted or as contemplated to be conducted.

139

## ARTICLE VII. <u>NEGATIVE COVENANTS</u>

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligations hereunder (other than contingent obligations as to which no claim has been asserted) remains outstanding, then from and after the Closing Date, each Borrower (and, with respect to <u>Section 7.13</u> only, the Parent) shall not and shall not permit any of the Restricted Subsidiaries to, directly or indirectly:

Section 7.01.    <u>Liens</u>.

Create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens (i) created pursuant to any Loan Document and (ii) on the Collateral securing Cash Management Obligations and all other Secured Obligations;

(b)    Liens existing on the Closing Date (i) that secure Indebtedness or other obligations not in excess of $500,000 in the aggregate (when taken together with all other Liens securing obligations outstanding in reliance on this <u>clause (b)(i)</u>) or (ii) listed on <u>Schedule 7.01(b)</u> and any modifications, replacements, renewals, restructurings, refinancings or extensions thereof; *provided* that (I) except as otherwise permitted by another clause of this <u>Section 7.01</u> (which shall constitute an incurrence thereunder), the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under <u>Section 7.03</u>, (B) proceeds and products thereof, (C) assets subject to any cross-collateralization of obligations owed to the holder of such Lien with respect to any Capitalized Leases or purchase money Indebtedness listed on <u>Schedule 7.01(b)</u>; and (D) the proceeds and products thereof and customary security deposits and (II) the replacement, renewal, extension or refinancing of the obligations secured or benefited by such Liens, to the extent constituting Indebtedness, is permitted by <u>Section 7.03</u>;

(c)    Liens for taxes, assessments or other governmental charges that are (i) not overdue for a period of more than any applicable grace period related thereto, (ii) that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, (iii) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (iv) for property taxes on property a Borrower or any Subsidiary thereof has determined to abandon if the sole recourse for such tax, assessment, charge, levy, or claim is to such property;

(d)    statutory or common law Liens, including landlords', sub-landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction contractors or other like Liens, so long as, in each case, such Liens (i) secure amounts not overdue for a period of more than 30 days or (ii) if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP or (iii) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(e)    (i) Liens granted in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) Liens granted in the ordinary course of business to secure liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrowers or any of the Restricted Subsidiaries;

140

(f)    Liens to secure the performance of bids, trade contracts, utilities, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)    survey exceptions, minor encumbrances, ground leases, easements, or reservations of, rights of others for, licenses, rights-of-way, servitudes, sewers, electric lines, drains, telegraph and telephone and cable television lines, gas and oil pipelines, and other similar purposes, or zoning, building codes, or other restrictions (including, minor defects or irregularities in title and similar encumbrances) as to the use of Real Property or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness for borrowed money and which do not individually or in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business as currently conducted or as contemplated to be conducted;

(h)    Liens (i) securing judgments for the payment of money not constituting an Event of Default under Section 8.01(g), (ii) arising out of judgments or awards against the Borrowers or any of the Restricted Subsidiaries with respect to which an appeal or other proceeding for review is then being pursued and (iii) notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings for which adequate reserves have been made;

(i)    leases, licenses, subleases or sublicenses (including the provision of software or the licensing of other intellectual property rights), in each case granted to others on a non-exclusive basis in the ordinary course of business which do not secure any Indebtedness and which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the value of said properties or materially impair their use in the operation of the business as currently conducted or as contemplated to be conducted;

(j)    Liens (i) in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business or (ii) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;

(k)    Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes, (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institutions general terms and conditions and (iv) that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into with customers of a Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(l)    Liens (i) on cash advances or earnest money deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 7.02(g), (i), (n), (x) and (bb) to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05 (or reasonably expected to be permitted), in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted (or reasonably expected to be permitted) on the date of the creation of such Lien;

141

(m)    Liens (i) in favor of any Borrower or any Guarantor and (ii) in favor of a Restricted Subsidiary that is not a Loan Party on assets of a Restricted Subsidiary that is not a Loan Party securing Indebtedness permitted under Sections 7.03 and that is not recourse to any Loan Party except as otherwise permitted under another clause of this Section 7.01 (which, for the avoidance of doubt, shall constitute an incurrence thereunder);

(n)    any interest or title of a lessor, sub-lessor, licensor or sub-licensor under leases, subleases, licenses or sublicenses entered into by the Borrowers or any of the Restricted Subsidiaries in the ordinary course of business;

(o)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrowers or any of the Restricted Subsidiaries in the ordinary course of business permitted by this Agreement;

(p)    Liens deemed to exist in connection with Investments in repurchase agreements under  Section 7.02;

(q)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(r)    Liens that are contractual rights of set-off or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrowers or any of the Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrowers or any of the Restricted Subsidiaries, or
(iii) relating to purchase orders and other agreements entered into with customers of the Borrowers or any of the Restricted Subsidiaries in the ordinary course of business;

(s)    Liens solely on any cash earnest money deposits made by the Borrowers or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder or otherwise reasonably expected to be permitted herein;

(t)    Liens to secure Indebtedness permitted under Section 7.03(e); *provided* that
(i)    such Liens are created within 270 days of the acquisition, construction, repair, lease or improvement of the property subject to such Liens, (ii) such Liens do not at any time encumber property (except for replacements, additions, accessions and proceeds to such property) other than the property financed by such Indebtedness and the proceeds and products thereof and customary security deposits and (iii) with respect to Capitalized Leases, except as otherwise permitted by another clause of this Section 7.01 (which shall constitute an incurrence thereunder), such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(u)    Liens on property of any Restricted Subsidiary that is not a Loan Party, which Liens secure Indebtedness permitted under  Section 7.03;

(v)    Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary or otherwise incurred pursuant to Section 7.03(g) to finance a Permitted Acquisition or permitted Investment, in each case after the Closing

142

Date; *provided* that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary, (ii) except as otherwise permitted by another clause of this Section 7.01 (which shall constitute an incurrence thereunder), such Lien does not extend to or cover any other assets or property (other than the proceeds, products and accessions thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition); *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender, and (iii) the Indebtedness secured thereby is permitted under Section 7.03(g);

(w)   (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business materially complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrowers and the Restricted Subsidiaries;

(x)   Liens arising from precautionary Uniform Commercial Code financing statement or similar filings securing obligations permitted to be incurred on a secured basis under Section 7.03 and elsewhere under this Section 7.01;

(y)   Liens on assets that are not otherwise required to be Collateral so long as the Facilities are equally and ratably secured thereby;

(z)   the modification, replacement, renewal or extension of any Lien permitted by Sections 7.01(b), (h), (t), (v), (aa), (gg), (qq) or (uu); *provided* that (i) the Lien does not extend to any additional property, other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien, (B) proceeds and products thereof, (C) assets subject to any cross collateralization of obligations owed to the holder of such Lien; (D) the proceeds and products thereof and customary security deposits, and (ii) the renewal, extension, restructuring or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03 (to the extent constituting Indebtedness);

(aa)   Liens with respect to property of the Borrowers or any of the Restricted Subsidiaries securing obligations in an aggregate principal amount outstanding at any time not to exceed the greater of $1,500,000 and 15% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis), in each case determined as of the date of incurrence;

(bb)   Liens on the Collateral securing obligations in respect of Permitted First Priority Refinancing Debt or Permitted Junior Priority Refinancing Debt and any Permitted Refinancing of any of the foregoing;

(cc)   deposits of cash with the owner or lessor of premises leased and operated by a Borrower or any of its Subsidiaries to secure the performance of such Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(dd)   [reserved];

(ee)   Liens on Supplier Financing Assets incurred in connection with a Supplier Financing Facility permitted hereby;

143

(ff)    Liens on Collateral securing Other Term Loans and Other Notes incurred pursuant to  Section 7.03(w);

(gg)    Liens on property subject to any sale-leaseback transaction permitted hereunder and general intangibles related thereto where the Fair Market Value of all property to which such Liens attach is less than the greater of $1,500,000 and 15% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis) at any time outstanding;

(hh)    Liens securing Swap Contracts so long as (x) such Swap Contracts do not constitute Secured Hedge Agreements and (y) the value of the property securing such Swap Contracts at any time does not exceed, when taken together with the aggregate principal amount of all outstanding Hedging Obligations and/or Cash Management Obligations owed to all Hedge Banks that are so designated pursuant to clause (y) of the definition thereof, $5,000,000;

(ii)    Liens consisting of contractual restrictions of the type described in the definition of "Restricted Cash" (excluding the proviso thereto) so long as such contractual restrictions are permitted under Section 7.09;

(jj)    Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(kk)    Liens on goods purchased in the ordinary course of business which is financed by a documentary letter of credit issued for the account of any Borrower or any Restricted Subsidiary in the ordinary course of business; *provided* that such Lien secures only the obligations of the Borrowers or the Restricted Subsidiaries in respect of such letter of credit to the extent permitted to be incurred pursuant to Section 7.03;

(ll)    (a) Liens on Equity Interests in joint ventures and (b) purchase options, call, rights of refusal, rights of first offer, rights of tag and drag and similar rights of, and restrictions for the benefit of, a third party with respect to Equity Interests held by the Borrowers or any Restricted Subsidiary in joint ventures;

(mm)    Liens on cash and Cash Equivalents that are earmarked to be used to satisfy or discharge Indebtedness; *provided* (i) such cash and/or Cash Equivalents are deposited into an account from which payment is to be made, directly or indirectly, to the Person or Persons holding the Indebtedness that is to be satisfied or discharged, (ii) such Liens extend solely to the account in which such cash and/or Cash Equivalents are deposited and are solely in favor of the Person or Persons holding the Indebtedness (or any agent or trustee for such Person or Persons) that is to be satisfied or discharged and (iii) the satisfaction or discharge of such Indebtedness is expressly permitted hereunder;

(nn)    with respect to any Foreign Subsidiary, other Liens and privileges arising mandatorily by any Law;

(oo)    Liens on Equity Interests of an Unrestricted Subsidiary that secure Indebtedness or other obligations of such Unrestricted Subsidiary;

(pp)    Liens or rights of set-off against credit balances of the Borrowers or any of the Restricted Subsidiaries with credit card issuers or credit card processors or amounts owing by such credit card issuers or credit card processors to the Borrowers or any Restricted Subsidiaries in the ordinary course of business to secure the obligations of any Subsidiary to the credit card issuers or credit card processors as a result of fees and charges;

144

(qq)    additional Liens, so long as (i)(x) with respect to Indebtedness that is secured by Liens on a *pari passu* basis in right of security with the Secured Obligations (without regard to control of remedies), immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated Senior Secured Net Leverage Ratio is no greater than 4.50:1.00 as of the most recently ended Test Period, and (y) with respect to Indebtedness that is secured by Liens that are junior in right of security to the Liens securing the Secured Obligations (without regard to control of remedies), immediately after the incurrence thereof, on a Pro Forma Basis, the Consolidated Secured Net Leverage Ratio is no greater than 4.50:1.00 as of the most recently ended Test Period and (ii) the holder(s) of such Liens (or a representative thereof) shall have entered into an Intercreditor Agreement and/or another intercreditor agreement or arrangement reasonably acceptable to the Administrative Agent and the Lead Borrower; *provided* that, cash proceeds of any new Indebtedness then being incurred shall not be netted from the numerator in the Consolidated Total Net Leverage Ratio for purposes of calculating the Consolidated Senior Secured Net Leverage Ratio and the Consolidated Secured Net Leverage Ratio, as applicable under this clause (qq) for purposes of determining whether such Liens can be incurred;

(rr)    Liens on equipment of the Borrowers or any Restricted Subsidiary granted in the ordinary course of business to such Borrower's or such Restricted Subsidiary's client at which such equipment is located;

(ss)    Liens on Receivables Assets incurred in connection with a Receivables Facility and Liens on Securitization Assets arising in connection with a Qualified Securitization Financing;

(tt)    Liens provided in the ordinary course of business on the insurance policy and proceeds of such insurance policy to finance premiums with respect thereto, liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Parent or any Subsidiaries or any other insurance or self-insurance arrangements;

(uu)    Liens securing Indebtedness incurred pursuant to Section 7.03(aa) hereunder;

(vv)    Liens in connection with any Permitted Tax Restructuring not securing Indebtedness for borrowed money; and

(ww)    Liens constituting licensing arrangements in the ordinary course of business. Section 7.02.    Investments.

Make or hold any Investments, except:

(a)    Investments by the Borrowers or any of the other Restricted Subsidiaries of the Parent in assets that were cash or Cash Equivalents when such Investment was made;

(b)    loans or advances (or guarantees) to officers, directors, managers, consultants, advisors, service providers or employees of the Parent, any Borrower or any Restricted Subsidiary that is a Loan Party (or any direct or indirect parent thereof) or any of its Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's cashless purchase of Equity Interests of the Parent or any direct or indirect parent thereof, (iii) to permit the payment of taxes with respect to any such Equity Interest purchase described in clause (ii); and (iv) for any other purposes not described in the foregoing clauses (i), (ii) and (iii); *provided* that the aggregate principal amount outstanding at any time under this clause (iv) and the foregoing clause (i) shall not exceed the greater of (x) $1,000,000 and (y) 10% of Consolidated EBITDA as of the last day of the last Test Period (calculated on a Pro Forma Basis);

145

(c)         Investments (i) by any Borrower or any Restricted Subsidiary in any Loan Party, (ii) by any Restricted Subsidiary that is not a Loan Party in any other Restricted Subsidiary that is not a Loan Party and (iii) to the extent that no Event of Default has occurred and is continuing or would result therefrom, by any Loan Party in any Restricted Subsidiary that is not a Loan Party; *provided* that (A) no such Investments made pursuant to this clause (iii) in the form of intercompany loans shall be evidenced by a promissory note unless such promissory note is pledged to the Collateral Agent to the extent required by the Security Agreement and subordinated to the Obligations pursuant to the terms of the Intercompany Note and (B) the aggregate amount of Investments at any time outstanding made pursuant to this clause (iii) shall not, when aggregated with the aggregate amount of Dispositions made pursuant to Section 7.05(d)(ii), exceed at the time of incurrence the greater of (i) $2,500,000 and 25% of Consolidated EBITDA as of the last day of the last Test Period (calculated on a Pro Forma Basis);

(d)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)     Investments (excluding loans and advances made in lieu of Restricted Payments pursuant to and limited by Section 7.02(m) below) consisting of, or resulting from, transactions permitted under Sections 7.01), 7.03 (other than 7.03(d)), 7.04 (other than 7.04(c)(ii) or (e)), 7.05 (other than 7.05(d)(ii) and (e)), 7.06 (other than 7.06(d)) and 7.12, respectively;

(f)     Investments existing or contemplated on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date (i) in an amount not to exceed $1,000,000 in the aggregate (when taken together with all other Investments outstanding in reliance on this clause (f)(i)) or (ii) set forth on Schedule 7.02(f) and any modification, replacement, renewal, reinvestment or extension thereof so long as the amount of any Investment subject to any such modification, replacement, renewal, reinvestment or extension does not exceed the amount outstanding (plus any (x) unused commitments, accrued interest, fees and expenses and premiums incurred in connection therewith and (y) amounts permitted to otherwise be incurred under this Section 7.02) on the Closing Date;

(g)     Investments in Swap Contracts permitted under Section 7.03(f) and Cash Management Obligations;

(h)     promissory notes, securities and other non-cash consideration received in connection with Dispositions permitted by Section 7.05;

(i)     any acquisition of all or substantially all the assets of a Person or any Equity Interests in a Person or division or line of business of a Person (or any subsequent Investment made in a Person, division or line of business previously acquired in a Permitted Acquisition), in a single transaction or series of related transactions, if immediately after giving effect thereto: (i) subject to Section 1.11(g), no Event of Default under Section 8.01(a) or 8.01(f) exists immediately after giving effect to such acquisition; (ii)     to the extent required by the Collateral and Guarantee Requirement, (A) the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and (B) any such newly created or acquired Restricted Subsidiary (other than an Excluded Subsidiary or an Unrestricted Subsidiary) shall become a Borrower or a Guarantor, in each case, in accordance with and subject to Section 6.11; (iii)    the aggregate amount of Investments by Loan Parties pursuant to this Section 7.02(i) in assets (other than Equity Interests) that are not (or do not become at the time of such acquisition) directly owned by a Loan Party or in Equity Interests of Persons that do not become Loan Parties at any time outstanding shall not exceed the sum of (1) the greater of (x) $1,500,000 and 15% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis), *plus* (2) so long as no Event

146

of Default has occurred and is continuing or would result therefrom, the Cumulative Credit at such time, *plus* (3) to the extent such amount has not otherwise been applied to increase any other "basket" hereunder an amount equal to the net cash proceeds from the issuance of Equity Interests from the Lead Borrower or, to the extent contributed to the Borrowers as cash common equity, any direct or indirect parent, to finance such acquisition (other than Disqualified Equity Interests or Cure Amounts); (iv) the assets and/or Person acquired complies with Section 6.16; (vi) the Consolidated Total Net Leverage Ratio (calculated on a Pro Forma Basis in accordance with Section 1.11) is not greater than the then-applicable maximum Consolidated Total Net Leverage Ratio permitted by Section 7.11; and (vi) subject to clause (iii) above and Section 6.14, any such acquired Person shall become a Restricted Subsidiary (any such acquisition under this Section 7.02(i), a "**Permitted Acquisition**"); *provided*, that if any Investment made pursuant to clause
(iii) is in Equity Interests of a Person that subsequently becomes a Loan Party, such Investment shall thereafter be deemed permitted under Section 7.02(c)(i) and shall not be included as having been made pursuant to Section 7.02(i)(iii);

(j)        Investments made to effect, or otherwise in connection with, the Transactions;

(k)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(l)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)    loans and advances to any direct or indirect parent of the Lead Borrower not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments to the extent permitted to be made to such parent in accordance with Section 7.06, such Investment being treated for purposes of the applicable clause of Section 7.06, including any limitations, as if a Restricted Payment had been made pursuant to such clause in an amount equal to such Investment;

(n)    to the extent that no Event of Default has occurred and is continuing or would result therefrom, Investments (including Permitted Acquisitions) in an aggregate amount outstanding pursuant to this Section 7.02(n) at any time not to exceed the sum of (w) any amount which the Lead Borrower may, from time to time, elect to be redesignated from the General RP Basket and the General RJDP Basket, *plus* (x) the greater of (x) $1,500,000 and (y) 15% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis) *plus* (y) the Cumulative Credit at such time *plus* (z) the Excluded Contribution Amount (less any amounts redesignated to the General RP Basket or the General RJDP Basket) (the "**General Investments Basket**");

(o)    Investments made in respect of joint ventures or other similar agreements or partnerships not to exceed at any time outstanding the sum of (I) the greater of (x) $1,000,000 and 10% of Consolidated EBITDA as of the last day of the most recently ended last Test Period (calculated on a Pro Forma Basis) at any time *plus* (II) any amount which the Lead Borrower may, from time to time, elect to be redesignated from the Unrestricted Subsidiary Investment Basket (less any amounts redesignated to the Unrestricted Subsidiary Investment Basket) (the "**Joint Venture Investments Basket**");

(p)    (i) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contracts and loans or advances made to distributors and suppliers

147

in the ordinary course of business and (ii) Investments to the extent that payment for such Investments is made with Equity Interests of the Lead Borrower (or any direct or indirect parent of the Lead Borrower);

(q)        [Reserved];

(r)        [Reserved];

(s)        (i) any Investment in a Receivables Subsidiary or a Securitization Subsidiary in order to effectuate a Receivables Facility or a Qualified Securitization Financing, respectively, or any Investment by a Receivables Subsidiary or a Securitization Subsidiary in any other Person in connection with a Receivables Facility or a Qualified Securitization Financing, respectively; *provided*, *however*, that any such Investment in a Receivables Subsidiary or a Securitization Subsidiary is in the form of a contribution of additional Receivables Assets or Securitization Assets, as applicable, or as equity, and (ii) distributions or payments of Receivables Fees or Securitization Fees and purchases of Receivables Assets or Securitization Assets pursuant to a Securitization Repurchase Obligation in connection with a Receivables Facility or a Qualified Securitization Financing, respectively;

(t)        asset purchases (including purchases of inventory, supplies and materials) pursuant to joint marketing arrangements with other Persons;

(u)        [Reserved];

(v)        Investments in connection with a Permitted Tax Restructuring or a Permitted IPO Reorganization;

(w)        the non-exclusive licensing or contribution of Intellectual Property in the ordinary course of business, which is not otherwise restricted under the Loan Documents;

(x)        Investments held by a Restricted Subsidiary acquired after the Closing Date or of a Person merged into, amalgamated with or consolidated into any Borrower or any other Restricted Subsidiary of the Parent in accordance with Section 7.04 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation or of such Person becoming a Restricted Subsidiary and were in existence on the date of such acquisition, merger, amalgamation or consolidation; *provided* that, for the avoidance of doubt, with respect to any such Investment that constitutes the acquisition of or Investment in a Restricted Subsidiary that is not a Loan Party, such Investment shall constitute a utilization of such other clause or clauses of this Section 7.02 permitting such Investment in such Restricted Subsidiary;

(y)        Investments in deposit accounts, commodities and securities accounts opened in the ordinary course of business;

(z)        Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business of the Borrowers and the Restricted Subsidiaries in the ordinary course of business;

(aa)       guarantees by any Borrower or any of the other Restricted Subsidiaries of the Parent in the ordinary course of business of leases (other than Capitalized Leases), contracts or of other obligations of any other Borrower or any other Restricted Subsidiary that do not constitute Indebtedness in an aggregate amount not to exceed at any time outstanding the greater of $1,000,000 and 10% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma

148

Basis);

    (bb)   any additional Investments; *provided* that (x) no Event of Default has occurred and is continuing or would result from such Investments (subject to Section 1.11(g)) and (y) after giving Pro Forma Effect to such Investments, the Consolidated Total Net Leverage Ratio is equal to or less than 4.00 to 1.00 as of the most recently ended Test Period; *provided*, *further*, that no Investments may be made in an Unrestricted Subsidiary in reliance on this clause (bb);

    (cc)   the acquisition of additional Equity Interests of Restricted Subsidiaries from minority shareholders (it being understood that to the extent that any Restricted Subsidiary that is not a Loan Party is acquiring Equity Interests from minority shareholders then this clause (cc) shall not in and of itself create, or increase the capacity under, any basket for Investments by Loan Parties in any Restricted Subsidiary that is not a Loan Party) in an aggregate amount not to exceed the greater of $1,000,000 and 10% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis);

    (dd)   (i) Loans and (ii) Credit Agreement Refinancing Indebtedness, in each case, repurchased by any Borrower or any other Restricted Subsidiary of the Parent pursuant to and in accordance with Sections 2.05 and 10.07 under this Agreement, as applicable;

    (ee)   Guarantee obligations of any Borrower or any other Restricted Subsidiary of the Parent in respect of letters of support, bank guarantees or similar obligations issued, made or incurred for the benefit of any Restricted Subsidiary of the Parent to the extent required by law or in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than within the United States;

    (ff)   To the extent that no Event of Default has occurred and is continuing or would result therefrom, Investments in Unrestricted Subsidiaries at any time not to exceed the sum of (I) the greater of $1,000,000 and 10% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis) *plus* (II) any amount which the Lead Borrower may, from time to time, elect to be redesignated from the Joint Venture Investment Basket (less any amounts redesignated to the Joint Venture Investment Basket) (the " **Unrestricted Subsidiary Investments Basket**"); and

    (gg)   Investments constituting licensing arrangements in the ordinary course of business. Notwithstanding any of the definitions or covenants

    contained in this Agreement to the contrary,

no Loan Party shall make any Investment in or Disposition to any controlled Affiliate (other than a Loan Party) in the form of the transfer of (i) Material Intellectual Property or (ii) Core Intellectual Property, in each case outside the ordinary course of business to such controlled Affiliate (other than a Loan Party), *provided* that such transfers in respect of the forgoing clause (i) shall be permitted to the extent such Investment or Disposition is in excess of, in the aggregate for all such Investments or Dispositions made since the Closing Date, a Fair Market Value of the sum of (a) the greater of (x) $1,000,000 and (y) 10% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) at the time of such Investment or Disposition plus (b) an amount equal to the Fair Market Value of Material Intellectual Property transferred to any Loan Party from any Affiliate (other than a Loan Party) following the Closing Date.

    Section 7.03. Indebtedness.

