1

```
                 IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                      JACKSONVILLE DIVISION
```

| | |
|---|---|
| JED LEMEN & JARED THOMPSON, | Jacksonville, Florida |
| Plaintiffs, | Case No. 3:21-cv-1254-TJC-PDB |
| vs. | March 27, 2024 |
| REDWIRE CORPORATION, ETC., | 1:26 p.m. |
| Defendants. | Courtroom No. 5B |

```
                DIGITALLY RECORDED MOTION HEARING
            BEFORE THE HONORABLE PATRICIA BARKSDALE
                UNITED STATES MAGISTRATE JUDGE
```

PLAINTIFFS' COUNSEL:

 **REED R KATHREIN**, ESQ.
 Hagens Berman Sobol Shapiro, LLP
 715 Hearst Avenue, Suite 202
 Berkeley, CA  94710

DEFENSE COUNSEL:

 **GLENNYS ORTEGA RUBIN**, ESQ.
 **BENJAMIN FRANCIS ELLIOTT**, ESQ.
 Shutts & Bowen, LLP
 300 South Orange Avenue, Suite 1600
 Orlando, FL  32801

COURT REPORTER:

 Shannon M. Bishop, RDR, CRR, CRC
 300 North Hogan Street, Suite 9-150
 Jacksonville, FL  32202
 Telephone:  (904)549-1307
 dsmabishop@yahoo.com

(Proceedings recorded by mechanical stenography;
transcript produced by computer.)

P R O C E E D I N G S

March 27, 2024                                    1:26 p.m.

- - -

MR. KATHREIN:  Good afternoon, Your Honor.

THE COURT:  We're on the record in *Lemen verse Redwire*.  It's 3:21-cv-1254.

I'll ask counsel to introduce themselves for the record, starting with counsel for plaintiff.

MR. KATHREIN:  Your Honor, Reed Kathrein with Hagens Berman on behalf of the plaintiff.

THE COURT:  Good afternoon.  You came all the way from --

MR. KATHREIN:  California.

THE COURT:  -- California, from Berkeley.

Sorry it's so ugly out.

MR. KATHREIN:  It was beautiful yesterday.

THE COURT:  Yesterday, it was.  That's true.  Well, welcome to Florida.

MR. KATHREIN:  Thank you.

THE COURT:  And our folks from Orlando?

MS. RUBIN:  Glennys Ortega Rubin and Ben Elliott from Shutts & Bowen, representing the defendants.

THE COURT:  All right.  So you're used to bad weather.

MR. ELLIOTT:  Yes, Your Honor.

THE COURT:  All right.  We're here on four different motions.  Hopefully some of them have been resolved, or portions of them have been resolved, it sounds like, from plaintiffs' responses, but at least you've solved some issues. So we'll stick with the ones that haven't been resolved yet.

And I guess we'll go ahead and start with the plaintiffs' motion for a determination of protection.

The PricewaterhouseCoopers memorandum, do the defendants have any issue submitting that in camera under seal for the Court's review?

MS. RUBIN:  We would suggest that the Court not review it under -- not review it in camera at this point due to the fact that we do not believe that the plaintiffs have made the requisite showing that it should be reviewed in camera.

Obviously, it's at Your Judge -- Your Honor's discretion.  But we believe that we have evidence sufficient to support our position such that it should not be reviewed in camera at this juncture.

THE COURT:  What showing do you think has to be made before a court can review something in camera?  And will you point me to the specific rule.

MS. RUBIN:  So it's not a rule, Your Honor.  It's -- I have the case of -- the landmark case.

THE COURT:  And from which court?

MS. RUBIN:  Hang on one second, Your Honor.  I'm

sorry. I apologize.

Middle District of Florida, *United States versus Florida Oncology Network*.

THE COURT: Uh-huh (affirmative). And is it citing any binding precedent?

MS. RUBIN: I will -- if you give me a moment, Your Honor, I will find that case real quick and let you know what --

THE COURT: You have a lot of cases there.

MS. RUBIN: I do. I appreciate that you let us sit and do this, because there's a lot of paper.

THE COURT: Well, I didn't say you could sit. You're actually -- actually supposed to stand under the local rules.

MS. RUBIN: I apologize.

THE COURT: However, since you have so much paper, I will waive that requirement. It's fine.

MS. RUBIN: Thank you. My apologies.

THE COURT: You're welcome. That's okay.

MS. RUBIN: Okay. Let's see.

THE COURT: It is in our local rules under courtroom decorum, but the only lawyers who actually follow the rule are our U.S. Attorneys, Assistant U.S. Attorneys, and Assistant Federal Defenders, because they're here in court all the time and they know the rule. But other lawyers are here so infrequently they forget it.

MS. RUBIN:  My apologies.

THE COURT:  That's okay.

MS. RUBIN:  And I can stand there if you'd like as well.

THE COURT:  It's fine.  No, because -- you made a good point.  Because you have so much, why don't you sit and be comfortable.  Just speak directly into the microphone.

MS. RUBIN:  Thank you, Your Honor.

THE COURT:  Okay.

MS. RUBIN:  So taking a quote from that case -- it's *U.S. versus Florida Oncology Network*.  That's a Middle District of Florida case, citing *United States v. Zolin*, 491 U.S. 554, a 1989 case.

And I quote:  While in camera review is not appropriate merely because a party requests a district court to undertake such an endeavor, where there is a sufficient evidentiary showing that an issue exists regarding application of a privilege, the court must utilize its own discretion and determine whether an in camera review is appropriate under the circumstances presented.  But in camera review is not a substitute for a party's obligation to justify its withholding of documents.

So my point is, Your Honor -- I think as the argument develops, we -- we have evidence that is on point that will, I think, carry the day today.  And I don't believe that the

evidence that we have -- the declaration that we submitted we think is uncontroverted.  So because of that evidence, I would request that the --

THE COURT:  That I not look at it in camera?

MS. RUBIN:  Yes, Your Honor.

THE COURT:  Okay.  I asked you that at the outset just because I've had no one ever say, No, we don't want you to look at it in camera.  They usually just give me the documents and say, Look at it in camera and decide the issue.  But I understand your position.

It is plaintiffs' motion, so I'll go ahead and let you argue that particular motion, and then you can have a chance to respond.

MR. KATHREIN:  Yes, Your Honor.  Thank you.

THE COURT:  You're welcome.

MR. KATHREIN:  I do have a lot of paper, but I think I can...

First of all, Your Honor, thank you.  And I apologize for filing a request to file a reply.  You rejected it telling us that I should be prepared to respond.  And I will respond.

THE COURT:  Okay.  And -- and I wasn't trying to be really nitpicky.  It's just over time we've realized that lawyers are just not following the rules.  And when we don't -- when we enforce some and don't enforce others, it leads to people picking and choosing which ones they want to enforce.

And so I've taken sort of the position I'm just going to enforce them carte blanche.  If you don't follow them, you don't get to play.

MR. KATHREIN:  That is --

THE COURT:  And I hated doing that to you --

MR. KATHREIN:  It's okay.

THE COURT:  -- because it was -- it did seem kind of nitpicky, but I thought, Well, you'll learn the rule and you'll get to come here and -- and reply anyway, so...

MR. KATHREIN:  Okay.  Well, Your Honor, everyone has been chastised, local counsel and Peter Shaeffer, who works with me on the case, and the paralegal.

THE COURT:  And chastising wasn't the point.  It was more just if you're going to practice here, look at the rules and follow them, but it wasn't meant in a chastising manner.

MR. KATHREIN:  Well, no, I mean, we -- I -- everyone read the local rules, but did not read that properly, because we're so used to local rules --

THE COURT:  Right.

MR. KATHREIN:  -- that say, you know, the main body --

THE COURT:  Right.

MR. KATHREIN:  -- the introduction through the conclusion, and then -- and I now realize that now every --

THE COURT:  All parts -- yeah.  I didn't write the

"all parts" part of the local rule.  My colleague did.  But it seemed to make sense when it was put into the local rules.

I don't know why parties continue to file certificates of service.  They're not required.  But they do add an extra page to a document.  And so I -- I wonder why just the law firm hasn't changed the forms, the law firm is uncomfortable not doing that.

MR. KATHREIN:  We rely often on our paralegals who are working in so many different districts that --

THE COURT:  Right.

MR. KATHREIN:  We did eventually realize that we did not need to file a certificate of service on this, especially with the electronic filings and everything.  So we've learned how to do it.

THE COURT:  But, you're right, practicing is --

MR. KATHREIN:  And, also, I appreciate that, you know, we do tend to overwrite our briefs.  And we cut and cut and cut.  And this just tells us cut more, which I'm fine with.  So I apologize for that.

I did want to say, though, at the outset I thought that -- I didn't want to come here and repeat everything in our brief.  I'm sure you're familiar with it.  There may be citations to parts in the record that need further clarification.

But what I wanted to do was mostly reply to what --

what they -- what they've said and -- and perhaps the best -- I mean, I can go through it and then we can address the clawback issue.

I do agree that the Supreme Court case in *Zolin* is the primary case that you rely upon. And I think that -- as you'll see as we go throughout here that they've got a heavy burden of showing and that they haven't met that.

And the reason for the -- the privilege -- the work product privilege is that it's to be fair to litigants who are litigating against each other so you don't see each other's -- each other's work.

And the bottom line here is that they have not shown, except through a subsequently filed Baliff declaration, and a document that they did not attach, which they claim privilege over, which they produced to me two days ago as the threat of litigation -- they cite many cases that I would like to deal with. And because they cite the cases, we have pulled together, for our reply, other cases.

What I'd like to do is I've got a list of just the case names so I could hand that up so that the court reporter and you don't have to look up those and I don't have to read those.

THE COURT: Okay.

MR. KATHREIN: I'll show it to the defendants first.

(Counsel confer.)

*Shannon M. Bishop, RDR, CRR, CRC ~ dsmabishop@yahoo.com*

THE COURT:  What's -- what's the gist of the cases?

MR. KATHREIN:  I will go through each one --

THE COURT:  Okay.

MR. KATHREIN:  -- and explain it to you.

May I hand...

MS. RUBIN:  Yes.

MR. KATHREIN:  A couple of those cases, Your Honor, are cases that were cited in our initial brief.  I am not going to address those cases.  But the case -- I will go through this in the --

THE COURT:  You're not going through every single case, are you?

MR. KATHREIN:  No, I'm not going to go through every single case.  But I will be referring to them.

And the first case that -- we address it in our brief -- is the *Deloitte* case, work product only protects the thoughts and opinions of counsel.  That is a case -- I believe a case they address.

THE COURT:  Well, let's talk about that statement work product only addresses thoughts and opinions.

MR. KATHREIN:  Uh-huh (affirmative).

THE COURT:  If you look at -- if you follow Rule 26 and you look at that, it's -- it's more than just opinion.  There's two different types of work product.  One is fact work product and then one is opinion work product.

Do you have the rule right in front of you there?

MR. KATHREIN:  No, I do not, but I -- I understand what you're saying here --

THE COURT:  I mean, it --

MR. KATHREIN:  -- Your Honor.

THE COURT:  -- the rule which I'd apply -- it's just the codification of *Hickman v. Taylor* is what we're dealing with, right?

MR. KATHREIN:  Right.

THE COURT:  It's such a beautiful case we learned in law school, right?

MR. KATHREIN:  No, it's not.

THE COURT:  But now -- but that is different circumstances.

MR. KATHREIN:  Yeah.

THE COURT:  Now it's in the rule.  And it says a party -- ordinarily, a party may not discover documents that are prepared in anticipation of litigation -- it sounds like that's the big fight here, anticipation of litigation -- or for trial -- or for another party -- blah, blah, blah -- its representative, including the other party's attorney, consultant, surety, indemnitor, insurer, or agent.

But they can be discovered -- so regardless of whether they're in anticipation of litigation -- if they're otherwise discoverable, so relevant and proportional.

It sounds like that's not an issue here.  These would be relevant to your client.

MR. KATHREIN:  They certainly would be.

THE COURT:  And proportionate, it doesn't sound like that's an issue here.

MR. KATHREIN:  Right.  Well, I mean, they --

THE COURT:  They didn't raise that anywhere, did they?

MR. KATHREIN:  No, they did not.

THE COURT:  Okay.  And then "the party shows it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means" -- you're contending a substantial need for these because they're sort of at the heart of some of your claims, right?

MR. KATHREIN:  Yeah.  We didn't actually brief substantial need.  And the reason we didn't is because we felt that we were trying to get through --

THE COURT:  You didn't think it was work product in the first place?

MR. KATHREIN:  -- well, first of all, this -- we're talking about one document here.  We're not talking about --

THE COURT:  Right.

MR. KATHREIN:  -- the underlying investigation.

THE COURT:  Right.  Just the memorandum.

MR. KATHREIN:  Just the memorandum.

THE COURT:  Right.

MR. KATHREIN:  It may be back on the other documents.

THE COURT:  Right.

MR. KATHREIN:  But we -- we -- and that's one reason we're asking for you to -- to look at it.

THE COURT:  But the -- it goes on to say if the court orders disclosure of these materials -- if the court says you've got it, then it has to protect against mental impressions, conclusions, opinions.

So it sounds like you -- because of that "must," meaning I shall protect against disclosure, that it sounds like you're pinning your argument to the it's not work product at all, so that "must" part doesn't even come into play.

MR. KATHREIN:  I guess that's -- you put it better than I did, but, yes, you're right, the "must" part does not come into play.  We have seen the document.  We went to PricewaterhouseCoopers and said, "Hey, where are all these investigative materials you're referring to?"

THE COURT:  And they gave it to you and they didn't even object until, what, several weeks later?

MR. KATHREIN:  Well, they gave it to us -- they gave it to us originally.  We then went to them and said, "Hey, where are these documents?"

THE COURT:  Where are the documents, yes.

MR. KATHREIN:  Then they produced some additional documents.  And then we raised it with defense counsel separately.  And then two weeks later they asked us to claw it back.  And we -- and I think in our -- in one of our exhibits we list exactly what defense counsel -- what documents were in there that are referred to.

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  Now, my recollection of the document and Mr. Shaeffer's recollection of the document was that they're -- and I think that's in the declaration, is that we didn't see any opinions of counsel in there, any legal advice, or any thoughts.  What we saw was --

THE COURT:  You didn't see mental impressions, conclusions, opinions, or legal theories.

MR. KATHREIN:  No.

THE COURT:  And so why didn't you just pin your argument on substantial need?

MR. KATHREIN:  Because substantial need requires us to show that we can't get it elsewhere, this information elsewhere.

THE COURT:  Can you?

MR. KATHREIN:  And so that's why we were trying to schedule a 30(b)(6) deposition of what they relied on and everything, so that -- in coming out with these statements, so that we could see that if they relied on something else other

than this we weren't coming to court saying, "We have a substantial need," and they were saying, "Well, you can get it this way," which appears right now to be just trying to use search terms and guessing what -- what the basis of this was.

We do believe we have a substantial need in this case.  And we do believe we have a substantial need for the underlying documents --

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  -- but --

THE COURT:  But you're sticking with the memo alone right now?

MR. KATHREIN:  We're sticking with it, because we tried to get a 30(b)(6) schedule that took us from September to February to get it scheduled.  We negotiated it.  We negotiated who was going to testify, a limited subject matter.  And then a week and a half before that deposition they sent us a bunch of objections saying, "Well, you only get one deposition for any 30(b)(6).  It's got to be seven hours.  You only get one witness."

And so we've been meeting and conferring -- so we pulled off the deposition, because we weren't going to go into the deposition with those restrictions.  And we may be back to you on that.

THE COURT:  Okay.

MR. KATHREIN:  So that was our strategy, not basing

it on substantial need, although we do contend there's a substantial need, because this is the core of the case.  They said there's insufficient "tone at the top."  And it appears to have been based solely on the work of the audit committee investigation, which -- but -- but then let me jump into a little bit about the audit committee investigation.

The original declaration they gave us of Jonathan Baliff and Mr. Koch, who -- who was with King & Spalding, was provided to us to show why they had redacted documents from the board minutes.

