**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

|  |  |
|---|---|
| JED LEMEN, Individually and on Behalf of All Others Similarly Situated,<br>       Plaintiffs,<br>v.<br><br>REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ,<br>       Defendants. | Case No.: 3:21-CV-1254-TJC-PDB<br><br>CLASS ACTION<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

REDWIRE CORPORATION ("Redwire"), a Jacksonville, Florida based company, PETER CANNITO, and WILLIAM READ (together, "Defendants") oppose Lead Plaintiff Jared Thompson's ("LP") *Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel* (Doc. 85) ("Motion"). The Court must deny the motion as LP lacks standing, fails to satisfy Rule 23(b)(3)'s predominance requirement, and fails to satisfy Rule 23(a)'s typicality requirement. Class certification is improper as a matter of fact and law.

## INTRODUCTION

NASA Administrator and former U.S. Sen. Bill Nelson has touted Redwire's prominent work and presence in space development, making Jacksonville, Florida "the center for space technology." (**Ex. 1**). In February

2024, an American-made spacecraft landed on the Moon for the first time since 1972 equipped with Redwire designed and built components. (**Composite Ex. 2**). Redwire has evolved into a cutting-edge space exploration company whose technology powers missions to the International Space Station, Mars, distant asteroids, and, now, America's return to the Moon. (**Composite Ex. 3**, pp. 1-2, 4-7, 30, 70-74). Redwire recently announced it is expanding its focus on government work with a new facility, providing a "front door for the national security community." Ex. 3, p. 59. Redwire is led by CEO and former Marine Corps Officer, Peter Cannito—a seasoned government industry veteran with extensive executive management experience. *Id.*, pp. 61-63. Today, Redwire is an innovative growing company, pioneering America's development of a sustainable space infrastructure. *See generally id.*

This forward-looking company is now hindered by this meritless litigation. To date, Redwire has expended significant resources defending against this conjured up suit. Through the Motion, LP now asks the Court to greatly expand the scope of this litigation. In support of exponentially increasing case size, LP offers an off-the-shelf, generic, motion for class certification that fails to account for the nuances and particular circumstances here or support the extraordinary relief sought. Indeed, LP's expert (upon whose work the Motion rests) concedes that he spent no more than 22 hours on his analysis. *Dep. of Matthew Cain, Ph.D.*, March 15, 2024 ("Cain Tr.") (**Ex.**

4) at 30:14-31:3 (basis for 22-hour calculation).  Such "analysis" is unreliable and unhelpful to the Court as it fails to follow established academic standards.

Redwire *will* demonstrate that LP's claims lack merit[1] at the appropriate time. In the interim, the Court should deny the thinly supported request to expand this matter on a Motion that fails to carry its burden.

### FACTUAL BACKGROUND

Redwire results from a September 2, 2021 merger between a private entity ("Old Redwire") and public Genesis Park Acquisition Corp. ("GPAC").

GPAC was a special purpose acquisition company whose common stock traded on the New York Stock Exchange("NYSE") as GNPK.  *Expert Report of Andrew H. Roper* ("Roper Report") (**Ex. 5**), ¶¶ 31, 33.  From the start of trading until August 30, 2021 (two business days before merger approval), GNPK was supported by a redemption right that allowed shareholders to redeem individual shares for $10.15 at the time of a merger (the "Redemption Right"). *Id.*, ¶¶ 31-33, 35.  This provided GNPK shareholders with downside protection as regardless of stock price movement, investors could always exchange their shares at this price at the time of any merger.  *Id.*  Until the merger ("SPAC Period")[2], GNPK stock traded at or below $10.15 on 81 of 113 days.  *Id.*, ¶ 45. Post-merger, Redwire common stock traded as RDW. (GNPK, RDW, and

---

[1] Defendants dispute the allegations of the operative complaint, including the recitation of same in the Motion and expressly denies making any misrepresentations.
[2] Dates following the merger are referred to as the "de-SPAC Period".

associated options and warrants, together, "Class Securities.") *Id.*, ¶¶ 34-35. RDW had no redemption right. *Id.* ¶ 35. The GNPK Redemption Right made GNPK and RDW fundamentally different investments as the securities had different risk profiles, exhibited different levels of volatility, and public disclosures impacted the securities differently. *Id.* ¶¶ 37-40.

LP alleges Defendants made incomplete public statements throughout 2021; **Ex. 6** (LP index of alleged misstatements) (the "Alleged Misstatements"); and that the Alleged Misstatements caused the price of Class Securities to artificially inflate. First Am. Compl., ¶ 128 (Doc. 47) ("Compl."). LP further alleges that subsequent "corrective statements" removed price inflation from Class Securities on November 10 and 15, 2021 ("November Statements") and in March, April, and June 2022 (with the November Statements, the "Alleged Corrective Statements"). **Ex. 7** (LP index of alleged corrective disclosures).

## LEGAL STANDARD

Courts have broad discretion in certification determinations. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992). The presumption is ***against*** class certification as "class actions are an exception to our constitutional tradition of individual litigation." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016). The named plaintiff must have standing, and the putative class must meet each of the requirements in Rule 23(a), plus, at least one of the requirements in Rule 23(b);

4

*Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (quotation omitted); and, make such proof by a preponderance of the evidence. *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 662-63 (S.D. Fla. 2014).

## ARGUMENT

Class certification is improper as LP lacks standing, fails to satisfy Rule 23(b)(3)'s predominance requirement, and fails to satisfy Rule 23(a)'s typicality requirement.

## I.    LP LACKS STANDING

Certification is improper as LP lacks Article III and statutory standing.

Class certification analysis begins with a foundational assessment of standing. *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987). In the Eleventh Circuit, prior to class certification and before undertaking any analysis under Rule 23, the court "must determine that at least one named **class representative** has Article III standing to raise each class claim." *Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1262 (S.D. Fla. 2021) (citation and quotation omitted) (emphasis added). Absent establishing the required case or controversy between himself and the defendants, the named plaintiff cannot seek relief for anyone in the class—not for himself or any other class member. *Griffin*, 823 F.2d at 1483. Here, class certification is not proper as the only individual offered as a class representative (LP) lacks standing.

5

## A.    LP Did Not Suffer any Injury

LP lacks Article III standing because he is not injured in that he sold his Class Securities *before* Redwire "corrected" the Alleged Misstatements.

