Matthew Cain, Ph.D.
March 15, 2024

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| JED LEMEN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: |
| | ) | 3:21-CV-1254-TJC-PDB |
| -vs- | ) | CLASS ACTION |
| | ) | |
| | ) | |
| REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

The videotaped deposition of MATTHEW CAIN, Ph.D., called by the Defendants for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Noreen E. Resendez, RPR, CRR, CSR, and Notary Public within and for the County of DuPage and State of Illinois, at 455 North Cityfront Plaza, Suite 2410, Chicago, Illinois, commencing at the hour of 9:36 a.m. on Friday, March 15th, 2024.

Exhibit 4

Matthew Cain, Ph.D.
March 15, 2024

A P P E A R A N C E S:

        HAGENS BERMAN SOBOL SHAPIRO, LLP, By
        PETER A. SHAEFFER
        REED KATHREIN (via remote)
        455 North cityfront Plaza Drive, Suite 2410
        Chicago, Illinois  60611
        708.628.4955
        petersh@hbsslaw.com

             On behalf of the Plaintiffs;


        SHUTTS & BOWEN, LLP, By
        FRANK A. ZACHERL
        GLENNYS ORTEGA RUBIN
        BUD BEDDINGTON  (via Zoom)
        BENJAMIN ELLIOTT (via Zoom)
        ERIN TUCK (via Zoom)
        200 South Biscayne Boulevard, Suite 4100
        Miami, Florida  33131
        305.358.6300
        FZacherl@shutts.com
        GRubin@shutts.com

             On behalf of the Defendants.




ALSO PRESENT:

        Lucas Schroeder, Videographer
        Andrew Roper, The Brattle Group, (via Zoom)
        Mame Maloney, The Brattle Group, (via Zoom)
        Adam Karageorge, The Brattle Group, (via Zoom)

Matthew Cain, Ph.D.
March 15, 2024

                          I N D E X


WITNESS                                 EXAMINATION

MATTHEW CAIN, Ph.D.

    BY MR. ZACHERL                           5




                   E X H I B I T S

    MATTHEW CAIN, Ph.D.

DEPOSITION EXHIBIT                   MARKED FOR ID

    No. 1   Notice of Deposition          8

    No. 2   Cain Expert Report            13

    No. 3   1970 Fama Study               97

    No. 4   1991 Fama Study               101

    No. 5   November 10th Disclosure      143

    No. 6   November 15th Disclosure      143

    No. 7   Validea Report                214

    No. 8   Redwire                       236

Matthew Cain, Ph.D.
March 15, 2024

THE VIDEOGRAPHER:  We are now on the record.  The time is 9:36 a.m. Central on March 15th, 2024.  Audio and video recording will continue to take place until all parties agree to go off the record.  Please note that microphones are sensitive and may pick up whispering and private conversations.

At this time will counsel please state their appearances for the record after which the court reporter will swear in our witness.

MR. SHAEFFER:  Peter Shaeffer, Hagens, Berman, Sobol, Shapiro, LLP, on behalf of the plaintiffs and the witness today.

MR. ZACHERL:  Good morning, everybody. Frank Zacherl with Shutts & Bowen in Miami. I represent the defendants William Read, Peter Cannito, and Redwire.  I have with me my partner, Glennys Rubin, who is going to announce the other attendees on our side.

MS. RUBIN:  We also have from Shutts & Bowen, Bud Beddington, Benjamin Elliott, and Erin Tuck.  And in addition to them, we have Andrew Roper, Mame Maloney, and Adam Karageorge.

Matthew Cain, Ph.D.
March 15, 2024

MR. SHAEFFER:  Just one thing, my partner and colleague, Reed Kathrein, will be joining the Zoom in a little bit, but I wanted to announce it for the record.

(Witness duly sworn.)

WHEREUPON:

MATTHEW CAIN, Ph.D.,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ZACHERL:

Q.    Good morning, Dr. Cain.  As you heard, my name is Frank Zacherl.  I represent the defendants in this case.  I'm here to ask you a few questions about your expert report.  I'm going to try to be expeditious and go through this.

I will tell you that you know more in your little finger about these topics than I know in my entire body.  So if I appear to be obtuse, it is not intentional.  It is just a learning experience for me, okay?

A.    Sounds good.

Q.    All right.  I guess the first thing is you understand you are under oath, you have to tell the truth?

Matthew Cain, Ph.D.
March 15, 2024

A.    Yes.

Q.    You've been deposed before so I don't need to go over the rules of deposition with you?

A.    That's correct.

Q.    Okay.  In terms of your mental state today, and forgive me for asking this, but it has happened in the past, is there anything that is preventing you from giving full and complete testimony today, anything physical, anything mental, anything like that?

A.    No.

Q.    Are you under the influence of any medications this morning?

A.    No.

Q.    What did you do to prepare for today's deposition, if anything?

A.    I met with counsel yesterday and also I had a phone call with them last week.  Also reviewed my report and some of the materials cited within my report.

Q.    Okay.  Just a couple of bookend questions.

Besides your report and the citations in your report, did you review any other documents?

Matthew Cain, Ph.D.
March 15, 2024

A.    No.  I don't believe I reviewed anything that's not already been cited within my report.

Q.    Okay.  And then the second book end thing is besides the conversations you had with counsel, which I don't need to know the details of, did you talk to anyone else or meet with anyone else to prepare for the deposition today?

A.    I also had one phone call with Fideres which is the support team who assisted me in the preparation of this report.

Q.    What was the purpose of that call?

A.    It was just to talk through my report and refresh my recollection since it has been, I think, a couple months now since I executed the report.

Q.    And did you discuss anything else besides that?

A.    No.  Just the report and the analyses within the report.

MR. ZACHERL:  Okay.  Glennys, let's go ahead and mark the deposition notice as Exhibit 1.

                    (Deposition Exhibit No. 1 was

                    introduced to the witness.)

BY MR. ZACHERL:

    Q.    And, sir, I'm going to have my
assistant show you now what's been marked as
Exhibit No. 1 for the purposes of this deposition.

        Do you recognize that document?

    A.    Yes.

    Q.    And can you tell us what it is, please?

    A.    I believe it is the notice for today's
deposition.

    Q.    Great.  Okay.  I forgot to ask you
something earlier about the preparation of your
report.  And I just want to clarify that now.

        Besides you, who else had a hand in
drafting the report?

    A.    I instructed the staff at Fideres to
assist me with some of the drafting.  So that
would have included, I believe, Robert Cheng and
Zohaib, spelled Z-O-H-A-I-B, Moonis, M-O-O-N-I-S,
from Fideres.

    Q.    Are you able to tell us what sections
of the report they drafted as opposed to you?

        MR. SHAEFFER:  I would just caution the
    witness, to the extent you can answer the

Matthew Cain, Ph.D.
March 15, 2024

question without revealing the contents of
drafts of the report, those are protected
work product, I instruct you not to disclose
those contents.

BY THE WITNESS:

A.    The only way I can describe the report
is just as my report.  Like I said before, I did
ask them to run analyses and to put in the numbers
or the explanations of those analyses.  But beyond
that, there is nothing in the report that I would
say that they drafted independently separate and
apart from any of my opinions or work on the case.

Q.    Let me make it easy.  Is it fair to say
that, for the purposes of the report, you drafted
all of the conclusions yourself?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Again, I think it would be similar to
what I said before.

Q.    So it is more collaborative?

A.    Well, it's -- I would say the entire
report is my report and I asked them to help
assist and put certain things into the report for
me and then I review and edit everything that's --
anything that they put in I review and edit in

Matthew Cain, Ph.D.
March 15, 2024

order to make sure it reflects my views or my opinions.

Q.    I'm going to jump ahead a little bit just to, again, get a bookend.

With regard to the events that you identified in your report in your Event Study, which I think is Exhibit 6a of your report, if I'm not mistaken, did the folks that you were working with have a hand in identifying which events you include in your report?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No.  In this case, as well as any time that I conduct a Cammer 5 analysis, I lay out certain criteria, and then anything that meets those criteria both Fideres would review and I would also review the information environment to ensure that we objectively carried out that criteria.

So I think, you know, there's really like two categories.  One is sort of the speck-related identification of the target and the closing of the business combination, and then the earnings announcements or inability to provide earnings announcements, it's really just -- once

Matthew Cain, Ph.D.
March 15, 2024

I've articulated that objective criteria, making sure that we've pulled all of those in.

So back to your original question, I don't think there is much discretion left in terms of identifying events once I've laid out that objective criteria.

Q.    The criteria.  With regard to that criteria -- and I know your counsel may take the position that this is work product but I'd like to know if it exists -- is there a document where you wrote down the criteria that you used to identify the events that you included in your Event Study?

A.    It would be within the report itself. Once you give me a copy I can point you to a specific paragraph that explains that.

Q.    I remember the paragraph.  I'm thinking of something independent of your report.

A.    Nothing outside of the report.

Q.    Okay.  Fair enough.  Let's get some other preliminary stuff out of the way and we can dig into the opinions.

Can you give us the benefit of your educational background?

A.    Yes.  I have an undergraduate degree in finance.  I've got a Ph.D. in finance, and I've

Matthew Cain, Ph.D.
March 15, 2024

held a number of positions at different academic institutions as either a professor or a research fellow.

I'm happy to answer any follow-up questions to give more detail on any of those things.

Q.    Well, again, I think I can make it easy.

MR. ZACHERL:  Let's go ahead and mark his report, Glennys, as Exhibit 2.

BY MR. ZACHERL:

Q.    And, sir, while she's doing that -- I'll be showing you what's been marked as Exhibit No. 2 for this deposition -- is it fair to say that your educational background is summarized within the materials contained in your report?

A.    Yes, it is provided at the top of my CV in my report.

Q.    Is there any other education that you have -- formal education -- besides what's noted in the CV attached to your report?

A.    No, I don't believe so.

Q.    Okay.  Do you have any professional licenses of any kind?

A.    No.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Okay.  Have you in the past?

A.    No, I don't believe so.

Q.    And, again, I think that your work history is also summarized in the report; is that correct?

A.    Yes.

Q.    Is there any -- can we agree for the purposes of the deposition that the report accurately summarizes your work history as it pertains to the work that you did in this case?

A.    Yes.

Q.    Is there any other work experience that you have that would be pertinent to the opinions you provide here that is not contained in your report?

MR. SHAEFFER:  I would just ask if Dr. Cain needs to review his report that he gets a copy.

MS. RUBIN:  I'm marking it as Exhibit 2.

(Deposition Exhibit No. 2 was introduced to the witness.)

MR. ZACHERL:  While she's marking it, my questions really are to look at the CV and make sure it is accurate and look at the work

Matthew Cain, Ph.D.
March 15, 2024

history to make sure there is nothing

omitted.

THE WITNESS:  I don't think there is

anything omitted in terms of the work

history.  Obviously within a number of the

bullet points, there is a lot of different

types of work that I did, which may be

relevant to doing an analysis like I've done

in this report.  I don't spell out every

single task or every other types of things

I've worked on within each work position.

But I think at a high level, this accurately

reflects all of my affiliations from a

professional standpoint.

BY MS. RUBIN:

Q.    And is that true with regard to your

educational background as well, summarized

accurately in the report?

A.    Yes, it is.

Q.    All right.  How would you describe, at

this point in your career at the time when you

prepared the report for this case, how would you

describe your specialty, your area of expertise?

A.    I guess at a high level, I would say it

is financial economics.  So within financial

Matthew Cain, Ph.D.
March 15, 2024

economics there would be under that large umbrella a wide variety of topic areas that I would include within my areas of expertise or areas of specialization.

So that would include -- and that would be based on my teaching experience, my experience conducting research and publishing that research in journals, my experience working at the securities and exchange commission, experience as an analyst in debt capital markets, my educational experience.  So all of these different professional experiences that provided me with that background.

And then within that large umbrella of financial economics, I would say that includes expertise in evaluating corporate disclosures, matters of corporate governance, mergers and acquisitions, financial analysis such as valuation analysis, event studies, just generally evaluating the importance of the information to investors.

So one way we often talk about that would be evaluating the economic materiality of information to investors; obviously, looking at financial markets and institutions and evaluating market efficiency; calculating profits or losses

Matthew Cain, Ph.D.
March 15, 2024

or damages or evaluating loss causation.  All of those different types of topics that fall under that broad umbrella of financial economics.

Q.    You mentioned something that I was going to get into later and I'll just address it initially briefly here in the beginning.  Within the umbrella of this financial economics specialization that you've developed over the years, you mentioned that there is something that relates to the materiality of information to investors that you've done work on, you've studied, I guess you've written papers on that. Do you know what I'm referring to?

A.    Yes.  From -- and I would say from an economic standpoint, not from a legal standpoint. So I think there is an important distinction to draw but with that caveat, yes.

Q.    Sure.  And here is my question, because this comes up a few times in the events that you selected.  An announcement is made that -- and I'm going to not take an example from this case, just a hypothetical example -- an announcement is made that there is going to be a shareholder vote and the shareholder vote is going to occur the next day, okay.

Matthew Cain, Ph.D.
March 15, 2024

And in the announcement there is reference to the fact that the shareholder vote is expected to pass.  And then the next day it is announced that the shareholder vote passed as expected.

Within the specialization that you're talking about concerning financial economics and the materiality of information to investors, is the second announcement, which is really just a regurgitation of the one before, separately material to the investors?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    It certainly can be.  So I think the first thing I would explain is that the hypothetical you just put forward, I would not necessarily characterize that second announcement as merely a regurgitation of the first announcement that you described.  That is the first thing I would really push back on.

Q.    Sure.

A.    But certainly just when we're speaking hypothetically or very generally, the -- even though a company may announce that there's a certain type of expectation that a shareholder

Matthew Cain, Ph.D.
March 15, 2024

vote may pass, there can still be significant

uncertainty over whether that is actually going to

happen and whether everything is going to be able

to be lined up in order for a transaction to

close, such as all the financing and all the

necessary regulatory approvals or, I think in the

broad context of mergers and acquisitions, again,

something I studied and taught and also practiced

as an analyst for many years, knowing that there

are many things that can go wrong, all the way to

the last minute until the deal closes, and frankly

even after a deal is closed, things can still go

wrong.

So there are really a wide variety of

pieces of information that can still be sort of

coming out through that closing process that are

relevant for investors.

Q.   Okay.  And I think you've answered --

let's zoom out a little farther and take it out of

the hypothetical.  Are there ever instances where

there is an announcement one day, there's a second

announcement the next day, and the second

announcement is not material because it's just a

regurgitation of what happened the day before?

MR. SHAEFFER:  Objection to form.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

A.    There may also be times where you might have a repetition of a previous sort of disclosure and there can be times when that repetition provides nothing new.  It is merely a repetition and there's nothing informative for investors, nothing economically material.

There can also be times when a mere repetition is still deemed as value relevant for investors and there could be reasons for that as well.

Q.    Okay.  So in terms of identifying the events that you chose to include in your Event Study, is this one of the things that you looked at as to whether each event that you chose was independently economically material to investors in your view as an expert?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    So you're -- so I think now you're moving to the Cammer 5 criteria and News Days?  Is that a fair question?

Q.    Actually not.  This is one of those things where it may appear that I'm being obtuse, but I just don't know.

It just has to do with -- you testified earlier that you had identified certain criteria that you use for selecting the events that you include in your Event Study.

And my question is, did you apply -- is one of those criteria -- let's ask it this way: Is one of those criteria that you used to do your analysis in this case whether each event that you chose was independently economically material as you discussed?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    So, no.  There's really -- I think a conclusion on whether an event actually is economically material to investors is typically something that is done ex-post after you look at the results of an analysis.

So looking at did this announcement have an impact on stock price or the trading volume, did analysts look at this and talk about it as being meaningful, was it covered by the news or the financial media.

And there can even be times when very important information comes out and yet it doesn't move the stock price.  That doesn't mean that the

Matthew Cain, Ph.D.
March 15, 2024

information was unimportant.  It could just be that it was in line with investor expectations or it had a mix of positive and negative information or components that were offsetting.  So you can also look at it from a valuation standpoint.

But within the context of your question about the analysis in this report for those News Days, the step that I take, as well as any other expert would take, is to lay out an objective criteria ex-ante without inserting my own subjectivity by looking at the results and then deciding whether or not to include an event within the sample or not.

Q.    Okay.  To make sure that I get this so I don't have to perseverate all day on this, what you're saying is that you didn't have, whether a particular event was economically material in your selection criteria for choosing the events, but you did conclude for each one of these events that it was economically material after going through your analysis; is that a fair summary?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No.  That's not actually -- the design of the test is not for me to draw that conclusion.

Matthew Cain, Ph.D.
March 15, 2024

Because I think in order to draw a conclusion like that would require additional work in terms of looking at the information environment, what came out, what were the expectations and a lot of other factors to draw any sort of conclusion on a standalone basis as to whether any individual event was economically material for investors.

So the goal of the Cammer 5 analysis is not to answer that specific question, but it is a broader, higher level question of just testing whether there is a general relationship, cause-and-effect relationship the way that the Cammer court described it between disclosures and stock price movements.

Q.    Okay.  So let me take out the second part of what I said and see if this is accurate. Is it fair to say that within your selection criteria for the events that you included, to identify the events you included in your Event Study, economic materiality of the particular news event was not one of those criteria on the front end when you were choosing them; is that fair?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, I think there is not really a

Matthew Cain, Ph.D.
March 15, 2024

clear answer to that question.  So it probably would be helpful for me to point you to the way I describe it within the report itself.

Q.    Absolutely.  Any time, by the way, throughout the deposition if you need to make reference to the report or another document, please feel free to do so.

A.    Great.  Thank you.

So in paragraph 76, I talk about the actual --

Q.    76 of your report?

A.    Paragraph 76 of my report on 31.  I describe the two categories of News Days and so I explain that at a high level these two categories represent the types of information that are very often viewed as economically material or important to investors.

But ultimately I lay out that objective criteria, I pull in or include any market impact dates that pertain to disclosures that fall within these two categories and then I look at running the Event Study, looking at whether the stock price moved more frequently in reaction to these types of disclosures relative to other days where there were no pieces of news or disclosures like

Matthew Cain, Ph.D.
March 15, 2024

this.

So I'm explaining at a high level, this is the type of information that is often viewed as economically material, but I'm not going on a day-by-day basis and evaluating whether each disclosure was material and then deciding whether or not to include it within the test myself.

Q.    You answered my question.  Thank you. That's exactly what I was trying to get to.  And like I said, this obtuse sort of approach is going to happen again and again just because I don't know this area very well.  So thank you for indulging me.

A.    No problem.

Q.    Go ahead.  Were you going to say something?

A.    No.  Go ahead.

Q.    I just wanted to finish up the prelims. I know you've been deposed as an expert and I saw those references in your report.  Are there any cases in which you were deposed as an expert that are not disclosed in the report that you provided in this case?

MR. SHAEFFER:  I would just caution the witness not to disclose anything where he has

Matthew Cain, Ph.D.
March 15, 2024

a confidentiality obligation.

BY MR. ZACHERL:

Q.    So, yeah, for purposes of that, you can tell me if there are indications where you testified that are not included, and then if we need to deal with the identification of the case, we can do that.

A.    Nothing comes to mind.  The only thing I'm looking at is just to try to recall whether I've had any depositions since January 19th.  So certainly my CV is current in terms of listing all testimony as of the date of this report, January 19th.

Q.    Sure.

A.    I don't recall having any depositions since -- between January 19th and right now. After the fact, if I do find any, I'll follow up and let you know.

Q.    Has there ever been a time in your career, Doctor, where you've been retained as a consulting expert to review a matter and you've declined to participate in the matter because you didn't have an opinion that would be helpful to the party who asked you to participate?

MR. SHAEFFER:  Same instruction not to

Matthew Cain, Ph.D.
March 15, 2024

disclose anything.

BY MR. ZACHERL:

Q.    Nothing specific?

A.    There have been times that I reviewed a case or interviewed for a case and looked into it and determined that I would not be able to provide the types of opinions that were being sought, yes.

Q.    When was the last time that happened?

A.    Well, probably last week.

Q.    Has that ever happened in connection with cases you've handled with the law firm that's handling this case, the Hagens firm?

A.    No, it has not.

Q.    Okay.  And while I'm on that topic, how many times have you been engaged by the law firm in this case, the Hagens firm, to provide expert assistance in securities litigation?

A.    I believe that I've got this case as well as the Vaxart case, which is on page A4 in terms of those are the two cases in which I've been retained and provided public testimony at this point in time.

Q.    Have there been any other cases where you've been retained on a consulting basis but have not testified with this law firm?

MR. SHAEFFER:  I would instruct the witness not to answer questions where he has not been disclosed as an expert for his work with Hagens Berman.

MR. ZACHERL:  Let me ask it this way because I think I can accommodate what you're concerned about without -- without getting into the protected areas.

BY MR. ZACHERL:

Q.    Without identifying the name of any case, are you able to tell me generally whether there has ever been a time where you've provided consulting assistance to the law firm, consulting expert assistance, but didn't testify for whatever reason, the case settled early, got dismissed, there could be a thousand reasons why you didn't, but has that ever happened?

A.    Yes.

Q.    And how many times?

A.    I believe one other time.

Q.    Okay.  All right.  Other than the times that you've described, has there ever been a time when you've done any work for either the law firm, the Hagens firm, or any of the lawyers in the law firm besides what you described so far?

Matthew Cain, Ph.D.
March 15, 2024

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I can't think of anything that would fall outside of what I already described with the previous response.

Q.    Fair enough.  Fair enough.

You know, one thing I couldn't tell from your report, there's some experts that only testify for plaintiffs, there's some that only testify for defendants, there's some that do both. I know you're testifying on behalf of the plaintiff here.

Have you ever testified on behalf of a defendant as an expert in any kind of securities litigation?

A.    Yes, I have.

Q.    And without having to go through each one, can you give me a percentage in terms of -- a rough percentage or a range as to the number of cases plaintiff versus defense?

A.    The majority -- in terms of the cases that proceed to the point of public testimony, the majority of the securities class action types of cases are on the plaintiff's side.  I think there is one on here involving Bank of California in

Matthew Cain, Ph.D.
March 15, 2024

which I put in a report on the defense side.

I've also worked on a number of engagements on the defense side on cases that either settled or were dismissed.  But in terms of public testimony proceeding to the point of public disclosure -- in terms of limiting it only to securities cases, obviously there is other types of cases on here that I've been on both sides, but securities class actions, I think the majority of those cases are on the plaintiff side.

Q.    Is it pretty much the vast majority except for that one that you mentioned?

A.    Yeah.  In terms of the ones that proceeded to this point in litigation, yes.

Q.    Got it.  Got it.  Okay.

A couple other questions just about your experience as an expert.  Have you been accepted as an expert by any state or federal court in the United States in the area of financial economics in a securities case?

A.    What do you mean by "accepted"?

Q.    Well, let me ask it another way.

Has a court ever declined to recognize you as an expert in a securities litigation?

A.    No, I don't believe so.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Do you know if your testimony -- I guess this could have happened without your knowledge -- but do you know if your testimony has ever been rejected by a court either because of the flaws in your methodology or your qualifications to serve as an expert?

A.    Never for those reasons, no.  There were two times just due to the procedural grounds with the court schedule not permitting submission of reply reports or not permitting plaintiffs to attach a declaration to a complaint.  But never on the actual basis of the content of the opinions or my qualifications.

Q.    Okay.  To serve in this case, I guess I'll ask you first your fee.  I think I saw you're getting paid $950 an hour; is that right?

A.    Yes, I believe so.

Q.    How much money have you been paid to date?

A.    I think it's -- I think it's in the ballpark of between 15 and $20,000.

Q.    And do you have any outstanding bills that have not yet been paid?

A.    I don't believe so.  I've obviously tracked some hours for the month of March, but I

Matthew Cain, Ph.D.
March 15, 2024

won't submit those for a while.  So I believe

that -- I've submitted invoices for December and

January and both of those were paid.

Q.    Okay.  In terms of the your arrangement

with the law firm, is all the work hourly or is

there any component like if you testify it becomes

a flat fee?

A.    It is all just hourly based on that

hourly rate.

Q.    Got it.  Okay.

Who was it within the firm contacted

you to retain you on this matter?

A.    I believe it was Reed Kathrein.

Q.    Do you remember when that was?

A.    My best estimate would be in November

or beginning of December, to the best of my

recollection.

Q.    Do you know if that was before or after

suit was filed?

A.    I believe that was after the suit was

filed.

Q.    Is $950 an hour your rate for this law

firm or is that your standard rate for all the

work you do as an expert?

A.    It's my standard rate.  Other than I

Matthew Cain, Ph.D.
March 15, 2024

give a discounted rate for any government matters,

but, otherwise, it is the standard rate.

Q.    Got it.  Okay.

Let's take a look -- you have the

report in front of you, sir?

A.    Yes.

Q.    You've described the lawsuit in your

report and I just want to make sure I understand

the outer limits of your opinions.  Is it fair to

say that you're not here to provide any opinions

on whether there was a violation of the securities

laws?

A.    That is correct.

Q.    Okay.  And you don't have any opinion

on whether there were any affirmative

misrepresentations; is that right?

A.    That's correct.

Q.    And you don't have any opinion as to

whether any fraud was committed; is that correct?

A.    Correct.

Q.    And you don't have any opinion as to

whether there were any material omissions from any

disclosures; is that correct?

A.    That's correct.

Q.    And I'm just going to try to summarize

Matthew Cain, Ph.D.
March 15, 2024

this and I don't mean to exclude your actual

testimony, but on the substantive allegations that

have been asserted against my clients, are you

providing any opinions other than the opinions

that you provided in your report related to the

efficient market and the calculation of damages?

        MR. SHAEFFER:  Object to form.

BY THE WITNESS:

    A.    At this point in time I'm not providing

any opinions beyond those that are summarized in

the report here.

    Q.    Okay.  All right.  Thank you.

        I want to get into the merits because I

do want to try to get you out of here as soon as

we can.

        I noted that in your report you've

encapsulated the entire class period -- and I had

to write the dates down -- March 25th, 2021

through March 31st, 2022; is that right?

        MR. SHAEFFER:  Object to form.

BY THE WITNESS:

    A.    Yes, that is the class period; March

25th, 2021 through March 3st, 2022.

    Q.    And I know to accommodate your

counsel's objection, I know that you provide

Matthew Cain, Ph.D.
March 15, 2024

opinions with some -- some earnings reports that

came out after the end of the class period.

But really what I was getting to is

just simply for the purposes of your analysis, it

was within that class period time frame other than

those earnings reports; is that fair?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Yes, in terms of -- certainly in terms

of my, for example, my opinion about the market

being efficient, that opinion applies to the class

period itself as well as the damages methodology

to -- for class members within that class period.

Q.    Okay.  And the report -- I guess I

should ask this for the record.

Is the report that is in front of you

as Exhibit 2 a true and correct copy of the report

that you prepared for your counsel in this case --

for counsel in this case.

A.    Yes, I believe so.

Q.    The reason I asked you the question

about the class period will become clear.  You

used the term Redwire common stock to refer to

that time period; is that correct?

A.    Yes.  I do -- obviously I sort of

Matthew Cain, Ph.D.
March 15, 2024

define what that means during the report, but I generally just refer to it as the common stock, even though that time period spans both the SPAC shares as well as the post business accommodation period.

Q.   That's what I was getting to.  If you could just state for the record, when you use the term "Redwire common stock," what do you mean?

A.   Yeah, so I'm using that as a shorthand to refer to my opinions over the course of the class period.  So that would refer to the GPAC or Genesis Park Acquisition Corporation SPAC shares prior to the closing on September 2nd, 2021, and then post closing starting on September 2nd, 2021 and the actual trading starting on September 3rd, 2021, the actual Redwire common stock trading under, I believe, symbol RDW beyond that time period.

Q.   Okay.  So just so that we have it clear for the record as we move forward, when you have used the term Redwire common stock, you are actually referring to the stock prices of two different stock tickers.  One would be the Genesis Park, I think, it's GNPK, and the other one would be Redwire RDW; is that right?

Matthew Cain, Ph.D.
March 15, 2024

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Yes.  They did have two different tickers for that security.

Q.    Let's go to page 70 of your report and I think it's --

MR. SHAEFFER:  Is there a paragraph?

BY THE WITNESS:

A.    Do you mean paragraph?

Q.    Well, I think actually it's E2.  It is figure 1 in your report and this is just a -- well, I can see it is a slide.  Do you have it there?

A.    Yes.

Q.    Okay.  And the title of the slide reads "Redwire Common Stock Closing Stock Price and Daily Volume."  And then the subtitle reads "March 25th, 2021 to April 30th, 2022."

Do you see that?

A.    Yes.

Q.    Is it fair to say that figure 1 in this chart -- I'm sorry, figure 1 of this chart plots the Redwire common stock, as you've defined that closing price, over this time period?

A.    Yes.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Did Redwire common stock, as you've

defined it, always trade on an exchange during

that time period?

A.    Yes, I believe so.

Q.    Was it always the New York Stock

Exchange?

A.    Yes, I believe so.

Q.    And then I noted in this chart that, it

looks to me and I'm asking you to confirm this,

that you plotted the Redwire common stock, as you

defined it, closing price using an orange line.

Is that what the orange line represents?

A.    Yes.

Q.    Is each of the data points plotted on

that line a closing price for this Redwire common

stock, as you defined it?

A.    Yes, I believe so.

Q.    Okay.  You mentioned earlier GPAC.

What did you mean when you refer to GPAC?

A.    Well, that was from the first paragraph

in the case background section, paragraph 16.  So

that's just a shorthand reference to the SPAC

Genesis Park Acquisition Corp.

Q.    Is there a difference between GPAC,

G-P-A-C, and the actual name that you just

Matthew Cain, Ph.D.
March 15, 2024

articulated, Genesis Park Acquisition Corp. or are they one in the same?

A.    That's not something that I've investigated, whether there is any sort of legal structure or corporate parents or subsidiaries with different names or references.

Q.    Okay.  Fair enough.  Let me ask it differently because it may just be my -- the language I'm using.

Was Genesis Park Acquisition Corporation the corporate issue -- issuer of the GPAC security, as you understand it?

A.    Again, it is not something that I've researched closely.  But as far as I'm aware, I believe so.

Q.    Well, let me ask you this way:  Was that an assumption that you made in doing your report that, in fact, Genesis Park Acquisition Corporation originally issued the security with the ticker GPAC?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    That's generally my understanding.

Q.    Okay.  Do you know if Genesis Park Acquisition Corporation issued any other

securities besides this GPAC ticker?

A.    Other than the units, the common stock and the warrants that are described in paragraph 16, I don't have any awareness of any other securities.

Q.    You mentioned common stock.  Was the GPAC ticker that we've been talking about, G-P-A-C, is that referring to a share of common stock of Genesis Park Acquisitions Corp?

A.    The tickers that I have in paragraph 16 are GNPK for the common stock.  But to the best of my recollection, that's the -- that was the ticker.

Q.    And that was the security which was common stock?

A.    Common stock and warrants, to the best of my recollection.

Q.    Okay.  If the ticker was actually GPNK --

MS. RUBIN:  GNPK.

BY MR. ZACHERL:

Q.    -- I'm sorry, GNPK, would that just be a misnomer on your part?  Let me ask this way:  Is the ticker actually GNPK as opposed to GPAC?

A.    I don't know.  I'd have to go back and

Matthew Cain, Ph.D.
March 15, 2024

look at the underlying data files.

Q.    Okay.  Do you know if the ticker, whether it was GNPK or GPAC, besides being common stock, do you know if that common stock had any voting rights, any right to receive dividends, any other rights?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    My recollection is that the common stock had a redemption right to be redeemed prior to the closing of the business combination.

Q.    Are you able to describe for us your understanding exactly of what the redemption right was?

A.    So I believe it was described as a redemption value of $10 plus interest.  I don't recall if there was any -- sometimes, you know, you get a few cents of interest on top of that $10 per share.  Other times it basically is zero on top of the $10 per share.  So I don't recall what the exact amount was.  But the shareholders could exercise their redemption right and have the shares redeemed for that redemption value prior to the closing of the business combination.

Q.    Got it.  And I have it down as $10.15

Matthew Cain, Ph.D.
March 15, 2024

in cash that they would get for each share if they didn't want to participate in the merger.  Is that your understanding?

A.    That sounds right.  Again, I don't have that number in front of me, but that seems reasonable.

Q.    Did you see anything anywhere in the materials that you reviewed to prepare your report that the shareholders of this GPAC entity were not ever provided with the opportunity to redeem their shares?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I don't recall seeing anything along those lines.

Q.    And did you -- the flip side of that, did you see any indication that any of the shareholders in the GPAC entity did exercise their redemption rights prior to closing?

MR. SHAEFFER:  Same objection.

BY MR. ZACHERL:

Q.    At 10.15 a share?

MR. SCHAEFFER:  Same objection.

BY THE WITNESS:

A.    I don't remember what the number is in

Matthew Cain, Ph.D.
March 15, 2024

terms of those who elected to exercise their redemption rights. I'd have to go back and look at the reporting after the closing of the business combination when they announced their redemptions.

Q. Do you -- do you remember if there were any, not knowing the number?

A. It was not a factor that I analyzed for this report.

Q. Okay. You have said this, but I just want to make sure that I get it on the record, do you agree with me that GNPK and RDW are two different tickered securities?

MR. SHAEFFER: Object to form.

BY THE WITNESS:

A. Those are two different tickers. I think the question of whether they are two separate securities is more of a legal question. I've always, just as a financial economist, understood them as the same security, but I'm not expressing any sort of legal opinions on whether legally those are separate and distinct securities.

Q. Fair enough. Yeah, and you've said that a few times. Just so it's clear, I'm not asking you to give legal opinions. I'd like you

Matthew Cain, Ph.D.
March 15, 2024

to stay within your area of expertise.  I
appreciate you making that distinction.

Where I was going was, to your
understanding, did the RDW stock ticker, people
who owned that stock, did they have redemption
rights?

A.   Not that I'm aware of.  Typically once
you get passed the redemption deadline then there
are no more redemption rights on SPAC shares.
That's my general understanding from working with
transactions involving SPACs.

But, again, that is not a question I
specifically or specifically looked into with
regards to this case but just generally my
understanding of SPACs is once you get past the
redemption deadline there are no more redemption
rights on the common stock.  There can be other
factors that affect the warrants, but in terms of
the common stock, that's my general understanding.

Q.   Is it your understanding that -- I
don't know if I asked you this so if I did I
apologize for asking the same question twice --
but the RDW stock ticker, is it your understanding
that if you owned one share of RDW, you owned
common stock?

Matthew Cain, Ph.D.
March 15, 2024

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    That's my understanding, yes.

Q.    And the reason I'm asking this question really boils down to in your cause-and-effect analysis, did you give any consideration to whether the existence of the redemption right for one security but not the other could either impact the methodology or the conclusions you've reached with regard to cause and effect and market efficiency?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Yes, I think -- I guess I would clarify, again, I don't necessarily view these as one security and another security but actually the same security, just having a redemption right at one point in time and then not having a redemption right beyond that point in time.

I think that is a dynamic that is common to SPAC shares, generally, and it is something that I've encountered with the previous efficiency reports that I've run on SPACs.

So that time period prior to the closing of the business combination where you've

Matthew Cain, Ph.D.
March 15, 2024

got a SPAC share that is basically -- it is essentially a puddle of cash worth $10 per share with a redemption right is a dynamic, and that is why I look at that aspect of the securities when I conduct the Cammer 5 test.

That's why every SPAC case for the News Days -- if I got a SPAC case where the class period goes back in time to the announcement of the target and I always include the announcement of the target as a News Day as well as the information about the closing of the transaction because those are the two -- typically those are the two most consequential disclosures for a SPAC generally.  So that is part of the objective criteria for News Days.

And then I'll also look at other dynamics in terms of there's different volatility for that preclosing period or the preannounce -- period prior to the announcement.  So that is something that the rolling regression model controls for, that change in volatility over time and I'll also look at the other factors also typically the -- that involve you -- I won't go through every factor, but that is also a consideration when looking at the other efficiency

Matthew Cain, Ph.D.
March 15, 2024

factors.

Q.    Okay.  And specifically with regard to the redemption rights that were available with the GNPK ticker but not available on RDW ticker, did you address that difference anywhere in your report?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Again, yes, I think it is not explicitly spelled out, but it is something that is controlled for with the event-study methodology in terms of -- and also looking at the News Days.

But, like I said, the rolling regression model actually updates for changes in volatility.  So we typically have lower volatility prior to the announcement of a target, and then typical higher volatility after a business combination closes and you're often somewhere in between when you're in that period between the announcement of a target and the closing.  The model itself updates for changes in volatility over time.

So that's something that, you know, any company can have other types of changes over time. It doesn't have to be a redemption right, but

Matthew Cain, Ph.D.
March 15, 2024

there can be other fundamental changes over time, and that's how the event-study methodologies is set up to handle those types of changes over time.

Q.    You used the word "fundamental change." Would you agree that a redemption right existing for one security and not existing for the second security would be one of those fundamental changes?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I do think for SPACs, the nature of the SPAC share does change over time.  That is something that I consider in the efficiency report for valuation of every SPAC company.

So I think that -- it's -- the redemption right is part of that.  I mean, you could say the same thing about any merger or acquisition as well.  Like once a merger transaction has been announced, then fundamentally things are trading very differently.  Talk about how merger arbitrage traders look at their trading strategies.

So, yeah, in terms of a SPAC share, there's a period of time up until the redemption deadline where you've got that redemption value

Matthew Cain, Ph.D.
March 15, 2024

that is typically going to represent sort of a floor on the stock price. We typically don't really see the SPAC shares trade very much below $10 per share because of that redemption value prior to their redemption deadline and then volatility tends to increase after that point in time.

So I think that is a change that takes place. But, again, it is something that is incorporated into the methodology here.

Q. Well, you mentioned methodology and you mentioned the word "model" earlier. Are those the same thing?

A. Well, what I would say is there's an Event Study model and then there are different inputs to the model, a variety of inputs; like how are we controlling for the market or the industry or the estimation window or these types of things. So I think all of those different inputs could be considered part of the methodology as well.

So sometimes I might use those terms interchangeably. Other times I might be speaking about a specific input in terms of the methodology for carrying out the Event Study. But I'll also talk about just the Cammer 5 methodology sometimes

Matthew Cain, Ph.D.
March 15, 2024

as well.

Q.    Okay.  Is the output of the model depending on the input?  In other words, if you change the input you get a different output?

A.    You might.  It depends, but you might.

Q.    Okay.  And then where you use the Cammer 5 factors analysis, you have identified that in your report, correct?

A.    Yes.

Q.    Are there any other models that you could refer to by name, for example, that you have used in the report that are not mentioned in the report?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    So I guess I would say that there's the Event Study model that is used for Cammer 5.  I would probably just describe all of the other factors as like an analysis of data.  So I don't know that I would necessarily describe any of the other analyses as a specific model other than the Event Study model itself.

Q.    Okay.  So if you used the Event Study model, and you made reference to that in your report -- I think you just said this, but let me

Matthew Cain, Ph.D.
March 15, 2024

make sure I understand it -- are there any other

models that you refer to by name or methodologies

other than what's referred to specifically in the

report?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I also talk about, for example, the

Black-Scholes model of option pricing for one

example.  So I mean there might be other things

within the report that we can look at, but I'm not

really sure what you're trying to get at beyond

that.

Q.    Forgive me.  It was kind of a bad

question.  That's not going to be the first nor

will it be the last bad question.

I just want to know that if you have

used a specific model or methodology you described

it in the report.

A.    Yes.  If I used any sort of methodology

or model for this case, then it is described in

the report.

Q.    Okay.  And, you know, this redemption

right thing, I think you covered this, but I don't

know if you covered it explicitly in terms of what

I'm trying to understand.

Matthew Cain, Ph.D.
March 15, 2024

I guess as a threshold question, would you agree with me that the existence of a redemption right would matter in terms of assessing whether a particular market is efficient?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.   I'm not sure that it would always matter necessarily.  But, again, I do think it is something that is relevant and it is something that I considered when I carried out my analysis in this case.

You know, you could have a hypothetical where you might ask if there was no redemption right would the results have been different, and I don't know the answer to that.

Q.   You didn't do that analysis, right?

A.   Exactly.  That would be a purely hypothetical question.  So it is conceivable that if you took away the redemption right all the analysis might look the same.

But at least in this case, it is something that I explicitly considered when I was carrying out the analyses.

Q.   Let me ask you just more specifically.

Matthew Cain, Ph.D.
March 15, 2024

Why do you think that it is relevant?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, again, I'm not offering the opinion that it necessarily had an impact on the efficiency of the market.  So it -- like I said, it may or may not be relevant.

But the way that we do see the, I think, the effects of the redemption right for SPACS, typically going back to one of my previous answers, is that that represents typically a floor on the price for the SPAC shares up to the redemption deadline.

So once you get beyond the redemption deadline, sort of simultaneously a couple things change, right?  You no longer have the redemption right but you also are closing the business combination.  So the value of the stock -- you've taken away the uncertainty over whether or not the business combination is actually going to close.  Once it is closed, it is done.  And so the stock price is purely trading on the information about the target company.  It still reflected that prior to the closing.  There was just some uncertainty as to whether the transaction would actually

Matthew Cain, Ph.D.
March 15, 2024

close.

So, again, what I said before is that you can see this from, I think, the graphs in my report but the volatility changes over time related to these factors, both the redemption value and the closing of the business combination.

But that's, again, part of the reason for using a rolling regression approach like I do here is because that approach actually updates for changes in the volatility over time.

Q.    I'll ask you a more general question. Would you agree that having a redemption right in a stock makes -- in a share of stock makes that share of stock more valuable than -- all things being equal -- a share of stock that does not have a redemption right because there will always be a sum certain for which the share can be sold?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, I think it probably -- it probably depends.  It's not a question of actually research.  I think on the one hand what the redemption value does is it lowers the volatility or lowers the riskiness because it puts a floor on the price.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Yes.

A.    But if you think about just basic concepts of finance and valuation analysis, riskier investments, there's like a risk/reward payoff.  So sometimes riskier investments have a higher expected payoff so those can have a higher value because of the higher risk.

So I think in the terms -- in the way you asked your question about value, it is unclear what the ex-ante prediction would be if you were to compare two identical securities, one with a redemption value and one without.  It is not something I researched up to this point in time.

Q.    Is it fair to say, based on what you just said, that in that scenario where you have two identical securities, one with a redemption right and one without, that holding the one with the redemption right would be inherently less risky because it does set forth a price?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, again, I think I would have to study the actual scenario to really form an opinion on that.  It's just not something I've studded or it's not a question that I have asked

Matthew Cain, Ph.D.
March 15, 2024

up to this point in time.

Q.    You didn't study that in connection with preparing your opinions in this case; is that correct?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    It is not an explicit question that I asked.  Like I said before, it is something that the Vince study methodology controls for those changes in risk for volatility over time.

So I don't have to -- you could come up with 100 different types of questions about what things may change for any company over time in terms of the riskiness or the volatility and things like that.  I don't have to sit down and ask each of those 100 different questions because the Event Study methodology sort of explicitly controls for those changes every time without having to sit down and make a list of 100 different things that may evolve over time for any company.

Q.    Okay.  So to my layman's ear, it sounds like you're saying that you didn't account for the redemption right -- forgive me.  You didn't study the redemption right sum with regard to whether it

Matthew Cain, Ph.D.
March 15, 2024

made the GNPK security more valuable, but you did account for whether it was more valuable or not because that's part of the model that you're using.

Do I have that right?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I think that's basically right.  I'm not sitting down and asking that specific question, but like I said, I don't have to sit down and ask the question because I have confidence in the Event Study methodology to control for those types of questions to the extent that they're relevant for a Cammer 5 analysis.

Q.    Are there any academic treatises or studies or is there any literature that you can point us to that would say that in this Event Study methodology you're automatically taking into account the existence of a redemption right?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    So I think just one example is in paragraph -- sorry, Footnote 70 on page 26.  I cite a few different times to -- in this and other footnotes to a study by Craig MacKinlay, for

Matthew Cain, Ph.D.
March 15, 2024

example.  And, like, if you look at this study and the other academic studies that I cite in the footnotes, what they explain is that the event-study model, it is controlling for changes in any dynamics, fundamentals, valuation, volatility over time.  They don't -- again, going back to what I explained previously, they don't make a list either of here's all 100 different factors including redemption values, right, because we don't have to make that list.  That's just one of many things that can change over time for any company.

So I would point you to that as one example and also the other footnotes within the Event Study references.

Q.    Is it fair to say that the MacKinlay study here from 1997 that you referenced in Footnote 70 doesn't explicitly address the role of redemption rights in the Event Study's analysis?  In other words, it doesn't use the word "redemption rights" anywhere?

A.    Well, again, like I said, it doesn't make a list of every factor and it doesn't list out redemption rights, but it just talks about these things more generally.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Is that true of the other authoritative citations that you have made in the report?

A.    Yeah.  I think that's -- that would apply to all of these citations.  They're not making a list that is company specific, but just laying out the theory that can be applied to any company, including SPACs.

Q.    Okay.  I think I know the answers to these questions.  I got a couple -- a few in a row that are more or less the same question about different things but just so I get it on the record.

First, did the existence of the redemption right over part, but not all of the class period in this case, impact the way you did your analysis of market efficiency?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Like I said before, it is something that I considered and I don't think it caused me to change the approach that I take or the methodology that I take because the approach I take in every efficiency report is to conduct the analyses in an objective manner, but it is something that I considered and that I was

Matthew Cain, Ph.D.
March 15, 2024

confident that the rolling Event Study regression

methodology was capable of reasonably and

appropriately handling.  And it is also something

that I considered when I looked at the other

factors and how those other factors may have

changed over time from the pre-business

combination to the post-business combination

period, which also coincides with the change in

the redemption right.

Q.   Okay.  And I'm going to use a word that

you have not used so if this is not accurate, just

tell me.

But it sounds like what you're saying

is that the existence of a redemption right for

part of the class period would be something that

would be baked into the model that you used in

terms of it would be considered along with 100

other factors that might not be explicitly

mentioned, but you didn't explicitly consider the

existence of these redemption rights over part,

but not all, of the class period in doing your

analysis; is that accurate?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.   Well, again, I would say that it is

Matthew Cain, Ph.D.
March 15, 2024

something I explicitly was aware of.  And like I said, I was confident that the methodology for both the Cammer 5 and the other factors is capable of handling that change.

So it is something that I was explicitly aware of at the time that I conducted the analyses and I determined that there were no separate adjustments required to the model based on that knowledge.

Q.    Are you able to point us to any place in your report where the analysis you just described is outlined?

A.    Yeah.  Well, it is outlined throughout the report, but I think if you're talking about Cammer 5 --

Q.    Just so it is clear, I'm specifically referring to redemption rights, but I didn't mean to interrupt you.  Go ahead.

MR. SHAEFFER:  While he's looking we've been going about an hour.

MR. ZACHERL:  We can take a break.

MR. SHAEFFER:  So after we finish this one.  Just wanted to make sure we were at a good stopping point.

MR. ZACHERL:  Yeah, for sure.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

A.    So I think I'll point you to a couple of things.  So the first thing would be like Footnote 72 on page 28, which is a footnote to the rolling regression model that explains how the regression estimates occur over the 120 days prior to each event.  So that is changing.

And then you can also see the effect of that.  For example, if you look at Exhibit 5 on page E6, you can see that the volatility, like the residual volatility of the daily abnormal returns, it changes over time, and it's held constant at the beginning because there has to be a fixed window because I cannot go back prior to the IPO date to estimate the model because there were no publicly traded prices prior to the SPAC IPO.

But then you can see that once we get past that fixed period, the volatility dips down and then it starts to increase as we get beyond the rolling historical window, it gets beyond that redemption value.

Again, like I said before, I don't explicitly lay out a list of all of these different changes for a company, because the rolling regression model itself actually controls

Matthew Cain, Ph.D.
March 15, 2024

for those changes.

Q.    Okay.  A couple questions.  So, first, with regard to the rolling regression model, are there any authoritative treatises or studies or other citations that you can direct us to where there's an explicit mention that the existence of redemption rights for part, but not all, of the time period would be captured by that regression analysis?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Like I said previously, these academic studies articulate the benefits of a rolling regression model.  They don't make a list of here's the 100 different changes that are explicitly controlled for and list out the change in the redemption price, but they would just explain that these models update for changes in volatility for the company.  That would include change in the redemption value.  That would include the change in the closing of the business combination, any other changes in the information environment or aspects for any given company.  That would include the MacKinlay study and the other studies that we talked about earlier.

Matthew Cain, Ph.D.
March 15, 2024

Q.    And -- but you did say that none of those studies actually explicitly discuss redemption rights in this context, right?

A.    Right.  Like I said, they don't make a list of every factor, but that would be one of them.  They just don't take the time to list out every single possible reason that there could be a change over time for any company.

Q.    Okay.  And then you mentioned something else which I had not actually noticed until you mentioned it.  You said that there was reduced volatility up to the point of the merger, and then afterwards there was more volatility.  And I'm looking at page E6 on Exhibit 5.

Did I get that right?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    That's -- yeah.  I mean, it is something that you can visually kind of see that the volatility was changing over time.  I've not -- I've not formed any explicit opinions on exactly how it evolved; just acknowledging that that model controls for those changes over time.

Q.    And what I'm getting to is, is the reason it was less volatile prior to the closing

Matthew Cain, Ph.D.
March 15, 2024

of this transaction because there was a

redemption, right, that set forth the price prior

to the close?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    That is not an explicit question that I

tried to ask or answer.  But just generally

speaking, with SPACs, they are usually less

volatile certainly prior to the announcement of a

business combination target and often still less

volatile prior to the closing of the business

combination.

I do think that the redemption right is

a component of that lower volatility for SPACs

generally.

Q.    Before the dSPAC?

A.    Correct.

Q.    Okay.  All right.

Now, one other question on this then we

can take a break.  Sorry.  If you can indulge me

just a little bit.  I just want to get through

this topic.

MR. SHAEFFER:  No, no.  That's fine.

BY MR. ZACHERL:

Q.    I don't mean to sound flippant with

Matthew Cain, Ph.D.
March 15, 2024

this, but so far you haven't really been able to point to a place in your report where you explicitly considered the existence of the redemption right for part, but not all, of the class period in connection with market efficiency, and you have not been able to point to an authoritative treatise where it is explicitly mentioned that that redemption right is part of the analysis or is captured by the analysis.

So my question is, are we just supposed to take your word for it?  And, again, I don't mean that disrespectfully, but is that the case?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, I guess I would disagree with the premise of your question.  I actually do think that I've pointed you to multiple academic articles that talk about changes in volatility. And that's ultimately what you keep asking about in terms of this change in the redemption value.

Q.    Okay.

A.    Just because the different academic authorities don't make a list out of each of those factors to your satisfaction, doesn't, in any way, weigh against their reliability or their validity

Matthew Cain, Ph.D.

March 15, 2024

in terms of articulating how the rolling regression model updates for those changes over time.

And, obviously, I made reference to the other factors.  I looked at those as well.  I didn't want to give too long-winded of an answer, but we can certainly, whenever you're ready, we can talk about the other factors and how those also changed over time.

So I didn't limit this just to the Cammer 5 analysis.  This is something that you can see in the evolution of the other factors as well.

MR. ZACHERL:  Well, I'll tell you what.  Let's take a break.  I do have some more questions about redemption rights as they relate to damages calculations, for example, and cause and effect and things like that, and maybe we can get into what you're describing then.  But let's take five or ten minutes.  It is now 10:50.  Does everybody agree we can go off the record?

MR. SHAEFFER:  Yeah.

THE VIDEOGRAPHER:  Going off the record.  The time is 10:51 a.m. Central.

(Whereupon, a break was taken,

Matthew Cain, Ph.D.
March 15, 2024

                      after which the following

                      proceedings were had:)

           THE VIDEOGRAPHER:  We are back on the

      record.  The time is 11:05 a.m. Central.

BY MR. ZACHERL:

      Q.    Okay.  Dr. Cain, there was one thing

that I neglected to follow up on in the testimony

earlier that I just want to hit now.

           You mentioned that -- you mentioned

that authoritative source, I think it was in

Footnote 70, the MacKinlay source, and you talked

about the rolling regression analysis.

           Are you able to -- and I have not read

the MacKinlay report so I don't know if it's in

there, but are you able to point us to any place

in the MacKinlay report where there is an explicit

discussion of a rolling regression analysis?

      A.    So I think -- let me see if I can point

to you the quote that I've got in my report, see

if that answers your question.

           So if I look at Footnote 72, it starts

out with -- it first mentions another one and then

it mentions the MacKinlay study and it gives a

quote there.  So that is talking about estimating

your parameters or the estimation window in the

Matthew Cain, Ph.D.
March 15, 2024

120 days prior to the event that you're asking a question about.

So if you think about, like Exhibit 6 where we've got different events and you're estimating the regression for the 120 days leading up to each of those events, so that's what I mean when I talk about the rolling regression window.

Q.   Okay.  Sorry.  So it's not explicitly mentioned in MacKinlay, but what you're saying -- I don't want to put words in your mouth -- but what you're saying is based on the way they do have this 120-day lookback for each one of the events, effectively that's a rolling regression analysis?

A.   Yes, that is -- I mean, I don't know if they use the word "rolling" or not, but that's explicitly the same thing we're talking about.

Q.   Got it.  Okay.  Let's get back to this topic of the redemption rights.

I had asked you about the impact on your analysis of market efficiency.  I'm going to ask the same question now.

Was your analysis of cause and effect as outlined in your report impacted at all by the existence of this redemption right for part, but

Matthew Cain, Ph.D.
March 15, 2024

not all, of the class period?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    So like I said previously, the analysis had self controls for that, but I don't have an opinion one way or another on whether the results would have been different if there was no redemption right at all.

So I don't have an answer on explicitly, you know, by what magnitude did the redemption right have an impact on the cause-and-effect results themselves.

Q.    Okay.  And is that because you didn't explicitly consider redemption rights as opposed to it being part of, as you said earlier, the overall model?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Well, it's because it wasn't a question that I asked.  It's explicitly controlled for in the model, but it's not the focus of my questions.  I'm not carrying out a report with the goal of answering the question what was the impact of the redemption right for this or any other SPAC that I've done an efficiency report on.  That's not a

Matthew Cain, Ph.D.
March 15, 2024

question that the Cammer 5 test is asking, right.

If you go back to the Cammer court and you look in a quote from it, in the report here, the Cammer court said, you know, you're looking for evidence of a cause-and-effect relationship between company disclosures and resulting stock price movements.

Q.    Right.

A.    The Cammer court did not say we're trying to study what impact does the redemption right have on the stock price itself.

So, again, the context here with my report is evaluating the Cammer factors and the other factors to assess market efficiency.

Q.    Okay.  And so the same question then with regard to damages.  Is it fair to say that you didn't explicitly consider the existence of a redemption right for part, but not all, of the class period in providing your opinions with regard to the appropriate models to calculate damages with generalized proofs in this matter?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Again, like I said with the other factors, it is something that I considered, but

Matthew Cain, Ph.D.
March 15, 2024

after considering that, I determined that there was no need to propose an alternative damages methodology that differed from the standard out-of-pocket damages methodology that I explain in my report.

Q.    Okay.  And the reason I'm asking you all of these questions, so that one day there's GNPK security and then the next day there is RDW security.

Did you do any analysis to determine whether the price of the GNPK security transitioned efficiently to the price of the RDW security?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I'm not really sure what you mean when you say -- when you ask whether the price transitioned efficiently.  You mean when the ticker actually changed on the New York Stock Exchange?

Q.    Yes, sir.  What I'm getting to is, ultimately my question is going to be, how do we know that the price transferred efficiently from the old security to the new security?  That's where I was going.

Matthew Cain, Ph.D.
March 15, 2024

A.    Okay.

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    So like I said before, I don't consider these different securities so I wouldn't call it old versus new, just that there was a tickler change in the completion of the business combination.

But I think that your -- you could ask this question or many other types of questions about whether something happened efficiently at any point in time.  And what I would say is that I've assessed all of these different efficiency factors over the course of the class period, and my conclusion from that analysis is that the stock traded efficiently throughout the class period from day one to the last day of the class period and, therefore, because I've concluded that the stock traded efficiently, then that conclusion would apply to any questions about efficiency on any given days or any given points in time, which would include the question you're asking, I think, in the beginning of September 2021 in terms of that transition.

Q.    Notwithstanding the existence of the

Matthew Cain, Ph.D.
March 15, 2024

redemption right, you've just stated that in your

mind it is the same security regardless of the

ticker designation, right?

    A.    Right.  From, again, from the

perspective of a financial economist.  I'm not

offering any legal opinions.

    Q.    Understood.  Just within your area of

expertise.

    A.    Right.

    Q.    Did you examine specifically -- I'm not

implying that you should have -- but did you

examine specifically whether the stock price on

the last day GNPK existed was -- I know I said

efficiently transitioned before and you didn't

like that wording -- but did you examine

specifically whether the stock price that existed

on the last day that GNPK traded was a similar

price, let's say that, to the price of RDW on the

first day it traded?

        MR. SHAEFFER:  Object to form.

BY THE WITNESS:

    A.    Well, I guess I would start off by

saying that there's no reason to expect that any

company's stock price when it closes trading today

should open up at the same price tomorrow in terms

Matthew Cain, Ph.D.
March 15, 2024

of your question.  Because you could have

information that comes out after hours and it can

open up at a different price from where it closed

the previous day.

So I don't think that opening at the

same price where it closed is actually a

precondition or in any way necessary under an

efficient market.

Q.    Well, let me ask you this way, because

I hear what you're saying, and I wasn't really

intending to ask whether the price was the same.

I think I used the word similar.

Accounting for the factors that you

just described, other information, all other

things being equal, did you do any specific

analysis?  You may have done this or you may not

have done this.  I just want to know if you did

any specific analysis on whether the price of GNPK

on its last day of existence was similar to the

price of RDW on its first day of existence,

accounting for all the factors that you're

describing?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Again, I did not explicitly look to see

Matthew Cain, Ph.D.
March 15, 2024

whether the price was similar for the reasons that I explained.  I don't think that would actually be a relevant inquiry into market efficiency.

Q.    Well, that was where I was going.  So in your view -- well, first of all, you didn't do that analysis with regard to market efficiency and the reason is because you didn't believe it was relevant; is that fair?

A.    Yes.

Q.    Okay.  Good enough.

All right.  Let's look at your report and we can go through this pretty quickly.  Okay.

To go to paragraphs 1 and 2, and my question is going to be, is -- are you identifying the assignment that you were asked to complete by the folks who hired you in these paragraphs?

A.    Yes.

Q.    Okay.  And you're basically asked to determine whether the market for Redwire common stock options and warrants was efficient, that's one; and then you were asked to opine on whether damages for investors trading in Redwire common stock options and warrants can be calculated using a common methodology.  Is that a fair summary?

A.    Yes.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Okay.  And then in paragraph 3 you list out sort of a summary of your opinions; is that right?

A.    Yes.

Q.    Okay.  Here's the questions that I have with regard to this because I've had experts surprise me on these.  Did you believe that you had enough time to conduct the research you needed to do in order to render your opinions that are summarized in paragraph 3?

A.    Yes.

Q.    And did you feel that you had access to all of the information you needed to examine before you rendered those opinions?

A.    Yes.

Q.    Okay.  You opined that the market for Redwire common stock, as you defined it, was efficient throughout the class period, right?

A.    Yes.

Q.    Okay.  And just asking you about the GNPK ticker, is it your opinion that the market for the GNPK tickered security was sufficient over the time period that it traded within the class period?

A.    Yes.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Okay.  Switching now to the RDW ticker, and I know that you believe they are the same, is it your opinion that the market for the RDW tickered security was efficient over the time period that it traded during the class period?

A.    Yes.

Q.    And can you describe for us -- I've used the word "efficient," you used it in your report, but I haven't asked you what it means in this context.  Can you tell us?

A.    Yes.  I do talk about that in my report.  But I think I can give you just a high level summary of what I mean by that.

So there are academic definitions of market efficiency which tend to be stricter definitions, and then there's the definition as it's evaluated or considered for purposes of a market efficiency report.

And what I would say is to the high level summary of efficiency is, for purposes of a market efficiency report, is whether the stock price reflects information about the company; does the price reflect information about the company such that the value impact of any alleged misstatements or omissions would be impounded and

Matthew Cain, Ph.D.
March 15, 2024

reflected into the stock price.

So the investors who are trading in the stock are implicitly relying on those previous statements or omissions just by virtue of them being priced into the stock itself.

Q.   I think it's in paragraph 23 of your report, if my notes are right.  You talk about something called "informational efficiency."  Is that what you just described?

And really what I'm getting to is, you know -- first of all, is that accurate?

A.   Yes, that is.

Q.   And can you tell us, unless you already have, what exactly that term "informational efficiency" means?

A.   Yeah.  So, again, I think it -- it goes on -- I go on in subsequent paragraphs, for example, I talk about the Halliburton II court decision, and basically it means that information about the company is reflected in its stock price.

So I think the way that I would provide maybe some additional clarity on what that means is to contrast that with fundamental efficiency. So fundamental efficiency would refer to the stock price actually reflecting the fundamental value of

Matthew Cain, Ph.D.
March 15, 2024

a company.  And that's something that is very different because in any securities class action case there is an allegation that the stock price has been distorted by misrepresentations or omissions and it is no longer reflecting the fundamental value.

So that is not a precondition or prerequisite for market efficiency in this context.

Q.    Okay.  I think I understand what you're saying.  And just to get to the ultimate point, and maybe we can move on after this, is it your opinion that the market for Redwire common stock, as you've used that term in your report, traded in an efficient market on every single day in the class period?

A.    Yes.

Q.    You had -- I wasn't going to ask you too much about options and warrants, but I just want to make sure.

Are your conclusions the same, and when I read the report it seemed like they were, but are your conclusions the same that the market for Redwire options and warrants was efficient throughout the class period?

Matthew Cain, Ph.D.
March 15, 2024

A.    Yes.

Q.    Okay.  And are you using the same kind of informational efficiency when you say "efficient" in answering that question?

A.    Yes.

Q.    Okay.  So there is no difference between efficiencies with regard to trading the common stock versus trading the warrants and options?

A.    That's correct.

Q.    Okay.  Got it.

If you can go to paragraph 107 of your report.  It's where you talk about the 544,000 call option contracts, 131,000 put option contracts.  And those are estimated numbers.

Is it your opinion that each and every one of those call option contracts and put option contracts traded in an efficient manner during the class period?

A.    Yes.

Q.    Okay.  You have given the opinion with regard to the damages calculation that you -- the court can use standard common methodologies.  I think that's the phrase you used for each of the claims.  And then you talked about out-of-pocket

Matthew Cain, Ph.D.
March 15, 2024

damages methodology.

Do you know what I'm referring to?

A.    Yes.

Q.    Is it fair to say that the work that you did with regard to -- all the work you did with regard to identifying a damages model is discussed in your report?

A.    Yes.

Q.    And I'll tell you, the reason I'm asking that is that in my view, reading -- in my mind, reading your opinions, the opinions that you rendered in the damages section were much less -- well, there just wasn't as much analysis.  And I'm just wondering, is that because you didn't have enough information to do damages calculations?  You were just pointing out models?  And let me rephrase the question because I'm just telling you where I'm coming from.

In identifying -- or in rendering the opinion that damages can be calculated using, for lack of a better word, generalized proof or based on common methodologies, did you stop or were you stopped because you didn't have any additional information to evaluate?

MR. SHAEFFER:  Object to form.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

A.    I don't think I would describe it that way.  So I think the first thing I want to clarify is that I do think that in paragraph 125 I have -- I might call it a typo at the end of paragraph 125 where I say that lead plaintiff's claims can be calculated on a class-wide basis through one or more common methodologies.

Q.    Right.

A.    I don't know if that is a typo or just maybe overly vague and confusing the way that I've described it.

Q.    Yes.

A.    Basically -- and I think it's clear when you read through the following paragraphs, but I'm putting forth the out-of-pocket methodology for each of the securities and for each of the claims.

The actual execution of that methodology differs when you calculate it using -- or applying it to the common stock versus the options and the warrants because you have to use the Black-Scholes model or the binomial pricing model or another option pricing model for the options and the warrants.  And I think those are

Matthew Cain, Ph.D.
March 15, 2024

models, and so those are different.

That's kind of what I'm saying in paragraph 125 at the end there, that there's these different ways in which you can actually calculate. But those all still fall under the out-of-pocket methodology as a singular methodology. It's just going to be different for different securities.

So I wanted to clarify that and I know that probably doesn't really answer your question so feel free to ask again.

Q.    I think you answered it. I mean, I was really just asking a more fundamental question.

You just had such a -- the analysis and the other part of your report is very robust and here it wasn't as robust. That was my takeaway.

And my question was, did you stop or were you stopped with your opinions with regard to calculation of damages because you just didn't have any information, any evidence to evaluate?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    So the -- I guess to back up and provide an explanation for why I approached the different sections of my reports differently.

Matthew Cain, Ph.D.
March 15, 2024

So the market efficiency section, those opinions are always premised upon an analysis of, at minimum, the Cammer factors and typically additional factors and that involves an analysis of the data.

At the stage of a case when it proceeds to the loss causation and merits report stage, then I will do an analysis of artificial inflation.  I'll estimate by what amount was stock inflated, if at all.  And then construct an artificial inflation ribbon over the course of a class period which can then -- that's then the formula or the input for the calculation of damages.

But that report and that analysis is not done at the market efficiency stage.  That's done at the loss causation or merits stage.  So at the class certification stage of any report, the burden on me is merely to articulate or put forward a methodology, but it's not my burden or my role at this point in time to actually do those calculations of damages of artificial inflation. That's done after class certification at the loss causation or the merits of a case.

Q.    Okay.

Matthew Cain, Ph.D.
March 15, 2024

A.    I do explain this in the paragraphs here, and I explain that that can also depend on documents or evidence that's produced in the course of discovery, the case record.  Things like that.

Q.    That's where I was going with it. Okay.  I understand.  Yeah, I just wanted to get a sense of why was that differing level of detail in the two opinions.

I want to ask you about -- you know, what we're really here to talk about finally, which is market efficiency and your analysis of cause and effect.  And, again, my layperson's understanding is -- I'll articulate it and you can tell me if this is accurate or not -- that what you're ultimately doing in conducting a cause-and-effect analysis is you're trying to identify new or unexpected information that you believe would cause investors to change their -- their views as to -- or beliefs, I guess, as to the value of the stock.

And once you've done that, then you go and test that.  I mean, is that the basic approach?

MR. SHAEFFER:  Object to form.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

    A.    That's very close to it.  I would just modify that slightly to say that I'm identifying a type of information that might provide new information that would cause investors to change their valuation of the stock, but it also might not.

            And that's something that I explain for a variety of reasons.  Earnings might be announced that are in line with investor expectations or there might be both positive and neglect news and so it might be offsetting.

            So I'm not -- I'm not going through each piece, each announcement, and then throwing some out because I subjectively, you know, determined that, well, this one was more of a mix of good and bad news.  I keep everything in, but at a high level, I define the criteria and say, objectively, an earnings announcement is an opportunity for a company like this, at least, to provide new information for investors that could be value relevant without going all the way into it -- a determination of specific earnings announcements and answering yes or no, was this actually impactful for investors.

Matthew Cain, Ph.D.

March 15, 2024

Q.   Yeah.  And I think you hit on the part that I was really inquiring about, which is, and I'll just ask you this directly:  In your analysis of cause and effect, is it fair to say that what you're looking for is -- is whether, in the first instance, the information is new or unexpected?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.   What is ultimately the goal and what I'm looking for is just evidence from a statistical testing standpoint of whether the stock price reacts to disclosures of new information.

I'm not, again, trying to form an opinion on whether any individual disclosure had price impact or was novel or new or meaningful, but rather at a high level from the perspective of the Cammer 5, what the court said, just testing whether there is evidence that the stock price does react, in general, to new disclosures of information.

Q.   Okay.  So are you saying that there could be, on the one hand, new information that comes out that doesn't impact the stock price or, on the other hand, there could be information that

Matthew Cain, Ph.D.
March 15, 2024

is not new that comes out or not unexpected that does impact the stock price?  Is that a fair summary?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, just as a general rule, talking at a very high level, a hypothetical level, I think all of those are possible for any company.

But what I'm testing for and what I'm basing my opinions and conclusions on is really Exhibit 7 where I look at the difference between these two buckets, News Days and no News Days.

Q.    Right.

A.    I'm looking for a statistical difference from a statistical testing standpoint. That's -- ultimately that's the only conclusion or opinion that I'm drawing from the analysis.

Q.    Okay.  All right.  We're going to go in more detail on that whole issue in a minute.

You described, and I think it was paragraph 26 of your report, the concept we talked about before of informational efficiency, and I think you said this, but let me just make sure I get it on the record, did you examine whether the markets in which this Redwire stock traded were

Matthew Cain, Ph.D.
March 15, 2024

informationally efficient?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Yes.  That's the -- that's the question that I'm asking in the market efficiency section of my report.

Q.    Yeah.  And, again, just trying to make sure I get it and understand it, these are not -- that's what I'm trying to do.

In -- in the world of financial economics, as I guess a financial economist, how can you determine whether a particular piece of information is reflected in stock prices?  And I'm going to read here because you used this phrase, quote, up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs, end quote.

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Yeah.  So one of the things that I look at is an autocorrelation test.  That might be, I don't know, Exhibit 11 maybe.

Q.    I saw that in your report.

A.    So there's -- if the company stock price does not adequately react to new

Matthew Cain, Ph.D.
March 15, 2024

information, then there might be an arbitrage opportunity where an investor, whether it is a hedge fund or a high-frequency trader or just an individual investor or institution, they could come up with a trading strategy because the stock price does not adequately react to new information.

And so a common way to look at that question is with the autocorrelation. Basically you're asking, is there evidence that systematically the prices either under-react or overreact to new information. And if you see this persistent pattern and it is significant and it exceeds the trading costs, the bid-ask spread, then that would -- that would call into question whether the stock price really does adequately react to new information.

Q.    And besides the autocorrelation test that you referenced, are there any other methodologies that you used in that context?

A.    In the context of asking whether there are arbitrage opportunities that would exceed trading costs, I think that's the one that addresses that particular question.

Q.    Okay.

Matthew Cain, Ph.D.
March 15, 2024

A.    Again, I think that that's actually a higher bar.  Asking that question is a higher bar than just the general "however" and "to" type of question about whether prices reflect information.

So, again, I think there is a difference between the question of market efficiency within the legal context here versus the way that academics study market efficiency.

There are countless -- there are numerous academic studies that talk about market efficiency on a micro structure level and they might look at, you know, like, on a second-by-second basis or even shorter than that or hours or days looking at, you know, costs of trading.  And they might see slight differences and they might talk about that as inefficiencies, but that's not the same type of efficiency that we're talking about within a market efficiency report like this.

Q.    Okay.  And it's really the same question I was asking initially just about a specific piece of information.

Would the answer be the same with just, in general, with regard to publicly-available information?

Matthew Cain, Ph.D.
March 15, 2024

A.    Yeah.  I think that's what I'm talking about is publicly-available information.

Q.    Well, let me ask you this then:  Would the answer be different if we were talking about a particular piece of information, specific piece of information?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, I think, again, to the extent you're still talking about publicly-available information, I'm not opining on private information.

Q.    I am referring to something that would be public.

A.    Right.

Q.    But is the analysis different because you're looking at one piece of information as opposed to all publicly-available information?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Right.  So I think that -- this question of market efficiency over a class period can really only be answered by looking at statistics over the course of a class period because you can have an individual announcement

that may come out and the stock price may start to
react to that today and may continue to react
tomorrow.  It may continue to react even for an
additional day after tomorrow.  And there can be a
variety of reasons for that.  And there is
academic research that talks about some of those
reasons.

Q.    Sure.

A.    So for that reason we don't, in the
market efficiency report, we don't look at one
single disclosure in isolation and -- and then
draw any conclusions just from one single data
point because it would be problematic to try to
draw any reliable conclusions just from a single
data point like that.

Q.    Okay.  You mentioned -- you kind of
anticipated where I was going with this
ultimately.  I think there's a phrase -- I can't
remember if it was in the literature or if it was
in your report -- "market impact day."

A.    Uh-huh.

Q.    So I guess my question would be -- I
think you said this already.  There are times
where the effect of the new or unexpected
information will reverberate beyond the market

Matthew Cain, Ph.D.
March 15, 2024

impact day.  Is that fair to say?

A.    Right.  I think --

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    -- it can.  So let's say that the market impact day is -- let's say that information comes out this morning and we see impact today but then we also see impact tomorrow.  So I'd call that a two-day window, right.

So there are times when prices can continue to respond for two, even three days.  And like I said before, there can be multiple reasons for that.

Q.    And then specifically with regard to the arbitrage that you talked about where the -- you know, there isn't any additional meat to be gotten off the bone so to speak.  Is there any difference in the analysis that you're describing on those subsequent days as opposed to the market impact day?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    What do you mean when you ask is there a difference in the analysis?  I'm not sure what you're referring to.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Well, the Event Study.  I mean, what I'm referring to is just that.  Do you look at it any differently because it is a subsequent day as opposed to the market impact day?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    So in the Cammer 5 test, with the Event Study, I'm looking only at the market impact date to see whether there is evidence that the price responds to information coming out.

The -- it's a separate question, though, of whether the price systematically takes two or three days to react to new information when we -- if that were to happen where systematically the stock price tends to under-react or overreact to information, then we would see evidence of that in the autocorrelation test in Exhibit 11.

Q.    Okay.  Okay.  But in any event, if you did look at it, you would expect to see that same phenomenon at work in the subsequent days as opposed to on the market impact day?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Well, again, I think it depends on the question you're asking.  So if you're asking

Matthew Cain, Ph.D.
March 15, 2024

whether a stock price reaction that takes two days instead of one day is evidence against market efficiency for one single disclosure, the answer is no.  That is not evidence against market efficiency.

But if the company stock price systematically, over a long period of time, under-reacts or overreacts to information to the extent that an arbitrage trader could profit, based on that pattern that persists over a long period of time, then that could be evidence that -- that could weigh against market efficiency.

Q.    Right.  I didn't see anything in your report that you saw anything like that in this case, did you?

A.    No.  There was not a statistically significant autocorrelation pattern over time for this company stock.  But, again, you could have an individual disclosure here or there where the price may continue to drop or move or even reverse.  That, on an individual disclosure basis, does not weigh against market efficiency.

Q.    Okay.  All right.

So let's look at exhibit -- I think it is going to be 5.  Is it 4 or 5?  It's the Fama

Matthew Cain, Ph.D.
March 15, 2024

study.  I guess it's a paper from 1970.

And my question is going to be, while she's handing this to you, did you rely on this Fama paper in formulating your opinions with regard to market efficiency?  It's in paragraph 26 of your report I believe.

MS. RUBIN:  Let's mark this as Exhibit 3.

(Deposition Exhibit No. 3 was introduced to the witness.)

MR. SHAEFFER:  Is this the 1970 or 1991?

MR. ZACHERL:  This is the 1970.

MR. SHAEFFER:  Thank you.

BY MR. ZACHERL:

Q.    I think this is the one -- I'm going to look at the report now.  I think it's in paragraph 26.

A.    Yes.  This is one of the academic studies that I cited.

Q.    Okay.  And so I read some of that.  I can't say that I understood it, but I read it. And they talked about something called "semi-strong form efficiency."

Are you familiar with that definition

Matthew Cain, Ph.D.
March 15, 2024

of market efficiency?

A.    Yes.

Q.    All right.  What is the definition of semi-strong form efficiency as opposed to informational efficiency, as we talked about earlier?

A.    Well, I think that the semi-strong form of market efficiencies is very similar to the -- what we talked about as informational efficiency, which is basically when public information is announced and comes out, that it is quickly reflected in the stock prices.

So the way to think about it is to really contrast that with the strong form of market efficiency, which is, in my opinion, a purely theoretical concept that even nonpublic information is also reflected in stock prices.

And, again, I think that's theoretical because I don't think there's really any empirical support for that.

Q.    Hard to test for that?

A.    Right.  Exactly.

But the way you can test it actually is by looking at, when there are disclosures of information that was private information and

Matthew Cain, Ph.D.
March 15, 2024

nonpublic, does the stock price react to the

exposure, and if it does react, then that, in my

view, would reject the strong form because you

would not see any reaction to the disclosure of

nonpublic information if it was already reflected

in the stock prices.

Q.    I hear you.

So with regard to the informational

efficiency versus semi-strong market efficiency,

is it fair to say that, at least as you've done

your analysis here and used these terms in your

report, that they're basically interchangeable?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I think they are very similar.  Like I

said earlier, I think that when academics talk

about efficiency they're often evaluating a much

higher bar than what we're looking at in terms of

informational efficiency within the market

efficiency report from a legal standpoint.

Because academics are often looking at -- for

anomalies.

You know, could you come up -- if you

look at large datasets, could you come up with a

trading strategy where there is a few bases

Matthew Cain, Ph.D.
March 15, 2024

points, you know, that you could identify these patterns.

And I think one of the things that, if you look at a lot of the research -- it's easy to find individual studies that purport to identify anomalies.  But one of the things that Fama and French over time, and others over time have shown, is that most of these anomalies that people will find are not really replicable or persistent.  They're often just consistent with random patterns in the data where they don't account for trading costs or things like that.

So you've got a lot of papers that they say -- they might say we've identified an anomaly and that's inconsistent with semi-strong form market efficiency, and, yet, what we would say is, that does not in any way overturn informational efficiency within sort of a class certification context.

So I do think that, even though there is a lot of overlap, there is also a lot of differences with how academics talk about market efficiency.

Q.    No, that's fair.  And I appreciate you making that distinction.

Matthew Cain, Ph.D.
March 15, 2024

I was really only just asking in your report, from my reading of it, it seemed like you were treating those concepts as more or less the same for the purposes of your analysis?

A.    I think they are very similar because what we're really talking about is whether public information is reflected in stock prices.  So to that extent, that's the same overlapping element between those two terms.

                        (Deposition Exhibit No. 4 was

                          introduced to the witness.)

BY MR. ZACHERL:

Q.    Okay.  So let's look at the '91 study now, which will be Exhibit 4, I believe.  And this is also Fama.  And my reading of that study, which I actually did read, is that they're basically saying that the cleanest way to get cause and effect -- to evaluate cause and effect under semi-strong form market efficiency would be to use an Event Study.  And that's my question to you.

Is that your view, that an Event Study provides the cleanest evidence of cause and effect when you're looking at it under a semi-strong form market efficiency?

A.    Yes, I would agree with that.

Matthew Cain, Ph.D.
March 15, 2024

Q.    All right.  That saves us a lot of time.

The other thing about event studies that I gleaned from reading these different reports or these different sources is that the Event Study can give you a pretty clear picture of the speed of the adjustment of the prices based on information.  Is that fair or is it assumed to be instantaneous?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, I think there is really a lot of sort of subcategories of even academic research that look into the question that you just asked. So there are studies that look at it on a second-by-second basis or minute-by-minute basis, and then there are studies that are more using daily returns.

Q.    You mentioned that, yeah.

A.    So I -- you know, the most common Event Study framework is looking at prices on a daily basis.

Q.    That's what I -- yeah, that's what I'm getting to.  Go ahead and finish your answer. Sorry.

Matthew Cain, Ph.D.
March 15, 2024

A.    So I don't know that that daily type of Event Study necessarily answers your question on speed down to a market microstructure level on a second-by-second basis, but you can use it to look at did it take one day or two days or three days, for example.

Q.    Yeah.  That's where I was ultimately going is, you know, even if you're looking at a price adjustment that occurs over multiple days, is the Event Study the best way for you to get to the bottom of the impact of information on stock price?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, it would depend on the specific question and the specific context.  But what I can tell you is that I've used daily event studies in all of my market efficiency reports and I believe all of my loss causation and merits reports.  You certainly don't have to.  You could use a valuation model, like just kind of cash flow analysis for purposes of loss causation.

But, yeah, in my merits reports, I've looked at daily event studies and there have been times, I would say commonly it is fully impounded

Matthew Cain, Ph.D.
March 15, 2024

on the first market impact date but there are also

times where it might take two or three days and

the Event Study picks that up.

Again, when we're talking about sort of

valuing the alleged misstatements or omissions in

a case by measuring corrective disclosure

impacts --

Q.    Well, I'm going to get there.  The more

immediate question for my purposes, just in terms

of understanding this whole concept of market

efficiency was whether and to what extent, you

know, you were basing your conclusions on the

impact of information on the stock price over a

day, a course of days and I think you've answered

that.  You used a market impact day, is what you

did?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Correct.  I'm testing the market impact

date of the news disclosures to test whether the

prices respond quickly, you know, within one day.

They could continue to respond after one day, but

I'm setting a high bar for asking whether they

respond within that first day to information

disclosures.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Well, you know, you mentioned that there is all sorts of -- my sister is in Academicion, she's a college professor, so she makes this joke all of the time.  You can get a group of academics and you can look at anything, pick something to evaluate -- that is not part of the question, by the way.  It's just funny.  We talk about this all of the time.

We've talked about the millisecond approach, the second approach, we talked about that.  Is there literature that talks about the impact over multiple days?  For example, does Fama talk about that?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I'd have to look through all of -- I think Fama talks about it on average.  So the issue is that a lot of the academic studies talk about average effects.  So I do think that Fama may say on average prices tend to react within the first -- fully react within the first day.

But the problem is that when you're speaking about an average, you're talking about the average of a distribution.  So you could still have a number of observations to the right of that

average where it takes --

Q.    Sort of like an echo or something?

A.    It takes two or three days, even though they're just quoting the average effect.

There are other studies that you can see from graphs.  I think even the MacKinlay study has a graph in there, has several graphs, and if you look at the graphs you can actually see the evidence of two, even three days for some of those graphs, even on average.

And there is other studies that talk about other reasons for why it can take -- it could be more complex information or there could be additional clarity or context provided by follow-up conversations with management or analysts or analysts digesting the information and putting out the reports.

So incrementally some literature talks about leakage and that could be both before the announcement and also additional leakage coming out after the announcement of additional context for information.

So there is, again, sort of just to summarize a long answer, I apologize, but most of the academics will often talk about an average

Matthew Cain, Ph.D.
March 15, 2024

effect, but that, I think, obscures evidence that

you see on a case-by-case basis and also in other

studies that it can easily take more than one day

to be fully reflected in stock prices.

Q.    Okay.  And in all of those scenarios,

what you're really talking about, ultimately, is

the effect of new information on the stock price,

whether it happens instantaneously, over days, or

seconds?

A.    Yes.

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Yes, I am.

Q.    Just to move along, because we are

already -- it's already almost noon, I'm not

halfway through yet, so I want to get through this

today.

Can we look at the Fama 1970 report

again?  I think it is Exhibit 3.  And go to page

404.  There was something I saw in there that I

have some questions about just to make sure I

understand your understanding of this.

Let me know when you're there and I'll

point you to what I'm talking about.

A.    Okay.

Matthew Cain, Ph.D.
March 15, 2024

Q.    There's a section where it talks about -- the sentence starts [as read]:  In general, semi-strong form tests of efficient market models are concerned with whether current prices fully reflect all, obviously, publicly-available information.

Do you see that there?

A.    Yes.

Q.    And then it says [as read]:  Each individual test, however, is concerned with the adjustment of security prices to one kind of information generating event.

And they give some examples.  Do you see that?

A.    Yes.

Q.    Then it says [as read]:  Does each test only bring supporting evidence for the model with the idea that by accumulating such evidence the validity of the model will be established.

Do you see that?

A.    Yes.

Q.    Now, what I want to know is, what is your understanding when they say "the adjustment of the security prices to one kind of information-generating event," what is your

Matthew Cain, Ph.D.
March 15, 2024

understanding of what they're saying there?

A.    So I think that what they're talking about is more from the academic perspective of evaluating this idea of semi-strong form market efficiency and they're referring to a couple of different things that -- I can't remember if -- I can't remember if Fama talks about this.

MR. SHAEFFER:  If you need a minute to look through, take your time.

MR. ZACHERL:  Yeah.  There is no rush.

BY THE WITNESS:

A.    So I know that he's talked about it in other papers and he's sorting hinting at it in this paper, but the challenge with a lot of these academic studies, and this is sort of what they're -- what they're talking about is that if an academic study finds some sort of what they might refer to as a violation of market efficiency or they reject market efficiency, what he explains is that there is like a joint testing problem that it's very possible that your actual model that you used to test it may be flawed.

So it's very difficult to differentiate between whether you rejected market efficiency or you just rejected the model in the way in which

Matthew Cain, Ph.D.
March 15, 2024

you're testing the market efficiency within these academic studies.

So I think that is sort of what -- if I go back to the highlighted portion here, he is kind of talking about the validity of the model at the end of that highlight. So I think that's kind of what's going on. And then he kind of puts out these different models throughout this paper and talks about sort of different dynamics there.

Q.    The part that I'm interested in is the same thing I've been asking you about again and again which is this -- I just lost my microphone -- you know, the price settling within one market day in reaction to the new information.

Is it your view that in an efficient market typically you would have the reaction occurring within one market impact day?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Typically you start to see the reaction on that first market impact day but it could continue for another day or two within efficient market.

Q.    So you're saying that you could have an efficient market and yet it still could take a

Matthew Cain, Ph.D.
March 15, 2024

couple of days for the new information to be fully

reflected in the stock price?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Absolutely.  That is not at all

uncommon to see that empirically.

Q.    Okay.  All right.  I think you answered

a lot of my stuff here.  One second.

You mentioned earlier that there are

many reasons why -- actually you mentioned this in

your report.  I don't think we talked about it

yet.

You said there are many reasons why

stock prices can move.  One of them is new or

unexpected information, but even in the absence of

new or unexpected information there can be

movements in the price.  Do you know what I'm

talking about?

A.    Yes.

Q.    Do you know what I'm referring to

there?

And you described it in your report as,

you know, it could be anything from the sector in

which the stock trading's performing poorly that

day or the overall market not doing well that day

Matthew Cain, Ph.D.
March 15, 2024

or news relating to -- I forget the examples you used, but you gave a number of examples of situations where the stock price can move even in the absence of new or unexpected information.

So what I'm getting to is, in those instances, what is moving the stock price?  That's the question.

A.    Yeah.  So there can be times where the stock price changes even without any information coming out about the company, the market, the industry and that can be a revision of like the bid-and-ask quotes from market makers.

More commonly it can be just trading by different investors.  So investors may be buying and selling at different rates.  So you could have a change in the supply and demand, and that might just be due to random reasons.  You can have a block holder who holds a large chunk of shares and they want to sell down for some reason that has nothing to do with the company.  Maybe they need liquidity and that can have a price impact on the stock.

There can just be other random day-to-day fluctuations in the stock price for any company.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Okay.  And where I'm going with this is just in terms of your expectations as an expert in this field, everything else being equal, if there is -- well, let's ask it this way:  Would you expect to see the stock price go up when there's good news about a company?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    To the extent that that good news is viewed by investors as unambiguously positive in terms of the value of the company and it was also unexpected, it was significant in magnitude, then I would typically expect to see the stock price increase when that information comes out.

Q.    And is the answer the same with regard to stock price decreases after bad news?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Yes.

Q.    That's what I figured.  And then in the absence of good news or bad news, the only thing that's going to move the stock price are the factors that you described earlier, one of which could just be randomness, right?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.     Yeah.  So I don't think I limited myself in any way with that previous answer, right.  So what I said is the price can and does for any company move from day to day.

Q.     Well, yeah, I'm not trying to limit you to what you said.  There could be a myriad of reasons I think is what you're saying.

A.     Exactly.

Q.     Now, when you performed your Event Study, the phrase that you used was the phrase we talked about earlier which was the adjustment of security prices to one kind of information generating event.

Do you remember that?

A.     Yes.

Q.     Okay.  So what type of adjustment did you test then?

A.     I tested whether the stock price starts to react within the first day.

Q.     Okay.

A.     Essentially, immediately upon the release of information.

Q.     All right.  Did you anywhere assess whether Redwire common stock, as you defined that

Matthew Cain, Ph.D.
March 15, 2024

term, went up following good news?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No.  That's not part of the test because that would require subjectivity on my part in terms of defining whether the news was unambiguously good or bad.

Q.    You have anticipated where I was going. So the same question with regard to bad news.  I mean, did you look at whether the Redwire common stock, as you defined that term, went down following bad news?

MR. SHAEFFER:  Same objections.

BY THE WITNESS:

A.    Same as my previous answer.

Q.    Okay.  And then the other way that I phrase this in my thinking, because you have this phrase new and unexpected facts, did you assess whether Redwire common stock, as you have used that term, changed following the arrival of new or unexpected information?

A.    Well, I do think that the way that I've articulated the criteria is to try and focus on announcements that would have the potential to provide new information as opposed to merely the

Matthew Cain, Ph.D.
March 15, 2024

repetition of previous disclosures.  So I do think

I am attempting to focus on things that are new,

yes.

Q.    And the impact of those new things on

the stock price?

A.    Correct.

Q.    That was my takeaway from your report.

So in the context of Redwire common

stock, again, as you've used that term, did you

conclude that the price within a day always

reflected the new information up to the point that

the gains from trading don't exceed the trading

costs?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    So I guess I would -- I think there is

a lot of overlap with what you just asked and what

I did in my report.  But I think you're phrasing

it in a way that is not perfectly aligned with the

tests that I'm doing or the opinions I'm

providing.

So I'm basically testing for

informational efficiency, and I don't see any

evidence of sort of systematic ability of

investors to trade based on historical information

Matthew Cain, Ph.D.
March 15, 2024

and earn an abnormal profit after controlling for trading costs.

Q.    Okay.

A.    But that's not -- you know, we look at all the different factors, the Cammer factors and the other factors that are relevant.  They're not specifically looking at that question, each of those factors.  It is just looking for evidence of informational efficiency over the class period.

Q.    Okay.  All right.  That was my takeaway.

When -- I'm going to switch gears a little bit and talk about the events that you chose to evaluate, which are in that -- I think it's Exhibit 6a to your report.

You mentioned previously that you -- well, let me ask you this way:  Did you believe that each of those events were new or unexpected information at the time that they were released?

A.    I believed that they had the potential to provide new and unexpected information.

Q.    Okay.  And is that one of the reasons why you selected those particular events?

A.    Yes.

Q.    And the reason is because you believed

that those events would be likely to cause

investors to change their beliefs about the value

of the security; is that right?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, that they had the potential to do

so.

Q.    Okay.  Fair enough.  Fair enough.

And then I did see the statistical

analysis you did with regard to News Days versus

what you find as Non-News Days.  And I got into

this earlier a little bit and I am going to

perseverate on this point because I want to

understand it better.

The News Days that you selected, you

said it was because that -- it was because those

potentially had new or unexpected information; is

that what you said?

A.    Yes.

Q.    It is not that you made this decision

that, in fact, each one did.  You just identified

it based on the potential?

A.    Correct.

Q.    Is that fair?

A.    Yes.

Q.    And why is it that you did it that way as opposed to picking dates where you believed that it, in fact, did?

A.    Yeah.  I know this was something we talked about earlier this morning.  The only way to really determine whether an event did have price impact or did reveal new information to the market that caused investors to change their valuation of the company is to look on an ex-post basis after that information came out.  How did investors react to it.  Did it cause the price to move.  Did it have an effect on trading volume. Did it -- do we have evidence from either analysts' reports or media or things that executives said or valuation, you know, theory that would lead us to believe.

And that's an ex-post of evaluation which is something that we do in a loss-causation report.  But for purposes of a Cammer report, my role is to remain objective and to just ex-ante lay out criteria, pull in all the dates that fit that criteria and then test for a cause-and-effect relationship.

If I were to look ex-post and then only include those that I determined revealed

Matthew Cain, Ph.D.
March 15, 2024

information that impacted price, then I would be

altering the test.  I would be putting my hand on

the scale to tilt the test in favor of market

efficiency.

So the goal is to remain agnostic and

objective when carrying out the test itself.

Q.    That's why I was asking the question,

to see exactly what methodology you used.

And then, as we sit here today,

obviously you're looking back at this point, are

you able to identify which of the events you

selected that did cause investors to change their

beliefs about the value of the stock versus which

ones did not?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    That's not explicitly part of the

Cammer test itself.  I think we could certainly

look at Exhibit 6b and we could go row by row and

see that there was a statistically significant

price reaction to many of these, and I think that

would be consistent with a conclusion that those

events caused investors to revise their valuation

of the company itself.  But, you know, the

challenge is that there could also be other

Matthew Cain, Ph.D.

March 15, 2024

disclosures on the same days that may have also

contributed, right, to these things.

Q.    Other causations?

A.    Right.  So at a high level, the test

itself is robust to that because it's a

statistical comparison of these buckets.  But on a

disclosure-by-disclosure basis, in order to really

isolate and identify the causal connection between

here's the disclosure and here's the valuation

impact of that disclosure requires an exhaustive

review of the full information environment around

those time periods.

Q.    Okay.

MR. ZACHERL:  So, you know what let's

do -- it is now 12:11.  Are we having lunch

delivered?

MR. SHAEFFER:  Yeah, it has been

delivered.

MR. ZACHERL:  So do you guys want to

take, say, 20 minutes, eat, and then we go

back on the record?  I'm going to ask you

some more questions on this whole topic, but

I want to start looking at your Exhibit 6a

and getting more granular so we can finish

up.  Maybe -- it's 12:11.  You want to say

Matthew Cain, Ph.D.
March 15, 2024

12:40 we'll come back?

MR. SHAEFFER:  That's fine for me.

THE WITNESS:  Fine for me.

MR. ZACHERL:  Just to shorten up the day if we can.

MR. SHAEFFER:  That's fine.

MR. ZACHERL:  We all okay to go off the record?

MR. SCHAEFFER:  Yes.

THE VIDEOGRAPHER:  Going off the record.  The time is 12:11 p.m. Central.

(Whereupon, a break was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER:  So we are back on the record.  The time is 12:53 p.m. Central.

BY MR. ZACHERL:

Q.    Thank you.  Dr. Cain, I want to look at your Exhibit 6a to your report.  It is page 7.

A.    Yes.

Q.    The first question is:  Does Exhibit 6a contain all of the events that you identified for your Event Study?

A.    That is all of the News Days that form the News Days and the analysis period.  And then I

Matthew Cain, Ph.D.
March 15, 2024

think a subset also in one of the iterations of the Cammer test, a subset of those, but yes, that is all of the News Day events that I'm testing.

Q.    Okay.  All right.

And just by looking at Exhibit 6a, is there anything you can tell us about your Event Study in terms of the selection?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I describe that in the paragraph earlier in the report.  So there are two -- two categories of objective criteria.  So prior to the closing of the business combination I looked for information about the identification of the SPAC target and then updates on the potential closing of the transaction, the two key events for the life of the SPAC, and then throughout the full analysis period.

The second category of information is earnings announcements or information about those earnings announcements or inability to file those earnings announcements.  So those are the two, sort of, objective criteria that each of these News Days would fall within one of those two categories.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Okay.  Okay.  And then is it fair to say that each one of the separate lines, 1 through 12, in this exhibit is a separate -- I should say a different event that you used as part of your Event Study?

A.    Yes.

Q.    And you used a phrase I want to ask you about, this key communication.  Would you say that each one of these 12 events is a key communication or represents a key communication?

A.    Yes.  I think just in the way that I'm defining those criteria within the report, I think each of those events falls within that criteria as -- you could call it a key communication, sure.  I think that's fair.

Q.    Okay.  And is it your view, as the person who selected these 12 events, that each one of these 12 events or key communications, whatever you want to call them, publicly discloses a new or unexpected fact or piece of information?

A.    It is my opinion that each one of those has the potential to do that.  Again, like we talked about this morning, I've not gone through and conducted a subjective assessment and then kicked certain ones out if I felt that it was not

Matthew Cain, Ph.D.
March 15, 2024

new enough or substantial enough, but rather

sticking to the objective criteria and saying each

of these 12 events has the potential to disclose

new value relevant information to investors.

Q.    Okay.  So let's just go through a few

of these.  Let's look at event number 2, which is

May 18th, 2021, Genesis Park Acquisition

Corporation - Late Filing Notice.

Do you see that?

A.    Yes.

Q.    Now, for that -- for that event, what

was the new or unexpected information that you

were examining in your Event Study?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    It was the potential information that

the company may be unable to timely report

financials to investors.  So it's related to --

these notifications, these late filing notices or

notifications are all connected to the criteria of

the earnings announcement.

Q.    Okay.  Anything else besides what you

just described?

A.    That is the reason that they're

selected.  Obviously, any of these may actually

Matthew Cain, Ph.D.
March 15, 2024

disclose a variety of pieces of information, but that's the criteria that is used to select each of these dates.

Q.    How about event 3, September 2nd, 2021, the announcing shareholder approval of the business combination?  Same question:  What was the new or unexpected information contained in that communication that you were using for your Event Study?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    So the information for number 3, that was included because the first category of disclosures that I selected relate to information about the identification of the SPAC target and the potential closing of the transaction.

So for example, if they announced that they were going to terminate the deal or shareholders had not approved it, anything along those lines, and conversely announcements about shareholders approving the deal or finalizing the transaction, completing the transaction so it has the potential to provide information to investors about the ultimate completion of the merger with the SPAC target.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Okay.  With regard to this one which is event number 3, anything else other than what you described that you would characterize as new or unexpected information?

A.    So, again, like I said, any of these might have multiple pieces of information that was actually disclosed, which is an ex-post analysis that I could look at.  But that's not the analysis here.  Rather, this is the potential to give investors information about the completion.  So that's the reason that it was selected for the sample here.

Q.    Okay.  And let's look at the next one in your Event Study.  Event number 4, the next day, September 3rd, 2021, Redwire Announces Completion of Business Combination With Genesis Park Acquisition Corporation.

Do you see that one?

A.    Yes.

Q.    What's the new or unexpected information in number 4 that you're evaluating?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    So it's similar to the previous answer. I am including this in the sample of News Days

Matthew Cain, Ph.D.
March 15, 2024

because it has the potential to provide investors

with an update or information about the completion

of the transaction itself.

Q.    Okay.  And this is one of the ones I

was thinking of when I asked you earlier about --

hypothetically about, you know, two announcements

on consecutive days that are more or less the same

information.

And I'm going to ask you the question

now.  Would you agree with me that in -- that

number 4 is more or less a recapitulation of what

number 3 was the day before shareholders had

approved and the next day the combination closes?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No.  I don't think it is just a

regurgitation of the same information.

So the reason for that would be that

you could have shareholders approve a merger

transaction and yet the merger transaction may

still not be completed.  There could be a variety

of reasons.  There could be issues with financing.

Closing, you could have regulatory issues.  You

could have other issues that could come up.

So I've seen -- I've worked on cases in

Matthew Cain, Ph.D.
March 15, 2024

which the financing is all fully funded for an offering like a bond offering and yet on the day that it is suppose to close, the company announces that they are not going to be able to close the bond offering because they've discovered accounting irregularities, for example.

So that's why there is still incrementally the potential for new information coming out on September 3rd, even though on September 2nd, we've got a market impact date for the shareholder approval of the transaction.

Q.    Okay.  So you described what could have happened, and in other cases may have happened with regard to a gap, I guess, between shareholder approval and the actual combination closing.

In this case, if you're an investor on September 2nd and you hear that shareholders have approved it, and then the next day on September 3rd, you hear that the transaction has been completed, in this case, there really are no differences between those two disclosures, correct?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No, absolutely not.  Again, until a

business combination is completed, there's still the possibility that it may not be completed, right?

So if shareholders -- hypothetically speaking, if on September 2nd shareholders say, okay, we've passed this hurdle of the shareholder vote, there still may be uncertainty until the deal actually closes regarding the financing being lined up.

Q.   For example.

A.   For example, or regulatory reviews or anything else.  So there could still be new information when the transaction closes even though both of those may be directionally similar pieces of information that can still be separate and distinct pieces of information.

Q.   So am I doing what you said you didn't do, which is asking you after the fact to look back and, as a factual matter, you know, from one day to the next nothing changed but you didn't do that analysis for the purposes of this report; is that where we're disconnecting on this?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.   No.  Again, I think when I look at the

Matthew Cain, Ph.D.
March 15, 2024

criteria, I'm selecting the News Days that fit

within that objective criteria.  And I disagree

with you characterizing September 3rd, even

looking at it after the fact, as the same

information that came out on the 2nd, because it

is not the same information.  It is actually

different information.

There is a difference between

shareholder approval and actual completion of a

deal or a financing transaction or any other

transaction.  Those are two separate pieces of

information.

Q.    Okay.  We'll come back to that.  I

don't want to belabor that right now.  I want to

get through the other ones.

What about 5?  November 10th, 2021,

Redwire Corporation to Reschedule Third Quarter

2021 Results.  Is this one of those delay issues

that you mentioned earlier?

A.    Yes.

Q.    What is the new or unexpected

information?  I interrupted you.  I'm sorry.

A.    Go ahead.  No, you're fine.

Q.    Just what is the new or unexpected

information that's provided here in number 5?

Matthew Cain, Ph.D.
March 15, 2024

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    So this is potential information relating to earnings for the company.  So when I laid out the criteria for all of the earnings announcements, each earnings announcement has the potential to provide new information to the market but also an announcement that the company may be unable to report earnings on a timely basis. That's also new information.

So that's the potential new information on November 10th for this one.

Q.    Okay.  Let's look at number 6, which is the November 15th, 2021, Late Filing Notice (Form NT 10-Q).  What's the new or unexpected information in that number 6?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    And it is a similar answer to the previous one.  There can be the potential for new information provided to investors for any announcements relating to the potential inability to report financials or earnings on a timely basis.

Q.    For the last couple of these, you have

Matthew Cain, Ph.D.
March 15, 2024

used the word "potential." And I understand why because that is your methodology.

But would you agree with me that you're unable to articulate, as we sit here today, any new or unexpected information that are -- that was contained, for example, in the November 15th, disclosure that wasn't already provided in the November 10th disclosure?

MR. SHAEFFER: Object to form.

BY THE WITNESS:

A. I don't have those disclosures memorized. I'd be happy to look at both of those and I can -- I did look at both of those as I was preparing the report, but, again, the Cammer 5 analysis is not -- and as you can see from my report, I'm not going through each of these dates and actually providing an assessment of all of the pieces of information that came out in each of these because each of these 12 observations has a lot of information associated with it and I don't have it memorized.

But to the extent that you have a question about rows 5 and 6, whether November 15th differed from November 10th in any way, I'd be happy to look at the complaint or the actual

Matthew Cain, Ph.D.
March 15, 2024

disclosures and talk through those with you if

that is helpful.

Q.    Well, let me ask you this way just to

save us time:  Would you agree with me that

whatever new or unexpected information there is

would be readily apparent by comparing the two

disclosures?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, I guess it depends on -- I guess

I don't think I would agree with that blanket

statement.

So for example, a company -- just use

another example but within a very similar context

--  a company can announce earnings, right, and

then you might have an 8K in an earnings press

release that has a lot of information, but then

the company may then have an earnings call that it

hosts with research analysts who can ask questions

and the executives may provide additional

information on the earnings call, additional color

and context were the earnings, they'll answer

questions from analysts so you can get additional

information from that.

And there can even be follow-up

Matthew Cain, Ph.D.
March 15, 2024

conversations they might have with analysis over

the subsequent days.  They may go on and do --

give interviews to the financial press and provide

additional context and color.

So I think for that reason, I don't --

I would not agree that you can simply look at two

documents and necessarily identify the totality of

new information that's revealed.  But that's a

good starting point, right, to look at the

documents and see how they may differ.  That's a

good starting point.

Q.   Okay.  And so I understand the example

that you gave.  Let me ask you about these actual

disclosures.

On November 10th, Redwire announced

that they were rescheduling the third quarter 2021

results, and then on November 15th they did the

late filing notice confirming that.

What are -- what is the new information

in the late filing notice that wasn't already

contained in the announcement that they're going

to reschedule the results?  Do you understand my

question?

MR. SHAEFFER:  Object to form.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

A.    I do understand your question.

My recollection is that those are -- there's more detail provided in the complaint on both of those.  Let me turn back to my -- earlier in my report to see if I summarize any of that.

So I think paragraph 19 of my report provides a very high level summary of the way the complaint alleges that the different pieces of information were provided on November 10th versus November 15th.  And that refers to different portions of the complaint and also the actual press release from Redwire.

But I won't waste your time by reading the entirety of paragraph 19, but I think that is a high level summary.  Beyond that, I don't have these memorized, so I'd have to look at the documents to talk in more specificity.

Q.    I see what's here in paragraph 19, and I appreciate you referring us to that.  It looks like on November 10th, Redwire said they were going to postpone the release of their third quarter earnings and they give the reasons why.

And then on November 15th they say they can't timely file the quarterly report as opposed

Matthew Cain, Ph.D.
March 15, 2024

to saying they are going to postpone the release
of the quarterly report for the 3rd quarter and
then they give the reasons why.  Is that accurate?

A.    Yeah.  And I think there is a little
bit more at the end of paragraph 19 where it says
they stated the company has not been able to
finalize financial statements or its assessment of
the effectiveness of its disclosure controls and
procedures and any impact.  But that's the summary
that I provide in paragraph 19.

Q.    When you were preparing this report in
the days -- or the time period leading up to
preparing the report, did you read the actual
releases or did you just look at the titles of the
releases?

A.    I read the releases.

Q.    And that would have been you or
somebody working with you?

A.    I would assume they also read the
releases, but I did as well.

Q.    You read them yourself?

A.    Yes.

Q.    Okay.  I asked you earlier with these
sorts of announcements, just relating to the
timing of a quarterly filing, would we be able to

Matthew Cain, Ph.D.
March 15, 2024

glean the differences in the announcements from

the announcements themselves?

            MR. SHAEFFER:  Object to form.

BY THE WITNESS:

    A.    So I think the first part of your

question where you said "these announcements" just

relate to the timing of filings.  I don't

necessarily agree that that's a full and accurate

description of the November announcements.

            But beyond that, in terms of the

question of whether we could assess the full

importance or impact for investors of those,

purely from reading the announcements, that is not

an opinion that I formed at this point in time.

            I think that because these are alleged

corrected disclosures, if I were to -- if I were

asked to form any opinion about the importance or

the relevance of the price impact for investors, I

would want to conduct a more thorough review and

analysis of the information environment before

forming any sorts of opinions.

    Q.    Okay.  And you made a fair point.  I

was incomplete when I was describing it.  It is

not just that there is going to be a delay.  There

is also the reason given for the delay.  That's

Matthew Cain, Ph.D.
March 15, 2024

the second part, right?

A.    That's possible.  Again, at the end of paragraph 19, the summary talks about these other disclosures.  I don't know if -- because I don't have the disclosure memorized, I don't recall if it was presented as the reason for the delay or just presented as additional information or disclosure.  I'd have to look at that in context.

Q.    Let me ask you this:  You cited to the complaint for these quotations, not the actual disclosures, correct?

A.    Well, I think I've give -- in Footnote 8 I refer to the Redwire press release from November 10th.

Q.    You do, actually.  Yes, that's true.

A.    And so I certainly did review, but I also cite to the complaint so I would say both.

Q.    Okay.  Now, what I'm ultimately going to ask you is, with regard to these two disclosures, the second one, the quote in your paragraph 19 is [as read]:  The company has been -- has not been able to finalize its financial statements or its assessment of the effectiveness of its disclosure controls and procedures and any impact.

Matthew Cain, Ph.D.
March 15, 2024

Do you see that?

A.    I do.

Q.    And then in the -- the announcement on November 10th is actually more detailed.  It says that they're going to postpone their earnings results due to a notification from employee about potential accounting issues at a business subunit and that its audit committee had opened an internal investigation.

Do you see that?

A.    I see that quote, yes.

Q.    I mean, wouldn't you agree that the reasons given with regard to the November 10th and the November 15th disclosures are pretty much the same?  One is just more specific than the other?

MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

Q.    Just using the words in this paragraph?

A.    No, I don't necessarily agree with your interpretation of the disclosures.

Q.    What is different about the disclosure on November 15th as it is written here as opposed to November 10th, other than the fact that different words were used and November 10th was more specific?

Matthew Cain, Ph.D.
March 15, 2024

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Well, again, like I said before, I would really like to look at both of the disclosures if possible if you're asking me to evaluate their difference.

Q.    Let's do that.  And can you get those, Glennys?

And while we're doing that, just based on the language in paragraph 19, are you able to tell me whether those reasons for the delay are substantially similar without looking at the actual press releases?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    So just looking at my very cursory summary in paragraph 19, I do think that the -- at the end of paragraph 19 provides disclosures that are not contained within the November 10th disclosure in terms of stating that company has not been able to finalize its final statements or its assessment of the effectiveness of its disclosure controls and procedures and any impact.

Q.    You don't think that that subsumes or would include a notification by an employee about

Matthew Cain, Ph.D.
March 15, 2024

potential accounting issues in the business

subunit and that the audit committee had opened an

internal investigation?

          MR. SHAEFFER:  Object to form.

BY THE WITNESS:

     A.    Just in terms of my summary, I think

those two things are different.  It sounds to me

like you're asking a question that is more along

the lines of a loss causation and damages

question, which is, could the second disclosure be

corrective, I think is the impression that I'm

getting.  And obviously I've not formed any

opinions and I think that would require an indepth

loss-causation analysis including looking at the

information environment to really answer this

question of whether incrementally investors

learned something new on November 15th relative to

what they knew as of November 10th.

     Q.    Well, yeah.  And the second part of

what you just said is what I'm looking for, but

not for the reason that you identified in terms of

loss causation.

          I'm really just looking at it at a more

fundamental level, isn't it true that the

announcements are more or less the same.  That's

Matthew Cain, Ph.D.
March 15, 2024

really where I'm coming from.

So before -- and you said no.  You answered that, I believe, a few times.  So I don't want to belabor the point but I do want to show you the disclosures.

MR. ZACHERL:  Glennys, on my computer I have the November 10th disclosure.

MS. RUBIN:  That's what I put up here and it is going to be exhibit -- is this the correct one we're looking at?

MR. ZACHERL:  Is that November 10th?  Yes.

MS. RUBIN:  This will be Exhibit 5.

(Deposition Exhibit Nos. 5-6 were introduced to the witness.)

MR. ZACHERL:  Does the witness have it in front of him?

MS. RUBIN:  Not yet.

MR. ZACHERL:  And I'm going to ask you, sir, once it's put in front of you, and I think this is going to be Exhibit 5 and 6; is that right?

MS. RUBIN:  Five will be November 10th, and 6 --

Matthew Cain, Ph.D.
March 15, 2024

BY MR. ZACHERL:

Q.    If you could review Exhibit 5, which is the November 10th.  It's pretty short and then we'll give you Exhibit 6, which will be the November 15th.  And we'll take a second.

Have you had a chance to read Exhibit 5, sir?

A.    Yes.

Q.    The November 10th disclosure?

A.    Yes.

Q.    Okay.  And so ultimately what they say in the second full paragraph is that the company hasn't finalized its financial statements.  They expect to file Form NT 10-Q and they voluntarily reported the matter to the SEC, correct?

A.    Yes, I see that.

Q.    And so when the NT 10-Q is filed, that's not new information because they already had said here that they were expecting to file one; is that right?

MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

Q.    Five days later?

A.    Again, I would want to take a look at the November 15th disclosure as well to answer

Matthew Cain, Ph.D.
March 15, 2024

your question.

Q.   Let's get it out.

MR. ZACHERL:  I may have it here if you don't have it.  I have it.  It's in the exhibits to his report.

MS. RUBIN:  What number is that?

MR. ZACHERL:  This is going to be number 6.

MS. RUBIN:  No, no.  What number exhibit did we have it marked as or is this attached?

MR. ZACHERL:  It came from the other side.  It is in the SEC's filings that were part of his report.

MS. RUBIN:  Okay.  Is there an exhibit letter?

MR. ZACHERL:  No.

MS. RUBIN:  It's just part of his report?

MR. ZACHERL:  At least in the version I have it doesn't have an exhibit number.

MS. RUBIN:  So I will post the report.

MR. ZACHERL:  And like I said, if you want to use mine, that's fine.

MS. RUBIN:  It was exhibit what?

Matthew Cain, Ph.D.
March 15, 2024

MR. ZACHERL:  Well, it's not an exhibit number to his report.  It's the stuff that he looked at preparing the report.  So it's the November 15th, NT 10-Q, the actual filing.

MS. RUBIN:  Okay.

MR. ZACHERL:  As opposed to the announcement.

BY MR. ZACHERL:

Q.    We're going to be handing you now what's been marked as Exhibit 6 for this deposition.  I'll represent to you it is the NT 10-Q filed by Redwire for the period ending September 30th, 2021.  The filing date is November 15th, 2021.

(Deposition Exhibit No. 6 was introduced to the witness.)

MR. ZACHERL:  Take your time to read it and let me know when you're done.

THE WITNESS:  Okay.

BY MR. ZACHERL:

Q.    Did you look at the narrative section of Exhibit 6?

A.    Yes, I did.

Q.    You see in the narrative section it talks about almost verbatim the same language that

Matthew Cain, Ph.D.
March 15, 2024

was in the press release about potentially accounting issues at a business subunit, that it's been reported to the audit committee and they commenced an independent investigation and the company has voluntarily notified the SEC.

Do you see that?

A.    I see some parts that are very similarly reported the same, yes.

Q.    And what I'm getting to is, that is the meat of this, isn't it?  That's the meat of this filing?  They'll followed through now and said we're going to be delayed in making this third quarter report because of these issues that we described in this document.  Is that a fair the summary?

MR. SHAEFFER:  Object to the form.

BY THE WITNESS:

A.    I don't know that I necessarily agree with your assessment of the comparison between the two documents.

Q.    What would you disagree with?

A.    Well, even just looking at the two documents there are additional disclosures provided in the Exhibit 6 here on November 15th.

Q.    And what are those?

Matthew Cain, Ph.D.
March 15, 2024

A.    So, for example, it says the company has not been able to finalize its financial statements or its assessment of the effectiveness of its disclosure controls and procedures and any impact relating to the Form 10-Q.

It also says that the audit committee investigation is ongoing and the company cannot predict the duration or outcome of the investigation.

Under part 4 there is a box checked under number 3 on [as read]:  Is it anticipated that any significant change in results of operations from the corresponding period for the last fiscal year will be reflected by their earnings statements to be included in the subject report or portion thereof.  The box is checked yes.

And then it goes on below point 3 and there is a paragraph that talks about some additional results that reflect significant changes from the corresponding period of the prior fiscal year.

So, again, I've conducted an assessment of the information environment.  But I do think just looking on the surface of these two

Matthew Cain, Ph.D.
March 15, 2024

documents, there's very clearly some differences.

Q.    Okay.  That's fair with regard to differences.  But let me ask you now about new or unexpected information.

In Exhibit 6, what is unexpected that wasn't already disclosed in Exhibit 5?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, I've not conducted an assessment of market expectations in terms of evaluating the entirety of the information environment and looking at what did investors know at each point in time and what was actually expected versus unexpected.

But in terms of what was new between these two documents, I think all of the things that I just mentioned with the previous answer are all new relative to the Exhibit 5 document.

Q.    Let me ask you about that for a second. It's new in the sense that it wasn't in the press release, but it's not unusual nor is it unexpected for this additional information to be provided in the actual filing; is that fair?

MR. SHAEFFER:  Object to form.

Matthew Cain, Ph.D.
March 15, 2024

BY MR. ZACHERL:

Q.    Based on your experience?

A.    I'm not sure what you mean by that.

Q.    Well, what I'm getting to is, and really maybe we're getting caught up in the nomenclature between new and unexpected, but the additional information that you mentioned that is in Exhibit 6 is not in Exhibit 5, none of that is really information that's surprising, is it?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Like I said before, I have not conducted an assessment of the information environment to form any opinions on whether any of this information was surprising to investors.

Q.    Well, let's go through just a couple of these because I don't think it will take that long and it might be helpful in terms of narrowing the gap between where my mind is at and where you're at.

So if we look at part 4 or the information that you alluded to earlier in Exhibit 6, and the number 2, have all other periodic reports required during the previous 12 months -- I'm paraphrasing -- been filed, the answer is yes.

Matthew Cain, Ph.D.
March 15, 2024

Do you see that there?

A.    Yes, I do.

Q.    Okay.  Now, that's new information but is not really material to investors in the sense of impacting the price of the stock.  Would you agree with me on that?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I have not conducted any sort of assessment to reach an opinion on that question one way or another at this point in time.

Q.    So as we sit here today, you can't answer that question?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Well, it is a question that is answerable.  It's just that I have not done the analysis to try to form an opinion on it at this point in time.

Q.    Well, let me ask you a slightly different question because it may just be the way I phrased that.

This is -- this is information that's provided under applicable law.  I mean, this is -- let me ask it this way.  This is a form that a

Matthew Cain, Ph.D.
March 15, 2024

company is required to file when they're making --

a publicly traded company is required to file when

they're making a late filing, correct?

    A.    The NT -- the NT 10-Q form, is that

what you mean?

    Q.    Yes, sir.

    A.    Yes.  That is consistent with my

understanding of the securities regulations.

    Q.    Okay.  So this question is on every --

is answered on every NT 10-Q that's filed,

correct?

        MR. SHAEFFER:  Object to form.

BY THE WITNESS:

    A.    That's not a research question that I

looked into or sought to answer so I don't know

one way or another.  I have not analyzed all NT

10-Qs.

    Q.    Well, do you think that there is

different NT 10-Q forms that are used by the SEC

in this situation when a company is not able to

timely make its quarterly filings?

        MR. SHAEFFER:  Object to form.

BY THE WITNESS:

    A.    It's not something that I looked into

to research are there any differences across NT

Matthew Cain, Ph.D.
March 15, 2024

10-Qs for different companies.

Q.    Okay.  So as we sit here today, you don't know.  Is that the answer?

A.    Yeah.  That's, I think, something I just don't know, whether the NT 10-Qs have changed over time or are there differences.  Obviously, there's differences in the disclosures within those 10-Qs, that we've been talking about, but beyond the starting points for those, I'd have to do more research to get up to speed on that.

Q.    Okay.  So let's look at Number 3 and the other thing you mentioned is new information.  Is it anticipated -- and I'm going to be paraphrasing again -- that any significant change in results of operations from the corresponding period for the last fiscal year will be reflected by the earning statement to be included in the subject report, and the answer is yes.

Do you see that there?

A.    I see it.  I didn't describe it necessarily as new information; just something that was provided in this exhibit that was not provided in Exhibit 5.

Q.    Okay.  But that wouldn't -- really neither of these answers would qualify as new or

Matthew Cain, Ph.D.

March 15, 2024

unexpected information under the way you used

those terms in your report, correct?

            MR. SHAEFFER:  Object to form.

BY THE WITNESS:

    A.    So, again, I have not conducted an

analysis or an assessment of the information

environment to form an opinion one way or another

on whether them checking the box yes under section

3 presented incrementally new information for

investors at that point in time.

    Q.    Well, all they've said here in number 3

is that there is anticipated there will be a

significant change.  But it doesn't say whether

it's a good change or a bad change, right?

    A.    In terms of that box, it's just a

yes-or-no box so I would agree it is just checking

a box and before you get into any of the other

disclosures, yes.

    Q.    Okay.  And then with regard to number 2

and 3, that's the only additional information

that's provided in this report, correct?

            MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

    Q.    Over to the five, excuse me.

            MR. SHAEFFER:  Same objection.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

A.    I'm sorry, could you say the question again?

Q.    Yes, sir.  Maybe I misunderstood your testimony earlier.

My understanding is that the information in Exhibit 6 that's different from the information that we talked about in Exhibit 5 is the answer to these two questions, numbers 2 and 3, under Part 4, Other Information; is that correct?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No, I don't think that's consistent with my prior answers.

Q.    Okay.  What is the other new information besides 2 and 3?  And forgive me if you've answered this already.  I just didn't get it.

A.    Sure.  So, first, I have not formed any opinions on what was new information for investors because I have not evaluated the information environment.  But what I was explaining is that there are differences between Exhibit 5 and Exhibit 6 here in terms of just looking on the

Matthew Cain, Ph.D.
March 15, 2024

surface, and part of that comes in part 3,

Narrative, and part of that comes in part 4, Other

Information under Exhibit 6 here.

     Q.     Got it.  Okay.

            All right.  So you said that you

have -- you don't have an opinion with regard to

whether there is new information.  Is the same

true with regard to whether there is unexpected

information?  You just haven't done the analysis

to have an opinion on that?

            MR. SHAEFFER:  Object to form.

BY THE WITNESS:

     A.     Yeah, that's correct.  Like I said, I

have not done analysis to determine whether there

was new unexpected information provided to

investors through these disclosures at this point

in time.

     Q.     Okay.  And other than the fact that

there are some slight differences as you described

them in the information provided in 5 and 6,

you're not able to identify what is new and

unexpected as between 6 and 5 as we sit here

today, correct?

            MR. SHAEFFER:  Object to form.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

    A.    Well, again, I did not describe them as slight differences in information.  So I point you back to my previous answers, but the latter part of your question, I agree.  I have not done an assessment of the information environment and I have not formed any opinions on what was new, surprising or unexpected information provided to investors on November 15th.

    Q.    Okay.  Fair enough.  I was -- when I said slight, that was my own impression was not your word.  I'm not sure exactly what you said.  That was just my takeaway.

          I think there is only one other one that is before -- yeah, the rest of these are financial.  So number 7, March 31st, 2022, Redwire's Late Filing Notice, NT 10-Q, it was filed after hours on March 30th, 2022.  Do you see that?

    A.    I do.

    Q.    What was the new or unexpected information in that filing or that -- that filing?

          MR. SHAEFFER:  Object to form.

BY THE WITNESS:

    A.    I think it is going to be a slot of

Matthew Cain, Ph.D.
March 15, 2024

similar answers to the ones you were just asking

about.  I would point you also to paragraph 20 in

my report where I talk about what the complaint

alleges was revealed to investors.  I'm sorry, I

might be looking at the wrong dates.  Let me just

--

Q.    The one I can orient you, it's number

7, March 31st, 2022, and it is a late filing

notice NT 10-K.  It included this notice in an 8-K

filed the day before.

A.    Got it.

MS. RUBIN:  This will be Exhibit 7?

MR. ZACHERL:  I don't know if we have

to look at it or not.  I just want to know if

the witness knows right now what the new or

unexpected information in that document was.

MR. SHAEFFER:  I'm going to make the

same objection to form.

BY THE WITNESS:

A.    So like the previous ones, I've not

sought to identify what information was actually

new or unexpected for investors.  I do recall

looking at this filing.  I don't have it

memorized, but I do recall that there were some

discussion within that filing relating to -- I

believe it was commenting on restatements or the need to do restatements.  But I would have to look at the actual filing to refresh my recollection.

Q.   Okay.  All right.  Let me switch gears a little bit.  I don't think we need to look at the filing.  I mean, the filing speaks for itself, right?  It either contains new or unexpected information or it doesn't, right?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.   No, I don't think that's an accurate way to describe filings or disclosures.  But I do think you can look at the disclosure and look at what it says.  Sometimes there are, you know, calls or further conversations or context provided by investors or anyone else or executives at the company, but I do think -- I agree, like I said before, a good starting point is to look at the filing itself and see what it says.

Q.   The folks that helped you draft the report in this case, are those people that you pay and it comes out of your $950 an hour or are those people that you bill to the client, I'm guessing at a reduced rate, and the client pays for the -- the person who hired you pays for their time?

Matthew Cain, Ph.D.
March 15, 2024

A.    So in this case, Hagens, Berman retained both Fideres and me, and I believe that the retention was through Fideres, and so I actually bill my time to Fideres and then they pass that along to the client.  So the client pays Fideres directly.  It doesn't in any way come out of my billings.

Q.    Okay.  Well, the reason I was asking is you said earlier that at least with regard to some of these other events that you have included in your Event Study, you would have reviewed the press release and they would have reviewed it also?

A.    I said that I definitely recall reviewing them, and I believe that they also reviewed the content.  They may not have reviewed it as closely as I did.  But I can certainly speak for myself that I reviewed the content of these, yes.

Q.    Okay.  I want to switch gears a little bit and look at 6a, and I want to bring you back to your report.  Actually not 6a.  It is getting late in the day.  I need more coffee is what I need.  Sorry about that.

I'll summarize what I think your

Matthew Cain, Ph.D.
March 15, 2024

approach was and tell me if I got this right.  So

you listed out Cammer factors and additional

factors for 11 factors in total, and then you

listed out three comparisons that you did to

academic literature, statistical information, and

I think the third one was peer-reviewed -- I'm

sorry, court decisions?

        MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

    Q.    Do I have that right in term of your

methodology?

    A.    Generally speaking at a high level.

There may be some factors where the court provided

guidance and other factors where the court did not

provide guidance, right.  Or there may be some

factors where I have a benchmark from a

peer-reviewed academic study and some that I

don't.  But yes, I think at a high level, that's

fair.

    Q.    Well, and where I'm going is I didn't

see that for each of the 11 factors you compared

the factors' application against each of those

three things.  Is that accurate?

    A.    Yes.  Just like I said at the previous

response.  The Cammer court, for example, provided

Matthew Cain, Ph.D.
March 15, 2024

guidance for trading volume, turnover, for

example.  But the Cammer court did not provide

guidance for a benchmark to assess analyst

coverage, for example.

So there are -- with some of the

factors, we have a threshold or a benchmark that

was actually put forward by the court and other

ones we don't.  So that's why you'll see

differences across the different factors with the

benchmarks I'm using to evaluate them.

Q.    Take a look at -- thank you for that,

by the way.

Take a look at paragraph 31 of your

report.  I want to direct your attention to the

language that you used here because it might just

have been loose language but I want to make sure I

understand because I wasn't sure if I had seen

everything.

You write here in paragraph 31 [as

read]:  In the following section I discuss the

Cammer, Krogman, and additional factors and

evaluate them in relation to Redwire common stock.

In doing so, I compare the factors' application to

Redwire's common stock against, one, benchmarked

by the courts; two, scientific tests, statistical

Matthew Cain, Ph.D.
March 15, 2024

significance and/or three findings from peer-reviewed published academic research.

Do you see that there?

A.    Yes.

Q.    When I first read that, I understood it to mean that for each of the 11 factors you compared it against those three benchmarks.

A.    You just read, it says "and/or."

Q.    That's what I'm getting to.

So you said "and/or" because you didn't compare to the three benchmarks for each one of the 11 factors; is that a fair summary?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Right.  Like I said before, I compare it to the benchmarks that are available.  If the Cammer court provides a benchmark, then I use it and if the Cammer court did not provide a benchmark, then there's nothing provided by the court.  So it's obviously not even a judgment call on my part but rather what the courts have put forth.

Q.    Well, that's what I was getting to.  I think you understand where I'm coming from just based on what you just said.

Matthew Cain, Ph.D.
March 15, 2024

The way I read this, as we sit here now, without having seen the "and/or" is that you've listed the three benchmarks that you could have compared to each one of those factors.  Is that fair just in terms of my understanding of it?

MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

Q.    It wasn't that you did compare all three to each one of the factors, it's that you could have?

A.    Well, I'm not sure how to answer that because if the Cammer court does not put forth a benchmark, then there is no way for me to compare it to a court benchmark.  So I would not say that I could have and chose not to because it is just not possible if the court doesn't give us any guidance on it.  So where available, I did compare it to any of these categories.

Q.    Okay.  Or where if you compared it to Cammer then you didn't need to go any further.  That's what I understood you to say earlier.  Is that --

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No, no.  No, I think you'll see for

certain factors like trading volume where the Cammer court gave a benchmark but I also still compared it to benchmarks from peer-reviewed academic research. But the statistical -- test of statistical significance, that's more really driven by, like, Cammer 5 and the autocorrelation coefficient. Most of these other ones don't -- there's not an explicit test of statistical significance for most of the other factors. It's just looking at sort of this average versus either what the Cammer court said or the peer-reviewed academic research.

Q. So is it fair to say then based on what you just said, just to move it along, that with regard to this factor average weekly trading volume, you didn't compare to a statistical test because there wasn't one that would be applicable? Do I have that right?

A. Yeah, I'm not aware of an applicable statistical test that anyone has put forward. But rather, I am aware of the Cammer threshold as well as the peer-reviewed academic study benchmarks.

Q. Okay. And so that's why you picked those two over the statistical?

A. Well, again, I'm not picking it over

Matthew Cain, Ph.D.
March 15, 2024

it.  It's just that I'm not aware of a statistical test of trading volume.  But I am aware of the Cammer threshold as well as peer-reviewed academic research.  And so like I've been saying, I use what's available to me.  It's not picking one over another; it's using whatever I have available at my disposal.

Q.   So that's another question I had just because I'm not sure how your process works.

Did either you or any of the folks who were helping you put together this report look to see if there were any statistical tests that might inform this comparison on this average weekly trading volume factor?

A.   I would -- what I would say is what I set out to do my very first market efficiency report, I've probably done 20 of those now, so when I set out to do my very first one I canvassed the academic literature to identify statistical tests or other peer-reviewed academic research that could provide a reasonable benchmark for use. And I identified the statistical test for Cammer 5 and the statistical test for autocorrelation, and I did not identify other statistical tests that I felt were reliable and reasonable for any of the

Matthew Cain, Ph.D.

March 15, 2024

other factors.

I'm not aware of any changes since I first did that search for the first market efficiency report.  So I don't go back -- I don't ask the staff to reevaluate that question every time I do an efficiency report.

But my reports do evolve over time as I become aware of new research or literature that I can use for comparison purposes.

Q.    Right.  Well, that's kind of what I was getting to.  When was that first report?  How long ago?  I mean, was it a matter of years, was it a matter of months?

A.    It was probably somewhere in the ballpark of two and a half years ago.

Q.    Okay.  And so what you're saying is because you just did this two and a half years ago, when you did this report, neither you nor anybody on your team went back to see if there was a statistical test that would be applicable on this factor?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, I guess what I was trying to explain is that we don't need to because I do

Matthew Cain, Ph.D.
March 15, 2024

update my report methodology over time to reflect any new tests that I do become aware of.  So there is no need to do that search in January of 2024 because I've already -- I mean, there are elements in this report that were not present in my first report because of new tools or techniques that I have become aware of over the past two and a half years.

Q.    Okay.  Let's switch gears and move on to the factor analyst coverage.  And what I saw, and you tell me if I'm wrong, you compared an analyst coverage to benchmarks established by the courts to academic papers but not to statistical tests.  Is that a fair summary?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I don't think that the court articulated a threshold of available coverage.  Did not provide any guidance in terms of needing -- requiring a minimum amount.  So really the comparison here is to the academic literature.

Q.    Okay.  All right.  Now, is the reason you didn't do a statistical or compare to a statistical test or benchmarks from the court because you are unaware of any issue of analyst

Matthew Cain, Ph.D.
March 15, 2024

coverage?

A.    I'm not aware of any that I would determine were appropriate and reasonable for this purpose.

Q.    Okay.  I have another question and this is digression, but I want to make sure I understand what you did with the analyst coverage.

Is it fair to say that you did not look at the substance of the analysts' reports in preparing your expert opinions here?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I did review just generally to have an understanding of the types of analyst reports that were included in the exhibit here.

Q.    Okay.  So let me ask you some questions about that then.  Is it -- well, is it true that none of the analysts wrote or even mentioned any of the fraud, misrepresentation, omission allegations that were alleged in this complaint?

MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

Q.    At least the ones you reviewed.

A.    Oh, that wasn't something I was looking to answer when I reviewed the analyst reports.  So

Matthew Cain, Ph.D.
March 15, 2024

I don't know one way or another.

Q.    All right.  Is it fair to say that none of the analysts wrote anything about any fraud or wrong doing at the company, the ones you reviewed?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Again, I don't know.  That's not a question I was trying to answer.

Q.    And I'm just referring to the analysts that are in your report.  Is it fair to say that none of the analysts even mentioned this lawsuit?

A.    Again, I don't know.  That wasn't something I was trying to research.

Q.    Do you have a recollection that of the reports you reviewed, the analysts' reports were largely bullish on the company and its prospects?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I don't recall what their price targets were or buy/sell recommendations.

Q.    Okay.  Fair enough.

With regard to market makers, this factor, I have noted here that you did not compare the benchmarks established by the court and you did not compare to findings from an academic

Matthew Cain, Ph.D.
March 15, 2024

paper; is that accurate?

A.    No.

Q.    All right.  So tell me where I'm wrong.
Because my notes are --

A.    Sure.  So if you look at paragraph 51,
I report what the Cammer court said.

Q.    So you did compare it to a court
benchmark then?

A.    Yes.

Q.    So give me a second.  Forgive me on
this.

Okay, yeah, you did.  I forgot.  Okay.
So forgive me on that one.

So for this factor you did look at
court, you know, benchmark, I guess --

A.    Yes.

Q.    -- for lack of a better word.

You did not look to the statistical
test or academic findings; is that right, or
academic papers?

A.    I think I talk about some academic
papers but I did not compare to explicit benchmark
from academic papers or statistical tests because
the court itself provided guidance, which I'm
happy to explain that guidance.

Matthew Cain, Ph.D.
March 15, 2024

Q.    No, I can see it here.  What I'm getting to ultimately is for each of these I want to know why it is you picked one benchmark over another.  And so far you've been able to explain that to me and I just want to make sure I do that for each one of the factors.

My original reaction was that you just sort of picked and choose which ones you used of the three benchmarks.  Is that accurate?

A.    No, that's not accurate.  I think that it's also important to understand the differences and the different factors.  So, for example, in paragraph 51, the Cammer court actually makes clear that the number of market makers, either five or ten market makers, is relevant if a company is trading over-the-counter markets so it is not listed on an exchange.

So just the fact that Redwire was listed on the New York Stock Exchange, that satisfies the factor.  There is really no need to go any further relative to the way that the court described that factor.  But I do go on and I say that they have over 60 market makers.

But -- so I think also it is important to consider the context of each factor as well.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Okay.  Let's look at market capitalization, which is the next factor that you evaluated.  Did you compare this factor to benchmarks established by the courts?

A.    I'm not aware of any benchmarks that the courts have explicitly put forward as a minimum market cap threshold other than the S3 eligibility, which is a float minimum of $75 million.

So I do note in paragraph 86 that Redwire's market cap exceeded the minimum float requirement of $75 million.

Q.    Okay.

A.    That's, obviously, not a court.  That's a regulator in terms of the SEC.

Q.    Understood.  So you make that comparison which is sort of quasi court, I guess is what you're saying; is that right?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    It's a regulator.  It's not a court but it is a regulatory benchmark that I'm using here.

Q.    Okay.  And then you didn't use a statistical test for this factor market capitalization; is that correct?

Matthew Cain, Ph.D.
March 15, 2024

A.    That is correct.  I mean, obviously, just looking at the market cap throughout the class period being hire than $75 million, that is a comparison of the numbers.  But beyond that, there is no other statistical test, yep.

Q.    And then you did, according to my notes here, compare it to a finding from an academic paper; is that right?

A.    Yeah.  One or two academic papers, I think.

Q.    Can you show us where you did that in the report?

A.    So in paragraph 85, I report that the market cap from the MRK study for firms that had no analyst coverage, which I explain earlier on in the report that are more similar to firms that might be trading in a market that might not be efficient; that they had a median market cap of just under $28 million.

And then in paragraph 86, I report that compared to all companies listed on the Nasdaq and the NYSE, Redwire's market cap placed it above the 25th percentile.  That is referencing a study by Bhole, B-H-O-L-E.

Q.    Sure.  I'm going ask you about that in

Matthew Cain, Ph.D.
March 15, 2024

a second.  Let's go back to paragraph 85 of your

report.  The last sentence you say [as read]:

This study, thus supports the view that firms with

larger market caps tend to trade in more efficient

markets.

Do you see that there?

A.    I do.

Q.    Now, the MRK study didn't make --

didn't draw that conclusion, correct?  That's a

conclusion that you drew?

A.    Well, I think that they do have that

conclusion but it is worded very differently.  So

they talk about investor interest, I think, which

is -- I think it's a different phrase when they

talk about investor interest.  But that is

basically what we're looking at with all these

factors within a market industry report.

So even though they don't call it

market efficiency, they call it investor interest,

and they show that it is correlated with many of

these factors, I interpret that to be market

efficiency even though they use a different

phrase.

Q.    Okay.  That's something that you're

doing, though.  It is not something that they did,

Matthew Cain, Ph.D.
March 15, 2024

fair?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, again, they did it, they just used different phraseology.

Q.    Okay.  Let's just say this:  They didn't use the words "efficient markets," they used the other phrases you're talking about?

A.    That's correct.  They talk about it in the context of investor attention or investor interest.

Q.    Okay.  Let me go back.  I'm trying to get through this.

Where you did not compare to statistical tests, is the reason because there were no statistical tests that you were aware of?

A.    Like I said before, I've adopted statistical tests that I found to be reasonable and appropriate.  There may be other statistical tests that one could conduct for factors, but I have not found any that I've concluded or determined are reasonable and appropriate for these other factors where I've not employed those.

Q.    Okay.  And you did not go back and redo that analysis for this report.  You're relying on

Matthew Cain, Ph.D.
March 15, 2024

analysis of the statistical reports that existed

two and a half years ago; is that fair?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No, that is not what I said earlier.

What I said is that was my first report

and then all of my reports have continued to

evolve as I have incorporated new techniques or

approaches over time.

Q.    When was the last time you've looked

for scientific tests of statistical significance

in doing this analysis?

A.    I'm reviewing academic research every

week.  So I'd say on a weekly basis I'm keeping up

with changes or developments or just review of the

academic literature.  So it is actually on a

continual basis.

Q.    Sort of ongoing?

A.    Ongoing basis as a apart of -- I'd say

both my work as an academic and also my work as an

expert who incorporates academic research and

statistical tests into my research.

Q.    Okay.  So basically you're saying

you've looked but not in connection with any

particular report, just because this is what you

Matthew Cain, Ph.D.
March 15, 2024

do and so you keep up with it within your field?

A.    And sometimes it is in connection with reports because I'll get, for example, rebuttal reports who may put forth statistical tests.  I commonly see that people are actually manipulating or abusing or taking tests that were designed for one thing and then they're applying them in a way that's not reasonable and appropriate.  And so I have to explain why that's the case if I'm putting in reply reports.

So some of it is in the context of my work as an expert, and some of it's in the context of my work as an academic.

Q.    Let me ask you about benchmarks established by the courts.  I think, this could be my notes again, but I think that I only saw one of the factors where you looked at benchmarks established by the courts; is that accurate, out of the 11?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I think that the Cammer court -- I don't think that's accurate.  So I'm happy to try to walk through these.

Q.    If you don't mind because I did go

Matthew Cain, Ph.D.
March 15, 2024

through these but I was wrong once in my

questioning and I want to make sure we get the

testimony accurate, even if it takes a minute.

MR. ZACHERL:  I'll tell you what, while

you're doing that, can we take five minutes?

MR. SHAEFFER:  Yeah.

MR. ZACHERL:  Okay.  So it's 1:59.

We'll come back at 2:05 or so.  Everybody

okay to go off the record?

MR. SHAEFFER:  Yes.

THE VIDEOGRAPHER:  Going off the

record.  The time is 1:59 p.m. Central.

(Whereupon, a break was taken,

after which the following

proceedings were had:)

THE VIDEOGRAPHER:  We are back on the

record.  The time is 2:15 p.m. Central.

BY MR. ZACHERL:

Q.    Okay.  Dr. Cain, while we were off the

record I had asked you to take a look at the

factors and to see if I was right in my notes that

you had compared these factors against benchmarks

established by the courts in one of these factors,

and you said you thought there was more?

A.    Yes.  So I think just going through the

Matthew Cain, Ph.D.
March 15, 2024

factors, I think weekly trading volume, the Cammer court said 1 to 2 percent.  For market makers, the court said, A, trading on a national exchange versus over-the-counter and, B, for if it's only over-the-counter then 5 or 10 market makers would be a threshold.

For S3 filing eligibility, that I think the court explicitly instructs to just to look at S3 filing eligibility and SEC has those requirements laid out.  So I think that's pretty consistent with the guidance from the courts.

Beyond that, I believe that you're correct, that the other factors are not really provided any explicit guidance or benchmarks from the courts themselves.

Q.   Okay.  Fair enough.  Thank you for that clarification.

I want to talk about the average weekly trading volume and kind of drill down a little bit in terms of that factor and the analysis that you did on the peer-reviewed literature.

There were, according to my notes here, there were two peer-reviewed papers that you relied on; the MRK study and the Bhole study.  Do I have that right?

A.    Yes.

Q.    Now, I've read the MRK study and I almost put myself to sleep several times doing that; no offense.  Very interesting stuff but I didn't see anything in the MRK study that referenced market efficiency or provided a threshold for market efficiency; is that fair?

A.    Again, like I discussed earlier, they use the phraseology of investor interest or investor attention.  They don't use the phrase market efficiency, but they are looking at these same types of analyses in terms of analyst coverage, institutional ownership, trading volume, bid ask spreads, market cap, these types of things.  And they're showing significant differences between those two groups of firms.

But I would agree that they do not articulate it as an explicit threshold, but I do think that it's a very relevant reference point for comparison purposes.

Q.    Okay.  All right.  And then the other question I had with regard to the MRK study is what I'm going to call comparing apples to apples.  Okay.  So you have in paragraph 39 of your report, you had Redwire at 9.03 percent, traded 3.6

Matthew Cain, Ph.D.
March 15, 2024

million shares per week and the daily turnover was 1.82 percent.  And this goes to paragraph 39, paragraph 40 and paragraph 41.

Do you see that?

A.    Yes.

Q.    So the way I looked at it, you measure it three ways; twice as a percentage, once as a number.  And I guess the question is, why?  Why did you not use a consistent measurement, for lack of a better word?

A.    Well, I think the first thing to keep in mind is, this is all the same data.  It's just that you can look at it from different angles.  So we're still talking about the daily amount of shares that trade every day during the class period.

So you could look at that as the Cammer court did in terms of a weekly percentage, so that's why I calculated 9 percent because that compares to the way the Cammer court laid out those percentages.

Q.    Okay.

A.    You can look at it just in terms of the number of shares traded, and I do that in paragraph 40 because there are numbers of shares

Matthew Cain, Ph.D.
March 15, 2024

traded reported in the MRK study, so I can compare it against that benchmark.

And then in paragraph 41, I calculated in terms of a daily percentage as opposed to a weekly percentage because I can then compare that to the benchmark in the Bhole study, for example. But it is still the same data on daily trading. It's just how do you -- do you scale that, do you divide it by shares outstanding, do you look at it on a weekly basis like a weekly average or a daily average, things like that. It's still all looking at the same underlying data.

Q. Let me tell you what tripped me up specifically on this one. So the MRK study had a median weekly trading volume, .034 million shares. And you have used a number of 3.6 million shares, doesn't appear to be a median number. So that's what I'm getting to.

I mean, are you measuring average weekly trading volume as a number in this instance because the MRK study used a median and not a percentage or for some other reason?

A. Those are both numbers. That's the number of shares traded. So the Redwire is one company. The MRK studied a lot of companies and

Matthew Cain, Ph.D.
March 15, 2024

so then there is a distribution and they are reporting the median. I don't have their study in front of me. They may also report the average and I can compare the average. But that's across a large sample of companies. Redwire is one company. But both of these are just the number of shares traded on a weekly basis. So it is apples to apples by looking at the number of shares traded.

Q. Well, what threw me was the word "median." What you mean when you say that is that it actually is average weekly trading volume. It's just average weekly trading volume spread over a whole bunch of companies?

A. Correct. It's a large sample of companies.

Q. Okay. I got it.

So in the MRK study -- I'm not sure how to ask this. We talked about the fact that they don't use the words "efficient market" or "efficiency."

Are you able to point to a place in the MRK study where they have used the -- I think you used the word equivalent methodology to efficiency -- are you able to point us to where

Matthew Cain, Ph.D.
March 15, 2024

that is in the MRK report?

A.    I mean, I think even if you just look at the abstract they'll talk about investor interest and how this is reflective of investor interest in those companies and their securities, which is essentially the same thing that we're looking at in a market efficiency report.

Q.    Okay.  This gets more specific to what we're dealing with here.  So did the MRK study do its own Event Study demonstrating that the prices of these securities and these companies that were in the study would adjust efficiently to the presence of new or unexpected information?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I don't recall there being an Event Study in the MRK study.

Q.    Okay.  And that would have been an easier way to ask it, right?

Okay.  So let's talk about the Bhole study.  Is it fair to say that while Bhole, it does speak to efficiency, they don't actually say that any of the companies in their rankings are efficient?

MR. SHAEFFER:  Object to form.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

A.    I'd have to go back and see exactly how they articulate it.  I think it is possible that they say something about like 10 percent.  You know, if you exceed the 10th percentile, then you're clearly efficient.

I think the thing to keep in mind about the Bhole study is that that's a study of firms traded on the New York Stock Exchange and the Nasdaq.  And what many commentators and academics and professionals have said is -- and I talked about this earlier on in my report -- there is actually a strong presumption of market efficiency for these large, nationally recognized stock exchanges of the Nasdaq and NYSE.

So even if you fall in terms of at the low end of the distribution for any of these factors under the Bhole study, these are still -- this is still a distribution of companies that actually have a presumption of market efficiency because they're traded on the New York Stock Exchange or the Nasdaq.

But back to your original question, I think because we routinely see companies exhibiting the hallmarks or any indicia of market

Matthew Cain, Ph.D.
March 15, 2024

efficiency on the New York Stock Exchange or the Nasdaq, it's actually very difficult to come up with a bright-line test for any of these factors that would say, well, if you fall just below this bright line, you're clearly not efficient, right, because the reality is that these companies that trade on these exchanges, arbitragers have such a strong financial incentive to be -- if they see the price is wrong, they have an incentive to step in and try to make money until the price gets back to the right place.

Q.   Right.  Okay.  So let me ask you a couple other questions about the Bhole study and then we can move on.  You've addressed some of what I wanted to ask you.

Do you believe that the Bhole study supports a conclusion that a factor application of 75 percent would support a finding of efficiency?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.   I think it is consistent with that type of conclusion.

Q.   And did you do that analysis on that point in preparing your report?

A.   I guess what I would say is I read

Matthew Cain, Ph.D.
March 15, 2024

through the Bhole study, I've looked at the distributions of companies.  I think that if you had a company that was at the very bottom percentile, you know, well below the 10th percentile, then that's where it would look more like an outlier relative to the distribution there.  So that's the way that I would interpret the Bhole study.  I don't think -- like I said before, it doesn't provide any bright-line thresholds but rather useful comparison points so that you can see how the company stacks up relative to all other companies on the New York Stock Exchange and the Nasdaq.

Q.    Okay.  The final question I guess then would be, it sounds like you would agree that the Bhole study doesn't explicitly say that a daily turnover rate in the 75th percentile would support a finding of market efficiency.  That's your conclusion but that's not in the Bhole study; is that right?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Again, I think that -- I'd have to go back -- but I think they said if the company is below the 10th percentile, then you might question

Matthew Cain, Ph.D.
March 15, 2024

whether it weighs in favor of market efficiency. I still think a company that's at the 10th percentile, we're still talking about relative to all other companies that have a presumption of efficiency on these large exchanges.

But, obviously, when they talk about the 10th percentile, anything above that is more and more in favor of efficiency. So 75th percentile is far well above the 10th percentile.

But, again, I agree with you. They don't provide a bright-line threshold and state that you have to either be above or below this for a bright-line determination of efficiency.

Q. That's what I was asking. Because I looked at it and didn't see it and I just wanted to see what your process was. So I understand that.

I know on this factor, average weekly trading volume, that you did compare to Cammer. And you reached a conclusion that, I think, that this 1 to 2 percent threshold justifies the presumption of efficiency, if I'm not mistaken; is that right?

A. Well, I think that's what the Cammer court said.

Matthew Cain, Ph.D.
March 15, 2024

Q.    Okay.

A.    The Cammer court quoted in paragraph 38, Cammer said [as read]:  Turnover measured by average weekly trading of 2 percent or more would justify a strong presumption that the market is efficient.

So the Cammer court said 2 percent gives a strong presumption of efficiency.  Redwire is more than 4 times higher than that strong presumption of efficiency that the Cammer court articulated.

Q.    Now, are you aware -- and I know this goes beyond Cammer, but I'm just curious if you looked at this -- are you aware of whether there is any peer-reviewed literature out there that would support this 1 to 2 percent threshold that Cammer talks about?

A.    I know that they're quoting -- like, if you look at Footnote 43, the Cammer court was actually quoting from Bromberg and Rollenfelds, which I believe was some sort of a study.  I'd have to go back and look.

But beyond that, again, I think it would be probably the same answer for all of the factors.  There's -- I don't think there's any

Matthew Cain, Ph.D.
March 15, 2024

peer-reviewed study that gives a bright-line threshold for any of these factors that would say if you're just below this threshold, you're inefficient, and if you're just above this threshold you are efficient.  Because ultimately the question is, does the company -- are investors paying sufficient interest to this company information that the price is impounding publicly available information.

Q.   Right.

A.   And that's like -- it is very difficult to have a very strict bright-line threshold for these different factors to be able to answer that question.

Q.   Okay.  All right.  Let me try to jump ahead a little bit in my outline here.  Because you anticipated a lot of stuff that I wanted to ask you.

These are going to be some questions for my own understanding as much as anything else just to make sure I understand your opinions.

So in analyst coverage, the benchmark that you used was the MRK study; is that right?

A.   That's one of --

MR. SHAEFFER:  Object to form.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

A.     That's one of the benchmarks I used, the MRK study.  I also compared it to the Bhole study and I also compared it to a study by Lee, L-E-E, and So, S-O, in paragraph 45.  So three different comparisons for analyst coverage.

Q.     Okay.  And in -- let me just talk to you about the MRK study.  I think that you looked at three separate firms and it was like 3, 3, and 2.  There were 8 total analyst reports; is that right?

A.     Yes.

Q.     Okay.  And what did you compare that application to in the MRK study?

A.     So the MRK -- both the MRK study and the Lee and So study, it's basically -- they document that a lot of firms have no analyst coverage like zero.  So MRK study notes that almost 20 percent of U.S. firms have no analyst coverage.

Q.     Right.

A.     So if you have -- if you're covered by any analysts, then you would compare favorably to that benchmark of having no analyst coverage provided by, what I would say, both the MRK study

Matthew Cain, Ph.D.
March 15, 2024

and the Lee and So study.

Q.    Okay.  So let me make sure I understand this because this is where I got tied up in my own mind.

So you're not comparing the eight reports, the three firms to the number 19 percent.  You're not comparing apples to oranges?

A.    Correct.

Q.    What you're doing is saying, well, this is a company that has three different firms and eight different reports and only one-fifth of the market doesn't have any reports.  Is that more or less your methodology?

A.    For paragraph 45, yes.

Q.    Okay.  Is it your opinion that if a firm has any analyst coverage that it trades in an efficient market?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No.  I've never formed a market efficiency opinion purely based on just only looking at analyst coverage.

Q.    Okay.  Did the MRK study conclude that the 81 percent of firms that do have analyst coverage trade in efficient markets?

Matthew Cain, Ph.D.
March 15, 2024

A.    They didn't use that phraseology.  The they said the firms that do not have any analyst coverage, they lack investor interest and investor attention as reflected by many of the other factors.  But they did not use that same phraseology of market efficiency.

Q.    Okay.  And in the MRK study itself, did they define loss of analyst coverage as -- based on the number of reports that were filed or the number of companies filing reports or some other way?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    My recollection is that they would define that as a firm going from having at least some analyst coverage to losing all of its analyst coverage.  So that could mean you were covered by one firm and went down to zero firms.

Q.    Right.

A.    Or you could have been covered by more than one firm and went down to zero firms.  But that's the -- my recollection is that's the way they identified that.

Q.    Understood.

So let me ask you about, on this

Matthew Cain, Ph.D.

March 15, 2024

particular issue of analyst coverage, did you compare to any benchmark set by the court?

A.    I'm not aware of any explicit guidance that the courts have provided other than I summarized that the, you know, the Cammer court said it was persuasive to allege that there is coverage.  But beyond that, I'm not aware of any bright-line thresholds that the courts have laid out.

Q.    Okay.  You -- when you were doing this analysis about analyst coverage, I think I asked you this before, you said you did -- I'm going to paraphrase -- I think you said you did briefly review the actual analyst reports but that's not what you're providing the opinion on, the contents of the report, it's just the number of reports; is that right?

A.    Essentially, yes.  That's fair.  I mean, like I said, I do want to be familiar with the types of coverage that's being provided by the analyst, but -- and I do think that is relevant, but in terms of the comparison, it is based on more of a numerical comparison.

Q.    Okay.  Now, I'm going to use some language that you used in your report at paragraph

Matthew Cain, Ph.D.
March 15, 2024

43.  You said [as read]:  Analyst coverage can be indicative of market efficiency since research analysts ensure that new, important company-specific information is disseminated to investors and thus impounded in the stock prices efficiently.

Do you see that?

A.    Yes.

Q.    Would you agree that in order for the analyst reports to be meaningful in this analysis that they should do that?  That they should ensure that there's new company-specific information that is disseminated to investors?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I'm not really -- I'm not sure what you're trying to ask.

Q.    Just what I'm -- we were talking about the content of the reports, and what I'm asking is in order for the existence of an analyst report to be relevant in this inquiry or persuasive in this inquiry that you're doing, this analysis, would you agree with me that the analyst report should have new, important company-specific information in it?

Matthew Cain, Ph.D.
March 15, 2024

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Well, I think that can be part of it but it doesn't have to be.  That's not a necessary condition.  So I can give you a couple examples to illustrate that.

Q.    Sure.

A.    For example, when you get a headline that one analyst is downgrading the company from buy to hold, right, or they're lowering their price target from $50 to $40 per share --

Q.    Right.

A.    -- we often see pretty quick price responses to those types of headlines, even if people have not read the analyst report, even if the report itself doesn't layout explicitly all the new information that went into their model that went into the decision to make that change or that update.

So there can be times when an analyst report can come out and that can still communicate information to investors because they've taken a lot of information environment and they've distilled it down into even one or two numbers that you can put into a headline.  So there can be

Matthew Cain, Ph.D.
March 15, 2024

--

Q.    Before you go further, let me interrupt you and I'll let you finish but I want to ask a question.

So in that case, the case you just described, the new, important company-specific information would be the downgrade, for example, right?

A.    Well, that can be -- that can be part of sort of distilling the valuation impact of the new information.  But you'll see analysts' reports do this after very long disclosures by companies or by earnings announcements or things like that. So they can still be overlapping with the new company-specific information or their disclosures. They may talk about some of that in their report, they may not.  They may give you an updated valuation model.

So you can look at the qualitative component of analyst reports and that can distill down a lot of information into a number.  I mean, that's what we do with -- I've taught discount of cash flow analysis and valuation of companies, right.  You take all of the information about a company and you put it into the forecast and the

Matthew Cain, Ph.D.

March 15, 2024

discount rate.  You do all of this work, and at the end of it, you have a stock price.  This is what we think the company is worth in terms of the stock price.

So all of that context of the disclosure, the new information, that may be important and you may be able to capture the value impact of that in a model like that.  So that's one hypothetical example, I think, back to your original question.

Q.    Sure.  And I understand what you're saying.  I'm going to ask you, because the three sources that you looked at were Jefferies, Validea and ValueEngine, Inc.; is that right?

A.    Yes.

Q.    I read these reports, and I am just going to ask you some summary questions, maybe we can avoid going through the actual reports.

I didn't see in the Validea reports that there was an earnings forecast for either Redwire or GNPK.  Is that accurate, that they didn't have that information?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I don't have the reports memorized, but

Matthew Cain, Ph.D.
March 15, 2024

that's very possible that that's the case.

Q.    And I also didn't see that the Validea
reports had any information as to the -- I guess
you call it the future financial performance of
the company; is that accurate?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Again, I don't have the report
memorized, so I'd have to look at it to try to
provide any sort of assessment like that.

Q.    Well, let me ask you a hypothetical
question.  Assuming that there are no earnings
forecasts for either of the stock tickers and
there is no information as to future financial
performance of the company in these Validea
reports, would you agree with me that they don't
provide the kind of new, important information
that would make them meaningful in this context?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No, I would not agree with that.

Q.    And why not?

A.    So I've seen many analyst reports that
provide commentary and context on new disclosures.
So company may announce something and then the

Matthew Cain, Ph.D.
March 15, 2024

analyst report will talk about it.  The analyst report will report on the historical financials of the company and investors may take that information and use it for their own projections or sort of forward-looking projections.

But historical information or context on historical information is still a very important part of value relevant information for companies.

Q.    Okay.  So let me ask you a different sort of summary question again to try to avoid going through each one of these reports.  It may or may not get us there so let's try.

In your opinion, and you selected these three firms and these reports, correct?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I'm just reporting on all of the analyst reports that I was able to find from my publicly available information.  There are likely -- for any company there may be additional analyst coverage that's not publicly available.  I'm just reporting what I was able to find in the public domain.

Q.    Okay.  So in your opinion, would these

Matthew Cain, Ph.D.
March 15, 2024

eight reports be good examples, to use your

language, or reports that ensure that new,

important company-specific information is

disseminated to investors?

MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

Q.    Are these eight reports an example of

what you're talking about when you say new,

important, company-specific information being

disseminated to investors?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    They may be.  Ultimately I have not

gone through each report and tried to evaluate

whether each report actually provided new

information or merely commented on or provided

additional context or color.

So, again, I think it's important to

remember that I'd say that a large portion of the

time new company disclosures come from companies

or news articles or press releases.  Sometimes the

new information comes through an analyst report

itself.

But the analyst reports are often

commenting for commentary or just reporting of the

Matthew Cain, Ph.D.
March 15, 2024

company-specific disclosures, right?  And there are times when you may have a disclosure by a company and you don't have any analyst coverage.

So I think that is sort of a separate question in terms of did these specific analyst reports cut out after individual company-specific disclosures.  So it is more of, like, I think a high-level macro question in terms of their contribution to the overall information environment for a company.

Q.    Well, let's assume, just for the sake of discussion, you mentioned this, that all eight of the reports discussed information that was already publicly available and there wasn't any new information in the reports.  There may have been analysis, there may have been rankings, there may have been things that the analyst did with the information that was already out there.

A.    Sure.

Q.    In those -- in that case, would the existence of these eight reports which don't provide any new information be pertinent on this factor?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Yes, I think so.  So, again, we're not saying that analyst reports are only valuable within the Cammer factor 2 context if they disclose new information, right.  It is rather that they are indicative of investor interest in a company and they contribute to the overall quality of information environment for a company.

So you could have a company where they provide earnings releases and then the analyst reports come out after the earnings release and provide their assessments and their updates to their valuation models, their buy/sell recommendations, their price targets, their commentary.  And it's possible that they are providing that on the earnings announcement that was already disclosed.  But that can still be beneficial to the investors in the information environment, and you may have significant disagreements across analysts, too.  That doesn't undermine their validity, disagreement among analysts.  It could also be a good thing for the information environment because it may cause investors to ask questions and think more deeply about these types of questions.

Matthew Cain, Ph.D.
March 15, 2024

So we are certainly not premising the relevance of an analyst report only on it being the source of a new disclosure because that's very frequently not the role or not the case for many analyst reports.

Q.    Okay.  Let me refer you to paragraph 49 in your report.  That may clear this up a little bit.

You've written [as read]:  As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about Redwire supports the conclusion that it's common stock traded in a well-developed and informationally efficient market.

Do you see that?

A.    Yes.

Q.    Did you, in making that statement, did you rely on any specific facts or information contained within the analyst reports?

A.    That conclusion is not conditional on the specific content of any single analyst reports.  It reflects the fact that there are analysts producing reports on Redwire.  There is also over 400 news articles during the class

Matthew Cain, Ph.D.
March 15, 2024

period.  There's also numerous SEC filings.

So that's basically talking about the information environment for the company itself.

Q.   Okay.  You know, I have a lot of questions here, for example, about the Validea reports.  And I'm going to give you an example of one and see if we can pile through this without having to pull the report out and read it together.  So let me ask you a question.

Is it your testimony that these analyst reports do not need to contain new company-specific information in order to be relevant to this analysis on this factor?

A.   Yes.  That is definitely my testimony. When we evaluate analyst reports in any market efficiency analysis we never only limit the summary of analyst reports only to those in which we determine that they disclosed something new that was not previously available to the market. That's not a relevant component of the analysis.

Q.   Okay.  And let me tell you why I'm asking.  We can go back to paragraph 43, you make the specific statement that research analysts ensure that new, important company-specific information is disseminated to investors, and

Matthew Cain, Ph.D.
March 15, 2024

that's why analyst coverage can be indicative of

market efficiency.

Do you see that there?

A.    Yeah.  So I think maybe you're

over-interpreting what is being said there.  So

I'm not saying the analysts themselves are the

source of the new information.  The company

disclosure may be the source of the new

information.

But the fact that analysts put out

reports helps that new information to reach a

wider audience of investors who are paying

attention to the company and, therefore, that's

beneficial for the overall information environment

of the company and the stock prices reflecting

that information.

Q.    Okay.  And so let me tell you the

specific scenario that I'm anticipating when I'm

asking you these questions.  It's a scenario where

the analyst report doesn't contain new, important

company-specific information, regardless of the

source, and you had said previously that even in

that instance these reports -- the existence of

these reports can be relevant to the analyst

coverage factor.

Matthew Cain, Ph.D.
March 15, 2024

And what I'm getting to is, you didn't say that part anywhere in your report; is that right?

MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

Q.    You didn't say that even if an analyst report doesn't have new, important company-specific information, the existence of that report is still relevant on this factor; is that right?

MR. SHAEFFER:  Same objection.

BY THE WITNESS:

A.    Well, I think that's implied by just looking at the way that I've carried out the analysis.  Because if you read through the analysis, nowhere in the analysis am I limiting my summary of analyst coverage only to reports that I would say provided new information to investors. I'm reporting on all of the publicly available analyst reports that I was able to find during the class period.

Q.    Well, here's where I'm coming out on this, and maybe you can explain to me whether this is accurate or not.

You're saying that you have given the

Matthew Cain, Ph.D.
March 15, 2024

reason that this analyst coverage can be

indicative of market efficiency because it

contains new information, right?  And that's what

you said.  That's what you said in paragraph 43.

Then you're saying, well, it's implicit

in my analysis that even if it's not new

information, it still contributes to the

information environment, I think you said.

And so what I'm trying to get to is, it

seems like those two things are irreconcilable.

Either the analyst reports are useful in this --

in determination of market efficiency because they

have new, important information in them or not.

MR. SHAEFFER:  Objection --

BY MR. ZACHERL:

Q.    I'll ask the question.  So you didn't

say anywhere in your report that even in the

absence of new information, these analyst reports

can still be indicative of market efficiency,

right?

MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

Q.    You said you implied it but you didn't

say it?

MR. SHAEFFER:  Same objection.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

A.    Again, I think you're misunderstanding paragraph 43 because I've never said that analyst reports have to contain new information.

What paragraph 43 is explaining is that they can help to ensure that new information that is company-specific is disseminated to investors. But the reports themselves may not be the source of disclosing anything new.

They are very commonly -- the new information comes out when companies file 10-Ks and 10-Qs or 8-Ks and press releases and earnings calls or even, you know, financial articles.

So the analyst reports may follow that and, therefore, they may not contain any new information because the information has already been disclosed but they're still adding value to the information environment by disseminating that, even if it is merely repeating the information or it is providing their commentary on the information or their valuation models based on the information.  That is still valuable to the information environment for a company.

Q.    Okay.  Just to be specific about the company that I was referring to, it was a scenario

Matthew Cain, Ph.D.
March 15, 2024

where there wasn't any new information that had been put out by any source and it was merely an analysis of a company that didn't contain new information.

And I understood your testimony earlier that that analyst report would still be indicative of market efficiency. And what I was getting to is you didn't make that point in writing anywhere in your report. That's the ultimate question; is that correct?

MR. SHAEFFER: Object to form.

BY THE WITNESS:

A.    Well, again, I apologize if the language was confusing to you. But I think that when you read through the section here, it's pretty clear, at least to me, that I'm summarizing all analyst reports without regard to the actual content of the analyst reports. So that would include whether they were disclosing something new or not.

Q.    Okay. So the question would be then, if they're not disclosing anything new or discussing anything new, did you say anywhere in your report that those kinds of reports would be indicative of market efficiency?

Matthew Cain, Ph.D.
March 15, 2024

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Again, I think I answered this already. But I think it is clear, if you read through this section, I'm looking at every analyst report regardless if there is something new or not within it.  So I think that's, at least to me, it's clear from this section of my report.

Q.    Okay.  I mean, we may agree to disagree on that point.  I have to go back and read the transcript, but I appreciate you indulging that. I'm not going to ask you again.

Let me look at the rest of these here because a lot of this is going to be me showing you these reports.  And I think based on your answer, I don't think we need to do that.

You said that you read the reports. Did you read the reports from Jefferies, the full reports?

A.    I believe I skimmed the Jefferies' reports.

Q.    Does that mean -- I had a boss years ago, he used to tell me, he'd say, Zacherl, stop top sheeting these files.  You're only reading the first page and that's it.  Is what effectively you

Matthew Cain, Ph.D.
March 15, 2024

were doing was top sheeting the reports, the

Jefferies' reports?

                MR. SHAEFFER:  Object to form.

BY THE WITNESS:

        A.     I skimmed at least one report from each

of these three different analysts, to just have a

sense of the nature of the reports.  Not -- again,

I was not looking for any -- I was not asking any

specific questions about the content, but just

rather have an understanding of sort of the

subjectivity or the extent to which each report

provided any subjective commentary.

        Q.     Let's pull up one of the reports, maybe

just as an exemplar.

                MR. ZACHERL:  Let's pull up the May 28,

        2021, Validea analyst report, Glennys.  And I

        think we can do this one time and kind of go

        through my questions.  And I'll give you a

        second to read it before we answer -- before

        I ask you any questions.

                MR. SHAEFFER:  May 2021.

                MR. ZACHERL:  I believe it's May 8th,

        2021.

                MR. SHAEFFER:  Thank you.

                MR. ZACHERL:  Have you had a chance to

Matthew Cain, Ph.D.
March 15, 2024

look at it?

MS. RUBIN:  I was posting it.  This will be Exhibit 7 on my notes.

(Deposition Exhibit No. 7 was introduced to the witness.)

BY MR. ZACHERL:

Q.    What I'll do is direct your attention to page 2 of that report under the label, Company Profile.

A.    Sorry.  Which page again?

Q.    Page 2.  There should be something called Company Profile there.

A.    Yep.

Q.    And you'll see it says [as read]:  The company is formed to effect a merger, share exchange, asset acquisition, share purchase reorganization or similar business combination.

Do you see that?

A.    I do.

Q.    Okay.  Now, in that report is Redwire mentioned anywhere?

A.    I just gave it a quick skim, and I don't see Redwire mentioned in the report.

Q.    I didn't either, which is why I'm asking.  And so this is May of 2021.  Genesis Park

Matthew Cain, Ph.D.
March 15, 2024

had identified Redwire as the merger target in March of 2021, right?

A.    I believe so, yes.

Q.    So this is roughly two months later that Validea puts out this report and doesn't even mention information that's been on -- in the public domain for two months.

Do you see that?

A.    I do, yes.

Q.    Now, is it your opinion as an expert that -- well, let me ask you another question.

Do you see anything in there where Validea provided any facts or information specific to Redwire's business operations or financial performance?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    From my quick skimming of this, everything seems to be commenting on GNPK.

Q.    Right.  And so assuming that there isn't any mention of Redwire two months after that announcement, there is no discussion of Redwire's financials in any way, there's, you know, no indication that there is a specific target at this time, there's no indication of expected future

Matthew Cain, Ph.D.
March 15, 2024

earnings.  I mean, in your opinion, is this

report, this analyst report by Validea, an example

of an analyst that ensures that new, important --

what did you call it -- company-specific

information is disseminated to investors?

MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

Q.    Just this one report.

A.    Well, what I would say is that this is

an example of an analyst report.  There is a lot

of details pertaining to GNPK, which at this point

in time, as we discussed this morning, GNPK was

still a pot of cash with a redemption price of $10

plus some interest.

Q.    Right.

A.    So I do think that there's a lot of

details that are inside of this report.  Beyond

that, I have not conducted any sort of assessment

to determine whether there was anything new

provided in this report relative to before the

report was issued.  But it is, you know, at

minimum, it is an analyst report that is providing

some degree of coverage on the firm.

Q.    Okay.  And so we're talking here about

market efficiency and we're talking about analyst

Matthew Cain, Ph.D.
March 15, 2024

reports contributing to the information

environment, I think you said earlier, and you

made the point -- the statement in your report

that the reason these analyst reports are

pertinent is because they provide new

company-specific information.  And you've now

elaborated it to say or they spread that,

disseminate that information that may already

exist from another source.

A.    Right.

Q.    So this is now we got one report.  And

in this instance where this one report is -- isn't

reporting information that's two months old, it

doesn't say anything about financials, doesn't

talk at all about Redwire, would you believe that

this is a good example of an analyst report that

would be pertinent on the question of whether

there is an efficient market for this stock?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, again, I think it is one of the

examples of analyst reports.  So they've got a

sell rating on Genesis Park Acquisition Corp.

They provided other details beyond that.

I don't have any opinions on their

Matthew Cain, Ph.D.
March 15, 2024

other scores that they're providing these rankings or these scores along different types of categories that they're evaluating.  I don't have any opinions one way or another over the extent to which those scores or all these different rankings or ratings are valuable to investors.  But this is one of three analysts that were providing coverage to Redwire.

Like I said from the beginning, I don't go into the analyst reports and conduct my own subjective assessment and then decide whether or not to count the analyst report because I think that would be inserting my own subjectivity into the actual analysis.

But like I also mentioned, I did do a review just to have an understanding of the nature of the analyst coverage.  I do think that my recollection, we haven't looked at any yet, but my recollection is that the Jefferies reports provided more subjective commentary.  But, you know, without looking at that to refresh my recollection, it would be difficult for me to draw the additional comparisons between different analysts that were providing coverage.

Q.    Would you agree with me that certainly

Matthew Cain, Ph.D.
March 15, 2024

there are analyst reports that do a better job of contributing to this information environment than this particular report that we just looked at?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    You know, I think that is an empirical question.  There has been academic studies --  a lot of academic studies on analysts' reports and I think they've come to different types of conclusions, somewhat conflicting conclusions of class academic studies.

So let's say hypothetically -- so you could come up with a lot of different hypothetical ways to answer your question.  You could say hypothetically, if an investor were to have followed Jefferies' recommendation and another investor would have followed the Validea recommendation of sell at this point in time, and then look at what would their performance have been over the next two years.  Would an investor have been better off selling their shares when Validea's report came out versus doing whatever Jefferies said to do when their report came out.

You know, you could evaluate on an ex-post basis how an investor would have performed

Matthew Cain, Ph.D.
March 15, 2024

if they had followed the recommendations from the different analysts, that's one way.  And academics we'll look at buy/sell recommendations, for example, as a way on an ex-post basis to evaluate the accuracy of analyst reports.

But, again, like I've said a number of times now, that is not part of the analysis here. I'm not tasked with going back on an ex-post basis and evaluating the performance of any individual analyst.  But rather just documenting that there's analysts that are putting out recommendations or information to investors and then investors can do what they want with that information.

Q.    Yeah.  And I think along the lines of what you just said, my question was specific to market efficiency and contributing to the information environment, the quality of the report.  And I may have been pronouncing it wrong, Validea instead of Validea.  Sorry.  I heard you say that.

So with the Validea report we just looked at, you would agree with me that certainly there are better analyst reports that you've seen that do more to contribute to the information environment than this one?

Matthew Cain, Ph.D.
March 15, 2024

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Again, that's not what I said.  Like I said, it would be interesting to -- I think an interesting sort of academic study would be to set up a study and look at if investors had followed the buy/sell ratings of the different analysts, how would their outcomes have differed.

But beyond that, and even with that, I think that is more of an ex-post evaluation of outcomes and that's not really answering the question of market efficiency, right.

Q.    Let me come at it a different way.  You said something earlier.  You said that -- you said two things.  You said, one, that you didn't -- it is not the content of the reports that is meaningful here, and then you've also said that you did look briefly at the content of the reports to make sure that there was something there.  That's what I'm trying to reconcile, Doctor.  Which one, ultimately, in your expert opinion, would apply in the process that -- through which you use the existence of an analyst report to determine whether there is market efficiency?

MR. SHAEFFER:  Object to form.

Matthew Cain, Ph.D.
March 15, 2024

BY THE WITNESS:

A.    So I just want to be clear.  I never said that the content of analyst reports doesn't matter.  So that was not -- if I gave that impression, I apologize.  As a general rule, I was not trying to say anything along those lines.

But, rather, what I'm saying is my purpose here for the analyst coverage is to document whether or not there analyst coverage.  There could be a -- you can have a case that may go to the loss-causation phase of a case and I might look at the content of their reports to see how analysts reacted to a disclosure of information.  And that can be a different -- there's a different question being asked at a different phase of a case or different types of cases.

The question I'm answering here within the market efficiency context is, essentially, yes or no, is there analyst coverage.  That's a very simple yes-or-no type of question.

And if you look at the quote in paragraph 43 from the Cammer court, the Cammer court says it is persuasive to allege a significant number of securities analysts followed

Matthew Cain, Ph.D.
March 15, 2024

and reported on the company's stock during the

class period.

So it's not saying that you need to

look at the content of the reports and whether

they, you know, provided any certain types of

commentary or content.  Just looking at whether or

not there's analyst coverage.

So that's -- and that's what I explain

in the text.  In Exhibit 3 I'm documenting, yes,

there is analyst coverage.

Q.    Well, yeah.  You've been more specific.

You go on to say that there's analyst coverage

that provides new, important, company-specific

information in order to -- in order for a report

to be contributing to the information environment

and increasing market efficiency, and you've also

said that the content of the reports under Cammer

is not as important as the existence of the

report.

And I'm not trying to mischaracterize

your testimony so if I have, please tell me that.

The question is, in light of those -- that

testimony, as I understand it, is it still your

position that the existence of a report that

doesn't contain any new information, doesn't

Matthew Cain, Ph.D.
March 15, 2024

comment on new information from another source,

meaning fully contribute to the information

environment in a way that would be indicative of

market efficiency?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    So in terms of the beginning of your

question, I don't think that I opined on the

extent to which any of the analyst reports here

disclose new information.

But in terms of the back end of your

question, ultimately I've not gone through any of

these reports and conducted an assessment of the

extent to which any of these reports provided

anything new or valuable to investors.

So, for example, this Validea report

has an upgrade from F to D and yet there's a

celebrating.  So I think it's an open question as

to whether that information was viewed as valuable

to investors.  I'm not offering any opinions on

whether or not investors found that information or

anything else within this report to be valuable

for their investment decisions.

So, ultimately, you're asking a lot of

questions about the content of the reports and

Matthew Cain, Ph.D.
March 15, 2024

whether the evaluation of analyst reports for purposes of a market efficiency opinion, whether that evaluation is contingent upon the content of the reports, and the answer is no because it is an objective assessment to document, yes or no, whether there's analyst coverage.

Q.    Okay.  And would that -- the statement you just gave, the testimony you just gave, would that be equally applicable to all of the analyst reports that are contained in your expert report?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Yes, it is the same objective criteria applied consistently across all the analyst reports.

Q.    And to summarize what you're saying, essentially, is the content of the report isn't important, but you did look to see if the reports had content?

A.    Yes.

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    The content may be very important to investors or other questions, but that is not important to the question that I'm answering right

Matthew Cain, Ph.D.
March 15, 2024

now which is, yes or no, was there analyst coverage and, yes or no, does this factor weigh in favor of market efficiency.

Q.    Okay.  So I think we saved ourselves a little time here by doing it that way.  Let's move on to the market makers factor.

A.    I'll need a break whenever is convenient.

MR. ZACHERL:  We can do it now.

MR. SHAEFFER:  That's fine.

MR. ZACHERL:  It's 3:12.  You guys want to come back at 3:25?

MR. SCHAEFFER:  That's fine.

MR. ZACHERL:  Let's go and have a call and talk a little bit.

THE VIDEOGRAPHER:  Going off the record.  The time is 3:12 p.m. Central.

(Whereupon, a break was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:29 p.m. Central.

BY MR. ZACHERL:

Q.    Okay.  Dr. Cain, the next thing I wanted to ask you about is I want to drill down a

Matthew Cain, Ph.D.
March 15, 2024

little bit on the factor of market makers.  Okay.

And you have done analysis in your report at

Section 5C or V.C of your report.

The first thing is I didn't see that

you did a comparison on this factor to any

peer-reviewed or authoritative treatises or

anything like that; is that correct?

A.    Let me take a look.  But I think that I

just compared it with what the Cammer court

pointed to since that was pretty clearcut.

Q.    That's what I understood as well.  But

take a minute and confirm that, please.

A.    Yes, I think that's right.

Q.    Okay.  So with respect to this Redwire

common stock, as you defined it, I believe that

your opinion is that Redwire had at least 60

market makers and brokers over the class period;

is that accurate?

A.    That's part of the opinion, yes.

Q.    Okay.  And I don't mean to limit it,

but that is part of your opinion, right?

A.    Yes.

Q.    Okay.  Now, I need to drill down a

little bit on what you mean by market makers.  I

mean, are some of those just index funds?  They're

Matthew Cain, Ph.D.
March 15, 2024

just buying everything in the market?  Another way of saying that is, is it your testimony that you independently verified that there were actually 60 market makers or brokers who were actually involved in making a market for this stock?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    All right.  So it's going to be kind of a longer answer to explain the historical complex of what is a market maker because that is actually quite different today from when the Cammer court came out with the decision, I think, in the 1980s.

Q.    Yes.

A.    Structure has evolved quite significantly over the past 40 years now.

So back when the Cammer court came out with the decision, there were individual people who were physically present in these open outcry pits who were designated market makers to facilitate trading.  It was actually necessary to have someone like that in order to trade stocks.

Today, the markets are fully electronic and so we don't have physical people standing in physical pits any more as market makers.

Q.    Right.

Matthew Cain, Ph.D.
March 15, 2024

A.    We have -- you can still have designated market makers, but you also have other entities who are basically doing the same thing, whether or not they're officially designated as a market maker.  These are often high-frequency trading firms, electronic trading firms and they're also the traditional investment banks who have trading desks and trading firms.

So they're not institutions like Vanguard or Fidelity, you know, these large asset managers; but, rather, hedge funds or high-frequency trading firms and electronic trading firms who provide markets in a wide variety of securities, often algorithmically.

So in order to count up that 60, that actually comes -- I explain that in Footnote Number 60 on page 22.  Bloomberg has a function called "Rank" where you type in rank and then you set the time period to like the class period, and then it produces a report of all of the brokers and market makers who facilitated trading in the securities over that period of time.

So that list of 60 different entities is what is referenced in paragraph 54.

Q.    Okay.  I see that here.  So what did

Matthew Cain, Ph.D.
March 15, 2024

you compare the 60 to?

A.    So the comparison here is -- I know we talked about this earlier, but this is in paragraph 51 what the Cammer court said so --

MS. RUBIN:  Sorry.  Did you say 51?

MR. ZACHERL:  I remember this conversation.

THE WITNESS:  51 and paragraph 52 a little bit.

BY THE WITNESS:

A.    But basically the Cammer court said, essentially, if a company is traded on a large exchange like New York Stock Exchange or Nasdaq, then it satisfies this factor.  If it's not, if it's traded over the counter, then documenting that there's at least five or ten market makers would then weigh in favor of market efficiency.

So for Redwire, the fact that they traded on the New York Stock Exchange satisfies the intent of the factor.  And beyond that, I compare 60 to 5 to 10, as the Cammer court said.

Q.    Now, are you aware of any peer-reviewed literature, treatises, academic literature that comes to the conclusion that the Cammer court came to with regard to the number of market makers?

Matthew Cain, Ph.D.
March 15, 2024

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    It's ultimately not a question that I sought to ask one way or another.  So it's not something I researched.

Q.    So you don't know the answer to that?

A.    Yeah, it is not a question I tried to research separately from the guidance provided by the court.

Q.    Okay.  I don't think I have any other questions on market makers.

Let's talk about market capitalization, which is Section V.B or 5B of your report.

A.    Say that again.

Q.    And actually it's V.F, Market Capitalization.  I mistyped it here.

A.    Okay.

Q.    So I believe, if I recall correctly, that you did compare the market cap of this Redwire common stock, as defined by you earlier, to peer-reviewed academic research; is that right?

A.    Yes.

Q.    Okay.  And then is it the Bhole study and the MRK study?

A.    Yes.  That's part of it, and also the

Matthew Cain, Ph.D.
March 15, 2024

S3 criteria, but yes, the MRK and Bhole study.

Q.    Okay.  And when you did this analysis to apply this factor to the Redwire common stock, as you defined that, you found that there was a market capitalization of 353 million over the class period, is that right?  Paragraph 86 of your report?

A.    Yes.

Q.    Okay.  And then what did you compare that market cap to when you compared it to other numbers published in the peer-reviewed literature?

A.    So that compares to the Bhole study in Footnote 89, which shows that the 25th percentile market cap for firms on the NYSE and the Nasdaq was 167 million.

Q.    Okay.

A.    And I also compared it to the MRK sample firms that did not have analyst coverage, which had a market cap of 27.91, just under $28 million.

Q.    Okay.

A.    And then I've also got Footnote 90 that -- because the MRK sample period was a number of years ago, I also looked at that on an inflation-adjusted basis so that it is comparing

Matthew Cain, Ph.D.
March 15, 2024

more apples to apples.  And then I also compared

it in paragraph 86 to the $75 million float

requirement for S3 eligibility.

Q.    Got it.  All right.  Let's switch

gears.

Earlier today we started talking about

something that -- a phrase that you used and I

didn't ask you enough questions about it.  The

phrase was, I think, "key communications."  And

you've used that phrase in your report.  You know

what I'm talking about?

A.    I'm not really sure which part of my

report you're talking about.

Q.    Take a look at 86.  This is an example.

I think it is used in more places but it is

paragraph 76 and you say, "these are the key GPAC

and/or Redwire communications relating to the

status of the business combination."

Do you see that there?

A.    I do.

Q.    Did you define key communications

anywhere in your report?

A.    I think what I'm just trying to explain

there in paragraph 76 is that those relate to the

status of the business combination itself and so

Matthew Cain, Ph.D.
March 15, 2024

that is the identification of the target.  And

then if they had announced a termination of -- or

delay in closing the transaction, which in this

case they did not, or the completion of the

transaction, such as shareholder approval, the

final completion.

Q.    Okay.  So it is right that you didn't

define the term "key communication" in the report,

correct?

A.    I think it is defined there.  But I'm

happy to provide that additional interpretation if

it is confusing.

Q.    No.  I was just looking -- I looked at

the report, obviously, and I didn't see that there

was a definition, per se.  I saw context that you

provided.

A.    Okay.

Q.    I just didn't see a definition.

And let me just ask you, maybe you can

just describe for us, what criteria would you use

to categorize a communication as a key

communication?

A.    Yeah.  So I've done a number of market

efficiency reports on SPACs now and in every one

of those efficiency reports I'm looking at, to the

Matthew Cain, Ph.D.
March 15, 2024

extent that the class period goes back this far in time, I'm looking at when they announced that they've identified a target company and when they, essentially, announce that the deal is going to be successfully completed.

So those are the really two key communications for any SPAC company.

Q.   Okay.  And other than that description that you just gave, is there any other criteria that you use to identify a key communication?

A.   Again, these are key communications relating to the status of the business combination.  So that's why I think it's important to consider the word "status" there.  It's not just any key communications about the business combination; it's the status.

So it's identify the target and the completion, sort of the front and back end of the life of a SPAC acquirement, a target company.

So if, in my review of the information environment, something else jumped out at me that did not, you know -- that is not included in what I described, I would certainly consider it.  Up to this point, all the efficiency reports that I've worked on, I have not seen anything other than

Matthew Cain, Ph.D.
March 15, 2024

identifying the target and then whether the deal

is completed or terminated.

Q.    Okay.  And then in terms of the key

communications that you used, how did you find

them?

A.    So those were reflected both in Edgar

SEC filings as well as company press releases.

And I believe were also included in the Captiva

news articles that I've downloaded, to the best of

my recollection.

Q.    Okay.  And then did you use every

communication that you found in your research in

your report?

        MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    I think that I identified those three

dates and I used all three of those dates.

Q.    Okay.  Let's put up Exhibit K.

        MR. ZACHERL:  Well, Exhibit K on mine.

    I'm not sure what it is on yours, Glennys.

        MS. RUBIN:  It will be 8.

                (Deposition Exhibit No. 8 was

                introduced to the witness.)

BY MR. ZACHERL:

Q.    While she's pulling that up, if you

Matthew Cain, Ph.D.
March 15, 2024

look at Exhibit 6a and its event number 4,

September 3rd, 2021, Redwire Announces the

Completion of the Business Combination.

Do you see that there?

A.    Yes.

Q.    On that one in particular, how did you

know to include that communication as a key

communication about the status of the business

combination?  Was it because the merger closed?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    It is the company announcing that the

transaction has been completed.

Q.    And that's why you included it?

A.    Yes.

Q.    Okay.  I know the word "status" isn't

used anywhere in that headline, and I know that

that's not necessarily indicative of whether it is

a status update.  But is -- well, what I'm getting

to is, you chose this particular communication,

Redwire Announces Completion of Business

Combination With Genesis Park Acquisition

Corporation.  What I'm getting to is why did you

choose that particular -- that particular

communication?

Matthew Cain, Ph.D.
March 15, 2024

A.    So I guess I would say, for many years, probably now about two decades I've studied mergers and acquisitions.  I've done many academic research articles that I've published on mergers and acquisitions.  I've taught it in undergraduate and graduate courses.

Prior to academia I was an analyst helping companies raise capital for mergers and acquisitions.  So I'm quite familiar from a professional standpoint and a academic standpoint with the high-level category of mergers and acquisitions.  And knowing that, after studying countless transactions and working on transactions, the key pieces of information for investors, at a general level, would be identifying the target company to acquire and then closing the transaction.

Q.    You mentioned that, yeah.

A.    In any context, you can also have merger arbitrage traders who will trade just in general public company M&A context.  So they may get updates in between those two time periods about regulators stepping in and trying to block the deal and antitrust concerns or financing falling through.  These types of things that can

Matthew Cain, Ph.D.
March 15, 2024

be important updates about the status of a merger

transaction.

But really the bookends from beginning

to end, would be the initial announcement of a

target company and then all the way through to the

completion of a merger transaction.  So that's the

theoretical basis from an M&A merger and

acquisition standpoint.

Again, it's something I've taught,

something I've researched and published articles

on over many years.

Q.    Okay.  I get it.  I mean, what I'm

really trying to see is whether there is -- or

what was the methodology you used to identify

these communications that you referred to as key

communications regarding the status of the

business, and I think you described that.

Is there anything else you have not

told me?

A.    No, I don't believe so.

Q.    Okay.  That makes it easy.  All right.

Give me a second.  I don't know if I need to show

you the document but you may recall this.

In number 1 on Exhibit 6a there's a

March 25th, 2021, announcement:  Redwire Merge

Matthew Cain, Ph.D.
March 15, 2024

With Genesis Park Acquisition and Become a

Publicly Traded Company.

Do you see that?

A.    Yes.

Q.    Okay.  So there are things in the

documents that surround this document, okay, the

form 8K for example, that talk about closing

conditions or conditions to closing.

Are you familiar with that?

A.    In general, I'm familiar with closing

conditions, but that's -- I did not pay attention

to those specific closing conditions in this

transaction.

Q.    Well, the reason I'm asking about that

is I'm trying to see if there is a difference in

your mind between -- or if you made, as part of

your criteria in selecting these key

communications, did you differentiate between

communications that related to conditions for

closing, like I'll go vote of shareholder to

approve the merger as opposed to just simply

status events?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Again, I've not studied the closing

Matthew Cain, Ph.D.
March 15, 2024

conditions of the transaction here.  I'm just looking at those bookends that I described earlier.  Identifying a merger target and then closing the transaction.

Q.    Okay.  So is there a difference then in terms of conditions for closing, like a shareholder vote being necessary, in your mind, as opposed to a simple status shareholders have approved, for example, in terms of identifying key communications?

A.    Again, I wasn't looking at the closing conditions when I articulated the status updates. I was just focusing on the beginning and the end.

There may be other closing conditions and there may have been updates throughout the time period on other types of closing conditions and those being satisfied, but that wasn't part of the criteria that I laid out here to study.

Q.    So let me give you another one.  There are others, obviously.  Approval by the New York Stock Exchange.  Okay.  So that's one of the other conditions for closing.

Is that something that would be related to the status of the merger and would be a key communication, in your view?

Matthew Cain, Ph.D.

March 15, 2024

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    It is not something that I've ever studied in the context of the SPAC market efficiency reports that I worked on.  So I don't have an opinion one way or another on whether it would be relevant to study that.  Certainly, another expert could come up with their own separate criteria to try to study other dates in the intervening months and whether those were meaningful for investors.

But, again, when I talked about the status, I'm really talking about identifying a target and closing the transaction.

Q.    Okay.  So there was another condition that related to the Genesis Park having a certain amount of money for closing; $185 million, I think.

Is that something that would, in your mind, be a status/key communication regarding status event?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    Well, I mean, I think there's an element of that that is reflected at the back end

Matthew Cain, Ph.D.
March 15, 2024

in terms of the closing and why there is
uncertainty.  Until the company announces, you
know, the shareholder approval and the successful
completion, there is a potential question mark
about redemptions, something we talked about a lot
earlier today.

            If a company's redemptions are so great
that they don't have sufficient cash on hand to
actually close the transaction, that's one of the
potential sources, in general, for SPACs --

        Q.    Right.

        A.    -- for why a deal might not close.  Or
we talked about financing also earlier.  You may
have financing lined up, but there are times when
financing can fall through at the last minute for
different reasons.

            So I think that's why, looking at this
second bookend for successful completion, why
that's meaningful for investors and those other
factors can be a component of that.

            But like I said before, I'm not -- I
did not articulate a criteria where I said I'm
going to evaluate every closing condition, even
though those may be a component or a driver for
why the updates about completion may still be

informative or relevant for investors.

Q.    Okay.  So all these things we've been talking about, the amount of cash that is required to be in Genesis Park's trust account, approval for listing by the New York Stock Exchange, you know, the vote of the shareholders to approve the merger, the determination of which of these is a key communication by you is based on your own subjective criteria; isn't it?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No.  Like I said before, I've worked on market efficiency reports for many SPAC cases now and there is academic research that have studded SPACs, too, and have said the key -- academic research says the key date in the life of a SPAC after its IPO is when they announced that they have identified a target to acquire.

And then really the next key date is successfully completing that acquisition of the target company.

So I don't think it's in any way subjective.  In fact, I think it's the opposite. I'm being objective across every case in which I evaluate a SPAC.  I always look at the

Matthew Cain, Ph.D.
March 15, 2024

identification of the target and the successful completion or termination of the deal as long as the class period goes back far enough in time to cover those potential dates.

Q.    What I'm getting to is whether the decision to include these other events and communications regarding these other events, these key communications, that would be a decision that would be subjective to you as the expert?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    If I decided to look at other closing conditions, is that what you mean?

Q.    Yes.

A.    Yeah, I think it's possible that if I wanted to look at closing conditions and conduct a study of closing conditions, that is something that I could subjectively decide to do.

But what I've explained is guided by academic research on SPACs.  I formed a very objective set of criteria for ever market efficiency report and I apply that criteria the same across reports so that I'm being as objective as possible as an expert.

Q.    Let me ask it this way:  You have a

Matthew Cain, Ph.D.
March 15, 2024

process and that process is a process you follow for every one of these analyses that you do with regard to market efficiency, and that process includes your identification of the same key communications in every report.  Is that what you're saying?

A.    Yes, I think that's what I'm saying.

Q.    And you came up with that process yourself, right?

MR. SHAEFFER:  Object to form.

BY THE WITNESS:

A.    No.  What I said is academic research clearly demonstrates that.  Like I said, there is research on SPACs that say the key event in the life of a SPAC after its IPO is to identify a target to close an acquisition on.

So the research -- academic research on SPACs and just basic professional understanding of SPACs dictates that that's why SPACs exist. Otherwise, it's just a pot of cash worth $10 per share.  That's basic valuation analysis, too.

So I think the finance theory, academic research, understanding of SPACs from a professional standpoint is all very consistent in pointing to these dates as the most relevant dates

Matthew Cain, Ph.D.
March 15, 2024

in the life of almost any SPAC that's been
publicly trading.

Q.    Are you able to give examples of the
academic research that you're describing?

A.    I don't have the research memorized.  I
think there is one study by Michael Ohlrogge, but
I can't pronounce the last name.  I also can't
spell it.  I know it begins with the letter O.
There's an H in there somewhere.

But there's been a handful of papers on
SPACs, but I just don't have it memorized.  There
are times when I've done reply reports when I
received a rebuttal report on market efficiency
cases involving SPACs that I'll quote or site to
or point to some of that academic research.  But I
have not done that up to this point in this case.

Q.    Okay.  Let me ask you about the damages
calculations because you did a pretty good job of
describing the out-of-pocket measurement theory
and basically it is comparing the inflation at the
time of -- inflation at the time of purchase
versus inflation at the time of sale, I think you
said?

A.    Correct.

Q.    How do you determine the inflation?

Matthew Cain, Ph.D.
March 15, 2024

A.    So the amount of inflation is determined at a later stage in the case, at the loss-causation stage of a case.  And I'll put in a loss causation or merits for damages report where I conduct a more exhaustive analysis of the information environment.  I'll look at the front end, the alleged misrepresentations or omissions, and at the back end, alleged corrective disclosures.  And then I'm giving you -- this is all kind of summarized in the damages methodology section of this report.

But it often relies on an Event Study looking at either the front end or back end or it could involve valuation techniques as well.  And then identifying the amount of -- ultimately identifying the amount by which the securities were artificially inflated on every day during the class period.  That's the inflation ribbon that evolves throughout the class period.

Q.    So what you just described to me, is that the methodology that you use to measure the amount of inflation?

A.    Well, the -- so the measurement -- the actual calculation -- let me back up.

The out-of-pocket damages methodology,

Matthew Cain, Ph.D.
March 15, 2024

it's a methodology and it's formulaic and it's common across class members.  There is an input to the formula, which is the amount of artificial inflation on each day, right?

Q.    Yes.

A.    So the question is how do you calculate the input to the formula.

Q.    Exactly.

A.    And that is a calculation that is not done at the market efficiency stage but rather at the loss-causation stage.

Q.    You need more information than you have, right?

A.    Correct.  Potentially.

When I do that calculation it starts with looking at the information environment and, you know, again, the front end and the back end, corrective disclosures, identifying the nature of corrective disclosures and their value impact on the stock.

So that can -- that is commonly measured using an Event Study, but it doesn't have to be.  It could be done using a discounted cash flow model or some other valuation technique.

Often if there is -- you may have

Matthew Cain, Ph.D.
March 15, 2024

confounding information so there could be corrective information that comes out, for example, in an earnings announcement; but there may be other information that comes out in the earnings announcement that is not part of the corrective information but may have caused some of that change in the stock price. So I may have to disaggregate some part of the movement.

So those are the tools, the techniques that are used to actually measure that input to the formula down the road.

Q. All right. So let's get specific just because we're very close to the end here from my perspective. I need to talk to my gang here.

But how -- can you describe for us how you would calculate this inflation for Redwire?

MR. SHAEFFER: Object to form.

BY THE WITNESS:

A. So it would be similar to what I just described and I think this is also laid out. I mean, it's probably worth me pointing you to the --

Q. Yeah, because I didn't see this in the report. I may have overlooked it so that is fine.

A. So let me turn to the report. So it

kind of starts around paragraph 129 and it goes on for several paragraphs.

Q.    Give me a second to look at that, please.

A.    I think it goes on for several pages, starting with paragraph 129.

Q.    I just want to be able to focus this. I don't want to make you reiterate what's here.

A.    Sure.

Q.    So if I can summarize, effectively what you're going to do is a loss-causation analysis using the event studies that you have not yet done to quantify the artificial inflation.

Do I have that right?

MR. SHAEFFER:  Object to form.

BY MR. ZACHERL:

Q.    Or am I conflating?

A.    That's one possible approach.  It often, like I said, starts with an Event Study to measure the price -- the amount by which the stock price dropped due to the corrective disclosure. It may involve disaggregating some part of that drop may not have been due to the revelation of any corrective information.  I could use valuation.

Matthew Cain, Ph.D.
March 15, 2024

Some experts have used purely, just without using an Event Study, just using pure valuation tools, like a discounted cash flow analysis.

Q.    Right.

A.    But the most common is, like you said, an Event Study.  And then in paragraph -- around paragraph 134, 135, 136, explains how, if you're doing the Event Study at the back end on the corrective disclosures, there are different ways to back-cast that artificial inflation on a daily basis to the start of the class period.

Q.    You know what?  Maybe there is an easier way to do this.

Is there any methodology that you would employ to calculate the artificial inflation that is not described in your report?

A.    Nothing that I can think of.

MR. ZACHERL:  Let me take a five-minute break.

THE VIDEOGRAPHER:  Going off the record.  The time is 4:02 p.m. Central.

(Whereupon, a break was taken, after which the following proceedings were had:)

Matthew Cain, Ph.D.
March 15, 2024

THE VIDEOGRAPHER:  We're back on the record.  The time is 4:11 p.m. Central.

MR. ZACHERL:  Okay.  This is Frank Zacherl.  At this time, sir, we have no further questions.  Thank you very much for sticking around on a Friday afternoon.  It is nice to meet you.

Counsel, do you have any questions?

MR. SHAEFFER:  No questions from me. Thank you, Dr. Cain, for your time.

MR. ZACHERL:  So we will order the transcript.  We'd like to get a rough if we can.  And we'll order a transcript on a rush basis.

At this time we are not going to order the video but we will let you know.

THE VIDEOGRAPHER:  This will conclude today's deposition.  The time is 4:12 p.m. Central.  We are off the record.

WITNESS EXCUSED AT 4:12 P.M.

Matthew Cain, Ph.D.
March 15, 2024

REPORTER'S CERTIFICATE


                I, Noreen E. Resendez, Registered

Professional Reporter and Notary Public in and for

the County of DuPage, State of Illinois, do hereby

certify that on 15th day of March, 2024, the

deposition of the witness, MATTHEW CAIN, Ph.D.,

called by the Defendants, was taken before me,

reported stenographically and was thereafter

reduced to typewriting through computer-aided

transcription.

                The said witness, MATTHEW CAIN, Ph.D.,

was first duly sworn to tell the truth, the whole

truth, and nothing but the truth, and was then

examined upon oral interrogatories.

                I further certify that the foregoing is

a true, accurate and complete record of the

questions asked of and answers made by the said

witness, at the time and place hereinabove

referred to.

                The signature of the witness was waived

by agreement.

                The undersigned is not interested in

the within case, nor of kin or counsel to any of

the parties.

Matthew Cain, Ph.D.
March 15, 2024

Witness my official signature and seal

as Notary Public, in and for DuPage County,

Illinois, on this 21st day of March, 2024.


/s/ Noreen E. Resendez, CSR, RPR, CRR
Notary Public
Illinois License No. 084-004182
New Mexico License No.:  602
Washington License No.:  23031563

Matthew Cain, Ph.D.
March 15, 2024

---

**Exhibits**

---

EX 0001 Matthew Cain, Ph.D. 031524
3:10 7:23 8:1,6

EX 0002 Matthew Cain, Ph.D. 031524
3:11 12:10, 13,14 13:20, 21 34:17

EX 0003 Matthew Cain, Ph.D. 031524
3:12 97:8,9 107:19 223:9

EX 0004 Matthew Cain, Ph.D. 031524
3:13 101:10, 14

EX 0005 Matthew Cain, Ph.D. 031524
3:14 61:9 63:14 143:13,14,22 144:2,7 149:6,18 150:8 153:23 155:8,24

EX 0006 Matthew Cain, Ph.D. 031524
3:15 68:3 143:14 144:4 146:10,15,22 147:24 149:5 150:8,22,23 155:7,25 156:3

EX 0007 Matthew Cain, Ph.D. 031524
3:16 88:11

158:12 214:3,4

EX 0008 Matthew Cain, Ph.D. 031524
3:17 236:22

---

**$**

---

$10
40:16,18,20 45:2 48:4 216:13 246:20

$10.15
40:25

$185
242:17

$20,000
30:21

$28
174:19 232:20

$40
197:11

$50
197:11

$75
173:9,12 174:3 233:2

$950
30:16 31:22 159:22

---

**0**

---

034
183:15

---

**1**

---

1
7:23 8:1,6 36:11,21,22 75:13 124:2 180:2 189:21

190:16 239:24

1.82
182:2

10
180:5 186:4 230:21

10-K
158:9

10-ks
210:11

10-Q
132:15 144:14,17 146:4,12 148:5 152:4, 10,19 157:17

10-qs
152:17 153:1,5,8 210:12

10.15
41:22

100
55:12,16,19 57:8 59:17 62:15

107
80:12

10:50
66:20

10:51
66:24

10th
131:16 132:12 133:8,24 135:15 136:10,21 139:14 140:4,13,23, 24 141:19 142:18 143:7,11,24 144:3,9 186:5 188:4, 25 189:2,7,9

11
89:22 95:17 161:3,21 163:6,12 178:19

11:05
67:4

12
124:3,9,17, 18 125:3 133:19 150:24

120
61:6 68:1,5

120-day
68:12

125
82:4,5 83:3

129
251:1,6

12:11
121:15,25 122:11

12:40
122:1

12:53
122:16

131,000
80:14

134
252:8

135
252:8

136
252:8

15
30:21

15th
4:3 132:14 133:6,23 135:17 136:11,24 140:14,22 142:17 144:5,25 146:4,14 147:24 157:9

Matthew Cain, Ph.D.
March 15, 2024

**16**
  37:21 39:4,
  10
**167**
  232:15
**18th**
  125:7
**19**
  136:7,15,19
  137:5,10
  139:3,21
  141:10,17,18
  193:6
**1970**
  97:1,11,13
  107:18
**1980s**
  228:12
**1991**
  97:12
**1997**
  57:17
**19th**
  25:10,13,16
**1:59**
  179:7,12

---

**2**

**2**
  12:10,14
  13:20,21
  34:17 75:13
  125:6 150:23
  154:19
  155:9,17
  180:2 189:21
  190:4,7,16
  192:10 204:4
  214:8,11
**20**
  121:20 158:2
  166:17
  192:19
**2021**
  33:18,23
  35:13,14,16

36:18 72:23
125:7 126:4
127:15
131:16,18
132:14
135:16
146:13,14
213:16,21,23
214:25 215:2
237:2 239:25
**2022**
  33:19,23
  36:18
  157:16,18
  158:8
**2024**
  4:3 168:3
**22**
  229:17
**23**
  78:6
**25th**
  33:18,23
  36:18 174:23
  232:13
  239:25
**26**
  56:23 88:21
  97:5,18
**27.91**
  232:19
**28**
  61:4 213:15
**2:05**
  179:8
**2:15**
  179:17
**2nd**
  35:13,14
  126:4
  129:10,17
  130:5 131:5

---

**3**

**3**
  76:1,10

97:8,9
107:19
126:4,12
127:2 128:12
148:11,18
153:11
154:9,11,20
155:10,17
156:1 192:9
223:9
**3.6**
  181:25
  183:16
**30th**
  36:18 146:13
  157:18
**31**
  23:12
  162:13,19
**31st**
  33:19 157:16
  158:8
**353**
  232:5
**38**
  190:3
**39**
  181:24 182:2
**3:12**
  226:11,17
**3:25**
  226:12
**3:29**
  226:22
**3rd**
  35:15 127:15
  129:9,19
  131:3 137:2
  237:2
**3st**
  33:23

---

**4**

**4**
  96:25
  101:10,14

127:14,21
128:11
148:10
150:21
155:10 156:2
190:9 237:1
**40**
  182:3,25
  228:15
**400**
  205:25
**404**
  107:20
**41**
  182:3 183:3
**43**
  190:19 196:1
  206:22 209:4
  210:3,5
  222:23
**45**
  192:5 193:14
**49**
  205:7
**4:02**
  252:22
**4:11**
  253:2
**4:12**
  253:19,21

---

**5**

**5**
  10:14 19:21
  22:8 45:5
  48:25 49:7,
  17 56:14
  60:3,15 61:9
  63:14 66:11
  70:1 87:18
  95:7 96:25
  131:16,25
  133:14,23
  143:13,22
  144:2,7
  149:6,18

Matthew Cain, Ph.D.
March 15, 2024

**150:8 153:23**
155:8,24
156:20,22
165:6 166:22
180:5 230:21

**5-6**
143:14

**51**
171:5 172:13
230:4,5,8

**52**
230:8

**54**
229:24

**544,000**
80:13

**5B**
231:13

**5C**
227:3

---

**6**

**6**
68:3 132:13,
16 133:23
143:22,25
144:4 145:8
146:10,15,22
147:24 149:5
150:8,23
155:7,25
156:3,20,22

**60**
172:23
227:16 228:4
229:15,17,23
230:1,21

**6a**
10:7 117:15
121:23
122:19,21
123:5
160:21,22
237:1 239:24

**6b**
120:19

---

**7**

**7**
88:11 122:19
157:16
158:8,12
214:3,4

**70**
36:5 56:23
57:18 67:11

**72**
61:4 67:21

**75**
187:18

**75th**
188:17 189:8

**76**
23:9,11,12
233:16,24

---

**8**

**8**
139:13
192:10
236:21,22

**8-K**
158:9

**8-ks**
210:12

**81**
193:24

**85**
174:13 175:1

**86**
173:10
174:20 232:6
233:2,14

**89**
232:13

**8K**
134:16 240:7

**8th**
213:22

---

**9**

**9**
182:19

**9.03**
181:25

**90**
232:22

**91**
101:13

**9:36**
4:2

---

**A**

**a.m.**
4:2 66:24
67:4

**A4**
26:19

**ability**
116:24

**able**
8:22 18:3
26:6 27:11
40:12 60:10
65:1,6
67:13,15
120:11 129:4
137:6,25
139:22
141:10,21
148:2 152:20
156:21 172:4
184:22,25
191:13 199:7
201:19,23
208:20 247:3
251:7

**abnormal**
61:11 117:1

**above**
174:22
189:7,9,12
191:4

**absence**
111:15 112:4
113:21
209:18

**absolutely**
23:4 111:5
129:25

**abstract**
185:3

**abusing**
178:6

**academia**
238:7

**academic**
12:1 56:15
57:2 62:12
65:17,22
77:14 91:10
93:6 97:19
102:13
105:18
109:3,15,17
110:2 161:5,
17 163:2
165:4,12,22
166:3,19,20
168:13,21
170:25
171:19,20,
21,23 174:7,
9 177:13,16,
20,21 178:13
219:7,8,11
221:5 230:23
231:21
238:3,10
244:14,15
245:20
246:12,17,22
247:4,15

**Academicion**
105:3

**academics**
91:8 99:16,
21 100:22
105:5 106:25
186:10 220:2

Matthew Cain, Ph.D.
March 15, 2024

accepted
  29:18,21
access
  76:12
accommodate
  27:6 33:24
accommodation
  35:4
account
  55:23 56:2,
  19 100:11
  244:4
accounting
  74:13,21
  129:6 140:7
  142:1 147:2
accumulating
  108:18
accuracy
  220:5
accurate
  13:25 22:16
  59:11,22
  78:11 85:15
  137:3 138:8
  159:11
  161:23 171:1
  172:9,10
  178:18,23
  179:3 199:21
  200:5 208:24
  227:18
accurately
  13:9 14:12,
  18
acknowledging
  63:22
acquire
  238:16
  244:18
acquirement
  235:19
acquisition
  35:12 37:23
  38:1,10,18,
  25 47:18
  125:7 127:17

214:16
217:23
237:22 239:8
240:1 244:20
246:16
acquisitions
  15:18 18:7
  39:9 238:3,
  5,9,12
across
  152:25 162:9
  184:4 204:20
  225:14
  244:24
  245:23 249:2
action
  28:23 79:2
actions
  29:9
actual
  23:10 30:12
  33:1 35:15,
  16 37:25
  54:23 82:19
  109:21
  129:15 131:9
  133:25
  135:13
  136:12
  137:13
  139:10
  141:13 146:4
  149:23 159:3
  195:14
  199:18
  211:17
  218:14
  248:24
Adam
  4:24
adding
  210:17
addition
  4:23
additional
  22:2 78:22
  81:23 84:4
  93:4 94:16

106:14,20,21
134:20,21,23
135:4 139:7
147:23
148:20
149:22 150:7
154:20 161:2
162:21
201:21
202:17
218:23
234:11
address
  16:5 46:5
  57:18
addressed
  187:14
addresses
  90:24
adequately
  89:25 90:6,
  16
adjust
  185:12
adjustment
  102:7 103:9
  108:11,23
  114:12,17
adjustments
  60:8
adopted
  176:17
affect
  43:18
affiliations
  14:13
affirmative
  32:15
afternoon
  253:6
afterwards
  63:13
agnostic
  120:5
ago
  167:12,15,18
  177:2 212:23

232:24
agree
  4:5 13:7
  42:11 47:5
  51:2 53:12
  66:21 101:25
  128:10 133:3
  134:4,11
  135:6 138:8
  140:12,19
  147:18 151:6
  154:16 157:5
  159:17
  181:17
  188:15
  189:10
  196:9,23
  200:16,21
  212:9 218:25
  220:22
ahead
  7:22 10:3
  12:9 24:15,
  17 60:18
  102:24
  131:23
  191:16
algorithmical
ly
  229:14
aligned
  116:19
allegation
  79:3
allegations
  33:2 169:20
allege
  195:6 222:24
alleged
  77:24 104:5
  138:15
  169:20
  248:7,8
alleges
  136:9 158:4
alluded
  150:22

Matthew Cain, Ph.D.
March 15, 2024

**altering**
  120:2
**alternative**
  71:2
**amount**
  40:21 84:9
  168:20
  182:14
  242:17 244:3
  248:1,15,16,
  22 249:3
  251:20
**analyses**
  7:19 9:8,9
  49:21 51:24
  58:24 60:7
  181:12 246:2
**analysis**
  10:14 14:8
  15:18,19
  20:8,17
  21:7,21 22:8
  34:4 44:6
  49:7,19
  51:11,17,21
  54:3 56:14
  57:19 58:16
  59:22 60:11
  62:9 65:9
  66:11 67:12,
  17 68:14,21,
  23 69:4
  71:10 72:15
  74:16,18
  75:6 81:13
  83:14 84:2,
  4,8,15
  85:12,17
  87:3 88:17
  92:16 94:18,
  24 99:11
  101:4 103:22
  118:10
  122:25
  123:18
  127:7,8
  130:21
  133:15 135:1

138:20
142:14
151:18 154:6
156:9,14
176:25
177:1,12
180:20
187:23
195:11
196:10,22
198:23
203:16
206:13,16,20
208:15,16
209:6 211:3
218:14 220:7
227:2 232:2
246:21 248:5
251:11 252:4
**analyst**
  15:10 18:9
  162:3
  168:10,12,25
  169:7,14,25
  174:15
  181:12
  191:22
  192:6,10,17,
  19,24
  193:16,22,24
  194:2,8,16
  195:1,11,14,
  21 196:1,10,
  20,23 197:9,
  15,20 198:20
  200:23
  201:1,19,21
  202:22,24
  203:3,5,17
  204:3,10
  205:2,5,10,
  20,22
  206:10,15,17
  207:1,20,24
  208:6,17,20
  209:1,11,18
  210:3,14
  211:6,17,18
  212:5 213:16

216:2,3,10,
22,25 217:4,
16,22
218:10,12,17
219:1 220:5,
10,23 221:23
222:3,8,9,20
223:7,10,12
224:9 225:1,
6,9,14 226:1
232:18 238:7
**analysts**
  20:20 106:16
  134:19,23
  169:18
  170:3,9,11
  192:23 196:3
  204:20,22
  205:24
  206:23
  207:6,10
  213:6 218:7,
  24 220:2,11
  221:7
  222:13,25
**analysts'**
  119:14 169:9
  170:15
  198:11 219:8
**analyzed**
  42:7 152:16
**and/or**
  163:1,8,10
  164:2 233:17
**Andrew**
  4:24
**angles**
  182:13
**announce**
  4:20 5:4
  17:24 134:15
  200:25 235:4
**announced**
  17:4 42:4
  47:19 86:9
  98:11 126:17
  135:15 234:2
  235:2 244:17

**announcement**
  16:20,22
  17:1,9,17,19
  18:21,22,23
  20:18 45:8,
  9,19 46:16,
  20 64:9
  86:14,19
  92:25
  106:20,21
  125:21
  132:6,8
  135:21 140:3
  146:7 204:16
  215:22
  239:4,25
  250:3,5
**announcements**
  10:24,25
  86:24 115:24
  123:20,21,22
  126:20 128:6
  132:6,22
  137:24
  138:1,2,6,9,
  13 142:25
  198:13
**announces**
  127:15 129:3
  237:2,21
  243:2
**announcing**
  126:5 237:12
**anomalies**
  99:22 100:6,
  8
**anomaly**
  100:14
**answer**
  8:25 12:4
  22:9 23:1
  27:2 51:16
  64:7 66:6
  69:9 83:10
  91:23 92:4
  96:3 102:24
  106:24
  113:15 114:3

Matthew Cain, Ph.D.
March 15, 2024

115:15
127:24
132:19
134:22
142:15
144:25
149:17
150:25
151:13
152:15
153:3,18
155:9 164:11
169:25 170:8
190:24
191:13
212:16
213:19
219:14 225:4
228:9 231:6

**answerable**
151:17

**answered**
18:18 24:8
83:12 92:23
104:14 111:7
143:3 152:10
155:18 212:3

**answering**
69:23 80:4
86:24 221:11
222:18
225:25

**answers**
52:11 58:8
67:20 103:2
153:25
155:15 157:4
158:1

**anticipated**
93:17 115:8
148:11
153:13
154:12
191:17

**anticipating**
207:18

**antitrust**
238:24

**anybody**
167:19

**anyone**
7:7,8 159:16
165:20

**apart**
9:12 177:19

**apologize**
43:22 106:24
211:13 222:5

**apparent**
134:6

**appearances**
4:9

**apples**
181:23
184:7,8
193:7 233:1

**applicable**
151:24
165:17,19
167:20 225:9

**application**
161:22
162:23
187:17
192:14

**applied**
58:6 225:14

**applies**
34:11

**apply**
20:5 58:4
72:20 221:22
232:3 245:22

**applying**
82:21 178:7

**appreciate**
43:2 100:24
136:20
212:11

**approach**
24:10 53:8,9
58:21,22
85:24 105:10
161:1 251:18

**approached**
83:24

**approaches**
177:9

**appropriate**
70:20 169:3
176:19,22
178:8

**appropriately**
59:3

**approval**
126:5
129:11,15
131:9 234:5
241:20 243:3
244:4

**approvals**
18:6

**approve**
128:19
240:21 244:6

**approved**
126:19
128:13
129:18 241:9

**approving**
126:21

**April**
36:18

**arbitrage**
47:21 90:1,
22 94:15
96:9 238:20

**arbitragers**
187:7

**area**
14:23 24:12
29:19 43:1
73:7

**areas**
15:2,3 27:8

**around**
121:11 251:1
252:7 253:6

**arrangement**
31:4

**arrival**
115:20

**articles**
65:18 202:21
205:25
210:13 236:9
238:4 239:10

**articulate**
62:13 84:19
85:14 133:4
181:18 186:3
243:22

**articulated**
11:1 38:1
115:23
168:18
190:11
241:12

**articulating**
66:1

**artificial**
84:8,11,22
249:3 251:13
252:11,16

**artificially**
248:17

**asked**
9:22 25:24
34:21 43:21
54:9,25 55:8
68:20 69:20
75:15,18,21
77:9 102:14
116:17 128:5
137:23
138:17
179:20
195:11
222:15

**asking**
6:6 37:9
42:25 43:22
44:4 56:9
65:19 68:1
70:1 71:6
72:22 76:20
81:10 83:13
89:5 90:10,

Matthew Cain, Ph.D.
March 15, 2024

21 91:2,21
95:25 101:1
104:23
110:11 120:7
130:18 141:5
142:8 158:1
160:8 189:14
196:19
206:22
207:19 213:8
214:25
224:24
240:14

**aspect**
45:4

**aspects**
62:23

**asserted**
33:3

**assess**
70:14 114:24
115:18
138:11 162:3

**assessed**
72:13

**assessing**
51:4

**assessment**
124:24
133:17 137:7
139:23
141:22
147:19
148:3,23
149:9 150:13
151:10 154:6
157:6 200:10
216:18
218:11
224:13 225:5

**assessments**
204:12

**asset**
214:16
229:10

**assignment**
75:15

**assist**
8:18 9:23

**assistance**
26:17 27:13,
14

**assistant**
8:5

**assisted**
7:10

**associated**
133:20

**assume**
137:19
203:11

**assumed**
102:8

**assuming**
200:12
215:20

**assumption**
38:17

**attach**
30:11

**attached**
12:21 145:11

**attempting**
116:2

**attendees**
4:20

**attention**
162:14
176:10
181:10 194:4
207:13 214:7
240:11

**audience**
207:12

**Audio**
4:3

**audit**
140:8 142:2
147:3 148:6

**authoritative**
58:1 62:4
65:7 67:10
227:6

**authorities**
65:23

**autocorrelati
on**
89:21 90:9,
18 95:17
96:17 165:6
166:23

**automatically**
56:18

**available**
46:3,4
163:16
164:17
166:5,6
168:18 191:9
201:20,22
203:14
206:19
208:19

**average**
105:17,19,
20,23,24
106:1,4,10,
25 165:10,15
166:13
180:18
183:10,11,19
184:3,4,12,
13 189:18
190:4

**avoid**
199:18
201:11

**aware**
38:14 43:7
60:1,6
165:19,21
166:1,2
167:2,8
168:2,7
169:2 173:5
176:16
190:12,14
195:3,7
230:22

**awareness**
39:4

**B**

**B-H-O-L-E**
174:24

**back**
11:3 17:20
39:25 42:2
45:8 52:10
57:7 61:14
67:3 68:18
70:2 83:23
110:4 120:10
121:21
122:1,15
130:19
131:13 136:5
157:4 160:21
167:4,19
175:1
176:12,24
179:8,16
186:2,23
187:10
188:24
190:22 199:9
206:22
212:10 220:8
224:11
226:12,21
228:16
235:1,18
242:25 245:3
248:8,13,24
249:17 252:9
253:1

**back-cast**
252:11

**background**
11:23 12:15
14:17 15:13
37:21

**bad**
50:13,15
86:17
113:16,21
115:7,9,12
154:14

Matthew Cain, Ph.D.
March 15, 2024

**baked**
59:16
**ballpark**
30:21 167:15
**Bank**
28:25
**banks**
229:7
**bar**
91:2 99:18
104:23
**based**
15:6 31:8
54:14 60:8
68:11 81:21
96:10 102:7
116:25
118:22 141:9
150:2 163:25
165:13
193:21 194:8
195:22
210:21
212:15 244:8
**bases**
99:25
**basic**
54:2 85:23
246:18,21
**basically**
40:19 45:1
56:8 75:18
78:19 82:14
90:9 98:10
99:12 101:16
116:22
175:16
177:23
192:16 206:2
229:3 230:11
247:20
**basing**
88:10 104:12
**basis**
22:6 24:5
26:24 30:12
82:7 91:13
96:21

102:16,22
103:4 107:2
119:10 121:7
132:9,24
177:14,17,19
183:10 184:7
219:25
220:4,8
232:25 239:7
252:12
253:15
**Beddington**
4:22
**beginning**
16:6 31:16
61:13 72:23
218:9 224:7
239:3 241:13
**begins**
247:8
**behalf**
4:13 28:11,
13
**belabor**
131:14 143:4
**beliefs**
85:20 118:2
120:13
**believe**
7:1 8:10,19
12:22 13:2
26:18 27:20
29:25 30:17,
24 31:1,13,
20 34:20
35:17 37:4,
7,17 38:15
40:15 75:7
76:7 77:2
85:19 97:6
101:14
103:18
117:17
119:16 143:3
159:1 160:2,
15 180:12
187:16
190:21

212:20
213:22 215:3
217:15
227:15
231:18 236:8
239:20
**believed**
117:20,25
119:2
**below**
48:3 148:18
187:4 188:4,
25 189:12
191:3
**benchmark**
161:16
162:3,6
163:17,19
164:13,14
165:2 166:21
171:8,15,22
172:3 173:22
183:2,6
191:22
192:24 195:2
**benchmarked**
162:24
**benchmarks**
162:10
163:7,11,16
164:3 165:3,
22 168:12,24
170:24 172:9
173:4,5
178:14,17
179:22
180:14 192:2
**beneficial**
204:18
207:14
**benefit**
11:22
**benefits**
62:13
**Benjamin**
4:22
**Berman**
4:13 27:4

160:1
**besides**
6:23 7:5,18
8:15 12:20
27:25 39:1
40:3 90:18
125:22
155:17
**best**
31:15,16
39:11,16
103:10 236:9
**better**
81:21 118:14
171:17
182:10
219:1,21
220:23
**Bhole**
174:24
180:24 183:6
185:20,21
186:8,18
187:13,16
188:1,8,16,
19 192:3
231:23
232:1,12
**bid**
181:14
**bid-and-ask**
112:12
**bid-ask**
90:14
**bill**
159:23 160:4
**billings**
160:7
**bills**
30:22
**binomial**
82:23
**bit**
5:3 10:3
64:21 117:13
118:12 137:5
159:5 160:21

| | | | |
|---|---|---|---|
| 180:19 | **briefly** | 233:18,25 | 124:14,19 |
| 191:16 205:8 | 16:6 195:13 | 235:12,15 | 134:18,21 |
| 226:15 | 221:18 | 237:3,8,21 | 163:20 |
| 227:1,24 | **bright** | 239:17 | 175:18,19 |
| 230:9 | 187:5 | **buy** | 181:23 200:4 |
| **Black-scholes** | **bright-line** | 197:10 | 216:4 226:14 |
| 50:8 82:23 | 187:3 188:9 | **buy/sell** | **called** |
| **blanket** | 189:11,13 | 170:20 | 5:8 78:8 |
| 134:11 | 191:1,12 | 204:13 220:3 | 97:23 214:12 |
| **block** | 195:8 | 221:7 | 229:18 |
| 112:18 | **bring** | **buying** | **calls** |
| 238:23 | 108:17 | 112:14 228:1 | 159:15 |
| **Bloomberg** | 160:21 | | 210:13 |
| 229:17 | **broad** | | **Cammer** |
| **body** | 16:3 18:7 | **C** | 10:14 19:21 |
| 5:19 | **broader** | | 22:8,13 45:5 |
| **boils** | 22:10 | **Cain** | 48:25 49:7, |
| 44:5 | **brokers** | 5:7,12 13:17 | 17 56:14 |
| **bond** | 227:17 228:4 | 67:6 122:18 | 60:3,15 |
| 129:2,5 | 229:20 | 179:19 | 66:11 70:1, |
| **bone** | **Bromberg** | 226:24 | 2,4,9,13 |
| 94:17 | 190:20 | 253:11 | 84:3 87:18 |
| **book** | **buckets** | **calculate** | 95:7 117:5 |
| 7:4 | 88:12 121:6 | 70:20 82:20 | 119:19 |
| **bookend** | **Bud** | 83:5 249:6 | 120:18 123:2 |
| 6:21 10:4 | 4:22 | 250:16 | 133:14 |
| 243:18 | **bullet** | 252:16 | 161:2,25 |
| **bookends** | 14:6 | **calculated** | 162:2,21 |
| 239:3 241:2 | **bullish** | 75:23 81:20 | 163:17,18 |
| **boss** | 170:16 | 82:7 182:19 | 164:12,20 |
| 212:22 | **bunch** | 183:3 | 165:2,6,11, |
| **bottom** | 184:14 | **calculating** | 21 166:3,22 |
| 103:11 188:3 | **burden** | 15:25 | 171:6 172:13 |
| **Bowen** | 84:19,20 | **calculation** | 178:22 180:1 |
| 4:16,22 | **business** | 33:6 80:22 | 182:17,20 |
| **box** | 10:23 35:4 | 83:19 84:13 | 189:19,24 |
| 148:10,16 | 40:11,24 | 248:24 | 190:2,3,7, |
| 154:8,15,16, | 42:3 44:25 | 249:9,15 | 10,13,17,19 |
| 17 | 46:17 52:17, | **calculations** | 195:5 204:4 |
| **break** | 20 53:6 | 66:16 81:15 | 222:23 |
| 60:21 64:20 | 62:21 64:10, | 84:22 247:18 | 223:17 227:9 |
| 66:14,25 | 11 72:7 | **California** | 228:11,16 |
| 122:12 | 123:13 126:6 | 28:25 | 230:4,11,21, |
| 179:13 | 127:16 130:1 | **call** | 24 |
| 226:7,18 | 140:7 142:1 | 6:18 7:9,12 | **Cannito** |
| 252:20,23 | 147:2 214:17 | 72:5 80:14, | 4:18 |
| | 215:14 | 17 82:5 | **canvassed** |
| | | 90:15 94:8 | 166:18 |

Matthew Cain, Ph.D.
March 15, 2024

cap
  173:7,11
  174:2,14,18,
  22 181:14
  231:19
  232:10,14,19
capable
  59:2 60:3
capital
  15:10 238:8
capitalizatio
n
  173:2,25
  231:12,16
  232:5
caps
  175:4
Captiva
  236:8
capture
  199:7
captured
  62:8 65:9
career
  14:21 25:20
carried
  10:18 51:11
  208:14
carrying
  48:24 51:24
  69:22 120:6
case
  5:14 9:12
  10:13 13:10
  14:22 16:21
  20:8 24:23
  25:6 26:5,
  12,16,18,19
  27:11,15
  29:20 30:14
  34:18,19
  37:21 43:14
  45:6,7 50:20
  51:12,22
  55:3 58:15
  65:12 79:3
  84:6,24 85:4

  96:15 104:6
  129:16,20
  159:21 160:1
  178:9 198:5
  200:1 203:20
  205:4
  222:10,11,16
  234:4 244:24
  247:16
  248:2,3
case-by-case
  107:2
cases
  24:21 26:11,
  20,23 28:20,
  21,24 29:3,
  7,8,10
  128:25
  129:13
  222:17
  244:13
  247:14
cash
  41:1 45:2
  103:21
  198:23
  216:13 243:8
  244:3 246:20
  249:23 252:3
categories
  10:21 23:13,
  14,21
  123:12,25
  164:18 218:3
categorize
  234:21
category
  123:19
  126:13
  238:11
caught
  150:5
causal
  121:8
causation
  16:1 84:7,
  17,24
  103:19,22

  142:9,22
  248:4
causations
  121:3
cause-and-
effect
  22:12 44:5
  69:12 70:5
  85:17 119:22
caused
  58:20 119:8
  120:23 250:6
caution
  8:24 24:24
caveat
  16:17
celebrating
  224:18
Central
  4:2 66:24
  67:4 122:11,
  16 179:12,17
  226:17,22
  252:22
  253:2,20
cents
  40:18
certain
  9:23 10:15
  17:25 20:2
  53:17 124:25
  165:1 223:5
  242:16
certainly
  17:14,22
  25:11 34:9
  64:9 66:7
  103:20
  120:18
  139:16
  160:17 205:1
  218:25
  220:22
  235:23 242:7
certification
  84:18,23
  100:18

challenge
  109:14
  120:25
chance
  144:6 213:25
change
  45:21 47:4,
  12 48:8 49:4
  52:16 55:13
  57:11 58:21
  59:8 60:4
  62:16,20,21
  63:8 65:20
  72:7 85:19
  86:5 112:16
  118:2 119:8
  120:12
  148:12
  153:14
  154:13,14
  197:18 250:7
changed
  59:6 66:9
  71:19 115:20
  130:20 153:5
changes
  46:14,21,24
  47:1,3,8
  53:4,10
  55:10,18
  57:4 61:12,
  24 62:1,15,
  18,22 63:23
  65:18 66:2
  112:9 148:21
  167:2 177:15
changing
  61:7 63:20
characterize
  17:17 127:3
characterizin
g
  131:3
chart
  36:22 37:8
checked
  148:10,16

Matthew Cain, Ph.D.
March 15, 2024

checking
  154:8,16
Cheng
  8:19
choose
  172:8 237:24
choosing
  21:18 22:22
chose
  19:13,15
  20:9 117:14
  164:15
  237:20
chunk
  112:18
citations
  6:23 58:2,4
  62:5
cite
  56:24 57:2
  139:17
cited
  6:19 7:2
  97:20 139:9
claims
  80:25 82:6,
  18
clarification
  180:17
clarify
  8:14 44:15
  82:3 83:9
clarity
  78:22 106:14
class
  28:23 29:9
  33:17,22
  34:2,5,11,
  13,22 35:11
  45:7 58:15
  59:15,21
  65:5 69:1
  70:19 72:14,
  16,17 76:18,
  23 77:5
  79:2,16,25
  80:19 84:12,

18,23 92:22,
24 100:18
117:9 174:3
182:15
205:25
208:21
219:11 223:2
227:17
229:19 232:6
235:1 245:3
248:18,19
249:2 252:12
class-wide
  82:7
cleanest
  101:17,22
clear
  23:1 34:22
  35:19 42:24
  60:16 82:14
  102:6 172:14
  205:7 211:16
  212:4,7
  222:2
clearcut
  227:10
clearly
  149:1 186:6
  187:5 246:13
client
  159:23,24
  160:5
clients
  33:3
close
  18:5 52:20
  53:1 64:3
  86:2 129:3,4
  243:9,12
  246:16
  250:13
closed
  18:12 52:21
  74:3,6 237:9
closely
  38:14 160:17
closes

18:11 46:18
73:24 128:13
130:8,13
closing
  10:23 18:16
  35:13,14
  36:16,24
  37:11,15
  40:11,24
  41:19 42:3
  44:25 45:11
  46:20 52:17,
  24 53:6
  62:21 63:25
  64:11
  123:13,15
  126:16
  128:23
  129:15 234:3
  238:17
  240:7,8,10,
  12,20,25
  241:4,6,11,
  14,16,22
  242:14,17
  243:1,23
  245:12,16,17
coefficient
  165:7
coffee
  160:23
coincides
  59:8
collaborative
  9:20
colleague
  5:2
college
  105:3
color
  134:21 135:4
  202:17
combination
  10:23 40:11,
  24 42:4
  44:25 46:18
  52:18,20
  53:6 59:7

62:22 64:10,
12 72:8
123:13 126:6
127:16
128:13
129:15 130:1
214:17
233:18,25
235:13,16
237:3,9,22
come
  55:11 90:5
  93:1 99:23,
  24 122:1
  128:24
  131:13 160:6
  179:8 187:2
  197:21
  202:20
  204:11
  219:9,13
  221:13
  226:12 242:8
comes
  16:19 20:24
  25:8 74:2
  87:24 88:1
  94:7 98:11
  113:14
  156:1,2
  159:22
  202:22
  210:11
  229:16
  230:24
  250:2,4
commenced
  147:4
comment
  224:1
commentary
  200:24
  202:25
  204:15
  210:20
  213:12
  218:20 223:6

Matthew Cain, Ph.D.
March 15, 2024

commentators
  186:10
commented
  202:16
commenting
  159:1 202:25
  215:19
commission
  15:9
committed
  32:19
committee
  140:8 142:2
  147:3 148:6
common
  34:23 35:2,
  8,16,21
  36:16,23
  37:1,10,15
  39:2,6,8,11,
  15,16 40:3,
  4,9 43:17,
  19,25 44:21
  75:19,22,24
  76:17 79:13
  80:8,23
  81:22 82:8,
  21 90:8
  102:20
  114:25
  115:10,19
  116:8
  162:22,24
  205:14
  227:15
  231:20 232:3
  249:2 252:6
commonly
  103:25
  112:13 178:5
  210:10
  249:21
communicate
  197:21
communication
  124:8,9,10,
  14 126:8
  234:8,21,22

235:10
236:12
237:7,8,20,
25 241:25
242:20 244:8
communication
s
  124:18
  233:9,17,21
  235:7,11,15
  236:4
  239:15,16
  240:18,19
  241:10
  245:7,8
  246:5
companies
  153:1 174:21
  183:25
  184:5,14,16
  185:5,11,23
  186:19,24
  187:6 188:2,
  12 189:4
  194:10
  198:12,23
  201:9 202:20
  210:11 238:8
company
  17:24 46:24
  47:14 52:23
  55:13,21
  57:12 58:5,7
  61:24 62:19,
  23 63:8 70:6
  77:22,23
  78:20 79:1
  86:20 88:8
  89:24 96:6,
  18 112:10,
  20,25 113:6,
  11 114:5
  119:9 120:24
  125:17 129:3
  132:4,8
  134:13,15,18
  137:6 139:21
  141:20

144:12 147:5
148:1,7
152:1,2,20
159:17
170:4,16
172:16
183:25 184:6
188:3,11,24
189:2 191:6,
7 193:10
197:9 198:25
199:3 200:5,
15,25 201:3,
21 202:20
203:3,10
204:7,8,9
206:3 207:7,
13,15
210:23,25
211:3 214:8,
12,15 230:12
235:3,7,19
236:7 237:12
238:16,21
239:5 240:2
243:2 244:21
company's
  73:24 223:1
  243:7
company-
specific
  196:4,12,24
  198:6,15
  202:3,9
  203:1,6
  206:12,24
  207:21 208:8
  210:7 216:4
  217:6 223:13
compare
  54:11 162:23
  163:11,15
  164:8,13,17
  165:16
  168:23
  170:23,25
  171:7,22
  173:3 174:7

176:14
183:1,5
184:4 189:19
192:13,23
195:2 230:1,
21 231:19
232:9
compared
  161:21 163:7
  164:4,19
  165:3 168:11
  174:21
  179:22
  192:3,4
  227:9
  232:10,17
  233:1
compares
  182:20
  232:12
comparing
  134:6 181:23
  193:5,7
  232:25
  247:20
comparison
  121:6 147:19
  166:13 167:9
  168:21
  173:17 174:4
  181:20
  188:10
  195:22,23
  227:5 230:2
comparisons
  161:4 192:6
  218:23
complaint
  30:11 133:25
  136:4,9,12
  139:10,17
  158:3 169:20
complete
  6:8 75:15
completed
  128:21
  129:20
  130:1,2

Matthew Cain, Ph.D.
March 15, 2024

235:5 236:2 237:13

**completing**
126:22
244:20

**completion**
72:7 126:24
127:10,16
128:2 131:9
234:4,6
235:18
237:3,21
239:6 243:4,
18,25 245:2

**complex**
106:13 228:9

**component**
31:6 64:14
198:20
206:20
243:20,24

**components**
21:4

**computer**
143:6

**conceivable**
51:19

**concept**
88:21 98:16
104:10

**concepts**
54:3 101:3

**concerned**
27:7 108:4,
10

**concerns**
238:24

**conclude**
21:19 116:10
193:23
253:18

**concluded**
72:18 176:21

**conclusion**
20:14 21:25
22:1,5
72:15,19

88:16 120:22
175:9,10,12
187:17,22
188:19
189:20
205:13,21
230:24

**conclusions**
9:15 44:9
79:21,23
88:10 93:12,
14 104:12
219:10

**condition**
197:5 242:15
243:23

**conditional**
205:21

**conditions**
240:8,11,12,
19 241:1,6,
12,14,16,22
245:13,16,17

**conduct**
10:14 45:5
58:23 76:8
138:19
176:20
218:10
245:16 248:5

**conducted**
60:6 124:24
148:23 149:9
150:13 151:9
154:5 216:18
224:13

**conducting**
15:7 85:16

**confidence**
56:12

**confident**
59:1 60:2

**confidentiali
ty**
25:1

**confirm**
37:9 227:12

**confirming**
135:18

**conflating**
251:17

**conflicting**
219:10

**confounding**
250:1

**confusing**
82:11 211:14
234:12

**connected**
125:20

**connection**
26:10 55:2
65:5 121:8
177:24 178:2

**consecutive**
128:7

**consequential**
45:13

**consider**
47:13 59:19
69:14 70:17
72:4 172:25
235:14,23

**consideration**
44:6 45:25

**considered**
48:20 51:11,
23 58:20,25
59:4,17 65:3
70:25 77:17

**considering**
71:1

**consistent**
100:10
120:22 152:7
155:14
180:11 182:9
187:21
246:24

**consistently**
225:14

**constant**
61:12

**construct**
84:10

**consulting**
25:21 26:24
27:13

**contacted**
31:11

**contained**
12:16 13:14
126:7 133:6
135:21
141:19
205:20
225:10

**contains**
159:7 209:3

**content**
30:12
160:16,18
196:19
205:22
211:18 213:9
221:16,18
222:3,12
223:4,6,17
224:25
225:3,17,19,
23

**contents**
9:1,4 195:15

**context**
18:7 21:6
63:3 70:12
77:10 79:9
90:20,21
91:7 100:19
103:16
106:14,21
116:8
134:14,22
135:4 139:8
159:15
172:25
176:10
178:11,12
199:5
200:18,24
201:6 202:17

Matthew Cain, Ph.D.
March 15, 2024

204:4 222:19
234:15
238:19,21
242:4

**contingent**
225:3

**continual**
177:17

**continue**
4:4 93:2,3
94:11 96:20
104:22
110:22

**continued**
177:7

**contracts**
80:14,15,17,
18

**contrast**
78:23 98:14

**contribute**
204:7 220:24
224:2

**contributed**
121:2

**contributes**
209:7

**contributing**
217:1 219:2
220:16
223:15

**contribution**
203:9

**control**
56:13

**controlled**
46:11 62:16
69:20

**controlling**
48:17 57:4
117:1

**controls**
45:21 55:9,
18 61:25
63:23 69:5
137:8 139:24
141:23 148:4

**convenient**
226:8

**conversation**
230:7

**conversations**
4:7 7:5
106:15 135:1
159:15

**conversely**
126:20

**copy**
11:14 13:18
34:17

**Corp**
37:23 38:1
39:9 217:23

**corporate**
15:16,17
38:5,11

**Corporation**
35:12 38:11,
19,25 125:8
127:17
131:17
237:23

**correct**
6:4 13:5
32:13,17,19,
20,23,24
34:17,24
49:8 55:4
64:17 80:10
104:19 116:6
118:23
129:22
139:11
143:10
144:15
152:3,11
154:2,21
155:11
156:13,23
173:25 174:1
175:9 176:9
180:13
184:15 193:8
201:15
211:10 227:7

234:9 247:24
249:14

**corrected**
138:16

**corrective**
104:6 142:11
248:8
249:18,19
250:2,6
251:21,24
252:10

**correctly**
231:18

**correlated**
175:20

**corresponding**
148:13,21
153:15

**costs**
89:17 90:14,
23 91:14
100:12
116:13 117:2

**counsel**
4:8 6:17 7:6
11:8 34:18,
19 253:8

**counsel's**
33:25

**count**
218:12
229:15

**counter**
230:15

**countless**
91:9 238:13

**couple**
6:21 7:15
29:16 52:15
58:9 61:2
62:2 109:5
111:1 132:25
150:16
187:13 197:5

**course**
35:10 72:14
84:11 85:4

92:24 104:14

**courses**
238:6

**court**
4:10 22:13
29:19,23
30:4,9 70:2,
4,9 78:18
80:23 87:18
161:7,13,14,
25 162:2,7
163:17,18,20
164:12,14,16
165:2,11
168:17,24
170:24
171:6,7,15,
24 172:13,21
173:14,17,21
178:22
180:2,3,8
182:18,20
189:25
190:2,7,10,
19 195:2,5
222:23,24
227:9
228:11,16
230:4,11,21,
24 231:9

**courts**
162:25
163:21
168:13
173:4,6
178:15,18
179:23
180:11,15
195:4,8

**cover**
245:4

**coverage**
162:4
168:10,12,18
169:1,7
174:15
181:13
191:22

Matthew Cain, Ph.D.
March 15, 2024

192:6,18,20,
24 193:16,
22,25 194:3,
8,16,17
195:1,7,11,
20 196:1
201:22 203:3
205:10
207:1,25
208:17 209:1
216:23
218:7,17,24
222:8,9,20
223:7,10,12
225:6 226:2
232:18
**covered**
20:21 50:23,
24 192:22
194:17,20
**Craig**
56:25
**criteria**
10:15,16,19
11:1,6,7,8,
11 19:21
20:2,6,7
21:10,18
22:18,21
23:19 45:15
86:18 115:23
119:21,22
123:12,23
124:12,13
125:2,20
126:2 131:1,
2 132:5
225:13 232:1
234:20 235:9
240:17
241:18 242:9
243:22 244:9
245:21,22
**curious**
190:13
**current**
25:11 108:4

**cursory**
141:16
**cut**
203:6
**CV**
12:17,21
13:24 25:11

---

**D**

**daily**
36:17 61:11
102:18,21
103:1,17,24
182:1,14
183:4,7,10
188:16
252:11
**damages**
16:1 33:6
34:12 66:16
70:16,21
71:2,4 75:22
80:22 81:1,
6,12,15,20
83:19 84:14,
22 142:9
247:17
248:4,10,25
**data**
37:14 40:1
49:19 84:5
93:12,15
100:11
182:12
183:7,12
**datasets**
99:24
**date**
25:12 30:19
61:15 95:8
104:1,20
129:10
146:13
244:16,19
**dates**
23:20 33:18

119:2,21
126:3 133:16
158:5 236:17
242:9 245:4
246:25
**day**
16:25 17:3
18:21,22,24
21:15 45:10
71:7,8 72:17
73:13,17,19
74:4,19,20
79:15 93:4,
20 94:1,6,20
95:3,4,21
96:2 103:5
104:14,15,
21,22,24
105:21 107:3
110:14,17,
21,22 111:25
114:5,20
116:10 122:5
123:3 127:15
128:12,13
129:2,18
130:20
158:10
160:23
182:15
248:17 249:4
**day-by-day**
24:5
**day-to-day**
112:24
**days**
19:21 21:8
23:13,24
45:7,15
46:12 61:6
68:1,5 72:21
88:12 91:14
94:11,19
95:13,20
96:1 103:5,9
104:2,14
105:12
106:3,9

107:8 111:1
118:10,11,15
121:1
122:24,25
123:24
127:25 128:7
131:1 135:2
137:12
144:23
**deadline**
43:8,16
47:25 48:5
52:13,15
**deal**
18:11,12
25:6 126:18,
21 130:8
131:10 235:4
236:1 238:24
243:12 245:2
**dealing**
185:9
**debt**
15:10
**decades**
238:2
**December**
31:2,16
**decide**
218:11
245:18
**decided**
245:12
**deciding**
21:12 24:6
**decision**
78:19 118:20
197:18
228:12,17
245:6,8
**decisions**
161:7 224:23
**declaration**
30:11
**declined**
25:22 29:23

Matthew Cain, Ph.D.
March 15, 2024

decreases
  113:16
deemed
  19:9
deeply
  204:24
defendant
  28:14
defendants
  4:17 5:14
  28:10
defense
  28:20 29:1,3
define
  35:1 86:18
  194:8,15
  233:21 234:8
defined
  36:23 37:2,
  11,16 76:17
  114:25
  115:11
  227:15
  231:20 232:4
  234:10
defining
  115:6 124:12
definitely
  160:14
  206:14
definition
  77:16 97:25
  98:3 234:15,
  18
definitions
  77:14,16
degree
  11:24 216:23
delay
  131:18
  138:24,25
  139:6 141:11
  234:3
delayed
  147:12
delivered
  121:16,18

demand
  112:16
demonstrates
  246:13
demonstrating
  185:10
depend
  85:2 103:15
depending
  49:3
depends
  49:5 53:21
  95:24 134:10
deposed
  6:2 24:19,21
deposition
  6:3,16 7:8,
  22 8:1,6,11
  12:14 13:8,
  21 23:5 97:9
  101:10
  143:14
  146:11,15
  214:4 236:22
  253:19
depositions
  25:10,15
describe
  9:6 14:20,23
  23:3,13
  40:12 49:18,
  20 77:7 82:2
  123:10
  153:20 157:2
  159:12
  234:20
  250:15
described
  17:19 22:13
  27:22,25
  28:4 32:7
  39:3 40:15
  50:17,20
  60:12 74:14
  78:9 82:12
  88:20 111:22
  113:23
  125:23 127:3

129:12
  147:14
  156:19
  172:22 198:6
  235:23
  239:17 241:2
  248:20
  250:20
  252:17
describing
  66:19 74:22
  94:18 138:23
  247:4,19
description
  138:9 235:8
design
  21:24
designated
  228:19
  229:2,4
designation
  73:3
designed
  178:6
desks
  229:8
detail
  12:5 85:8
  88:19 136:4
detailed
  140:4
details
  7:6 216:11,
  17 217:24
determination
  86:23 189:13
  209:12 244:7
determine
  71:10 75:19
  89:12 119:6
  156:14 169:3
  206:18
  216:19
  221:24
  247:25
determined
  26:6 60:7

71:1 86:16
  119:25
  176:22 248:2
developed
  16:8
developments
  177:15
dictates
  246:19
differ
  135:10
differed
  71:3 133:24
  221:8
difference
  37:24 46:5
  80:6 88:11,
  15 91:6
  94:18,24
  131:8 141:6
  240:15 241:5
differences
  91:15 100:22
  129:21 138:1
  149:1,3
  152:25
  153:6,7
  155:24
  156:19 157:3
  162:9 172:11
  181:16
different
  12:1 14:6
  15:11 16:2
  35:23 36:3
  38:6 42:12,
  15 45:17
  48:15,19
  49:4 51:15
  55:12,16,20
  56:24 57:8
  58:11 61:24
  62:15 65:22
  68:4 69:7
  72:5,13 74:3
  79:2 83:1,4,
  7,8,25 92:4,
  16 102:4,5

Matthew Cain, Ph.D.
March 15, 2024

| | | | |
|---|---|---|---|
| 109:6 110:8, 9 112:14,15 117:5 124:4 131:7 136:9, 11 140:21,24 142:7 151:21 152:19 153:1 155:7 162:9 172:12 175:14,22 176:5 182:13 191:13 192:6 193:10,11 201:10 213:6 218:2,5,23 219:9,13 220:2 221:7, 13 222:14, 15,16 228:11 229:23 243:16 252:10 **differentiate** 109:23 240:18 **differently** 38:8 47:20 83:25 95:3 175:12 **differing** 85:8 **differs** 82:20 **difficult** 109:23 187:2 191:11 218:22 **dig** 11:21 **digesting** 106:16 **digression** 169:6 **dips** 61:18 **direct** 62:5 162:14 214:7 | **directionally** 130:14 **directly** 87:3 160:6 **disaggregate** 250:8 **disaggregating** 251:22 **disagree** 65:15 131:2 147:21 212:9 **disagreement** 204:21 **disagreements** 204:20 **disclose** 9:3 24:25 26:1 125:3 126:1 204:5 224:10 **disclosed** 24:22 27:3 127:7 149:6 204:17 206:18 210:17 **discloses** 124:19 **disclosing** 210:9 211:19,22 **disclosure** 19:3 24:6 29:6 87:15 93:11 96:3, 19,21 99:4 104:6 121:9, 10 133:7,8 137:8 139:5, 8,24 140:21 141:20,23 142:10 143:7 144:9,25 148:4 159:13 199:6 203:2 205:3 207:8 | 222:13 251:21 **disclosure-by-disclosure** 121:7 **disclosures** 15:16 22:13 23:20,24,25 32:23 45:13 70:6 87:12, 20 98:24 104:20,25 116:1 121:1 126:14 129:21 133:11 134:1,7 135:14 138:16 139:4,11,20 140:14,20 141:5,18 143:5 147:23 153:7 154:18 156:16 159:12 198:12,15 200:24 202:20 203:1,7 248:9 249:18,19 252:10 **disconnecting** 130:22 **discount** 198:22 199:1 **discounted** 32:1 249:23 252:3 **discovered** 129:5 **discovery** 85:4 **discretion** 11:4 **discuss** 7:17 63:2 | 162:20 **discussed** 20:10 81:7 181:8 203:13 216:12 **discussing** 211:23 **discussion** 67:17 158:25 203:12 215:22 **dismissed** 27:15 29:4 **disposal** 166:7 **disrespectfully** 65:12 **disseminate** 217:8 **disseminated** 196:4,13 202:4,10 206:25 210:7 216:5 **disseminating** 210:18 **dissemination** 205:12 **distill** 198:20 **distilled** 197:24 **distilling** 198:10 **distinct** 42:21 130:16 **distinction** 16:16 43:2 100:25 **distorted** 79:4 **distribution** 105:24 184:1 186:17,19 188:6 |

| | | | |
|---|---|---|---|
| **distributions** | 236:9 | | 199:20 |
| 188:2 | **draft** | **E** | 200:12 |
| **divide** | 159:20 | | 204:10,11,16 |
| 183:9 | **drafted** | **E2** | 210:12  216:1 |
| **dividends** | 8:23  9:11,14 | 36:10 | 250:3,5 |
| 40:5 | **drafting** | **E6** | **easier** |
| **Doctor** | 8:16,18 | 61:10  63:14 | 185:19 |
| 25:20  221:20 | **drafts** | **ear** | 252:14 |
| **document** | 9:2 | 55:22 | **easily** |
| 8:7  11:10 | **draw** | **earlier** | 107:3 |
| 23:6  147:14 | 16:17  21:25 | 8:13  20:2 | **easy** |
| 149:18 | 22:1,5 | 37:18  48:12 | 9:13  12:8 |
| 158:16 | 93:12,14 | 62:25  67:8 | 100:4  239:21 |
| 192:17  222:9 | 175:9  218:22 | 69:15  98:6 | **eat** |
| 225:5  239:23 | **drawing** | 99:16  111:9 | 121:20 |
| 240:6 | 88:17 | 113:23 | **echo** |
| **documenting** | **drew** | 114:12 | 106:2 |
| 220:10  223:9 | 175:10 | 118:12  119:5 | **economic** |
| 230:15 | **drill** | 123:11  128:5 | 15:22  16:15 |
| **documents** | 180:19 | 131:19  136:5 | 22:20 |
| 6:25  85:3 | 226:25 | 137:23 | **economically** |
| 135:7,10 | 227:23 | 150:22  155:5 | 19:7,16 |
| 136:18 | **driven** | 160:9  164:21 | 20:9,15 |
| 147:20,23 | 165:6 | 174:15  177:5 | 21:17,20 |
| 149:1,16 | **driver** | 181:8  186:12 | 22:7  23:16 |
| 240:6 | 243:24 | 211:5  217:2 | 24:4 |
| **doing** | **drop** | 221:14  230:3 | **economics** |
| 12:12  14:8 | 96:20  251:23 | 231:20  233:6 | 14:25  15:1, |
| 38:17  59:21 | **dropped** | 241:3  243:6, | 15  16:3,7 |
| 85:16  111:25 | 251:21 | 13 | 17:7  29:20 |
| 116:20 | **dspac** | **early** | 89:11 |
| 130:17  141:9 | 64:16 | 27:15 | **economist** |
| 162:23  170:4 | **due** | **earn** | 42:18  73:5 |
| 175:25 | 30:8  112:17 | 117:1 | 89:11 |
| 177:12  179:5 | 140:6 | **earning** | **Edgar** |
| 181:3  193:9 | 251:21,23 | 153:17 | 236:6 |
| 195:10 | **duly** | **earnings** | **edit** |
| 196:22  213:1 | 5:5,8 | 10:24,25 | 9:24,25 |
| 219:22  226:5 | **duration** | 34:1,6  86:9, | **education** |
| 229:3  252:9 | 148:8 | 19,23 | 12:19,20 |
| **domain** | **dynamic** | 123:20,21,22 | **educational** |
| 201:24  215:7 | 44:20  45:3 | 125:21 | 11:23  12:15 |
| **downgrade** | **dynamics** | 132:4,5,6,9, | 14:17  15:10 |
| 198:7 | 45:17  57:5 | 23  134:15, | **effect** |
| **downgrading** | 110:9 | 16,18,21,22 | 44:10  61:8 |
| 197:9 | | 136:23  140:5 | 66:17  68:23 |
| **downloaded** | | 148:15 | 85:13  87:4 |
| | | 198:13 | |

Matthew Cain, Ph.D.
March 15, 2024

93:24
101:18,22
106:4 107:1,
7 119:12
214:15

**effectively**
68:13 212:25
251:10

**effectiveness**
137:8 139:24
141:22 148:3

**effects**
52:9 105:19

**efficiencies**
80:7 98:8

**efficiency**
15:25 44:11,
23 45:25
47:13 52:6
58:16,23
65:5 68:21
69:25 70:14
72:13,20
75:3,6
77:15,18,20,
21 78:8,15,
23,24 79:8
80:3 84:1,16
85:12 88:22
89:5 91:7,8,
11,17,18
92:22 93:10
96:3,5,12,22
97:5,24
98:1,4,5,9,
15 99:9,17,
19,20
100:16,18,23
101:19,24
103:18
104:11
109:5,18,19,
24 110:1
116:23 117:9
120:4 166:16
167:4,6
175:19,22
181:6,7,11

184:21,25
185:7,22
186:13,20
187:1,18
188:18
189:1,5,8,
13,22 190:8,
10 193:21
194:6 196:2
206:16 207:2
209:2,12,19
211:7,25
216:25
220:16
221:12,24
222:19
223:16 224:4
225:2 226:3
230:17
234:24,25
235:24 242:5
244:13
245:22 246:3
247:13
249:10

**efficient**
33:6 34:11
51:5 74:8
75:20 76:18
77:4,8
79:15,24
80:4,18 89:1
108:3
110:15,22,25
174:18 175:4
176:7 184:20
185:24 186:6
187:5 190:6
191:5
193:17,25
205:15
217:18

**efficiently**
71:12,18,23
72:11,16,19
73:14 185:12
196:6

**eight**
193:5,11
202:1,7
203:12,21

**either**
12:2 27:23
29:4 30:4
44:8 57:8
90:11 119:13
159:7 165:10
166:10
172:14
189:12
199:20
200:13
209:11
214:24
248:13

**elaborated**
217:7

**elected**
42:1

**electronic**
228:22
229:6,12

**element**
101:8 242:25

**elements**
168:4

**eligibility**
173:8 180:7,
9 233:3

**Elliott**
4:22

**empirical**
98:19 219:6

**empirically**
111:6

**employ**
252:16

**employed**
176:23

**employee**
140:6 141:25

**encapsulated**
33:17

**encountered**
44:22

**end**
7:4 22:22
34:2 82:5
83:3 89:17
110:6 137:5
139:2 141:18
186:17 199:2
224:11
235:18 239:4
241:13
242:25
248:7,8,13
249:17
250:13 252:9

**ending**
146:12

**engaged**
26:15

**engagements**
29:3

**ensure**
10:18 196:3,
11 202:2
206:24 210:6

**ensures**
216:3

**entire**
5:19 9:21
33:17

**entirety**
136:15
149:11

**entities**
229:3,23

**entity**
41:9,18

**environment**
10:17 22:3
62:23 121:11
138:20
142:15
148:24
149:11
150:14 154:7
155:23 157:6

197:23
203:10
204:8,19,23
206:3 207:14
209:8
210:18,23
217:2 219:2
220:17,25
223:15 224:3
235:21 248:6
249:16
**equal**
53:15 74:15
113:3
**equally**
225:9
**equivalent**
184:24
**Erin**
4:23
**essentially**
45:2 114:22
185:6 195:18
222:19
225:17
230:12 235:4
**established**
108:19
168:12
170:24 173:4
178:15,18
179:23
**estimate**
31:15 61:15
84:9
**estimated**
80:15
**estimates**
61:6
**estimating**
67:24 68:5
**estimation**
48:18 67:25
**evaluate**
81:24 83:20
101:18 105:6
117:14 141:6

162:10,22
202:14
206:15
219:24 220:4
243:23
244:25
**evaluated**
77:17 155:22
173:3
**evaluating**
15:16,19,22,
24 16:1 24:5
70:13 99:17
109:4 127:21
149:10 218:3
220:9
**evaluation**
119:17
221:10
225:1,3
**event**
10:6 11:12
15:19 19:13,
15 20:4,8,14
21:12,17
22:7,19,21
23:22 48:15,
24 49:17,22,
23 55:17
56:12,17
57:15,19
59:1 61:7
68:1 95:1,7,
18 101:20,21
102:3,6,20
103:2,10,17,
24 104:3
108:12,25
114:10,14
119:6 122:23
123:6 124:4,
5 125:6,11,
13 126:4,9
127:2,14
160:11
185:10,16
237:1 242:21
246:14

248:12
249:22
251:12,19
252:2,7,9
**event-study**
46:11 47:2
57:4
**events**
10:5,9 11:5,
12 16:19
19:13 20:3
21:18,19
22:18,19
68:4,6,13
117:13,18,23
118:1
120:11,23
122:22
123:3,16
124:9,13,17,
18 125:3
160:10
240:22
245:6,7
**everybody**
4:15 66:20
179:8
**evidence**
70:5 83:20
85:3 87:10,
19 90:10
95:9,16
96:2,4,11
101:22 106:9
107:1
108:17,18
116:24 117:8
119:13
**evolution**
66:12
**evolve**
55:20 167:7
177:8
**evolved**
63:22 228:14
**evolves**
248:19

**ex-ante**
21:10 54:10
119:20
**ex-post**
20:16 119:9,
17,24 127:7
219:25
220:4,8
221:10
**exact**
40:21
**exactly**
24:9 40:13
51:18 63:22
78:14 98:22
114:9 120:8
157:12 186:2
249:8
**EXAMINATION**
5:10
**examine**
73:10,12,15
76:13 88:24
**examined**
5:9
**examining**
125:13
**examples**
108:13
112:1,2
197:5 202:1
217:22 247:3
**exceed**
89:17 90:22
116:12 186:5
**exceeded**
173:11
**exceeds**
90:14
**exchange**
15:9 37:2,6
71:20
172:17,19
180:3 186:9,
22 187:1
188:13
214:16

Matthew Cain, Ph.D.
March 15, 2024

230:13,19
241:21 244:5
**exchanges**
186:15 187:7
189:5
**exclude**
33:1
**excuse**
154:24
**EXCUSED**
253:21
**executed**
7:15
**execution**
82:19
**executives**
119:15
134:20
159:16
**exemplar**
213:14
**exercise**
40:22 41:18
42:1
**exhaustive**
121:10 248:5
**exhibit**
7:23 8:1,6
10:7 12:10,
13 13:20,21
34:17 61:9
63:14 68:3
88:11 89:22
95:17 96:24
97:8,9
101:10,14
107:19
117:15
120:19
121:23
122:19,21
123:5 124:3
143:9,13,14,
22 144:2,4,7
145:10,15,
21,25 146:1,
10,15,22

147:24
149:5,6,18
150:8,22
153:22,23
155:7,8,24,
25 156:3
158:12
169:15
214:3,4
223:9
236:18,19,22
237:1 239:24
**exhibiting**
186:25
**exhibits**
145:5
**exist**
217:9 246:19
**existed**
73:13,16
177:1
**existence**
44:7 51:2
56:19 58:13
59:14,20
62:6 65:3
68:25 70:17
72:25 74:19,
20 196:20
203:21
207:23 208:8
221:23
223:18,24
**existing**
47:5,6 89:16
**exists**
11:10
**expect**
73:23 95:19
113:5,13
144:14
**expectation**
17:25
**expectations**
21:2 22:4
86:10 113:2
149:10

**expected**
17:3,5 54:6
149:13
215:25
**expecting**
144:19
**expeditious**
5:16
**experience**
5:21 13:12
15:6,8,9,11
29:17 150:2
**experiences**
15:12
**expert**
5:15 19:17
21:9 24:19,
21 25:21
26:16 27:3,
14 28:14
29:17,18,24
30:6 31:24
113:2 169:10
177:21
178:12
215:10
221:21
225:10 242:8
245:9,24
**expertise**
14:23 15:3,
16 43:1 73:8
**experts**
28:8 76:6
252:1
**explain**
17:15 23:14
57:3 62:18
71:4 85:1,2
86:8 167:25
171:25 172:4
174:15 178:9
208:23 223:8
228:9 229:16
233:23
**explained**
57:7 75:2
245:19

**explaining**
24:2 155:23
210:5
**explains**
11:15 61:5
109:19 252:8
**explanation**
83:24
**explanations**
9:9
**explicit**
55:7 62:6
63:21 64:6
67:16 165:8
171:22
180:14
181:18 195:3
**explicitly**
46:10 50:24
51:23 55:17
57:18 59:18,
19 60:1,6
61:23 62:16
63:2 65:3,7
68:8,17
69:10,14,20
70:17 74:25
120:17 173:6
180:8 188:16
197:16
**exposure**
99:2
**expressing**
42:20
**extent**
8:25 56:13
92:9 96:9
101:8 104:11
113:9 133:22
213:11 218:4
224:9,14
235:1

---

**F**

---

**facilitate**
228:20

Matthew Cain, Ph.D.
March 15, 2024

**facilitated**
229:21
**fact**
17:2 25:17
38:18 118:21
119:3 124:20
130:18 131:4
140:23
156:18
172:18
184:19
205:23
207:10
230:18
244:23
**factor**
42:7 45:24
57:23 63:5
165:15
166:14
167:21
168:10
170:23
171:14
172:20,22,25
173:2,3,24
180:20
187:17
189:18
203:23 204:4
206:13
207:25 208:9
226:2,6
227:1,5
230:14,20
232:3
**factors**
22:5 43:18
45:22 46:1
49:7,19 53:5
57:9 59:5,18
60:3 65:24
66:5,8,12
70:13,14,25
72:14 74:13,
21 84:3,4
113:23
117:5,6,8

161:2,3,13,
14,16,21
162:6,9,21
163:6,12
164:4,9
165:1,9
167:1 172:6,
12 175:17,21
176:20,23
178:17
179:21,22,23
180:1,13
186:18 187:3
190:25
191:2,13
194:5 243:20
**factors'**
161:22
162:23
**facts**
115:18
205:19
215:13
**factual**
130:19
**fair**
9:13 11:19
12:14 19:22
21:21 22:17,
22 28:6 32:9
34:6 36:21
38:7 42:23
54:14 57:16
70:16 75:8,
24 81:4 87:4
88:2 94:1
99:10 100:24
102:8 118:8,
24 124:1,15
138:22
147:14
149:2,23
157:10
161:19
163:12 164:5
165:13
168:14 169:8
170:2,10,21

176:1 177:2
180:16 181:7
185:21
195:18
**fall**
16:2 23:20
28:4 83:5
123:24
186:16 187:4
243:15
**falling**
238:25
**falls**
124:13
**Fama**
96:25 97:4
100:6 101:15
105:12,17,19
107:18 109:7
**familiar**
97:25 195:19
238:9 240:9,
10
**far**
27:25 38:14
65:1 172:4
189:9 235:1
245:3
**farther**
18:19
**favor**
120:3 189:1,
8 226:3
230:17
**favorably**
192:23
**federal**
29:18
**fee**
30:15 31:7
**feel**
23:7 76:12
83:11
**fellow**
12:3
**felt**
124:25

166:25
**Fidelity**
229:10
**Fideres**
7:9 8:17,21
10:16 160:2,
3,4,6
**field**
113:3 178:1
**figure**
36:11,21,22
**figured**
113:20
**file**
123:21
136:25
144:14,19
152:1,2
210:11
**filed**
31:19,21
144:17
146:12
150:25
152:10
157:18
158:10 194:9
**files**
40:1 212:24
**filing**
125:8,19
132:14
135:18,20
137:25
146:4,13
147:11
149:23 152:3
157:17,22
158:8,23,25
159:3,6,19
180:7,9
194:10
**filings**
138:7 145:13
152:21
159:12
205:12 206:1
236:7

Matthew Cain, Ph.D.
March 15, 2024

| | | | |
|---|---|---|---|
| **final** | **findings** | 126:13 138:5 | **focusing** |
| 141:21 | 163:1 170:25 | 155:20 163:5 | 241:13 |
| 188:14 234:6 | 171:19 | 166:16,18 | **folks** |
| **finalize** | **finds** | 167:3,11 | 10:8 75:16 |
| 137:7 139:22 | 109:17 | 168:5 177:6 | 159:20 |
| 141:21 148:2 | **fine** | 182:11 | 166:10 |
| **finalized** | 64:23 122:2, | 212:25 227:4 | **follow** |
| 144:13 | 3,6 131:23 | **fiscal** | 25:17 67:7 |
| **finalizing** | 145:24 | 148:14,22 | 210:14 246:1 |
| 126:21 | 226:10,13 | 153:16 | **follow-up** |
| **finally** | 250:24 | **fit** | 12:4 106:15 |
| 85:11 | **finger** | 119:21 131:1 | 134:25 |
| **finance** | 5:18 | **five** | **followed** |
| 11:25 54:3 | **finish** | 66:19 143:24 | 147:11 |
| 246:22 | 24:18 60:22 | 144:23 | 219:16,17 |
| **financial** | 102:24 | 154:24 | 220:1 221:6 |
| 14:25 15:15, | 121:24 198:3 | 172:15 179:5 | 222:25 |
| 18,24 16:3,7 | **firm** | 230:16 | **following** |
| 17:7 20:22 | 26:11,12,15, | **five-minute** | 67:1 82:15 |
| 29:20 42:18 | 16,25 27:13, | 252:19 | 115:1,12,20 |
| 73:5 89:10, | 23,24,25 | **fixed** | 122:13 |
| 11 135:3 | 31:5,11,23 | 61:13,18 | 162:20 |
| 137:7 139:23 | 193:16 | **flat** | 179:14 |
| 144:13 148:2 | 194:15,18,21 | 31:7 | 226:19 |
| 157:16 187:8 | 216:23 | **flawed** | 252:24 |
| 200:4,14 | **firms** | 109:22 | **follows** |
| 210:13 | 174:14,16 | **flaws** | 5:9 |
| 215:14 | 175:3 181:16 | 30:5 | **footnote** |
| **financials** | 186:8 192:9, | **flip** | 56:23 57:18 |
| 125:18 | 17,19 193:6, | 41:16 | 61:4 67:11, |
| 132:23 201:2 | 10,24 194:2, | **flippant** | 21 139:12 |
| 215:23 | 18,21 201:15 | 64:25 | 190:19 |
| 217:14 | 229:6,8,12, | **float** | 229:16 |
| **financing** | 13 232:14,18 | 173:8,11 | 232:13,22 |
| 18:5 128:22 | **first** | 233:2 | **footnotes** |
| 129:1 130:8 | 5:8,23 | **floor** | 56:25 57:3, |
| 131:10 | 17:15,18,20 | 48:2 52:11 | 14 |
| 238:24 | 30:15 37:20 | 53:24 | **forecast** |
| 243:13,14,15 | 50:14 58:13 | **flow** | 198:25 |
| **find** | 61:3 62:2 | 103:21 | 199:20 |
| 25:17 100:5, | 67:22 73:19 | 198:23 | **forecasts** |
| 9 118:11 | 74:20 75:5 | 249:24 252:3 | 200:13 |
| 201:19,23 | 78:11 82:3 | **fluctuations** | **forget** |
| 208:20 236:4 | 87:5 104:1, | 112:24 | 112:1 |
| **finding** | 24 105:21 | **focus** | **forgive** |
| 174:7 187:18 | 110:21 | 69:21 115:23 | 6:6 50:13 |
| 188:18 | 114:20 | 116:2 251:7 | 55:24 155:17 |
| | 122:21 | | |

171:10,13
**forgot**
  8:12 171:12
**form**
  9:16 10:11
  17:12 18:25
  19:18 21:22
  22:23 28:1
  33:7,20 36:1
  38:21 40:7
  41:12 42:13
  44:1,12 46:7
  47:9 49:14
  50:5 51:6
  52:2 53:18
  54:20,23
  55:5 56:6,20
  58:17 59:23
  62:10 63:16
  64:4 65:13
  69:2 70:22
  71:14 73:20
  74:23 81:25
  83:21 85:25
  87:7,14 88:4
  89:2,18 92:7
  94:3,21
  97:24 98:4,
  7,14 99:3,13
  100:15
  101:19,23
  102:10
  103:13
  104:17
  105:14
  107:11 108:3
  109:4 110:18
  111:3 113:7
  115:2 116:14
  118:4 120:15
  122:24 123:8
  125:14
  126:10
  127:22
  128:14
  129:23
  130:23
  132:1,14

133:9 134:8
135:24
138:3,17
140:16 142:4
144:14,21
147:16 148:5
149:7,24
150:14
151:7,18,25
152:4,12,22
154:3,7,22
155:12
156:11,24
157:23
158:18 159:9
161:8 163:13
164:6,23
167:22
168:15
169:11,21
170:5,17
173:19 176:2
177:3 178:20
185:14,25
187:19
188:21
191:25
193:18
194:12
196:14
199:23
200:19
201:16 202:5
203:24 208:4
209:21
211:11 212:1
213:3 215:16
216:6 217:19
219:4 221:1,
25 224:5
225:11,21
228:6 231:1
236:14
237:10
240:7,23
242:1,22
244:10
245:10
246:10

250:17
251:15
**formal**
  12:20
**formed**
  63:21 138:14
  142:12
  155:20 157:7
  193:20
  214:15
  245:20
**forming**
  138:21
**forms**
  152:19
**formula**
  84:13 249:3,
  7 250:11
**formulaic**
  249:1
**formulating**
  97:4
**forth**
  54:19 64:2
  82:16 163:22
  164:12 178:4
**forward**
  17:16 35:20
  84:20 162:7
  165:20 173:6
**forward-
looking**
  201:5
**found**
  176:18,21
  224:21 232:4
  236:12
**frame**
  34:5
**framework**
  102:21
**Frank**
  4:16 5:13
  253:3
**frankly**
  18:11

**fraud**
  32:19 169:19
  170:3
**free**
  23:7 83:11
**French**
  100:7
**frequently**
  23:23 205:4
**Friday**
  253:6
**front**
  22:21 32:5
  34:16 41:5
  143:18,21
  184:3 235:18
  248:6,13
  249:17
**full**
  6:8 121:11
  123:17
  138:8,11
  144:12
  212:18
**fully**
  103:25
  105:21 107:4
  108:5 111:1
  129:1 224:2
  228:22
**function**
  229:17
**fund**
  90:3
**fundamental**
  47:1,4,7
  78:23,24,25
  79:6 83:13
  142:24
**fundamentally**
  47:19
**fundamentals**
  57:5
**funded**
  129:1
**funds**
  227:25

Matthew Cain, Ph.D.
March 15, 2024

funny
105:7
future
200:4,14
215:25

---

**G**

---

G-P-A-C
37:25 39:8
gained
89:16
gains
116:12
gang
250:14
gap
129:14
150:19
gave
112:2 135:13
165:2 214:22
222:4 225:8
235:9
gears
117:12 159:4
160:20 168:9
233:5
general
22:11 43:10,
19 53:11
87:20 88:6
91:3,24
108:3 222:5
238:15,21
240:10
243:10
generalized
70:21 81:21
generally
15:19 17:23
27:11 35:2
38:23 43:14
44:21 45:14
57:25 64:7,
15 161:12

229:11
169:13
generating
108:12
114:14
Genesis
35:12,23
37:23 38:1,
10,18,24
39:9 125:7
127:16
214:25
217:23
237:22 240:1
242:16 244:4
getting
27:7 30:16
34:3 35:6
63:24 71:21
78:10 102:24
112:5 121:24
142:12 147:9
150:4,5
160:22
163:9,23
167:11 172:2
183:18 208:1
211:7
237:19,23
245:5
give
11:14,22
12:5 28:18
32:1 42:25
44:6 66:6
77:12 102:6
108:13 127:9
135:3 136:23
137:3 139:12
144:4 164:16
171:10 197:5
198:17 206:6
213:18
239:22
241:19 247:3
251:3
given
62:23 72:21
80:21 138:25

140:13
208:25
giving
6:8 248:9
glean
138:1
gleaned
102:4
Glennys
4:19 7:21
12:10 141:8
143:6 213:16
236:20
GNPK
35:24 39:11,
20,22,24
40:3 42:11
46:4 56:1
71:8,11
73:13,17
74:18 76:21,
22 199:21
215:19
216:11,12
goal
22:8 69:22
87:9 120:5
goes
45:8 78:16
148:18 182:2
190:13 235:1
245:3 251:1,
5
going
4:19 5:15
8:4 10:3
16:5,21,23,
24 18:2,3
21:20 24:4,
10,15 32:25
43:3 48:1
50:14 52:10,
20 57:6
59:10 60:20
66:23 68:21
71:22,25
75:4,14
79:18 83:7

85:6 86:13,
22 88:18
89:14 93:17
96:25 97:2,
16 103:8
104:8 110:7
113:1,22
115:8 117:12
118:12
121:21
122:10
126:18 128:9
129:4 133:16
135:21
136:22 137:1
138:24
139:18 140:5
143:9,20,22
145:7 146:9
147:12
153:13
157:25
158:17
161:20
174:25
179:11,25
181:23
191:19
194:15
195:12,24
199:12,17,18
201:12 206:6
212:12,14
220:8 226:16
228:8 235:4
243:23
251:11
252:21
253:16
good
4:15 5:12,22
60:24 75:10
86:17 113:6,
9,21 115:1,7
135:9,11
154:14
159:18 202:1
204:22
217:16

247:18
**governance**
15:17
**government**
32:1
**GPAC**
35:11 37:18,
19,24 38:12,
20 39:1,7,24
40:3 41:9,18
233:16
**GPNK**
39:19
**graduate**
238:6
**granular**
121:24
**graph**
106:7
**graphs**
53:3 106:6,
7,8,10
**great**
8:12 23:8
243:7
**grounds**
30:8
**group**
105:5
**groups**
181:16
**guess**
5:23 14:24
16:12 30:2,
14 34:14
44:14 49:16
51:1 65:15
73:22 83:23
85:20 89:11
93:22 97:1
116:16
129:14
134:10
167:24
171:15
173:17 182:8
187:25

188:14 200:3
238:1
**guessing**
159:23
**guidance**
161:14,15
162:1,3
164:17
168:19
171:24,25
180:11,14
195:3 231:8
**guided**
245:19
**guys**
121:19
226:11

————————————

**H**

————————————

**Hagens**
4:12 26:12,
16 27:4,24
160:1
**half**
167:15,17
168:7 177:2
**halfway**
107:16
**Halliburton**
78:18
**hallmarks**
186:25
**hand**
8:15 10:9
53:22 87:23,
25 120:2
243:8
**handful**
247:10
**handing**
97:3 146:9
**handle**
47:3
**handled**
26:11

**handling**
26:12 59:3
60:4
**happen**
18:3 24:11
95:14
**happened**
6:7 18:24
26:8,10
27:17 30:2
72:11 129:13
**happy**
12:4 133:12,
25 171:25
178:23
234:11
**Hard**
98:21
**headline**
197:8,25
237:17
**headlines**
197:14
**hear**
74:10 99:7
129:17,19
**heard**
5:12 220:19
**hedge**
90:3 229:11
**held**
12:1 61:12
**help**
9:22 210:6
**helped**
159:20
**helpful**
23:2 25:23
134:2 150:18
**helping**
166:11 238:8
**helps**
207:11
**high**
14:12,24
23:14 24:2
77:12,19

86:18 87:17
88:7 104:23
121:4 136:8,
16 161:12,18
**high-
frequency**
90:3 229:5,
12
**high-level**
203:8 238:11
**higher**
22:10 46:17
54:6,7 91:2
99:18 190:9
**highlight**
110:6
**highlighted**
110:4
**hinting**
109:13
**hire**
174:3
**hired**
75:16 159:25
**historical**
61:20 116:25
201:2,6,7
228:9
**history**
13:4,9 14:1,
5
**hit**
67:8 87:1
**hold**
197:10
**holder**
112:18
**holding**
54:17
**holds**
112:18
**hosts**
134:19
**hour**
30:16 31:22
60:20 159:22

Matthew Cain, Ph.D.
March 15, 2024

hourly
  31:5,8,9
hours
  30:25 74:2
  91:14 157:18
hurdle
  130:6
hypothetical
  16:22 17:16
  18:20 51:13,
  19 88:7
  199:9 200:11
  219:13
hypothetically
  17:23 128:6
  130:4
  219:12,15

_____

I

_____

idea
  108:18 109:4
identical
  54:11,16
identification
  10:22 25:6
  123:14
  126:15 234:1
  245:1 246:4
identified
  10:6 20:2
  49:7 100:14
  118:21
  122:22
  142:21
  166:22
  194:23 215:1
  235:3 236:16
  244:18
identify
  11:11 22:19
  85:18 100:1,
  5 120:11
  121:8 135:7
  156:21

158:21
166:19,24
235:10,17
239:14
246:15
identifying
  10:9 11:5
  19:12 27:10
  75:14 81:6,
  19 86:3
  236:1 238:16
  241:3,9
  242:13
  248:15,16
  249:18
II
  78:18
illustrate
  197:6
immediate
  104:9
immediately
  114:22
impact
  20:19 23:19
  44:8 52:5
  58:15 68:20
  69:11,23
  70:10 77:24
  87:16,24
  88:2 93:20
  94:1,6,7,8,
  20 95:4,8,21
  103:11
  104:1,13,15,
  19 105:12
  110:17,21
  112:21 116:4
  119:7 121:10
  129:10 137:9
  138:12,18
  139:25
  141:23 148:5
  198:10 199:8
  249:19
impacted
  68:24 120:1

impactful
  86:25
impacting
  151:5
impacts
  104:7
implicit
  209:5
implicitly
  78:3
implied
  208:13
  209:23
implying
  73:11
importance
  15:20
  138:12,17
important
  16:16 20:24
  23:16
  172:11,24
  196:3,24
  198:6 199:7
  200:17 201:8
  202:3,9,18
  206:24
  207:20 208:7
  209:13 216:3
  223:13,18
  225:18,23,25
  235:13 239:1
impounded
  77:25 103:25
  196:5
impounding
  191:8
impression
  142:11
  157:11 222:5
inability
  10:24 123:21
  132:22
incentive
  187:8,9
include
  10:10 15:2,5

19:13 20:4
21:12 23:19
24:7 45:9
62:19,21,24
72:22 119:25
141:25
211:19 237:7
245:6
included
  8:19 11:12
  22:18,19
  25:5 126:13
  148:15
  153:17 158:9
  160:10
  169:15
  235:22 236:8
  237:14
includes
  15:15 246:4
including
  57:9 58:7
  127:25
  142:14
incomplete
  138:23
inconsistent
  100:15
incorporated
  48:10 177:8
incorporates
  177:21
increase
  48:6 61:19
  113:14
increasing
  223:16
incrementally
  106:18 129:8
  142:16 154:9
independent
  11:17 147:4
independently
  9:11 19:16
  20:9 228:3
indepth
  142:13

Matthew Cain, Ph.D.
March 15, 2024

index
  227:25
indication
  41:17
  215:24,25
indications
  25:4
indicative
  196:2 204:6
  207:1 209:2,
  19 211:6,25
  224:3 237:18
indicia
  186:25
individual
  22:6 87:15
  90:4 92:25
  96:19,21
  100:5 108:10
  203:6 220:9
  228:17
indulge
  64:20
indulging
  24:13 212:11
industry
  48:17 112:11
  175:17
inefficiencie
s
  91:16
inefficient
  191:4
inflated
  84:10 248:17
inflation
  84:9,11,22
  247:20,21,
  22,25 248:1,
  18,22 249:4
  250:16
  251:13
  252:11,16
inflation-
adjusted
  232:25

influence
  6:12
inform
  166:13
information
  10:17 15:20,
  23 16:10
  17:8 18:15
  20:24 21:1,3
  22:3 23:15
  24:3 45:11
  52:22 62:22
  74:2,14
  76:13 77:22,
  23 78:19
  81:15,24
  83:20 85:18
  86:4,5,21
  87:6,13,21,
  23,25 89:13,
  16 90:1,7,
  12,17 91:4,
  22,25 92:2,
  5,6,11,12,
  17,18 93:25
  94:6 95:10,
  13,16 96:8
  98:10,17,25
  99:5 101:7
  102:8 103:11
  104:13,24
  106:13,16,22
  107:7 108:6,
  12 110:14
  111:1,15,16
  112:4,9
  113:14
  114:13,23
  115:21,25
  116:11,25
  117:19,21
  118:17
  119:7,10
  120:1 121:11
  123:14,19,20
  124:20
  125:4,12,16
  126:1,7,12,

  14,23 127:4,
  6,10,21
  128:2,8,17
  129:8
  130:13,15,16
  131:5,6,7,
  12,22,25
  132:3,7,10,
  11,16,21
  133:5,18,20
  134:5,17,21,
  24 135:8,19
  136:10
  138:20 139:7
  142:15
  144:18
  148:24
  149:4,11,22
  150:7,9,13,
  15,22 151:3,
  23 153:12,21
  154:1,6,9,20
  155:7,8,10,
  17,21,22
  156:3,7,9,
  15,20 157:3,
  6,8,22
  158:16,21
  159:8 161:5
  185:13
  191:8,9
  196:4,12,24
  197:17,22,23
  198:7,11,15,
  21,24 199:6,
  22 200:3,14,
  17 201:4,6,
  7,8,20
  202:3,9,16,
  22 203:9,13,
  15,18,22
  204:5,8,18,
  23 205:13,19
  206:3,12,25
  207:7,9,11,
  14,16,21
  208:8,18
  209:3,7,8,
  13,18 210:4,

  6,11,16,18,
  19,21,22,23
  211:1,4
  215:6,13
  216:5 217:1,
  6,8,13 219:2
  220:12,13,
  17,24 222:14
  223:14,15,25
  224:1,2,10,
  19,21 235:20
  238:14 248:6
  249:12,16
  250:1,2,4,6
  251:24
information-
generating
  108:25
informational
  78:8,14 80:3
  88:22 98:5,9
  99:8,19
  100:17
  116:23 117:9
informational
ly
  89:1 205:15
informative
  19:6 244:1
inherently
  54:18
initial
  239:4
initially
  16:6 91:21
input
  48:23 49:3,4
  84:13 249:2,
  7 250:10
inputs
  48:16,19
inquiring
  87:2
inquiry
  75:3 196:21,
  22

Matthew Cain, Ph.D.
March 15, 2024

inserting
  21:10 218:13
inside
  216:17
instance
  87:6 183:20
  207:23
  217:12
instances
  18:20 112:6
instantaneous
  102:9
instantaneous
ly
  107:8
institution
  90:4
institutional
  181:13
institutions
  12:2 15:24
  229:9
instruct
  9:3 27:1
instructed
  8:17
instruction
  25:25
instructs
  180:8
intending
  74:11
intent
  230:20
intentional
  5:20
interchangeab
le
  99:12
interchangeab
ly
  48:22
interest
  40:16,18
  175:13,15,19
  176:11 181:9
  185:4,5

191:7 194:3
  204:6 216:14
interested
  110:10
interesting
  181:4 221:4,
  5
internal
  140:9 142:3
interpret
  175:21 188:7
interpretatio
n
  140:20
  234:11
interrupt
  60:18 198:2
interrupted
  131:22
intervening
  242:10
interviewed
  26:5
interviews
  135:3
introduced
  8:2 13:22
  97:10 101:11
  143:15
  146:16 214:5
  236:23
investigated
  38:4
investigation
  140:9 142:3
  147:4 148:7,
  9
investment
  224:23 229:7
investments
  54:4,5
investor
  21:2 86:10
  90:2,4
  129:16
  175:13,15,19
  176:10

181:9,10
  185:3,4
  194:3 204:6
  219:15,17,
  20,25
investors
  15:20,23
  16:11 17:8,
  11 18:17
  19:6,10,16
  20:15 22:7
  23:17 75:22
  78:2 85:19
  86:5,21,25
  112:14
  113:10
  116:25 118:2
  119:8,11
  120:12,23
  125:4,18
  126:23
  127:10 128:1
  132:21
  138:12,18
  142:16
  149:12
  150:15 151:4
  154:10
  155:21
  156:16 157:9
  158:4,22
  159:16 191:6
  196:5,13
  197:22 201:3
  202:4,10
  204:18,24
  206:25
  207:12
  208:18 210:7
  216:5 218:6
  220:12 221:6
  224:15,20,21
  225:24
  238:15
  242:11
  243:19 244:1
invoices
  31:2

involve
  45:23 248:14
  251:22
involved
  228:5
involves
  84:4
involving
  28:25 43:11
  247:14
IPO
  61:14,16
  244:17
  246:15
irreconcilabl
e
  209:10
irregularitie
s
  129:6
isolate
  121:8
isolation
  93:11
issue
  38:11 88:19
  105:18
  168:25 195:1
issued
  38:19,25
  216:21
issuer
  38:11
issues
  128:22,23,24
  131:18 140:7
  142:1 147:2,
  13
iterations
  123:1

_____

J

_____

January
  25:10,12,16
  31:3 168:3

Matthew Cain, Ph.D.
March 15, 2024

**Jefferies**
199:13
212:18
218:19
219:23
**Jefferies'**
212:20 213:2
219:16
**job**
219:1 247:18
**joining**
5:3
**joint**
109:20
**joke**
105:4
**journals**
15:8
**judgment**
163:20
**jump**
10:3 191:15
**jumped**
235:21
**justifies**
189:21
**justify**
190:5

**K**

**Karageorge**
4:25
**Kathrein**
5:2 31:13
**keep**
65:19 86:17
178:1 182:11
186:7
**keeping**
177:14
**key**
123:16
124:8,9,10,
14,18 233:9,
16,21 234:8,
21 235:6,10,

11,15 236:3
237:7 238:14
239:15
240:17
241:9,24
244:8,15,16,
19 245:8
246:4,14
**kicked**
124:25
**kind**
12:24 28:14
50:13 63:19
80:2 83:2
93:16 103:21
108:11,24
110:5,6,7
114:13
167:10
180:19
200:17
213:17 228:8
248:10 251:1
**kinds**
211:24
**knew**
142:18
**know**
5:17,18 7:6
10:20 11:8,
10 16:13
19:25 24:12,
19 25:18
28:7,11
30:1,3 31:18
33:24,25
38:24 39:25
40:2,4,17
43:21 46:23
49:20 50:16,
22,24 51:13,
16 58:8
67:14 68:15
69:10 70:4
71:23 73:13
74:17 77:2
78:11 81:2
82:10 83:9

85:10 86:15
89:22 91:12,
14 94:16
99:23 100:1
102:20
103:1,8
104:12,21
105:1 107:23
108:22
109:12
110:13
111:17,20,23
117:4 119:4,
15 120:24
121:14 128:6
130:19 139:4
146:18
147:18
149:12
152:15
153:3,5
158:13,14
159:14
170:1,7,12
171:15 172:3
186:5 188:4
189:18
190:12,18
195:5 206:4
210:13
215:23
216:21
218:21
219:6,24
223:5 229:10
230:2 231:6
233:10
235:22
237:7,16,17
239:22 243:3
244:6 247:8
249:17
252:13
253:17
**knowing**
18:9 42:6
238:12
**knowledge**

30:3 60:9
**Krogman**
162:21

**L**

**L-E-E**
192:5
**label**
214:8
**lack**
81:21 171:17
182:9 194:3
**laid**
11:5 132:5
180:10
182:20 195:8
241:18
250:20
**language**
38:9 141:10
146:25
162:15,16
195:25 202:2
211:14
**large**
15:1,14
99:24 112:18
184:5,15
186:14 189:5
202:19
229:10
230:12
**largely**
170:16
**larger**
175:4
**late**
125:8,19
132:14
135:18,20
152:3 157:17
158:8 160:23
**law**
26:11,15,25
27:13,23,24
31:5,22

151:24

**laws**
32:12

**lawsuit**
32:7 170:11

**lawyers**
27:24

**lay**
10:14 21:9
23:18 61:23
119:21

**laying**
58:6

**layman's**
55:22

**layout**
197:16

**layperson's**
85:13

**lead**
82:6 119:16

**leading**
68:5 137:12

**leakage**
106:19,20

**learned**
142:17

**learning**
5:20

**Lee**
192:4,16
193:1

**left**
11:4

**legal**
16:15 38:4
42:17,20,25
73:6 91:7
99:20

**legally**
42:21

**letter**
145:16 247:8

**level**
14:12,24
22:10 23:14
24:2 77:13,

20 85:8
86:18 87:17
88:7 91:11
103:3 121:4
136:8,16
142:24
161:12,18
238:15

**licenses**
12:24

**life**
123:17
235:19
244:16
246:15 247:1

**light**
223:22

**limit**
66:10 114:6
206:16
227:20

**limited**
114:2

**limiting**
29:6 208:16

**limits**
32:9

**line**
21:2 37:11,
12,15 86:10
187:5

**lined**
18:4 130:9
243:14

**lines**
41:15 124:2
126:20 142:9
220:14 222:6

**liquidity**
112:21

**list**
55:19 57:8,
10,23 58:5
61:23 62:14,
16 63:5,6
65:23 76:1
229:23

**listed**
161:2,4
164:3
172:17,19
174:21

**listing**
25:11 244:5

**literature**
56:16 93:19
105:11
106:18 161:5
166:19 167:8
168:21
177:16
180:21
190:15
230:23
232:11

**litigation**
26:17 28:15
29:14,24

**little**
5:3,18 10:3
18:19 64:21
117:13
118:12 137:4
159:5 160:20
180:19
191:16 205:8
226:5,15
227:1,24
230:9

**LLP**
4:13

**long**
96:7,10
106:24
150:17
167:11
198:12 245:2

**long-winded**
66:6

**longer**
52:16 79:5
228:9

**look**
13:24,25
20:16,20

21:5 23:21
32:4 40:1
42:2 45:4,
16,22 47:21
50:10 51:21
57:1 61:9
67:21 70:3
74:25 75:11
88:11 89:20
90:8 91:12
93:10 95:2,
19 96:24
97:17 99:24
100:4 101:13
102:14,15
103:4 105:5,
16 106:8
107:18 109:9
115:10 117:4
119:9,24
120:19
122:18 125:6
127:8,13
130:18,25
132:13
133:12,13,25
135:6,9
136:17
137:14 139:8
141:4 144:24
146:21
150:21
153:11
158:14
159:2,5,13,
18 160:21
162:11,13
166:11 169:8
171:5,14,18
173:1 179:20
180:8
182:13,17,23
183:9 185:2
188:5
190:19,22
198:19 200:9
212:13 214:1
219:19 220:3
221:6,18

Matthew Cain, Ph.D.
March 15, 2024

222:12,22
223:4 225:18
227:8 233:14
237:1 244:25
245:12,16
248:6 251:3

**lookback**
68:12

**looked**
19:14 26:5
43:13 59:4
66:5 103:24
123:13 146:3
152:15,24
177:10,24
178:17 182:6
188:1 189:15
190:14 192:8
199:13
218:18 219:3
220:22
232:24
234:13

**looking**
15:23 20:18
21:11 22:3
23:22 25:9
45:25 46:12
60:19 63:14
70:4 87:5,10
88:14 91:14
92:17,23
95:8 98:24
99:18,21
101:23
102:21 103:8
117:7,8
120:10
121:23 123:5
131:4
141:12,16
142:14,20,23
143:10
147:22
148:25
149:12
155:25
158:5,23

165:10
169:24 174:2
175:16
181:11
183:11 184:8
185:7 193:22
208:14 212:5
213:8 218:21
223:6
234:13,25
235:2 241:2,
11 243:17
248:13
249:16

**looks**
37:9 136:20

**loose**
162:16

**losing**
194:16

**loss**
16:1 84:7,
17,23
103:19,22
142:9,22
194:8 248:4

**loss-causation**
119:18
142:14
222:11 248:3
249:11
251:11

**losses**
15:25

**lost**
110:12

**lot**
14:6 22:4
100:4,13,21
102:1,12
105:18
109:14 111:8
116:17
133:20
134:17
183:25
191:17

192:17
197:23
198:21 206:4
212:14
216:10,16
219:8,13
224:24 243:5

**low**
186:17

**lower**
46:15 64:14

**lowering**
197:10

**lowers**
53:23,24

**lunch**
121:15

—————————

**M**

—————————

**M&a**
238:21 239:7

**M-O-O-N-I-S**
8:20

**Mackinlay**
56:25 57:16
62:24 67:11,
14,16,23
68:9 106:6

**macro**
203:8

**made**
16:20,22
38:17 49:24
56:1 58:2
66:4 118:20
138:22 217:3
240:16

**magnitude**
69:10 113:12

**majority**
28:21,23
29:9,11

**make**
9:13 10:1
12:7 13:25
14:1 21:14

23:5 32:8
42:10 50:1
55:19 57:8,
10,23 60:23
62:14 63:4
65:23 79:20
88:23 89:7
107:21
152:21
158:17
162:16 169:6
172:5 173:16
175:8 179:2
187:10
191:21 193:2
197:18
200:18
206:22 211:8
221:19 251:8

**maker**
228:10 229:5

**makers**
112:12
170:22
172:14,15,23
180:2,5
226:6 227:1,
17,24 228:4,
19,24 229:2,
21 230:16,25
231:11

**makes**
53:13 105:4
172:13
239:21

**making**
11:1 43:2
58:5 100:25
147:12
152:1,3
205:18 228:5

**Maloney**
4:24

**Mame**
4:24

**management**
106:15

Matthew Cain, Ph.D.
March 15, 2024

managers
  229:11
manipulating
  178:5
manner
  58:24 80:18
March
  4:3 30:25
  33:18,19,22,
  23 36:17
  157:16,18
  158:8 215:2
  239:25
marginal
  89:15
mark
  7:22 12:9
  97:7 243:4
marked
  8:5 12:13
  145:10
  146:10
market
  15:25 23:19
  33:6 34:10
  44:10 48:17
  51:4 52:6
  58:16 65:5
  68:21 70:14
  74:8 75:3,6,
  19 76:16,21
  77:3,15,18,
  21 79:8,13,
  15,23 84:1,
  16 85:12
  89:5 91:6,8,
  10,18 92:22
  93:10,20,25
  94:6,19
  95:4,8,21
  96:2,4,12,22
  97:5 98:1,8,
  15 99:9,19
  100:16,22
  101:19,24
  103:3,18
  104:1,10,15,
  19 108:4

109:4,18,19,
  24 110:1,13,
  16,17,21,23,
  25 111:25
  112:10,12
  119:8 120:3
  129:10 132:7
  149:10
  166:16 167:3
  170:22
  172:14,15,23
  173:1,7,11,
  24 174:2,14,
  17,18,22
  175:4,17,19,
  21 180:2,5
  181:6,7,11,
  14 184:20
  185:7
  186:13,20,25
  188:18 189:1
  190:5
  193:12,17,20
  194:6 196:2
  205:15
  206:15,19
  207:2 209:2,
  12,19 211:7,
  25 216:25
  217:18
  220:16
  221:12,24
  222:19
  223:16 224:4
  225:2 226:3,
  6 227:1,17,
  24 228:1,4,
  5,10,19,24
  229:2,5,21
  230:16,17,25
  231:11,12,
  15,19 232:5,
  10,14,19
  234:23 242:4
  244:13
  245:21 246:3
  247:13
  249:10

markets
  15:10,24
  88:25 172:16
  175:5 176:7
  193:25
  228:22
  229:13
marking
  13:19,23
material
  17:11 18:23
  19:7,16
  20:9,15
  21:17,20
  22:7 23:16
  24:4,6 32:22
  151:4
materiality
  15:22 16:10
  17:8 22:20
materials
  6:19 12:16
  41:8
matter
  25:21,22
  31:12 51:3,9
  70:21 130:19
  144:15
  167:12,13
  222:4
matters
  15:17 32:1
MATTHEW
  5:7
mean
  20:25 29:21
  33:1 35:8
  36:9 37:19
  47:16 50:9
  60:17 63:18
  64:25 65:12
  68:6,15
  71:16,18
  77:13 83:12
  85:23 94:23
  95:1 115:10
  140:12 150:3
  151:24 152:5

159:6 163:6
  167:12 168:4
  174:1 183:19
  184:11 185:2
  194:17
  195:19
  198:21
  212:9,22
  216:1
  227:20,24,25
  239:12
  242:24
  245:13
  250:21
meaning
  224:2
meaningful
  20:21 87:16
  196:10
  200:18
  221:17
  242:11
  243:19
means
  35:1 77:9
  78:15,19,22
measure
  182:6 248:21
  250:10
  251:20
measured
  190:3 249:22
measurement
  182:9 247:19
  248:23
measuring
  104:6 183:19
meat
  94:16 147:10
media
  20:22 119:14
median
  174:18
  183:15,17,21
  184:2,11
medications
  6:13

Matthew Cain, Ph.D.
March 15, 2024

meet
  7:7 253:7
meets
  10:15
members
  34:13 249:2
memorized
  133:12,21
  136:17 139:5
  158:24
  199:25 200:9
  247:5,11
mental
  6:5,10
mention
  62:6 215:6,
  21
mentioned
  16:4,9 29:12
  37:18 39:6
  48:11,12
  49:12 59:19
  63:9,11 65:8
  67:9 68:9
  93:16 102:19
  105:1 111:9,
  10 117:16
  131:19
  149:17 150:7
  153:12
  169:18
  170:11
  203:12
  214:21,23
  218:15
  238:18
mentions
  67:22,23
mere
  19:8
Merge
  239:25
merger
  41:2 47:17,
  18,21 63:12
  126:24
  128:19,20
  214:15 215:1

237:9 238:20
239:1,6,7
240:21
241:3,24
244:7
mergers
  15:17 18:7
  238:3,4,8,11
merits
  33:13 84:7,
  17,24
  103:19,23
  248:4
met
  6:17
methodologies
  47:2 50:2
  80:23 81:22
  82:8 90:20
methodology
  30:5 34:12
  44:9 46:11
  48:10,11,20,
  23,25 50:17,
  19 55:9,17
  56:12,18
  58:22 59:2
  60:2 71:3,4
  75:24 81:1
  82:17,20
  83:6,7 84:20
  120:8 133:2
  161:11 168:1
  184:24
  193:13
  239:14
  248:10,21,25
  249:1 252:15
Miami
  4:16
Michael
  247:6
micro
  91:11
microphone
  110:12
microphones
  4:6

microstructur
e
  103:3
million
  173:9,12
  174:3,19
  182:1
  183:15,16
  232:5,15,20
  233:2 242:17
millisecond
  105:9
mind
  25:8 73:2
  81:11 150:19
  178:25
  182:12 186:7
  193:4 240:16
  241:7 242:20
mine
  145:24
  236:19
minimum
  84:3 168:20
  173:7,8,11
  216:22
minute
  18:11 88:19
  109:8 179:3
  227:12
  243:15
minute-by-
minute
  102:16
minutes
  66:20 121:20
  179:5
mischaracteri
ze
  223:20
misnomer
  39:23
misrepresenta
tion
  169:19

misrepresenta
tions
  32:16 79:4
  248:7
misstatements
  77:25 104:5
mistaken
  10:8 189:22
mistyped
  231:16
misunderstand
ing
  210:2
misunderstood
  155:4
mix
  21:3 86:16
model
  45:20 46:14,
  21 48:12,15,
  16 49:2,17,
  21,22,24
  50:8,17,20
  56:3 57:4
  59:16 60:8
  61:5,15,25
  62:3,14
  63:23 66:2
  69:16,21
  81:6 82:23,
  24 103:21
  108:17,19
  109:21,25
  110:5 197:17
  198:18 199:8
  249:24
models
  49:10 50:2
  62:18 70:20
  81:16 83:1
  108:4 110:8
  204:13
  210:21
modify
  86:3
money
  30:18 187:10
  242:17

| | | | |
|---|---|---|---|
| **month** | **multiple** | **need** | 236:9 |
| 30:25 | 65:17 94:12 | 6:3 7:6 23:5 | **nice** |
| **months** | 103:9 105:12 | 25:6 71:2 | 253:7 |
| 7:15 150:24 | 127:6 | 109:8 112:20 | **nomenclature** |
| 167:13 | **myriad** | 159:2,5 | 150:6 |
| 215:4,7,21 | 114:7 | 160:23,24 | **Non-news** |
| 217:13 | | 164:20 | 118:11 |
| 242:10 | | 167:25 168:3 | **nonpublic** |
| **Moonis** | _____ | 172:20 | 98:16 99:1,5 |
| 8:20 | | 206:11 | **noon** |
| **morning** | **N** | 212:16 223:3 | 107:15 |
| 4:15 5:12 | _____ | 226:7 227:23 | **Nos** |
| 6:13 94:7 | | 239:22 | 143:14 |
| 119:5 124:23 | **name** | 249:12 | **note** |
| 216:12 | 5:13 27:10 | 250:14 | 4:5 173:10 |
| **mouth** | 37:25 49:11 | **needed** | **noted** |
| 68:10 | 50:2 247:7 | 76:8,13 | 12:20 33:16 |
| **move** | **names** | **needing** | 37:8 170:23 |
| 20:25 35:20 | 38:6 | 168:20 | **notes** |
| 79:12 96:20 | **narrative** | **needs** | 78:7 171:4 |
| 107:14 | 146:21,24 | 13:17 | 174:6 178:16 |
| 111:14 112:3 | 156:2 | **negative** | 179:21 |
| 113:22 114:5 | **narrowing** | 21:3 | 180:22 |
| 119:12 | 150:18 | **neglect** | 192:18 214:3 |
| 165:14 168:9 | **Nasdaq** | 86:11 | **notice** |
| 187:14 226:5 | 174:21 | **neglected** | 7:22 8:10 |
| **moved** | 186:10,15,22 | 67:7 | 125:8 132:14 |
| 23:23 | 187:2 188:13 | **never** | 135:18,20 |
| **movement** | 230:13 | 30:7,11 | 157:17 158:9 |
| 250:8 | 232:14 | 193:20 | **noticed** |
| **movements** | **national** | 206:16 210:3 | 63:10 |
| 22:14 70:7 | 180:3 | 222:2 | **notices** |
| 111:17 | **nationally** | **news** | 125:19 |
| **moving** | 186:14 | 19:21 20:21 | **notification** |
| 19:21 112:6 | **nature** | 21:7 22:20 | 140:6 141:25 |
| **MRK** | 47:11 213:7 | 23:13,25 | **notifications** |
| 174:14 175:8 | 218:16 | 45:6,10,15 | 125:19,20 |
| 180:24 | 249:18 | 46:12 86:11, | **notified** |
| 181:2,5,22 | **necessarily** | 17 88:12 | 147:5 |
| 183:1,14,21, | 17:17 44:15 | 104:20 112:1 | **Notwithstandi** |
| 25 184:18,23 | 49:20 51:9 | 113:6,9,16, | **ng** |
| 185:1,9,17 | 52:5 103:2 | 21 115:1,6, | 72:25 |
| 191:23 | 135:7 138:8 | 9,12 118:10, | **novel** |
| 192:3,8,14, | 140:19 | 15 122:24,25 | 87:16 |
| 15,18,25 | 147:18 | 123:3,24 | **November** |
| 193:23 194:7 | 153:21 | 127:25 131:1 | 31:15 131:16 |
| 231:24 | 237:18 | 202:21 | 132:12,14 |
| 232:1,17,23 | **necessary** | 205:12,25 | |
| | 18:6 74:7 | | |
| | 197:4 228:20 | | |
| | 241:7 | | |

Matthew Cain, Ph.D.
March 15, 2024

133:6,8,23,
24 135:15,17
136:10,11,
21,24 138:9
139:14
140:4,13,14,
22,23,24
141:19
142:17,18
143:7,11,24
144:3,5,9,25
146:4,13
147:24 157:9

**NT**
132:15
144:14,17
146:4,11
152:4,10,16,
19,25 153:5
157:17 158:9

**number**
12:1 14:5
28:19 29:2
41:5,25 42:6
105:25 112:2
125:6 126:12
127:2,14,21
128:11,12
131:25
132:13,16
145:6,8,9,21
146:2 148:11
150:23
153:11
154:11,19
157:16 158:7
172:14
182:8,24
183:16,17,
20,24 184:6,
8 193:6
194:9,10
195:16
198:21
205:10 220:6
222:25
229:17
230:25

232:23
234:23 237:1
239:24

**numbers**
9:8 80:15
155:9 174:4
182:25
183:23
197:24
232:11

**numerical**
195:23

**numerous**
91:10 206:1

**NYSE**
174:22
186:15
232:14

---

**O**

---

**oath**
5:24

**Object**
9:16 10:11
17:12 19:18
21:22 22:23
28:1 33:7,20
36:1 38:21
40:7 41:12
42:13 44:1,
12 46:7 47:9
49:14 50:5
51:6 52:2
53:18 54:20
55:5 56:6,20
58:17 59:23
62:10 63:16
64:4 65:13
69:2 70:22
71:14 73:20
74:23 81:25
83:21 85:25
87:7 88:4
89:2,18 92:7
94:3,21
99:13 102:10
103:13

104:17
105:14
107:11
110:18 111:3
113:7 115:2
116:14 118:4
120:15 123:8
125:14
126:10
127:22
128:14
129:23
130:23 132:1
133:9 134:8
135:24 138:3
140:16 142:4
144:21
147:16
149:7,24
151:7
152:12,22
154:3,22
155:12
156:11,24
157:23 159:9
161:8 163:13
164:6,23
167:22
168:15
169:11,21
170:5,17
173:19 176:2
177:3 178:20
185:14,25
187:19
188:21
191:25
193:18
194:12
196:14
199:23
200:19
201:16 202:5
203:24 208:4
209:21
211:11 212:1
213:3 215:16
216:6 217:19
219:4 221:1,

25 224:5
225:11,21
228:6 231:1
236:14
237:10
240:23
242:1,22
244:10
245:10
246:10
250:17
251:15

**objection**
18:25 20:11
33:25 34:7
41:20,23
69:17 72:2
92:19 95:5,
22 113:17,25
132:17
141:1,14
150:10
151:14
154:25
158:18 197:1
200:6 202:11
208:11
209:14,25

**objections**
115:13

**objective**
11:1,6 21:9
23:18 45:14
58:24 119:20
120:6
123:12,23
125:2 131:2
225:5,13
244:24
245:21,23

**objectively**
10:18 86:19

**obligation**
25:1

**obscures**
107:1

**observations**
105:25

133:19

**obtuse**
5:19 19:24
24:10

**obviously**
14:5 15:23
29:7 30:24
34:25 66:4
108:5 120:10
125:25
142:12 153:6
163:20
173:14 174:1
189:6 234:14
241:20

**occur**
16:24 61:6

**occurring**
110:17

**occurs**
103:9

**offense**
181:4

**offering**
52:4 73:6
129:2,5
224:20

**officially**
229:4

**offsetting**
21:4 86:12

**Ohlrogge**
247:6

**okay**
5:21 6:5,21
7:4,21 8:12
11:19 12:23
13:1 16:25
18:18 19:12
21:14 22:15
26:14 27:21
29:15 30:14
31:4,10
32:3,14
33:12 34:14
35:19 36:15
37:18 38:7,

24 39:18
40:2 42:9
46:2 49:2,6,
23 50:22
55:22 58:8
59:10 62:2
63:9 64:18
65:21 67:6
68:8,18
69:13 70:15
71:6 72:1
75:10,12,18
76:1,5,16,20
77:1 79:10
80:2,6,11,21
84:25 85:7
87:22 88:18
90:25 91:20
93:16 95:18
96:23 97:21
101:13
107:5,25
111:7 113:1
114:17,21
115:16
117:3,10,22
118:8 121:13
122:7 123:4
124:1,16
125:5,22
127:1,13
128:4 129:12
130:6 131:13
132:13
135:12
137:23
138:22
139:18
144:11
145:15
146:5,19
149:2 151:3
152:9 153:2,
11,24 154:19
155:16
156:4,18
157:10 159:4
160:8,20
164:19

165:23
167:16
168:9,22
169:5,16
170:21
171:12
173:1,13,23
175:24
176:6,12,24
177:23
179:7,9,19
180:16
181:21,24
182:22
184:17
185:8,18,20
187:12
188:14 190:1
191:15
192:7,13
193:2,15,23
194:7
195:10,24
201:10,25
205:6 206:4,
21 207:17
210:24
211:21 212:9
214:20
216:24 225:7
226:4,24
227:1,14,20,
23 229:25
231:10,17,23
232:2,9,16,
21 234:7,17
235:8 236:3,
11,18 237:16
239:12,21
240:5,6
241:5,21
242:15 244:2
247:17 253:3

**omission**
169:19

**omissions**
32:22 77:25
78:4 79:5

104:5 248:7

**omitted**
14:2,4

**once**
10:25 11:5,
14 43:7,15
47:18 52:14,
21 61:17
85:22 143:21
179:1 182:7

**one**
5:1 7:9
10:21 15:21
17:10 18:21
19:14,23
20:6,7 21:19
22:21 27:20
28:7,18,25
29:12 35:23,
24 38:2
43:24 44:8,
16,18 47:6,7
50:8 52:10
53:22 54:11,
12,16,17
56:22 57:11,
13 60:23
63:5 64:19
67:6,22
68:12 69:6
71:7 72:17
75:21 80:17
82:7 86:16
87:23 89:20
90:23 92:17
93:10,12
96:2,3
97:16,19
100:3,6
103:5
104:21,22
107:3
108:11,24
110:13,17
111:8,14
113:23
114:13
117:22

Matthew Cain, Ph.D.
March 15, 2024

118:21
123:1,24
124:2,9,17,
21 127:1,13,
18 128:4
130:19
131:18
132:12,20
139:20
140:15
143:10
144:20
151:11
152:16 154:7
157:14 158:7
161:6 162:24
163:11
164:4,9
165:17
166:5,18
170:1 171:13
172:3,6
174:9 176:20
178:7,16
179:23
183:14,24
184:5 191:24
192:2
194:18,21
197:9,24
199:9 201:12
206:7 213:5,
13,17 216:8
217:11,12,21
218:4,7
220:2,25
221:15,21
231:4 234:24
237:6
241:19,21
242:6 243:9
246:2 247:6
251:18
**one-fifth**
193:11
**ones**
29:13 120:14
124:25 128:4

131:15
158:1,20
162:8 165:7
169:23 170:4
172:8
**ongoing**
148:7
177:18,19
**open**
73:25 74:3
224:18
228:18
**opened**
140:8 142:2
**opening**
74:5
**operations**
148:13
153:15
215:14
**opine**
75:21
**opined**
76:16 224:8
**opining**
92:11
**opinion**
25:23 32:14,
18,21 34:10,
11 52:5
54:24 69:6
76:21 77:3
79:13 80:16,
21 81:20
87:15 88:17
98:15 124:21
138:14,17
151:10,18
154:7 156:6,
10 193:15,21
195:15
201:14,25
215:10 216:1
221:21 225:2
227:16,19,21
242:6
**opinions**
9:12 10:2

11:21 13:13
26:7 30:12
32:9,10
33:4,10 34:1
35:10 42:20,
25 55:3
63:21 70:19
73:6 76:2,9,
14 81:11
83:18 84:2
85:9 88:10
97:4 116:20
138:21
142:13
150:14
155:21 157:7
169:10
191:21
217:25 218:4
224:20
**opportunities**
90:22
**opportunity**
41:10 86:20
90:2
**opposed**
8:23 39:24
69:14 92:18
94:19 95:4,
21 98:4
115:25 119:2
136:25
140:22 146:6
183:4 240:21
241:8
**opposite**
244:23
**option**
50:8 80:14,
17 82:24
**options**
75:20,23
79:19,24
80:9 82:22,
25
**orange**
37:11,12

**oranges**
193:7
**order**
10:1 18:4
22:1 76:9
121:7 196:9,
20 206:12
223:14
228:21
229:15
253:12,14,17
**orient**
158:7
**original**
11:3 172:7
186:23
199:10
**originally**
38:19
**out-of-pocket**
71:4 80:25
82:16 83:6
247:19
248:25
**outcome**
148:8
**outcomes**
221:8,11
**outcry**
228:18
**outer**
32:9
**outlier**
188:6
**outline**
191:16
**outlined**
60:12,13
68:24
**output**
49:2,4
**outside**
11:18 28:4
**outstanding**
30:22 183:9

Matthew Cain, Ph.D.
March 15, 2024

over-
interpreting
  207:5
over-the-
counter
  172:16
  180:4,5
overlap
  100:21
  116:17
overlapping
  101:8 198:14
overlooked
  250:24
overly
  82:11
overreact
  90:12 95:15
overreacts
  96:8
overturn
  100:17
owned
  43:5,24
ownership
  181:13

———————————

P

———————————

p.m.
  122:11,16
  179:12,17
  226:17,22
  252:22
  253:2,19,21
page
  26:19 36:5
  56:23 61:4,
  10 63:14
  107:19
  122:19
  212:25
  214:8,10,11
  229:17
pages
  251:5

paid
  30:16,18,23
  31:3
paper
  97:1,4
  109:14 110:8
  171:1 174:8
papers
  16:12 100:13
  109:13
  168:13
  171:20,22,23
  174:9 180:23
  247:10
paragraph
  11:15,16
  23:9,12
  36:7,9
  37:20,21
  39:3,10
  56:23 76:1,
  10 78:6
  80:12 82:4,5
  83:3 88:21
  97:5,17
  123:10
  136:7,15,19
  137:5,10
  139:3,21
  140:18
  141:10,17,18
  144:12
  148:19 158:2
  162:13,19
  171:5 172:13
  173:10
  174:13,20
  175:1 181:24
  182:2,3,25
  183:3 190:2
  192:5 193:14
  195:25 205:6
  206:22 209:4
  210:3,5
  222:23
  229:24
  230:4,8
  232:6 233:2,

  16,24 251:1,
  6 252:7,8
paragraphs
  75:13,16
  78:17 82:15
  85:1 251:2
parameters
  67:25
paraphrase
  195:13
paraphrasing
  150:25
  153:14
parents
  38:5
Park
  35:12,24
  37:23 38:1,
  10,18,24
  39:9 125:7
  127:17
  214:25
  217:23
  237:22 240:1
  242:16
Park's
  244:4
part
  22:16 39:23
  45:14 47:16
  48:20 53:7
  56:3 58:14
  59:15,20
  62:7 65:4,8
  68:25 69:15
  70:18 83:15
  87:1 105:6
  110:10
  115:4,5
  120:17 124:4
  138:5 139:1
  142:19
  145:14,18
  148:10
  150:21
  155:10
  156:1,2
  157:4 163:21

  197:3 198:9
  201:8 208:2
  220:7
  227:19,21
  231:25
  233:12
  240:16
  241:17
  250:5,8
  251:22
participate
  25:22,24
  41:2
particular
  21:17 22:20
  51:4 89:12
  90:24 92:5
  117:23
  177:25 195:1
  219:3 237:6,
  20,24
parties
  4:4
partner
  4:19 5:2
parts
  147:7
party
  25:24
pass
  17:3 18:1
  160:5
passed
  17:4 43:8
  130:6
past
  6:7 13:1
  43:15 61:18
  168:7 228:15
pattern
  90:13 96:10,
  17
patterns
  100:2,10
pay
  159:21
  240:11

Matthew Cain, Ph.D.
March 15, 2024

paying
  191:7 207:12
payoff
  54:5,6
pays
  159:24,25
  160:5
peer-reviewed
  161:6,17
  163:2 165:3,
  11,22 166:3,
  20 180:21,23
  190:15 191:1
  227:6 230:22
  231:21
  232:11
people
  43:4 100:8
  159:21,23
  178:5 197:15
  228:17,23
percent
  180:2 181:25
  182:2,19
  186:4 187:18
  189:21
  190:4,7,16
  192:19
  193:6,24
percentage
  28:18,19
  182:7,18
  183:4,5,22
percentages
  182:21
percentile
  174:23 186:5
  188:4,5,17,
  25 189:3,7,9
  232:13
perfectly
  116:19
performance
  200:4,15
  215:15
  219:19 220:9
performed

114:10
219:25
performing
  111:24
period
  33:17,22
  34:2,5,12,
  13,22,24
  35:3,5,11,18
  36:24 37:3
  44:24 45:8,
  18,19 46:19
  47:24 58:15
  59:8,15,21
  61:18 62:8
  65:5 69:1
  70:19 72:14,
  16,17 76:18,
  23,24 77:5
  79:16,25
  80:19 84:12
  92:22,24
  96:7,11
  117:9 122:25
  123:18
  137:12
  146:12
  148:13,21
  153:16 174:3
  182:16 206:1
  208:21 223:2
  227:17
  229:19,22
  232:6,23
  235:1 241:16
  245:3
  248:18,19
  252:12
periodic
  150:23
periods
  121:12
  238:22
permitting
  30:9,10
perseverate
  21:15 118:13

persistent
  90:13 100:9
persists
  96:10
person
  124:17
  159:25
perspective
  73:5 87:17
  109:3 250:14
persuasive
  195:6 196:21
  222:24
pertain
  23:20
pertaining
  216:11
pertains
  13:10
pertinent
  13:13 203:22
  217:5,17
Peter
  4:12,18
Ph.d.
  5:7 11:25
phase
  222:11,16
phenomenon
  95:20
phone
  6:18 7:9
phrase
  80:24 89:14
  93:18 114:11
  115:17,18
  124:7
  175:14,23
  181:10
  233:7,9,10
phrased
  151:22
phraseology
  176:5 181:9
  194:1,6
phrases
  176:8

phrasing
  116:18
physical
  6:9 228:23,
  24
physically
  228:18
pick
  4:6 105:6
picked
  165:23
  172:3,8
picking
  119:2 165:25
  166:5
picks
  104:3
picture
  102:6
piece
  86:14 89:12
  91:22 92:5,
  17 124:20
pieces
  18:15 23:25
  126:1 127:6
  130:15,16
  131:11
  133:18 136:9
  238:14
pile
  206:7
pits
  228:19,24
place
  4:4 48:9
  60:10 65:2
  67:15 184:22
  187:11
places
  233:15
plaintiff
  28:12,20
  29:10
plaintiff's
  28:24 82:6

Matthew Cain, Ph.D.
March 15, 2024

| | | | |
|---|---|---|---|
| **plaintiffs** | **pointing** | 117:20 | **preparing** |
| 4:14 28:9 | 81:16 246:25 | 118:6,22 | 55:3 133:14 |
| 30:10 | 250:21 | 123:15 | 137:11,13 |
| **please** | **points** | 124:22 | 146:3 169:10 |
| 4:5,8 8:9 | 14:6 37:14 | 125:3,16 | 187:24 |
| 23:7 223:21 | 72:21 100:1 | 126:16,23 | **prerequisite** |
| 227:12 251:4 | 153:9 188:10 | 127:9 128:1 | 79:8 |
| **plots** | **poorly** | 129:8 132:3, | **presence** |
| 36:22 | 111:24 | 7,11,20,22 | 185:13 |
| **plotted** | **portion** | 133:1 140:7 | **present** |
| 37:10,14 | 110:4 148:16 | 142:1 243:4, | 168:5 228:18 |
| **point** | 202:19 | 10 245:4 | **presented** |
| 11:14 14:21 | **portions** | **potentially** | 139:6,7 |
| 23:2 26:22 | 136:12 | 118:17 147:1 | 154:9 |
| 28:22 29:5, | **position** | 249:14 | **press** |
| 14 33:9 | 11:9 14:11 | **practiced** | 134:16 135:3 |
| 44:18,19 | 223:24 | 18:8 | 136:13 |
| 48:6 54:13 | **positions** | **pre-business** | 139:13 |
| 55:1 56:17 | 12:1 | 59:6 | 141:13 147:1 |
| 57:13 60:10, | **positive** | **preannounce** | 149:20 |
| 24 61:2 | 21:3 86:11 | 45:18 | 160:12 |
| 63:12 65:2,6 | 113:10 | **preclosing** | 202:21 |
| 67:15,18 | **possibility** | 45:18 | 210:12 236:7 |
| 72:12 79:11 | 130:2 | **precondition** | **presumption** |
| 84:21 89:15 | **possible** | 74:7 79:7 | 186:13,20 |
| 93:13,15 | 63:7 88:8 | **predict** | 189:4,22 |
| 107:24 | 109:21 139:2 | 148:8 | 190:5,8,10 |
| 116:11 | 141:5 164:16 | **prediction** | **pretty** |
| 118:13 | 186:3 200:1 | 54:10 | 29:11 75:12 |
| 120:10 | 204:15 | **preliminary** | 102:6 140:14 |
| 135:9,11 | 245:15,24 | 11:20 | 144:3 180:10 |
| 138:14,22 | 251:18 | **prelims** | 197:13 |
| 143:4 148:18 | **post** | 24:18 | 211:16 |
| 149:12 | 35:4,14 | **premise** | 227:10 |
| 151:11,19 | 145:22 | 65:16 | 247:18 |
| 154:10 | **post-business** | **premised** | **preventing** |
| 156:16 157:3 | 59:7 | 84:2 | 6:8 |
| 158:2 159:18 | **posting** | **premising** | **previous** |
| 181:19 | 214:2 | 205:1 | 19:3 28:5 |
| 184:22,25 | **postpone** | **preparation** | 44:22 52:10 |
| 187:24 211:8 | 136:22 137:1 | 7:11 8:13 | 74:4 78:3 |
| 212:10 | 140:5 | **prepare** | 114:3 115:15 |
| 216:11 217:3 | **pot** | 6:15 7:8 | 116:1 127:24 |
| 219:18 | 216:13 | 41:8 | 132:20 |
| 235:24 | 246:20 | **prepared** | 149:17 |
| 247:15,16 | **potential** | 14:22 34:18 | 150:24 157:4 |
| **pointed** | 115:24 | | 158:20 |
| 65:17 227:10 | | | 161:24 |

Matthew Cain, Ph.D.
March 15, 2024

**previously**
  57:7 62:12
  69:4 117:16
  206:19
  207:22
**price**
  20:19,25
  22:14 23:23
  36:16,24
  37:11,15
  48:2 52:12,
  22 53:25
  54:19 62:17
  64:2 70:7,11
  71:11,12,17,
  23 73:12,16,
  18,24,25
  74:3,6,11,
  18,20 75:1
  77:22,23
  78:1,20,25
  79:3 87:12,
  16,19,24
  88:2 89:25
  90:6,16 93:1
  95:9,12,15
  96:1,6,20
  99:1 103:9,
  12 104:13
  107:7 110:13
  111:2,17
  112:3,6,9,
  21,24 113:5,
  13,16,22
  114:4,19
  116:5,10
  119:7,11
  120:1,21
  138:18 151:5
  170:19
  187:9,10
  191:8
  197:11,13
  199:2,4
  204:14
  216:13 250:7
  251:20,21
**priced**

  78:5
**prices**
  35:22 61:16
  89:13 90:11
  91:4 94:10
  98:12,17
  99:6 101:7
  102:7,21
  104:21
  105:20 107:4
  108:5,11,24
  111:14
  114:13
  185:10 196:5
  207:15
**pricing**
  50:8 82:23,
  24
**prior**
  35:13 40:10,
  23 41:19
  44:24 45:19
  46:16 48:5
  52:23 61:6,
  14,16 63:25
  64:2,9,11
  68:1 123:12
  148:21
  155:15 238:7
**private**
  4:7 92:11
  98:25
**probably**
  23:1 26:9
  49:18 53:20,
  21 83:10
  166:17
  167:14
  190:24 238:2
  250:21
**problem**
  24:14 105:22
  109:20
**problematic**
  93:13
**procedural**
  30:8

**procedures**
  137:9 139:25
  141:23 148:4
**proceed**
  28:22
**proceeded**
  29:14
**proceeding**
  29:5
**proceedings**
  67:2 122:14
  179:15
  226:20
  252:25
**proceeds**
  84:6
**process**
  18:16 166:9
  189:16
  221:22
  246:1,3,8
**produced**
  85:3 205:11
**produces**
  229:20
**producing**
  205:24
**product**
  9:3 11:9
**professional**
  12:23 14:14
  15:12 238:10
  246:18,24
**professionals**
  186:11
**professor**
  12:2 105:3
**Profile**
  214:9,12
**profit**
  96:9 117:1
**profits**
  15:25 89:15
**projections**
  201:4,5
**pronounce**
  247:7

**pronouncing**
  220:18
**proof**
  81:21
**proofs**
  70:21
**propose**
  71:2
**prospects**
  170:16
**protected**
  9:2 27:8
**provide**
  10:24 13:14
  26:6,16
  32:10 33:25
  78:21 83:24
  86:4,21
  115:25
  117:21
  126:23 128:1
  132:7 134:20
  135:3 137:10
  161:15 162:2
  163:18
  166:21
  168:19 188:9
  189:11
  200:10,17,24
  203:22
  204:10,12
  217:5 229:13
  234:11
**provided**
  12:17 15:12
  24:22 26:21
  27:12 33:5
  41:10 106:14
  131:25
  132:21 133:7
  136:4,10
  147:24
  149:22
  151:24
  153:22,23
  154:21
  156:15,20
  157:8 159:15

161:13,25
163:19
171:24
180:14 181:6
192:25
195:4,20
202:15,16
208:18
213:12
215:13
216:20
217:24
218:20 223:5
224:14 231:8
234:16

**provides**
19:5 101:22
136:8 141:18
163:17
223:13

**providing**
33:4,9 70:19
116:21
133:17
195:15
204:16
210:20
216:22
218:1,7,24

**public**
26:21 28:22
29:5 92:14
98:10 101:6
201:23
205:11 215:7
238:21

**publicly**
61:16 124:19
152:2 191:8
201:20,22
203:14
208:19 240:2
247:2

**publicly-**
**available**
91:24 92:2,
10,18 108:6

**published**
163:2 232:11
238:4 239:10

**publishing**
15:7

**puddle**
45:2

**pull**
23:19 119:21
206:8
213:13,15

**pulled**
11:2

**pulling**
236:25

**purchase**
214:16
247:21

**pure**
252:2

**purely**
51:18 52:22
98:16 138:13
193:21 252:1

**purport**
100:5

**purpose**
7:12 169:4
222:8

**purposes**
8:6 9:14
13:8 25:3
34:4 77:17,
20 101:4
103:22 104:9
119:19
130:21 167:9
181:20 225:2

**push**
17:20

**put**
9:8,23,25
17:16 29:1
68:10 80:14,
17 84:19
143:8,21
162:7 163:21

164:12
165:20
166:11 173:6
178:4 181:3
197:25
198:25
207:10 211:2
236:18 248:3

**puts**
53:24 110:7
215:5

**putting**
82:16 106:17
120:2 178:9
220:11

---

**Q**

---

**qualification**
**s**
30:6,13

**qualify**
153:25

**qualitative**
198:19

**quality**
204:7 220:17

**quantify**
251:13

**quarter**
131:17
135:16
136:23 137:2
147:13

**quarterly**
136:25
137:2,25
152:21

**quasi**
173:17

**question**
9:1 11:3
16:18 19:22
20:5 21:6
22:9,10 23:1
24:8 34:21
42:16,17

43:12,22
44:4 50:14,
15 51:1,19
53:11,21
54:9,25 55:7
56:10,11
58:10 64:6,
19 65:10,16
67:20 68:2,
22 69:19,23
70:1,15
71:22 72:10,
22 74:1
75:14 80:4
81:17 83:10,
13,17 89:4
90:9,15,24
91:2,4,6,21
92:22 93:22
95:11,25
97:2 101:20
102:14
103:2,16
104:9 105:7
112:7 115:9
117:7 120:7
122:21 126:6
128:9 133:23
135:23 136:2
138:6,11
142:8,10,16
145:1
151:10,13,
16,21 152:9,
14 155:2
157:5 166:8
167:5 169:5
170:8 181:22
182:8 186:23
188:14,25
191:6,14
198:4 199:10
200:12
201:11
203:5,8
206:9 209:16
211:9,21
215:11
217:17

219:7,14
220:15
221:12
222:15,18,21
223:22
224:8,12,18
225:25
231:3,7
243:4 249:6
**questioning**
179:2
**questions**
5:15 6:22
12:5 13:24
27:2 29:16
55:12,16
56:13 58:9
62:2 66:15
69:21 71:7
72:10,20
76:5 107:21
121:22
134:19,23
155:9 169:16
187:13
191:19
199:17
204:24,25
206:5 207:19
213:9,18,20
224:25
225:24
231:11 233:8
253:5,9,10
**quick**
197:13
214:22
215:18
**quickly**
75:12 98:11
104:21
**quite**
228:11,14
238:9
**quotations**
139:10
**quote**
67:19,24

70:3 89:15,
17 139:20
140:11
222:22
247:14
**quoted**
190:2
**quotes**
112:12
**quoting**
106:4
190:18,20

---

**R**

**raise**
238:8
**random**
100:10
112:17,23
**randomness**
113:24
**range**
28:19
**rank**
229:18
**rankings**
185:23
203:16
218:1,5
**rate**
31:9,22,23,
25 32:1,2
159:24
188:17 199:1
**rates**
112:15
**rating**
217:23
**ratings**
218:6 221:7
**RDW**
35:17,25
42:11 43:4,
23,24 46:4
71:8,12
73:18 74:20

77:1,3
**reach**
151:10
207:11
**reached**
44:9 189:20
**react**
87:20 89:25
90:6,17
93:2,3 95:13
99:1,2
105:20,21
114:20
119:11
**reacted**
222:13
**reaction**
23:23 96:1
99:4 110:14,
16,20 120:21
172:7
**reacts**
87:12
**read**
4:17 67:13
79:22 82:15
89:14 97:21,
22 101:16
108:2,9,16
137:13,16,
19,21 139:21
144:6 146:17
148:11
162:20
163:5,8
164:1 175:2
181:2 187:25
190:3 196:1
197:15
199:16 205:9
206:8 208:15
211:15
212:4,10,17,
18 213:19
214:14
**readily**
134:6

**reading**
81:10,11
101:2,15
102:4 136:14
138:13
212:24
**reads**
36:15,17
**ready**
66:7
**reality**
187:6
**reason**
27:15 34:21
44:4 53:7
63:7,25 71:6
73:23 75:7
81:9 93:9
112:19
117:25
125:24
127:11
128:18 135:5
138:25 139:6
142:21 160:8
168:22
176:15
183:22 209:1
217:4 240:14
**reasonable**
41:6 166:21,
25 169:3
176:18,22
178:8
**reasons**
19:10 27:16
30:7 75:1
86:9 93:5,7
94:12 106:12
111:10,13
112:17 114:8
117:22
128:22
136:23 137:3
140:13
141:11
243:16

Matthew Cain, Ph.D.
March 15, 2024

rebuttal
  178:3 247:13
recall
  25:9,15
  40:17,20
  41:14 139:5
  158:22,24
  160:14
  170:19
  185:16
  231:18
  239:23
recapitulatio
n
  128:11
receive
  40:5
received
  247:13
recognize
  8:7 29:23
recognized
  186:14
recollection
  7:14 31:17
  39:12,17
  40:9 136:3
  159:3 170:14
  194:14,22
  218:18,19,22
  236:10
recommendatio
n
  219:16,18
recommendatio
ns
  170:20
  204:14
  220:1,3,11
reconcile
  221:20
record
  4:2,5,9 5:4
  34:15 35:7,
  20 42:10
  58:12 66:21,
  24 67:4 85:4

88:24 121:21
122:8,11,16
179:9,12,17,
20 226:17,22
252:22
253:2,20
recording
  4:3
redeem
  41:10
redeemed
  40:10,23
redemption
  40:10,13,16,
  22,23 41:19
  42:2 43:5,8,
  9,16 44:7,
  17,18 45:3
  46:3,25
  47:5,16,24,
  25 48:4,5
  50:22 51:3,
  14,20 52:9,
  13,14,16
  53:5,12,16,
  23 54:12,16,
  18 55:24,25
  56:19 57:9,
  19,21,24
  58:14 59:9,
  14,20 60:17
  61:21 62:7,
  17,20 63:3
  64:2,13
  65:4,8,20
  66:15 68:19,
  25 69:8,11,
  14,24 70:10,
  18 73:1
  216:13
redemptions
  42:4 243:5,7
redo
  176:24
reduced
  63:11 159:24
Redwire
  4:18 34:23

35:8,16,21,
25 36:16,23
37:1,10,15
75:19,22
76:17 79:13,
24 88:25
114:25
115:10,19
116:8 127:15
131:17
135:15
136:13,21
139:13
146:12
162:22
172:18
181:25
183:24 184:5
190:8 199:21
205:13,24
214:20,23
215:1,21
217:15 218:8
227:14,16
230:18
231:20 232:3
233:17
237:2,21
239:25
250:16
Redwire's
  157:17
  162:24
  173:11
  174:22
  215:14,22
Reed
  5:2 31:13
reevaluate
  167:5
refer
  34:23 35:2,
  10,11 37:19
  49:11 50:2
  78:24 109:18
  139:13 205:6
reference
  17:2 23:6

37:22 49:24
66:4 181:19
referenced
  57:17 90:19
  181:6 229:24
references
  24:20 38:6
  57:15
referencing
  174:23
referred
  50:3 239:15
referring
  16:13 35:22
  39:8 60:17
  81:2 92:13
  94:25 95:2
  109:5 111:20
  136:20 170:9
  210:25
refers
  136:11
reflect
  77:23 91:4
  108:5 148:20
  168:1
reflected
  52:23 78:1,
  20 89:13
  98:12,17
  99:5 101:7
  107:4 111:2
  116:11
  148:14
  153:16 194:4
  236:6 242:25
reflecting
  78:25 79:5
  207:15
reflective
  185:4
reflects
  10:1 14:13
  77:22 205:23
refresh
  7:14 159:3
  218:21

Matthew Cain, Ph.D.
March 15, 2024

**regard**
  10:5 11:7
  14:16 44:10
  46:2 55:25
  62:3 70:16,
  20 75:6 76:6
  80:7,22
  81:5,6 83:18
  91:24 94:14
  97:5 99:8
  113:15 115:9
  118:10 127:1
  129:14
  139:19
  140:13 149:2
  154:19
  156:6,8
  160:9 165:15
  170:22
  181:22
  211:17
  230:25 246:3
**regarding**
  130:8 239:16
  242:20 245:7
**regression**
  45:20 46:14
  53:8 59:1
  61:5,6,25
  62:3,8,14
  66:2 67:12,
  17 68:5,7,13
**regulations**
  152:8
**regulator**
  173:15,21
**regulators**
  238:23
**regulatory**
  18:6 128:23
  130:11
  173:22
**regurgitation**
  17:10,18
  18:24 128:17
**reiterate**
  251:8

**reject**
  99:3 109:19
**rejected**
  30:4 109:24,
  25
**relate**
  66:16 126:14
  138:7 233:24
**related**
  33:5 53:5
  125:18
  240:19
  241:23
  242:16
**relates**
  16:10
**relating**
  112:1 132:4,
  22 137:24
  148:5 158:25
  233:17
  235:12
**relation**
  162:22
**relationship**
  22:11,12
  70:5 119:23
**relative**
  23:24 142:17
  149:18
  172:21
  188:6,12
  189:3 216:20
**release**
  114:23
  134:17
  136:13,22
  137:1 139:13
  147:1 149:21
  160:12
  204:11
**released**
  117:19
**releases**
  137:14,15,
  16,20 141:13
  202:21

  204:10
  210:12 236:7
**relevance**
  138:18 205:2
**relevant**
  14:8 18:17
  19:9 51:10
  52:1,7 56:14
  75:3,8 86:22
  117:6 125:4
  172:15
  181:19
  195:21
  196:21 201:8
  206:13,20
  207:24 208:9
  242:7 244:1
  246:25
**reliability**
  65:25
**reliable**
  93:14 166:25
**relied**
  180:24
**relies**
  248:12
**rely**
  97:3 205:19
**relying**
  78:3 176:25
**remain**
  119:20 120:5
**remember**
  11:16 31:14
  41:25 42:5
  93:19 109:6,
  7 114:15
  202:19 230:6
**render**
  76:9
**rendered**
  76:14 81:12
**rendering**
  81:19
**reorganizatio
n**
  214:17

**repeating**
  210:19
**repetition**
  19:3,4,5,9
  116:1
**rephrase**
  81:17
**replicable**
  100:9
**reply**
  30:10 178:10
  247:12
**report**
  5:15 6:19,
  20,23,24
  7:3,11,13,
  16,19,20
  8:14,16,23
  9:2,6,7,10,
  14,22,23
  10:6,7,10
  11:13,17,18
  12:10,16,18,
  21 13:4,8,
  15,17 14:9,
  18,22 21:7
  23:3,6,11,12
  24:20,22
  25:12 28:8
  29:1 32:5,8
  33:5,11,16
  34:14,16,17
  35:1 36:5,11
  38:18 41:8
  42:8 46:6
  47:13 49:8,
  12,13,25
  50:4,10,18,
  21 53:4
  58:2,23
  60:11,14
  65:2 67:14,
  16,19 68:24
  69:22,25
  70:3,13 71:5
  75:11 77:9,
  12,18,21
  78:7 79:14,

Matthew Cain, Ph.D.
March 15, 2024

22 80:13
81:7 83:15
84:7,15,18
88:21 89:6,
23 91:19
93:10,20
96:14 97:6,
17 99:12,20
101:2 107:18
111:11,22
116:7,18
117:15
119:19
122:19
123:11
124:12
125:17
130:21
132:9,23
133:14,16
136:6,7,25
137:2,11,13
145:5,14,19,
22 146:2,3
147:13
148:16
153:18
154:2,21
158:3 159:21
160:22
162:14
166:11,17
167:4,6,11,
18 168:1,5,6
170:10 171:6
174:12,13,
16,20 175:2,
17 176:25
177:6,25
181:24 184:3
185:1,7
186:12
187:24
195:16,25
196:20,23
197:15,16,21
198:16 200:8
201:1,2
202:14,15,22

205:2,7
206:8 207:20
208:2,7,9
209:17
211:6,9,24
212:5,8
213:5,11,16
214:8,20,23
215:5 216:2,
8,10,17,20,
21,22 217:3,
11,12,16
218:12
219:3,22,23
220:18,21
221:23
223:14,19,24
224:16,22
225:10,17
227:2,3
229:20
231:13 232:7
233:10,13,22
234:8,14
236:13
245:22 246:5
247:13
248:4,11
250:24,25
252:17
**reported**
  144:15
  147:3,8
  183:1 223:1
**reporter**
  4:10
**reporting**
  42:3 184:2
  201:18,23
  202:25
  208:19
  217:13
**reports**
  30:10 34:1,6
  44:23 83:25
  102:5
  103:18,19,23
  106:17

119:14
150:24 167:7
169:9,14,25
170:15
177:1,7
178:3,4,10
192:10
193:6,11,12
194:9,10
195:14,16
196:10,19
198:11,20
199:16,18,
19,25 200:3,
16,23
201:12,15,19
202:1,2,7,24
203:6,13,15,
21 204:3,11
205:5,11,20,
23,24 206:6,
11,15,17
207:11,23,24
208:17,20
209:11,18
210:4,8,14
211:17,18,24
212:15,17,
18,19,21
213:1,2,7,13
217:1,4,22
218:10,19
219:1,8
220:5,23
221:16,18
222:3,12
223:4,17
224:9,13,14,
25 225:1,4,
10,15,18
234:24,25
235:24 242:5
244:13
245:23
247:12
**represent**
  4:17 5:13
  23:15 48:1
  146:11

**represents**
  37:12 52:11
  124:10
**require**
  22:2 115:5
  142:13
**required**
  60:8 150:24
  152:1,2
  244:3
**requirement**
  173:12 233:3
**requirements**
  180:10
**requires**
  121:10
**requiring**
  168:20
**reschedule**
  131:17
  135:22
**rescheduling**
  135:16
**research**
  12:2 15:7
  53:22 76:8
  93:6 100:4
  102:13
  134:19
  152:14,25
  153:10 163:2
  165:4,12
  166:4,20
  167:8 170:13
  177:13,21,22
  196:2 205:10
  206:23
  231:8,21
  236:12 238:4
  244:14,16
  245:20
  246:12,14,
  17,23 247:4,
  5,15
**researched**
  38:14 54:13
  231:5 239:10

Matthew Cain, Ph.D.
March 15, 2024

residual
  61:11
respect
  227:14
respond
  94:11
  104:21,22,24
responds
  95:10
response
  28:5 161:25
responses
  197:14
rest
  157:15
  212:13
restatements
  159:1,2
result
  205:9
resulting
  70:6
results
  20:17 21:11
  51:15 69:6,
  12 131:18
  135:17,22
  140:6
  148:12,20
  153:15
retain
  31:12
retained
  25:20 26:21,
  24 160:2
retention
  160:3
returns
  61:11 102:18
reveal
  119:7
revealed
  119:25 135:8
  158:4
revealing
  9:1

revelation
  251:23
reverberate
  93:25
reverse
  96:21
review
  6:24 9:24,25
  10:16,17
  13:17 25:21
  121:11
  138:19
  139:16 144:2
  169:13
  177:15
  195:14
  218:16
  235:20
reviewed
  6:19 7:1
  26:4 41:8
  160:11,12,
  16,18
  169:23,25
  170:4,15
reviewing
  160:15
  177:13
reviews
  130:11
revise
  120:23
revision
  112:11
ribbon
  84:11 248:18
right
  5:23 14:20
  25:16 27:21
  30:16 32:16
  33:12,19
  35:25 40:5,
  10,13,22
  41:4 44:7,
  17,19 45:3
  46:25 47:5,
  16 50:23
  51:3,15,17,

20 52:9,16,
17 53:12,16
54:17,18
55:24,25
56:5,8,19
57:9 58:14
59:9,14
63:3,4,15
64:2,13,18
65:4,8 68:25
69:8,11,24
70:1,8,11,18
73:1,3,4,9
75:11 76:3,
18 78:7 82:9
88:13,18
92:15,21
94:2,9
96:13,23
98:3,22
102:1 105:25
111:7 113:24
114:4,24
117:10 118:3
121:2,4
123:4 130:3
131:14
134:15 135:9
139:1 143:23
144:20
154:14 156:5
158:15
159:4,7,8
161:1,10,15
163:15
165:18
167:10
168:22 170:2
171:3,19
173:18 174:8
179:21
180:25
181:21
185:19
187:5,11,12
188:20
189:23
191:10,15,23
192:11,21

194:19
195:17
197:10,12
198:8,24
199:14 203:1
204:5 208:3,
10 209:3,20
215:2,20
216:15
217:10
221:12
225:25
227:13,21
228:8,25
231:21 232:6
233:4 234:7
239:21
243:11 246:9
249:4,13
250:12
251:14 252:5
rights
  40:5,6 41:19
  42:2 43:6,9,
  17 46:3
  57:19,21,24
  59:20 60:17
  62:7 63:3
  66:15 68:19
  69:14
risk
  54:7 55:10
risk/reward
  54:4
riskier
  54:4,5
riskiness
  53:24 55:14
risky
  54:19
road
  250:11
Robert
  8:19
robust
  83:15,16
  121:5

Matthew Cain, Ph.D.
March 15, 2024

role
  57:18 84:21
  119:20 205:4
Rollenfelds
  190:20
rolling
  45:20 46:13
  53:8 59:1
  61:5,20,25
  62:3,13 66:1
  67:12,17
  68:7,13,16
Roper
  4:24
rough
  28:19 253:13
roughly
  215:4
routinely
  186:24
row
  58:9 120:19
rows
  133:23
Rubin
  4:19,21
  13:19 14:15
  39:20 97:7
  143:8,13,19,
  24 145:6,9,
  15,18,22,25
  146:5 158:12
  214:2 230:5
  236:21
rule
  88:6 222:5
rules
  6:3
run
  9:8 44:23
running
  23:21
rush
  109:10
  253:14

_____

S

_____

S-O
  192:5
S3
  173:7 180:7,
  9 232:1
  233:3
sake
  203:11
sale
  247:22
sample
  21:13
  127:12,25
  184:5,15
  232:18,23
satisfaction
  65:24
satisfied
  241:17
satisfies
  172:20
  230:14,19
save
  134:4
saved
  226:4
saves
  102:1
saying
  21:16 55:23
  59:13 68:9,
  11 73:23
  74:10 79:11
  83:2 87:22
  101:17 109:1
  110:24 114:8
  125:2 137:1
  166:4 167:16
  173:18
  177:23 193:9
  199:12 204:3
  207:6 208:25
  209:5 222:7
  223:3 225:16

  228:2 246:6,
  7
says
  108:9,16
  137:5 140:4
  148:1,6
  159:14,19
  163:8 214:14
  222:24
  244:16
scale
  120:3 183:8
scenario
  54:15,23
  207:18,19
  210:25
scenarios
  107:5
SCHAEFFER
  41:23 122:9
  226:13
schedule
  30:9
scientific
  162:25
  177:11
scores
  218:1,2,5
search
  167:3 168:3
SEC
  144:15 147:5
  152:19
  173:15 180:9
  205:12 206:1
  236:7
SEC's
  145:13
second
  7:4 17:9,17
  18:21,22
  22:15 47:6
  105:10 111:8
  123:19
  139:1,20
  142:10,19
  144:5,12

  149:19
  171:10 175:1
  213:19
  239:22
  243:18 251:3
second-by-
second
  91:13 102:16
  103:4
seconds
  107:9
section
  37:21 81:12
  84:1 89:5
  108:1
  146:21,24
  154:8 162:20
  211:15
  212:5,8
  227:3 231:13
  248:11
sections
  8:22 83:25
sector
  111:23
securities
  15:9 26:17
  28:14,23
  29:7,9,20,24
  32:11 39:1,5
  42:12,17,22
  45:4 54:11,
  16 72:5 79:2
  82:17 83:8
  152:8 185:5,
  11 222:25
  229:14,22
  248:16
security
  36:4 38:12,
  19 39:14
  42:19 44:8,
  16,17 47:6,7
  56:1 71:8,9,
  11,13,24
  73:2 76:22
  77:4 108:11,
  24 114:13

Matthew Cain, Ph.D.
March 15, 2024

118:3

**see**
22:16 36:12,
19 41:7,17
48:3 52:8
53:3 61:8,
10,17 63:19
66:12 67:18,
19 74:25
90:12 91:15
94:7,8 95:9,
16,19 96:13
99:4 106:6,8
107:2 108:7,
14,20 110:20
111:6 113:5,
13 116:23
118:9 120:8,
20 125:9
127:18
133:15
135:10
136:6,19
140:1,10,11
144:16
146:24
147:6,7
151:1
153:19,20
157:18
159:19
161:21 162:8
163:3 164:25
166:12
167:19 172:1
175:6 178:5
179:21 181:5
182:4 186:2,
24 187:8
188:11
189:15,16
196:7 197:13
198:11
199:19 200:2
205:16 206:7
207:3
214:14,18,23
215:8,12
222:12

225:18 227:4
229:25
233:19
234:14,18
237:4 239:13
240:3,15
250:23
**seeing**
41:14
**select**
126:2
**selected**
16:20 117:23
118:15
120:12
124:17
125:25
126:14
127:11
201:14
**selecting**
20:3 131:1
240:17
**selection**
21:18 22:17
123:7
**sell**
112:19
217:23
219:18
**selling**
112:15
219:21
**semi-strong**
97:24 98:4,7
99:9 100:15
101:19,23
108:3 109:4
**sense**
85:8 149:20
151:4 213:7
**sensitive**
4:6
**sentence**
108:2 175:2
**separate**
9:11 42:17,

21 60:8
95:11 124:2,
3 130:15
131:11 192:9
203:4 242:9
**separately**
17:10 231:8
**September**
35:13,14,15
72:23 126:4
127:15
129:9,10,17,
18 130:5
131:3 146:13
237:2
**serve**
30:6,14
**set**
47:3 54:19
64:2 166:16,
18 195:2
221:5 229:19
245:21
**setting**
104:23
**settled**
27:15 29:4
**settling**
110:13
**several**
106:7 181:3
251:2,5
**Shaeffer**
4:12 5:1
8:24 9:16
10:11 13:16
17:12 18:25
19:18 20:11
21:22 22:23
24:24 25:25
27:1 28:1
33:7,20 34:7
36:1,7 38:21
40:7 41:12,
20 42:13
44:1,12 46:7
47:9 49:14
50:5 51:6

52:2 53:18
54:20 55:5
56:6,20
58:17 59:23
60:19,22
62:10 63:16
64:4,23
65:13 66:22
69:2,17
70:22 71:14
72:2 73:20
74:23 81:25
83:21 85:25
87:7 88:4
89:2,18
92:7,19
94:3,21
95:5,22
97:11,14
99:13 102:10
103:13
104:17
105:14
107:11 109:8
110:18 111:3
113:7,17,25
115:2,13
116:14 118:4
120:15
121:17
122:2,6
123:8 125:14
126:10
127:22
128:14
129:23
130:23
132:1,17
133:9 134:8
135:24 138:3
140:16
141:1,14
142:4 144:21
147:16
149:7,24
150:10
151:7,14
152:12,22
154:3,22,25

Matthew Cain, Ph.D.
March 15, 2024

155:12
156:11,24
157:23
158:17 159:9
161:8 163:13
164:6,23
167:22
168:15
169:11,21
170:5,17
173:19 176:2
177:3 178:20
179:6,10
185:14,25
187:19
188:21
191:25
193:18
194:12
196:14 197:1
199:23
200:6,19
201:16
202:5,11
203:24
208:4,11
209:14,21,25
211:11 212:1
213:3,21,24
215:16 216:6
217:19 219:4
221:1,25
224:5
225:11,21
226:10 228:6
231:1 236:14
237:10
240:23
242:1,22
244:10
245:10
246:10
250:17
251:15
253:10
**Shapiro**
 4:13
**share**

39:8 40:19,
20 41:1,22
43:24 45:1,2
47:12,23
48:4 53:13,
14,15,17
197:11
214:15,16
246:21
**shareholder**
 16:23,24
 17:2,4,25
 126:5
 129:11,14
 130:6 131:9
 234:5 240:20
 241:7 243:3
**shareholders**
 40:21 41:9,
 18 126:19,21
 128:12,19
 129:17
 130:4,5
 241:8 244:6
**shares**
 35:4,12
 40:23 41:11
 43:9 44:21
 48:3 52:12
 112:18
 182:1,15,24,
 25 183:9,15,
 16,24 184:7,
 8 219:21
**sheeting**
 212:24 213:1
**short**
 144:3
**shorten**
 122:4
**shorter**
 91:13
**shorthand**
 35:9 37:22
**show**
 8:5 143:4
 174:11
 175:20

 239:22
**showing**
 12:13 181:15
 212:14
**shown**
 100:7
**shows**
 232:13
**Shutts**
 4:16,21
**side**
 4:20 28:24
 29:1,3,10
 41:16 145:13
**sides**
 29:8
**significance**
 163:1 165:5,
 9 177:11
**significant**
 18:1 90:13
 96:17 113:12
 120:20
 148:12,20
 153:14
 154:13
 181:15
 204:19
 222:25
**significantly**
 228:15
**similar**
 9:18 73:17
 74:12,19
 75:1 98:8
 99:15 101:5
 127:24
 130:14
 132:19
 134:14
 141:12 158:1
 174:16
 214:17
 250:19
**similarly**
 147:8

**simple**
 222:21 241:8
**simply**
 34:4 135:6
 240:21
**simultaneousl
y**
 52:15
**single**
 14:10 63:7
 79:15 93:11,
 12,14 96:3
 205:22
**singular**
 83:6
**sir**
 8:4 12:12
 32:5 71:21
 143:21 144:7
 152:6 155:4
 253:4
**sister**
 105:2
**sit**
 55:15,19
 56:10 120:9
 133:4 151:12
 153:2 156:22
 164:1
**site**
 247:14
**sitting**
 56:9
**situation**
 152:20
**situations**
 112:3
**skim**
 214:22
**skimmed**
 212:20 213:5
**skimming**
 215:18
**sleep**
 181:3
**slide**
 36:12,15

Matthew Cain, Ph.D.
March 15, 2024

slight
  91:15 156:19
  157:3,11
slightly
  86:3 151:20
slot
  157:25
Sobol
  4:13
sold
  53:17
sort
  10:21 18:15
  19:3 22:5
  24:10 34:25
  38:4 42:20
  48:1 50:19
  52:15 55:17
  76:2 100:18
  102:13 104:4
  106:2,23
  109:15,17
  110:3,9
  116:24
  123:23 151:9
  165:10 172:8
  173:17
  177:18
  190:21
  198:10
  200:10
  201:5,11
  203:4 213:10
  216:18 221:5
  235:18
sorting
  109:13
sorts
  105:2 137:24
  138:21
sought
  26:7 152:15
  158:21 231:4
sound
  64:25
sounds
  5:22 41:4
  55:22 59:13

142:7 188:15
source
  67:10,11
  205:3 207:7,
  8,22 210:8
  211:2 217:9
  224:1
sources
  102:5 199:13
  243:10
SPAC
  35:3,12
  37:22 43:9
  44:21 45:1,
  6,7,13
  47:12,14,23
  48:3 52:12
  61:16 69:24
  123:14,17
  126:15,25
  235:7,19
  242:4
  244:13,16,25
  246:15 247:1
SPACS
  43:11,15
  44:23 47:11
  52:10 58:7
  64:8,14
  234:24
  243:10
  244:15
  245:20
  246:14,18,
  19,23
  247:11,14
spans
  35:3
speak
  94:17 160:17
  185:22
speaking
  17:22 48:22
  64:8 105:23
  130:5 161:12
speaks
  159:6

specializatio
n
  15:4 16:8
  17:6
specialty
  14:23
specific
  11:15 22:9
  26:3 48:23
  49:21 50:17
  56:9 58:5
  74:15,18
  86:23 91:22
  92:5 103:15,
  16 140:15,25
  185:8 203:5
  205:19,22
  206:23
  207:18
  210:24 213:9
  215:13,24
  220:15
  223:11
  240:12
  250:12
specifically
  43:13 46:2
  50:3 51:25
  60:16 73:10,
  12,16 94:14
  117:7 183:14
specificity
  136:18
speck-related
  10:22
speed
  102:7 103:3
  153:10
spell
  14:9 247:8
spelled
  8:20 46:10
spread
  90:14 184:13
  217:7
spreads
  181:14

stacks
  188:11
staff
  8:17 167:5
stage
  84:6,7,16,
  17,18 248:2,
  3 249:10,11
standalone
  22:6
standard
  31:23,25
  32:2 71:3
  80:23
standing
  228:23
standpoint
  14:14 16:15
  21:5 87:11
  88:15 99:20
  238:10 239:8
  246:24
start
  73:22 93:1
  110:20
  121:23
  252:12
started
  233:6
starting
  35:14,15
  135:9,11
  153:9 159:18
  251:6
starts
  61:19 67:21
  108:2 114:19
  249:15
  251:1,19
state
  4:9 6:5
  29:18 35:7
  189:11
stated
  73:1 137:6
statement
  134:12

Matthew Cain, Ph.D.
March 15, 2024

153:17
205:18
206:23  217:3
225:7

**statements**
78:4  137:7
139:23
141:21
144:13
148:3,15

**States**
29:19

**stating**
141:20

**statistical**
87:11  88:14,
15  118:9
121:6  161:5
162:25
165:4,5,8,
16,20,24
166:1,12,19,
22,23,24
167:20
168:13,23,24
171:18,23
173:24  174:5
176:15,16,
18,19  177:1,
11,22  178:4

**statistically**
96:16  120:20

**statistics**
92:24

**status**
233:18,25
235:12,14,16
237:8,16,19
239:1,16
240:22
241:8,12,24
242:13,21

**status/key**
242:20

**stay**
43:1

**step**
21:8  187:9

**stepping**
238:23

**sticking**
125:2  253:6

**stock**
20:19,25
22:14  23:22
34:23  35:2,
8,16,21,22,
23  36:16,23
37:1,5,10,16
39:2,6,9,11,
15,16  40:4,
10  43:4,5,
17,19,23,25
48:2  52:18,
21  53:13,14,
15  70:6,11
71:19  72:15,
19  73:12,16,
24  75:20,23
76:17  77:21
78:1,3,5,20,
24  79:3,13
80:8  82:21
84:9  85:21
86:6  87:12,
19,24  88:2,
25  89:13,24
90:5,16  93:1
95:15  96:1,
6,18  98:12,
17  99:1,6
101:7  103:11
104:13
107:4,7
111:2,14,24
112:3,6,9,
22,24  113:5,
13,16,22
114:19,25
115:11,19
116:5,9
120:13  151:5
162:22,24
172:19
186:9,14,21
187:1  188:13

196:5  199:2,
4  200:13
205:14
207:15
217:18  223:1
227:15  228:5
230:13,19
231:20  232:3
241:21  244:5
249:20  250:7
251:20

**stocks**
228:21

**stop**
81:22  83:17
212:23

**stopped**
81:23  83:18

**stopping**
60:24

**strategies**
47:22

**strategy**
90:5  99:25

**strict**
191:12

**stricter**
77:15

**strong**
98:14  99:3
186:13  187:8
190:5,8,9

**structure**
38:5  91:11
228:14

**studded**
54:25  244:14

**studied**
16:12  18:8
183:25  238:2
240:25  242:4

**studies**
15:19  56:16
57:2  62:4,
13,25  63:2
91:10  97:20
100:5  102:3,

15,17
103:17,24
105:18
106:5,11
107:3  109:15
110:2  219:7,
8,11  251:12

**study**
10:6  11:12
19:14  20:4
22:20  23:22
48:15,24
49:17,22,23
54:23  55:2,
9,17,24
56:12,18,25
57:1,15,17
59:1  62:24
67:23  70:10
91:8  95:1,8
97:1  101:13,
15,20,21
102:6,21
103:2,10
104:3  106:6
109:17
114:11
122:23  123:7
124:5  125:13
126:9  127:14
160:11
161:17
165:22
174:14,23
175:3,8
180:24
181:2,5,22
183:1,6,14,
21  184:2,18,
23  185:9,10,
12,17,21
186:8,18
187:13,16
188:1,8,16,
19  190:21
191:1,23
192:3,4,8,
14,15,16,18,
25  193:1,23

Matthew Cain, Ph.D.
March 15, 2024

194:7 221:5,
6 231:23,24
232:1,12
241:18
242:7,9
245:17 247:6
248:12
249:22
251:19
252:2,7,9
**Study's**
57:19
**studying**
238:12
**stuff**
11:20 111:8
146:2 181:4
191:17
**subcategories**
102:13
**subject**
148:15
153:18
**subjective**
124:24
213:12
218:11,20
244:9,23
245:9
**subjectively**
86:15 245:18
**subjectivity**
21:11 115:5
213:11
218:13
**submission**
30:9
**submit**
31:1
**submitted**
31:2
**subsequent**
78:17 94:19
95:3,20
135:2
**subset**
123:2

**subset also**
123:1
**subsidiaries**
38:5
**substance**
169:9
**substantial**
125:1 205:11
**substantially**
141:12
**substantive**
33:2
**subsumes**
141:24
**subtitle**
36:17
**subunit**
140:7 142:2
147:2
**successful**
243:3,18
245:1
**successfully**
235:5 244:20
**sufficient**
76:22 191:7
243:8
**suit**
31:19,20
**sum**
53:17 55:25
**summarize**
32:25 106:24
136:6 160:25
225:16
251:10
**summarized**
12:15 13:4
14:17 33:10
76:10 195:5
248:10
**summarizes**
13:9
**summarizing**
211:16
**summary**
21:21 75:24

76:2 77:13,
20 88:3
136:8,16
137:9 139:3
141:17 142:6
147:15
163:12
168:14
199:17
201:11
206:17
208:17
**supply**
112:16
**support**
7:10 98:20
187:18
188:17
190:16
**supporting**
108:17
**supports**
175:3 187:17
205:13
**suppose**
129:3
**supposed**
65:10
**sure**
10:1 11:2
13:25 14:1
16:18 17:21
21:14 25:14
32:8 42:10
50:1,11 51:8
60:23,25
71:16 79:20
88:23 89:8
93:8 94:24
107:21
124:14 150:3
155:20
157:12
162:16,17
164:11 166:9
169:6 171:5
172:5 174:25
179:2 184:18

191:21 193:2
196:16 197:7
199:11
203:19
221:19
233:12
236:20 251:9
**surface**
148:25 156:1
**surprise**
76:7
**surprising**
150:9,15
157:8
**surround**
240:6
**swear**
4:10
**switch**
117:12 159:4
160:20 168:9
233:4
**Switching**
77:1
**sworn**
5:5,9
**symbol**
35:17
**systematic**
116:24
**systematicall
y**
90:11 95:12,
14 96:7

─────────

**T**

─────────

**take**
4:4 11:8
16:21 18:19
21:8,9 22:15
32:4 58:21,
22,23 60:21
63:6 64:20
65:11 66:14,
19 103:5
104:2 106:12

Matthew Cain, Ph.D.
March 15, 2024

107:3 109:9
110:25
121:20
144:5,24
146:17
150:17
162:11,13
179:5,20
198:24 201:3
227:8,12
233:14
252:19

**takeaway**
83:16 116:7
117:11
157:13

**taken**
52:19 66:25
122:12
179:13
197:22
226:18
252:23

**takes**
48:8 95:12
96:1 106:1,3
179:3

**taking**
56:18 178:6

**talk**
7:7,13 15:21
20:20 23:9
47:20 48:25
50:7 65:18
66:8 68:7
77:11 78:7,
18 80:13
85:11 91:10,
16 99:16
100:22
105:8,13,18
106:11,25
117:13 134:1
136:18 158:3
171:21
175:13,15
176:9 180:18
185:3,20

189:6 192:7
198:16 201:1
217:15
226:15
231:12 240:7
250:14

**talked**
62:25 67:11
80:25 88:21
94:15 97:23
98:5,9
105:9,10
109:12
111:11
114:12 119:5
124:23 155:8
184:19
186:11 230:3
242:12
243:5,13

**talking**
17:7 39:7
60:14 67:24
68:17 88:6
91:18 92:1,
4,10 101:6
104:4 105:23
107:6,24
109:2,16
110:5 111:18
153:8 176:8
182:14 189:3
196:18 202:8
206:2
216:24,25
233:6,11,13
242:13 244:3

**talks**
57:24 93:6
105:11,17
106:18 108:1
109:7 110:9
139:3 146:25
148:19
190:17

**target**
10:22 45:9,
10 46:16,20

52:23 64:10
123:15
126:15,25
197:11
215:1,24
234:1 235:3,
17,19 236:1
238:16 239:5
241:3 242:14
244:18,21
245:1 246:16

**targets**
170:19
204:14

**task**
14:10

**tasked**
220:8

**taught**
18:8 198:22
238:5 239:9

**teaching**
15:6

**team**
7:10 167:19

**technique**
249:24

**techniques**
168:6 177:8
248:14 250:9

**tell**
5:17,25 8:9,
22 25:4
27:11 28:7
59:12 66:13
77:10 78:13
81:9 85:15
103:17 123:6
141:11 161:1
168:11 171:3
179:4 183:13
206:21
207:17
212:23
223:21

**telling**
81:17

**ten**
66:19 172:15
230:16

**tend**
77:15 105:20
175:4

**term**
34:23 35:8,
21 78:14
79:14 115:1,
11,20 116:9
161:10 234:8

**terminate**
126:18

**terminated**
236:2

**termination**
234:2 245:2

**terms**
6:5 11:4
14:4 19:12
22:2 25:11
26:20 28:18,
21 29:4,6,13
31:4 34:9
42:1 43:18
45:17 46:12
47:23 48:21,
23 50:24
51:3 54:8
55:14 59:17
65:20 66:1
72:23 73:25
99:11,18
101:9 104:9
113:2,11
115:6 123:7
138:10
141:20
142:6,21
149:10,15
150:18
154:2,15
155:25 164:5
168:19
173:15
180:20
181:12

Matthew Cain, Ph.D.
March 15, 2024

**182:18,23**
183:4 186:16
195:22 199:3
203:5,8
224:7,11
236:3 241:6,
9 243:1

**test**
21:25 24:7
45:5 70:1
85:23 89:21
90:18 95:7,
17 98:21,23
104:20
108:10,16
109:22
114:18 115:4
119:22
120:2,3,6,18
121:4 123:2
165:4,8,16,
20 166:2,22,
23 167:20
168:24
171:19
173:24 174:5
187:3

**tested**
114:19

**testified**
5:9 20:1
25:5 26:25
28:13

**testify**
27:14 28:9,
10 31:6

**testifying**
28:11

**testimony**
6:9 25:12
26:21 28:22
29:5 30:1,3
33:2 67:7
155:5 179:3
206:10,14
211:5
223:21,23
225:8 228:2

**testing**
22:10 87:11,
18 88:9,15
104:19
109:20 110:1
116:22 123:3

**tests**
108:3 116:20
162:25
166:12,20,24
168:2,14
171:23
176:15,16,
18,20
177:11,22
178:4,6

**text**
223:9

**thank**
23:8 24:8,12
33:12 97:14
122:18
162:11
180:16
213:24
253:5,11

**theoretical**
98:16,18
239:7

**theory**
58:6 119:15
246:22
247:19

**thereof**
148:16

**thing**
5:1,23 7:5
17:15,20
25:8 28:7
47:17 48:13
50:23 61:3
67:6 68:17
82:3 102:3
110:11
113:21
153:12 178:7
182:11 185:6
186:7 204:22

**226:24 227:4**
229:3

**things**
9:23 12:6
14:10 18:10,
12 19:14,24
47:20 48:18
50:9 52:15
53:14 55:13,
15,20 57:11,
25 58:11
61:3 66:17
74:15 85:4
89:20 100:3,
6,12 109:6
116:2,4
119:14 121:2
142:7 149:16
161:23
181:15
183:11
198:13
203:17
209:10
221:15
238:25 240:5
244:2

**think**
7:15 9:18
10:7,20 11:4
12:7 13:3
14:3,12
16:16 17:14
18:6,18
19:20 20:13
22:1,25 27:6
28:3,24 29:9
30:15,20
35:24 36:6,
10 42:16
44:14,20
46:9 47:11,
15 48:8,19
49:25 50:23
51:9 52:1,9
53:3,20,22
54:2,8,22
56:8,22

**58:3,8,20**
60:14 61:2
64:13 65:16
67:10,18
68:3 72:9,22
74:5,12 75:2
77:12 78:6,
16,21 79:10
80:24 82:2,
3,4,14,25
83:12 87:1
88:8,20,23
90:23 91:1,5
92:1,9,21
93:18,23
94:2 95:24
96:24 97:16,
17 98:7,13,
18,19 99:15,
16 100:3,20
101:5 102:12
104:14
105:17,19
106:6 107:1,
19 109:2
110:3,6
111:7,11
114:2,8
115:22
116:1,16,18
117:14
120:18,21
123:1
124:11,12,15
128:16
130:25
134:11 135:5
136:7,15
137:4 138:5,
15 139:12
141:17,24
142:6,11,13
143:22
148:24
149:16
150:17
152:18 153:4
155:14
157:14,25

Matthew Cain, Ph.D.
March 15, 2024

159:5,11,13,
17 160:25
161:6,18
163:24
164:25
168:17
171:21
172:10,24
174:10
175:11,13,14
178:15,16,
22,23 179:25
180:1,7,10
181:19
182:11
184:23 185:2
186:3,7,24
187:21
188:2,8,23,
24 189:2,20,
24 190:23,25
192:8
195:11,13,21
197:3 199:3,
9 202:18
203:4,7
204:2,24
207:4 208:13
209:8 210:2
211:14
212:3,4,7,
15,16 213:17
216:16
217:2,21
218:12,17
219:6,9
220:14
221:4,10
224:8,18
226:4 227:8,
13 228:12
231:10
233:9,15,23
234:10
235:13
236:16
239:17
242:18,24
243:17

244:22,23
245:15
246:7,22
247:6,22
250:20 251:5
252:18
**thinking**
11:16 115:17
128:5
**third**
131:17
135:16
136:22
147:12 161:6
**thorough**
138:19
**thought**
179:24
**thousand**
27:16
**three**
94:11 95:13
103:5 104:2
106:3,9
161:4,23
163:1,7,11
164:3,9
172:9 182:7
192:5,9
193:6,10
199:12
201:15 213:6
218:7
236:16,17
**threshold**
51:1 162:6
165:21 166:3
168:18 173:7
180:6 181:7,
18 189:11,21
190:16
191:2,3,5,12
**thresholds**
188:10 195:8
**threw**
184:10
**throwing**
86:14

**ticker**
38:20 39:1,
7,13,18,24
40:2 43:4,23
46:4 71:19
73:3 76:21
77:1
**tickered**
42:12 76:22
77:4
**tickers**
35:23 36:4
39:10 42:15
200:13
**tickler**
72:6
**tied**
193:3
**tilt**
120:3
**time**
4:2,8 10:13
14:21 23:4
25:19 26:8,
22 27:12,20,
22 33:9
34:5,24
35:3,17
36:24 37:3
44:18,19,24
45:8,21
46:22,24
47:1,3,12,24
48:7 53:4,10
54:13 55:1,
10,13,18,20
57:6,11 59:6
60:6 61:12
62:8 63:6,8,
20,23 66:3,
9,24 67:4
72:12,21
76:8,23 77:4
84:21 96:7,
11,17 100:7
102:2 105:4,
8 109:9
117:19

121:12
122:11,16
134:4 136:14
137:12
138:14
146:17
149:13
151:11,19
153:6 154:10
156:17
159:25 160:4
167:6,7
168:1 177:9,
10 179:12,17
202:20
213:17
215:25
216:12
219:18
226:5,17,22
229:19,22
235:2 238:22
241:16 245:3
247:21,22
252:22
253:2,4,11,
16,19
**timely**
125:17
132:9,23
136:25
152:21
**times**
16:19 19:2,
4,8 20:23
26:4,15
27:19,21
30:8 40:19
42:24 48:22
56:24 93:23
94:10 103:25
104:2 112:8
143:3 181:3
190:9 197:20
203:2 220:7
243:14
247:12

Matthew Cain, Ph.D.
March 15, 2024

| | | | |
|---|---|---|---|
| **timing** | 228:21 | **trading's** | **trust** |
| 137:25 138:7 | 238:20 | 111:24 | 244:4 |
| **title** | **traded** | **traditional** | **truth** |
| 36:15 | 61:16 72:16, | 229:7 | 5:25 |
| **titles** | 19 73:17,19 | **transaction** | **try** |
| 137:14 | 76:23 77:5 | 18:4 45:11 | 5:16 25:9 |
| **today** | 79:14 80:18 | 47:19 52:25 | 32:25 33:14 |
| 4:14 6:6,9 | 88:25 152:2 | 64:1 123:16 | 93:13 115:23 |
| 7:8 73:24 | 181:25 | 126:16,22 | 151:18 |
| 93:2 94:7 | 182:24 | 128:3,20 | 178:23 |
| 107:17 120:9 | 183:1,24 | 129:11,19 | 187:10 |
| 133:4 151:12 | 184:7,9 | 130:13 | 191:15 200:9 |
| 153:2 156:23 | 186:9,21 | 131:10,11 | 201:11,13 |
| 228:11,22 | 205:14 | 234:3,5 | 242:9 |
| 233:6 243:6 | 230:12,15,19 | 237:13 | **trying** |
| **today's** | 240:2 | 238:17 | 24:9 50:11, |
| 6:15 8:10 | **trader** | 239:2,6 | 25 70:10 |
| 253:19 | 90:3 96:9 | 240:13 | 85:17 87:14 |
| **told** | **traders** | 241:1,4 | 89:7,9 114:6 |
| 239:19 | 47:21 238:20 | 242:14 243:9 | 167:24 |
| **tomorrow** | **trades** | **transactions** | 170:8,13 |
| 73:25 93:3,4 | 193:16 | 43:11 | 176:12 |
| 94:8 | **trading** | 238:13,14 | 196:17 209:9 |
| **tools** | 20:19 35:15, | **transcript** | 221:20 222:6 |
| 168:6 250:9 | 16 47:20,21 | 212:11 | 223:20 |
| 252:3 | 52:22 73:24 | 253:13,14 | 233:23 |
| **top** | 75:22 78:2 | **transferred** | 238:23 |
| 12:17 40:18, | 80:7,8 | 71:23 | 239:13 |
| 20 212:24 | 89:16,17 | **transition** | 240:15 |
| 213:1 | 90:5,14,23 | 72:24 | **Tuck** |
| **topic** | 91:15 99:25 | **transitioned** | 4:23 |
| 15:2 26:14 | 100:11 | 71:12,18 | **turn** |
| 64:22 68:19 | 112:13 | 73:14 | 136:5 250:25 |
| 121:22 | 116:12 117:2 | **treating** | **turnover** |
| **topics** | 119:12 162:1 | 101:3 | 162:1 182:1 |
| 5:18 16:2 | 165:1,15 | **treatise** | 188:17 190:3 |
| **total** | 166:2,14 | 65:7 | **twice** |
| 161:3 192:10 | 172:16 | **treatises** | 43:22 182:7 |
| **totality** | 174:17 | 56:15 62:4 | **two** |
| 135:7 | 180:1,3,19 | 227:6 230:23 | 10:21 23:13, |
| **tracked** | 181:13 | **tripped** | 14,21 26:20 |
| 30:25 | 183:7,15,20 | 183:13 | 30:8 35:22 |
| **trade** | 184:12,13 | **true** | 36:3 42:11, |
| 37:2 48:3 | 189:19 190:4 | 14:16 34:17 | 15,16 45:12, |
| 116:25 175:4 | 228:20 | 58:1 139:15 | 13 54:11,16 |
| 182:15 187:7 | 229:6,8,12, | 142:24 156:8 | 85:9 88:12 |
| 193:25 | 13,21 247:2 | 169:17 | 94:11 95:13 |
| | | | 96:1 101:9 |

Matthew Cain, Ph.D.
March 15, 2024

103:5 104:2
106:3,9
110:22
123:11,16,
22,24 128:6
129:21
131:11 134:6
135:6 139:19
142:7
147:20,22
148:25
149:16 155:9
162:25
165:24
167:15,17
168:7 174:9
177:2 180:23
181:16
197:24
209:10
215:4,7,21
217:13
219:20
221:15 235:6
238:2,22
**two-day**
94:9
**type**
17:25 24:3
86:4 91:3,17
103:1 114:17
187:21
222:21
229:18
**types**
14:7,10 16:2
23:15,24
26:7 28:23
29:7 46:24
47:3 48:18
55:12 56:13
72:10 169:14
181:12,14
195:20
197:14
204:25 218:2
219:9 222:16
223:5 238:25

241:16
**typical**
46:17
**typically**
20:15 43:7
45:12,23
46:15 48:1,2
52:10,11
84:3 110:16,
20 113:13
**typo**
82:5,10

———————

**U**

———————

**U.S.**
192:19
**Uh-huh**
93:21
**ultimate**
79:11 126:24
211:9
**ultimately**
23:18 65:19
71:22 85:16
87:9 88:16
93:18 103:7
107:6 139:18
144:11 172:2
191:5 202:13
221:21
224:12,24
231:3 248:15
**umbrella**
15:1,14
16:3,7
**unable**
125:17 132:9
133:4
**unambiguously**
113:10 115:7
**unaware**
168:25
**uncertainty**
18:2 52:19,
24 130:7
243:2

**unclear**
54:9
**uncommon**
111:6
**under-react**
90:11 95:15
**under-reacts**
96:8
**undergraduate**
11:24 238:5
**underlying**
40:1 183:12
**undermine**
204:21
**understand**
5:24 32:8
38:12 50:1,
25 79:10
85:7 89:8
107:22
118:14 133:1
135:12,22
136:2 162:17
163:24 169:7
172:11
189:16
191:21 193:2
199:11
223:23
**understanding**
38:23 40:13
41:3 43:4,
10,15,19,20,
23 44:3
85:14 104:10
107:22
108:23 109:1
152:8 155:6
164:5 169:14
191:20
213:10
218:16
246:18,23
**understood**
42:19 73:7
97:22 163:5
164:21
173:16

194:24 211:5
227:11
**unexpected**
85:18 87:6
88:1 93:24
111:15,16
112:4 113:12
115:18,21
117:18,21
118:17
124:20
125:12 126:7
127:4,20
131:21,24
132:15 133:5
134:5 149:4,
5,14,21
150:6 154:1
156:8,15,22
157:8,21
158:16,22
159:7 185:13
**unimportant**
21:1
**United**
29:19
**units**
39:2
**unusual**
149:21
**update**
62:18 128:2
168:1 197:19
237:19
**updated**
198:17
**updates**
46:14,21
53:9 66:2
123:15
204:12
238:22 239:1
241:12,15
243:25
**upgrade**
224:17

Matthew Cain, Ph.D.
March 15, 2024

**V**

**v.b**
  231:13
**v.c**
  227:3
**v.f**
  231:15
**vague**
  82:11
**Validea**
  199:13,19
  200:2,15
  206:5 213:16
  215:5,13
  216:2 219:17
  220:19,21
  224:16
**Validea's**
  219:22
**validity**
  65:25 108:19
  110:5 204:21
**valuable**
  53:14 56:1,2
  204:3 210:22
  218:6
  224:15,19,22
**valuation**
  15:18 21:5
  47:14 54:3
  57:5 86:6
  103:21
  119:9,15
  120:23 121:9
  198:10,18,23
  204:13
  210:21
  246:21
  248:14
  249:24
  251:25 252:3
**value**
  19:9 40:16,
  23 47:25
  48:4 52:18

53:6,23
54:7,9,12
61:21 62:20
65:20 77:24
78:25 79:6
85:21 86:22
113:11 118:2
120:13 125:4
199:7 201:8
210:17
249:19
**Valueengine**
  199:14
**values**
  57:9
**valuing**
  104:5
**Vanguard**
  229:10
**variety**
  15:2 18:14
  48:16 86:9
  93:5 126:1
  128:21
  229:14
**vast**
  29:11
**Vaxart**
  26:19
**verbatim**
  146:25
**verified**
  228:3
**version**
  145:20
**versus**
  28:20 72:6
  80:8 82:21
  91:7 99:9
  118:10
  120:13
  136:10
  149:13
  165:10 180:4
  219:22
  247:22

**video**
  4:3 253:17
**VIDEOGRAPHER**
  4:1 66:23
  67:3 122:10,
  15 179:11,16
  226:16,21
  252:21
  253:1,18
**view**
  19:17 44:15
  75:5 81:10
  99:3 101:21
  110:15
  124:16 175:3
  241:25
**viewed**
  23:16 24:3
  113:10
  224:19
**views**
  10:1 85:20
**Vince**
  55:9
**violation**
  32:11 109:18
**virtue**
  78:4
**visually**
  63:19
**volatile**
  63:25 64:9,
  11
**volatility**
  45:17,21
  46:15,17,21
  48:6 53:4,
  10,23 55:10,
  14 57:6
  61:10,11,18
  62:19 63:12,
  13,20 64:14
  65:18
**volume**
  20:20 36:17
  119:12 162:1
  165:1,16

166:2,14
180:1,19
181:13
183:15,20
184:12,13
189:19
**voluntarily**
  144:14 147:5
**vote**
  16:23,24
  17:2,4 18:1
  130:7 240:20
  241:7 244:6
**voting**
  40:5


**W**

**walk**
  178:24
**want**
  8:14 32:8
  33:13,14
  41:2 42:10
  50:16 64:21
  66:6 67:8
  68:10 74:17
  79:20 82:3
  85:10 107:16
  108:22
  112:19
  118:13
  121:19,23,25
  122:18
  124:7,19
  131:14
  138:19 143:4
  144:24
  145:24
  158:14
  160:20,21
  162:14,16
  169:6 172:2,
  5 179:2
  180:18
  195:19 198:3
  220:13 222:2
  226:11,25

Matthew Cain, Ph.D.
March 15, 2024

251:7,8
**wanted**
  5:4 24:18
  60:23 83:9
  85:7 187:15
  189:15
  191:17
  226:25
  245:16
**warrants**
  39:3,16
  43:18 75:20,
  23 79:19,24
  80:8 82:22,
  25
**waste**
  136:14
**way**
  9:6 11:20
  15:21 18:10
  20:6 22:12
  23:2,4 27:5
  29:22 38:16
  39:23 52:8
  54:8 58:15
  65:24 68:11
  69:6 74:7,9
  78:21 82:3,
  11 86:22
  90:8 91:8
  98:13,23
  100:17
  101:17
  103:10 105:7
  109:25 113:4
  114:3
  115:16,22
  116:19
  117:17
  119:1,5
  124:11
  133:24 134:3
  136:8
  151:11,21,25
  152:16
  154:1,7
  159:12 160:6
  162:12

164:1,13
170:1 172:21
178:7 182:6,
20 185:19
188:7
194:11,22
208:14
215:23 218:4
220:2,4
221:13 224:3
226:5 228:1
231:4 239:5
242:6 244:22
245:25
252:14
**ways**
  83:4 182:7
  219:14
  252:10
**week**
  6:18 26:9
  177:14 182:1
**weekly**
  165:15
  166:13
  177:14
  180:1,18
  182:18
  183:5,10,15,
  20 184:7,12,
  13 189:18
  190:4
**weigh**
  65:25 96:12,
  22 226:2
  230:17
**weighs**
  189:1
**well-
developed**
  205:14
**went**
  115:1,11
  167:19
  194:18,21
  197:17,18
**whispering**
  4:7

**wide**
  15:2 18:14
  229:13
**wider**
  207:12
**William**
  4:17
**window**
  48:18 61:14,
  20 67:25
  68:7 94:9
**witness**
  4:11,14 5:5,
  8 8:2,25
  9:5,17 10:12
  13:22 14:3
  17:13 19:1,
  19 20:12
  21:23 22:24
  24:25 27:2
  28:2 33:8,21
  34:8 36:2,8
  38:22 40:8
  41:13,24
  42:14 44:2,
  13 46:8
  47:10 49:15
  50:6 51:7
  52:3 53:19
  54:21 55:6
  56:7,21
  58:18 59:24
  61:1 62:11
  63:17 64:5
  65:14 69:3,
  18 70:23
  71:15 72:3
  73:21 74:24
  82:1 83:22
  86:1 87:8
  88:5 89:3,19
  92:8,20
  94:4,22
  95:6,23
  97:10 99:14
  101:11
  102:11
  103:14

104:18
105:15
107:12
109:11
110:19 111:4
113:8,18
114:1 115:3,
14 116:15
118:5 120:16
122:3 123:9
125:15
126:11
127:23
128:15
129:24
130:24
132:2,18
133:10 134:9
136:1 138:4
141:2,15
142:5
143:16,17
146:16,19
147:17 149:8
150:11
151:8,15
152:13,23
154:4 155:1,
13 156:12
157:1,24
158:15,19
159:10
163:14
164:24
167:23
168:16
169:12
170:6,18
173:20 176:3
177:4 178:21
185:15 186:1
187:20
188:22 192:1
193:19
194:13
196:15 197:2
199:24
200:7,20
201:17

Matthew Cain, Ph.D.
March 15, 2024

202:12 204:1
208:12 210:1
211:12 212:2
213:4 214:5
215:17
217:20 219:5
221:2 222:1
224:6
225:12,22
228:7 230:8,
10 231:2
236:15,23
237:11
240:24
242:2,23
244:11
245:11
246:11
250:18
253:21
**wondering**
81:14
**word**
47:4 48:12
57:20 59:10
65:11 68:16
74:12 77:8
81:21 133:1
157:12
171:17
182:10
184:10,24
235:14
237:16
**worded**
175:12
**wording**
73:15
**words**
49:3 57:20
68:10
140:18,24
176:7 184:20
**work**
9:3,12 11:9
13:3,9,10,
12,25 14:4,
7,11 16:11

22:2 27:3,23
31:5,24
81:4,5 95:20
177:20
178:12,13
199:1
**worked**
14:11 29:2
128:25
235:25 242:5
244:12
**working**
10:8 15:8
43:10 137:18
238:13
**works**
166:9
**world**
89:10
**worth**
45:2 199:3
246:20
250:21
**write**
33:18 162:19
**writing**
211:8
**written**
16:12 140:22
205:9
**wrong**
18:10,13
158:5 168:11
170:4 171:3
179:1 187:9
220:18
**wrote**
11:11 169:18
170:3

_____

**Y**
_____

**yeah**
25:3 29:13
35:9 42:23
47:23 58:3
60:13,25

63:18 66:22
78:16 85:7
87:1 89:7,20
92:1 102:19,
23 103:7,23
109:10 112:8
114:2,6
119:4 121:17
137:4 142:19
153:4 156:13
157:15
165:19
171:12 174:9
179:6 207:4
220:14
223:11 231:7
234:23
238:18
245:15
250:23
**year**
148:14,22
153:16
**years**
16:9 18:9
167:12,15,17
168:8 177:2
212:22
219:20
228:15
232:24 238:1
239:11
**yes-or-no**
154:16
222:21
**yesterday**
6:17
**York**
37:5 71:19
172:19
186:9,21
187:1 188:12
230:13,19
241:20 244:5

_____

**Z**
_____

**Z-O-H-A-I-B**
8:20
**Zacherl**
4:15,16
5:11,13 7:21
8:3 12:9,11
13:23 25:2
26:2 27:5,9
39:21 41:21
60:21,25
64:24 66:13
67:5 97:13,
15 101:12
109:10
121:14,19
122:4,7,17
140:17
143:6,11,17,
20 144:1,22
145:3,7,12,
17,20,23
146:1,6,8,
17,20 150:1
154:23
158:13 161:9
164:7 169:22
179:4,7,18
202:6 208:5
209:15,22
212:23
213:15,22,25
214:6 216:7
226:9,11,14,
23 230:6
236:19,24
251:16
252:19
253:3,4,12
**zero**
40:19 192:18
194:18,21
**Zohaib**
8:20
**zoom**
5:3 18:19

Matthew Cain, Ph.D.
March 15, 2024