**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| JED LEMEN, Individually and on Behalf of All Others Similarly Situated, | Case No.: 3:21-CV-1254-TJC-PDB |
| Plaintiffs, | <u>CLASS ACTION</u> |
| v. | **DEFENDANTS' DAUBERT MOTION TO EXCLUDE THE EXPERT OPINIONS OF MATTHEW D. CAIN** |
| REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ, | |
| Defendants. | |

REDWIRE CORPORATION ("Redwire"), PETER CANNITO, and WILLIAM READ ("Defendants") move to exclude the report, opinions, and testimony of Matthew D. Cain, Ph.D. ("Dr. Cain"), that Lead Plaintiff Jared Thompson ("LP") offers in support of his *Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel* (Doc. 85) ("Certification Motion"). In conducting his rushed analysis, Dr. Cain not only (admittedly) strays from accepted scientific standards, but conducts inquiry on matters with no nexus to relevant issues, resulting in an unreliable analysis that is unhelpful to the Court's consideration of the Certification Motion. The Court should, through its gatekeeping function under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), exclude Dr. Cain's opinions.

1

## BACKGROUND

LP brought this action under §§10(b) and 20(a) of the Securities Exchange Act of 1934, alleging that Defendants made certain false statements, artificially inflating the price of publicly traded securities.  (Doc. 47) (Compl.). LP now seeks class certification.  (Doc. 85).

Redwire is the result of a September 2, 2021 merger[1] between a private entity and the public, special purpose acquisition company, Genesis Park Acquisition Corp. ("GPAC'). GPAC's common stock traded as GNPK.  *Expert Report of Andrew H. Roper* (Doc. 129-5) ("Roper Report") (**Exhibit 1)**, ¶¶ 31, 33.  GNPK was supported by a redemption right that allowed shareholders to redeem individual shares for $10.15 at the time of a merger ("Redemption Right").  *Id*., ¶¶ 31-33, 35.  Post-merger, Redwire common stock traded as RDW.  *Id*., ¶¶ 34-35.  RDW had no redemption right.  *Id.* ¶ 35.  LP's proposed class period spans both the SPAC and de-SPAC periods, (Doc. 85., p. 3), such that the securities in question include both GNPK and RDW, along with options and warrants of both.  Compl. ¶¶ 40, 44 (together, "Class Securities").

LP asserts that class treatment is appropriate because the reliance element of his claim is provable on a class-wide basis as the Class Securities traded in an *efficient market*.  (Doc. 85, pp. 14-23).  LP argues that such efficiency entitles him to the presumption under *Basic Inc. v. Levinson*, 485

---

[1] The time prior to the merger, the "SPAC Period;" after the merger, the "de-SPAC Period".

U.S. 224 (1988),[2] that all class members relied on the alleged misstatements without consideration of individual evidence. *Id.* LP offers Dr. Cain's report (Doc. 86-1) ("Cain Report") (**Exhibit 2**) to demonstrate such efficiency which considers factors in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)[3], as well as factors[4] in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001), and other "additional" factors.[5] Cain Report, pp. 14-41.

Dr. Cain's market efficiency analysis is both unreliable (prepared for litigation, fails to comply with generally accepted practices, and is incapable of replication) and unhelpful (significant portions of his work are not relevant to the issues here). Dr. Cain's opinions fail under *Daubert*.

## LEGAL STANDARD

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education,

---

[2] In *Basic*, the Supreme Court determined that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations" may be presumed for purposes of Rule 10b–5. 485 U.S. at 247.

[3] The *Cammer* factors are: "(1) high average trading volume during the class period; (2) a significant number of analysts following the stock; (3) numerous market makers who react quickly to, and trade based upon, new information about the company; (4) entitlement to file a Securities and Exchange Commission (SEC) Form S–3, which has minimum stock and trading requirements; and (5) empirical facts showing a cause and effect relationship between unexpected corporate events and an immediate response in the stock price." *Thorpe v. Walter Inv. Mgmt., Corp.,* No. 1:14-CV-20880-UU, 2016 WL 4006661, *12 (S.D. Fla. Mar. 16, 2016).

[4] *Krogman* factors are "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the "float")." 202 F.R.D. at 474.

[5] Dr. Cain's "additional factors" are: (1) institutional ownership; (2) autocorrelation; and (3) active options trading. Cain Report, pp. 37-43.

3

may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702.

