**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JED LEMEN, Individually and On Behalf of All Others Similarly Situated, | Case No. 3:21-cv-01254-TJC-PDB |
| Plaintiff, | CLASS ACTION |
| v. | |
| REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ, | **REDACTED PUBLIC VERSION** |
| Defendants. | |

**LEAD PLAINTIFF JARED THOMPSON'S MOTION
TO COMPEL PRODUCTION OF ALLEGED WORK PRODUCT AND
OTHER DOCUMENTS**

Defendants refuse to produce documents responsive to Lead Plaintiff Jared Thompson's ("Plaintiff") requests for production ("RFP"). Instead, Defendants acknowledge the most responsive documents are cloaked by privilege, and that requiring them to search for non-privileged documents using anything other than an artificially limited search of collected documents would be unduly burdensome and costly. Plaintiff has exhausted all avenues through extensive meet and confers, attempts to take 30(b)(6) depositions, and efforts to decipher Defendants' privilege claims. Now, Plaintiff moves the Court for a Fed. R. Civ. P. Rule 37 order compelling Defendants to produce identified responsive documents they refuse to

- 1 -

produce under questionable privilege claims and to search for and produce other

responsive documents which they know to exist but refuse to produce.[1]

## I.    INTRODUCTION

Plaintiff brings a suit alleging Redwire's president and former CEO Peter

Cannito and former CFO William Read have violated the Securities Exchange Act

of 1934 and SEC Rule 10b-5.  To prevail, Plaintiff must prove Cannito and Read

knew or were reckless in not knowing that the public statements at issue were

inaccurate when made. *See* MTD Order (ECF 62) at 9-10. Plaintiff's claims center

on a March 31, 2022 Redwire press release that a previously disclosed Audit

Committee investigation into a whistleblower complaint:

> confirmed the existence of previously identified internal
> control deficiencies as well as identified certain additional
> internal control deficiencies…. Specifically, certain members
> of senior management failed to reinforce the need for
> compliance with certain of the Company's accounting and
> finance policies and procedures, including reinforcement of
> appropriate communication.

*See* ¶ 75.[2] Redwire's Form 10-Q filed on April 1, 2022, and Form 10-K Annual

---

[1] Plaintiff does not concede that Defendants' claims of privilege are proper. Separately, Plaintiff has filed motions on the insufficiency of Defendants' categorical privilege log (ECF No. 133) and seeking to compel 30(b)(6) depositions (ECF No. 132). Plaintiff also filed a motion with respect to one PricewaterhouseCoopers LLP document for which Plaintiff argues Defendants' work product claims are generally unsupported for the Audit Investigation materials based on the primary purpose test. ECF No. 91. While this motion is waiting determination, Plaintiff maintains many of the same arguments likely will apply to the documents at issue in this motion, but discovery on privilege claims is pending.

[2] "¶" refers to paragraphs in the First Amended Complaint (ECF No. 47).

Report filed on April 11, 2022 also stated that "certain members of senior management" failed to "set certain aspects of an appropriate tone at the top. ¶¶ 77-79; *see also* MTD Order (ECF No. 62) at 3-4, 6-7.

Since discovery began approximately one year ago, Plaintiff has sought discovery of the facts forming the basis of Defendants' disclosures for which Plaintiff must prove scienter. The disclosures, while damming, lack specifics as to their basis and underlying facts, and what and when Defendants knew. Yet, Defendants refuse to answer interrogatories, provide 30(b)(6) witnesses, and produce relevant documents based on privilege and undue burden. As a result, to date, Defendants have produced less than 1,400 documents.  This limited production consists of a small amount of "known responsive" documents, as well as documents identified through the application of Defendants' self-selected search terms over 2 million documents. Those terms identified, per Defendants, approximately 30,000 unique documents that were then subject to a further relevancy and privilege review. None of the documents produced to date disclose the factual basis for Defendants' March and April 2022 disclosures nor when Defendants had knowledge of these facts.

Given this deficiency, and Defendants' unilateral application of search terms without any input from Plaintiff, Defendants agreed to consider additional search terms. But those negotiations have come to an impasse. Defendants claim that even

the narrow set of search terms Plaintiff request (though they are a shot in the dark) identify too many documents and any review would be too expensive and burdensome. Defendants' last proposal accepted a much-narrowed set of search terms, but Defendants insisted upon a further non-iterative TAR-type[3] review of documents that hit on the terms to cull them further, before a linear relevancy and privilege review. Plaintiff rejected this approach as the literature shows Defendants' proposal would result in a miniscule chance of identifying relevant documents.[4]

