UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| JED LEMEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITON CORP., PETER CANNITO, and WILLIAM READ,<br><br>Defendants. | Case No. 3:21-cv-01254-TJC-PDB<br><br>CLASS ACTION<br><br>**LEAD PLAINTIFF JARED THOMPSON'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |

Defendants' opposition ("Opp.") (ECF No. 129) fails to provide any compelling reasons to deny Lead Plaintiff's class certification motion ("Mot." or "Motion") (ECF No. 85). The totality of evidence strongly supports class certification, as Lead Plaintiff satisfies all Rule 23 requirements.

**A. Lead Plaintiff Has Standing.**

Defendants erroneously assert that Lead Plaintiff lacks standing on two grounds, both of which are without merit. First, Defendants argue that Lead Plaintiff suffered no injury because he sold his shares in December 2021. Opp. at 6-7. Although this sale occurred after two alleged corrective disclosures in November 2021 revealed a whistleblower complaint and subsequent Audit Committee

- 1 -

investigation (*see* Mot. at 9-10), Defendants assert those disclosures revealed no truth because the alleged false and misleading statements do not reference either the timing of required SEC disclosures or accounting practices in business subunits.

This position lacks merit. There is no requirement that a corrective disclosure "precisely mirror the earlier misrepresentation." *See Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013).[1] Lead Plaintiff's alleged false and misleading statements emphasized management's qualifications and commitment to remediating deficient ICFR, ethics, and honesty. Mot. at 8-10. Defendants' November 2021 disclosures called all of this into question and evidenced an undisclosed risk of management, overseeing remediation of deficient internal controls, merely paying lip service to honesty and ethics. *Id.* The stock price fell in response, and Lead Plaintiff therefore suffered an injury for purposes of standing.[2]

---

[1] *Meyer* does not support Defendants' standing arguments, as it involved rejected corrective disclosures in the form of a third-party investor presentation and announcements of SEC investigations. *Meyer*, 710 F.3d at 1197-1201. The court found that the presentation reflected information already known by the market, which is not the case here as investors were unaware about the whistleblower complaint and Audit Committee investigation until Redwire's announcement. *Id.* at 1200. Furthermore, in *Meyer,* the announcements of the SEC investigations could not constitute a corrective disclosure because there was no subsequent finding of wrongdoing. *Id.* at 1201. In contrast, the November 2021 disclosed Audit Committee investigation resulted in a finding of deficient "tone at the top" and additional internal control deficiencies and a prolonged need for remediation. Mot. at 10-11; ECF No. 47, ¶¶ 76-80.

[2] Defendants also rely on *Luczak v. National Beverage Corp.*, 548 F. Supp. 3d 1256 (S.D. Fla. 2021), which is readily distinguishable. In *Luczak*, the rejected corrective disclosure was an analyst report, and the plaintiff did not allege that the analyst report was a partial corrective disclosure prior to filing the class certification motion. *Id.* at 1262-63. In this case, the corrective disclosures came from Redwire, and there is no disconnect between what Lead Plaintiff alleges in the complaint and what is argued in the class certification motion.

Second, Defendants argue Lead Plaintiff lacks standing because he purchased *Redwire* common stock after the GPAC-Redwire merger, while most of the alleged false and misleading statements were made prior to the merger. Opp. at 7-8. Defendants rely on *In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d 71, 78-79 (S.D.N.Y. 2023) (citing *Menora Mivtachim Ins. Ltd. v. Frutarom Indust. Ltd.*, 54 F.4th 82, 86 (2d Cir. 2022)), which found that plaintiffs lacked standing when they did not purchase securities from the pre-merger entity about which the misstatements were made. This argument is misguided, as many of the false and misleading statements from the pre-merger period were incorporated in a Redwire Registration Statement to investors filed *after* the merger. ECF No. 47, ¶¶ 68-69.

