UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| JED LEMEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITON CORP., PETER CANNITO, and WILLIAM READ,<br><br>Defendants. | Case No. 3:21-cv-01254-TJC-PDB<br><br>CLASS ACTION<br><br>**LEAD PLAINTIFF JARED THOMPSON'S RESPONSE TO DEFENDANTS' DAUBERT MOTION TO EXCLUDE THE EXPERT OPINIONS OF MATTHEW D. CAIN** |

Lead Plaintiff Jared Thompson ("Lead Plaintiff") files this response to Defendants' *Daubert* Motion to Exclude the Expert Opinions of Matthew D. Cain ("Motion" or "Mot.") (ECF No. 136).

## I.    INTRODUCTION

Lead Plaintiff's expert Dr. Matthew D. Cain is indisputably qualified, and Defendants do not question his qualifications. Instead, Defendants contest the reliability and usefulness of Dr. Cain's expert report and testimony. These opinions address whether Redwire's common stock traded in an efficient market, which is crucial for invoking the "fraud-on-the-market" theory of reliance established in

- 1 -

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

Defendants' *Daubert* challenge is without merit.  Defendants paradoxically argue that Dr. Cain tailored his opinions for litigation purposes, despite the fact that his expert report addresses a legal doctrine – the *Basic* presumption of reliance. Dr. Cain analyzed the standard market efficiency criteria applied in securities cases, including the factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*") and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*").  Surprisingly, Defendants argue Dr. Cain's report is unreliable and unhelpful *precisely because* he evaluates the widely accepted *Cammer* and *Krogman* factors.  It is difficult to accept Defendants' argument that Dr. Cain's expert testimony should be excluded under *Daubert* for examining the criteria that courts in the Eleventh Circuit and elsewhere commonly use to evaluate market efficiency.

Defendants' substantive challenges, which focus on Dr. Cain's analysis of *Cammer* Factor 5, are equally without merit. To demonstrate cause and effect between company disclosures and resulting movements in stock price, Dr. Cain compared the price reaction of Redwire common stock on "news" days versus "no news" days.  Defendants claim this event study is fatally flawed because: (1) Dr. Cain did not determine whether "new, unexpected" information was disclosed on the identified "news" days; and (2) Dr. Cain did not predict the stock price's reaction in response to the news.  But, Courts evaluating *Cammer* Factor 5 event studies have

routinely rejected such criticisms. At best, these critiques and others raised by Defendants go to the weight of Dr. Cain's opinions, not their admissibility.

## II.    LEGAL STANDARD

A proposed expert's opinion is admissible if the expert is qualified, the methodology is reliable, and the testimony is helpful to the trier of fact. *See* Fed. R. Evid. 702. *Daubert v. Merrell Pharm.*, 509 U.S. 579 (1993) provides "illustrative, not exhaustive" factors for trial courts to consult in evaluating the reliability of expert testimony. *See Calta v. N. Am. Arms., Inc.*, 2007 WL 4800641, at *3 (M.D. Fla. Nov. 27, 2007) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150-52 (1999)). These factors include "(1) [w]hether the expert's theory can be and has been tested; (2) [w]hether the theory has been subject to peer review; (3) [t]he known or potential rate of error of the particular scientific technique; and (4) [w]hether the technique is generally accepted in the scientific community." *Id.*

However, "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible." *U.S. v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005). Here, the Court "is free to consider the ones which are relevant to the case before them, keeping in mind that not all of the factors will apply in every case." *Calta*, 2007 WL 48000641, at *3 (citing *Kumho*, 526 U.S. at 150-52). The Court's inquiry is "meant to be flexible and fact specific" allowing for the evaluation of an "expert's reliability without bright line rules." *Id.*

Under this analysis, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *See Quiet Tech. DC-8, Inc. v. Hurel Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Rather, "vigorous cross-examination [and] presentation of contrary evidence . . . are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* Accordingly, "challenges to the weight and sufficiency of the expert testimony are not properly raised under *Daubert*," and "exclusion of expert testimony under *Daubert* should be the exception rather than the rule." *See Walters v. Altec Indus., Inc.*, 2003 WL 25686829, at \*3 (M.D. Fla. Sept. 3, 2003).

