# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JED LEMEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ,<br><br>Defendants. | Case No.  3:21-cv-01254-TJC-PDB<br><br><u>CLASS ACTION</u> |

REBUTTAL REPORT OF MATTHEW D. CAIN, PHD

July 2, 2024

**Table of Contents**

1. Introduction ........................................................................................................................ 2

2. Summary of Opinions ....................................................................................................... 2

3. Market Efficiency of Redwire Securities ........................................................................ 5

   3.1  Dr. Roper's Views on Market Efficiency Render His Opinions Irrelevant in this Matter . 5

   3.2  Overview of Redwire Common Stock Market Efficiency .................................................. 5

   3.3  Dr. Roper Confuses Informational Efficiency and Fundamental Efficiency ..................... 7

   3.4  Dr. Roper's Efficiency Opinions are Irrelevant Because He Fails to Properly Consider
and Apply the *Cammer* and *Krogman* Factors ......................................................... 10

   3.5  Dr. Roper's Critiques of my *Cammer* and *Krogman* Factor Analyses are Unsupported . 13

   3.6  Dr. Roper is Wrong to Assert that Redwire's Common Stock Price Increase Upon the
Successful Closing of the Business Combination Reflects Inefficiency ................................. 15

   3.7  Dr. Roper's Critiques of My *Cammer* 5 Analysis are Unfounded ................................. 18

      3.7.1  My Selection of News Days is Objective .................................................. 18

      3.7.2  Dr. Roper's Directionality Assessments Introduce Subjectivity Into His Opinions. 23

      3.7.3  My Regression Analysis Is Reliable and Adapts to Changes in the Information
Environment During the Analysis Window ......................................................................... 26

   3.8  Market Efficiency of Redwire's Options and Warrants ................................................. 28

   3.9  Def's Opp Brief Mischaracterizes the Amount of Time Involved in Forming my
Efficiency Report Opinions ................................................................................................ 29

4. Dr. Roper Fails To Establish That The Alleged Misrepresentations Did Not Have Price
Impact ................................................................................................................................ 30

   4.1  Redwire's Common Stock Returns Following the Alleged Corrective Disclosures
Establish Price Impact ...................................................................................................... 30

   4.2  The $10.15 Redemption Value Does Not Refute Price Impact ..................................... 33

   4.3  Redwire's Stock Price Change Following Completion of the Business Combination Does
Not Undermine Price Impact ............................................................................................. 36

5. Damages Can Be Calculated On A Class-Wide Basis Subject To A Common Methodology
Consistent with Plaintiff's Theory of Liability ............................................................... 37

Appendix A ........................................................................................................................... 41

Appendix B ........................................................................................................................... 48

## 1. INTRODUCTION

1. On January 19, 2024, I submitted an expert report on market efficiency in this matter ("Efficiency Report"), in which I concluded that: a) the market for shares of Redwire's Common Stock was efficient throughout the course of the Class Period, b) the market for Redwire's Options and Warrants was efficient throughout the course of the Class Period, and c) Common Stock, Warrants and Options damages in this matter can be calculated on a class-wide basis subject to a common methodology.[1]

2. Following the submission of my Efficiency Report, Counsel provided me with the April 24, 2024 Expert Report of Dr. Andrew H. Roper ("Roper Report") in conjunction with Defendants' Opposition to Class Certification ("Def's Opp Brief").[2] Counsel also provided me on May 8, 2024 Defendants' Daubert Motion ("Def's Daubert Motion").[3] I have been asked to review, evaluate, and respond to the opinions in the Roper Report, Def's Opp Brief and Def's Daubert Motion.

3. My qualifications and rate of compensation for work in this matter are identified in my Efficiency Report, and I attach an updated version of my curriculum vitae as **Appendix A**. I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process or future rulings from the Court.

4. In formulating my opinions set forth in this Expert Rebuttal Report, I have relied upon the analyses already described in my Efficiency Report, as well as my knowledge, professional experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts in this matter. All of the materials I considered in forming my opinions are identified in **Appendix B** to this report in addition to **Appendix B** to my Efficiency Report.

## 2. SUMMARY OF OPINIONS

5. My opinions can be summarized as follows:

---

[1] Efficiency Report ¶3.

[2] Defendants' Response in Opposition to Lead Plaintiff's Motion for Class Certification, Apr. 24, 2024 (Doc. 129).

[3] Defendants' Daubert Motion to Exclude The Expert Opinions of Matthew D. Cain, May 8, 2024 (Doc. 136)

6.  Despite his assertions to the contrary, Dr. Roper's market efficiency opinions are based on a standard of market efficiency – fundamental efficiency – which has been rejected by multiple courts, including the U.S. Supreme Court, further undermining any relevance of his opinions.

7.  Dr. Roper's rigid adherence to fundamental efficiency also leads him to reject the reliable and widely-accepted application of the *Cammer* and *Krogman* factors to evaluate market efficiency. Because his market efficiency opinions do not stem from a reliable application of these factors, his subjective and unscientific conclusions are flawed and irrelevant.

8.  Dr. Roper's opinions also ignore that numerous courts, including those within this Circuit, accept the *Cammer* and *Krogman* factors as reasonable, reliable, and relevant for inquiries into market efficiency.[4] Moreover, these factors are grounded in academic research, which supports their applicability to tests of market efficiency.[5] My Efficiency Report evaluates these factors in the same objective manner that I have applied to over 25 prior market efficiency reports. These analyses have been accepted by various courts.[6]

9.  Dr. Roper opines that Redwire's "share price had been corrupted by an inefficient market."[7] Despite his assertion of an inefficient stock price movement upon the successful closing of the business combination, Dr. Roper admitted in testimony that he has not assessed Redwire's market efficiency over the Class Period;[8] he does not opine that the market was *inefficient* throughout the Class Period. Furthermore, his assertion that Redwire's stock price should not have increased by $0.20 upon the successful closing of the business combination is contradicted by basic principles of financial trading and markets, as well as by Redwire's own

---

[4] Efficiency Report ¶29, fn. 32-33. *See, e.g.*, *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661, at *13; *In re Netbank, Inc. Secs. Litigation*, 259 F.R.D. 656, 669-676 (N.D. Ga. 2009); *Aranz v. Catalyst Pharmaceutical Partners, Inc.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014); *see also Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501-502 (S.D. Fla. 2003); *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[5] Efficiency Report ¶¶33-37, fn. 36, 40, 42.

[6] *See, e.g.*: *In re: Under Armour Securities Litigation*, 631 F.Supp.3d 285, 311-12 (D. Md. 2022); *In re: QuantumScape Securities Class Action Litigation*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022); *Homyk v. ChemoCentryx, Inc. et al.*, Case No. 4:21-cv-03343-JST. (N.D. Ca.).

[7] Roper Report ¶28.

[8] Roper Tr. 55:18-56:9.

3

executives touting the announcement as a "milestone achievement" and a "thrilling day."

10. Def's Opp Brief repeatedly points to the Roper Report in arguing that there was no price impact of the alleged misrepresentations.[9] However, the Roper Report does not purport to offer a reliable assessment of price impact throughout the entire Class Period, and it does not evaluate the price impact of the alleged corrective disclosures. My event study reveals statistically significant stock price declines following all of the alleged corrective disclosures, and I find that the alleged corrective disclosures are economically linked to the alleged misrepresentations. Thus, I conclude that the alleged misrepresentations had price impact.[10]

11. Dr. Roper speculates that the $10.15 Redemption Value of the SPAC shares represented an absolute "floor" on the stock price during the Class Period prior to the Redemption Deadline. Dr. Roper therefore opines that GNPK's stock price had $0 of artificial inflation during portions of the Class Period, yet he admitted in testimony that he has not conducted a merits-based loss causation analysis.[11] His assumption of a $10.15 share price floor is also contradicted by basic financial and valuation principles. Thus, Dr. Roper presents loss causation opinions that lack support, rendering them irrelevant.

12. Dr. Roper critiques my damages methodology for Redwire Common Stock, Options, and Warrants. His opinions relate to specific calculations of the inputs to the formula, not the methodology itself, which is widely-employed across securities cases. None of his critiques disturb my Efficiency Report conclusion that the out-of-pocket methodology represents a reliable methodology to calculate damages and can be applied across Class members.

13. In summary, none of Dr. Roper's, Def's Opp Brief's or Def's Daubert Motion's criticisms disturb my Efficiency Report conclusions, which I reaffirm herein. The following sections explain the various flaws in Dr. Roper's and Defendants' critiques.

---

[9] Def's Opp Brief, pp. 29-30.

[10] I have made no independent investigation of the issues of liability and loss causation in this case, as neither is required for the opinions expressed herein. Nor have I been asked to calculate damages or the relevant artificial inflation ribbon required for such calculations, as likewise, neither is required for my opinions here.

[11] Roper Tr. 13:17-20.

### 3. MARKET EFFICIENCY OF REDWIRE SECURITIES

**3.1    Dr. Roper's Views on Market Efficiency Render His Opinions Irrelevant in this Matter**

14. Dr. Roper explicitly rejects the application of certain of the *Cammer* factors and all of the *Krogman* factors as relevant tests of market efficiency. He characterizes these widely accepted analyses as "counts and comparisons" and opines that they are "not connected in the literature to whether prices adjust efficiently"[12] and are "unreliable."[13] Because Dr. Roper rejects the applicability of the widely relied upon *Cammer* and *Krogman* factors to an analysis of market efficiency, his opinions and conclusions are ultimately irrelevant in this matter. Nonetheless, in the following sections I explain additional flaws in his critiques of the analyses contained within my Efficiency Report.

**3.2    Overview of Redwire Common Stock Market Efficiency**

15. In my Efficiency Report, I conclude that the market for shares of Redwire Common Stock, Warrants, and Options was efficient throughout the course of the Class Period.[14] I base this conclusion on my evaluation of the *Cammer*, *Krogman*, and additional factors, my consideration of Redwire as a SPAC from the beginning of the Class Period through the closing of the business combination, including the redemption right, and then as a public operating company for the remainder of the Class Period, and my consideration of the various efficiency factors over both the full Class Period and the portion of the Class Period prior to the closing of the business combination.[15] I explained these analyses and considerations in my Efficiency Report as well as during my deposition. For example:

> Q. Okay, I think I know the answers to these questions. I got a couple – a few in a row that are more or less the same question about different things but just so I get it on the record.

---

[12] Roper Report ¶78.

[13] Roper Report ¶81.

[14] Efficiency Report ¶3.

[15] Efficiency Report Section 5.

First, did the existence of the redemption right over part, but not all of the class period in this case, impact the way you did your analysis of market efficiency?

