# EXHIBIT B

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

- - - - - - - - - - - - - - - - - - - -x

:

JED LEMEN, Individually and On          :

Behalf of All Others Similarly          :

Situated,                               : Case No.

                                        : 3:21-cv-01254-TJC-PDB

                    Plaintiffs,         :

                                        :

        v.                              :

                                        :

REDWIRE CORPORATION f/k/a               :

GENESIS PARK ACQUISITION                :

CORP., PETER CANNITO, and               :

WILLIAM READ,                           :

                                        :

                    Defendants.         :

- - - - - - - - - - - - - - - - - - - -x

        Remote, video-recorded deposition of ANDREW ROPER, Ph.D., taken pursuant to Notice, was held via videoconference, commencing June 5, 2024, at 8:32 a.m. PT, on the above date, before Amanda McCredo, a Court Reporter and Notary Public in the State of New York.

A P P E A R A N C E S: (via videoconference)

Appearing on behalf of the lead plaintiff Jared Thompson:

PETER A. SHAEFFER, ESQ.

Hagens Berman Sobol Shapiro LLP

455 North Cityfront Plaza Drive

Suite 2410

Chicago, Illinois 60611

petersh@hbsslaw.com

708.628.4949

Appearing on behalf of defendants:

FRANK A. ZACHERL, ESQ.

ERIN TUCK, ESQ.

GLENNYS ORTEGA RUBIN, ESQ.

BENJAMIN F. ELLIOT, ESQ.

ALFRED BENNINGTON, JR., ESQ.

Shutts & Bowen LLP

200 South Biscayne Boulevard

Suite 4100

Miami, Florida 33131

fzacherl@shutts.com

etuck@shutts.com

grubin@shutts.com

belliott@shutts.com

bbennington@shutts.com

305.358.6300

ALSO PRESENT:

Mame Maloney - The Brattle Group

Audrey Xu - The Brattle Group

Matthew D. Cain - Analysis Group

Lee Bowry - videographer

Page 3

**I N D E X**

WITNESS                 EXAMINATION BY                    PAGE

Andrew Roper, Ph.D. Mr. Shaeffer                            5

**EXHIBITS**

EXHIBIT                                                   PAGE

Exhibit 1      Expert Report of Andrew H. Roper     8

               dated April 24, 2024

Exhibit 2      Expert Report of Dr. Matthew Cain    9

**Page 4**

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 8:32 a.m. Pacific Time on June 5, 2024.

Please note that this deposition is being conducted remotely using virtual technology.  Quality of recording depends on the quality of camera and Internet connection of participants.  What is seen from the witness and heard on-screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.  This is media unit 1 of the video-recorded deposition of Dr. Andrew Roper taken by counsel for plaintiff in the matter of Jed Lemen et al. versus Redwire Corporation f/k/a Genesis Park Acquisition Corp., et al., filed in the United States District Court, Middle District of Florida.  Case number 3:21-cv-01254-TJC-PDB.

My name is Lee Bowry representing Veritext New York and I am the videographer.  The court reporter is Amanda McCredo, also with Veritext.

I am not related to any party in this action, nor am I financially interested in the outcome.

Page 5

A. Roper, Ph.D.

Counsel attending remotely will be noted on the stenographic record.  Will the court reporter please swear in the witness and then counsel may proceed.

ANDREW ROPER, Ph.D., the witness herein, after having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. SHAEFFER:

Q    Good morning, Dr. Roper.  We did meet you off the record, but for the sake of the record, my name is Peter Shaeffer.  I'm with the law firm of Hagens Berman LLP, and my firm represents the lead plaintiff in this matter.

Can you please state and spell your full name for the record?

A    My name is Andrew Hardy Roper.  Andrew, A-N-D-R-E-W; Hardy, H-A-R-D-Y; Roper, R-O-P-E-R.

Q    And you know we're using a remote video system today for the deposition.  If you have any difficulty hearing me or accessing the exhibits, will you please let me know?

A    Yes.

Page 6

A. Roper, Ph.D.

Q    And are you able to hear me now?

A    Yes.

Q    And you can -- you can see me?

A    Yes.

Q    And you can see the window on your screen where documents will be displayed if they need to be displayed?

A    Yes.  I believe so.

Q    Okay.

And do you just have one computer screen in front of you?

A    I have two screens in front of me.

Q    Okay.

And do you have your email open on your computer?

A    No.

Q    Okay.

Any messaging system on your computer?

A    Zoom, which is what we're in.

Q    Okay.

And do you have your phone with you?

A    Yes.

Q    Okay.

So I understand you've been deposed before,

Page 7

A. Roper, Ph.D.

but I just want to go through some ground rules to
make sure we're on the same page.

You do understand that your answers are
under oath as if given in a court of law?

A    Yes.

Q    And I'll ask that you please wait until
I've completed my question before responding.

Is that okay?

A    Yes.

Q    And we do have a court reporter here today
who will be transcribing the deposition, so we need
clear, verbal answers.  That means "yes" or "no" and
not shaking your head or something similar.

Is that okay?

A    Yes.

Q    And since we have a court reporter here, we
want the court reporter to be able to type every
word, so it's important that you and I speak
slightly slower than we would in normal
conversation.

Does that work?

A    Yes, it does.

Q    We'll see if I actually do that.  If you
need to have a question repeated, let me know, and

A. Roper, Ph.D.

the court reporter can read it back to you.

Okay.  And if you can please let me know if you do not understand a question and need me to rephrase it.

Can you do that?

A    Yes.

Q    If you need to take a break, I'm fine taking breaks when you need to.  I'll just ask that you not request a break while a question is pending.

Does that work?

A    I can try to make it work.

Q    Are there any circumstances that would affect your ability to testify truthfully and completely today?

A    No.

Q    Okay.

And I've already introduced Exhibit 1 to your deposition.

(Expert Report of Andrew H. Roper dated April 24, 2024, was marked as Exhibit 1 for identification, as of this date.)

Page 9

A. Roper, Ph.D.

BY MR. SHAEFFER:

Q    It's the expert report that you provided for use in this case.

Do you have that in front of you?

A    Yes, I do.

Q    Okay.

Is this the report that you provided for use in this case?

A    If you represent it is, I will accept it is.

Q    Can you go to page 87 of the report.  Just let me know when you're there.

A    I'm at page 87 of 124 on Exhibit 1.

Q    Okay.

Is that your -- is that your signature on page 87?

A    Yes, it is.

Q    Okay.

And you were retained by defendants to provide expert testimony, correct?

A    I was retained by defendants to provide expert testimony in this case, yes.

(Expert Report of Dr. Matthew Cain was marked as Exhibit 2 for

Page 10

A. Roper, Ph.D.

identification, as of this

date.)

BY MR. SHAEFFER:

Q    Okay.

So I've also introduced Exhibit 2, which should be on your Exhibit Share.  Exhibit 2 is the expert report provided by lead plaintiffs' expert, Dr. Matthew Cain.

This was the expert report you were retained to address, right?

A    Can I ask a question about the technology for a second?

Q    Sure.

A    When you just moved to Exhibit 2, was I supposed to see a change on my screen, or do I need to go into Exhibit Share and move myself to Exhibit 2?

Q    So I think you can go into Exhibit Share and move to Exhibit 2.  And I think you can have two separate windows open so you don't have to go back and forth.

A    Give me one second to see if I can execute that.

Q    Do you want to go off the record for just a

Page 11

A. Roper, Ph.D.

second while you do that?

MR. SHAEFFER:  Can we go off the record, Frank?

MR. ZACHERL:  Yeah, sure.

THE VIDEOGRAPHER:  Going off the record. The time is 8:39 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 8:43 a.m.

BY MR. SHAEFFER:

Q   All right, Dr. Roper.

So you now have both Exhibit 1 and Exhibit 2 open as separate documents in Adobe; is that right?

A   That is correct.

Q   Okay.

And do you have any paper copies or any paper documents in front of you at the moment?

A   I have a paper copy of Exhibit 1 and a paper copy of Exhibit 2.

Q   Okay.

Are -- are those clean copies, or did you annotate them in any way?

A   There is a Post-it that says "assignment"

Page 12

A. Roper, Ph.D.

that points me to my assignment.

Q    Okay.

A    And there is a Post-it -- there's a couple of Post-its like that that say a word that just remind me of what is in the report.

Q    Okay.

Like I said, I think, off the record, if you want to refer -- use your paper copy when you're answering questions, that's fine by me.

So can you go to paragraph 10 of your report.

So you were retained by defendants to review, analyze, and respond to Dr. Cain's assertions regarding whether securities traded in an efficient market as postulated under the fraud-on-the market theory; is that right?

A    More broadly, my report stipulates and says I was asked by counsel to respond to plaintiffs' assertion that individualized inquiry into reliance can be overcome by applying the fraud-on-the-market theory.  So, as an example of that, I was also asked specifically to respond and analyze Dr. Cain's assertions.

Q    Okay.

Page 13

A. Roper, Ph.D.

And those assertions relating to the efficient market or assertions more broadly?

A     To his assertions regarding whether certain securities traded in an efficient market as postulated and whether damages can be calculated on a class-wide basis using routine methodologies commonly employed by plaintiffs in federal security class action litigation.

Q     So you were not asked to perform your own event study, correct?

A     I was neither asked nor asked not to.

Q     And you were not asked to calculate damages in this case, correct?

A     I was not asked to calculate damages in this case.

Q     And you were not asked to perform your own loss causation analysis, correct?

A     I was not asked to assess loss causation for the purposes of merits.

Q     So what -- so for purposes of class certification, what aspect of loss causation were you asked to assess?

A     I'm only hesitating on the question because certain of the events that were selected by Dr. Cain

Page 14

A. Roper, Ph.D.

are included in plaintiffs' alleged corrective disclosures.

To the extent I am engaging in those transaction -- in those actual disclosures, we're engaging in information that may or may not be related to the topic of loss causation.

Q    To what extent, for purposes of your report, were you engaging in assessing the alleged corrective disclosures?

A    I didn't assess the alleged corrective disclosures for the purposes of my report.

Q    Okay.

So you're not offering an opinion that the alleged corrective disclosures did not have a price impact, right?

A    Again, that question is too vague for me to answer.  Which corrective disclosure are you talking about?  Which price impact are you talking about?

Q    So would you agree with me that there are different ways for a plaintiff to show price impact?

A    Price impact of what?

Q    The alleged false and misleading statements.

A    Are you asking me if I agree that there are

Page 15

A. Roper, Ph.D.

multiple commonly accepted methodologies that would allow plaintiff to demonstrate price impact of an alleged fraudulent misstatement?

Q    Yes.

A    There are multiple ways that one can assess price impact.  Not all of those ways may be reliable in every particular case.

Q    So one way to show price impact would be an immediate price impact, correct, based on following a false and misleading statement -- an alleged false and misleading statement?

A    Again, I think your question was one way to show a price impact would be to show an immediate impact.  I think that's reduced to nothing, that question.  You're saying I show a price impact by showing a price impact?  Do you assume -- can you be more specific in your question?

Q    So one of your opinions in the case addresses price impact to the share price of the Genesis Park common stock; is that correct?

A    I do address the lack of price impact in GNPK during the class period.

Q    And your opinion relating to the lack of price impact of GNPK during the class period relates

Page 16

A. Roper, Ph.D.

to the fact that the GNPK common stock had a

redemption right, correct?

A    I considered the fact, the unique fact in

this case, that the GNPK stock had a redemption

right in assessing whether there is evidence of

price impact from an economic point of view.

Q    And how did the fact that there was a

redemption right impact your assessment of whether

there was a price impact from an economic point of

view?

A    The existence of the redemption right

allows an economist to create -- allows an economist

to explore the price discovery process in a unique

way in this matter.

Q    What do you mean by "price discovery

process"?

A    "Price discovery" is how information is or

is not embedded into price.  As traders trade,

through their trading, information can, in certain

instances, be embedded into that price.  That

process is known as "price discovery."

Q    Can you explain the connection between the

price discovery process and your price impact

analysis in this case?

Page 17

A. Roper, Ph.D.

A    When we think about price discovery in GNPK stock during the class period, one of the things that has to be taken into consideration is the fact that there is a redemption right.  That redemption right created a floor in the price of GNPK stock.

GNPK stock, if the market were efficient as alleged by plaintiffs in the complaint and as suggested by Dr. Cain in Exhibit 2, if the market were efficient, then the price should not have fallen below that floor, net of transaction cost in making that trade.

That fact allows us to explore the inquiry of price impact for the purposes of class certification.

Q    So if you want to go back to your discussion of market efficiency for the GNPK stock -- we'll address that later.

In terms of when you were assessing the price impact in this case, for purposes of class certification, did you consider the price maintenance theory at all?  Are you aware of what "the price maintenance theory" is?

A    I've heard the term "price maintenance theory."  I haven't heard the term "the price

Page 18

A. Roper, Ph.D.

maintenance theory."

Q    So a price maintenance theory, what's your understanding of that theory?

A    Price maintenance theory, in the context of securities litigation, can be used to describe a situation in which a price is maintained at a certain level by the continued omission of certain material information, allegedly omitted and allegedly material.

Q    So, to put it differently, would the misrepresentation prevent the inflation from dissipating?  Is that right?

A    Under price maintenance theory, a commonly alleged theory of damage is that the continued, maintained materially -- or alleged material omission maintains the price by not allowing the price to fall.

Q    So would you agree with me that for -- in the price maintenance theory context, economic experts often look to the back end price drop after the truth is disclosed to calculate the price impact of the alleged false and misleading misrepresentations?

          MR. ZACHERL:  Object to form.

Page 19

A. Roper, Ph.D.

A    Who are you defining in these commonly -- people that are commonly looking?  Can you be more specific in your question?

BY MR. SHAEFFER:

Q    So you're co-chair of the securities litigation practice at The Brattle Group, correct?

A    It's pronounced "Brattle."

Q    Brattle, sorry, thanks.

A    I'm co-chair, yes.

Q    So have you assessed damages in the securities litigation context?

A    I have.

Q    So, as part of that assessment, you look at whether artificial inflation can be calculated, correct?

A    Yes.

Q    And, in that context, have you addressed a securities class action plaintiff who alleged a price maintenance theory of price impact?

A    Yes.

Q    So, in those contexts, when a securities class action plaintiff is trying to assess price impact, have you seen a plaintiffs' expert look at the back end price drop after the truth is disclosed

Page 20

A. Roper, Ph.D.

to calculate the price impact of an alleged false

and misleading representation -- misrepresentation,

excuse me?

A    I have seen plaintiffs examine price

changes associated with alleged corrective

disclosures for the purposes of meeting loss

causation.  I've seen plaintiffs look at corrective

disclosures and price changes associated with

corrective disclosures to estimate inflation to be

used in per-share damages using an out-of-pocket

measure of damage.

Your question is have I seen plaintiffs use

corrective disclosures to assess price impact.

I haven't seen plaintiffs assess price

impact outside of cases in which I have examined

price impact being challenged at class

certification.  So I'm hesitating on your question,

because price impact has a very unique definition in

the context of securities class action litigation.

Q    So you just testified "I haven't seen

plaintiffs assess price impact outside of cases in

which I have examined price impact being challenged

at class certification."

So, do you mean -- I just want to make sure

Page 21

A. Roper, Ph.D.

I understand.

So, outside of the context of class certification, you haven't seen plaintiffs assess price impact?

A    It's the way you're using the term "price impact."

Q    Okay.

A    We're talking about Halliburton II and inquiries subject to that of price impact.  That's what my former answer relates to.

The question of whether security prices are affected by alleged misrepresentations, that question, right, has been addressed by plaintiffs and others by looking at alleged corrective disclosures and by looking at the statements when they were actually made.  There's multiple ways people look at whether alleged false and misleading information caused the stock price to deviate from what it would have been but for that information.

Q    So your answer just now, that's how your understand the term "price impact"; is that correct?

A    That's one definition of "price impact."

Q    Okay.

A    That's how one would interpret it, as well.

Page 22

A. Roper, Ph.D.

Q    And in the context of securities class actions, are there other definitions of price impact aside from the one you just stated that you're aware of?

A    I use price impact in the broadest sense of the term when information impacts the price discovery process.  That's the way we can use that for the purposes of this conversation.  It has unique definitions elsewhere.

Q    Okay.

So when you're discussing price impact in the context of your report, you're not necessarily narrowing it to whether alleged false and misleading information caused the stock price to deviate from what it would have been but for that information, as you previously testified?

MR. ZACHERL:  Object to form.

A    I disagree with your characterization of my opinion in my report.

BY MR. SHAEFFER:

Q    I guess I just want to make sure we're on the same page in terms of when you use the term "price impact" or "impact to the price."

When I read that, I'm reading that maybe in

Page 23

A. Roper, Ph.D.

the narrower sense of what I just said.  You're looking at the alleged false and misleading information that caused the stock price to deviate from what it would have been but for that false and misleading information.  So when I hear the term "price impact," that's what I'm thinking of.

So, do you understand that?

A    I understand what you said, yes.

Q    Okay.

And based on your prior testimony, you're using "price impact" in the broadest sense of the term, and that's when information impacts the price discovery process, correct?

A    We were having a discussion about price impact.  For the purposes of that discussion, I defined it in the broadest terms.

Q    Okay.

A    For the purposes of my report, what I am looking at in my report is in my report and we'd refer to that.

Q    And I think that's where I'm trying to understand what you're referring to by "price impact."  Maybe, why don't we -- let's put a -- let's maybe shift, and let's see if some other

Page 24

A. Roper, Ph.D.

questions will kind of tease out what I'm looking

for and what you're trying to say.

So I want to shift back to sort of what you

were asked to do and what you weren't asked to do

and what's in your report.

So you were not asked to determine whether

any of the alleged misrepresentations or omissions

in this case were material to a reasonable investor;

is that correct?

A    I was not asked to assess materiality for

the purposes of this report.

Q    Okay.

And you weren't asked to determine whether

any of the alleged false and misleading statements

were in fact false or misleading; is that correct?

A    I was asked to assume liability as is

commonly done.

Q    Okay.

A    Right.

Q    Sorry, I didn't mean to cut you off.

Any other assumptions that you were asked

to make when drafting your report?

A    Not that I'm aware of.

Q    Were you asked to provide any other

Page 25

A. Roper, Ph.D.

opinions other than what is set forth in your

report?

    A    My report expresses my opinions.

    Q    Again, I'm asking a slightly different

question.

         Were you asked to provide any other

opinions other than what is set forth in your report

and then you didn't end up providing those opinions?

    A    No.

    Q    Okay.

         And did you suggest offering any other

opinions other than what is offered in the report?

    A    No.  The report offers the opinions that I

was prepared to offer.

    Q    Okay.

         So, just so I'm clear, you didn't suggest

or recommend offering any other opinions that were

not in your report?

    A    No.

    Q    I think -- let's go to Section III of your

report.  I think that starts with paragraph 12.

         So, in paragraphs 12 through 28 of your

report, you provide a summary of the opinions that

you've reached in this case; is that correct?

Page 26

A. Roper, Ph.D.

A    I provide an executive summary of the opinions.

Q    Okay.

And how many opinions did you reach in this case?

A    I've never counted my opinions.

Q    So I -- so, I mean, I ask you because the executive summary of your opinions is -- it's 16 paragraphs of your report.  And I'm just trying to understand the scope of the opinions in your case.

Did you intend for the bolded language in paragraphs 16 to 28 to be your primary opinions?

A    No.

Q    Okay.

So maybe -- this will be, I think, a process that we'll need to do.

Let's start with paragraph 16.  So you write "Dr. Cain fails to provide a reliable economic assessment of market efficiency using the commonly accepted methods available in the peer reviewed economic literature."

You wrote that, correct?

A    Yes.

Q    Is that an opinion that you're offering in

Page 27

A. Roper, Ph.D.

this case?

A    Yes.

Q    Okay.

Same paragraph number 16, you write "The alleged fraud did not impact the security prices paid by investors, as alleged by plaintiffs."

Is this an opinion that you're offering in this case?

A    Yes.

Q    Go to paragraph 18.  Fourth line from the top of paragraph 18 starting with "while," you write "While these counts and comparisons may be instructive to the court, they do not provide an economist with reliable evidence from which to opine on market efficiency."

So you're discussing the Cammer factors in this paragraph; is that correct?

A    I'm discussing more than the Cammer factors.

Q    You're also discussing the Krogman factors?

A    I'm discussing, broadly, the counts and comparisons performed by Dr. Cain in his report.

Q    So those included the Cammer factors, correct?

Page 28

A. Roper, Ph.D.

A    It includes his analysis of Cammer factors, his analysis of Krogman factors, and his analysis of what he labels as "additional factors."

Q    Okay.

So it's your opinion that these counts and comparisons could be instructive to the Court?

A    It's not my opinion that it could be instructive to the Court.  I'm deferring to the Court to allow the Court its own -- its own interpretation.

Q    Okay.

But, in your opinion, they're not instructive for the Court to assess when considering the presumption of reliance under the fraud-on-the-market theory?

A    If the Court is looking for testimony that follows commonly accepted methods to inform its decision as to whether GNPK and RDW traded in an efficient market as postulated by plaintiffs in their complaint, then my advice to the Court is that Dr. Cain has not provided that commonly available methodology -- that commonly used and reliable methodology, that it would not be useful if that's what the Court was trying to do.

Page 29

A. Roper, Ph.D.

If the Court was trying to be a gatekeeper, this is not useful testimony.

Q    So go to the last sentence that you write in paragraph 18.  You write that "Dr. Cain is authoring an analysis purposely suited for litigation."

Is that an opinion that you're offering in this case?

A    Yes.

Q    Okay.

So Dr. Cain's report addresses the fraud-on-the-market theory; is that correct?

A    This is correct.

Q    And the fraud-on-the-market theory is a legal doctrine; is that correct?

A    I don't know that either the law or the field of economics has a copyright on who owns that theory.

Q    Okay.

So outside of the context of securities litigation, is fraud-on-the-market theory something that's addressed by economists?

A    Economists address fraud-on-the-market theory, and it was originally addressed to

Page 30

A. Roper, Ph.D.

investigate the intersection of an economic theory
of market efficiency and a legal requirement of
reliance. The scholars that originally entertained
thinking about fraud-on-the-market were economists.

Q So I understood they were economists, but
they -- do economists discuss or analyze or
address -- however you want to put it -- the
fraud-on-the-market theory in a context that is not
related to litigation?

A I mean, we do assess the impact of what is
being looked at on fraud-on-the-market theory
outside of litigation. It may not be labeled
fraud-on-the-market theory, but we look at similar
questions outside of litigation.

Q So if it's not labeled fraud-on-the-market
theory, what's it labeled? What's it labeled as?

A Well, in the efficient market theory
literature itself, we look at the role of public
information on prices and we look at whether those
prices are being impacted by the release of new and
unexpected information. So we're looking at aspects
of what the fraud-on-the-market theory is borrowing,
right, from the field, to bridge a legal question.

Q What do you mean by "to bridge a legal

A. Roper, Ph.D.

question"?  I just have a question about that last part of your testimony.

A    My understanding, under Section 10 and Rule 10b-5, is that investors have to demonstrate reliance, right?

Under the strictest definition, one might interpret that as eyeball reliance.  Did they actually read the alleged public misstatement that's at issue in this case to circumvent that eyeball reliance, right?

Legal doctrine looks to the fraud-on-the-market theory borrowed from economics to say can we bridge that proof without actually demonstrating, on a case-by-case, individualized basis, that everyone put eyeballs on the alleged false and misleading information.

So, to bridge that method of proof, to build a bridge, we look at fraud-on-the-market theory as a possible bridge.

Q    So is it fair to say it's your testimony that academic literature addressing efficient market theory generally is applicable to analyzing the fraud-on-the-market theory in the context of securities class action?

Page 32

A. Roper, Ph.D.

A     I don't know if I agree or disagree with your characterization of my testimony.

I'll say that the fraud-on-the-market theory relies on principles that are coming from the economic literature on efficient markets, right?  So it's borrowing from that literature and the assumptions that are made in that literature and the results that have been shown in that literature.

To the extent it's borrowing from that literature, right, we can assess whether it's reasonably and reliably relying on that literature.

In the context of this case, when I analyzed the facts, we find that Dr. Cain's analysis does not reasonably rely on that literature to demonstrate what he says he needs to demonstrate for the purposes of assessing market efficiency and applying the fraud-on-the-market theory in this case.  He simply does not apply commonly accepted methodologies to demonstrate what he says is an efficient market, or what he says is a reliable application of fraud-on-the-market theory, or what he says is a case in which damages can be calculated.

Q     So part of what you just testified is that

A. Roper, Ph.D.

Dr. Cain does not apply commonly accepted methodology when performing his analysis on market efficiency; is that correct?

