**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| JED LEMEN, Individually and on Behalf of All Others Similarly Situated, | Case No.: 3:21-CV-1254-TJC-PDB |
| Plaintiffs, | CLASS ACTION |
| v. | **DEFENDANTS' RESPONSE IN OPPOSITION TO LEAD PLAINTIFF'S DAUBERT MOTION TO EXCLUDE THE OPINIONS OF EXPERT DR. ANDREW H. ROPER** |
| REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ, | |
| Defendants. | July 30, 2024 |

REDWIRE CORPORATION ("Redwire"), PETER CANNITO, and

WILLIAM READ ("Defendants") oppose Lead Plaintiff JARED THOMPSON's

("LP") *Daubert Motion to Exclude the Opinions of Andrew H. Roper* (Doc. 161)

(the "Motion").  The Court should deny the Motion as Dr. Roper's opinions are

admissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## I.    ARGUMENT

Dr. Roper's report and testimony are derived from, and, supported by the

field of economics. Indeed, the Motion appears to argue that the Court should

exclude Dr. Roper's opinions for being *too* scientific. The Motion argues that

Dr. Roper's opinions, and the *Daubert* standard of admission, should be strictly

cabined by LP and Dr. Cain's narrow recitations of what they unilaterally deem to be the applicable legal standards.

The Court's gatekeeping function under *Daubert*, however, ensures that an expert employ "in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That is precisely what Dr. Roper does. While Dr. Cain admittedly relies on his interpretation of legal standards rather than his scientific field to render his opinions, (*see* Doc. 136), Dr. Roper renders opinions supported by the applicable field of economics. As such, Dr. Roper's opinions are relevant, reliable, and, therefore, admissible.

### A.    Dr. Roper's Opinions are Relevant

LP argues that Dr. Roper's <u>market efficiency</u> and <u>damages</u> opinions are irrelevant. Under *Daubert,* relevance is met where "the proposed expert testimony is relevant to the task at hand .. i.e., that it logically advances a material aspect of the proposing party's case," *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (quotation omitted), and, has an appropriate "fit" between the offered opinion and case facts, and a "justified scientific relationship to the pertinent facts." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004). Dr. Roper's opinions are relevant as to both.

### *1.    Dr. Roper's Market Efficiency Opinions are Relevant*

The Motion argues that Dr. Roper's market efficiency opinions are irrelevant based on an overly restrictive application of judicially-created tests and asks the Court to ignore applicable economic research. This contradicts operative Eleventh Circuit directive. *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1254-58 (11th Cir. 2014).

The *Regions* Court addressed the task of finding market efficiency in order to establish the *Basic* presumption and declined to adopt a "mandatory analytical framework". *Id.* at 1254-58. Instead, *Regions* gave courts "the flexibility to make the fact-intensive inquiry on a case-by-case basis." *Id.* Such flexibility "allow[s] District Courts in the future to consider new factors yet unknown to this Court that market theorists might consider to indicate market efficiency." *Id.* at 1254-55. The court noted that there are "general signs of an efficient market" that may be helpful to consider, and approved, but did not require, application of the *Cammer* factors. *Id.* at 1255. Accordingly, binding Eleventh Circuit precedent does not require district courts to apply narrow checklists to analyze market efficiency, but rather invites them to consider developments in economic theories and the specifics of each case. *See id.*

Dr. Roper's opinions on market efficiency—discussed in more detail below—are thus appropriately drawn from contemporary economic theories and facts unique to this case.  Yet, LP asks this Court to ignore the *Regions*

3

mandate and instead perform a perfunctory review of judicial factors alone.

The Court must reject LP's approach. Dr. Roper's market efficiency opinions

are relevant to the task at hand and have a justified scientific relationship to

the facts. *See Daubert*, 43 F.3d at 1315; *McDowel*, 392 F.3d at 1299.

### a.    Directional Hypothesis

The Motion takes issue with Dr. Roper's opinion that Dr. Cain's event

study is flawed because it failed to employ a "directional hypothesis."[1] Mot., pp.

6-9. The Motion's arguments are misplaced.

