**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| JED LEMEN, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>v.<br><br>REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ,<br><br>    Defendants. | Case No.: 3:21-CV-1254-TJC-PDB<br><br>CLASS ACTION<br><br>**DEFENDANTS' SUR-REPLY TO LEAD PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |

Defendants[1] file this sur-reply in response to LP's *Reply in Support of Motion for Class Certification* (Doc. 159) (the "Reply").

I.    **ARGUMENT**

    A.    **Standing & Typicality**

Defendants argue in the *Resp. in Opp'n. to Lead Pl.'s Mot. for Class Certification* (Doc. 129) (the "Response"), that LP's sale of securities before any corrective disclosure means that he (a) lacks standing; Resp., pp. 6-7; and (b) is atypical of other members of the proposed class. *Id.*, p. 34. In reply, LP incorrectly argues that the November Statements were corrective disclosures so as to blunt the impact of this case-ending fact. Reply, pp. 1-2, 14.

---

[1] Capitalized terms shall have the same meaning as used in the Response.

1

LP asserts that Defendants apply the incorrect standard for identifying a "corrective" statement, arguing that "[t]here is no requirement that a corrective disclosure 'precisely mirror the earlier misrepresentation.'" *Id.*, p. 2 (quoting *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013)). But, *Defendants never claimed this was the standard. See* Resp., pp. 6-7. Defendants explained that a corrective statement "must at least relate back to the misrepresentation and not to some other negative information about the company," and should "reveal[] to the market the falsity of a previous representation." *Meyer*, 710 F.3d at 1197. The November Statements do not pass this test.

The Reply strains itself to relate the November Statements to the alleged misstatements. LP describes the alleged misstatements as addressing "management's qualifications and commitment to remediating deficient ICFR, ethics, and honesty." Reply, p. 2. The November Statements announce the postponement of Redwire's third quarter earnings results and quarterly report, the allegation by an employee of "potential accounting issues at a business subunit," and the Audit Committee investigation into those allegations. Compl., ¶¶ 15, 17. LP summarily claims that the November Statements "called all of this [the alleged misstatements] into question and evidenced an undisclosed risk of management, overseeing remediation of deficient internal controls, merely paying lip service to honesty and ethics." *Id.* This is not credible. The November Statements' non-descript disclosure of the

2

investigation and delay of filings do not address or otherwise "evidence" anything regarding management, remediation, and internal controls. *Meyer*, 710 F.3d at 1201 ("The announcement of an investigation reveals just that— an investigation—and nothing more"). Rather, these topics are not substantively addressed in the way LP suggests until the later disclosures of the Audit Committee's findings that occurred between March 31 and April 11, 2022 (the "Investigation Statements"), *after* LP sold his shares, and which LP alleges are separate corrective disclosures. Doc. 129-7, pp. 1-2.

In a footnote, LP points out that *Meyer* left open the question of whether a disclosure of an investigation that is followed by a later finding of fraud or wrongdoing could qualify as a partial corrective disclosure. 710 F.3d at 1201 n.13; Reply, p. 2 n.1. To the extent LP is arguing (as it is not clear) that the November Statements are partial corrective disclosures due to the later, Investigation Statements months after LP sold his securities, the Eleventh Circuit already considered and rejected such position.

In *MacPhee v. MiMedx Grp., Inc.*, the appellate court revisited the "hypothetical" posed in *Meyer*, and determined that, upon strikingly similar facts as this case, the mere announcement of an investigation, even where such investigation later revealed problems, was not a corrective disclosure because the plaintiff <u>sold its shares before release of the investigation results</u>. 73 F.4th

1220, 1247-48 (11th Cir. 2023)[2]. Similarly, here, the fatal fact that LP sold his shares before the Investigation Statements precludes consideration of whether such statements render the November Statements corrective disclosures.

In sum, LP fails to show that the November Statements were corrective disclosures. Thus, LP sold before any putative corrective disclosure. The consequences are twofold. First, LP lacks standing because he was not injured and thus cannot serve as a class representative. *Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1263-64 (S.D. Fla. 2021). Second, LP cannot satisfy the typicality requirement because his claim is subject to a unique defense (he will never be able to establish loss causation) that is inapplicable to those who sold after the Investigation Statements. *MacPhee*, 73 F.4th at 1247-48; *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1328-29 (N.D. Ga. 2007) (considering ability to prove loss causation as to typicality); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 39-40 (2d Cir. 2009) (same); *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010) (same).

