**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| JED LEMEN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ, <br><br> Defendants. | Case No.: 3:21-CV-1254-TJC-PDB <br><br> <u>CLASS ACTION</u> <br><br> **DEFENDANTS' REPLY TO LEAD PLAINTIFF'S RESPONSE TO DEFENDANTS' DAUBERT MOTION TO EXCLUDE THE EXERPT OPINIONS OF MATTHEW D. CAIN** |

REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP. ("Redwire"), PETER CANNITO, and WILLIAM READ (collectively "Defendants") hereby file this reply to Lead Plaintiff JARED THOMPSON's ("LP") *Response to Defendants' Daubert Motion to Exclude the Expert Opinions of Matthew D. Cain* (Doc. 160) (the "Response"), and in support of Defendants' *Daubert Motion to Exclude the Expert Opinions of Matthew D. Cain* (Doc. 136) (the "Motion").

## I.    <u>ARGUMENT</u>

### A.    **Litigation Opinion**

First, the Response unpersuasively attempts to rebut Defendants' argument that Dr. Cain improperly rendered his opinion for litigation purposes. Resp., pp. 4-5. LP argues that Dr. Cain's opinions grow out of his two

1

decades of experience and that Defendants ignore that LP asked Dr. Cain to opine as to market efficiency so as to establish the *Basic* presumption. *Id.*

LP misses the point. That LP hired Dr. Cain as an expert in this litigation does not presumptively mean his opinions are for litigation purposes. Rather, the inquiry under *Daubert* and Federal Rule of Evidence 702 is whether Dr. Cain's opinions "grow[] naturally and directly out of research [he] has conducted independent of the litigation," or whether his opinions were developed "expressly for purposes of testifying."[1] Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amends.) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"[2]).

Similarly, Dr. Cain's experience in the field does not presumptively mean he is utilizing that experience to render his opinions. Dr. Cain's deposition shows that his opinions are not rendered naturally and directly out of the academic field of economics, but, rather, are rendered from a separate "legal

---

[1] The Response argues that Defendants' cases as to the impropriety of opinions rendered for litigation purposes are distinguishable simply because they are in the product liability context. Resp., p. 5, n. 1. But, this analysis was proscribed by *Daubert*, and codified by Rule 702 and LP offers no rationale for why its application would vary by practice area. Regardless, courts have assessed whether opinions were rendered for litigation purposes in assessing the opinions of experts in economics as well. *See, e.g., Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322, 1333 (S.D. Fla. 2012), *aff'd*, 746 F.3d 1008 (11th Cir. 2014) (considering whether regression analysis was reliable under the litigation purpose analysis); *Bowman for J.B. v. Int'l Bus. Machines Corp.*, No. 1:11-CV-0593 RLY-TAB, 2013 WL 12290828, at *5 (S.D. Ind. Aug. 16, 2013); *In re Titanium Dioxide Antitrust Litig.*, No. CIV.A. RDB-10-0318, 2013 WL 1855980, at *11-12 (D. Md. May 1, 2013).

[2] On remand from the United States Supreme Court, the U.S. Court of Appeals for the Ninth Circuit addressed the expert issues in *Daubert* and offered its "guidance on the application of the *Daubert* standard." 43 F.3d at 1315.

context." *Dep. of Matthew D. Cain, Ph.D.* (Doc. 129-4) ("Cain Dep."), at 91:5-8; 99:15-22. LP has not established that this self-created legal context is "based directly on legitimate, preexisting research unrelated to the litigation." *Daubert II*, 43 F.3d at 1317. Instead, Dr. Cain testified that his opinions are explicitly, and intentionally, related to litigation. Cain Dep. at 91:5-8; 99:15-22.

That Dr. Cain created a "legal context" from which to render these types of market efficiency opinions expressly for litigants is precisely what *Daubert* seeks to protect against. *Daubert II*, 43 F.3d at 1317 ("[I]n determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office."); *see also Bowman for J.B. v. Int'l Bus. Machines Corp.*, No. 1:11-CV-0593 RLY-TAB, 2013 WL 12290828, at *5 (S.D. Ind. Aug. 16, 2013) (exclusion was warranted where in rendering her opinions the expert "did not follow the same procedure as when she conducts research in her field"); *Ebbert v. Nassau Cnty.*, No. CV 05-5445 FB AKT, 2008 WL 4443238, at *5 (E.D.N.Y. Sept. 26, 2008). Here, Dr. Cain admits that his analysis was not derived from the field, but instead derived from case law. Cain Dep. at 91:5-19; 99:15-22.  LP's arguments to the contrary fail.

