**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JED LEMEN, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  v.<br><br>REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ,<br><br>    Defendants. | Case No. 3:21-cv-01254-TJC-PDB<br><br><u>CLASS ACTION</u><br><br>**LEAD PLAINTIFF JARED THOMPSON'S RENEWED MOTION TO COMPEL PRODUCTION OF ALLEGED WORK PRODUCT (SUBSTANTIAL NEED)**<br><br><u>**REDACTED PUBLIC VERSION**</u> |

Defendants claim the most responsive documents are cloaked by privilege, and it would be unduly burdensome and costly to require them to produce non-privileged documents using anything other than an artificially limited technology assisted review ("TAR") / search term method of identifying requested relevant documents. Defendants, however, now admit their method would not have collected nearly one-third of critical documents given by Audit Committee investigators to the Securities and Exchange Commission ("SEC"). This admission comes about only because of the late June production of Defendants' presentations to the SEC, which had been hidden from Lead Plaintiff for over a year. Lead Plaintiff, therefore, renews his motion to compel production of all documents upon which the Audit Committee's March and April 2022 publicly filed conclusions were based because

- 1 -

of his substantial need and the inability, without undue hardship, to obtain the substantial equivalent by other means. *See* Fed. R. Civ. P. 26(b)(3)(A)(ii). This motion may be moot if the Court rules pursuant to Lead Plaintiff's pending motion that Defendants have not shown privilege or have waived privilege.

## I.       INTRODUCTION

This case centers on Redwire Corporation's March and April 2022 disclosures regarding material weaknesses in internal controls and improper "tone at the top" by senior management. These disclosures, prompted by a whistleblower complaint and subsequent Audit Committee investigation, form the basis of Lead Plaintiff's securities fraud claims. *See* ¶¶ 75, 77-79[1]*;* MTD Order (ECF No. 62) at 3-4, 6-7.

Defendants have stymied Lead Plaintiff's efforts to obtain the underlying factual basis for these disclosures known only by the Audit Committee, their investigators and Redwire's auditors, citing undue burden and blanket claims of privilege.[2] Instead, Defendants have produced less than 1,400 documents, insisting on using artificially limited search terms that failed to capture clearly relevant materials. But the recent reluctant production of undisclosed presentations to the SEC reveal the true scope of relevant materials being withheld.[3] These presentations,

---

[1] "¶" refers to paragraphs in the First Amended Complaint (ECF No. 47).

[2] Lead Plaintiff contests Defendants' claims of privilege and is filing a motion challenging the privilege claims and asserting they were waived by disclosure to the SEC. *See infra* at 13-14.

[3] Defendants requested a meet and confer to discuss a production of Audit Committee materials that could obviate the Court's need to intervene after Lead Plaintiff filed the initial motion to

created by the Audit Committee investigators King & Spalding LLP ("K&S") and KPMG LLP, detail an extensive investigative process involving nearly ███████ ████████████████████████████████████████████████████ ███████████ Shockingly, until these presentations were produced in June 2024, Defendants had denied possessing any documents related to government investigations. Moreover, they reveal a complete lack of good faith or reasonable thoroughness in using their superior knowledge to identify relevant documents.

The fact section below and the Kathrein Declaration detail the parties' onerous negotiation process that spanned nearly a year to reach agreement on the scope of document production but resulted in rejection of most of the terms Lead Plaintiff requested. Defendants' final offer came with the condition of filtering any documents collected by search terms through TAR,[4] followed by a further review by attorneys for relevancy and privilege. Literature shows, however, that such a review would result in a very small percentage of the relevant documents being produced.[5]

---

compel in May 2024. *See* ECF No. 155 at 4-5. After Lead Plaintiff agreed to withdraw the original motion, Defendants produced February and June 2022 presentations created by K&S and KPMG to the SEC. *See infra* at 13-14.

[4] TAR uses machine learning to identify relevant documents in large electronic discovery collections. *See* EDRM & Duke Law School, TECHNOLOGY ASSISTED REVIEW (TAR) GUIDELINES (January 2019) ("TAR Guidelines") at 1.

[5] Search terms themselves have a less than 30% chance of identifying relevant documents. *See, e.g.,* Maura R. Grossman & Gordon V. Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, 17 RICH. J.L. & TECH. 8, 18-19 (2011) (keyword search resulted in average recall of relevant documents of "only 20%").

