UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| JED LEMEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITON CORP., PETER CANNITO, and WILLIAM READ,<br><br>Defendants. | Case No. 3:21-cv-01254-TJC-PDB<br><br>CLASS ACTION |

**OMNIBUS DECLARATION OF REED R. KATHREIN IN SUPPORT OF LEAD PLAINTIFF JARED THOMPSON'S (1) RENEWED MOTION TO COMPEL PRODUCTION OF ALLEGED WORK PRODUCT (SUBSTANTIAL NEED), (2) MOTION FOR DETERMINATION OF PRIVILEGE AND MOTION TO COMPEL PRODUCTION OF WAIVED PRIVILEGED MATERIALS, AND (3) MOTION FOR SANCTIONS**

**REDACTED PUBLIC VERSION**

I, Reed R. Kathrein, declare as follows:

1.      I am a partner with the law firm of Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), counsel for Proposed Class Representative Jared Thompson in this action. The Court appointed me, along with my Hagens Berman colleagues Steve Berman and Lucas Gilmore, as Lead Counsel by Order dated April 4, 2022. *See* ECF No. 43.

2.      I submit this omnibus declaration in support of Lead Plaintiff Jared Thompson's ("Lead Plaintiff") three motions: (i) Renewed Motion to Compel Production of Alleged Work Product (Substantial Need); (ii) Motion for Determination of Privilege and Motion to Compel Production of Waived Privileged Materials; and (iii) Motion for Sanctions. I have personal knowledge of the matters described in this declaration and I am competent to testify thereto.

**Defendants' Initial Disclosures**

3.      Defendants served their initial disclosures on June 2, 2023. They stated that the only documents Defendants may use to support their defenses are public documents "filed with the U.S. Securities and Exchange Commission." The disclosures identified only three individuals (Peter Cannito, William Read, and Jonathan Baliff ) as persons likely to have discoverable information that Defendants may use to support their defenses. Lead Plaintiff noted they believed that the initial disclosures were insufficient and Defendants had adequate time to identify other

- 1 -

documents.   Defendants responded to Lead Plaintiff in a June 5, 2023 email, asserting the disclosures were complete and appropriate. To date, Defendants have not amended their disclosures, and they maintain their answers in their initial disclosures were appropriate.

**Lead Plaintiff's Document Requests and the Parties' Search Term Negotiations**

4.        Lead Plaintiff served document requests and one set of interrogatories to all Defendants on May 19, 2023.

5.        To expedite the process of receiving documents, Lead Plaintiff identified core known, responsive documents on May 30, 2023 that Defendants could identify and produce without any search tool. Specifically, Lead Plaintiff requested: (1) the Board and Audit Committee documents; (2) reports from the Audit Committee; (3) the whistleblower complaints; (4) investigations and reports following up on the complaints; (5) documents relating to the Audit Committee findings regarding "tone at the top"; and (6) documents relating to the termination of William Read. Lead Plaintiff further explained the core documents would help develop targeted search terms for identifying responsive documents. Given counsel's presumed knowledge of Defendants' documents, Lead Plaintiff also requested a search term proposal from Defendants to begin negotiations of appropriate terms.

6.     Defendants responded to the interrogatories and RFPs on July 20, 2023, after a stipulated extension. The responses from each individual Defendant to the interrogatories were nearly identical.  Exhibits A and B contain true and correct copies of Redwire's responses and objections to the interrogatories and excerpts from Defendants' responses to the document requests, respectively.

7.     Lead Plaintiff requested a meet and confer with Defendants in a July 26, 2023 email, before Defendants began the review and production of documents via search terms. Lead Plaintiff stated that the parties should agree on search terms and custodians by mid-August. Lead Plaintiff noted, moreover, that Defendants had previously indicated they would produce known, responsive documents concurrently with their discovery responses.  Yet by July 26, 2023, Defendants had not made this production.  Finally, Lead Plaintiff added an additional set of known responsive documents to the previous May 30, 2023 request – (7) documents relating to auditor reports/communications to Redwire relating to the "tone at the top" and other allegations in the operative complaint – and maintained that the identification and production of the documents did not require search terms.

