UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| JED LEMEN, Individually and On Behalf of All Others Similarly Situated, | Case No. 3:21-cv-01254-TJC-PDB <br><br> <u>CLASS ACTION</u> |
| Plaintiff, | |
| v. | |
| REDWIRE CORPORATION f/k/a GENESIS PARK ACQUISITION CORP., PETER CANNITO, and WILLIAM READ, | |
| Defendants. | |

**DECLARATION OF REED R. KATHREIN IN SUPPORT OF: (I) LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S UNOPPOSED MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND COMPENSATORY AWARD TO LEAD PLAINTIFF**

I, REED R. KATHREIN, declare under penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

1.     I am a Partner of Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), Lead Counsel for Lead Plaintiff Jared Thompson ("Lead Plaintiff") and the Settlement Class in the above-captioned action. Unless otherwise indicated, I have personal knowledge of the matters set forth herein based both on my extensive participation in the prosecution and settlement of the claims asserted in the Action and my supervision of those working at my direction. If called upon, I could and would competently testify that the following facts are true and correct.[1]

2.     Attached hereto are true and correct copies of Exhibits 1 through 6:

**Exhibit 1:** Declaration of Sarah Evans Regarding: (A) Dissemination of Notice; (B) Publication/Transmission of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date ("Evans Decl.");

**Exhibit 2:** Declaration of Jared Thompson in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Compensatory Award to Lead Plaintiff ("Thompson Decl.");

**Exhibit 3:** Declaration of Reed R. Kathrein on Behalf of Hagens Berman Sobol Shapiro LLP Concerning Attorneys' Fees and Expenses ("Hagens Berman Decl.");

---

[1] All capitalized terms used herein that are not otherwise defined have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated November 15, 2024 (the "Stipulation") (ECF No. 213-2).

1

**Exhibit 4:** Declaration of Brian Schall on Behalf of Schall Law Firm Concerning Attorneys' Fees and Expenses;

**Exhibit 5:** Declaration of David M. Buckner on Behalf of Buckner + Miles Concerning Attorneys' Fees and Expenses; and

**Exhibit 6:** Table of Peer Law Firm Billing Rates.

3.      I respectfully submit this declaration, together with the attached exhibits, in support of Lead Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation and the incorporated memorandum in support thereof (the "Final Approval Memorandum"). As set forth in the Final Approval Memorandum, Lead Plaintiff seeks final approval of the $8 million Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

4.      I also respectfully submit this declaration in support of Lead Counsel's Unopposed Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Compensatory Award to Lead Plaintiff, and the incorporated memorandum in support thereof (the "Fee Memorandum"). As set forth in the Fee Memorandum, Lead Counsel, on behalf of Lead Plaintiff's Counsel, seeks an award of attorneys' fees in the amount of 33% of the Settlement Fund (or $2,640,000, plus interest at the same rate as the Settlement Fund), and reimbursement of litigation expenses, to be paid out the Settlement Fund, in the total amount of $430,087.97.

2

Lead Counsel also seeks an award to Lead Plaintiff in the amount of $10,000, to be paid out of the Settlement Fund, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs incurred in connection with his representation of the Settlement Class.

5.    The Court preliminarily approved the proposed Settlement by its Order entered on January 24, 2025 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 214. Pursuant to the Preliminary Approval Order, Strategic Claims Services ("SCS"), the Court-approved Claims Administrator, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail or email and by publication. *See* Ex. 1, Evans Decl., ¶¶ 2-12.

6.    In total, as of June 25, 2025, a copy of the Notice was timely mailed or a link to the Notice was emailed to approximately 39,181 potential Settlement Class Members. *Id.*, ¶ 10. To date, not a single objection has been filed with the Court and no requests for exclusion or objections have been received by Lead Counsel or the Claims Administrator. *See id.*, ¶¶ 15-16. The deadline to submit an objection or a request for exclusion is July 10, 2025.

## I.    INTRODUCTION

7.    Lead Plaintiff in this action alleges claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and

Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, arising from Defendants' alleged misrepresentations and omissions made during the period between March 25, 2021 and March 31, 2022, both dates inclusive (the "Settlement Class Period").

8.     The proposed Settlement presented to the Court for final approval provides for the resolution of all claims in the Action in exchange for a cash payment of $8,000,000 (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, Lead Plaintiff and Lead Plaintiff's Counsel submit that the proposed Settlement represents an extremely favorable result for the Settlement Class in light of the significant risks remaining in the Action.

9.     Here, the total *maximum* damages available would be approximately $88.3 million. Thus, the $8,000,000 Settlement Amount represents approximately 9.0% of the total *maximum* damages *potentially* available. A recovery of at least 9.0% of maximum damages is an excellent result for the Settlement Class. In fact, it exceeds the average recovery in similar situations. In 2024, the median settlement as a percentage of total class-wide damages in securities fraud cases with damages ranging from $75 million to $149 million was 7.5%.[2]

---

[2] *See Securities Class Action Settlements—2024 Review and Analysis* (Cornerstone Research 2024), at 7, https://www.cornerstone.com/wp-content/uploads/2025/03/Securities-Class-Action-Settlements-2024-Review-and-Analysis.pdf.

10.    Thus, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing at all) after years of additional litigation and delay.

