1

```
        IN THE UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
             JACKSONVILLE DIVISION
```

JED LEMEN, Individually and on  Jacksonville, Florida
Behalf of All Others Similarly
Situated,                        Case No. 3:21-cv-01254-TJC-PDB

          Plaintiffs,           July 31, 2025

  v.                             10:59 a.m. to 12:05 p.m.

REDWIRE CORPORATION f/k/a        Courtroom No. 10D
GENESIS PARK ACQUISITION CORP.,
PETER CANNITO, and WILLIAM
READ,

          Defendants.
_____


                    FAIRNESS HEARING
        BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
          SENIOR UNITED STATES DISTRICT JUDGE






 COURT REPORTER:

        Heather Randall, RPR, FPR-C
        221 North Hogan Street, #185
        Jacksonville, Florida 32202
        Telephone:  (904) 549-1307
        randall4817@yahoo.com


                (Proceedings recorded by mechanical stenography;
                       transcript produced by computer.)
```

A P P E A R A N C E S

COUNSEL FOR THE PLAINTIFFS:

     PETER SHAEFFER, ESQUIRE
     Hagens Berman Sobol Shapiro, LLP
     455 North Cityfront Plaza Drive
     Suite 2410
     Chicago, Illinois 60611

COUNSEL FOR THE DEFENDANTS:

     FRANK ZACHERL, III, ESQUIRE
     Shutts & Bowen, LLP
     200 South Biscayne Boulevard
     Suite 4100
     Miami, Florida 33131

     BENJAMIN ELLIOTT, ESQUIRE
     Shutts & Bowen, LLP
     300 South Orange Avenue
     Suite 1600
     Orlando, Florida 32801

P R O C E E D I N G S

July 31, 2025                                    10:59 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  The United States District Court in and for the Middle District of Florida is now in session, the Honorable Timothy J. Corrigan presiding.

Please be seated.

THE COURT:  Good morning.  This is the case of *Lemen versus Redwire*.  That's 3:21-cv-01254.  Mr. Shaeffer is representing the plaintiff.  Mr. Zacherl is representing -- and Mr. Elliot are representing the defendants; is that right?

MR. ZACHERL:  Yes, Your Honor.  Good morning.

THE COURT:  Good morning.  We're here today on -- on the Motion to Give Final Approval to the Settlement and also the Plan of Allocation and then also the issue of attorney's fees.  The Court's, of course, entered the order in January of '25 at Doc 214 preliminarily approving the settlement and providing for notice.  It appears that that order's been effectuated.

Now I'll -- now the issue of final approval and the other collateral issues are before the Court.  I always do these in open court, because even though there have been no objections, I always want to leave open the opportunity for anybody who did object and -- and knew about the hearing to appear if they wanted to.  And -- and so I -- so we set the --

set it for open court, and -- but the Court sees nobody out there.  And I'm not aware of any other objections to the settlement and the final approval.

I noticed -- I think there was one party that opted out, but that's -- that's not an objection.  So nobody else seemed to -- everybody else seemed to be supportive of it or at least did not object to it or opt out.

So I have a couple of questions and then we'll -- we'll see where we are.  The first question I have is -- I tried to look at the Plan of Allocation -- and let me -- let me actually get -- get to where I'm -- I can do it.  I think this will be a better way to approach it.

In the -- in the reply memorandum, which was filed just a little -- a few days ago, there was an Exhibit B attached to it.  And that Exhibit B, if I understand it correctly, captures the total number of claims, which is recited in the -- in the papers.

What's not recited in the papers, I don't think, is the fact that out of the 14 million -- I'm sorry, 14,000 claims that were filed, almost 9,000 of those claims were rejected, another 269 claims were found to be deficient, and only 5,000 were found to be valid, with total recognized losses of about 23 million dollars.

So my questions are, what's the -- tell me a little bit about that.  Why -- I don't know if that's a normal

percentage.  How come more than -- well, more than half of the claims were rejected.  And I think the claims bar date has already come and gone.  So I just need to understand this a little bit better.

So who's -- are you speaking --

MR. SHAEFFER:  Yes, Your Honor.  May I approach the lectern?

THE COURT:  Please.

MR. SHAEFFER:  So, Your Honor, just a couple of things --

THE COURT:  By the way, that -- that podium adjusts. There's a button down on -- because it -- you're a little taller than the last person that -- okay.

MR. SHAEFFER:  No.  This -- this works fine for me.

THE COURT:  All right.

MR. SHAEFFER:  Your Honor, to address the points that you raised, I think the first thing that's important to note is that under the notice plan, we want to be as overinclusive as possible.

So our claims administrator, SCS, uses a proprietary database that's -- to identify potential nominees who hold stock in the street name for the Redwire investors.  So we try to have a broad circulation of notice.  So notice went out to over 39,000 potential settlement class members.

And in terms of the rejected claims, it's possible

that -- you know, SCS is still working through them.  And we'll plan to file the settlement's approved distribution order that will give more fine detail to the rejected claims.

But claims could be rejected for various reasons: They don't have a recognized loss; they purchased shares outside of the settlement class period and they submitted a claim; they -- they're -- they're -- so the claims -- so, yes, there's a high number of claims that have -- have been rejected.

And I do have some statistics to give the Court some -- some idea about whether this is unusual or not.  I -- my firm was the -- one of co-counsels in the Blink Securities case that was settled in the Southern District of Florida last year.  In that case we had about 48,000 claims that were filed. And ultimately there were about 40,000 rejected claims for the reasons that I stated, that sometimes people submit the wrong claims, they don't have a recognized loss.