    Create, incur, assume or suffer to exist any Indebtedness, except:

(a)        Indebtedness of any Loan Party under the Loan Documents;

(b)    Indebtedness outstanding on the Closing Date (i) not in excess of $500,000 in the aggregate (when taken together with all other indebtedness outstanding in reliance on this clause (b)(i)) or
(ii)    listed on Schedule 7.03(b) and any Permitted Refinancing thereof; *provided* that all such Indebtedness of any Loan Party owed to any Restricted Subsidiary that is not a Loan Party shall be subordinated to the Obligations pursuant to an Intercompany Note;

(c)    Guarantees by any Borrower or any other Restricted Subsidiary of the Parent in respect of Indebtedness of any Borrower or any Restricted Subsidiary otherwise permitted hereunder (and cross-guarantees of guarantees by the Parent of Indebtedness of any Borrower or any Restricted Subsidiary of Indebtedness otherwise permitted hereunder); *provided* that (A) no Guarantee by any Restricted Subsidiary of any Indebtedness constituting a Specified Junior Financing Obligation shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein and (B) if the Indebtedness being Guaranteed is subordinated in right of payment to the Obligations, such Guarantee shall be subordinated in right of payment to the Guarantee of the Obligations on terms (taken as a whole) at least as favorable (as reasonably determined by the Lead Borrower) to the Lenders as those contained in the subordination of such Indebtedness;

(d)    Indebtedness of any Borrower or any other Restricted Subsidiary of the Parent owing to any Loan Party (other than the Parent) or any other Restricted Subsidiary (or issued or transferred to any direct or indirect parent of a Loan Party (other than the Parent) which is substantially contemporaneously transferred to a Loan Party (other than the Parent) or any Restricted Subsidiary of the Parent that is a Loan Party); *provided* that in the case of Indebtedness of a non-Loan Party owing to a Loan Party such Indebtedness (x) is an Investment permitted by Section 7.02(c)(iii), (y) consists of any part of a Permitted IPO Reorganization or Permitted Tax Restructuring or (z) is in an amount not to exceed the greater of $1,500,000 or 15% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma basis); *provided*, *further*, that (x) no such Indebtedness owed to a Loan Party shall be evidenced by a promissory note unless such promissory note is pledged to the Administrative Agent in accordance with, and subject to, the terms of the Security Agreement and (y) all such Indebtedness of any Loan Party owed to any Restricted Subsidiary that is not a Loan Party shall be subordinated to the Obligations pursuant to subordination terms substantially consistent with the terms of the Intercompany Note;

(e)    (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) financing an acquisition, construction, repair, replacement, lease or improvement of a fixed or capital asset incurred by any Borrower or any Restricted Subsidiary prior to or within 270 days after the acquisition, lease or improvement of the applicable asset thereof in an aggregate amount not to exceed the greater of $2,000,000 and 20% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis), in each case, determined at the time of incurrence (together with any Permitted Refinancings thereof) at any time outstanding, and (ii) Attributable Indebtedness arising out of sale-leaseback transactions permitted by Section 7.05(m) and any Permitted Refinancing of such Attributable Indebtedness in an aggregate amount not to exceed the greater of $1,500,000 and 15% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis) at any time under this clause (e)(ii);

(f)    Indebtedness in respect of Swap Contracts designed to hedge against any Borrower's or any Restricted Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

150

(g)    Indebtedness of any Borrower or any Restricted Subsidiary assumed in connection with any Permitted Acquisition or other Investment permitted by Section 7.02 or Capital Expenditures (*provided* that such Indebtedness is not incurred in contemplation of such Permitted Acquisition or any Permitted Refinancing thereof); *provided* that the aggregate amount of such Indebtedness does not exceed the greater of $2,000,000 and 20% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis) at any time outstanding; *provided*, *further*, that the aggregate principal amount of any such Indebtedness assumed under this clause (g) by any Restricted Subsidiary that is not a Loan Party shall not exceed the greater of $1,000,000 and 10% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis) at any time outstanding;

(h)    Indebtedness representing deferred compensation or similar arrangements to employees of the Borrowers or any of the Restricted Subsidiaries incurred in the ordinary course of business;

(i)    Indebtedness consisting of promissory notes issued by any Borrower or any of the other Restricted Subsidiaries of the Parent to current or former officers, managers, consultants, advisors, directors and employees, their respective estates, spouses or former spouses of Parent (or any direct or indirect parent thereof) and any Restricted Subsidiary to finance the purchase or redemption of Equity Interests of the Lead Borrower or any direct or indirect parent of the Lead Borrower permitted by Section 7.06;

(j)    Indebtedness incurred by any Borrower or any of the other Restricted Subsidiaries of the Parent in connection with the Transactions, a Permitted Acquisition, any other Investment, merger or Disposition permitted hereunder or transaction with Affiliates permitted hereunder, in each case, constituting indemnification obligations or obligations in respect of deferred purchase price (including earn- outs and seller paper) or other similar adjustments which, solely in the case of seller paper, shall not exceed the greater of $2,000,000 and 20% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis) at any time outstanding;

(k)    Indebtedness consisting of obligations of any Borrower or any of the other Restricted Subsidiaries of the Parent under deferred compensation or other similar arrangements (in each case other than in respect of deferred purchase price (including, without limitation, earn-outs and seller paper)) incurred by such Person in connection with the Transactions, Permitted Acquisitions, transactions with Affiliates or any other Investment, in each case, permitted hereunder;

(l)    Cash Management Obligations and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within 10 Business Days of its incurrence;

(m)    Indebtedness in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, would not exceed the greater of $1,500,000 and 15% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis);

(n)    Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or- pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o)    Indebtedness incurred by any Borrower or any of the other Restricted Subsidiaries of the Parent in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or

151

similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(p)    obligations in respect of self-insurance, performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by any Borrower or any of the other Restricted Subsidiaries of the Parent or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice or to the extent required by Laws or pursuant to any statutory filing;

(q)    letters of credit (i) issued in an aggregate amount at any time outstanding not to exceed $2,000,000, (ii) constituting trade letters of credit in an aggregate amount at any time outstanding not to exceed $500,000 and (iii) in additional amounts to the extent the extent the issuance thereof is accompanied by a simultaneous permanent reduction in Revolving Commitments in an amount equal to the maximum face value of such letter of credit;

(r)        [Reserved];

(s)    Permitted Ratio Debt and any Permitted Refinancing thereof; *provided* that, with respect to any such Permitted Ratio Debt and/or Permitted Refinancing thereof that is secured on a *pari passu* basis with the Obligations, the Lenders party to this Agreement at the time of the proposed incurrence of any such Permitted Ratio Debt or Permitted Refinancing thereof shall have the right, on a pro rata basis, to make an initial offer with respect to any such Permitted Ratio Debt or Permitted Refinancing thereof;

(t)    Credit Agreement Refinancing Indebtedness; *provided* that, with respect to any such Credit Agreement Refinancing Indebtedness that is secured on a *pari passu* basis with the Obligations, the Lenders party to this Agreement at the time of the proposed incurrence of any such Credit Agreement Refinancing Indebtedness shall have the right, on a pro rata basis, to make an initial offer with respect to any such Credit Agreement Refinancing Indebtedness;

(u)    Indebtedness of a Subsidiary of the Parent (other than a Loan Party) in an amount outstanding not to exceed the greater of $2,000,000 and 20% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis) at any time outstanding;

(v)        [reserved];

(w)    Indebtedness in respect of Other Term Loans and Other Notes incurred or issued in accordance with Section 2.14 (and Permitted Refinancings thereof);

(x)    Incremental Loans and Revolving Commitment Increases incurred in accordance with  Section 2.14 and Permitted Refinancings thereof;

(y)    Indebtedness of any Borrower and any other Restricted Subsidiaries of the Parent in respect of any Supplier Financing Facilities in the ordinary course of business;

(z)    Indebtedness (a) of any Securitization Subsidiary arising under any Qualified Securitization Financing at any time, (b) of any Borrower or any other Restricted Subsidiary of the Parent arising under any Receivables Facility or (c) in connection with accounts receivable factoring facilities in the ordinary course of business; *provided* that the aggregate amount of Indebtedness incurred pursuant to this clause (z) shall not exceed the greater of $2,500,000 and 25% of Consolidated EBITDA as of the last

152

day of the most recently ended Test Period (calculated on a Pro Forma Basis) at any time outstanding;

(aa)    Indebtedness in respect of Permitted Debt Exchange Notes incurred pursuant to a Permitted Debt Exchange in accordance with Section 2.18; *provided* that, with respect to any such Permitted Debt Exchange Notes that are secured on a *pari passu* basis with the Obligations, the Lenders party to this Agreement at the time of the proposed incurrence of any such Permitted Debt Exchange Notes shall have the right, on a pro rata basis, to make an initial offer with respect to any such Permitted Debt Exchange Notes;

(bb)    Indebtedness to the seller of any business or assets permitted to be acquired by the Parent or any Restricted Subsidiary under this Agreement; *provided* that the aggregate amount of Indebtedness permitted under this clause (bb) shall not exceed the greater of $1,500,000 and 15% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) outstanding at any time; *provided*, *further*, that, other than Indebtedness in an amount not to exceed the greater of $1,000,000 and 10% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) at any time outstanding, such Indebtedness contains subordination terms (or is subject to a subordination agreement in favor of the Administrative Agent and Lenders) acceptable to each of the Lead Borrower and the Administrative Agent in its reasonable discretion;

(cc)    obligations in respect of Disqualified Equity Interests and preferred Equity Interests in an amount not to exceed the greater of $1,000,000 and 10% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) outstanding at any time;

(dd)    Indebtedness consisting of management fees to any Sponsor payable pursuant to the Management Agreement;

(ee)    to the extent constituting Indebtedness, Guarantees in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Borrowers and the other Restricted Subsidiaries of the Parent in an aggregate amount not to exceed at any time outstanding the greater of $1,000,000 and 10% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis);

(ff)    Indebtedness in an amount not to exceed at any time outstanding the Excluded Contribution Amount; and

(gg)    to the extent constituting Indebtedness, all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (ff) above.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, *plus* the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and

153

expenses (including OID) incurred in connection with such refinancing.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Parent dated such date prepared in accordance with GAAP.

The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior in right of payment to any other senior Indebtedness merely because it has a junior priority with respect to the same Collateral.

Section 7.04.    Fundamental Changes.

Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any other Person (other than as part of the Transactions), except that:

(a)    any Restricted Subsidiary may merge, amalgamate or consolidate with (i) the Lead Borrower (including a merger, the purpose of which is to reorganize the Lead Borrower into a new U.S. jurisdiction); *provided* that the Lead Borrower shall be the continuing or surviving Person or (ii) one or more other Restricted Subsidiaries; *provided* that when any Person that is a Loan Party is merging with a Restricted Subsidiary, a Loan Party shall be the continuing or surviving Person;

(b)    (i) any Restricted Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Restricted Subsidiary that is not a Loan Party, (ii) any Subsidiary (other than the Lead Borrower) may liquidate or dissolve and (iii) any Subsidiary of the Parent may change its legal form if, with respect to clauses (ii) and (iii), the Lead Borrower determines in good faith that such action is in the best interest of the Parent and its Subsidiaries and is not materially disadvantageous to the Lenders (in their capacity as such) (it being understood that in the case of any change in legal form, a Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder);

(c)    any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Lead Borrower or to any another Restricted Subsidiary of the Parent; *provided* that if the transferor in such a transaction is a Guarantor, then (i) the transferee must be a Guarantor or a Borrower or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in or Indebtedness of a Restricted Subsidiary which is not a Loan Party in accordance with Sections 7.02 (other than Section 7.02(e)) and 7.03, respectively;

(d)    so long as no Event of Default has occurred and is continuing or would result therefrom, the Lead Borrower may merge or consolidate with any other Person; *provided* that (i) the Lead Borrower shall be the continuing or surviving corporation or (ii) if the Person formed by or surviving any such merger or consolidation is not the Lead Borrower (any such Person, the "**Successor Company**"), (A) the Successor Company shall be an entity organized or existing under the Laws of the United States,

154

any state thereof, the District of Columbia or any territory thereof, (B) the Successor Company shall expressly assume all the obligations of the Lead Borrower under this Agreement and the other Loan Documents to which the Lead Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Lead Borrower (including with respect to the satisfaction of customary USA Patriot Act and Beneficial Ownership Regulation requirements), (C) each Guarantor, unless it is the other party to such merger or consolidation, shall have confirmed that its Guarantee shall apply to the Successor Company's obligations under the Loan Documents, (D) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement and other applicable Collateral Documents confirmed that its obligations thereunder shall apply to the Successor Company's obligations under the Loan Documents, (E) if reasonably requested by the Administrative Agent, each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to the Administrative Agent and the Lead Borrower) confirmed that its obligations thereunder shall apply to the Successor Company's obligations under the Loan Documents, and
(F) the Lead Borrower shall have delivered to the Administrative Agent an officer's certificate and, if reasonably requested by the Administrative Agent, a customary opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Collateral Document comply with this Agreement; *provided*, *further*, that if the foregoing are satisfied, the Successor Company will succeed to, and be substituted for, the Lead Borrower under this Agreement;

(e)    any Restricted Subsidiary of the Parent may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to Section 7.02 (other than Section 7.02(e)); *provided* that (i) the continuing or surviving Person shall be a Restricted Subsidiary of the Parent, which together with each of its Restricted Subsidiaries, shall have complied with the requirements of Section 6.11 and Section 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement, (ii) if a Loan Party is a party to such transaction, the surviving Person shall be a Loan Party and (iii) if the Lead Borrower is party to such transaction, the surviving party shall be the Lead Borrower;

(f)    the Borrower and the Restricted Subsidiaries may consummate the transactions contemplated by the Acquisition Agreement (and documents related thereto) and the Transactions; and

(g)    a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect (i) a Disposition permitted pursuant to Section 7.05, (ii) a Permitted Tax Restructuring,
(iii)    corporate tax restructuring in connection with the Transactions, (iv) a Permitted IPO Reorganization or (v) an Investment pursuant to Section 7.02; *provided* that, in each case, if the Lead Borrower is party to such transaction, the surviving party shall be the Lead Borrower.

Section 7.05.    Dispositions.

Make any Disposition, except:

(a)    Dispositions of (i) negligible, obsolete, damaged, worn out, aged, immaterial, used or surplus tangible property, whether now owned or hereafter acquired, in the ordinary course of business and (ii) property (including any leasehold property interest) that is no longer (x) economical in its business or (y) commercially desirable or commercially reasonable to maintain or used or useful in the conduct of the business of the Borrowers or any of the Restricted Subsidiaries;

(b)    Dispositions of inventory, goods held for sale in the ordinary course of business and immaterial assets (including termination of leases and licenses in the ordinary course of business, and a voluntary or mandatory recall of any product);

155

(c)     Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)     Dispositions of property to any Borrower or any other Restricted Subsidiary; *provided* that if the transferor of such property is a Loan Party, (i) the transferee thereof must be a Loan Party or (ii) (x) no Event of Default shall have occurred and be continuing or would result therefrom and (y)    such Dispositions to non-Loan Parties, when aggregated with the aggregate amount of Investments made pursuant to Section 7.02(c)(iii), do not exceed in the aggregate during the term of this Agreement the greater of $2,500,000 and 25% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis);

(e)             to the extent constituting Dispositions, transactions permitted by (i) Section 7.01, (ii) Section 7.02 (other than 7.02(e) or (h)), (iii) Section 7.04 (other than 7.04(g)(i)) and (iv) Section 7.06 (other than 7.06(d)) and in each case other than by reference to this Section 7.05;

(f)             Dispositions to consummate, or resulting from, the Transactions;

(g)             Dispositions of cash and Cash Equivalents;

(h)     (i) non-exclusive leases, subleases, licenses or sublicenses (including the provision of software under an open source license or the non-exclusive licensing of other intellectual property rights) and terminations thereof, in each case, in the ordinary course of business and which do not materially interfere with the business of the Borrowers and the Restricted Subsidiaries (taken as a whole) and (ii)    Dispositions, including the lapse and abandonment, of IP Rights, and of inbound and outbound licenses to IP Rights, that do not materially interfere with the business of the Borrowers and the Restricted Subsidiaries (taken as a whole) to the extent permitted by Section 3.03(f)(i) of the Security Agreement;

(i)     foreclosures, condemnations, expropriation, dispositions required by a Governmental Authority or any similar action on assets or casualty or insured damage to assets, including pursuant to a Casualty Event;

(j)     Dispositions of property not otherwise permitted under this Section 7.05; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a commitment entered into at a time when no Event of Default exists), no Event of Default shall exist or would result from such Disposition, (ii) (1) such Borrower or such Restricted Subsidiary, as the case may be, receives consideration at least equal to the Fair Market Value (as determined at the time of contractually agreeing to such Disposition) of the assets sold or otherwise disposed of and (2) if the property sold or otherwise disposed of has a Fair Market Value in excess of $2,500,000 as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis), at least 75% of the consideration therefor received by such Borrower or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided*, *however*, that for the purposes of this clause (j)(ii), the amount of:

(A)     any liabilities (as reflected on such Borrower's or such Restricted Subsidiary's most recent consolidated balance sheet provided hereunder or in the footnotes thereto, or if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Parent's consolidated balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet, as determined in good faith by the Lead Borrower), other than liabilities that are by their terms subordinated to the Loans or any guarantee of the Loans, that (A) are assumed by the transferee of

156

any such assets or (B) are otherwise cancelled, extinguished or terminated in connection with the transactions relating to such asset sale and, in the case of <u>clause</u>
<u>(A)</u>    only, for which the Borrowers and all such Restricted Subsidiaries have been validly released by all applicable creditors in writing;

<u>(B)</u>    any securities, notes or other obligations or assets received by such Borrower or such Restricted Subsidiary from such transferee that are converted by such Borrower or such Restricted Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received), in each case, within 180 days following the closing of such Disposition;

<u>(C)</u>    Indebtedness of a Borrower or a Restricted Subsidiary, other than liabilities that are by their terms subordinated to the Loans, that is of any Person that is no longer a Loan Party or a Restricted Subsidiary as a result of such Disposition, to the extent that the Borrowers and all Restricted Subsidiaries have been validly released from any guarantee or other payment obligation of such Indebtedness and other liabilities in connection with such Disposition; and

<u>(D)</u>    any Designated Non-Cash Consideration received by such Borrower or such Restricted Subsidiary in such Disposition having an aggregate Fair Market Value, taken together with all other Designated Non-Cash Consideration received pursuant to this <u>clause (D)</u> that is at that time outstanding, not to exceed the greater of $1,500,000 and 15% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis) at the time of the receipt of such Designated Non-Cash Consideration, with the Fair Market Value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value,

shall be deemed to be cash for purposes of this <u>clause (j)</u> and for no other purpose and (iii) such Disposition does not constitute all or substantially all of the assets of the Borrower and the Restricted Subsidiaries, taken as a whole;

(k)    Dispositions (i) of non-core assets acquired in connection with Permitted Acquisitions or other Investments in each case for Fair Market Value or (ii) made to obtain the approval of an anti-trust authority;

(l)    discounts of accounts receivable, or notes receivable in the ordinary course of business or the conversion of accounts receivable to notes receivable in the ordinary course of business;

(m)    Dispositions of property pursuant to sale-leaseback transactions permitted hereunder;

(n)    any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrowers and their Subsidiaries as a whole, as determined in good faith by the Lead Borrower, in an aggregate amount not to exceed during the term of this Agreement the greater of $1,000,000 and 10% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis);

(o)    any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

157

(p)     Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)     the unwinding or settling of any Swap Contract or Cash Management Obligations;

(r)     Dispositions of assets not constituting Collateral in an aggregate amount not to exceed during the term of this Agreement the greater of $1,000,000 and 10% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis);

(s)     Dispositions set forth on Schedule 7.05(s);

(t)     any Disposition of assets or any issuance or sale of Equity Interests of any Restricted Subsidiary in any transaction or series of related transactions with an aggregate Fair Market Value of less than the greater of (x) $1,000,000 and 10% of Consolidated EBITDA (calculated on a Pro Forma Basis) for the most recently ended Test Period at the time of such Disposition, as applicable;

(u)     to the extent allowable under Section 1031 of the Code, or any comparable or successor provision, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(v)     any sale, transfer and other Disposition of accounts receivable (including write- offs, discounts and compromises) in connection with the compromise, settlement or collection thereof;

(w)     sales or dispositions of Supplier Financing Assets in connection with Supplier Financing Facilities;

(x)     (i) Dispositions of Receivables Assets in connection with any Receivables Facility, and any Disposition of Securitization Assets in connection with any Qualified Securitization Financing, *provided* that the Indebtedness incurred in connection therewith shall not exceed the amount of Indebtedness permitted by Section 7.03(z), and (ii) Dispositions of accounts receivable and related assets in connection with accounts receivable factoring facilities in the ordinary course of business;

(y)     any Borrower and any other Restricted Subsidiary of the Parent may (i) convert any intercompany Indebtedness to Equity Interests otherwise permitted hereunder, (ii) discount, write off, forgive or cancel any intercompany Indebtedness or other obligation owing by such Borrower or any Subsidiary Guarantor to a Restricted Subsidiary that is not, in each case, a Loan Party or to another Loan Party, (iii) settle, discount, write-off, forgive or cancel any Indebtedness owing by any present or former consultants, managers, directors, officers, employees of the Parent, any Borrower or any Subsidiary or any of their successors or assigns, in the ordinary course of business or (iv) surrender or waive contractual rights and settle, release, surrender or waive contractual or litigation claims, in the case of clause (iv), in the ordinary course of business (and other than with respect to Indebtedness among the Borrowers and their Restricted Subsidiaries);

(z)     any Disposition in connection with a Permitted Tax Restructuring or a Permitted IPO Reorganization;

(aa)     Dispositions constituting licensing arrangements in the ordinary course of business, and

(bb)     any other Disposition of immaterial assets in an amount not to exceed the greater

of $1,000,000 and 10% of Consolidated EBITDA as of the last day of the most recently ended Test Period (calculated on a Pro Forma Basis).

Notwithstanding any of the definitions or covenants contained in this Agreement to the contrary, no Loan Party shall make any Investment in or Disposition to any controlled Affiliate (other than a Loan Party) in the form of the transfer of (i) Material Intellectual Property or (ii) Core Intellectual Property, in each case outside of the ordinary course of business to such controlled Affiliate (other than a Loan Party); *provided* that such transfers in respect of the forgoing clause (i) shall be permitted to the extent such Investment or Disposition is in excess of in excess of, in the aggregate for all such Investments or Dispositions made since the Closing Date, a Fair Market Value of the sum of (a) the greater of (x) $1,000,000 and (y) 10% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) at the time of such Investment or Disposition plus (b) an amount equal to the Fair Market Value of Material Intellectual Property transferred to any Loan Party from any Affiliate (other than a Loan Party) following the Closing Date.

Section 7.06.    Restricted Payments.