And that -- Baliff's deposition -- declaration specifically states what the purpose was of hiring King & Spalding and KPMG.  Nowhere does it say anything about "in anticipation of litigation."

And then attached to the King & Spalding -- to Mr. Koch's and Mr. Baliff's declaration are those redacted documents.  And while we didn't -- we didn't point this out so much in our initial brief, I'd like to draw your attention to -- if you look at those -- those redacted documents, in each of the board audit committee minutes -- meetings, the audit committee talks about, "We're not able to get our financial reports out.  King & Spalding's investigation is not finished."

And then it continues month to month with -- with a discussion about how -- "we're having another meeting with King & Spalding eventually.  And now we're having a meeting with

King & Spalding briefing -- having briefed PwC."

There is no mention anywhere about litigation. Typically when we see board minutes, you see something that says, you know, litigation discussion.  That is not anywhere in there.

And the prime example, I think -- and I'm going to refer to the one that's attached to the Koch deposition, which is K-o-c-h -- or declaration, Exhibit K.  And it's -- it would be pincite number RDW -- -- well, let me start with the first one, which is on November 15th.

That says on there, which is RDW000396 -- it says, "Mr. Baliff thanked the committee members for joining and reported that since the last meeting he had been meeting every day with the advisors regarding Project Athena."

The advisors are King & Spalding and KPMG.

"He confirmed the company has been cooperating fully with the document and interview requests.  He summarized the company's disclosures."

The disclosures are the company's public disclosures since the last committee meeting.  And they had already disclosed that there's a whistleblower and they were investigating.

Then there's a redaction.  Nothing in here about litigation, anticipation of litigation.

On November 22nd, which is pincite 3927, he goes --

Mr. Baliff says -- Mr. Baliff reported that significant work had been done on Project Athena.  Again, that's King & Spalding.  That's their -- the audit committee investigation.

Since then --

THE COURT:  Project Athena.

MR. KATHREIN:  Project Athena.

THE COURT:  Yeah.

MR. KATHREIN:  Since the last audit committee meeting, including daily briefings with King & Spalding, KPMG, and Mr. Baliff -- since the last meeting, the company had determined it would not be in a position to file its form 10-Q or Q3 2021, within the extended filing period due to Project Athena.

So you say -- the business purpose here with Project Athena is so that we can do the disclosure, but Project Athena, which is ongoing -- period.

So Project Athena here is defined as a business purpose.  There's nothing -- then Mr. Baliff asked the advisors to report on the work performed to date.

There's nothing in there about "in anticipation of litigation."  I -- then if we go -- and I'm going to just skip the -- through here.

But let's see, December -- under the December 8th one there's nothing.  Mr. Koch provided an allegation raised by a former employee -- Mr. Koch noted.  And that's blacked out.

Mr. Baliff informed the audit committee that they received a -- a short briefing from the audit committee, was about to learn regarding Project -- about Project Athena. Again, there's nothing in here defining Project Athena as being litigation.

On December 14th, Mr. Baliff informed the audit committee they had spoken twice with -- he had spoken with Mr. Koch twice since the PwC meeting. He referred the committee members to the report of the PwC briefing that had circulated. Mr. Koch reported that the advisor made the recommendations and next steps for the company -- again, nothing, you know -- and although a meeting was scheduled for the time that the audit committee meeting would be completed, there's nothing in here about litigation.

On December 21st, again, Mr. Koch provided an overview of the current status and presentation plan for PwC on December 22nd. Nothing in here about litigation.

THE COURT: So this is your Exhibit K?

MR. KATHREIN: Exhibit K. And it's identical on -- on Mr. -- attached to Mr. Baliff's declaration, which is Exhibit J, I believe, the immediately preceding one.

THE COURT: Okay.

MR. KATHREIN: And then eventually they get to reporting the conclusions of -- of the -- of Project Athena in January.

And February 14th, again, there's -- there's reference to the Project Athena and back-and-forth dialogue with King & Spalding, PwC's Forensic Team regarding the NASA memorandum and investigation into the team's analysis. Mr. Baliff asked the audit committee to address the necessary revisions to the memorandum.

Nothing about litigation.

THE COURT:  Now, I'll look through your Exhibit K pretty carefully.  There were so many documents attached to these motions, I haven't looked at all of them carefully.  But I'll take your word for it.

MR. KATHREIN:  Okay.

THE COURT:  But as you go through it, there's references to Project Athena without reference to litigation or potential litigation.

MR. KATHREIN:  Yeah, or the advisors.  Sometimes it just says "the advisors."

THE COURT:  And the advisors they're talking about are King & Spalding and KPMG?

MR. KATHREIN:  Correct.

THE COURT:  Not PwC?  But PwC indirectly?

MR. KATHREIN:  It is -- King & Spalding is -- it talks about King & Spalding meeting and giving information to PwC.

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  But there's -- okay.  So primarily -- there's nothing in there indicating that anything is even given to PwC, just for this document, for litigation purposes.

So -- and then other documents that we've provided -- and I -- I'm -- I'm happy to spend a little bit of time marching down them since you haven't had a chance to look at them -- would be Exhibits L and M, which are the two engagement letters of PwC.

THE COURT:  And generally stated, why did you provide those?

MR. KATHREIN:  Because those show that they were hired solely to do audit work, in the scope of their audit work, and to show that there was nothing in there about them being hired to advise on litigation.

THE COURT:  Okay.

MR. KATHREIN:  And there's two other reasons I would want you to look at -- or -- at PwC engagement letters.  And this is important, because the cases that hold that, you know -- and you -- if you've given us an auditor, that doesn't necessarily waive -- those cases usually discuss, one, if you retain the auditor for litigation purposes or, two, whether there was an expectation of confidentiality, which they cite.

But the Courts say that, well, if there's no confidentiality agreement, you can't have that expectation -- and I -- I'll be able to cite you a couple of cases on that --

and, two, the -- the engagement letters anticipate that -- that PwC could be subpoenaed -- could be requested to turn over documents.

And there's nothing in there saying that they can't. It just says that -- that they'll be reimbursed for that work by the company.  So there's an anticipation that these documents could get turned over in their engagement letter to third parties.

So, clearly, if they wanted to preserve an expectation of privacy, they should have had a confidentiality agreement, not Mr. Baliff's later-filed declaration with their motion that says "unsupported," that they had an expectation of confidentiality.  That just is not sufficient.

THE COURT:  Did you look at -- there's a recent Fifth Circuit case about an independent audit being done for the University of Texas.  Does that ring a bell to you?

MR. KATHREIN:  Oh, boy.

THE COURT:  You have a lot of cases there.  It's okay.  If it's not ringing a bell, you can go on.  When you said they should have had an agreement for confidentiality, I think that came up in that case.

That's okay.  I don't see it on your list.  But if you're not familiar with it, it's okay.

MR. KATHREIN:  Well, here, let me -- they do cite *Gutter versus DuPont*, defendants, saying that there's no waiver

by turning it over to a third party.

But in that case the court made clear that there had been -- was a need for expectation of confidentiality.  And apparently there was something in that case that had created an expectation or we disagree with its analysis.

THE COURT:  Okay.

MR. KATHREIN:  They also cite the *Regions* case.  And in that case there was a confidentiality agreement.

I would like to refer you to the *Hatfield* case, *United States versus Hatfield*, for finding a waiver of work product, noting auditors owed ultimate allegiance to the corporation's creditors.

And also in that case there's no disclosure.  There is -- there is -- found no support for work product protection when there is no -- the auditor served no litigation purpose.

One of the other cases on my list is *In re King Pharma*, which holds no application when the company furnished materials to PwC -- it's an Eastern District of Tennessee case -- to enable -- when it was to enable PwC to render truthful, accurate earnings in financial statements.

There's a Northern California case, *In re Diasonics,* where there's no common interest between an auditor and a company because the public accountant has responsibilities to the creditors and stockholders.

I also cite on there a revision to the commission's

auditor independent requirements under the Exchange Act, where the SEC recognized that unqualified independents must exist between the auditor and the client.

And then I'd like to also address some other cases. There's the *Trenary* case, which is Middle District of Florida, that says there must be more than a remote possibility of litigation.  When the audit committee started, it wasn't a remote possibility.  Retaining an attorney isn't sufficient. That's *First -- EverBank*, and is not determinative.

*S.E.C. versus Microtune:*  Initiation of an SEC investigation is not dispositive, especially when the company self-reported.

And along those grounds I'd like to provide another copy -- another document, which I'll show defendants first.

This is the interrogatory -- are the responses to -- this document, if defendants don't object, is defendant's response as an excerpt to lead plaintiff's first request for the production of documents.

And in that document we asked them to turn over any documents relating to investigations.  And their response was that they're unaware of any.

(Counsel confer.)

MR. KATHREIN:  If you look at this page 51 excerpt, the very bottom, they say pursuant to Federal Rule 34(b)(c)(2) [verbatim] defendants are unaware of any

investigation by a government or administrative agency regarding the stated subject matter, and thus defendants are not withholding any documents pursuant to the above objection, but reserve the right to do so if they later determine -- determine there's responsive documents.

So their argument that they were under threat of litigation with the SEC falls flat. They've -- they -- they've told us that there is no investigation.

THE COURT: But they were sued by you.

MR. KATHREIN: Well, they were sued by us, but they never claimed that our lawsuit -- or maybe they do. That was late in December. And certainly --

THE COURT: They were anticipating it?

MR. KATHREIN: Well, I don't know if they were anticipating it, but -- but certainly the remote possibility of litigation -- if they -- you know, just the fact that someone may sue does not mean that you can claim privilege. Otherwise you could hire lawyers to do all your work behind closed doors. And what's being done for this purpose --

THE COURT: This *Hickman v. Taylor*, did you read it recently?

MR. KATHREIN: I haven't read the case in a long time. And I've been reading cases that have interpreted it since, but...

THE COURT: I don't think there was a lawsuit in

existence then, or even threatened.  I'm not sure -- it might have been threatened.  I have to read it again myself.  But I don't think you see either that case, or cases following it, where you have to have a very specific litigation that's going on, do you?

MR. KATHREIN:  Well -- well, you have to have more than a remote possibility, and --

THE COURT:  I'm thinking that something in between a remote possibility and actual litigation is okay, right?

MR. KATHREIN:  Yeah.  Yes, yes.  I mean, you -- I mean -- I mean, I will -- I will concede that the Gievers letter and our lawsuit told them there was a possibility of litigation.  The problem is that started in December.

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  Their -- Project Athena started in November.  King & Spalding and KPMG were hired in November, early in November.  So Project Athena was well underway.  And at that point they had the remote possibility.

So for them to now say, okay, that we've -- now that litigation is -- and now that there's a litigation threat in December, that that happens, the primary purpose of the investigation was to -- we're talking about primary purpose test here.  And I --

THE COURT:  They say that doesn't apply.

MR. KATHREIN:  Well, to address that one -- of

course, you know, we cited your case on primary purpose, which is the *Norton* case.  But --

THE COURT:  And I was right, but -- I think I'm always right, but I'm not always right.

MR. KATHREIN:  Well, but I will also --

THE COURT:  No, I do recall that.  It's interesting you cite that.  I mean, there's a difference of opinion on that, right?

MR. KATHREIN:  Well, but I will say in the Middle District every argument that they raised was -- was rejected.  In the case prior to the case that you -- to your case, it went through and said that -- it's the attorney case I'm looking for, the *Trenary* case -- no, not *Trenary*, *Tillman* case.

*Tillman* was Middle District, 2015, *Tillman versus C.R. Bard*.  And it adopts the primary purpose test.  And he looked -- they look at defendants' arguments there, because those arguments have been around.  And it rejects them.

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  So -- but there's -- so primary purpose following *Davis*, there's no court that's -- that -- there's no Eleventh Circuit decision that says *Davis* is wrong.

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  I mean, maybe -- maybe they're going to appeal it all the way to the Eleventh Circuit, if they get ruled against here, but the --

THE COURT:  Well, they ultimately have the burden of showing this was prepared in anticipation of litigation, right?

MR. KATHREIN:  Right.

THE COURT:  And their burden is preponderance of the evidence, right?

MR. KATHREIN:  Yes.

THE COURT:  And if they -- if it's 50/50, it's kind of like both of you have pretty good arguments, they lose, right?

MR. KATHREIN:  Yes.

THE COURT:  And the Court really could apply either test, right?

MR. KATHREIN:  Well, if you apply the "because of" test --

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  -- you look back at the original purpose that they -- of the original --

THE COURT:  Yeah, I mean, I don't -- the tests -- the parties made such hay out of the tests that they don't actually seem to be that different.

MR. KATHREIN:  It's -- it's -- I will be honest with you, Your Honor, I've seen court cases that say it's a narrower test, but I don't -- I don't see the difference, really.

And it's -- and so if we look back at why they started this, it was -- it was because of business purpose, was

to get out these 10-Ks -- these 10-Qs.  They had to do an investigation.  They had to see if their statements were false or fraudulent.

THE COURT:  Right.

MR. KATHREIN:  And they had to be "tone at the top" findings.  And without doing an investigation, they could not have done that.

So the audit committee could have done that investigation in house, but they chose to go outside.  There's nothing indicating in the record that when they decided to go outside that there was a litigation purpose, or at least a primary litigation purpose.

You can always claim that there's -- there's -- there's, you know, a remote possibility of litigation.  But there's no -- there's not even an engagement letter that they provided us that says that it's in anticipation of litigation. They haven't provided engagement letters with King & Spalding or with KPMG.

THE COURT:  Okay.  All right.  I think I have your argument.  Did you want to do any other reply to their response, or you covered that?

MR. KATHREIN:  Let me just...

I did want to address the Gievers letter a second. And I would like to -- you know, they cite it.  I mean, it's not the most helpful to me, in one sense.  But they gave it to

us two days ago.  And they cite it in their briefs, so you should have it.  And I want to address it.

THE COURT:  Okay.

MR. KATHREIN:  And, really, Your Honor, the only thing I need to address there -- I mean, this is in litigation -- it is a demand by Gievers that their client has a claim.  It's not a claim over fraud.  It's a claim over harassment and -- and being unfairly targeted as a whistleblower.  It's a different purpose.

And there's no evidence that this audit committee investigation was to look at whether or not he was unfairly harassed or unfairly attacked as a whistleblower.

The Gievers letter itself -- I can see why they withheld it, first of all.  They should have produced it.  It's nowhere in their privilege log.  It shows up under 172 documents as a -- one of 172 documents that include this law firm's name on it that they gave us on February 23rd, very, very late in the game.  The Gievers letter, if you read it, is core to our case, so they didn't want to give it to us.

But, also, if you read it, there was no basis whatsoever to claim privilege of it.  It's a letter from opposing counsel to Redwire.  It wasn't on any of their privilege logs until they gave us a revised one for PwC.

They should have had it on their log.  It's not on their log.  They should have produced it early on.  And the

reason I give it to you is, you can't take their word for it that -- that this document that they don't want you to look at in camera does not contain legal opinions or conclusions or mental impressions.

And I think if you look at it, maybe you'll find something in there, but you can redact that.  They have not provided any redactions, list of redactions.  They're just claiming the whole document created by PwC in support of its audit is privileged.

So with that I'll rest, Your Honor.  I think the -- we would request that they have not met their burden to not allow you to look at it in camera, that we've met the *Zolin* burden, and respectfully request that you review the document.

THE COURT:  All right.  And it's -- what you handed me is a December 10, 2021, letter to Nathan O'Konneck, just for the record.

MR. KATHREIN:  Right.  And let me --

THE COURT:  And that -- you just got that two days ago?

MR. KATHREIN:  Yeah.

THE COURT:  Okay.

MR. KATHREIN:  And -- but it's referred to the brief and the Baliff and the -- and they provide a new Baliff declaration to clean up the first one, where they claim there's confidentiality expectation.  It's footnote 2 of that brief

where they cite that.  And -- where Baliff cites that this is why they had an expectation beyond the self-reporting to the SEC.

THE COURT:  Okay.  Thank you.

MR. KATHREIN:  Thank you, Your Honor.

THE COURT:  I was wondering where Redwire was in Jacksonville because I didn't know it was here until this lawsuit, but now I see it's on Philips Highway.  Okay.