Article III standing requires an "injury-in-fact[.]" *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (citation omitted).  In 10(b) litigation, "an inflated purchase price alone is insufficient to plead loss causation..." *Luczak,* 548 F. Supp. 3d at 1264.  A shareholder must sell shares *after* a corrective statement to have any injury. The Supreme Court found that "if…the purchaser sells the shares…before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  That is the case here.

No truly corrective statement precedes LP's sale of securities. LP sold his Class Securities on December 30, 2021.  (Doc. 24-3); **Ex. 8** (Record of sale). Only the November Statements precede that date. Such statements; however, were not actually *corrective*[3] as "[a] corrective disclosure reveals to the market the falsity of a previous representation." *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013) (citations and quotations omitted).  The November Statements do not do this. Specifically, the Compl. states:

- On **November 10, 2021**, "Redwire announced that it would postpone the release of its third quarter earnings results. The Company disclosed that it 'was notified by an employee of

---

[3] A "corrective" statement "must at least relate back to the misrepresentation and not to some other negative information about the company." *Meyer*, 710 F.3d at 1197.

6

- potential accounting issues at a business subunit,' and the Audit committee was investigating the allegations." Compl. ¶ 15.
- On **November 15, 2021**, "Redwire stated that it could not timely file its quarterly report for the period ended September 30, 2021…" Compl. ¶ 17.

Neither of these statements reveal any falsity in the Alleged Misstatements as such Alleged Misstatements do not reference either the timing of disclosures or accounting practices in business sub-units. *See* **Ex. 6**. Thus, the November Statements are not *corrective* of anything in the Alleged Misstatements. *See Meyer*, 710 F.3d at 1197. Accordingly, the Alleged Misstatements did not injure LP. *See Dura*, 544 U.S. at 342; *Luczak,* 548 F. Supp. 3d at 1264.

*Luczak* is on-point. There, in denying certification, the court determined that lead plaintiff lacked standing because he sold his shares before any alleged corrective statement and; thus, could not "show that he suffered a concrete and actual injury…or the subsequent causal connection necessary to establish standing." 548 F. Supp. 3d at 1263-64.

LP never held Class Securities at the time of a corrective statement and has no standing to serve as a representative. As no other individual has moved to serve as representative, the Court must deny the Motion. *See id.* at 1264.

### B.  LP Did Not Purchase the Correct Security

LP lacks statutory standing as he did not purchase securities about which most of the Alleged Misstatements were made. To have standing, plaintiffs must "have bought or sold the security *about which* a misstatement

was made..." *In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d 71, 78 (S.D.N.Y. 2023) (*quoting Menora Mivtachim Insurance Ltd. v. Frutarom Industries Ltd.*, 54 F.4th 82, 86 (2d Cir. 2022)) (emphasis in original).  Here, almost all of the Alleged Misstatements relate to pre-merger securities; *see* **Ex. 6** (All but three statements pre-date the creation of RDW); yet, LP only purchased *post-merger* RDW.  (Doc. 24-3); **Ex. 9** (Purchase record).  In *CarLotz* (also a de-SPAC merger), the court ruled that plaintiffs lacked standing as they did not purchase securities[4] from the pre-merger entity about which the misstatements were made.  667 F. Supp. 3d at 78-79.  Similarly, here LP lacks standing as to Alleged Misstatements made prior to the creation of RDW, the only stock he owned.  *Id.*

The Motion is improper as LP lacks both Article III and statutory standing.[5] Such threshold failures alone warrant denial.

## II.   **LP DOES NOT SATISFY RULE 23(b)(3)**

LP fails to satisfy Rule 23(b)(3) as the Motion does not demonstrate that common questions predominate over individual questions.

Under Rule 23(b)(3), the Court must find that "questions of law or fact common to class members predominate over any questions affecting only

---

[4] Rejecting argument that the entities were the same: "Plaintiffs provide no explanation as to why, as a legal matter, the post-merger entity can be considered interchangeable with the pre-merger, privately held company." *CarLotz*, 667 F. Supp. 3d at 78.
[5] LP also fails to satisfy the typicality requirement due to his lack of standing. *See infra* § III.

individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Supreme Court stated that as this part of Rule 23(b) is "an adventuresome innovation…designed for situations in which class-action treatment is not as clearly called for[;]" it is "the court's duty to take a 'close look' at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (internal quotations omitted). Here, such a "close look" reveals that class treatment is *not* warranted.

A movant must "show that issues subject to generalized proof, which are applicable to the putative class members equally, predominate over issues requiring individualized evidence." *Aranaz*, 302 F.R.D. at 666. This requires consideration of the elements of the operative cause of action so that the Court may determine the feasibility of proving those elements on common evidence. *Id.* at 666-67 ("Because predominance turns on the nature of the legal and factual issues presented, an understanding of the underlying claims and the types of evidence they require is essential."). The elements of LP's 10(b) claim[6] are "(1) a material misrepresentation (or omission)…; (2) scienter…; (3) a

---

[6] LP's second claim under §20(A); *see* Compl., ¶¶142-147; requires proof that "the defendant: (1) had the power to control the general affairs of the entity primarily liable for securities fraud at the time of the violation; and (2) had the power to control or influence the specific corporate policy that resulted in primary liability." *Aranaz*, 302 F.R.D. at 667. This claim is, thus, dependent on proof of the underlying 10(b) claim. *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1189-90 (S.D. Fla. 2005).

connection with the purchase or sale of a security…; (4) reliance…; (5) economic loss…; [and] (6) 'loss causation'…" *Dura Pharms.*, 544 U.S. at 341-42.

Here, common issues do not predominate. As to the 10(b) claim, LP fails to demonstrate that: (A) **reliance** is provable on a class-wide rather than individual basis, and (B) **damages are measurable** through a methodology common to the entire class. Thus, LP fails to satisfy Rule 23(b)(3).

### A.   <u>LP Fails to Show Reliance is Provable Class-Wide</u>

LP does not demonstrate a means to prove reliance on a class-wide basis. First, the fraud-on-the-market presumption of class-wide reliance articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) [7] does not apply because LP fails to establish that the Class Securities traded in an efficient market. Second, the nature of LP's allegations precludes application of a class-wide presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). Finally, even if LP could demonstrate market efficiency to trigger *Basic*, which he has not, Redwire can rebut that presumption by showing the Alleged Misstatements had no impact on the price of Class Securities.