Courts act as "'gatekeepers' to ensure that speculative, unreliable expert

testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298

F.3d 1253, 1257 (11th Cir. 2002). Under *Daubert*, the Court "must determine

whether the evidence is genuinely scientific, as distinct from being unscientific

speculation offered by a genuine scientist." *Chapman v. Procter & Gamble

Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) (quotation omitted). Expert

testimony is admissible only if (1) the expert is qualified; (2) his methodology

is reliable; and (3) his testimony is helpful to the trier of fact. *Chapman*, 766

F.3d at 1304. Such rulings require the court to "conduct an exacting analysis"

of the "expert's" methodology. *McCorvey*, 298 F.3d at 1257.

**ARGUMENT**

Dr. Cain's opinions are unreliable and unhelpful to the pending class

certification determination.

**I.    THIS *DAUBERT* MOTION MUST PRECEDE CERTIFICATION**

As a threshold issue, the Court must rule on this *Daubert* challenge prior

to, or contemporaneously with, the Certification Motion as Dr. Cain's expert

testimony is critical to LP's request for class certification. *See Sher v. Raytheon

Co.*, 419 F. App'x 887, 890 (11th Cir. 2011) (District Court erred by not

conducting *Daubert* analysis prior to ruling on class certification). Here, a core

question of the Certification Motion is whether the Class Securities traded in

4

an efficient market. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*"). To succeed, LP must demonstrate such efficiency. *Id.* LP offers Dr. Cain's analysis as the primary support for certification (Doc. 85, pp. 16-23), necessitating consideration of this *Daubert* challenge before ruling on the Certification Motion.

## II. DR. CAIN'S OPINIONS ARE UNRELIABLE

The Court should exclude Dr. Cain's opinions as unreliable.

As gatekeeper, the Court "must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid" and if that methodology can be applied to the facts at issue. *Chapman*, 766 F.3d at 1306. Under Rule 702, in assessing reliability, *Daubert* considers non-exclusive factors, i.e., whether (1) the theory or technique can be tested; (2) it has been subjected to peer review; (3) it has a high known or potential rate of error; and (4) the theory has attained general acceptance in the scientific community. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999). Here, Dr. Cain's methodology suffers from two flaws: (1) he develops his opinions for purposes of testimony and not out of independent scientific research; and (2) his analysis of central *Cammer* factors fails to follow generally accepted principles in his field and is incapable of replication. Such flaws introduce bias into his process and leads him to incorrect conclusions.

### A.    Dr. Cain Created His Opinions for Litigation Purposes Only

Dr. Cain **admits** that his conclusions were derived from methods developed in a litigation context. This "significant fact"; *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"); weighs "heavily against" admission of his testimony; *see Sumner v. Biomet, Inc.*, 434 F. App'x 834, 843 (11th Cir. 2011); and explains his failure to conduct an appropriate analysis.

*Daubert*'s reliability determination includes consideration of "[w]hether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, **or whether they have developed their opinions expressly for purposes of testifying**.'" Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amends.) (citing *Daubert II*, 43 F.3d at 1317) (emphasis added).  Under *Daubert*, this is a "very significant fact to be considered."  43 F.3d at 1317.  Where an expert develops opinions for litigation, rather than academic purposes, the Court should weigh such fact against its admission.  *Payne v. C.R. Bard, Inc.*, No. 6:11-CV-1582-ORL-37, 2014 WL 988754, at *7-8 (M.D. Fla. Mar. 13, 2014), *aff'd*, 606 F. App'x 940 (11th Cir. 2015).  Dr. Cain concedes that his opinions grow from the context of testifying in this litigation:

> So, again, I think there is a difference between the question of market efficiency within the legal context here versus the way that academics study market efficiency.

Cain Tr. at 91:5-8; *see also id.* at 91:9-19.  Dr. Cain also stated:

> Like I said earlier, I think that when academics talk about efficiency they're often evaluating a much higher bar than what we're looking at in terms of informational efficiency within the market efficiency report from a legal standpoint.

*Id.*, 99:15-22.

Dr. Cain's conclusions arise "from a legal standpoint," and not from the higher bar of research conducted independent of this litigation.  *See id.*  This denies the Court the ability to rely on markers of reliability found where experts conduct research outside the courtroom.  *See Daubert II*, 43 F.3d at 1317 (independent research is subject to various forms of exterior scrutiny that increases reliability).  Thus, the Court should weigh the context of his opinions "heavily against" admission.  *See Sumner*, 434 F. App'x at 843; *see also Salinero v. Johnson & Johnson*, No. 1:18-CV-23643-UU, 2019 WL 7753441, at *4 (S.D. Fla. Oct. 28, 2019) (excluding opinion not from "independent research but rather rel[ied] on work done as [a]…witness and litigation services provider").