Defendants' refusal to do a meaningful search is unjustified. When confronted with search terms they believe are overly burdensome, a party opposing discovery has an obligation to explain the grounds for the objection, and use their superior knowledge to identify relevant documents and come up with a means to produce these documents. *See, e.g., L–3 Commc'ns Corp. v. Sparton Corp.*, 313 F.R.D. 661, 670 (M.D. Fla. 2015) (describing defendants' obligation to use their "superior information" to "offer specific suggestions for narrowing the offending search terms

---

[3] Technology Assisted Review ("TAR") uses machine learning to identify relevant documents in large electronic discovery collections. The software is initially trained on a subset of documents coded by attorneys as relevant or not relevant. *See* Judicature Staff, "Unlocking the e-discovery TAR blackbox," JUDICATURE, Volume 102, Number 2 (Summer 2018) at 66. It then applies this learning to predict the relevancy of remaining documents. *Id.* The process is usually an iterative one, with the algorithm's predictions being validated and refined through further attorney input as the review progresses. *Id.* at 65-67.

[4] Search terms themselves have a less than 30% chance of identifying relevant documents. *See, e.g.,* Stephen Tomlinson, *et al.*, "Overview of the 2007 TREC Legal Track" (April 30, 2008) (showing 22% recall).

in a way that addresses their concerns while still retrieving as many of the relevant documents targeted by the disputed search terms as possible"). Thus, mere claims of undue burden and use of self-selected search terms to pretend to do a meaningful search is not sufficient. The terms Defendants used were merely a narrow set of words from their public disclosures with boolean connectors to reduce them further. None come from the facts forming the basis of their public disclosures.

Having hit an impasse, where Defendants can identify no meaningful means to find and produce responsive documents, Defendants' purported claims of privilege must fall aside. Under Federal Rule of Civil Procedure 26(b)(3)(A)(ii), the Court may order production of work-product documents if the requesting party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."

Here, with the August 5, 2024 deadline for merits discovery rapidly approaching, Defendants' discovery responses and other pleadings establish Plaintiff's substantial need because they show Defendants are shielding crucial information either based on undue burden or that the relevant discovery is uniquely held by their outside auditor, investigation counsel, forensic consultant and regular counsel. By broadly claiming undue burden and privilege, Defendants have made it impossible for Plaintiff to obtain the substantial equivalent of this responsive evidence without undue hardship. The Court should therefore order production of

- 5 -

the documents Defendants are improperly withholding.

## II.   FACTUAL BACKGROUND

### A.   Defendants Confirm They Plan to Rely on SEC Public Filings, "Good Faith," and Lack of Scienter in Their Defense.

After Plaintiff overcame the motion to dismiss, Defendants filed their Answer on April 21, 2023.  *See* ECF No. 68.  In their Answer, Defendants assert "lack[]" of "scienter" and "good faith" as their Ninth and Eleventh Affirmative Defenses.  *Id.* at 26-27.  In addition, Defendants' initial disclosures served on June 2, 2023 identified only publicly filed SEC documents as those Defendants may use to support their defenses.  *See* Declaration of Reed Kathrein ("Kathrein Decl.") ¶ 3. When Plaintiff protested that the initial disclosures were insufficient and Defendants had adequate time to identify other documents, Defendants claimed their disclosures were complete and appropriate. *Id.*

### B.   Plaintiff Serves Discovery Requests and Asks for Known, Responsive Documents.

Plaintiff served RFPs and interrogatories on May 19, 2023.  *Id.*, ¶ 4.  To cut to the chase, on May 30, 2023, Plaintiff identified for early production core known, responsive documents related to the Audit Committee investigation, whistleblower complaints and related investigations, the publicly disclosed "tone at the top" finding, and Defendant Read's termination.  *Id.*, ¶ 5. Plaintiff explained the core documents would help develop targeted search terms for identifying responsive documents, and also requested a search term proposal from Defendants given their

presumed knowledge of their client's documents.  *Id.*

### C. Defendants' Discovery Responses Claim Undue Burden and Privilege Over Requests Concerning The Key Issues in Case.

After an extension, Defendants responded to the interrogatories and RFPs on July 20, 2023. *Id.*, ¶ 6 and Exs. A and B.  Interrogatory No. 1 to Redwire, Cannito, and Read sought "all persons or entities likely to have knowledge or information relevant to the subject matters of this action," and included subparts concerning, among other things, Redwire's disclosure controls and procedures, assessments of internal controls, "tone at the top," remediation plans, the Audit Committee investigation, and Read's termination. *Id.*, Ex. A at 5-23.  In response to Interrogatory 1 subparts (a)-(e), (j) and (k), Defendants identified certain individuals whose knowledge came solely from participating in "meetings of Redwire's Audit Committee" or "conduct[ing] the [Audit Committee] investigation." *Id.* at 6-12, 15-18.  Defendants also identified PricewaterhouseCoopers LLP, King & Spalding LLP ("K&S"), KPMG, and Kirkland & Ellis LLP as entities that may have relevant knowledge regarding these issues. *Id.* at 6-12, 14-18 (responses to subparts 1(a)-(e), (i)-(k)). However, Defendants assert privilege over any information these entities possess. *Id.*