The reasoning from *CarLotz* and *Menora* has also been rejected by multiple courts including in a SPAC case similar to the one here. In *In re CCIV/Lucid Motors Sec. Litig.*, 2023 WL 325251, at *2-3, 10 (N.D. Cal. Jan. 11, 2023) the court found standing where plaintiffs who purchased SPAC (CCIV) shares sought to hold the target company (Lucid) and its CEO liable for pre-merger misrepresentations about Lucid's value. The court rejected arguments that standing required plaintiffs to have purchased securities in pre-merger Lucid as opposed to the SPAC. *Id.* at *4-10; *see also In re Robinhood Order Flow Litig.*, 2023 WL 4543574, at *1 (N.D. Cal. Jan. 18, 2023) (rejecting reasoning of *Menora* and finding plaintiff has standing to sue Robinhood for damages resulting from securities purchased on Robinhood's

platform); *In re Mullen Auto Sec. Litig.*, 2023 WL 8125447, at *4-6 (C.D. Cal. Sept. 28, 2023) (rejecting *Menora* and finding plaintiff had standing as to statements made by company whose stock plaintiff never purchased).

In reaching this decision, the *CCIV* court found such a narrow standing rule in conflict with Section 10(b). *See In re CCIV*, 2023 WL 325251, at *8-9. Specifically, the elements of a Section 10(b) claim, including "scheme" liability and the "in connection with" requirement, already ensure that actions are only brought "where a defendant's conduct is meaningfully related to the plaintiff's harm." *Id.* This reasoning applies here. Like in *CCIV*, Lead Plaintiff purchased post-merger shares (Redwire) and alleges harm from a scheme involving pre-merger misstatements about the target company (pre-merger Redwire). *See, e.g.,* ECF No. 47, ¶¶ 46-63, 104-105, 136. The alleged misstatements concern Peter Cannito and William Read, who continued in their roles at Redwire after the merger, as well as internal controls and required remediation. *Id.*, ¶¶ 46-63. Furthermore, the *CCIV* court emphasized that Section 10(b) should be interpreted "flexibly to effectuate its remedial purposes" of safe guarding market integrity. *In re CCIV*, 2023 WL 325251, at *9. Denying standing here would frustrate those purposes by immunizing pre-merger misstatements in SPAC transactions.

### B.   Lead Plaintiff Has Established Class-Wide Reliance Based on Redwire Securities Trading in an Efficient Market.

Defendants' arguments fail to demonstrate that Lead Plaintiff cannot invoke

the *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) presumption of reliance. The totality of evidence, including Lead Plaintiff's expert Dr. Matthew D. Cain's thorough analysis of the *Cammer v. Bloom*, 711. F. Supp. 1264 (D.N.J. 1989) factors and additional efficiency indicators, strongly supports a finding that Redwire's securities traded in an efficient market during the Class Period.

***Lead Plaintiff Does Not Concede Cammer Factor 4.*** Lead Plaintiff has not "conceded" *Cammer* Factor 4 because Redwire did not file a Form S-3 during the Class Period. Opp. at 14. Indeed, Redwire's characteristics, including public float, satisfaction of debts and dividends, and volume of trading on the NYSE, were consistent with the Form S-3 "facts which imply efficiency" identified by the *Cammer* court. ECF No. 86-1 ("Cain Rpt."), ¶¶ 56, 58.

***Dr. Cain's Event Study Establishes Cammer Factor 5.*** *Cammer* Factor 5 concerns a "cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. The use of event studies to test for this cause and effect relationship is widely accepted, and Defendants' expert Dr. Andrew H. Roper does not dispute it is the proper methodology. *See* ECF No. 129-5 ("Roper Rpt."), ¶ 102. Nonetheless, Defendants argue Dr. Cain offers a flawed event study comparing the price reaction of Redwire stock on "news" days versus "no news" days. Opp. at 14-20.