### III.    ARGUMENT

#### A. Dr. Cain's Opinions Are Reliable.

#### 1.    Dr. Cain's Opinions Arise Out of His Expertise and Research and Are Not Created for Litigation Purposes.

Defendants assert that Dr. Cain's opinions are unreliable because they were "derived from methods developed in a litigation context." *See* Mot. at 6-7. These opinions, however, "grow[] naturally and directly" out of Dr. Cain's research and two decades of experience. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Specifically, Dr. Cain worked at the SEC as a financial economist, and has had teaching, research, and academic responsibilities related to shareholder lawsuits, disclosures of financial information, and shareholder activism, among other topics. *See* ECF No. 136-2 (the "Cain Rpt."), ¶¶ 5-12 and Appendix A.

In asserting that Dr. Cain's opinions are driven by litigation purposes, Defendants overlook the crucial context of his report. Lead Plaintiff tasked Dr. Cain to determine whether Redwire's common stock traded in an efficient market, a condition necessary for Lead Plaintiff to rely on the "fraud-on-the-market" theory of reliance established in *Basic*. *See* Cain Rpt., ¶¶ 1, 23-24. To that end, Dr. Cain analyzed market efficiency in the framework provided by the *Cammer* and *Krogman* courts. *Id.*, ¶¶ 37-96. Courts in the Eleventh Circuit have relied on experts addressing the *Cammer* and *Krogman* factors to determine whether a plaintiff can invoke the *Basic* presumption of reliance. *See* ECF No. 85 at 19-24 (citing Eleventh Circuit cases analyzing *Cammer* and *Krogman* factors). Dr. Cain's reliance on *Cammer* and *Krogman* to evaluate market efficiency therefore "does not render his methodology unreliable and does not turn his economic opinion into a legal one." *Willis v. Big Lots, Inc.*, 2017 WL 1074048, at *3-4 (S.D. Ohio Mar. 17, 2017); *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *11 (N.D. Ill. Mar. 5, 2015) (finding expert's testimony reliable when analyzing *Cammer* and *Krogman* factors).[1]

### 2. Dr. Cain's *Cammer* Factor 5 Analysis Relies on a Commonly Accepted Event Study Framework.

---

[1] Defendants' cases in support of their "litigation purpose" argument all relate to expert testimony in product liability claims. Mot. at 6-7 (citing cases). Given the "fact specific" nature of the *Daubert* analysis, such cases do not support excluding Dr. Cain's opinions. *Calta*, 2007 WL 48000641, at *3. In addition, Defendants mischaracterize the time spent putting together the Cain Report (Mot. at 7 n.6) by ignoring the hours worked by associates from Fideres Partners LLP, who assisted Dr. Cain. *See* Cain Rebuttal Report (Ex. A) ("Cain Rbtl."), ¶ 70.

All "Ex." Citations are to Exhibits in the Kathrein Declaration.

Analysis under *Cammer* Factor 5 seeks to establish a "cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711. F. Supp. at 1291. Dr. Cain's analysis is reliable and consistent with *Cammer*'s directive. In conducting his event study, Dr. Cain analyzed seven "news" days during the Class Period relating to "key GPAC and/or Redwire communications relating to the status of the business combination, or any delays in the filing of relevant SEC Form 10-Qs or 10-Ks." Cain Rpt., ¶ 76. After accounting for market and industry movements on those days, Dr. Cain determined that 85.7% of "news" days (6/7) during the Class Period had stock movements that were statistically significant at the 95% level. *Id.*, Ex. 7b. In contrast, only 7.7% of the 104 "no news" days during the Class Period had statistically significant stock price movements. *Id.* Dr. Cain's analysis therefore demonstrates a cause and effect relationship between Redwire's disclosures and stock price movement. *Id.*, ¶ 83.