A. Like I said before, it is something that I considered and I don't think it caused me to change the approach that I take or the methodology that I take because the approach I take in every efficiency report is to conduct the analyses in an objective manner, but it is something that I considered and that I was confident that the rolling Event Study regression methodology was capable of reasonably and appropriately handling. And it is also something that I considered when I looked at the other factors and how those other factors may have changed over time from the pre-business combination to the post-business combination period, which also coincides with the change in the redemption right.[16]

16. As explained in my Efficiency Report and in my testimony quoted above, I considered the unique characteristics of SPACs when conducting my analysis of Redwire's market efficiency. Furthermore, I considered and incorporated information about Redwire both before and after completion of the business combination, including differences in volatility and other aspects of the Company's information environment. Furthermore, Def's Opp Brief mischaracterizes my testimony in claiming that I view a redemption right to be "inconsequential."[17] I did not testify that redemption rights are inconsequential. Rather, I explain throughout this report that redemption rights are not unique but rather are routine in SPAC securities, I have encountered them in multiple efficiency reports, and the standard approaches to evaluating market efficiency and the ability to calculate class-wide damages does not require any modifications to account for the presence or expiration of redemption rights.

17. As I explain in the following sections, Dr. Roper's criticisms of my efficiency analyses are flawed and irrelevant because a) he confuses informational efficiency and fundamental efficiency, b) he fails to properly consider and apply the widely-accepted *Cammer* and *Krogman* factors, and c) his opinions are based on subjective and flawed assessments of Redwire's stock price movements.

---

[16] Cain Tr. 58:8-59:9.

[17] Def's Opp Brief, at fn. 26: "Dr. Cain 'considered' the Redemption Right, but 'determined that there was no need to propose an alternative damages methodology that differed from the standard out-of-pocket damages methodology[;]' Cain Tr. at 70:24-71:5; yet, never explained why it is inconsequential."

### 3.3    Dr. Roper Confuses Informational Efficiency and Fundamental Efficiency

18. Dr. Roper's opinions regarding the efficiency of the market for Redwire Common Stock during the Class Period are flawed and irrelevant, as he focuses on a definition of fundamental market efficiency which has been routinely rejected by courts in evaluating whether reliance can be presumed under the fraud-on-the-market theory. Dr. Roper appears to confuse informational efficiency and fundamental efficiency. For example, Dr. Roper testified that he is not assessing fundamental efficiency in this case. [18] Yet he relies on academic literature that assesses fundamental efficiency in motivating his analysis – for example, a study by Fama (1991). Dr. Roper mischaracterizes this study as one that does not assess fundamental efficiency but rather informational efficiency. [19] Yet, the Fama study makes clear that its focus is on fundamental value, and thus fundamental efficiency. For example:

- "This means, however, that the new results run head-on into the joint-hypothesis problem: Does return predictability reflect rational variation through time in expected returns, irrational ***deviations of price from fundamental value***, or some combination of the two." [20]

- "They present simple models in which stock prices take large slowly decaying ***swings away from fundamental values*** (fads, or irrational bubbles), but short-horizon returns have little autocorrelation…To illustrate the point, suppose the ***fundamental value of a stock*** is constant and the unconditional mean of the stock price is its ***fundamental value***… All variation in the price then results from long mean-reverting ***swings away from the constant fundamental value***." [21]

- "the long ***swings away from fundamental value*** proposed in the model imply that long-horizon returns have strong negative autocorrelation…Intuitively, since the ***swings away from fundamental value*** are temporary, over long horizons they tend to be reversed." [22]

- "On the other hand, in a world of irrational bubbles, low [dividend yield] signals irrationally high stock prices that will ***move predictably back toward fundamental values***." [23]

---

[18] Roper Tr. 80:19-21.

[19] Roper Tr. 83:11-84:18.

[20] Fama, Eugene F., 1991, "Efficient Capital Markets II," *Journal of Finance* 46, at p. 1577.

[21] *Id*., at p. 1580.

[22] *Id*., at p. 1581.

[23] *Id*., at p. 1583.

- "There is a large event-study literature on issues in corporate finance. The results indicate that *on average stock prices adjust quickly to information* about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that *prices adjust efficiently to firm-specific information*.[24]

19. Under Dr. Roper's definition of market efficiency, "stock prices are **at all times** equal to the market's unbiased consensus of the present value of expected future cash flows," and "[w]hen unexpected new information become publicly available […] price of the stock changes rapidly to reflect the new information **fully and fairly**."[25] Dr. Roper then opines that "a proper test of market efficiency requires the researcher to objectively specify whether the unexpected new information is expected to cause prices to increase, decrease, or stay the same,"[26] and "[w]hen stock prices move unexpectedly, these instances can provide important indications of market inefficiency."[27]

20. Dr. Roper's evaluation of fundamental efficiency represents a standard that has been routinely rejected by courts. For example, *Halliburton II* notes that the presumption of reliance is based on "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" In addition, the Supreme Court in *Halliburton II* also recognized that the debate about fundamental efficiency has "not refuted the modest premise underlying the presumption of reliance."[28]

---

[24] *Id.*, at p. 1607.

[25] Roper Report ¶64 (emphasis added).

[26] Roper Report ¶123.

[27] Roper Report ¶69.

[28] *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 270-72 (2014). *See also In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005). ("For purposes of establishing the fraud-on-the-market presumption of reliance, we adopt the prevailing definition of market efficiency, which provides that an efficient market is one in which the market price of the stock fully reflects all publicly available information. By 'fully reflect,' we mean that market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information. This is known as 'informational efficiency.' We reject a second and much broader meaning of 'fully reflect,' known as 'fundamental value efficiency,' which requires that a market respond to information not only quickly but accurately, such that the market price of a stock reflects its fundamental value."); *In re VeriFone Sec. Litig.*, 784 F.Supp. at 1479 (N.D. Cal. 1992) n. 7 (stating that the fraud-on-the-market theory does not require "proof that the market correctly reflects some 'fundamental value' of the security. To apply the fraud-on-the-market theory, it is sufficient that the market for a security be 'efficient' only in the sense that market prices reflect the available information about the security.").

21. Instead, when assessing market efficiency, courts have adopted the definition of "informational efficiency." In an informationally efficient market, the stock price quickly reflects all publicly available information.[29] As agreed by financial economists, this standard of market efficiency "does not require that markets be anywhere near perfectly efficient."[30]

22. Dr. Roper also fails to acknowledge that many courts have explicitly ruled that a showing of directionality between expected and observed price moves is not necessary for market efficiency.[31]

23. Dr. Roper further confuses fundamental and informational efficiency when he claims that academic research disputes the presumption of market efficiency for companies traded on major stock exchanges.[32] Dr. Roper's view is contradicted by courts and practitioners.[33] But it also reflects his confusion between fundamental and informational efficiency, as the academic studies documenting market anomalies, behavioral finance, investment bubbles, and

---

[29] *See*, e.g., *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005). The Appeals Court for the First Circuit explained, "[t]he district court was right to worry about these implications of Defendants' efficiency arguments; it did not err by rejecting Defendants' proposed definition of market efficiency requiring consistency with fundamental value. By drawing on the standard of efficiency in Cammer and holding that 'a share's market price [must] reflect publicly available information, not . . . perfectly and correctly incorporate it,' the district court adopted the correct standard of efficiency." Id.

[30] Brief of Financial Economists as *Amici Curiae* in Support of Respondents for the Supreme Court of the United States, *Halliburton Co. v. Erica P. John Fund, Inc*. 573 U.S. 258 (2014).

[31] *See, e.g.*, *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 370 (S.D.N.Y. 2016) ("Such evidence goes to the accuracy of the price of a security, and the Supreme Court has explained that it is not the accuracy of a price as a reflection of underlying value but instead the sensitivity of the price to false statements that underlies the Basic presumption"); *In re Teva Secs. Litig.*, 2021 WL 872156, at *29 (D. Conn. Mar. 9, 2021) ("[I]t is a virtue that [the expert] does not analyze the news' content before running his tests. By reducing subjectivity in that way, [the] tests give me confidence that [the expert] has not intentionally (or unconsciously) influenced the outcome of his tests results" and noting that "[n]umerous other courts have also credited non-directional event studies.").

[32] Roper Report ¶76: "The fact that market participants commented on the irrationality of SPAC prices during this time illustrates an important point: one cannot presume that a publicly traded stock traded in an efficient market just because it is publicly traded (as is improperly suggested by Dr. Cain)."

[33] *See, e.g., Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'" (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988))); *Thorpe v. Walter Inv. Mgmt. Corp.,* 2016 WL 4006661, at *13 ("Walter Investment common stock trades on a national exchange, the New York Stock Exchange, which further supports an efficiency finding.").

---

9

irrationality he relies on speak to questions of fundamental, not informational, efficiency. [34]

24. I further clarified the difference between Dr. Roper's fundamental efficiency tests and the informational efficiency standard routinely accepted by courts during my deposition:

> Q. And can you tell us, unless you already have, what exactly that term "informational efficiency" means?
>
> A. Yeah. So, again, I think it – it goes on – I go on in subsequent paragraphs, for example, I talk about the Halliburton II court decision, and basically it means that information about the company is reflected in its stock price.
>
> So I think the way that I would provide maybe some additional clarity on what that means is to contrast that with fundamental efficiency. So fundamental efficiency would refer to the stock price actually reflecting the fundamental value of a company. And that's something that is very different because in any securities class action case there is an allegation that the stock price has been distorted by misrepresentations or omissions and it is no longer reflecting the fundamental value.
>
> So that is **not a precondition or prerequisite for market efficiency in this context**. [35]

### 3.4   Dr. Roper's Efficiency Opinions are Irrelevant Because He Fails to Properly Consider and Apply the *Cammer* and *Krogman* Factors

25. In his report, Dr. Roper explicitly rejects the applicability of *Cammer* Factors 3-4 and the *Krogman* factors when assessing market efficiency, despite conceding that the *Cammer* and *Krogman* "counts and comparisons may be instructive to the Court."[36] This argument ignores that virtually all securities class action cases since the *Cammer* Court decision, including those heard in this Circuit, have relied on some subset of these factors when determining market efficiency.[37]

26. My reliance on this set of factors is not based solely on the *Cammer* Court's decision however, as numerous academic sources have also assessed these factors in relation to investor interest and as indicia of efficiency. In my Efficiency Report, I compare Redwire's *Cammer* and

---

[34] Roper Report ¶¶71-76.

[35] Cain Tr. 78:13-79:9 (emphasis added).

[36] Roper Report ¶18; Roper Tr. 28:13-29:3.

[37] *See supra* n. 4.

*Krogman* factors to the relevant court thresholds in the case that such thresholds have been provided, but I also compare Redwire to market-wide thresholds established in academic studies, such as the MRK Study and the Bhole Study. While Dr. Roper argues that these studies fail to objectively identify samples of firms that trade efficiently,[38] his critique falls flat. These published academic studies clearly document differences across firms along the same factors evaluated in *Cammer* and *Krogman*, as explained below. Moreover, these studies clearly explain that these factors are reflective of "investor interest" in companies, which ultimately reflects the extent to which investors are interested in and react to new disclosures from companies, thus impounding the value of new information into company stock prices. This conclusion is confirmed by additional academic research discussed further below.