A     That is correct.

Q     And this commonly accepted methodology is what you are -- strike that.

When you're referring to the "commonly accepted methodology," you're referring to what -- the methodology economists use to analyze efficient market theory in the academic literature?

A     What economists commonly rely on to address market efficiency and hypotheses related to market efficiency.  Yes, that is what is commonly accepted.

Q     Are you referring to commonly accepted methodology for an economist assessing whether the fraud-on-the-market presumption of reliance should be applied in a class certification in a class action?

A     My report speaks for itself.  The sources that I cite in my report are cited.  Those sources come from the economic literature.

I don't -- I don't know how to answer your broad question.  If you've -- if you have a specific question about a source and how it fits, we can go

Page 34

A. Roper, Ph.D.

to the report.  I don't know how to answer these broad questions like this.

Q    Sure.  I guess I'll just ask you directly.

In your report, what sources that you cite to are specifically in the context of an economist assessing fraud-on-the-market theory in a securities class action?

MR. ZACHERL:  Object to form.

A    In my report, what sources are specific to an economist -- I'm sorry, can you repeat the question?

BY MR. SHAEFFER:

Q    Yeah.

So what I'm trying to get at is I understand from your testimony that there is commonly accepted methodology that economists use when they're assessing the efficient market theory odds in the context of a securities litigation.

Is that -- is that a fair -- is that a fair statement of your testimony?

A    There are sources economists can rely on to examine what are reliable methodologies that could be employed to answer questions about market efficiency and how those questions apply to

Page 35

A. Roper, Ph.D.

fraud-on-the-market theory.

Q    And I guess my question to you is in your report, do you cite any literature that is assessing fraud-on-the-market theory in the context of a securities class action?

A    Not assessing.  I have multiple sources that are looking at questions relating to market efficiency in the context of securities class action litigation.

Q    So for purposes of the event study that you analyze from Dr. Cain's report, and when you were developing your opinion on Dr. Cain's event study, were you relying on any literature regarding the use of event studies in the context of assessing fraud-on-the-market theory in a securities class action?

A    Yes.

Q    Which -- can you identify the literature?

A    I'll give you an example.  Barber 1994.

Q    So, in Barber 1994, did the authors of that study detail a methodology for performing an event study for purposes of assessing whether fraud-on-the-market theory and the presumption of reliance should apply in a securities class action?

Page 36

A. Roper, Ph.D.

A    Barber and Lev, in that study, conducted an analysis to examine whether the Cammer factors and Krogman factors that are commonly considered, by course, can actually discriminate between efficient and inefficient stock price responses.

As part of that analysis, they grappled with event selection, which is part of an event study. I describe that event selection inside my report.

Q    Outside of their grappling with event study selection, there wasn't any other discussion of using an event study for purposes of assessing whether fraud-on-the-market theory and the presumption of reliance should apply in a securities class action?

A    It's front and center in the entire paper. The entire paper is grappling with the question of how can the Court assess whether fraud-on-the-market theory is applicable through the lens of how can the Court assess whether a market is efficient. That's the purpose of that paper.

Q    And I guess I'm asking -- I'm focusing on the narrow aspect.

I understand that the Barber paper is

A. Roper, Ph.D.

focused on looking at whether the other Cammer factors other than Cammer five are appropriate for assessing whether a market is efficient.  So I understand that.

What I'm asking is a narrow question about literature that you relied on in your report that addressed specifically the methodology an expert -- or an economist should use for assessing whether the fraud-on-the-market presumption should apply in a securities class action.  And so far you've only mentioned the Barber report.

Is there any other literature in your report that you can cite to?

A      There's a number.  If you want to turn to -- if you can turn to docs relied, there is a number of academic articles that are cited in my docs rely.

Q      I'm going there right now.

So if you want to take a second and review the literature that you cited to, my specific question is which of these papers address the specific issue of conducting an event study to assess whether the fraud-on-the-market theory presumption of reliance should apply in a securities

Page 38

A. Roper, Ph.D.

class action.

A    My paper with Allen Ferrell entitled "Price Impact, Materiality, and Halliburton II" describes the role of event studies and thinking about questions related to price impact and fraud-on-the-market for the purposes of class certification.

Paper by Allen Ferrell and Atanu Saha describes, in part, the role of event studies professing price impact as it typically is looked at when assessing loss causation.

Cornell and Morgan describe the role of event studies in the context of measuring damages, which also gets to price impact and inflation.

Barber, Griffin and Lev describe the role and use an event study to investigate the predictive capabilities of Cammer, Krogman, and other factors.

There is a number of other papers that are on that list that are at the intersection of describing how economic theory is applied in the fraud-on-the-market context.  And in those papers, there are discussions about how event studies are used in those contexts.

Q    So is it your testimony that when you were

Page 39

A. Roper, Ph.D.

assessing Dr. Cain's event study, in this case in his expert report, that you were relying on the literature that you just cited to assess and evaluate whether Dr. Cain provided an appropriate event study for purposes of invoking the fraud-on-the-market presumption in this class certification stage?

A    I rely on this literature that is cited in my documents relied to demonstrate that Dr. Cain has not followed commonly accepted methods in implementing his event study or in counting and comparing other various attributes of market characteristics.  That's what I rely on this literature to establish.

MR. SHAEFFER:  We've been going for close to an hour.  Why don't we take a break and go off the record.

MR. ZACHERL:  That sounds fine.  When do you want to come back?  Five minutes?  Ten minutes?

MR. SHAEFFER:  I think 10 is fine.

MR. ZACHERL:  Okay.

12:40, so that would be 9:40 your time.

THE WITNESS:  Before -- when we go off the

Page 40

A. Roper, Ph.D.

record, someone instruct me how do I leave this program and be able to get back into it.

THE VIDEOGRAPHER:  Should we just go off the record, first, and we'll take care of that?

Going off the record.  The time is 9:30 a.m.  This is the end of media unit 1.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 9:43 a.m.  This is the beginning of media unit 2.

BY MR. SHAEFFER:

Q    So, Dr. Roper, I want to go back to your executive summary of opinions.  So that's starting with paragraph 12.

So once you're there, what I would like to have you do is review paragraphs 12 through 28.  And when you review them, if you can just mark down how many opinions that you're asserting that are contained within paragraphs 12 through 28.

Can you do that for me?

MR. ZACHERL:  Object to form.

A    No, I can't do that for you.  I wouldn't know how to identify what's an opinion from every sentence which forms the basis of opinions or

Page 41

A. Roper, Ph.D.

opinions themselves.

BY MR. SHAEFFER:

Q    Okay.

So your testimony is that you're not able to identify your opinions in your executive summary of your opinions; is that correct?

A    No, that's not my testimony.

Q    You testified you wouldn't know how to identify what's an opinion from every sentence which forms the basis of opinions or opinions themselves.

You said -- you testified to that, right?

MR. ZACHERL:  Object to form.

A    I testified to what was on the record.

BY MR. SHAEFFER:

Q    So -- just so -- I want to make sure that we're clear.

You're unable to review paragraphs 12 through 28 in your report and identify what opinions you're offering in the report?

A    No.  Your original question was could I read paragraphs 12 through 28 and tick off or identify and count the number of opinions that I'm offering in those paragraphs.  My response is I don't count opinions.  I cannot count an opinion.  I

Page 42

A. Roper, Ph.D.

wouldn't know where one starts and one stops.

It is my opinion that paragraphs 12 through 28 are an executive summary of my opinions.

Q   So it's your testimony that paragraphs 12 through 28 are an executive summary of your opinions, but -- strike that.  I think we can -- I think we can just move on.

I want to go back to your -- what I'm going to call your price impact opinion.  You do write in paragraph 16 that the alleged fraud did not impact the security prices paid by investors; is that correct?

A   It is correct that I write in paragraph 16 the alleged fraud did not impact the security prices paid by investors.

Q   Can you go to paragraph 26.  Can you just review paragraph 26 for me.

A   (Perusing document.)

Q   Are you finished?  Okay.

Is paragraph 26 part of your opinion, or does it support your opinion, that the alleged fraud did not impact the security prices paid by investors?

A   That's part of my opinion that it did not

Page 43

A. Roper, Ph.D.

impact the security prices paid by investors as

alleged by plaintiffs.

Q    So what other paragraphs in your executive

summary relate to your opinion that the -- that the

alleged fraud did not impact the security prices

paid by investors?

MR. ZACHERL:  Object to form.

A    My opinion is that it did not impact the

security prices paid by investors as alleged by

plaintiffs.

Other paragraphs that relate to that

opinion?  Paragraph 25, paragraph 27, paragraph 28,

paragraph 24.  They all relate to that opinion.

There may be more.

BY MR. SHAEFFER:

Q    So are you able to put -- describe for me

what your price impact opinion is in this case?

A    You're characterizing it as an opinion.

There's lots of facts that I document through

reliable analysis that relate to the discussion of

price impact.

Q    So what -- I'm characterizing it as an

opinion because you say that the alleged fraud did

not impact the security prices paid by investors.

Page 44

A. Roper, Ph.D.

So I'm trying to understand the scope of that opinion and the basis of that opinion and the specifics of the opinion that you give that the alleged fraud did not impact the security prices paid by investors.

A     Let me describe some of my report.

My report documents how plaintiffs allege that the price was inflated at the start of the class period.

According to that allegation and plaintiffs, that inflation is price impact of the alleged misrepresentation.  Under that allegation, plaintiffs allege that the price would have been lower had the truth been revealed.  That is the allegation of plaintiffs at the beginning of the class.

At the beginning of the class, GNPK stock is trading with the redemption right.  Whenever GNPK stock trades at $10.15 or below, the Court can reliably conclude that the price was not impacted on that day by any of the alleged prior misrepresentations.

That is one of the findings that I have from price impact that relates to the paragraph you

Page 45

A. Roper, Ph.D.

originally identified.

Plaintiffs go on to further suggest that that price impact -- which now has been documented not to exist -- continued in GNPK's sticker price and eventually was transferred through the retickering to RDW shares.

I also describe how, at the moment of that retickering, Dr. Cain's own analysis reveals episodes of market inefficiency, which call into question the ability of plaintiffs to identify any price impact going forward from that point in this litigation.  It's at that point of retickering where plaintiffs' theory relies on efficiency the most and, in fact, it's at that point in time where the price impact is corrupted not by the alleged misrepresentations, but it lacks integrity because of the inefficiency of the market itself.

All of those relate to the ability for plaintiffs to demonstrate price impact for the purposes of relying on fraud-on-the-market theory.

Those are some of the examples of the opinions that I have relating to price impact.  The rest are described in my report.

Q    Okay.

Page 46

A. Roper, Ph.D.

So in performing your price impact analysis, you didn't analyze plaintiffs' allegation under any theory of price maintenance theory, correct?

A    I disagree with that characterization.

I took into account plaintiffs' theory of price maintenance and performed an analysis that revealed, even given that theory, it can be reliably examined by the Court and demonstrated that there is no price impact in GNPK stock price for the vast majority of the days on which it traded.

Q    Do you specifically mention or identify price maintenance theory in your report?  You don't, right?

A    I don't use the word -- or maybe I do or don't use the words "price maintenance theory."

I describe the price maintenance theory that is alleged by plaintiffs in my report.

Q    So it's your testimony, by describing the price maintenance theory that is alleged by plaintiffs in this court, your report addresses that theory in your analysis?

A    That's not my opinion.  I know I addressed that theory in my analysis because I performed the

Page 47

A. Roper, Ph.D.

analysis cognizant that that was the theory that was being described by plaintiffs in their complaint.

So I performed my analysis pursuant to my engagement knowing that this was, in part, an alleged price maintenance theory case.

Q    Do you offer any opinions on price impact on Redwire stock after the closing of the business combination?

A    Yes.

Q    So what -- where in your report do you offer opinions on price impact on Redwire stock after the closing of the business combination?

A    Paragraph 27 is an example.

Q    So let's hold up at paragraph 27.

So is it your testimony that when you write in paragraph 27 "There's no evidence that the price of GNPK was impacted at the point in time that RDW purportedly inherited inflation from plaintiffs' theory," that's you offering an opinion on the price impact on Redwire stock after the closing of the business combination?

A    That's my offering the opinion that's expressed in 27, that there's no evidence of price impact at the point in time when RDW purportedly

Page 48

A. Roper, Ph.D.

inherited the inflation under plaintiffs' theory.

Q    And the basis of that opinion is simply that because the fact that GNPK shares traded at or below $10.15 on September 1, 2021, that indicates that where -- that there was no inflation in the price when it was retickered over to Redwire; is that your opinion?  Or is that your basis for your opinion?

A    That is a basis, yes.

Q    So let's move -- I guess I'm still just wondering where in paragraph 27 do you offer a price impact opinion on Redwire common stock.  I'm still not seeing that in paragraph 27.

A    GNPK was not -- I'm reading the last sentence from paragraph 27.

"As such, there's no evidence that the price of GNPK was impacted at the point in time RDW purportedly inherited inflation under plaintiffs' theory."

At that point in time when RDW -- when GNPK was retickered as RDW, the last observation of GNPK was not inflated.  There is no evidence that it inherited inflation from this prior security.  That is, that there is no inflation in RDW at the time of

Page 49

A. Roper, Ph.D.

the retickering that was inherited from this prior security.  That's what that opinion says.

Q    So it's your opinion that because there is no inflation inherited at the time that GNPK was retickered as RDW, there's no way for which RDW could have had -- there is no way the false and misleading statements would have affected the Redwire common stock moving forward?  Is that your opinion?

MR. ZACHERL:  Object to form.

A    My opinion is in my opinion, right.

BY MR. SHAEFFER:

Q    And the basis for that opinion is that you just looked at the last closing price for GNPK on September 1, you found that there wasn't any inflation; and based on that, your finding is that there could be no price impact on the Redwire common stock moving forward?  That's the basis of your opinion, correct?

A    That's not my opinion.

Q    It's a finding.  So you're distinguishing that being separate from your opinion?

A    My opinion is that if we walk forward in time and we ask "Let's follow the alleged

Page 50

A. Roper, Ph.D.

inflation."  The day before it's retickered, what is going to be the same holder, owns a share of GNPK, which is not impacted by the alleged fraud because it trades at a price below the redemption value two days before.

Q    Right.

A    So, at that point in time, there is no evidence of price impact in GNPK shares.

This stock gets retickered as RDW.  At that point in time, pursuant to paragraph 27, there is no evidence that it inherited any inflation from the former stock.

At the same time that it is set to inherit any inflation, it starts trading on its own. Subsequently in the report I describe that trading environment as being two episodes of market inefficiency.  In those two episodes of market inefficiency, the integrity of the market price is corrupted by the inefficiency.  There was no inflation coming into the price and the price process has now been corrupted by market inefficiency.

My opinion is that plaintiffs have provided no method to be able to identify price impact

Page 51

A. Roper, Ph.D.

subsequent to that corruption that is going to be required for them to calculate individualized damages, and there is no reason, given that period of inefficiency, to presume that the market continued to rely on the integrity of the price as is presumed by the fraud-on-the market theory. Because any investor that purchased after September 2 or September 3 and bought RDW, purchased shares on a market in which it was known that the price had moved substantially not because of new unexpected public information.

Those investors, going forward, those RDW investors, for the purposes of economics, could not be presumed to simply have relied on the integrity of the market price given that inefficiency and given the fact that they had purchased a share which had no inflation in it at the time it was retickered.

Q    Okay.

So you've said a lot here, and I want to address your discussion of market inefficiency in one second.

I want to just kind of close the loop on --

as part of this price impact questioning.

Page 52

A. Roper, Ph.D.

During the course of your analysis in this report, you did not consider statistical significance -- strike that.

Are you aware of the alleged corrective disclosure dates in this case?

A    Yes.

Q    Are you aware there were three alleged corrective disclosure dates in this case?

A    Yes.  There are three identified alleged corrective disclosures in the complaint.

Are you representing that there are only three alleged corrective disclosures in this case?

Q    At this time, there are the three alleged corrective disclosures in this case.

So, as part of your analysis in your report, you didn't consider the statistical significance of the corrective disclosures price impact on Redwire stock; is that correct?

A    I did consider it for the context of assessing whether Dr. Cain's analysis, when commonly applied for Cammer factor four, whether it showed statistical significance or not and whether that was consistent with market efficiency.  So I examined statistical significance of some of the alleged

Page 53

A. Roper, Ph.D.

corrective disclosures in this case in that context.

Q    But in the context of market efficiency and not in the context of price impact; is that right?

A    I did not have to examine the statistical significance of those disclosures to assess price impact in this case because this case is not routine.

In this case, the unique facts and circumstances permit the Court to perform a uniquely situated analysis of price impact.  I try and educate the Court on how to perform that analysis by looking at the stock price of GNPK.

By looking at the stock price of GNPK, the Court can reliably conclude that if the price falls below $10.15, there is no price impact because the price would have been the same whether or not plaintiffs' allegations are true.

Q    So, in this case, you're saying it's possible to evaluate price impact on stock -- on Redwire stock without evaluating the corrective disclosures; is that correct?

A    In this case, given the unique facts and circumstances, you can examine price impact as I have done in my report, and that would be commonly

Page 54

A. Roper, Ph.D.

accepted by the field.

Q     Are you aware of any other cases that have relied on your approach to assessing price impact?

A     "Cases," are you talking litigation cases?

Q     Yeah, in litigation cases.

A     I'm not aware or not aware of any other cases that are examining this.  As I said, plaintiffs have a unique case.  Plaintiffs filed a case in which it alleged inflation transmitted between two separately -- economically, very separate and distinct securities.  In the other SPAC cases that I'm familiar with, they don't allege that sort of continued activity across two separately tickered economically distinct securities.

Q     So you're not aware of your approach being applied in any other cases; is that your testimony?

A     No.  But if it was applicable, it could be applied.

Q     All right.

So I want to shift the discussion to what I'm just going to describe as your market efficiency opinions, and I'm going to try to specifically identify what in your report I want to discuss.

Broadly, it's your opinion that Dr. Cain

Page 55

A. Roper, Ph.D.

fails to provide a reliable economic assessment of market efficiency using the commonly accepted methods available for him in the peer economic litigation; is that correct?

A     Broadly, yes.

Q     So in this report -- and for purposes of my testimony, I'm going break it down by GNPK and RDW stock.  So that's how I'm going to ask these questions.

In this report, are you offering an opinion that the market for GNPK common stock was inefficient?

A     I'm offering that the market for GNPK stock exhibited an episode of inefficiency at a crucial point in time in plaintiffs' theory of damage in harm and reliance.

Q     But that's different from saying that the market for GNPK stock was inefficient; is that right?

A     The market for GNPK stock was efficient, would also go back to January 2021, at the time it was listed, which is prior to this class period.

I don't have an opinion about the efficiency of GNPK stock trading over its entire

Page 56

A. Roper, Ph.D.

existence, nor do I have an opinion of GNPK's stock's efficiency over the entire period of trading in the class period.

I have an opinion that GNPK stock experienced an episode of inefficiency, which is crucial to this case, and it's that interruption in efficiency which negates the applicability of fraud-on-the-market.

Q   So I want to make sure I have, kind of, a clear question and clear answer.

In this report, are you offering an opinion that the market for GNPK stock was efficient during the class period?  Yes or no.

MR. ZACHERL:  Object to form.

A   I'm not offering an opinion that the market for GNPK stock was efficient during the class period.

BY MR. SHAEFFER:

Q   Are you offering an opinion that the market for GNPK common stock was inefficient during the class period?

A   I am offering an opinion that the market for GNPK stock was inefficient during the class period, yes.

Page 57

A. Roper, Ph.D.

Q    Now, is that the entirety of the class period?

A    I point to an episode of inefficiency at the end of the trading life of GNPK.

I point to another episode of potential inefficiency at the time of the merger announcement March, 25, 2021.  And I describe that, as well.

Q    So when you're pointing to these episodes, is it your opinion that the market for GNPK stock was inefficient just on the date -- the date of the episode that you're describing?

A    My opinion with respect to those two episodes are those two episodes contained public information.  In one of those episodes, that information was new and unexpected.  The market appeared to react to that new and unexpected information.

But within 17 days, that reaction had been entirely removed.  An efficient market doesn't take 17 days to consider new and unexpected information to resolve the uncertainty as to how that information impacts the value of the stock price.

In the second example --

Q    So is your -- okay, sorry.

Page 58

A. Roper, Ph.D.

A    An example -- I give an example of a case where there is no new and unexpected information that could -- should cause a change in the stock price, and we see a change in the stock price that's occurring on that day.

Both of those examples are examples of reliably using an event study to assess a public disclosure to reach a determination as to whether the actual change in stock price is consistent with an efficient adjustment in stock price as suggested in an efficient market theory and postulated on the fraud-on-the-market theory.

Q    So I guess what I'm asking you is -- let's take your first example.

There is an announcement on March 25, 2021. And then, within 17 days, that -- the reaction to the announcement had been entirely removed.

This is your first example of market inefficiency for GNPK stock, correct?

A    This is a potential episode of market inefficiency that's not considered by Dr. Cain in his analysis, yes.

Q    So it's a potential episode of market inefficiency?

Page 59

A. Roper, Ph.D.

A   That's --

Q   It is your opinion that this potential episode of market inefficiency that took place during the class period mean that, for the entire class period, GNPK common stock was trading in an inefficient market?

A   That is not my opinion.

Q   Okay.

So your opinion in terms of market inefficiency of GNPK common stock for this first example you gave is that it was inefficient between March 25, 2021 and 17 days after; is that right?

A   No.  My opinion is that the price reaction news to that could be interpreted as inefficiency as I describe in my report.  But, at the same time, unless one does a rigorous analysis of that news -- which neither Dr. Cain nor I did in this case -- that that event, in and of itself, is not necessarily dispositive of efficiency.  So it's a data point which may or may not shine the light on the question of efficiency.

I note that it may or may not shine that light, but, at the same time, I do note that the market reaction in the long run is inconsistent with

Page 60

A. Roper, Ph.D.

the efficient market hypothesis.  That's my opinion.

Q    Okay.

So it's an indication of market
inefficiency, but you don't know one way or the
other whether, during that time, the GNPK common
stock was trading in an inefficient market, correct?

A    Not on the basis of that test alone, no, I
do not have that information.

Q    Okay.

A    That's the boundary of that opinion.

Q    Okay.

Now, the second sort of episode you
described happened in September 2021.

Is it your opinion that the market for GNPK
common stock was inefficient during that event in
September 2021 that you previously referred to?

A    Yes.  I believe that the stock price
reaction to the news disclosed in September 1 that's
identified as Dr. Cain's event, that that stock
price reaction is inconsistent with an efficient
adjustment in prices as postulated under the
efficient market theory.

Q    So in the process of identifying first --
strike that.

Page 61

A. Roper, Ph.D.

Let's start with your discussion and analysis of the March 25, 2021, announcement, the stock price reaction, and then the dissipation of that reaction. I want to focus on that.

When you were conducting your analysis and you identified that period as an example or as indicating market inefficiency, you didn't apply any of the Cammer factors, correct?

A    I disagree.

Q    Which Cammer factors did you apply in making that conclusion?

A    Cammer factor five, cause and effect.

Q    So just Cammer factor five, right?

A    Yes, Cammer factor five.

Q    Did you apply any of the Krogman factors in assessing market -- that example of market efficiency?

A    No, I did not. Nor would I because they're not commonly accepted by the field to be dispositive of the field of whether a stock price adjustment is efficient as postulated on the fair market hypothesis.

Q    But, no, you did not apply those factors, correct?

Page 62

A. Roper, Ph.D.

A    No, I did not apply those factors, because I did not need to apply those factors.

Q    And you didn't conduct your own event study, correct?

A    I disagree with that.

Q    Okay.

Did -- where did you conduct a separate event study separate from what Dr. Cain relied on in his report?

A    That's entirely described in Section VI.E. of my report.  I reliably performed an event study of Dr. Cain's seven events that occurred during the class period.

I borrowed from Dr. Cain the subjective identification of those, quote, key, unquote, communications.  And so, I inherit that bias which I document is potentially harmful and unreliable.  But I inherit that bias, and then I correct the other failures that are identified in my report.  In doing so, I conducted an event study of those seven days, specifically the news that he's identified he's assessing on those seven days.

Q    So it's your testimony that you conducted your own event study separate and apart from what

Page 63

A. Roper, Ph.D.

Dr. Cain did in his report?

A    I conducted the only reliable event study in this case.

Q    I want to move, again, to the same -- that second event about indication of market inefficiency.  I'm going to ask you similar questions.

Outside of Cammer factor five, did you apply any other Cammer factors in assessing whether the market was efficient in that September 2021 episode?

A    No, I did not, because that would not be following commonly accepted methodologies.