The Motion parses the language of *Halliburton Co. v. Erica P. John

Fund, Inc.*, 573 U.S. 258 (2014), to argue that Dr. Roper's opinions are

irrelevant by seeking to hold Dr. Cain to a standard that exceeds judicial

requirements. Mot., pp. 8-9. This misses the point. Dr. Roper's opinion is

relevant because it provides the Court a tool to assess the weight and

credibility of Dr. Cain's conclusions on market efficiency.

Other courts have recognized that an event study's utilization of a

directional hypothesis is relevant to an expert's market efficiency opinions. In

*Bell v. Ascendant Sols., Inc.*, the court struck an expert's testimony, in part,

because his methodology did not include such analysis. No. CIV.A.

---

[1] A directional hypothesis is where the researcher "objectively specif[ies] whether the
unexpected new information is expected to cause prices to increase, decrease, or stay the
same." *Expert Report tof Andrew H. Roper* (Doc. 129-5) ("Roper Rep."), ¶ 155.

4

301CV0166N, 2004 WL 1490009, at *4 (N.D. Tex. July 1, 2004). The court explained the expert's method of testing efficiency "while able to reflect responsiveness to new information, [] cannot determine whether changes in stock price are unbiased, a central requirement of market efficiency theory." *Id*. This is because "[t]he very purpose of requiring market efficiency before applying the fraud-on-the-market presumption is severely *undercut by ignoring the direction of price movement in response to new information.*" *Id*. (emphasis added). Akin to what Dr. Roper has stated here, Roper Rep., ¶ 124, the *Bell* Court continued that "if stock price is inversely related to the content of new information (for example, stock price decreases upon the announcement of good news, and increases on the announcement of bad news), a plaintiff class cannot be presumed to have relied upon positive statements in purchasing stock." 2004 WL 1490009 at *4. The expert's failure to assess such directional movement was, in part, reason for striking the testimony. *Id*.

Likewise, in *Petrie v. Elec. Game Card, Inc.*, the court found that the "lack of evidence about the direction of the price impact is…relevant to how much weight the study is given." 308 F.R.D. 336, 355 (C.D. Cal. 2015) (event study tests, not utilizing a directional hypothesis, were "not very helpful").

Moreover, neither *Halliburton*, nor any cases cited in the Motion, deem a defendant's criticism of a plaintiff expert's market efficiency analysis (for failure to employ a directional hypothesis) irrelevant under *Daubert*. In

*Halliburton*, the Court stated that the *Basic* presumption does not reflect "the degree to which an investor can earn an abnormal, above-market return by trading on such information." *Id.* at 271. That *Halliburton* declined to "enter the fray" of this academic debate, does not preclude Defendants from presenting, and the Court considering, Dr. Roper's opinion, based in economics, that Dr. Cain failed to establish market efficiency. The *Halliburton* Court recognized that market efficiency "is a matter of degree and accordingly made it a matter of proof," *id.* at 272, which is what Defendants challenge here.

The Motion then incorrectly asserts that *Regions* endorses event studies without a directional hypothesis. Mot., p. 8. That case was silent as to whether evidence of efficient adjustment is required. Rather, it merely outlined "some" efficient market features while leaving the remainder of the analysis largely open to the district courts. 762 F.3d at 1255. As noted, *Regions* encourages a broad review of applicable science not limited by judicial preference. *Id.*, at 1254-56. That is precisely what Dr. Roper does—his opinion on directional hypothesis is derived from scientific source. Roper Rep., ¶¶ 122-31.

None of the LP's remaining caselaw resulted in exclusion of an expert for relevance due to criticizing the opposing expert's failure to use a directional hypothesis. *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 514 (D. Minn. 2015); *Willis v. Big Lots, Inc.*, 2017 WL 1074048, at *3-4 (S.D. Ohio Mar. 17, 2017); *In re Teva Sec. Litig.*, 2021 WL 872156, at *2 (D. Conn. Mar. 9, 2021);

*Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *1 (S.D. Fla. Mar. 16, 2016); *In re Netbank*, 259 F.R.D. 656, 662 (N.D. Ga. 2009).