---

[2] *MacPhee* addressed whether a plaintiff adequately pled loss causation as an element of its 10-b claim in the context of a Rule 12(b)(6) motion to dismiss. 73 F.4th at 1240-48. Nevertheless, this case provides dispositive appellate direction as to what constitutes a "corrective disclosure" that is applicable to this case. *See id.* Furthermore, the *MacPhee* Court's determination that the plaintiff had, despite its failure to allege loss causation, adequately *alleged* standing is inapplicable because here at class certification stage, unlike the motion to dismiss stage in that matter, *id.* at 1240 ("Taken as true, the allegations sufficiently satisfy our test for Article III…"), the Court should not accept LP's pleadings as true, *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016) (at class certification district courts should not accept the allegations in a complaint as true because "[t]he party seeking class certification has a burden of *proof*, not a burden of pleading").

4

Denial of class certification is due as LP lacks standing and typicality.

**B.      Certain *Cammer*, *Krogman*, and other Factors**

Next, the Reply mischaracterizes various issues attendant to certain *Cammer*, *Krogman*, and other factors.

*First*, LP argues that he "has not 'conceded' *Cammer* Factor 4," which is S-3 Form Eligibility. Reply, p. 5. This is false. LP stated that "this factor neither supports nor disputes market efficiency…." Doc. 85, p. 22. While LP tries to recast its position with reference to Dr. Cain, in fact, Dr. Cain concludes his opinion by stating, "[t]hus, my interpretation of this *Cammer* Factor for Redwire … indicates that it neither supports nor disputes the efficiency of the market for Redwire Common Stock during the Class Period." Doc. 86-1, ¶ 58. As LP bears the burden at class certification; *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014); neutral factors point in Defendants' favor and Defendants' argument is accurate. Resp, p. 14.

*Second*, LP disputes Defendants' *Cammer* factor 2 (analyst coverage) analysis, claiming that courts do not require reports to contain earnings forecasts or transmit new and unexpected information. Reply, pp. 8-9. But, Dr. Roper's opinion that reports are only indicative of efficiency where they make an earnings forecast is supported by economic authorities and literature. Roper Report, (Doc. 129-5), ¶¶ 88-90. The Eleventh Circuit market efficiency standard—discussed at length in recent briefing (Doc. 169)—invites trial

courts to rely on such academic analysis. *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1254-55 (11th Cir. 2014) ("[A]llow[s] District Courts in the future to consider new factors yet unknown to this Court that market theorists might consider to indicate market efficiency."). Caselaw permits Defendants to present, and the Court to consider, Dr. Roper's opinions that are grounded in the field of economics.

*Third*, the Reply disagrees that LP failed to provide enough information to make *Cammer* Factor 3 (market makers) meaningful. Reply, p. 9. However, several courts have recognized, as Dr. Roper opines, that "[t]he economic literature has criticized reliance upon the number of market makers as an indicator of efficiency." *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1996); Roper Report, p. 41, Figure 5. The *O'Neil* Court concluded that "the mere number of market makers, without much more information, is not a very important indicia of market efficiency," and it "does not contribute to a finding of efficiency …." 165 F.R.D. at 502; *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 324 (5th Cir. 2005) (collecting cases); *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 422 (D. Utah 1998); *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 304 (S.D. Tex. 2000).

Courts within the Eleventh Circuit have followed suit. *See, e.g., In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 671 (N.D. Ga. 2009) ("Importantly, a number of courts have acknowledged a growing concern that the mere number

6

of market makers, without further analysis, has little to do with market efficiency…. Because the number of market makers alone is of limited usefulness in determining market efficiency, the court finds that this factor is of little help to the inquiry, and that it does not weigh in favor of market efficiency."); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500 (S.D. Fla. 2003).

The Reply merely cites to a case that has not yet acknowledged this shift in the economic literature, Reply, p. 9, which does not prevent the Court here from doing so in congruence with Dr. Roper's opinion and the above caselaw.

### C.    News Days Selection

LP incorrectly claims that Defendants cite no authority that Dr. Cain should have identified new and unexpected information in his studied News Days. Reply, pp. 5-6. In fact, Defendants cite numerous authorities that explain the central purpose of an event study is to study *new* and *unexpected* information. *See* Resp., pp. 15-17; Roper Report, ¶¶ 105-117.

The Reply merely argues that two cases cited in the Response are not in the specific context of an "event study developed to evaluate market efficiency under *Cammer* Factor 5." Reply, p. 6, n.3. However, these cases still discuss the principles of an event study purported to measure market efficiency in a Section 10(b) case. *Hubbard v. BankAtlantic Bancorp, Inc.,* 688 F.3d 713, 715-16, 721 n.18 (11th Cir. 2012) (motion for judgment as a matter of law and new trial in 10(b) case); *United States v. Schiff,* 538 F. Supp. 2d 818, 839 (D.N.J.