B.    **The Need to Identify New and Unexpected Information**

3

The Response disagrees with Dr. Roper's opinion that Dr. Cain's event study is unreliable because he did not identify the new and unexpected information in his News Days. Resp., pp. 7-8. LP, however, provides no support for such position, which contradicts applicable science on the question of market efficiency.

LP argues that Defendants' cited authority for this position does not "warrant[] a conclusion" that Dr. Cain had to engage in this scientific exercise. *Id.*, p. 8. In doing so, LP simply points out that the caselaw cited in the Motion was at various procedural postures. *Id.*, n. 2. However, LP provides no explanation for why this is relevant. Nor are Defendants aware of why it is. Defendants provided this caselaw as support for Dr. Roper's opinion that measuring the cause and effect of *new, unexpected* information is the key principle of an event study and *Cammer* factor 5. Mot., pp. 9-11; *Expert Report of Andrew H. Roper, Ph.D.* (Doc. 129-5) ("Roper Report"), ¶¶ 104-21. It is unclear why this principle would change throughout the life of a case, as the Response suggests.

Dr. Roper explains that his opinion is derived from multiple sources of economic authority. *Id.*, ¶¶ 104-21. Importantly, the Response makes <u>no attempt</u> to address such authority or offer contrary economic literature in support of LP's position. Rather, the Response points to two, out-of-circuit cases that do not support LP's position.

First, the issue in *Angley v. UTi Worldwide Inc.*, was whether the expert at issue should have evaluated the news days for "new, relevant" information. 311 F. Supp. 3d 1117, 1124 (C.D. Cal. 2018). But, Dr. Roper is not opining that Dr. Cain should have determined what news was "relevant," but rather, what was *new and unexpected* given the information already disclosed to the market. Roper Report, ¶¶ 104-21, 142-43. While the court in *Angley* noted that looking for "relevant" information may lead to subjectivity, 311 F. Supp. at 1124, Dr. Roper opines that Dr. Cain should have looked for new or unexpected information based on an objective analysis of what information had already been disclosed to the market. Roper Report, ¶¶ 104-21. Such an exercise does not have the same threat of subjectivity as that in *Angley*, and, in fact, is designed to *prevent* bias from entering an event study. *Id.* This case is thus distinguishable.

Second, the court in *In re NII Holdings, Inc. Sec. Litig.*, did not agree with LP that analyzing news days for new and unexpected information was not required. 311 F.R.D. 401, 412 (E.D. Va. 2015). Rather, in that case, when the defendants pointed out this flaw in the plaintiff's expert's conclusions, the court explained that the plaintiff "persuasively rebut[ted] this attack," by arguing that their expert's study "avoids bias by using objective measures of event days…." *Id.* LP fails to do this.

5

As Dr. Roper has explained, identifying new and unexpected information is important in ensuring that bias does not enter an event study. Roper Report, ¶¶ 104-21. Dr. Roper opines that this failure is one of many that render Dr. Cain's event study flawed, including, contrary to the expert in *In Re NII Holdings*, Dr. Cain's failure to objectively select his News Days. Roper Report, ¶¶ 104-21, 138-58. Thus, while the plaintiff in *In re NII Holdings* established other safeguards against bias, LP has not done so here as Dr. Roper has shown that Dr. Cain's event study is riddled with bias and cherry-picked events resulting in flaws that cannot be cured. *See* Mot., pp. 8-20; *In re NII Holdings*, 311 F.R.D. at 412 ("Indeed, an expert report relying on a study containing cherry-picked event dates is far less persuasive than one in which objective criteria were used."). LP has not "persuasively rebut[ted] this attack." *In re NII Holdings*, 311 F.R.D. at 412.

### C.   *Cammer* Factors 2 and 3

Next, the Response mischaracterizes various issues attendant to certain *Cammer* factors.