Indeed, Defendants conceded this month that the documents collected under their proposal did not contain nearly one-third of critical documents identified in the investigators' presentation to the SEC. *See* Kathrein Decl., ¶ 22. And Defendants previously identified that only six (6) of the over fifty (50) documents given to the SEC were included in the ~1,400 documents Defendants have produced using their own search terms. *Id.*

Defendants' refusal to produce these materials violates their discovery obligations under Fed. R. Civ. P. ("FRCP") 34. A party opposing discovery must explain the grounds for the objection and use its superior knowledge to identify relevant documents and develop means to produce these documents. *See L–3 Commc'ns Corp. v. Sparton Corp.*, 313 F.R.D. 661, 670 (M.D. Fla. 2015) (describing defendants' obligation to use their "superior information" to suggest ways to "narrow[] the offending search terms in a way that addresses their concerns while still retrieving as many of the relevant documents targeted by the disputed search terms as possible"). Mere claims of undue burden are insufficient.

Having hit an impasse, Lead Plaintiff seeks relief on three primary grounds. First, under FRCP 34, Defendants have an affirmative obligation to produce these responsive materials, which they acknowledge exist but improperly withheld based on deficient search terms and an inadequate search term/TAR hybrid proposal, unsupported claims of burden, and overbroad privilege claims. Second, even if the

- 4 -

Court finds these materials constitute work product, Lead Plaintiff has demonstrated the "substantial need" required under FRCP 26(b)(3)(A)(ii) to overcome work product protection for ordinary work product. The requested documents contain the only contemporaneous record of the facts underlying Defendants' critical disclosures, which Lead Plaintiff cannot obtain through other means without undue hardship. Finally, to the extent any materials constitute opinion work product, their disclosure is justified by the extraordinary circumstances present here: Defendants have put the very conclusions of the Audit Committee investigation at issue through their affirmative defenses and reliance on the investigation's findings in their public statements and court filings.

With the November 5, 2024 discovery deadline fast approaching, Lead Plaintiff moves this Court to compel Defendants to produce all materials the Audit Committee relied upon including: (1) the ███████████████████████████ ██████; (2) witness interview notes authored by K&S, KPMG and Kirkland and Ellis LLP ("Kirkland"); (3) materials gathered, reviewed or created by their auditor PricewaterhouseCoopers LLP ("PwC") concerning the Audit Committee investigation; and (4) any other materials underlying the Audit Committee's investigation. Lead Plaintiff further requests the Court to extend the discovery cut-off to give Lead Plaintiff the necessary time to review the materials and depose the key fact witnesses identified in the documents. These materials are critical to Lead

Plaintiff's ability to prove his case and test Defendants' defenses. The Court should reject Defendants' attempts to use restrictive search terms and overbroad privilege claims as both a sword and a shield, and order production of these vital documents.

## II.    FACTUAL BACKGROUND

### A.    Defendants Identify Their Plan to Rely Solely on SEC Public Filings, "Good Faith," and Lack of Scienter in Their Defense.

Defendants filed their Answer on April 21, 2023, and asserted "lack[]" of "scienter" and "good faith" as their Ninth and Eleventh Affirmative Defenses. ECF No. 68 at 26-27.  In addition, Defendants' initial disclosures served on June 2, 2023 identified only publicly filed SEC documents as those Defendants may use to support their defenses.  *See* Kathrein Decl. ¶ 3.

### B.    Lead Plaintiff Serves Discovery Requests and Asks for Known, Responsive Documents.

Lead Plaintiff served requests for production ("RFP") and interrogatories in May 2023 and identified for early production core known, responsive documents related to the Audit Committee investigation and whistleblower complaints. *Id.*, ¶¶ 4-5. The core documents would help develop targeted search terms. *Id.* Lead Plaintiff also requested a search term proposal from Defendants given their superior knowledge of their clients' documents.  *Id.*

### C.    Defendants Claim Undue Burden and Privilege Over Requests Concerning the Key Issues in Case.

Defendants responded to the interrogatories and RFPs on July 20, 2023. *Id.*, ¶

6  and Exs. A-B.[6] Interrogatory No. 1 sought "all persons or entities likely to have knowledge or information relevant to the subject matters of this action," including Redwire's internal controls, "tone at the top," remediation plans, the Audit Committee investigation, and Read's termination. Ex. A at 5-23. The response to Interrogatory 1 identified certain individuals whose knowledge, per Defendants, came solely from participating in "meetings of Redwire's Audit Committee" or "conduct[ing] the [Audit Committee] investigation." *Id.* at 7-11, 16-17. PwC, K&S, KPMG, and Kirkland were identified as having relevant knowledge, but Defendants asserted privilege over any information they possessed. *Id.* at 7-12, 15-18.