8.     Defendants stated that King & Spalding LLP almost exclusively prepared the Board and Audit Committee materials requested by Lead Plaintiff, and therefore, any initial document production would not be significant, during an

- 3 -

August 3, 2023 meet and confer call.  Defendants also said a privilege log would be forthcoming.

9.      Defendants identified only two non-privileged documents on August 11, 2023 that fell within the previously requested categories of known responsive documents: the whistleblower complaint and William Read's separation agreement. Defendants also sent an initial list of custodians and document sources against which Defendants insisted they would run their self-selected terms.  Lead Plaintiff agreed, only on the condition that the process would be iterative with each party reserving rights. This agreement included an agreement to negotiate in good faith on additional terms for use in future productions.

10.      Lead Plaintiff received Defendants' initial list of search terms and a corresponding hit report on August 14, 2023, a few days later. Defendants drafted the search terms without any input from Lead Plaintiff and apparently made no effort to use their knowledge to craft terms best-suited to identify responsive documents. Rather, Defendants simply pulled words from their public disclosures. Per Defendants' report, their initial search terms hit for approximately 46,000 non-unique documents.  Exhibit C contains a true and correct copy of Defendants' initial set of search terms and hit report.

11.      Defendants confirmed the date ranges and custodians used to identify the set of documents collected by King & Spalding and KPMG during the Audit

Committee investigation were encompassed entirely by the date parameters and custodians used to search for documents responsive to Lead Plaintiff's requests during a September 7, 2023 meet and confer. Defendants also stated that King & Spalding and KPMG provided no written reports to any third-party concerning the Audit Committee investigation.

12. To avoid further delay for document collection and production based on Defendants' initial search terms, Lead Plaintiff provisionally agreed to an end-date of June 1, 2022 for document collection. Lead Plaintiff based this agreement on Defendants' representations that (1) the Audit Committee investigation concluded in March 2022, (2) Defendants had already collected documents dated through June 1, 2022 prior to any meet and confers, and (3) collecting more documents would be unduly burdensome. The parties, however, eventually agreed that for documents concerning William Read's departure from Redwire, the end-date for collection would be June 30, 2022.

13. Lead Plaintiff sent Defendants a set of proposed terms on September 28, 2023. The proposed terms were purposefully broad to have a greater chance to capture key responsive documents because very little was known (and continues to be unknown) about the facts on which the disclosures were based. A true and correct copy of Lead Plaintiff's counter-proposal is attached as Exhibit D.

14.     Defendants sent a counterproposal to Lead Plaintiff's terms on October 13, 2023.  Defendants noted that Lead Plaintiff's proposal returned 1.4 million documents, which Defendants claimed was "unduly burdensome, disproportional to the needs of the case and extremely costly."  Per Defendants, their counterproposal, which consisted mainly of conclusory words, hit 32,385 documents (not including family records).

15.     Following receipt of Defendants' counterproposal, Lead Plaintiff continued negotiations with Defendants over other discovery issues, including the production of documents from GPAC, Defendants' objections to the first set of document requests, and the collection period of documents relating to William Read's departure, among other issues.  Lead Plaintiff also took the time to review Defendants' initial document production to help refine the search term proposal.  In fact, Lead Plaintiff uncovered a codename for the Audit Committee investigation through its review of documents, which Defendants had not identified in their initial set of search terms.

16.     Lead Plaintiff sent the next counterproposal on November 29, 2023. The parties exchanged additional proposals on December 8, 2023 (Defendants), December 14, 2023 (Lead Plaintiff), January 5, 2024 (Defendants), and January 22, 2024 (Lead Plaintiff).

17.    Defendants sent their "final" counterproposal on February 7, 2024. Exhibit E(a), E(b), and E(c) contain a true and correct copy of Defendants' February 7, 2024 counterproposal converted into multiple PDF parts for ease of the Court's review, which reflects the parties' previous proposals identified in paragraph 16.

18.    Defendants proposed using Technology Assisted Review ("TAR") for the first time when sending their "final" counterproposal, aiming to review the documents culled by search terms and further narrow the number of documents for manual review. Defendants made this proposal despite previously stating during a December 14, 2023 meet and confer that the number of documents would be a "roadblock" for the application of TAR, claiming the amount was too small to employ TAR.