11.    The Settlement was only achieved after a hard-fought litigation, during which Lead Plaintiff's Counsel became well informed of the relative strengths and weaknesses of Lead Plaintiff's claims in the Action. In prosecuting the Action, Lead Plaintiff's Counsel expended great efforts and resources on behalf of the Settlement Class, including: (i) conducting an extensive legal and factual investigation of Defendants and their alleged violations of the securities laws, including detailed reviews of Redwire's SEC filings, press releases, and other publicly available information; (ii) drafting the factually detailed First Amended Complaint (the "Complaint"); (iii) researching and drafting an opposition to Defendants' motion to dismiss; (iv) identifying, retaining and working with loss causation, damages, and market efficiency experts; (v) propounding party and non-party discovery and reviewing documents; (vi) preparing for and conducting the deposition of non-party whistleblower Daniel Gievers; (vii) drafting and filing multiple motions related to Defendants' discovery and non-party discovery and attending and arguing one multi-hour hearing on one of those motions; (viii) assisting Lead Plaintiff in completing discovery, including document production, written discovery responses, and a

5

deposition; (ix) prior to settlement, preparing for fact witness depositions as well as the 30(b)(6) depositions of Redwire and Redwire's auditor; (x) researching and drafting the motion for class certification and *Daubert* briefing concerning the market efficiency experts; (xi) drafting a mediation statement and presentation highlighting key documents and addressing both liability and damages issues and participating in a full-day mediation session overseen by a well-respected mediator, Gary S. Salzman, Esq., as well as intense follow-up calls over the proceeding weeks following the mediation; (xii) engaging in negotiations regarding the terms of the proposed Settlement; (xiii) preparing the initial draft of the Stipulation and supporting documents; (xiv) working with Lead Plaintiff's consulting damages expert to craft the Plan of Allocation; and (xv) drafting the final approval motion and supporting papers.

12. Based on the foregoing efforts, Lead Plaintiff and Lead Plaintiff's Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of all Settlement Class Members. For all the reasons set forth herein and in the accompanying memorandum of law and declarations, Lead Plaintiff and Lead Plaintiff's Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Federal Rule of Civil Procedure 23(e).

13.    In addition, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Plaintiff's Counsel developed the Plan of Allocation with the assistance of their consulting damages expert. *See infra*, ¶¶ 55-63 (discussing Plan of Allocation). The Plan of Allocation provides for the equitable distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss and the security at issue. Apart from differences in *pro rata* shares based on, among other factors, the type of security transacted by each Settlement Class Member, no Settlement Class Member (including Lead Plaintiff) receives preferential treatment under the plan.

14.    Finally, Lead Counsel, on behalf of Lead Plaintiff's Counsel, seeks approval of the request for attorneys' fees, reimbursement of litigation expenses, and compensatory award to Lead Plaintiff, as set forth in the accompanying Fee Memorandum. As discussed in the Fee Memorandum, the requested 33% fee is within the range of percentage awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and is warranted in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested litigation expenses of $430,087.97 and the requested PSLRA award of $10,000 to Lead Plaintiff are fair and reasonable. Accordingly, as set forth in the Fee

Memorandum and for the additional reasons set forth herein, I respectfully submit that Lead Counsel's request for attorneys' fees, reimbursement of litigation expenses, and compensatory award to Lead Plaintiff is fair and reasonable and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

15.    Redwire Corporation f/k/a Genesis Park Acquisition Corp. ("Redwire" or the "Company") provides critical space infrastructure technology and services to deliver solutions to meet the needs of national security, civil, and commercial customers for a full spectrum of activity in space.

16.    This securities class action arose from Defendants' allegedly false and misleading statements and omissions about the Company's senior management and their purported commitment to being honest and principled with respect to Redwire's internal controls over its accounting, financial reporting, and ethics. Redwire's senior management took the Company public through a de-SPAC transaction in March 2021 based on Defendants' repeated representations concerning the impeccable management and financial prowess, experience, and credentials of the individual Defendants, the Company's adherence to its published Code of Ethics and Conduct, and the Company's remediation efforts to bring the internal controls of the new Redwire entity up to regulatory standards as a public

8

company. As Lead Plaintiff alleged, these statements artificially inflated the price of Redwire securities until a series of disclosures revealed the truth.

17.    First, just two months after the September 2, 2021 closing date of the de-SPAC merger, Defendants disclosed on November 10, 2021 that Redwire would postpone the release of its third quarter earnings results, as the Company was "notified by an employee of potential accounting issues at a business subunit" and the Audit Committee would begin an independent investigation. *See* ECF No. 47, ¶¶ 44, 70.  On this news, Redwire's stock plummeted 16%. *Id.*, ¶ 71.

18.    Second, on November 15, 2021, the Company stated that due to the pending investigation, Redwire could not "finalize its financial statements or its assessment of the effectiveness of its disclosure controls and procedures." *Id.*, ¶ 72. Redwire's stock fell 8.3% following this announcement. *Id.*, ¶ 73.

19.    Third, nearly have a year later, on March 31, 2022, Redwire disclosed the Audit Committee's findings, specifically a previously undisclosed material weakness in internal control over financial reporting ("ICFR") that "certain members of senior management failed to reinforce the need for compliance with certain of the Company's accounting and finance policies and procedures, including reinforcement of appropriate communication." *Id.*, ¶ 75.  In response, Redwire's stock fell 29%, causing investor losses. *Id.*, ¶ 76.

20.     The next day, April 1, 2022, Redwire filed its first financial filing since the merger was consummated in September 2021 by filing its 10-Q for the period ending September 30, 2021. *Id.*, ¶ 77.  The 10-Q repeated the Audit Committee's conclusion that "certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top." *Id.* The 10-Q further revealed that "full remediation" of material weaknesses in ICFR would "likely go beyond December 31, 2022," would be time consuming and costly, and "investors may lose confidence in our financial reporting." *Id.*, ¶ 78.  Redwire's April 11, 2022 Annual Report on Form 10-K repeated the "tone at the top" revelation, reemphasized the delays and costs of remediation, and confirmed that Redwire's management could not assess its ICFR "as of December 31, 2021" and the "disclosure controls and procedures were not effective as of December 31, 2021." *Id.*, ¶ 79.