So I don't think in this case the number of rejected claims is outside the norm in terms of what we see typically in these securities class action settlements.

THE COURT:  So basically right now there's 5,000 valid claims, right?

MR. SHAEFFER:  That's right.

THE COURT:  And you're not really expecting any more than that?  I mean, you may see deficient claims are -- which

could end up being valid.  There's not that many of them.

So the ones that have been rejected, they're not going to be unrejected, right?  So they're -- so basically you're looking at a claim number somewhere between 5,000 and 5500, right?

MR. SHAEFFER:  I think that -- yes, that's correct, Your Honor.

THE COURT:  Okay.  And my second question was, under -- I didn't -- it was hard for me -- and I didn't spend a ton of time on it.  But it was hard for me to understand how the Plan of Allocation is going to work.  So out of these -- let's say you've got 5,000 claims --

MR. SHAEFFER:  Yes.

THE COURT:  -- and if I just divide -- I just divided the -- and I'm not -- we're going to talk about attorney's fees.  But I went ahead and assumed that I was going to take 33 percent off the top for your fees, and -- so that number left me with a number, 5,000-something -- 5-million-something, and I divided that by 5,088, and I come up to about $1,000, so about $1,000 a claim.

And I know that's not how the Plan of Allocation works, but is that number generally correct?  And, then, tell me how the Plan of Allocation, just -- and I don't need chapter and verse, but what do you -- if somebody's making a claim, how -- how is it known whether they're going to get more than

8

$1,000 or they're going to get less than $1,000?  And I'm just using $1,000 as the average -- I think -- I think I'm right, if I divide 5,000 into 5-point-something million, it comes out to about $1,000.

MR. SHAEFFER:  Yes.  So, Your Honor, just, first, in terms of calculating what we call the recognized claims for each individual class member, so under the Plan of Allocation, we do have a formula that we laid out in the notice.  And that's meant to calculate the recognized loss on each, you know, share that -- or a warrant or option that a class member submits the documentation on.

When the -- when the administrator calculates the recognized loss and adds it all together for an individual class member, that's called its recognized claim.  So under the Plan of Allocation, each class member is allocated their pro rata share of the net settlement funds, as you've described. Let's call it roughly 5 million dollars -- 8 million net of the fees, expenses, and administrative costs.

The pro rata share for each class member's recognized claim -- and I'm doing some math here -- it's the class member's recognized claim, let's call it $1,000, divided by the total of the recognized claims for each class member.  And we can -- just for a benefit, let's call that 5 million.  So it'd be the recognized claim for an individual class member, let's call that 1,000, divided by the total recognized claims for all

class members who submitted valid claims, let's call that 5 million.  Those two numbers are divided, then we multiply it by the net settlement fund to determine the pro rata allocation that each individual class member will get.

THE COURT:  So there's no differentiation -- so, like -- you know, we've got shares, we've got options, we've got warrants, we've got other things like that.  And are you saying that it just depends on how many shares the claim had owned, and that's the only determinant of how much money they're going to get?  Or are there -- is it more sophisticated than that?

MR. SHAEFFER:  It is a little more sophisticated than that, Your Honor.  In terms of calculating the recognized loss, there are different factors that go into that.  And that was laid out in the notice.  But for the benefit of the Court, one factor that affects recognized loss is when a class security was purchased or sold.  Because the security, you know, they change over the time of the class period, so that's a factor in determining a recognized loss.

Another type of factor that you alluded to, and I should have been more clear, is the type of security, whether a class member purchased the share, warrant, or put option -- or the different types of options.

Another factor is then the purchase and sale price of the security, because that's going to affect the recognized

loss, what the class member purchased the security at and what it eventually sold the security at.  And the number of claims submitted too will affect what the recognized loss is for each class member.

THE COURT:  And is that a, for lack of a better term, standard way of allocating?

MR. SHAEFFER:  Yes, Your Honor.  In my experience and my firm's experience doing these types of securities class cases, this is a kind of allocation that is typically used -- in the most general sense, the Plan of Allocation is meant to -- first of all, it's developed by our damages expert.  And our damages expert estimated the amount of artificial inflation that was in the price of the securities during the class period.

And under the Federal Securities law, an investor is only able to recover if they purchased or sold a security during the settlement class period.  They held that security through, what we call, a corrective disclosure.  In this case we allege that there were three of them, two in November of 2021 and one in March of 2022.

So in order to be able to recover, you had to purchase the share -- essentially what we allege to be an artificial price, and then hold that share through the disclosure of information that we allege corrected the previous misleading false statements.  So when that artificial inflation

is taken out of the share price, that's how investors are damaged, and that's why we're trying to compensate them here through the settlement.

THE COURT:  I was looking, and I thought I read somewhere -- and I can't find it right at this minute -- but that -- in your papers -- in your motion papers you focused on the 14,000 number as being a relatively high percentage of response rate for the class action, right?

MR. SHAEFFER:  I mean, I think -- it's roughly -- we sent out 39,000 notices.  We got 14,000 in return.  That's 36 percent.  I think that's in line with what our claims administrator estimated in the -- in the preliminary approval papers.  I think they estimated, you know, between -- I think I have it down here.

They estimated between 25,000 and 45,000 notices that would be sent out.  And the claims being sent back, between 7500 and 13,000.  So I think we're on the higher end of the estimates in -- in terms of the number of claims submitted and the -- and that of claims paid.

THE COURT:  But 9,000 of those claims were bogus. So, I mean, is that -- isn't that -- I mean, you only -- what would be expected -- what would have been an expected number of valid claims?