Declare or make any Restricted Payment, except:

(a)    each Restricted Subsidiary may make Restricted Payments to the Lead Borrower and other Restricted Subsidiaries of the Lead Borrower (and, in the case of a Restricted Payment by a non- Wholly-owned Restricted Subsidiary, to the Lead Borrower and any other Restricted Subsidiary of the Lead Borrower and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)    each Borrower and each other Restricted Subsidiary of the Lead Borrower may declare and make Restricted Payments payable solely in the Equity Interests (other than Disqualified Equity Interests not otherwise permitted by Section 7.03) of such Person (and, in the case of such a Restricted Payment by a non-wholly owned Restricted Subsidiary, to the Lead Borrower and any other Restricted Subsidiary of the Lead Borrower and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(c)    Restricted Payments made (i) to consummate the Transactions, including any related corporate tax restructuring, (ii) in respect of working capital adjustments or purchase price adjustments and other similar payments pursuant to the Acquisition Agreement, any Permitted Acquisition or other permitted Investments or Capital Expenditures, (iii) in order to satisfy indemnity and other similar obligations, earn-outs and other deferred purchase price obligations under the Acquisition Agreement, any Permitted Acquisition or other permitted Investments or Capital Expenditures, and (iv) to holders of Equity Interests of the Lead Borrower (immediately prior to giving effect to the Transactions) in connection with, or as a result of, their exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, in each case, with respect to the Transactions;

(d)    to the extent constituting Restricted Payments, the Borrowers (or any direct or indirect parent thereof) and the other Restricted Subsidiaries of the Parent may enter into and consummate transactions permitted by any provision of Sections 7.02 (other than Sections 7.02(e) and 7.02(m)), 7.04,
7.05 (other than Sections 7.05(e)(iv) and 7.05(g)) or 6.19 (other than Sections 6.19 (f), (h) and (n));

(e)    repurchases of Equity Interests in any Borrower or any other Restricted Subsidiary of the Parent deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

159

(f)      each Borrower and each other Restricted Subsidiary of the Parent may (i) pay (or make Restricted Payments to allow the Parent or any other direct or indirect parent thereof to pay) for the repurchase, retirement or other acquisition or retirement for value of Equity Interests of such Borrower or such other Restricted Subsidiary of the Parent (or any other such direct or indirect parent thereof) held by any future, present or former employee, officer, director, manager, advisor, service provider, employee, operator or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of such Borrower or such other Restricted Subsidiary of the Parent (or any other direct or indirect parent thereof) or any of its Subsidiaries or (ii) make Restricted Payments in the form of distributions to allow the Parent or any direct or indirect parent of the Parent to pay principal or interest on promissory notes that were issued to any future, present or former employee, officer, director, manager, operator or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of such Borrower or such other Restricted Subsidiary of the Parent (or any other direct or indirect parent thereof) in lieu of cash payments for the repurchase, retirement or other acquisition or retirement for value of such Equity Interests held by such Persons, in each case, upon the death, disability, retirement or termination of employment of any such Person or pursuant to any employee, manager, advisor, service provider, employee or director equity plan, employee, manager or director stock option plan or any other employee, manager or director benefit plan or any agreement (including any stock subscription or shareholder agreement) with any employee, director, officer, operator or consultant of such Borrower or such other Restricted Subsidiary of the Parent (or any other direct or indirect parent thereof) or any of its Restricted Subsidiaries; *provided* that the aggregate amount of Restricted Payments made pursuant to this Section 7.06(f) together with the aggregate amount of cash payments on account of loans and advances to Parent made pursuant to Section 7.02(m) in lieu of Restricted Payments permitted by this Section 7.06(f) shall not exceed the greater of $1,000,000 and 10% of Consolidated EBITDA for the most recently ended Test Period (calculated on a Pro Forma Basis) in any calendar year (with unused amounts in any calendar year being carried over to the immediately succeeding two calendar years only and increasing such amount); *provided*, *further*, that such amount in any calendar year may further be increased by an amount not to exceed the sum of:

(A)      amounts used to increase the Cumulative Credit pursuant to clauses (c) and (d) of the definition of "Cumulative Credit"; and

(B)      the Net Proceeds of key man life insurance policies received (directly or indirectly) by the Borrowers or the other Restricted Subsidiaries of the Parent *less* the amount of Restricted Payments previously made with the cash proceeds of such key man life insurance policies; *provided* that such proceeds are used solely to repurchase Equity Interests held by the employee (or any of his or her successors or assigns, including any family trusts) that is the subject of such key man life insurance; *provided*, *further*, that cancellation of Indebtedness owing to the Borrowers or any other Restricted Subsidiary of the Parent from members of management of the Borrowers, any of the Borrowers' direct or indirect parent companies or any of the Borrowers' Restricted Subsidiaries in connection with a repurchase of Equity Interests of any of the Borrowers' direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of this Agreement;

(g)      each Borrower and each other Restricted Subsidiary of the Parent may make Restricted Payments in an aggregate amount not to exceed the Cumulative Credit at such time; *provided* that (x) no Event of Default has occurred and is continuing or would result therefrom and (y) solely with respect to amounts used to increase the Cumulative Credit pursuant to clause (b) of the definition of "Cumulative Credit", after giving Pro Forma Effect to such Restricted Payments, the Consolidated Total Net Leverage Ratio is equal to or less than 3.50 to 1.00 as of the most recently ended Test Period;

160

(h)        [reserved];

(i)     each Borrower and each other Restricted Subsidiary of the Parent may make Restricted Payments to any direct or indirect parent of such Borrower or such other Restricted Subsidiary of the Parent to pay:

(i)     general corporate, administrative, compliance or other operating (including, expenses related to auditing or other accounting matters and director indemnities, fees and expenses) and overhead costs and expenses of any direct or indirect parent of the Borrowers and the other Restricted Subsidiaries of the Parent to the extent such costs and expenses are attributable to the ownership or operation of the Borrowers and the Restricted Subsidiaries, including the Borrowers' and the Restricted Subsidiaries' proportionate share of such amount relating to such parent company being a public company;

(ii)     (A) franchise, excise and similar taxes, and other fees and expenses, required to maintain its corporate, legal and organizational existence and (B) distributions to such direct or indirect parent's equity owners in proportion to their equity interests sufficient to allow each such equity owner to receive an amount at least equal to the aggregate amount of its out-of-pocket costs to any unaffiliated third parties directly attributable to creating (including any incorporation or registration fees) and maintaining the existence of the applicable equity owner (including doing business fees, franchise, excise and similar taxes and other fees and expenses), and legal and accounting and other costs directly attributable to maintaining its corporate, legal, or organizational existence and complying with applicable legal requirements, including such costs attributable to the preparation of tax returns or compliance with tax laws, so long as attributable to the operations of the Borrowers and the Restricted Subsidiaries and such taxes or expenses are incurred in the ordinary course of business;

(iii)     for any taxable period in which any Borrower and, if applicable, any of its Subsidiaries is a member of a consolidated, combined or similar income tax group (or a disregarded entity directly owned by a member of such a group) of which a direct or indirect parent of such Borrower is the common parent (a "**Tax Group**"), federal and applicable state and local income taxes of such Tax Group then due and payable to the extent attributable to the taxable income of such Borrower and its applicable Subsidiaries; *provided* that the amount of such distributions shall not be greater than the amount of such taxes that would have been due and payable by such Borrower and its applicable Subsidiaries had such Borrower filed a separate stand-alone corporate tax return (or the Borrower and such Subsidiaries filed a consolidated, combined, unitary or similar type return with the Borrower as the consolidated parent) for all relevant taxable periods (and in the case of taxes attributable to unrestricted subsidiaries, such distributions shall be limited to the extent of cash distributions received from such unrestricted subsidiaries);

(iv)            [Reserved];

(v)     to finance any Investment by a parent entity that would be permitted to be made pursuant to  Section 7.02 and Section 6.19 if such parent were subject to such Sections; *provided* that (A)   such Restricted Payment shall be made substantially concurrently with the closing of such Investment, (B)   such parent shall, promptly following the closing thereof, cause (1) all property acquired (whether assets or Equity Interests) to be contributed to the Borrowers or the other Restricted Subsidiaries of the Parent that are Loan Parties or (2) the merger (to the extent permitted in Section 7.04) of the Person formed or acquired into the Borrowers or the other Restricted Subsidiaries of the Parent (with the applicable Borrower or the applicable Restricted Subsidiary that is a Loan Party being the surviving or continuing entity) in order to consummate such Permitted Acquisition or Investment, in each case, in accordance with the requirements of Section 6.11 (and such contribution shall not comprise or form a portion of the Excluded Contribution Amount or increase the amounts available for a Restricted Payment pursuant to Section 7.06 or otherwise constitute any portion of the Cumulative Credit) and (C) such contribution shall constitute an

161

Investment by the applicable Borrower or the applicable Restricted Subsidiaries, as the case may be, at the date of such contribution or merger, as applicable, in an amount equal to the amount of such Restricted Payment;

(vi)    the proceeds of which shall be used to pay customary salary, bonus and other benefits payable to and indemnities provided on behalf of officers, employees, directors, consultants and managers of the Parent or any direct or indirect parent company of the Parent to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrowers and the Restricted Subsidiaries; and

(vii)   the proceeds of which shall be used by the Parent to pay (or to make Restricted Payments to allow any direct or indirect parent thereof to pay) fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering by the Parent (or any direct or indirect parent thereof);

(j)    payments made or expected to be made by the Parent, any Borrower or any of the other Restricted Subsidiaries of the Parent in respect of withholding or similar Taxes payable by or with respect to any future, present or former employee, advisor, service provider, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options;

(k)    (i) so long as no Event of Default has occurred and is continuing or would result therefrom, any Restricted Payment in an amount not to exceed during the term of this Agreement (x) the greater of $1,000,000 and 10% of Consolidated EBITDA as of the last day of most recently ended Test Period and on a Pro Forma Basis (less any amounts redesignated to the General Investments Basket or the General RJDP Basket) *plus* (y) any amount which the Lead Borrower may, from time to time, elect to be redesignated from the General RJDP Basket (the "**General RP Basket**"), (ii) any Restricted Payment constituting any part of a Permitted IPO Reorganization or Permitted Tax Restructuring, (iii) after a Qualified IPO, any Restricted Payment by the Borrowers, any other Restricted Subsidiaries of the parent or any direct or indirect parent thereof to pay listing fees and other costs and expenses attributable to being a publicly traded company which are reasonable and customary and, so long as no Event of Default exists at the time of, or would result therefrom, additional Restricted Payments in an aggregate amount *per annum* not to exceed an amount equal to 6.0% of the net proceeds received by (or contributed to) the Borrowers and the other Restricted Subsidiaries of the Parent from such Qualified IPO;

(l)    the Parent, the Borrowers or any of the other Restricted Subsidiaries of the Parent may pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any Permitted Acquisition;

(m)    the payment of any Restricted Payment within 60 days after the date of declaration thereof, if at the date of declaration or the giving of such notice such payment would have complied with the provisions of this Section 7.06; *provided* that the declaration of such Restricted Payment will reduce capacity for Restricted Payments pursuant to such other provision when so declared;

(n)    (i) the redemption, repayment, repurchase, extinguishment, defeasance, retirement or other acquisition of any Equity Interests ("**Retired Capital Stock**") of the Parent or any direct or indirect parent of the Parent in exchange for, or out of the proceeds of, the substantially concurrent sale (other than to the Parent, a Borrower or another Restricted Subsidiary of the Parent) of, Equity Interests of the Parent or any direct or indirect parent of the Parent or contributions to the equity capital of the Parent (other than any Disqualified Equity Interests or any Equity Interests sold to a Subsidiary of the Parent) (collectively,

162

including any such contributions, "**Refunding Capital Stock**") and (ii) the declaration and payment of Restricted Payments on the Retired Capital Stock out of the proceeds of the substantially concurrent sale or issuance (other than to a Subsidiary of the Parent) of Refunding Capital Stock of the Parent;

(o)    [reserved];

(p)    payments made or expected to be made by any Borrower or any other Restricted Subsidiary of the Parent in respect of withholding, employment or similar taxes payable by any future, present or former employee, director, manager, or consultant of the Borrowers or any Restricted Subsidiary of the Parent or any direct or indirect parent of the Borrowers or any other Restricted Subsidiary of the Parent, and any repurchases of Equity Interests deemed to occur, in each case, upon exercise, vesting or settlement of, or payment with respect to, any equity or equity-based award, including, without limitation, stock or other equity options, stock or other equity appreciation rights, warrants, restricted equity units, restricted equity, deferred equity units or similar rights, if such Equity Interests are used by the holder of such award to pay a portion of the exercise price of such options, appreciation rights, warrants or similar rights or to satisfy any required withholding or similar taxes with respect to any such award;

(q)    Restricted Payments in an amount that does not exceed the Excluded Contribution Amount;

(r)    [Reserved];

(s)    unlimited Restricted Payments, *provided* that (i) no Event of Default shall have occurred and be continuing immediately prior to, or shall result from, such Restricted Payment and (ii) after giving Pro Forma Effect to such Restricted Payments, the Consolidated Total Net Leverage Ratio is equal to or less than 2.50:1.00 as of the most recently ended Test Period;

(t)    the distribution, by dividend or otherwise, of shares of Equity Interests of, or Indebtedness owed to the Borrowers or any other Restricted Subsidiary of the Parent by, Unrestricted Subsidiaries or the proceeds thereof;

(u)    AHYDO Payments with respect to Indebtedness of the Borrowers and any other Restricted Subsidiaries of the Parent;

(v)    the declaration and payment of Restricted Payments by the Borrowers or any other Restricted Subsidiaries of the Parent to any direct or indirect parent of the Borrowers or any other Restricted Subsidiaries of the Parent in amounts required for any such direct or indirect parent (or such parent's direct or indirect equity owners) to pay:

(i)    to the extent constituting Restricted Payments, amounts that would be permitted to be paid directly by such Borrower or such Restricted Subsidiaries under Section 6.19(e), and

(ii)    AHYDO Payments with respect to Indebtedness of any direct or indirect parent of the Borrowers; *provided* that the proceeds of such Indebtedness have been contributed to the Borrowers as a capital contribution; and

(w)    Restricted Payments incidental to and made in connection with any Receivables Facility and any customary transactions with a Securitization Subsidiary effected as part of a Qualified Securitization Financing.

Section 7.07.    [Reserved].

163

Section 7.08.    [Reserved].

Section 7.09.    Burdensome Agreements.

Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of:

(a)    any Restricted Subsidiary of the Parent that is not a Guarantor to make Restricted Payments to the Parent or any Guarantor; or

(b)    any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Facilities and the Obligations; *provided* that the foregoing Sections 7.09(a) and (b) shall not apply to Contractual Obligations which:

(i)    (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09 and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing (taken as a whole) does not materially expand the scope of such Contractual Obligation (as reasonably determined by the Lead Borrower);

(ii)    are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary of the Parent, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary of the Parent;

(iii)    represent Indebtedness of a Restricted Subsidiary of the Parent which is not a Loan Party which is permitted by Section 7.03 and which does not apply to any Loan Party;

(iv)    are customary restrictions (as reasonably determined by the Lead Borrower) that arise in connection with (x) any Lien permitted by Sections 7.01(a), (b), (i), (j), (k), (l), (m), (o), (p), (q), (r)(i), (r)(ii), (s), (t), (u), (v), (w), (y), (z), (aa), (bb), (cc), (dd), (ee), (ff), (gg), (hh), (ll), (oo) and (qq) and relate to the property subject to such Lien or (y) arise in connection with any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition;

(v)    are customary provisions in joint venture agreements or arrangements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture and its equity entered into in the ordinary course of business;

(vi)    are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to (i) the property financed by such Indebtedness and the proceeds, accessions and products thereof or (ii) the Indebtedness secured by such property and the proceeds, accessions and products thereof so long as the agreements governing such Indebtedness permit the Liens securing the Obligations;

(vii)    are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(viii)    comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 7.03(b), (e), (g), (n)(i), (u), (v), (w) and (y) and to the extent that such restrictions apply only to the property securing such Indebtedness or, in the case of

164

Sections 7.03(g) or (u), to the Restricted Subsidiaries or Foreign Subsidiaries, as applicable, incurring or guaranteeing such Indebtedness;

(ix)    are customary provisions restricting subletting, transfer or assignment of any lease governing a leasehold interest of any Borrower or any other Restricted Subsidiary of the Parent;

(x)    are customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(xi)    are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(xii)    arise in connection with cash or other deposits permitted under Sections 7.01 and 7.02 and limited to such cash or deposit;

(xiii)    comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Closing Date and permitted under Section 7.03 that are, taken as a whole, in the good faith judgment of the Lead Borrower, no more restrictive with respect to any Borrower or any other Restricted Subsidiary of the Parent than customary market terms for Indebtedness of such type (and, in any event, taken as a whole, are not more restrictive than the restrictions contained in this Agreement), so long as the Lead Borrower shall have determined in good faith that such restrictions will not affect in any material respect its obligation or ability to make any payments required hereunder;

(xiv)    are restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(xv)    are restrictions in the documentation governing any Supplier Financing Facility that in the good faith determination of Lead Borrower are necessary or advisable to effect such Supplier Financing Facility;

(xvi)    are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder;

(xvii)    are restrictions that will not materially impair the Borrowers' ability to make payments under the Loan Documents (as determined in good faith by the Lead Borrower);

(xviii)    restrictions or encumbrances imposed by other Indebtedness of Restricted Subsidiaries permitted to be incurred subsequent to the Closing Date pursuant to the provisions of Section 7.01;

(xix)    are Standard Securitization Undertakings created in connection with any Receivables Facility or any Qualified Securitization Financing that, in the good faith determination of the board of directors (or analogous governing body) of the Lead Borrower, are necessary or advisable to effect such Receivables Facility or Qualified Securitization Financing, as the case may be; and

(xx)    any encumbrances or restrictions of the type referred to in clauses (a) and (b) above imposed by any amendments, modifications, restatements, renewals, increases, extensions, supplements, refundings, replacements, restructurings or refinancings of the contracts, instruments or obligations referred to in clauses (i) through (xix) above; provided that such amendments, modifications, restatements, renewals, increases, extensions, supplements, refundings, replacements, restructurings or refinancings (x) are, in the good faith judgment of the Lead Borrower, not materially more restrictive with

165

respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, extension, supplement, refunding, replacement, restructuring or refinancing or (y) do not materially impair the Borrowers' ability to pay their obligations under the Loan Documents as and when due (as determined in good faith by the Lead Borrower);

*provided* that (x) the priority of any preferred Equity Interests in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill requirements to) loans or advances made to any Borrower or any Restricted Subsidiary that is a Guarantor to other Indebtedness incurred by any Borrower or any Restricted Subsidiary that is a Guarantor shall not be deemed to constitute such an encumbrance or restriction.

Section 7.10.    <u>Amendments or Waivers of Organizational Documents.</u>

Agree, or permit any Restricted Subsidiaries to agree, to any material amendment, restatement, supplement or other modification to, or waiver of, any of its Organization Documents after the Closing Date in a manner that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 7.11.    <u>Financial Covenant.</u>

Subject to <u>Section 8.04</u>, permit the Consolidated Total Net Leverage Ratio as of the last day of any Test Period (commencing with the Test Period ending on March 30, 2021) to be greater than:

| Test Period Ending Date | Consolidated Total Net Leverage Ratio |
| --- | --- |
| March 30, 2021 | 5.00:1.00 |
| June 30, 2021 | 5.00:1.00 |
| September 30, 2021 | 5.00:1.00 |
| December 31, 2021 | 5.00:1.00 |
| March 30, 2022 | 5.00:1.00 |
| June 30, 2022 | 3.75:1.00 |
| September 30, 2022 | 3.75:1.00 |
| December 31, 2022 | 3.75:1.00 |
| March 30, 2023 | 3.75:1.00 |
| June 30, 2023 | 3.75:1.00 |
| September 30, 2023 | 3.00:1.00 |
| December 31, 2023 | 3.00:1.00 |

166

| March 30, 2024 | 3.00:1.00 |
|---|---|
| June 30, 2024 | 3.00:1.00 |
| September 30, 2024 | 3.00:1.00 |
| December 31, 2024 | 3.00:1.00 |
| March 30, 2025 | 3.00:1.00 |
| June 30, 2025 | 3.00:1.00 |
| September 30, 2025 | 3.00:1.00 |
| December 31, 2025 | 3.00:1.00 |
| March 30, 2026 | 3.00:1.00 |
| June 30, 2026 | 3.00:1.00 |
| September 30, 2026 | 3.00:1.00 |

Section 7.12.    Prepayments, Etc. of Junior Financings.

(a)    Voluntarily repay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof (it being understood that payments of regularly scheduled principal, interest and fees and mandatory expense reimbursement obligations and customary mandatory prepayments and AHYDO Payments and, in connection with the amendment of any Junior Financing, the payment of fees (other than in connection with any amendment that reduces or forgives the commitments, outstanding principal amount or effective yield of such Junior Financing) shall be permitted) any Indebtedness that is (x) subordinated in right of payment to the Obligations expressly by its terms, (y) secured on a junior lien basis to the Liens securing the Obligations (other than Indebtedness among the Borrowers and the other Restricted Subsidiaries of the Parent) and (z) any Indebtedness that is unsecured (collectively, "**Junior Financing**"), with a principal amount outstanding in excess of the Threshold Amount except (i) the refinancing thereof with any Indebtedness permitted by Section 7.03, (ii) the conversion or exchange of any Junior Financing to Equity Interests (other than Disqualified Equity Interests) of the Parent or any direct or indirect parent entity thereof, (iii) the prepayment, redemption, purchase, defeasement or satisfaction of Indebtedness of any Borrower or any other Restricted Subsidiary of the Parent to any Borrower or any other Restricted Subsidiary of the Parent, (iv) any forgiveness or repayment utilizing the cash escrow accounts as in effect on the Closing Date of any PPP Loan, (v) prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings prior to their scheduled maturity in an aggregate amount not to exceed, the Cumulative Credit at such time; *provided* that (x) no Event of Default has occurred and is continuing or would result therefrom and (y) solely with respect to amounts used to increase the Cumulative Credit pursuant to clause (b) of the definition of "Cumulative Credit", after giving Pro Forma Effect to such Restricted Payments, the Consolidated Total Net Leverage Ratio is equal to or less than 3.50:1.00 as of the most recently ended Test Period, (vi) so long as no Event of Default has occurred and is continuing or would result therefrom, the prepayment, redemption, defeasance, repurchase or other acquisition or retirement for value of Junior Financing in an aggregate amount not to exceed during the term of this Agreement the greater of $1,500,000 and 15% of Consolidated EBITDA as of the last day of the most

167

recently ended Test Period (calculated on a Pro Forma Basis) (plus any amount which the Lead Borrower may, from time to time, elect to be redesignated from the General RP Basket and less any amounts redesignated to the General Investments Basket or the General RP Basket) (the "**General RJDP Basket**"),

(vii) the prepayment, redemption, defeasance, repurchase, or satisfaction of Junior Financing so long as (x) no Event of Default has occurred and is continuing or would result therefrom and (y) the Borrowers are in compliance (on a Pro Forma Basis) with a Consolidated Total Net Leverage Ratio of equal to or less than 3.25:1.00 (computed as of the last day of the most recently ended Test Period), (viii) in an amount not to exceed the Excluded Contribution Amount (other than amounts constituting Cure Amounts or the Cumulative Credit), and (ix) prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings prior to their scheduled maturity in an aggregate amount equal to Declined Proceeds.

(b)    Amend or modify any term or condition of any Junior Financing Documentation in respect of any Junior Financing having an aggregate outstanding principal amount in excess of the Threshold Amount in any manner materially adverse to the interests of Lenders (in their capacity as such) except (x) pursuant to a refinancing, replacement or extension expressly permitted pursuant to Section 7.03 or (y) to the extent not expressly prohibited in the applicable Intercreditor Agreement.

Notwithstanding anything to the contrary in any Loan Document, the Loan Parties and their Restricted Subsidiaries may make regularly scheduled payments of interest and fees on any Junior Financing, and may make any payments required by the terms of such Indebtedness in order to avoid the application of Section 163(e)(5) of the Code to such Indebtedness.

Section 7.13.    Permitted Activities.

The Parent will not engage in any material operating or business activities; *provided* that the following and any activities incidental or related thereto shall be permitted in any event: (i) its ownership of the Equity Interests of the Borrowers and indirectly all other Equity Interests held by the Borrowers or any Subsidiary, including receipt and payment of Restricted Payments and other amounts in respect of Equity Interests, (ii) the maintenance of its legal existence (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance), (iii) the performance of its obligations with respect to the Transactions (including under the Acquisition Agreement), the Loan Documents and any other documents governing Indebtedness of the Borrowers or the other Restricted Subsidiaries of the Parent permitted hereby, (iv) any public offering of its or a direct or indirect parent entity's common equity or any other issuance or sale of its or a direct or indirect parent entity's Equity Interests, (v) financing activities incidental to or in connection with its ownership and operations of the Borrowers or any Subsidiary, including (a) the issuance of unsecured securities and other unsecured holding company debt, including any Permitted Parent Holdco Financing (subject to the terms set forth in the definition thereof); *provided* that (x) neither the Borrowers nor any other Restricted Subsidiary of the Parent is a borrower or a guarantor with respect to such debt under this clause (a) and (y) except in respect of any Permitted Parent Holdco Financing, such debt under this clause (a) shall have a final maturity date that is after the then existing Latest Maturity Date with respect to the Term Loans, (b) receipt and payment of dividends and distributions, (c) making contributions to the capital of its Subsidiaries and (d) guaranteeing and/or incurring Liens to the extent such Liens would otherwise be permitted to be incurred pursuant to Section 7.01 as if applicable to the Parent to secure any obligations of the Borrowers and the other Restricted Subsidiaries of the Parent incurred pursuant to Section 7.03, (vi) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries, (vii) holding any cash or property (but not operating any property), (viii) making and receiving of any Restricted Payments or Investments permitted hereunder, (ix) providing indemnification to officers and directors, (x) activities relating to any Qualified

168

IPO, (xi) merging, amalgamating or consolidating with or into any direct or indirect parent or subsidiary of the Parent that becomes "New Parent" (in compliance with the definitions of "Parent" and "New Parent" in this Agreement), (xii) activities incidental to Permitted Acquisitions or similar Investments consummated by the Borrowers and the other Restricted Subsidiaries of the Parent, including the formation of acquisition vehicle entities and intercompany loans and/or Investments incidental to such Permitted Acquisitions or similar Investments, (xiii) any transaction with any Borrower or any Restricted Subsidiary to the extent expressly permitted under this Article VII, (xiv) transactions in connection with a Permitted Tax Reorganization or Permitted IPO Reorganization and (xv) any activities incidental or reasonably related to the foregoing.