MS. RUBIN:  Thank you, Your Honor.  I'm going to address --

THE COURT:  Why did -- why did this get produced just two days ago?

MS. RUBIN:  So -- and this will be part of what I'm going to explain.  So the reason that this was produced was because we did reference the letter, although we're not really -- we're not really relying on the content necessarily.

But when the issue of privilege was raised, there is -- as -- as opposing counsel admitted, there's no -- there's a litigation issue now when this letter comes up, so we had to provide it.

But I will say this, we -- we did not provide -- things were logged in the PwC privilege log not because they are, in essence, themselves privileged, but because some of the things that are on that privilege log are things that the audit committee looked to for purposes of assessing the -- doing

their investigation, which we have claimed a privilege on from the inception.

So we -- they -- they correctly said it's -- you've referenced it.  And so we discussed internally and we provided the document.

THE COURT:  All right.

MS. RUBIN:  So I'll start with kind of -- with kind of countering the arguments.  And the first one is about the clawback chronology.  I want to talk about -- a little bit about how that came to be.

THE COURT:  Does it really matter?  I mean, you've clawed it back.  Does it matter at this point?

MS. RUBIN:  Well, if you -- if -- there are certain things that were left out that might matter, but only Your Honor knows if it matters, right?

THE COURT:  Well, I am curious.  Why did it take you as long as it did to claw it back?

MS. RUBIN:  That's -- that's the key to the whole thing.  Okay.  So we -- there's the inadvertent disclosure. And then Pw --

THE COURT:  It's not inadvertent.  It was just a disclosure, right?

MS. RUBIN:  No.  It was inadvertent.  We just didn't know it was inadvertent yet.  So in October of 2023 PwC hands over the documentation.  We -- plaintiff follows up with PwC

seeking documents that are referenced in the memo.  And that's around November 29 of 2023.

At that point the -- Mr. Kathrein's declaration, at paragraph 6, references Exhibits C and D.  And you can see there that they're requesting the King & Spalding -- King & Spalding interview notes, legal letters from King & Spalding, presentations by King & Spalding, et cetera, et cetera.  Those are things we claimed a privilege on from inception.

And defense counsel is not copied on that.  So we have no idea this exchange is really happening.

So when we had a meet-and-confer and opposing counsel advised, "Hey, there are missing documents," we were very confused.  We didn't know what the issue was, at which point we went back and looked and identified that that document had been inadvertently produced.  And that's where you see the clawback letter of December 25, 2023, in opposing counsel's declaration, Exhibit F.

THE COURT:  But PwC handed it over when originally?

MS. RUBIN:  Originally in October.

THE COURT:  October.  And at that point in October, did you see that they -- would you have been able to see that they handed the memo over?

MS. RUBIN:  Yes, except for the fact I didn't go back and look and see what had been transmitted.  So when -- it was only brought to light when the issue of the, quote/unquote,

missing documents --

THE COURT:  Right.  But it was -- you had that information in October that they -- PwC had given over the memorandum to the plaintiffs?

MS. RUBIN:  We knew -- I guess we knew what had been turned over --

THE COURT:  Not given over.  How many pages were there at that point?

MS. RUBIN:  Excuse me, Your Honor.

MR. KATHREIN:  Your Honor, there were 33 documents turned over to us.

THE COURT:  33 documents.

MR. KATHREIN:  Yes.

MS. RUBIN:  All right.

THE COURT:  So the memo was one of the 33?

MS. RUBIN:  It was a smaller amount, yes.

THE COURT:  So you know the 33 documents in October. You just weren't really focused on the fact that one of them was this memorandum until the issue of the attached documents got brought up?

MS. RUBIN:  Right.  Because an issue arose of the, quote/unquote, missing documents.  And we said, "What missing documents?"

And so -- and this is kind of how -- the issue happened.  Because after we clawed back the memo, we were

notified by PwC that the -- that these documents were still being sought by opposing counsel.  And that's when we sent the letter of -- the February 9, 2024, letter about misuse of the privilege, et cetera.

So we were very surprised when PwC surprisingly sent us another two batches of documents of a couple hundred pages -- or couple hundred documents.  So that was the delay in doing that.  The delay in doing it was a time -- a matter of sequencing.  And we didn't know there was an issue.

Once the issue was identified, I sent the clawback memo.  Thereafter, when PwC notified us that -- even after the clawback memo had been sent, that they were still requesting the same materials, I sent a letter, which I can provide a copy to the Court, basically saying, "Please cease and desist misuse of the clawback until this issue is resolved."

At that point, though, we've produced two privilege logs.  There were about 200-something documents on the surprise documents we received.

THE COURT:  Okay.

MS. RUBIN:  And so that issue has been resolved, but that -- but that -- I appreciate the opportunity to explain why that was.  So it was inadvertent initially.  And we just -- we didn't go back until we thought there was a problem.

THE COURT:  Well, I think that was already explained, but...

Okay. The -- you have the burden to show the -- the memorandum was prepared in anticipation of litigation, correct?

MS. RUBIN: Yes.

THE COURT: And usually when a party has a burden, they would want -- I'm going to go back to the in camera review. To try to help satisfy your burden, you want me to look at the documents to see -- or the memorandum here to see if it satisfies the definition, but you don't want that -- you don't want to add that to your showing, which seems like it would help you, if you're right.

I mean, if there is -- if there's actually mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative, I must protect it.

But I really don't know if that's in there right now. I can only guess because I haven't read the memorandum. I know generally what it is. It's an audit memo, right?

MS. RUBIN: Yes. But it summarizes the -- the -- summarizes things that the audit committee was doing in connection with an investigation that was, from our perspective -- and I'll explain why privilege --

THE COURT: Driven by this whistleblower?

MS. RUBIN: Correct.

THE COURT: Right?

MS. RUBIN: Correct, correct. I will say that, you know, part of the issue, I think, is that -- their

characterizations about what the committee did or didn't do, and what it meant from a bigger-picture perspective that opposing counsel is making by extrapolating maybe something here from a press release or something there -- but everything that's in their brief on its own does not substantiate anything really attendant to the issues that are salient here.

So, for example, they talk -- they spoke about this -- the audit committee investigation, and spent a lot of time on this concept of these declarations mean -- the Baliff declaration and the original Koch declaration from King & Spalding, that those -- that those declarations didn't talk about -- something being in anticipation of litigation.

That declaration -- or those two declarations were provided for the sole purpose of explaining the redactions that were done to something that was called something that it really wasn't.

And so, again, we're taking kind of, you know, creative -- creative ideas about what is meant by what's in those documents without truly understanding them.  And I think that's part of the issue that I have with some of the comments or some -- some of the -- the position that opposing counsel is making.

And various -- I think it's important to note that the Baliff declaration, which is the one that was kind of focused on -- the new declaration says nothing inconsistent

with the first declaration.  They just serve two different purposes.

I also --

THE COURT:  Do you -- you don't take issue with the fact that the memorandum is relevant and proportional?

MS. RUBIN:  I would -- potentially relevant.  I don't -- I don't -- the memorandum by itself I can't say is not proportional.  This is one document.  But the --

THE COURT:  Relevant to a claim or defense -- yes?

MS. RUBIN:  Yes, yes.  I'm sorry.

THE COURT:  Okay -- you're not arguing about that.

Okay.  Your real argument is either that it's in anticipation of litigation; yes?

MS. RUBIN:  It is, yes.

THE COURT:  Okay.  Or it's opinion work product, although you didn't argue this.  But you didn't say this is opinion work product that the rules say -- they use the word must, m-u-s-t, protect.

So are you really making that argument that it's -- you didn't tell me I must, even if it is work product, so --

MS. RUBIN:  I haven't gotten to that point yet, but, Your Honor, yes -- so one of the -- one of the issues that we have is that we think that opposing counsel is taking a very narrow view of what the product privilege is.

And you articulated it in connection with the *Hickman*

case.  So there's tangible work product and intangible work product, right?

And part of the issue that we're having is there are things that King & Spalding, the attorneys, that -- that generated documentation, et cetera, that shared information for -- with PricewaterhouseCoopers.  PricewaterhouseCoopers, by virtue of being the independent auditors, wrote some of these things down, and these -- these memorandum -- this memorandum particularly, by example, has that information in it.

So I -- I am taking the position, Your Honor, that -- that it's both, in which case it should be protected.  But your question was about relevancy.  But, yes, opinion work product must be protected.

THE COURT:  Okay.

MS. RUBIN:  Should I continue?

THE COURT:  Uh-huh (affirmative).

MS. RUBIN:  Okay.  Sorry.  I'm trying to respond in the order that he did things.  So forgive me.  Actually, we landed just where we were.

So the next thing I was going to talk about is, you know, 26(b)(3) and *Hickman* and talking about the difference between tangible and intangible, because they are taking too narrow of a view of what we are seeking here.

The motion admits that the memo relies on the audit committee investigation.  And that is what -- that is what --

the audit committee investigation itself is what we are claiming the work product on.

And, Your Honor, I apologize, but this is probably a good point -- a good time to say we would request that the transcript be sealed until -- since some of the information we're discussing here is under seal, either sealed entirely or us given the opportunity to determine which aspects of it should be potentially sealed, given what the submissions were under seal.

THE COURT:  Yeah, that's fine.  I mean, there's no transcript yet, but...

MS. RUBIN:  Right, when there is.

THE COURT:  So when you order a transcript, it can be provisionally under seal for, I'll say, a 30-day period to give the parties a chance to look at what needs to -- or a request to seal any information.

Any issue with that?

MR. KATHREIN:  No, as long as they will designate what they think should be under seal, and then we could respond.  Is that --

THE COURT:  Yeah.  I mean, the Court is going to decide what goes under seal.

MR. KATHREIN:  Right, right.

THE COURT:  And, yes, the Court would want both sides to explain why -- why not something should be under seal.

MR. KATHREIN:  Thank you, Your Honor.

THE COURT:  I don't think we've really talked about anything that needs to be sealed right now, but you'll have the chance to look at any future possible transcript and tell me.

MS. RUBIN:  All right.  Thank you very much, Your Honor.

So the -- my point is that the memo relies on the audit committee investigation.  And to quote something that has been redacted for -- for purposes of this hearing, the motion at page 1 says, "At issue is the fact the PwC memo relies on facts provided to PwC by Redwire's audit committee," et cetera, et cetera.

And then it goes on to say, on page 11, "The report to the audit committee detailed PwC's reliance and the conclusions reached and the recommendations from the investigation and described the steps PwC took in its review of the audit committee investigation.  The PwC memo appears to summarize this reliance internally."

The memo then refers to the audit committee investigating documents and briefing, at page 17.

And then in the declaration of opposing counsel, he says, at paragraph 5, "The memo reflects PwC's reliance on facts and conclusions provided by Redwire's" committee -- "audit committee and third parties hired by the audit committee to conduct the investigation."

The P- -- and, again, at paragraph 6 of his declaration, "The PwC memo identifies investigation-related documents."

And I could go on and on.  There's Exhibit 7.  And then there's -- I mean, paragraph 7 of the declaration. Exhibit N, Exhibit L.

The bottom line is this, we are not taking the position, obviously, that PwC created the document and that we're looking at this from the fact that it was a third party that created this document.

We're approaching this from we have taken the position and we stand on our position that the audit committee was formed in anticipation of litigation.

And Mr. -- yeah, opposing counsel conceded that at the point of the demand letter in December that was the case, but maybe November it wasn't.

But the point is this, this all started with the Gievers resignation letter.  At the time -- at that time Gievers gave his resignation letter, highlighted, you know, the various issues.  He highlighted HR issues and --

THE COURT:  In anticipation of litigation or, geez, there's some issues going on.  We've got to figure this out for our business purposes.  We can't have this mess going on in our company.  We've got to get it figured out?

MS. RUBIN:  So -- and I understand -- I understand --

THE COURT:  You've got to at least admit it's a combination of those two.

MS. RUBIN:  I do not necessarily agree with that. I --

THE COURT:  Really?  Like, if there were no trial -- if there were no lawyers in the universe, wouldn't that company still need to do that audit based on the allegations from the whistleblower?  You don't think so?

MS. RUBIN:  The whistleblower -- well, the whistleblower -- the whistleblower letter, as we're calling it -- alleged whistleblower -- but the whistleblower resignation letter had the name of an attorney on it.  We already knew that he had retained counsel.  Once the --

THE COURT:  For the -- whistle for retaliation, right?

MS. RUBIN:  Not necessarily.  If you look at the demand letter and the --

THE COURT:  This is the letter that I just got.

MS. RUBIN:  Yeah.  That demand letter -- if you compare that with the resignation letter, this is more carefully drafted because it's drafted by an attorney.

But the resignation letter and the demand letter focus on all the same issues.  They might call them slightly different things, but it's all the same things.  He was still -- he was still making gripes about --

THE COURT:  So you're not going to admit that Redwire looks at either letter -- first letter -- let's say the resignation letter -- and thinks solely, "We're going to get sued.  Let's do this"?

MS. RUBIN:  Well, it was more because of --

THE COURT:  You're not even going to admit it's a combination, "We've got to clean up our house and we might get sued"?

MS. RUBIN:  If anything it might have been secondary. Because if you look at the timing of the events -- and that's laid out in our brief -- everything happened so quickly.

We get -- we get the resignation letter.  The next day there's a report.  They hire top-notch attorneys to do all of -- to do this investigation.

By this time other things are going on in the business unit that had nothing to do with the -- this -- this investigation.

So the reason they hired these top-notch attorneys included those that had SEC law enforcement experience, and -- because they were concerned not just about some kind of employment claim from Gievers, but based on the allegation, some kind of SEC enforcement action.

So from the onset that was what it was about.  And so I guess the -- the distinction I'm trying to make is, had there not been this resignation letter, the audit committee would

have never been -- been invoked for purposes of doing an audit of this nature, as far as an audit committee investigation.

THE COURT:  Okay.

MS. RUBIN:  So I think that that's -- that's where I want to kind of make the distinction between -- between, you know, the notion of the creation of a document that I create, whether or not it's work product, and -- and *Hickman*-type factors, where you have the tangible and intangible and I am being ascribed, but it is still my work product.

And I think at one point there was commentary about confidentiality, and that was -- it shouldn't be -- we shouldn't think that it was going to be confidential.  But I'll say, Your Honor, that --

THE COURT:  Give me three piece -- three good reasons why you thought it was going to be confidential.

MS. RUBIN:  All right.  If you'll give me one second, Your Honor, I will.

THE COURT:  Okay.

MS. RUBIN:  The first is that --

THE COURT:  There's no confidentiality agreement, correct?

MS. RUBIN:  No, Your Honor.  However --

THE COURT:  No mean- -- yes, correct?

MS. RUBIN:  Correct.

THE COURT:  Okay.

MS. RUBIN:  But I want to give you the reasons why.

THE COURT:  Okay.

MS. RUBIN:  Yes.  There's no separate confidentiality agreement.

THE COURT:  Okay.

MS. RUBIN:  But you do have the Baliff declaration that's telling you what -- the people that engaged King & Spalding and engaged PwC, what their expectations were.  And so that's someone -- Baliff's declaration is someone with firsthand knowledge as to all those things.

The second thing is the engagement letter that -- the PwC engagement letter clearly states that it follows the standards of the American Institute of Public Accounting.  And that -- there's a rule, Rule 401, that says you're not supposed to -- independent account- -- an independent auditor can't disclose confidential information.

And then you have the *Deloitte* case, which also talks about something that's, I think, quite important, which is a chilling effect of -- of companies and entities sharing this kind of information with an external auditor.

THE COURT:  But they could fix that chill by just having a confidentiality agreement, right?

MS. RUBIN:  That's a fair point, Your Honor.  But I do think they're -- the standards that -- the standards that -- that the -- that they go by by virtue of the nature of their

services would be implicated.

THE COURT:  Okay.  What about work -- what if I say, okay, yeah, these are documents -- this is a document prepared in anticipation of litigation, but the plaintiffs have shown it's otherwise discoverable because it's relevant and proportional; we have a substantial need for the memorandum to prove your claim; and they can't obtain the substantial equivalent?  Then can at least some of it be discovered, the part that's not mental impressions, conclusions, opinions, or legal theories?