### 1.   The *Basic* Presumption is Inapplicable

LP fails to show that GNPK and RDW (and associated options and warrants) traded in an efficient market to justify application of *Basic*.

---

[7] In *Basic*, the Supreme Court determined that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations" may be presumed for purposes of Rule 10b–5.  485 U.S. at 247.

A plaintiff must meet certain requirements[8] including "that the stock **traded in an efficient market**" to apply the *Basic* presumption. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) (emphasis added); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*"). Shareholders are not entitled to the presumption simply through "purchase of stocks at a price set by the market…" *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1255 (11th Cir. 2014). The Eleventh Circuit has not adopted formal standards to find market efficiency. *Id.* at 1255. Instead, courts should "consider the nature of the market on a case-by-case basis to decide whether the totality of the circumstances supports a finding of market efficiency." *Id.*

Nevertheless, the Eleventh Circuit has cited the five factors[9] articulated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), as useful in assessing market efficiency. *Regions*, 762 F.3d at 1255-56 (acknowledging that "many" circuits apply the *Cammer* factors). Moreover, academic research finds that

---

[8] In full, the requirements to trigger the *Basic* presumption also include "that the alleged misrepresentation was publicly known" and "that it was material." *Goldman Sachs.*, 594 U.S. at 118; *see also Halliburton II*, 573 U.S. at 268. Materiality is reserved for consideration after class certification. At this procedural juncture, Redwire challenges only market efficiency.

[9] "The *Cammer* factors are: "(1) high average trading volume during the class period; (2) a significant number of analysts following the stock; (3) numerous market makers who react quickly to, and trade based upon, new information about the company; (4) entitlement to file a Securities and Exchange Commission (SEC) Form S–3, which has minimum stock and trading requirements; and (5) empirical facts showing a cause and effect relationship between unexpected corporate events and an immediate response in the stock price." *Thorpe v. Walter Inv. Mgmt., Corp.,* No. 1:14-CV-20880-UU, 2016 WL 4006661, *12 (S.D. Fla. Mar. 16, 2016).

11

certain *Cammer* factors (Nos. 1, 2, and 5) do discriminate between efficient and inefficient stock price adjustments.  Roper Report, ¶¶ 84, 102; *id.*, p. 42, Figure 5.  Notably, the fifth *Cammer* factor "has been considered 'the most important *Cammer* factor'."  *In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 673 (N.D. Ga. 2009) (*quoting Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207 (2d Cir. 2008)).  *Cammer* itself noted that this factor captures "the essence of an efficient market and the foundation for the fraud on the market theory."  711 F. Supp. at 1287.  This factor relies on "[e]mpirical evidence suggesting a causal connection between new information and price movement[;]"  *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009); which is often demonstrated by an event study.[10]  *Halliburton II*, 573 U.S. at 280.  The remaining *Cammer* factors offer only "**circumstantial** evidence that a security's market is conducive to efficiency…."  *In re Countrywide Fin*, 273 F.R.D. at 614 (emphasis added).

Beyond *Cammer*, other factors cited in the Motion are of limited value.  Certain courts consider factors[11] enumerated in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).  The Eleventh Circuit; however, does not regularly

---

[10] Event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280.

[11] These are: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the "float")." *Krogman*, 202 F.R.D. at 474.

use or rely on them.[12]  Indeed, none of the *Krogman* factors are supported by academic research to reliably discriminate between an efficient and inefficient market.  Roper Report[13], n. 88; *id.*, p. 42, Figure 5.  The Motion also references four additional factors (listing on the NYSE, institutional ownership, autocorrelation, and active options trading); Mot., pp. 16, 20-21; however, there is no research to support these first three factors as indicative of market efficiency.  Roper Report, ¶¶ 71, 73-76, 81; *id.*, p. 42, Figure 5.

Here, LP fails to demonstrate that the above factors (considering their relative weight) show that Class Securities traded in an efficient market to support application of the *Basic* presumption. Specifically, (a) the Motion concedes that the fourth *Cammer* factor does not support a finding of market efficiency; (b) the Motion relies heavily on Dr. Matthew D. Cain, Ph.D.'s fatally flawed expert report (Doc. 86-1) (the "Cain Report"), rendering the Motion without reliable support on central issues, and (c) the Motion's remaining argument is, on its own, insufficient to justify market efficiency. LP's market

---

[12] In the roughly twenty-two years following *Krogman*, the Eleventh Circuit has never recognized *Krogman*, and the *Krogman* factors have only been considered by trial courts in this circuit six times.  *See Stanaford v. Genovese*, No. 13-CV-80923, 2016 WL 4198146, at *7 (S.D. Fla. Mar. 14, 2016) (assessing the "traditional" *Cammer* factors, but also considering the *Krogman* factors); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 498 (S.D. Fla. 2003); *S.E.C. v. Gane*, No. 03-61553-CIV-SEITZ, 2005 WL 90154, at *13 (S.D. Fla. Jan. 4, 2005); *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 383 (N.D. Ga. 2019); *In re Netbank*, 259 F.R.D. at 669; *Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*, No. 4:20-CV-00005-VMC, 2022 WL 17920570, at *9 n.2 (N.D. Ga. Nov. 28, 2022).

[13] Roper refers to the three *Krogman* factors (market capitalization, bid-ask spread, and public float) as "Additional Factors" 1-3, respectively.  *See* Roper Report, p. 42, Figure 5.

efficiency arguments fall flat.

### a. The Motion Concedes *Cammer* Factor Four

The Motion concedes that the fourth *Cammer* factor (S-3 Form Eligibility) does not support market efficiency stating that "this factor neither supports nor disputes market efficiency in light of the guidance in *Cammer*." Mot., p. 22. As LP is the party with the burden of proof; *Halliburton II*, 573 U.S. at 276; this neutral factor favors Defendants.

### b. The Motion Relies on a Deficient Expert Report

The Motion relies exclusively on the Cain Report for the lion's share of its arguments. The Cain Report is, however, unreliable for a myriad of reasons, including its overall divergence from established academic standards, failing to lend any support for its claim of market efficiency.

#### i. Dr. Cain's Failure to Conduct a Reliable Event Study to Analyze *Cammer* Factor Five is Fatal

Dr. Cain does not conduct a reliable event study measuring the cause and effect relationship between *unexpected corporate events* and an *ordered response in the stock price* consistent with an efficient market. He does not (i) adequately select dates for study, (ii) develop a testable hypothesis as to whether and in what direction stock prices would adjust as expected on the selected dates, or (iii) develop a proper regression model. The Motion is left without support for the fifth—and most important—*Cammer* factor.