Here, that Dr. Cain's opinions emerge from litigation rather than independent research explains the discrepancies between his analyses and widely accepted principles.  *See, infra.*  The Court should exclude his hastily-crafted[6] "opinions" created for litigation purposes as unreliable under *Daubert*.

---

[6] Dr. Cain spent at most 22 hours on this case—including his 88-page report.  Cain Tr. 30:14-31:3 (charges $950/hour; paid between $15,000 and $20,000 with no outstanding bills).

7

**B.** **Analysis Departs from Generally Accepted Principles**

Dr. Cain's opinions as to the second and fifth *Cammer* factors are unreliable as he fails to adhere to generally accepted principles. Instead, Dr. Cain follows his own subjective methods that are incapable of replication.

### *1.    Dr. Cain's Event Study is Methodologically Flawed*

Dr. Cain's event study, purportedly assessing the fifth *Cammer* factor, does not follow accepted methods. Specifically, he fails to (i) properly select events for study; (ii) develop a hypothesis of market movement following such events; or (iii) conduct a proper regression model to measure the "effect" of such events. His methods are, thus, outside the scientific community and preclude replication of his analysis. Moreover, such flaws result in identifiable errors in Dr. Cain's conclusions. His event study is unreliable under *Daubert*.

a.    Dr. Cain Does Not Properly Select Events for Study

Dr. Cain's event study is flawed because he does not select events for study—called "News Days" in the Cain Report—in a manner that is consistent with generally accepted practices and in a manner that others can replicate.

A    reliable    event    study    analyzes    "public    information disclosure[s]…containing an identifiable piece of unexpected new information that the researcher believes will cause investors to change their expectations about the value of a firm or its stock price." Roper Report, ¶ 140. Selecting events has two parts: (1) "identifying and isolating the new unexpected

8

information being studied"; and (2) "objectively defining the set of events to be studied." *Id.*, ¶ 140.  Dr. Cain's event study fails both steps.

i.    *Dr. Cain Does Not Identify New Information*

Dr. Cain did not review and appropriately select News Days containing *new* and *unexpected* information.

Event studies show a "cause and effect relationship between <u>unexpected</u> corporate events and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1286-87 (emphasis added).  A reliable event study thus presumes that only new and unexpected information is being studied:

> When significant <u>new</u> information about the company…is disclosed to the market, the market model is used to determine the component of the stock return that would be expected based on the return of the overall market and industry. The remaining component of the stock return (that which cannot be explained by the return on the market and industry) is attributed to the <u>new</u> company-specific information or to chance. If the disclosure of the <u>new</u> information is accompanied by a stock return that is outside of the stock's normal volatility range (as measured by the market model), then the return is said to be 'statistically significant.'

*Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 721 n. 18 (11th Cir. 2012) (citing Frank Torchio, *Proper Event Study Analysis in Securities Litigation*, 35 J. Corp. L. 159, 160–61 (2009)).

The entire purpose of an event study is to measure the market's reaction to <u>new</u> and <u>unexpected</u> information.  *Id.*; *see also United States v. Schiff*, 538 F. Supp. 2d 818 (D.N.J. 2008), *aff'd*, 602 F.3d 152 (3d Cir. 2010) ("An event

9

study methodology can only measure the impact of new and unexpected information on stock prices." (citation omitted)).  Dr. Cain admits this, testifying: "What is ultimately the goal and what I'm looking for is just evidence from a statistical testing standpoint of whether the stock price reacts to disclosures of <u>new</u> information." Cain Tr. at 87:9-13 (emphasis added).

It follows that a reliable event study requires identification of the new and unexpected information being studied. Academic literature, including that cited by Dr. Cain, agrees. Roper Report, ¶¶ 104-121. Ensuring events contain new and unexpected information is crucial as "significant stock price reactions are not expected in an efficient market when [events] merely confirm" prior market expectations. Torchio, *Proper Event Study Analysis*, *supra* at 164.

Dr. Cain fails at this fundamental step. He admits that he does not determine whether his News Days contain new, unexpected information:

> A: … Like I said, I have not done [an] analysis to determine whether there was new unexpected information provided to investors through these disclosures at this point in time.

Cain Tr. at 156:13-17; *see also id.*, 86:2-25; 150:21-151:19; 154:5-10; 155:20-23 ("So, first, I have not formed any opinions on what was new information for investors because I have not evaluated the information environment."); 157:5-9.  His failure to ensure that his News Days contain new, unexpected information deviates from the generally accepted principles and prevents his "study" from measuring the market's reaction to new, unexpected information.