Interrogatory No. 2 asked Defendants to state the "substance" of the knowledge of persons identified in response to Interrogatory No. 1. *Id.* at 23. Defendants refuse to provide any such information and claim it would be "overly

broad and oppressive." *Id.* Interrogatory No. 4 requested Defendants identify the existence, custodian, location and description of all relevant documents. *Id.* at 24-25. Defendants again object that providing this information is "unduly burdensome" and the interrogatory "directly infringes" on protected work product, "as it would require disclosure of documents that Redwire's counsel asserts are relevant to the various factual allegations and its defenses." *Id.*

In response to the RFPs, Defendants similarly claimed undue burden and privilege. *See id.*, Ex. B at 16-35, 42-50, 52-63. For example, request nos. 14-26, 27-28, 34-37, and 40-50 seek critical documents, including documents that form the basis of Defendants' disclosures in the April 1, 2022 10-Q and April 11, 2022 10-K regarding "tone at the top" and internal control material weaknesses that form the basis of this lawsuit (RFP Nos. 14-16). *Id.* at 16-20. These requests also cover documents related to Read's termination (RFP Nos. 27-28), accounting, internal controls, and financial policies and procedures (RFP No. 36), public statements during the Class Period (RFP No. 40), and Cannito and Read's role in preparing the statements (RFP No. 41). *Id.* at 33-36, 44-47, 52-54. For these requests, Defendants responded they would only produce documents captured by search terms (as any other method would be unduly burdensome), and withhold documents that are not responsive or privileged. *Id.*

- 8 -

For request nos. 29-30 – which seek documents concerning the whistleblower complaint and Audit Committee investigation – Defendants agreed to produce only the whistleblower complaint itself, non-privileged Audit Committee meeting records regarding the complaint, and documents collected by search terms, as any other method would be "unduly burdensome."  *Id.* at 36-40.  In stating that all other documents would be withheld and logged as privileged, Defendants explained:

> …the Audit Committee ***was not provided with specific documents in connection with the investigation.*** Rather, the Audit Committee's counsel and their accountants were provided access to electronic records meetings specific custodian and date-range parameters, and then outside counsel and their retained consultants identified their own documents in an effort to carry out their advisory functions. ***Redwire does not have possession, custody, or control—or means to identify—the documents that outside counsel selected.*** Additionally, ***the specific compilation and/or selection of documents by the Audit Committee's outside counsel would reflect the mental impressions of outside counsel, and thus, be protected by the work-product immunity***.

> … All interviews, questioning, or examinations of former or current Redwire employees in connection with the investigation were performed by Redwire's outside counsel and, as such, ***all attendant notes, transcripts, recordings, or other records are subject to attorney-client and/or work product privileges***. Fed R. Civ. P. 26(b)(1), (3).

*Id.* at 39.

### D.    After Delay, Defendants Produce A Small Set of Known, Responsive Documents and Claim Privilege Over Rest.

Plaintiff immediately engaged Defendants over the objections and responses to the discovery requests. In a July 26, 2023 email to Defendants, Plaintiff sought a meet and confer before Defendants undertook the review and production via search terms, and stated the parties should agree on search-terms and custodians by mid-

August. *Id.*, ¶ 7. Plaintiff also noted that Defendants did not produce known responsive documents concurrently with their discovery responses, despite previously indicating they would. *Id.*

In an August 3, 2023 meet and confer, Defendants stated that K&S almost exclusively prepared the board/audit materials requested by Plaintiff, and as such, any initial document production would not be significant and a privilege log would be forthcoming. *Id.*, ¶ 8. One week later, August 11, 2023, Defendants identified only the whistleblower complaint and Read's separation agreement as "known documents" previously requested by Plaintiff that were not privileged. *Id.*, ¶ 9. Defendants also identified custodians and sources of their document collection against which they would run their self-selected search terms, though the parties agreed the process would be iterative with each party reserving rights. *Id.*

### E.    The Parties Begin Negotiations Over Search Terms.

On August 14, 2023, Plaintiff received Defendants' search terms and hit report and limited privilege log. *See id.*, Exs. C and D. These search terms would be used to collect documents for Defendants' first wave of productions, yet reflected no attempt by Defendants to rely on their knowledge to craft terms capable of identifying responsive documents. *Id.*, ¶ 10 and Ex. C. Rather, Defendants simply pulled words from their public disclosures, ran those terms, and identified approximately 46,000 non-unique documents. *Id.* ███████████

- 10 -

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████   *Id.*, ¶ 11 and Ex. D.