First, Defendants claim Dr. Cain needed to identify new and unexpected

information in his "news" days, but cite no authority stating this is a necessary step to test "cause and effect." Opp. at 14-17.³ Indeed, Dr. Cain testified that he did not identify new and unexpected information *ex ante* to avoid imputing subjectivity into his analysis. ECF No. 129-4 ("Cain Dep. Tr.") at 21:6-13; 86:13-25; 124:16-125:4. Courts generally agree with Dr. Cain's approach. *See, e.g., Angley v. Uti Worldwide Inc.*, 311. F. Supp. 3d 1117, 1124-25 (C.D. Cal. 2018) (citing cases finding "engaging in such *ex ante* determinations . . . would be subjective").

Second, Defendants mischaracterize Dr. Cain's event selection criteria as subjective. Opp. at 17. In reality, Dr. Cain has two categories of objective criteria for "news" days that would have the "potential to disclose new value relevant information to investors": (1) information about the identity of the SPAC target and updates on the potential closing of the transaction; and (2) earnings announcements or information about earnings announcements (including the inability to issue earnings). *See* Cain Dep. Tr. at 123:4-25, 124:16-125:4; Cain Rpt., ¶ 76. These categories are supported by Dr. Cain's knowledge of the important disclosure events in a SPAC's information environment, as well as the academic literature. *See* Cain Rebuttal Report (Ex. A to Kathrein Declaration) ("Cain Rbtl."), ¶¶ 44-48.

Third, Defendants fault Dr. Cain for not offering *ex ante* predictions of

---

³ None of Defendants' cited authority in support of their purported requirement that an event study must measure the market's reaction to "new and unexpected" information address an event study developed to evaluate market efficiency under *Cammer* Factor 5. *See* Opp. at 15 n.14, 16.

"whether and in what direction stock prices would adjust as expected under market efficiency." Opp. at 17-18, 20. But establishing *Cammer* Factor 5 has no requirement to show that certain information caused prices to move in a specific direction, and courts accept evidence of stock price reactivity based on event studies like Dr. Cain's.[4] *See, e.g., In re Teva Sec. Litig.*, 2021 WL 872156, at *27 (D. Conn. Mar. 9, 2021) (listing cases accepting event studies comparing stock price movement on "news" days versus "no news" days); *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *13 (S.D. Fla. Mar. 16, 2016) (crediting event study assessing whether "'financial releases' promptly caused an identifiable price movement"); *In re Netbank, Inc. Secs. Litig.*, 259 F.R.D. 656, 674 (N.D. Ga. 2009) (accepting event study showing "price of [] stock moves more on news days than non-news days").

Finally, Defendants argue that Dr. Cain's regression model "overestimates [] market reaction" because it uses "GNPK stock price data" to predict movement in Redwire's share price. Opp. at 19. Defendants' "corrections" to the model, however, do not control for volatility better than Dr. Cain's model and contradict best practices in event study modeling. Cain Rbtl., ¶¶ 60-65. Even if the Court credited Defendants' analysis, 71% of "news" days during the Class Period (5/7 days) would

---

[4] Nor should the Court accept Dr. Roper's analysis of market efficiency on the "news" days to assess the direction the stock price should have moved based on the news released. Opp. at 20. Per Dr. Cain, Dr. Roper's directional assessment, predictions of stock price movement, and findings of market inefficiency are flawed, subjective, and defy common sense based on the news released on the days at issue. Cain Rbtl., ¶¶ 40-41, 55-57.

have statistically significant stock price movements, still satisfying *Cammer* Factor 5. *See Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *5 (E.D. Mich. Nov. 19, 2020) (26% of "news" days with statistically significant price movements); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d. 415, 433 (S.D.N.Y. 2014) (42% of "news" days with statistically significant price movements).

***Cammer* Factors 1-3, the Krogman Factors, and Additional Factors 4-6 Support Market Efficiency.** Defendants have no basis to assert that the Court should disregard Dr. Cain's analysis of the remaining market efficiency factors. Regarding *Cammer* Factor 1, Defendants claim Dr. Cain should have calculated "average daily dollar volume of trading" in contradiction to *Cammer*'s guidance of assessing "average weekly trading volume." Opp. at 20 (citing Roper Rpt., ¶ 85 n.93). *Cammer*, moreover, never dictated a calculation method but rather determined that "[t]urnover measured by average weekly trading volume of 2% or more of the outstanding shares" justified a "strong presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1286, 1293. Dr. Cain's analysis demonstrated that Redwire's average weekly trading volume easily exceeded *Cammer's* 2% threshold. Cain Rpt., ¶ 39.