Defendants claim Dr. Cain's event study is unreliable. *See* Mot. at 8-20. As their expert Dr. Andrew H. Roper notes, however, the event study methodology is properly used in determining market efficiency. *See* ECF No. 136-1 (the "Roper Rpt."), ¶ 102; *see also Willis*, 2017 WL 1074048, at *4 (noting expert utilized event study and "there is no evidence that he conceived, executed, or invented that methodology solely for use in this litigation"). In addition, Dr. Cain's event study framework of comparing the price reaction of Redwire common stock on "news"

days versus "no news" days bears indicia of reliability because it is commonly accepted by courts in support of *Cammer* Factor 5. *See, e.g., Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *13 (S.D. Fla. Mar. 16, 2016) (crediting event study assessing whether "'financial releases' promptly caused an identifiable price movement"); *In re Netbank, Inc. Secs. Litig.*, 259 F.R.D. 656, 674 (N.D. Ga. 2009) (accepting event study showing that "price of [] stock moves more on news days than non-news days"); *In re Teva Sec. Litig.*, 2021 WL 872156, at *27 (D. Conn. Mar. 9, 2021) (listing cases accepting event studies comparing stock price movement on "news" days versus "no news" days); *id.* at *38 (rejecting argument that event study methodology comparing "news" and "no news" days was "made-for-litigation methodology").

Accordingly, Dr. Cain's *Cammer* Factor 5 methodological framework is beyond dispute, and at most, the criticisms Lead Plaintiff addresses below go to the weight, but not the admissibility, of Dr. Cain's market efficiency opinion. *See Quiet Tech. DC-8, Inc.*, 326 F.3d at 1345 ("[O]bjections to the inadequacies of a study are more appropriately considered an objection" going to weight, not admissibility.).

**Dr. Cain Had A Proper and Objective Criteria for Selecting "News" Days.**
First, Defendants argue that Dr. Cain's event study is unreliable because he does not identify new information released in the "news" days. Mot. at 8-10. Per Defendants, the failure to ensure that the "news days" contain new, unexpected information

- 7 -

deviates from generally accepted principles. *Id.* Defendants are wrong. None of Defendants' cited authority warrants a conclusion that to test "cause and effect" under *Cammer* Factor 5, Dr. Cain had to identify new, unexpected information.[2] Moreover, Dr. Cain testified that he purposefully did not identify new and unexpected information *ex ante* to avoid imputing any subjectivity into his analysis. *See* ECF No. 129-4 ("Cain Dep. Tr.") at 21:6-13; 86:13-25; 124:16-125:4. In assessing *Cammer* Factor 5, courts generally agree with Dr. Cain's approach. *See, e.g., Angley v. Uti Worldwide Inc.*, 311. F. Supp. 3d 1117, 1124-25 (C.D. Cal. 2018) (citing cases where "courts have found, engaging in such *ex ante* determinations . . . would be subjective"); *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 412 (E.D. Va. 2015) (rejecting argument that expert's conclusions were unfounded because he failed to analyze whether the news released on event days was new or unexpected,

---

[2] Defendants' authority does not address event studies evaluating market efficiency under *Cammer* Factor 5, but rather loss causation or materiality relevant for determining damages at latter stages of litigation. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 721 n. 18 (11th Cir. 2012) (evaluating damages and loss causation); *United States v. Schiff*, 538 F. Supp. 2d 818, 838 (D.N.J.. 2008) (evaluating materiality); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 86, 94-95 (1st Cir. 2014) (evaluating loss causation). Defendants also selectively edit the quote from *Proper Event Study Analysis in Securities Litigation* to omit the article's context, which discussed event studies conducted to assess loss causation and materiality. *See* Mot. at 11 (citing Frank Torchio, *Proper Event Study Analysis in Securities Litigation*, 35 J. Corp. L 159, 160 (2009)) ("The failure of an economist to have engaged in an event study and formulated conclusions ***about loss causation and materiality*** . . .") (emphasis added). In fact, the article's author, Frank Torchio, conducted an event study to evaluate *Cammer* Factor 5 without identifying new, unexpected information. *See Loritz v. Exide Techs.*, 2015 WL 6790247, at *11 (C.D. Cal. July 21, 2015) ("To avoid making subjective decisions based on his own valuation of news events, [Torchio] defines news as [press releases and disclosures of financial results.]")

reasoning the event study avoided bias by using objective measures of event days).