27. As I explained in my Efficiency Report, the authors of the MRK Study documented the differences in *Cammer* and *Krogman* factor values — such as trading volume, bid-ask spread, analyst coverage, and market capitalization — across two different samples of firms: one sample that was covered actively by analysts and one sample that had lost all analyst coverage. The authors used these factor comparisons to gauge varying "investor interest" between the two samples, finding that the differences in average market capitalization, trading volume, bid-ask spread, and institutional ownership were all significant at the 99% level.[39] The results of the MRK Study support the conclusion that the *Cammer* and *Krogman* factors test for meaningful differences in investor interest across companies, consistent with the focus of inquiry into market efficiency.

28. I also refer to another academic paper in my Efficiency Report which established market wide benchmarks for efficiency analysis: the Bhole Study. The authors of the Bhole Study applied a subset of the *Cammer* and *Krogman* factors — trading volume, analyst coverage, bid-ask spread, market capitalization, and market maker presence — to all stocks listed on the NYSE and the NASDAQ.[40] I clarified in my Efficiency Report and during my deposition that all stocks traded on large established exchanges such as the NYSE or NASDAQ benefit from a

---

[38] Roper Report ¶¶96-101.

[39] Efficiency Report ¶¶33-35.

[40] Bhole Study, p. 96.

general presumption of market efficiency:[41]

> Q. Okay. So let's talk about the Bhole study. Is it fair to say that while Bhole, it does speak to efficiency, they don't actually say that any of the companies in their rankings are efficient?
>
> A. I'd have to go back and see exactly how they articulate it. I think it is possible that they say something about like 10 percent. You know, if you exceed the 10th percentile, then you're clearly efficient.
>
> I think the thing to keep in mind about the Bhole study is that that's a study of firms traded on the New York Stock Exchange and the Nasdaq. And what many commentators and academics and professionals have said is – and I talked about this earlier on in my report – there is actually a strong presumption of market efficiency for these large, nationally recognized stock exchanges of the Nasdaq and NYSE.
>
> So even if you fall in terms of at the low end of the distribution for any of these factors under the Bhole study, these are still – this is still a distribution of companies that actually have a presumption of market efficiency because they're traded on the New York Stock Exchange or the Nasdaq.[42]

29. Additional academic research has confirmed the relevance of these factors in assessing market efficiency. For example, a study by Villanueva and Feinstein stated "Stocks with large capitalization, high trading volume, broad analyst coverage, a large number of market makers, and narrow bid-ask spread are far more likely to react significantly to earnings announcements than stocks without these characteristics."[43] Therefore, by comparing the results of the *Cammer* and *Krogman* factor analysis for Redwire during the Class Period to the results of the MRK Study and the Bhole Study, I can observe how the Company compared to others that benefit from such presumptions of efficiency.

30. In my Efficiency Report, I ***objectively*** compare Redwire's factor analysis to whatever appropriate thresholds are available for assessing market efficiency, whether that be guidance from the Courts, academic research, or some combination of the two. I reiterated this point during deposition:

---

[41] Efficiency Report ¶53.

[42] Cain Tr. 185:20-186:22.

[43] Villanueva, O. Miguel, and Steven Feinstein, 2021, "Stock price reactivity to earnings announcements: the role of the *Cammer*/*Krogman* factors," *Review of Quantitative Finance and Accounting* 57.

Q. That's what I'm getting to.

So you said "and/or" because you didn't compare to the three benchmarks for each one of the 11 factors; is that a fair summary?

A. Right. Like I said before, I compare it to the benchmarks that are available. If the Cammer court provides a benchmark, then I use it and if the Cammer court did not provide a benchmark, then there's nothing provided by the court. So it's obviously not even a judgment call on my part but rather what the courts have put forth.[44]

31. Thus, because he rejects *Cammer* Factors 3-4 and the *Krogman* factors as a basis of market efficiency, analysis despite the large volume of evidence from both Courts and academic sources supporting their relevance, Dr. Roper's opinions are flawed and unreliable.

### 3.5   Dr. Roper's Critiques of my *Cammer* and *Krogman* Factor Analyses are Unsupported

32. After rejecting the applicability of *Cammer* Factors 3-4 and the *Krogman* factors, Dr. Roper then criticizes their implementation in my Efficiency Report, as well as my analysis of *Cammer* Factors 1-2. He points repeatedly to a 1994 study by Barber, Griffin, and Lev which measured certain factors in ways that differed from the *Cammer* and *Krogman* courts' description of the factors.[45] As noted above, I have measured the *Cammer* and *Krogman* factors in the same objective, reasonable, reliable, and consistent manner across all of my over 25 market efficiency reports. Dr. Roper's criticisms of my analyses are thus unsupported and irrelevant. Nonetheless, I note the following additional flaws in his factor criticisms:

- *Cammer* **Factor 1: Average Weekly Trading Volume**. Dr. Roper argues that trading volume should be measured over 40 days using "average daily dollar volume of trading,[46] in contradiction to the *Cammer* court's guidance of assessing "average weekly trading…"[47] The *Cammer* court also did not dictate an exact method by which to calculate "average weekly trading volume."[48] Dr. Roper does not argue that an alternative measure of trading volume is

---

[44] Cain Tr. 163:9-163:22.

[45] Barber, Brad M., Paul A. Griffin, and Baruch Lev, 1994, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporation Law* 19. *See* Roper Report ¶¶79-82; 84-85; 113-117; 128; Figure 5.

[46] Roper Report ¶85; fn. 93.

[47] Efficiency Report ¶38.

[48] *Cammer*, 711 F. Supp. at 1286, 1293.

inconsistent with market efficiency.

- *Cammer* **Factor 2: Analyst Coverage**. Dr. Roper discounts the relevance of analyst reports issued by Validea and ValuEngine and claims that I "subjectively choose[] how to count analyst coverage" because I purportedly ignore how "analysts" were defined in the literature I cited.[49] But for purposes of applying *Cammer* Factor 2, there is no set definition of "analyst" defined by the *Cammer* court.[50] Moreover, in contrast, I objectively include *all* analyst reports, following the *Cammer* court's guidance that "[I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period."[51] In testimony I also explained that the same analysts that Dr. Roper wishes to ignore actually had more pessimistic buy/sell recommendations on Redwire's stock, which may have been beneficial for investors.[52]

- **Additional Factor 5: Autocorrelation**. Citing to Fama, Dr. Roper agrees that autocorrelation tests can be used to evaluate whether stock prices "fully reflect any value relevant information in past prices."[53] This contradicts Dr. Roper's assertion that such tests are not relevant, because as explained in my Efficiency Report: "if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters, and if such autocorrelation is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly-available information about prior stock price movements would not be fully reflected in current stock prices."[54]

- **Additional Factor 6: Active Options Trading**. Dr. Roper agrees that "the presence of options has been shown to contribute to efficient adjustment in prices…" but argues that I "perform[] no analysis to demonstrate the efficient adjustment of prices in this matter…"[55] In contrast, Exhibits 12 and 13 in my Efficiency Report demonstrate that prices of the Warrants and Options in this

---

[49] Roper Report ¶¶85-95.

[50] *Cammer,* 711 F.Supp. at 1286.

[51] Efficiency Report ¶43.

[52] Cain Tr. 218:25-220:13. "You could say hypothetically, if an investor were to have followed Jefferies' recommendation and another investor would have followed the Validea recommendation of sell at this point in time, and then look at what would their performance have been over the next two years. Would an investor have been better off selling their shares when Validea's report came out versus doing whatever Jefferies said to do when their report came out."

[53] Roper Report ¶83.

[54] Efficiency Report ¶103.

[55] Roper Report ¶81.

matter tended to move in a manner consistent with market efficiency.[56]

33. In summary, Dr. Roper's criticisms of my Efficiency Report analyses are unsupported, inconsistent with objective standards applied across numerous cases, inconsistent with guidance from the *Cammer* and *Krogman* courts, and ultimately irrelevant.

**3.6    Dr. Roper is Wrong to Assert that Redwire's Common Stock Price Increase Upon the Successful Closing of the Business Combination Reflects Inefficiency**

34. Dr. Roper asserts that "GNPK and RDW share prices changed dramatically despite there being no new unexpected information" between September 2, 2021 and September 3, 2021.[57] He then concludes this change in Redwire's Common Stock price represents a "telltale sign of market inefficiency."[58] He asserts this inefficiency "corrupted the price formation process" of Redwire's Common Stock on this date.[59] This assertion represents the basis of his opinion that the fraud-on-the-market theory cannot be applied to Redwire's Securities from the closing of the business combination through the end of the Class Period.[60]

35. After market hours on September 2, 2021, the business combination was completed and GNPK merged with Redwire. Redwire's Common Stock closed at $10.50 on September 2, 2021, and opened trading on the NYSE at $10.70 on September 3, 2021.[61] *In other words, because Redwire's stock price increased by $0.20 overnight, Dr. Roper concludes that this is a "telltale sign of market inefficiency."* Dr. Roper further opined in testimony that stock prices should never change in the absence of new information:

> Q. So is it your opinion that if no new unexpected information comes out, stock prices should not change?
>
> A. Not in an efficient market. You should not see material change in stock price that's unassociated with the release of public information, when you are thinking about assessing reliance under fraud-on-the-market. The question is whether public information causes price to change. Not whether prices change

---

[56] Efficiency Report ¶¶118-122; Exhibits 12-13.

[57] Roper Report ¶54.

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] Source: Bloomberg.

15

because of a cascade of investors.[62]

36. Dr. Roper's opinion that a $0.20 change in stock price indicates inefficiency reflects a complete lack of understanding of basic principles of financial trading & markets. First, as I explain below, stock prices routinely change in the absence of new value-relevant information. These price changes are commonly caused by changes in investors' buying and selling activities, order imbalances, and other market microstructure factors.[63] Second, Dr. Roper's claim that no new information came out between September 2 and 3, 2021 is false: Redwire announced the shareholder voting results and successful completion of the business combination.[64]

37. Regarding the first flaw in Dr. Roper's understanding of financial trading and markets, stock prices routinely change even in the absence of new information. Finance textbooks and academic research demonstrate that the mere activity of trading by investors causes stock prices to change.[65] This buying and selling activity can reflect many motivations. For example, investors may sell to lock in profits. This activity can affect the stock prices of even the largest companies in the world. For example, a *Bloomberg* article titled "Nvidia Sheds $220 Billion After Short Run as Top Stock" explained a recent drop in Nvidia's stock:

> "Shares of the semiconductor giant have fallen 6.7% in the last two days, erasing over $220 billion in market capitalization and dragging the company from its place as the world's top stock…***Traders said there weren't any fundamental reasons behind the two-day selloff*** at the end of the week…"

> "'***It's just the usual fluctuations in the stock market***, which, with such large companies, can wipe or add hundreds of millions or even billions of dollars to their market value,' said Russ Mould, investment banker at AJ Bell. 'Nothing has

---

[62] Roper Tr. 69:6-15. *See also* Roper Tr. 69:25-71:9.