Q    And same with the Krogman factors.  You didn't analyze any of the Krogman factors, correct?

A    I did not analyze the Krogman factors with respect to assessing whether the adjustment to prices in response to that second event is consistent with an adjustment of prices under the efficient market theory.

Q    And it's your testimony that you conducted your own separate event study in reaching the conclusion that there was an indication of market inefficiency in that September 21 event; is that

Page 64

A. Roper, Ph.D.

correct?

A   This is correct.

Q   I want to -- can you go to paragraph 37.  I want to stay on this issue of GNPK market inefficiency.

Are you there?  What I'm focusing on is the sentence where you write "Whereas RDW share price could have fallen below $10.15, GNPK share price should have remained at or above $10.15, ignoring trading costs, given the redemption right if traded in an efficient market."

Do you see what you wrote there?

A   Yes.

Q   Did I read that correctly?

A   I wasn't following specifically.

Q   Is it your opinion that when GNPK shares fell below $10.15, GNPK shares traded in an inefficient market?

A   No, that's not my opinion.

Q   So outside of the March 25th starting event, the September 2021 starting event, you don't have any other indications of market inefficiency for GNPK common stock?

A   I don't know if I agree with the

Page 65

A. Roper, Ph.D.

characterization. I think the way I would phrase it is as follows.

My event study analysis of cause and effect of the episode that occurred on March 25, 2021, and the episode that was occurring in the September 1st and follow-on price reaction September 2, 2021, that those episodes cannot be explained by efficient market theory, that those price reactions are inconsistent with the adjustment of prices. That's one of my findings.

Another one of my findings is we look at what has been shown by the literature to potentially be helpful and discriminating between efficient and inefficient market prices.

Analyst coverage. If we look at analyst coverage over that period that Dr. Cain has put on the table, we find that the analyst coverage was lacking during most of that period. That's not suggestive of market efficiency, but I'm not going to conclude on the finding of market efficiency based upon that factor alone because that's inconsistent with the literature. So that factor can be considered by the Court for that period, as well.

Page 66

A. Roper, Ph.D.

Q     But it's not -- going back to paragraph 37, is it not your opinion that where GNPK share prices traded below $10.15, that, in and of itself, is not evidence of GNPK trading in an inefficient market?

MR. ZACHERL:  Object to form.

A     More information is needed to answer that question.  As I say in my report, the share price could trade below $10.15 because of transaction costs embedded in that trade, right?  However, net of those transaction costs and the time opportunity of value of money in holding that trade, net of those, it should not have traded below $10.15.

I have a footnote in my report that says it is not my opinion that this is always inefficient whenever it traded, but the Court could look to that as an indication of inefficiency because there are periods of time where the stock price trades below $10.15, which can't, on its face, be explained by efficient market theory.

BY MR. SHAEFFER:

Q     So you haven't done any sort of analysis in your report to determine, in the instances where the stock price traded below $10.15, on those days the market was inefficient; is that correct?

Page 67

A. Roper, Ph.D.

A    It's not my opinion that just because the stock price traded below $10.15 that means, on that day or in that transaction, that the stock price traded in an inefficient market.

It is my opinion that there was episodes of inefficiency that occur at crucial points in time of plaintiffs' theory of harm in this case.

And when you look at those crucial moments in time, that's where the applicability of the fraud-on-the-market fails.  It doesn't matter whether the market was efficient before or after that point in time.  The application of the fraud-on-the-market will still fail because the market is not efficient at that crucial point in time of plaintiffs' theory.

Q    So you didn't really answer my question, but I want to touch on something that you said.

It's your opinion that in that crucial moment in time, that September 1 to 2, sort of, retickering between GNPK and RDW, since the market was not efficient at that point in time, that prevents the fraud-on-the-market theory from applying throughout the rest of the class period. That's your opinion and that's your testimony?

Page 68

A. Roper, Ph.D.

A     That prevents the fraud-on-the-market theory from being applied to solve two issues.

It prevents the fraud-on-the-market theory from being applied to solve the issue of individualized reliance.  There is a specific reason for that.

It also prevents the applicability of the style of damage calculation that Dr. Cain proposes he will use in this case.  The standard that he will use in this case is to take price declines at the end of the class period, and he will argue that those price declines are a measure of the price impact earlier in time.

The ability to make that economic statement is disrupted by this period of inefficiency between September 1 and September 3.  He simply can't apply what he says he's going to apply.

Q     So finishing up on this last part of the conversation, can you go to paragraph 54.  To paraphrase, paragraph 54, I think, summarizes the testimony that you just gave in response to my last question.

Is that a fair characterization?

A     I don't know if I'm just going to tie it to

Page 69

A. Roper, Ph.D.

that response, but the paragraph speaks for itself.
It describes the period of inefficiency at that
point in time where plaintiffs' theory relies on
efficiency the most.

Q    So is it your opinion that if no new
unexpected information comes out, stock prices
should not change?

A    Not in an efficient market.  You should not
see material change in stock price that's
unassociated with the release of public information,
when you are thinking about assessing reliance under
fraud-on-the-market.  The question is whether public
information causes price to change.  Not whether
prices change because of a cascade of investors.

MR. ZACHERL:  Peter, is now a good time for
a break?

MR. SHAEFFER:  Just a few more questions
and I think we can take a break.

MR. ZACHERL:  Sure, sure.

MR. SHAEFFER:  Because I kind of want to
wrap up.

MR. ZACHERL:  No problem.

BY MR. SHAEFFER:

Q    If you go to paragraph 24 of your report.

Page 70

A. Roper, Ph.D.

I'll ask this a different way.

You write "Because of the lack of new unexpected information, the RDW price on the first day of trading should have been equal to the GNPK price on its last day of trading."

So you wrote that, correct?

A    Correct.

Q    So it's your opinion that it's evidence of inefficiency if -- strike that.

So let me ask you, again.

If there's no new unexpected information that comes out, it's your opinion that stock prices shouldn't change.  That's right?  That's correct?

A    In a situation where no new unexpected information is relayed to the public, the testable hypothesis of the efficient market hypothesis is there should be no change in stock price.  That is the testable hypothesis that comes out of the application of efficient market theory to a situation in which the information event is one that contains no new unexpected information.  You expect no change in stock price.

Q    So if we can go back to paragraph 54.  I'm focusing on specifically the last sentence that the

Page 71

A. Roper, Ph.D.

corruption caused by this inefficiency that

corrupted the price formation process prevents the

fraud-on-the-market theory from being applied to the

Redwire security going forward in time until the end

of the class period.

Do you see that?  That's your opinion,

correct?

A    Yes.

Q    And in support of that specific opinion in

your report, you don't cite to any academic

literature, correct?

A    I don't know if I can agree or disagree.

That's in the executive summary of opinions.

Q    No, I'm on paragraph 54.  So I'm outside of

the executive summary.  I'm in paragraph 54.  That's

the body of your report.

A    Yes, I understand.  There's also discussion

of -- that relates to that last sentence that occurs

later in the report.

Q    But here -- so your testimony is you

don't -- you're not citing to any literature here,

but there's discussion later in your report that

supports this idea that the inefficiency that

corrupted the price process prevents the

Page 72

A. Roper, Ph.D.

fraud-on-the-market from being applied to the RDW

security going forward in time until the end of the

class period.  Is that your testimony?

MR. ZACHERL:  Object to form.

A   It's not my opinion that it's unsupported

or uncited -- that it's unsupported by economic

literature or unsupported by other literature.

BY MR. SHAEFFER:

Q   But you don't cite -- I'm sorry, are you

finished?

A   It's simply -- there's not a specific cite

to this sentence in my report.

Q   And you're not -- you don't cite any case

law where a court found that the fraud-on-the-market

theory did not apply in similar circumstances; is

that correct?

A   I don't know if a court has ever

entertained the unique facts and circumstances that

exist in this case, which is what I attempted to do

in my analysis, which was not addressed by your

expert.

Q   So you're not aware of any cases --

A   I don't know.

Q   -- again --

Page 73

A. Roper, Ph.D.

A    I would be speculating one way or the other.  I don't know.

MR. ZACHERL:  Just to have a clean record, guys, Drew, if you can wait until he finishes his question before you answer or, Peter, I know there's a little bit of a delay sometimes on Zoom, but if you could do the same.

Thank you.  I appreciate that.  And I think we've been pretty good so far, but...

BY MR. SHAEFFER:

Q    Just for the sake of a clean record.

You're not aware of any cases where the Court has accepted your opinion relating to the application of the fraud-on-the-market theory after there's an instance of market inefficiency that corrupts the price formation process; is that correct?

A    As I sit here today, I couldn't answer that question one way or the other.

Q    Just a few more questions, and we can take a break.

In reaching this opinion about the application of the fraud-on-the-market theory being applied to the Redwire securities going forward in

Page 74

A. Roper, Ph.D.

time until the end of the class period, outside of Cammer factor five, did you look at any of the other Cammer factors in reaching that opinion?

A     I think the same caveat applies to my comment about analyst reports.  So there's a discussion of when there is coverage in analyst reports.

Q     Okay.

Outside of the cause and effect analyst reports, you didn't conduct your own analysis on the Cammer factors in support of the opinion you detail in paragraph 54?

A     I could not have conducted analysis of the Cammer factors in support of the opinion I provided because doing so would be providing evidence which is not commonly accepted.

So I could not --

Q     Not commonly accepted by -- but it's commonly accepted by the courts, right?

A     Not commonly accepted by the peer-reviewed economics and finance literature upon which the opinion is supposed to reside.

Q     And just to wrap this up.

You didn't look at any of the Krogman

Page 75

A. Roper, Ph.D.

factors -- you didn't analyze any of the Krogman factors when reaching your opinion in paragraph 54; is that correct?

A    In reaching my opinion for paragraph 54, not with the specific opinion to RDW's lack of integrity, no.

Q    And it's your testimony that you did conduct a separate event study apart from Dr. Cain's event study in reaching this opinion in paragraph 54; is that correct?

A    Part of the analysis that was conducted for paragraph 54 was an event study.

MR. SHAEFFER:  Okay.  Why don't we take a break.  We can go off the record.

THE VIDEOGRAPHER:  Going off the record. The time is 10:38 a.m.  This is the end of media unit 2.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 10:57 a.m.  This is the beginning of media unit 3.

BY MR. SHAEFFER:

Q    Okay, Dr. Roper, we're back on the record. I want to kind of continue some questioning about

Page 76

A. Roper, Ph.D.

your market efficiency opinions.

Is it your opinion that market efficiency cannot be conclusively established without conducting the analysis under Cammer factor five? Is that correct?

A    I don't know that that's my testimony.

I think my testimony is that the central testable hypothesis of efficient market theory relates to the discussion that Cammer factor five identifies.  But Cammer factor five does not describe how to test that.  It just describes a cause and effect between public information and a change in stock price.

Q    Okay.

I guess, in your experience -- strike that.

Let me ask this a different way.

Is it your opinion that you apply the fraud-on-the-market theory, in this case, Dr. Cain had to show that -- let's start with Genesis Park -- that GNPK share prices adjusted efficiency [sic], that's your opinion, right?

A    I'm sorry, I think you misspoke.  Can you restate that question?

Q    Yeah.

Page 77

A. Roper, Ph.D.

So it's your opinion that to apply the fraud-on-the-market theory in this case, Dr. Cain had to show that GNPK share prices adjusted efficiently; is that right?

A    It's my opinion that he had to show that GNPK stock prices traded in an efficient market.

The means by which he would assess whether they traded in an efficient market is if he followed commonly accepted methodology, which he did not, because he would have tested the central hypothesis coming out of strengths market theory. That hypothesis relates to the adjustment of the stock price which he referred to.

Q    So I understand that in order for Dr. Cain to show -- in order to apply the fraud-on-the-market theory presumption of reliance, Dr. Cain had to show that GNPK stock prices traded in an efficient market. I understand that point.

But to do that, it's your opinion that Dr. Cain had to show and demonstrate that the GNPK share prices adjusted efficiently; isn't that correct?

A    It's not just my opinion. It's the opinion of the field as what is commonly accepted as

Page 78

A. Roper, Ph.D.

demonstrating evidence of market efficiency.

So it's me and the field saying if you want to assess whether a stock traded in an efficient market, you need to assess whether the stock price adjusted efficiently to the release of new information.  That comes exactly out of Dr. Fama's 1991 paper, which is quoted in my report.

Q   You're being offered as an expert potentially in this case.

So if the Court were to ask you, Dr. Roper, if I need -- if plaintiff needs to establish that the fraud-on-the-market theory applies in this case, is it your opinion that he -- that plaintiff has to show that the stock price is adjusted efficiently?

MR. ZACHERL:  Object to form.

BY MR. SHAEFFER:

Q   Would you say "yes, that is my opinion"?

A   I don't have a legal --

MR. ZACHERL:  Object to form.

A   -- opinion for the Court.

My opinion for the Court would be if plaintiff is appealing to fraud-on-the-market, the fraud-on-the-market relies on the presumption that the stock traded in an efficient market.

Page 79

A. Roper, Ph.D.

To ascertain whether the stock traded in an efficient market, it is my opinion that if the Court wants to follow commonly accepted methods in assessing that question, that the Court would look to what the field advocates is the primary hypothesis.  The Court would look to how does the stock price adjust when new public unexpected information is revealed.  And the Court should ask whether that adjustment is efficient, because that is the hypothesis that comes out of the literature upon which the Court is relying for the efficient market hypothesis.

If the Court wants to be consistent with economic theory, then that could be what it would do.  The Court may have its own prerogative.  I'm only describing the boundaries of economic theory.

BY MR. SHAEFFER:

Q     Just so we're on the same page, when you say "prices adjusted efficiently," when you use that kind of nomenclature in your report, is it fair to say you mean that good news causes stock prices to go up and bad news causes stock prices to go down?

A     That is one colloquial way of phrasing it.

More specifically, it's phrasing that the

Page 80

A. Roper, Ph.D.

public information is fully reflected in the stock price such that investors cannot continue to trade upon that information and make abnormal profits. Your description is part of that definition, but not the full part.

Q    Are you aware of a concept called "fundamental efficiency"?

A    I've heard the term, yes.

Q    Does fundamental efficiency require -- strike that.

What's your understanding of the term?

A    There's a perception of efficiency called fundamental efficiency in which the stock price accurately reflects the true intrinsic value given all the relevant information.  It's a question of accuracy of price relative to the intrinsic model of value.  That is not what I'm assessing in this case.

Q    You're not assessing fundamental efficiency?

A    No.

Q    Are you assessing informational efficiency in this case?

A    I'm following the commonly accepted methods for assessing what the field has formerly called

Page 81

A. Roper, Ph.D.

semi-strong form market efficiency, which has collectively, at times, been referred to as informational efficiency when informational efficiency refers to public information.  But those words have been used interchangeably, not always synonymously.

Q    Can you give your understanding of "informational efficiency"?

A    My understanding of "informational efficiency" would follow my understanding of semi-strong form efficiency.

That new unexpected public information is rapidly incorporated into stock prices such that investors cannot continue to trade and make a profit upon that existing public information.

Q    And as part of that new unexpected -- strike that.

When the new unexpected public information is rapidly incorporated into the stock price, does that include this efficient adjustment of stock prices?  Is that part of that?

A    I apologize for overspeaking you.

The efficient adjustment in stock price that I allude to refers to that price discovery

Page 82

A. Roper, Ph.D.

process.

Is the price moving?  Once the price moves, does the price stay or does it revert?  Those are all questions which relate to the efficient adjustment in prices as described by Fama and others in the field.

Q    I don't mean to be dense, but I want to make sure that I'm getting an answer to my question.

You described that the rapid -- I asked for your definition -- or your understanding of "informational efficiency."

And you described that as new unexpected public information is rapidly incorporated into the stock price; is that correct?

A    I added more to that in a manner in which future investors cannot continue to trade upon that information and make -- and make a profit.

Q    I guess I'm focused on sort of the language "new unexpected public information is rapidly incorporated into a stock price."  I'm focused on that terminology that you used.

This rapid incorporatedness -- the rapid incorporation into the stock price of new unexpected information, does that process include this

Page 83

A. Roper, Ph.D.

efficient adjustment of stock prices that you discuss in your report?

A    That is part of the efficient adjustment in stock prices.

Q    Is the rapid incorporation of information. Okay.

You referred to the Fama 1991 article; is that correct?

A    I have referred to that article, yes.

Q    This is a yes-or-no question.

Does the Fama 1991 paper assess fundamental efficiency or informational efficiency -- let me strike that.

I guess my question is, yes or no, does the Fama 1991 paper you rely on assess fundamental efficiency?

MR. ZACHERL:  Object to form.

A    Not to my knowledge.

But, again, the fundamental efficiency is not something that's mentioned in Fama because, at that time, that definition or that term may not have even been in the parlance or in the vernacular.

BY MR. SHAEFFER:

Q    Okay.

Page 84

A. Roper, Ph.D.

And same question.  Does the 1991 Fama paper assess informational efficiency, yes or no?

MR. ZACHERL:  Object to form.

A    Again, I can't answer that as a yes-or-no question.  The Fama paper describes semi-strong form and assesses [sic] and tests that are commonly used to assess semi-strong form, including event studies to assess cause and effect as proposed under semi-strong form.

That definition of semi-strong form, as I've described earlier, is sometimes synonymous or broadly similar with what you were referring to as informational efficiency.

So, yes, he describes the factors surrounding informational efficiency and the tests of informational efficiency.  He doesn't use the words "informational efficiency."

BY MR. SHAEFFER:

Q    You're aware of a concept regarding stock price reactivity, right?

A    That's kind of vague, but sure.

Q    Let me -- appreciate that.

Let me point you to a specific part in your report.  Bear with me one second.

Page 85

A. Roper, Ph.D.

Can you go to footnote 88.

A    Can you give me a paragraph number?

Q    Yeah, sure, sorry.  That is 81,
paragraph 81, footnote 88.

Here in footnote 88, you write "In
particular, none of the Krogman factors are
supported by academic research to be probative
regarding efficient adjustments in price.  One
research paper cited by Dr. Cain associates size,
number of market makers, and bid-ask spread with
higher stock price reactivity.  However, this test
is not dispositive for whether stock prices adjust
efficiently or not."

So in the context of your footnote 88, you
are aware of the concept of stock price reactivity;
is that correct?

A    In the context as it's used by Villanueva,
yes.

Q    Okay.

And, in Villanueva, the report that was
cited by Dr. Cain and you reference in your report,
as well, that paper finds or notes that stock price
reactivity is a measurement of informational
efficiency in the context of securities class

A. Roper, Ph.D.

actions; is that correct?

A     No, it does not note that.  It does not state that as commonly accepted.  It's proposing it as a possible -- possibility.

Q     Is it your understanding that, in Villanueva, they propose that stock price reactivity -- the proposed stock price reactivity as sort of an empirical measurement of efficiency and then they reject that?  Is that your understanding of Villanueva?

A     No.

Q     But it's your opinion that evidence of stock price reactivity, as understood in the Villanueva paper, is insufficient to establish market efficiency for purposes of invoking the fraud-on-the-market presumption of reliance?

A     It's my opinion that the test of reactivity as performed by Villanueva and is attempted by Dr. Cain, right, do not discriminate between efficient and inefficient adjustment of prices.

Those tests cannot discriminate between those inefficient and efficient adjustment of prices because they're not about whether the adjustment was consistent with an efficient market.  Those tests

Page 87

A. Roper, Ph.D.

are simply about whether the stock price moved, whether it reacted.  The stock price can move or react in a way that is not consistent with the efficient market hypothesis.  So whether a stock price, quote, reacts, unquote, is not, in and of itself, probative of whether a stock price adjusts efficiently to the release of new public information, which is the central premise or assumption that the fraud-on-the-market theory relies on to establish reliance without individualized inquiry.

Q    So I think the answer to my question is yes, it's your opinion that evidence of stock price reactivity is insufficient to establish market efficiency for purposes of invoking the fraud-on-the-market presumption of reliance; is that correct?

MR. ZACHERL:  Object to form.

A    Again, my opinion is that stock price reactivity tests do not test the central testable hypothesis of market efficiency.  So stock price reactivity tests are not commonly accepted as a form of distinguishing between inefficient and efficiently stocked price.  Stocks.  That's my

Page 88

A. Roper, Ph.D.

opinion.

You're asking a question about whether the Court holds that standard.  I don't know what that standard is for the Court.  If the Court wants to follow commonly accepted, reactivity does not demonstrate market efficiency.

BY MR. SHAEFFER:

Q    So, again, I'm going to ask you a hypothetical question given the fact that you're being presented as a potential expert for the Court.

If the Court is looking at Dr. Cain's report and your report and he determines that, for purposes of invoking the fraud-on-the-market presumption of reliance in this case, plaintiff is not required to show an efficient adjustment of stock prices, but, rather, that the -- but, rather, show stock price reactivity.

Are you with me so far?  Do you understand what I'm asking, the hypothetical I'm presenting?

A    I believe.

Q    Okay.

If Dr. Cain just needed to show stock price reactivity in this case for purposes of demonstrating or invoking the presumption of

Page 89

A. Roper, Ph.D.

reliance through the fraud-on-the-market theory, would you still hold the same criticisms of his event study that you do in your report?

A    I'm sorry, is this connected to the hypothetical?  Can you phrase the whole question as one?

Q    Yeah.  I see what I did there.  So let me take that back.

A    Thank you.

Q    If the Court in this situation were to ask you, Dr. Roper, whether if lead plaintiff needed to show stock price reactivity in order to invoke the fraud-on-the-market presumption for purposes of this securities class action case, if the Court asks you -- lead plaintiff just has to show stock price reactivity -- would you still have the same criticisms of Dr. Cain's event study that he offered in this case?

MR. ZACHERL:  Object to form.

A    The criticisms that I have of Dr. Cain's event study hold regardless of the standard that the Court has asked me to assess or your question.

The flaws in Dr. Cain's event study come about because he is not following commonly accepted

Page 90

A. Roper, Ph.D.

methods and applies that event study.  Those flaws will exist.  He doesn't identify well-defined events.  That flaw still exists even in his test of, quote, reactivity.  He does not know what information, if any information, is being reacted to.

So, in that single statement, Dr. Cain doesn't even follow what Villanueva says is happening.  He hasn't engaged in the information itself.  His regression is fatally flawed.  His subjectivity in choosing events is still there.

The other criticisms that I have of his event study methodologies survive regardless of whether he is instructed to assess reactivity or he's instructed to assess an efficient adjustment of stock price.  In either scenario, he's not doing what he says he's doing.

BY MR. SHAEFFER:

Q    I wanted to actually ask you about -- as part of your analysis of Dr. Cain's news days.  So I'm kind of shifting topics now.

Can you go to Exhibit 3 of your report. That's paragraph 195.

Are you there?

Page 91

A. Roper, Ph.D.

A    Yes.

Q    So, as part of your report, you analyzed Dr. Cain's news days to assess what new facts or information were contained in each of the company's communications; is that correct?

A    The communications identified by Dr. Cain, yes.

Q    Okay.

If you go to paragraph 251 -- so it's going to be several steps down.  Just let me know when you're there.

A    Yes.

Q    Here you're discussing a March 30 Exhibit 99.1 attached to a Form 8-K; is that correct?

A    I'm discussing and describing the information included in the Form NT 10-K, which was included in the 8-K filed after hours.

Q    Okay.

And based on your review of this -- of Exhibit 99.1 attached to the Form 8-K, you found that there was new and unexpected news in the filing; is that correct?

A    Yes.

Page 92

A. Roper, Ph.D.

Q    And specifically that new and unexpected news was that Redwire would be delayed in filing its Form 10-K; is that correct?

A    The fact that it would be delayed was new and unexpected, yes.

Q    Okay.

A    Potentially unexpected.

Q    And, based on this, it was your hypothesis that the stock price would be expected to decrease based on this news; is that correct?

A    It's not just my hypothesis.  It's the hypothesis that's advanced in the literature itself.

Q    But, in reality, the stock price increased, is that correct, following the release of this news?

A    But, in reality, the stock price did increase following that news.

Q    Okay.

I want you to look at the actual Exhibit 99.1 that was attached to the Form 8-K. It's going to be on page -- let me see.

It's going to be page -- one of the appendixes.

It's going to be on page 316 of Exhibit 2 [sic].  Just take a moment to look at this.  I just

Page 93

A. Roper, Ph.D.

have a couple of specific questions on this.  If you

need to take time to review it, I just want to make

sure we're on the same page.

     A     (Perusing document.)

     Q     Have you had a chance to look at this,

Dr. Roper?

     A     Yes, I have.

     Q     Is this the Exhibit 99.1 attached to the

Form 8-K that we were previously discussing?