In finding a directionally hypothesis unnecessary, the courts in *Willis* and *In re Teva* considered that such analysis would have little effect on the outcome of the event study in the circumstances of those cases. *Willis*, 2017 WL 1074048, at *5; *In re Teva*, 2021 WL 872156, at *29. By contrast, here, Dr. Roper found the outcome of Dr. Cain's event study *is affected*, because when a directional hypothesis is applied only two of Dr. Cain's seven "key" communications are consistent with efficient adjustments in price, and, certain dates selected by Dr. Cain indicate market *in*efficiency. Roper Rep., ¶ 181.

Finally, neither *Thorpe v. Walter Inv. Mgmt., Corp.*, nor *In re Netbank, Inc. Sec. Litig.*, directly addressed the issue of a directional hypothesis. *Thorpe* found the expert's study was "undisputed," 2016 WL 4006661, at *13, and *In re Netbank* declined to "engage in the parties' battle of the experts at the class certification stage," 259 F.R.D. at 674. LP's caselaw is thus distinguishable

Here, Dr. Roper points out that Dr. Cain failed to engage in this analysis and, therefore, concludes based on appropriate scientific authority that Dr. Cain's conclusions are unreliable. Roper Rep., ¶¶ 155-58. Therefore, Dr. Roper's observations and conclusions are relevant as they have a valid scientific connection to the disputed facts in the case and are admissible under *Daubert*. 43 F.3d at 1315, *McDowel*, 392 F.3d at 1299.

b.     Certain *Cammer, Krogman,* and Other Factors[2]

LP next argues that Dr. Roper's opinions as to the inapplicability of *Cammer* factors 3 and 4, the *Krogman* factors, and other factors, are irrelevant. Mot., p. 9. These arguments also fail.

Dr. Roper opines that *Cammer* factors 3 (market makers) and 4 (SEC Form S-3 Filing Eligibility), all three of the *Krogman* factors (market capitalization, bid-ask spread, and public float), and the additional factor of institutional ownership, are unreliable factors of market efficiency. Roper Rep., Fig. 5, ¶¶ 80-81. Dr. Roper bases these opinions on economic literature and methods commonly accepted by the field of economics, and, concludes Dr. Cain's finding of market efficiency is improper based on his mistaken reliance on such factors. *Id.,* ¶ 82; *Dep. of Andrew Roper, Ph.D.* (Doc. 162-2) ("Roper Dep."), at 27:11-29:3 61:16-23; 63:5-14.

The Motion is devoid of contrary economic authority disputing Dr. Roper's opinions. Instead, LP points to various cases that have recognized these factors in piecemeal fashion. Mot., p. 10. But therein lies the issue—the Motion fails to argue (much less establish) that Dr. Roper's opinions are inconsistent with economic theory so as to render them unhelpful. As Dr. Roper's scientific conclusions are within the broad scope of analysis permitted

---

[2] While the Motion lumps these factors into the directional hypothesis section (Mot., p. 9), it is unclear how LP's arguments as to directional hypotheses applies to these other factors.

8

under *Regions*, the Court may properly consider such critique in assessment of Dr. Cain's conclusions—rendering them admissible under *Daubert*.

Illustrative of Dr. Roper's point is that courts have adapted application of the judicially crafted *Cammer* factor 3 (market makers) to accommodate for developments in the economic field. In *O'Neil v. Appel*, the court recognized that "[t]he economic literature has criticized reliance upon the number of market makers as an indicator of efficiency."[3] 165 F.R.D. 479, 502 (W.D. Mich. 1996). Stating, "the mere number of market makers, without much more information, is not a very important indicia of market efficiency," and it "does not contribute to a finding of efficiency in the present case." *Id.*  Nor is the *O'Neil* court alone. *See, e.g., Unger v. Amedisys Inc.*, 401 F.3d 316, 324 (5th Cir. 2005) (collecting cases and citing the Barber study; finding "the mere number of market makers, without further analysis, has little to do with market efficiency"); *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 422 (D. Utah 1998) ("evidence of the number of market makers, without more, does not weigh in favor of a finding of an efficient market"); *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 304 (S.D. Tex. 2000) (same).