2008), (criminal 10(b)-5 prosecution). LP offers no rationale, nor is there, for why the principles of an event study would vary in these circumstances.

Moreover, Defendants cite to *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-97 (D.N.J. 1989), a securities case discussing market efficiency under *Cammer* factor 5; Dr. Cain's *own deposition testimony* as to the ultimate goal of an event study in assessing market efficiency under *Cammer* factor 5, Doc. 129-4, 87:9-13; and economic authority, such as author Frank Torchio, and the studies of MacKinlay (1997) and Barber et al. (1994), that Dr. Cain himself relies on in his report, *compare* Resp., p. 16 *and* Roper Report, ¶¶ 105-117, *with* Cain Report (Doc. 86-1), pp. 67-68. LP's attempt to ignore such authority fails.

### D.   Redemption Right

Finally, the Reply raises various erroneous arguments attendant to Defendants' explanation that there is no price impact due to the circumstance of the $10.15 GNPK Redemption Right. Reply, pp. 11-12.

*First*, LP takes issue with Dr. Roper's lack of a loss causation analysis. *Id.* But, this is not required at the certification stage. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455 (2013) ("loss causation ... need not be adjudicated before a class is certified"). LP provides no contrary authority.

*Second*, Dr. Cain conjures up a tenuous hypothetical to argue that the principle of time value of money contradicts Dr. Roper's opinion. Reply, p. 11. Dr. Roper considered the minimal effect of time value of money, and concluded

that the evidence still demonstrated that the GNPK stock price traded in an inefficient market when it traded below $10.15. Roper Report, ¶ 44, n. 37.[3]

Regardless, Dr. Roper's opinion is about the whether the share price at or below $10.15 could reflect any price impact of alleged misstatements due to the backing of the Redemption Right. An individual's personal, present valuation of receiving the $10.15 at the time of redemption is simply inconsequential because such valuation is still predicated on the value of the $10.15 being held in trust per the Redemption Right, not on the truth or falsity of any alleged misstatement. Roper Report, ¶¶ 41-45. There is no connection between the principles of time value of money and price impact, nor does Dr. Cain provide one. Cain Reb. Report, ¶¶ 84-85. This argument fails.

*Third*, the Reply argues that the "mere fact of price stability, standing alone, cannot rebut the *Basic* presumption," and that Defendants did not address such an issue. Reply, p. 12. This argument is irrelevant. Defendants do not argue that there is no price impact merely because of a lack of price movement. Rather, Defendants explain that much of the pre-merger Class Period has no price impact because of the price movement at or below $10.15

---

[3] The Reply also argues that Dr. Roper is operating under the presumption that an investor could invoke the Redemption Right at any point in time during the Class Period. Reply, p. 11, n.6. The Cain Rebuttal Report (Doc. 162-1) does not provide any citation for this assertion, *id.*, ¶ 83, nor could it, as Dr. Roper did not make this claim. Rather, the Roper Report explains that a purchase of GNPK provides the investor "a *claim* on a cash redemption of at least $10.15." Roper Report, ¶ 42; *see also id.*, ¶ 43 (providing a hypothetical where the investor could "h[old] onto the share until redemption," and then redeem for a profit).

in light of the function of the Redemption Right. Resp., pp. 28-30.

*Fourth*, the Reply complains that Defendants did not analyze the decline in stock price following the alleged corrective disclosures. Reply, p. 12. But such an exercise is not necessary. Defendants may rebut the *Basic* presumption with "[a]ny showing that severs the link between the alleged misrepresentation and [] the price received (or paid) by the plaintiff…." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). Courts "should be open to *all* probative evidence on that question—qualitative as well as quantitative— aided by a good dose of common sense." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) (emphasis in original). Defendants were not required, as LP suggests, to offer specific evidence analyzing the stock prices following each alleged corrective disclosure. *See Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019).

## II.    CONCLUSION

For the reasons stated above, the Court should deny the Motion.

Respectfully submitted,
*/s/ Glennys Ortega Rubin*
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**BENJAMIN F. ELLIOTT, ESQ.**
Florida Bar No.: 1010706
belliott@shutts.com

Dated: August 6, 2024.
**FRANK A. ZACHERL, ESQ.**
Florida Bar No. 868094
fzazherl@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue,
Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile: (407) 849-7255
*Attorneys for Defendants*

10