*First*, the Response argues that Defendants mischaracterize the analysis required under *Cammer* factor 2 (analyst coverage), because the courts do not require analyst reports to contain earnings forecasts or transmit new and unexpected information. Reply, pp. 8-9. Dr. Roper opines that analyst reports are indicative of market efficiency where the analyst makes an earnings

forecast. Roper Report, ¶¶ 88-90. Dr. Roper renders this opinion from the field and literature of economics. *Id.*

The Eleventh Circuit has declined to adopt a "mandatory analytical framework" to analyze market efficiency giving courts "the flexibility to make the fact-intensive inquiry on a case-by-case basis." *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1254 (11th Cir. 2014). Such flexibility, the Court explained, "allow[s] District Courts in the future to consider new factors yet unknown to this Court that market theorists might consider to indicate market efficiency." *Id.* at 1254-55.

Accordingly, per *Regions*, district courts in the Eleventh Circuit are not required to apply a strict framework when analyzing market efficiency, but rather should consider developments in economic theories and the specifics of each case.  This binding precedent invites district courts to consider the full breadth of economic theory when assessing market efficiency instead of looking exclusively at any one narrowly focused checklist so as to intentionally blind itself to economic research. Thus, Defendants are not mischaracterizing the caselaw, as the Eleventh Circuit caselaw permits Defendants to present, and the Court to consider, Dr. Roper's analyst opinions that are grounded in the field of economics.

Dr. Roper explains that Dr. Cain's consideration of analyst reports fails

to meet these generally accepted methods as set forth by the field of economics[3] as, for instance, two analysts never issued earnings forecasts during the Class Period and one post-merger report did not even mention Redwire. Roper Report, ¶¶ 91, 93. LP's arguments on the matter of analyst reports fail.

*Second*, the Response disagrees that LP failed to provide enough information to make *Cammer* Factor 3 (market makers) meaningful. Resp., p. 17. However, several courts have recognized, as Dr. Roper opines, that "[t]he economic literature has criticized reliance upon the number of market makers as an indicator of efficiency." *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1996); Roper Report, p. 41, Figure 5. The *O'Neil* Court concluded that "the mere number of market makers, without much more information, is not a very important indicia of market efficiency," and it "does not contribute to a finding of efficiency in the present case." 165 F.R.D. at 502; *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 324 (5th Cir. 2005) (collecting cases in finding that "the mere number of market makers, without further analysis, has little to do with market efficiency"); *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 422 (D. Utah 1998) ("this evidence of the number of market makers, without more, does not weigh in favor of a finding of an efficient market"); *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 304 (S.D. Tex. 2000) (same).

---

[3] In fact, Dr. Cain agrees that analyst coverage can be indicative of market efficiency as a means to transmit unexpected new information to the market. Cain Report, ¶ 43

Courts within the Eleventh Circuit have followed suit. *See, e.g., In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 671 (N.D. Ga. 2009) ("Importantly, a number of courts have acknowledged a growing concern that the mere number of market makers, without further analysis, has little to do with market efficiency…. Because the number of market makers alone is of limited usefulness in determining market efficiency, the court finds that this factor is of little help to the inquiry, and that it does not weigh in favor of market efficiency."); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500 (S.D. Fla. 2003).

While the Response cites two Eleventh Circuit district court cases that have not yet acknowledged this shift in the economic literature as to market makers, Resp., p. 17, that does not prevent the Court here from doing so in congruence with the above caselaw.

## II.   CONCLUSION

For the reasons stated above, the Court should grant the Motion.

Respectfully submitted,                          Dated: August 6, 2024.

*/s/ Glennys Ortega Rubin*                        **FRANK A. ZACHERL, ESQ.**
**ALFRED J. BENNINGTON, JR., ESQ.**              Florida Bar No. 868094
Florida Bar No. 0404985                          fzazherl@shutts.com
bbennington@shutts.com                           **SHUTTS & BOWEN LLP**
**GLENNYS ORTEGA RUBIN, ESQ.**                    300 South Orange Avenue,
Florida Bar No. 556361                           Suite 1600
grubin@shutts.com                                Orlando, Florida 32801
**BENJAMIN F. ELLIOTT, ESQ.**                     Telephone: (407) 835-6755
Florida Bar No.: 1010706                         Facsimile: (407) 849-7255
belliott@shutts.com                              *Attorneys for Defendants*
SBDOCS 366500 5

9