Further, Defendants objected it would be "overly broad and oppressive" to provide the "substance" of the knowledge of persons identified in response to Interrogatory No. 1. *Id.* at 23 (response to Interrogatory No. 2). Defendants objected to providing the existence, custodian, location and description of all relevant documents as "unduly burdensome." *Id.* at 24-25 (response to Interrogatory No. 4). Defendants also asserted the interrogatory "directly infringes" on protected work product because answering would require the "disclosure of documents that Redwire's counsel asserts are relevant" to the claims and defenses. *Id.*

Defendants similarly claimed undue burden and privilege in response to the RFPs seeking documents regarding (i) the basis of Defendants' disclosures in the

---

[6] All "Ex." citations are to Exhibits in the Kathrein Declaration.

April 1, 2022 10-Q and April 11, 2022 10-K regarding "tone at the top" and internal control material weaknesses that form the basis of this lawsuit (RFP Nos. 14-16); (ii) Read's termination (RFP Nos. 27-28); (iii) accounting, internal controls, and financial policies and procedures (RFP No. 36); (iv) public statements during the Class Period (RFP No. 40); and (v) Cannito and Read's role in preparing the statements (RFP No. 41). *See* Ex. B at 16-20, 33-36, 44-47, 52-54. Instead, Defendants would *only produce documents captured by search terms* (as any other method would be unduly burdensome), withholding those not responsive or privileged. *Id.*

In response to requests concerning the whistleblower complaint and Audit Committee investigation, Defendants agreed to produce only the whistleblower complaint itself, non-privileged Audit Committee meeting records regarding the complaint, and documents collected by search terms, as any other method would be "unduly burdensome." *Id.* at 36-40 (responses to RFP Nos. 29-30).[7] All other documents would be withheld and logged as privileged as:

> …the Audit Committee *was not provided with specific documents in connection with the investigation.* Rather, the Audit Committee's counsel and their accountants were provided access to electronic records meeting[] specific custodian and date-range parameters, and then outside counsel and their retained consultants identified their own documents in an effort to carry out their advisory functions. *Redwire does not have possession, custody, or control—or means to identify—the documents*

---

[7] Months later, only because they relied upon it in response to Lead Plaintiff's motion regarding the clawback of a PwC memorandum, Defendants revealed they had failed to produce, log or otherwise identify a more detailed letter from the whistleblower. Kathrein Decl., ¶ 21.

*that outside counsel selected.* Additionally, ***the specific compilation and/or selection of documents by the Audit Committee's outside counsel would reflect the mental impressions of outside counsel, and thus, be protected by the work-product immunity***.

… All interviews, questioning, or examinations of former or current Redwire employees in connection with the investigation were performed by Redwire's outside counsel and, as such, ***all attendant notes, transcripts, recordings, or other records are subject to attorney-client and/or work product privileges***. Fed R. Civ. P. 26(b)(1), (3).[8] *Id.* at 39.

### D.    After Delay, Defendants Produce a Small Set of Known, Responsive Documents and Claim Privilege Over Rest.

Lead Plaintiff immediately engaged Defendants over the objections. In a July 2023 email, Lead Plaintiff sought a meet and confer before Defendants undertook the review and production via their own search terms, and stated the parties should agree on search-terms and custodians by mid-August. Kathrein Decl., ¶ 7.

In August 2023, Defendants identified only the whistleblower complaint and Read's separation agreement as "known documents" previously requested by Lead Plaintiff that were not privileged. *Id.*, ¶ 9. Defendants insisted that they would run their own ***self-selected search terms***, against custodians they selected, without prejudice to future negotiation. *Id.* Defendants further confirmed the date ranges and custodians used to identify the set of documents collected by K&S and KPMG during the Audit Committee investigation were encompassed entirely by the date parameters and custodians used to search for documents responsive to Lead

---

[8] Since serving the discovery responses, Defendants have confirmed they are able to identify and retrieve the documents selected by outside counsel for review. *See* Kathrein Decl., ¶ 40.

Plaintiff's requests. *Id.*, ¶ 11.