19.    Lead Plaintiff sent a letter addressing Defendants' proposal to use TAR on February 15, 2024.  The letter outlined how TAR should be used and noted that when properly employed, TAR can identify 80% or more responsive documents in a corpus, compared to less than 30% of responsive documents search terms generally retrieve.  Lead Plaintiff argued that if used, TAR should be run over the largest possible document corpus because when search terms and TAR are combined – as Defendants proposed – the resulting estimated recall level will be the product of the recall at each stage.  Nonetheless, Lead Plaintiff was willing to discuss Defendants' proposal and seek further clarification.  Exhibit F is a demonstrative created by Lead

- 7 -

Plaintiff's counsel demonstrating the issues with the recall level of using search terms and TAR to identify responsive documents.

20.      On February 28, 2024, Lead Plaintiff learned Defendants agreed to review a document corpus of approximately 245,000 documents identified through the application of a narrower set of search terms than Lead Plaintiff sought originally. The TAR program would utilize a seed set primarily consisting of the documents Defendants collected through their initial set of search terms and were coded "responsive" or "non-responsive" by reviewers.  The TAR program would then apply this learning to predict the relevancy of the documents Defendants agreed to review. Defendants proposed to limit the use of TAR further by using it statically, *i.e.,* without "continuous," "active" learning. After additional exchanges of questions and answers, Defendants final response, provided on March 29, 2024, made clear that the process Defendants were amenable to would have a very low probability of identifying the key documents in the case. The parties had reached an impasse. Exhibit G is a true and correct copy of Defendants' March 29, 2024 email.

21.      Defendants had produced less than 1,400 documents by the end of November 2023. Few of these documents disclose the basis for the Audit Committee findings and conclusions.  For example, Defendants produced earlier drafts and the final November 2021 resignation letter from the whistleblower, Daniel Gievers, which gave some indication of the subject matters of the Audit Committee

investigation.  In March 2024, Defendants also produced a more detailed letter from the whistleblower dated December 2021, but only after they cited to the letter in response to Lead Plaintiff's motion regarding the claw back of a PricewaterhouseCoopers LLP ("PwC")  memorandum, and failed to clearly identify it on any privilege log.

22.     Prior to Defendants' June 2024 supplemental production, Defendants confirmed that only six of the documents identified in the June 2022 SEC presentation had previously been collected, reviewed, and produced pursuant to Defendants' initial search terms. *See infra*, ¶¶ 32-35.  At the time, Defendants did not disclose that the presentation was given to the SEC.  Furthermore, during the parties' meet and confers, Defendants stated that of the fifty-nine (59) documents in the supplemental production, thirty-eight (38) would have been included in the universe of documents that Defendants previously offered to review in February/March 2024. Thus, nearly one-third of the documents the Audit Committee investigators identified to the SEC as being critical to their conclusions were not even included in the universe of documents Defendants agreed to review, not withstanding whether they would have been identified as responsive based on the TAR algorithm. Similarly, only fourteen (14) of twenty-one (21) documents Lead Plaintiff identified in the supplemental production as being authored by Mr. Gievers

or relating to his whistleblower complaint were included in the universe of documents Defendants offered to review.

**Defendants' Privilege Logs**

23.     Defendants served their first privilege log identifying Audit Committee materials on August 11, 2023.  The privilege log consisted of twelve redacted "[u]nofficial" Audit Committee meeting minutes, of which only five appear to be unique.  These minutes were authored by King & Spalding. The log also included an unidentified number of "[a]ttorney notes from witness interviews" in the possession of Kirkland & Ellis dated between November 11, 2021 to February 7, 2022 which were withheld entirely. No other documents were identified on the log. Exhibit H is a true and correct copy of Defendants' initial privilege log.

24.     Defendants produced a categorical privilege log and individual privilege log on November 29 and 30, 2023.  Exhibit I is a true and correct copy of the individual privilege log produced on November 30, 2023.