**B.     Commencement of the Instant Action and Appointment of Lead Plaintiff and Lead Counsel**

21.     On December 17, 2021, plaintiff Jed Lemen filed a class action complaint in this matter. ECF No. 1. By further Orders dated March 17, 2022 and April 4, 2022, the Court appointed Jared Thompson as Lead Plaintiff and Hagens Berman Sobol Shapiro LLP as Lead Counsel. ECF Nos. 36, 43.

10

**C.   The Comprehensive Pre-Filing Investigation and Preparation of the Complaint**

22.   Lead Plaintiff's Counsel conducted an extensive and detailed pre-filing investigation of Defendants, which included, among other things: (i) review and analysis of the Company's SEC filings, press releases, and other public statements made by Defendants prior to, during, and after the Settlement Class Period; (ii) review and analysis of research reports prepared by securities and financial analysts regarding Redwire; (iii) review and analysis of publicly available documents, reports, announcements, and news articles concerning Redwire and the Defendants; (iv) interviews of former Company employees; and (v) consultation with an expert in loss causation and damages.

23.   On June 17, 2022, Lead Plaintiff filed the First Amended Complaint. ECF No. 47. The Complaint asserted claims against Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the individual Defendants Peter Cannito and William Read under Section 20(a). Among other things, the Complaint alleged (i) Defendants made or caused to be made a series of materially false and/or misleading statements about the Company's senior management and their purported commitment to being honest and principled with respect to Redwire's internal controls over its accounting, financial reporting, and ethics; (ii) Defendants' disclosures of receipt of a whistleblower complaint relating to accounting issues, an investigation into the complaint to be conducted by the

11

Audit Committee and corresponding delay in reporting financial results, and months later, the Audit Committee's determination that "certain members of senior management failed to consistently message and set certain aspects of an appropriate tone at the top," negatively affected the value of the Company's securities; and (iii) Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices. *Id.*

### D. Defendants' Motion to Dismiss the Complaint

24. Defendants moved to dismiss the Complaint on August 16, 2022, arguing that the (i) Complaint failed to adequately allege that the representations about management's experience, Redwire's financial health, and the Company's corporate governance policies were materially false or misleading and (ii) Lead Plaintiff failed to plead particularized facts giving rise to the requisite inference of scienter. ECF No. 48. Lead Plaintiff filed the opposition to the motion to dismiss on October 17, 2022 (ECF No. 58), and Defendants filed their reply on November 14, 2022 (ECF No. 60).

25. The Court denied Defendants' motion to dismiss on March 22, 2023. ECF No. 62. Defendants thereafter filed their Answer to the Complaint on April 21, 2023. ECF No. 68.

**E.     Lead Plaintiff's Discovery Efforts**

26.     Formal fact discovery began in May 2023. Lead Plaintiff and Defendants (collectively, the "Parties") exchanged initial Rule 26 disclosures, and Lead Plaintiff served fifty-seven (57) document requests and four (4) interrogatories with multiple subparts. In response to the initial document requests, the Parties negotiated an ESI protocol and protective order, and discovery commenced. Defendants produced over 1,700 documents, totaling more than 20,000 pages. In September 2024, Lead Plaintiff served additional interrogatories and document requests to Defendants and noticed fact depositions.  The Parties agreed to settle the Action before the deadlines for discovery responses and dates for the depositions.

27.     Lead Plaintiff also issued document subpoenas to four (4) third-parties, which resulted in additional document discovery.  Lead Plaintiff served three (3) deposition notices to third-parties and took the deposition of the whistleblower prior to the Settlement.

28.     Lead Plaintiff himself searched for, collected, and produced documents, sat for an all-day deposition, and provided responses to interrogatories and requests for admission.

29.     Over the course of discovery, the Parties filed multiple discovery briefs. These briefs related to: (i) Defendants' claw back of a Pricewaterhouse Coopers LLP ("PwC") memorandum (ECF Nos. 108-109); (ii) Lead Plaintiff's responses to

Defendants' document requests, interrogatories, and requests for admission (ECF Nos. 94-96, 113-115); (iii) Defendants' objections to Lead Plaintiff's 30(b)(6) deposition notice to Redwire (ECF Nos. 132, 139); (iv) Defendants' categorical privilege logs (ECF No. 133, 141); (v) Defendants' claim of privilege over the Audit Committee investigation materials and Lead Plaintiff's assertion that such materials should be produced based on lack of privilege, waiver of privilege, and/or substantial need (ECF Nos. 176-177, 185-186, 204, 206); (vi) Lead Plaintiff's request for sanctions against Defendants based on alleged discovery misconduct (ECF Nos. 178, 187, 205); and (vii) Defendants' motion for a protective order concerning the PwC 30(b)(6) deposition notice (ECF Nos. 197, 201). The Court had not ruled on the motions to compel relating to the Audit Committee investigation materials, the sanctions motion, and the PwC protective order motion when the Parties agreed to the Settlement.