MR. SHAEFFER:  Well, I -- Your Honor, I think that that's hard to know until you actually get the claims back.  I

mean, I think each individual securities case can be different in terms of who the investors are, who holds the shares.  You know, the settlement class period, if it's longer or shorter, I think that could affect the number of claims that are submitted and the number of valid claims.

So I don't --

THE COURT:  I mean, are these mostly -- the 5,000, are they mostly institutional claims?

MR. SHAEFFER:  You know, we noted in our -- in the reply brief and in the declaration that our claims administrator submitted -- and let me make sure I get the right stats for you.

The short answer is yes, the overwhelming majority of the claims submitted were from institutional investors and other third parties, like mutual funds, and, what we call, nominees who hold the shares in street name.

I have that estimate here for you.  Of the claims submitted to date, 98 percent of the total number of claims have been filed by these institutional investors or third-party filers.

And just to give you a little more granularity to it, 93 percent of the total number of damaged common shares; 97 percent of the total number of damaged warrants; and approximately 100 percent of the total number of damaged option contracts have been filed by these institutional investors and

third-party filers.

THE COURT:  Do you have any calculation -- like, my back of the -- my back of the envelope -- I -- and I just found it in my notes here.  So I took $5,360,000, which, if you get your 33 percent, is what I think the remaining number will be, although I did not take out the costs so it's actually going to be less.  So, anyway, I divided that by 5,088, which is the number of valid claims, and I came out with $1,053 per claim.

You're telling me that there's going to be all kinds of different factors that are going to actually adjust each claim, so that's just a -- that's just a -- a number.  But do you have any range of payouts or anything like that that tells me what people are actually -- what kind of money they're actually going to get?

MR. SHAEFFER:  So, Your Honor, the claims administrator is still working through processing the claims.  For example, the deficient claims, they're going to get an opportunity to cure those, those 270-ish-thousand deficient claims.  And it's possible that more claims will be received and we'll have to decide how we want to address those claims.

What I can provide is an estimate of the net recovery per share, per warrant, and per option contract.  So, again, I just want to --

THE COURT:  Yeah, I get you.

MR. SHAEFFER:  This is preliminary.  This isn't

final.  So the estimated net recovery -- so that means based on net settlement fund, is 40 cents per common stock share; 18 cents per affected warrant; and about 2 cents per option.  So that's kind of the best estimate I can give to you right now.

Because in terms of the -- you know, the -- what each class member will receive, again, that will depend on the number of shares.  So 1,000 is -- could be a rough estimate.  But some shareholders might only have 50 shares, others might have 2,000.  So those ranges can really vary.

But this estimated recovery per share, kind of is -- is what we can provide right now.  And I'll note that exceeds -- for -- for common stock and warrant, that exceeds the estimated net recoveries that we -- that we detailed in the notice.  And that's not -- that's to be expected, I think, because those estimates that we provided in the notice assume that every class member would participate in the settlement.

THE COURT:  So am I doing my math right -- which I may not be.  If I own 1,000 shares at 40 cents a share, that's going to be 40 bucks?

MR. SHAEFFER:  I -- I don't know if I'm doing my math right, but that -- I think 40 -- let's say 40 percent of each -- let's say $1 -- if you had $1 -- let's say the share costs $1.  You had 1,000.  That would be $1,000 -- 40 cents, I think it would be closer to 400 than --

THE COURT:  So it's the 400.  I missed the --

MR. SHAEFFER:  Yes.  I just wanted to work through that myself to make sure I got it right.

THE COURT:  All right.  I was off by a factor.  So it's 400 bucks?

MR. SHAEFFER:  Yes.

THE COURT:  So that's not nothing.

MR. SHAEFFER:  I think this is a broader point, Your Honor, that -- I mean, when we're looking at what the settlement's going to provide the class members, I think we need to recognize that this is a guaranteed recovery versus, as we laid out in our brief, that uncertainty, that if litigation were to continue, we might not have achieved the number of 8 million or might not have gotten anything at all on behalf of the class.

THE COURT:  Well, I've been doing this a long time and I've seen a lot of class action settlements.  And, you know, I'm not -- I'm not -- I'm not saying that what you're saying is not accurate or that it would have been hard to go to trial.  I mean, there's a lot of -- there's a lot of -- between here and there.  So -- but it -- it's -- isn't it -- didn't you say it was 9 percent of --

MR. SHAEFFER:  Yes.

THE COURT:  -- of what the potential maximum recovery could have been?

MR. SHAEFFER:  That's correct.  And that exceeds --

we've cited that stat a couple of times -- the 7.5 median recovery in similar damages amounts from last year.

THE COURT:  Yeah.  All right.  Well, let's -- let's talk about a couple of other things and we'll see where we are.

So why -- you've got a $10,000 award to the lead plaintiff here.  And, you know, I've got that Johnson case in the Eleventh Circuit.  Why -- why -- is that because it's under the Federal Securities Act?  Is that why Johnson doesn't apply or -- or what?

MR. SHAEFFER:  That's our position, Your Honor, is that the PSLRA specifically allows for a lead plaintiff in these types of securities class action cases to be reimbursed for costs and expenses, including lost wages.

And we do -- in the Johnson case -- and we quoted that language from the case where they essentially said -- the Eleventh Circuit said if Congress doesn't like the result that we've had here, we can -- they can make a change via statutes.

So obviously the PSLRA predates Johnson, but the PSLRA includes Congress's view and its intent that lead plaintiffs be compensated for the time that they spent leading -- leading the class.  And there are cases that post -- that came -- come after Johnson --

THE COURT:  Yes.  I mean, I've never had any problem. I mean --

MR. SHAEFFER:  Yeah.