## ARTICLE VIII.
## EVENTS OF DEFAULT AND REMEDIES

Section 8.01.  Events of Default.

Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)  *Non-Payment*. Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, (ii) within five (5) Business Days after the same becomes due, any interest on any Loan, or (iii) within ten (10) Business Days after the same becomes due, any fees or other amounts payable hereunder or with respect to any other Loan Document; or

(b)  *Specific Covenants*. Any Borrower, any other Restricted Subsidiary of the Parent or, in the case of  Section 7.13, the Parent, fails to perform or observe any term, covenant or agreement contained in any of Sections 6.01(a), 6.01(b), 6.01(c) (in the case of Sections 6.01(a), 6.01(b) and 6.01(c), which failure continues for twenty (20) days), 6.03(a) (*provided* that notice of such Event of Default shall cure any such Event Default as a result of a breach under Section 6.03(a)) or 6.05(a) (solely with respect to the Lead Borrower), 6.13(b), 6.19 or Article VII; *provided*, that the covenant in Section 7.11 is subject to cure pursuant to  Section 8.04 and an Event of Default with respect to Section 7.11 shall be deemed not to have occurred if the Lead Borrower delivers written notice of its intent to exercise its cure right pursuant to Section 8.04 on or prior to the fifteenth Business Day after the date (and exercises such cure right prior to such date) that the relevant financial statements are required to be delivered pursuant to Section 6.01(a) (with respect to the fourth fiscal quarter of any fiscal year) or (b) (with respect to the first three fiscal quarters of any fiscal year), as applicable, for the fiscal quarter in which such default occurred; or

(c)  *Other Defaults*. Any Loan Party or Restricted Subsidiary fails to perform or observe any other covenant or agreement (not specified in Sections 8.01(a), (b) or (d)) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier to occur of (i) receipt by the Lead Borrower of written notice thereof from the Administrative Agent and (ii) actual knowledge of such failure by a Responsible Officer of the Lead Borrower; or

(d)  *Representations and Warranties*. (i) On the Closing Date, any Specified Representation shall be incorrect in any material respect and (ii) after the Closing Date, any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein, or in any other Loan Document, shall be incorrect in any material respect when made or deemed made; or

(e)  *Cross-Default*. Any Loan Party or any Restricted Subsidiary (A) fails to make any payment beyond the applicable grace or cure period, if any, and following all required notices whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount of not

169

less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (B) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness, if such sale or transfer is permitted hereunder, (ii) any Indebtedness if (x) the sole remedy of the holder thereof in the event of the non-payment of such Indebtedness or the non-payment or non-performance of obligations related thereto or (y) sole option is to elect, in each case, to convert such Indebtedness into Qualified Equity Interests and cash in lieu of fractional shares, (iii) in the case of Indebtedness which the holder thereof may elect to convert into Qualified Equity Interests, such Indebtedness from and after the date, if any, on which such conversion has been effected and (iv) any breach or default that is (I) contested in good faith, (II) remedied by the Parent, the applicable Borrower or the applicable Restricted Subsidiary or (III) waived (including in the form of amendment) by the required holders of the applicable item of Indebtedness, in either case, prior to any termination of the Commitments or the acceleration of Loans pursuant to this Section 8.01(e); or

(f)      *Insolvency Proceedings, Etc.* Other than to the extent otherwise permitted hereunder, any Loan Party or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or substantially all of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 consecutive calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 consecutive calendar days, or an order for relief is entered in any such proceeding; or

(g)      *Judgments.* There is entered against any Loan Party or any Material Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by either (i) independent third-party insurance as to which the insurer does not deny coverage or (ii) another creditworthy (as reasonably determined by the Lead Borrower in consultation with the Administrative Agent) indemnitor)); and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of 60 consecutive days; or

(h)      *Invalidity of Loan Documents.* Any material provision of the Loan Documents, at any time after its execution and delivery and for any reason other than (i) as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05), (ii) as a result of acts or omissions by the Administrative Agent or any Lender, or (iii) the satisfaction in full of all the Obligations (other than contingent indemnification obligations not then due)), ceases to be in full force and effect; or any Loan Party that is a Material Subsidiary contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral; or any Loan Party that is a Material Subsidiary denies in writing that it has any or further liability or obligation under any Loan Document (other than (i) as a result of repayment in full of the Obligations and termination of the Aggregate Commitments or (ii) in accordance with its terms), or purports in writing to revoke or rescind any Loan Document (other than in

170

accordance with its terms); or

(i)         *Change of Control*. There occurs any Change of Control; or

(j)    *Collateral Documents*. The Collateral Documents after delivery thereof pursuant to <u>Sections 4.01</u>, <u>6.11</u> or <u>6.13</u> or the Collateral Documents shall for any reason (other than pursuant to the terms thereof, including as a result of a transaction not prohibited under this Agreement) cease to create a valid and perfected Lien on, and security interest in a portion of the Collateral purported to be covered thereby in an aggregate value exceeding the Threshold Amount, subject to Liens permitted under <u>Section 7.01</u>, (i) except to the extent that (x) any such perfection is not required pursuant to the Collateral and Guarantee Requirement or (y) any such loss of perfection results from the action or inaction of the Administrative Agent or any Lender and (ii) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(k)    *ERISA*. (i) An ERISA Event occurs which has resulted or could reasonably be expected to result in liability of a Loan Party or a Restricted Subsidiary in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party, any Restricted Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and a Material Adverse Effect could reasonably be expected to result.

Section 8.02.    <u>Remedies Upon Event of Default</u>.

Subject to <u>Section 8.04</u>, if any Event of Default occurs and is continuing, the Administrative Agent may, and at the request of the Required Lenders, shall take any or all of the following actions (and, for the avoidance of doubt, in the case of an Event of Default under <u>Section 8.01(b)</u> in respect of a failure to observe or perform the covenant under <u>Section 7.11</u>, such actions hereinafter described will be permitted to occur only following the expiration of the ability to effectuate the cure right if such cure right has not been so exercised, and at any time thereafter during the continuance of such event):

(i)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers (to the extent permitted by applicable Law); *provided* that, in event of an acceleration of the Initial Term Loans (A) prior to the date that is one year after the Closing Date, the Borrowers shall pay to the Term Lenders a fee equal to 2.00% of the aggregate principal amount of the Initial Term Loans subject to such acceleration or (B) on or after the date that is one year after the Closing Date but prior to the date that is two years after the Closing Date, the Borrowers shall pay to the Term Lenders a fee equal to 1.00% of the aggregate principal amount of the Initial Term Loans subject to such acceleration;

(iii)         [reserved]; and

(iv)    exercise on behalf of itself and the Lenders subject to the terms herein, all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

Notwithstanding anything to the contrary, upon an Event of Default pursuant to <u>Section 8.01(f)</u> or upon the

entry of an order for relief with respect to the Borrowers under the Bankruptcy Code of the United States or any Debtor Relief Laws, the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender.

Section 8.03.    Application of Funds.

Except as may be otherwise provided in the applicable Incremental Amendment with respect to Obligations under the applicable Incremental Loans, in any applicable Refinancing Amendment with respect to Obligations under the applicable loans thereunder or in any agreement with respect to Obligations in any Extension Amendment, and subject to the terms of any intercreditor arrangement permitted by this Agreement to which the Administrative Agent or Collateral Agent is a party, after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable Law):

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) earned, due and payable to the Administrative Agent or Collateral Agent in their capacities as such hereunder;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest and amounts under Treasury Services Agreements or Secured Hedge Agreements) earned, due and payable to the Lenders hereunder (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest or premiums on the Loans, and any fees, premiums and scheduled periodic payments due under Treasury Services Agreements or Secured Hedge Agreements, ratably among the Secured Parties in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans and any breakage, termination or other payments under Treasury Services Agreements or Secured Hedge Agreements, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the payment of all other Obligations of the Loan Parties that are earned, due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Obligations then earned, due and payable have been paid in full, to the Borrowers or as otherwise required by Law.

Notwithstanding the foregoing, amounts received from any Guarantor that is not an "Eligible Contract Participant" (as defined in the Commodity Exchange Act) shall not be applied to its Obligations that are Excluded Swap Obligations.

Section 8.04.    Borrower's Right to Cure.

172

Notwithstanding anything to the contrary contained in Article VIII:

(a)    For the purpose of determining whether an Event of Default under Section 7.11 has occurred, the Lead Borrower may on one or more occasions designate any portion of the net cash proceeds from a sale or issuance of Equity Interests (other than Disqualified Equity Interests unless reasonably acceptable to Administrative Agent) of the Lead Borrower (or any direct or indirect parent company), which proceeds are then contributed to the Lead Borrower as cash common equity) or any cash contribution to the common equity capital of the Lead Borrower (the "**Cure Amount**") as an increase to Consolidated EBITDA for the applicable fiscal quarter; *provided*, that (A) such amounts to be designated (i)    are actually received by the Lead Borrower after the end of the applicable fiscal quarter and on or prior to the fifteenth Business Day after the date on which financial statements are required to be delivered pursuant to Section 6.01(a) (with respect to the fourth fiscal quarter of any fiscal year) or (b) (with respect to the first three fiscal quarters of any fiscal year) (such date, the "**Cure Expiration Date**") and (ii) do not exceed the aggregate amount necessary to cure any Event of Default under Section 7.11 as of such date and (B) the Lead Borrower shall have provided notice (the "**Notice of Intent to Cure**") to the Administrative Agent that such amounts are designated as a "Cure Amount" (it being understood that to the extent such notice is provided in advance of delivery of a Compliance Certificate for the applicable period, the amount of such Net Proceeds that is designated as the Cure Amount may be lower than specified in such notice to the extent that the amount necessary to cure any Event of Default under Section 7.11 is less than the full amount of such originally designated amount). At the request of the Lead Borrower, the Cure Amount used to calculate Consolidated EBITDA for one fiscal quarter shall be used and included when calculating Consolidated EBITDA for each Test Period that includes such fiscal quarter solely for purposes of determining actual compliance with Section 7.11.

(b)    The parties hereby acknowledge that this Section 8.04 may (i) not be relied on for purposes of calculating any financial ratios or Consolidated EBITDA other than for determining actual compliance with Section 7.11 (and not Pro Forma Compliance with Section 7.11 that is required by any other provision of this Agreement) and (ii) shall not result in any adjustment to any amounts (including the amount of Indebtedness or Consolidated Total Net Debt or any other calculation of net leverage or Indebtedness hereunder (including any cash netting of the proceeds thereof) and shall not be included for purposes of determining pricing, mandatory prepayments and the availability or amount permitted pursuant to any covenant under Article VII) other than the amount of the Consolidated EBITDA referred to in Section 8.04(a) above; *provided*, that the prepayment of Indebtedness with the proceeds of such Cure Amount shall be given effect in each applicable fiscal quarter following the fiscal quarter in respect of which the Cure Amount was received.

(c)    In furtherance of Section 8.04(a) above, (i) upon receipt of the Cure Amount prior to the Cure Expiration Date, the covenant under Section 7.11 shall be deemed retroactively cured with the same effect as though there had been no failure to comply with the covenant under such Section 7.11 and any Default, Event of Default or potential Event of Default under Section 7.11 (or any notice required by Section 6.03(a) as a result thereof) shall be deemed not to have occurred for purposes of the Loan Documents, and (ii)(x) for purposes hereof, no Default, Event of Default or potential Event of Default shall exist with respect to a breach of Section 7.11 until and unless the Cure Expiration Date has occurred without the Cure Amount having been received, and (y) none of the Administrative Agent, any Lender or any other Secured Party may exercise any rights or remedies under Section 8.02 (or under any other Loan Document) on the basis of any actual or purported Default or Event of Default under Section 7.11 until and unless the Cure Expiration Date has occurred without the Cure Amount having been received unless such Event of Default shall have been waived in accordance with the terms of this Agreement. Notwithstanding the foregoing, the Lenders shall not be required to make any Revolving Credit Borrowing. None of the Administrative Agent, any Lender or any other Secured Party shall take any action to foreclose on, or take possession of, the Collateral, accelerate any Obligations, terminate any Commitments or otherwise exercise

173

any remedies under any Loan Document or any applicable laws on the basis of a breach of Section 7.11 (or as a direct result of consummation of any transaction pursuant to Article VII that would be not permitted hereunder solely due to the continuance of a Default or Event of Default under Section 7.11 or the failure to deliver a notice of default, solely in respect of a Default or Event of Default under Section 7.11 as required pursuant to Section 6.03(a)), unless and until the Cure Expiration Date has occurred and the Lead Borrower has not received the Cure Amount.

(d)    (i) In each period of four consecutive fiscal quarters, there shall be at least two fiscal quarters in which no cure right set forth in this Section 8.04 is exercised and (ii) there shall be no *pro forma* reduction in Indebtedness with the Cure Amount for determining compliance with Section 7.11 for the fiscal quarter with respect to which such Cure Amount was made.

(e)    There can be no more than five fiscal quarters in which the cure rights set forth in this Section 8.04 are exercised during the term of the Facilities.

**ARTICLE IX. ADMINISTRATIVE AGENT AND OTHER AGENTS**

Section 9.01.    Appointment and Authority.

(a)    Each of the Lenders hereby irrevocably appoints Adams Street Credit Advisors LP to on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Admaicntistrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental or related thereto. The provisions of this Article IX (other than Sections 9.01, 9.05, 9.06 and 9.09 through and including 9.13) are solely for the benefit of the Administrative Agent and the Lenders, and no Loan Party has rights as a third party beneficiary of any of such provisions.

(b)    The Administrative Agent shall also act as the "Collateral Agent" under the Loan Documents, and each of the Lenders (including in its capacities as a potential Hedge Bank) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "Collateral Agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and Article X (including the second paragraph of Section 10.05), as though such co-agents, sub-agents and attorneys-in-fact were the "Collateral Agent" under the Loan Documents as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to (i) execute any and all documents (including releases) with respect to the Collateral (including each Intercreditor Agreement and any other applicable intercreditor agreements contemplated hereby and any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

Without prejudice to the provisions of this Agreement and the other Loan Documents, the parties

174

hereto acknowledge and agree with the creation of parallel debt obligations of the Loan Parties in connection with a Foreign Subsidiary becoming a Guarantor in accordance with Section 6.11, including that any payment received by the Administrative Agent in respect of parallel debt obligations will be deemed a satisfaction of the corresponding amounts of the Secured Obligations.

Section 9.02.    Rights as a Lender.

The Person serving as the Administrative Agent or the Collateral Agent, as applicable, hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent or the Collateral Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent or the Collateral Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrowers or any Subsidiary of the Parent or any other Affiliate thereof as if such Person were not the Administrative Agent or the Collateral Agent hereunder and without any duty to account therefor to the Lenders.

Section 9.03.    Exculpatory Provisions.

Neither the Administrative Agent nor the Collateral Agent shall have any duties or obligations to the Lenders except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent and the Collateral Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent or the Collateral Agent, as applicable, is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that neither the Administrative Agent nor the Collateral Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose the Administrative Agent or the Collateral Agent, as applicable, to liability or that is contrary to any Loan Document or applicable law or (ii) be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law;

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or the Collateral Agent, as applicable, or any of its Affiliates in any capacity;

(d)    shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent or the Collateral Agent, as applicable, shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence, willful misconduct or bad faith as determined by a court of competent jurisdiction in a final and non-appealable judgment. The Administrative Agent and the Collateral Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Lead Borrower or a Lender; and

175

(e)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or the Collateral Agent, as applicable.

Section 9.04.    Reliance by Administrative Agent and Collateral Agent .

The Administrative Agent and the Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent and the Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent and the Collateral Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by either of them, and shall not be liable to the Lenders for any action taken or not taken by either of them in accordance with the advice of any such counsel, accountants or experts.

Section 9.05.    Delegation of Duties.

The Administrative Agent and the Collateral Agent may perform any and all of their duties and exercise their rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent or the Collateral Agent, as applicable. The Administrative Agent and the Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory and indemnification provisions of this Article IX shall apply to any such sub-agent and to the Related Parties of the Administrative Agent or the Collateral Agent, as applicable, and any such sub-agent, and shall apply to their activities as Administrative Agent or Collateral Agent, as applicable. The Administrative Agent and the Collateral Agent shall not be responsible to the Lenders for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent or the Collateral Agent, as applicable, acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.06.    Resignation of Administrative Agent.

The Administrative Agent may at any time give notice of its resignation to the Lenders and the Lead Borrower. If the Administrative Agent is a Defaulting Lender or is in material breach of its obligations under this Agreement, the Lead Borrower may remove such Defaulting Lender from such role upon 15 days' notice to the Lenders. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Lead Borrower at all times other than upon the occurrence and during the continuation of an Event of Default under Sections 8.01(a) or 8.01(f) (which consent of the Lead

176

Borrower shall not be unreasonably withheld, denied, conditioned or delayed), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above (including consent of the Lead Borrower other than upon the occurrence and during the continuation of an Event of Default under Section 8.01(a) or 8.01(f)); *provided* that if the Administrative Agent shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations (other than in respect of confidentiality obligations pursuant to and in accordance with Section 10.08 and to the extent not discharged pursuant to the terms thereof) hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed and, with respect to its rights and obligations under any parallel debt obligations, until such rights and obligations have been assigned to and assumed by the successor Administrative Agent) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section 9.06. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations (other than in respect of confidentiality obligations pursuant to and in accordance with Section 10.08 and to the extent not discharged pursuant to the terms thereof) hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.06). The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Sections 10.04 and 10.05 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Upon any resignation by Adams Street Credit Advisors LP as Collateral Agent and acceptance of a successor's appointment as Collateral Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Collateral Agent and (ii) the retiring Collateral Agent shall be discharged from all of its respective duties and obligations (other than in respect of confidentiality obligations pursuant to and in accordance with Section 10.08 and to the extent not discharged pursuant to the term thereof) hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.06) (except that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed and, with respect to its rights and obligations under any parallel debt obligations, until such rights and obligations have been assigned to and assumed by the successor Collateral Agent).

Without prejudice to the provisions of this Agreement and the other Loan Documents, each of the Administrative Agent and the Collateral Agent will reasonably cooperate in assigning its rights and obligations under any parallel debt obligations established in connection with a Foreign Subsidiary becoming a Guarantor in accordance with Section 6.11 to, and assumption of such rights and obligations by, any such successor agent and will reasonably cooperate in transferring all rights under any relevant

177

foreign Collateral Document (as the case may be) to such successor agent.

Section 9.07.   Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or the Collateral Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.08.   No Other Duties, Etc.

Anything herein to the contrary notwithstanding, none of the Administrative Agent, Collateral Agent, Bookrunner or Lead Arranger listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, the Collateral Agent or a Lender hereunder.

Section 9.09.   Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)   to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel, in each case reimbursable hereunder, and all other amounts due the Lenders and the Administrative Agent under Sections 2.09, 10.04 and 10.05) allowed in such judicial proceeding; and

(b)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, in each case reimbursable hereunder, and any other amounts due the Administrative Agent under Sections 2.09, 10.04, and 10.05.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent

to vote in respect of the claim of any Lender or in any such proceeding.

Section 9.10.    <u>Collateral and Guaranty Matters</u>.

Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise expressly set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time, to take any action with respect to any Collateral or Collateral Documents which may be necessary to create, perfect and maintain perfected security interests in and Liens upon the Collateral granted pursuant to the Loan Documents. Each of the Lenders irrevocably authorizes the Administrative Agent and the Collateral Agent, at its option:

(a)    to enter into and sign for and on behalf of the Lenders as Secured Parties the Collateral Documents for the benefit of the Lenders and the other Secured Parties;

(b)    to automatically release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (x) contingent indemnification obligations not then due and (y) Cash Management Obligations or obligations and liabilities pursuant to Secured Hedge Agreements) that are accrued and payable and the termination of the Commitments), (ii) at the time the property subject to such Lien is disposed or to be disposed as part of or in connection with any Disposition permitted hereunder or under any other Loan Document to a Person that is not a Loan Party, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, (iv) such property constitutes Excluded Assets (other than if such Lien on the Collateral was originally created on Excluded Assets at the request of the Lead Borrower; provided that the Lead Borrower may re-designate such property as an Excluded Asset by notice in writing to the Agents in its sole discretion if the property would then constitute an Excluded Asset at the time of such re-designation), (v) to the extent provided in the Collateral Documents and an Intercreditor Agreement or (vi) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to Section 9.10(d);

(c)    (i) to release or subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to another Lien (A) permitted to exist on such property, including any Lien permitted under Sections 7.01(b) and (v), and (B) permitted to be senior to the Liens of the Secured Parties under this Agreement and (ii) to enter into subordination or intercreditor agreements with respect to Indebtedness that is expressly required or permitted to be subordinated hereunder and/or secured by Liens (including priority thereof) and to the extent the Administrative Agent or the Collateral Agent is otherwise contemplated herein as being a party to such intercreditor or subordination agreement, including an Intercreditor Agreement; and

(d)    to automatically release any Guarantor (other than the Lead Borrower) from its obligations under the Guaranty if such Person ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder.

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Administrative Agent and

179

the Collateral Agent shall (and each Lender irrevocably authorizes the Administrative Agent and the Collateral Agent to), at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

Section 9.11.    Secured Treasury Services Agreements and Secured Hedge Agreements.

Anything contained in any of the Loan Documents to the contrary notwithstanding, the Parent, the Borrowers, the Agents and each Secured Party hereby agree that no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under the Guaranty may be exercised solely by the Administrative Agent, on behalf of the Secured Parties, in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent, in each case, on behalf of the Secured Parties. No Hedge Bank that obtains the benefits of Section 8.03, any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article IX to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Treasury Services Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Secured Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Hedge Bank.

The Hedge Banks hereby authorize the Administrative Agent and the Collateral Agent to enter into any Intercreditor Agreement or other intercreditor or subordination agreement permitted under this Agreement, and any amendment, modification, replacement, extension, supplement or joinder with respect thereto, and any such intercreditor agreement is binding upon the Hedge Banks.

Section 9.12.    Withholding Tax Indemnity.

To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective or if any payment has been made by the Administrative Agent to any Lender without applicable withholding Tax being deducted from such payment), such Lender shall, within 10 days after written demand therefor, indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrowers pursuant to Sections 3.01 and 3.04 and without limiting or expanding the obligation of the Borrowers to do so) for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this

180

Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.12. The agreements in this Section 9.12 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

## ARTICLE X. MISCELLANEOUS

Section 10.01.   Amendments, Etc.

Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) (other than with respect to any amendment or waiver contemplated in Sections 10.01(a) through (g) below, which shall only require the consent of the Lenders expressly set forth therein and not the Required Lenders) (with a copy of all amendments provided to the Administrative Agent) and the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)   extend or increase the Commitment of any Lender without the written consent of each Lender holding such Commitment (it being understood that a waiver of any condition precedent set forth in Sections 4.01 or 4.02 or of any Default, Event of Default, Default Rate, mandatory prepayment or mandatory reduction of any Commitments shall not constitute such an extension or increase);

(b)   postpone any date scheduled for any payment of principal (including final maturity), interest, premiums or fees hereunder, without the written consent of each Lender directly and adversely affected thereby (it being understood that (i) the waiver (or amendment to the terms of) of any mandatory prepayment of the Loans or any obligation of the Borrowers to pay interest at the Default Rate, any Default or Event of Default, mandatory prepayment or mandatory reduction of any Commitments shall not constitute such a postponement of any date scheduled for the payment of principal or interest and
(ii)   any change to the definition of "Consolidated Total Net Leverage Ratio" or the component definitions thereof shall not constitute a postponement of such scheduled payment);

(c)   reduce or forgive the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.01) any premiums, fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any obligation of the Borrowers to pay interest at the Default Rate or to comply with any most- favored-nation pricing protection, any mandatory prepayment of the Loans or mandatory reduction of any Commitments shall not constitute such a reduction and (ii) any change to the definition of "Consolidated Total Net Leverage Ratio" or the component definitions thereof shall not constitute a reduction or forgiveness in any rate of interest, principal, premiums, fees or other amounts);

(d)   change any provision of (i) this Section 10.01 or (ii) the definition of "Required Lenders" or any other provision specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents in each case to reduce the percentage set forth therein, without the written consent of each Lender directly and adversely affected thereby (it being understood that, with the consent of the Required Lenders (if such consent is otherwise required) or the Administrative Agent (if the consent of the Required Lenders is not otherwise required), additional extensions of credit pursuant to this Agreement may be included in the determination of the Required

181

Lenders on substantially the same basis as the Term Commitments or Revolving Credit Commitments, as applicable);

(e)    other than in connection with a transaction permitted under Sections 7.04 or 7.05 or as otherwise permitted under this Agreement, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(f)    other than in connection with a transaction permitted under Sections 7.04 or 7.05 or as otherwise permitted under this Agreement, release all or substantially all of the Guarantors, without the written consent of each Lender; and

(g)    amend or modify Section 8.03 or the pro rata sharing requirements hereunder set forth in the definition of "Pro Rata Share", Section 2.12(a) and Section 2.13 without the written consent of each Lender directly and adversely affected thereby;

*provided*, *further*, that (i) [reserved]; (ii) [reserved]; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (iv) only the consent of the parties to the Fee Letter shall be required to amend, modify or supplement the terms thereof; and (v)(x) no Lender consent is required to effect an Incremental Amendment, Refinancing Amendment or Extension Amendment (except as expressly provided in Sections 2.14, 2.15, or 2.16, as applicable) (and the Administrative Agent and the Lead Borrower may effect such amendments to this Agreement and the other Loan Documents without the consent of any other party as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Lead Borrower, to effect the terms of any such incremental facility, refinancing facility or extension facility); and (y) in connection with an amendment in which any Class of Term Loans is refinanced with a replacement Class of term loans bearing (or is modified in such a manner such that the resulting term loans bear) a lower All-In Yield and other customary amendments related thereto (a "**Permitted Repricing Amendment**"), only the consent of the Lenders holding Term Loans subject to such permitted repricing transaction that will continue as a Lender in respect of the repriced tranche of Term Loans or modified Term Loans shall be required for such Permitted Repricing Amendment. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each directly and adversely affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any such Defaulting Lender may not be increased or extended without the consent of such Lender (it being understood that a waiver of any condition precedent set forth in Sections 4.01 or 4.02, or the waiver of any Default, Event of Default, Default Rate, mandatory prepayment or mandatory reduction of any Commitments shall not constitute such an extension or increase), and (y) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms materially and adversely affects any Defaulting Lender disproportionally to other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding the foregoing, no Lender consent is required for the Administrative Agent to enter into or to effect any amendment, modification or supplement to any Intercreditor Agreement or other intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral, including any Incremental Commitment, any Other Commitment, any Other Term Loan, any Other Notes, or any Permitted First Priority Refinancing Debt, any Permitted Junior Priority Refinancing Debt, or any Permitted Ratio Debt for the purpose of adding the holders of such Indebtedness (or their Senior Representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case as contemplated

182

by the terms of such Intercreditor Agreement or such other intercreditor agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make (i) such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent and the Lead Borrower, are required to effectuate the foregoing, (ii)    any immaterial changes and (iii) material changes thereto in light of prevailing market conditions approved by the Administrative Agent and the Lead Borrower, which material changes shall be posted to the Lenders not less than five (5) Business Days (or such shorter period as agreed by the Administrative Agent) before execution thereof and, if the Required Lenders shall not have objected to such changes within five (5) Business Days after posting (or such shorter period as agreed by the Administrative Agent), then the Required Lenders shall be deemed to have agreed that the Administrative Agent's entry into such intercreditor agreement (with such changes) is reasonable and to have consented to such intercreditor agreement (with such changes)); *provided*, *further*, that no such agreement shall adversely affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Lead Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and Revolving Credit Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Lead Borrower, the Required Lenders and the Lenders providing the Replacement Term Loans (as defined below) to permit the refinancing of all or a portion of the outstanding Term Loans of any Class ("**Refinanced Term Loans**") with one or more tranches of replacement term loans ("**Replacement Term Loans**") hereunder; *provided* that (a) except as otherwise permitted by Section 2.14, the aggregate principal amount of such Replacement Term Loans shall not exceed the aggregate principal amount of such Refinanced Term Loans (plus accrued interest, fees, expenses and premium), (b) the Weighted Average Life to Maturity of Replacement Term Loans shall not be shorter than the Weighted Average Life to Maturity of such Refinanced Term Loans, at the time of such refinancing (except by virtue of amortization or prepayment of the Refinanced Term Loans prior to the time of such incurrence), (c) such Replacement Term Loans shall constitute and qualify as Credit Agreement Refinancing Indebtedness and (d) all other terms applicable to such Replacement Term Loans shall be as agreed between the Lead Borrower and the Lenders providing such Replacement Term Loans.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, Collateral Documents and related documents executed by the Loan Parties or their Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended, modified, supplemented and waived with the consent of the Administrative Agent at the request of the Lead Borrower without the need to obtain the consent of any other Lender if such amendment, modification, supplement or waiver is delivered (A) in order to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, (B) as required by local Law or advice of counsel to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable requirements of Law, or (C) in order to cure ambiguities, omissions, mistakes or defects (as reasonably determined by the Administrative Agent and the Lead Borrower) or (D) in order to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

183

Notwithstanding anything in this Agreement or any Collateral Document to the contrary, the Administrative Agent may, in its sole discretion, grant extensions of time for the satisfaction of any of the requirements described in the definition of "Collateral and Guarantee Requirement" under Sections 6.11 and 6.13 or any Collateral Document in respect of any particular Collateral or any particular Subsidiary if it determines that the satisfaction thereof with respect to such Collateral or such Subsidiary cannot be accomplished without undue expense or unreasonable effort or due to factors beyond the control of the Parent, the Borrowers and the other Restricted Subsidiaries of the Parent by the time or times at which it would otherwise be required to be satisfied under this Agreement or any Collateral Document.

In addition, notwithstanding the foregoing, this Agreement may be amended, supplemented or modified with the written consent of the Administrative Agent and the Lead Borrower in a manner not materially adverse to any Lender.

Notwithstanding anything to the contrary contained in Section 10.01, if at any time after the Closing Date, the Administrative Agent and the Lead Borrower shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Lead Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof.

Notwithstanding anything to the contrary contained in this Section 10.01, the Administrative Agent and the Lead Borrower shall be permitted to amend this Agreement in the event of an Alternative Interest Rate Election Event in accordance with Section 3.03(b).

Section 10.02.    Notices and Other Communications; Facsimile Copies.

(a)    Notices; Effectiveness; Electronic Communications.

(i)    Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.02(a)(ii)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(A)    if to the Borrowers or the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(B)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in Section 10.02(a)(ii) shall be effective as provided in such Section 10.02(a)(ii).

(ii)    Electronic Communications. Notices and other communications to the Lenders

184

hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement) and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(b)    The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent, any of its Related Parties (collectively, the " **Agent Parties**") or any of the Loan Parties have any liability to any party to this Agreement or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrowers' or the Administrative Agent's transmission of the Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence, bad faith, material breach or willful misconduct of such Agent Party (or its Representatives); *provided*, *however*, that in no event shall any Person have any liability to any other Person hereunder for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); *provided* that nothing in this sentence shall limit any Loan Party's indemnification obligations set forth herein.

(c)    Change of Address, Etc. Each of the Lead Borrower and the Administrative Agent may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Lead Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to the Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain Material Non-Public Information.

185

(d)     <u>Reliance by Administrative Agent and Lenders</u>. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including Committed Loan Notices) purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers in accordance with <u>Section 10.05</u> hereof. All telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 10.03.    <u>No Waiver; Cumulative Remedies</u>.

No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with <u>Section 8.02</u> for the benefit of all the Secured Parties, including the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents and (b) any Lender from exercising setoff rights in accordance with <u>Section 10.09</u> (subject to the terms of <u>Section 2.13</u>), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; *provided*, *further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to <u>Section 8.02</u>.

Section 10.04.    <u>Attorney Costs and Expenses</u>.

The Borrowers agree (a) if the Closing Date occurs, to pay or reimburse the Administrative Agent and the Lead Arranger and the Bookrunner (without duplication) for all reasonable and documented out- of-pocket costs and expenses incurred in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, and the consummation and administration of the transactions contemplated hereby and thereby, which in the case of (i) Attorney Costs, which shall be limited to Winston & Strawn LLP and, if reasonably necessary, one local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) material to the interests of the Lenders taken as a whole and counsel otherwise retained with the Lead Borrower's consent, and (ii) fees and expenses related to any other advisor or consultant, solely to the extent the Lead Borrower has consented (not to be unreasonably withheld) to the retention or engagement of such Person and (b) from and after the Closing Date, to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or protection of any rights or remedies under this Agreement or the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (including

186

all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and in the case of (i) all respective Attorney Costs, limited to Attorney Costs of one counsel to the Administrative Agent and the Lenders taken as a whole and, if reasonably necessary, one local counsel in each relevant material jurisdiction and, solely in the case of any actual or perceived conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected parties, and (ii) fees and expenses related to any other advisor or consultant, solely to the extent the Lead Borrower has consented (not to be unreasonably withheld) to the retention or engagement of such Person. The agreements in this <u>Section 10.04</u> shall survive the termination of the Aggregate Commitments and repayment of all other Obligations. All amounts due under this <u>Section 10.04</u> shall be paid within 30 days following receipt by the Lead Borrower of an invoice relating thereto setting forth such expenses in reasonable detail; *provided* that, with respect to the Closing Date, all amounts due under this <u>Section 10.04</u> shall be paid on the Closing Date solely to the extent invoiced to the Lead Borrower within three Business Days of the Closing Date (or such shorter period agreed by the Lead Borrower). If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its discretion following five Business Days' prior written notice to the Lead Borrower. For the avoidance of doubt, this <u>Section 10.04</u> shall not apply to Taxes, except any Taxes that represent costs and expenses arising from any non-Tax claim.

Section 10.05.    <u>Indemnification by the Borrower</u>.

The Borrowers shall, within thirty (30) days after written demand containing a reasonably detailed description thereof, indemnify and hold harmless each Agent (including Lead Arranger and Bookrunner), Agent-Related Person, Lender, and their respective controlled Affiliates and controlling Person (other than Excluded Affiliates), and their respective officers, directors, employees, partners, agents, advisors and other representatives of each of the foregoing and their respective successors (collectively the "**Indemnitees**") from and against any and all actual liabilities, obligations, actual losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (in the case of (i) Attorney Costs, limited in the case of legal fees and expenses to the reasonable and documented or invoiced out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction, and solely in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict informs the Lead Borrower of such conflict and thereafter retains its own counsel one additional counsel in each relevant jurisdiction to each group of similarly situated affected Indemnitees and any other counsel obtained with the Lead Borrower's consent, excluding in all cases allocated costs of in-house counsel, and (ii) fees and expenses related to any other advisor or consultant, solely to the extent the Lead Borrower has consented (not to be unreasonably withheld) to the retention or engagement of such Person), joint or several, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment or Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability of the Loan Parties or any Subsidiary, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (a "**Proceeding**") and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by any Borrower or any other Person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all of the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not,

187

as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (w) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives, as determined by a final non-appealable judgment of a court of competent jurisdiction, (x) a material breach of any obligations under any Loan Document by such Indemnitee or of any of its controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives, as determined by a final non-appealable judgment of a court of competent jurisdiction or (y) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under any Facility and other than any claims arising out of any act or omission of the Parent, the Borrowers, the Sponsor or any of their Affiliates. No party hereto shall be liable for any damages arising from the use or misuse by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, in each case, except to the extent any such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of, or material breach of this Agreement or the other Loan Documents by, such Indemnified Person (or its officers, directors, employees, partners, agents, advisors, other representatives or Affiliates), nor shall any Indemnitee, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); it being agreed that this sentence shall not limit the indemnification obligations of the Parent or any Subsidiary (including, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party and for any out-of-pocket expenses otherwise set forth herein). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective (and otherwise subject to the limitations herein) whether or not such investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto. By accepting the benefits hereof, each Indemnitee agrees to refund and return any and all amounts paid by Borrowers to such Indemnitee to the extent items in clauses (w) through (y) above occur. All amounts due under this Section 10.05 shall be paid within 30 days after written demand therefor (together with backup documentation supporting such reimbursement request); *provided*, *however*, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 10.05. The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses and disbursements arising from any non-Tax claims.

To the extent that the Borrowers for any reason fail to pay any amount required under this Sections 10.05 or 10.04 to be paid by them to the Administrative Agent or Collateral Agent (or any sub- agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent or Collateral Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this paragraph are subject to the provisions of Section 2.12(e). For the avoidance of doubt, this Section 10.05 shall not apply to Taxes, except any Taxes that represent costs

188

and expenses arising from any non-Tax claim. Section 10.06.    Payments Set Aside.

To the extent that any payment by or on behalf of the Borrowers is made to the Administrative Agent, any Lender, or the Administrative Agent, any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.07.    Successors and Assigns.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (except as permitted by Section 7.04) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Assignee pursuant to an assignment made in accordance with the provisions of Section 10.07(b) (such an assignee, an "**Eligible Assignee**") and (A) in the case of any Assignee that, immediately prior to or upon giving effect to such assignment, is a Sponsor-Controlled Affiliated Lender, Section 10.07(k), (B) in the case of any Assignee that is the Parent or any of its Subsidiaries, Section 10.07(l) or (C) in the case of any Assignee that, immediately prior to or upon giving effect to such assignment, is a Debt Fund Affiliate, Section 10.07(o),
(ii)    by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h); *provided*, *however*, that notwithstanding the foregoing, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (i) any Person that is a Defaulting Lender, (ii) a natural Person or (iii) the Parent, the Borrowers or any of their respective Subsidiaries (except pursuant to Sections 2.05(a)(v) or 10.07(l)). No assignment, transfer or participation may be made to a Disqualified Lender absent the prior written consent of the Lead Borrower (which consent may be made or withheld in its sole and absolute discretion). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

Notwithstanding the foregoing:

(i)    For the avoidance of doubt, with respect to any assignee that becomes a Disqualified Lender after the applicable trade date (including as a result of the specification by the Lead Borrower pursuant to the definition of "Disqualified Lender"), (x) such assignee shall not retroactively be disqualified from becoming a Lender and (y) the execution by the Lead Borrower of an Assignment and Assumption with respect to such assignee will not by itself result in such assignee no longer being considered a Disqualified Lender. Any assignment to a Disqualified Lender in violation of this Section 10.07 shall not

189

be void, but the other provisions of this Section 10.07 shall apply.

(ii)    If any assignment or participation is made to any Disqualified Lender without the Lead Borrower's prior written consent in violation of this Section 10.07, or if any Person becomes a Disqualified Lender after the applicable trade date, (I) for purposes of voting on any plan of reorganization pursuant to the Bankruptcy Code of the United States, each Disqualified Lender party hereto hereby agrees (A) not to vote on such plan of reorganization, (B) if such Disqualified Lender does vote on such plan of reorganization notwithstanding the restriction in the foregoing clause (A), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code of the United States (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such plan of reorganization in accordance with Section 1126(c) of the Bankruptcy Code of the United States (or any similar provision in any other Debtor Relief Laws) and (C) not to contest any request by any party for a determination by the Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (B), (II) such Disqualified Lender shall not vote for any purpose under the Loan Documents, (III) such Disqualified Lender shall not be entitled to any expense reimbursement or indemnification under the Loan Documents, and nothing in the Loan Documents shall restrict the rights and remedies of the Loan Parties against such Disqualified Lender and (IV) the Lead Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Lender and the Administrative Agent, (A) terminate any Revolving Credit Commitment of such Disqualified Lender and repay all obligations of the Borrowers owing to such Disqualified Lender in connection with such Revolving Credit Commitment, (B) in the case of outstanding Term Loans held by Disqualified Lenders, purchase or prepay such Term Loans by paying the lesser of
(x) the amount that such Disqualified Lenders paid to acquire such Term Loans and (y) the par value of such Term Loans, in each case, plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (C) require such Disqualified Lender to assign or transfer, without recourse (in accordance with and subject to the restrictions contained in this Section 10.07), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of
(x) the amount that such Disqualified Lender paid to acquire such interests, rights and obligations and
(y)    the par value of such Term Loans, in each case, plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

(iii) The Lenders and the Parent, on behalf of itself, the Borrowers and their Restricted Subsidiaries, expressly acknowledges that the Administrative Agent (solely in its capacity as such or as an arranger, bookrunner or other agent hereunder) shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or participant or prospective Lender or participant is a Disqualified Lender or Excluded Affiliate or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Lender or Excluded Affiliate. Without limiting the forgoing, the parties hereto acknowledge and agree that the Administrative Agent and the Collateral Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce compliance with the provisions hereof relating to Disqualified Lenders or Excluded Affiliates.

(b)    (i) Subject to the conditions set forth in Section 10.07(b)(ii) below, any Lender may at any time assign to one or more assignees (each, an "**Assignee**") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, denied, conditioned or delayed) of:

(A)    the Lead Borrower; *provided* that no consent of the Lead Borrower shall be required for (i) an assignment of all or a portion of the Term Loans to a Lender or to an Affiliate of a Lender or an Approved Fund thereof, (ii) an assignment of all or a portion of any Revolving

190

Credit Commitments or Revolving Credit Exposure to a Lender, an Affiliate of a Lender or any Approved Fund thereof, (iii) [reserved] and (iv) after the occurrence and during the continuance of an Event of Default under Sections 8.01(a) or 8.01(f), to any Assignee (other than, for the avoidance of doubt, a Disqualified Lender); *provided*, *further*, that the Lead Borrower shall be deemed to have consented to any such assignment unless it shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received written notice thereof; and

        (B)    the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment (i) of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund, (ii) of all or any portion of any Revolving Credit Commitments or Revolving Credit Exposure to a Lender, an Affiliate of a Lender or any Approved Fund thereof,
(iii) of all or a portion of the Loans pursuant to Sections 2.05(a)(v), 10.07(k) or 10.07(l), or
(iv) from an Agent to its Affiliates.

(ii)      Assignments shall be subject to the following additional conditions:

        (A)    except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $2,500,000 (in the case of each Revolving Credit Loan or Revolving Credit Commitment) and $1,000,000 (in the case of a Term Loan) unless each of the Lead Borrower and the Administrative Agent otherwise consents; *provided* that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

        (B)    the parties to each assignment shall (1) execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or (2) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, together, in each case, with a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent);

        (C)    other than in the case of assignments pursuant to Section 10.07(l), the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, and all "know your customer" documents reasonably requested in writing by the Administrative Agent pursuant to anti-money laundering rules and regulations, including, but without limitation, the USA Patriot Act; and

        (D)    the Assignee shall execute and deliver to the Administrative Agent and the Lead Borrower the forms described in Sections 3.01(d) and 3.01(e) applicable to it.

This Section 10.07 shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-*pro rata* basis among such Facilities.

(c)    Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the recordation date specified in each Assignment and Assumption, (1) the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (2) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such

191

Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, and the surrender by the assigning Lender of its Note, the Borrowers (at their expense) shall promptly execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.07(c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at the Administrative Agent's Office in the United States a copy of each Assignment and Assumption, each Sponsor-Controlled Affiliated Lender Assignment and Assumption delivered to it, and each notice of cancellation of any Loans delivered by the Lead Borrower pursuant to Section 10.07(l) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). Upon its receipt of, and consent to (to the extent required), a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, and each other party thereto an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.07(b)(ii)(B) above, if applicable, and the written consent of the Administrative Agent and, if required, the Lead Borrower, to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Assumption and (ii) promptly record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this Section 10.07(d). The entries in the Register shall be conclusive, absent manifest error, and the Borrowers, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers, any Agent and any Lender, at any reasonable time and from time to time upon reasonable prior written notice. The parties intend that Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations). Notwithstanding the foregoing, in no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any Lender is a Sponsor- Controlled Affiliated Lender nor shall the Administrative Agent be obligated to monitor the aggregate amount of Term Loans or Incremental Term Loans held by Sponsor-Controlled Affiliated Lenders.

(e)    Any Lender may at any time, sell participations to any Person (other than a natural person, a Defaulting Lender or a Disqualified Lender) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right (i) to enforce this Agreement and the other Loan Documents and (ii) to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents, except for those described in Sections 10.01(b), 10.01(c) with respect to amounts, or dates fixed for payment of amounts, to which such Participant would otherwise be entitled and Sections 10.01(e), 10.01(f) and 10.01(g) to which such Participant would otherwise be entitled. Subject to Section 10.07(f) and a Participant's compliance with Sections 3.01(d) and (e) and agreement to be subject to the provisions of Section 3.07 and Section 3.06(f) as if it were an Assignee under paragraph (b) of this Section 10.07, the Borrowers agree that each Participant shall be entitled to the benefits and obligations of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections, including the

192

requirements under Section 3.01(d) and (e) (it being understood that the documentation required under Section 3.01(d) and (e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c). To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related stated interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)    A Participant shall not be entitled to receive any greater payment under Sections 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.

(g)    Any Lender may, without the consent of the Lead Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Lead Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof, shall be appropriately reflected in the Participant Register. Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Section), but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrowers under this Agreement except, in the case of Section 3.01, to the extent that the grant to the SPC was made with the prior written consent of the Lead Borrower (for the avoidance of doubt, the Lead Borrower shall have reasonable basis for withholding consent if an exercise by an SPC immediately after the grant would result in materially increased indemnification obligation to the Borrowers at such time), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Lead Borrower and the Administrative Agent

193

and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)    [Reserved].

(j)    [Reserved].

(k)    Any Lender may, at any time, without any consent, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to a Person who is or will become, after such assignment, a Sponsor-Controlled Affiliated Lender (without any consent of any Person but subject to acknowledgment by the Administrative Agent (which acknowledgement shall be provided promptly after request therefor)) through (x) Dutch auctions open to all Lenders on a *pro rata* basis in accordance with procedures of the type described in Section 2.05(a)(v) or (y) open market purchases on a non-*pro rata* basis, in each case subject to the following limitations:

(i)    no assignment of Term Loans to a Sponsor-Controlled Affiliated Lender may be purchased with the proceeds of any Revolving Credit Loan;

(ii)    the assigning Lender and the Sponsor-Controlled Affiliated Lender purchasing such Lender's Term Loans shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit I hereto (a "**Sponsor-Controlled Affiliated Lender Assignment and Assumption**");

(iii)    Sponsor-Controlled Affiliated Lenders (A) will not receive information provided solely to Lenders by the Administrative Agent or any Lender, including through access to electronic information maintained on the Platform, other than the right to receive notices of prepayments and other administrative notices in respect of its Loans or Commitments required to be delivered to Lenders pursuant to Article II, (B) will not be permitted to attend or participate in conference calls or meetings attended solely by the Lenders and the Administrative Agent and (C) will not receive advice of counsel to the Administrative Agent and the Lenders;

(iv)    in connection with each assignment pursuant to this Section 10.07(k), the assigning Lender and the Sponsor-Controlled Affiliated Lender purchasing such Lender's Term Loans may render customary "big boy" letters to each other (and, in connection with any assignments pursuant to clause (x) above, the Auction Agent) regarding information that is not known to such assigning Lender that may be material to the decision by such assigning Lender to enter into such assignment to such Sponsor- Controlled Affiliated Lender and no Sponsor-Controlled Affiliated Lender purchasing any Term Loans shall be required to make a representation that it is not in possession of Material Non-Public Information with respect to the Parent, the Borrowers and their respective Subsidiaries or their respective securities;

(v)    the aggregate principal amount of Term Loans (as of the date of consummation of any transaction under this Section 10.07(k)) held at any one time by all Sponsor-Controlled Affiliated Lenders shall not exceed 25% of the outstanding principal amount of all Term Loans; *provided* that in addition to the foregoing, the amount of Incremental Term Loans assigned to Sponsor-Controlled Affiliated Lenders pursuant to this Section 10.07(k) shall not exceed 25% of the outstanding principal amount of all Incremental Term Loans (such percentage, the " **Sponsor-Controlled Affiliated Lender Cap**");

(vi)    at no time shall the Sponsor-Controlled Affiliated Lenders and Debt Fund Affiliates exceed in number more than 49.9% of the aggregate number of Term Lenders at any time; and

194

(vii)    except with respect to any amendment, modification, waiver, consent or other action (I) in  Section 10.01  requiring the consent of all Lenders, all Lenders directly and adversely affected or specifically such Lender, (II) that alters a Sponsor-Controlled Affiliated Lender's *pro rata* share of any payments given to all Lenders or (III) affects the Sponsor-Controlled Affiliated Lender (in its capacity as a Lender) in a manner that is disproportionate to the effect on any Lender in the same Class, the Loans held by a Sponsor-Controlled Affiliated Lender shall be disregarded in both the numerator and denominator in the calculation of any Lender vote (and, in the case of a plan of reorganization that does not affect the Sponsor-Controlled Affiliated Lender in a manner that is adverse to such Sponsor-Controlled Affiliated Lender relative to other Lenders, shall be deemed to have voted its interest in the Term Loans in the same proportion as the other Lenders in the same Class) (and shall be deemed to have been voted in the same percentage as all other applicable Lenders voted if necessary to give legal effect to this paragraph) (but, in any event, in connection with any amendment, modification, waiver, consent or other action, shall be entitled to any consent fee, calculated as if all of such Sponsor-Controlled Affiliated Lender's Loans had voted in favor of any matter for which a consent fee or similar payment is offered).