MS. RUBIN:  Working our way backwards, though, I think opposing counsel said that they are not taking the position that they can't discover it otherwise because we're not far enough in the discovery process, so it isn't clear.

THE COURT:  So they didn't know -- they didn't know if they can or not, right?

MS. RUBIN:  Right.  The 30(b)(6) hasn't been taken.  And I disagree with the characterization of what's transpired with the 30(b)(6).

But separate and apart from that, we are too early on in the process for that determination to -- for that determination to be made.  And, again --

THE COURT:  Is some of the memo fact work product and some opinion work product?

MS. RUBIN:  Yes.

THE COURT:  And what part of it is opinion work product?  You said that the documents that King & Spalding decided to give them, that alone -- the decision on which documents to provide is opinion work product?

MS. RUBIN:  I think -- I think, Your Honor, that is accurate.

THE COURT:  Anything else in there that's opinion work product?

MS. RUBIN:  I'd have to go look at the document and go through --

THE COURT:  Okay.

MS. RUBIN:  -- to make that determination.

THE COURT:  If it's easy to do that, if you've already figured out --

MS. RUBIN:  I don't know -- we haven't.  I would need a minute to parse out --

THE COURT:  Okay.

MS. RUBIN:  -- those things.

THE COURT:  Okay.

MS. RUBIN:  May I have a moment, Your Honor?

THE COURT:  Well, I think -- I think our -- and we probably need to wrap up this motion, because we've got three others that we need to talk about, unless you resolved those.

Did you resolve those yet?

MS. RUBIN:  We resolved portions of them, but not all

of them, Your Honor.

THE COURT:  I think I will order you to submit that for an in camera, under seal view.  And in the process of doing that, you can submit with it just the parts of it that you believe are opinion work product.  That way you have time to really look at it and decide that.

Can you do that?

MS. RUBIN:  Yes.  Certainly, Your Honor.

THE COURT:  Okay.  And how long will you need to do that?

MS. RUBIN:  We can do it in short order, by --

MR. ELLIOTT:  This week.

MS. RUBIN:  Yeah, before the weekend -- I mean, before Friday.  Friday.

THE COURT:  By Friday?  Okay.

MS. RUBIN:  Yes.

THE COURT:  Okay.  Perfect.  And you can submit it under seal in camera.  You know how to do that.  You can do that on ECF now, and just with a cover page directing me to what you contend is opinion work product.

MS. RUBIN:  Okay.

MR. ELLIOTT:  Just a housekeeping, sorry, on that point.  Will you be issuing an order today directing to do that?  Is that necessary to do --

THE COURT:  Well, I just issued the order verbally.

If you prefer for your client's sake for me to put that in writing, I certainly could.

MR. ELLIOTT:  No, just from a technical --

MS. RUBIN:  It was for our own procedural --

THE COURT:  I see.

MS. RUBIN:  Making sure we were following the rules.

THE COURT:  I see.  It will be in the minutes, my courtroom deputy says.  So if that suffices for you, that suffices for me.

MS. RUBIN:  Oh, for sure.

THE COURT:  That's okay.

MS. RUBIN:  If it suffices for Your Honor.

THE COURT:  All right.

MS. RUBIN:  I do want to make one last point which I think is quite salient.  And I understand that you have those briefs and you know what our position is, but I think that if something is very salient as -- there's been a narrative here today and in the -- and in plaintiffs' briefs regarding what really is the merits of the case, and opinion about what things mean and documents and information that has not been seen, and parsing together things from press releases that don't really impact this issue and things of that nature.

But we have submitted competent evidence -- and there's case law out there that says that in most instances like this the declarations or affidavits are not only helpful,

and sometimes they're, you know, required.

So we submitted the Baliff declaration that is firsthand knowledge.  The -- that declaration remains uncontroverted as to what it is that transpired, what the intent of the audit committee was, and what the intent of the audit committee was in connection with, you know, PwC as well.  Because that would have never been addressed in connection with the first declaration, which, again, is not -- the first Baliff declaration, which, again, is not inconsistent with the second.

THE COURT:  Right.

MS. RUBIN:  So I just wanted to put that for the record.  And the only secondary thing I would say is we are taking a much broader view, which I think Your Honor kind of acknowledged on --

THE COURT:  Oh, I don't know about that.  I'm just --

MS. RUBIN:  Well, I don't know that --

THE COURT:  If it's narrow or broad, you know, work product is a special protection.  And you have the burden of showing it applies.  I'm not sure if I'd call it narrow or broad.  It just is what it is.  It's just a protection available for some documents, right?

MS. RUBIN:  Understood, yes, Your Honor.

THE COURT:  And then I think it's a mere absolute protection if it's opinion work product.  It says "must," which you would think is absolute.  There's some exceptions -- I just

looked at this in another case, a crime fraud exception.

MS. RUBIN:  Right.

THE COURT:  But that's rare and extraordinary.  So that's not going to apply.

It sort of behooves you to identify opinion work product that falls under the mere absolute protection.  But maybe some of -- maybe a lot of it's not.  Maybe it's just regular work product.  And there it can be disclosed if those other elements are satisfied, right?  But we don't know about that.  We don't know about "can't obtain the substantially equivalent yet," right?

MS. RUBIN:  Correct.  We're in the infancy of discovery.

THE COURT:  Okay.  I can't believe you guys are in the infancy of discovery with this old case, but okay.

MS. RUBIN:  There's been a lot of -- we spent months doing an initial -- we had a team of people doing an initial doc review of just lots and lots of materials, and those --

THE COURT:  Right.

MS. RUBIN:  And we've been discussing another round of search terms since last September.  We're trying to get going.

THE COURT:  That's a lot.  Okay.  Well, let's move on to the other motions we have and turn first to your first request for production.

Does anyone need to take a break yet?  We've been here an hour and five minutes.  You want to take a break?

MR. KATHREIN:  I'm fine, Your Honor.

THE COURT:  Take a break?

MR. ELLIOTT:  Your Honor's preference.

THE COURT:  Okay.  I think we can keep going.

MR. ELLIOTT:  Thank you, Your Honor.

Benjamin Elliott on behalf of the defendant.  Before we start, I'd just like to personally thank you for mentioning the certificate of service issue.

THE COURT:  Okay.

MR. ELLIOTT:  That's a crusade I've been waging to convince people we don't need to attach this.  So I appreciate your comments.

THE COURT:  You've waged that campaign?

MR. ELLIOTT:  I have.  I have.

THE COURT:  Yeah.  Like, why?  It's also -- you know, it's just digital information --

MR. ELLIOTT:  Right.

THE COURT:  -- that's in our database.  But you're not alone.  There's very few firms -- big, good firms that are bold enough to just refuse to do it.

MR. ELLIOTT:  And it isn't being bold enough.  That's right.  People get very nervous when they --

THE COURT:  They get nervous.  And I do think --

there might be some federal courts that have local rules that will still --

MR. ELLIOTT:  Require it.

THE COURT:  -- require it.  But I think they're few and far between.  Ours does not.  So in our court --

MR. ELLIOTT:  I'm going to order the transcript and share this with --

THE COURT:  That part -- and I'm not going to seal that part.

MR. ELLIOTT:  Thank you.

Okay.  So starting with the request for production, as Attorney Rubin mentioned, there have been a number of issues that have been resolved based on the plaintiffs' opposition. And they indicated in their briefs on all three issues that -- all three RFPs that doc -- the interrogatories and the admissions, that they would provide a revised copy of those. And I would just ask that we could have a set date for that.

THE COURT:  Okay.

MR. ELLIOTT:  I mean, I haven't conferred with opposing counsel on that, but, you know, something reasonable in the next couple of weeks.

THE COURT:  Okay.  Well, let's go ahead and do that before we forget.  Do you have a date that's reasonable for you to comply with that?

MR. KATHREIN:  We would like to only do it once.  So

if you're going to order us to comply with some additional ones, I just want to take a look at --

THE COURT:  You want to wait for the date to see what you have to do?  No, I mean, that's fine.

MR. KATHREIN:  Two weeks.

THE COURT:  I don't know what depositions you guys have coming up.  I mean, in my mind 30 days is fine, if everybody's okay with 30 days.

MR. ELLIOTT:  It's okay with two weeks.  The only hesitation I would have is we have a class cert opposition deadline next month.  So I would like that --

THE COURT:  You want them before that?

MR. ELLIOTT:  -- slightly before that.  And --

THE COURT:  What's that deadline?  That was extended recently.

MR. KATHREIN:  We just -- we keep extending it because --

MR. ELLIOTT:  I can tell you, Your Honor.

MR. KATHREIN:  -- of the unavailability to take the deposition.

THE COURT:  I can tell you.  It's right here.  I think it's just --

MR. KATHREIN:  Your Honor, why don't we just say two weeks --

THE COURT:  April -- April 24th.

MR. KATHREIN:  -- because --

THE COURT:  Yeah.  Two weeks sounds great, from today.

MR. KATHREIN:  Two weeks.

MR. ELLIOTT:  Two weeks.

THE COURT:  That's fine.  And if you -- while we're on this topic, you're redoing all of them, the requests for admissions, the answers to interrogatories, and the responses to the RFP?

MR. KATHREIN:  RFAs don't impact class cert.  The RFAs --

THE COURT:  Well, I'm just asking -- he said that you were going to redo your discovery responses.  Are you redoing the discovery responses for all three types of discovery or just one?

MR. KATHREIN:  Can you remind me if we --

MR. ELLIOTT:  You have resolved issues on all three.

MR. KATHREIN:  So we have to revise those?

MR. ELLIOTT:  And I think -- yeah.  And I think --

MR. KATHREIN:  I think it's dropping objections.  That's -- yeah.  Okay.  Right.

THE COURT:  All right.  Well, when you revise them -- I'm glad you're taking the opportunity to do that -- I would implore you to, before you do it, actually read the rules.  And read them really carefully.  And then also read our Middle

District of Florida Discovery Handbook, which I think both sides have read, because it's cited in some of the documents.

But, you know, things like requests for production, the rule says you're really supposed to say, "Yes, we have responsive documents," or, "No, we don't."

If you don't, it ends there, right? We don't have -- we don't have responsive documents. If you do, "Yes, we have them, but, hey, we're not going to produce these because of these reasons," one, two, three, and be very specific.

So a problem with some of your objections is they're not really following that rule. At the end of the day, you know, they -- all the objections -- there's a lot of them, a lot of them.

And then at the end of the day it's like, "Notwithstanding these objections, here's what we'll produce."

It just doesn't leave anybody really understanding what you have and what you don't have. So when you revise them, just take care to hew closely not to old go-bys or forms, but to the rules themselves.

MR. KATHREIN: Understood, Your Honor.

THE COURT: This is not a problem just in this case. It happens in every case. I'm -- just follow the rules, and then you won't get in trouble here.

MR. KATHREIN: I agree with you, Your Honor. I -- we will do that.

THE COURT: All right. And I have -- let me see. I wrote one example down. Let me see if I can find it really quickly.

I'm not going to be able to find it quickly on these papers. So you can just go ahead and --

MR. ELLIOTT: I think you may -- I'll sort of take it out of order, because that's -- you know, one of my comments sort of comes close to your concern, Your Honor.

So in response to some of our requests for production, plaintiffs make the objection that the documents may not exist in a physical form. They say, you know, undue burden because the document can't be reduced to physical form.

And I think this is more of an overt objection. This is sort of a housekeeping issue -- but there's objections in here asserting undue burden because of this obligation to reduce something to a physical form that maybe can't be reduced to physical form.

And in certain instances that might be perfectly appropriate. But I think the answer more appropriate -- rather than stating objections is just saying none, as, you know, documents available for --

THE COURT: What are we talking about here, something that can't be reduced to physical form?

MR. ELLIOTT: Sure.

THE COURT: And I'm assuming electronic form, too.

What --

MR. ELLIOTT:  Yes.  So I think the issue is -- you know, by one example we asked in RFP No. 1 for documents that are referenced on their amended Rule 26 disclosure.

THE COURT:  That's the one I was looking for.

MR. ELLIOTT:  Okay.  RFP No. 1.

THE COURT:  Okay.  All right.  Give us the documents that you disclosed in your initial disclosures, right?  That's what you're asking for?

MR. ELLIOTT:  That's -- that's the point, Your Honor.

THE COURT:  It's such an easy -- it's such an easy request.  An ordinary person -- like a pro se litigant would say, "We gave you the documents in our initial disclosures.  As we supplement our initial disclosures, we'll give you additional documents.  There are some documents that exist in the public realm, and we're not going to give you those because, hey, look, buddy, you can get those just as easy as we can."

But that's all you need.  Instead, we've got one, two, three, four, five -- all right.  And then this long paragraph.

We just -- that's why people don't like lawyers sometimes, because there was a simple answer to that question. "You can get a lot of these documents on your own.  Don't make us do your work for you.  Otherwise we've given them over or we

will supplement," that's all you need to say there.

MR. ELLIOTT:  And so I think, Your Honor, in that instance -- and this is -- again, for the briefing, it's the document format issue.  For the record, this issue in place -- RFP No. 1, 7, 10 through 14, 16 through 19, 22 through 24, 27, 30, 31, 33, and 34.

And I think the point that opposing counsel was trying to make is that in certain instances lead plaintiff may have consulted a website and cannot produce that website in the form he has -- in the form that he looked at it originally.

And so I think the answer to that is he is -- the plaintiff is not in possession of a document to produce.  So the answer should be none.

However, to the extent there are documents within this category that can be reduced to physical form -- point being, you know, RFP No. 1 on the Rule 26 disclosure, where the document does exist, I think it should just -- it should be produced.

THE COURT:  Right.  And I think -- I think we're probably all on the same page with that, right?  It's just an ordinary person's understanding.

If you looked at websites as part of this litigation and you can't go back -- you can't use the way-back machine and get the same website, or it's not in his possession or what have you, you can ask him about it in the deposition.

62

You can do that, right?

MR. ELLIOTT:  Correct, Your Honor.

THE COURT:  So I don't think there's really an issue there.  I don't think you have to worry about that.  I mean, you -- they understand now what you're talking about, that he looked at websites and you can't reproduce those.  They're not in your possession and custody or control.

Is that what you're talking about?

MR. KATHREIN:  Well, I don't think he -- he hasn't been deposed yet, so he hasn't said that he's looked at websites.

I think in our interview with him -- I don't know, did we -- we've -- we've run a search term -- we searched all of his materials for that.

So if there are sites that he reviewed, I guess the problem is there's a chicken-and-egg problem here.  Maybe those who talked to this plaintiff did not ask him if he can identify any websites.  They will certainly be taking his deposition in a couple of weeks.  And if there are any identified -- oh, I, you know --

THE COURT:  Just -- just -- when you go to revise these --

MR. KATHREIN:  Yeah.

THE COURT:  -- you don't have to do that stuff.  Just answer, "Yes, we have documents and we've already" -- or, "No,

we don't have documents."

That's all you have to do.

MR. KATHREIN:  I thought we did that, but maybe we didn't.  I will clarify that.

THE COURT:  Well --

MR. KATHREIN:  Your Honor, you don't need to look.  I understand your direction.

THE COURT:  I can tell you you didn't do that.

MR. KATHREIN:  Okay.  I understand.

THE COURT:  But if you do that, it's going to make everybody's life a lot easier.  And some of your objections certainly are valid ones.  And, you know, it's fine to raise those objections.

It's just after, "Yes, I have them," or "No, I don't."  And if it's, "No, I don't have the documents," you really don't need any objections, right?  If you don't have documents, you don't have documents.

MR. KATHREIN:  I think part of the reason for the objections is to clarify how we're interpreting what we're -- what we're producing.

For instance, if it's in the public realm, you know, in SEC filings, they've got equal access to it.  I think the trickier one here is -- I don't think our clients have identified websites to us.  I can go back and have our people look and ask.  They will be taking his deposition shortly.

THE COURT:  But websites aren't even really part of an RFP.  If a client looked at a website, that's not a document in their custody, possession, or control, right?