**First**, the Cain Report relies on a subjective and deficient selection of

14

events for analysis in his "study." An adequate event study, to determine the cause and effect of new and unexpected information, requires a researcher to first identify well-defined events containing *new and unexpected* information using objective protocols for analysis.  Roper Report, ¶¶ 104-121.  Here, Dr. Cain does not (i) identify dates that contain new and unexpected information; *id.*, ¶¶ 142-43; or (ii) use an objective protocol to identify his events, introducing subjectivity into his own results.  *Id.*, ¶ 144.

Dr. Cain ignores the critical inquiry of whether his selected dates contained new and unexpected information, undermining the very purpose of the event study. The central purpose of the study[14] is to show a "cause and effect relationship between <u>unexpected</u> corporate events and an immediate response in the stock price."  *Cammer*, 711 F. Supp. at 1286-87 (emphasis added).  Dr. Cain himself acknowledges this principle.  *See* Cain Tr. at 87:9-13 ("What is ultimately the goal and what I'm looking for is just evidence from a statistical testing standpoint of whether the stock price reacts to disclosures of <u>new</u> information." (emphasis added)).

It thus follows that conducting a reliable event study requires identification of the new and unexpected information being studied.  Roper

---

[14] The purpose of an event study is to measure the market's reaction to <u>new</u> and <u>unexpected</u> information.  *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 721 n. 18 (11th Cir. 2012); *see also United States v. Schiff*, 538 F. Supp. 2d 818 (D.N.J. 2008), *aff'd*, 602 F.3d 152 (3d Cir. 2010) ("An event study methodology can only measure the impact of new and unexpected information on stock prices." (citation omitted)).

Report, ¶¶ 104-21.  Dr. Cain's "study" is rendered unreliable by failing to

identify new and unexpected information as the methodology of a reliable event

study *presumes* such identification of new and unexpected information:

> When significant <u>new</u> information about the company…is
> disclosed to the market, the market model is used to determine the
> component of the stock return that would be expected based on the
> return of the overall market and industry. The remaining
> component of the stock return (that which cannot be explained by
> the return on the market and industry) is attributed to the <u>new</u>
> company-specific information or to chance. If the disclosure of the
> new information is accompanied by a stock return that is outside
> of the stock's normal volatility range (as measured by the market
> model), then the return is said to be 'statistically significant.'"

*Hubbard*, 688 F.3d at 721 n. 18 (citing Frank Torchio, *Proper Event Study*

*Analysis in Securities Litigation*, 35 J. Corp. L. 159, 160–61 (2009)) (emphasis

added).

Relatedly, a reliable event study should also seek to avoid analysis of

days involving information that is already known to the market:

> In conducting an event study, the economic expert must always be
> concerned with circumstances in which the information being
> studied is already in the marketplace. As discussed previously, a
> predicate of an event study is that the information being studied
> is new to the marketplace. Consequently, care must be taken when
> conducting an event study of an alleged misrepresentation to
> ensure that the misrepresented information does not merely
> confirm or coincide with prior market expectations. This is because
> significant stock price reactions are not expected in an efficient
> market when alleged misstatements merely confirm the market's
> prior expectations.

16

Torchio[15], *Proper Event Study Analysis*, 35 J. Corp. L. at 164.    When researchers "fail to identify *which news is relevant* that could *cause investors to change their expectations about the value of a firm*, they fail to identify well-defined events." Roper Report, ¶ 117 (emphasis in original).    Dr. Cain's admitted failure to complete this step; Cain Tr. at 156:13-17, 155:20-23; renders the event study unreliable on its face.

Further, Dr. Cain does not implement an objective protocol for the selection of dates to study. The Cain Report states that the days he selected include news related to (1) "key" communications regarding the GPAC/Redwire merger, (2) "key" communications regarding the delay of SEC filings, and (3) quarterly earnings announcements.  Cain Report, ¶ 76.  However, he does not implement an objective protocol to assist in the reliable identification of information events that fall within those categories.  Roper Report, ¶¶ 145-47. Instead, Dr. Cain inexplicably chooses some dates that fall within those categories and excludes others. *Id.*, ¶¶ 144, 149-53.  The result is a report ripe for bias and suggestive of improper advocacy as it under-includes and over-includes dates for study. *Id.*

**Second**, Dr. Cain fails to identify a "testable hypotheses pertaining to whether and in what direction stock prices would adjust as expected under

---

[15] The Cain Report relies on materials published by Torchio.  Cain Report, ¶ 16, n. 40.

17

market efficiency[,]" precluding him from determining that stock movement is indicative of market efficiency. *Id.*, ¶ 155. Dr. Cain concedes that he did not create a hypothesis as to the direction of the market after the arbitrarily selected[16] dates. Cain Tr. at 114:24-115:15. A proper event study, unlike Dr. Cain's, requires specificity as to "whether the unexpected new information is expected to cause prices to increase, decrease, or stay the same." Roper Report, ¶ 123. Such directional hypothesis allows the researcher to "know whether a stock price change that goes up is consistent with market efficiency," as price movement in the opposite direction indicates inefficiency. *Id.*, ¶ 131.

Absent such hypothesis, Dr. Cain does not answer the relevant question of whether the change was *efficient*. Instead, he tests *volatility* which only shows whether Class Securities changed price on the selected days. Dr. Cain merely records when a stock price changed, and then concludes, without a proper analysis, that a change shows efficiency, regardless of whether that change is consistent with market efficiency or not. *Id.*, ¶¶ 157-58. Missing from his analysis is consideration of whether any observed price changes were in the direction supportive of efficiency.[17] Thus, Dr. Cain prematurely makes his conclusions on efficiency without engaging in the necessary analysis

---

[16] Failure to determine whether selected events had new and unexpected information precludes hypothesizing about the expected direction of the stock price. Roper Report, ¶ 131.

[17] Dr. Roper notes that there were days immediately after the start of RDW's trading with dramatic price increases despite no new information. Roper Report, ¶¶ 175-83. A proper event study would identify those dates as indicative of market *inefficiency*.

preceding such determination.