10

This results in the very error such principles seek to avoid: review of "stale" information.[7] Several of Dr. Cain's selected News Days do not contain new and/or unexpected information, but are included in his study.  Roper Report, ¶¶ 176, 178-79; p. 83, Figure 10; Ex. 3.  Dr. Cain is blind to these errors as he did not review for new and unexpected information.

Dr. Cain's failure to examine News Days for new and unexpected information is fatal. Indeed, "[t]he failure of an economist to have engaged in an event study … **without any consideration as to whether the events being studied contain new information** versus events that merely repeat prior disclosures **is a serious methodological error in event study analyses and should fail under Daubert**."  Torchio[8], *Proper Event Study Analysis*, *supra* at 167 (emphases added); *see also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC,* 752 F.3d 82, 94-95 (1st Cir. 2014) (exclusion where "several of the relevant events" in the event study were based on previously disclosed information, not new information).

Dr. Cain's event study is unreliable as his failure to identify the new and unexpected information contradicts generally accepted practices.

### ii.    Dr. Cain Subjectively Selects Events

The Cain Report is also unreliable as Dr. Cain fails to define objective

---

[7] "[A] predicate of an event study is that the information being studied is new…"  Torchio, *Proper Event Study Analysis*, *supra* at 164.

[8] In his Report, Dr. Cain relies on a paper co-authored by Torchio.  Cain Report, p. 16 n. 40.

criteria for selecting events to study.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009) ("It should be obvious…that the events for study should be selected using criteria that are as objective as possible."); *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 412 (E.D. Va. 2015) ("[A]n expert report relying on a study containing cherry-picked event dates is far less persuasive than one in which objective criteria were used."). Instead, he subjectively chooses News Days without any defined protocol rendering his methods inconsistent with proper methods, incapable of replication, and poisoned by his biased selection.

Dr. Cain selects News Days from categories he himself created. He looked at (1) "key" communications regarding the GPAC/Redwire merger, (2) "key" communications regarding the delay of SEC filings; and (3) quarterly earnings announcements.  Cain Report, ¶ 76.  He fails, however, to document how he selects dates within such categories. Specifically, he does not identify an objective basis to define what are "key" communications.

Not only is the Cain Report silent as to what constitutes "key" communications; *see, e.g.,* Cain Report, ¶ 76; but, his testimony confirms that there are no guardrails. Rather, determination of what is a "key" event for study is whatever personally strikes him as interesting.  Cain Tr. at 237:16-239:17 (selection based on his unique—and undefined—personal experience). He stated, "if, in my review of the information environment, something else

12

jumped out at me that did not, you – that is not included in what I described, I would certainly consider it." *Id.*, 235:11-23.  Accordingly, Dr. Cain fails to "implement any objective protocol to define the set of events to be studied." Roper Report, ¶ 144.  Such lack of objective criteria defies generally accepted practices and warrants exclusion. *Brown v. China Integrated Energy Inc.*, No. CV1102559BROPLAX, 2014 WL 12576643, at \*7-8 (C.D. Cal. Aug. 4, 2014) (Excluding study where there were no objective criteria for event selection).

Moreover, Dr. Cain's arbitrary selection of events within his categories precludes replication of his study. "Reproducibility is one of the hallmarks of reliable scientific testing and is pertinent to an analysis under *Daubert.*" *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075, 1130 (S.D. Fla. 2022).  For example, the court in *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, excluded an expert under *Daubert*, finding that, in addition to "depart[ing] from generally accepted scientific standards," the expert's methodology "was not reproducible because he failed to document and disclose the procedures he used to conduct his tests."  282 F.R.D. 655, 667 (M.D. Fla. 2012), *aff'd*, 725 F.3d 1377 (Fed. Cir. 2013); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 747-48 (3d Cir. 2000) (expert's method was "subjective and unreproducible" because "without an inkling as to the standards controlling [the expert's] method—i.e., how he excludes for other variables…an expert trying to reproduce [the expert's] methods would be lost.").

13

Here, Dr. Cain only broadly points to his experience (or anything that "jumps out at him") as his "method," but does not document and disclose any actual procedure for selecting "key" communications. Thus, another researcher would be "without an inkling as to the standards controlling" his selection of events making his study incapable of replication. By example, Dr. Cain chooses a *Business Wire* article announcing the delay of certain filings as one of his studied events. Cain Report, Ex. 6a (Event No. 5). This reveals that Dr. Cain is using press release coverage to identify delay. Roper Report, ¶ 153. Yet, he does not consider other press releases alerting investors to potential delays; *id.*; and never provides a reason "for why his chosen press release related to the filing delay is more 'key' than Redwire's other press releases relating to the delay." *Id.* Only Dr. Cain knows why this particular article was studied over others. Such ambiguity prohibits admission under *Daubert*.

b.     Failure to Employ Economically Relevant Hypothesis

Dr. Cain failed to identify an economically relevant hypothesis to assess market efficiency in regard to his ill-selected News Days, precluding him from assessing market efficiency consistent with economic principles.