Given the terms proposed by Defendants, Plaintiff essentially had to start from scratch to develop a proposal for additional search terms.  On September 28, 2023, Plaintiff sent Defendants a set of proposed terms.  *Id.*, ¶ 12 and Ex. E. Out of necessity, the terms were purposefully broad to have a greater chance to capture key documents of which Plaintiff had little idea of their actual details. *Id.* On October 13, 2023, Defendants sent a counter-proposal and noted Plaintiff's proposal returned 1.4 million documents, and reviewing them would be "unduly burdensome, disproportional to the needs of the case and extremely costly."  *Id.*, ¶ 13. Per Defendants, the counter-proposal, which consisted largely of conclusory words, hit 32,385 documents (not including family records). *Id.*

In light of negotiations over other discovery issues (*i.e.*, GPAC document production, objections to Plaintiff's RFPs, and the collection period for documents relating to Read's departure), and to allow for Plaintiff to review Defendants' initial document productions and refine proposed terms, Plaintiff sent a counter-proposal on November 29, 2023. *Id.*, ¶ 15.  Plaintiff's efforts paid off, as the review revealed a codename for the Audit Committee investigation that had not been identified in

Defendants' initial set of search terms. *Id.*, ¶ 14  The parties subsequently exchanged additional proposals on December 8, 2023 (Defendants), December 14, 2023 (Plaintiff), January 5, 2024 (Defendants), and January 22, 2024 (Plaintiff).  *Id.*, ¶ 15.

**F.      After Many Months of Negotiations, Defendants Propose to Use TAR to Further Cull Documents Hit By Search Terms.**

On February 7, 2024, Defendants sent their "final" counterproposal. *Id.*, ¶ 16 and Ex F(a)-(c). For the first time, and despite previously stating during a December 14, 2023 meet and confer that the number of documents would be a "roadblock," Defendants proposed using TAR to further cull the documents identified by search terms to further narrow the number of documents for manual review.  *Id.*, ¶ 17. Plaintiff sent Defendants a letter on February 15, 2024 outlining how TAR should be used and noting that when employed properly, TAR can identify 80% or more of responsive documents in the corpus.[5] *Id.*, ¶ 18. In contrast, search terms generally retrieve just 20-25% of relevant materials from a given set of ESI.[6] *Id.*  Plaintiff maintained that if used, TAR should be run over the largest possible document corpus because when search terms and TAR are combined, the resulting estimated

---

[5] *See*, *e.g.,* Maura R. Grossman & Gordon V. Cormack, "A Tour of Technology-Assisted Review," PERSPECTIVES ON PREDICTIVE CODING AND OTHER ADVANCED SEARCH METHODS FOR THE LEGAL PRACTITIONER (ABA 2016).

[6] *See, e.g.*, Stephen Tomlinson, *et al.*, "Overview of the 2007 TREC Legal Track" (April 30, 2008) (showing 22% recall); Douglas W. Oard, *et al.*, "Overview of the TREC 2008 Legal Track" (March 17, 2009) (showing 24% recall).

level of recall will be the product of the recall of each stage.[7] *Id.* and Ex. G. Nevertheless, Plaintiff was willing to discuss the proposal and seek further clarification. *Id.*

On February 28, 2024, Plaintiff learned Defendants proposed to limit the use of TAR further by using it statically, without "continuous," "active" learning. *Id.*, ¶ 19. Ultimately, on March 29, 2024, Defendants provided the final response to Plaintiff's questions, making clear the process Defendants were amenable to would have a very low probability of identifying documents that were the basis of the Audit Committee's public disclosures. *Id.* and Ex. H.

On April 11, 2024, Plaintiff informed Defendants they reached an impasse, and on April 19, 2024, Plaintiff requested that the parties reach out to the court jointly to discuss this dispute. *Id.*, ¶ 20. Defendants never responded to Plaintiff's request. *Id.* To date, Defendants have produced less than 1,400 documents. *Id.*, ¶ 23. None shed light on the underlying basis for Defendants' disclosures. *Id.*

### III. DEFENDANTS ABUSED DISCOVERY BY WITHHOLDING KEY DOCUMENTS THROUGH UNREASONABLE KEYWORD SEARCHES AND UNFOUNDED PRIVILEGE CLAIMS

#### A. Defendants Cannot Withhold Key Documents Based on Unilateral Application of Deficient Search Terms.

---

[7] For example, if use of TAR has estimated recall of 80%, and a separate search term stage had estimated recall of 25-30%, then overall estimated recall would be just 20-24%. Per OpenText, a 80% recall is a "modest target" and "a common standard." *See* Open Text, "Choosing the Right Technology-Assisted Review Protocol to Meet Objectives" at 9.