Defendants further mischaracterize the analysis required under *Cammer* Factor 2, as there is no set standard that to be considered, analyst reports must make "earnings forecasts" or transmit "new and unexpected information." Opp. at 20-22.

Rather, the *Cammer* court noted that "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period." *Cammer,* 711 F. Supp. at 1286. Courts similarly do not restrict the definition of "analyst" under Defendants' purported standards. *See, e.g.*, *Aranaz v. Catalyst Pharm. Partners, Inc.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014) (describing *Cammer* Factor 2 as "the presence of numerous financial analysts following the company and reporting on the stock"). Defendants offer no grounds to discount Dr. Cain's analysis of *Cammer* Factor 2. *See* Mot. at 21; Cain Rbtl., ¶ 32.

For *Cammer* Factor 3, Defendants argue that Dr. Cain's analysis lacks "necessary detail" regarding market makers, including the volume and price of traded shares, which renders it "meaningless." Opp. at 23-24 (citing *In re Netbank,* 259 F.R.D. at 671). Not so. Courts assessing *Cammer* Factor 3 have credited analysis like Dr. Cain's identifying the number of market makers or the fact that the stock traded on the NYSE without requiring the details Defendants claim are necessary.[5] *See Monroe Cty. Emps' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 383 (N.D. Ga. 2019).

Defendants further claim that Dr. Cain's analysis considering market

---

[5] Contrary to Defendants' representations, the Eleventh Circuit in *Local 703 v. Regions Fin. Corp.*, 762 F.3d 1248, 1257-58 (11th Cir. 2014) identified listing on a national exchange as supporting market efficiency. Opp. at 26-27. Furthermore, Dr. Roper's view that academic research disputes the presumption of market efficiency for companies traded on major exchanges relies on a view of "market efficiency" that requires stock prices to move in a direction consistent with the news released (*e.g.*, stock price goes up in response to "good" news). *See* Cain Rbtl., ¶ 23; Roper Dep. Tr. (Ex. B) at 79:19-80:6. This standard is not applicable to the market efficiency determination for purposes of invoking the *Basic* presumption. *See supra* at 6-7.

capitalization, bid-ask spread, and public float (the "*Krogman*" factors), institutional ownership (Additional Factor 4), and active trading options (Additional Factor 6) should be given no "weight." Opp. at 24-25. This argument ignores Eleventh Circuit precedent, where courts have evaluated the *Krogman* factors and credited institutional ownership in addressing the *Basic* presumption. Mot. at 19, 23-24 (identifying cases). Courts also credit evidence of options activity in evaluating market efficiency. *See, e.g.*, *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2023 WL 3569981, at *9 (N.D. Cal. May 19, 2023). Dr. Cain's analysis of these factors supports market efficiency. Mot. at 25; Cain Rbtl., ¶ 32. Finally, Defendants argue that the analysis of autocorrelation (Cain Rpt., ¶¶ 100-106) is irrelevant. Opp. at 25-26. Courts recognize, however, that "lack of autocorrelation may 'provide some support'" for market efficiency. *See Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 519 (D. Minn. 2015).

***Dr. Cain's Analysis Supports Market Efficiency for Redwire Options and Warrants.*** Despite Defendants' efforts, Dr. Cain has established that Redwire common stock traded in an efficient market, and it is well-settled that this suffices to establish options and warrants traded efficiently. Mot. at 26-27. Courts have also *rejected* the notion – advanced by Defendants here – that Dr. Cain had to perform independent analysis of each option and warrant. *See Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *11-12 (C.D. Cal. Dec. 19, 2022); Cain Rbtl., ¶ 69.