Second, Defendants assert that Dr. Cain does not define objective criteria for his selection of events. Mot. at 11-14. However, this claim misrepresents Dr. Cain's criteria and analysis. As detailed in his report, and confirmed in his deposition, there are two categories of objective criteria for "news" days: (1) "information about the identification of the [special purpose acquisition company ("SPAC")] target and then updates on the potential closing of the transaction"; and (2) "earnings announcements or information about those earnings announcements or inability to file those earnings announcements." Cain Dep. Tr. at 123:4-25; Cain Rpt., ¶ 76. Per Dr. Cain, each event that falls under either one of these categories "has the potential to disclose new value relevant information to investors."[3] Cain Dep. Tr. at 124:16-

---

[3] Defendants' reliance on *Brown v. China Integrated Energy Inc.*, 2014 WL 12576643, at *7-8 (C.D. Cal. Aug. 4, 2014) is misguided. *See* Mot. at 13, 17-18. In *Brown*, the court excluded an expert report containing an event study because it lacked an objective criteria for the selection of "17 days associated with Company-specific disclosures or other Company-specific relevance" as events. *Id.* at *7. Notably, the court cited the expert's own testimony and found that the expert, in identifying events for the study, "look[ed] to see how the market reacted to [the information] – whether the share price jumped or dropped after the information was released." *Id.* at *8. In the court's view, this approach "compromise[d] the reliability of [the] methodology and conclusion." *Id.* Here, Defendants only speculate, and point to no portion of Dr. Cain's report or his deposition testimony, showing that Dr. Cain looked to how the market reacted to the release of news as a reason for inclusion as a "news" day in the event study. Mot. at 17-18. In fact, Dr. Cain explicitly rejected this type of approach in his deposition. *See* Cain Dep. Tr. at 20:5-21:13 (describing how he "la[id] out an objective criteria ex-ante without inserting my own subjectivity by looking at the results and then deciding whether or not to include an event within the sample or not").

The remaining cases cited by Defendants fare no better. Mot. at 11-12. *In re NII Holdings, Inc.*, 311 F.R.D. at 412 actually supports the reliability of Dr. Cain's event study, as the court rejected the exact same arguments Defendants raise in this case, including that the expert should have "analyze[d] whether the news released on the 18 event days was new or unexpected" and "analyze[d] whether price reactions were consistent with the nature of the news released[.]" *In re*

125:4.

Dr. Cain, moreover, has objective reasons for developing this criteria. This case involves a SPAC, GPAC, entering into a business combination with Redwire. Cain Rpt., ¶ 16.  Dr. Cain's "news" day criteria recognized that in assessing changes in the information environment surrounding a SPAC, the announcement of the target company and the close of the business combination are typically the two most important disclosures. Cain Dep. Tr. at 244:2-245:4; *id.* 45:6-46:1; Cain Rbtl., ¶ 46. Therefore, Dr. Cain included the announcements of Redwire as GPAC's target company for acquisition, the successful merger vote, and the closing of the business combination as "news" days.  Cain Rpt., Ex. 6a. This approach is consistent with Dr. Cain's other market efficiency reports involving SPACs and is supported by the literature.  *See* Cain Dep. Tr. at 244:2-245:4; Cain Rbtl., ¶¶ 46-48.

Similarly, Dr. Cain's inclusion of dates concerning delays in filing SEC Form 10-Qs and 10-Ks and the announcements of quarterly earnings all find support in the academic literature for having the potential to provide new information to the market, the primary consideration separating a "news" day from a "no news" day under Dr. Cain's criteria. [4] *See* Cain Rbtl., ¶ 44.

---

*Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 619 (C.D. Cal. 2009) is cited by Defendants for the proposition that event studies need objective criteria, a requirement Dr. Cain does not dispute and follows in this case. *See supra* at 9-10.