[63] *See, e.g.*, Harris, Larry, *Trading & Exchanges*, 2003: Oxford University Press, at pp. 11-22; Kaniel, Ron and Hong Liu, 2006, "So What Orders Do Informed Traders Use?," *Journal of Business* 79, at p. 1867; Brogaard, Jonathan, Terrence Hendershott, and Ryan Riordan, 2019, "Price Discovery without Trading: Evidence from Limit Orders," *Journal of Finance* 74, at p. 1622.

[64] "Redwire Announces Completion Of Business Combination With Genesis Park Acquisition Corp," Sep. 2, 2021 (4:11pm ET), Available at: https://ir.redwirespace.com/news-events/press-releases/detail/25/redwire-announces-completion-of-business-combination-with.

[65] *See, e.g.*, Harris, Larry, *Trading & Exchanges*, 2003: Oxford University Press, at pp. 11-22; Kaniel, Ron and Hong Liu, 2006, "So What Orders Do Informed Traders Use?," *Journal of Business* 79, at p. 1867; Brogaard, Jonathan, Terrence Hendershott, and Ryan Riordan, 2019, "Price Discovery without Trading: Evidence from Limit Orders," *Journal of Finance* 74, at p. 1622.

gone wrong at Nvidia.'"[66]

38. To further demonstrate the fallacy in Dr. Roper's logic, I examined the common stock prices for all public companies listed on the NYSE and NASDAQ during the time period covered by the Class Period (March 25, 2021 – March 31, 2022).[67] This sample represents over 1 million daily observations. In this sample, more than 93% of the daily company observations had a change in stock price from market close on one day to market open on the following trading day. Over 98% had an intraday change in stock price and over 97% had a change in the close-to-close daily price. In other words, consistent with explanations from market professionals, academic research, and basic principles of financial trading and markets, company daily stock prices routinely change even in the absence of new information.

39. Regarding the second flaw in Dr. Roper's understanding of financial trading and markets, Redwire *did in fact report new information* to investors after the 4pm ET market close of regular trading on September 2, 2021. In a press release with a timestamp of 4:11pm ET, Redwire announced the successful completion of the business combination, noting, for example:

> Redwire's shares of common stock and warrants are expected to commence trading on the NYSE on September 3, 2021 under the new ticker symbols "RDW" and "RDW WS," respectively.  The transaction values Redwire at a $620 million pro forma enterprise value.
> …
> Peter Cannito, Chairman and CEO of Redwire, said, "*This is a thrilling day for our team, and this milestone achievement* is the culmination of the hard work and unmatched innovation of our talented employees. We are grateful for the support of our shareholders and to our partners at Genesis Park and AE Industrial Partners for their continued commitment to Redwire…[68]

40. Dr. Roper's view of what constitutes "new unexpected information" is purely speculative, subjective, and defies common sense. He claims that because the media coverage of the outcome of Redwire's shareholder vote and successful closing of the business combination

---

[66] "Nvidia Sheds $220 Billion After Short Run as Top Stock," Bloomberg, Jun 21, 2024.

[67] Source: Center for Research in Security Prices (CRSP).

[68] "Redwire Announces Completion Of Business Combination With Genesis Park Acquisition Corp," Sep. 2, 2021 (4:11pm ET), Available at: https://ir.redwirespace.com/news-events/press-releases/detail/25/redwire-announces-completion-of-business-combination-with.

17

"did not note anything surprising about the outcome" – that the disclosure "was not a surprise or unexpected," – and therefore "no stock price change is expected in an efficient market."[69] If Dr. Roper found no media articles following a company's earnings announcement which expressed a subjective emotion of "surprise," then he would deem any stock price movement following the announcement as evidence of inefficiency. His speculative and subjective approach to evaluating disclosures of new information renders his opinions unsupported, flawed, and irrelevant.

41. Moreover, Dr. Roper's assertion that there was "no new unexpected information" on September 2-3, 2021 is contradicted by Redwire's announcements of the shareholder voting results and the successful completion of the business combination. Dr. Roper's opinion that a $0.20 increase in Redwire's Common Stock price was unwarranted is contradicted by the Company's own executives touting a "*thrilling day*" and "*milestone achievement*" associated with its announcement of the successful completion of the business combination. In summary, the two flaws explained above demonstrate the fallacies in Dr. Roper's opinion that the $0.20 increase in Redwire's Common Stock price reflects inefficiency. As a result, his opinions are flawed and irrelevant.

### 3.7    Dr. Roper's Critiques of My *Cammer* 5 Analysis are Unfounded

42. Dr. Roper critiques the *Cammer* 5 analysis in my Efficiency Report but he does not conduct an objective *Cammer* 5 analysis of his own to evaluate the efficiency of Redwire Common Stock during the Class Period. Instead, he forms speculative and subjective predictions about which direction Redwire's stock should have moved on each of the News Days contained within my *Cammer* 5 analysis. As I explain below, this type of analysis is not objective; it is inherently subjective and something I cautioned against in my testimony. Moreover, I show that Dr. Roper's directionally predictions are ultimately flawed, further rendering his conclusions irrelevant.

#### 3.7.1    My Selection of News Days is Objective

43. In my Efficiency Report, I conduct an objective assessment of News Days for my *Cammer* 5

---

[69] Roper Report ¶¶225-226; 234-236.

analysis. Specifically, I consider "communications relating to the status of the business combination, or any delays in the filing of relevant SEC Form 10-Qs or 10-Ks," and "quarterly earnings announcements."[70] These are the same types of news days I have identified and evaluated in my prior reports.[71]

44. Def's Daubert Motion mischaracterizes my selection of News Days in this case as "anomalous" to my event selection in other SPAC cases because I include Redwire's notifications of inability to file financials in a timely manner (filed on SEC Forms NT 10-K and NT 10-Q).[72] My inclusion of these delays is consistent with my focus on Redwire's earnings announcements, because the announced delays were inherently connected to the Company's ability to announce financial earnings to investors.[73] In contrast, the filing delays cited by Defendants in the other SPAC cases concerned their need for additional time to finalize the forms to comply with new SEC guidance on accounting for warrants.[74] Moreover, academic research confirms that delays in a company's ability to timely report financial results, in and of itself, represents potentially value-relevant information for investors.[75] Dr. Roper agrees, stating that the "economics literature documents that announcements of filing delays can result in negative price declines."[76] Thus, my inclusion of Redwire's announcements relating to filing delays is consistent with my objective criteria relating to the Company's earnings announcements.

45. I also emphasized in my testimony the importance of relying on objective criteria for the selection of News Days and conducting a *Cammer* 5 analysis:

---

[70] Efficiency Report ¶76.

[71] *See William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.); *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.); *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.).

[72] Def's Daubert Motion, fn. 10.

[73] In order to remain objective, I included *all* NT filings as News Days in this matter, regardless of their content.

[74] *See* ECF No. 136-3 (May 18, 2021 PureCycle Form 12b-25); March 31, 2021 Romeo Power, Inc. Form 12b-25. Available at: https://www.sec.gov/Archives/edgar/data/1757932/000110465921044895/0001104659-21-044895-index.htm.

[75] *See, e.g.*, Bartov, Eli and Yaniv Konchitchki, 2017, "SEC Filings, Regulatory Deadlines, and Capital Market Consequences," *Accounting Horizons* 31.

[76] Roper Report ¶216.

Q. With regard to the events that you identified in your report in your Event Study, which I think is Exhibit 6a of your report, if I'm not mistaken, did the folks that you were working with have a hand in identifying which events you include in your report?

A. No. In this case, as well as any time that I conduct a Cammer 5 analysis, I lay out certain criteria, and then anything that meets those criteria both Fideres would review and I would also review the information environment to ensure that we **objectively carried out that criteria**.

So I think, you know, there's really like two categories. One is sort of the [SPAC]-related identification of the target and the closing of the business combination, and then the earnings announcements or inability to provide earnings announcements, it's really just – once I've articulated that **objective criteria**, making sure that we've pulled all of those in.

So back to your original question, I don't think there is much discretion left in terms of identifying events once I've laid out that **objective criteria**.[77]

46. When assessing changes in the information environment surrounding a SPAC, the announcement of the target company and the close of business combination are typically the two most impactful disclosures during that SPAC's lifetime.[78] Therefore, in class periods involving a SPAC in which I have been asked to assess market efficiency, I typically include the announcements of the shareholder voting results and successful business combination completions as News Days.[79] Similarly, in these cases I have also included the announcement of the target company selection as a News Day.[80] These dates represent important changes in the information environment. For example, as one academic study explained:

> "Because some *shareholders may choose to redeem their shares*, collecting the redemption value of the initial trust amount plus interest, *the amount of cash available for a merger is uncertain…If the merger is approved by shareholders and the SPAC still has enough cash after redemptions to meet*

---

[77] Cain Tr. 10:5-11:6 (emphasis added). *See also, id.* 21:6-13; 23:18-24:7; 86:13-25; 119:17-120:6; 124:21-125:4.

[78] *See, e.g*., Gahng, Minmo, Jay R. Ritter, and Donghang Zhang, 2023, "SPACs," *Review of Financial Studies* 36. ("Gahng Study") at p. 3465 ("Once a SPAC identifies a target company and reaches an agreement for a merger, shareholders of the SPAC vote whether or not to approve the proposed merger.").

[79] See *Bond v. Clover Health Investments, Corp*., *et al*., Case No. 3:21-cv-00096 (M.D. Tenn.) (including shareholder approval press release market impact date of Jan. 6, 2021 and successful business combination closing press release market impact date of Jan. 7, 2021); *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.) (including successful business combination closing press release market impact date of Mar. 18, 2021; no separate disclosure of shareholder voting results was provided by the company).

[80] *Id*.

*the terms of the merger agreement, the business combination is consummated*, and the SPAC starts to trade as a newly merged company under a new ticker symbol."[81]

47. Put differently, investors in SPACS have the opportunity to redeem their shares and will thus consider the announcements of information relating to whether or not a merger has been approved, and whether or not all requirements to close a merger and publicly list on an exchange have been satisfied, as relevant.