     A     This is the disclosure that Dr. Cain relies

upon as one of his information events, specifically

an information event related to the delay of

financial filings and the filing of a Form NT 10-Q.

     Q     So there was other information that was

released in this Form 8-K; is that correct?

          MR. ZACHERL:  Object to form.

     A     The information that's in the form is in

the form.

BY MR. SHAEFFER:

     Q     Okay.

     A     I think we can talk about information.

     Q     Sure.

          So if you go to the second full paragraph

in this document, Redwire -- I'll just read it.

Page 94

A. Roper, Ph.D.

"Redwire confirms that the previously announced independent investigation into potential accounting issues at a business subunit is resolved. Following a thorough and comprehensive review, the Company's independent Audit Committee of the Board of Directors, along with independent, external legal and accounting firms, completed the investigation. It did not identify any material misstatements or the need for any restatements of Redwire's previously filed financial statements."

Do you see what I read just there?

A    I have.

Q    So you did not consider this news when predicting whether the stock price adjusted efficiently; is that correct?

A    No, that's not correct.

Q    Could you explain what I'm missing?  What am I not understanding?

A    About what?

Q    Either in your analysis of this Exhibit 99.1 in Exhibit 3 of your report, you make no mention of the fact that this press release -- that this communication also disclosed preliminary results of the Audit Committee investigation.

Page 95

A. Roper, Ph.D.

A    It wasn't the first time that preliminary results were announced, first of all.

Q    I'll represent to you that, yes, this was the first time, I believe, when preliminary results were announced.

A    First of all, preliminary results had not been announced.  They're going to be announced.

But if you turn to page 310, on page 310, I'll read from a prior disclosure which was a disclosure that I believe was maybe November 15th. But if you read there, it says "On November 5, senior management received a notification from an employee that included allegations of potential accounting issues about the business unit. Management properly reported the matter to the Audit Committee.  The Audit Committee has commenced an independent investigation."

So it's alerted that there is an investigation going on.  In addition, the company has voluntarily reported the matter to the Securities and Exchange Commission.

Given the timing of the notification, the company has not finalized its financial assessment on the effectiveness or disclosure of controls.

Page 96

A. Roper, Ph.D.

The next sentence says "To date, the company has not identified any material misstatements or restatements of previously filed financial statements."

So, to date, the company has given you, previously, an update on the outcomes of that Audit Committee process.

Q   So just so -- I want to make sure I'm clear.

You just read from a company communication that was dated -- is this November 15th, 2021?

A   According from Appendix B.6a in my report, that appears to be attached or related to a press release from November 9.

Q   Okay.

So this is relating to a November 9 press release?

A   Yes.

Q   Okay.

And, in that press release, the company stated that it was only on November 5, 2021, that it received allegations about potential accounting issues at a business subunit; is that right?

A   No.

Page 97

A. Roper, Ph.D.

Q    Okay.

A    November 5 it identifies that it receives a notification.

But what I'm pointing to and what I'm looking at is the paragraph that says "To date, the company has not identified material misstatements or restatements of its previously filed statements."

I'm looking at that, and I've comparing it to what you have identified on the disclosure on March 31, which says that the Audit Committee has completed its investigation and did not identify any material misstatements or the need for any restatements.

Q    Okay.

So I just --

A    So I look at the two together, and I say what is new and unexpected about that?  To date, they have not identified any new and material misstatements.  And they're confirming, once again, that they still have not identified any new material misstatements.

Q    Okay.

So -- but -- it's your opinion and your view that the Audit Committee completing its

Page 98

A. Roper, Ph.D.

investigation and finding that there were no -- not identifying any material misstatements or restatements, is not new unexpected news that was released to the investing public?

A    No.  I'm saying that that news is related to the prior news.  There's not anything on the face that says it's new and unexpected.

But, importantly, that's not the information that Dr. Cain says he's assessing in his report.  Dr. Cain lumps these together as filing delays, NTQs.  It's the existence of the filing delay that Dr. Cain says is the information.  The existence of the delay.  Dr. Cain does not engage with the information to explore what's contained inside each of his individual exposures.

Q    So I understand that point and that's your position.

But I'm also trying to understand when you're analyzing these communications and you're trying to determine whether there's new and unexpected information, I want to make sure I understand your thought process and the basis for those thought processes.

So, with that in mind, it's your opinion or

Page 99

A. Roper, Ph.D.

it's your view that an Audit Committee investigation -- the company receives a notification on November 5, it commences an -- it says it's commencing an independent investigation.  Four days later it says "To date" -- so this is four days after receiving the notification and the Audit Committee investigation has commenced -- "To date, the company has not identified any material misstatements or restatements."

In this November 9 filing, it says the Audit Committee investigation is ongoing.  So we have all of those facts together.

It's your opinion that, months later, when the Audit Committee announces the conclusions of its investigation and confirms that there were no -- there's no -- they didn't identify any material misstatements or restatements, that that's not new unexpected information, that's just confirming prior information released to the market.

Am I getting your position correctly?

A    No, I don't have that opinion.

Q    But that's how you were reviewing the -- these news -- isn't that what you were describing when you were reviewing these two dates?

Page 100

A. Roper, Ph.D.

A    No that's not what I described I was doing when I reviewed these two dates.

I inherited these dates from Dr. Cain.  Not only did I inherit the dates from Dr. Cain, I inherit the subject matter that I'm supposed to look at from Dr. Cain.

I stated that clearly in my report, that I inherit that subjectivity bias.  Dr. Cain identifies the March 31 disclosure, the November 9 disclosure, the November 15 disclosure, and the May 12 disclosure as NT 10-K filing delays.  That is all Dr. Cain says that he is assessing for cause and effect.  The existence of having to file a form NT 10-K or, separately, via press release, report on the outcome of delaying the filing.  Dr. Cain does not engage in any specific analysis of that subject.

When I engage at the subject level, which is what I'm doing for the purposes of my analysis, right, from the subject level about the delay in the financial filing, the new information is that the Form 10-K for the year-end would be delayed.  I'm identifying that new information inside his subject given his subject.

Q    Okay.

Page 101

A. Roper, Ph.D.

We started this line of questioning because I asked you to confirm that you did not consider, in the March 30 press release, this fact that Redwire had announced that the Audit Committee investigation had not identified any material misstatements and restatements.

Do you -- do you remember when I asked you that question just a few minutes ago?

A    Yes.

Q    And, in response, you did not agree with my assessment of what you did, correct?

A    You asked whether I considered it or not. I did consider it.

However, the thrust of the analysis doesn't rely on the existence of that new and unexpected information, because what Dr. Cain is attempting to do and what I am commenting on is whether he has shown a cause and effect relationship between the release of public information in which a filing is delayed and that is the fact that is disclosed.  I'm looking at whether that fact is disclosed that moves prices as suggested by him.  It does not.

Q    So -- but I -- I understand that.

What I'm trying to get at -- I'm trying to

Page 102

A. Roper, Ph.D.

understand when you are analyzing these communications and you're analyzing for new and unexpected information, what you're considering to be new and unexpected.

Let's change the context of this.

If Dr. Cain's event study was meant to look at the announcement of news relating to the Audit Committee investigation and you looked at this November 9, 2021, release, and then you looked at the March 30 press release, would you consider there to be new and unexpected information that was released in the March 30 press release that relates to the Audit Committee investigation?

A    If that was a specific question that was asked -- which is not what Dr. Cain did in his report, right -- then I would take additional time to consider that information.

But, on its face, that information does not appear to be new and unexpected.  It appears to be a reaffirmation of an earlier finding.

Q    A reaffirmation of an earlier finding when the investigation was announced on November 5 -- or commenced on November 5 and the press release came out on November 9, so four days, correct?

Page 103

A. Roper, Ph.D.

A    All you've changed is the context in which the statement is made, the duration in time between the two.

The statement on its face is the same statement.  More information is needed to assess how the market would think about that additional information.

I would note that the market and what the literature suggests is that even given that additional information, the fact of the delay should have led to a negative stock price.  That's what the literature finds.

Q    You're talking about literature relating to the delay in filing?

A    Yes.

Q    So I'm talking about -- I'm taking this out of the context of focusing on the news that relates to the filing delays and focusing on the Audit Committee investigation.

And, based on your testimony, sitting here today, you will need to do more analysis to determine whether, in the context of a news event relating to the Audit Committee investigation, whether, on March 30, there was new and unexpected

Page 104

A. Roper, Ph.D.

information released by the company; is that correct?

A    No, that's not my prior testimony.

Q    Okay.  So what am I missing?

I guess I'm just trying to -- I'm sorry, I'm, like...

A    For the purposes of this report, I'm asking a question: does Dr. Cain's analysis prove what he says it proves?  Dr. Cain says "My reactivity shows that the stock price reacted when we disclosed delays in filings."  I'm examining that question, right?

In examining that question, he has identified an event, right, which contains new and unexpected information about the existence of a delay, and it contains passages relating to an investigation.

When Dr. Cain looked at that event, he described it as an earnings delay.  He did not describe that event as an Audit Committee revelation or corrective disclosure.  He did not assess that information.  He was looking at whether the delay itself was fully reflected into the stock price in a manner that's consistent with commonly accepted

Page 105

A. Roper, Ph.D.

methods.

When you asked that question, the literature, which is cited in my report, says that a filing delay leads to, on average, a stock price decline regardless of whether that filing delay includes positive news potentially about the timing of when the file may come.  I borrowed that commonly accepted hypothesis to examine the event.

According to Cain, it's supposed to be a delay.  According to the literature, delays cause stock prices to go down.  The stock price did not go down.  This event does not provide reliable evidence of cause and effect which reflect to the information of delays.  That's my opinion.

Q    Again, I understand that's your opinion in the context of Dr. Cain's event study where he was focusing on the news relating to delays in the filing of a Form 10-K and a Form 10-Q.  I understand that.

I want to separate that from my next line of questioning, okay, so can we just be on the same page there?

A    We'll see if we can.

Q    See if we can, and see if I can land the

Page 106

A. Roper, Ph.D.

plane here.

Just now when I'm asking you these questions, I'm not asking about Dr. Cain's event study and the steps that you took to analyze those news events' dates.  What I'm asking about is different.

So, as part of your event study analysis, is it fair to say that you review the communications within any given parameters to determine whether those communications contain new and unexpected news?  Is that a fair statement?

A    Whether they contain new or unexpected news related to the topic of interest.

Q    Yes.  Related to the topic of interest, okay.

So what started all of this is I noted to you in one of my questions that, on March 30, in the press release, there was news that the Audit Committee investigation and -- I just want to make sure I get the precise language right -- that the Audit Committee investigation that was previously announced was resolved.

And following a thorough and comprehensive review, the company's independent Audit Committee

Page 107

A. Roper, Ph.D.

found and did not identify any material

misstatements or the need for any restatements of

Redwire's previously financial statements [sic].

So I pointed that out to you, and I asked

you whether this was -- you didn't consider that in

determining in your analysis that the stock price

adjusted inefficiently following the release of this

disclosure.

Do you remember when I asked you that?

A    Yes, I remember when you asked me that.

Q    And you said no, I was incorrect, that this

was something that you had considered.

And then you pointed me back to the

November 9 press release.  And you noted that, on

November 9, the company had already found -- or had

previously announced that, to date, it had not

identified any material misstatements or

restatements.

Do you remember when you pointed that out

to me?

A    Yes.

Q    So what I'm asking -- do you have any

opinion relating to the topic at issue that I'm

talking about -- the Audit Committee investigation

Page 108

A. Roper, Ph.D.

results -- sitting here today, whether there was new and unexpected information released to the public on March 30, 2022, relating to the Audit Committee investigation when it announced that it had completed its investigation, and after that thorough investigation, it had not identified any material misstatements or restatements?  That's my question to you, whether that is new and unexpected information in the context of news relating to the Audit Committee investigation.

A    We discussed my view on whether the new -- the piece of information regarding the conclusion of the Audit Committee's findings disclosed on March 31.  We've discussed my opinion as to whether that news was new or unexpected.

My answer to that question was, on its face, those words appear very similar to the words that were sudden on November 9th.

So, on its face, that news appears to be a reaffirmation of what was previously disclosed: That although the Audit Committee had found a potential issue, that issue would not necessarily require a restatement, right?

In that world and in that context, that

Page 109

A. Roper, Ph.D.

information itself was not new or unexpected, and it cannot be shown that way just based upon those two statements.

That's my conclusion as I sit here today.

Q    Okay.

So I'm going to ask you a slightly different question.  I want to go back to Dr. Cain's event study, so we can separate this discussion about the Audit Committee investigation.

In Dr. Cain's event study when he's looking at his news days and he identifies his news days, does Dr. Cain purport to provide a complete summary of the information environment on each of those days which allowed -- which would allow you to assess the predicted direction of the stock price movement each day?  Is that something he purports to do?

MR. ZACHERL:  Object to form.

A    Dr. Cain does not engage, at any fundamental level, in the information which he's identified is supposed to be driving changes in prices.

BY MR. SHAEFFER:

Q    So he's not saying "Here's a complete summary of the information environment for which you

Page 110

A. Roper, Ph.D.

can then assess the predicted direction of the stock price movement each day," right?

MR. ZACHERL:  Object to form.

A    He identifies the disclosure that he is looking at through discovery as well as Appendix 6a. Combined, you can identify the disclosure between those two places.

All right?

In describing the news that's related to these disclosures, he describes it en masse under his subject matter, what he is looking at.

For certain disclosures, he is looking at NT 10-Q filings.  For other disclosures post-class period, he's looking at earnings announcements.

And then he looks at a subjective -- further subjective criterion of status of merger events.  That's the only place in which he identifies what is the type of information that he is suggesting the Court could entertain as being dispositive of cause and effect.  It's a limit in his analysis.

MR. SHAEFFER:  Can we go off the record?

THE VIDEOGRAPHER:  Going off the record. The time is 11:49 a.m.

Page 111

A. Roper, Ph.D.

(Recess taken.)

MR. SHAEFFER:  We will take a rough, but no
expedited.

THE VIDEOGRAPHER:  We're back on the
record.  The time is 1:02 p.m.

BY MR. SHAEFFER:

Q    Okay, Dr. Roper.

We are back on the record, and I just want
to ask a few questions about your opinions relating
to the proposed damages methodology that Dr. Cain
provides in this case.

So Dr. Cain is proposing to use the
out-of-pocket methodology to calculate damages on a
class-wide basis in this case; is that correct?

A    He's proposing to use the out-of-pocket
formula as a formula to be used to approximate
damages, yes.

Q    Okay.

I guess you use that specific term
"formula" rather than "methodology."  Is there a
particular reason for that?

A    Because the formula requires inputs to be
used.

Q    Okay.

Page 112

A. Roper, Ph.D.

So I'm just going to try to make this quick. I'm going to ask you a yes-or-no question about this.

Given the facts and the circumstances of this case, are you offering an opinion that the out-of-pocket methodology formula cannot be used to calculate damages on a class-wide basis in this case?

A    No.  I'm offering an opinion that plaintiff and Dr. Cain has not specified how they're going to measure the inputs that are required for use in the out-of-pocket method -- out-of-pocket method calculation.

Q    So I just want to make sure that I'm -- that I understand your testimony.

It's no, you're not offering the opinion given the facts and circumstances of this case that the out-of-pocket formula cannot be used to calculate damages on a class-wide basis?

A    I'm offering -- I'm offering the opinion that plaintiff has not shown how it is going to reliably use that formula.

I don't have an issue with the formula itself. Out-of-pocket formula is a common measure

Page 113

A. Roper, Ph.D.

of damages and in securities 10b-5 litigation.

However, in this case, in my opinion, plaintiff has not shown how they can reliably apply that formula because Dr. Cain has not given the key inputs they need.  He has not identified the inputs to that formula and how he's going to be able to measure those reliably so that the formula provides a reliable indication of actual per-share harm in this matter.

Q    So one of the inputs that Dr. Cain needs to provide is artificial inflation; is that correct?

A    That is correct.

Q    So maybe I'll ask you another yes-or-no question.

Is it your opinion that Dr. Cain cannot calculate artificial inflation in this case based on the facts of this case?

A    I'm not aware of a method that Dr. Cain can rely on to do so in this case.  In this case, Dr. Cain has not identified a method that would do it, is the way I would phrase that.

Q    So, sitting here today, you can't name a method under which Dr. Cain can calculate artificial inflation in this case, correct?

Page 114

A. Roper, Ph.D.

A    Not given the inefficiency that occurred at the time of the retickering.  Not given the facts and circumstances that these are two separately tickered securities with separate risk profiles. He's not addressed any of those case-specific facts when he suggests that he can identify inflation based upon a price decline that occurs at the end of this class period in a particular security.

Q    I think you've answered my question, but I just want to ask it again and give another opportunity.

Yes or no, can Dr. Cain calculate artificial inflation in this case given the facts that you've laid out?

A    Dr. Cain has not identified a commonly used methodology which will allow him to calculate inflation in this case, and I am not aware of a commonly used methodology that will allow Dr. Cain to estimate inflation in this case given the facts and circumstances that are unique to this case.

Q    Okay.

So, Dr. Roper, have you ever applied the out-of-pocket methodology to calculate damages in a securities class action?

Page 115

A. Roper, Ph.D.

A    Yes.

Q    So what was that context?

A    There's a variety of contexts in which that's been done.  It's commonly done.

Q    So have you ever calculated damages using the out-of-pocket methodology on behalf of a plaintiff in a securities class action?

A    No, I have not.

Q    Have you ever testified as an expert on behalf of a plaintiff in a securities class action?

A    I'm sorry, I'd like to -- I have calculated out-of-pocket damages on behalf of plaintiff in a security class action.  I was not serving as expert in that security class action.

Q    So would that have -- okay.

A    I want --

Q    Yeah.  Thank you for clarifying.

So would that case have been listed in exhibit -- in your CV that you provided with your expert report?

A    No, because I was not providing expert testimony in that case.

Q    Okay.

So outside of that one instance where you

Page 116

A. Roper, Ph.D.

didn't provide expert testimony on behalf of a

plaintiff, you haven't provided any expert testimony

on behalf of a plaintiff regarding damages in a

securities class action?

A     No, that's not correct.  I have.

Q     Okay.

So which -- so which case is that?  Is that

listed in your -- in your CV?

A     I believe it is.

Q     Could you -- let's go to it.  Can you point

it out for me?

A     On page 89 of 124 of Exhibit 1.

Q     Yes.

A     This is the second page of Exhibit 1,

curriculum vitae.  Under "Expert Testimony" heading,

the first bullet point, In re Sterling Financial

Corporation v. Clyde Conklin and Bank of Whitman

Securities Litigation.

In that litigation, I testified on behalf

of a plaintiff and provided an out-of-pocket measure

of damages for that plaintiff.

Q     Okay.

And that was a federal securities class

action case?

Page 117

A. Roper, Ph.D.

A    No.  That was a federal securities 10(b) case that was not a class action.

Q    Okay.  Thank you.  So that's good to clarify.

A    Excuse me, one second.  I think there were state claims.  I believe it was federal, as well.

Q    Okay.

Just so we have a clean record -- and I understand, maybe, additional context I need for my question.

Have you ever provided expert testimony on behalf of a plaintiff in a federal securities class action case?

A    There is another case I'm looking for, that was a federal, by definition, of Cana- -- Canadian federal securities litigation in which I provided an expert opinion on materiality.  It was -- it may have been that In re Tanzanian Gold litigation.

Q    Okay.

But you're in the -- you're not sure one way or the other?

A    That's -- I know I provided testimony on materiality on a plaintiffs' side mass action or class action, depending on how it's referred to in

Page 118

A. Roper, Ph.D.

Canada.

Q     Okay.

A     And I believe it is the In re Tanzanian Gold litigation case.

Q     Okay.

So, outside of this case, which you believe is a Canadian case, have you provided any other testimony on behalf of plaintiffs in a federal securities class action case?

A     No.

Q     Okay.

A     That is the extent of my testimony.

MR. SHAEFFER:  I just want to go back...

Dr. Roper, I think that's all the questions I have for you today.  So depending on whether your counsel has any, I'm passing over the baton.

MR. ZACHERL:  Thank you, Peter.

Can we take -- I don't know -- five minutes or so, in the breakout rooms, and I'll talk and see if we are going to have any questions?  I can tell you right now, I don't.  But let me get with my team.

MR. SHAEFFER:  Yup, sure.

**Page 119**

A. Roper, Ph.D.

THE VIDEOGRAPHER:  Going off the record.
The time is 1:14 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the
record.  The time is 1:20 p.m.

MR. ZACHERL:  So we have no questions of
the witness.  Thank you, everybody.

And as I said off the record, we'll order
the rough and the final and the witness will be
a read and you can send the transcript to me.

Thank you.

THE VIDEOGRAPHER:  Okay.

We are off the record at 4:20 p.m. -- I'm
sorry, 1:20 p.m. Pacific Time, and this
concludes today's testimony given by Andrew
Roper.  The total number of media used was
three and will be retained by Veritext.

(Time adjourned: 1:20 p.m. PT)

**Page 120**

C E R T I F I C A T E

I, AMANDA McCREDO, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn, and that such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

_____

AMANDA McCREDO

**Page 121**

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:            Lemen v. Redwire Corporation, et al.

Dep. Date:            June 5, 2024

Deponent:             Andrew Roper, Ph.D.


CORRECTIONS:

Pg.   Ln.   Now Reads            Should Read          Reason

___   ___   _____        _____      _____

___   ___   _____        _____      _____

___   ___   _____        _____      _____

___   ___   _____        _____      _____

___   ___   _____        _____      _____

___   ___   _____        _____      _____

___   ___   _____        _____      _____

___   ___   _____        _____      _____

___   ___   _____        _____      _____

___   ___   _____        _____      _____


                                  _____

                                  Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS___DAY OF_____, 20__


_____

(Notary Public)  MY COMMISSION EXPIRES:_____

**Page 122**

ACKNOWLEDGMENT OF DEPONENT

I,                              , do hereby

certify that I have read the foregoing

pages, and that the same is a correct

transcription of the answers given by me

to the questions therein propounded,

except for the corrections or changes in

form or substance, if any, noted in the

attached Errata Sheet.

_____

ANDREW ROPER, Ph.D.

Subscribed and sworn to

before me on this_____ day

of _____, _____.