---

[3] The *O'Neil* Court considered the critique of market makers put forth in Brad M. Barber, Paul A. Griffin & Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J.CORP.L. 285, 307 (1994), the "Barber study," which study both Dr. Roper and Dr. Cain use for support throughout their respective reports. Roper Report, p. 102; *Expert Report of Matthew D. Cain, Ph.D.* (Doc. 86-1) ("Cain Report"), B-1.

Courts within the Eleventh Circuit have followed suit. *See, e.g., In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 671 (N.D. Ga. 2009) ("a number of courts have acknowledged a growing concern that the mere number of market makers, without further analysis, has little to do with market efficiency.… Because the number of market makers alone is of limited usefulness in determining market efficiency, the court finds that this factor is of little help to the inquiry, and that it does not weigh in favor of market efficiency."); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500 (S.D. Fla. 2003).

Dr. Roper's opinions ask this Court to engage in the same analysis and consider that economic research suggests these factors are not strictly indicative of market efficiency. Such opinions, as to which are the appropriate market efficiency factors to consider, are relevant to determining whether the market is efficient, and have a valid scientific connection to the disputed facts here. *Daubert*, 43 F.3d at 1315, *McDowel*, 392 F.3d at 1299.

### c.    Primacy of *Cammer* Factor 5

LP disregards scientific (and legal) conclusions to argue that Dr. Roper's opinion that *Cammer* factor 5 is the most important factor is irrelevant.

Dr. Roper testified that "the central testable hypothesis of efficient market theory relates to the discussion the *Cammer* factor five identifies." Mot., p. 11; Roper Dep. at 76:8-11. LP points to various cases where this factor was not deemed *per se* necessary and argues that "*Cammer* Factor 5 is not an

10

'unwavering evidentiary requirement.'" Mot, pp. 10-11. From there[4], LP makes a weak logical leap, concluding this establishes that Dr. Roper's opinion as to the relative significance of *Cammer* factor 5 is irrelevant. *Id.*, pp. 11-12.

LP ignores language from *Cammer* which called this factor "the essence of an efficient market and the foundation for the fraud on the market theory." *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989). Moreover, other courts recognize the centrality of this factor. *See e.g., In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005) (noting the fifth factor is "in many ways, the most important"); *In re Glob. Brokerage, Inc.*, No. 17-CV-916 (RA) (BCM), 2021 WL 1160056, at *16 (S.D.N.Y. Mar. 18, 2021) ("Courts have considered [factor five] the most important *Cammer* factor because without finding this causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price." (quotation omitted)) *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427 (D. Ariz. 2019).

Dr. Roper's opinion as to the relative weight of the various economic indicators of efficiency is relevant to permit the Court to assess the validity of Dr. Cain's efficiency determinations, rendering it admissible under *Daubert*.

---

[4] LP concedes that there is no strict list of factors required for determination of efficiency which supports Defendants' position. *See, e.g., supra* § I.A.1.

11

### *2.*    Dr. Roper's Damages Opinions are Relevant

The Motion incorrectly challenges Dr. Roper's damages opinions as irrelevant. Mot., pp. 16-18. To establish predominance, LP must show that damages in this case can be measurable on a class-wide basis. *Comcast Corp. v. Behrend*, 569 U.S. 27, 29-30 (2013). Courts should conduct a "rigorous analysis" to determine whether the purported damages model fits the theory of liability. *Id.* at 35. Dr. Roper appropriately opines that the circumstances of this matter prevent application of LP's chosen method to measure damages.

Here, LP has put forth the "out-of-pocket" formula for measuring damages. *See* (Doc. 85, pp. 27-28). Dr. Roper does not dispute that this is a common measure of damages in securities litigation. Roper Dep. at 112:24-113:2. As Dr. Cain describes, however, out-of-pocket damages are "the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale." *Expert Report of Matthew D. Cain, Ph.D.* (Doc. 86-1) ("Cain Rep."), ¶ 127. Here, Dr. Roper opines that inflation—the "input" in LP's chosen formula—cannot be calculated in this matter. Roper Rep., ¶ 184. As a necessary condition of being able to measure damages, this question is relevant to the instant dispute.