Defendants later produced a limited privilege log. The privilege log listed only twelve redacted "[u]nofficial" Audit Committee minutes drafted by K&S, and an unidentified number of "[a]ttorney notes from witness interviews" in the possession of Kirkland that were withheld entirely. *Id.*, ¶ 23 and Ex. H.  No other documents were identified.[9]  *Id.*  Defendants have since stated Kirkland independently represented Redwire in connection with legal issues and legal advice related to Mr. Gievers' allegations and other matters, and did not perform the Audit Committee investigation but just took notes of the interviews taken by K&S/KPMG. *Id.*, ¶¶ 42-43. Recently produced documents also show that ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ . *Id.*, ¶ 43.

Defendants similarly maintain privilege over investigation documents in PwC's possession. *See* Exs. J and K. PwC continues to withhold fifteen internal memorandums regarding the investigation per Category No. 2 of the PwC categorical log. *See* Ex. J. PwC is also withholding item nos. 1-5 and 7 in the PwC

---

[9] Defendants confirmed on August 13, 2024 that K&S also drafted notes from witness interviews, but did not possess any transcripts or recordings. Kathrein Decl., ¶ 41.

individual log, including three PowerPoint presentations authored by K&S and KPMG. *See* Ex. K.

### E. The Parties Negotiate Search Terms.

When Lead Plaintiff received Defendants' search terms and hit report, it appeared the search terms reflected no attempt by Defendants to rely on their knowledge to craft terms capable of identifying responsive documents. *Id.*, ¶ 10 and Ex. C. Rather, Defendants simply pulled words from their public disclosures, ran those terms, and produced less than 1,400 documents as a result. *Id.*, ¶¶ 10, 21. Few shed light on the underlying basis for Defendants' disclosures. *Id.*, ¶ 21. Only earlier drafts and the final resignation letter from the whistleblower, Daniel Gievers, gave indication of some of the subject matters of the Audit Committee investigation. *Id.*

Without any knowledge of the basis of the Audit Committee disclosures, Lead Plaintiff blindly developed a proposal for additional search terms. *Id.*, ¶ 13. In late September 2023, Lead Plaintiff sent a set of proposed terms. *Id.*, ¶ 13 and Ex. D. These dogged negotiations persisted through the end of January 2024. *Id.*, ¶¶ 14-16.

### F. Defendants Propose a Unique Hybrid Search Process.

Defendants sent a counterproposal in early 2024. *Id.*, ¶ 17 and Ex. E (a)-(c). For the first time, and despite previously rejecting a TAR approach, Defendants also proposed using TAR to cull the documents identified by search terms to further narrow the number of documents for a manual privilege and relevancy review. *Id.*,

¶ 18. After research, Lead Plaintiff responded by outlining how TAR should be used and noting that when employed properly, TAR can identify 80% or more of responsive documents in the corpus.[10] *Id.*, ¶ 19. In contrast, search terms generally retrieve just 20% of relevant materials from a given set of ESI.[11] *Id.* As such, if used, TAR should be run over the largest possible document corpus because when search terms and TAR are combined, the resulting estimated level of recall will be the product of the recall of each stage.[12] *Id.* and Ex. F.

Ultimately, Defendants proposed a TAR review of a document corpus culled by a narrower set of search terms than Lead Plaintiff sought during search term negotiations. *Id.*, ¶ 20 and Ex. G. The TAR program would rely on a seed set primarily consisting of the documents collected through Defendants' initial set of restrictive search terms and were coded as "responsive" or "non-responsive" by reviewers.[13] *Id.* In turn, the TAR program would apply this learning to predict the

---

[10] *See, e.g.,* Maura R. Grossman & Gordon V. Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, 17 RICH. J.L. & TECH. 23-24 (2011) ("the average recall and precision [for TAR] were 76.7% and 84.7%").

[11] *See id.* at 8, 18-19 (keyword search resulted in average recall of relevant documents of "only 20.0%").

[12] For example, if use of TAR has estimated recall of 80%, and a separate search term stage had estimated recall of 25-30%, then overall estimated recall would be just 20-24%. Per OpenText, a 80% recall is a "modest target" and "a common standard." *See* Open Text, "Choosing the Right Technology-Assisted Review Protocol to Meet Objectives" at 9.

[13] TAR software is initially trained on a subset of documents coded by attorneys as relevant or not relevant. *See* TAR Guidelines at 1. It then applies this learning to predict the relevancy of remaining documents. *Id.*

relevancy of the documents Defendants agreed to review. *Id.* Defendants, however, would limit the effectiveness of TAR by using it statically, without "continuous," "active" learning, followed by manual review for relevancy and privilege.[14] *Id.*, ¶¶ 18, 20. Lead Plaintiff objected because Defendants' process would have a very low probability of identifying documents concerning the Audit Committee's public disclosures. *Id.*, ¶ 20.