25.     The November 30, 2023 individual privilege log included one document authored by King & Spalding and KMPG – a February 2022 presentation. Defendants redacted from the log the fact that this presentation was given to the SEC.  The June 2022 presentation to the SEC eventually produced by Defendants has never been logged. Lead Plaintiff has not identified any other investigation documents authored by the investigators on the individual logs.

26.     In response to Lead Plaintiff's motion to compel individual privilege logs (*see* ECF No. 133), Defendants agreed to revise the categorical privilege log in certain aspects. *See* ECF No. 141. Despite Defendants' agreement to serve a revised categorical privilege, none has been served to date.

**Privileged Documents in the Possession of PwC**

27.     Defendants clawed back a PwC memorandum in December 2023, which PwC had initially produced pursuant to a document subpoena. The PwC memorandum identified documents not produced by PwC nor Defendants, which Lead Plaintiff raised with PwC and Defendants.  Following this notice, Defendants served a categorical log and document-by-document log on behalf of PwC on February 23, 2024.  The privilege logs show PwC received three PowerPoint presentations authored by King & Spalding and KPMG, as well as drafted at least fifteen memoranda summarizing discussions with the Audit Committee investigators, among other material.  These documents are critical to understanding the basis of Redwire's public statements about the Audit Committee and PwC's findings and conclusions.  Exhibits J and K are true and correct copies of PwC's categorical log and individual privilege log served on February 23, 2024.

**The Deposition of Daniel Gievers**

28.     Lead Plaintiff served a deposition and document subpoena on Daniel Gievers, the whistleblower, in May 2024.  Mr. Gievers' deposition was taken on

June 18, 2024. The deposition remains open pending future questioning, but Defendants object to no more than one hour of additional questioning by Lead Plaintiff, and Mr. Gievers has no obligation to agree to Lead Plaintiff asking any further questions.

29.      During the deposition,  . *See* Gievers Dep. Tr. at 16:3-19:12, 177:20-180:5. 

*Id.* at 17:13-24.   Defendants further claimed 

*Id.* at 179:23-180:5. In fact, the deposition subpoena to Mr. Gievers asked for "[a]ll documents and communications relating to the resolution of any claims [he] raised in the Whistleblower Complaint and December 2021 letter," which would include the separation agreement, as does Lead Plaintiff's RFP No. 29, which sought "[a]ll documents concerning Redwire's notification, decisions to investigate, and investigation of the whistleblower

- 12 -

complaint." Further, the separation agreement was never logged as being withheld on confidentiality grounds.

30. Defendants also

. *See* Gievers Dep. Tr. at 16:3-19:12, 176:19-177:19, 247:13-248:21, 276:6-279:18.

. *Id.*

. *Id.* at 177:12-16, 248:21, 276:16, 279:14-18.

31. Exhibit L is a true and correct copy of the transcript from the June 18, 2024 deposition of Mr. Gievers.

**Defendants' June 2024 Supplemental Production**

32. After Lead Plaintiff filed a motion to compel the production of the Audit Committee investigation materials in May 2024, Defendants requested a meet and confer to discuss a production of those materials. Defendants represented that they would make a supplemental production that should alleviate Lead Plaintiff's claims of substantial need and undue burden.

33.    After discussions, on June 14, 2024, Lead Plaintiff agreed to withdraw the motion, without prejudice, and pause compliance with subpoenas issued to King & Spalding, KPMG, and PwC.  In exchange, Defendants agreed to supplement their production with King & Spalding/KPMG February 2022 and June 2022 presentations and documents referenced therein. Lead Plaintiff assumed, and Defendants gave no indication otherwise, that the presentations were made to the Audit Committee. Defendants also did not disclose at any time prior to Mr. Gievers' deposition that the supplemental production would include documents authored by Mr. Gievers that had not been previously produced.