## F.   Lead Plaintiff's Motion for Class Certification

30.   On January 19, 2024, Lead Plaintiff filed his Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel. ECF No. 85. On April 24, 2024, Defendants filed their opposition. ECF No. 129. The Parties filed additional briefs regarding class certification between July and September 2024, including Lead Plaintiff's reply (ECF No. 159), Defendants' sur-reply (ECF No. 170), and Lead Plaintiff's sur-sur-reply (ECF No. 182). After

14

depositions, the Parties also sought to exclude each other's experts offered during the briefing on class certification. ECF Nos. 136, 160-161, 169, 171. Finally, in response to arguments raised by Defendants in opposing class certification, Lead Plaintiff filed on September 4, 2024 a motion for leave to amend the Complaint and class certification motion and to add a new class representative. ECF No. 183. Defendants opposed the motion on September 18, 2024. ECF No. 198. The Court had not ruled on the class certification motion nor the motion for leave to amend when the Parties agreed to settle the Action.

**G.    Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement**

31.    On September 25, 2024, the Parties participated in a full-day virtual mediation session before Gary S. Salzman, Esq. In advance of that session, Lead Plaintiff provided a detailed mediation statement and presentation to Mr. Salzman highlighting key documents and addressing both liability and damages issues. The Parties did not reach a resolution with Mr. Salzman at that time. Although no resolution was reached during the mediation, the Parties continued discussions through multiple follow-up calls.  On October 7, 2024, the Parties reached a settlement in principle. After negotiations, the Parties executed a confidential term sheet to settle the Action on October 17, 2024. The Parties thereafter worked diligently to finalize the Settlement, which involved numerous complex terms and other issues that required substantial negotiation among the Parties. The terms of the

Settlement are memorialized in the November 15, 2024 Stipulation. *See* ECF No.
213-2.

32.   On January 24, 2025, the Court issued its Order Preliminarily
Approving Settlement and Providing for Notice. ECF No. 214. The Order
preliminarily approved the Settlement, conditionally certified the Settlement Class
for settlement purposes only, appointed Lead Plaintiff as Class Representative,
appointed Lead Counsel as Class Counsel, approved the proposed procedure to
provide notice of the Settlement, and set July 31, 2025 as the date for the final
approval hearing. *Id.* The Settlement Class is defined as:

> all Persons and entities which, between March 25, 2021 and March 31, 2022,
> inclusive (the "Settlement Class Period"), (a) purchased or otherwise acquired Class
> Securities, or (b) sold or otherwise disposed of Put Options.

Excluded from the Settlement Class are Defendants, the officers and directors of
Redwire, at all relevant times, members of their Immediate Family and their legal
representatives, heirs, successors, or assigns, and any entity in which Defendants
have or had a controlling interest. Also excluded are any Persons or entities who
properly exclude themselves by filing a valid and timely request for exclusion in
accordance with the requirements set by the Court.

## III.   THE SETTLEMENT IS FAIR AND REASONABLE

33.   The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a cash payment of $8,000,000. As explained in detail below, this amount reflects a fair and reasonable settlement.

### A.   The Risks of Continued Litigation

34.   The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a cash payment of $8,000,000. As explained in detail below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case proceeded through additional years of litigation. These risks, among many others, were carefully considered in evaluating whether the Settlement was in the Settlement Class's best interests. There was simply no guarantee that Lead Plaintiff and the Settlement Class would achieve any recovery, let alone one greater than $8 million.

35.   While Lead Plaintiff's Counsel is confident that all of the Rule 23 requirements would have been met, and that the Court would have certified the proposed class, Defendants raised non-frivolous arguments challenging the propriety of class certification. For example, Defendants asserted that the alleged November 2021 corrective disclosures did not "reveal[] to the market the falsity of a previous representation." *See, e.g.,* ECF No. 129 at 6-7, 34. Therefore, according to Defendants, Lead Plaintiff lacked standing and typicality because he sold his

shares in December 2021, before any viable alleged corrective disclosure. *Id.* Defendants also argued against Lead Plaintiff's standing because he purchased Redwire common stock after the GPAC-Redwire merger, and most of the alleged false and misleading statements were made prior to the merger. *Id.* at 7-8. As for predominance and reliance, Defendants' expert presented several challenges to Lead Plaintiff's expert analysis finding that Redwire securities traded in an efficient market and damages could be calculated on a class-wide basis. *Id.* at 10-34. If the Court accepted any of Defendants' arguments in opposition to class certification, that would have created significant hurdles for the proposed class to overcome and the benefit to the class would have been substantially reduced or eliminated. Even if the Court granted class certification, it could revisit the decision at any time, which would present a continuous risk that the case might not be maintained on a class-wide basis through trial.

36.    In addition, Lead Plaintiff and Lead Plaintiff's Counsel would face numerous risks in establishing Defendants' liability. Like at the motion to dismiss stage, Defendants undoubtedly would have argued that Lead Plaintiff could not establish the elements of his claim under the Exchange Act. *See* ECF No. 48. Lead Plaintiff would have to prevail on materiality, falsity, scienter, loss causation and damages at summary judgment and trial, as well as the inevitable appeals that would follow, before any recovery.

18

37.     For example, Defendants' briefs indicated they would likely argue that investors do not find the "tone at the top" of a company to be material. *See, e.g.,* ECF No. 60 at 9-10.  Defendants would also note that the Company did not have to restate any financials, which they would argue cuts against any finding that the challenged statements were false and misleading. *See, e.g., id.* at 10.

38.     To challenge scienter, Defendants similarly indicated they would point to the Audit Committee investigation's conclusions regarding the whistleblower complaint, as well as the SEC's decision to not pursue any enforcement proceeding after the Company self-reported the whistleblower complaint in November 2021. *See, e.g.,* ECF No. 60 at 11; ECF No. 185 at 10; ECF No. 186 at 14-15; ECF No. 68 at 26-27 (raising lack of scienter and good faith affirmative defenses). Additional document discovery could also undermine any inference that Defendants knew or condoned any deficient "tone at the top."