THE COURT: -- I've rewarded them a lot. And then the Eleventh Circuit case was a little bit of a surprise, because we've been doing it forever.

MR. SHAEFFER: Sure.

THE COURT: And nobody's ever told us we couldn't. And -- and so -- but, of course, I'm bound by their decision. And I -- are you -- did you -- you cited cases which said that -- notwithstanding Johnson, that you can award them in Federal Securities cases?

MR. SHAEFFER: Yeah, we did, Your Honor. And I have some of the cites here that I can read to you. One was the Pritchard case. This is in the Middle District of Florida. That was decided, I believe, in November 2020, so after the Johnson decision. That case cite, if you want me to read it, is 2020-WL-6937821.

That case --

THE COURT: That's in your brief?

MR. SHAEFFER: Yes, it is in the brief. And maybe it'd be better -- let me go to the copy of the brief. And -- bear with me.

So in -- this is ECF No. 216, page 23 of 25. We do have cases in Footnote 11. One was that Pritchard case, which I described. Another one was the *In Regard: Health Insurance Innovations* case. That was another Middle District of Florida case. That's a pincite of 2021-WL-1341881. That granted a

$3100 PSLRA award.

The *Maz Partners* --

THE COURT: Yes, I see them.

MR. SHAEFFER: Yes. Okay. So, yes, we -- there are cases predate -- or post Johnson where -- where Courts are granting this -- this type of service award.

THE COURT: Let me -- let's talk about attorney's fees for a minute.

MR. SHAEFFER: Okay.

THE COURT: So -- and I don't know that you-all cited this. But -- so I -- and I may have done it other times. But I had a case back in 2017 called *In Re: Rayonier*.

MR. SHAEFFER: I'm aware of it, Your Honor.

THE COURT: Okay. Did you-all cite that?

MR. SHAEFFER: I don't know if we cited it in terms of the fee award, but --

THE COURT: Well, that would have been the thing to cite it for. That's what it's about, right? And in that case, a securities class action case, it's actually a 73-million-dollar recovery. At the time, at least I was told, it was the second largest securities recovery achieved in Middle Florida.

In that case I did the analysis. And I -- it never really -- I'm sure I had approved other class action settlements and so forth, but this is the one I remember that I

actually went through the analysis. And I used the *Camden I* benchmark from the Eleventh Circuit, which established a 25 percent benchmark. I recognize it wasn't a securities class action. But I did the analysis and decided that -- for lots of reasons -- some of which are present in this case, but some of which are not -- that I was going to award 30 percent.

And the way the opinion's written, that's kind of going up from -- basically I said, "The Eleventh Circuit says you should start at 25 percent and you should decide whether you should adjust from that," which is what I did, and I went up to 30 percent.

Turned out in that case 30 percent was almost 22 million dollars, for goodness sake. And, to my knowledge -- and if you have a case that I've decided -- and it easily could be, to my knowledge, that's the most I've ever awarded in a securities class action.

And, you know, it's not the end of the world, I guess, but what's my -- so if you're aware of *Rayonier*, then tell me -- tell me why I shouldn't be starting at 25 and looking to see what value is brought above that.

And, secondly, tell me -- you -- you make a lot in your papers about the fact that the lodestar is more; that is, this is what, I guess, you call a negative lodestar request. And I think *Camden* says you don't really look at the lodestar, I think. That's -- that's question one.

And then question two is -- and this is just me being maybe ignorant of what's going on in the world these days.  But your fee structure that gets you to the 4100 and 70 hours -- let me see if I can find it.

Yeah.  "Lead plaintiff's counsel rates ranged from 800 to $1425 per hour for partners and from $525 to $850 per hour for all other attorneys."

So I guess my questions are, why shouldn't I do the same analysis on this case that I did in *Rayonier*?  And where would I come out if I did that?  Secondly, is the lodestar even relevant at all?  And, third, if it is, do I have to figure out if any lawyer is worth $1425 an hour?  Those are my questions.

MR. SHAEFFER:  Yes.  I'll start with your first question about the *Camden* benchmark of 25 percent.  And I'll note in *Camden*, it did -- that case was decided in 1991.  And the Court noted that the benchmark fee was 25 percent, as you said; but the Court did say that there's no hard and fast rule mandating a certain percentage of the common fund, because the amount needed to be determined on the facts of each case.  So I think *Camden* itself recognizes that upward adjustments from 25 percent do happen.

We noted this in our brief as well, but I -- what we call the benchmark, in recent years, has been inching closer to the 33 percent or more of the fund.

We cited a case from the Southern District of Florida

just from this past May, *Asselta v. Nova Southeastern University*, 2025-WL-1560772, where it noted that the benchmark that Courts in the Eleventh Circuit have routinely awarded is a 33 percent fee.

We also cited another Middle District of Florida case from Judge Honeywell.  This is *Hanley v. Tampa Bay Sports*. That case cite was 2020-WL-2517766.  And there it referred to a slight increase from the one-third benchmark, recognizing that this benchmark for fees in the Eleventh Circuit is inching closer, and it can be seen as being 33 percent.

THE COURT:  Is that by Eleventh Circuit precedent, or is that just by district judges agreeing that when people ask for 33 percent, they're going to give it to them?

MR. SHAEFFER:  I -- I don't think the Eleventh Circuit has revised *Camden* to change the benchmark language from 25 percent.  So, no, Your Honor, I don't -- but the district courts are the ones that are seeing the attorney's fees that are coming in and are assessing the facts of each case.