Each Sponsor-Controlled Affiliated Lender agrees to notify the Administrative Agent promptly (and in any event within 10 Business Days) if it acquires any Person who is also a Lender, and each Lender agrees to notify the Administrative Agent promptly (and in any event within 10 Business Days) if it becomes a Sponsor-Controlled Affiliated Lender. As a condition to the execution and delivery of a Sponsor-Controlled Affiliated Lender Assignment and Assumption, the Administrative Agent shall have been provided a notice in the form of Exhibit E-2.

Each Lender participating in any assignment to Sponsor-Controlled Affiliated Lenders acknowledges and agrees that in connection with such assignment, (1) the Sponsor-Controlled Affiliated Lenders then may have, and later may come into possession of, Excluded Information, (2) such Lender has independently and, without reliance on the Sponsor-Controlled Affiliated Lenders or any of their Subsidiaries, the Parent, the Borrowers or any of their Subsidiaries, the Administrative Agent or any other Agent-Related Persons, has made its own analysis and determination to participate in such assignment notwithstanding such Lender's lack of knowledge of the Excluded Information, (3) none of the Sponsor- Controlled Affiliated Lenders or any of their Subsidiaries, the Parent, the Borrowers or their respective Subsidiaries, the Administrative Agent or any other Agent-Related Persons shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against the Sponsor-Controlled Affiliated Lenders and any of their Subsidiaries, the Parent, the Borrowers and their respective Subsidiaries, the Administrative Agent and any other Agent-Related Persons, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information and (4) the Excluded Information may not be available to the Administrative Agent or the other Lenders.

Notwithstanding anything to the contrary in the Loan Documents, any Term Loans or Incremental Term Loans assigned to a Sponsor-Controlled Affiliated Lender in accordance with this Section 10.07(k) or Section 10.07(o) may be contributed to the Parent or any of its Restricted Subsidiaries and be exchanged for debt or equity securities of Lead Borrower (or any of its direct or indirect parent) to the extent otherwise permitted herein.

(l)    Any Lender may, so long as no Event of Default has occurred and is continuing, at any time, without any consent, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to the Parent, the Borrowers or any Subsidiary through (x) Dutch auctions open to all Lenders on a *pro rata* basis in accordance with procedures of the type described in  Section 2.05(a)(v) or (y)    notwithstanding Sections 2.12 and 2.13 or any other provision in this Agreement, open market purchases of Term Loans on a non- *pro rata* basis, in each case, subject to the following:

(i)        no assignment of Term Loans to the Parent or the Borrowers may be purchased

195

with the proceeds of any Revolving Credit Loan;

(ii)     the assigning Lender and the Parent or the Borrowers, as applicable, shall execute and deliver to the Administrative Agent a Sponsor-Controlled Affiliate Lender Assignment and Assumption substantially in the form of Exhibit I hereto;

(iii)    if the Parent is the assignee, upon such assignment, transfer or contribution, the Parent shall automatically be deemed to have contributed the principal amount of such Term Loans, *plus* all accrued and unpaid interest thereon, to the Borrowers;

(iv)    if any Borrower or any Restricted Subsidiary is the assignee (including through contribution or transfers set forth in  clause (iii) above), (a) the principal amount of such Term Loans, along with all accrued and unpaid interest thereon, so contributed, assigned or transferred to any Borrower or any Restricted Subsidiary shall be deemed automatically cancelled and extinguished on the date of such contribution, assignment or transfer, (b) the aggregate outstanding principal amount of Term Loans of the remaining Lenders shall reflect such cancellation and extinguishment of the Term Loans then held by any such Borrower or Restricted Subsidiary and (c) such Borrower or applicable Subsidiary shall promptly provide notice to the Administrative Agent of such contribution, assignment or transfer of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register;

(v)     in connection with each assignment pursuant to this Section 10.07(l), the assigning Lender and the Parent, the Borrowers or the Subsidiaries, as applicable, may render customary "big boy" letters to each other (and, in connection with any assignments pursuant to clause (x) above, the Auction Agent) regarding information that is not known to such assigning Lender that may be material to the decision by such assigning Lender to enter into such assignment to the Parent or any Borrower, as applicable, and none of the Parent, any Borrower nor any Subsidiary purchasing any Term Loans shall be required to make a representation that it is not in possession of Material Non-Public Information with respect to the Parent, the Borrowers and their Subsidiaries or their respective securities; and

(vi)    in the case of any Term Loans (A) acquired by, or contributed to, the Parent, the any Borrower or any Subsidiary thereof and (B) cancelled and retired in accordance with this Section 10.07(l), (1) the aggregate outstanding principal amount of the Term Loans of the applicable Class shall be deemed reduced by the full par value of the aggregate principal amount of such Term Loans acquired by, or contributed to, the Parent, any such Borrower or any such Subsidiary and (2) any scheduled principal repayment installments with respect to the Term Loans of such Class occurring pursuant to Section 2.07(a), as applicable, prior to the final maturity date for Term Loans of such Class, shall be reduced *pro rata* by the par value of the aggregate principal amount of Term Loans so purchased or contributed (and subsequently cancelled and retired), with such reduction being applied solely to the remaining Term Loans of the Lenders which sold or contributed such Term Loans.

Each Lender participating in any assignment to the Parent, any Borrower or any Subsidiary acknowledges and agrees that in connection with such assignment, (1) the Parent, any Borrower or any Subsidiary then may have, and later may come into possession of Excluded Information, (2) such Lender has independently and, without reliance on the Parent, any Borrower or any Subsidiary, the Administrative Agent or any other Agent-Related Persons, has made its own analysis and determination to participate in such assignment notwithstanding such Lender's lack of knowledge of the Excluded Information, (3) none of the Parent, any Borrower or any Subsidiary, the Administrative Agent or any other Agent-Related Persons shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against the Parent, any Borrower or any Subsidiary, the Administrative Agent and any other Agent-Related Persons, under applicable laws or otherwise, with

196

respect to the nondisclosure of the Excluded Information and (4) the Excluded Information may not be available to the Administrative Agent or the other Lenders.

(m)    Notwithstanding anything in Section 10.01 or the definition of "Required Lenders" to the contrary, for purposes of determining whether the Required Lenders have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, or subject to Section 10.07(n), any plan of reorganization pursuant to the Bankruptcy Code of the United States, (ii) otherwise acted on any matter related to any Loan Document or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, no Sponsor-Controlled Affiliated Lender shall have any right to consent (or not consent), otherwise act or direct or require the Administrative Agent or any Lender to take (or refrain from taking) any such action and:

(A)    all Term Loans held by any Sponsor-Controlled Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders have taken any actions; and

(B)    all Term Loans held by Sponsor-Controlled Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether all Lenders have taken any action unless the action in question affects such Sponsor-Controlled Affiliated Lender in a disproportionately adverse manner than its effect on other Lenders.

(n)    Additionally, the Loan Parties and Sponsor-Controlled Affiliated Lenders hereby agree that if a case under Title 11 of the United States Code is commenced against any Loan Party, such Loan Party shall seek (and the Sponsor-Controlled Affiliated Lenders shall consent) to provide that the vote of the Sponsor-Controlled Affiliated Lenders with respect to any plan of reorganization of such Loan Party shall be counted in the same proportion as all other Lenders except that Sponsor-Controlled Affiliated Lenders' vote may be counted to the extent any such plan of reorganization proposes to treat the Obligations held by Sponsor-Controlled Affiliated Lenders in a manner that is less favorable to the Sponsor-Controlled Affiliated Lenders than the proposed treatment of similar Obligations held by Lenders that are not Affiliates of the Borrowers or would deprive the Sponsor-Controlled Affiliated Lenders of their Pro Rata Share of any payments to which all Lenders are entitled.

(o)    Although Debt Fund Affiliates shall be Eligible Assignees and shall not be subject to the provisions of Sections 10.07(k) or 10.07(l), any Lender may, at any time, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to a Person who is or will become, after such assignment, a Debt Fund Affiliate. Notwithstanding anything in Section 10.01 or the definition of "Required Lenders" to the contrary, for purposes of determining whether the Required Lenders have
(i)    consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom,
(ii)    otherwise acted on any matter related to any Loan Document or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, all Term Loans held by Debt Fund Affiliates may not account for more than 49.9% (*pro rata* among such Debt Fund Affiliates) of the Term Loans of consenting Lenders included in determining whether the Required Lenders have consented to any action pursuant to Section 10.01.

Notwithstanding anything to the contrary in this Section 10.07, such Disqualified Lenders may be liable to the Borrowers and the other Loan Parties for any and all claims, including breach of contract.

The Administrative Agent shall have the right, and the Borrowers hereby expressly authorize the

197

Administrative Agent to provide the list of Disqualified Lenders to each Lender requesting the same.

Section 10.08.    Confidentiality.

Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates (other than Excluded Affiliates) and its and its Affiliates' (other than Excluded Affiliates) limited partners, managers, administrators, directors, officers, employees, trustees, partners, investors, funding sources, investment advisors and agents, including accountants, legal counsel and other advisors involved in the Transactions on a "need to know basis" (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree to keep such Information confidential); (b) to the extent required or requested by any Governmental Authority or self-regulatory authority having or asserting jurisdiction over such Person (including any Governmental Authority regulating any Lender or its Affiliates); *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Lead Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Lead Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (d) to any other party to this Agreement; (e) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Lead Borrower), to (i) any pledgee referred to in Section 10.07(g), (ii) any direct or indirect contractual counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in any of its rights or obligations under this Agreement or (iii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrowers and their obligations, this Agreement or payments hereunder (other than any Person with respect to whom the Lead Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A) or any Disqualified Lender); (f) with the prior written consent of the Lead Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this  Section 10.08 or other obligation of confidentiality owed to you, the Sponsor, or your respective Affiliates or becomes available to the Administrative Agent, Collateral Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than a Loan Party or any Sponsor or their respective related parties (so long as such source is not known (after due inquiry) to the Administrative Agent, the Collateral Agent, such Lender or any of their respective Affiliates to be bound by confidentiality obligations to any Loan Party, the Sponsor or your respective Affiliates); (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to Loan Parties and their Subsidiaries received by it from such Lender) or to the CUSIP Service Bureau, the National Association of Insurance Commissioners or any similar organization; (i) to the extent such information is independently developed by the Administrative Agent, the Collateral Agent, any Lender or any of their respective Affiliates; or (j) with the prior consent of the Lead Borrower, in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of its rights hereunder or thereunder. In addition, the Agents and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration, settlement and management of this Agreement, the other Loan Documents, the Commitments and the Credit Extensions. For the purposes of this Section 10.08, "**Information**" means all information received from the Loan Parties relating to any Loan Party, its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, other than any such information that is publicly available to any Agent or any Lender prior to disclosure by

198

any Loan Party other than as a result of a breach of this  Section 10.08 or any other confidentiality obligation owed to any Loan Party or its Affiliates. All Obligations provided for in this Section 10.08 shall survive repayment of the Loans, cancellation of the Notes, any foreclosure under, or any modification, release or discharge of, any or all of the Collateral Documents and termination of this Agreement for a period of two (2) years.

Section 10.09.    Setoff.

In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (and the Administrative Agent, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time, without prior notice to the Borrowers, any such notice being waived by each Borrower (on its own behalf and on behalf of each Loan Party and each of its Subsidiaries) but with the prior consent of the Administrative Agent to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than escrow, payroll, employee health and benefits, pension, fiduciary, 401(K), petty cash, trust and tax accounts and other accounts of the type described in clause (x) of the definition of Excluded Assets) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates or the Administrative Agent to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the Administrative Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document but to the extent such Obligations are earned, due and owing; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender agrees promptly to notify the Lead Borrower and the Administrative Agent after any such set off and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.10.    Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c)    amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.11.    Counterparts.

This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document or any electronic signature complying with the U.S. federal

199

ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document. The Agents may also require that any such documents and signatures delivered by facsimile or other electronic transmission be confirmed by a manually signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or other electronic transmission.

Section 10.12.   <u>Integration</u>.

This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter. Subject to <u>Section 10.20</u>, in the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.13.   <u>Survival of Representations and Warranties</u>.

All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.14.   <u>Severability</u>.

If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions; *provided* that the Lenders shall charge no fee in connection with any such amendment. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this <u>Section 10.14</u>, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.15.   <u>GOVERNING LAW</u>.

(a)   THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK; *PROVIDED*, *HOWEVER*, THAT (A) THE INTERPRETATION OF THE DEFINITION OF "MATERIAL ADVERSE EFFECT" (AS DEFINED IN THE ACQUISITION AGREEMENT) AND WHETHER THERE SHALL HAVE OCCURRED A MATERIAL ADVERSE EFFECT (AS DEFINED IN THE ACQUISITION AGREEMENT), (B) WHETHER THE ACQUISITION HAS BEEN

CONSUMMATED IN ACCORDANCE WITH THE ACQUISITION AGREEMENT AND (C) WHETHER THE SPECIFIED ACQUISITION AGREEMENT REPRESENTATIONS ARE ACCURATE AND WHETHER THE BUYER (OR ITS AFFILIATES) HAS (OR HAVE) THE RIGHT (TAKING INTO ACCOUNT ANY APPLICABLE CURE PROVISIONS) TO TERMINATE ITS (OR THEIR) OBLIGATIONS UNDER THE ACQUISITION AGREEMENT OR DECLINE TO CONSUMMATE THE ACQUISITION (IN EACH CASE, IN ACCORDANCE WITH THE TERMS OF THE ACQUISITION AGREEMENT) AS A RESULT OF A BREACH OF ANY SPECIFIED ACQUISITION AGREEMENT REPRESENTATION, SHALL, IN EACH CASE, BE INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.

(b)    ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY (BOROUGH OF MANHATTAN) OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE (AND ANY APPELLATE COURT THEREFROM), AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY, EACH AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS AND AGREES THAT IT WILL NOT COMMENCE OR SUPPORT ANY SUCH ACTION OR PROCEEDING IN ANOTHER JURISDICTION. EACH LOAN PARTY, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN FACSIMILE) IN SECTION 10.02. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.16.    WAIVER OF RIGHT TO TRIAL BY JURY.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.16.

Section 10.17.    Binding Effect.

This Agreement shall become effective when it shall have been executed and delivered by the Loan

201

Parties and each other party hereto and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, each Agent and each Lender and their respective successors and assigns, in each case in accordance with Section 10.07 (if applicable) and except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 10.18.    USA Patriot Act and Beneficial Ownership Regulation Notice.

Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the USA Patriot Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies each Loan Party, including beneficial ownership, which information includes the name, address and tax identification number of such Loan Party and other information regarding such Loan Party that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party and beneficial ownership in accordance with each of the USA Patriot Act and the applicable Beneficial Ownership Regulation. This notice is given in accordance with the requirements of the USA Patriot Act and Beneficial Ownership Regulation, as applicable, and is effective as to the Lenders and the Administrative Agent.

Section 10.19.    No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i)(A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii)(A) the Administrative Agent, the Lead Arranger and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for each Loan Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent, the Lead Arranger nor any Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent nor any Lender has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates. To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.20.    Intercreditor Agreements.

Each Lender hereunder agrees that (a) it will be bound by and will take no actions contrary to the provisions of any Intercreditor Agreement and (b) authorizes and instructs the Administrative Agent and the Collateral Agent to enter into any Intercreditor Agreement as Administrative Agent and Collateral Agent, as applicable, and on behalf of such Lender. In the event of any conflict or inconsistency between the provisions of any Intercreditor Agreement and this Agreement, the provisions of such Intercreditor

202

Agreement shall control.

Section 10.21.   Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an Affected Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an Affected Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)   the effects of any Bail-in Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)   the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any Affected Resolution Authority.

Section 10.22. Closing Date Joinder. Immediately following consummation of the Acquisition on the Closing Date, each of the Subsidiaries of the Target designated as a "Guarantor" on the signature pages hereto expressly, unconditionally and irrevocably agrees to pay, perform and discharge all Indebtedness and Obligations of the Lead Borrower under this Agreement and the other Loan Documents in accordance with the terms of this Agreement and the other Loan Documents and otherwise be liable on a joint and several basis together with the other Guarantors and the other Loan Parties for such Indebtedness and to perform and discharge all of the Obligations and any and all covenants and other obligations under this Agreement and the other Loan Documents, and each of the Subsidiaries of the Target designated as a "Guarantor" on the signature pages hereto will become a "Guarantor" for all purposes under this Agreement and the other Loan Documents, on a joint and several basis together with the other Guarantors and the other Loan Parties.

Section 10.23. Acknowledgment Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for a Secured Hedge Agreement, a Treasury Services Agreement or any other agreement or instrument that is a QFC (such support "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**")

203

becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

Section 10.24.    Benchmark Transition Event.

(a)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Lead Borrower may amend this Agreement to replace the Eurocurrency Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Lead Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of the Eurocurrency Rate with a Benchmark Replacement pursuant to this Section will occur prior to the applicable Benchmark Transition Start Date. The Administrative Agent and the Lead Borrower shall use commercially reasonable efforts to satisfy any applicable IRS guidance so that the selection of a Benchmark Replacement will not be treated as a deemed exchange under Code Section 1001.

(b)    Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(c)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Lead Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this Section, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent

204

manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section.

(d)    Benchmark Unavailability Period. Upon the Lead Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Lead Borrower may revoke any request for a Eurodollar Borrowing of, conversion to or continuation of Eurodollar Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Lead Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon the Eurocurrency Rate will not be used in any determination of Base Rate.

(e)    Certain Defined Terms. As used herein:

"**Benchmark Replacement**" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Administrative Agent and the Lead Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the Eurocurrency Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided, if the Benchmark Replacement as so determined would be less than 1.00%, the Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the Eurocurrency Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Lead Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurocurrency Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurocurrency Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other

205

manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

**"Benchmark Replacement Date"** means the earlier to occur of the following events with respect to the Eurocurrency Rate:

(A)   in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the Eurocurrency Rate permanently or indefinitely ceases to provide the Eurocurrency Rate; or

(B)   in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

**"Benchmark Transition Event"** means the occurrence of one or more of the following events with respect to the Eurocurrency Rate:

(1)   a public statement or publication of information by or on behalf of the administrator of the Eurocurrency Rate announcing that such administrator has ceased or will cease to provide the Eurocurrency Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Eurocurrency Rate;

(2)   a public statement or publication of information by the regulatory supervisor for the administrator of the Eurocurrency Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the Eurocurrency Rate, a resolution authority with jurisdiction over the administrator for the Eurocurrency Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Eurocurrency Rate, which states that the administrator of the Eurocurrency Rate has ceased or will cease to provide the Eurocurrency Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Eurocurrency Rate; or

(3)   a public statement or publication of information by the regulatory supervisor for the administrator of the Eurocurrency Rate announcing that the Eurocurrency Rate is no longer representative.

206

"**Benchmark Transition Start Date**" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the $90_{th}$ day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and
(b)    in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Lead Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"**Benchmark Unavailability Period**" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Eurocurrency Rate and solely to the extent that the Eurocurrency Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the Eurocurrency Rate for all purposes hereunder in accordance with this Section and (y) ending at the time that a Benchmark Replacement has replaced the Eurocurrency Rate for all purposes hereunder pursuant to this Section.

"**Early Opt-in Election**" means the occurrence of:

(1)    (i) a determination by the Administrative Agent or (ii) a notification by the Required Lenders to the Administrative Agent (with a copy to the Lead Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in this Section, are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the Eurocurrency Rate, and

(2)    (i) the election by the Administrative Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Lead Borrower and the Lenders or by the Required Lenders of written notice of such election to the Administrative Agent.

"**Federal Reserve Bank of New York's Website**"  means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed

or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**SOFR**" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**Term SOFR**" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

## ARTICLE XI. GUARANTEE

Section 11.01.    The Guarantee.

Each Guarantor (including each Borrower other than with respect to the obligations of such Borrower). hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety, to each Secured Party and their respective permitted successors and assigns, the prompt payment in full, in cash, when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of (i) the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code and (ii) any other Debtor Relief Laws) on the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrowers, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party or Subsidiary under any Loan Document or any Secured Hedge Agreement or any Treasury Services Agreement, in each case, strictly in accordance with the terms thereof (such obligations, including any future increases in the amount thereof, being herein collectively called the "**Guaranteed Obligations**") (but excluding in all events, Excluded Swap Obligations). The Guarantors hereby jointly and severally agree that if the Borrowers or any other Guarantor shall fail to pay in full when due (whether at stated maturity, by required prepayment, declaration, demand, acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, upon written demand, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by required prepayment, declaration, demand, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 11.02.    Obligations Unconditional.

The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrowers under this Agreement, the Notes, if any, or any other Loan Document referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)     at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)     any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)     the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or except as permitted pursuant to Section 11.09, any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)     any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be or remain perfected or the existence of any intervening Lien or security interest; or

(v)     the release of any other Guarantor pursuant to Section 11.09.

The Guarantors hereby expressly waive (to the fullest extent permitted by Law) diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrowers under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrowers and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other Person at any time of any right or remedy against the Borrowers or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective permitted successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 11.03.    Reinstatement.

The obligations of the Guarantors under this Article XI shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrowers or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.04.    Subrogation; Subordination.

209

Each Guarantor hereby agrees that until the payment in full in cash of all Guaranteed Obligations (other than Cash Management Obligations, obligations pursuant to Secured Hedge Agreements and contingent obligations, in each case, not yet due and owing) and the expiration and termination of the Commitments of the Lenders under this Agreement it shall subordinate any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation, contribution or otherwise, against the Borrowers or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

Section 11.05.    Remedies.

The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrowers under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrowers and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.06.    Instrument for the Payment of Money.

Each Guarantor hereby acknowledges that the guarantee in this Article XI constitutes an instrument for the payment of money, and consents and agrees that any Secured Party or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 11.07.    Continuing Guarantee.

The guarantee in this Article XI is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.08.    General Limitation on Guarantee Obligations.

In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the liability under this Guaranty and the right of contribution established in Section 11.10, but before giving effect to any other guarantee) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 11.09.    Release of Guarantors.

If, in compliance with the terms and provisions of the Loan Documents, (i) all or substantially all of the Equity Interests of any Subsidiary Guarantor or a Borrower (other than the Lead Borrower) are sold or otherwise transferred to a Person or Persons none of which is a Loan Party in a transaction permitted hereunder or (ii) any Subsidiary Guarantor or a Borrower (other than the Lead Borrower) becomes an Excluded Subsidiary, or the Lead Borrower shall notify the Agents in writing that a Specified Guarantor is

210

to be released from its Guaranty, (any such Subsidiary Guarantor or Borrower, and any Subsidiary Guarantor or Borrower referred to in   clause (i), a "**Transferred Guarantor**"), such Transferred Guarantor shall, upon the consummation of such sale or transfer or other transaction (or, in the case of a Specified Guarantor, receipt of the foregoing notice by the Agents), be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and the other Loan Documents, including its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Collateral Agent pursuant to the Collateral Documents shall be automatically released, and, so long as the Lead Borrower shall have provided the Agents such certifications or documents as any Agent shall reasonably request, the Collateral Agent shall take such actions as are necessary to effect each release described in this Section 11.09 in accordance with the relevant provisions of the Collateral Documents.

When all Commitments hereunder have terminated, and all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied, this Agreement and the Guarantees made herein shall terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

Section 11.10.     Right of Contribution.

Each Guarantor hereby agrees that to the extent that a Subsidiary Guarantor or a Borrower shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor or such Borrower shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's and each Borrower's right of contribution shall be subject to the terms and conditions of Section 11.04. The provisions of this Section 11.10 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor or any Borrower to the Administrative Agent and the Lenders, and each Subsidiary Guarantor and each Borrower shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Subsidiary Guarantor and such Borrower hereunder.

Section 11.11.     Keepwell.

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guaranty in respect of Swap Obligations (*provided*, *however*, that each Qualified ECP Guarantor shall only be liable under this Section 11.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.11, or otherwise under this Guarantee, as it relates to such Loan Party, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 11.11 shall remain in full force and effect until all Commitments hereunder have terminated, and all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied. Each Qualified ECP Guarantor intends that this Section 11.11 constitute, and this Section 11.11 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 11.12.     Certain ERISA Matters.