MR. KATHREIN:  No, it's not.  So --

THE COURT:  So it doesn't really matter for this RFP. But what -- what did you want me to do here with this?

MR. ELLIOTT:  I think these are couched -- and it sort of builds into the second point I'm going to make.  But I think these are all couched as undue burden objections.  And I think to the extent the Court would direct them -- or would overrule the undue burden objections, to the extent they can just simply be stated as, "We don't have documents," that would be an appropriate resolution.

THE COURT:  So you could understand what he means by undue burden?

MR. ELLIOTT:  What's being said.

THE COURT:  What do you mean by "undue burden"?

MR. KATHREIN:  I think what we're talking about is going and looking for documents in the public domain.

THE COURT:  Okay.  So, yes, I agree with you there. When you go to revise them, instead of saying "undue burden," just say something to that extent, "These documents that respond to your request are in the public domain."

MR. KATHREIN:  Okay.

THE COURT:  And you have no issue with getting them

yourself, right?

MR. ELLIOTT:  Yeah.  We would be in the equal position of getting them.

THE COURT:  And you're fine with that?

MR. ELLIOTT:  That's fine.  Yes, Your Honor.

THE COURT:  Okay.

MR. ELLIOTT:  I said we were sort of building to my next issue, which is the general objection under undue burden. To the extent there are other instances in these revised written responses to the RFPs, where lead plaintiff nonetheless sees it proper to make an undue burden objection, we think it's proper in that instance for those objections to be properly supported by a declaration or affidavit or some other evidence suggesting that there is an actual burden to collect it, beyond them just being in the public realm.

Going back to your comment about how -- in a number of instances there was lengthy objections and then a characterization at the end, notwithstanding the foregoing "here's our response," this may be a form-over-function issue, because it -- they've -- opposing counsel has informed us that they are not withholding documents on the basis of any undue burden objection, which is even further justification for this, Your Honor, because if they're not withholding anything based on that objection, it seems there is no burden to begin with.

So I think it's the second part of, you know, the

order you're sort of crafting in your head, Your Honor, would be a direction that to the extent there is -- the extent that lead plaintiff maintains an undue burden objection, that they do so with the support of -- of such a declaration.

THE COURT:  Do you, for your clients -- when you make an undue burden objection, do you submit an affidavit and declaration with that all the time?

MR. ELLIOTT:  I have.

THE COURT:  Not have.  Every time?

MR. ELLIOTT:  I cannot say every time.

THE COURT:  Because it's not required anywhere.

MR. ELLIOTT:  Yes, but --

THE COURT:  But do you have a trust relationship with him if he doesn't submit an affidavit or declaration, but it's enough for him to explain the burden, for example?

MR. ELLIOTT:  Opposing counsel, you mean, Your Honor?

THE COURT:  Yes.

"The documents that you're requesting, you do have. They're on an email server in Kentucky."

MR. ELLIOTT:  Sure.

THE COURT:  "We checked with the server's owner.  It will cost us $50" -- whatever it is, "and a lot of time to do this.  So we're not" -- "it's not proportional to the case.  It would be an undue burden for us."

You don't need that in a declaration or affidavit.

MR. ELLIOTT:  No, that --

THE COURT:  You just want some details.

MR. ELLIOTT:  Yes.  And that's why I said "or evidence."  So any sort of support --

THE COURT:  Well, evidence would be a declaration or affidavit.  You just want an explanation of the burden?

MR. ELLIOTT:  Yes, that is correct.  That's what we --

THE COURT:  So then you can decide, "Well, we're going to fight this, because we don't see that as a real burden," or, "That is a pretty burdensome thing.  We're not going to go after this."

MR. ELLIOTT:  That is the precise reason, Your Honor.

THE COURT:  Okay.  Any issue with doing that?

MR. KATHREIN:  No, Your Honor.  I don't think there is.  I think the beyond all doubt with public domain, I think that's what it dealt with.

THE COURT:  Okay.

MR. ELLIOTT:  Okay.  So just going through -- so those were sort of the two overarching comments we had on the RFPs overall.

THE COURT:  Okay.

MR. ELLIOTT:  And if you'd give me just a minute, I'll look through the ones that were still in dispute to see if any are sort of outstanding based on our conversation.

THE COURT:  Sure.  Sure.  Go ahead.

If anyone is wondering who the mystery person in the back of the courtroom suffering through this discovery is, he's not related to either side.  He's just a court observer.

MR. KATHREIN:  Poor guy.

THE COURT:  Yeah.

MR. ELLIOTT:  Okay.  Your Honor, just a few remaining issues on the RFPs and then we can move on.

THE COURT:  Okay.

MR. ELLIOTT:  So a point of clarification, my understanding is that the Court is of the opinion that the parties should produce the documents stated under the Rule 26 disclosure, based on your comment earlier.

THE COURT:  Should produce them if they're in his possession, custody, or control, and they're not on the -- in the public realm.

MR. ELLIOTT:  Okay.  That answers my question.  Thank you.

THE COURT:  Okay.

MR. ELLIOTT:  Your Honor, RFP No. 6 --

THE COURT:  And, by the way, if he doesn't produce those, he doesn't get to use them, right?  That's what Rule 37 says.

MR. ELLIOTT:  That's correct.

THE COURT:  And so don't fight him on that.  If he

doesn't give them to you, and you can't otherwise get them on the public disclosure --

MR. ELLIOTT:  I've used that before, Your Honor.

THE COURT:  -- it benefits you, right?

MR. ELLIOTT:  But I want to make sure the request is documented that we're asking for them now.

THE COURT:  Okay.  Okay.  But you don't even have to ask for them.  I don't really understand that in the first place, because he has to either identify them or give them to you.

You're saying that all he did was identify them as the rule requires, but now you want him to go further and actually hand them over.

MR. ELLIOTT:  Yes.

THE COURT:  Okay.  I understand now.

MR. ELLIOTT:  So specifically RFP No. 6 deals with communications with prospective class members.

THE COURT:  Okay.

MR. ELLIOTT:  And the case law cited in the opposition brief about absent class member discovery suggests that there is some heightened burden that a party seeking discovery must make in order to get that.

My understanding of the case law is that that is a -- for seeking discovery from the absent class members, as opposed to from the plaintiff about those members.

I do understand that there is a disagreement between the parties whether communications between the opposing counsel and these prospective class members are privileged.  I'm not here today moving to compel those.  I'm only asking that they be logged; to the extent that there are those documents in existence, that they be provided on a privilege log so that we can assess it and determine whether we want to make a subsequent motion.

THE COURT:  Okay.  Any issue with that?

MR. KATHREIN:  Yeah.  We have a big issue with that. May I approach and stand up there?

THE COURT:  Yeah.  I think it's -- I think going back and forth would probably be the best thing to do.  Otherwise I'll lose -- I'll lose this request.

MR. ELLIOTT:  That's fine.

THE COURT:  Just producing a log here.  That's it.

MR. KATHREIN:  Yeah.  Because we get thousands of inquiries.  They're asking us who all inquired with us about the case.  And we have thousands of inquiries on every case by prospective class members.

THE COURT:  Okay.  They're calling your -- your firm to ask about the case?

MR. KATHREIN:  Right.

THE COURT:  Is that what you're talking about? That's not what you want, is it?

MR. KATHREIN:  That's what they want.

THE COURT:  Or is it?

MR. KATHREIN:  They want us to log every one of those.

MR. ELLIOTT:  Yes, Your Honor.

THE COURT:  That is what you want?

I'm laughing because we sent out a class action notice in another case, okay, and we put the lawyer's email address, if you had questions, write the -- write the lawyer.

But to be nice we also put poor Ms. Loeschen's name and her telephone number to say -- to say, "If you want accommodations for the fairness hearing, call Ms. Loeschen. She'll make some accommodations for you."  There's a disability component to the case.  And so that's the only reason.

But we've been getting hundreds and hundreds of calls.  So I'm aware of how many you can get in a general class action when -- but a notice hasn't even gone out yet.

MR. KATHREIN:  No, there's no notice.

THE COURT:  So you're just talking about potential class members.

MR. KATHREIN:  Right.

THE COURT:  So how many communications are we talking about?  You say...

MR. KATHREIN:  I actually don't know how many.  I'd have to --

THE COURT:  Yeah, because without a notice --

MR. KATHREIN:  -- we'd have to search our email servers.

THE COURT:  Without even a notice that's gone out, it's not likely to be very many.

MR. KATHREIN:  Well, we -- I mean, in cases we can get hundreds, but --

THE COURT:  Before notice you can get hundreds?

MR. KATHREIN:  Yes, yes, because --

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  But let -- because in these cases a notice goes out in the PSLRA case that says -- because anyone can move to be a lead plaintiff, but under the PSLRA there's --

THE COURT:  Okay.  Okay.

MR. KATHREIN:  So notices go out.  People respond.

THE COURT:  Okay.

MR. KATHREIN:  You're really looking at how big their losses are.  And then you're talking as to whether or not they want to participate in the case, whether or not they want to be a lead plaintiff.

Now, there's no reason for them to have that. There's no relevance to the case.  I've never seen a single case that says there's any relevance of clients' communications with potential -- or an attorney's communications with potential clients.  This is supposed to be discovery of the

lead plaintiff, not of their counsel.

I mean, we are not being accused of violating any rules. There's no motion against us. And these people have their own right and expectation of privacy that they reach out to counsel to -- what are we going to put in the log? Put in their names?

Now all of a sudden defense can track down class members who reached out with the expectation of privacy to us to discuss the case. There's -- I just -- there's no relevance to it. And it's -- it's harassment of class members.

THE COURT: Harassment? All they want is a log.

MR. KATHREIN: Well, yes, I mean, for -- well, I guess, Your Honor --

THE COURT: And privacy, I'm really confused on that one. But the --

MR. KATHREIN: Well, because --

THE COURT: Did you say, when they called you, "whatever you say to me will be held in confidence"?

MR. KATHREIN: Typically when someone reaches out to an attorney, they expect to consult with the attorney about the case.

THE COURT: But they're not your attorney -- they're not your clients yet.

MR. KATHREIN: They're seeking possible representation. They're reaching out to us.

THE COURT:  They're asking about this case?

MR. KATHREIN:  Yes.  And we -- and, you know, every class action throughout the country has -- every lawyer has communications with potential class members.

"Yes, my car didn't work.  Can I be involved in the class" -- "in the case?"

"Yes, I took this drug.  Can I be involved in the case?"

And unless they show any sort of relevancy for that -- and the cases we cite indicate that there isn't relevancy for this.  So I --

THE COURT:  What about -- well, you're talking about communications with your law firm.  Do you even -- do you log phone calls, or not?

MR. KATHREIN:  We -- we have to search our emails.

THE COURT:  It's -- I was talking about phone calls. You're talking about emails.  So this would --

MR. KATHREIN:  I mean, they would --

THE COURT:  Even without a log, you would still have a way to just get emails of people who are inquiring about the case, right?

MR. KATHREIN:  Yeah, we would, Your Honor.  Other people responded to our --

THE COURT:  Because those emails are not going to be destroyed in the course of this litigation.  They're going to

be out there and retained.

MR. KATHREIN:  No, we keep them, because then they're given -- at the end of the case -- let's assume there's a settlement or a class notice.  They're given to the claims administrator so they can make sure the mailing goes out to those people.

THE COURT:  Okay.  And then he's also asking about communications between the lead plaintiff and others.

MR. KATHREIN:  Oh, we've produced those.  There's -- we're not objecting to producing those.

THE COURT:  Regarding -- okay.  So we're only talking about your firm's communication with potential --

MR. KATHREIN:  Right.

MR. ELLIOTT:  Point of clarification, did you say you produced communications with --

MR. KATHREIN:  Well, if we had any, we would have produced them.

MR. ELLIOTT:  Okay.  Because there haven't been any.

MR. KATHREIN:  I don't think there were any.

MR. ELLIOTT:  Okay.

MR. KATHREIN:  So, Your Honor, it would just -- it would be a bad precedent if -- and it would show our, you know, plaintiffs' willingness to reach out.  All of a sudden their names are being turned over to defense counsel and can then turn over -- can start calling them.  And they have no reason

for it.

And I'm not sure that they really have a reason for it. I'm not sure what they think their reason is for it, what they want, and why we have to go through the process of putting together a privilege log and spending the time of that and redacting information that --

THE COURT: Well, you have no -- I guess I'm -- I'm just confused on how many we're talking about. Like, if you -- but you really have no idea --

MR. KATHREIN: I have no idea.

THE COURT: -- whether it was two people or 200 people who called you, because that might make a difference. If there were only two people, I'd say just do the log. So what?

MR. ELLIOTT: And, Your Honor, if I could --

MR. KATHREIN: But what is the relevance? That's what I'm trying to struggle with, Your Honor.

THE COURT: But you have no -- I'm correct that you don't know how many people we're talking about?

MR. KATHREIN: As I stand here today, no, I do not.

THE COURT: Even a range?

MR. KATHREIN: Not even a range, Your Honor.

THE COURT: Okay.

MR. KATHREIN: I would probably say more than ten, probably less than 100.

THE COURT:  Okay.  All right.  Thank you.

MR. KATHREIN:  Okay.  So it's not so much -- the burden is -- is, in part, that I consider this harassment.  I consider it harassment of the plaintiffs.  They're not entitled to reach out.  They're not even entitled to depose absent class members in most cases.  So why do they want to reach out to people who contacted us?

THE COURT:  I don't think he said he wanted to reach out to them.  I think he just wanted a log to see what was there to determine whether to ask for those documents.

MR. KATHREIN:  Well, I'll tell you what documents --

THE COURT:  That's what I thought that he wanted.  I didn't think he said he wanted these so he could call these people.  But that's what you're suggesting.

MR. KATHREIN:  I'm suggesting that.  And, also, there's really no relevance.  I don't think they fully understand why they want these documents.

The -- what we will typically get is the plaintiff will say something about, you know, "Yeah, I lost money.  Here's my transactions."

And then we will respond if -- if -- if they're not someone who's going to meet the requirements, that we're not going -- you know, "We appreciate your inquiry.  We're really not interested in talking to you.  And this is what you do to follow the litigation."

That's not the words we have, but we'll respond to that. Others will say, "Yeah, we're interested in talking to you."

And it really depends on, you know, the size of the person's losses, whether or not they would be a potential lead plaintiff in the case. And then you get others who continue to reach out and say, "What's going on with the case? What's going on with the case?"

And typically we refer them to our website. So I don't -- there's nothing in here that we get from these people unless they just want to start calling people up and -- and asking, you know, "Why do you feel you're defrauded in this case," and things like that.

And, you know, I don't think they're entitled to do that. They're not entitled to call up absent class members. Okay?

THE COURT: It's prospective members, right? Not absent class members. It's just absent prospective class members. And what if -- what if one wrote you and said, "Hey, I didn't rely on any fraud or anything else. I just came into these shares by happenstance, played the lottery and just bought random shares, but can I still be a member of this class if it's ultimately approved as a class action," would that be something that --

MR. KATHREIN: Well, that communication would be

privileged, that communication.

THE COURT:  It would, even if they're just a potential class member reaching out at the beginning or before --

MR. KATHREIN:  It's seeking advice of counsel.

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  So that would be protected.  But --

MR. ELLIOTT:  And that's why -- where we disagree and why we want a log, so that we can assess the privileged claim, and for the Court --

MR. KATHREIN:  This would be -- this would be unprecedented.  And there's not a single case that you can cite where this is -- where it --

THE COURT:  All right.  Well, let's not talk to the lawyer in the courtroom.

MR. KATHREIN:  Okay.  I'm sorry, Your Honor.

THE COURT:  That's okay.  We got a little informal here because we're at 93 minutes.  But I understand your position.

MR. KATHREIN:  Okay.  Okay.

THE COURT:  Okay.  Thank you.

All right.  Why do you want these?  You said to assess privilege.  But --

MR. ELLIOTT:  Yes, to --

THE COURT:  He said it's unprecedented.  Has this

been done before?