**Third**, Dr. Cain also uses incorrect benchmarks in his regression model to measure the "effect" of his arbitrarily selected news days. In a proper event study, "[r]esearchers commonly rely on statistical regression models…to filter changes in stock prices" to create a "yardstick to measure the typical day to day volatility in stock price changes in order to objectively define a benchmark to assess when these abnormal stock price changes are large relative to what usually happens." *Id.*, ¶¶ 133, 134.

Dr. Cain overestimates the market reaction on certain dates because he incorrectly relies on data from the SPAC Period to assess the de-SPAC Period. He estimates his regression on a "'rolling' basis, whereby each day's estimates are predicted using data from the previous 120 trading days." *Id.*, ¶ 162. This considers data from the SPAC Period when assessing movements in the de-SPAC Period. *Id.* Thus, "he uses GNPK stock price data from the SPAC Period to predict how RDW stock prices would be expected to change." *Id.* The two securities; however, are fundamentally different[18] as "GNPK stock price behaved differently than RDW…." *Id.*, ¶ 167. Dr. Cain's rolling regression model ignores such differences. *Id.*, ¶¶ 162 -167. Use of GNPK data to predict

---

[18] The change from GNPK to RDW represents a "structural break;" Roper Report, ¶¶ 135, 167; meaning "[t]he relationship between the stock price and the market—which is used to calibrate the 'yardstick' described above—…change[s] over time." *Id.*, ¶ 135. Here, the time period of change did not "occur gradually over time," but at merger closing. *Id.*, ¶ 38.

RDW stock price movement is scientifically unreliable, resulting in an overestimation of the significance in market reaction on his studied dates. *Id.*

Ultimately, the Cain Report cannot perform a reliable analysis of the cause and effect between company news and the stock price. At best, the Cain Report tests for "share price reactivity, rather than an efficient adjustment of prices to new information…." *Id.*, ¶ 172. Dr. Cain cannot distinguish between price movements reflective of an efficient market and those that show inefficiency. *Id.* Under his study, any price movement is a sign of efficiency, and he is blind to signs of inefficiency. *Id.* at ¶¶ 170-73. This is not a proper analysis. *Id.* Nor is it hypothetical, as correcting for as many of Dr. Cain's errors as possible and then re-testing for efficiency shows that the market reaction on certain studied days suggests _inefficiency_ where Dr. Cain improperly concludes the opposite. *Id.* at ¶¶ 174-83. As the Cain Report is the *only* means by which LP attempts to show cause and effect for purposes of the fifth *Cammer* factor, the Motion lacks reliable support to satisfy the **most important** of the factors assessing market efficiency.

ii.      Dr. Cain Misapplies the Remaining Factors

Dr. Cain improperly analyzes the remaining factors in the Cain Report.

***Cammer* Factor 1**: Dr. Cain's method of computing average weekly trading volume diverges from the field. *Id.*, ¶ 85. Specifically, the applicable academic paper (Barber (1991)) measures trading volume "using a value

20

weighted average sum of shares over 40 days[.]" *Id.*, ¶ 85 n.93.  Instead, Dr. Cain "measures trading volume as the equal weighted average across the sum of shares traded over 5-day periods." *Id.*

Dr. Cain also ignores that a security may have a high trading volume even when trading in an *inefficient* market; *id.*, ¶ 84 n.92; diminishing the probative value of this factor. Instead, a properly conducted event study under the fifth *Cammer* factor is more instructive of market efficiency. As discussed above, Dr. Cain does not adequately conduct such analysis. *Supra*, § II.A.1.b.i.

**_Cammer_ Factor 2**: Dr. Cain does not properly assess analyst coverage as to market efficiency as he fails to follow applicable academic standards for identifying relevant coverage and admits that he neglects to determine if identified reports serve their expected market efficiency role. Dr. Cain overstates the number of analyst reports, claiming that he identifies "8 reports issued by analysts at 3 separate firms" during the Class Period.  Cain Report, ¶ 44.  At best, there is *one* such analyst for a mere *portion* of the Class Period.

Dr. Cain correctly identifies the relevant parameter for identifying analyst coverage; but, fails to follow it. As described in cited studies[19], an analyst counts as covering a company for market efficiency purposes if the analyst makes earnings forecast.  Roper Report, ¶¶ 88-90.  Dr. Cain's

---

[19] Studies by Simona Mola, P. Raghavendra Rau and Ajay Khoran (the "MRK Study"); Charles M.C. Lee and Eric So (the "Lee So Study"); and Bharat Bhole, Sumita Surana, and Frank Torchio (the "Bhole Study").

identification of analyst coverage does not meet this standard. Specifically, two of the analysts (Validea[20] and ValuEngine) never issued earnings forecast during the Class Period. Roper Report, ¶ 91. By including these analysts, Dr. Cain "subjectively chooses how to count analyst coverage. He does not count following the commonly used methods described in his sources." *Id.*

The only analyst that Dr. Cain cites that included earnings forecasts was Jefferies. Jefferies did not issue its first report until September 21, 2021 (after the merger) meaning that there is no analyst report covering GNPK and no analyst coverage at all for roughly 50% of the Class Period trading days. *Id.*, ¶ 94. Case law suggests that this is not enough coverage for this factor to weigh in favor of market efficiency. *See Cheney*, 213 F.R.D. at 499 (finding that "the existence of two (2) analysts does not heavily favor a finding of efficiency.").

Moreover, Dr. Cain concedes he does not analyze his identified analysts to determine if their actions were suggestive of market efficiency by providing new and unexpected information to the market. Cain Tr. at 202:13-17; 212:20-21. Dr. Cain agrees that analyst coverage can be indicative of market efficiency as a means to transmit unexpected new information to the market. Cain Report, ¶ 43 ("Analyst coverage can be indicative of market efficiency since research analysts ensure that <u>new</u> important company-specific information is

---

[20] The May 28, 2021 Validea report, issued after the GPAC merger announcement, did not inform investors of the transaction or mention "Redwire." Roper Report, ¶ 93; *id.* at A.5.

disseminated to investors and thus impounded into stock prices quickly and efficiently.") (emphasis added).  Yet, he concedes[21] that he did not review his selected reports for unexpected new information. Cain Tr. at 202:13-17; 212:20-21. Thus, he cannot know whether or not these reports disseminated to investors important, new publicly available information.  Roper Report, ¶ 92.

Dr. Cain's analysis of the second *Cammer* factor does not comply with applicable standards and ignores the underlying policy reasons for examination of analyst coverage. His analysis does not support efficiency.