Following identification of new or unexpected information—which Dr. Cain did not do, *supra* § II(B)(1)(a)(i)—a proper event study requires specificity as to "whether the unexpected new information is expected to cause prices to increase, decrease, or stay the same." Roper Report, ¶ 123. Such hypotheses

14

allow the researcher to "know whether a stock price change that goes up is consistent with market efficiency," as inconsistent price movement indicates inefficiency. *Id.*, ¶ 131. Academic scholars, such as MacKinlay (1997) and Barber (1994), both relied on by Dr. Cain, explain that a researcher should "define a testable hypothesis about the direction of the stock price reaction given the identification of the unexpected component of the earnings announcement." *Id.*, ¶ 125-29. Thus, a researcher measures not just that the market reacts to news, *but that it reacts in a way that is expected, making it efficient. Id.* This is important because if the market reacts to the news, but in a way that is not expected, this indicates market *inefficiency. Id.*, ¶ 129.

Dr. Cain conceded he did not create a hypothesis as to the direction of the market after the selected dates. Cain Tr. at 114:24-115:15. Without this hypothesis, Dr. Cain is only testing *volatility* which tests only whether Class Securities changed price on the days he selected, rather than answering the relevant question of whether the change was efficient. Roper Report, ¶¶ 21-22. He merely records when a stock price changed, and then concludes that the market was efficient, regardless of whether that change is consistent with market efficiency or not. *Id.*, ¶¶ 157-58. Missing is consideration of whether any observed price changes were supportive of efficiency.

Dr. Cain's failure to develop such a hypothesis denies him the ability to "discriminate between stock price changes in efficient and inefficient markets.

15

*Id.*, ¶ 129; *see also In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 179 (S.D.N.Y. 2012) (Error where expert conducting event study "failed to recognize the relationship between the direction of the price movement and the relevant news," causing him to "improperly [] classify" dates as "abnormal".).

Failure to state a hypothesis as to the expected movement of stock prices following the News Days renders the event study unreliable.

> ### c.     Dr. Cain Employs an Unreliable Regression Model

In addition to failing to appropriately identify the "cause" through well-defined events, Dr. Cain cannot reliably measure the "effect" of such improperly selected events.  Roper Report, ¶ 132.  Dr. Cain fails to conduct a proper regression model in accordance with generally accepted principles.

Researchers rely on a regression model to "filter changes in stock prices." *Id.*, ¶ 133.  This tool creates a "yardstick to measure the typical day to day volatility in stock price changes in order to objectively define a benchmark to assess when these abnormal stock price changes are large relative to what usually happens." *Id.*, ¶ 134.  However, Dr. Cain uses the wrong benchmarks.

Dr. Cain estimates his regression on a "'rolling' basis, whereby each day's estimates are predicted using data from the previous 120 trading days." *Id.*, ¶ 162.  His use of the rolling approach considers data from the SPAC Period even when assessing movements in the de-SPAC period. *Id.*  Thus, "he uses GNPK

stock price data from the SPAC Period to predict how RDW stock prices would be expected to change." *Id.* The Cain Report fails to appreciate, however, that the two securities are fundamentally different[9], rendering the use of GNPK data to predict RDW stock price movement scientifically unreliable.

Here, "GNPK stock price behaved differently than RDW…." *Id.*, ¶ 167. Dr. Cain's rolling regression model does not control for such differences. *Id.*, ¶¶ 162, 166-67. This causes Dr. Cain to overestimate the significance of reaction to certain events. Thus, the regression model provides unreliable analysis.

### d.    Material Consequences of Dr. Cain's Failures

Dr. Cain's departure from accepted practices leads to the introduction of bias and erroneous conclusions of efficiency.