Defendants have acknowledged that responsive Audit Committee documents exist in the possession of the Company, its counsel, and its consultants. *See supra* at 9. Under Rule 34, Defendants have an affirmative obligation to produce these materials, including those held by their agents or consultants. *See Advanced Cable Ties, Inc. v. Am. Elite Molding, LLC*, 2019 WL 13280288, at *5 (N.D. Fla. Feb. 7, 2019) (noting documents held by "agents" were within company's control for Rule 34 purposes). Nor can Defendants artificially cabin their production obligations through restrictive search terms, as "the use of 'search terms' to identify responsive ESI is not a per se requirement of [Rule 34]." *Bison Advisors LLC v. Kessler*, 2016 WL 11544364, at *3 (D. Minn. Nov. 28, 2016). And search terms "are not a panacea for disputes regarding the scope of document collection and review." *Id.*

Therefore, Defendants' withholding of documents they concede are relevant based on unreasonable search terms fails to satisfy Rule 34 and is sanctionable under Rule 37. *See* Fed. R. Civ. P. 37(a)(3)(B)(iv) (permitting motions to compel when a party "fails to produce documents" requested under Rule 34). Defendants' unjustified exclusion of responsive materials through arbitrary search terms is also an "evasive or incomplete disclosure" which is treated as a failure to respond under Rule 37(a)(4). *See* Fed. R. Civ. P. 37(a)(4).

**B.    Defendants Cannot Hide Behind K&S's and KPMG's Control Over the Identification and Selection of Documents as Their Work Product Was Not Targeted by Plaintiff's Requests.**

- 14 -

The work product doctrine generally does not shield third-party documents from discovery, except when production would reveal counsel's legal theories and thought processes. *Hunter's Ridge Golf Co. v. Georgia-Pacific Corp.*, 233 F.R.D. 678, 681 (M.D. Fla. 2006).  While K&S and KPMG acted on behalf of Defendants and thus were not completely separate third parties, the same principles apply. To invoke this exception, Defendants must provide specific, non-conclusory details showing a real risk of such improper exposure. *Id.* at 682.

Plaintiff's requests do not implicate this exception, as the requests do not target a narrow set of documents counsel has singled out as significant, but broadly seek all materials revealing the factual basis for Redwire's March and April 2022 public disclosures. *See, e.g., Hunter's Ridge*, 233 F.R.D. at 682 (rejecting work product assertion over third-party documents and finding requests sought "documents relating to specific allegations in the litigation," not counsel's mental impressions or legal theories). Defendants, moreover, have not shown Plaintiff already has access to the documents at issue, a relevant factor in shielding third-party documents from discovery.[8] *Id.*

---

[8] Defendants may claim any summaries of witness interviews are work product.  Courts have held, however, that third-party affidavits, even if prepared by counsel, "merely recite relevant facts within the affiants' personal knowledge rather than revealing an attorney's mental impressions or legal strategy." *See Martensen v. Koch*, 301 F.R.D. 562, 582 (D. Colo. 2014); *see also Ford Motor Co. v. Edgewood Props., Inc.*, 257 F.R.D. at 418, 422-23 (D.N.J. 2009) ("[Plaintiff] seeks no more than factual statements of these non-party witnesses. It should not be frustrated in its ability to test the perception and credibility of these persons.").

Nor can Defendants justify withholding plainly relevant K&S/KPMG files based on search terms that may retrieve some documents but omits others outside those terms.  As the court admonished in *L–3 Communications Corp.*, a party cannot use restrictive search parameters to avoid producing clearly responsive documents. 313 F.R.D at 670.  When confronted with inadequate search terms, the party must suggest ways to broaden them to retrieve other discoverable materials. *Id.*

Based on this analysis, the facts here call for rejecting Defendants' conclusory privilege claim and ordering production of documents critical to uncovering the truth.[9]

## IV.   ALTERNATIVELY, PLAINTIFF MEETS THE "SUBSTANTIAL NEED" STANDARD FOR PRODUCTION OF ORDINARY WORK PRODUCT

### A.   Plaintiff has Substantial Need for the Audit Committee Investigation Documents and Cannot Without Undue Hardship Obtain the Substantial Equivalent by Other Means.

---

[9] Alternatively,  KPMG has arguably waived any privilege over these documents by failing to produce a proper log. Plaintiff served KPMG with a document subpoena dated November 30, 2023, and KPMG provided responses and objections on January 26, 2024 claiming nearly all of the responsive documents were privileged.  Kathrein Decl., ¶ 21.  Despite repeated requests from Plaintiff, however, Defendants did not serve a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ until May 13, 2024 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See id.* and Ex. I. The failure to timely provide a privilege log is grounds for waiver over the materials. *See, e.g., Jenkins v. Koch Foods Inc.*, 2020 WL 12992000, at *3-4 (M.D. Ala. Mar. 11, 2020 (finding privilege waived over documents due to failure to submit privilege log in response to subpoena). While Plaintiff also served a document subpoena on K&S on April 3, 2024, and provided notice of the subpoena to Defendants one day prior, to date Plaintiff has received no response to the subpoena nor a privilege log. On May 13, 2024, Defendants for the first time claimed that Plaintiff's service on K&S had not been "effected" without further elaboration.  Kathrein Decl., ¶ 22. Regardless, K&S is under Defendants' control and they should have provided a privilege log.