## C. Defendants Have Not Rebutted the *Basic* Presumption.

Defendants fail to rebut the *Basic* presumption. Opp. at 28-29. Defendants' attempt centers on the trading of GNPK (GPAC common stock) before the closing of the merger. Specifically, Defendants claim that when GNPK traded at or below the $10.15 value of the redemption right, there was no price impact from the alleged false and misleading statements because the price would have been the same regardless of "whether investors learned the alleged truth or not." *Id.* at 29. This argument assumes that there was $0 artificial inflation during this time, but Dr. Roper never performed a loss causation analysis and his assertion that $10.15 represents an absolute floor on the GNPK stock price is contradicted by basic finance and valuation principles.[6] Cain Rbtl., ¶¶ 83-85; Roper Dep. Tr. at 13:17-20.

Defendants, moreover, do not analyze what role the redemption right played in maintaining the GNPK share price as opposed to the false and misleading statements. *See* Roper Rpt., ¶¶ 41-53. This gap in the analysis is critical, because it

---

[6] Dr. Roper's analysis assumes that investors could redeem their GNPK shares for $10.15 at any point in time during the Class Period, but the redemption right was available only if the GPAC-Redwire merger closed. Cain Rbtl., ¶ 83. But basic finance and valuation principles demonstrate that the value of an investment can be represented by the discounted value of its future cash flows. *Id.,* ¶ 84. For example, if investors were uninterested in the merger and only wished to receive the redemption value, the *present* value of receiving $10.15 at some point in the future would be lower than $10.15 per share. *Id.* Simply put, this basic financial analysis illustrates that Dr. Roper improperly assumed $10.15 was the absolute "floor" on the GNPK share price. *Id.,* ¶ 85 This analysis also undercuts the claim (Opp. at 30 n.24) that GNPK's market price should not have gone below $10.15 due to the redemption right, and when it did, it reveals market "inefficiency." *Id.*, ¶ 81.

ignores that the "mere absence of a statistically significant *increase* in the share price in response to fraudulent information does not 'sever the link' between the material misstatements and the price of the stock." *In re HealthSouth Corp. Secs. Litig.*, 257 F.R.D. 260, 282 (N.D. Ala. 2009). Put differently, a stable price could reflect that the "alleged fraudulent statement conveys that the company has met market expectations, when in fact it has not." *In re Scientific-Atlanta Sec. Litig.*, 571 F. Supp. 2d 1315, 1340-41 (N.D. Ga. 2007). The mere fact of price stability, standing alone, cannot rebut the *Basic* presumption. *See Bond v. Clover Health Invest. Corp.*, 2023 WL 1999859, at *12 (M.D. Tenn. Feb. 14, 2023) (rejecting claim in SPAC case that price impact must be in form of a same-day increase in share value).

    Critically, Defendants also did not analyze the price impact of the alleged corrective disclosures, where Dr. Cain's analysis showed statistically significant declines in the stock price. Cain Rbtl., ¶ 76; Roper Dep. Tr. at 52:16-53:8. This omission is fatal to their attempt to rebut the *Basic* presumption. To rebut the *Basic* presumption, Defendants must "sever[] the link" between the alleged misstatements and the price of the stock. *Basic,* 485 U.S. at 248. By not assessing the price impact of the corrective disclosures, Defendants cannot meet this burden. *See Thorpe*, 2016 WL 4006661, at *13 ("To rebut the presumption of reliance, Defendants must demonstrate that the corrective disclosures played no part" in share price decline.); *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *7-8 (N.D. Cal.