[4] Defendants argue that Dr. Cain's inclusion of the November 2021 delay notices as "news" days is "anomalous to his event selection in other SPAC litigation where delays also occurred but

Defendants also falsely assert that Dr. Cain's event study is not reproducible because they identify potential "news" days that seemingly meet Dr. Cain's criteria but were not included for unknown reasons.[5] Mot. at 13-14. For example, Defendants propose December 2, 2021 as a "news" day because Redwire notified investors that the NYSE had alerted the Company that it was no longer in compliance with certain NYSE regulations due to its late 10-Q filing for Q3 2021. *See* Roper Rpt., ¶ 153. But this date does not meet Dr. Cain's objective "news" day criteria because it alerts investors as to Redwire's compliance with NYSE regulations rather than the status of the late 10-Q filing and delay in announcing earnings.[6] *See* Cain

---

that Dr. Cain did not consider." Mot. at 18 n.10. In those cases, however, the delay notices did not relate to potential problems with reporting the companies' earnings, as is the case here, but rather concerned their need for additional time to finalize the forms to comply with new SEC guidance on accounting for warrants. *See* ECF No. 136-3 (May 18, 2021 PureCycle Form 12b-25); Ex. C (March 31, 2021 Romeo Power, Inc. Form 12b-25); Cain Rbtl., ¶ 44. Given Dr. Cain's selection criteria in this case, which focused on earnings-related disclosures, there is nothing "anomalous" about including the November 2021 delay notices as "news" days. Cain Rbtl., ¶ 44. Furthermore, "courts have recognized that an expert conducting an event study must use [his] discretion or independent determination in identifying news." *See Angley*, 311 F. Supp. 3d at 1126.

[5] Defendants also cite *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075 (S.D. Fla. 2022), *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 665 (M.D. Fla. 2012), and *Elcock v. Kmart Corp.*, 233 F.3d 738 (3d Cir. 2000) to support their reproducibility argument. These cases, however, all address the reproducibility of scientific testing in product liability, patent, and premises liability cases, respectively. Mot. at 13. As previously noted, this Court's *Daubert* analysis is "meant to be flexible and fact specific," and cases not involving a *Cammer* Factor 5 analysis are not on-point for the Court's determination of the reliability of Dr. Cain's event study. *See Calta*, 2007 WL 48000641, at *3.

[6] Similarly, Defendants assert that February 3, 2022 should also have been included as a "news" day because the Company issued a press release stating that "Redwire [was] working to finalize its third quarter 2021 Form 10-Q." Roper Rpt., ¶ 153. Although this disclosure did not obviously relate to "delays" in filing SEC forms, the abnormal stock return on this date was

Rbtl., ¶ 49.  Simply put, Dr. Cain's selection criteria for "news days" is reliable and offers no grounds for exclusion.

***Dr. Cain Had No Obligation to Predict the Direction of the Stock Price Movement.*** Defendants further attack Dr. Cain's event study because he did not offer *ex ante* predictions of "whether the unexpected new information is expected to cause prices to increase, decrease, or stay the same." Mot. at 14.  This challenge holds little weight, because demonstrating "cause and effect" under *Cammer* Factor 5 does not require a showing that the stock price reaction "was directionally consistent with the tenor of the news." *See Första AP-Fonden v. St. Jude Medical, Inc.*, 312 F.R.D. 511, 521 n. 5 (D. Minn. 2015)*; see also Willis.*, 2017 WL 1074048, at *5 (recognizing "several courts have rejected the notion that a failure to include a directional hypothesis is fatal to an event study on market efficiency for purposes of securities litigation"); *In re Teva Sec. Litig.*, 2021 WL 872156, at *29 (citing cases "credit[ing] non-directional event studies").

Indeed, the Supreme Court recognizes that evidence of directional consistency ultimately goes to the "*degree* to which stock prices accurately reflect public information" and is "thus largely beside the point" in assessing the "fraud-on-the-market" theory. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272

---

statistically significant at 95%, so if it was included as a "news" day the *Cammer* Factor 5 test results would be even stronger.  Cain Rbtl., ¶ 49.