48. I also explained these points in my deposition:

> Q. Okay. So all these things we've been talking about, the amount of cash that is required to be in Genesis Park's trust account, approval for listing by the New York Stock Exchange, you know, the vote of the shareholders to approve the merger, the determination of which of these is a key communication by you is based on your own subjective criteria; isn't it?
>
> A. No. Like I said before, I've worked on market efficiency reports for many SPAC cases now and there is academic research that have studied SPACs, too, and have said the key – academic research says the key date in the life of a SPAC after its IPO is when they announced that they have identified a target to acquire.
>
> And then really the next key date is successfully completing that acquisition of the target company.
>
> So I don't think [it's] in any way subjective. In fact, I think it's the opposite. *I'm being objective across every case in which I evaluate a SPAC*. I always look at the identification of the target and the successful completion or termination of the deal as long as the class period goes back far enough in time to cover those potential dates.[82]

49. In his critique of my event study, Dr. Roper mischaracterizes the objective criteria I adopt when selecting News Days. For example, he proposes additional dates that he claims should also have been included as News Days. However, these dates do not fall within the objective criteria I adhere to for the selection of News Days in my Efficiency Report:

> **August 11, 2021:** Dr. Roper argues that, because I have included the date of the shareholder vote on the de-SPAC merger as a News Day and that Redwire was contractually obligated to share the results of the vote, I should have also

---

[81] Gahng Study, at p. 3465.

[82] Cain Tr. 244:2-245:4. *See also, id.* 45:6-46:1.

included other dates in which Redwire was contractually obligated to disclose information to investors.[83] This includes the August 11, 2021 disclosure that GNPK had received listing approval from the NYSE for Redwire.[84] However, this date does not fall under the objective criteria I followed when selecting News Days because it does not relate to the "status" of the business combination, and I have not included this type of disclosure in any of my prior *Cammer* 5 analyses involving SPACs.

**December 2, 2021:** Dr. Roper opines that, because I have included dates relating to Redwire's disclosures of its inability to timely file financials, I should also include December 2, 2021 as a News Day.[85] On December 2, 2021, Redwire notified investors that the NYSE had alerted the Company that it was no longer in compliance with certain NYSE regulations due to its late 10-Q filing for Q3 2021. The notice emphasized that this would not affect Redwire's listing on the NYSE.[86] This date does not meet the objective criteria I followed when selecting News Days, as it does not relate to "any delays in the filing of relevant SEC Form 10-Qs or 10-Ks."

**February 3, 2022:** Similar to December 2, 2021, Dr. Roper states that February 3, 2022, should also have been included as a News Day because the Company issued a press release including the statement that "Redwire [was] working to finalize its third quarter 2021 Form 10-Q."[87] This disclosure did not obviously relate to "any delays in the filing of the relevant SEC Form 10-Qs or 10-Ks." However, I note that the abnormal stock return on this date was statistically significant at better than the 95% level. Thus, had I included it in my analysis, my *Cammer* 5 test results would have been even stronger.

50. Dr. Roper's mischaracterization of the objective criteria I used when selecting my News Days renders his arguments about the reliability of my *Cammer* 5 analysis flawed and unreliable. Additionally, as explained further below, Dr. Roper's directionality analysis represents a purely subjective assessment that further renders his opinions flawed and unreliable.

---

[83] Roper Report, ¶150.

[84] *Id.*

[85] *Id.*, ¶153.

[86] "Redwire Update Regarding Delayed Form 10-Q Filing," Dec. 2, 2021. Available at: https://ir.redwirespace.com/news-events/press-releases/detail/37/redwire-update-regarding-delayed-form-10-q-filing.

[87] "Redwire Announces Preliminary Full Year 2021 Revenue and Backlog; Provides Update on Q3 2021 10-Q Filing," Feb. 3, 2022. Available at: https://redwirespace.com/newsroom/redwire-announces-preliminary-full-year-2021-revenue-and-backlog-provides-update-on-q3-2021-10-q-filing/.

### 3.7.2    Dr. Roper's Directionality Assessments Introduce Subjectivity Into His Opinions

51. Dr. Roper subjectively predicts whether, on each of my News Days, Redwire's Common Stock price should have increased, decreased, or remained the same. As explained in **Section 3.3** above, this represents a test of fundamental efficiency, which is not required within a market efficiency report or *Cammer* 5 analysis. Moreover, as I explain below, his directional predictions are flawed and subjective, rendering his opinions irrelevant. I also explained this in my testimony:

> Q. All right. Did you anywhere assess whether Redwire common stock, as you defined that term, went up following good news?
>
> A. No. That's not part of the test because that would require subjectivity on my part in terms of defining whether the news was unambiguously good or bad.[88]

52. Even Dr. Roper's subjective directionality analysis demonstrates its own failings: though he agrees that new information relating to the fundamental value of Redwire Common stock was released on March 25, 2021 and May 18, 2021, Dr. Roper was unable to predict the direction the stock price should have moved.[89] Because companies frequently disclose a mix of positive and negative news, and because many disclosures must be compared with the full history of the information environment for that company in order to predict whether the new disclosure was unambiguously a positive or negative surprise relative to expectations, it is an inherently subjective and error-prone exercise to predict whether a company's stock price would increase, decrease, or remain the same following many disclosures. Dr. Roper's directionality analysis is thus by nature subjective, error-prone, and unreliable, as demonstrated by his own admission that he is unable to predict Redwire's stock price movements upon certain disclosures. Dr. Roper's predictions on other disclosure dates fall victim to these flaws as well, as explained further below.

53. For example, after market close on September 1, 2021, Redwire disclosed the successful

---

[88] Cain Tr. 114:24-115:7.

[89] Roper Report ¶219; p. 82 Figure 10.

business combination merger vote.[90] And after market close on September 2, 2021, Redwire announced the successful completion of the business combination.[91] However, Dr. Roper's subjective prediction is that Redwire's Common Stock should not have changed at all on the market impact dates following each of these disclosures.[92] As explained in **Section 3.6** above, Dr. Roper's view of what constitutes "new unexpected information" is purely speculative, subjective, and defies common sense. He claims that because the media coverage of the outcome of Redwire's shareholder vote and successful closing of the business combination "did not note anything surprising about the outcome" – that the disclosure "was not a surprise or unexpected," – and therefore "no stock price change is expected in an efficient market."[93] If Dr. Roper found no media articles following a company's earnings announcement which expressed a subjective emotion of "surprise," then he would deem any stock price movement following the announcement as evidence of inefficiency. His speculative and subjective approach to evaluating disclosures of new information renders his opinions unsupported, flawed, and irrelevant.

54. As discussed in **Section 3.6** above, Dr. Roper's subjective prediction defies common sense and is also contradicted by the Company's own executives who described these successful disclosures as "***a milestone achievement***" and a "***thrilling day***."

55. After market close on March 30, 2022, Redwire filed an SEC Form 8-K. Dr. Roper opines that Redwire's Common Stock price increase on the following trading day is inconsistent with market efficiency because part of the 8-K disclosure discussed a delay for the filing of the Company's 2021 10-K.[94] However, Redwire's disclosure was not unambiguously negative as implied by Dr. Roper. For example, the disclosure included the following:

---

[90] Genesis Park Acquisition Corp., SEC Form 8-K, Sep. 1, 2021 (5:30pm ET). Available at: https://www.sec.gov/Archives/edgar/data/1819810/000119312521263391/0001193125-21-263391-index.htm.

[91] "Redwire Announces Completion Of Business Combination With Genesis Park Acquisition Corp," Sep. 2, 2021 (4:11pm ET). Available at: https://ir.redwirespace.com/news-events/press-releases/detail/25/redwire-announces-completion-of-business-combination-with.

[92] Roper Report, p. 82 (Figure 10).

[93] Roper Report ¶¶225-226; 234-236.

[94] Roper Report ¶¶255-257.

24

In addition, Redwire confirms that the previously announced independent investigation into potential accounting issues at a business subunit is resolved. Following a thorough and comprehensive review, the Company's independent Audit Committee of the Board of Directors along with independent, external legal and accounting firms, completed the investigation and did not identify any material misstatements or the need for any restatements of Redwire's previously filed financial statements. Redwire is pleased to have concluded the internal investigation and looks forward to continuing to execute its strategic objectives. As previously disclosed, the Company self-reported this matter to the SEC on November 8, 2021 and intends to continue to cooperate with any requests from the SEC.

The Company is working with its external auditor to complete the 2021 audit and expects to file a Form NT 10-K on March 31, 2022, indicating a short-term delay in filing the 2021 Form 10-K as the Company requires additional time to complete the annual audit process. However, the Company expects to file both the third quarter 2021 Form 10-Q and the 2021 Form 10-K on or before April 15, 2022 during the 15 day grace period, ***resulting in a timely filing of the Form 10-K***.[95]

56. Contrary to Dr. Roper's claims, Redwire disclosed that it expected to file its 2021 10-K within the 15-day grace period, and that it would thus be "timely." Moreover, Redwire disclosed the resolution of its independent investigation into the Company's accounting issues. These disclosures demonstrate the subjectivity of Dr. Roper's directionality predictions, as well as the unreliability of his own review of Redwire's disclosures.[96]

57. In summary, Dr. Roper's directionality predictions are subjective and flawed, rendering his criticisms of my *Cammer* 5 analysis irrelevant. Moreover, Dr. Roper does not conduct his own

---

[95] Redwire Corp, SEC Form 8-K, Mar. 30, 2022. Available at: https://www.sec.gov/Archives/edgar/data/1819810/000181981022000009/0001819810-22-000009-index.htm.

[96] The unreliability and subjectivity of Dr. Roper's review of the "news" days was further revealed in his deposition. Dr. Roper testified that the March 30, 2022 disclosure – which announced that the Audit Committee had not identified any "material misstatements or the need for any restatements of Redwire's previous financial statements" as a result of its investigation – did not necessarily contain "new and unexpected information." Roper Tr. at 102:7-21. Per Dr. Roper, the March 30, 2022 disclosure "appear[ed] to be a reaffirmation of an earlier finding" from Redwire in November 2021, where just days after announcing the Audit Committee investigation, the Company stated that the investigation "had not identified any material misstatements or restatements of its previously filed financial statements" but its investigation was "ongoing and the Company cannot predict the duration or the outcome of the investigation." *Id.*; *id.* at 108:12-109:5; *see also* Redwire Corp., SEC Form NT 10-Q, Nov. 15, 2021. Available at: https://www.sec.gov/Archives/edgar/data/1819810/000162828021023269/0001628280-21-023269-index.htm. That Dr. Roper's initial analysis at the deposition could assess a disclosure announcing the final results of an investigation as not reflecting "new and unexpected information" because a company had previously disclosed preliminary results months earlier calls into question the reliability and objectivity of his review.