_____

Notary Public

**[& - 88]**

**&**

**&** 2:12

**0**

**01254** 1:5 4:19

**1**

**1** 3:8 4:13 8:18
8:22 9:14
11:13,20 40:7
48:5 49:16
60:19 67:20
68:17 116:13
116:15
**10** 12:11 31:4
39:22 91:18
92:4 93:14
100:12,15,22
105:19,19
110:14 117:2
**10.15** 44:20
48:5 53:16
64:9,10,18
66:4,9,19,24
67:3
**10.15.** 66:13
**10:38** 75:17
**10:57** 75:21
**10b** 31:5 113:2
**11:49** 110:25
**12** 25:22,23
40:15,17,20
41:18,22 42:3
42:5 100:11
**124** 9:14
116:13

**12:40** 39:24
**15** 100:11
**15th** 95:11
96:12
**16** 26:9,13,18
27:5 42:11,14
**17** 57:19,21
58:17 59:13
**18** 27:11,12
29:5
**195** 90:24
**1991** 78:8 83:8
83:12,16 84:2
**1994** 35:20,21
**1:02** 111:6
**1:14** 119:3
**1:20** 119:6,15
119:19
**1st** 65:6

**2**

**2** 3:9 9:25 10:6
10:7,15,18,20
11:14,21 17:9
40:11 51:9
65:7 67:20
75:18 92:24
**20** 121:22
**200** 2:13
**2021** 48:5
55:22 57:8
58:16 59:13
60:14,17 61:3
63:11 64:22
65:5,7 96:12
96:22 102:10

**2022** 108:4
**2024** 1:16 3:8
4:4 8:21 121:4
**21** 63:25
**24** 3:8 8:21
43:14 69:25
**2410** 2:5
**25** 43:13 57:8
58:16 59:13
61:3 65:5
**251** 91:10
**25th** 64:21
**26** 42:17,18,21
**27** 43:13 47:14
47:15,17,24
48:12,14,16
50:11
**28** 25:23 26:13
40:17,20 41:19
41:22 42:4,6
43:13
**28363** 120:16

**3**

**3** 51:9 68:17
75:22 90:23
94:22
**30** 91:14 101:4
102:11,13
103:25 106:18
108:4
**305.358.6300**
2:17
**31** 97:11
100:10 108:15

**310** 95:9,9
**316** 92:24
**33131** 2:14
**37** 64:4 66:2
**3:21** 1:5 4:19

**4**

**4100** 2:13
**455** 2:5
**4:20** 119:14

**5**

**5** 1:16 3:4 4:4
31:5 95:12
96:22 97:3
99:4 102:23,24
113:2 121:4
**54** 68:20,21
70:24 71:15,16
74:13 75:3,5
75:11,13

**6**

**60611** 2:6
**6a** 110:6

**7**

**708.628.4949**
2:7

**8**

**8** 3:8 91:15,19
91:22 92:20
93:10,16
**81** 85:4,5
**87** 9:12,14,17
**88** 85:2,5,6,15

**[89 - alfred]**                                                    Page 2

**89** 116:13
**8:32** 1:16 4:3
**8:39** 11:7
**8:43** 11:10

**9**

**9** 3:9 96:15,17
  99:11 100:10
  102:10,25
  107:15,16
**99.1** 91:15,22
  92:20 93:9
  94:22
**9:30** 40:7
**9:40** 39:24
**9:43** 40:10
**9th** 108:19

**a**

**a.m.** 1:16 4:3
  11:7,10 40:7
  40:10 75:17,21
  110:25
**ability** 8:14
  45:11,19 68:15
**able** 6:2 7:18
  40:3 41:5
  43:17 50:25
  113:7
**abnormal** 80:4
**above** 1:16
  64:10
**academic** 31:22
  33:11 37:17
  71:11 85:8

**accept** 9:10
**accepted** 15:2
  26:21 28:18
  32:19 33:2,6,9
  33:14,15 34:17
  39:11 54:2
  55:3 61:20
  63:14 73:14
  74:17,19,20,21
  77:10,25 79:4
  80:24 86:4
  87:23 88:6
  89:25 104:25
  105:9
**accessing** 5:23
**account** 46:7
**accounting**
  94:4,8 95:15
  96:23
**accuracy** 80:17
**accurately**
  80:15
**acknowledg...**
  122:2
**acquisition** 1:8
  4:17
**action** 4:24
  13:9 19:19,23
  20:20 31:25
  33:19 34:8
  35:6,9,17,25
  36:16 37:11
  38:2 89:15
  114:25 115:8
  115:11,14,15

  116:5,25 117:3
  117:14,24,25
  118:10 120:12
**actions** 22:3
  86:2
**activity** 54:14
**actual** 14:5
  58:10 92:19
  113:9
**actually** 7:24
  21:17 31:9,14
  36:5 90:20
**added** 82:16
**addition** 95:20
**additional** 28:4
  102:17 103:7
  103:11 117:10
**address** 10:11
  15:22 17:18
  29:24 30:8
  33:12 37:22
  51:22
**addressed**
  19:18 21:14
  29:23,25 37:8
  46:24 72:21
  114:6
**addresses**
  15:20 29:12
  46:22
**addressing**
  31:22
**adjourned**
  119:19

**adjust** 79:8
  85:13
**adjusted** 76:21
  77:4,22 78:6
  78:15 79:20
  94:15 107:8
**adjustment**
  58:11 60:22
  61:21 63:18,20
  65:10 77:13
  79:10 81:21,24
  82:6 83:2,4
  86:21,23,24
  88:16 90:16
**adjustments**
  85:9
**adjusts** 87:7
**adobe** 11:14
**advanced**
  92:13
**advice** 28:21
**advocates** 79:6
**affect** 8:14
**affected** 21:13
  49:8
**ago** 101:9
**agree** 4:12
  14:20,25 18:19
  32:2 64:25
  71:13 101:11
**al** 4:16,17
  121:3
**alerted** 95:19
**alfred** 2:12

**[allegation - apply]** Page 3

**allegation**
44:11,13,16
46:3
**allegations**
53:18 95:14
96:23
**allege** 44:8,14
54:13
**alleged** 14:2,9
14:11,15,23
15:4,11 17:8
18:15,16,23
19:19 20:2,6
21:13,15,18
22:14 23:3
24:8,15 27:6,7
31:9,16 42:11
42:15,22 43:3
43:6,10,24
44:5,13,22
45:16 46:19,21
47:6 49:25
50:4 52:5,8,10
52:13,14,25
54:10
**allegedly** 18:9
18:10
**allen** 38:3,9
**allow** 15:3
28:10 109:15
114:17,19
**allowed** 109:15
**allowing** 18:17
**allows** 16:13,13
17:13

**allude** 81:25
**amanda** 1:17
4:22 120:4,18
**analysis** 2:22
13:18 16:25
28:2,3,3 29:6
32:14 33:3
36:3,7 43:21
45:9 46:3,8,23
46:25 47:2,4
52:2,16,21
53:11,12 58:23
59:17 61:3,6
65:4 66:22
72:21 74:11,14
75:12 76:5
90:21 94:21
100:17,19
101:15 103:22
104:9 106:8
107:7 110:22
**analyst** 65:16
65:16,18 74:6
74:7,10
**analyze** 12:14
12:23 30:7
33:10 35:12
46:3 63:16,17
75:2 106:5
**analyzed** 32:14
91:3
**analyzing**
31:23 98:20
102:2,3

**andrew** 1:14
3:4,8 4:14 5:6
5:19,19 8:20
119:16 121:5
122:13
**annotate** 11:24
**announced**
94:3 95:3,6,8,8
101:5 102:23
106:23 107:17
108:5
**announcement**
57:7 58:16,18
61:3 102:8
**announcements**
110:15
**announces**
99:15
**answer** 14:18
21:11,21 33:23
34:2,24 56:11
66:7 67:17
73:6,19 82:9
84:5 87:13
108:17
**answered**
114:10
**answering**
12:10
**answers** 7:4,13
122:6
**apart** 62:25
75:9
**apologize** 81:23

**appealing**
78:23
**appear** 102:20
108:18
**appeared** 57:17
**appearing** 2:3
2:9
**appears** 96:14
102:20 108:20
**appendix** 96:13
110:6
**appendixes**
92:23
**applicability**
56:8 67:10
68:8
**applicable**
31:23 36:20
54:18
**application**
32:22 67:13
70:20 73:15,24
**applied** 33:18
38:21 52:22
54:17,19 68:3
68:5 71:4 72:2
73:25 114:23
**applies** 74:5
78:13 90:2
**apply** 32:19
33:2 34:25
35:25 36:15
37:10,25 61:8
61:11,16,24
62:2,3 63:10

**[apply - back]**                                                                 Page 4

68:17,18 72:16
76:18 77:2,16
113:4
**applying** 12:21
32:18 67:24
**appreciate** 73:9
84:23
**approach** 54:4
54:16
**appropriate**
37:3 39:5
**approximate**
111:17
**april** 3:8 8:21
**argue** 68:12
**article** 83:8,10
**articles** 37:17
**artificial** 19:15
113:12,17,24
114:14
**ascertain** 79:2
**aside** 22:4
**asked** 12:19,22
13:10,12,12,13
13:15,17,19,23
24:5,5,7,11,14
24:17,22,25
25:7 82:10
89:23 101:3,8
101:13 102:16
105:3 107:5,10
107:11
**asking** 14:25
25:5 36:23
37:6 58:14

88:3,20 104:8
106:3,4,6
107:23
**asks** 89:15
**aspect** 13:22
36:24
**aspects** 30:22
**asserting** 40:19
**assertion** 12:20
**assertions**
12:15,24 13:2
13:3,4
**assess** 13:19,23
14:11 15:6
19:23 20:14,15
20:22 21:4
24:11 28:14
30:11 32:11
36:19,21 37:24
39:4 53:6 58:8
77:8 78:4,5
83:12,16 84:3
84:8,9 89:23
90:15,16 91:4
103:6 104:22
109:15 110:2
**assessed** 19:11
**assesses** 84:7
**assessing** 14:9
16:6 17:19
32:17 33:16
34:7,18 35:4,7
35:15,23 36:13
37:4,9 38:12
39:2 52:21

54:4 61:17
62:23 63:10,18
69:12 79:5
80:18,19,22,25
98:10 100:13
**assessment**
16:9 19:14
26:20 55:2
95:24 101:12
**assignment**
11:25 12:2
**associated** 20:6
20:9
**associates**
85:10
**assume** 15:17
24:17
**assumption**
87:10
**assumptions**
24:22 32:8
**atanu** 38:9
**attached** 91:15
91:22 92:20
93:9 96:14
122:10
**attempted**
72:20 86:19
**attempting**
101:17
**attending** 5:2
**attributes**
39:13
**audio** 4:10

**audit** 94:6,25
95:16,17 96:7
97:11,25 99:2
99:7,12,15
101:5 102:8,14
103:19,24
104:21 106:19
106:22,25
107:25 108:4
108:11,14,22
109:10
**audrey** 2:21
**authoring** 29:6
**authors** 35:21
**available** 26:21
28:22 55:4
**average** 105:5
**aware** 17:22
22:4 24:24
52:5,8 54:3,7,7
54:16 72:23
73:13 80:7
84:20 85:16
113:19 114:18

**b**

**b** 117:2
**b.6a** 96:13
**back** 8:2 10:21
11:9 17:16
18:21 19:25
24:4 39:20
40:3,9,13 42:9
55:22 66:2
70:24 75:20,24
89:9 107:14

**[back - call]**                                                                Page 5

109:8 111:5,9
118:14 119:5
**bad** 79:23
**bank** 116:18
**barber** 35:20
35:21 36:2,25
37:12 38:16
**based** 15:10
23:11 49:17
65:22 91:21
92:9,11 103:21
109:3 113:17
114:8
**basis** 13:7
31:16 40:25
41:11 44:3
48:3,8,10
49:14,19 60:8
98:23 111:15
112:8,20
**baton** 118:18
**bbennington**
2:16
**bear** 84:25
**beginning**
40:11 44:16,18
75:22
**behalf** 1:4 2:3,9
115:7,11,13
116:2,4,20
117:13 118:9
**believe** 6:9
60:18 88:21
95:5,11 116:10
117:7 118:4,7

**belliott** 2:16
**benjamin** 2:11
**bennington**
2:12
**berman** 2:4
5:15
**bias** 62:17,19
100:9
**bid** 85:11
**biscayne** 2:13
**bit** 73:7
**blood** 120:12
**board** 94:6
**body** 71:17
**bolded** 26:12
**borrowed**
31:13 62:15
105:8
**borrowing**
30:23 32:7,10
**bought** 51:9
**boulevard** 2:13
**boundaries**
79:17
**boundary**
60:11
**bowen** 2:12
**bowry** 2:23
4:20
**brattle** 2:20,21
19:7,8,9
**break** 8:8,10
39:17 55:8
69:17,19 73:22
75:15

**breakout**
118:21
**breaks** 8:9
**bridge** 30:24,25
31:14,18,19,20
**broad** 33:24
34:3
**broadest** 22:6
23:12,17
**broadly** 12:18
13:3 27:22
54:25 55:6
84:13
**build** 31:19
**bullet** 116:17
**business** 47:8
47:13,22 94:4
95:15 96:24

**c**

**c** 2:2 120:2,2
**cain** 2:22 3:9
9:25 10:9
13:25 17:9
26:19 27:23
28:22 29:5
33:2 39:5,10
54:25 58:22
59:18 62:9,15
63:2 65:17
68:9 76:19
77:3,15,17,21
85:10,22 86:20
88:23 90:8
91:7 93:11
98:10,11,13,14

100:4,5,7,9,13
100:16 101:17
102:16 104:10
104:19 105:10
109:13,19
111:11,13
112:11 113:5
113:11,16,19
113:21,24
114:13,16,19
**cain's** 12:14,23
29:12 32:14
35:12,13 39:2
45:9 52:21
60:20 62:13
75:9 88:12
89:18,21,24
90:21 91:4
102:7 104:9
105:17 106:4
109:8,11
**calculate** 13:13
13:15 18:22
20:2 51:3
111:14 112:8
112:20 113:17
113:24 114:13
114:17,24
**calculated** 13:6
19:15 32:24
115:6,12
**calculation**
68:9 112:14
**call** 42:10
45:10

**[called - class]**                                                    Page 6

**called**  80:7,13
  80:25
**camera**  4:8
**cammer**  27:17
  27:19,24 28:2
  36:3 37:2,3
  38:18 52:22
  61:9,11,13,14
  61:15 63:9,10
  74:3,4,12,15
  76:5,10,11
**cana**  117:16
**canada**  118:2
**canadian**
  117:16 118:8
**cannito**  1:9
**capabilities**
  38:18
**care**  40:5
**cascade**  69:15
**case**  1:5 4:19
  9:4,9,23 13:14
  13:16 15:8,19
  16:5,25 17:20
  24:9 25:25
  26:6,11 27:2,9
  29:9 31:10,15
  31:15 32:13,19
  32:23 39:2
  43:18 47:6
  52:6,9,13,15
  53:2,7,7,9,19
  53:23 54:9,10
  56:7 58:2
  59:18 63:4

67:8 68:10,11
  72:14,20 76:19
  77:3 78:10,13
  80:18,23 88:15
  88:24 89:15,19
  111:12,15
  112:6,9,18
  113:3,17,18,20
  113:20,25
  114:6,14,18,20
  114:21 115:19
  115:23 116:8
  116:25 117:3
  117:14,15
  118:5,7,8,10
  121:3
**cases**  20:16,22
  54:3,5,5,6,8,13
  54:17 72:23
  73:13
**causation**
  13:18,19,22
  14:7 20:8
  38:12
**cause**  58:4
  61:13 65:4
  74:10 76:13
  84:9 100:13
  101:19 105:11
  105:14 110:21
**caused**  21:19
  22:15 23:4
  71:2
**causes**  69:14
  79:22,23

**caveat**  74:5
**center**  36:17
**central**  76:8
  77:11 87:9,21
**certain**  13:4,25
  16:20 18:8,8
  110:13
**certification**
  13:22 17:15,21
  20:18,24 21:4
  33:18 38:8
  39:8
**certify**  120:6,11
  122:4
**chair**  19:6,10
**challenged**
  20:17,23
**chance**  93:6
**change**  10:16
  58:4,5,10 69:8
  69:10,14,15
  70:14,18,23
  76:14 102:6
**changed**  103:2
**changes**  20:6,9
  109:21 122:8
**characteristics**
  39:14
**characterizati...**
  22:19 32:3
  46:6 65:2
  68:24
**characterizing**
  43:19,23

**chicago**  2:6
**choosing**  90:12
**circumstances**
  8:13 53:10,24
  72:16,19 112:5
  112:18 114:4
  114:21
**circumvent**
  31:10
**cite**  33:21 34:5
  35:4 37:14
  71:11 72:10,12
  72:14
**cited**  33:21
  37:17,21 39:4
  39:9 85:10,22
  105:4
**citing**  71:22
**cityfront**  2:5
**claims**  117:7
**clarify**  117:5
**clarifying**
  115:18
**class**  13:7,9,21
  15:23,25 17:3
  17:14,20 19:19
  19:23 20:17,20
  20:24 21:3
  22:2 31:25
  33:18,18 34:8
  35:6,9,16,25
  36:16 37:11
  38:2,7 39:7
  44:10,17,18
  55:23 56:4,14

**[class - conduct]**                                                        Page 7

56:17,22,24
57:2 59:5,6
62:14 67:24
68:12 71:6
72:4 74:2
85:25 89:15
110:14 111:15
112:8,20 114:9
114:25 115:8
115:11,14,15
116:5,24 117:3
117:13,25
118:10
**clean** 11:23
73:4,12 117:9
**clear** 7:13
25:17 41:17
56:11,11 96:10
**clearly** 100:8
**close** 39:16
51:24
**closing** 47:8,13
47:21 49:15
**clyde** 116:18
**cognizant** 47:2
**collectively**
81:3
**colloquial**
79:24
**combination**
47:9,13,22
**combined**
110:7
**come** 33:22
39:20 89:24

105:8
**comes** 69:7
70:13,19 78:7
79:11
**coming** 32:5
50:21 77:12
**commenced**
95:17 99:8
102:24
**commences**
99:4
**commencing**
1:16 99:5
**comment** 74:6
**commenting**
101:18
**commission**
95:22 121:25
**committee** 94:6
94:25 95:17,17
96:8 97:11,25
99:2,8,12,15
101:5 102:9,14
103:20,24
104:21 106:20
106:22,25
107:25 108:4
108:11,22
109:10
**committee's**
108:14
**common** 15:21
16:2 48:13
49:9,18 55:12
56:21 59:6,11

60:6,16 64:24
112:25
**commonly** 13:8
15:2 18:14
19:2,3 24:18
26:20 28:18,22
28:23 32:19
33:2,6,8,12,14
33:15 34:17
36:4 39:11
52:21 53:25
55:3 61:20
63:14 74:17,19
74:20,21 77:10
77:25 79:4
80:24 84:7
86:4 87:23
88:6 89:25
104:25 105:8
114:16,19
115:5
**communication**
94:24 96:11
**communicati...**
62:17 91:6,7
98:20 102:3
106:9,11
**company** 95:20
95:24 96:3,6
96:11,21 97:7
99:3,9 104:2
107:16
**company's**
91:5 94:6
106:25

**comparing**
39:13 97:9
**comparisons**
27:13,23 28:7
**complaint** 17:8
28:21 47:3
52:11
**complete**
109:13,24
**completed** 7:8
94:8 97:12
108:6
**completely**
8:15
**completing**
97:25
**comprehensive**
94:5 106:24
**computer** 6:11
6:16,19
**concept** 80:7
84:20 85:16
**conclude** 44:21
53:15 65:21
**concludes**
119:16
**conclusion**
61:12 63:24
108:13 109:5
**conclusions**
99:15
**conclusively**
76:4
**conduct** 62:4,8
74:11 75:9

**[conducted - course]** Page 8

**conducted** 4:6
36:2 62:21,24
63:3,22 74:14
75:12
**conducting**
37:23 61:6
76:5
**confirm** 101:3
**confirming**
97:20 99:19
**confirms** 94:2
99:16
**conklin** 116:18
**connected** 89:5
**connection** 4:8
16:23
**consider** 17:21
52:3,17,20
57:21 94:14
101:3,14
102:11,18
107:6
**consideration**
17:4
**considered**
16:4 36:4
58:22 65:24
101:13 107:13
**considering**
28:14 102:4
**consistent**
52:24 58:10
63:20 79:14
86:25 87:4
104:25

**contain** 106:11
106:13
**contained**
40:20 57:14
91:5 98:15
**contains** 70:22
104:15,17
**context** 18:5,20
19:12,18 20:20
21:3 22:2,13
29:21 30:9
31:24 32:13
34:6,19 35:5,9
35:15 38:14,22
52:20 53:2,3,4
85:15,18,25
102:6 103:2,18
103:23 105:17
108:10,25
115:3 117:10
**contexts** 19:22
38:24 115:4
**continue** 4:11
75:25 80:3
81:15 82:17
**continued** 18:8
18:15 45:5
51:6 54:14
**controls** 95:25
**conversation**
7:21 22:9
68:20
**copies** 11:18,23
**copy** 11:20,21
12:9

**copyright**
29:18
**cornell** 38:13
**corp** 1:9 4:17
**corporation**
1:8 4:16
116:18 121:3
**correct** 9:21
11:16 13:11,14
13:18 15:10,21
16:3 19:7,16
21:22 23:14
24:10,16 25:25
26:23 27:18,25
29:13,14,16
33:4,5 41:7
42:13,14 46:5
49:20 52:19
53:22 55:5
58:20 60:7
61:9,25 62:5
62:19 63:16
64:2,3 66:25
70:7,8,14 71:8
71:12 72:17
73:18 75:4,11
76:6 77:23
82:15 83:9
85:17 86:2
87:18 91:6,16
91:24 92:4,11
92:15 93:16
94:16,17
101:12 102:25
104:3 111:15

113:12,13,25
116:6 122:5
**corrections**
121:7 122:8
**corrective** 14:2
14:10,11,15,18
20:6,8,10,14
21:15 52:5,9
52:11,13,15,18
53:2,21 104:22
**correctly** 64:15
99:21
**corrupted**
45:16 50:20,22
71:3,25
**corruption**
51:2 71:2
**corrupts** 73:17
**cost** 17:11
**costs** 64:11
66:10,11
**counsel** 4:14
5:2,5 12:19
118:17
**count** 41:23,25
41:25
**counted** 26:7
**counting** 39:12
**counts** 27:13
27:22 28:6
**couple** 12:4
93:2
**course** 36:5
52:2

**[court - described]** Page 9

**court** 1:2,17
4:18,21 5:3 7:5
7:11,17,18 8:2
27:14 28:7,9
28:10,10,14,17
28:21,25 29:2
36:19,21 44:20
46:10,22 53:10
53:12,15 65:24
66:16 72:15,18
73:14 78:11,21
78:22 79:3,5,7
79:9,12,14,16
88:4,5,5,11,12
89:11,15,23
110:20
**courts** 74:20
**coverage** 65:16
65:17,18 74:7
**create** 16:13
**created** 17:6
**criterion**
110:17
**criticisms** 89:3
89:18,21 90:13
**crucial** 55:15
56:7 67:7,9,15
67:19
**curriculum**
116:16
**cut** 24:21
**cv** 1:5 4:19
115:20 116:9

**d**

**d** 2:22 3:2 5:20
5:20
**damage** 18:15
20:12 55:16
68:9
**damages** 13:6
13:13,15 19:11
20:11 32:23
38:14 51:4
111:11,14,18
112:8,20 113:2
114:24 115:6
115:13 116:4
116:22
**data** 59:21
**date** 1:16 8:24
10:3 57:11,11
96:2,6 97:6,18
99:6,8 107:17
121:4
**dated** 3:8 8:21
96:12
**dates** 52:6,9
99:25 100:3,4
100:5 106:6
**day** 44:22 50:2
58:6 67:4 70:5
70:6 109:17
110:3 121:22
122:16
**days** 46:12 50:6
57:19,21 58:17
59:13 62:21,23
66:24 90:21

91:4 99:5,6
102:25 109:12
109:12,14
**decision** 28:19
**decline** 105:6
114:8
**declines** 68:11
68:13
**decrease** 92:10
**defendants**
1:10 2:9 9:20
9:22 12:13
**deferring** 28:9
**defined** 23:17
90:3
**defining** 19:2
**definition**
20:19 21:23
31:7 80:5
82:11 83:22
84:11 117:16
**definitions** 22:3
22:10
**delay** 73:7
93:13 98:13,14
100:20 103:11
103:15 104:17
104:20,23
105:5,6,11
**delayed** 92:3,5
100:22 101:21
**delaying**
100:16
**delays** 98:12
100:12 103:19

104:12 105:11
105:15,18
**demonstrate**
15:3 31:5
32:16,16,20
39:10 45:20
77:21 88:7
**demonstrated**
46:10
**demonstrating**
31:15 78:2
88:25
**dense** 82:8
**dep** 121:4
**depending**
117:25 118:16
**depends** 4:7
**deponent** 121:5
121:20 122:2
**deposed** 6:25
**deposition** 1:14
4:5,14 5:22
7:12 8:19
**describe** 18:6
36:9 38:13,16
43:17 44:7
45:8 46:18
50:16 54:22
57:8 59:16
76:12 104:21
**described**
45:24 47:3
60:14 62:11
82:6,10,13
84:12 100:2

**[described - dr]**                                                      Page 10

104:20
**describes** 38:4
  38:10 69:3
  76:12 84:6,15
  110:11
**describing**
  38:21 46:20
  57:12 79:17
  91:17 99:24
  110:10
**description**
  80:5
**detail** 35:22
  74:12
**determination**
  58:9
**determine** 24:7
  24:14 66:23
  98:21 103:23
  106:10
**determines**
  88:13
**determining**
  107:7
**developing**
  35:13
**deviate** 21:19
  22:15 23:4
**different** 14:21
  25:5 55:18
  70:2 76:17
  106:7 109:8
**differently**
  18:11

**difficulty** 5:23
**direction**
  109:16 110:2
**directly** 34:4
**directors** 94:7
**disagree** 22:19
  32:2 46:6
  61:10 62:6
  71:13
**disclosed** 18:22
  19:25 60:19
  94:24 101:21
  101:22 104:11
  108:14,21
**disclosure**
  14:18 52:6,9
  58:9 93:11
  95:10,11,25
  97:10 100:10
  100:10,11,12
  104:22 107:9
  110:5,7
**disclosures**
  14:3,5,10,12,15
  20:7,9,10,14
  21:16 52:11,13
  52:15,18 53:2
  53:6,22 110:11
  110:13,14
**discovery**
  16:14,16,18,22
  16:24 17:2
  22:8 23:14
  81:25 110:6

**discriminate**
  36:5 86:20,22
**discriminating**
  65:14
**discuss** 30:7
  54:24 83:3
**discussed**
  108:12,15
**discussing**
  22:12 27:17,19
  27:21,22 91:14
  91:17 93:10
**discussion**
  17:17 23:15,16
  36:12 43:21
  51:22 54:21
  61:2 71:18,23
  74:7 76:10
  109:9
**discussions**
  38:23
**displayed** 6:7,8
**dispositive**
  59:20 61:20
  85:13 110:21
**disrupted**
  68:16
**dissipating**
  18:13
**dissipation**
  61:4
**distinct** 54:12
  54:15
**distinguishing**
  49:22 87:24