The Motion claims that Dr. Roper's damages opinion "does not directly refute Dr. Cain's work," but rather "presents alleged complications that may or may not materialize as the case progresses." Mot., pp. 16, 18. On the

12

contrary, Dr. Roper substantively refutes the capacity of Dr. Cain's proposed formula to measure damages in this matter, and establishes flaws in Dr. Cain's methodology *that have already materialized*. Specifically, that there are unique circumstances in this case that prevent Dr. Cain from calculating inflation which in turn renders the out-of-pocket formula unable to measure damages on a class-wide basis. Roper Rep., ¶¶ 185-93; Roper Dep. at 112:5-114:21.

While LP attempts to delay its obligations to a later date, "in order to satisfy *Comcast*, a plaintiff must actually demonstrate, through evidentiary proof, that class-wide damages are capable of measurement, not simply assert that it is so." *Id*. Dr. Roper's opinion that Dr. Cain's methodology cannot measure damages (due to an inability to measure inflation) gets to the heart of the question under *Comcast*. That analysis does not ask what damages were actually incurred, "but rather, whether those damages are capable of class-wide measurement." *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 697 (S.D. Fla. 2014). Dr. Roper opines that based on the methodology put forth by Dr. Cain, the answer to this question is no. Thus, his opinion is relevant.

## B. Dr. Roper's Opinions are Reliable

The Motion also argues that "two opinions related to price impact and market efficiency [] are unreliable because they are devoid of any support and contradict basic financial principles." Mot., p. 12. These arguments must fail.

13

### 1.    Dr. Roper's Price Impact Opinions are Reliable

First, the Motion takes issue with Dr. Roper's opinion that there is a lack of price impact due to the $10.15 redemption right associated with the GNPK security ("Redemption Right"). Mot., pp. 12-13. In rendering his opinion, Dr. Roper properly analyzed whether there was causation between the alleged misrepresentations and the impact on stock prices. Roper Rep., ¶¶ 42-54, 67. LP argues that this is "unsupported and at best speculative" because "Dr. Roper...did not conduct any loss causation analysis." *Id.* However, it is well settled that loss causation is not a showing to be made at this stage. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455 (2013) ("loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified."); *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 813 (2011) (same). Indeed, the Motion recognizes this principle, in claiming that Dr. Cain need not perform a loss causation analysis at this stage. Mot., p. 17.

Thus, the absence of a loss causation analysis does not render Dr. Roper's opinion unreliable. Nor do the two cases cited by the Motion support LP's contention. Mot., p. 13. If anything, they support the principle that loss causation is an analysis that is not conducted as class certification. *In re BankAtlantic Bancorp, Inc. Sec. Litig.,* 2010 WL 6397501, *1 (S.D. Fla. Aug. 23, 2010) (considering the admissibility of an expert propounded "to counter

14

the testimony of Plaintiffs' loss causation and damages expert"); *In re Zonagen, Inc. Sec. Litig.*, 322 F. Supp. 2d 764, 768 (S.D. Tex. 2003) (at summary judgment). LP's argument easily fails.

Second, LP argues that Dr. Roper's price impact opinion is "contradicted by basic finance and valuation principles." Mot., p. 13. Rather, Dr. Roper's opinion is founded in economic principles. He explains that the Redemption Right allows the Court to identify periods where there was no inflation in the stock price. The Redemption Right ensured that each GNPK share was redeemable for at least $10.15 in cash that was being held in trust. Roper Rep., ¶ 42. Both experts agree that the Redemption Right thus acted as a "floor" to the GNPK share price. *See id.*, ¶¶ 37, 45; *Deposition of Matthew D. Cain, Ph.D.* (Doc. 129-4) ("Cain Dep."), at 48:1-2.[5] Dr. Roper explains that when GNPK traded at or below $10.15 there was no inflation as the Redemption Right alone justified the price. Roper Rep., ¶¶ 41-45. In such circumstance, "GNPK's share price conservatively reflected the fair market value of its cash redemption value." *Id.*, ¶ 42. This is true whether the alleged misstatements are true or false because when an investor purchased a GNPK share for $10.15 or less,

---

[5] Dr. Cain attempts to escape his testimony by arguing that he "did not testify that $10.15 represented an absolute floor on the share prices." Cain Reb., ¶ 83, n. 134. However, Dr. Cain explained several times that a redemption right "is typically going to represent sort of a floor on the stock price." Cain Dep., at 48:1-2; *see also id.*, at 52:8-13 ("the effects of the redemption right for SPACs…is that that represents typically a floor on the price for the SPAC shares up to the redemption deadline"); 53:22-25 ("I think on the one hand what the redemption value does is it…puts a floor on the price.").