### G.    Defendants Produce Undisclosed SEC Presentations.

Given the parties' impasse, Lead Plaintiff filed a motion seeking to compel production of Audit Committee materials in May 2024. *See* ECF No. 148. After filing, Defendants offered to produce February 2022 and June 2022 presentations made by K&S and KPMG and documents from those presentations in exchange for Lead Plaintiff withdrawing the motion and pausing further compliance with subpoenas issued to K&S, KPMG, and PwC. Kathrein Decl., ¶¶ 32-33. Defendants noted that six of the documents that were disclosed in the presentations had previously been produced as part of Defendants' document productions based on their initial set of search terms.  *Id.*, ¶ 22. Defendants further represented that this supplemental production should satisfy Lead Plaintiff's needs. *Id.*, ¶ 32.

---

[14] The TAR process is usually an iterative one, with the algorithm's predictions being validated and refined through further attorney input as the review progresses. *See* TAR Guidelines at 10, 16-19; *see also The Sedona Conference, Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery*, 15 Sedona Conf. J. 217, 242-43 (2014) ("Iterative monitoring of the training process ensures that the [TAR] system is adequately trained.").

Defendants made the supplemental production of fifty-nine (59) documents on June 21, 2024. *Id.*, ¶¶ 22, 35. Shockingly, despite Defendants' earlier unqualified statements[15] that they had no responsive documents related to any formal or informal government investigations, the newly produced documents revealed the K&S/KPMG exculpatory presentations were given to the SEC. *Id.*, ¶ 35. The presentations detailed ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████ *See, e.g.,* Ex. N at -12554-55. ████████████████████████████████████

███████████████████████████████████████████

███████████████████ *Id.* at -12566. Nonetheless, ████████████████

███████████████████████████████████████████

████████████████████████████████ *Id.* at -12566. As such, ████

███████████████████████████████████████████

██████████████████████████ *Id.* at -12569. After additional meet and confer discussions, Defendants reiterated they would not produce the ████████████

████████ nor any witness interview notes or memoranda. *See* Kathrein Decl., ¶ 40. Nevertheless, Defendants confirmed their intent to "likely" rely on some of these documents identified in the SEC presentations and produced as part of the

---

[15] *See* Ex. B at 50-51 (response to Lead Plaintiff's RFP No. 38).

supplemental production, but will not identify which at this time. *Id.*, ¶ 45.

Similarly shocking is Defendants' subsequent admission that the document corpus they proposed to review in their final proposal would not have included nearly one-third of the over 50 documents produced with the SEC presentation materials. *Id.*, ¶ 22. These were documents known to them, without having to resort to search terms, and should have been used to craft search terms and train TAR.

### III.    ARGUMENT

While Lead Plaintiff contends Defendants have failed to show that the Audit Committee materials are work product, under FRCP 26(b)(3)(A)(ii), the Court may order production of work product documents if the requesting party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."

**A.    Defendants are Withholding Key Documents Based on Unilateral Application of Deficient Search Terms and an Inadequate Search Term/TAR Hybrid Proposal.**

Defendants acknowledge responsive Audit Committee documents exist in the possession of the Company, its counsel, and its consultants. *See supra* at 8-9. Defendants also admit the search protocol they insist upon did not use the information available to them from the recently produced SEC presentations and underlying documents to craft specific terms. *Id.* at 13-15. Otherwise, 100%, not ~10% (6 out of 59), of the SEC presentation documents should have been captured

and produced when they used their self-selected terms. Kathrein Decl., ¶ 22. Similarly, had Defendants used the documents presented to the SEC, then their last offered search term/TAR hybrid proposal would have captured more than a clearly deficient two-thirds of the documents included in the supplemental production. *Id.*

Under FRCP 34, Defendants have an affirmative obligation to produce these materials, including those held by their agents or consultants. *See Advanced Cable Ties, Inc. v. Am. Elite Molding, LLC*, 2019 WL 13280288, at *5 (N.D. Fla. Feb. 7, 2019) (documents held by "agents" were within company's control for FRCP 34 purposes). Furthermore, as the court admonished in *L–3 Communications Corp.*, a party cannot use restrictive search parameters based on purported burden concerns to avoid producing clearly responsive documents. 313 F.R.D. at 670. When confronted with inadequate search terms, the party opposing discovery must suggest ways to broaden search terms that address burden concerns but still retrieve "as many of the relevant documents targeted by the disputed terms as possible." *Id.*

But, as seen above, Defendants' document collection and review process has been fundamentally flawed. First, the terms Defendants initially selected, based on their superior knowledge, reveal a complete dereliction of their duty. The terms merely pull words from public disclosures without attempting to capture the underlying factual basis for those disclosures. Kathrein Decl., ¶ 10. This approach ignores relevant information that does not use the exact language of the public

- 16 -

disclosures. Moreover, Defendants' production of 1,400 documents, compared to the ███████████████████████████, clearly evidences the deficient nature of their original terms and collection process. *See supra* at 11, 14.