34.    Defendants also agreed to allow PwC to produce documents collected by counsel during the Audit Committee investigation and then provided to PwC. The documents were previously withheld and identified in Category No. 1 of PwC's categorical log. *See supra*, ¶ 27. Still other documents in PwC's possession remain withheld, including three PowerPoint presentations created by King & Spalding and KPMG and PwC internal memos regarding their audit work based on the investigation. *Id.*

35.    Defendants supplemented their production on June 21, 2024 – three days after the deposition of Mr. Gievers.  Despite Defendants' earlier unqualified statements in response to Request for Production No. 38 that they had no responsive documents related to any formal or informal government investigations, the newly

- 14 -

produced documents revealed the K&S/KPMG presentations were given to the SEC.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

Exhibits M and N contain true and correct copies of the February 2022 presentation and the June 2022 presentation, respectively. Exhibit O is a true and correct copy of King & Spalding's June 8, 2022 letter to the SEC.

**The Parties' Meet and Confer Efforts Regarding the Supplemental Production and Other Discovery Issues**

36.     Following Defendants' supplemental production, Lead Plaintiff reviewed the documents and researched relevant case law. Defendants' supplemental production included more than 50 documents discussed in the June 2022 presentation, including numerous emails authored by Mr. Gievers, that had not been previously produced. The production included documents from Redwire's internal messaging system, even though the original production of ~1,400 documents included no such internal messages despite Defendants stating they would collect "MS Team chats."

37.     On July 23, 2024, Lead Plaintiff initiated meet and confer efforts by sending a comprehensive letter. The parties met and conferred on July 30, 2024.

- 15 -

Lead Plaintiff sent a follow-up letter on July 31, 2024, and Defendants responded on August 13, 2024.

38. During the July 30, 2024 meet and confer, Defendants defended their discovery responses. Specifically, they argued that (i) there was no "formal or informal" SEC investigation; (ii) Defendants were not obligated to produce the June 2022 presentation because it fell outside the June 1, 2022 end date the parties purportedly agreed upon for Defendants' document collection; and (iii) public knowledge of Redwire's self-notification to the SEC about the whistleblower complaint somehow was disclosure of their interactions with the SEC (although Defendants' counsel claimed they did not know in what manner the SEC was notified). When Lead Plaintiff noted that Redwire has reported in its SEC filings that on August 1, 2023, the SEC had closed the "matter," Defendants claimed ignorance of this disclosure and asserted that a "matter" differed from an "investigation."

39. In their August 13, 2024 follow-up letter, however, Defendants admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Accordingly, Defendants said they would update the response to RFP No. 38. Defendants also made a production of a limited number of communications between the SEC and outside counsel on August 16, 2024. Exhibit P is a true and correct copy of a June 2022 email chain among King & Spalding,

Kirkland & Ellis, and the SEC ████████████████████████████

██████████████████████

40.    In the July 23, 2024 meet and confer letter, Lead Plaintiff also pointed out that the SEC presentations demonstrated the non-privileged nature of the Audit Committee investigation. Alternatively, any privilege was waived through disclosure to the SEC. Accordingly, Lead Plaintiff requested the production of the ████████████████████████████████████████, witness interview materials, and any other documents concerning the Audit Committee's findings. During the July 30, 2024 meet and confer Defendants maintained their privilege assertions and refused to produce the ██████████████████████████████ ██████████████ nor any material related to witness interviews. In their August 13, 2024 follow-up letter, Defendants confirmed that King & Spalding had segregated the ████████████████████████████████████████ and the documents are presently recoverable in their system.

41.    Defendants could not confirm during the July 30, 2024 meet and confer whether King & Spalding had created any witness interview material, despite King & Spalding being the lead outside counsel for the Audit Committee investigation, and having already produced privilege logs showing no such documents. In their follow-up letter, Defendants revealed for the first time that King & Spalding attorneys drafted notes of the witness interviews. King & Spalding also gave oral

"characterization[s]" of the witness interviews during the February 2022 and June 2022 presentations to the SEC. However, Defendants stated no transcripts or recordings exist of the witness interviews.

42.     Lead Plaintiff further confirmed during the July 30th meet and confer that Kirkland & Ellis also authored notes for witness interviews conducted by K&S/KPMG. While these notes were previously identified in the August 2023 privilege log, they were not identified as being the same interviews as taken by the Audit Committee investigators.