39.     Another risk is that Lead Plaintiff would have confronted challenges in establishing loss causation and damages. To prove loss causation and damages, Lead Plaintiff would need to proffer expert testimony demonstrating: (i) what the "true value" of Redwire securities would have been had there been no alleged material misstatements and omissions; (ii) the amount by which Redwire securities were inflated by the alleged material misstatements and omissions; and (iii) the amount of artificial inflation removed by the alleged corrective disclosures. Defendants

19

would almost certainly present their own loss causation and damages expert(s). These expert(s) would present conflicting conclusions and theories regarding, by way of example, the non-fraud reasons for the decline in the prices of Redwire securities on the alleged corrective disclosure dates or the lack of artificial inflation in the prices of Redwire securities during the Class Period. *See, e.g.,* ECF No. 129 at 6-7 (arguing no corrective disclosures occurred in November 2021); ECF No. 136-1, ¶¶ 191-192 (Defendants' expert explaining no artificial inflation existed in common stock prior to consummation of de-SPAC merger in September 2021).

40.    Expert testimony can often rest on many assumptions, and a jury's reaction to such expert testimony is highly unpredictable. As such, Lead Plaintiff's Counsel recognized that, in such a "battle of the experts," there is the possibility that a jury could be swayed by Defendants' expert(s) and could find only a fraction of the amount of damages Lead Plaintiff contended were suffered by the Settlement Class. Thus, the amount of damages that the Settlement Class would recover at trial, even if successful on liability issues, was uncertain.

41.    Similarly, there was no assurance that any evidentiary documents and testimony relating to liability and damages could be obtained or would be admitted as evidence by the Court at trial. *See, e.g., supra*, ¶ 29 (detailing pending discovery motions at time case settled). These issues could have seriously affected Lead Plaintiff's ability to successfully prosecute the allegations in this case.

42.    The timing of the Settlement is also important. Had the case not settled, Lead Plaintiff would have needed to complete substantial discovery and motion practice related thereto, including (i) seeking, reviewing and analyzing documents produced by Defendants and other relevant third parties; (ii) taking fact depositions; and (iii) conducting all expert discovery. The costs of these tasks are assuredly high and the fruits of which are largely uncertain.

43.    Lead Plaintiff's Counsel know from experience that despite the most vigorous and competent efforts, attorneys' success in contingent litigation such as this is never assured. And, even if Lead Plaintiff had prevailed at all stages, counsel would have had to succeed on the post-trial appeals that would have surely followed. This process could have extended for years and might have ultimately led to a smaller recovery—or no recovery at all. Indeed, even prevailing at trial would not have guaranteed a recovery larger than the $8 million Settlement.

44.    Given these significant litigation risks, Lead Plaintiff and Lead Plaintiff's Counsel believe that the Settlement represents an excellent result for the Settlement Class.

**B.    The Potential Recovery of Available Damages**

45.    In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable considering the potential recovery of available damages. If Lead Plaintiff had fully prevailed on all of his claims at summary

21

judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Lead Plaintiff's damages theory—*i.e.*, Lead Plaintiff's best-case scenario—estimated total maximum damages would be approximately $88.3 million. Thus, the $8 million Settlement Amount represents approximately 9.0% of the total maximum damages potentially available in this Action. This figure exceeds the 2024 median settlement as a percentage of total class-wide damages in securities fraud cases, 7.5%, for cases with damages ranging from $75 million to $149 million. *See supra*, ¶ 9.

## IV.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

46.    The Court's Preliminary Approval Order (ECF No. 214) directed that the Notice be disseminated to the Settlement Class. The Preliminary Approval Order also set a deadline of July 10, 2025 to object to the Settlement, Plan of Allocation and/or the application for attorneys' fees, expenses, and/or PSLRA award to Lead Plaintiff and to request exclusion from the Settlement Class. Additionally, the Preliminary Approval Order set a final fairness hearing date of July 31, 2025.

47.    Pursuant to the Preliminary Approval Order, SCS, the Court-approved Claims Administrator, began mailing and emailing notice of the Settlement and published the Summary Notice. SCS also posted downloadable copies of the Notice and Claim Form online at www.strategicclaims.net/redwire/ (the "Settlement

22

Website"). Upon request, SCS mailed copies of the Notice and Claim Form, or emailed a link to the Notice and Claim Form, to Settlement Class Members. *See* Ex. 1, Evans Decl., ¶¶ 2-10.

48.     The Notice contains, among other things, (i) a description of the Action; (ii) the definition of the Settlement Class; (iii) a summary of the terms of the Settlement and the proposed Plan of Allocation; (iv) a description of a Settlement Class Member's right to participate in the Settlement; (v) a description of a Settlement Class Member's right to object to the Settlement, the Plan of Allocation and/or the application for attorneys' fees, expenses, and/or PSLRA award to Lead Plaintiff; and (vi) a description of a Settlement Class Member's right to seek exclusion from the Settlement Class. *See* Ex. 1, Evans Decl., Ex. A. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33% of the Settlement Fund (plus interest), for reimbursement of litigation expenses in an amount not to exceed $550,000 (plus interest), and for reimbursement of the reasonable costs incurred by Lead Plaintiff directly related to his representation of the Settlement Class in an amount not to exceed $10,000. *Id.*, Ex. A, ¶ 76.