In *Thorpe* as well, in terms of where we want to, at least, lay the benchmark -- this was *Thorpe v. Walter Investment Management Corporation*.  This was a 2016 case in the Southern District of Florida.  The case cite is 2016-WL-10518902.  That Court recognized that in securities class action cases, that the benchmark should be seen at 30

percent rather than the 25 percent *Camden* level.

THE COURT:  30 percent or 33?

MR. SHAEFFER:  30 percent.  So I'm just -- so if you want to look at benchmarks, I think you can look at *Camden*, what's developed since *Camden*, Courts looking at the facts. Here's a securities class action case from nearly ten years ago stating that the benchmark should be closer to 30 percent.

So I think this -- showing sort of developments of where the fee awards have gone when Courts are assessing these, a 33 percent request is in line with what Courts in the Eleventh Circuit are doing.

And we spent some time in our fee brief, Your Honor, identifying six cases within the last seven to eight years -- I think some may be around the time that you made your decision in *Rayonier*, where the Courts have awarded 33 percent of the settlement fund in securities class action settlements with funds that were under 10 million dollars.

And these include cases within the last year:  The *Bush* case that we cited from the Southern District of Florida as well as the *Alfie* case from the Southern District of Florida, where Courts awarded 33 percent of -- of settlement funds that were less than what we have here and were settled on postures that weren't as far advanced as the case here.  And that kind of addresses the *Camden* factor where you need to look at the time and labor required that counsel is spending on

these cases.

THE COURT:  Remind me where -- where were we in the case when it settled?

MR. SHAEFFER:  So we were -- class certification had been fully briefed.  We were awaiting a decision on that.  The parties had engaged in fairly substantive discovery.  We had produced -- defendants and third parties had produced documents to us, totalling about 20,000 pages.  We had deposed the whistleblower that was -- whose allegations kind of served as, like, these central issues in the litigation.  We were preparing to depose fact witnesses from Redwire.  We were preparing to do 30(b)(6) depositions of Redwire and Redwire's counsel.  So there had been a lot of sufficient, significant developments in the case by the time it settled.

THE COURT:  All right.  And you didn't address the lodestar.

MR. SHAEFFER:  Yes.  Sorry, Your Honor.  Thank you for the reminder.

You know, I don't -- *Camden* doesn't -- you're right, that *Camden* doesn't necessarily require an analysis of the lodestar when assessing the fees.  But, again, lower courts have looked at the lodestar as sort of a crosscheck, to see, Hey, is this fee request that we're looking at, is this reasonable?  Is the percentage of the funds recovery reasonable when you look at the lodestar?

And we cited a few cases in our brief.  But what Courts look at when they see a negative multiplier is that that's a factor in favor of the fee request that --

THE COURT:  Well, maybe so or maybe not.

MR. SHAEFFER:  Yeah.

THE COURT:  But if I had to guess, and I was actually being asked to award attorney's fees based upon the amount that was being sought under the lodestar -- I've never seen a fee request that I gave 100 percent on.

MR. SHAEFFER:  Sure.

THE COURT:  So -- I mean, this is just you-all saying, here's -- "We worked really hard and we worked all of these hours and our partners bill at $1400 an hour and so now it's 4 million dollars," or whatever it is.  And so it doesn't seem all that pertinent to me, other than -- I mean, it shows that it was -- you know, that you had to work hard, and I appreciate that.

And -- so I just wanted to know your thought on that.  And --

MR. SHAEFFER:  And the last point, Your Honor, on the fee structure for attorneys in my firm, I will point to -- it was --

THE COURT:  You're not the one that's billing $1400 an hour?

MR. SHAEFFER:  No, Your Honor, I am not billing

nearly that much.

THE COURT:  Are you a --

MR. SHAEFFER:  I'm an associate, so I'm billing under 600.

THE COURT:  Okay.

MR. SHAEFFER:  I will tell you I believe my -- my rate is perfectly reasonable.

THE COURT:  Well, I'm sure that's true.

MR. SHAEFFER:  Yes.  But --

THE COURT:  I'm sure that's true.  I've had to -- you know, as the years have gone on, I've had to just get used to the fact that the fees are just -- it's hard for me to even fathom that -- what they are now.

MR. SHAEFFER:  So, Your Honor, I do want to point to Exhibit 6, to our -- to the Reed Kathrein declaration that we filed with our moving papers.  That was, I believe, ECF No. 217-6.  We do lay out a table of law firm billing rates, what we -- what we consider to be our peer firms in securities class action space.  And just looking at one, Cohen Milstein, they have a partner fee range between 1085 and 1495.

Labaton --

THE COURT:  I'm not going to -- I'm not going to argue with you.

MR. SHAEFFER:  Yes.  So I just -- I wanted to make sure I emphasized --

26

THE COURT:  Are you-all -- is this what you do -- I mean, is this what your firm mostly does, this class action securities litigation?

MR. SHAEFFER:  Our firm is primarily a class action firm, but, no, securities is not our sole avenue.  We do a lot of antitrust work, consumer protection work.

THE COURT:  I mean, is most of the -- so most of the fee awards are going to be through class action settlements and contingency and so forth, right?

MR. SHAEFFER:  That's right.  I mean, it's rare, I think, for any case -- a civil case to go to trial these days. I think that's really true in terms of the class actions that we work on.

THE COURT:  But my point was, you-all don't have that many paying clients that are paying you the rates that are set here, right?

MR. SHAEFFER:  No.