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3- 101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable, and the conditions of such exemptions are satisfied, with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub- sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, such Lender and the Borrower, provided that the Borrower shall not unreasonably withhold its consent.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Lead Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that:

(i)    none of the Administrative Agent, the Lead Arranger or their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)- (E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

212

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent, the Lead Arranger or any of their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(c)    The Administrative Agent and the Lead Arranger hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

[*Signature Pages Follow*]

213

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**COSMOS ACQUISITION, LLC,**
as the Lead Borrower

By:  __/s/ Peter Cannito__
Name: Peter Cannito
Title: Chief Executive Officer

**COSMOS FINANCE, LLC,**
as the Parent

By:  __/s/ Peter Cannito__
Name: Peter Cannito
Title: Chief Executive Officer

[Signature Page to Credit Agreement]

**IN SPACE GROUP, INC. MADE IN SPACE, INC.
MADE IN SPACE EUROPE, LLC ADCOLE SPACE, LLC
DEEP SPACE SYSTEMS INC. ROCC**
each as a Guarantor

By: /s/ Peter Cannito
Name: Peter Cannito
Title: Chief Executive Officer

[Signature Page to Credit Agreement]

**ADAMS STREET CREDIT ADVISORS LP**, as
Administrative Agent and Collateral Agent

By: Adams Street Credit Advisors GP LLC its general partner

By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

[Signature Page to Credit Agreement]

**Adams Street (KOC) LLC**, as a Lender

By: Adams Street Credit Advisors LP, its manager
By: Adams Street Credit Advisors GP LLC, its general partner By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title:   Executive Vice President

**ASP SPC II Facilitation LLC**, as a Lender

By: ASP SR PRIVATE CREDIT FUND II-A LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner By: Adams Street Private Credit Fund GP-GP LLC, its general partner By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

By: ASP SR PRIVATE CREDIT FUND II-B LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner By: Adams Street Private Credit Fund GP-GP LLC, its general partner By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

By: ASP SR PRIVATE CREDIT FUND II-C LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner By: Adams Street Private Credit Fund GP-GP LLC, its general partner By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

[Signature Page to Credit Agreement]

**ASP PC II Direct Funding LLC**, as a Lender

By: ADAMS STREET PRIVATE CREDIT FUND II-A LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner By: Adams Street Private Credit Fund GP-GP LLC, its general partner By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell Name: Eric R. Mansell
Title: Executive Vice President

By: ADAMS STREET PRIVATE CREDIT FUND II GP LP, its member
By: Adams Street Private Credit Fund GP-GP LLC, its general partner By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell Name: Eric R. Mansell
Title: Executive Vice President

**Adams Street Private Income Fund LP**, as a Lender By: ASP PIF GP Management LP,

its general partner

By: Adams Street Private Credit Fund GP-GP LLC, its general partner By: Adams Street Partners, LLC, its managing member

By: /s/ Eric R. Mansell Name: Eric R. Mansell
Title: Executive Vice President

[Signature Page to Credit Agreement]

**Exhibit 10.14**

## FIRST AMENDMENT TO CREDIT AGREEMENT

This FIRST AMENDMENT TO CREDIT AGREEMENT (this " **Amendment**"), dated as of February 17, 2021, is entered into by and among Cosmos Acquisition, LLC, a Delaware limited liability company (the "**Buyer**" and the "**Lead Borrower**"), Cosmos Finance, LLC, a Delaware limited liability company (the "**Parent**"), the other Borrowers party hereto from time to time, the other Guarantors party hereto from time to time, Adams Street Credit Advisors LP, as Administrative Agent (in such capacity, including any permitted successors thereto, the "**Administrative Agent**") and as Collateral Agent (in such capacity, including any permitted successors thereto, the " **Collateral Agent**"), each lender party hereto (which shall constitute Required Lenders), and the First Amendment Term Lenders (as defined herein) party hereto.

### W I T N E S S E T H

WHEREAS, on October 28, 2020, Lead Borrower, Parent, the other Borrowers, the other Guarantors, the Lenders (as defined therein) from time to time parties thereto, Collateral Agent and Administrative Agent entered into that certain Credit Agreement (as amended, modified, renewed, extended, restated or supplemented from time to time prior to the date hereof, the "**Existing Credit Agreement**" and as further modified by this Amendment, the " **Credit Agreement**"). Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed thereto in the Credit Agreement.

WHEREAS, in accordance with <u>Section 2.14(a)</u> of the Existing Credit Agreement, the Lead Borrower has requested an increase to the principal amount of the Term Loans by an aggregate principal amount of $32,000,000 as an Incremental Term Loan (the "**First Amendment Term Loans**" and, the commitments with respect thereto, the "**First Amendment Term Commitments**") on the terms and conditions set forth herein and which constitute Incremental Term Commitments, the proceeds of which will be used by the Lead Borrower to (i) finance the acquisition of all of the issued and outstanding capital stock of Deployable Space Systems, Inc., a California corporation ("**DSS**"), pursuant to that certain Securities Purchase Agreement, dated as of the date hereof (together with all exhibits, schedules, and disclosure letters attached thereto, as amended, restated, supplemented, modified and/or waived from time to time, the "**DSS Acquisition Agreement**"), by and among Buyer, the Persons listed therein as sellers and the representative of the sellers party thereto (the " **DSS Acquisition**") and (ii) pay fees and expenses in connection with the DSS Acquisition, this Amendment and the transactions contemplated thereby and hereby (collectively, the "**First Amendment Transactions**") and has requested that such First Amendment Term Loans be provided by banks or financial institutions that become or are existing Lenders under the Credit Agreement (each such Person committing to provide and providing any such First Amendment Term Loans on the First Amendment Effective Date (as defined below) being referred to herein as a "**First Amendment Term Lender**");

WHEREAS, each Person listed on <u>Schedule I</u> hereto is a First Amendment Term Lender and is willing to provide a First Amendment Term Commitment in the amount set forth on <u>Schedule I</u> hereto on the terms and conditions hereof; and

WHEREAS, (a) the First Amendment Term Lenders agreeing to make the First Amendment Term Loans are willing to grant the extension of credit contemplated hereby, in each case on the terms and subject to the conditions of this Amendment and (b) to the extent such consent is required, the Administrative Agent consents to each of the First Amendment Term Lenders providing the First Amendment Term Loans being Lenders under the Credit Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I.
## FIRST AMENDMENT TERM LOANS; CONSENTS

Section 1.01. Subject to the terms and conditions set forth herein, including without limitation Article III, each First Amendment Term Lender hereby agrees to make First Amendment Term Loans to the Lead Borrower on the First Amendment Effective Date in a principal amount equal to such First Amendment Term Lender's First Amendment Term Commitment as set forth on Schedule I hereto on the First Amendment Effective Date. It is understood and agreed that (i) all First Amendment Term Loans funded on the First Amendment Effective Date shall, from and after the funding thereof, be Term Loans for all purposes of the Credit Agreement but shall be treated as a different Class of Term Loans than the Initial Term Loans and (ii) each First Amendment Term Lender shall become a party to the Credit Agreement as a Lender to the extent not already a Lender thereunder.

Section 1.02. The First Amendment Term Loans shall have the following terms:

(a)     Currency. The First Amendment Term Loans shall be denominated in the same currency as the Initial Term Loans.

(b)     Applicable Rate. The Applicable Rate with respect to the First Amendment Term Loans shall be the same as the Applicable Rate that applies to the Initial Term Loans.

(c)     Maturity. The maturity date of the First Amendment Term Loans shall be the date that is the Maturity Date that applies to the Initial Term Loans.

(d)     Payments. For the avoidance of doubt, the provisions of Sections 2.05, 2.07(a) and 2.12 of the Credit Agreement shall apply to the First Amendment Term Loans on the same basis as such provisions apply to the Initial Term Loans. After the First Amendment Effective Date, all prepayments of Term Loans shall be applied ratably to the Initial Term Loans and the First Amendment Term Loans.

(e)     Guarantees, Collateral Documents, Collateral. The First Amendment Term Loans shall be entitled to the benefit of the Guaranty, the Collateral Documents and the Collateral on the same basis as the Initial Term Loans.

(f)Credit Agreement Governs. Except as expressly set forth in this Amendment, the First Amendment Term Loans shall have (and benefit from) the same terms as the Initial Term Loans (but, for the avoidance of doubt, the First Amendment Term Loans shall be a separate Class of Term Loans from the Initial Term Loans) and shall be governed by the terms and conditions of the Credit Agreement and the other Loan Documents.

Section 1.03. Certain Agreements and Consents. Subject to the terms and conditions set forth herein, including without limitation Article III:

(a)     The parties hereto hereby agree that, for all purposes under the Credit Agreement and the other Loan Documents, (i) the First Amendment Term Loans will constitute Loans and Term Loans, (ii) each First Amendment Term Lender will be a Lender and a Term Lender, (iii) the First Amendment Term Loans will constitute Incremental Term Loans which shall be a separate Class of Term Loans, (iv) this

2

Amendment shall be deemed to be an Incremental Request delivered in accordance with Section 2.14(a) of the Credit Agreement and shall be deemed to satisfy the notice and offer requirements as set forth in the last sentence of Section 2.14(a) and (vi) this Amendment shall be deemed to be an Incremental Amendment for all purposes under Section 2.14(f) of the Credit Agreement.

(b)        Each of the Lead Borrower, the other Loan Parties and the Administrative Agent hereby consents to the provisions of this Article I.

(c)        To the extent such consent is required, the Administrative Agent consents to each of the First Amendment Term Lenders providing the First Amendment Term Loans being Lenders under the Credit Agreement.

**ARTICLE II. AMENDMENTS**

The Loan Parties hereby request the amendment of the Credit Agreement such that, and the Lenders party hereto (constituting First Amendment Term Lenders committing to provide the First Amendment Term Loans on the date of such effectiveness or constituting Required Lenders, as applicable), hereby agree with respect to the Credit Agreement that, in each case, upon the effectiveness of this Amendment:

(a)  **Amendments of Section 1.01.** Section 1.01 is hereby revised by:

(i)  Inserting the following definitions in the appropriate alphabetical order therein:

"**DSS Acquisition**" means Lead Borrower's acquisition of Deployable Space Systems, Inc. pursuant to the DSS Acquisition Agreement.

"**DSS Acquisition Agreement**" means that certain Securities Purchase Agreement, dated as of February 17, 2021, by and among Cosmos Acquisition, LLC, as the buyer, the Persons listed therein as sellers and the representative of the sellers party thereto, as amended, modified, supplemented or waived from time to time.

"**First Amendment**" means the First Amendment to Credit Agreement dated as of February 17, 2021, among Lead Borrower, Parent, the other Guarantors party thereto, the financial institutions party thereto as Lenders and the Administrative Agent.

"**First Amendment Effective Date**" has the meaning assigned to such term in the First Amendment.

"**First Amendment Term Commitment**" has the meaning assigned to such term in the First Amendment.

"**First Amendment Term Lender**" means each Lender described in clause (b) of the definition of Lender.

"**First Amendment Term Loans**" has the meaning assigned to such term in the First Amendment. For the avoidance of doubt, the First Amendment Term Loans shall constitute Incremental Term Loans.

3

"**First Amendment Transactions**" has the meaning assigned to such term in the First Amendment.

(ii) Amending and restating the defined terms set forth below to read in their entirety as follows:

"**Lenders**" (a) has the meaning set forth in the introductory paragraph to this Agreement, (b) effective as of the First Amendment Effective Date, includes the Persons listed on Schedule I to the First Amendment and (c) as the context requires, includes, in each case, their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender".

"**Term Commitment**" means, as to each Term Lender, its obligation to make a Term Loan to the Borrowers hereunder, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Term Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to Section 2.06 and (b)    reduced or increased from time to time pursuant to (i) assignments by or to such Term Lender pursuant to an Assignment and Assumption, (ii) an Incremental Amendment, (iii) a Refinancing Amendment, (iv) an Extension Amendment or (v) the incurrence of Replacement Term Loans. The initial amount of each Term Lender's Commitment on the Closing Date is set forth on Schedule 1.01A under the caption "Initial Term Commitment" and the initial amount of each First Amendment Term Lender's First Amendment Term Commitment on the First Amendment Effective Date is set forth on Schedule I to the First Amendment, or, otherwise, in the Assignment and Assumption, Incremental Amendment, Extension Amendment or Refinancing Amendment pursuant to which such Lender shall have assumed its Commitment, as the case may be.

"**Term Lender**" means, at any time, (a) any Lender that has (i) an Initial Term Commitment, Incremental Term Commitment or Refinancing Term Commitment or (ii) a Term Loan at such time and (b) on the First Amendment Effective Date, any First Amendment Term Lender that has a Term Commitment.

"**Term Loan**" means any Initial Term Loan, Extended Term Loan, Delayed Draw Term Loan, Incremental Term Loan (including the Term Loans made on the First Amendment Effective Date by the First Amendment Term Lenders to the Borrowers pursuant to the First Amendment), Refinancing Term Loan or Replacement Term Loan, as the context may require.

(b) **Amendment of Section 2.01.** Section 2.01(a)(i) is amended and restated to read in its entirety as follows:

"(a)    *Term Borrowings*.

(i) *Term Loan Borrowings*. Subject to the terms and conditions expressly set forth herein, each Term Lender severally agrees to make to the Lead Borrower on the Closing Date one or more Term Borrowings denominated in Dollars in an aggregate amount not to exceed at any time outstanding the amount of such Term Lender's Term Commitment. Subject to the terms and conditions expressly set forth herein, with respect to any First Amendment Term Lender having a Term Commitment as of the First Amendment Effective Date, each First Amendment Term Lender agrees to make a Term Loan to the Lead Borrower on the First Amendment

4

Effective Date in the principal amount not to exceed its Term Commitment as of the First Amendment Effective Date. Amounts borrowed under this <u>Section 2.01(a)(i)</u> and repaid or prepaid may not be re-borrowed. Term Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein."

(c)  **Amendment of Section 2.02.** The second sentence of <u>Section 2.02(a)</u> is amended and restated to read in its entirety as follows:

"Each such notice must be received by the Administrative Agent not later than 2:00 p.m., (I) three (3) Business Days prior to the requested date of any Borrowing or continuation of Eurocurrency Rate Loans or any conversion of Base Rate Loans to Eurocurrency Rate Loans, and (II) three (3) Business Days prior to the requested date of any Borrowing of Base Rate Loans or any conversion of Eurocurrency Loans to Base Rate Loans; *provided* that the notice referred to in <u>clause (I)</u> above may be delivered no later than (x) three
(3) Business Day prior to the Closing Date in the case of initial Credit Extensions and (y) one
(1) Business Day prior to the First Amendment Effective Date in the case of the First Amendment Term Loans."

(d)  **Amendment of Section 2.06.** <u>Section 2.06(b)</u> is amended and restated to read in its entirety as follows:

"*Mandatory*. (i) The Initial Term Commitments of each Term Lender shall be automatically and permanently reduced to $0 upon the funding of the Initial Term Loans to be made by such Term Lender on the Closing Date, (ii) the Delayed Draw Term Loan Commitments of each Term Lender shall be automatically and permanently reduced by the aggregate amount of any Delayed Draw Term Loan funded up by such Term Lender on the date such Delayed Draw Term Loan is funded and (iii) the First Amendment Term Commitments of each First Amendment Term Lender shall be automatically and permanently reduced to $0 upon the funding of the First Amendment Term Loans to be made by such First Amendment Term Lender on the First Amendment Effective Date. The Revolving Credit Commitments of each Revolving Credit Lender shall automatically and permanently terminate on the Maturity Date."

(e)  **Amendment of Section 2.07.** <u>Section 2.07(a)</u> is amended and restated to read in its entirety as follows:

"*Term Loans.* The Borrowers shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders (A) on the last Business Day of each March, June, September and December, commencing with the first full fiscal quarter after the Closing Date, an aggregate principal amount equal to the sum of (i) 0.25% of the aggregate principal amount of all Initial Term Loans outstanding on the Closing Date, and (ii) 0.25% of the aggregate principal amount of all funded Delayed Draw Term Loans (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in <u>Sections 2.05</u> or <u>10.07</u> (including pursuant to Dutch auctions or open market purchases, but for the avoidance of doubt without a reduction in the outstanding principal amount of any Loans not prepaid pursuant to such Dutch auction or open market purchase, as applicable)), (B) on the last Business Day of each March, June, September and December, commencing with the first full fiscal quarter after the First Amendment Effective Date, an aggregate principal amount equal to 0.25% of the aggregate principal amount of all First Amendment Term Loans outstanding on the First Amendment Effective Date (which payments shall be reduced as a

5

result of the application of prepayments in accordance with the order of priority set forth in Sections 2.05 or 10.07 (including pursuant to Dutch auctions or open market purchases, but for the avoidance of doubt without a reduction in the outstanding principal amount of any Loans not prepaid pursuant to such Dutch auction or open market purchase, as applicable)) and (C) on the Maturity Date for the Initial Term Loans, the Delayed Draw Term Loans and the First Amendment Term Loans, the aggregate principal amount of all Initial Term Loans, the Delayed Draw Term Loans and the First Amendment Term Loans outstanding on such date."

(f) **Amendment of Section 6.15(a).** Section 6.15(a) is amended and restated to read in its entirety as follows:

"(i) The proceeds of the Initial Term Loans will be applied, together with any amount drawn under the Revolving Credit Facility and certain cash on the balance sheet of the Parent and its Subsidiaries, (i) on the Closing Date to finance a portion of the Acquisition, (ii) on the Closing Date to pay Transaction Expenses and (iii) on or after the Closing Date for working capital and other general corporate purposes, including financing of Permitted Acquisitions, Capital Expenditures and other transactions not prohibited by the Loan Documents and (ii) the proceeds of the First Amendment Term Loans will be applied (A) on the First Amendment Effective Date to finance and pay consideration for the DSS Acquisition and (B) on the First Amendment Effective Date to pay fees and expenses incurred in connection with the DSS Acquisition and the other First Amendment Transactions."

(g) **Amendment of Section 7.11.** Section 7.11 is amended and restated to read in its entirety as follows:

"Subject to Section 8.04, permit the Consolidated Total Net Leverage Ratio as of the last day of any Test Period (commencing with the Test Period ending on March 30, 2021) to be greater than:

| Test Period Ending Date | Consolidated Total Net Leverage Ratio |
|---|---|
| March 31, 2021 | 6.50:1.00 |
| June 30, 2021 | 6.00:1.00 |
| September 30, 2021 | 6.00:1.00 |
| December 31, 2021 | 6.00:1.00 |
| March 31, 2022 | 5.50:1.00 |
| June 30, 2022 | 5.00:1.00 |
| September 30, 2022 | 5.00:1.00 |
| December 31, 2022 | 5.00:1.00 |
| March 31, 2023 | 4.50:1.00 |

6

| June 30, 2023 | 4.00:1.00 |
|---|---|
| September 30, 2023 | 4.00:1.00 |
| December 31, 2023 | 4.00:1.00 |
| March 31, 2024 and for each Test Period thereafter | 3.50:1.00 |

**ARTICLE III.**
**CONDITIONS PRECEDENT; MAKING OF TERM LOANS**

The effectiveness of this Amendment and the commitments and obligations of each First Amendment Term Lender under this Amendment shall be subject to the satisfaction or waiver (by the First Amendment Term Lenders) of each of the following conditions (the date of satisfaction or waiver of such conditions being referred to herein as the "**First Amendment Effective Date**"):

Section 3.01. Execution. The Administrative Agent shall have received a counterpart of this Amendment and the other documents related to or contemplated thereby, executed and delivered by a duly authorized officer of the Lead Borrower, Parent, the Guarantors, the lenders party hereto constituting Required Lenders, and each First Amendment Term Lender immediately prior to or concurrently with the First Amendment Effective Date.

Section 3.02. Committed Loan Notice. The Administrative Agent shall have received a Committed Loan Notice with respect to the First Amendment Term Loans as required by Section 2.02(a) of the Credit Agreement (or such notice as shall have been deemed given in accordance with Section 2.02(a) of the Credit Agreement).

Section 3.03. Representations and Warranties . The representations and warranties of each Loan Party set forth in Article V of the Credit Agreement and in each other Loan Document shall be true and correct in all material respects on and as of the First Amendment Effective Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (except where such representations and warranties are already qualified by materiality, in which case such representation and warranty shall be accurate in all respects).

Section 3.04. Event of Default. No Event of Default exists or shall exist after giving effect to the First Amendment Term Commitments.

Section 3.05 Corporate Documents and Officer Certification. The Administrative Agent shall have received (A) such certificates of good standing (to the extent such concept exists) and corporate charters from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other corporate or limited liability company action approving and authorizing the Borrowing of the First Amendment Term Loans, the reaffirmation of Obligations, and the execution, delivery and performance of this Amendment and the other Loan Documents which such Loan Party is executing as of the First Amendment Effective Date and prior to the funding of the First Amendment Term Loans, certified as of the First Amendment Effective Date by such Loan Party as being in full force and effect without modification or amendment and incumbency certificates of Responsible Officers of each

7

Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Amendment and (B) a certificate of a Responsible Officer of the Lead Borrower certifying that the conditions specified in Sections 3.03, 3.04 and 3.10 have been satisfied.

Section 3.06. Solvency Certificate. The Administrative Agent shall have received a solvency certificate from the chief financial officer or another senior financial or accounting officer with similar responsibilities of the Lead Borrower substantially in the form attached as Exhibit D-2 to the Credit Agreement.

Section 3.07. Fees. Each First Amendment Term Lender shall have received (i) a upfront fee equal to 1.0% of the aggregate principal amount of the First Amendment Term Loans funded by such First Amendment Term Lender on the First Amendment Effective Date and (ii) a structuring fee equal to 1.0% of the aggregate principal amount of the First Amendment Term Loans funded by such First Amendment Term Lender on the First Amendment Effective Date.

Section 3.08. Costs and Expenses. All reasonable out-of-pocket costs, fees and expenses required to be paid to the Administrative Agent, the Collateral Agent, and Lenders hereunder, in each case to the extent invoiced at least three (3) Business Days before the First Amendment Effective Date shall have been paid, or shall be paid substantially concurrently with, the funding of the First Amendment Term Loans on the First Amendment Effective Date (which amount may be offset against the proceeds of the First Amendment Term Loans).

Section 3.09. Opinions of Counsel. The Administrative Agent shall have received a customary opinion from each of Kirkland & Ellis LLP and Brownstein Hyatt Farber Schreck, LLP, as counsel to the Loan Parties.

Section 3.10. DSS Acquisition. The DSS Acquisition shall have been consummated, or substantially simultaneously with the funding of the First Amendment Term Loans hereunder shall be consummated, in all material respects in accordance with the DSS Acquisition Agreement.

## ARTICLE IV REPRESENTATIONS AND WARRANTIES

To induce (a) each First Amendment Term Lender to provide its First Amendment Term Commitments and to fund the First Amendment Term Loans thereunder on the First Amendment Effective Date and to become a party hereto, and (b) the Administrative Agent and the Lenders party hereto to consent to amend the Credit Agreement in the manner provided herein, each Loan Party hereby represents and warrants to the Administrative Agent, the Collateral Agent, and each Lender (including each First Amendment Term Lender) that, as of the First Amendment Effective Date:

Section 4.01. The execution, delivery and performance by each Loan Party of this Amendment,
(a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any of such Person's Organization Documents; (ii) conflict with or result in any breach or contravention of, or the creation of any Lien (other than as permitted by Section 7.01 of the Amended Credit Agreement), any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Law; except with respect to any violation, conflict, breach or contravention (but not creation of Liens) referred to in clauses
(ii) and (iii), to the extent that such violation, conflict, breach or contravention would not reasonably be expected to have a Material Adverse Effect..

8

Section 4.02. No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Amendment, except for (i) approval, consent, exemption, authorization, or other action by, or notice to, or filing necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties (or release existing Liens) under applicable U.S. law, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

Section 4.03. This Amendment has been duly executed and delivered by each Loan Party. This Amendment constitutes, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party in accordance with its terms, except as such enforceability may be limited by applicable Enforcement Qualifications.

**ARTICLE V MISCELLANEOUS**

Section 5.01. <u>Execution of this Amendment</u>. This Amendment is executed and shall be construed as an amendment to the Credit Agreement, and, as provided in the Credit Agreement, this Amendment forms a part thereof. The Loan Parties and the other parties hereto acknowledge that this Amendment shall constitute a Loan Document and on and after the First Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to the "Credit Agreement", "thereunder", "thereof" or words of like import referring to the Credit Agreement shall mean and be a reference to the Existing Credit Agreement as amended by this Amendment. This Amendment shall not constitute a novation of the Credit Agreement or any of the Loan Documents.