MR. ELLIOTT:  I don't have an answer to that, Your Honor.  But to your point, we don't know what characterization has been made to third parties, and about the details of this lawsuit, or what third parties are saying about the -- the alleged false statements.

These are potential shareholders who hold Redwire stock who may have relevant things to say about this lawsuit. On the point of, you know, the --

THE COURT:  So you want to contact them?

MR. ELLIOTT:  I want to -- I want to assess whether this is a potential -- no, I want to see the communications. The requests of -- a request of production of documents is for the communications themselves, because the -- the communications themselves --

THE COURT:  And they're relevant why, to -- to which claim or defense?

MR. ELLIOTT:  Sure.  So the elements -- Your Honor cited reliance on a class-wide basis.  If for class certification we can show that there was not a reliance on the market, we can rebut class certification.

THE COURT:  But that would be -- what I -- my hypothetical, counsel says would be privileged.

MR. ELLIOTT:  And that goes to a legal argument as to whether communications with prospective class members are

privileged at all.

THE COURT:  Are they?

MR. ELLIOTT:  We disagree with opposing counsel. They think they are.  We think there's an argument that they're not.

THE COURT:  Florida law?

MR. ELLIOTT:  I don't know if it's Florida law.  I think it's other federal court cases.  I don't have those with me here.

THE COURT:  Would -- the Florida privilege would apply?

MR. ELLIOTT:  The Florida privilege --

THE COURT:  Or a federal common law privilege, or what -- federal common law?

MR. ELLIOTT:  Probably not Florida law if you have a Colorado shareholder contacting a California attorney.  And so I would imagine there would be a very particularized analysis, perhaps on a case-by-case basis, which if there's less than a hundred contacts, it's not insurmountable.

And so the log would allow us to assess the validity of the privilege claims.  I'm not going to move to compel if I see their log and I see, you know, information that's relevant to a privilege determination, I think, yeah, opposing counsel is correct, we won't be in front of you.  But I don't have the information.  Our team does not have that information to assess

at the moment.

I'll comment that the parties have been working with individual logs and categorical logs.  So if the -- in the course of this, opposing counsel were to call us up and tell us that this really is unduly burdensome, there's hundreds and hundreds and hundreds of records, let's talk about a categorical log, we would have that conversation.  They've extended that courtesy to us and we've agreed to that based on a protocol between the parties.  And so there's ways to sort of cut through some of the concerns you just heard a few minutes ago.

MR. KATHREIN:  May I just address one point?

THE COURT:  You can if you also tell -- I mean, you were -- you were saying at the lectern that these are not relevant, not relevant, not relevant.  You said it multiple times.

MR. KATHREIN:  Yes.

THE COURT:  That's not even an objection you raised.  So why would you say it now?  I mean, you have a lot of objections in here, but none of that is relevance.

MR. KATHREIN:  I guess I'd have to --

THE COURT:  And it might be that you read this -- it might be that you read the requests for production and you were really thinking about just documents between the prospective members or members of the punitive class and the lead

plaintiff, that you really weren't inserting yourself as one of these possible people in communication.

MR. KATHREIN:  I think that's -- I think that's what we were doing, Your Honor.  I think that's how we said we would read it.  But let me just address the one question about reliance, because I did raise that.

Under the class certification, case law in class under a securities fraud lawsuit under 10b-5, reliance is not an element, individual reliance is not an element of -- of the fraud.  What it is is fraud on the market.  It's whether or not the market was defrauded.  So reliance isn't even applicable.

MR. ELLIOTT:  If the fraud in the market is deemed to apply, which the Court in this case has not yet found, and we will be disputing.

THE COURT:  Okay.  All right.  I'll take that one under advisement.

MR. ELLIOTT:  Understood.

THE COURT:  Next dispute.

MR. ELLIOTT:  Sure.

RFP No. 7 seeks documents in lead -- regarding lead plaintiff's knowledge of Redwire.  I think there's -- it couched as an undue burden, but it's addressing documents in the possession of third parties.

And I think just a clarification, so we're on the same page, that to the extent lead plaintiff has the ability to

get documents in the third party's control, that they would be required to produce those documents.

THE COURT:  Well, possession, custody, or control. What are we talking about?  Do you know?

MR. ELLIOTT:  The request is documents showing lead plaintiff's knowledge of Redwire.

THE COURT:  Right.

MR. ELLIOTT:  I don't know what documents might be third parties.  I suspect this is a form-over-function type of issue.

THE COURT:  Well, let me ask -- let me ask counsel here.

All right.  Documents sufficient to show how and when lead plaintiff first became aware of Redwire.  So question to you, do you have documents?

MR. KATHREIN:  No, we don't, Your Honor.

THE COURT:  You have no documents?

MR. KATHREIN:  Well --

THE COURT:  All right.  Then there's your answer.

MR. KATHREIN:  Well, other than what we produced.  We produced everything according to the search terms that they agreed to, so...

THE COURT:  All right.  So is there really an issue there?

MR. ELLIOTT:  As long as that's removed from the

revised things, then I would say no.

THE COURT:  Okay.

MR. ELLIOTT:  The last -- the last particular RFP to consider is No. 34.  And this seeks analysts' reports mentioning the alleged false statements or supposed corrective disclosures.

And I understand in the recent expert report there was a citation to a number of analysts' reports or -- or not a number, a few analysts' reports discussing Redwire, what they would couch as analysts' reports.

It's unclear from the objection whether there are any others that would be responsive to this.  And if there are, I think they should be produced, or if we just clarify that the entire universe is what has been disclosed.

THE COURT:  All right.  Do we have an answer for that?

MR. KATHREIN:  Yes.  The analysts' report are in the public domain.  They're equally available to them.  Their expert has -- has access to all the analysts' reports.

THE COURT:  Okay.  How many analysts' reports are we talking about?

MR. KATHREIN:  I don't know.  Probably --

MR. ELLIOTT:  There are very few.

MR. KATHREIN:  Pardon?

MR. ELLIOTT:  Very few.  I don't think there's many,

right?

MR. KATHREIN:  I don't know.  We might have quite a few that we've collected that we're not necessarily relying on.  But the analysts' reports -- this is part of what goes on in the expert discovery.  The experts look at the analysts' reports.  They produce what they've looked at.  If they haven't looked at it and you cannot get it, we're happy to get it.

THE COURT:  So all of them are in the public domain?

MR. KATHREIN:  All of them are in the public demain.  You may have to pay Reuters for it, or you may have to pay -- but they have equal access to it.  And they can --

THE COURT:  All right.  So if they're all -- all on the public domain, you don't dispute that, do you?  You haven't -- you don't have --

MR. ELLIOTT:  I don't have a basis to say --

THE COURT:  He says what they have -- the analysts' reports that they have, they pulled from the public domain.

MR. ELLIOTT:  Sure.

THE COURT:  Okay.  So we don't really have to keep going with this, do we?

MR. ELLIOTT:  I think that's probably right.  You know, this gets into an issue that's raised more directly with the interrogatories, which we'll get into in a minute.

Part of the exercise with this discovery, here and more directly with the interrogatories, is to speak from a

common page.

One of the issues that's very important for class certification is the existence of analysts' reports. Are there analysts' reports out there talking about the Redwire stock?

I want everybody to be on the same page. Here are all the analysts' reports that are going to be looked at for that determination.

THE COURT: And that's fine. We'll get to the interrogatories. I mean, if you can identify the ones he's considered -- is that what you're asking for in one of the interrogatories?

MR. ELLIOTT: So I would think it would be unjust for them to come and say that we should find that class certification is appropriate because of the existence of all these analysts' reports and not have to produce them to us in discovery.

MR. KATHREIN: Well, they have our brief.

THE COURT: Well, if they simply identified the analysts' reports, that's fine, right?

MR. ELLIOTT: That is fine.

THE COURT: And then you can go to Reuters, pay them. They really won't want to make your copies for you.

MR. ELLIOTT: That's fine. That's fine.

THE COURT: All right. Any issue with identifying the analysts' reports?

88

MR. KATHREIN:  Well, they have equal access to our --

THE COURT:  No, no, no.  Not that --

MR. KATHREIN:  No, to our --

THE COURT:  No.  I'm not talking about giving over the documents.  They can get those online, it sounds like.

MR. KATHREIN:  No.  What I'm saying, Your Honor, is the analysts -- our expert has identified -- they've got -- they've already taken his deposition.  They've already got his report.  They've got everything he relied on.

THE COURT:  Is that the universe of analysts' reports?

MR. KATHREIN:  That the expert's relying on.

THE COURT:  No, out there, just universe of analysts' reports are out -- is in that expert's report?

MR. KATHREIN:  I don't know what the universe is.  I'd have to go and I -- and I'd have to search.  I'd have to search what I've pulled.  I'd have to search what else is out there.

THE COURT:  For your class certification, you're relying -- you've specified the ones you're relying on?

MR. KATHREIN:  Correct.  And they're in the expert report.  And they've got their own expert who sat --

THE COURT:  And the expert report.  And there might be some more out there that you've looked at, but you're not relying on them?

MR. KATHREIN:  Correct.

MR. ELLIOTT:  And if there's a stipulation that their arguments are going to be confined to what's already been disclosed in the expert reports, I think we could resolve it that way, Your Honor.

MR. KATHREIN:  Well, Your Honor, there will be an issue on damages where expert reports are going to be submitted in -- in -- in September.

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  And in September our experts on damages may be looking at other issues.

THE COURT:  At additional ones?  Well, you could disclose them at that time, right?

MR. KATHREIN:  Correct.  And they will be disclosed at that time.

THE COURT:  Yeah.  I don't think this is really an issue that we need to keep going with.

MR. ELLIOTT:  Understood.  So that's the last of the RFPs, requests for production.

THE COURT:  Okay.

MR. ELLIOTT:  We can turn to -- we can --

THE COURT:  Let's do requests for admissions.  I am troubled by those.  But before I tell you my trouble, tell me what remains at issue there.

MR. ELLIOTT:  Sure.  So the primary issues that

remain are the reliance on a unstated context to provide an admission or denial, and then two other minor issues, one about the interpretation of two different terms, author and speaker, and then a small issue about whether some of them attacked disputed facts.

But I think the primary issue is what I consider a context objection, where in a number of responses lead plaintiff states that the request takes an identified statement from a Redwire disclosure out of context.

The responses then state that the lead plaintiff will respond by interpreting the statement in -- quote, in context and not in isolation.

And our -- our position is that this approach introduces some ambiguity into the response, because we don't know what context the responses -- or the lead plaintiff is using in the response.

We attempted to confer on this issue, but I think that just made things more confusing.  In our conferral the lead plaintiff indicated that they would respond -- states that the context includes the full presentation at issue and, quote, the purpose for each statement.

And so from our perspective, this introduces a second layer of subjectivity as to lead plaintiffs or even lead plaintiff counsel's assessment as to what the purpose of a quoted statement is in determining whether to admit or deny the

request.

And so in the opposition, lead plaintiff suggests that, you know, this context can become clear only if we look at the parties' conferral discussions, the operative complaint, lead plaintiff's opposition.

And I would submit that if so many sources are needed to understand the context, it is not actually clear and does not provide the parties or the Court a clear record upon which to proceed in this litigation.

THE COURT:  How many requests for admission did you ask --

MR. ELLIOTT:  A couple -- I think 100- --

MR. KATHREIN:  I think it's 410.

MR. ELLIOTT:  Is it 400?  Okay.  There's a lot.

THE COURT:  I've never seen anything like it.

MR. ELLIOTT:  Okay.

THE COURT:  I don't think when I read the rule -- and the advisory committee notes it's really intended for this type of purpose.  I think it was more intended for admit the light was green; admit/deny.

MR. ELLIOTT:  Sure.

THE COURT:  Or I can't do either because I wasn't there at the scene.

MR. ELLIOTT:  Uh-huh (affirmative).

THE COURT:  What you've done -- and I'm not sure why

you're even doing this -- is pulled statements from various things and said, "Admit this is absent from that statement," right?

"Admit this is absent from that statement.  Admit this is absent from that statement."

Maybe effective cross-examination at trial -- you know, you could ask, "Is it in this statement?  No, you don't have it in this statement.  Is it in this statement?"

Fine.

But for requests for admission, it seemed very, very peculiar.  And there is some -- there's some appeal to the argument the plaintiff's making that first this was a little bit abusive.

MR. ELLIOTT:  Uh-huh (affirmative).  It was not meant to be.

THE COURT:  I understand.  I don't believe you meant to harass or abuse.  I'm sure you've seen something like this in other cases and you're following suit.  But I could see where this is going too far, that you've gone past the purpose of a request for admission to sort of narrow the issues in the case, which is really the purpose, you know, admit liability or deny liability.  If you admit it, great, we're going to just go to damages.

MR. ELLIOTT:  Right.

THE COURT:  That would be a great purpose for a

request for admission.  But sort of using it to -- I don't know.  When I read them, I was like, "Really, this is how you're going to use the requests for admission?"

It was more like a -- it wasn't to narrow the issues at all.  It was almost read to play gotcha in some kind of motion for a summary judgment or at a trial.

"You admit it's not in here.  You admit it's not in here.  You admit it's not in here."

It would be maybe effective before the fact finder.  But that's really not why we're using requests for admissions, is it?

MR. ELLIOTT:  Well, I understand your response, just because of the number that there are.  I would say that the intent of them, especially those referencing the statements that we gleaned from the complaint, are to tease out -- or to not necessarily tease out, but to establish the bounds of the field that we're playing on.

THE COURT:  And I think your request for -- your Interrogatory No. 1 identified the statements -- is for that purpose, right?

MR. ELLIOTT:  It is.  Absolutely, Your Honor.

THE COURT:  Let's narrow this.  What statements are we talking about in this lawsuit?

MR. ELLIOTT:  Absolutely.  Absolutely.

THE COURT:  That's fair.

MR. ELLIOTT:  Sure.

THE COURT:  That's my ruling on that.  That's not -- that particular interrogatory is not a contention interrogatory.  And it's fine to identify.  The ones you have now, you can supplement as the case goes on, because I'm sure the case will develop and you'll want to add more to that answered interrogatory.

But for this request for admission, very peculiar way to go about that, and -- and kind of abusive.  Did you say 400?  How many?

MR. KATHREIN:  410.

THE COURT:  Yeah, 410.  I mean, yes, you don't have a limit, like you do the hours of a deposition or other types of limitations.  But if you had come to me first and said, "Judge, can I ask them 410 requests for admissions," and you showed me what you were going to ask, I would say, "No, you can't."

MR. ELLIOTT:  Okay.  Well, I will submit that the -- and I'll leave you with this, because I don't need to -- I know when -- when my day is cooked.

But I would submit that the purpose of these RFAs was to narrow the playing field, as using my word previously, because a lot of the false statements that we could glean from the complaint don't have the things that opposing counsel -- that the briefs suggest they should -- don't discuss the subject matter that would naturally be discussed had, you know,

opposing counsel's theory of the case been -- or theory of what should have happened come to pass.  So that was the intent.  I do understand Your Honor --

THE COURT:  Is there any -- in this 400-odd requests for admission, are there any that are different, that -- are there any like that, like what I suggested is the appropriate use of them, the light -- was the light red?  Admit or deny.  Or admit the light was red?

MR. ELLIOTT:  You know, there was one -- and, you know, to me this context problem really came to light on when I was getting ready for this hearing.  It was No. 11.

THE COURT:  Okay.

MR. ELLIOTT:  And it, I think, goes to -- as you were saying -- I'll just pull my binder here.  One moment.

THE COURT:  No. 11 to any of the --

MR. ELLIOTT:  The Redwire one.  I'm sorry, Your Honor.

THE COURT:  The Redwire?  Okay.

MR. ELLIOTT:  Yes.

And so -- when you're ready, Your Honor.

THE COURT:  These I did not print, for obvious reasons, but I did read them.

MR. ELLIOTT:  Sure.  I understand.

THE COURT:  Okay.  No. 11 is what?

MR. ELLIOTT:  So this says, Admit that the phrase,

quote, 50-plus years of space heritage and deep customer relationships in space and aerospace, end quote, as set forth in the March 25, 2021 Press Release, does not make any representation regarding GPAC's management's attitude towards internal controls or financial reporting.