***Cammer* Factor 3**: Dr. Cain fails to consider necessary detail in regard to the third *Cammer* factor rendering his identification of market makers meaningless.

"[A] number of courts have acknowledged a growing concern that **the mere number of market makers, without further analysis**, has little to do with market efficiency."  *In re Netbank*, 259 F.R.D. at 671 (internal quotation omitted) (emphasis added).  In addition to identifying the number of market makers, courts ask experts to "provide…additional information, such as (1) the volume of shares these market makers committed to trade; (2) the volume of shares they actually traded; or (3) the prices of these traded shares."

---

[21] When pressed on this deficiency, Dr. Cain claimed without support that analyst reports do not need to contain new information in order to be relevant to the efficiency analysis.  Cain Tr. at 206:10-20.  Dr. Cain could not harmonize the obvious tension between that statement and what he wrote in the Cain Report. *See* Cain Report, ¶ 43.

*Id.* In *Netbank*, the court concluded that "[b]ecause the number of market makers alone is of limited usefulness in determining market efficiency…this factor is of little help to the inquiry, and…does not weigh in favor of market efficiency." *Id.* Indeed, academic research shows that "the number of market makers…do[es] not allow researchers to reliably discriminate between efficient and inefficient adjustments in stock prices." Roper Report, ¶ 81.

Here, Dr. Cain's analysis is similarly deficient. He states the number of market makers present without consideration of the additional data or economic analysis that the Court in *Netbank* found necessary. Cain Report, ¶¶ 50-52, 54. The Motion also fails to provide the necessary detail. Mot. pp. 17-18. In light of the judicial and academic concerns as to the relevance of the mere number of market makers, this factor does not weigh in favor of market efficiency.

***Krogman* and Additional Factors 4 & 6:** Dr. Cain does not engage in any *expert* analysis as to the *Krogman* factors (market capitalization, bid-ask spread, and public float) and his Additional Factors Nos. 4 (institutional ownership) and 6 (active trading options). Instead, he simply "count[s] and compare[s] various assessments of market structure" outside of accepted economic principles, not citing any peer-reviewed literature to support his rote application of such factors to an efficiency analysis. Roper Report, ¶¶ 80-83.

As to each of these factors, "neither Dr. Cain, nor [Dr. Roper] have

24

identified any research paper documenting that counting or comparing [as to these factors] …can reliably allow a researcher to discriminate between an efficient and inefficient adjustment in prices." *Id.*, ¶ 81. Indeed, research shows that market capitalization, bid-ask spread, and institutional ownership do not allow researchers to reliably "discriminate between efficient and inefficient adjustments" in stock prices. *Id.* Moreover, neither the Cain Report nor the Motion acknowledge the relative weight of the *Cammer* factors over those in *Krogman* or otherwise identified. *See supra*, § II.A.1.

As to Additional Factor No. 6 (active trading options), while such factor may be indicative of efficiency, Dr. Cain does not conduct a sufficient analysis. He merely identifies the existence of options trading, without examining whether such counting "demonstrate[s] the efficient adjustment of price in this matter." Roper Report, ¶ 81. He cannot show that the existence of options trading performs the "price arbitrage function indicated by the literature." *Id.*

Dr. Cain's opinions on the *Krogman* and Additional Factors 4 and 6 are not derived from economics and these factors should be given little, if any, weight. *Id.*, ¶ 82.

**Additional Factor No. 5:** Dr. Cain's autocorrelation analysis tests the wrong information. Such analyses "assess whether a stock trades in a ***weak*** form efficient market." *Id.* ¶ 83 (emphasis original). Prices in such markets "reflect any value relevant information in past prices." *Id.* Here, however, the

actual question is "whether stock prices fully reflect any value relevant information **found in public disclosures**." *Id.* (emphasis added).  Thus, any test of autocorrelation fails to "provide reliable economic evidence of whether stock prices fully reflect public information…" *Id.*  This is the wrong test to answer the relevant inquiry. The Court should ignore this argument in full.

iii. <u>The Cain Report Does Not Independently Review Options and Warrants</u>

Dr. Cain fails to show efficiency of the market for options and warrants. First, the Cain Report relies on the efficiency of the common stock to show efficiency for options and warrants.  Cain Report §VI.F, p. 49.  As Dr. Cain fails to establish efficiency as to the common stock, *see supra*, § II.A.1.b.i-ii, this argument fails.  Second, "Dr. Cain's price comparison exercise is not a reliable substitute for conducting a reliable event study for the warrants or options at issue..." Roper Report, ¶ 61.  Dr. Cain should have conducted an independent analysis of each option and warrant at issue. He did not. The Motion fails to support that the options and warrants traded in an efficient market.

**c. The Motion's Remaining Argument, Not Reliant on Dr. Cain, Does Not Support Market Efficiency**

The Motion's remaining argument, not reliant on the Cain Report, does not independently support market efficiency.

While the Motion claims that listing on the NYSE supports efficiency; Mot., p. 1; the Eleventh Circuit has rejected that such listing is a *per se*

26

indicator of efficiency. *Regions*, 762 F.3d at 1257 ("[W]e share Regions's resistance to a *per se* rule of market efficiency for all stocks that trade on a national exchange, without regard for the particular characteristics of that stock."). Also, academic literature has moved on from the idea that merely being a publicly traded security suggests efficiency. *See* Roper Report, ¶¶ 71, 73-76. Finally, trading on the NYSE does not cure LP's failure to show other key indicators of market efficiency. *See Cunha v. Hansen Nat. Corp.*, No. EDCV 08-1249-GW(JCX), 2013 WL 12124073, at *7-8 (C.D. Cal. June 20, 2013) (denying class certification even though securities at issue traded on the NASDAQ, as plaintiff could not demonstrate market efficiency under the *Cammer* factors). As numerous factors that LP relies on do not weigh in favor of market efficiency, trading on the NYSE is not enough to find efficiency.

The Motion does not meet its burden of demonstrating market efficiency. Thus, the *Basic* presumption is inapplicable.