First, Dr. Cain's failure to comply with generally accepted practices in a manner capable of replication permits him to cherry-pick dates for study in a biased manner. Indeed, he appears to be conducting the event study in reverse: selecting dates for study (without an objective protocol) that he knows are coupled with stock price movement and then claiming that such movement is a sign of efficiency. By example, three of the twelve selected dates for study

---

[9] Dr. Cain admitted that there are key differences between the two securities, including the fact that GNPK had a redemption right, acknowledging that this represents a "fundamental change" in the security and attendant volatility. Cain Tr. at 43:3-11, 47:4-48:10, 63:9-64:15. However, Dr. Cain also opined that the securities are economically equivalent when they are not. Roper Report, ¶ 160. The change from GNPK to RDW represents a "structural break;" *id.*, ¶¶ 135, 167; meaning that "[t]he relationship between the stock price and the market—which is used to calibrate the 'yardstick' described above—…change[s] over time." *Id.*, ¶ 135. The change did not "occur gradually over time," but at merger closing. *Id.*, ¶ 38.

are—coincidentally—the alleged corrective disclosures identified in the Compl. Cain Report, Ex. 6a (Event Nos. 5-6, 8). The Compl., which Dr. Cain read, highlights price movement after these dates. Compl. ¶¶ 106-108. Dr. Cain does not justify their selection of through an objective protocol[10]. See, *supra* § II(B)(1)(a)(ii). His eventual conclusion that these dates are signs of efficiency; Cain Report, ¶¶80-81[11]; is thus not the product of an objective selection process, but rather the product of his subjective choice to include the days.

Such backwards analysis warrants exclusion. In *Brown*, the court concluded that the expert did "not use objective criteria to determine what kind of information should be included as an event in his study." 2014 WL 12576643 at *8. Rather, that expert "looks to see how the market reacted to it—whether the share price jumped or dropped after the information was released." *Id.* This "compromised[d] the reliability of [the expert's] methodology and conclusion." *Id.* The Court should find the same here.

---

[10] Indeed, inclusion of notices of filing delays (Event Nos. 5,6) here is anomalous to his event selection in other SPAC litigation where delays also occurred but that Dr. Cain did not consider. *Compare Theodore v. Purecycle Techs., Inc., No. 6:21-CV-809-PGB-GJK (M.D. Fla.)*, Doc. 163-1, ¶¶ 7, 47-48 (Dr. Cain's expert report), *with* **Exhibit 3** (Delay notice related to same entity); compare *In re Romeo Power Inc. Sec. Litig.*, No. 1:21-cv-03362-LGS (S.D.N.Y.), Doc. No. 149-1 ¶¶ 45-46) (Dr. Cain's expert report), *with id.*, Doc. 135, ¶¶ 1, 96 (Second Am. Compl. referencing the existence of delay notice). Such inconsistency with his prior analyses suggests that he chose such delays here merely to ensure his studied News Days had notable price movement.

[11] Dr. Cain notes that eight of his studied days "were associated with same-day stock price movements that were statistically significant at the 95% level or better." Cain Report, ¶ 81. Review of Exhibit 6b to the Cain Report shows eight days with a "t-Statistic" greater than 2 or less than negative 2. This permits identification of the specific events (inclusive of Event Nos. 5-6, 8) referenced by Dr. Cain.

Second, failure to follow proper practices prevents Dr. Cain from correctly classifying price movement. As an example, he incorrectly concludes that price reaction after the shareholder vote approving the merger; Cain Report, Ex. 6a (Event No. 3); shows efficiency. Cain Report, Ex. 6b. He did not, however, determine if this was new and unexpected; *see supra* § II(B)(1)(a)(1); or form a hypothesis as to whether the price should go up, down, or stay the same. *See, supra* § II(B)(1)(b). He simply views a price response as efficiency. *See* Cain Report, Ex. 6b. In reality, the vote was *not* new and unexpected. Roper Report, Ex. 3, ¶¶ 220-229. Had he considered this, he should have developed a hypothesis of no price movement. *See* Roper Report, ¶ 182, Figure 10. This would have led him to observe the subsequent stock price movement (as opposed to staying flat) as a sign of inefficiency. *Id.*, ¶¶ 182, Figure 10, 229. Similarly, he classifies stock price movement as to Event Nos. 4 and 7 as signs of efficiency when a correctly calibrated test would have shown the movement as *inefficient*. *Id.*, ¶¶ 182, Figure 10, 230-237, 251-257.

At best, the Cain Report tests for "share price reactivity, rather than an efficient adjustment of prices to new information…." *Id.*, ¶ 172. This prevents Dr. Cain from distinguishing between price movements reflective of efficiency and those that show inefficiency. *Id.* Under Dr. Cain's study, any price movement is a sign of efficiency. *Id.*, ¶ 170. This is a "volatility detector", not a proper analysis indicative of market efficiency. *Id.*, ¶ 173.