Under Federal Rule of Civil Procedure 26(b)(3)(A)(ii), the Court may order production of work product documents if the requesting party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."

Plaintiff can demonstrate substantial need. Plaintiff cannot piece together the factual basis for Defendants' disclosures from other sources, as Defendants stated the Audit Committee was orally briefed and did not directly receive documents. *See supra* at 7-9. Rather, counsel and consultants collected and reviewed the underlying information and generated the work product. *Id.* Defendants also represented that counsel conducted all witness interviews, so any notes or transcripts are being withheld. *Id.* Plaintiff cannot replicate those efforts.

Furthermore, Defendants have put the Audit Committee materials at issue in this litigation. Specifically, Defendants assert "lack[]" of "scienter" and "good faith" as their Ninth and Eleventh Affirmative Defenses, and explicitly state their intent to rely on SEC filings outlining the findings of the Audit Committee in support of their defense. *See supra* at 6. Defendants' affirmative use and reliance on the Audit Committee materials further reinforces Plaintiff's substantial need.[10]

---

[10] To the extent Defendants claim attorney-client privilege over the materials, their Ninth and Eleventh Affirmative Defenses operate as a waiver of that privilege, as they place their state of mind, knowledge, and basis for their beliefs and the accuracy of their statements directly at issue. These defenses make the privileged Audit Committee investigation materials and related legal advice highly relevant to testing and challenging Defendants' defenses. For example, in *Mattel v. MGA Ent., Inc.*, 2010 WL 3705902 (C.D. Cal. Sept. 22, 2010), the court found a waiver of privilege

For example, in *Martensen v. Koch*, the court found the defendant relied on investigative reports to justify his conduct and impugn the plaintiff while denying plaintiff access to those same reports to challenge those assertions. 301 F.R.D. 562, 583-84 (D. Colo. 2014). This was improper, as "a litigant cannot use the work product doctrine as both a sword and shield." *Id.* at 573. Similarly, in S*henwick v. Twitter, Inc.*, the court rejected an attempt by defendants to admit the conclusions of an internal investigation while withholding the underlying factual basis as privileged.  2021 WL 1232451, at *7 (N.D. Cal. Mar. 31, 2021). The court explained that "[d]efendant cannot use the outputs of the audit committee investigation to exonerate themselves while shielding the inputs as work product."

That same inequity discussed in *Martensen* and *Shenwick* would result here if Defendants are permitted to tout the Audit Committee's findings to mitigate their culpability while denying Plaintiff access to the underlying record. Indeed,

---

in similar circumstances, even though the defendants did not explicitly state that they were relying on privileged communications. *Mattel*, 2010 WL 3705902, at *5-6. The court recognized that by putting their state of mind and the basis for their good faith belief at issue through their defenses, the defendants could be seen as implicitly waiving privilege over communications and materials related to the formation of that state of mind or belief. *Id*. at *6-9; *see also In re Broadcom Corp. Secs. Litig.*, 2005 WL 1403516, at *2 (C.D. Cal. Feb. 10, 2005) (finding implied waiver of privilege where defendants asserted good faith defense); *Cox v. Administrator, U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir. 1994) (holding that assertion of good faith defense meant party injected its knowledge of law into the case and thereby waived attorney-client privilege). Fairness and the need to properly test Defendants' asserted defenses require disclosure of the privileged materials in these circumstances. *See, e.g., Chabot v. Walgreens Boots Alliance, Inc.*, 2020 WL 3410638, at *8 (M.D. Pa. 2020) (noting core principle underlying "at-issue" waiver is "fairness"); *Mattel,* 2010 WL 3705902, at *7;  Broadcom, 2005 WL 1403516, at *2.

Defendants go even further by expressly placing their own good faith and lack of culpable intent directly at issue while relying upon their SEC filings, which stated, among other things, that the Audit Committee investigation "concluded that the potential issues raised by the former employee did not require a restatement or adjustment" of the financial statements."[11] The withheld documents are necessary for Plaintiff to test the investigation's reliability and conclusions. Moreover, Plaintiff must prove Defendants acted with scienter in making inaccurate public statements about Redwire's internal controls and "tone at the top." ¶¶ 75-79. But Defendants' disclosures on these issues were general and unspecific. This makes the Audit Committee documents imperative to assess Defendants' affirmative defenses, as they likely reflect Defendants' knowledge and motivations and detail the findings that no restatement was necessary and "certain members of senior management" had improper "tone at the top."