Mar. 26, 2016) ("[E]vidence that there was no statistically significant price impact" on one end "cannot alone persuade where, as here, expert reports show statistically significant price impacts" on the other end).[7]

### D. Damages Can Be Calculated on a Classwide Basis.

Defendants concede that the out-of-pocket method can calculate damages on a class-wide basis, effectively acknowledging the appropriateness of Dr. Cain's damages methodology. *See* Roper Dep. Tr. at 112:5-113:2. Defendants instead assert Dr. Cain has not explained how a damages expert would later account for the calculation of artificial inflation in light of the GNPK redemption right, among other issues. Opp. at 32-33; Roper Dep. Tr. at 113:3-114:21. The relevant authority, however, rejects any notion that an expert in a § 10(b) case must provide details at class certification to the extent Defendants claim is necessary, including the specific methods he would use to calculate loss causation and the results from that analysis. *See, e.g.*, *City of Sunrise Gen. Emps. Ret. Plan v. FleetCor Tech., Inc.*, 2019 WL 3449671, at *7 n.2 (N.D. Ga. July 17, 2019) (no requirement to "prove loss causation at the class certification stage"); *Thorpe*, 2016 WL 4006661, at *16 (same); *S.Co.*,

---

[7] Dr. Roper further suggests there was market inefficiency precluding application of the *Basic* presumption when GNPK relisted as RDW, because on that day the stock price changed "dramatically" despite the lack of any new and unexpected information being released to the market. Opp. at 29-30. But Dr. Roper's opinion that, in an efficient market, stock prices should not change absent new unexpected information is contradicted by the trading dynamics present in virtually all publicly listed companies and thus has no basis in how stock markets function. *See* Cain Rbtl., ¶¶ 36-38; Roper Dep. Tr. at 69:6-15, 69:25-71:9.

332 F.R.D. at 399 (rejecting argument that expert needs to specify valuation tools at class certification). Dr. Cain explains how he will use the out-of-pocket methodology to calculate classwide damages, which is particularly appropriate in this case given the nature of the alleged misrepresentations and the corrective disclosures. Cain Rpt., ¶¶ 126-40; Cain Rbtl., ¶¶ 90-96. This is sufficient for establishing predominance. *S.Co.*, 332 F.R.D. at 399 (finding predominance "even though certain of the inputs to [the] model are not yet ascertainable").

### E. Lead Plaintiff is Typical.

Defendants' arguments against Lead Plaintiff's typicality (Opp. at 34-35) are without merit and fail to demonstrate any conflicts that would place the Class's interests "in significant jeopardy," as required to defeat typicality. *See In re Recoton Corp. Sec. Litig.,* 248 F.R.D. 606, 619 (M.D. Fla. 2006). As discussed above, Defendants' typicality argument related to the November 2021 statements fails because those are properly considered corrective disclosures. *See supra* at 1-2. The timing of Lead Plaintiff's transactions and the fact that he sold his shares before *additional* corrective disclosures also does not raise typicality concerns. Mot. at 15 n.5-6. Defendants also raise typicality issues related to the *Basic* presumption, application of *Cammer* Factor 2, and the presence of the redemption right, but offer no authority explaining why these purported conflicts between Lead Plaintiff and the Class would place the Class's interests "in significant jeopardy." *See Recoton*,

248 F.R.D. at 619; *see also* Cain Rbtl., ¶ 95.

### F. Conclusion

For the reasons stated herein and those in the opening brief, Lead Plaintiff has satisfied the Rule 23 requirements for class certification. The evidence overwhelmingly demonstrates that Redwire's securities traded in an efficient market, invoking the *Basic* presumption of reliance. Defendants have not rebutted this presumption or raised any legitimate concerns regarding typicality or damages. Lead Plaintiff therefore requests that the Motion be granted.

Dated: July 2, 2024

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: *s/ Reed R. Kathrein*
Reed R. Kathrein (Fla. Bar. No. 262161)
reed@hbsslaw.com
Lucas E. Gilmore (admitted *pro hac vice*)
lucasg@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001

Steve W. Berman (admitted *pro hac vice*)
steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Peter A. Shaeffer (admitted *pro hac vice*)
petersh@hbsslaw.com
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950

*Lead Counsel for Lead Plaintiff*
*Jared Thompson*

**THE SCHALL LAW FIRM**
Brian Schall (admitted *pro hac vice*)
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

**BUCKNER + MILES**
David M. Buckner (Fla. Bar No. 60550)
david@bucknermiles.com

*Liaison Counsel for Lead Plaintiff*