(2014); *id.* ("'That the . . . price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss,' which is 'all that *Basic* requires.'"). At most, the disagreement over the need for an *ex ante* directional hypothesis goes to the weight of Dr. Cain's market efficiency opinion, and not its admissibility.[7] *See Walters*, 2003 WL 25686829, at *3.

***Dr. Cain Employs A Reliable Regression Model.*** Defendants also criticize Dr. Cain's use of a "rolling method" in his regression model because it does not control for the redemption right available to GNPK shareholders. Mot. at 16-17. This argument is not only incorrect, as Dr. Cain's model accounts for changing volatility during the Class Period, but also primarily concerns the inputs to the model. Cain Rbtl., ¶¶ 60-64.  Like the other attacks on Dr. Cain's event study, such a criticism goes to the weight of Dr. Cain's market efficiency opinion and not its admissibility. *See, e.g., In re Allstate Corp. Sec. Litig.*, 2022 WL 842737, at *15 (N.D. Ill. Jan. 10, 2022) (finding that uncertainty regarding data used in regression model in securities class action affected weight of expert's opinion, not admissibility).

---

[7] Defendants rely on *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174 (S.D.N.Y. 2012) to support their "directional hypothesis" argument. This case is readily distinguishable.  The *Freddie Mac* court excluded the expert's opinion as unreliable because the expert submitted multiple reports utilizing different methodologies and the "analysis changed so many times in important ways and was so internally inconsistent." *Id.* at 181-82.  Unlike the expert in *Freddie Mac*, Dr. Cain has not submitted event studies based on different methodologies rendering his analysis "internally inconsistent."

***Dr. Cain's Event Study Produces Reliable, Unbiased Conclusions.***

Defendants' claims of "bias and erroneous conclusions" resulting from Dr. Cain's analysis ring hollow when placed in the proper context of an event study addressing *Cammer* Factor 5. Mot. at 17-20. First, Dr. Cain did not cherry-pick events for his study by selecting dates "he knows are coupled with stock price movement." *Id.* at 17-18. Dr. Cain instead relied on an objective criteria, and Defendants offer nothing but speculation and conjecture to argue otherwise. *See supra* at 9-12. Inclusions of corrective disclosure dates is also not evidence of bias or grounds for exclusion. *See, e.g., Willis*, 2017 WL 1074048, at *4 ("That the objective criterion incorporated corrective disclosure dates does not undermine the reliability of the methodology employed in the event study."); *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2016 WL 4138613, at *13 (E.D. Penn. Aug. 4, 2016) (accepting an event study that included corrective disclosure dates).

Second, as demonstrated above, courts regularly accept evidence of stock price reactivity to meet *Cammer* Factor 5's "cause and effect" requirement. *See supra* at 6-7; *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d. 415, 430 (S.D.N.Y. 2014) (accepting test "involv[ing] comparing the percentage of days with news that have a statistically significant price movement to the percentage of days without news that have a statistically significant price movement"). Therefore, Defendants' argument that Dr. Cain's event study is not a "proper analysis indicative

of market efficiency" fails. Mot. at 19.

Third, while Defendants assert Dr. Cain's regression model is "fatally flawed," in reality the modifications made by Dr. Roper only resulted in one "news" day losing a statistically significant price movement. Roper Rpt., ¶¶ 165-66; Cain Rbtl., ¶ 65. This overlap of statistical significance findings between Dr. Roper and Dr. Cain undermines any claim of the regression model's unreliability.[8] Mot. at 19.

Finally, Defendants assert that Dr. Roper's analysis of the "news" days during the Class Period show multiple instances of market inefficiency based on the news released and the resulting direction of the stock price movement. Mot. at 19-20. For example, Dr. Roper claims that the "news" in the form of results from the shareholder vote approving the GPAC-Redwire merger was "*not* new and unexpected," which should have led Dr. Cain to observe the "subsequent stock price movement (as opposed to staying flat) as a sign of inefficiency." *Id.* at 19. However, as detailed in Dr. Cain's rebuttal report, Dr. Roper's directional assessment, predictions of stock price movement, and findings of market inefficiency are flawed, subjective, and defy common sense.[9] *See* Cain Rbtl., ¶¶ 40-41, 55-57.