*Cammer* 5 analysis (nor any other *Cammer* or *Krogman* analysis), further rendering his conclusions irrelevant.[97]

### 3.7.3 My Regression Analysis Is Reliable and Adapts to Changes in the Information Environment During the Analysis Window

58. In my Efficiency Report, I explain that the business combination was completed on September 2, 2021. I also explain that, prior to this date, the Company's SPAC shares were traded on the NYSE under the symbol GNPK, and that after the business combination, starting on September 3, 2021, Redwire's shares were traded on the NYSE under the symbol RDW.[98]

59. Dr. Roper asserts that my rolling regression model "conflates two different securities" because it includes Redwire's Common Stock returns both before and after completion of the business combination.[99] He claims that, because GNPK shares were subject to a redemption right whereas RDW shares were not, these represent two distinct securities and should not be analyzed together. He also conducts statistical tests of changing volatility over these time periods (Chow and Levene tests)[100] and based on these tests, he asserts that his fixed window event studies are superior to my rolling event study models.

60. Dr. Roper's critique is wrong for several reasons. First, my rolling event study model adapts to changes in volatility over time. Specifically, I considered the redemption right and Redwire's information environment and circumstances when constructing my event study.[101] I explained these details, as well as the strength of my rolling regression models in adapting to these changes over time, in my testimony:

> And then I'll also look at other dynamics in terms of there's different volatility for that preclosing period or the preannounce – period prior to the announcement. So that is something that the rolling regression model controls for, that change in volatility over time…[102]

---

[97] *See, e.g.,* Roper Dep. Tr. at 74:10-75:7.

[98] Efficiency Report ¶16.

[99] Roper Report ¶161.

[100] Roper Report, fn. 157.

[101] Cain Tr. 58:8-79:9.

[102] Cain Tr. 44:14-46:1.

61. In contrast, Dr. Roper's event study models do not account for changing volatility throughout his fixed estimation windows, and moreover, they fail the same volatility structural break test that he uses as motivation.[103] This represents a crucial flaw in his event studies since he explicitly relies on this test:

> "statistical testing confirms the existence of a structural break. Simply put, GNPK stock price behaved differently than RDW and this difference causes Dr. Cain to speculate about whether stock prices changed or did not. Dr. Cain is forced to speculate because his rolling regression method causes his yardstick to be biased."[104]

62. As explained above, Dr. Roper mischaracterizes my event studies because my models explicitly account for and adjust to changing volatility throughout the entire Class Period. Dr. Roper's do not, rendering his event studies flawed.

63. Second, the fact that Redwire's volatility increased over time is consistent with market efficiency because this demonstrates that investors recognized the value-relevance of information relating to the post-closing business.[105]

64. Third, Dr. Roper's fixed window event studies have a look-ahead bias because they benchmark the significance of stock returns on *future* volatility. As academic research explains, when possible, an event study model should be based on volatility *prior to* the event of interest:

> Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period ***prior to the event window for the estimation window***. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. ***Generally the event period itself is not included in the estimation period*** to prevent the event from influencing the normal performance model parameter estimates.[106]

---

[103] I tested Dr. Roper's fixed event study windows from his Exhibit 4 models over the "SPAC Period" and the "De-SPAC Period." Each of his fixed event studies failed his own Chow test on multiple dates within the sub-period windows, with statistical significance at the 95% level or greater.

[104] Roper Report ¶167.

[105] *See* Efficiency Report, Exhibits 6a-6b, documenting statistically significant Redwire Common Stock price movements around Company earnings releases and related disclosures.

[106] MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at p. 15.

Here, Dr. Roper's fixed window includes the event period itself (*i.e.*, parts of the Class Period after the consummation of the business combination) in the estimation period. Dr. Roper thus goes against best practices when constructing his (flawed) event studies.

65. Fourth, even Dr. Roper's flawed event study approach supports market efficiency, as my News Days have a significantly greater percentage of statistically significant stock returns (5 out of 7, or 71%) than No News Days (4 out of 104, or 4%) using his event study output. Thus, even if one were to adopt Dr. Roper's (flawed) event study approach using a fixed window, it would support a conclusion of market efficiency under my *Cammer* 5 testing approach.

66. In summary, none of Dr. Roper's critiques undermine the reasonableness and reliability of my Efficiency Report rolling event study regression models. Thus, none of his critiques disturb my conclusion that my *Cammer* 5 test weighs in favor of the market efficiency of Redwire's Common Stock throughout the Class Period.

### 3.8   Market Efficiency of Redwire's Options and Warrants

67. While Dr. Roper does not conduct any market efficiency analyses involving Redwire's Options and Warrants, he opines that I have "failed to provide any reliable analysis of the cause-and-effect relationship between new unexpected information and the prices of the warrants or options at issue in this matter."[107] Def's Opp Brief also asserts that I "should have conducted an independent analysis of each option and warrant at issue" in this matter.[108] These arguments are flawed, as explained below.

68. First, option pricing theory dictates that the pricing of options and warrants is formulaically and mechanically dictated by the pricing of stock. This basic principle of finance is widely understood by academics, practitioners, and courts as expressed in the case law accepting market efficiency of stock translating into market efficiency of derivative securities.[109] Moreover, my conclusion that Redwire's Options and Warrants traded in an efficient market during the Class Period is further supported by the results of my additional cause-and-effect

---

[107] Roper Report ¶61.

[108] Def's Opp Brief, p. 26.

[109] Efficiency Report ¶¶123-124.

analysis, which demonstrates that price changes in Redwire's Options and Warrants are consistent with what one would expect to observe in an efficient market given Redwire's Common Stock price changes. Many of these dates of evaluation coincided with the release of potentially new, value-relevant information, as studied in my Common Stock *Cammer* 5 test.[110] Dr. Roper's criticism is thus false.

69. Second, it is not necessary to separately analyze each Option and Warrant series, as asserted in Def's Opp Brief. This is because standard option pricing models account for all of the economic characteristics underlying each Option and Warrant series. For example, as discussed throughout my Efficiency Report, the Black-Scholes pricing model incorporates all of these factors, including the current (or spot) stock price, the option exercise (or strike) price, the time to expiration, the volatility of the underlying stock, the risk-free interest rate, and expected dividends.[111] It is standard, straightforward, and formulaic to incorporate these relevant characteristics into an analysis of stock options. The fact that standard option pricing models, such as the Black-Scholes model, incorporate all of these economic characteristics into a valuation formula demonstrates that all Redwire Options and Warrants – despite their varying characteristics – trade in an efficient market.

**3.9    Def's Opp Brief Mischaracterizes the Amount of Time Involved in Forming my Efficiency Report Opinions**

70. Def's Opp Brief mischaracterizes my testimony by claiming that only 22 hours of work were involved in the preparation of my Efficiency Report opinions.[112] Their false assertion is based on a deposition question about the amount of money I had been paid to date.[113] However, their assertion ignores the research and analytics work that staff at Fideres Partners conducted on my behalf. These support staff invested over 150 hours of work supporting me in the analysis and formation of my opinions contained in my Efficiency Report. Thus, Defendants

---

[110] Efficiency Report ¶¶118-122; Exhibits 6-7, 12-13.

[111] Efficiency Report ¶¶109, 139-140.

[112] Def's Opp Brief, pp. 2-3.

[113] Cain Tr. 30:14-21. "Q. Okay. To serve in this case, I guess I'll ask you first your fee. I think I saw you're getting paid $950 an hour; is that right? A. Yes, I believe so. Q. How much money have you been paid to date? A. I think it's – I think it's in the ballpark of between 15 and $20,000."

misrepresent the amount of time involved in preparing my Efficiency Report.

## 4. DR. ROPER FAILS TO ESTABLISH THAT THE ALLEGED MISREPRESENTATIONS DID NOT HAVE PRICE IMPACT

71. In his report, Dr. Roper asserts that the alleged misrepresentations made prior to the business combination could not have impacted the price of Redwire's Common Stock. He supports his argument by asserting that the $10.15 redemption right created an absolute "floor" price during the period prior to the Redemption Deadline.[114] He also claims that price impact is refuted by an inefficient stock price on the first day of trading following the closing of the business combination.[115]

72. Dr. Roper's assertions are flawed for several reasons. First, Dr. Roper does not evaluate the price impact of the alleged Corrective Disclosures, which is a common method for evaluating price impact of Alleged Misrepresentations.[116] My event study demonstrates that all three of the alleged Corrective Disclosures resulted in statistically significant declines in Redwire's Common Stock prices, establishing price impact of the alleged misrepresentations. Second, the presence of the $10.15 redemption value was consistent with that in other efficiency analyses of SPAC securities, and does not refute the price impact established by price declines following the alleged Corrective Disclosures. Third, as explained in **Section 3.6** above, Redwire's stock price change on the date following completion of the business combination does not indicate market inefficiency; it also does not undermine price impact.

### 4.1 Redwire's Common Stock Returns Following the Alleged Corrective Disclosures Establish Price Impact

73. Dr. Roper's opinions on price impact are contradicted by the statistically significant declines in Redwire's Common Stock following the alleged corrective disclosures. As Dr. Roper stated in his own prior research:

> "Not surprisingly, so-called corrective disclosures—disclosures that revealed the misrepresentation to the market—have been a common focal point of

---

[114] Roper Report ¶45.

[115] Roper Report ¶¶23; 28; 54; 60; 188.

[116] Roper Dep. Tr. at 52:16-53:8.

analysis in post-*Halliburton II* price impact cases. For instance, the district court's opinion in *Halliburton II* on remand focused significant attention on whether the alleged corrective disclosure dates in that matter were statistically significant."[117]

74. In contrast to his focus on corrective disclosures in his prior academic work, Dr. Roper fails to consider the significance of the alleged Corrective Disclosures in assessing price impact in this matter:[118]

> Q. To what extent, for purposes of your report, were you engaging in assessing the alleged corrective disclosures?
>
> A. I didn't assess the alleged corrective disclosures for the purposes of my report.
>
> Q. Okay. So you're not offering an opinion that the alleged corrective disclosures did not have a price impact, right?
>
> A. Again, that question is too vague for me to answer. Which corrective disclosure are you talking about? Which price impact are you talking about?
>
> Q. So would you agree with me that there are different ways for a plaintiff to show price impact?
>
> A. Price impact of what?[119]

75. In fact, Dr. Roper testified that "unique facts and circumstances permit the Court to perform a uniquely situated analysis of price impact" in this case by somehow ignoring the alleged corrective disclosures and instead focusing on the stock price of GNPK.[120] Dr. Roper could not cite any case law in which such an approach to price impact was accepted, instead claiming that this is a "unique case."[121] However, I have worked on multiple securities class action cases involving SPACs with redemption rights; their existence in this matter is not "unique." Dr. Roper's departure from a traditional price impact analysis of corrective disclosures is itself unique and in contradiction to his own prior research as well as the standard evaluation in

---

[117] "Price Impact, Materiality, and Halliburton II," 2015, Allen Ferrell and Andrew Roper, *Washington University Law Review* 93, at p. 573.

[118] Dr. Roper asserts that under his (flawed) event study approach, Redwire's stock price decline on Nov. 15, 2021 was not statistically significant (see Roper Report ¶¶165-166). However, Dr. Roper does not dispute the statistically significant declines on the other two alleged Corrective Disclosure market impact dates of Nov. 10, 2021 and Apr. 1, 2022.