**district** 1:2,2
  4:18,18
**docs** 37:16,18
**doctrine** 29:16
  31:12
**document**
  42:19 43:20
  62:18 93:5,25
**documented**
  45:4
**documents** 6:7
  11:14,19 39:10
  44:8
**doing** 62:20
  74:16 90:17,18
  100:2,19
**dr** 3:9 4:14
  5:12 9:24 10:9
  11:12 12:14,23
  13:25 17:9
  26:19 27:23
  28:22 29:5,12
  32:14 33:2
  35:12,13 39:2
  39:5,10 40:13
  45:9 52:21
  54:25 58:22
  59:18 60:20
  62:9,13,15
  63:2 65:17
  68:9 75:9,24
  76:19 77:3,15
  77:17,21 78:7
  78:11 85:10,22
  86:20 88:12,23

**[dr - episode]**                                                    Page 11

89:12,18,21,24
90:8,21 91:4,7
93:7,11 98:10
98:11,13,14
100:4,5,7,9,13
100:16 101:17
102:7,16 104:9
104:10,19
105:17 106:4
109:8,11,13,19
111:8,11,13
112:11 113:5
113:11,16,19
113:21,24
114:13,16,19
114:23 118:15
**drafting**  24:23
**drew**  73:5
**drive**  2:5
**driving**  109:21
**drop**  18:21
  19:25
**duly**  5:7 120:8
**duration**  103:3

**e**

**e**  2:2,2 3:2 5:20
  5:20 120:2,2
**earlier**  68:14
  84:12 102:21
  102:22
**earnings**
  104:20 110:15
**economic**  16:7
  16:10 18:20
  26:19,22 30:2

32:6 33:22
38:21 55:2,4
68:15 72:7
79:15,17
**economically**
  54:11,15
**economics**
  29:18 31:13
  51:14 74:22
**economist**
  16:13,13 27:15
  33:16 34:6,11
  37:9
**economists**
  29:23,24 30:5
  30:6,7 33:10
  33:12 34:17,22
**educate**  53:12
**effect**  61:13
  65:4 74:10
  76:13 84:9
  100:14 101:19
  105:14 110:21
**effectiveness**
  95:25
**efficiency**
  17:17 26:20
  27:16 30:3
  32:17 33:4,13
  33:14 34:25
  35:9 45:14
  52:24 53:3
  54:22 55:3,25
  56:3,8 59:20
  59:22 61:18

65:20,21 69:5
76:2,3,21 78:2
80:8,10,13,14
80:20,22 81:2
81:4,5,9,11,12
82:12 83:13,13
83:17,20 84:3
84:14,16,17,18
85:25 86:9,16
87:16,22 88:7
**efficient**  12:16
  13:3,5 17:7,10
  28:20 30:18
  31:22 32:6,21
  33:10 34:18
  36:5,21 37:4
  55:21 56:13,17
  57:20 58:11,12
  60:2,21,23
  61:22 63:11,21
  64:12 65:8,14
  66:20 67:12,15
  67:22 69:9
  70:17,20 76:9
  77:7,9,18 78:4
  78:25 79:3,10
  79:12 81:21,24
  82:5 83:2,4
  85:9 86:21,23
  86:25 87:5
  88:16 90:16
**efficiently**  77:5
  77:22 78:6,15
  79:20 85:14
  87:8,25 94:16

**either**  29:17
  90:17 94:21
**elliot**  2:11
**email**  6:15
**embedded**
  16:19,21 66:10
**empirical**  86:9
**employed**  13:8
  34:24
**employee**  95:14
**en**  110:11
**engage**  98:14
  100:17,18
  109:19
**engaged**  90:10
**engagement**
  47:5
**engaging**  14:4
  14:6,9
**entertain**
  110:20
**entertained**
  30:4 72:19
**entire**  36:17,18
  55:25 56:3
  59:5
**entirely**  57:20
  58:18 62:11
**entirety**  57:2
**entitled**  38:3
**environment**
  50:17 109:14
  109:25
**episode**  55:15
  56:6 57:4,6,12

**[episode - exposures]**                                          Page 12

| | | | |
|---|---|---|---|
| 58:21,24 59:4 60:13 63:12 65:5,6 | 63:3,6,19,23,25 64:22,22 65:4 70:21 75:9,10 75:13 84:8 89:4,18,22,24 90:2,14 93:13 102:7 103:23 104:15,19,21 105:9,13,17 106:4,8 109:9 109:11 | **examining** 54:8 104:12,14 | **existence** 16:12 56:2 98:12,14 100:14 101:16 104:16 |
| **episodes** 45:10 50:17,18 57:9 57:14,14,15 65:8 67:6 | | **example** 12:22 35:20 47:14 57:24 58:2,2 58:15,19 59:12 61:7,17 | **existing** 81:16 |
| **equal** 70:5 | | | **exists** 90:4 |
| **erin** 2:10 | | | **expect** 70:22 |
| **errata** 121:2 122:10 | | **examples** 45:22 58:7,7 | **expected** 92:10 |
| **esq** 2:4,10,10 2:11,11,12 | **events** 13:25 62:13 90:4,12 93:12 106:6 110:18 | **except** 122:8 | **expedited** 111:4 |
| **establish** 39:15 78:12 86:15 87:11,15 | | **exchange** 95:22 | **experience** 76:16 |
| | | **excuse** 20:4 117:6 | **experienced** 56:6 |
| **established** 76:4 | **eventually** 45:6 | **execute** 10:23 | **expert** 3:8,9 8:20 9:3,21,23 9:24 10:8,8,10 19:24 37:8 39:3 72:22 78:9 88:11 115:10,14,21 115:22 116:2,3 116:16 117:12 117:18 |
| **estimate** 20:10 114:20 | **everybody** 119:8 | **executive** 26:2 26:9 40:14 41:6 42:4,6 43:4 71:14,16 | |
| **et** 4:15,17 121:3 | **evidence** 16:6 27:15 47:17,24 48:17,23 50:9 50:12 66:5 70:9 74:16 78:2 86:13 87:14 105:13 | **exhibit** 3:7,8,9 8:18,22 9:14 9:25 10:6,7,7 10:15,17,18,19 10:20 11:13,14 11:20,21 17:9 90:23 91:15,22 92:20,24 93:9 94:22,22 115:20 116:13 116:15 | |
| **etuck** 2:15 | | | |
| **evaluate** 39:5 53:20 | | | **experts** 18:21 |
| **evaluating** 53:21 | **exactly** 78:7 | | **expires** 121:25 |
| **event** 13:11 35:11,13,15,22 36:8,8,9,11,13 37:23 38:5,10 38:14,17,23 39:2,6,12 58:8 59:19 60:16,20 62:4,9,12,21,25 | **examination** 3:3 5:10 120:7 120:9 | | **explain** 16:23 94:18 |
| | **examine** 20:5 34:23 36:3 53:5,24 105:9 | **exhibited** 55:15 | **explained** 65:8 66:19 |
| | | **exhibits** 3:6 5:23 | **explore** 16:14 17:13 98:15 |
| | **examined** 5:8 20:16,23 46:10 52:24 | **exist** 45:5 72:20 90:3 | **exposures** 98:16 |

**[expressed - focused]**

**expressed**
  47:24
**expresses**  25:4
**extent**  14:4,8
  32:10 118:13
**external**  94:7
**eyeball**  31:8,10
**eyeballs**  31:16

**f**

**f**  1:8 2:11 4:16
  120:2
**face**  66:19 98:7
  102:19 103:5
  108:18,20
**fact**  16:2,4,4,8
  17:4,13 24:16
  45:15 48:4
  51:17 88:10
  92:5 94:23
  101:4,21,22
  103:11
**factor**  52:22
  61:13,14,15
  63:9 65:22,23
  74:3 76:5,10
  76:11
**factors**  27:17
  27:20,21,24
  28:2,3,4 36:3,4
  37:3 38:18
  61:9,11,16,24
  62:2,3 63:10
  63:15,16,17
  74:4,12,15
  75:2,3 84:15

85:7
**facts**  32:14
  43:20 53:9,23
  72:19 91:4
  99:13 112:5,18
  113:18 114:3,6
  114:14,20
**fail**  67:14
**fails**  26:19 55:2
  67:11
**failures**  62:20
**fair**  31:21
  34:20,20 61:22
  68:24 79:21
  106:9,12
**fall**  18:18
**fallen**  17:11
  64:9
**falls**  53:15
**false**  14:23
  15:11,11 18:23
  20:2 21:18
  22:14 23:3,5
  24:15,16 31:17
  49:7
**fama**  82:6 83:8
  83:12,16,21
  84:2,6
**fama's**  78:7
**familiar**  54:13
**far**  37:11 73:10
  88:19
**fatally**  90:11
**federal**  13:8
  116:24 117:2,7

117:13,16,17
  118:9
**fell**  64:18
**ferrell**  38:3,9
**field**  29:18
  30:24 54:2
  61:20,21 77:25
  78:3 79:6
  80:25 82:7
**file**  100:14
  105:8
**filed**  4:17 54:9
  91:19 94:11
  96:4 97:8
**filing**  91:24
  92:3 93:14
  98:11,12 99:11
  100:12,16,21
  101:20 103:15
  103:19 105:5,6
  105:19
**filings**  93:14
  104:12 110:14
**final**  119:10
**finalized**  95:24
**finance**  74:22
**financial**  93:14
  94:11 95:24
  96:5 100:21
  107:4 116:17
**financially**  4:24
**find**  32:14
  65:18
**finding**  49:17
  49:22 65:21

98:2 102:21,22
**findings**  44:24
  65:11,12
  108:14
**finds**  85:23
  103:13
**fine**  8:8 12:10
  39:19,22
**finished**  42:20
  72:11
**finishes**  73:5
**finishing**  68:19
**firm**  5:14,15
**firms**  94:8
**first**  5:7 40:5
  58:15,19 59:11
  60:24 70:4
  95:2,3,5,7
  116:17
**fits**  33:25
**five**  37:3 39:20
  61:13,14,15
  63:9 74:3 76:5
  76:10,11
  118:20
**flaw**  90:4
**flawed**  90:11
**flaws**  89:24
  90:2
**floor**  17:6,11
**florida**  1:2 2:14
  4:19
**focus**  61:5
**focused**  37:2
  82:19,21

**[focusing - gnpk]** Page 14

**focusing** 36:23
  64:7 70:25
  103:18,19
  105:18
**follow** 49:25
  65:7 79:4
  81:11 88:6
  90:9
**followed** 39:11
  77:9
**following** 15:10
  63:14 64:16
  80:24 89:25
  92:15,17 94:5
  106:24 107:8
**follows** 5:9
  28:18 65:3
**footnote** 66:14
  85:2,5,6,15
**foregoing**
  122:4
**form** 18:25
  22:18 34:9
  40:22 41:13
  43:8 49:11
  56:15 66:6
  72:5 78:16,20
  81:2,12 83:18
  84:4,6,8,10,11
  87:19,23 89:20
  91:15,18,22
  92:4,20 93:10
  93:14,16,17,18
  93:19 100:14
  100:22 105:19

105:19 109:18
  110:4 122:9
**formation** 71:3
  73:17
**former** 21:11
  50:13
**formerly** 80:25
**forms** 40:25
  41:11
**formula** 111:17
  111:17,21,23
  112:7,19,23,24
  112:25 113:5,7
  113:8
**forth** 10:22
  25:2,8 120:8
**forward** 45:12
  49:9,19,24
  51:13 71:5
  72:3 73:25
**found** 49:16
  72:15 91:22
  107:2,16
  108:22
**four** 52:22 99:5
  99:6 102:25
**fourth** 27:11
**frank** 2:10 11:4
**fraud** 12:17,21
  27:6 28:16
  29:13,15,22,24
  30:5,9,12,14,16
  30:23 31:13,19
  31:24 32:4,18
  32:22 33:17

34:7 35:2,5,16
  35:24 36:14,19
  37:10,24 38:7
  38:22 39:7
  42:11,15,22
  43:6,24 44:5
  45:21 50:4
  51:7 56:9
  58:13 67:11,14
  67:23 68:2,4
  69:13 71:4
  72:2,15 73:15
  73:24 76:19
  77:3,16 78:13
  78:23,24 86:17
  87:10,17 88:14
  89:2,14
**fraudulent**
  15:4
**front** 6:12,13
  9:5 11:19
  36:17
**full** 5:17 80:6
  93:24
**fully** 80:2
  104:24
**fundamental**
  80:8,10,14,19
  83:12,16,20
  109:20
**further** 45:3
  110:17 120:11
**future** 82:17
**fzacherl** 2:14

**g**

**gatekeeper**
  29:2
**generally** 31:23
**genesis** 1:8 4:16
  15:21 76:20
**getting** 82:9
  99:21
**give** 10:23
  35:20 44:4
  58:2 81:8 85:3
  114:11
**given** 7:5 46:9
  51:4,16,17
  53:23 64:11
  80:15 88:10
  95:23 96:6
  100:24 103:10
  106:10 112:5
  112:18 113:5
  114:2,3,14,20
  119:16 120:10
  122:6
**glennys** 2:11
**gnpk** 15:23,25
  16:2,5 17:2,6,7
  17:17 28:19
  44:18,19 46:11
  47:18 48:4,15
  48:18,21,22
  49:5,15 50:3,9
  53:13,14 55:8
  55:12,14,19,21
  55:25 56:5,13
  56:17,21,24

**[gnpk - identifying]** Page 15

57:5,10 58:20
59:6,11 60:6
60:15 64:5,9
64:17,18,24
66:3,5 67:21
70:5 76:21
77:4,7,18,21
**gnpk's** 45:5
56:2
**go** 4:12 7:2
9:12 10:17,19
10:21,25 11:3
12:11 17:16
25:21 27:11
29:4 33:25
39:17,25 40:4
40:13 42:9,17
45:3 55:22
64:4 68:20
69:25 70:24
75:15 79:23,23
85:2 90:23
91:10 93:24
105:12,12
109:8 110:23
116:11 118:14
**going** 4:3 11:6
37:19 39:16
40:6 42:9
45:12 50:3
51:2,13 54:22
54:23 55:8,9
63:7 65:20
66:2 68:18,25
71:5 72:3

73:25 75:16
88:9 91:10
92:21,22,24
95:8,20 109:7
110:24 112:2,3
112:11,22
113:7 118:22
119:2
**gold** 117:19
118:5
**good** 4:2 5:12
69:16 73:10
79:22 117:4
**grappled** 36:7
**grappling**
36:11,18
**griffin** 38:16
**ground** 7:2
**group** 2:20,21
2:22 19:7
**grubin** 2:15
**guess** 22:22
34:4 35:3
36:23 48:11
58:14 76:16
82:19 83:15
104:6 111:20
**guys** 73:5

**h**

**h** 3:8 5:20 8:21
**hagens** 2:4 5:15
**halliburton**
21:9 38:4
**happened**
60:14

**happening**
90:10
**hardy** 5:19,20
**harm** 55:17
67:8 113:9
**harmful** 62:18
**hbsslaw.com**
2:6
**head** 7:14
**heading** 116:16
**hear** 6:2 23:6
**heard** 4:9 17:24
17:25 80:9
**hearing** 5:23
**held** 1:15
**helpful** 65:14
**hereinbefore**
120:8
**hesitating**
13:24 20:18
**higher** 85:12
**hold** 47:15 89:3
89:22
**holder** 50:3
**holding** 66:12
**holds** 88:4
**hour** 39:17
**hours** 91:19
**hypotheses**
33:13
**hypothesis** 60:2
61:23 70:17,17
70:19 76:9
77:11,13 79:7
79:11,13 87:5

87:22 92:9,12
92:13 105:9
**hypothetical**
88:10,20 89:6

**i**

**idea** 71:24
**identification**
8:23 10:2
62:16
**identified** 45:2
52:10 60:20
61:7 62:20,22
91:7 96:3 97:7
97:10,19,21
99:9 101:6
104:15 107:18
108:7 109:21
113:6,21
114:16
**identifies** 76:11
97:3 100:9
109:12 110:5
110:19
**identify** 35:19
40:24 41:6,10
41:19,23 45:11
46:13 50:25
54:24 90:3
94:9 97:12
99:17 107:2
110:7 114:7
**identifying**
60:24 98:3
100:23

**[ignoring - information]**                                          Page 16

| | | | |
|---|---|---|---|
| **ignoring** 64:10 | 48:18 50:4 | **indicates** 48:5 | 66:25 67:5 |
| **ii** 21:9 38:4 | **impacts** 22:7 | **indicating** 61:8 | 86:21,23 87:24 |
| **iii** 25:21 | 23:13 57:23 | **indication** 60:4 | **inefficiently** |
| **illinois** 2:6 | **implementing** | 63:6,24 66:17 | 107:8 |
| **immediate** | 39:12 | 113:9 | **inflated** 44:9 |
| 15:10,14 | **important** 7:19 | **indications** | 48:23 |
| **impact** 14:16 | **importantly** | 64:23 | **inflation** 18:12 |
| 14:19,21,22 | 98:9 | **individual** | 19:15 20:10 |
| 15:3,7,9,10,14 | **include** 81:21 | 98:16 | 38:15 44:12 |
| 15:15,16,17,20 | 82:25 | **individualized** | 47:19 48:2,6 |
| 15:22,25 16:7 | **included** 14:2 | 12:20 31:15 | 48:19,24,25 |
| 16:9,10,24 | 27:24 91:18,19 | 51:3 68:6 | 49:5,17 50:2 |
| 17:14,20 18:22 | 95:14 | 87:12 | 50:12,15,21 |
| 19:20,24 20:2 | **includes** 28:2 | **individually** | 51:18 54:10 |
| 20:14,16,17,19 | 105:7 | 1:4 | 113:12,17,25 |
| 20:22,23 21:5 | **including** 84:8 | **inefficiency** | 114:7,14,18,20 |
| 21:7,10,22,23 | **inconsistent** | 45:10,18 50:18 | **inform** 28:18 |
| 22:3,6,12,24,24 | 59:25 60:21 | 50:19,20,23 | **information** |
| 23:7,12,16,24 | 65:10,23 | 51:5,16,22 | 14:6 16:18,20 |
| 27:6 30:11 | **incorporated** | 55:15 56:6 | 18:9 21:19,20 |
| 38:4,6,11,15 | 81:14,20 82:14 | 57:4,7 58:20 | 22:7,15,16 |
| 42:10,11,15,23 | 82:21 | 58:22,25 59:4 | 23:4,6,13 |
| 43:2,6,9,18,22 | **incorporated...** | 59:11,15 60:5 | 30:20,22 31:17 |
| 43:25 44:5,12 | 82:23 | 61:8 63:7,25 | 51:12 57:15,16 |
| 44:25 45:4,12 | **incorporation** | 64:6,23 66:17 | 57:18,21,23 |
| 45:16,20,23 | 82:24 83:6 | 67:7 68:16 | 58:3 60:9 66:7 |
| 46:2,11 47:7 | **incorrect** | 69:3 70:10 | 69:7,11,14 |
| 47:12,21,25 | 107:12 | 71:2,24 73:16 | 70:4,12,16,21 |
| 48:13 49:18 | **increase** 92:17 | 114:2 | 70:22 76:13 |
| 50:9,25 51:25 | **increased** | **inefficient** 36:6 | 78:7 79:9 80:2 |
| 52:19 53:4,7 | 92:14 | 55:13,19 56:21 | 80:4,16 81:5 |
| 53:11,16,20,24 | **independent** | 56:24 57:11 | 81:13,16,19 |
| 54:4 68:14 | 94:3,6,7 95:18 | 59:7,12 60:7 | 82:14,18,20,25 |
| **impacted** 30:21 | 99:5 106:25 | 60:16 64:19 | 83:6 87:9 90:6 |
| 44:21 47:18 | | 65:15 66:5,15 | 90:6,10 91:5 |

**[information - know]** Page 17

91:18 93:12,13
93:15,18,22
98:10,13,15,22
99:19,20
100:21,23
101:17,20
102:4,12,18,19
103:6,8,11
104:2,16,23
105:14 108:3
108:10,13
109:2,14,20,25
110:19
**informational**
80:22 81:4,4,9
81:10 82:12
83:13 84:3,14
84:16,17,18
85:24
**inherit** 50:14
62:17,19 100:5
100:6,9
**inherited** 47:19
48:2,19,24
49:2,5 50:12
100:4
**inputs** 111:23
112:12 113:6,6
113:11
**inquiries** 21:10
**inquiry** 12:20
17:13 87:12
**inside** 36:9
98:16 100:23

**instance** 73:16
115:25
**instances** 16:21
66:23
**instruct** 40:2
**instructed**
90:15,16
**instructive**
27:14 28:7,9
28:14
**insufficient**
86:15 87:15
**integrity** 45:17
50:19 51:6,15
75:7
**intend** 26:12
**interchangea...**
81:6
**interest** 106:14
106:15
**interested** 4:24
120:13
**internet** 4:8
**interpret** 21:25
31:8
**interpretation**
28:11
**interpreted**
59:15
**interruption**
56:7
**intersection**
30:2 38:20
**intrinsic** 80:15
80:17

**introduced**
8:18 10:6
**investigate**
30:2 38:17
**investigation**
94:3,8,25
95:18,20 97:12
98:2 99:3,5,8
99:12,16 101:5
102:9,14,23
103:20,24
104:18 106:20
106:22 107:25
108:5,6,7,11
109:10
**investing** 98:5
**investor** 24:9
51:8
**investors** 27:7
31:5 42:12,16
42:24 43:2,7
43:10,25 44:6
51:13,14 69:15
80:3 81:15
82:17
**invoke** 89:13
**invoking** 39:6
86:16 87:16
88:14,25
**issue** 31:10
37:23 64:5
68:5 107:24
108:23,23
112:24

**issues** 68:3 94:4
95:15 96:24

**j**

**january** 55:22
**jared** 2:3
**jed** 1:4 4:15
**jr** 2:12
**june** 1:16 4:4
121:4

**k**

**k** 1:8 4:16
91:15,18,19,22
92:4,20 93:10
93:16 100:12
100:15,22
105:19
**key** 62:16 113:5
**kind** 24:2 51:24
56:10 69:21
75:25 79:21
84:22 90:22
**know** 5:21,24
7:25 8:3 9:13
29:17 32:2
33:23 34:2
40:24 41:9
42:2 46:24
60:5 64:25
68:25 71:13
72:18,24 73:3
73:7 76:7 88:4
90:5 91:11
117:23 118:20

**[knowing - making]**                                    Page 18

**knowing** 47:5
**knowledge**
  83:19
**known** 16:22
  51:10
**krogman** 27:21
  28:3 36:4
  38:18 61:16
  63:15,16,17
  74:25 75:2
  85:7

**l**

**labeled** 30:13
  30:16,17,17
**labels** 28:4
**lack** 15:22,24
  70:3 75:6
**lacking** 65:19
**lacks** 45:17
**laid** 114:15
**land** 105:25
**language** 26:12
  82:19 106:21
**law** 5:14 7:5
  29:17 72:15
**lead** 2:3 5:15
  10:8 89:12,16
**leads** 105:5
**leave** 40:2
**led** 103:12
**lee** 2:23 4:20
**legal** 29:16
  30:3,24,25
  31:12 78:19
  94:7

**lemen** 1:4 4:15
  121:3
**lens** 36:20
**lev** 36:2 38:16
**level** 18:8
  100:18,20
  109:20
**liability** 24:17
**life** 57:5
**light** 59:21,24
**limit** 110:21
**line** 27:11
  101:2 105:21
**list** 38:20
**listed** 55:23
  115:19 116:9
**literature**
  26:22 30:19
  31:22 32:6,7,8
  32:9,11,12,15
  33:11,22 35:4
  35:14,19 37:7
  37:13,21 39:4
  39:9,15 65:13
  65:23 71:12,22
  72:8,8 74:22
  79:11 92:13
  103:10,13,14
  105:4,11
**litigation** 13:9
  18:6 19:7,12
  20:20 29:7,22
  30:10,13,15
  34:19 35:10
  45:13 54:5,6

  55:5 113:2
  116:19,20
  117:17,19
  118:5
**little** 73:7
**llp** 2:4,12 5:15
**ln** 121:8
**long** 59:25
**look** 18:21
  19:14,24 20:8
  21:18 30:14,19
  30:20 31:19
  65:12,16 66:16
  67:9 74:3,25
  79:5,7 92:19
  92:25 93:6
  97:17 100:6
  102:7
**looked** 30:12
  38:11 49:15
  102:9,10
  104:19
**looking** 19:3
  21:15,16 23:3
  23:20 24:2
  28:17 30:22
  35:8 37:2
  53:13,14 88:12
  97:6,9 101:22
  104:23 109:11
  110:6,12,13,15
  117:15
**looks** 31:12
  110:16