"they received a claim on a cash redemption of at least $10.15." *Id.* Thus, there was no price impact when GNPK traded at $10.15 or below because the price would have been the same regardless of the statements. *Id.*, ¶ 44.

The Motion does not dispute these principals, but rather creates irrelevant hypotheticals that attempt to provide potential explanations for price changes that have nothing to do with alleged fraud or inflation. The Motion argues that Dr. Roper's analysis relied on the flawed premise that investors were "able to redeem their GNPK shares for $10.15 at any point in time during the Class Period," and doesn't consider that, due to the discounted value of future cash flows, the present value of receiving $10.15 at some point in the future would be lower than $10.15 per share. Mot., p. 13.

However, Dr. Roper did *not* say that the Redemption Right could be redeemed at any time during the Class Period. Indeed, the Rebuttal Report of Dr. Cain (Doc. 162-1) ("Cain Reb.") does not provide any citation for this assertion (nor could it). Cain Reb., ¶ 83. Rather, Dr. Roper explains that a purchase of GNPK provides the investor "a *claim* on a cash redemption of at least $10.15." Roper Rep., ¶¶ 42, 43 (providing a hypothetical where investor could "h[old] onto the share until redemption," and then redeem for a profit).

The Motion ignores that Dr. Roper considered the minimal effect time value of money may place in the analysis. Dr. Roper opined that in an efficient market, "trading below the cash trust value of $10.15 could be due to

16

transaction costs, *time value of money*, and uncertainty regarding whether the trust was being appropriately preserved." Roper Rep., ¶ 44, n. 37 (emphasis added). Per Dr. Roper, evidence still demonstrated the GNPK stock price could be considered to trade in an efficient market when it traded below $10.15. *Id.*

Dr. Roper's opinion is whether the share price at or below $10.15 could reflect any price impact of alleged misstatements. An individual's personal, present valuation of the Redemption Right is inconsequential. Nor does the Cain Rebuttal Report provide connectivity between the two ideas, Dr. Cain explaining the principle of time value of money and then summarily concluding that Dr. Roper's opinion is flawed. Cain Reb., ¶¶ 84-85. At best, disagreement as to the existence of price impact is a matter of weight, not admissibility.

### 2.    Dr. Roper's Opinions as to Signs of Market Inefficiency are Reliable

Finally, the Motion unpersuasively challenges the reliability of Dr. Roper's opinions related to the dramatic change of share price between September 2-3, 2021. Dr. Roper stated that such change, in the absence of new and unexpected information, is a sign of market inefficiency and that, as a result, the *Basic* presumption cannot be applied for the remainder of the Class Period. Roper Rep., ¶¶ 53-54, 178-82. These opinions are appropriate.

### a.    Dr. Roper's Opinion as to Sign of Inefficiency is Proper

The Motion fails to justify exclusion of Dr. Roper's opinion under *Daubert*

17

that the price change was a sign of inefficiency. Instead, presenting a speculative hypothetical scenario in which a stock *may* change price without new information. Mot., p. 14.; Cain Reb., ¶ 37.  Such speculative alternative cause does not render Dr. Roper's opinion inadmissible.

The Motion ignores that Dr. Roper offered his opinion (that in an efficient market prices should not change in the absence of new[6] unexpected information) in the context of "the efficient market hypothesis" before the Court. Roper Dep. at 69:9-13. Dr. Roper explained that in this context, "[t]he question is whether public information causes prices to change. Not whether prices change because of a cascade of investors." *Id.* at 69:13-15. LP's hypotheticals as to why prices may change are not responsive to the central question of whether there was a causal relationship between the alleged misstatements and the GNPK and RDW stock prices between September 2-3.