Second, Defendants insist on applying TAR only to the limited set of documents identified by the search terms the parties could agree on during their months-long negotiation process, rather than the full corpus of potentially relevant documents. Kathrein Decl., ¶ 20. This severely limits the effectiveness of the TAR process from the outset. *Id.*, ¶ 19 and Ex. F. Defendants further propose training their TAR system based on Defendants' responsiveness determinations for documents collected by their initial restrictive search terms. *Id.*, ¶ 20. This initial collection resulted in a production of less than 1,400 responsive documents, including only six documents from the SEC presentation materials consisting of primarily early drafts of the resignation letter, and the final letter itself, from the whistleblower. *Id.*, ¶¶ 20-22. Put differently, the TAR system would be trained under an unfairly limited view of what is relevant and responsive. This issue would be compounded by Defendants' employment of a static, and non-iterative TAR process, rather than a continuous active learning model. *Id.*, ¶ 20. Industry best practices use iterative TAR processes that continually refine the algorithm's understanding of relevance. *See supra* at 13 n.14. Even more, Defendants then seek to implement additional manual reviews on top of the TAR process, further reducing the likelihood of identifying relevant

materials. *Id.* at 13.This multi-layer approach means known relevant documents will likely be excluded. *Id.* at 15.

Critically, Defendants' proposal masks the fundamental issue. Defendants know what documents the Audit Committee relied upon. ██████████████████

███████████████████████████████████████████████████████████████

████████, these documents formed the basis of the Audit Committee's conclusions, and Defendants can retrieve these documents as their identity has been preserved. *Id.* at 14; Kathrein Decl., ¶ 40. The investigative materials also likely show exactly which documents the investigators considered relevant for the Audit Committee's conclusions. *See supra* at 14.   Similarly, the witness interview notes would fill in the blanks Defendants refused to answer in response to the interrogatories. *Id*. at 7.

Accordingly, Defendants' withholding of relevant documents based on unreasonable search terms and protocols has failed to satisfy FRCP 34 and is sanctionable under FRCP 37. *See* Fed. R. Civ. P. 37(a)(3)(B)(iv) (permitting motions to compel when a party "fails to produce documents" requested under FRCP 34). Defendants' unjustified exclusion of responsive materials through arbitrary search terms and protocols is also an "evasive or incomplete disclosure," which is treated as a failure to respond under FRCP 37(a)(4).

**B.      Lead Plaintiff Meets the "Substantial Need" Standard for Production of Ordinary Work Product.**

Lead Plaintiff cannot piece together the factual basis for Defendants'

- 18 -

disclosures from other sources. Defendants have stated the Audit Committee was orally briefed and did not directly receive documents. *See supra* at 7-9. Instead, counsel and consultants collected and reviewed ████████████ and generated the work product. *Id.* at 8-9, 14. Defendants also represented that counsel conducted all ████████████████, so any notes are being withheld. *Id.* Lead Plaintiff cannot feasibly replicate those efforts.

Furthermore, Defendants have put the Audit Committee materials at issue in this litigation. Defendants assert "lack[]" of "scienter" and "good faith" as their Ninth and Eleventh Affirmative Defenses. *Id.* at 6. Defendants explicitly state their intent to rely on SEC filings outlining the findings of the Audit Committee in support of their defense. *Id.* Defendants, moreover, have confirmed they will "likely" rely on at least some of the SEC presentation materials in their defense. *Id.* at 14-15. This affirmative use and reliance on the Audit Committee materials reinforces Lead Plaintiff's substantial need.