43.     In their follow-up letter, Defendants reiterated that Kirkland & Ellis "did not perform the Audit Committee's investigation, but independently represented Redwire in conjunction with legal issues and legal advice, including but not limited to Mr. Gievers' allegations." Furthermore, for the first time, Defendants disclosed that ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████ Defendants agreed to produce the documents ████████████████████████, and those documents were produced on August 16, 2024. The documents revealed that ████████████████████ ██████████████████████. Thus, the only record of what the witnesses remembered almost three years ago are the King & Spaulding and Kirkland

interview notes. Exhibit Q is a true and correct copy of Kirkland & Ellis' ████████

████████████████████████████████████████ .

44.     During the meet and confer, Defendants claimed they redacted information from the November 2023 individual log to conceal privileged information, including that the February 2022 K&S/KPMG presentation was given to the SEC. In their August 13, 2024 letter, Defendants said they would update their individual privilege log to reflect the King & Spalding interview notes, provide further details to "clarify" Kirkland & Ellis' role, and remove any documents that have now been produced to Lead Plaintiff. Defendants also said they would revisit their redactions on the log.

45.     Regarding their initial disclosures, Defendants only offered vague assurances they would amend them "in advance of trial" but did not offer a specific date. Defendants further claimed in their August 13, 2024 letter that they were not going to use "much of the material" in support of their defense that Lead Plaintiff asserts was not properly disclosed. Specifically, Defendants stated:

> [Rule 26] only states that a party must disclose information related to documents or witnesses "that the disclosing party may use to support its claims or defenses…" ***Certainly, much of the material that Lead Plaintiff suggests was not properly disclosed on Defendants' Rule 26 disclosure is not information that Defendants will use in support of their defense***. It seems that Lead Plaintiff believes that Rule 26 disclosures must identify every source where discoverable or relevant information may be located—this is simply not the Rule.
> . . .

Moreover, it is common in federal civil litigation that Rule 26 disclosures be updated throughout the course of litigation. Indeed, case law suggests that so long as the other side knew of the information, no update is required. ***As stated, Defendants will likely update their Rule 26 disclosure as this case proceeds through discovery—which is still ongoing***.

46.     Defendants also stood by their objections at Mr. Gievers' deposition during the July 30th meet and confer, and ██████████████████████ ████████████████████████████████████████████████████.

Defendants could not identify any authority supporting their position that they could ████████████████████████████████████████████████████

████████████████████████████████████████. Defendants also offered to allow Lead Plaintiff one additional hour of questioning of Mr. Gievers once his deposition continues to address their production of relevant documents after the June 18, 2024 deposition. Finally, Defendants said they would contact Mr. Gievers' counsel to ask ████████████████████████████

████████████████████████████████████████████████████

██████████████████. This information would allow Defendants to reconsider their

████████████████████████████████████████████████████

████████.

47.     In the August 13, 2024 letter, Defendants changed course, and agreed to ████████████████████████████████████████████████. ██

████████████████████████████████████████████████████



48.     During the deposition, ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████. *See* Gievers Dep. Tr. at 126:22-128:3,

267:24-268:10. Prior to this deposition testimony, Lead Plaintiff had not been aware

that ███████████████████████ existed, as Defendants never identified them

as possible sources of responsive ESI. Lead Plaintiff raised this issue with

Defendants on August, 6, 2024. In their August 13, 2024 letter, Defendants stated

they would refuse to produce ████████████████████████████████ are not

responsive to any document request, and the production of this material would be

overbroad and disproportionate to the needs of the case. However, █████████

████████████████████████████████████████ would be plainly

responsive to RFP No. 29, which seeks documents concerning the investigation of

the whistleblower complaint. Lead Plaintiff defined "Document" to include

█████████ which Defendants never objected to as being overbroad or

- 21 -

disproportionate, and Defendants have never put the ████████ on any privilege log.

Exhibit R contains a true and correct copy of the definition of "Document" in Lead Plaintiff's document requests.

49.    Lead Plaintiff's counsel has devoted over 2,400 hours to the litigation since June 2023.

50.    Exhibit S is a true and correct copy of excerpts from Redwire's Form 10-Q filed on April 1, 2022 where the Audit Committee made its findings and conclusions public.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of August, 2024 in Berkeley, California.

*/s/ Reed R. Kathrein*
REED R. KATHREIN