49.     To disseminate the Notice, Lead Plaintiff's Counsel requested from Defendants the names and addresses of record holders of Class Securities. The transfer agent information provided by Defendants contained a total of 44 unique

23

names and addresses of persons or entities who were identified as registered purchasers of Class Securities during the Settlement Class Period. *See* Ex. 1, Evans Decl., ¶ 3. Lead Plaintiff's Counsel provided these transfer records to SCS and SCS disseminated copies of the Notice and Claim Form to each of these potential Settlement Class Members via first-class mail by February 24, 2025. *Id.*

50.    In addition, SCS maintains a proprietary master list with the names and addresses of the largest and most common banks, brokers, mutual funds, insurance companies, pension funds, and money managers. *See id.*, ¶ 5. On February 19, 2025, SCS caused a letter to be mailed or emailed to the 2,447 nominees and institutional groups contained in the SCS master mailing list. *Id.* The letter notified recipients of the Settlement and requested that, within 7 days from the date of the letter, they either (a) request sufficient copies of the Notice and Claim Form to forward to all such beneficial owners, and within 7 days of receipt of those Notices and Claim Forms, mail them to all such beneficial owners; (b) request from SCS a link to the Notice and Claim Form on the Settlement Website and email the link to all such beneficial owners for whom valid email addresses are available within 7 days of receipt of the link; or (c) send a list of the names, mailing addresses and email addresses (to the extent available) of all such beneficial owners so that SCS could promptly provide notice to them. *Id.*

51.    As of June 25, 2025, 39,181 Notice and Claim Forms have been sent to potential Settlement Class Members, either via mail or via an emailed link. *Id.*, ¶ 10.

52.    On March 10, 2025, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*. *Id.*, ¶ 12 and Ex. C.

53.    In addition, SCS established the dedicated Settlement Website, which became operational on February 18, 2025. *Id.*, ¶ 13.   The Settlement Website provides potential Settlement Class Members with information concerning the Settlement, and allows Settlement Class Members to submit a claim online and download copies of the Notice and Claim Form, the Stipulation, and Preliminary Approval Order. *Id.* Once filed, the website will provide potential Settlement Class Members with copies of the Final Approval and Fee Memorandums.

54.    There is a July 10, 2025 deadline for Settlement Class Members to request exclusion from the Settlement Class, or to object to the Settlement, Plan of Allocation, and/or the request for attorneys' fees, expenses, or PSLRA award to Lead Plaintiff. To date, no requests for exclusion have been received by SCS. *Id.*, ¶ 15. SCS will file a supplemental declaration after the deadline addressing whether any requests for exclusion have been received. Furthermore, to date, no objections have been entered on the Court's docket, and Lead Counsel has not received any objections. SCS, in turn, has neither received nor been notified of the filing of any

objections. *Id.*, ¶ 16. Lead Counsel will file reply papers by July 24, 2025 that will address any objections that may be received.

## V.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

55.     Pursuant to the Preliminary Approval Order (ECF No. 214), and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $8 million Settlement Amount plus any and all interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any attorneys' fees awarded by the Court; (iv) any Litigation Expenses awarded by the Court; and (v) any award to Lead Plaintiff for his costs incurred in representing the Settlement Class) must submit a valid Claim Form with all the required information no later than June 24, 2025. *See* Ex. 1, Evans Decl., Ex. A, ¶¶ 31, 33. The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, subject to Court-approval.

56.     The Plan of Allocation is detailed in the Notice. *See id.*, Ex. A, ¶¶ 41-75. The Notice is posted on the Settlement Website, is downloadable, and upon request, was mailed to any potential Settlement Class Member. *See id.*, ¶¶ 6, 13. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered losses as a result of the alleged

violations of the Exchange Act as opposed to losses caused by market, industry, or Company-specific factors unrelated to the alleged violations of law. *Id.*, Ex. A, ¶ 42.

57.     Under the Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund based on the type of security transacted and his, her, or its total Recognized Loss Amount as compared to the total Recognized Loss Amounts of all Authorized Claimants. *See id.*, Ex. A, ¶¶ 43, 48, 59, 70-71. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the maximum amount that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. *Id.*, Ex. A, ¶ 43. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.*, Ex. A, ¶¶ 42-43.

58.     The Plan of Allocation, developed by the consulting damages expert in conjunction with Lead Plaintiff's Counsel, is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Lead Plaintiff contends could have been recovered under the theories of liability and damages asserted in the Action. *Id.*, Ex. A, ¶¶ 44-48. More specifically, the Plan of Allocation reflects, and is based on, Lead

Plaintiff's allegation that the price of Class Securities was artificially inflated due to Defendants' materially false and misleading statements and omissions.[3] *Id.*, Ex. A, ¶ 46.

59.     The Plan of Allocation is based on the premise that the decreases in the price of a Class Security that followed the alleged corrective disclosures may be used to measure the alleged artificial inflation in the price of that Class Security prior to the alleged corrective disclosures. *Id.,* Ex. A, ¶¶ 46-47.

60.     An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including the timing of the purchase and sale of any Class Security, the types of Class Securities purchased and sold[4], the purchase and sale price of the Class Security, the estimated amount of artificial inflation in the price of the Class Security at the time of purchase or sale, and the number and value of claims submitted by Claimants. *Id.,* Ex. A, ¶¶ 48, 50-57, Tables 1A-1D.

61.     If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. *Id.,* Ex. A, ¶ 72. Any prorated amounts of less than $10.00 will be included in the pool

---

[3] As noted in the Plan of Allocation, for Put Options, the inflation is negative. *See* Ex. 1, Evans Decl., Ex. A, ¶ 46 n.3.