THE COURT:  It comes through --

MR. SHAEFFER:  We -- yes.  We work on contingency. And when we set these fees, and it is for purposes of when we petition courts for fee requests, we do look at what the market rates are.  We do look at what our competitors and what defense firms are billing as well.

THE COURT:  Okay.  What's the -- and, again, I'm -- you know, you're the one here so you've got to answer these

questions.

MR. SHAEFFER:  I understand.

THE COURT:  What's the -- what's different now than was true in *Camden*'s day about the percentages?  I mean, why -- why is now 33 percent the benchmark instead of 25?  What's -- what's changed?  Is that -- is it because the hourly rates of lawyers are so much higher now?  Or what inherently is more valuable now than it was 10 years ago or 20 years ago?

MR. SHAEFFER:  Your Honor, I think that's -- that's not the easiest question to answer.  But I think you've been on the bench for over 20 years now and you were in private practice before.  I think it's safe to say that the nature of litigation has changed.  I mean, I think you can look at the rise of just electronic discovery.  That process takes more and more attorney hours, time, costs, expenses to negotiate, review, identify key documents.  So there's a lot of work and hours there that I think is different from when *Camden* was decided in 1991.

I also think in the securities class action context, *Camden* was decided before the PSLRA, the Private Securities Litigation Reform Act, in 1995.  And that act raised the pleading standards --

THE COURT:  So your idea -- your point -- and I -- a point with which I ultimately agreed in *Rayonier* is that securities class actions are a little bit -- I think I quoted

something that said, "They're a sophisticated animal," or something -- "A securities case by its very nature is a complex animal," according to some Court that I cited.  And, you know, I get that.

And so I guess I'm just trying to figure out -- you know, you can get -- just like you can get creep in anything, you can get fee creep, right, you can -- okay, it used to be 25, now it's 30, now it's 33, somebody's going to get 40, and we're just going to keep going until -- I mean, class actions are already -- and this was the point that I almost said to you before, but I've kind of given up.

You know, I mean, sure, this is going to be fine for these institutional investors who have clients that have, you know -- but nobody's going to get rich off of this.  Nobody is going to be -- if your numbers are right, nobody's going to be anywhere close to whole in terms of the amount they lost.  But the attorneys are going to get millions of dollars.

And that doesn't mean that wasn't the best that could happen.  It doesn't mean it's not something -- I think there are other salutary reasons for class actions, which is it probably -- at least at some level has some deterrent value for future conduct and so forth, although you never seem to run out of people to sue.

But that's just my -- you know, I just see it -- I just see it increasing.  And my -- I've always -- and I think

the law supports this.  In a little bit of a way, I'm the only one -- because the defendants don't care, right, they know they're going to pay 8 million dollars, they're not going to pay any more than that.  I mean, I could award attorney's fees at 70 percent, and they wouldn't really care.  And I can't really -- I could, but I won't ask them how much they've charged in this case, and it could be just exactly what, you know, you're talking about.  So I understand all of that.

But I have to -- my job is to look out for the class.  And I know that's your job too.  But in this situation, every dollar that goes to you is taken away from them.  And I have to at least try to be true to that and try to come up with a number that's fair but is not extravagant.  So that's what I'm trying to do.

And there's probably no good way for you to answer that question.  But if you have any wisdom to share with me, I'm happy to hear it.

MR. SHAEFFER:  I don't want to -- I don't want to state the obvious.  I know you're aware.  But we -- my firm and other firms in this space, we do work on contingency.  So there is no guarantee that at the end of the day, we can have a lodestar of over 3 million dollars and our case can get kicked at summary judgment.

THE COURT:  Does that happen very often to you?

MR. SHAEFFER:  We -- I mean, we -- sometimes our

cases don't even get to summary judgment.  We lose on a motion to dismiss.  Our fees won't be as high, but we've had cases that go through class certification, which is not an insignificant step, and the Court will find, "Hey, I don't think this class should be certified," and that can be something --

THE COURT:  Or you can have -- a thing I just went through in a nonsecurities case where we spent years working on it and they settled the class, and it goes up to the Eleventh Circuit and they decide there's no subject matter jurisdiction.

MR. SHAEFFER:  Yes.

THE COURT:  Yeah, it does happen, and -- but probably not very often.  I'm guessing you-all do fine.

But -- anyway. . .

MR. SHAEFFER:  So I think, Your Honor, it's -- point understood and understood what your role is right now.  And we do recognize that every dollar that goes to us is one less dollar that goes to the class.

But I think, A, when we're faced with the real risk of not recovering anything, we work on contingency, and we provide, in our view, you know, top notch legal work on behalf of investors who, without our firm stepping up or another firm stepping up, wouldn't recover anything.

So I think that's -- and I understand that the Court recognizes this, but I think that's just an important thing to

keep at the forefront.

THE COURT:  Well, I fully agree with you that --

MR. SHAEFFER:  Yeah.

THE COURT:  -- that not every lawyer can do this kind of work.  I mean, it's complex and it's difficult and it's challenging and you've got to know what you're doing.  And I don't -- I don't -- it's not -- it's a little bit like patent work, I mean, because I -- when those lawyers come in, I know they're charging -- you couldn't believe what they're charging.  But it's a similar thing, not everybody can do it and it's complex, challenging legal work.  So I --

All right.  So let me just have you stand there for one second.

Is the -- Mr. Zacherl, do you want to say anything, or are you standing mute?

MR. ZACHERL:  We agree, Judge, we would take no position on the fees.  I will say that, you know, we worked on this case.  Counsel had to spend 4,000 hours with Mr. Elliott, very difficult -- that's just a joke.  But at the end of the day, we have agreed to take no position on the attorney's fee issue.