Section 5.02. <u>No Waiver; Effect on Loan Documents</u>. This Amendment is made in modification of, but not extinguishment of, the obligations set forth in the Credit Agreement and, except as specifically modified pursuant to the terms of this Amendment, the terms and conditions of the Credit Agreement and the other Loan Documents remain in full force and effect. Nothing herein shall limit in any way the rights and remedies of the Administrative Agent and the Secured Parties under the Credit Agreement and the other Loan Documents. Except to the extent permitted or provided for herein, the execution, delivery and performance by the Administrative Agent and the Lenders party hereto of this Amendment shall not constitute a waiver, forbearance or other indulgence with respect to any Default or Event of Default now existing or hereafter arising or in any way limit, impair or otherwise affect the rights and remedies of the Administrative Agent or the Secured Parties under the Loan Documents. To the extent that any of the terms and conditions in any of the Loan Documents shall contradict or be in conflict with any of the terms or conditions of the Credit Agreement after giving effect to this Amendment, such terms and conditions are hereby deemed modified or amended accordingly to reflect the terms and conditions of the Credit Agreement as modified or amended hereby

Section 5.03. <u>Acknowledgement and Agreement</u>. The Administrative Agent and the Lead Borrower acknowledge and agree, pursuant to <u>Section 2.14(f)</u> of the Credit Agreement, that the amendments to the Credit Agreement set forth in this Amendment are necessary and appropriate, in the reasonable opinion of the Administrative Agent and Lead Borrower, to effectuate the provisions of <u>Section 2.14</u> of the Credit Agreement.

9

Section 5.04. <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Amendment or a signature page of any notice, certificate, document, agreement or instrument in respect thereof by facsimile transmission or electronic transmission (including "pdf") shall be as effective as delivery of a manually executed counterpart hereof or thereof, as applicable. The words "execution," "signed," "signature," and words of similar import in this Amendment or any notice, certificate, document, agreement or instrument in respect thereof shall be deemed to include electronic or digital signatures or the keeping of records in electronic form, each of which shall be of the same effect, validity and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000, the Electronic Signatures and Records Act of 1999, or any other similar state Laws based on the Uniform Electronic Transactions Act.

Section 5.05. <u>Entire Agreement</u>. This Amendment embodies the entire agreement of the parties and supersedes all prior agreements and understandings relating to the subject matter hereof involving any Loan Party and any of the Administrative Agent, any Lender or any of their respective Affiliates. Upon the effectiveness of this Amendment as set forth in <u>Article III</u> of this Amendment, this Amendment shall be binding upon and inure to the benefit of the parties hereto and, subject to and in accordance with <u>Section 10.07</u> of the Credit Agreement, their respective successors and assigns.

Section 5.06. <u>Governing Law; Waiver of Jury Trial</u>. Each of the parties hereto hereby agrees that <u>Sections 10.15</u> and <u>10.16</u> of the Existing Credit Agreement are incorporated by reference herein, *mutatis mutandis*, and shall have the same force and effect with respect to this Amendment as if originally set forth herein.

Section 5.07. <u>Severability</u>. Any provision of this Amendment being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of this Amendment or any part of such provision in any other jurisdiction.

Section 5.08. <u>Headings</u>. Section headings herein are included herein for convenience of reference only and shall not affect the interpretation of this Agreement.

Section 5.09. <u>Amendment, Modification and Waiver</u>. This Amendment may not be amended, modified or waived except as permitted by <u>Section 10.01</u> the Credit Agreement.

Section 5.10. <u>Reaffirmation of Obligations</u>. Each Loan Party, subject to the terms and limits contained herein and in the Loan Documents, (a) has incurred or guaranteed the Secured Obligations, including, without limitation, all obligations with respect to First Amendment Term Loans (collectively, the "<u>Obligations</u>") and all of its Obligations shall remain in full force and effect on a continuous basis after giving effect to this Amendment, (b) acknowledges and agrees that nothing in this Amendment shall constitute a novation or termination of such Obligations and (c) has created Liens and security interests in favor of the Collateral Agent on certain of its Collateral to secure its obligations hereunder. Each Loan Party hereby acknowledges that it has reviewed the terms and provisions of this Amendment and consents to this Amendment. Each Loan Party hereby confirms that each Loan Document to which it is a party or is otherwise bound and all Collateral encumbered thereby will continue to guarantee or secure, as the case may be, to the fullest extent possible in accordance with the Loan Documents, the payment and performance of the Obligations, as the case may be, including without limitation the payment and performance of all

10

such applicable Obligations that are joint and several obligations of each Loan Party now or hereafter existing.

[*Remainder of Page Intentionally Left Blank*]

11

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**COSMOS FINANCE, LLC**,
as Parent

By: /s/ Peter Cannito
Name: Peter Cannito
Title: Chief Executive Officer

**COSMOS ACQUISITION, LLC**,
as the Lead Borrower

By: /s/ Peter Cannito
Name: Peter Cannito
Title: Chief Executive Officer

**IN SPACE GROUP, INC. REDWIRE SPACE, INC.,
formerly known as MADE IN SPACE, INC. MADE IN SPACE EUROPE, LLC
ADCOLE SPACE, LLC
DEEP SPACE SYSTEMS INC. ROCCOR, LLC**,
each as a Guarantor

By: /s/ Peter Cannito
Name: Peter Cannito
Title: Chief Executive Officer

*[Signature Page to First Amendment to Credit Agreement (Redwire)]*

**ADAMS STREET CREDIT ADVISORS LP**,
as Administrative Agent and Collateral Agent

By: Adams Street Credit Advisors GP LLC, its general partner
By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

*[Signature Page to First Amendment to Credit Agreement (Redwire)]*

**ASP PC II DIRECT FUNDING LLC**, as a First
Amendment Term Lender

By: ADAMS STREET PRIVATE CREDIT FUND II-A LP,
its member
By: Adams Street Private Credit Fund II GP LP, its general partner
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member


By:/s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President


By: ADAMS STREET PRIVATE CREDIT FUND II GP LP,
its member
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member


By:/s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President


*[Signature Page to First Amendment to Credit Agreement (Redwire)]*

**ASP SPC II FACILITATION LLC**, as a First Amendment Term Lender

By: ASP SR PRIVATE CREDIT FUND II-A LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

By: ASP SR PRIVATE CREDIT FUND II-B LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member

By:/s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

By: ASP SR PRIVATE CREDIT FUND II-C LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member

By:/s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

*[Signature Page to First Amendment to Credit Agreement (Redwire)]*

**ADAMS STREET (KOC) LLC**, as a First Amendment Term Lender

By: Adams Street Credit Advisors LP, its manager
By: Adams Street Credit Advisors GP LLC, its general partner
By: Adams Street Partners, LLC, its member


By:/s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President


*[Signature Page to First Amendment to Credit Agreement (Redwire)]*

**ADAMS STREET PRIVATE INCOME FUND LP**, as a
First Amendment Term Lender

By: ASP PIF GP Management LP, its general partner By: Adams Street Private Credit
Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its managing member

By:/s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

*[Signature Page to First Amendment to Credit Agreement (Redwire)]*

**ADAMS STREET SHBNPP US SENIOR SECURED FUND LP**

By: ASP SHBNPP GP Management LP, its general partner
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member


By:/s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President


*[Signature Page to First Amendment to Credit Agreement (Redwire)]*

**Exhibit 10.15**

<u>**SECOND AMENDMENT TO CREDIT AGREEMENT**</u>

This SECOND AMENDMENT TO CREDIT AGREEMENT (this " **Amendment**"), dated as of September 2, 2021, is entered into by and among Redwire Holdings, LLC, formerly known as Cosmos Acquisition, LLC, a Delaware limited liability company (the "**Lead Borrower**"), Redwire Intermediate Holdings, LLC, formerly known as Cosmos Finance, LLC, a Delaware limited liability company (the "**Parent**"), the other Borrowers party hereto from time to time, the other Guarantors party hereto from time to time, Adams Street Credit Advisors LP, as Administrative Agent (in such capacity, including any permitted successors thereto, the "**Administrative Agent**") and as Collateral Agent (in such capacity, including any permitted successors thereto, the "**Collateral Agent**") and each lender party hereto (which shall constitute the Required Lenders under the Credit Agreement).

**W I T N E S S E T H**

WHEREAS, on October 28, 2020, Lead Borrower, Parent, the other Borrowers, the other Guarantors, the Lenders (as defined therein) from time to time parties thereto, Collateral Agent and Administrative Agent entered into that certain Credit Agreement (as amended by that certain First Amendment to Credit Agreement, dated as of February 17, 2021, as supplemented by that certain Joinder to Credit Agreement, dated as of March 16, 2021, and as further amended, modified, renewed, extended, restated or supplemented from time to time prior to the date hereof, the "**Existing Credit Agreement**" and as further modified by this Amendment, the " **Credit Agreement**"). Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed thereto in the Credit Agreement.

WHEREAS, Lead Borrower, Parent, the other Borrowers and the other Guarantors have requested that the Administrative Agent and the Lenders amend certain provisions of the Existing Credit Agreement, and, subject to the satisfaction of the conditions set forth herein, the Required Lenders signatory hereto are willing to do so, on the terms set forth herein.

<u>**AGREEMENT**</u>

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I. AMENDMENTS**

The Loan Parties hereby request the amendment of the Credit Agreement such that, and the Required Lenders party hereto, hereby agree with respect to the Credit Agreement that, in each case, upon the effectiveness of this Amendment:

Section 1.01.    <u>Amendments of Section 1.01</u>. Section 1.01 is hereby revised by:

(a)    Amending and restating clause (i) of the last paragraph of the definition of "Consolidated EBITDA" to read in its entirety as follows:

"(i)(x) all amounts added to Consolidated EBITDA pursuant to  <u>clauses (a)(vi)(x)</u>, <u>(a)(vii)(A)</u> and <u>(a)(vii)(B)(ii)</u> above, together with all amounts added back to Consolidated EBITDA pursuant to <u>Section 1.11(c)(ii)</u>, shall not exceed, in the aggregate, 30% of Consolidated EBITDA (determined after giving effect to all such amounts that would be added back pursuant to

the foregoing) and (y) all amounts added to Consolidated EBITDA pursuant to clause (a)(vii)(B)(i) above in respect of new contracts shall not exceed, in the aggregate, 30% of Consolidated EBITDA (determined after giving effect to all such amounts that would be added back pursuant to the foregoing) and".

(b)    Amending and restating the defined term set forth below to read in its entirety as follows:

"**Qualified Cash**" means, as of any date of determination, an amount equal to the aggregate amount of cash and Cash Equivalents (other than Restricted Cash) of the Loan Parties on such date.

(c)    Inserting the following definitions in the appropriate alphabetical order therein:

"**Second Amendment**" means the Second Amendment to Credit Agreement dated as of September 2, 2021, among Lead Borrower, Parent, the other Guarantors party thereto, the financial institutions party thereto as Lenders and the Administrative Agent.

"**Second Amendment Effective Date**" has the meaning assigned to such term in the Second Amendment.

Section 1.02. <u>Amendment to Section 2.05</u>. Section 2.05(a)(i) and Section 2.05(b)(iii) are amended by replacing all references therein to "Closing Date" with "Second Amendment Effective Date".

Section 1.03. <u>Amendment to Section 7.11</u>. Section 7.11 is amended and restated to read in its entirety as follows:

"Subject to Section 8.04, permit the Consolidated Total Net Leverage Ratio as of the last day of any Test Period (commencing with the Test Period ending on September 30, 2021) to be greater than 6.50:1.00."

Section 1.04. <u>Amendment to Section 8.02</u>. Section 8.02(ii) is amended by replacing all references therein to "Closing Date" with "Second Amendment Effective Date".

## ARTICLE II. CONDITIONS PRECEDENT

The effectiveness of this Amendment shall be subject to the satisfaction or waiver (by the Required Lenders) of each of the following conditions (the date of satisfaction or waiver of such conditions being referred to herein as the "**Second Amendment Effective Date**"):

Section 2.01. <u>Execution</u>. The Administrative Agent shall have received a counterpart of this Amendment, executed and delivered by a duly authorized officer of the Lead Borrower, Parent, the Guarantors, and the Required Lenders party hereto immediately prior to or concurrently with the Second Amendment Effective Date.

Section 2.02. <u>Qualified IPO</u>. A Qualified IPO, on terms previously disclosed to the Administrative Agent, shall have been consummated or will be consummated substantially concurrently with the Second Amendment Effective Date.

2   LEGAL_US_E # 157661465.6

Section 2.03. <u>Representations and Warranties</u>. The representations and warranties of each Loan Party set forth in <u>Article V</u> of the Credit Agreement and in each other Loan Document shall be true and correct in all material respects on and as of the Second Amendment Effective Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (except where such representations and warranties are already qualified by materiality, in which case such representation and warranty shall be accurate in all respects).

Section 2.04. <u>Event of Default</u>. No Event of Default exists or shall exist after giving effect to the Second Amendment.

## ARTICLE III REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Required Lenders party hereto to consent to amend the Credit Agreement in the manner provided herein, each Loan Party hereby represents and warrants to the Administrative Agent, the Collateral Agent, and each Required Lender that, as of the Second Amendment Effective Date:

Section 3.01. The execution, delivery and performance by each Loan Party of this Amendment, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any of such Person's Organization Documents; (ii) conflict with or result in any breach or contravention of, or the creation of any Lien (other than as permitted by Section 7.01 of the Amended Credit Agreement), any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Law; except with respect to any violation, conflict, breach or contravention (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such violation, conflict, breach or contravention would not reasonably be expected to have a Material Adverse Effect..

Section 3.02. No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Amendment, except for (i) approval, consent, exemption, authorization, or other action by, or notice to, or filing necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties (or release existing Liens) under applicable U.S. law, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

Section 3.03. This Amendment has been duly executed and delivered by each Loan Party. This Amendment constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party in accordance with its terms, except as such enforceability may be limited by applicable Enforcement Qualifications.

## ARTICLE IV MISCELLANEOUS

3    LEGAL_US_E # 157661465.6

Section 4.01. <u>Execution of this Amendment</u>. This Amendment is executed and shall be construed as an amendment to the Credit Agreement, and, as provided in the Credit Agreement, this Amendment forms a part thereof. The Loan Parties and the other parties hereto acknowledge that this Amendment shall constitute a Loan Document and on and after the Second Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to the "Credit Agreement", "thereunder", "thereof" or words of like import referring to the Credit Agreement shall mean and be a reference to the Existing Credit Agreement as amended by this Amendment. This Amendment shall not constitute a novation of the Credit Agreement or any of the Loan Documents.

Section 4.02. <u>No Waiver; Effect on Loan Documents</u>. This Amendment is made in modification of, but not extinguishment of, the obligations set forth in the Credit Agreement and, except as specifically modified pursuant to the terms of this Amendment, the terms and conditions of the Credit Agreement and the other Loan Documents remain in full force and effect. Nothing herein shall limit in any way the rights and remedies of the Administrative Agent and the Secured Parties under the Credit Agreement and the other Loan Documents. Except to the extent permitted or provided for herein, the execution, delivery and performance by the Administrative Agent and the Required Lenders party hereto of this Amendment shall not constitute a waiver, forbearance or other indulgence with respect to any Default or Event of Default now existing or hereafter arising or in any way limit, impair or otherwise affect the rights and remedies of the Administrative Agent or the Secured Parties under the Loan Documents. To the extent that any of the terms and conditions in any of the Loan Documents shall contradict or be in conflict with any of the terms or conditions of the Credit Agreement after giving effect to this Amendment, such terms and conditions are hereby deemed modified or amended accordingly to reflect the terms and conditions of the Credit Agreement as modified or amended hereby

Section 4.03. <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Amendment or a signature page of any notice, certificate, document, agreement or instrument in respect thereof by facsimile transmission or electronic transmission (including "pdf") shall be as effective as delivery of a manually executed counterpart hereof or thereof, as applicable. The words "execution," "signed," "signature," and words of similar import in this Amendment or any notice, certificate, document, agreement or instrument in respect thereof shall be deemed to include electronic or digital signatures or the keeping of records in electronic form, each of which shall be of the same effect, validity and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000, the Electronic Signatures and Records Act of 1999, or any other similar state Laws based on the Uniform Electronic Transactions Act.

Section 4.04. <u>Entire Agreement</u>. This Amendment embodies the entire agreement of the parties and supersedes all prior agreements and understandings relating to the subject matter hereof involving any Loan Party and any of the Administrative Agent, any Lender or any of their respective Affiliates. Upon the effectiveness of this Amendment as set forth in <u>Article II</u> of this Amendment, this Amendment shall be binding upon and inure to the benefit of the parties hereto and, subject to and in accordance with <u>Section 10.07</u> of the Credit Agreement, their respective successors and assigns.

Section 4.05.    <u>Governing Law; Waiver of Jury Trial</u>. Each of the parties hereto hereby agrees that <u>Sections 10.15</u> and <u>10.16</u> of the Existing Credit Agreement are incorporated by reference herein,

4    LEGAL_US_E # 157661465.6

*mutatis mutandis*, and shall have the same force and effect with respect to this Amendment as if originally set forth herein.

Section 4.06. <u>Severability</u>. Any provision of this Amendment being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of this Amendment or any part of such provision in any other jurisdiction.

Section 4.07. <u>Headings</u>. Section headings herein are included herein for convenience of reference only and shall not affect the interpretation of this Agreement.

Section 4.08. <u>Amendment, Modification and Waiver</u>. This Amendment may not be amended, modified or waived except as permitted by <u>Section 10.01</u> the Credit Agreement.

Section 4.09. <u>Reaffirmation of Obligations</u>. Each Loan Party, subject to the terms and limits contained herein and in the Loan Documents, (a) has incurred or guaranteed the Secured Obligations and all of its Obligations shall remain in full force and effect on a continuous basis after giving effect to this Amendment, (b) acknowledges and agrees that nothing in this Amendment shall constitute a novation or termination of such Obligations and (c) has created Liens and security interests in favor of the Collateral Agent on certain of its Collateral to secure its obligations hereunder. Each Loan Party hereby acknowledges that it has reviewed the terms and provisions of this Amendment and consents to this Amendment. Each Loan Party hereby confirms that each Loan Document to which it is a party or is otherwise bound and all Collateral encumbered thereby will continue to guarantee or secure, as the case may be, to the fullest extent possible in accordance with the Loan Documents, the payment and performance of the Obligations, as the case may be, including without limitation the payment and performance of all such applicable Obligations that are joint and several obligations of each Loan Party now or hereafter existing.

[*Remainder of Page Intentionally Left Blank*]

5    LEGAL_US_E # 157661465.6

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**REDWIRE INTERMEDIATE HOLDINGS, LLC,** as Parent

By: /s/ William Read
Name: William Read
Title: Chief Financial Officer

**REDWIRE HOLDINGS, LLC,** as the Lead Borrower

By: /s/ William Read
Name: William Read
Title: Chief Financial Officer

**IN SPACE GROUP, INC.**
**REDWIRE SPACE, INC.**
**MADE IN SPACE EUROPE, LLC**
**ADCOLE SPACE, LLC**
**DEEP SPACE SYSTEMS INC.**
**ROCCOR, LLC**
**OAKMAN AEROSPACE, LLC**
**LOADPATH, LLC**
**DEPLOY ABLE SPACE SYSTEMS, INC.**

By: /s/ William Read
Name: William Read
Title: Chief Financial Officer

*[Signature Page to Second Amendment to Credit Agreement (Redwire)]*

**ADAMS STREET CREDIT ADVISORS LP**,
as Administrative Agent and Collateral Agent

By: Adams Street Credit Advisors GP LLC, its general partner
By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

*[Signature Page to Second Amendment to Credit Agreement (Redwire)]*

**ASP PC II FACILITATION LLC**,
as a Lender

By: ADAMS STREET PRIVATE CREDIT
FUND II-A LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

By: ADAMS STREET PRIVATE CREDIT
FUND II-B LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President

**ASP PC II LEV FACILITATION LLC**,
as a Lender

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Secretary and Corporate Vice President

**ASP PIF LEV FACILITATION LLC**,
as a Lender

By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Assistant Secretary and Corporate Vice President

*[Signature Page to Second Amendment to Credit Agreement (Redwire)]*

**ADAMS STREET (KOC) LLC**, as a
Lender

By: Adams Street Credit Advisors LP, its manager
By: Adams Street Credit Advisors GP LLC, its general partner
By: Adams Street Partners, LLC, its member


By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President


**ADAMS STREET SHBNPP US SENIOR
SECURED FUND LP,** as a Lender

By: ASP SHBNPP GP Management LP, its general partner
By: Adams Street Private Credit Fund GP- GP LLC, its general partner
By: Adams Street Partners, LLC, its member


By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President


*[Signature Page to Second Amendment to Credit Agreement (Redwire)]*

**ASP SPC II FACILITATION LLC**, as a
Lender

By: ASP SR PRIVATE CREDIT FUND II-A
LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member


By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President


By: ASP SR PRIVATE CREDIT FUND II-B
LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member


By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President


By: ASP SR PRIVATE CREDIT FUND II-C
LP, its member
By: Adams Street Private Credit Fund II GP LP, its general partner
By: Adams Street Private Credit Fund GP-GP LLC, its general partner
By: Adams Street Partners, LLC, its member


By: /s/ Eric R. Mansell
Name: Eric R. Mansell
Title: Executive Vice President


*[Signature Page to Second Amendment to Credit Agreement (Redwire)]*

**Exhibit 21**

## SUBSIDIARIES OF THE REGISTRANT

| Legal Name | Formerly Known As | Jurisdiction of Incorporation |
|---|---|---|
| Redwire Corporation | Genesis Park Acquisition Corp. | Delaware |
| Redwire Intermediate Holdings, LLC | Cosmos Finance, LLC | Delaware |
| Redwire Holdings, LLC | Cosmos Acquisition, LLC | Delaware |
| Adcole Space, LLC | — | Delaware |
| Deep Space Systems, Inc. | — | Delaware |
| Deployable Space Systems Inc. | — | California |
| In Space Group, Inc. | — | Delaware |
| Loadpath, LLC | — | New Mexico |
| Made in Space Europe, LLC | — | Delaware |
| Made in Space Europe SARL | — | Luxembourg |
| Oakman Aerospace, LLC | — | Colorado |
| Redwire Space, Inc. | — | Delaware |
| Roccor, LLC | — | Colorado |
| Techshot, Inc. | — | Indiana |

Page 1

**Exhibit 23.1**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 (No. 333-260661) of Redwire Corporation of our report dated May 11, 2021 relating to the financial statements of In Space Group, Inc., which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
Jacksonville, Florida
April 8, 2022

Page 1

**Exhibit 23.2**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 (No. 333-260661) of Redwire Corporation of our report dated April 8, 2022 relating to the financial statements of Redwire Corporation, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
Jacksonville, Florida
April 8, 2022

**Exhibit 31.1**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Peter Cannito, Chief Executive Officer and Chairman, certify that:

1.  I have reviewed this Annual Report on Form 10-K for the period ended December 31, 2021, of Redwire Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

| Date: | April 8, 2022 | By: | /s/ Peter Cannito |
| | | Name: | Peter Cannito |
| | | Title: | Chief Executive Officer and Chairman |
| | | | *(Principal Executive Officer)* |

1

**Exhibit 31.2**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, William Read, Chief Financial Officer, certify that:

1. I have reviewed this Annual Report on Form 10-K for the period ended December 31, 2021, of Redwire Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

| | | |
|---|---|---|
| Date: | April 8, 2022 | By: | /s/ William Read |
| | | Name: | William Read |
| | | Title: | Chief Financial Officer |
| | | | *(Principal Financial Officer)* |

1

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**

**Certification Pursuant to Section 18 U.S.C. Section 1350,**
**As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Redwire Corporation (the "Company") for the period ended December 31, 2021, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Peter Cannito, Chief Executive Officer and Chairman of the Company, certifies, to the best of his knowledge, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company

| Date: | April 8, 2022 | By: | /s/ Peter Cannito |
| | | Name: | Peter Cannito |
| | | Title: | Chief Executive Officer and Chairman |
| | | | *(Principal Executive Officer)* |

**Exhibit 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**

**Certification Pursuant to Section 18 U.S.C. Section 1350,**
**As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Redwire Corporation (the "Company") for the period ended December 31, 2021, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), William Read, Chief Financial Officer of the Company, certifies, to the best of his knowledge, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

| Date: | April 8, 2022 | By: | /s/ William Read |
| --- | --- | --- | --- |
| | | Name: | William Read |
| | | Title: | Chief Financial Officer |
| | | | *(Principal Financial Officer)* |