For the Court's reference, GPAC is Genesis Park Acquisition Company, which was a SPAC, that itself had no operations at any point in time and was a shell corporation that merged with the formerly privately held Redwire, a business combination.

And so, to me, this is a "the light was red versus the light was green."  This is a statement that has nothing to do with GPAC's management's attitude towards internal controls or financial reporting.

And so I would assume that this is a fairly easy thing to admit, but we get to a denial at the end of this RFA, I can only assume based on the subjective contextual issues that I was referencing earlier.  And so, you know, I -- I don't know how we get from this to a denial, because --

THE COURT:  Well, that was -- you know, I'm troubled by the answers, too.  Like, denying that?  Like, okay, I guess you're denying it, but that seems peculiar.

I mean, is it really -- if you take out all of the objections and then you just answer admit or deny, you're going to deny that?

MR. KATHREIN:  Your Honor, these are specific statements that were in a complaint where defendants argued against them and the Court upheld that -- all these statements as being false, didn't subrogate any, and said that per -- per -- to rule out, these statements all implicate the "tone at the top," which was not disclosed.

So for us to admit that would be against our theory of the case, that they are making all these representations about management's experience, while omitting "tone at the top."  That's why it's denied.

And it's -- and it's -- there's a court opinion that all these were upheld.  So now they're just trying to reargue everything.

THE COURT:  When you say "upheld," you mean Judge Corrigan's order denying the motion to dismiss?  Is that what --

MR. KATHREIN:  Yes.  He denied --

THE COURT:  It's not upholding the statements.  He was just denying the motion to dismiss, saying it was pleaded -- it satisfies the plausibility requirement, right?

MR. KATHREIN:  It's worse than that.  Under the PLSRA we have to show --

THE COURT:  And the other two things as well, and fraud.

MR. KATHREIN:  -- strong inference --

THE COURT:  But he said the pleading suffices. That's a little bit different from what you said, the pleading suffices under all the standards.

MR. KATHREIN:  The pleadings -- and it's --

THE COURT:  Yes.

MR. KATHREIN:  -- a very strict standard, yes.

THE COURT:  There's three standards.  And it suffices under all three, right?

MR. KATHREIN:  When you say --

THE COURT:  Well, the regular basic *Iqbal/Twombly* standard --

MR. KATHREIN:  No.  Yeah.

THE COURT:  -- the fraud standard, and then for a 10b-5 fraud standard.

MR. KATHREIN:  Well, the 10b-5 standard is very, very strict.  You have to list each one.

THE COURT:  Yes.

MR. KATHREIN:  And they haven't had a chance to --

THE COURT:  We're not arguing this right now.

MR. KATHREIN:  Right, right.

THE COURT:  It's just the way you said it, "it's been upheld," seems strange in this context.  But I understand what you're saying.

MR. KATHREIN:  But that's the theory of the case. And he didn't -- and typically a judge will go through and

he'll say, "Well, no, I don't find that this" -- he says that all these were permeate -- that the "tone at the top" was permeated.  And that's our theory of the case.

THE COURT:  He's not upholding anything.  He said your pleading was sufficient, motion to dismiss denied.  But I understand what you're saying right now.

MR. KATHREIN:  Right.

THE COURT:  Okay?

MR. KATHREIN:  And that's at a very early stage of discovery now.  I mean, so they're basically trying to relitigate the complaint.

THE COURT:  All right.

MR. KATHREIN:  But, Your Honor, I don't think --

THE COURT:  I'm going to cut you off there.  This is a good time for a break in this proceeding because we have a criminal case coming in.  We'll just take a really short break. This shouldn't take more than five minutes.

MR. KATHREIN:  Okay.

MR. ELLIOTT:  Thank you, Your Honor.

THE COURT:  Let's see.  We have -- we have the defendant coming in?

MARSHAL:  Yes, Your Honor.

THE COURT:  All right.  So just -- you can stay there, or -- no, you can't stay there.  We have a prosecutor coming in.  But your papers can stay there.  Your papers need

to move, and then just take a break.  Come back in about ten minutes.

MR. ELLIOTT:  Absolutely, Your Honor.

THE COURT:  All right.  Thank you.

Court's in brief recess in this civil case.

COURT SECURITY OFFICER:  All rise.

(Recess from 3:24 p.m. to 3:34 p.m.)

COURT SECURITY OFFICER:  This Honorable Court is now in session.

Please be seated.

THE COURT:  All right.  We're back on the record in Lemen and Redwire.  Sorry for that brief interruption.

MR. ELLIOTT:  Not a problem, Your Honor.

THE COURT:  All right.  Did you have anything else you wanted to say about the requests for admission?

MR. ELLIOTT:  I think my -- my only -- the only other issues -- there was an objection on the definition of "author" and "speaker," if Your Honor would like to hear argument on that, or move on.

THE COURT:  I mean, because of my issue with them --

MR. ELLIOTT:  That's why I --

THE COURT:  -- I was not going to order anything on the requests for admission.  I'm just a little bit confounded by them.  And I'm not even sure what to say about them, except any relief on them as they're written is not going to be

provided by me.  I will enforce whatever agreement you reached with plaintiffs' counsel.

And it sounds like he's going to revise those in some way to respond to some of the concerns you have.  But I don't think in fairness I can order them to redo 400-odd requests for admissions that are peculiar in the first instance.

MR. ELLIOTT:  Then we can move to interrogatories, Your Honor.

THE COURT:  Okay.  I think I just ruled on the first interrogatory asking them to identify statements that they contend -- it sounds like they have a combination of statements made in the amended complaint or the pleading itself.  And so beyond that you're looking for other statements that might support their theory?

MR. ELLIOTT:  Well, Your Honor, the response is -- this answer can be found by looking at the complaint.  It can be found by looking at the motion to dismiss briefing, the appendices to that briefing and the court order.  And to my point earlier --

THE COURT:  Well, I'll tell you -- before -- I'm sorry.

MR. ELLIOTT:  No, go ahead, Your Honor.

THE COURT:  I'll tell you this, if you take a look at those documents and you see what they have in them, you get kind of the gist of what they're arguing here, the theory of

the case.

If they were to poll anything else out there, any other statement that couldn't be fairly encompassed in that, they don't get to use that, right --

MR. ELLIOTT:  That's correct, Your Honor.

THE COURT:  -- because they have not disclosed it?

MR. ELLIOTT:  Correct.

THE COURT:  They are limited now based on this answer in the interrogatory to the amended complaint statements, what's in the motion to dismiss -- what else did they say?

MR. ELLIOTT:  The appendices and the court order on the motion to dismiss.  I would -- and I would say that the reference to the court order is spoken in generalities.

And I -- I don't want to open the door for creative lawyering to say, "Well, this was referenced because it had to do with 'tone at the top' versus in some general" -- "general way, versus having a specific enumerated list in an interrogatory response that we can all look at when we need to know what are the issues, alleged misrepresentations."

And I think it goes -- I think it's important in a case like this, where their expert has already testified that he is going to assess damages in a particular way, so -- so what alleged misrepresentations were, the dates of those statements, who made them, when were the corrective statements, which is Interrogatory No. 8, which is sort of the inverse of

No. 1 -- what were the alleged corrective statements?  What were the dates of those statements?

I would like for -- for the parties and the Court to have a clear record of when all these key statements were made so that we can all make our arguments, both as attorneys and for the experts, as to the meaning for purposes of this lawsuit.

THE COURT:  Uh-huh (affirmative).

MR. ELLIOTT:  And so the intent of these first ten interrogatories is to -- is to create that type of clear record.

THE COURT:  Okay.  You -- you say that applies to the first ten?

MR. ELLIOTT:  Yes, Your Honor.  And I will -- I will say for Nos. 3 and 7 -- this is where I get to be the reasonable attorney.  We're willing to stipulate that it's proper -- this is for 3 through 7 on the Redwire interrogatories.  We would stipulate that a response more -- closer to the end of the discovery period was something we could agree to.

Counsel and I were discussing this earlier.  And we would suggest an order directing those responses to say 45 days before the close of the discovery period.

But for the others -- 1, 2, 8, 9 and 10, when it comes to the Redwire interrogatories, we think a response now

is appropriate because it sets the stage for a lot of further discovery and for the parties' arguments in a near term.

THE COURT:  What was the agreement you reached?  If he's revising the responses, what was that agreement?

MR. ELLIOTT:  This is not -- this is something that we're willing to stipulate now.  It's not something --

THE COURT:  I understand.  But beyond that, they said they were going to revise these in some way.  How was that?

MR. ELLIOTT:  Yes.  So my understanding -- and I can be corrected.  My understanding is that objections as to relevancy, vagueness, or ambiguity, and issues with the definitions of "you," "your," and/or "lead plaintiff" are the issues that would be revised in a subsequent draft.

THE COURT:  And then you have some agreement for 3 to 7 45 days before the close --

MR. ELLIOTT:  No, no.  That's what I'm saying.  I would --

THE COURT:  You would propose that?

MR. ELLIOTT:  I would propose that.  Yes, Your Honor.

THE COURT:  And then 1 -- the other ones, so 1, 2, 8, 9, and 10, you want now?

MR. ELLIOTT:  That is correct, Your Honor.

MR. KATHREIN:  Your --

THE COURT:  I'm going to give you a chance to speak.  Just a second.

Is that -- is that the only issue remaining for these interrogatories?

MR. ELLIOTT:  I think for the Redwire interrogatories, that is the only issue that the -- the idea of them being a contention interrogatory sort of blends into the reference -- the responses largely reference other materials, which I've just hit on.

And then No. 10 -- my understanding is the only remaining issues on No. 10 for Redwire -- for Redwire is the contention that this is a premature expert discovery interrogatory.  And I can address that when the Court is ready.

But I think those are the only remaining issues when it comes to the interrogatories, but we can march through them one by one if you prefer.

THE COURT:  And any -- any issues with the interrogatories to the other defendants?

MR. ELLIOTT:  Yes.  Yes, Your Honor.  So as to the Cannito and Read interrogatories, which mirror each other, No. 1 is very similar to the Redwire one.  This is just identifying statements that are attributable to the respective defendants.  It may be all of the ones that are in the first list, or maybe some subset.

Again, my proposal for a later compliance date would apply to Nos. 2 through 5 and No. 7 of these individual defendant interrogatories.  And then we are also seeking

immediate responses to Nos. 6, 8 through 10.

THE COURT:  8 through 10.

MR. ELLIOTT:  8, 9, and 10, yes.

THE COURT:  Okay.  That's for both individual defendants?

MR. ELLIOTT:  Yes, Your Honor.

THE COURT:  And then do you want to go ahead and address the issue just raised with No. 10?

MR. ELLIOTT:  Sure, Your Honor.

THE COURT:  On the premature expert, do you agree?

MR. ELLIOTT:  So No. 10 narrowly seeks information regarding lead plaintiff's theory in the case.  Basically, we want to know is this a price maintenance theory case.  The language of the interrogatory reads, "State whether plaintiff claims."

It is not asking for a lengthy recitation of expert opinion or the conclusions of any expert.  It's merely asking for a clarification as to what the plaintiffs' allegations are, which is, you know, a permissible use of an interrogatory.

The reason why this is important is because in a price maintenance case that has meaning for how you measure damages -- and the means of measuring damages is important for the upcoming class certification process -- lead plaintiff is obligated to demonstrate to the Court that they have ability to measure damages on a class-wide basis.

We've taken their expert deposition.  You know, that combined with this would provide us with a basis -- or a foundation upon which to start our argument in opposition of class certification.  So I'm not asking for expert analysis.

THE COURT:  And then he said the damages expert reports aren't due until September.

MR. ELLIOTT:  Damages expert, but the parties -- the lead plaintiff has disclosed an expert report in support of their motion for class certification on a variety of issues.

When it comes to damages, it's merely stating that the expert believes he has the ability to measure damages class-wide, briefly explains why that's the case, doesn't actually do that analysis.

THE COURT:  Uh-huh (affirmative).

MR. ELLIOTT:  You know, in our -- in opposition, we're going to consider and potentially argue that he doesn't have the ability to do that.

THE COURT:  Which of these three helps you or hurts you in that argument?

MR. ELLIOTT:  So it's more than just -- it gives us the understanding of how to argue.  If it's a price maintenance theory case, you can look at a back-end stock drop as a proxy for the inflation of a stock at the time that a false statement was made.  I think I have that right.

And so just knowing that that's -- confirming that

that's the road they're going to walk down allows us to focus our arguments on -- our responses on their arguments, and doesn't require us to brief anything beyond what their contention --

THE COURT:  You have arguments for all three, though?

MR. ELLIOTT:  I think we would tailor our response based on what -- what we see from the expert report, what we see from the pleadings, and the arguments may be nuanced -- differences between how they answer this -- this interrogatory.

THE COURT:  All right.  Thank you.

MR. KATHREIN:  I don't have a lot, Your Honor.  But I just want to be clear -- I know you're going to order us to answer Interrogatory No. 1.

And if we provide them a chart like in our opposition -- I will just hand this to you -- which was in our opposition to their motion -- I think we supplied you with the chart.

If we provided a chart like that, is that going to be sufficient, just put it in an interrogatory answer?  Because every statement that -- that we rely upon in the current status of the litigation with minimal discovery is there.

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  I don't know, you know -- and, of course, if we -- we're going to amend the complaint to add additional statements, we would -- I have to show good cause,

and we would do so at such a time.

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  But these are -- it's a -- the only thing it doesn't say is that -- on that chart is that we're alleging that Redwire, Read, and Cannito are responsible for these statements.  That would be, I think, the only addition we would make to such a chart.

THE COURT:  And would you be able to make that?

MR. KATHREIN:  Yes.

THE COURT:  And then the Interrogatory 10?

MR. KATHREIN:  Interrogatory 10 -- if I understand, that's the expert one?

THE COURT:  Yes.

MR. KATHREIN:  So the problem with that is we sequence expert discovery in these cases so that you don't have to pay experts a lot of money up front until it's a ripe issue.

Throughout discovery we will determine things that our experts will rely on in calculating damages.  And that's why experts on damages are after discovery.

And so our reports in September will state beyond what the complaint states.  We -- I mean, the complaint identifies a stock drop.  We'll identify how the expert is calculating damages at that time.

THE COURT:  What does your pleading say?  Which of these three, that it caused the -- an increase in the prices?

MR. KATHREIN:  I don't think we --

THE COURT:  It didn't say that.  It --

MR. KATHREIN:  Here, I've got the complaint.  There's a whole loss causation section in the complaint.

I think it's fairly simple on this case.  I think -- and I think our expert explained in his deposition that he would apply an out-of-pocket theory, which you would look at inflation throughout the class period and how much it impacted.

So I think he explained, you know, the types of theories that could be used and could be applied.  And our complaint for loss causation says that they made the false statements and that then there were corrective -- corrective disclosures on November 10th and 15th.

THE COURT:  And the corrective disclosures caused the share price to fall?

MR. KATHREIN:  To fall.  And that's paragraph 107 -- 6, 107, and 108.  And then in terms of whether or not an expert will decide whether or not it was a material drop and whether it's statistically significant, that will be work that the expert is going to have to do at the end and -- at the end of the case.

THE COURT:  So for all -- like, looking at your chart, if you look at this interrogatory, and it says for each statement please state whether it caused an increase in the price of Redwire stock, are you able to answer that for the

statements in general?

MR. KATHREIN:  I would have to look at an expert report that -- and they also have the expert report where -- and they have their own that indicates whether or not -- statistically significant movement on that date.  And I would have to take a look at that.

THE COURT:  And did not cause a price increase, but prevented the stock price from falling, you're not able to say that yet until you have an expert?

MR. KATHREIN:  Well, because this is an omissions theory, it would be that it was more -- it was a continuation of the fraud.  Whether or not that statement in and of itself moved the stock, I don't know.  And I'd have to look at the expert reports.

They've got the -- they've got the statistical significant charts.  They've done their own.  So, I mean, these are going to be a battle of experts.  So it's not that there's really a theory on -- that's undisclosed to them.