### 2.    No Presumption of Reliance under *Affiliated Ute*

Nor can LP satisfy Rule 23(b)(3) through a presumption of reliance under *Affiliated Ute* in light of the allegations here. That decision permits a presumption of reliance in cases "involving primarily a failure to disclose in which defendants who had an affirmative duty to disclose stood mute, leaving plaintiffs absolutely nothing upon which to rely." *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 755 (11th Cir. 1984). It does not apply to "half-truths

and misstatements whose only omission is the truth that the statement misrepresents…" *In re Jan. 2021 Short Squeeze Trading Litig.*, No. 21-2989-MDL, 2023 WL 9035671, at *25 (S.D. Fla. Nov. 13, 2023) (internal citation omitted).   Here, LP asserts that all of the Alleged Misstatements are "incomplete half truth[s]." **Ex. 6**.  Thus, *Affiliated Ute* is inapplicable.  *See In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 9035671 at *25.

### 3.   *Basic* **Presumption Rebutted By Lack of Price Impact**

Redwire can rebut the *Basic* presumption, even if initially applicable, as the Alleged Misstatements had *no price impact* on Class Securities.

A defendant may <u>rebut</u> the *Basic* presumption by "show[ing] that the misrepresentation in fact did not lead to a distortion of price," *i.e.*, that it had no price impact.  *Basic*, 485 U.S. at 248; *see also Halliburton II*, 573 U.S. at 279 (*Basic* presumption rebuttable at class certification "by showing … that the particular misrepresentation at issue did not affect the stock's market price."). Here, the fundamental premise[22] of *Basic's* presumption (misrepresentations are reflected in market price) is inherently missing as the Redemption Right demonstrates a lack of price impact.

---

[22] In an efficient market, the "market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price."  *Basic*, 485 U.S. at 244 (quotation omitted). Thus, that a "misrepresentation was reflected in the market price at the time of the transaction—that it had price impact—is Basic's fundamental premise." *Halliburton II*, 573 U.S. at 283 (quotations omitted).

Here, when GNPK traded at or below the $10.15 Redemption Right there was *no inflation* in that security as the Redemption Right alone justified the stock price. The GNPK stock price was at or below $10.15 on 81 out of 113 days of the SPAC Period. Roper Report, ¶ 45. Whenever GNPK traded at or below $10.15, the share price reflected its cash redemption value regardless of the veracity of LP's allegations. *Id.*, ¶ 42. In these instances, "*GNPK share price would have been the same regardless of whether investors learned the alleged truth or not.*" *Id.*, ¶ 44 (emphasis added). There were many instances during the SPAC Period where, following certain Alleged Misstatements, GNPK stock nevertheless traded at or below the Redemption Right. *Id.*, ¶¶ 45-52. Thus, it can be "reasonably conclude[d] based on reliable economic analysis that this share price was not impacted by any of the alleged prior misrepresentations regardless of whether the market was efficient[;]" *id.*, ¶ 44; cutting the "link between the alleged misrepresentation and ... the price received (or paid) by the plaintiff[.]" *Basic*, 485 U.S. at 248; Roper Report, ¶ 47.

Further, the lack of measurable price impact in the GNPK securities market carries over to RDW. As late as September 1, 2021 GNPK's price was $10.03. Roper Report, ¶ 53. Thus, when RDW began trading after the close of trading on September 2, 2021 it could not have inherited any inflation caused by Alleged Misstatements made prior to September 1. *Id.* Additionally, immediately following the start of RDW's trading, the stock price changed

29

dramatically despite the lack of any new unexpected information suggesting *inefficiency* precluding the digestion of prior Alleged Misstatements into RDW's share price.[23]  *Id.*, ¶¶ 54, 178-82.

Even if the Court finds market efficiency,[24] Redwire rebuts the *Basic* presumption because there was no measurable price impact.

### 4.    Individual Issues of Reliance Dominate

LP cannot demonstrate class-wide proof of reliance because the Motion does not satisfy the requirements for application of presumptions under *Basic* or *Affiliated Ute*.  *See supra*, §§ II.A.1-2.  Even if the Court determined that LP met his burden as to *Basic,* such presumption is rebutted by the showing that the Alleged Misstatements had no price impact.  *See supra*, § II.A.3.  Absent such presumptions, class-wide proof of reliance is impossible. "[E]ach plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." *Halliburton II*, 573 U.S. at 281–82.  Individualized issues of reliance defeat predominance and "'preclude certification' of a securities-fraud class action." *Goldman Sachs*,

---

[23] LP cannot argue that inflation suddenly materialized when RDW began trading.

[24] GNPK's stock price trading at or below $10.15 reveals inefficiency.  Under *Basic,* where the "value of the stock is worth the market price," 485 U.S. at 244, GNPK's market price should not have gone below $10.15, because the value of GNPK securities could not fall below $10.15.  Roper Report, ¶ 42.  GNPK's stock price traded at or below $10.15 for 81 out of the 113 days (72%) it traded during the Class Period, *id.*, ¶ 45, showing GNPK shares were not impacted by the Alleged Misstatements, rendering *Basic* inapplicable.  *Id.*, ¶¶ 44-45, 47, 54.

594 U.S. at 119.[25]  Certification is improper here.

### B.   <u>Failure to Establish a Class-Wide Measurement of Damages</u>

The lack of measurable inflation in Class Securities prevents LP from establishing that damages are measurable on a class-wide basis. Accordingly, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34.

Neither the Motion nor the Cain Report show how damages can be measured for all class members using their preferred generic "out-of-pocket" method in the absence of measurable inflation.  Mot., p. 28; Cain Report, ¶ 127.

In a typical 10(b) case, unlike here, the "out-of-pocket" approach may work. But, key nuances preclude rote application. Traditionally, "[u]nder the out-of-pocket loss rule, the plaintiff can recover the difference between the price paid and the 'real' value of the security, i.e., the fair market value absent the misrepresentations, at the time of the initial purchase by the defrauded buyer." *Trondheim Cap. Partners, LP v. Life Ins. Co. of Alabama*, 505 F. Supp. 3d 1213, 1230 (N.D. Ala. 2020).  This approach "measure[s] how much the defendants' fraud inflates the value of the subject securities." *HCM High Yield*

---

[25] Determination that individual issues of reliance predominate also warrants a finding that LP fails to satisfy the Rule 23(b)(3)'s superiority requirement.  *In re Genesisintermedia, Inc. Sec. Litig.*, No. CV 01-9024-SVW VBKX, 2007 WL 1953475, at *14 (C.D. Cal. June 28, 2007), *aff'd sub nom. Desai v. Deutsche Bank Sec. Ltd.,* 573 F.3d 931 (9th Cir. 2009) (internal quotation omitted).  "A class action is not a superior method of resolving a securities fraud action where individual issues of reliance predominate any common issues." *Id.*

*Opportunity Fund, LP v. Skandinaviska Enskilda Banken AB*, No. 99-1350-CIV, 2001 WL 36186526, at *15 (S.D. Fla. Dec. 14, 2001).  Dr. Cain describes the approach as a means to "calculate[] damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale."  Cain Report, ¶ 127.