19

Third, correcting for Dr. Cain's improper rolling regression model and instead treating the SPAC and de-SPAC period separate, shows that Dr. Cain's Event No. 6 (November 15, 2021) does not actually have statistically significant price movement when Dr. Cain claimed it did. *Id.*, ¶¶ 163-66.

Ultimately, correcting for Dr. Cain's errors as best as possible reveals that his improper methodology blinds him to signs of inefficiency. *Id.*, ¶ 181. While Dr. Cain concludes that six of the seven events occurring within the Class Period (Event Nos. 1-7) show efficiency, in reality, only two show efficiency (Event Nos. 5-6). *Id.* Moreover, proper methods demonstrate that multiple of his selected events are actually indicative of *inefficiency. Id.* While these revised conclusions remain tainted by Dr. Cain's improper selection criteria, they reveal the consequence of his mistaken methods.

Accordingly, Dr. Cain's failures lead to incorrect substantive conclusions.

### 2. *Analyst Coverage Analysis Ignores Proper Standards*

Dr. Cain's analysis of the second *Cammer* factor—analyst coverage—also deviates from generally accepted principles. Dr. Cain thus falsely presents the Court with supposed proof that the market is digesting new information.

The Cain Report references three academic sources[12] that set out parameters for identifying analysts. Cain Report, ¶¶ 42, 45, 46. Each only

---

[12] A study by Simona Mola, P. Raghavendra Rau and Ajay Khoran (the "MRK Study"); a paper by Charles M.C. Lee and Eric So (the "Lee So Study"); and a study by Bharat Bhole, Sumita Surana, and Frank Torchio (the "Bhole Study").

count an analyst as covering a company if the analyst makes earnings forecast. Roper Report, ¶¶ 89-90.  However, contrary to such requirement, two of the three analysts studied by Dr. Cain (Validea and ValuEngine) never issued earnings forecast during the Class Period.  Roper Report, ¶ 91.

Moreover, Dr. Cain did not review selected reports for unexpected new information.  Cain Tr. at 202:13-17; 212:20-21.  He did; however, agree that coverage can be indicative of efficiency as it transmits *new* and *unexpected* information to the market.  Cain Report, ¶ 43 ("[C]overage can be indicative of market efficiency since research analysts ensure that <u>new</u>…information is disseminated to investors and thus impounded into stock prices quickly and efficiently.") (emphasis added).  This prevents him from knowing whether the reports perform the function he says is important.[13]  Roper Report, ¶ 92.

Dr. Cain's assessment of analyst coverage departs from generally accepted principles which results in him falsely suggesting that new information is fed into the market. While Dr. Cain correctly suggests that analyst coverage is indicative of market efficiency; Cain Report, ¶ 43; he improperly concludes that there are sufficient analysts performing this function here. Thus, again, Dr. Cain's failures lead to a false claim of efficiency.

## III.   DR. CAIN'S OPINIONS ARE UNHELPFUL TO THE COURT

Dr. Cain's opinions as to certain factors do not inform the question of

---

[13] One report lacked any Redwire information, let alone new information. Roper Report, ¶ 93.

market efficiency. LP must show, by a preponderance of the evidence, that the opinion is relevant and "logically advances a material aspect' of its case." *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009). Opinions without "'valid scientific connection to the pertinent inquiry'" are excludable. *Id.* (citing *Daubert*, 509 U.S. at 587). Dr. Cain's review of certain *Cammer* and other factors does not assist the Court.

*__Cammer__* **Factor 3**: Dr. Cain's assessment of *Cammer* factor 3 (market makers) omits information necessary to render his analysis meaningful. "**[T]he mere number of market makers, without further analysis**, has little to do with market efficiency." *In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 671 (N.D. Ga. 2009) (emphasis added). To be helpful, an expert should "provide…additional information, such as (1) the volume of shares these market makers committed to trade; (2) the volume of shares they actually traded; or (3) the prices of these traded shares." *Id.* In *Netbank*, the Court concluded that "[b]ecause the number of market makers alone is of limited usefulness in determining market efficiency, the court finds that this factor is of **little help to the inquiry**…" *Id.* (emphasis added).

Dr. Cain's analysis lacks such necessary information. *See* Cain Report, ¶¶ 50-52, 54. He simply states the number of market makers present[14]; *id.*, ¶

---

[14] No economic threshold to compare his tally of makers cited. Cain Report, ¶¶ 50-52, 54.

54; rendering his market maker opinion unhelpful; *In re Netbank*, 259 F.R.D. at 671; and excludable. *Boca Raton*, 582 F.3d at 1232.