In *United States v. Petit*, the court compelled production of fact work product from an audit committee investigation, including "statements made by potential witnesses to K&S" and "contents" of audit committee presentations. 438 F.Supp.3d 212, 215 (S.D.N.Y. 2020). The court reasoned the former CEO and COO required this "possibly exculpatory" information to prepare their defense and could not obtain

---

[11] *See, e.g.,* Kathrein Decl., Ex. J (April 1, 2022 10-Q) at 58; *see also* ECF 48 (Defendants' MTD) at 12.

the substantial equivalent elsewhere. *Id.* The circumstances here are analogous. The withheld materials are, by Defendants' own admission, the only materials which will reveal the critical facts and witness statements upon which they based their key internal control disclosures. *See supra* at 7-9. While possibly not establishing when Defendants became aware of these facts, this evidence will allow Plaintiff to focus additional discovery on what Defendants knew and when.[12]

In *State of Florida v. Industrial Chemicals*, *Inc.*, the Florida Attorney General issued civil investigative demands ("CIDs") for depositions during the course of a two-year antitrust investigation. 145 F.R.D. 585, 586  (N.D. Fla. 1991). When the state later filed an antitrust lawsuit, a defendant sought to compel production of the CID materials through discovery, and the state objected, arguing the materials were protected work product. *Id.* The court disagreed and ordered disclosure, finding that the defendant had shown substantial need for the CID materials and could not obtain the substantial equivalent without undue hardship.  *Id.* at 588. As to substantial need, the Court noted the CID materials contained the evidentiary basis for the complaint, including the "acts" and "dates" of the alleged conspiracy, as well as the "names" of persons involved in the conspiracy and who provided information.  *Id..*  Addressing

---

[12] *See also United States v. ISS Marine Servs., Inc.* 905 F. Supp. 2d 121, 139 (D.D.C. 2012) (finding the government had substantial need for an internal audit report summarizing an investigation into wrongdoing not just for the facts but also for evidence of "when [the company] became aware of any potential overpayments, which [went] to the heart of the [Government's] case").

hardship, the court emphasized that the CID materials contained the essential evidence underlying the state's complaint, and it "would be extremely difficult, not to mention wasteful, for [defendant] to attempt to replicate the State's two year investigation when the information it seeks is readily available through discovery of the CID depositions." *Id.* The court held the cost of discovery was also a relevant factor in assessing undue hardship. *Id.*

The CID materials in *Industrial Chemicals* (*i.e.*, materials and testimony subpoenaed as part of a pre-suit investigation) are similar to the Audit Committee documents at issue in this case, which were gathered by counsel during an internal investigation commenced prior to filing of this litigation. The Audit Committee documents, in turn, are the only source of the foundational evidence underlying Defendants' March and April 2022 disclosures about accounting improprieties and "tone at the top." As in *Industrial Chemicals*, requiring Plaintiff to reconstruct the Audit Committee's work through duplicative discovery would be enormously burdensome and expensive, particularly given Defendants' admission that the known responsive key evidence exists only in the possession of its agents in work-product form. *Supra* at 9. Imposing such undue hardship on Plaintiff to instead fish for documents using search terms would further undermine the Federal Rules' goal of securing a "just, speedy, and inexpensive determination." *See* Fed. R. Civ. P. 1.

The common threads running through *Martensen, Shenwick*, *Petit,* and

- 21 -

*Industrial Chemicals* compel production of the withheld documents. In each case, the materials sought were essential to the movant's case, could not be feasibly obtained elsewhere, and were necessary to probe the factual basis of the opposing party's position. The Audit Committee documents implicate these same concerns. With trial fast approaching and Defendants' stonewalling, Plaintiff's need for these materials is substantial and urgent.[13]

**B.    Plaintiff Demonstrates Compelling Need for Any Alleged Audit Committee Opinion Work Product As Defendants Put The K&S/KPMG Purported Opinion Work Product *At Issue* In This Case.**

If the Court finds the withheld K&S/KPMG documents are opinion rather than ordinary work product, Plaintiff has shown the extraordinary necessity required to obtain any opinion work product.[14]

---

[13] Defendants have also asserted a "self-critical analysis" privilege over certain documents. To the extent this privilege purportedly applies to Audit Committee materials, the Court should reject its application. Indeed, Courts have found the privilege does not apply in securities fraud actions. *See, e.g., In re Sahlen & Assocs., Inc.*, 1990 WL 284508, at *1 (S.D. Fla. Nov. 5, 1990) (finding "self evaluative" privilege inapplicable in action for securities fraud); *In re Winstar Commc'ns, Sec. Litig.*, 2007 WL 4115812, at *2 (S.D.N.Y. Nov. 15, 2007) ("The recognition of a self-evaluative privilege was never intended to protect those accused of securities fraud scienter from disclosure of direct evidence which may bear on knowledge and intent."). Other courts have observed that the privilege should not attach "unless the report is prepared for purely internal review purposes," which is not the case here as Defendants publicly disclosed the results from the Audit Committee investigation. *See, e.g., In re Air Crash Near Cali, Colombia on Dec. 20, 1995*, 959 F. Supp. 1529, 1532 (S.D. Fla. 1997).