---

[8] Even if the Court credited Defendants' analysis, 71% of "news" days during the Class Period (5/7 "news" days) would have statistically significant stock price movements, more than enough to satisfy *Cammer* Factor 5. *See, e.g., Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *5 (E.D. Mich. Nov. 19, 2020) (26% of "news" days with statistically significant price movement); *McIntire*, 38 F. Supp. 3d. at 433 (42% of "news" days with statistically significant price movement); *see also* Cain Rbtl., ¶ 65.

[9] While Lead Plaintiff does not accept Defendants' conclusions, for the reasons stated herein, findings of market inefficiency are not necessarily fatal to satisfying *Cammer* Factor 5. *See, e.g.,*

### 3. Dr. Cain Properly Assessed "Analyst" Coverage Under *Cammer* Factor 2.

Defendants mischaracterize the analysis required under *Cammer* Factor 2, claiming that in order to be considered under this factor and support a finding of market efficiency, analyst reports must make "earnings forecasts" or transmit "new and unexpected information." Mot. at 20-21. But *Cammer* merely states "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period." *See Cammer,* 711 F. Supp. at 1286. And Courts do not restrict the definition of "analyst" under Defendants' purported parameters. *See, e.g., Cheney v. Cyberguard*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (defining analysts as "investment professionals who . . . make buy/sell recommendations to client investors"); *Aranaz v. Catalyst Pharm. Partners, Inc.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014) (describing *Cammer* Factor 2 as "the presence of numerous financial analysts following the company and reporting on the stock"). Dr. Cain's analysis, where he identified eight (8) reports issued by three (3) analysts during the Class Period, is therefore sufficient for purposes of assessing *Cammer* Factor 2. *See* Cain Rpt., ¶¶ 42-49; Cain Rbtl., ¶ 32.

### B. Dr. Cain's Opinions Are Helpful to the Court.

The Court should reject Defendants' remaining arguments regarding whether

---

*In re Netbank, Inc.*, 259 F.R.D. at 674-75 (finding two examples of market inefficiency not enough to overcome other evidence of market efficiency at class certification stage).

Dr. Cain's opinions are "helpful." Mot. at 21-25. Dr. Cain's report addresses relevant *Cammer* factors and other indicia of market efficiency that will aid the Court's analysis of whether Lead Plaintiff can invoke the *Basic* presumption of reliance.

 ***Cammer* Factor 3**. Defendants assert that Dr. Cain's analysis of *Cammer* Factor 3 (market makers) "omits information necessary to render his analysis meaningful," including "the *volume* of shares the [] market makers committed to trade," the "*volume* of shares they actually traded," or the "*prices* of these traded shares." *See* Mot. at 22 (citing *In re Netbank, Inc.*, 259 F.R.D. at 671). However, this position contradicts other Eleventh Circuit court decisions that have assessed *Cammer* Factor 3. These courts have approved analyses that cite the number of market makers or the fact that the stock traded on a national exchange, without requiring the additional details Defendants claim are necessary. *See, e.g., Monroe Cty. Emps' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 383 (N.D. Ga. 2019) (noting 182 market makers and fact stock traded on NYSE); *Thorpe*, 2016 WL 4006661, at *13 (noting that stock traded on the NYSE in discussing *Cammer* Factor 3). Accordingly, similar information provided by Dr. Cain is helpful and should not be excluded. *See* Cain Rpt., ¶¶ 50-55.