[119] Roper Tr. 14:8-22.

[120] Roper Dep. Tr. 53:3-18.

[121] *Id.*, 54:3-15.

securities cases.

76. In this case, my Efficiency Report event study documents stock price declines at the 95% to 99% levels of statistical significance following each of the three alleged Corrective Disclosures. (A p-value equal to or less than 0.05 corresponds to statistical significance at the 95% level or better, and a p-value equal to or less than 0.01 corresponds to statistical significance at the 99% level or better). These results are summarized in Table 1 below:

**Table 1: Statistical Significance of Abnormal Returns Following Each of the Alleged Corrective Disclosures**

| Alleged Corrective Disclosure: | 10-Nov-21 | | 15-Nov-21 | | 1-Apr-22 | |
|---|---|---|---|---|---|---|
| Redwire Common Stock | Abnormal Return | p-Value | Abnormal Return | p-Value | Abnormal Return | p-Value |
| Efficiency Report Event Study | -17.19% | 0.000 | -6.86% | 0.020 | -34.62% | 0.000 |

77. Moreover, my reasonable and reliable event study documents a statistically significant stock price increase following the Alleged Misrepresentations at the start of the Class Period on March 25, 2021.[122] While I understand that front-end price impact is not required for inflation maintenance theories of liability, this front-end price impact provides further support of price impact in this matter.

78. After reviewing the information environment on these dates in further detail, I have determined that there is an economic link between the alleged misrepresentations and the increase in Redwire's stock price on March 25, 2021, and the decreases in Redwire's stock price on November 10, 2021, November 15, 2021, and April 1, 2022.[123] This, coupled with the statistically significant price changes on these dates, leads me to conclude that the alleged misrepresentations impacted the prices of Redwire's Securities during the Class Period.

---

[122] See Complaint ¶¶46-48; Genesis Park Acquisition Corp., SEC Form 8-K, filed Mar. 25, 2021 (6:12am ET). Available at: https://www.sec.gov/Archives/edgar/data/1819810/000119312521093279/0001193125-21-093279-index.htm. My Efficiency Report event study documents an abnormal return on Mar. 25, 2021 of 3.1%, statistically significant at the 95% level.

[123] My review of the information environment includes the Complaint, the alleged misrepresentations, and the alleged corrective disclosures.

## 4.2    The $10.15 Redemption Value Does Not Refute Price Impact

79. Dr. Roper speculates that the $10.15 Redemption Value of the SPAC shares represented an absolute "floor" on the stock price during the Class Period prior to the Redemption Deadline.[124] Despite admitting that he has not conducted any loss causation analysis,[125] Dr. Roper repeatedly opines that there was $0 of inflation during long portions of the Class Period:

- "…inflation does not exist for large periods of time during this Class Period…"[126]
- "There was no inflation when GNPK traded at or below $10.15…"[127]
- "Between April 19, 2021 and May 12, 2021, investors that purchased or acquired GNPK shares at any price purchased shares that were known to have not been impacted by the March 25 and March 29 alleged misrepresentations."[128]
- "…no such inflation existed in the GNPK share that could have been inherited."[129]
- "…a reliable analysis of inflation on April 20, 2021 indicates there is no inflation in GNPK share price…"[130]

80. Dr. Roper's opinions are unsupported and flawed because he asserts that artificial inflation was $0 for long periods of time during the Class Period, yet he has not conducted a loss causation or merits analysis to reach this conclusion.

81. Furthermore, Dr. Roper and Def's Opp Brief assert that when GNPK stock traded below $10.15 per share (81 days during the Class Period), this indicates "inefficiency."[131] As I explain below, this assertion reflects Dr. Roper's ignorance of basic principles of finance and valuation

---

[124] Roper Report ¶¶37-45; 160; 191.

[125] Roper Tr. 13:17-20: "Q. And you were not asked to perform your own loss causation analysis, correct? A. I was not asked to assess loss causation for the purposes of merits."

[126] Roper Report ¶28.

[127] Roper Report ¶43.

[128] Roper Report ¶47.

[129] Roper Report ¶53.

[130] Roper Report ¶191.

[131] Def's Opp Brief, at fn. 24 (citing to Roper Report): "GNPK's stock price trading at or below $10.15 reveals inefficiency."; Roper Report, fn. 37: "In these instances, GNPK stock price could be considered to trade in an inefficient market."

analysis, and is thus simply wrong.

82. I have encountered similar redemption values in cases involving SPACs, yet this redemption right has not previously and does not currently present a challenge in evaluating market efficiency, nor in determining whether damages can be calculated class-wide.[132] For example, my *Cammer* 5 rolling event study methodology updates for changes in volatility and the information environment over time, including the existence and then elimination of the redemption right. Also, as I discuss in the following section, the elimination of the right to receive a dividend does not present a challenge in evaluating market efficiency, artificial inflation, and damages. Moreover, as explained in my Efficiency Report, the out-of-pocket damages methodology is "flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period."[133] For example, if I were to determine that an adjustment to the back-casting of artificial inflation prior to the redemption right's elimination were required, I could easily make such an adjustment.

83. Moreover, Dr. Roper's assertion that $10.15 represents an absolute floor on the GNPK stock price is contradicted by basic finance and valuation principles.[134] Dr. Roper pretends that investors could redeem their GNPK shares for $10.15 at any point in time, back to the first day of the Class Period. However, this was not the case. The registration statements made clear that the redemption right was available only "if the Business Combination is consummated."[135]

---

[132] *See William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.); *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.); *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.).

[133] Efficiency Report ¶141. *See also* ¶¶142-146.

[134] In testimony, I explained that SPAC shares tend not to trade at prices much below $10 per share because of the redemption right. See Cain Tr. 47:4-48:10. However, I did not testify that $10.15 represented an absolute floor on the share prices. As explained *infra*, this is similar to securities such as zero coupon bonds, which trade within certain price ranges due to expectations about future fixed income payments to be received, yet these future payments do not establish any absolute floor on securities' trading prices.

[135] Genesis Park Acquisition Corp., SEC Form S-1, Sep. 25, 2020, Available at: https://www.sec.gov/Archives/edgar/data/1819810/000119312520254680/0001193125-20-254680-index.htm. (Front page): "We will provide our public shareholders with the opportunity to redeem all or a portion of their Class A ordinary shares, or public shares, upon the completion of our initial business combination, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account described below as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our taxes, divided by the number of then

---

Thus, if the merger were to be delayed or terminated, shareholders would have to wait for longer periods of time to have the possibility of a redemption for $10.15. Some SPACs have extended their life beyond the initial two-year limitation in order to locate an acquisition target (with shareholder approval), meaning that investors could face the possibility of waiting more than two years for the decision about whether to invest in the business combination or exercise their redemption rights.[136]

84. Basic finance and valuation principles demonstrate that the value of an investment can be represented by the discounted value of its future cash flows (a discounted cash flow, or "DCF" analysis).[137] For example, if a GNPK investor believed that it could take an additional two years to identify and successfully close on an acquisition, and wished to compare that possibility with a future redemption value at an expected price of $10.15, and the investor used a 5% discount rate, this would imply a present value of $9.21 for the shares.[138] This is how zero coupon bonds are priced and trade. As the textbook *Trading & Exchanges* explains, "Zero coupon bonds pay no interest. They simply return their principal value at maturity. Since they pay no interest, ***buyers will buy them only at a discount from their face value***."[139]

85. These basic principles of finance and valuation analysis illustrate the fallacy of Dr. Roper's assertion that $10.15 represented an absolute "floor" on the GNPK share price. Therefore, his claim that there was "no inflation when GNPK traded at or below $10.15" is fundamentally

---

outstanding public shares, subject to the limitations and on the conditions described herein. If we are unable to complete our initial business combination within 24 months from the closing of this offering, we will redeem 100% of the public shares at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest earned on the funds held in the trust account and not previously released to us to pay our taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, subject to applicable law and certain conditions as further described herein."

*See also*: Genesis Park Acquisition Corp., SEC Form DRS, May 11, 2021, Available at: https://www.sec.gov/Archives/edgar/data/1819810/000095012321005918/0000950123-21-005918-index.htm. (no page numbering): "Pursuant to the Existing Governing Documents, a holder of GPAC's public shares (a "public shareholder") may request that GPAC redeem all or a portion of such public shares for cash if the Business Combination is consummated."

[136]  *See e.g.*,  https://news.spacconference.com/2023/04/17/churchill-capital-vi-and-vii-files-proxies-to-extend-deadlines-into-2024/

[137] Rosenbaum, Joshua and Joshua Pearl, *Investment Banking*, 2009: John Wiley & Sons, Inc., at p. 109.

[138] $9.21 = $10.15 / (1.05^2)$.

[139] Harris, Larry, *Trading & Exchanges*, 2003: Oxford University Press, at p. 40.

---

flawed, further rendering his conclusions flawed and irrelevant.

### 4.3    Redwire's Stock Price Change Following Completion of the Business Combination Does Not Undermine Price Impact

86. Finally, Dr. Roper claims that price impact is refuted because there was an inefficient adjustment in stock prices upon the closing of the business combination:

> "On September 2 and 3, GNPK and RDW share prices changed dramatically despite there being no new unexpected information, a telltale sign of market inefficiency."[140]

> "More generally, Dr. Cain proposes to measure inflation in GNPK and RDW shares based on the share price declines observed in RDW shares at the end of the Class Period. However, the share price declines that happened at the end of the Class Period occurred after the share price had been corrupted by an inefficient market."[141]

87. As explained in **Section 3.6** above, Dr. Roper's opinions are flawed for two reasons. First, stock prices commonly change even in the absence of new public disclosures. This dynamic of stock price trading is commonly understood by market professionals and academics (apart from Dr. Roper). As noted above, not only is this phenomenon common, but it is observed in over 90% of trading days for all stocks listed on the NYSE and NASDAQ during the same time period covered by the Class Period in this matter.

88. Second, as also explained in **Section 3.6** above, I document new information disclosed on September 2 and 3, 2021 that is consistent with the stock price changes for Redwire: the announcements of shareholder approval of the Business Combination after-hours on September 1st (market impact date of September 2nd)[142] and successful completion of the Business Combination after-hours on September 2nd (market impact date of September 3rd).[143]

---

[140] Roper Report ¶54.

[141] Roper Report ¶188.

[142] Genesis Park Acquisition Corp., SEC Form 8-K, Sep. 1, 2021 (5:30pm ET), Available at: https://www.sec.gov/Archives/edgar/data/1819810/000119312521263391/0001193125-21-263391-index.htm.

[143] "Redwire Announces Completion Of Business Combination With Genesis Park Acquisition Corp," Sep. 2, 2021 (4:11pm ET), Available at: https://ir.redwirespace.com/news-events/press-releases/detail/25/redwire-announces-completion-of-business-combination-with.