**loop** 51:24
**loss** 13:18,19
  13:22 14:7
  20:7 38:12
**lot** 51:21
**lots** 43:20
**lower** 44:15
**lumps** 98:11

**m**

**made** 21:17
  32:8 103:3
**maintained**
  18:7,16
**maintains**
  18:17
**maintenance**
  17:22,23,24
  18:2,3,5,14,20
  19:20 46:4,8
  46:14,17,18,21
  47:6
**majority** 46:12
**make** 7:3 8:12
  20:25 22:22
  24:23 41:16
  56:10 68:15
  80:4 81:15
  82:9,18,18
  93:3 94:22
  96:9 98:22
  106:20 112:2
  112:15
**makers** 85:11
**making** 17:12
  61:12

**[maloney - methodology]**                                    Page 19

| | | | |
|---|---|---|---|
| **maloney** 2:20 | 39:13 45:10,18 | **markets** 32:6 | **measure** 20:12 |
| **mame** 2:20 | 45:21 50:17,18 | **marriage** | 68:13 112:12 |
| **management** | 50:19,22 51:5 | 120:13 | 112:25 113:8 |
| 95:13,16 | 51:7,10,16,22 | **mass** 117:24 | 116:21 |
| **manner** 82:16 | 52:24 53:3 | **masse** 110:11 | **measurement** |
| 104:25 | 54:22 55:3,12 | **material** 18:9 | 85:24 86:9 |
| **march** 57:8 | 55:14,19,21 | 18:10,16 24:9 | **measuring** |
| 58:16 59:13 | 56:9,13,16,20 | 69:10 94:9 | 38:14 |
| 61:3 64:21 | 56:23 57:10,16 | 96:3 97:7,13 | **media** 4:13 |
| 65:5 91:14 | 57:20 58:12,13 | 97:19,21 98:3 | 40:7,11 75:18 |
| 97:11 100:10 | 58:19,21,24 | 99:9,17 101:6 | 75:22 119:17 |
| 101:4 102:11 | 59:4,7,10,25 | 107:2,18 108:7 | **meet** 5:12 |
| 102:13 103:25 | 60:2,4,7,15,23 | **materiality** | **meeting** 20:7 |
| 106:18 108:4 | 61:8,17,17,22 | 24:11 38:4 | **mention** 46:13 |
| 108:15 | 63:6,11,21,24 | 117:18,24 | 94:23 |
| **mark** 40:18 | 64:5,12,19,23 | **materially** | **mentioned** |
| **marked** 8:22 | 65:9,15,20,21 | 18:16 | 37:12 83:21 |
| 9:25 | 66:5,20,25 | **matter** 4:15 | **merger** 57:7 |
| **market** 12:16 | 67:5,11,12,14 | 5:16 16:15 | 110:17 |
| 12:17,21 13:3 | 67:15,21,23 | 67:11 95:16,21 | **merits** 13:20 |
| 13:5 17:7,9,17 | 68:2,4 69:9,13 | 100:6 110:12 | **messaging** 6:19 |
| 26:20 27:16 | 70:17,20 71:4 | 113:10 120:14 | **method** 31:18 |
| 28:16,20 29:13 | 72:2,15 73:15 | **matthew** 2:22 | 50:25 112:13 |
| 29:15,22,24 | 73:16,24 76:2 | 3:9 9:24 10:9 | 112:13 113:19 |
| 30:3,5,9,12,14 | 76:3,9,19 77:3 | **mccredo** 1:17 | 113:21,24 |
| 30:16,18,23 | 77:7,9,12,16,19 | 4:22 120:4,18 | **methodologies** |
| 31:13,19,22,24 | 78:2,5,13,23,24 | **mean** 16:16 | 13:7 15:2 |
| 32:4,17,18,21 | 78:25 79:3,13 | 20:25 24:21 | 32:20 34:23 |
| 32:22 33:3,11 | 81:2 85:11 | 26:8 30:11,25 | 63:14 90:14 |
| 33:13,13,17 | 86:16,17,25 | 59:5 79:22 | **methodology** |
| 34:7,18,24 | 87:5,10,15,17 | 82:8 | 28:23,24 33:3 |
| 35:2,5,8,16,24 | 87:22 88:7,14 | **means** 7:13 | 33:6,9,10,16 |
| 36:14,19,21 | 89:2,14 99:20 | 67:3 77:8 | 34:17 35:22 |
| 37:4,10,24 | 103:7,9 | **meant** 102:7 | 37:8 77:10 |
| 38:7,22 39:7 | | | 111:11,14,21 |

**[methodology - note]**                                          Page 20

112:7 114:17
114:19,24
115:7
**methods** 26:21
28:18 39:11
55:4 79:4
80:24 90:2
105:2
**miami** 2:14
**middle** 1:2 4:18
**mind** 98:25
**minutes** 39:20
39:21 101:9
118:20
**misleading**
14:23 15:11,12
18:23 20:3
21:18 22:14
23:3,6 24:15
24:16 31:17
49:8
**misrepresent...**
18:12 20:3
44:13
**misrepresent...**
18:24 21:13
24:8 44:23
45:17
**missing** 94:18
104:5
**misspoke** 76:23
**misstatement**
15:4 31:9
**misstatements**
94:9 96:4 97:7

97:13,20,22
98:3 99:10,18
101:6 107:3,18
108:8
**model** 80:17
**moment** 11:19
45:8 67:20
92:25
**moments** 67:9
**money** 66:12
**months** 99:14
**morgan** 38:13
**morning** 4:2
5:12
**move** 10:17,20
42:8 48:11
63:5 87:3
**moved** 10:15
51:11 87:2
**movement**
109:16 110:3
**moves** 82:3
101:22
**moving** 49:9,19
82:3
**multiple** 15:2,6
21:17 35:7

**n**

**n** 2:2 3:2 5:20
**name** 4:20 5:14
5:18,19 113:23
121:3
**narrow** 36:24
37:6

**narrower** 23:2
**narrowing**
22:14
**necessarily**
22:13 59:20
108:23
**need** 6:7 7:12
7:25 8:4,8,9
10:16 26:17
62:3 78:5,12
93:3 94:10
97:13 103:22
107:3 113:6
117:10
**needed** 66:7
88:23 89:12
103:6
**needs** 32:16
78:12 113:11
**negates** 56:8
**negative**
103:12
**neither** 13:12
59:18
**net** 17:11 66:10
66:12
**never** 26:7
**new** 1:18 4:21
5:8 30:21
51:11 57:16,17
57:21 58:3
69:6 70:3,12
70:15,22 78:6
79:8 81:13,17
81:19 82:13,20

82:24 87:8
91:4,23 92:2,5
97:18,19,21
98:4,8,21
99:18 100:21
100:23 101:16
102:3,5,12,20
103:25 104:15
106:11,13
108:2,9,12,16
109:2 120:5
**news** 59:15,17
60:19 62:22
79:22,23 90:21
91:4,23 92:3
92:11,15,17
94:14 98:4,6,7
99:24 102:8
103:18,23
105:7,18 106:6
106:12,13,19
108:10,16,20
109:12,12
110:10
**nomenclature**
79:21
**normal** 7:20
**north** 2:5
**notary** 1:17 5:7
120:5 121:25
122:19
**note** 4:5 59:23
59:24 86:3
103:9

**[noted - opinion]**                                                    Page 21

**noted**  5:2
  106:17 107:15
  122:9
**notes**  85:23
**notice**  1:15
**notification**
  95:13,23 97:4
  99:3,7
**november**
  95:11,12 96:12
  96:15,17,22
  97:3 99:4,11
  100:10,11
  102:10,23,24
  102:25 107:15
  107:16 108:19
**nt**  91:18 93:14
  100:12,15
  110:14
**ntqs**  98:12
**number**  4:19
  27:5 37:15,17
  38:19 41:23
  85:3,11 119:17

**o**

**o**  5:20
**oath**  7:5
**object**  18:25
  22:18 34:9
  40:22 41:13
  43:8 49:11
  56:15 66:6
  72:5 78:16,20
  83:18 84:4
  87:19 89:20

93:17 109:18
  110:4
**observation**
  48:22
**occur**  67:7
**occurred**  62:13
  65:5 114:2
**occurring**  58:6
  65:6
**occurs**  71:19
  114:8
**odds**  34:19
**offer**  25:15
  47:7,12 48:12
**offered**  25:13
  78:9 89:18
**offering**  14:14
  25:12,18 26:25
  27:8 29:8
  41:20,24 47:20
  47:23 55:11,14
  56:12,16,20,23
  112:6,10,17,21
  112:21
**offers**  25:14
**okay**  6:10,14
  6:18,21,24 7:9
  7:15 8:3,17 9:7
  9:15,19 10:5
  11:17,22 12:3
  12:7,25 14:13
  21:8,24 22:11
  23:10,18 24:13
  24:19 25:11,16
  26:4,15 27:4

28:5,12 29:11
  29:20 39:23
  41:4 42:20
  45:25 51:20
  57:25 59:9
  60:3,10,12
  62:7 74:9
  75:14,24 76:15
  83:7,25 85:20
  88:22 91:9,20
  92:7,18 93:21
  96:16,20 97:2
  97:15,23
  100:25 104:5
  105:22 106:16
  109:6 111:8,19
  111:25 114:22
  115:16,24
  116:7,23 117:4
  117:8,20 118:3
  118:6,12
  119:13
**omission**  18:8
  18:17
**omissions**  24:8
**omitted**  18:9
**once**  40:16 82:3
  97:20
**ongoing**  99:12
**open**  6:15
  10:21 11:14
**opine**  27:15
**opinion**  14:14
  15:24 22:20
  26:25 27:8

28:6,8,13 29:8
  35:13 40:24
  41:10,25 42:3
  42:10,21,22,25
  43:5,9,13,14,18
  43:19,24 44:3
  44:3,4 46:24
  47:20,23 48:3
  48:8,9,13 49:3
  49:4,10,12,12
  49:14,20,21,23
  49:24 50:24
  54:25 55:11,24
  56:2,5,12,16,20
  56:23 57:10,13
  59:3,8,10,14
  60:2,11,15
  64:17,20 66:3
  66:15 67:2,6
  67:19,25 69:6
  70:9,13 71:7
  71:10 72:6
  73:14,23 74:4
  74:12,15,23
  75:3,5,6,10
  76:3,18,22
  77:2,6,20,24,24
  78:14,18,21,22
  79:3 86:13,18
  87:14,20 88:2
  97:24 98:25
  99:14,22
  105:15,16
  107:24 108:15
  112:6,10,17,21

**[opinion - performing]**                                                Page 22

113:3,16
117:18
**opinions**  15:19
25:2,4,8,9,13
25:14,18,24
26:3,5,7,9,11
26:13 40:14,19
40:25 41:2,6,7
41:11,11,19,23
41:25 42:4,7
45:23 47:7,12
54:23 71:14
76:2 111:10
**opportunity**
66:11 114:12
**order**  77:15,16
89:13 119:9
**original**  41:21
**originally**
29:25 30:4
45:2
**ortega**  2:11
**outcome**  4:25
100:16 120:14
**outcomes**  96:7
**outside**  20:16
20:22 21:3
29:21 30:13,15
36:11 63:9
64:21 71:15
74:2,10 115:25
118:7
**overcome**
12:21

**overspeaking**
81:23
**own**  13:10,17
28:10,10 45:9
50:15 62:4,25
63:23 74:11
79:16
**owns**  29:18
50:3

**p**

**p**  2:2,2 5:20
**p.m.**  111:6
119:3,6,14,15
119:19
**pacific**  4:3
119:15
**page**  3:3,7 7:3
9:12,14,17
22:23 79:19
92:21,22,24
93:4 95:9,9
105:23 116:13
116:15
**pages**  122:5
**paid**  27:7 42:12
42:16,23 43:2
43:7,10,25
44:6
**paper**  11:18,19
11:20,21 12:9
36:17,18,22,25
38:3,9 78:8
83:12,16 84:3
84:6 85:10,23
86:15

**papers**  37:22
38:19,22
**paragraph**
12:11 25:22
26:18 27:5,11
27:12,18 29:5
40:15 42:11,14
42:17,18,21
43:13,13,13,14
44:25 47:14,15
47:17 48:12,14
48:16 50:11
64:4 66:2
68:20,21 69:2
69:25 70:24
71:15,16 74:13
75:3,5,11,13
85:3,5 90:24
91:10 93:24
97:6
**paragraphs**
25:23 26:10,13
40:17,20 41:18
41:22,24 42:3
42:5 43:4,12
**parameters**
106:10
**paraphrase**
68:21
**park**  1:8 4:17
15:21 76:20
**parlance**  83:23
**part**  19:14 31:3
32:25 36:7,8
38:10 42:21,25

47:5 51:25
52:16 68:19
75:12 80:5,6
81:17,22 83:4
84:24 90:21
91:3 106:8
**participants**
4:8
**particular**  15:8
85:7 111:22
114:9
**parties**  4:12
120:12
**party**  4:23
**passages**
104:17
**passing**  118:17
**pdb**  1:5 4:19
**peer**  26:21 55:4
74:21
**pending**  8:10
**people**  19:3
21:18
**perception**
80:13
**perform**  13:10
13:17 53:10,12
**performed**
27:23 46:8,25
47:4 62:12
86:19
**performing**
33:3 35:22
46:2

**[period - postulated]** Page 23

**period** 15:23,25
  17:3 44:10
  51:4 55:23
  56:3,4,14,18,22
  56:25 57:3
  59:5,6 61:7
  62:14 65:17,19
  65:24 67:24
  68:12,16 69:3
  71:6 72:4 74:2
  110:15 114:9
**periods** 66:18
**permit** 53:10
**perusing** 42:19
  93:5
**peter** 1:9 2:4
  5:14 69:16
  73:6 118:19
**petersh** 2:6
**pg** 121:8
**ph.d.** 1:15 3:4
  5:1,6 6:1 7:1
  8:1 9:1 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1

  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1
  100:1 101:1
  102:1 103:1
  104:1 105:1
  106:1 107:1
  108:1 109:1
  110:1 111:1
  112:1 113:1
  114:1 115:1
  116:1 117:1
  118:1 119:1
  121:5 122:13
**phone** 6:22
**phrase** 65:2
  89:6 113:22
**phrasing** 79:24
  79:25

**piece** 108:13
**place** 4:11 59:4
  110:18
**places** 110:8
**plaintiff** 2:3
  4:15 5:16
  14:21 15:3
  19:19,23 78:12
  78:14,23 88:15
  89:12,16
  112:10,22
  113:4 115:8,11
  115:13 116:3,4
  116:21,22
  117:13
**plaintiffs** 1:6
  10:8 12:19
  13:8 14:2 17:8
  19:24 20:5,8
  20:13,15,22
  21:4,14 27:7
  28:20 43:3,11
  44:8,12,14,16
  45:3,11,14,20
  46:3,7,19,22
  47:3,19 48:2
  48:19 50:24
  53:18 54:9,9
  55:16 67:8,16
  69:4 117:24
  118:9
**plane** 106:2
**plaza** 2:5
**please** 4:5 5:4
  5:17,24 7:7 8:3

**pocket** 20:11
  111:14,16
  112:7,13,13,19
  112:25 114:24
  115:7,13
  116:21
**point** 16:7,10
  45:12,13,15
  47:18,25 48:18
  48:21 50:8,11
  55:16 57:4,6
  59:21 67:13,15
  67:22 69:4
  77:19 84:24
  98:17 116:11
  116:17
**pointed** 107:5
  107:14,20
**pointing** 57:9
  97:5
**points** 12:2
  67:7
**position** 98:18
  99:21
**positive** 105:7
**possibility** 86:5
**possible** 31:20
  53:20 86:5
**post** 11:25 12:4
  12:5 110:14
**postulated**
  12:16 13:6
  28:20 58:12
  60:22 61:22

**[potential - prior]**                                                    Page 24

| | | | |
|---|---|---|---|
| **potential** 57:6 | **presumed** 51:7 | 21:23 22:3,6,7 | 82:24 84:21 |
| 58:21,24 59:3 | 51:15 | 22:12,15,24,24 | 85:9,12,16,23 |
| 88:11 94:3 | **presumption** | 23:4,7,12,13,15 | 86:7,8,14 87:2 |
| 95:14 96:23 | 28:15 33:17 | 23:23 36:6 | 87:3,6,7,14,20 |
| 108:22 | 35:24 36:15 | 38:3,6,11,15 | 87:22,25 88:18 |
| **potentially** | 37:10,25 39:7 | 42:10 43:18,22 | 88:23 89:13,16 |
| 62:18 65:13 | 77:17 78:24 | 44:9,12,14,21 | 90:17 92:10,14 |
| 78:10 92:8 | 86:17 87:17 | 44:25 45:4,5 | 92:16 94:15 |
| 105:7 | 88:15,25 89:14 | 45:12,16,20,23 | 103:12 104:11 |
| **practice** 19:7 | **pretty** 73:10 | 46:2,4,8,11,11 | 104:24 105:5 |
| **precise** 106:21 | **prevent** 18:12 | 46:14,17,18,21 | 105:12 107:7 |
| **predicted** | **prevents** 67:23 | 47:6,7,12,17,20 | 109:16 110:3 |
| 109:16 110:2 | 68:2,4,8 71:3 | 47:24 48:7,12 | 114:8 |
| **predicting** | 71:25 | 48:18 49:15,18 | **prices** 21:12 |
| 94:15 | **previously** | 50:5,9,19,21,21 | 27:6 30:20,21 |
| **predictive** | 22:17 60:17 | 50:25 51:6,11 | 42:12,15,23 |
| 38:17 | 93:10 94:2,11 | 51:16,25 52:18 | 43:2,6,10,25 |
| **preliminary** | 96:4,7 97:8 | 53:4,6,11,13,14 | 44:5 60:22 |
| 94:24 95:2,5,7 | 106:22 107:4 | 53:15,16,17,20 | 63:19,20 65:10 |
| **premise** 87:9 | 107:17 108:21 | 53:24 54:4 | 65:15 66:3 |
| **prepared** 25:15 | **price** 14:15,19 | 57:23 58:5,5 | 69:7,15 70:13 |
| **prerogative** | 14:21,22 15:3 | 58:10,11 59:14 | 76:21 77:4,7 |
| 79:16 | 15:7,9,10,14,16 | 60:18,21 61:4 | 77:18,22 79:20 |
| **present** 2:19 | 15:17,20,20,22 | 61:21 64:8,9 | 79:22,23 81:14 |
| **presented** | 15:25 16:7,10 | 65:7,9 66:8,18 | 81:22 82:6 |
| 88:11 | 16:14,16,18,19 | 66:24 67:3,4 | 83:2,5 85:13 |
| **presenting** | 16:21,22,24,24 | 68:11,13,13 | 86:21,23 88:17 |
| 88:20 | 17:2,6,10,14,20 | 69:10,14 70:4 | 101:23 105:12 |
| **press** 94:23 | 17:21,23,24,25 | 70:6,18,23 | 109:22 |
| 96:14,17,21 | 18:3,5,7,14,17 | 71:3,25 73:17 | **primary** 26:13 |
| 100:15 101:4 | 18:18,20,21,22 | 76:14 77:14 | 79:6 |
| 102:11,13,24 | 19:20,20,23,25 | 78:5,15 79:8 | **principles** 32:5 |
| 106:19 107:15 | 20:2,5,9,14,15 | 80:3,14,17 | **prior** 23:11 |
| **presume** 51:5 | 20:17,19,22,23 | 81:20,24,25 | 44:22 48:24 |
| | 21:5,6,10,19,22 | 82:3,3,4,15,21 | 49:2 55:23 |

**[prior - quoted]**

95:10 98:7
99:19 104:4
**probative** 85:8
87:7
**problem** 69:23
**proceed** 5:5
**process** 16:14
16:17,22,24
22:8 23:14
26:17 50:22
60:24 71:3,25
73:17 82:2,25
96:8 98:23
**processes** 98:24
**professing**
38:11
**profiles** 114:5
**profit** 81:15
82:18
**profits** 80:4
**program** 40:3
**pronounced**
19:8
**proof** 31:14,18
**properly** 95:16
**propose** 86:7
**proposed** 84:9
86:8 111:11
**proposes** 68:9
**proposing** 86:4
111:13,16
**propounded**
122:7
**prove** 104:9

**proves** 104:10
**provide** 9:21,22
24:25 25:7,24
26:2,19 27:14
55:2 105:13
109:13 113:12
116:2
**provided** 9:3,8
10:8 28:22
39:5 50:24
74:15 115:20
116:3,21
117:12,17,23
118:8
**provides**
111:12 113:8
**providing** 25:9
74:16 115:22
**pt** 1:16 119:19
**public** 1:17 5:7
30:19 31:9
51:12 57:14
58:8 69:11,13
70:16 76:13
79:8 80:2 81:5
81:13,16,19
82:14,20 87:8
98:5 101:20
108:3 120:5
121:25 122:19
**purchased** 51:8
51:9,17
**purport** 109:13
**purportedly**
47:19,25 48:19

**purports**
109:17
**purpose** 36:22
**purposely** 29:6
**purposes** 13:20
13:21 14:8,12
17:14,20 20:7
22:9 23:16,19
24:12 32:17
35:11,23 36:13
38:7 39:6
45:21 51:14
55:7 86:16
87:16 88:14,24
89:14 100:19
104:8
**pursuant** 1:15
47:4 50:11
**put** 18:11 23:24
30:8 31:16
43:17 65:17

**q**

**quality** 4:7,7
**question** 7:8,25
8:4,10 10:12
13:24 14:17
15:13,16,18
19:4 20:13,18
21:12,14 25:6
30:24 31:2,2
33:24,25 34:12
35:3 36:18
37:6,22 41:21
45:11 56:11
59:22 66:8

67:17 68:23
69:13 73:6,20
76:24 79:5
80:16 82:9
83:11,15 84:2
84:6 87:13
88:3,10 89:6
89:23 101:9
102:15 104:9
104:12,14
105:3 108:8,17
109:8 112:3
113:15 114:10
117:11
**questioning**
51:25 75:25
101:2 105:22
**questions** 12:10
24:2 30:15
34:3,24,25
35:8 38:6
55:10 63:8
69:18 73:21
82:5 93:2
106:4,18
111:10 118:15
118:22 119:7
122:7
**quick** 112:3
**quote** 62:16
87:6 90:5
**quoted** 78:8

**[r - relates]**                                                    Page 26

| r | | | |
|---|---|---|---|
| **r**  2:2 5:20,20,20 5:20 120:2 | 87:21,23 88:6 88:18,24 89:13 89:17 90:5,15 104:10 | **recommend** 25:18 | **reference**  85:22 |
| **rapid**  82:10,23 82:23 83:6 | **reacts**  87:6 | **record**  4:3,12 5:3,13,13,18 | **referred**  60:17 77:14 81:3 83:8,10 117:25 |
| **rapidly**  81:14 81:20 82:14,20 | **read**  1:9 8:2 22:25 31:9 41:22 64:15 | 10:25 11:3,6 11:10 12:8 39:18 40:2,5,6 | **referring**  23:23 33:8,9,15 84:13 |
| **rather**  88:17,17 111:21 | 93:25 94:12 95:10,12 96:11 119:11 121:8 | 40:10 41:14 73:4,12 75:15 75:16,21,24 | **refers**  81:5,25 |
| **rdw**  28:19 45:7 47:18,25 48:18 | 122:4 | 110:23,24 111:6,9 117:9 | **reflect**  105:14 |
| 48:21,22,25 49:6,6 50:10 | **reading**  22:25 48:15 | 119:2,6,9,14 120:9 | **reflected**  80:2 104:24 |
| 51:9,13 55:8 64:8 67:21 | **reads**  121:8 | **recorded**  1:14 4:10,13 | **reflects**  80:15 |
| 70:4 72:2 | **reaffirmation** 102:21,22 | **recording**  4:7 4:11 | **regarding** 12:15 13:4 35:14 84:20 |
| **rdw's**  75:6 | 108:21 | **redemption** 16:3,5,9,12 | 85:9 108:13 116:4 |
| **reach**  26:5 58:9 | **reality**  92:14,16 | 17:5,5 44:19 50:5 64:11 | **regardless** 89:22 90:14 |
| **reached**  25:25 | **really**  67:17 | **reduced**  15:15 | 105:6 |
| **reaching**  63:23 73:23 74:4 | **reason**  51:4 68:6 111:22 | **redwire**  1:8 4:16 47:8,12 | **regression** 90:11 |
| 75:3,5,10 | 121:8 | 47:21 48:7,13 49:9,18 52:19 | **reject**  86:10 |
| **react**  57:17 87:4 | **reasonable** 24:9 | 53:21 71:5 73:25 92:3 | **relate**  43:5,12 43:14,21 45:19 |
| **reacted**  87:3 90:6 104:11 | **reasonably** 32:12,15 | 93:25 94:2 101:4 121:3 | 82:5 |
| **reaction**  57:19 58:17 59:14,25 | **received**  95:13 96:23 | **redwire's**  94:10 107:4 | **related**  4:23 14:7 30:10 33:13 38:6 |
| 60:19,21 61:4 61:5 65:7 | **receives**  97:3 99:3 | **refer**  12:9 23:21 | 93:13 96:14 98:6 106:14,15 |
| **reactions**  65:9 | **receiving**  99:7 | | 110:10 120:11 |
| **reactivity** 84:21 85:12,16 | **recess**  11:8 40:8 75:19 | | **relates**  15:25 21:11 44:25 |
| 85:24 86:8,8 86:14,18 87:15 | 111:2 119:4 | | 71:19 76:10 |