First, LP's alternative explanation of why a stock *might* change price does not render Dr. Roper's opinion inadmissible. At best, the Motion cites Dr. Cain's review of "the common stock prices for all public companies listed on the NYSE and NASDAQ" during the class period and that in a "sample of over 1 million daily company observations, more than 93% had a change in stock price

---

[6] The purpose of the fifth factor is to ascertain the market's reaction to new and unexpected information, not just whether the market contains movement. *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) (the fifth factor addresses a "cause and effect relationship between unexpected corporate events and an immediate response in the stock price.").

18

from market close on one day to market open on the following trading day." *Id.* The Motion fails to provide a reason for such observed changes so as to render it pertinent to Dr. Roper's conclusions. *Id.* There is no indication that such price changes occurred in the absence of new information, or what parameters Dr. Cain considered[7] to select his sample. LP's argument fails to demonstrate that Dr. Roper's opinion is unreliable under Rule 702's framework[8]. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999).

Second, LP incorrectly suggests that Dr. Roper must apply the other *Cammer* and *Krogman* factors to assess efficiency during this time. Mot., p. 15. Dr. Roper did not apply these factors because, as noted, they are not supported by economic literature as indicative of efficiency. *Supra*, § I.A.1. Dr. Roper applied economic theory that concludes prices should only move following the publication of new and unexpected information. Roper Rep., ¶¶ 53-54, 178-82. Such scientific analysis combined with the Eleventh Circuit's rejection of a strict standard for measuring efficiency; *supra* § I.A.1; defeat LP's argument.

> b.   LP Fails to Demonstrate Exclusion of Dr. Roper's Opinion as to the Preclusion of *Basic*

---

[7] Dr. Cain's failure to describe such parameters here is consistent with his prior failure to describe the parameters of his market efficiency analysis which Defendants have previously noted prevents any replication of his analysis on that question. *See* (Doc. 136, pp. 8-16).

[8] In assessing reliability, *Daubert* considers non-exclusive factors, i.e., whether (1) the theory or technique can be tested; (2) it has been subjected to peer review; (3) it has a high known or potential rate of error; and (4) the theory has attained general acceptance in the scientific community. *Allison*, 184 F.3d at 1310.

19

The Motion incorrectly asserts that Dr. Roper's opinion that the period of inefficiency between September 2-3 precludes application of the *Basic* presumption for the remainder of the Class Period is unsupported by academic literature or case law. Mot., p. 15. Dr. Roper based his opinion on the intersection of (a) tenets of the *Basic* presumption, and (b) the unique facts of this case. Dr. Roper explains that *Basic* assumes that in an efficient market, misstatements impact stock prices. Roper Rep., ¶¶ 10, 64-67. When a security no longer trades in an efficient market, however, it can no longer be *assumed* that the information in the supposed misstatement drives the stock price. *Id.*, ¶¶ 68-73. Thereafter, the Roper Report observes that LP attempts to transmit any supposed inflation from one security (GNPK) to another (RDW)[9] despite the fact that they exist in a market with signs of *inefficiency* incapable of fulfilling the information transmission role necessary to make the *Basic* presumption operate. His opinion is simply application of economic standards to the facts. The Motion cites no contrary authority and provides no basis for the Court to find that such opinion unreliable. Mot., pp. 15-16.

## II.    CONCLUSION

For the reasons stated, the Court should deny the Motion.

*/s/ Glennys Ortega Rubin*          **FRANK A. ZACHERL, ESQ.**
**ALFRED J. BENNINGTON, JR., ESQ.**    Florida Bar No. 868094

---

[9] Dr. Cain treats these securities as the same, and does not otherwise provide an analysis on the transition from GNPK to RDW securities. *See generally* Cain Rep.

20

Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**BENJAMIN F. ELLIOTT, ESQ.**
Florida Bar No.: 1010706
belliott@shutts.com

fzazherl@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue,
Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile: (407) 849-7255
*Attorneys for Defendants*

21