Relevant caselaw supports production. In *Martensen v. Koch*, the court found it improper for the defendant to rely on investigative reports to justify conduct while denying the plaintiff access to challenge those assertions, stating "a litigant cannot use the work product doctrine as both a sword and shield." 301 F.R.D. 562, 573, 578-83 (D. Colo. 2014). In *Shenwick v. Twitter, Inc.*, the court held that defendants could not introduce evidence implying "robust disclosure processes" based on

"advice from lawyers" while withholding documents on the same subject based on privilege. 2021 WL 1232451, at *4 (N.D. Cal. Mar. 31, 2021). These principles apply where Defendants rely upon the Audit Committee's findings while denying Lead Plaintiff access to the underlying record. *See supra* at 6, 14-15.[16]

Similarly, in *United States v. Petit*, the court compelled production of fact work product from an audit committee investigation, including "statements made by potential witnesses to K&S" and "contents" of audit committee presentations. 438 F.Supp.3d 212, 215 (S.D.N.Y. 2020). The court reasoned the former CEO and COO required this "possible exculpatory" information to prepare their defense and could not obtain the substantial equivalent elsewhere. *Id.* The circumstances here are analogous. The withheld materials are, by Defendants' own admission, the only materials which will reveal the critical facts and witness statements upon which they based their key internal control disclosures. *See supra* at 7-9. While possibly not establishing when Defendants became aware of these facts, this evidence will allow Lead Plaintiff to focus additional discovery on what Defendants knew and when.[17]

In *State of Florida v. Industrial Chemicals*, *Inc.*, the court ordered disclosure of pre-suit investigative materials, finding substantial need and undue hardship in

---

[16] *See, e.g.,* Ex. S (April 1, 2022 10-Q) at 58; *see also* ECF 48 at 12.

[17] *See also United States v. ISS Marine Servs., Inc.* 905 F.Supp.2d 121, 139 (D.D.C. 2012) (finding the government had substantial need for internal audit report summarizing investigation into wrongdoing not just for the facts but also for evidence of "when the company became aware of any potential overpayments, which [went] to the heart of the [Government's] case").

obtaining equivalent information through other means. 145 F.R.D. 585, 588 (N.D. Fla. 1991). The Florida Attorney General issued civil investigative demands for depositions during the course of a two-year antitrust investigation. *Id.* at 586. When the state later filed an antitrust lawsuit, a defendant sought production of the materials. *Id.* The state objected, arguing the materials were protected work product. *Id.* The court ordered disclosure. *Id.* at 588. As to substantial need, the court noted the materials contained the evidentiary basis for the complaint, including the "acts" and "dates" of the alleged conspiracy, as well as the "names" of persons involved in the conspiracy and who provided information. *Id*. Addressing hardship, the materials contained the essential evidence underlying the state's complaint, and it "would be extremely difficult, not to mention wasteful" for the defendant to try to recreate the state's investigation "when the information it seeks is readily available through discovery[.]" *Id.* Costs were also a relevant factor in assessing undue hardship. *Id.*

The investigative materials in *Industrial Chemicals* (*i.e.*, materials and testimony subpoenaed as part of a pre-suit investigation) are similar to the Audit Committee documents at issue in this case, as they are the only source of the foundational evidence underlying Defendants' March and April 2022 disclosures about accounting improprieties and "tone at the top." Requiring Lead Plaintiff to reconstruct the Audit Committee's work through non-duplicative discovery would be enormously burdensome and expensive, particularly given Defendants'

- 21 -

admission that the known responsive key evidence exists only in the possession of K&S and KPMG in work-product form.[18] *See supra* 7-9, 14. Forcing Lead Plaintiff to use search terms to fish for documents that were not necessarily reviewed and relied upon by the investigators would further undermine FRCP 1's goal of securing a "just, speedy, and inexpensive determination."

### C.    Lead Plaintiff Demonstrates Compelling Need for Any Alleged Opinion Work Product as Defendants Put the K&S/KPMG Purported Opinion Work Product *at Issue* in This Case.

Defendants may argue that some of the materials constitute opinion work product. If the Court agrees, Lead Plaintiff has shown the extraordinary necessity required to obtain any opinion work product.[19]

---

[18] The work product doctrine does not shield discovery of the documents selected by K&S, KPMG, and Kirkland for review during the investigation, except when production would reveal counsel's legal theories and thought processes. *See Hunter's Ridge Golf Co. v. Georgia-Pacific Corp.*, 233 F.R.D. 678, 681 (M.D. Fla. 2006). To invoke this exception, Defendants must provide specific, non-conclusory details showing a real risk of such improper exposure. *Id.* Defendants cannot make this showing here, as Lead Plaintiff's requests did not target a narrow set of documents revealing counsel's mental impressions, but broadly seek all materials underlying the factual basis for Redwire's March and April 2022 public disclosures, apparently only known by K&S, KPMG, and Kirkland. *See, e.g., id.* at 682 (rejecting work product assertion over third-party documents and finding requests sought "documents relating to specific allegations," not counsel's mental impressions or legal theories). Defendants, moreover, have not shown Lead Plaintiff already has access to the documents at issue, a relevant factor in shielding third-party documents from discovery. *Id.*