[4] As stated in the Notice, the "Settlement proceeds available for Call Options purchased/acquired during the Settlement Class Period and Put Options sold (written) during the Settlement Class Period shall be limited to a total amount equal to 10% of the Net Settlement Fund." Ex. 1, Evans Decl., Ex. A, ¶ 57.

distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. *Id.* In Lead Plaintiff's Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.

62.    In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund fairly among Settlement Class Members based on the losses they suffered on transactions in Class Securities that were attributable to the conduct alleged in the Complaint. Lead Plaintiff's Counsel believes that the proposed Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members.

63.    To date, no objections to the proposed Plan of Allocation have been filed on the Court's docket, and Lead Counsel has not received any objections. SCS has neither received nor been notified of the filing of any objections. Ex. 1, Evans Decl., ¶ 16.

## VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND COMPENSATORY AWARD TO LEAD PLAINTIFF

64.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel, on behalf of Lead Plaintiff's Counsel, is applying for a fee award of 33% of the Settlement Fund (*i.e.*, $2,640,000 plus interest accrued thereon). Lead Counsel is also requesting reimbursement in the amount of $430,087.97 (plus interest accrued thereon), to be paid out of the Settlement Fund,

for out-of-pocket expenses incurred in connection with the prosecution and resolution of the Action. Notably, the requested litigation expenses of $430,087.97 are below the maximum amount of $550,000 set forth in the Notice. Additionally, Lead Counsel is requesting a PSLRA award of $10,000 for Lead Plaintiff's costs incurred in connection with his role in the Action.

65.    The requested 33% fee award is well within the range of fee awards in other comparable securities class action settlements. Furthermore, the resulting fractional (or negative) multiplier on Lead Plaintiff's Counsel's lodestar of approximately 0.80 strongly supports the reasonableness of the requested attorneys' fee. The legal authorities supporting the requested fees and expenses are set forth in the concurrently filed Fee Memorandum. The primary factual bases for the requested fees and expenses are set forth below.

**A.    The Outcome Achieved is the Result of the Significant Time and Labor that Lead Plaintiff's Counsel Devoted to the Action**

66.    The work undertaken by Lead Plaintiff's Counsel in investigating and prosecuting the Action and arriving at the present Settlement in the face of substantial risks has been time-consuming and challenging. At all times throughout the pendency of the Action, for over three years, Lead Plaintiff's Counsel's efforts were driven and focused on advancing the Action to bring about the most successful outcome for the Settlement Class, whether through settlement or trial. That work is summarized in ¶¶ 11, 21-31 above.

30

67. Lead Plaintiff's Counsel will also continue to work towards effectuating the Settlement in the event the Court grants final approval. No additional compensation will be sought for this work.

68. As set forth in Exhibits 3-5, Lead Plaintiff's Counsel expended a combined 4,170.80 hours prosecuting this Action. These hours resulted in a collective total lodestar of $3,300,412.50, as reflected below:

| LAW FIRM | LODESTAR |
|---|---|
| Hagens Berman Sobol Shapiro LLP | $3,254,962.50 |
| The Schall Law Firm | $31,950.00 |
| Buckner + Miles | $13,500.00 |
| **TOTAL LODESTAR** | $3,300,412.50 |

69. The rates billed by Lead Plaintiff's Counsel (ranging from $800-$1,425 per hour for partners and $525-$850 per hour for all other attorneys) are comparable to peer plaintiff firms litigating matters of similar magnitude. *See* Ex. 6 (Table of Peer Law Firm Billing Rates).

70. Based on the work performed and the quality of the result achieved, Lead Plaintiff's Counsel respectfully submit that a 33% fee is fully merited under the "percentage of the fund" methodology. Furthermore, as set forth below, though not required in the Eleventh Circuit, the requested fee is fully supported by a "lodestar multiplier cross-check."

71.     The requested 33% attorneys' fee (which equates to $2,640,000), plus interest at the rate earned by the Settlement Fund, represents a 0.80 lodestar multiple compared to the base lodestar value of counsel's time. As shown in the accompanying Fee Memorandum, a negative (or fractional) multiplier is a strong indication that the percentage request is fair and reasonable.

72.     Lead Plaintiff's Counsel's substantial efforts resulted in the significant Settlement obtained for the benefit of the Settlement Class and, accordingly, this factor weighs strongly in favor of the requested 33% award of attorneys' fees.

**B.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

73.     This prosecution was undertaken by Lead Plaintiff's Counsel on a pure contingency fee basis. From the outset, Lead Plaintiff's Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Plaintiff's Counsel were obligated to ensure that sufficient resources were dedicated to cover the considerable litigation costs required for a case such as this.

74.     With an average lag time of years for complex cases such as this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Plaintiff's Counsel received no

32

compensation during the more than three years of litigation and Lead Counsel incurred $430,087.97 in litigation-related expenses in prosecuting the Action.

75.     Lead Plaintiff's Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery at all. *See supra*, ¶¶ 34-44. Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this is never assured. Lead Plaintiff's Counsel know that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels. And, even when that effort is put forth, sometimes plaintiffs fail.

76.     Moreover, courts have repeatedly recognized that it is in the public's interest to have experienced and able counsel enforce the securities laws and regulations. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("[P]rivate securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets."). As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this

33

important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

### C.  The Experience and Expertise of Lead Plaintiff's Counsel, and the Standing and Caliber of Defendants' Counsel

77.   As demonstrated by their firm resumes, Lead Plaintiff's Counsel have extensive and significant experience in the specialized area of securities litigation. *See* Exs. 3-5 (attaching firm resumes). The attorneys who were principally responsible for leading the prosecution of this case have prosecuted securities claims throughout their careers and have recovered tens of millions of dollars on behalf of investors. This experience allowed Lead Plaintiff's Counsel to develop and implement litigation strategies to address the complex obstacles that are inherent in securities class actions and those specific to this case that were raised by Defendants. The recovery achieved here for the Settlement Class reflects the high quality of Lead Plaintiff's Counsel's representation.