With regard to the settlement, you know, listen, our position from the beginning is that we didn't make any misrep- -- -representations.  In fact, we went the other way. We were overly transparent.  We've never run a public company

before.  We -- we are going to make mistakes.  We're going to blend the accounting and the finance functions.  We're going to screw up when it comes to internal controls.  We said all of this.  Right?

So our view from the beginning was, we did not do anything wrong.  And our client's instruction to us was, "We want you to litigate this case."  And ultimately they did succeed in getting, you know, a large number of -- a large amount of money out of us.  So that's as much as I think I can say.

We did fight this case very hard.  We felt like we had a very good position on the issue of class certification.  And we always said that even if the class is certified, that if we got to the merits, we like our chances, so. . .

THE COURT:  Fair enough.  Do you-all -- does your firm defend class actions mostly?  Are you ever on the other side, or are you just a defendant?

MR. ZACHERL:  I'm a 35-year lawyer, Judge.  It makes me feel very old.  It's horrifying that I turn 60 this year.  And I've spent 33 of those 35 years doing class action defense litigation.  I have consulted on three or four plaintiffs in that entire time.  And I am the chair of our class action practice group at Shutts.  We don't do as much securities work as counsel does, but we've done our share.

And these guys are as good as they get.  That's my

observation.

THE COURT:  Thank you, sir.

MR. ZACHERL:  Yes, sir.

THE COURT:  Do you have a position -- or do you have a -- and maybe you don't.  But do you have a position on the award to the lead plaintiff?  Do you have -- do you agree with the plaintiff on -- that Johnson is not applicable in these situations?  What have you seen in other cases?  What's your -- if you have any wisdom to give me on that.

MR. ZACHERL:  Your Honor, I will tell you that I was as surprised as you were when the decision came out.  And I didn't understand how we were going to handle class actions going forward if that decision was -- was followed verbatim. We run into this issue in other kinds of cases where we've had to tell the plaintiff's attorneys, "Right now, in the Eleventh Circuit, we probably can't give you an incentive award."

There are work-arounds that people try to do, you know, have a side deal, all of this stuff, pay money that's not taken away from the class at all.  But at the end of the day, the class representative is being treated differently than everybody else in the class if they get an award.  I understand the logic of the decision.

Having said all of that, I think counsel's point about how this case is different, because there is statutory authority from Congress, which was mentioned in the Johnson

decision, gives the Court the ability to make an incentive award.  And obviously the Court can adjust that up or down.  But I think that we're on solid ground with regard to that issue.

THE COURT:  Thank you, sir.

MR. ZACHERL:  Yes, sir.

THE COURT:  Anything else you want to say?

MR. SHAEFFER:  Let me just go through my notes here, Your Honor.  If you want to give me one sec.

I think just in terms of the service award, I just want to emphasize my client, Mr. Jared Thompson's work in this case.

THE COURT:  I don't -- you don't have to do that.

MR. SHAEFFER:  Okay.  All right.

THE COURT:  I mean, as I said, these were longstanding arrangements.  They're usually in the 5- to $10,000 range or something like that.  I never have a problem with it, because I feel like if you are the named person, you probably do --

MR. SHAEFFER:  Okay.

THE COURT:  -- end up spending a bunch of time.  But I've got to make sure I'm following the Eleventh Circuit, and that is why I wanted to ask you the question.

I don't know that I -- I can't remember if I've had one that I had to deal with -- the one that I just spoke about

that I worked on for a number of years, I did not award them because I thought it contravened Johnson.  But it wasn't a securities class action.  So I'll just have to take a quick look at that and see.

I don't -- I don't philosophically have any problem with it.  I just have to make sure that I'm following the Eleventh Circuit.

MR. SHAEFFER:  Understood.  Your Honor, just one more point on the recovery and the percentage that's being recovered, I'll note that in the *Rayonier* case -- and this was decided in 2017, so there has been some time.

THE COURT:  Right.

MR. SHAEFFER:  -- that the average recovery in a Section 10(b) case in the Eleventh Circuit was 2.2 percent between 2002 and 2017 and the median was 5.6 percent.  So I think, again, if you look at those figures and you see the recovery that we have here, 9 percent is a significant recovery.

And just one more point.  I just want to reemphasize, even with our estimated average recovery per share, warrants and contract, we did cite several Eleventh Circuit cases where fee awards were awarded at 33 percent.  And based on our review of the publicly available notice documents where they detailed average recoveries per share, our recovery exceeds those.

I'm happy to give you a few examples for -- on the

record if that would be helpful.

THE COURT:  I'm good.

MR. SHAEFFER:  Okay.  With that, Your Honor, thank you for the time and your questions.

THE COURT:  Thank you.

All right.  I'm going take a brief recess to confer with my law clerk and I'll come back out and tell you where I think we are.

COURTROOM SECURITY OFFICER:  All rise.

(Recess from 11:55 a.m. to 11:57 a.m.)

COURTROOM SECURITY OFFICER:  All rise.

THE COURT:  All right.  As I said at the outset or during the course of the hearing, the Court's task in these cases is to make sure that the interest of the class have been protected and that the settlement is appropriate.  I'd already made a preliminary decision, of course, that it was and -- and nothing about -- nothing that's occurred since then has caused me to change my mind about that.

And so -- but I do want to incorporate this record into -- into the discussion to show that the Court did -- did take this seriously and has tried to ask the questions that were of moment to it.

And so what I'm going to be doing is -- I'll be entering an order granting the lead plaintiff, Jared Thompson's Unopposed Motion for Final Approval of Class Action Settlement

and Plan of Allocation.