They -- I think it's kind of a -- kind of a false argument that they need me to tell them what their experts have already told them and what our experts have said on class certification.  They're -- they've got their own experts, who sat in on the deposition, who listened to the deposition.

THE COURT:  Uh-huh (affirmative).

MR. KATHREIN:  So it's -- the answer is that they

know the basis of our pleading here.  They've got the experts, and -- on class certification, who are testifying as to the efficiency of the market, the efficiency of the stock movements, and that these things are sequenced so that -- you know, that at the end of the case the experts can look at everything and make a determination.  That's why we have expert disclosures, I think, on September -- well, almost immediately after our mediation in September.

THE COURT:  I think your friend over here is saying he needs to respond to the motion for class cert.  And one of the arguments they'll make is they can't provide damages on a class-wide basis.  How do they respond to that without -- how do they make that argument, that nuanced argument, without knowing this?

MR. KATHREIN:  Our expert -- our expert testified to that.  And he's told them how he would calculate damages.

THE COURT:  Oh, okay.  So I thought you were waiting until September to figure that one out.

MR. KATHREIN:  Well, he hasn't calculated the damages.  He --

THE COURT:  But he has -- and what did he say?

MR. KATHREIN:  On class certification, the question is whether or not damages can be assessed on a class-wide basis.

THE COURT:  And he said what, yes?

MR. KATHREIN:  I believe he testified that it would be determined on the out-of-pocket method.  And beyond that I'd have to look at his transcript.  But we're bound by -- we're not --

THE COURT:  But it was something to the effect of the out-of-pocket method?

MR. KATHREIN:  Yeah.  It's out of pocket.

THE COURT:  So what are his responses going to be to that?

MR. KATHREIN:  That it's already -- they've already got discovery.  I think part of the problem is these -- these documents -- or these requests were made months ago.

THE COURT:  Okay.

MR. KATHREIN:  And they're -- and I think it's kind a moot issue right now.

THE COURT:  You've gotten it since then?

Okay.  Anything else on this?

MR. KATHREIN:  Let me see.  I just -- I think I --

THE COURT:  But what you provided me is helpful.

MR. KATHREIN:  Defendants have their own.  And we just -- we supplemented it.

THE COURT:  I mean, Mr. Elliott, what was handed to me -- is that what you're asking for in these interrogatories, this spreadsheet?

MR. ELLIOTT:  In large part.  I think, you know, to

the extent that information -- the information can certainly be provided in chart form.  And to the extent they want to take that informational chart and then add in additional information as requested by the interrogatories, I think that's a perfectly reasonable --

THE COURT:  What's missing?  If you look at the chart, what else does he need, besides what he said he'll add?

MR. KATHREIN:  Here, I'll give you the chart.

MR. ELLIOTT:  Thank you, Reed.

THE COURT:  Because it has -- it has the date of this statement.  And it has the statement in itself.  And then it has the reason for it being misleading.  It even has the location of the statement.

(Counsel confer.)

MR. ELLIOTT:  So as we noted, it doesn't have the name of the speaker making the statement.  It does not have -- it does not have -- it does have the date and it has the meeting.  So missing here would be the name of the person making the statement, which is 1(a).

THE COURT:  And do we know the person making all of these statements?  Or do they already know that?  I mean, this is their information, right?

MR. KATHREIN:  Well, from the complaint we allege that Mr. Read, Mr. Cannito, and Redwire are responsible for all the statements.  Mr. Read and Mr. Cannito were the CEO and CFO.

And they were the control persons of the organization, so...

THE COURT:  Because these are statements made just generally by Redwire, and they're attributing them to Redwire and to the two named defendants?

MR. KATHREIN:  Correct.

MR. ELLIOTT:  And, Your Honor, if I may, that's actually a key point, because -- I think a key dispute, because if you look at the dates of these statements they exist prior to the business combination that resulted in the current Redwire.

And at the time they were made, you have a corporate entity Genesis Park Acquisition Company, which is wholly separate from another corporate entity, which is privately held Redwire, and Mr. Read and Mr. Cannito's relationship is solely tied to the privately held Redwire.  They were officers of that company.  They were not officers of GPAC.

And to the extent these statements on, you know, these dates -- that were made, it's important to know are these statements being made by GPAC?

THE COURT:  Well they're your -- you know they made these statements, right, because you can just pull them up and see where they were made, right?

MR. ELLIOTT:  We can.  I guess it would be helpful to know what plaintiffs contend they're made by.

THE COURT:  Well, I think they're going to contend

you have the statements --

MR. ELLIOTT:  Okay.

THE COURT:  -- and you can figure out who made them. And they might make a legal argument:  These are attributed to publicly traded Redwire or these individual defendants for this reason.  But I don't think you need that legal argument here in an answer to interrogatory.

MR. ELLIOTT:  That's fine.  That's fine.  And I think a chart like this, if it's the definitive chart, would be sufficient.  The problem that we raised, and I mentioned earlier, is that Court and counsel and our side is required to go consult three different sources to then determine from the complaint, which varies from this chart -- there's -- there is a distinction --

THE COURT:  Well, I think you have the chart now.

MR. ELLIOTT:  Right.

THE COURT:  And he's going to put this into an interrogatory answer, get it signed by his clients, and then that's your answer to the interrogatory.

MR. ELLIOTT:  And that is a perfectly sufficient answer.

THE COURT:  And he's also combining the chart with this -- sort of the flavor of the original answer, which is, "This is our theory of the case.  Take a look at the motion to -- the response to the motion to dismiss" --

MR. ELLIOTT:  That's fine.

THE COURT:  -- "the order on the motion to dismiss, the complaint itself, and you'll understand what our case is about."

MR. ELLIOTT:  Sure.  And, you know, for Interrogatory No. 8, Your Honor, the chart -- opposing chart like this, as is stated, corrective disclosures.  And we can have a clear record as to when all the key statements both at the start and the end were made.  Because this chart does not -- I think this chart doesn't have the corrective disclosures.

THE COURT:  Doesn't have the corrective disclosures.  All right.  So you can add those corrective disclosures to the chart.  That doesn't sound objectionable.

MR. KATHREIN:  No, we don't object.

THE COURT:  All right.  It sounds like that's taken care of.

For 10, I mean, I agree with Mr. -- Kath-rein?

MR. KATHREIN:  Kathr-ein.

THE COURT:  Kathr-ein.

I agree with Mr. Kathrein that you have enough already to respond to the motion for class cert.  And requiring this type of specificity for each statement made at this point doesn't seem warranted.  That's sort of drifting into contention.

Okay.

MR. KATHREIN:  So the final point is he said we had an agreement on updating 45 days ahead of time.

MR. ELLIOTT:  Oh, no, I didn't say agreement.

MR. KATHREIN:  Okay.  Or that there --

THE COURT:  Suggested this.

MR. ELLIOTT:  A suggestion, yes.

MR. KATHREIN:  Well, I -- it's -- what's they're asking is overbroad, because those requests ask:  In support of this -- state each and every fact in support.  And I think that's an improper interrogatory in this -- in this district.  And certainly they're going to move for a summary judgment.

THE COURT:  Well, I think we -- I'm sorry.  I -- I thought we were going to resolve all of these interrogatory issues except for 10, which I just talked about, with a chart of this sort in response to the interrogatory.

MR. KATHREIN:  Oh, that's fine.  That's fine.

THE COURT:  And I don't think there's anything about 45 days -- once he provides this chart, as he wants to supplement it, however, and gets it signed, that's your answer to all of these.

MR. ELLIOTT:  I think that's the answer for No. 1 and No. 8; 8 being -- the distinction between No. 1 being the misstatements and 8 being the alleged corrective statements. The other interrogatories address different issues.

THE COURT:  Okay.  So let's -- and those are the ones

that you want.

MR. ELLIOTT:  In part.

THE COURT:  All right.  And No. 2 --

MR. ELLIOTT:  No. 2 I would suggest is appropriate to have a response now.

THE COURT:  So that's:  State whether it was affirmatively false or misleading or omitted material facts necessary to make the statement not misleading.

MR. ELLIOTT:  And, again, this is just clarification as to their allegations.  It's not asking for a recitation of all facts that would support what they contend.  And -- and to be fair to opposing counsel, the -- the chart does have this information as well.  So if we contain that information in this No. 2 --

THE COURT:  Yeah.  I mean, I'm looking at reason, misleading.

MR. ELLIOTT:  Yeah.  I'm looking at it now.  Yeah. That was my error, not thinking -- not recalling.  So if that stays in there, I think that satisfies No. 2 as well.

THE COURT:  All right.  And No. 9 is:  For each of the statements identified, please identify the manner in which such statement relates to defendant's "tone at the top" as lead plaintiff uses that term.

All right.  That's -- that is a contention interrogatory.  And that's not going -- I'm not going to go any

120

further with that one.

MR. ELLIOTT:  Okay.

THE COURT:  All right.  And then the other ones, the 45 days out -- so 3 to 7 -- I think No. 3 is answered in the chart.  Yes?  No.  Sort of.  Kind of.

The facts that would have been required to be disclosed in connection with each statement to render it not misleading.

Okay.  Now, that's a contention interrogatory.

MR. ELLIOTT:  To the extent that you consider these contention interrogatories, which is why I suggested we have this be responded to at the end of the discovery window -- I still have the 45 days because it would allow us to take these -- we'd still have, you know, a couple of days to think about whether there needed to be further discovery within, you know, a 30-day period before the end of the discovery period.

So to the extent Your Honor believes that some of these are contention interrogatories, we'd suggest at the appropriate time --

THE COURT:  But you think contention interrogatories are perfectly fine if they're at the end of discovery?  Do you think that's the reason why we prohibit them or don't like them?

MR. ELLIOTT:  I think that's the -- if I recall correctly, that's what -- even in opposing counsel's brief,

it's cited as a resolution for this type of interrogatory.

MR. KATHREIN:  We still think it's improper, Your Honor, and especially -- discovery is going --

THE COURT:  Well, if you -- did you propose it as a resolution?

MR. KATHREIN:  I think in there it was a suggestion if you're going to require us to answer contention interrogatories that it be at the end of discovery.

But right now -- I mean, they know the theories of the case.  They're going to know everything.  And for us to be essentially writing a reply to a motion for summary judgment ahead of -- ahead of their motion for summary judgment, I think, is unduly burdensome and I don't think it's proper under the Middle District rules.  And we would suggest they're unnecessary, they're just trying to throw burden on us.

THE COURT:  Well, I don't know if there's ill intent in asking these interrogatories, like that statement just suggested, just trying to throw a burden on you.  But I do agree with you that these -- these are contention interrogatories, for the most part.

But the bottom line is the plaintiff's going to provide this chart.  And I think the chart itself, and all the information it contains, will essentially get at all the information you need.  Beyond that, there's a lot of legal arguments that, as Mr. Kathrein suggested, can be hashed out at

summary judgment.

MR. ELLIOTT:  Understood.

THE COURT:  All right.  And I don't think requiring anything beyond this chart is going to help to narrow discovery in any way or help you with your case.

MR. ELLIOTT:  Thank you, Your Honor.

THE COURT:  Is that it from the defense?

MR. ELLIOTT:  Just clarifying that your order to produce the chart also applies as to Read and Cannito Interrogatory No. 1.

THE COURT:  Yes.  And they'll have to sign it to make it an appropriate answer to an interrogatory.

All right.  So pending before me is your motion.

MR. KATHREIN:  Correct.

THE COURT:  I've got to decide that.

MR. KATHREIN:  Correct.

THE COURT:  Is there a time that you need this decided by?  It's not going to --

MR. KATHREIN:  No.  No, there's not a time.  I mean, we -- this is going to -- no, there's not an upcoming deadline.

THE COURT:  I mean, you don't have an upcoming deposition scheduled --

MR. KATHREIN:  I'm not taking a deposition --

THE COURT:  -- or anything where you absolutely need a ruling on this?

MR. KATHREIN:  I'm not taking a deposition where I'm going to be putting it in front of -- a document in front of someone right now.

THE COURT:  All right.  The other thing I need to decide is your request for a log of communications with prospective class members, right?

MR. ELLIOTT:  Yes, Your Honor.

THE COURT:  The other thing that's going to happen is Mr. Kathrein is going to amend these discovery responses within 14 days.

MR. KATHREIN:  Correct.

THE COURT:  Okay.  What else needs to be decided -- done or decided?

MR. KATHREIN:  I think that's it, Your Honor.  May I ask a question unrelated?

THE COURT:  Sure.

MR. KATHREIN:  In the future, is it possible that we can have at least some of these, if we have future disputes, by Zoom?

THE COURT:  Because you're in California?

MR. KATHREIN:  And my associate's in Chicago.  And it -- you know, it took several days of -- of work just trying to get here and plan and everything.  I mean, I'm happy to come for big ones like this, but --

THE COURT:  Sure.

MR. KATHREIN:  -- if you want me here, I'll be here.

THE COURT:  No, not necessarily.  There were just -- there were a lot of motions going back and forth.  Sometimes when I set it in person it inspires the lawyers to resolve the issue.  That's one reason to have it in person.

One reason is because it could get you together -- you know, this is providing a time for you to meet in person --

MR. KATHREIN:  Right.

THE COURT:  -- face to face and simply talk about some of the issues.  Even when I leave the bench, I always encourage the lawyers in a civil case to stay in the courtroom and just chat about all of the issues that are out there, maybe even talk settlement if they want.

And then we have some judges who say if you file a case in our court, every motion in federal court is so important that you should come to court, just like the old days when you came to court.

I'm not that -- I'm not in that camp.  I understand -- because we're here for speedy, just, inexpensive resolution.  And making counsel travel from California doesn't really support that.

So most of the time I have discovery motions either by telephone -- I don't really like Zoom.  But I've been using telephone since before the pandemic for most discovery disputes if counsel is not in town, so counsel on both sides.  So that's

already my practice.

For this, there was just a lot out there.  It's a bigger case.  I kind of wanted the parties to get together in person.  I wanted to hear from them in person.  And so that's why I set this one in person.

MR. KATHREIN:  I -- I agree.  I wanted to be here, you know, face to face.

THE COURT:  You can drive down Philips Highway and see Redwire.  It's close.

MR. KATHREIN:  And take pictures.

THE COURT:  Where is it, Mr. Horovitz, about 15 minutes away?

MR. HOROVITZ:  (Inaudible.)

THE COURT:  That's true.  When is your flight?

MR. KATHREIN:  I am actually going to go down and visit my mother in Fort Myers.

THE COURT:  See, you're glad that I set this in person.  Your mother is thrilled that I set this in person.

In Fort Myers.

MR. KATHREIN:  In Fort Myers.  But I have two stops in between, my ex lead singer in my rock and roll band and my aunt, who is transitioning.

THE COURT:  Well, we can't let the ex rock and roll band go without -- without some sort of explanation.

MR. KATHREIN:  So this is -- thank you for making me

come out and seeing my mother and my friend.

THE COURT:  But you were a rock and roll --

MR. KATHREIN:  I was a drummer.

THE COURT:  You were the drummer.  Which band?

MR. KATHREIN:  Well, it was in high school.

THE COURT:  And the name of it?

MR. KATHREIN:  The Stowaways.

THE COURT:  The Stowaways.

Okay.  Can we find it on YouTube after --

MR. KATHREIN:  No, it was in the late '60s, and so...

THE COURT:  All right.  So you're going to visit aunt, mom, and the Stowaway band member.  So, again, you're glad that I called you here for this.

MR. KATHREIN:  Yes, I am.

THE COURT:  And then you're going back to Orlando tonight?

Okay.  So I'm going to let you guys go.  If you do want to stay in the courtroom and chat or do whatever you'd like, please do.  Otherwise I really appreciate you being here and presenting good arguments in both your briefing and in the courtroom.

So thank you.

MR. KATHREIN:  Thank you very much.

THE COURT:  Thank you, Mr. Horovitz.

(The digitally recorded proceedings concluded at

4:07 p.m.)

- - -

## CERTIFICATE

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.


        DATED this 7th day of April, 2024.



                s/Shannon M. Bishop

                Shannon M. Bishop, RDR, CRR, CRC