Here, the application of the "out-of-pocket" approach falls short as Dr. Cain cannot account for the inability to calculate inflation for large portions of the Class Period.  *See supra*, § II.A.3.  The presence of the Redemption Right[26] and the fact that GNPK securities traded at or below $10.15 for 72% of the pre-merger Class Period means that there was no measurable price impact (inflation) during that time, or during the time that the RDW securities were trading during the post-merger Class Period.  *See supra*, § II.A.3.

To use the out-of-pocket methodology, Dr. Cain would need to quantify the amount of inflation through an event study, which he cannot do, and then "tak[e] RDW's stock price declines back in time under the promise that GNPK's shares would have declined in the same way as did RDW's had the fraud not occurred. In other words, Dr. Cain proposes to estimate inflation and damages in this case by assuming that the stock prices of GNPK and RDW would adjust

---

[26] Dr. Cain "considered" the Redemption Right, but "determined that there was no need to propose an alternative damages methodology that differed from the standard out-of-pocket damages methodology[;]" Cain Tr. at 70:24-71:5; yet, never explained why it is inconsequential.

32

similarly to the same disclosure." Roper Report, ¶ 186. But, GNPK *did not have measurable inflation* and did not adjust similarly to the same disclosures. *See supra*, § II.A.3. RDW declines cannot serve as a proxy for GNPK inflation:

> [C]onsider April 20, 2021. Assume…that Plaintiffs'…analysis concludes that RDW's stock price declined by…$1.00 across the three corrective disclosure dates due to the fraud. Dr. Cain asserts that he can take this $1.00 back in time to measure inflation for GNPK. Under the "constant dollar inflation" approach described by Dr. Cain, Plaintiffs will assert GNPK's share price was inflated by $1.00 on April 20, 2021, simply by carrying the inflation backwards in time. In this litigation matter, back-casting is not an appropriate method. Because GNPK already traded at or below its floor price of $10.15 on April 20, 2021, GNPK stock price was not inflated at that time. Whereas a reliable analysis of inflation on April 20, 2021 indicates there is no inflation in GNPK share price, Dr. Cain's back-casting would say there is $1.00.

Roper Report, ¶¶ 190-91. Dr. Cain attempts to rubber stamp this case with the routine out-of-pocket methodology, without accounting for case specifics.

Further, Dr. Cain fails to identify the actual methods he will use for *calculating* inflation. Instead, he listed alternative ways to measure inflation ("constant dollar inflation" or "constant percentage inflation") and testified that there are "different ways to back-cast that artificial inflation…." Cain Report, ¶¶ 135-36; Cain Tr. at 252:6-12. While Dr. Cain does not need to actually perform his analysis at this stage, he does need to identify a methodology that could apply. *Comcast*, 569 U.S. at 35. By not providing further specificity as to the intended approach, Dr. Cain does not assess, nor can the Court, whether application of the out-of-pocket methodology could

33

measure damages in light of the specific issues in this case.

Thus, damages here are incapable of measurement on a class wide basis.

## III.    LP IS NOT TYPICAL OF THE CLASS

LP cannot show that his "claims or defenses…are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3).   His claims are subject to unique defenses, rendering them atypical.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (certification improper where defenses unique).

First, LP sold prior to any actual corrective disclosures; *see supra*, § I.A; separating him from those who sold after the later Alleged Corrective Statements. This "makes him atypical since Plaintiff and the Putative Class will be required to prove that their losses were caused by distinct and separate events, potentially fomenting a disunified class and placing the interests of the Class in significant jeopardy." *Luczak*, 548 F. Supp. 3d at 1266.

Second, LP's case depends on an assumption that alleged inflation transmits from GNPK to RDW.  *See supra*, § II.A.3.  This creates the need for an additional layer to the *Basic* presumption on reliance as the Court will need to presume that the price impact of pre-merger disclosures carried into the separate security such that when LP purchased RDW, he can be said to have relied on those pre-merger disclosures. GNPK purchasers, however, unlike RDW purchasers, do not need such additional presumption.

Third, Redwire's defenses on market efficiency differ between LP and

34

others. LP purchased after the only relevant analyst report was published; yet, purchasers during half of the class period purchased when *no* analyst reports existed, altering the Court's consideration of this *Cammer* factor between application as to LP and other putative class members. *See supra*, § II.A.1.b.ii.

Finally, LP only purchased RDW, which had no redemption right. Thus, LP's ability to measure damages, identify price inflation, and assess the impact of disclosures on stock prices is materially different than other class members who purchased GNPK that had the Redemption Right. *Supra*, §§ II.A.3; II.B.

Accordingly, LP fails to satisfy Rule 23(a).

**In sum**, the Court must deny the Motion as LP fails to adequately demonstrate a basis for class certification. Specifically, LP lacks standing, the Motion fails to demonstrate that common questions of law or fact predominate over individual ones under Rule 23(b)(3), and LP cannot satisfy the typicality requirement under Rule 23(a) as his claims or defenses are not typical of other class members. The Motion fails as a matter of fact and law.

Dated: April 24, 2024.

| | |
|---|---|
| */s/ Glennys Ortega Rubin* | **FRANK A. ZACHERL, ESQ.** |
| **ALFRED J. BENNINGTON, JR., ESQ.** | Florida Bar No. 868094 |
| Florida Bar No. 0404985 | fzazherl@shutts.com |
| bbennington@shutts.com | **SHUTTS & BOWEN LLP** |
| **GLENNYS ORTEGA RUBIN, ESQ.** | 300 South Orange Avenue, |
| Florida Bar No. 556361 | Suite 1600 |
| grubin@shutts.com | Orlando, Florida 32801 |
| **BENJAMIN F. ELLIOTT, ESQ.** | Telephone: (407) 835-6755 |
| Florida Bar No.: 1010706 | Facsimile: (407) 849-7255 |
| belliott@shutts.com | *Attorneys for Defendants* |

35