**Irrelevant *Cammer* Factor 5 Analysis**: Dr. Cain's analysis as to the fifth *Cammer* factor is not only *unreliable*; *see supra* § II(B)(1); but is also unhelpful as it does not inform the Court of efficiency during the Class Period. ***Five***[15] of Dr. Cain's twelve studied News Days *post-date* the Class Period. Cain Report, Ex. 6a. Indeed, the last is ***a full year after the Class Period***. *Id.* The relevant question is whether purchasers *during* the Class Period can be said to have relied on the alleged misstatements by operation of an efficient market alone. *See In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 297 (S.D.N.Y. 2008). Post-class analysis does not answer this question.

Market efficiency is not a fixed determination, but is a fluid concept such that a market may at one time be inefficient and then later become efficient. *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d at 297 ("[A]lthough the market…may have become efficient after a certain period of time, plaintiffs who purchased shares…would face different factual issues in demonstrating that the market was efficient at the time of their purchase."). To trigger *Basic*, LP must show the market was efficient at the time potential class members purchased. Whether the market was efficient a year later does not justify

---

[15] Dr. Cain studies market reaction on April 1, 2022; May 13, 2022; August 10, 2022; November 9, 2022; and March 29, 2023. Cain Report, p. 76, Ex. 6a.

application of *Basic* to purchases made during the Class Period. Dr. Cain's use of post-class data justifies exclusion under *Daubert*. *See In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 179 (S.D.N.Y. 2012) (inclusion of date outside class period "serious error"); *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 207, n.13 (2d Cir. 2008) (market maker activity outside class period not considered).

***Krogman* Factors and Additional Factor 4**: Dr. Cain's analysis as to all three *Krogman* factors (market capitalization, bid-ask spread, and public float) and Additional Factor No. 4 (institutional ownership) does not speak to market efficiency and is unhelpful to the Court's determination. Indeed, academic research shows that market capitalization, bid-ask spread, and institutional ownership do not permit an efficiency determination. Roper Report, ¶ 81. None of these factors allow researchers to reliably "discriminate between efficient and inefficient adjustments" in stock prices. *Id.*

**Additional Factor No. 5:** Dr. Cain's autocorrelation analysis makes inquiry of the wrong information. Autocorrelation "assess[es] whether a stock trades in a *weak* form efficient market." Roper Report, ¶ 83 (emphasis original). Prices in such markets "fully reflect any value relevant information in past prices." *Id.* Here, the actual question before the Court is different and is "whether stock prices fully reflect any value relevant information **found in public disclosures**." *Id.* (emphasis added). Thus, any autocorrelation test

24

fails to "provide reliable economic evidence of whether stock prices fully reflect public information…" *Id.* Dr. Cain's opinion as to autocorrelation thus is unhelpful as it does not have a "valid scientific connection to the pertinent inquiry" of market efficiency. *Boca Raton*, 582 F.3d at 1232.

**Additional Factor 6**: Dr. Cain's analysis of active trading options lacks necessary information to render it helpful. Dr. Cain merely identifies the existence of options trading without analysis on whether it "demonstrate[s] the efficient adjustment of price in this matter." Roper Report, ¶ 81. Dr. Cain does not show that the existence of options trading performs the "price arbitrage function indicated by the literature" relating to market efficiency. *Id.*

WHEREFORE, Defendants request the Court: (1) grant this Motion; (2) exclude Dr. Cain's opinions; and (3) grant such further relief as is proper.

## LOCAL RULE 3.01(g) CONFERRAL

Undersigned conferred with LP's counsel in a good faith effort to resolve this Motion via telephone on May 7, 2024. LP opposes the relief sought herein.

Dated: May 8, 2024.

| | |
|---|---|
| */s/ Glennys Ortega Rubin* | **FRANK A. ZACHERL, ESQ.** |
| **ALFRED J. BENNINGTON, JR., ESQ.** | Florida Bar No. 868094 |
| Florida Bar No. 0404985 | fzazherl@shutts.com |
| bbennington@shutts.com | **SHUTTS & BOWEN LLP** |
| **GLENNYS ORTEGA RUBIN, ESQ.** | 300 South Orange Avenue, |
| Florida Bar No. 556361 | Suite 1600 |
| grubin@shutts.com | Orlando, Florida 32801 |
| **BENJAMIN F. ELLIOTT, ESQ.** | Telephone: (407) 835-6755 |
| Florida Bar No.: 1010706 | Facsimile: (407) 849-7255 |
| belliott@shutts.com | *Attorneys for Defendants* |