[14] Moreover, as recognized in *Martensen*, there is little practical difference between opinion work product and non-testifying expert materials – both require a similar showing of "extraordinary" necessity to allow discovery. 301 F.R.D. at 580; *see also See* Fed. R. Civ. P. 26(b)(4)(D)(ii) (Facts known or opinions held by a non-testifying expert may be discoverable "on showing exceptional circumstances under which it is impracticable for the [moving] party to obtain facts or opinions on the same subject by other means."). As K&S and KPMG were hired as

While opinion work product enjoys almost absolute immunity, extraordinary circumstances may exist that justify a departure from this protection.  *See Willamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000).  Lower courts have held that disclosure of opinion work product is justified when "an *attorney's* opinions and legal theories" is placed at issue.  *See Maplewood Partners, L.P. v. Indian Harbor Ins. Co.,* 2011 WL 3918597, at *7 (S.D. Fla. Sept. 6, 2011); *see also Cozort v. State Farm Mut. Auto. Ins. Co.*, 233 F.R.D. 674, 676–77 (M.D. Fla. 2005) ("[T]his Court holds that the mental impressions of State Farm's counsel are directly at issue here, and thus, exceptional circumstances justify invading the opinion work product immunity.").

While the Audit Committee's internal memoranda and conclusions may ordinarily qualify as opinion work product, Defendants' reliance on the results put the mental impressions and conclusions of K&S – outside counsel hired to conduct the Audit Committee investigation – at issue and waive any absolute protection.  *See, e.g., Monitronics Int'l, Inc. v. Hall, Booth, Smith, P.C.*, 2017 WL 218397, at *2 (N.D. Ga. Jan 18, 2017) (finding opinion work product waived in legal malpractice case where plaintiff claimed defendants were the sole proximate cause of the verdict at issue). Here, the opinion work product of K&S was the sole and proximate cause of

---

investigators, they are the equivalent of non-testifying experts, and thus the analysis in this section will still apply and Plaintiff demonstrates "exceptional"/"extraordinary" necessity for this discovery.

the statements at issue.

Moreover, any opinion work product in the Audit Committee materials is inextricably intertwined with the facts upon which those opinions are based. Separating opinion from fact would be impracticable and would deprive Plaintiff of vital context needed to scrutinize the material facts found therein and Defendants' defenses to these facts. The rare combination of centrality to Plaintiff's claims, necessity to contesting Defendants' theories, and inseparability of fact and opinion establishes the extraordinary justification needed to pierce opinion work product protection.

Finally, even if Plaintiff could today independently replicate the K&S/KPMG investigation (a process that would be both time-consuming and expensive), the results of that *post hoc* investigation might bear little similarity to the information forming the basis of the Audit Committee's investigation. *Martensen*, 301 F.R.D. at 380. Such a fact is further evidence of "exceptional" circumstances justifying production of any opinion work product.

## V.    CONCLUSION

Plaintiff respectfully requests that the Court enter an order compelling Redwire to identify and produce the withheld Audit Committee investigation materials.

## LOCAL RULE 3.01(G) CERTIFICATION

Undersigned hereby certifies that on August 3, 2023, August 11, 2023, September 7, 2023, October 2, 2023, October 26, 2023, December 14, 2023, January 10, 2024, February 14, 2024, February 28, 2024, March 1, 2024, and April 11, 2024, Plaintiff's counsel conferred with counsel for Defendants via telephone and videoconference and exchanged additional correspondence regarding the relief requested in this Motion and Defendants' counsel indicated that they do not agree with any of the relief sought in this Motion.

Dated: May 13, 2024

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: *s/ Reed R. Kathrein*
Reed R. Kathrein (Fla. Bar. No. 262161)
reed@hbsslaw.com
Lucas E. Gilmore (admitted *pro hac vice*)
lucasg@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001

Steve W. Berman (admitted *pro hac vice*)
steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594

Peter A. Shaeffer (admitted *pro hac vice*)
petersh@hbsslaw.com
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile:  (708) 628-4950

*Lead Counsel for Lead Plaintiff*
*Jared Thompson*

**THE SCHALL LAW FIRM**
Brian Schall (admitted *pro hac vice*)
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

**BUCKNER + MILES**
David M. Buckner (Fla. Bar No. 60550)
david@bucknermiles.com

*Liaison Counsel for Lead Plaintiff*

- 25 -