 ***Cammer* Factor 5 Analysis Outside Class Period**. Defendants argue that Dr. Cain's event study is not helpful because it considers days that post-date the end of the Class Period (March 25, 2021-March 31, 2022). Mot. at 23-24. But Dr. Cain

provided two separate analyses.  One analysis limited the statistical tests to the seven "news" days and 104 "no news" days during the Class Period.  Cain Rpt., ¶¶ 66, 82, Ex. 7b.  Because Redwire only hosted one earnings announcement during the Class Period, Dr. Cain also extended the analysis period to account for all the earnings announcements between the start of the Class Period and March 31, 2023, resulting in twelve "news" days and 224 "no news" days.  *Id.*, ¶¶ 66, 77, 81, Ex. 7a. Defendants cite no authority demonstrating that the seven "news" days identified during the Class Period are an insufficient basis to assess market efficiency.[10] In fact, courts have found evidence of market efficiency from event studies with the same amount of days.  *See, e.g., S.Co.*, 332 F.R.D. at 385 (crediting *Cammer* 5 study with seven event dates).  Dr. Cain's use of dates outside the Class Period has also been accepted by Courts in assessing *Cammer* Factor 5. *See, e.g., Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *11, 13 (C.D. Cal. Dec. 19, 2022) (noting Dr. Cain's "approach of using dates outside the class period might be a best practice for statistical analysis" and finding Dr. Cain's event study, report and findings as being "sufficiently grounded in reliable analytical methods").

---

[10] Defendants' cases are factually distinguishable and at most show that this is a factor that goes to the weight of the opinion and not admissibility. *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 297 (S.D.N.Y. 2008) (providing no analysis of event study in support of *Cammer* Factor 5); *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207 n.13 (2d. Cir. 2008) (focusing on *Cammer* Factor 3); *Freddie Mac Sec. Litig.*, 281 F.R.D. at 179 (describing multiple issues with event studies beyond use of one day outside class period).

***Krogman* Factors and Additional Factor 4**.  Defendants claim that Dr. Cain's analysis considering market capitalization, bid-ask spread, and public float (the "*Krogman*" factors) and institutional ownership "do not speak to market efficiency and is unhelpful to the Court's determination." Mot. at 24.  This argument contradicts Eleventh Circuit precedent. Multiple courts have evaluated the *Krogman* factors and recognized that "institutional" ownership is a relevant factor to consider in evaluating the applicability of the *Basic* presumption. *See, e.g., In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (addressing market capitalization); *Cheney*, 213 F.R.D. at 501 (addressing bid-ask spread); *In re Netbank Inc.*, 259 F.R.D. at 672-73 (addressing public float); *Local 703 v. Regions Fin. Corp.*, 762 F.3d 1248, 1258 (11th Cir. 2014) (identifying the presence of "institutional investors" as a feature of an efficient market). Dr. Cain's report addressing these factors will assist the Court's market efficiency determination.

***Autocorrelation and Active Options Trading***. Finally, Defendants argue that Dr. Cain's analysis of autocorrelation and active trading in Redwire options are unhelpful. Mot. at 24-25.  Courts recognize, however, that "[a] finding of a lack of autocorrelation may 'provide some support,' albeit limited, that the stock traded in an efficient market."  *See Första,* 312 F.R.D. at 519.  Similarly, courts credit evidence of options activity in evaluating market efficiency.  *See, e.g., Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 483 n.3

(E.D. Pa. 2022); *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2023 WL 3569981, at *9 (N.D. Cal. May 19, 2023). Dr. Cain's analysis will be similarly helpful for the Court in assessing market efficiency.

## IV.   CONCLUSION

For the reasons stated herein, the Court should deny Defendants' *Daubert* motion to exclude Dr. Cain's expert opinions.

Dated: July 2, 2024

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: *s/ Reed R. Kathrein*
Reed R. Kathrein (Fla. Bar. No. 262161)
reed@hbsslaw.com
Lucas E. Gilmore (admitted *pro hac vice*)
lucasg@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001

Steve W. Berman (admitted *pro hac vice*)
steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Peter A. Shaeffer (admitted *pro hac vice*)
petersh@hbsslaw.com
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950

*Lead Counsel for Lead Plaintiff Jared Thompson*

**THE SCHALL LAW FIRM**
Brian Schall (admitted *pro hac vice*)
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

**BUCKNER + MILES**
David M. Buckner (Fla. Bar No. 60550)
david@bucknermiles.com

*Liaison Counsel for Lead Plaintiff*