Successful identification and completion of a target business combination is the sole purpose of SPAC investment vehicles like this. The outcome is unknown until disclosure of the successful completion, and thus stock price reactions following these types of announcements would be entirely consistent with market efficiency.[144] Thus, Dr. Roper's opinion that any change in Redwire's stock price at this time indicates inefficiency is contradicted by academic evidence and is fundamentally flawed.

89. In summary, Dr. Roper's price impact opinions are unfounded, contradicted by basic principles of finance and valuation analysis, and ultimately flawed and irrelevant. As noted above, I conclude that the alleged misrepresentations impacted the prices of Redwire's Securities during the Class Period.

### 5. DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS SUBJECT TO A COMMON METHODOLOGY CONSISTENT WITH PLAINTIFF'S THEORY OF LIABILITY

90. Dr. Roper opines that the out-of-pocket damages methodology proposed in my Efficiency Report is not applicable in this case due to the "unique facts and circumstances in this matter."[145] He bases this opinion on two main arguments. First, Dr. Roper states that, because Redwire's Common Stock transitioned inefficiently from GNPK to RDW upon the closing of the business combination, I have not "described any analysis that can separate the purported inflation from Plaintiffs' theory of harm from the inflation caused by this inefficiency."[146] Second, Dr. Roper argues that artificial inflation did not exist during certain periods of time, and that certain hypothetical approaches to the backcasting of artificial inflation estimation during these periods would be inappropriate.

91. Dr. Roper's opinions are flawed, unsupported, and irrelevant for several reasons. First, I have addressed numerous fallacies in both of Dr. Roper's critiques in **Section 4** above, and I

---

[144] *See, e.g*., Gahng Study, at p. 3465: "Because some shareholders may choose to redeem their shares, collecting the redemption value of the initial trust amount plus interest, the amount of cash available for a merger is uncertain…If the merger is approved by shareholders and the SPAC still has enough cash after redemptions to meet the terms of the merger agreement, the business combination is consummated, and the SPAC starts to trade as a newly merged company under a new ticker symbol."

[145] Roper Report ¶186.

[146] Roper Report ¶188.

incorporate that discussion herein. I also explain additional flaws in his opinions below.

92. Second, I understand that I am not obligated to, and in fact I have not, committed to using any specific approach to the estimation of artificial inflation at this point in time. Nor have I committed to how I would implement such approaches. I have not put forward any of the hypothetical artificial inflation ribbons that Dr. Roper speculatively proposes. Dr. Roper's opinions on specific artificial inflation ribbons are therefore speculative and irrelevant. Moreover, as explained in my Efficiency Report, the "quantification of artificial inflation per share is based upon a detailed loss causation analysis."[147] Because Dr. Roper opines that there was $0 of artificial inflation during sizeable portions of the Class Period,[148] yet he admits that he did not conduct a loss causation analysis,[149] his opinions are unsupported and flawed.

93. Third, Dr. Roper puts forward a hypothetical constant dollar example of artificial inflation, with a $1 decline following the corrective disclosures at the end of a Class Period, with this artificial inflation backcast to April 20, 2021.[150] He then opines that my "back-casting would say there is $1.00" of artificial inflation on this date, whereas his opinion "indicates there is no inflation in GNPK share price" on this date.[151] As explained above, his opinion of $0 artificial inflation on this date is unsupported and flawed. Moreover, his hypothetical example speculates how I would backcast artificial inflation. At this point in time I have not committed to any specific backcasting methodology.

94. Dr. Roper's criticisms betray a lack of basic understanding regarding factors that can affect stock prices, such as redemption rights. For example, consider dividend-paying stocks. Prior to the ex-dividend date, a stock will trade while incorporating the value of the dividend to be paid to investors who own the stock. But the stock price will fall by the value of the dividend to be paid out when the stock goes ex-dividend, because investors who purchase the stock following the ex-dividend date will not receive the dividend, even if they purchase the stock

---

[147] Efficiency Report ¶131.

[148] Roper Report ¶¶28; 43; 53; 191.

[149] Roper Tr. 13:17-20: "Q. And you were not asked to perform your own loss causation analysis, correct? A. I was not asked to assess loss causation for the purposes of merits."

[150] Roper Report ¶¶190-191.

[151] *Id.*

before the dividend is actually paid out.[152] One can see the similarities between the dynamics of a dividend payment and a redemption right. Yet these changes in securities – whether dividend payments or redemption rights – do not in any way undermine the applicability of the out-of-pocket methodology or the ability to estimate and backcast artificial inflation.

95. Def's Opp Brief asserts that damages cannot be calculated class-wide because of issues with typicality.[153] Specifically, Defendants allege that price impact and any artificial inflation cannot be presumed to carry over from GNPK before closing of the business combination to RDW following the completion of the business combination.[154] They also argue that existence of the redemption right constitutes a "materially different" class of investors pre- vs. post-closing due to differences in price impact, artificial inflation, and damages.[155] And they imply that market efficiency cannot be established during the first half of the Class Period.[156] As explained above, the Securities at issue in this matter, including the redemption right, are not novel, and the circumstances in evaluating market efficiency, price impact, and damages methodology are also not novel.[157] Similar to the differing rights of investors to receive stock dividends over time, the expiration of a redemption right for certain investors does not cause problems in assessing market efficiency, price impact, artificial inflation, and damages on a class-wide basis in a manner that is common across all Class members.

96. Ultimately, as I note in my Efficiency Report, the creation of an artificial inflation ribbon "will be based on the specific set of facts and circumstances in a given case."[158] I reiterate my Efficiency Report conclusion that "Common Stock, Options and Warrants damages in this matter under §10(b) and §20(a) can both be calculated on a class-wide basis utilizing common

---

[152] *See, e.g*., Charles Schwab, "Ex-Dividend Dates: Understanding Dividend Risk," Oct. 31, 2023. Available at: https://www.schwab.com/learn/story/ex-dividend-dates-understanding-dividend-risk.

[153] Def's Opp Brief, at pp. 34-35.

[154] *Id*.

[155] *Id*.

[156] *Id*.

[157] As noted *infra*, I have encountered the same economic characteristics, including expiration of redemption rights, in prior market efficiency analyses of SPAC securities.

[158] Efficiency Report ¶133.

97. In summary, none of Dr. Roper's criticisms disturb my Efficiency Report conclusions, which I reaffirm herein.

I declare under penalty of perjury that the foregoing is true and correct.

RESPECTFULLY SUBMITTED

Matthew D. Cain, Ph.D.

**APPENDIX A**

## Matthew D. Cain, Ph.D.             July 2024

E-mail: mdcain@outlook.com          Homepage
Mobile: 574-485-8065          SSRN

### Education

Ph.D., Finance, August 2007          Purdue University, West Lafayette, IN
B.S., Finance, May 2001          Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group

- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2024

    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business

    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007

**Expert Witness Experience**

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

45

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al*., Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**APPENDIX B**

**Court Documents:**

- First Amended Consolidated Complaint for Violations of the Federal Securities Laws, No. 3:21-cv-01254-TJC-PDB (Doc. 47).

- Order Denying Defendants' Motion to Dismiss, dated Mar. 22, 2023 (Doc. 62).

- Expert Report of Matthew D. Cain, Ph.D., dated Jan. 19, 2024 (Doc. 86-1).

- Defendants' Response in Opposition to Lead Plaintiff's Motion for Class Certification, dated Apr. 24, 2024 (Doc. 129).

- Expert Report of Andrew H. Roper, Ph.D., dated Apr. 24, 2024 (Doc. 129-5).

- Defendants' Daubert Motion to Exclude The Expert Opinions of Matthew D. Cain, May 8, 2024 (Doc. 136).

**Depositions:**

- Deposition of Matthew D. Cain, Ph.D., Mar. 15, 2024.

- Deposition of Andrew H. Roper, Ph.D., Jun. 5, 2024.

**Court Decisions and Securities Law:**

- *Aranz v. Catalyst Pharmaceutical Partners, Inc.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014).

- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).

- *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989).

- *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501-502 (S.D. Fla. 2003).

- *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 270-72 (2014).

- *Homyk v. ChemoCentryx, Inc. et al.*, Case No. 4:21-cv-03343-JST. (N.D. Ca.).

- *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

- *In re Netbank, Inc. Secs. Litigation*, 259 F.R.D. 656, 669-676 (N.D. Ga. 2009).

- *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 370 (S.D.N.Y. 2016).

- *In re PolyMedica Corp. Sec. Litig.,* 432 F.3d 1, 16 (1st Cir. 2005).

- *In re: QuantumScape Securities Class Action Litigation*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

- *In re Teva Secs. Litig.*, 2021 WL 872156 (D. Conn.).

- *In re: Under Armour Securities Litigation*, 631 F.Supp.3d 285, 311-12 (D. Md. 2022).

- *In re VeriFone Sec. Litig.*, 784 F.Supp. 1471 (N.D. Cal. 1992).

- *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005).

- *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 354 (C.D. Cal. 2015).

- *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661 (S.D. Fla.).


**Academic Literature:**

- Barber, Brad M., Paul A. Griffin, and Baruch Lev, 1994, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporation Law* 19.

- Bartov, Eli and Yaniv Konchitchki, 2017, "SEC Filings, Regulatory Deadlines, and Capital Market Consequences," *Accounting Horizons* 31.

- Bharat Bhole, Sunita Surana, and Frank Torchio, 2020, "Benchmarking Market Efficiency Indicators for Securities Litigation," University of Illinois Law Review Online.

- Brogaard, Jonathan, Terrence Hendershott, and Ryan Riordan, 2019, "Price Discovery without Trading: Evidence from Limit Orders," *Journal of Finance* 74.

- Fama, Eugene F., 1991, "Efficient Capital Markets II," *Journal of Finance* 46.

- Gahng, Minmo, Jay R. Ritter, and Donghang Zhang, 2023, "SPACs," *Review of Financial Studies* 36.

- Ferrell, Allen, and Roper, Andrew, 2015, "Price Impact, Materiality, and Halliburton II," *Washington University Law Review* 93.

- Larry Harris, *Trading and Exchanges*, Oxford University Press, 2003.

- Kaniel, Ron and Hong Liu, 2006, "So What Orders Do Informed Traders Use?," *Journal of Business* 79.

- MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35.

- Rosenbaum, Joshua and Joshua Pearl, *Investment Banking*, 2009: John Wiley & Sons, Inc.

- Villanueva, O. Miguel, and Steven Feinstein, 2021, "Stock price reactivity to earnings announcements: the role of the *Cammer*/*Krogman* factors," *Review of Quantitative Finance and Accounting* 57.


**Data Sources:**

- Bloomberg Terminal

- Factiva News

- CRSP

- SEC Edgar Online

- Redwire Press Releases and SEC Filings

**Other:**

All other data and documents cited or referred to within this report