**[relates - research]**

77:13 102:13
103:18
**relating** 13:2
15:24 35:8
45:23 73:14
96:17 102:8
103:14,24
104:17 105:18
107:24 108:4
108:10 111:10
**relationship**
101:19
**relative** 80:17
**relayed** 70:16
**release** 30:21
69:11 78:6
87:8 92:15
94:23 96:15,18
96:21 100:15
101:4,20
102:10,11,13
102:24 106:19
107:8,15
**released** 93:16
98:5 99:20
102:13 104:2
108:3
**relevant** 80:16
**reliable** 15:7
26:19 27:15
28:23 32:21
34:23 43:21
55:2 63:3
105:13 113:9

**reliably** 32:12
44:21 46:9
53:15 58:8
62:12 112:23
113:4,8
**reliance** 12:20
28:15 30:4
31:6,8,11
33:17 35:25
36:15 37:25
55:17 68:6
69:12 77:17
86:17 87:11,17
88:15 89:2
**relied** 37:7,16
39:10 51:15
54:4 62:9
**relies** 32:5
45:14 69:4
78:24 87:11
93:11
**rely** 32:15
33:12 34:22
37:18 39:9,14
51:6 83:16
101:16 113:20
**relying** 32:12
35:14 39:3
45:21 79:12
**remained** 64:10
**remember**
101:8 107:10
107:11,20
**remind** 12:6

**remote** 1:14
5:21
**remotely** 4:6
5:2
**removed** 57:20
58:18
**repeat** 34:11
**repeated** 7:25
**rephrase** 8:5
**report** 3:8,9
8:20 9:3,8,12
9:24 10:8,10
12:6,12,18
14:9,12 22:13
22:20 23:19,20
23:20 24:6,12
24:23 25:3,4,8
25:13,14,19,22
25:24 26:10
27:23 29:12
33:20,21 34:2
34:5,10 35:4
35:12 36:10
37:7,12,14
39:3 41:19,20
44:7,8 45:24
46:14,19,22
47:11 50:16
52:3,17 53:25
54:24 55:7,11
56:12 59:16
62:10,12,20
63:2 66:8,14
66:23 69:25
71:11,17,20,23

72:13 78:8
79:21 83:3
84:25 85:21,22
88:13,13 89:4
90:23 91:3
94:22 96:13
98:11 100:8,15
102:17 104:8
105:4 115:21
**reported** 95:16
95:21
**reporter** 1:17
4:22 5:4 7:11
7:17,18 8:2
120:4
**reports** 74:6,8
74:11
**represent** 9:10
95:4
**representation**
20:3
**representing**
4:20 52:12
**represents** 5:15
**request** 8:10
**require** 80:10
108:23
**required** 51:3
88:16 112:12
**requirement**
30:3
**requires**
111:23
**research** 85:8
85:10

**reside** 74:23
**resolve** 57:22
**resolved** 94:4
  106:23
**respect** 57:13
  63:18
**respond** 12:14
  12:19,23
**responding** 7:8
**response** 41:24
  63:19 68:22
  69:2 101:11
**responses** 36:6
**rest** 45:24
  67:24
**restate** 76:24
**restatement**
  108:24
**restatements**
  94:10 96:4
  97:8,14 98:4
  99:10,18 101:7
  107:3,19 108:8
**results** 32:9
  94:25 95:3,5,7
  108:2
**retained** 9:20
  9:22 10:11
  12:13 119:18
**retickered** 48:7
  48:22 49:6
  50:2,10 51:19
**retickering**
  45:7,9,13 49:2
  67:21 114:3

**revealed** 44:15
  46:9 79:9
**reveals** 45:9
**revelation**
  104:21
**revert** 82:4
**review** 12:14
  37:20 40:17,18
  41:18 42:18
  91:21 93:3
  94:5 106:9,25
**reviewed** 26:21
  74:21 100:3
**reviewing**
  99:23,25
**right** 10:11
  11:12,15 12:17
  14:16 16:3,6,9
  16:12 17:5,6
  18:13 21:14
  24:20 30:24
  31:6,11 32:6
  32:11 37:19
  41:12 44:19
  46:15 49:12
  50:7 53:4
  54:20 55:20
  59:13 61:14
  64:11 66:10
  70:14 74:20
  76:22 77:5
  84:21 86:20
  96:24 100:20
  102:17 104:13
  104:15 106:21

108:24 110:3,9
  118:23
**rigorous** 59:17
**risk** 114:5
**role** 30:19 38:5
  38:10,13,16
**rooms** 118:21
**roper** 1:14 3:4
  3:8 4:14 5:1,6
  5:12,19,20 6:1
  7:1 8:1,21 9:1
  10:1 11:1,12
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1,13
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1
  74:1 75:1,24
  76:1 77:1 78:1

78:11 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1,12 90:1
  91:1 92:1 93:1
  93:7 94:1 95:1
  96:1 97:1 98:1
  99:1 100:1
  101:1 102:1
  103:1 104:1
  105:1 106:1
  107:1 108:1
  109:1 110:1
  111:1,8 112:1
  113:1 114:1,23
  115:1 116:1
  117:1 118:1,15
  119:1,17 121:5
  122:13
**rough** 111:3
  119:10
**routine** 13:7
  53:8
**rubin** 2:11
**rule** 31:4
**rules** 7:2
**run** 59:25

**s**

**s** 2:2
**saha** 38:9
**sake** 5:13 73:12
**saying** 15:16
  53:19 55:18
  78:3 98:6

**[saying - show]** Page 29

109:24
**says** 11:25
12:18 32:16,20
32:21,23 49:3
66:14 68:18
90:9,18 95:12
96:2 97:6,11
98:8,10,13
99:4,6,11
100:13 104:10
104:10 105:4
**scenario** 90:17
**scholars** 30:4
**scope** 26:11
44:2
**screen** 4:10 6:6
6:11 10:16
**screens** 6:13
**second** 10:13
10:23 11:2
37:20 51:23
57:24 60:13
63:6,19 84:25
93:24 116:15
117:6
**section** 25:21
31:4 62:11
**securities** 12:15
13:5 18:6 19:6
19:12,19,22
20:20 22:2
29:21 31:25
34:7,19 35:6,9
35:16,25 36:15
37:11,25 54:12

54:15 73:25
85:25 89:15
95:22 113:2
114:5,25 115:8
115:11 116:5
116:19,24
117:2,13,17
118:10
**security** 13:8
21:12 27:6
42:12,15,23
43:2,6,10,25
44:5 48:24
49:3 71:5 72:3
114:9 115:14
115:15
**see** 6:4,6 7:24
10:16,23 23:25
58:5 64:13
69:10 71:7
89:8 92:21
94:12 105:24
105:25,25
118:22
**seeing** 48:14
**seen** 4:9 19:24
20:5,8,13,15,21
21:4
**selected** 13:25
**selection** 36:8,9
36:12
**semi** 81:2,12
84:6,8,10,11
**send** 119:11

**senior** 95:13
**sense** 22:6 23:2
23:12
**sentence** 29:4
40:25 41:10
48:16 64:8
70:25 71:19
72:13 96:2
**separate** 10:21
11:14 49:23
54:12 62:8,9
62:25 63:23
75:9 105:21
109:9 114:5
**separately**
54:11,14
100:15 114:4
**september** 48:5
49:16 51:9,9
60:14,17,19
63:11,25 64:22
65:6,7 67:20
68:17,17
**serving** 115:14
**set** 25:2,8 50:14
120:8
**seven** 62:13,21
62:23
**several** 91:11
**shaeffer** 2:4 3:4
5:11,14 9:2
10:4 11:3,11
19:5 22:21
34:13 39:16,22
40:12 41:3,15

43:16 49:13
56:19 66:21
69:18,21,24
72:9 73:11
75:14,23 78:17
79:18 83:24
84:19 88:8
90:19 93:20
109:23 110:23
111:3,7 118:14
118:25
**shaking** 7:14
**shapiro** 2:4
**share** 10:7,17
10:19 15:20
20:11 50:3
51:17 64:8,9
66:3,8 76:21
77:4,22 113:9
**shares** 45:7
48:4 50:9
51:10 64:17,18
**sheet** 121:2
122:10
**shift** 23:25 24:4
54:21
**shifting** 90:22
**shine** 59:21,23
**shorthand**
120:4
**show** 14:21
15:9,14,14,16
76:20 77:4,6
77:16,17,21
78:15 88:16,18

**[show - stock]**                                                    Page 30

88:23 89:13,16
**showed**  52:22
**showing**  15:17
**shown**  32:9
  65:13 101:19
  109:3 112:22
  113:4
**shows**  104:10
**shutts**  2:12
**shutts.com**
  2:14,15,15,16
  2:16
**sic**  76:21 84:7
  92:25 107:4
**side**  117:24
**signature**  9:16
  120:16 121:20
**significance**
  52:4,18,23,25
  53:6
**similar**  7:14
  30:14 63:7
  72:16 84:13
  108:18
**similarly**  1:4
**simply**  32:19
  48:3 51:15
  68:17 72:12
  87:2
**single**  90:8
**sit**  73:19 109:5
**sitting**  103:21
  108:2 113:23
**situated**  1:5
  53:11

**situation**  18:7
  70:15,21 89:11
**size**  85:10
**slightly**  7:20
  25:5 109:7
**slower**  7:20
**sobol**  2:4
**solve**  68:3,5
**sorry**  19:9
  24:21 34:11
  57:25 72:10
  76:23 85:4
  89:5 104:6
  115:12 119:15
**sort**  24:4 54:14
  60:13 66:22
  67:20 82:19
  86:9
**sounds**  39:19
**source**  33:25
**sources**  33:20
  33:21 34:5,10
  34:22 35:7
**south**  2:13
**spac**  54:12
**speak**  7:19
**speaks**  33:20
  69:2
**specific**  15:18
  19:4 33:24
  34:10 37:21,23
  68:6 71:10
  72:12 75:6
  84:24 93:2
  100:17 102:15

111:20 114:6
**specifically**
  12:23 34:6
  37:8 46:13
  54:23 62:22
  64:16 70:25
  79:25 92:2
  93:12
**specifics**  44:4
**specified**
  112:11
**speculating**
  73:2
**spell**  5:17
**spread**  85:11
**stage**  39:8
**standard**  68:10
  88:4,5 89:22
**start**  26:18
  44:9 61:2
  76:20
**started**  101:2
  106:17
**starting**  27:12
  40:14 64:21,22
**starts**  25:22
  42:2 50:15
**state**  1:18 5:8
  5:17 86:4
  117:7 120:5
**stated**  22:4
  96:22 100:8
**statement**
  15:11,12 34:21
  68:15 90:8

103:3,5,6
  106:12
**statements**
  14:24 21:16
  24:15 49:8
  94:11 96:5
  97:8 107:4
  109:4
**states**  1:2 4:18
**statistical**  52:3
  52:17,23,25
  53:5
**status**  110:17
**stay**  64:5 82:4
**stenographic**
  5:3
**steps**  91:11
  106:5
**sterling**  116:17
**sticker**  45:5
**stipulates**
  12:18
**stock**  15:21
  16:2,5 17:3,6,7
  17:18 21:19
  22:15 23:4
  36:6 44:18,20
  46:11 47:8,12
  47:21 48:13
  49:9,19 50:10
  50:13 52:19
  53:13,14,20,21
  55:9,12,14,19
  55:21,25 56:5
  56:13,17,21,24

**[stock - take]**                                                                 Page 31

57:10,23 58:4
58:5,10,11,20
59:6,11 60:7
60:16,18,20
61:4,21 64:24
66:18,24 67:3
67:4 69:7,10
70:13,18,23
76:14 77:7,13
77:18 78:4,5
78:15,25 79:2
79:8,22,23
80:2,14 81:14
81:20,21,24
82:15,21,24
83:2,5 84:20
85:12,13,16,23
86:7,8,14 87:2
87:3,5,7,14,20
87:22 88:17,18
88:23 89:13,16
90:17 92:10,14
92:16 94:15
103:12 104:11
104:24 105:5
105:12,12
107:7 109:16
110:2
**stock's** 56:3
**stocked** 87:25
**stocks** 87:25
**stops** 42:2
**strengths** 77:12
**strictest** 31:7

**strike** 33:7 42:7
52:4 60:25
70:10 76:16
80:11 81:18
83:14
**strong** 81:2,12
84:6,8,10,11
**studies** 35:15
38:5,10,14,23
84:8
**study** 13:11
35:11,13,22,23
36:2,9,11,13
37:23 38:17
39:2,6,12 58:8
62:5,9,12,21,25
63:3,23 65:4
75:9,10,13
89:4,18,22,24
90:2,14 102:7
105:17 106:5,8
109:9,11
**style** 68:9
**subject** 21:10
100:6,17,18,20
100:23,24
110:12
**subjective**
62:15 110:16
110:17
**subjectivity**
90:12 100:9
**subscribed**
121:21 122:15

**subsequent**
51:2
**subsequently**
50:16
**substance**
122:9
**substantially**
51:11
**subunit** 94:4
96:24
**sudden** 108:19
**suggest** 25:12
25:17 45:3
**suggested** 17:9
58:11 101:23
**suggesting**
110:20
**suggestive**
65:20
**suggests** 103:10
114:7
**suite** 2:5,13
**suited** 29:6
**summarizes**
68:21
**summary** 25:24
26:2,9 40:14
41:6 42:4,6
43:5 71:14,16
109:13,25
**support** 42:22
71:10 74:12,15
**supported** 85:8
**supports** 71:24

**supposed** 10:16
74:23 100:6
105:10 109:21
**sure** 7:3 10:14
11:5 20:25
22:22 34:4
41:16 56:10
69:20,20 82:9
84:22 85:4
93:4,23 96:9
98:22 106:21
112:15 117:21
118:25
**surrounding**
84:16
**survive** 90:14
**swear** 5:4
**sworn** 5:7
120:8 121:21
122:15
**synonymous**
84:12
**synonymously**
81:7
**system** 5:22
6:19

**t**

**t** 120:2,2
**table** 65:18
**take** 4:11 8:8
37:20 39:17
40:5 57:20
58:15 68:11
69:19 73:21
75:14 89:9

**[take - time]**                                                        Page 32

92:25 93:3
102:17 111:3
118:20
**taken**  1:15 4:14
11:8 17:4 40:8
75:19 111:2
119:4
**talk**  93:22
118:21
**talking**  14:18
14:19 21:9
54:5 103:14,17
107:25
**tanzanian**
117:19 118:4
**team**  118:24
**tease**  24:2
**technology**  4:6
10:12
**tell**  118:23
**ten**  39:20
**term**  17:24,25
21:6,22 22:7
22:23 23:6,13
80:9,12 83:22
111:20
**terminology**
82:22
**terms**  17:19
22:23 23:17
59:10
**test**  60:8 76:12
85:12 86:18
87:21 90:4

**testable**  70:16
70:19 76:9
87:21
**tested**  77:11
**testified**  5:9
20:21 22:17
32:25 41:9,12
41:14 115:10
116:20
**testify**  8:14
**testimony**  9:21
9:23 23:11
28:17 29:3
31:3,21 32:3
34:16,21 38:25
41:5,8 42:5
46:20 47:16
54:17 55:8
62:24 63:22
67:25 68:22
71:21 72:4
75:8 76:7,8
103:21 104:4
112:16 115:23
116:2,3,16
117:12,23
118:9,13
119:16 120:10
**tests**  84:7,16
86:22,25 87:21
87:23
**thank**  73:9
89:10 115:18
117:4 118:19
119:8,12

**thanks**  19:9
**theory**  12:17,22
17:22,23,25
18:2,3,4,5,14
18:15,20 19:20
28:16 29:13,15
29:19,22,25
30:2,9,12,14,17
30:18,23 31:13
31:20,23,24
32:5,18,22
33:11 34:7,18
35:2,5,16,24
36:14,20 37:24
38:21 45:14,21
46:4,4,7,9,14
46:17,18,21,23
46:25 47:2,6
47:20 48:2,20
51:7 55:16
58:12,13 60:23
63:21 65:9
66:20 67:8,16
67:23 68:3,4
69:4 70:20
71:4 72:16
73:15,24 76:9
76:19 77:3,12
77:17 78:13
79:15,17 87:10
89:2
**things**  17:3
**think**  10:19,20
12:8 15:13,15
17:2 23:22

25:21,22 26:16
39:22 42:7,8
65:2 68:21
69:19 73:9
74:5 76:8,23
87:13 93:22
103:7 114:10
117:6 118:15
**thinking**  23:7
30:5 38:5
69:12
**thompson**  2:3
**thorough**  94:5
106:24 108:6
**thought**  98:23
98:24
**three**  52:8,10
52:13,14
119:18
**thrust**  101:15
**tick**  41:22
**tickered**  54:15
114:5
**tie**  68:25
**time**  4:3 11:7
11:10 39:24
40:6,10 45:15
47:18,25 48:18
48:21,25 49:5
49:25 50:8,11
50:14 51:18
52:14 55:16,22
57:7 59:16,24
60:6 66:11,18
67:7,10,13,16

**[time - unexpected]**                                                          Page 33

67:20,22 68:14
69:4,16 71:5
72:3 74:2
75:17,21 83:22
93:3 95:2,5
102:17 103:3
110:25 111:6
114:3 119:3,6
119:15,19
**times**  81:3
**timing**  95:23
106:7
**tjc**  1:5 4:19
**today**  5:22 7:11
8:15 73:19
103:22 108:2
109:5 113:23
118:16
**today's**  119:16
**together**  97:17
98:11 99:13
**took**  46:7 59:4
106:5
**top**  27:12
**topic**  14:7
106:14,15
107:24
**topics**  90:22
**total**  119:17
**touch**  67:18
**trade**  16:19
17:12 66:9,10
66:12 80:3
81:15 82:17

**traded**  12:15
13:5 28:19
46:12 48:4
64:11,18 66:4
66:13,16,24
67:3,5 77:7,9
77:18 78:4,25
79:2
**traders**  16:19
**trades**  44:20
50:5 66:18
**trading**  16:20
44:19 50:15,16
55:25 56:3
57:5 59:6 60:7
64:11 66:5
70:5,6
**transaction**
14:5 17:11
66:9,11 67:4
**transcribing**
7:12
**transcript**
119:11 121:2
**transcription**
122:6
**transferred**
45:6
**transmitted**
54:10
**true**  53:18
80:15 120:9
**truth**  18:22
19:25 44:15

**truthfully**  8:14
**try**  8:12 53:11
54:23 112:2
**trying**  19:23
23:22 24:3
26:10 28:25
29:2 34:15
44:2 98:19,21
101:25,25
104:6
**tuck**  2:10
**turn**  37:15,16
95:9
**two**  6:13 10:20
50:5,17,18
54:11,14 57:13
57:14 68:3
97:17 99:25
100:3 103:4
109:3 110:8
114:4
**type**  7:18
110:19
**typically**  38:11

---

**u**

---

**unable**  41:18
**unassociated**
69:11
**uncertainty**
57:22
**uncited**  72:7
**under**  7:5
12:16 18:14
28:15 31:4,7
44:13 46:4

48:2,19 60:22
63:20 69:12
76:5 84:9
110:11 113:24
116:16
**understand**
6:25 7:4 8:4
21:2,22 23:8,9
23:23 26:11
34:16 36:25
37:5 44:2
71:18 77:15,19
88:19 98:17,19
98:23 101:24
102:2 105:16
105:19 112:16
117:10
**understanding**
18:4 31:4
80:12 81:8,10
81:11 82:11
86:6,10 94:19
**understood**
30:6 86:14
**unexpected**
30:22 51:12
57:16,17,21
58:3 69:7 70:4
70:12,15,22
79:8 81:13,17
81:19 82:13,20
82:24 91:23
92:2,6,8 97:18
98:4,8,22
99:19 101:16

**[unexpected - wondering]**

102:4,5,12,20
103:25 104:16
106:11,13
108:3,9,16
109:2
**unique** 16:4,14
20:19 22:10
53:9,23 54:9
72:19 114:21
**uniquely** 53:10
**unit** 4:13 40:7
40:11 75:18,22
95:15
**united** 1:2 4:18
**unquote** 62:16
87:6
**unreliable**
62:18
**unsupported**
72:6,7,8
**update** 96:7
**use** 9:4,9 12:9
20:13 22:6,8
22:23 33:10
34:17 35:14
37:9 38:17
46:16,17 68:10
68:11 79:20
84:17 111:13
111:16,20
112:12,23
**used** 18:6 20:11
28:23 38:24
81:6 82:22
84:7 85:18

111:17,24
112:7,19
114:16,19
119:17
**useful** 28:24
29:3
**using** 4:6 5:21
13:7 20:11
21:6 23:12
26:20 36:13
55:3 58:8
115:6

**v**

**v** 1:7 116:18
121:3
**vague** 14:17
84:22
**value** 50:5
57:23 66:12
80:15,18
**variety** 115:4
**various** 39:13
**vast** 46:11
**verbal** 7:13
**veritext** 4:20,22
119:18
**vernacular**
83:23
**versus** 4:16
**vi.e.** 62:11
**video** 1:14 4:11
4:13 5:21
**videoconfere...**
1:15 2:2

**videographer**
2:23 4:2,21
11:6,9 40:4,9
75:16,20
110:24 111:5
119:2,5,13
**view** 16:7,11
97:25 99:2
108:12
**villanueva**
85:18,21 86:7
86:11,15,19
90:9
**virtual** 4:6
**vitae** 116:16
**voluntarily**
95:21

**w**

**w** 5:20
**wait** 7:7 73:5
**walk** 49:24
**want** 7:2,18
10:25 12:9
17:16 20:25
22:22 24:4
30:8 37:15,20
39:20 40:13
41:16 42:9
51:21,24 54:21
54:24 56:10
61:5 63:5 64:4
64:5 67:18
69:21 75:25
78:3 82:8
92:19 93:3

96:9 98:22
105:21 106:20
109:8 111:9
112:15 114:11
115:17 118:14
**wanted** 90:20
**wants** 79:4,14
88:5
**way** 11:24 15:9
15:13 16:15
21:6 22:8 49:6
49:7 60:5 65:2
70:2 73:2,20
76:17 79:24
87:4 109:3
113:22 117:22
120:13
**ways** 14:21
15:6,7 21:17
**we've** 39:16
73:10 108:15
**whitman**
116:18
**wide** 13:7
111:15 112:8
112:20
**william** 1:9
**window** 6:6
**windows** 10:21
**witness** 3:3 4:9
5:4,6 39:25
119:8,10 120:7
120:10
**wondering**
48:12

**[word - zoom]**                                                   Page 35

**word**  7:19 12:5
  46:16
**words**  46:17
  81:6 84:18
  108:18,18
**work**  7:22 8:11
  8:12
**world**  108:25
**wrap**  69:22
  74:24
**write**  26:19
  27:5,12 29:4,5
  42:10,14 47:16
  64:8 70:3 85:6
**wrote**  26:23
  64:13 70:7

**x**

**x**  1:3,11 3:2
**xu**  2:21

**y**

**y**  5:20
**yeah**  11:5
  34:14 54:6
  76:25 85:4
  89:8 115:18
**year**  100:22
**york**  1:18 4:21
  5:8 120:5
**yup**  118:25

**z**

**zacherl**  2:10
  11:5 18:25
  22:18 34:9
  39:19,23 40:22

41:13 43:8
49:11 56:15
66:6 69:16,20
69:23 72:5
73:4 78:16,20
83:18 84:4
87:19 89:20
93:17 109:18
110:4 118:19
119:7
**zoom**  6:20 73:8

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.