[19] K&S and KPMG were hired as investigators (and Kirkland took notes of interviews conducted by K&S/KPMG) and thus they are the equivalent of non-testifying experts when it comes to justifying production. *See* Fed. R. Civ. P. 26(b)(4)(D)(ii) (Facts known or opinions held by a non-testifying expert may be discoverable "on showing exceptional circumstances under which it is impracticable for the [moving] party to obtain facts or opinions on the same subject by other means."). As recognized in *Martensen*, there is little practical difference between opinion work product and non-testifying expert materials – both require a similar showing of "exceptional"

While opinion work product enjoys almost absolute immunity, extraordinary circumstances may exist that justify a departure from this protection. *See Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000). Lower courts have held that disclosure of opinion work product is justified when "an *attorney's* opinions and legal theories" are placed at issue. *See Maplewood Partners, L.P. v. Indian Harbor Ins. Co.,* 2011 WL 3918597, at *7 (S.D. Fla. Sept. 6, 2011); *see also Cozort v. State Farm Mut. Auto. Ins. Co.*, 233 F.R.D. 674, 676–77 (M.D. Fla. 2005) (holding "that the mental impressions of State Farm's counsel are directly at issue here, and thus, exceptional circumstances justify invading the opinion work product immunity").

While some or parts of the Audit Committee's internal memoranda and conclusions may ordinarily qualify as opinion work product, Defendants' reliance on the results put the mental impressions and conclusions of K&S – outside counsel hired to conduct the Audit Committee investigation – at issue and waives any absolute protection. *See, e.g., Monitronics Int'l, Inc. v. Hall, Booth, Smith, P.C.*, 2017 WL 218397, at *2 (N.D. Ga. Jan 18, 2017) (finding opinion work product waived in legal malpractice case where plaintiff claimed defendants were the sole proximate cause of the verdict at issue). Here, the opinion work product was the sole and proximate cause of the statements at issue.  Moreover, any opinion work product

---

necessity to allow discovery. 301 F.R.D. at 580. Thus the analysis in this section applies to K&S, KPMG, and Kirkland.

in the Audit Committee materials is inextricably intertwined with the facts upon which those opinions are based. Separating opinion from fact would be impracticable and would deprive Lead Plaintiff of vital context needed to scrutinize the material facts found therein and Defendants' defenses to these facts. Finally, even if Lead Plaintiff could independently replicate the K&S/KPMG/Kirkland investigation, the results of that *post hoc* investigation might bear little similarity to the information forming the basis of the Audit Committee's investigation. *Martensen*, 301 F.R.D. at 580-81.

The Court should therefore pierce opinion work product protection due to three extraordinary factors: (1) these materials are central to Lead Plaintiff's claims, (2) they are necessary to contest Defendants' defenses, and (3) the factual information cannot be separated from the opinions without losing critical context. This rare combination of circumstances justifies the "extraordinary" or "exceptional" step of compelling production of opinion work product.

## IV.   CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant this motion to compel and order Lead Plaintiff's requested relief.

## LOCAL RULE 3.01(G) CERTIFICATION

Undersigned hereby certifies that between May 2023 and August 2024, Lead Plaintiff's counsel conferred with counsel for Defendants via telephone and

- 24 -

videoconference on several dates and exchanged additional correspondence regarding the relief requested in this Motion and Defendants' counsel indicated they do not agree with the relief sought. *See* Kathrein Decl., ¶¶ 5-20, 37.

Dated: August 23, 2024

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: *s/ Reed R. Kathrein*
Reed R. Kathrein (Fla. Bar. No. 262161)
reed@hbsslaw.com
Lucas E. Gilmore (admitted *pro hac vice*)
lucasg@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001

Steve W. Berman (admitted *pro hac vice*)
steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594

Peter A. Shaeffer (admitted *pro hac vice*)
petersh@hbsslaw.com
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile:  (708) 628-4950

*Lead Counsel for Lead Plaintiff*
*Jared Thompson*

**THE SCHALL LAW FIRM**
Brian Schall (admitted *pro hac vice*)
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

**BUCKNER + MILES**
David M. Buckner (Fla. Bar No. 60550)
david@bucknermiles.com

*Liaison Counsel for Lead Plaintiff*