78.   Additionally, the quality of the work performed by Lead Plaintiff's Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Kirkland & Ellis LLP at the pleading stage and Shutts & Bowen LLP throughout the entirety of the litigation—well-respected law firms that vigorously represented the interests of their clients throughout this Action. In the face of this experienced and formidable

opposition, Lead Plaintiff's Counsel were nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

**D.     The Reaction of the Settlement Class Supports Lead Counsel's Fee Request**

79.     As noted above, as of June 25, 2025, approximately 39,181 Notices or links to the Notice have been disseminated advising Settlement Class Members that Lead Counsel, on behalf of Lead Plaintiff's Counsel, would apply for an award of attorneys' fees in an amount not to exceed 33% of the Settlement Fund. *See* Ex. 1, Evans Decl., ¶ 10. In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted once over the *PR Newswire*. *Id.*, ¶ 12. To date, Lead Counsel has not received any objections to the requested attorneys' fees set forth in the Notice, and no such objection has been entered on this Court's docket. Any objections received after the date of this filing will be addressed in reply papers to be filed on July 24, 2025.

80.     In sum, Lead Plaintiff's Counsel accepted this case on a fully contingent basis, committed significant resources, and prosecuted the case for three years without any compensation or guarantee of success. Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Plaintiff's Counsel respectfully submit that a fee award of 33%, resulting in a fractional multiplier of 0.80, is fair and

reasonable, and is supported by the fee awards courts have granted in other class action securities litigation.

### E.   Lead Plaintiff Supports the Fee Request

81.   As set forth in Lead Plaintiff's declaration, Lead Plaintiff has concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Ex. 2, Thompson Decl., ¶¶ 8-9. Lead Plaintiff has been actively involved in this case since its early stages, and his endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

### F.   The Requested Litigation Expenses Are Fair and Reasonable

82.   Lead Counsel seeks reimbursement of litigation expenses in the amount of $430,087.97, plus interest. These expenses were reasonable and necessary for the prosecution of the Action.

83.   From the outset, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the case was successfully resolved. Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not compensate Lead Counsel for the lost use of funds it advanced to prosecute this Action. Thus,

Lead Counsel took significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

84.     A listing of the expenses incurred by Lead Counsel, compiled from its regularly maintained records, are set forth in the Hagens Berman Fee Declaration. *See* Ex. 3, Hagens Berman Decl. at Ex. B.  The expenses incurred pertaining to this case are reflected in the books and records of Hagens Berman and are believed to be an accurate record of the expenses incurred in the Action.

85.     Litigation expenses for which Lead Counsel seeks reimbursement include expert fees, mediator fees, court reporter/transcript fees, legal research fees, airfare/hotel fees, and filing fees, among others.

86.     The bulk of Lead Counsel's expenses ($394,466.30) concerned expert fees. The loss causation and damages expert performed a damages analysis so that Lead Plaintiff's Counsel could properly evaluate the damages in connection with this litigation, as well as negotiate the Settlement. The damages expert also helped develop the Plan of Allocation. The class certification expert performed a market efficiency analysis so Lead Plaintiff could present the strongest possible case for class certification.

87.     In light of the complex nature of securities class action litigation and the difficulties in pleading and ultimately proving liability, as well as establishing loss causation and damages, the litigation expenses incurred were reasonable and

37

necessary to pursue the interests of the Class. Thus, Lead Counsel respectfully requests reimbursement of $430,087.97, plus interest, for the litigation expenses incurred during the prosecution of this Action.

### G.    Compensatory Award to Lead Plaintiff

88.    Under the PSLRA, Lead Plaintiff can seek reimbursement of costs (including lost wages) incurred as a result of his representation of the Settlement Class. *See* 15 U.S.C. §§ 78u-4(a)(4), 77z-1(a)(4). Accordingly, Lead Plaintiff seeks reimbursement of his reasonable costs incurred directly in connection with representing the Settlement Class in the amount of $10,000. Lead Plaintiff devoted over 100 hours on the case, which means he would be compensated at approximately $100/hour. This hourly rate is consistent with the rates Lead Plaintiff charges for his work as a self-employed consultant. The foregoing information, as well as the substantial effort devoted to this Action by Lead Plaintiff, is detailed in his accompanying declaration and described in the Fee Memorandum. *See* Ex. 2, Thompson Decl., ¶¶ 4, 12. Based on the time and effort expended by Lead Plaintiff for the benefit of the Settlement Class, as well as the reasonable effective hourly rate for Lead Plaintiff's work on the case, Lead Plaintiff's Counsel would respectfully request that the Court grant the PSLRA award in full.

38

## VII.   CONCLUSION

89.   In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, Lead Plaintiff's Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should be approved as fair and reasonable. As described herein and in the accompanying Fee Memorandum, Lead Plaintiff's Counsel further submit that (i) the requested fee in the amount of 33% of the Settlement Fund, plus interest, should be approved as fair and reasonable; (ii) the request for reimbursement of total litigation expenses in the amount of $430,087.97, plus interest, should be approved; and (iii) the request for a compensatory award to Lead Plaintiff in the amount of $10,000 should be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this, the 26th day of June, 2025, at Berkeley, California.

*/s/ Reed R. Kathrein*
Reed R. Kathrein