With respect to that, though, I received proposed orders from the plaintiff, I think -- I assume from the plaintiff -- that ruled on the attorney's fees, expenses and approved the Plan of Allocation as a separate, standalone order, which I don't have any, I guess, problem with. But I don't think I -- let me see.

MR. SHAEFFER: Your Honor, with our preliminary approval papers, we included the proposed final judgment and order. I don't have the docket number in front of me, but I do have a copy of it.

THE COURT: Okay. Well, I overlooked that.

MR. SHAEFFER: Okay.

THE COURT: I didn't realize. Yeah. And so is it -- are you happy with its form at this point?

MR. SHAEFFER: That was part of the negotiations for the preliminary approval submissions.

THE COURT: Okay.

MR. SHAEFFER: We're good with it.

THE COURT: Okay. So we'll look that up, then. I did not realize that.

Why do I have to enter a separate order on the Plan of Allocation? Is that just required.

MR. SHAEFFER: Your Honor, I think if there was any sort of issue with the Plan of Allocation itself, it wouldn't

delay entry of the final judgment order regarding the settlement.

THE COURT:  I mean, I don't have any problem with it.

MR. SHAEFFER:  And if there was an objection made to it or anything, that's why we like to keep it.

THE COURT:  All right.  And so I'll be entering the order granting that motion, that is to -- for Final Approval of the Class Action Settlement and Plan of Allocation.

I'll be entering the order approving the Plan of Allocation of Net Settlement Fund.  I'll hunt up the order that -- the proposed order you-all gave us on the motion for final approval, and I'll take a look at that and enter it or some version of it.  I'll enter the order approving the Plan of Allocation of the Net Settlement Fund.

And, of course, I will be entering an order granting an award of attorney's fees.  I just want to think about it a minute.  I want to -- I want to look -- a couple of my colleagues have cited my *Rayonier* case.  I want to see what they said.  I didn't have a chance to do that.  I want to look at the ones that have awarded the 33 percent and see what they said.  So I want to do just a touch of work on that.

I think that it's probably fair to say -- I'm not going to commit myself, but I don't want you going home and having to tell your partners that you -- you know, you didn't do well on the attorney's fees.

I think probably -- and this may seem like, you know, I'm dancing on the head of a pin, but probably my thought would be, in light of the *Rayonier* decision and looking at that and in light of the upward pull on -- from some of my other colleagues around the district and the state, I'm probably going to come off of the 25 percent. Whether I get all the way to 33 percent or not is really my conundrum.

And, you know, part of my thinking about that is, you know, every time one of us does this and every time I do it, then I'm setting a precedent for the next case. And I just have to make sure that -- you know, that I'm well advised when I'm doing that. I'm going to take a look at a few of those cases and just kind of get my head around it.

What I intend to do -- because I don't want to have to write another order about this -- I'm going to have the discussion that you and I've had, that counsel and I've had be kind of my consideration of it. And so I'm just going to put a number in there and you -- but you will know that that consideration has been had both in this hearing and in my subsequent review. But I don't feel the need to write a big, long opinion. So that's what's going to happen.

I'm tentatively leaning toward going ahead and awarding the $10,000. I want to look at that just quickly too to make sure that I'm not running afoul of the Eleventh Circuit. But it makes sense to me that if there's a federal

statutory basis for treating a lead plaintiff differently, in terms of lost wages and other considerations, it makes sense to me that Johnson would not preclude that.  So I'm leaning toward that, but I want to take another look at that.

So, really, the only decision point I'm going to have will be percentage on fees and the lead plaintiff fee.  I will also take a quick look at the cost structure, but I -- I think it was 400-something thousand, but I think that's probably -- probably fine.

So that's where we are.  So your -- the approval will be entered by me -- the Final Approval will be entered.  The Plan of Allocation will be entered by me.  And the attorney's fees, reimbursement of litigation expenses, and compensatory award to lead plaintiff will all be entered by me in due course.

I wouldn't think it would take me too long.  I will tell you -- because it's public now -- they don't like it to be, but I'm actually sitting on the Eleventh Circuit in the next week or so, and so my focus is a little bit on that right now.  So I might have to wait until I come out on the other end of that sitting before you actually get an order out of me.

But you can take it to the bank that it's going to be approved.  And I'm going to approve the net allocation.  And I am going to approve attorney's fees, reimbursement, and compensatory award.  That's where I'm leaning.  And it's just a

question of percentage.

All right.  Is there anything else that I need to attend to this morning from counsel?

MR. SHAEFFER:  Nothing from me, Your Honor.  Thank you.

MR. ZACHERL:  Nothing from the defense, Your Honor. Good to see you.  Thank you.

THE COURT:  Good to see you-all.

And, Mr. Shaeffer, since you are an associate and not a partner, please convey to your partners that I thought you handled yourself admirably today.  I thought -- you know, I asked you some pretty hard questions and you had good, solid answers.  You're obviously well versed and you're well spoken. And so -- I know it's -- I don't know what your court experience is or whatever -- I know it's hard these days for young lawyers to get a lot of court experience, and I thought you did a nice job.

MR. SHAEFFER:  I appreciate that, Your Honor.  Thank you.

THE COURT:  All right.  Good to see everybody.

THE COURTROOM SECURITY OFFICER:  All rise.

(Proceedings concluded at 12:05 p.m.)

- - -

## CERTIFICATE

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


     I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


     DATED this 2nd day of September, 2025.


     s/Heather N. Randall_____
     Heather Randall, RPR, FPR-C